# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

FINJAN SOFTWARE, LTD., an Israel
corporation,

                 Plaintiff-Counterdefendant,

                       v.

SECURE COMPUTING CORPORATION,
a Delaware corporation, CYBERGUARD,
CORPORATION, a Delaware corporation,
WEBWASHER AG, a German corporation
and DOES 1 THROUGH 100,

                Defendants-Counterclaimants.

)
)
)
)
)
)
)
)
)
)
)
)
)

C. A. No. 06-369 (GMS)

**PUBLIC VERSION**

## PLAINTIFF FINJAN SOFTWARE, LTD.'S
## ANSWERING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Paul J. Andre
Lisa Kobialka
Meghan A. Wharton
James R. Hannah
Perkins Coie LLP
101 Jefferson Drive
Menlo Park, CA  94025-1114
(650) 838-4300

Dated: September 28, 2007
Public Version: October 4, 2007

Philip A. Rovner (#3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE  19899
(303) 984-6000
provner@potteranderson.com

*Attorneys for Plaintiff*
*Finjan Software, Ltd.*

TABLE OF CONTENTS

PAGE

I.     INTRODUCTION ................................................................................................ 1

II.    CONSTRUCTION OF TERMS ......................................................................... 2

       A.    Finjan's Claim Interpretation of The '194 Patent Is Supported By The Intrinsic
             Evidence Or Is Well Known In The Industry. ......................................... 2

             1.    "Downloadable" Means A Program Or Document Containing Mobile
                   Code. ...........................................................................................2

             2.    The Term "Addressed To A Client" Is Well Understood In
                   The Industry. .................................................................................6

             3.    The Ordinary Meaning Applies To The Term "Server That Serves As A
                   Gateway To The Client." ...........................................................10

       B.    The Ordinary Meaning Applies To The Disputed Term In The '780 Patent........ 11

             1.    No Additional Limitations Apply To The Term "Performing A
                   Hashing Function On The Downloadable And The Fetched
                   Software Components To Generate A Downloadable ID." ......................11

       C.    The Disputed Terms Of The '822 Patent Are Based On The Intrinsic Evidence
             Or Ordinary Meaning. .............................................................. 13

             1.    "Downloadable-information" Means Program Or Document That Can
                   Contain Mobile Code. ..............................................................13

             2.    The Term "Information-Destination" Means Client. .................................14

             3.    "Information-Recommunicator" Means "Server." ...................................15

             4.    The Ordinary Meaning Applies To The Term "Evaluating The
                   Detection Indicators." ..............................................................16

             5.    No Construction Of The Term "Level Of Downloadable-Information
                   Characteristic And Executable Code Characteristic Correspondence"
                   Is Necessary. .........................................................................16

       D.    The Four Disputed Terms Of The '010 Patent Require Construction. ................. 17

             1.    The Intrinsic Evidence Supports Finjan's Construction of "Document
                   Control Server." .....................................................................17

             2.    The Term "Fetching The Requested Document" Needs Construction. ......18

             3.    The Term "Proxy" Requires Construction. ............................................19

i

TABLE OF CONTENTS

Page

    4.    The Intrinsic Evidence Supports Finjan's Construction of The Term "Role." ........................................................................................20

E.    The Disputed Terms Of The '361 Patent Require Construction........................... 21

    1.    The Term "Firewall" Requires Construction. ............................................23

    2.    The Term "A Server Having At Least One Directory That Can Be Accessed Using A Network Protocol" Requires Construction.................27

    3.    The Term "Authorization Filter" Requires Construction. .........................29

    4.    The Term "Directory Schema That Is Predefined By Said Entity" Requires Construction.................................................................................30

    5.    The Term "Network Protocol" Requires Construction.............................31

    6.    The Term "Per-Service Authentication Scheme" Requires Construction. 31

    7.    The Term "Per-User Authentication Scheme" Requires Construction......32

IV.    THERE ARE NO INDEFINITE CLAIM TERMS IN THE FINJAN PATENTS. .......... 33

A.    The Terms in the '194 Patent are not Indefinite ................................................... 33

B.    The Terms in the '822 Patent are not Indefinite Under 35 U.S.C. § 112 ............. 36

V.    CONCLUSION..................................................................................................... 39

**TABLE OF AUTHORITIES**

PAGE

## Cases

*Alloc, Inc. v. International Trade Comm'n,*
  342 F.3d 1361 (Fed. Cir. 2003)..................................................................... 24

*Astrazeneca AB v. Mutual Pharm. Co.,*
  384 F.3d 1333 (Fed. Cir. 2004)..................................................................... 23

*Atmel Corp. v. Information Storage Devices, Inc.,*
  198 F.3d 1374 (Fed. Cir. 1999)..................................................................... 33

*Bell Atlantic Network Servs., Inc. v. Covad Communs. Group, Inc.,*
  262 F.3d 1258 (Fed. Cir. 2001)..................................................................... 17

*Bicon, Inc. v. Straumann Co.,*
  441 F.3d 945 (Fed. Cir. 2006)....................................................................... 22

*C.R. Bard, Inc. v. United States Surgical Corp.,*
  388 F.3d 858 (Fed. Cir. 2004)....................................................................... 22

*CCS* Fitness *Inc. v. Brunswick Corp.,*
  288 F.3d 1359 (Fed. Cir. 2002)..................................................................... 37

*Ex Parte William Z. Goldstein,*
  2005 WL 4773193 (Bd. Pat. App. June 7, 2005)........................................... 35

*Ex Parte Jerry Kitten,*
  1999 WL 33134953 (Bd. Pat. App. Sept. 16, 1999)...................................... 35

*Ex parte Simpson,*
  218 U.S.P.Q. 1020 (Bd. App. 1982) .............................................................. 34

*Home Diagnostics, Inc. v. LifeScan, Inc.,*
  381 F.3d 1352 (Fed. Cir. 2004)....................................................................... 5

*IMS Tech. Inc. v. Haas Automation Inc.,*
  206 F.3d 1422 (Fed. Cir. 2000)..................................................................... 36

*Iredeto Access, Inc. v. Echostar Satellite Corp.,*
  383 F.3d 1295 (Fed. Cir. 2004)..................................................................... 17

*Kemco Sales, Inc. v. Control Papers Co.,*
  208 F.3d 1352 (Fed. Cir. 2000)..................................................................... 37

*Kraft Foods, Inc. v. Int'l Trading Co.,*
  203 F.3d 1362 (Fed. Cir. 2000)..................................................................... 28

*LG Electronics, Inc. v. Bizcom Electronics, Inc.,*
  453 F.3d 1364 (Fed. Cir. 2006)..................................................................... 37

*Linear Tech. Corp. v. Impala Linear Corp.,*
  379 F.3d 1311 (Fed. Cir. 2004).............................................................................. 37

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
  357 F.3d 1340 (Fed. Cir. 2004).............................................................................. 22

*Pandrol USA, LP v. Airboss Railway Prods., Inc.,*
  320 F.3d 1354 (Fed. Cir. 2003).............................................................................. 22

*Pharmastem Therapeutics, Inc. v. Viacell, Inc.,*
  2003 WL 124149 (Sleet, J., D. Del., Jan. 13, 2003) ........................................ 33

*Phillips v AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005)......................................................................... 8, 37

*Polyvision Corp. v. Smart Techs. Whittaker Corp.,*
  2007 WL 1596425 (W.D.Mich. 2007)................................................................. 34

*Renishaw PLC v. Marposs Societa' per Azioni,*
  158 F.3d 1243 (Fed. Cir. 1998)............................................................................... 3

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,*
  242 F.3d 1337 (Fed. Cir. 2001).......................................................................... 22, 24

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.,*
  222 F.3d 958 n.2 (Fed. Cir. 2000)......................................................................... 22

*Technibilt Div. v. UNR Indus., Inc.,*
  911 F.2d 709 (Fed.Cir.1990).................................................................................. 34

**Statutes**

35 U.S.C. § 112............................................................................. 34, 36, 37, 38, 39

## I.    INTRODUCTION

Plaintiff Finjan Software, Ltd. and Counterdefendant Finjan Software, Inc.[1] (collectively "Finjan") respectfully request the Court to adopt their proposed construction of the patents-in-suit. As set forth in Finjan's Opening Claim Construction Brief, ("Finjan's Opening Brief"), the terms in dispute are either well defined by the intrinsic record or terms familiar to those skilled in the art such that the ordinary meaning of those terms apply.

With respect to the 120 claims found in Finjan's Patents, U.S. Patent No. 6,092,194 ("the '194 Patent"), U.S. Patent No. 7,058,822, ("the '822 Patent"), and U.S. Patent No. 6,804,780 ("the '780 Patent") (collectively "Finjan's Patents"), only nine terms are in dispute, of which four actually require construction. Apparent from Defendants Secure Computing Corporation, Cyberguard Corporation and Webwasher AG's (collectively "Secure Computing") Opening Claim Construction Brief ("Secure Computing's Opening Brief") is that their proposed constructions of such straightforward terms as "addressed to a client" and "server that serves as a gateway to the client" is a direct consequence of Defendants' attempt to advocate results-based interpretation of terms in order to escape infringement. As demonstrated below, the intrinsic evidence often contradicts the alleged support for Secure Computing's confusing and complex proposed constructions.

Somewhat confounding is Secure Computing's improper attempt to use the claim construction process to advocate invalidity of Finjan's Patents. As summary judgments are not to be filed in this case, claim construction is not Secure Computing's opportune moment to present summary judgment arguments to the Court. Moreover, the law of claim construction is unambiguous; the Court must construe the terms to be valid where possible, not invalidate them. With respect to Secure Computing's Patents, U.S. Patent No. 7,185,361 ("the '361 Patent") and U.S. Patent No. 6,357,010 ("the '010 Patent"), the intrinsic evidence supports Finjan's

---

[1] After the parties filed their respective opening claim construction briefs, Defendants amended their counterclaims for patent infringement to include Finjan Software, Inc. as a counterdefendant to this dispute. Consequently, Finjan Software, Inc. is jointly filing this Answering Claim Construction Brief with Finjan Software, Ltd.

construction of the terms in dispute. For instance, the intrinsic evidence for the '361 Patent, including various parts of the specification like the title of the patent, demonstrates that a key point of novelty for the alleged invention of this patent is the use of lightweight directory access protocol ("LDAP") directories. Secure Computing should not be permitted to overlook such fundamental intrinsic evidence supporting the proper interpretation of the disputed claim terms.

Additionally, Secure Computing makes a surprising request in its Opening Brief to have the Court delete "per-service authentication scheme" from the dependent claims of the '361 Patent and replace this explicit claim language with "per-service authorization scheme." Secure Computing admits that there is no disclosure in the specification of the '361 patent of a "per-service authentication scheme," but discloses a "per-service authorization scheme." Wholly apart from the fact that Secure Computing has not done anything to meet its burden of demonstrating that such a drastic change to the claims is appropriate, it is entirely improper to consider such a request during claim construction, particularly where Secure Computing has never put Finjan on notice that it believed the claim language of the '361 Patent was wrong. Accordingly, Secure Computing's request to change the claim language during claim construction should be rejected.

## II.    CONSTRUCTION OF TERMS

### A.    Finjan's Claim Interpretation of The '194 Patent Is Supported By The Intrinsic Evidence Or Is Well Known In The Industry.

#### 1.    "Downloadable" Means A Program Or Document Containing Mobile Code.

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| program or document containing mobile code | a program or document containing an executable application program that can be downloaded from one computer to another computer |

#### a.    The Intrinsic Evidence Supports Finjan's Construction.

As set forth in Finjan's Opening Brief, "Downloadable" means a "program or document containing mobile code" based on the intrinsic evidence. In several instances, the applicant explicitly stated in the intrinsic record that a "Downloadable" is "mobile code." *See* JA233

2

(Response to Office Action at 6)("a Downloadable is mobile code…"); JA410 (July 1, 2003 Response to Office Action at 7)("…mobile code downloaded to a client computer, referred to as a Downloadable."); JA53 ('822 Patent at 6:6-10)("[s]uch information can also include traditionally viewed 'Downloadables' or 'mobile code…"). Further, the applicant consistently referred to the same type of components when referring to Downloadables or mobile code in the intrinsic record, including in related patent specifications. JA13 ('194 Patent at 1:65-67)("Downloadable may include a Java Applet…"), JA33 ('780 Patent at 2:5-6)("Downloadable may include a Java Applet…"); JA39 ('822 Patent, Abstract) ("Java applet…or other 'Downloadables or 'mobile code'…."). Because an applicant is free to be his own lexicographer, the proper definition of "Downloadable" is a "program or document containing mobile code." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

Secure Computing's construction completely ignores the prosecution history which is the primary basis for Finjan's construction. During the prosecution of the '194 Patent, the examiner rejected the application which led to the '194 Patent in light of United States Patent No. 5,623,600 to Ji et al. ("Ji"). JA207-15 (Office Action mailed 6/17/99). In response, the applicant pointed out that:

> "Ji teaches gateway detection of viruses attached to executable files, and does not teach hostile Downloadable detection. As is well known in the art, *a Downloadable is mobile code* that is requested by an ongoing process, downloaded from a source computer to a destination computer for automatic execution. The programs or documents of Ji are not Downloadables." JA233 (Response to Office Action mailed 6/17/99 at 6) (emphasis added).

Based on this argument, the examiner allowed the application because of the clarification that a Downloadable is a program or document that contains mobile code. Secure Computing ignores this statement made during the prosecution history. Finjan's construction is the proper construction because it is consistent with the applicant's representation to the USPTO.

Further, Secure Computing's construction of "Downloadable" does not come directly from the specification as Secure Computing suggests, but rather includes the prefix "a program

or document containing" which makes the construction confusing and directed toward a different technology than what is covered by Finjan's Patents. Specifically, Secure Computing's proposed construction recites that a Downloadable is "a program or document containing an executable application program...." Thus, Secure Computing's construction requires that two programs are necessary for a "Downloadable" and that one program is within or contained by another program. There is simply no support for such a convoluted construction for the term "Downloadable" and Secure Computing does not cite any support.

Moreover, this technology is typically referred to as steganography (steganography is the art of hiding digital information within digital files[2]) and is not applicable to Finjan's Patents. In fact, Secure Computing's construction would only confuse one of skill in the art because steganography can be used as a method for bypassing network security, where in stark contrast, the subject matter of Finjan's Patents is protecting a network. Given that steganography is such a different concept than a program containing mobile code, which is what the patent applicant disclosed to the Patent Office and thus the world, it simply has no place in claim construction of the '194 Patent.

Secure Computing's statement that "[t]he one and only time that the applicant referred to 'mobile code' was in a response in the prosecution history dated October 27, 1999" is belied by the intrinsic evidence. As detailed in Finjan's Opening Brief, the applicant referred to mobile code on numerous occasions throughout the intrinsic record. Finjan's Opening Brief at 7-9. In fact, in related patents, the applicant reaffirmed its position that "a Downloadable is mobile code." For example, in a first Response to Office Action for the '780 Patent, which is a continuation of the '194 Patent, the applicant stated that "[t]he present invention concerns generation of an ID for *mobile code downloaded to a client computer, referred to as a Downloadable*." JA410 (July 31, 2003 Response to Office Action at 7). Moreover, in the specification of the '822 Patent, which is a continuation-in-part of the '194 Patent, the applicant

---

[2] See generally http://www.google.com/search?hl=en&q=define%3A+steganography.

stated "[s]uch information can also include more traditionally viewed *'Downloadables' or 'mobile code'* (i.e. distributable components)…" JA53 ('822 Patent at 6:6-10). Thus, there can be no question that the intrinsic evidence supports Finjan's construction.

### b.    Mobile Code is an Industry Term.

Mobile code is a common term known in the industry of network security. For example, during the prosecution of the '194 Patent, the patent applicant submitted to the Patent Office a number of relevant references, including an article entitled "Secure Code Distribution" by X.N. Zhang ("Zhang article") that was published in Computer Magazine in 1997. JA233 (Information Disclosure Statement dated 6/9/00); JA1228-32 (Zhang article). The Zhang article, which is about network security, discusses mobile code generally as a web-oriented technology that is found in web pages and other online components, including applets.

Additionally, Secure Computing's argument that the Court would need to construe mobile code is completely undermined by what Secure Computing's engineers testified to in this case about their understanding of the term mobile code. For example, several of Secure Computing's engineers and product managers in the network security field understood the term mobile code, and is some cases, equated the definition of "mobile code" with a "Downloadable." JA1253-54 (Alme Depo. at 60:22 through 61:4; 98:1-5); JA1235-36 (Stecher Depo. at 170:20 through 171:11); JA1266 (Gallagher Depo. at 92:3-8); JA1273 (Borgolte Depo. at 25:9-23); JA1276-77 (Schnellbacher Depo. at 10:25 through 11:2). Because "mobile code" is a term that is well understood by those in the industry, there is no need to construe mobile code, making Finjan's construction of "Downloadable" meaningful.

Secure Computing points out that Martin Stecher, Secure Computing's product manager, did not know the term "Downloadable." Secure Computing's Opening Brief at 24. Nonetheless, he knew what "mobile code" meant, such that Finjan's construction brings meaning to the term "Downloadable" for those in the industry. JA1235-36 (Stecher Depo. at 170:20 through 171:11). *Home Diagnostics, Inc. v. LifeScan, Inc.,* 381 F.3d 1352, 1358 (Fed. Cir. 2004)(construction should accord a claim the meaning it would have to a person of ordinary skill in the art). Based

on the evidence and arguments presented by Secure Computing, Finjan's construction of

"Downloadable" is proper.

**2.    The Term "Addressed To A Client" Is Well Understood In The Industry.**

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| Ordinary meaning within the context of the claims | addressed: containing the client computer's IP address<br>client: the destination computer |

**a.    Secure Computing's Engineers Recognized The Ordinary Meaning.**

The term "addressed to a client" should be given its ordinary meaning within the context

of the claims.  As best put by a Secure Computing's engineer, addressed to a client is a general

term and means that            REDACTED

JA1257 (Alme Depo. at 100:11-23).

Thus, Secure Computing cannot argue that this is not a term known to engineers in the industry.

**b.    "Addressed" is Not Restricted to "IP Address."**

Secure Computing states in a conclusory fashion that "addressed" means containing the

client computer's IP (or Internet Protocol) address.  Upon reading the '194 Patent, however, this

construction defies common sense.  The focus of the '194 Patent is about protecting a computer

and network from malicious content. *See e.g.*, JA13 ('194 Patent entitled "System and Method

For Protecting A Computer And A Network From Hostile Downloadables" and 1:60-65).  Under

Secure Computing's narrow construction, however, the data or information that the client is

requesting would go directly to the client, bypassing any security mechanism at the gateway

because it contains the IP address of the client.  This is completely contrary to the purpose of the

'194 Patent, which is directed at providing security at the gateway so you do not have to install

security mechanisms the client itself.  Finjan's Opening Brief at 2-3.

Furthermore, Secure Computing's proposed construction in the context of the claims

makes no sense and would require eliminating an explicit limitation found in every claim of the

'194 Patent.  Every claim of the '194 Patent recites in relevant part: "receiving an incoming

Downloadable addressed to a client, by a server that serves as a gateway to the client...." *See, generally*, JA17-19 ('194 Patent at 10:8 through 14:33). Using Secure Computing's proposed construction, the Downloadable would contain the IP address of the client, going straight to the client and thereby bypassing the gateway. However, the claims expressly require that the gateway receives the incoming Downloadable so it can inspect it for malicious content. Finjan's Opening Brief at 11-12. Secure Computing cannot ignore the actual language to support is results-based claim construction to avoid infringement.

Furthermore, the terms "IP address" or "Internet Protocol" are not found ***anywhere*** in the intrinsic record or disclosed specifically in the intrinsic evidence. Secure Computing states "[b]ecause the specification makes clear that the 'client' to which a Downloadable is addressed is a computer, one of ordinary skill in the art would understand that the term 'addressed' means containing the client computer's IP address." Secure Computing's Opening Brief at 23. However, Secure Computing has no support whatsoever that the phrase "addressed to a client" refers to "Internet Protocol" or "IP." In the technical background section of Secure Computing's Opening Brief regarding this claim element, Secure Computing ***admits*** that other types of protocols exist.[3] *Id.* at 21. Because other types of network protocols exist, it is improper for Secure Computing to attempt to limit the claim term to the Internet Protocol simply because it wants to. There is no support whatsoever for such a claim.

In an effort to manufacture support for its position, Secure Computing points to the dictionary definition of "Internet Protocol" to support its construction of the term "addressed." As a preliminary matter, Secure Computing makes no effort to explain why one would even consider using the definition of "Internet Protocol" for construing the straightforward term

---

[3] With its assertion that ***"most"*** and not all "the information communicated over local area networks (LANs) and the Internet is transferred using a standardized method or protocol known as TCP/IP," Secure Computing is admitting that other types of protocols exist and can be used to address data to clients. *See* Secure Computing's Opening Brief at 21. There is no dispute, however, the '194 Patent is directed to ***all*** networks protocols, and not just the Internet Protocol. Indeed, this is why the Internet Protocol is not specifically disclosed in the '194 Patent specification.

"addressed." Of course the definition of Internet Protocol is going discuss the particulars of the Internet Protocol, but it does not provide one with support for the meaning of the term "addressed to a client." "Addressed to a client" is not limited to a very specific protocol, the IP. Secure Computing should not be permitted to just point to a definition of a particular protocol and without any support, then require that the claim is limited to *only* this particular protocol simply because it says so and cited to a dictionary definition of that procotol. This is just one of many instances where Secure Computing makes a conclusion without support or any attempt to tie that definition to anything found in the intrinsic evidence. *See, e.g.* Secure Computing's Opening Brief at 23 (the term "addressed").

      **c.**     **Improper Limitations Should Not Be Imported Into The Well Known Term "Client."**

Secure Computing attempts to import limitations into the straightforward words "client" and "addressed." With respect to the term "client," Secure Computing has no support in the specification or prosecution history for its position that "client" is restricted to a destination computer. Even a cursory review of the specification reveals that while a destination computer is a possibility for a client, a client could be any type of general purpose computer or network of interconnected conventional components. *See* JA17 ('194 Patent at 9:61 through 10:6) ("general purpose digital computer...or using a network of interconnected conventional components."). Further, the client does not have to be a computer at all, but can be an application program as provided in the prosecution history of the '194 Patent. JA211 (Office Action mailed July 17, 1999 at 4). Moreover, Secure Computing admits that intrinsic evidence found in the related '822 Patent refers to a client as a device or process. Secure Computing's Opening Brief at 34, quoting JA54 ('194 Patent at 7:60-63 ("[a] suitable information-destination or 'user device' can further include one or more devices or processes (such as email, browser or other clients...."))). Because it is "unjust to the public, as well as an evasion of the law, to construe [client] in a manner different from the plain import of its terms," there is no need to construe "addressed to a client." *Phillips v AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005).

8

In fact, Secure Computing further admits in its opening brief that a client could be a computer or a process. Specifically, when rebutting Finjan's construction of information-destination found in the related '822 Patent which Finjan construes as "client", Secure Computing claimed that a client can include a device as well as a process. Secure Computing's Opening Brief at 33 ("If the term 'client' is taken out of context of the '822 patent, an individual may mistakenly believe that a client could only be a device as opposed to a process.") This admission undermines its position that a "client" in the '194 Patent is restricted to a computer.

### d.    A Reply to an Examination Report Does Not Support Secure Computing's Positions.

Secure Computing relies upon an incomplete citation to a Reply to an Examination Report ("RER") for a related, but different patent, to support its argument that "addressed to a client" means "containing the client computer's IP address." A RER is a procedure in which an applicant who files an international PCT application voluntarily responds to a report created by the examining authority. Accordingly, Secure Computing's reliance on this reference is questionable because the '194 Patent issued over five years before the RER was written such that the prosecution of the '194 Patent had closed years earlier and the RER was directed to a different set of proposed claims written specifically for a related international patent application.[4]

To the extent the RER is considered during claim construction, it should be noted that the RER actually spells out that "addressed to a client" is broad and is meant to cover all gateway systems.[5] The full citation from the RER is provided below, with portions omitted from Secure Computing's briefing underlined:

> "Likewise it would have been routine knowledge for the man in the art that the operation of the Internet and of computer networks involves the addressing of data, e.g. in the form of data packages, to individual computers and that the references in the present application originally filed to Downloadables being addressed to particular client necessarily involves such Downloadables being

---

[4] Secure Computing does not have any supporting case law that suggests a RER can be used to limit the claims of any related patent, much less a patent that had issued in the United States some five years earlier.

[5] Notably, the RER does not contain the words "IP address" or "Internet Protocol."

> incorporated in data or data packages addressed to particular client computers *and that the system of the present invention, like those of the prior art, must receive everything addressed to any of the client computers which is its function to protect, if it is to receive or examine Downloadables in particular.*"

JA2064 (emphasis added).

As can be seen from the entire quote, the gateway "must receive everything addressed to any of the client computers which is its function to protect." Under Secure Computing's construction, this would not be possible because the data would go straight to the client without first being intercepted by the gateway because under Secure Computing's interpretation, the data *must* contain the IP address of the client. Thus, no specific narrow interpretation should be ascribed to the term "addressed to a client" and the RER does not support Secure Computing's proposed construction.

**3.    The Ordinary Meaning Applies To The Term "Server That Serves As A Gateway To The Client."**

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| Ordinary meaning within the context of the claims | a computer that receives data from its external communications interface and transfers the data through its internal communications interface to the client |

A "server that serves as a gateway to the client" is another term that is generally understood in the network security field and requires no additional construction.   In fact, all of Secure Computing's product managers and engineers knew that a "server that serves as a gateway to the client" is simply "an intermediate between the Internet and the user." [6]  JA1248 (Berzau Depo. at 15:18-24); *see also* JA1234 (Stecher Depo. at 34:2-18); JA1252 (Alme Depo. at 29:1-9); JA1271-72 (Borgolte Depo. at 21:21 through 22:5); JA1277-78 (Schnellbacher Depo. at 11:24 through 12:5; JA1262-63 (Scholz Depo. at 16:24 through 17:3).  Because the term is straightforward and is commonly understood by those in the industry, the term needs no further construction.

---

[6] It should be noted this is merely an example of a gateway with regard to the Internet.  In general,                      REDACTED                                      JA1234 (Stecher Depo. at 34:2-18).

It is improper to import limitations into the claims, especially when the claim term is known to one skilled in the art. Here, Secure Computing is attempting to avoid infringement and confuse the fact-finder by using 22 words to describe a simple term. In doing so, Secure Computing introduces several terms, such as "external communications interface" and "internal communications interface," which are inappropriate because these vague terms are more difficult to understand than the term "gateway" and are likely to confuse the fact finder. Indeed, the purpose of claim construction is to provide clarity to the term, not confusion.

Moreover, while Secure Computing acknowledges that at least two embodiments are described in the '194 Patent, Secure Computing's proposed construction only covers one. Secure Computing's Opening Brief at 27. Specifically, Secure Computing's proposed construction requires two interfaces, namely an external and internal interface. However, the '194 Patent contemplates a second embodiment, whereby there is only a single interface, namely an integral interface. The '194 Patent specification states in relevant part that:

> "...[t]he external communications interface 210 and the internal communications interface 225 may be functional components of an *integral communications interface* (not shown) for both receiving Downloadables from the external computer network 105 and forwarding Downloadables to the internal computer network 115."

JA14 ('194 Patent at 3:27-41). Thus, Secure Computing's proposed construction fails to include an embodiment in which only one interface is used, which is the integral communications interface.

**B.    The Ordinary Meaning Applies To The Disputed Term In The '780 Patent.**

    **1.    No Additional Limitations Apply To The Term "Performing A Hashing Function On The Downloadable And The Fetched Software Components To Generate A Downloadable ID."**

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| Ordinary meaning within the context of the claims | performing a hashing function on both the Downloadable and the fetched software components together to generate a single Downloadable ID |

As is apparent from Secure Computing's proposed construction, no words of the term require construction. Rather than construing the claim term, Secure Computing is attempting to add the limitations "both", "together" and "single" without changing the other words of the claim term. As detailed in Finjan's brief, such limitations are contrary to the applicable law and to the applicant's intent as evidenced by the transitional phrase "comprising." Finjan's Opening Brief at 14-15. As such, the term should be given its ordinary meaning.

Secure Computing's primary argument is that the "plain language of the claim dictates the construction." Secure Computing's Opening Brief at 29. Finjan agrees that the plain language of the claim is sufficient, which is exactly why no construction of this term is necessary. For this reason, there is no need to include the additional words to the plain language of the claim, as Secure Computing proposes.

Secure Computing also argues that the intrinsic evidence justifies its proposed additional limitations when those words do not appear anywhere in specification. A review of the specification yields no instances of the words "together" or "single." Furthermore, Secure Computing's citation to the prosecution history is likewise unpersuasive. Nowhere in the cited Response to Office Action is there a statement that the hashing function needs to be performed on *both* the Downloadable and the fetched software components. JA 2060 ('780 Patent Application, Response to First Office Action). Rather, the prosecution history states that one type of hashing function can be performed on the downloadable and the same type of hashing function on the fetched software components. JA410 ("Specifically, the present invention fetches software components required by the Downloadable, and performs a hashing function on the Downloadable together with its fetched components."). Since there is no support whatsoever for Secure Computing's construction in the specification, Finjan's position should be adopted.

12

C.    **The Disputed Terms Of The '822 Patent Are Based On The Intrinsic Evidence Or Ordinary Meaning.**

    1.    **"Downloadable-information" Means Program Or Document That Can Contain Mobile Code.**

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| program or document that can contain mobile code | data downloaded from one computer to another |

As discussed in Finjan's Opening Brief, "downloadable-information" is a program or document that can, but does not necessarily, contain mobile code and this construction is the only construction that harmonizes the definitions of "downloadable-information" and "Downloadable." Secure Computing's proposed construction, on the other hand, is inconsistent with the intrinsic evidence and the other related Finjan Patents. The '822 Patent, entitled "Malicious Mobile Code Runtime Monitoring System and Methods," is directed toward programs that can contain mobile code. Secure Computing's proposed construction, "data downloaded from one computer to another," ignores this fact, as it is directed toward data, a much broader term. Further, as discussed above in connection with "Downloadable", Secure Computing once again ignores the intrinsic evidence that explicitly refers to Downloadable as a program or document that contains mobile code. In fact, the citations Secure Computing uses to support its position supports Finjan's construction. Secure Computing relies upon the following quote for its construction of "downloadable-information:"

> "*downloadable information*...such information *can* also *include* more traditionally viewed 'Downloadables' or '*mobile code*.'" Secure Computing Opening Brief, pg. 31-32 (emphasis added)

As is clear from Secure Computing's quote of the specification, downloadable-information is a program or document that can contain mobile code, which is precisely Finjan's proposed construction.

Secure Computing's proposed construction of downloadable information is inconsistent with Secure Computing's proposed definition for "information-destination" which is "a device or

13

process that is capable of receiving and initiating or other hosting mobile code execution." With this construction of "information-destination," Secure Computing is admitting that "downloadable-information," which is received by the "information-destination," must be a program or document that can contain mobile code because it hosts the mobile code execution.

By ignoring the claims, Secure Computing is oblivious to the fact that the claims of the '194 and '822 Patents provide meaningful guidance regarding the construction of the terms "Downloadable" and "downloadable-information." As set forth in Finjan's Opening Brief, the '822 Patent checks the downloadable-information for executable or mobile code, unlike the '194 Patent, which only covers a "Downloadable," which is a program or document that has already been determined to contain mobile code. Finjan's Opening Brief at 16-17. Thus, the claims themselves support Finjan's construction.

2.    The Term "Information-Destination" Means Client.

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| Client | a device or process that is capable of receiving and initiating or otherwise hosting a mobile code execution |

The proper construction of "information-destination" is "client." Finjan's construction is fully supported by the specification which consistently uses "information-destination" and "client" interchangeably. *See* Finjan's Opening Brief at 18-19. Further, the specification explicitly states that a "client-server configuration will be presumed unless otherwise indicated." JA53 ('822 Patent at 6:63-65). Secure Computing has done nothing to rebut this explicit presumption identified in the '822 Patent specification. Thus, "client" is a simple and straightforward definition of "information-destination" that will assist the fact-finder and is well known in the industry, as described above.

In contrast, Secure Computing's construction is inconsistent with its earlier arguments regarding "addressed to a client," as discussed above. Furthermore, its citations to the '822 Patent specification support Finjan's construction. Specifically, it quotes the specification stating that "a suitable information-destination or 'user device' can further include one or more

14

devices or processes (such as email, browser or <u>other clients</u>)." Secure Computing Opening

Brief at 34. Based on this quote, client generally refers to information-destination or user

devices, which can include but is not limited to devices, processes, and application programs,

such as a browser or email. Finally, Secure Computing's concerns regarding the alleged

underinclusiveness and simultaneous overinclusiveness of the term "client" is nonsensical.

3.    "Information-Recommunicator" Means "Server."

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| Server | information supplier or intermediary for servicing one or more further interconnected devices or processes or interconnected levels of devices or processes |

"Information-recommunicator" is simply a "server" as discussed throughout the

specification of the '822 Patent. In fact, the best quote from the specification comes from Secure

Computing's brief. According to Secure Computing, the specification provides that "[o]ne or

more devices can also be configurable to operate as a network server,…, or other information-

suppliers or intermediaries (i.e. as a 'recommunicator' or 'server')." Secure Computing's

Opening Brief at 34. Contrary to Secure Computing's twisted logic on the English language that

use of "or" suggests that the terms mean different things, using the ordinary rules of grammar, it

is clear that the use of the conjunction signifies that the terms are interchangeable. As such, the

proper, and presumed, definition of "information-recommunicator" is "server." JA53 ('822

Patent at 6:63-65)("a simple client-server configuration will be presumed unless otherwise

indicated.")

Unable to overcome this explicit presumption, Secure Computing proposes a

cumbersome and confusing construction. It is not clear what is meant by "information supplier

or intermediary for servicing" or the phrase "interconnected devices or processes or

interconnected levels of devices or processes." These terms could have a variety of meanings

and do not help provide any assistance for the fact finder. As such, Finjan's construction should

be adopted because it is consistent with the '822 Patent.

15

4.    **The Ordinary Meaning Applies To The Term "Evaluating The Detection Indicators."**

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| Ordinary meaning within the context of the claims | analyzing two or more detection indicators to determine whether executable code is detected |

As set forth in Finjan's Opening Brief, "evaluating the detection indicators" should be given its ordinary meaning in light of the claims and intrinsic evidence. Finjan's Opening Brief at 19-20. Secure Computing has no support whatsoever for its proposed construction, whereby it attempts to add the limitation of "two or more" to its definition. The sole argument by Secure Computing is that "'[d]etection indicators' is plural, so there must be two or more of them that are evaluated." Secure Computing's Opening Brief at 33. However, as discussed in Finjan's Opening Brief, the claims refer to "one or more analyses" which produce detection-indicators, suggesting that there are one or more detection indicators. Finjan's Opening Brief at 19-20. Therefore, the unnecessary limitations from Secure Computing should be rejected and the ordinary meaning should apply to this term.

5.    **No Construction Of The Term "Level Of Downloadable-Information Characteristic And Executable Code Characteristic Correspondence" Is Necessary.**

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| Ordinary meaning within the context of the claims | a value representing the degree of correspondence between the downloadable-information characteristic and the executable code characteristic |

The "level of downloadable-information characteristic and executable code characteristic correspondence" is perfectly clear in the context of the claim and requires no further construction. As detailed in Finjan's Opening Brief, the purpose of the term is to determine whether the level of correspondence meets a sufficient threshold. If it does, the downloadable-information is determined to be a Downloadable and further steps are taken to prevent malicious code from attacking the network. If it does not, no further processing steps are required. Finjan's Opening Brief at 20-21.

There is no basis for Secure Computing's inclusion of limitations regarding "value" and "level of correspondence" for this disputed term. Secure Computing's construction has pulled these terms out of then air as evidenced by the fact that it cites no support for its construction which expressly includes these limitations. In fact, these words are not used anywhere in the intrinsic record. Because the term is clear in the context of the claim, no construction is necessary.

**D.     The Four Disputed Terms Of The '010 Patent Require Construction.**

**1.     The Intrinsic Evidence Supports Finjan's Construction of "Document Control Server."**

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| a mechanism which allows a specified business partner to access documents on another company's non-public internal network | Ordinary meaning within context of the claim |

"Document control server" is a technical term that is not clear by examining the claim language alone. The '010 Patent generally describes a document control system that allows users access to a company's non-public internal network. *See, generally,* JA72 ('010 Patent at Abstract; 2:11-30). Specifically, the '010 Patent denotes a document control server component as 12 with reference to all illustrative diagrams of the document control system. *See* JA66, 68-70 ('010 Patent at FIG. 1, 4, 5, and 6). Moreover, in general terms, the specification describes the benefits of the document control server as offering "information to partners faster, easier and cheaper," and "more tightly integrates partners, thus improving business relations." JA79 ('010 Patent at 16:5-9). Since a business partner is the only user referred to in the '010 Patent, the scope of the term should be limited accordingly. *Iredeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1303 (Fed. Cir. 2004) (holding a claim term is limited to narrower construction when every example in the specification depicts the same embodiment); *see also Bell Atlantic Network Servs., Inc. v. Covad Communs. Group, Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001) ("Thus, when a patentee uses a claim term throughout the entire patent specification, in a manner

consistent with only a single meaning, he has defined the term 'by implication'.") (citations omitted); *see also* Finjan's Opening Brief at 21-23.

Contrary to Secure Computing's contentions, within the context of the '010 Patent, it is clear that the referenced user is a business partner. *See e.g.*, JA73 ('010 Patent at 3:6-16). For example, the specification describes a "Business Partner" as "an external user who needs access to data such as Web Pages which are not generally available to the public" and references an external business partner interchangeably with "user." JA73 ('010 Patent at 3:12-16; 4:44). The claim language further reinforces the fact that the '010 Patent intends "user" to mean a business partner. For example, claims 10 and 17 refer to a "business partner" who can dial to gain access to the document control server that receives document requests from users. JA80 ('010 Patent at 17"10-19, 27-31, 42-45; 18:9-12). Thus, this limitation comes directly from the claims themselves. Accordingly, Finjan's construction is consistent with the intrinsic evidence and should be adopted.

### 2.    The Term "Fetching The Requested Document" Needs Construction.

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| obtaining, parsing, and cleaning the document | Ordinary meaning within context of the claim |

In light of the specification, this term requires construction as "obtaining, parsing and cleaning of the document" are all necessary parts of the act of fetching. *See* Finjan's Opening Brief at 24-25. Secure Computing's assertion that Finjan's construction reads out a preferred embodiment is without merit. In reaching this conclusion, Secure Computing misinterprets the meaning of "parsing" as a process that indiscriminately parses all requested documents. Finjan's use of "parsing," however, simply means that a parsing step is performed where it is applicable. This understanding of "parsing" is wholly consistent with the intrinsic evidence. *See e.g.*, JA73 ('010 Patent at 3:52-53) ("document control server must parse and 'clean' the Web page prior to returning it to the requesting user").

In fact, the embodiments Secure Computing cite to are described in a section entitled "Parsing the Page." *See* Secure Computing's Opening Brief at 17; JA74 ('010 Patent at 5:7). This section title indicates that determining whether a requested page should be parsed is a part of the parsing process. Thus, parsing does not always occur, particularly where there are only non-text pages. JA74 ('010 Patent at 5:10 ("Non-text pages are not parsed....") As such, Finjan's construction does not exclude embodiments where it is improper to parse the requested page. In other words, including the parsing step in the definition of "fetching" does not mean that parsing will always occur. Thus, Secure Computing's arguments regarding Finjan's construction are entirely misplaced.

### 3.    The Term "Proxy" Requires Construction.

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| a process performed by a firewall in which the actual destination on the internal network is hidden from the business partner who is requesting the connection from an external network | Ordinary meaning within context of the claim |

Finjan and Secure Computing agree that a proxy functions to hide the destination of a file from a client requesting the file. Secure Computing's Opening Brief at 18. The parties disagree whether the client should be characterized as a "business partner." In fact, Secure Computing fails to recognize that the destination of the file is being hidden so that a business partner from an external network does not have access to the configuration of the internal network. *See* Finjan's Opening Brief at 25-26. During the prosecution of the '010 Patent, the applicant stated that the use of "client" here means "system users" and is "not to be confused with the use of the term 'client system.'" JA931 (Sept. 19, 2000 Response to Office Action at 6). Thus, the "client" refers to a user of the system which in this case is an external business partner, as explicitly defined in the specification. JA73 ('010 Patent at 4:44-45) ("When an external business partner (user) enters the URL...."). Also, as discussed above, the intrinsic evidence refers exclusively to a business partner as a user and the claims should therefore be limited as such.

19

In addition, Secure Computing argues that "external network" is unnecessarily limiting because the '010 Patent claims do not set out limitations "specifying from where the client request must originate." Secure Computing's Opening at Brief at 19. Secure Computing, however, overlooks the simple fact that the claim language itself clearly provides that the purpose of the alleged invention is to limit access from an external network to documents stored on an internal network. For example, claims 1 and 35, both of which refer to "proxy," state in the preamble that the alleged invention is directed to a method or apparatus for "limiting access from an external network to documents stored on an internal network." JA79, 81 ('010 Patent at 16:29-31; 20:15-17). As such, it is clear that the applicant intended for requests to originate from external networks for documents stored on an internal network. Accordingly, Finjan's construction is directly supported by the intrinsic evidence and should be adopted.

### 4.    The Intrinsic Evidence Supports Finjan's Construction of The Term "Role."

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| an alias which provides access to a list of allowed documents | membership in a group of one or more |

Finjan defines "role" as "an alias which provides access to a list of allowed documents." Secure Computing, in its Opening Brief, essentially argues that Finjan's construction is erroneous because it allows only one role for each server. Secure Computing's Opening Brief at 20. However, the claim language associates "role" with a user or client, and Finjan's construction does not limit the number of roles that may be assigned to users or clients. For example, claim 1 and 35 recite a step for building a client list by "assigning each client to *a role*" whereas claims 30 and 37 recite the step of "assigning each user to *one or more roles*." JA79, 81-82 ('010 Patent at 16:32-33; 19:38-40; 20:19-22; 21:1). As such, since the claims do not associate "role" with a server, Secure Computing's contention that Finjan's construction limits the number of roles that may be assigned to an *internal server* is irrelevant. Secure Computing's Opening Brief at 20 (emphasis added).

20

In addition, the intrinsic evidence fully supports Finjan's construction. The '010 Patent specification, for example, states that "each role has access to a set of allowed URLs associated with that role." JA73 ('010 Patent at 4:14-19); *see also* JA941 (Sept. 19, 2000 Response to Office Action at 16). The specification also provides that "an owner is assigned to one or more 'roles,' where a 'role' represents a mapping alias assigned to one of the servers." JA74 ('010 Patent at 6:50-54). The applicant further states, during the prosecution of the '010 Patent, that the invention "determines the client's identity, the role or roles available to that client and limits access to documents based on those roles." JA931 (Sept. 19, 2000 Response to Office Action at 6). As such, this Court should adopt Finjan's construction of "an alias which provides access to a list of allowed documents."

### E.    The Disputed Terms Of The '361 Patent Require Construction.

Contrary to Secure Computing's assertions, the claim terms in dispute here need construction because they are not clear and unambiguous. A key point of disagreement between the parties with respect to the proper construction of the '361 Patent is whether this patent is limited to a lightweight directory access protocol ("LDAP") directories. Given this dispute, it is important to understand what the '361 Patent describes.

Finjan's interpretation of "directory" as an LDAP directory is well founded in the '361 Patent itself. The '361 Patent specification makes no secret that one of the key novelties of the invention is the use of LDAP directories. The LDAP directory is specifically referenced throughout the '361 Patent, including the title, the drawings, and the specification. *See, generally,* JA84-93 ('361 Patent). In addition, the Background of the Invention distinctly points out a need "for leveraging an existing LDAP directory server as part of a firewall's authentication process." JA90 ('361 Patent at 2:63-64).

More tellingly, both the Abstract and the Summary of the Invention state that the present invention, and *not* a preferred embodiment, is a "system, method and computer program product" for authentication to a firewall "using a lightweight directory access protocol (LDAP) directory server." *See* JA84 ('361 Patent at Abstract; 3:1-6). The Federal Circuit has long

21

recognized that the various parts of a specification may be relied upon to determine the scope of claim terms. *Tate Access Floors, Inc. v. Maxcess Techs., Inc.,* 222 F.3d 958, 966 n.2 (Fed. Cir. 2000) ("in determining the scope of a claim, the abstract of a patent is a potentially useful source of intrinsic evidence as to the meaning of a disputed claim term.")(citations omitted); *see also Pandrol USA, LP v. Airboss Railway Prods., Inc.,* 320 F.3d 1354, 1363 n. 1, 1365 (Fed. Cir. 2003) (claims must be read in view of the specification; "This includes consulting … the abstract. *See e.g., SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1342 (Fed. Cir. 2001)."); *see also Bicon, Inc. v. Straumann Co.,* 441 F.3d 945, 950-51 (Fed. Cir. 2006) (a patent's specification described a feature "not only in the description of the preferred embodiments, but in the background and summary of the invention portions of the specification as well."). More importantly, the specification is deemed particularly limiting when describing the invention as a whole rather than preferred embodiments. *C.R. Bard, Inc. v. United States Surgical Corp.,* 388 F.3d 858 (Fed. Cir. 2004), discussed §§ 18.03[2][c][iii][B] (emphasis added) ("Although a statement's location is not 'determinative,' the location can signal the likelihood that the statement will support a limiting definition of a claim term. *Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition* of a claim term."); *see also Microsoft Corp. v. Multi-Tech Sys., Inc.,* 357 F.3d 1340, 1348 (Fed. Cir. 2004), cert. denied, 543 U.S. 821 (2004) ('Those statements, some of which are found in the "Summary of the Invention" portion of the specification, are *not limited to describing a preferred embodiment, but more broadly describe the overall inventions of all three patents'*), Accordingly, *other things being equal, certain sections of the specification are more likely to contain statements that support a limiting definition* of a claim term than other section, although what import to give language from the specification must, of course, be determined on a case-by-case basis.") (emphasis added).

In addition, the Background of the Invention states that "[a]n early standard for directory service was the directory access protocol (DAP)," then criticizes the DAP as "unwieldy in size," and finally points out a need "for leveraging an existing LDAP directory server as part of a

firewall's authentication process." JA90 ('361 Patent at 2:63-64). This criticism of earlier

techniques in conjunction with a general description of the advantages with using an LDAP

directory in the invention constitutes a clear disavowal of other types of directories. *Astrazeneca*

*AB v. Mutual Pharm. Co.,* 384 F.3d 1333, 1340 (Fed. Cir. 2004) ("Where the general summary

of description of the invention describes a feature of the invention … and criticizes other

products … that lack that same feature, this operates as a *clear disavowal* of these other products

and processes using these products.") (emphasis added) (citations omitted).

1.    The Term "Firewall" Requires Construction.

a.    The Intrinsic Evidence Supports Finjan's Construction.

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| firewall that does not authenticate users using its own database but, rather, information contained within an LDAP directory | Ordinary meaning within context of the claim |

Finjan's construction of "firewall" is exactly what the patent applicant intended based on

the '361 Patent specification itself. The specification plainly states "[i]n accordance with the

present invention, *firewall 210 does not authenticate users using its own database. Rather,*

*firewall 210 authenticates users using information contained within LDAP directory 204*."

JA91 ('361 Patent at 4:41-44 (emphasis added)). "Where the specification makes clear that the

invention does not include a particular feature, that feature is deemed to be outside the reach of

the claims of the patent, even though the language of the claims, read without reference to the

specification, might be considered broad enough to encompass the feature in question." *SciMed*,

242 F.3d at 1341. Thus, Secure Computing cannot attempt to capture a broader definition of

"firewall" as the '361 Patent explicitly discloses that the firewall in the '361 Patent does not

authenticate users using its own database, but rather, information contained within an LDAP

directory.

Furthermore, the '361 Patent specification also distinguishes the firewall from the prior

art which, under the law, limits the claims accordingly. It states:

23

> "*Firewalls also maintain a database* of users and are operative to prompt users for an identifying user identifier and password. *These conventional firewalls require* that employee names and passwords be entered into *a firewall authentication database. Maintenance of the firewall authentication database is especially burdensome* where there are a large number of employees that are frequently leaving or joining a company or when a company has a large number of firewalls. *Accordingly, what is needed is a mechanism for reducing this administrative burden.* More specifically, *what is needed is a mechanism for leveraging an existing LDAP directory server as part of a firewall's authentication process.* In this manner, *an existing LDAP server can be used as a central directory that stores the data used by all applications.*" '361 Patent, col. 2, lines 53-67 (emphasis added).

> "Conventional firewalls 110 included their own database *having a list of users and passwords, to enable authentication through firewall 110.* In accordance with the present invention, firewall 210 does not authenticate users using its own database. *Rather, firewall 210 authenticates users using information contained within LDAP directory 204.*"

JA91 ('361 Patent at 4:38-44) (emphasis added).

As shown by the above quotes, the specification is unambiguous about what is known in the prior art, namely firewalls having their own database. It then explicitly distinguishes the alleged invention over the prior art based on the claim that the prior art lacks an identified feature of the invention, namely a firewall that does not uses its own database. This is an instance where the claims should be limited because the patentee "described only those embodiments that included a particular feature and expressly distinguished the invention over prior art based on the fact that the prior art lacked the identified feature." *Alloc, Inc. v. International Trade Comm'n*, 342 F.3d 1361, 1378 (Fed. Cir. 2003). Because the specification clearly distinguishes the alleged invention from the prior art because the alleged invention does not authenticate using its own database while the conventional firewalls do, the ordinary meaning of "firewall", as proposed by Secure Computing, is improper.

The prosecution history further buttresses Finjan's position. During the prosecution of the '361 Patent, the patent applicant explicitly stated that the "[a]pplicant teaches that it can be difficult to maintain a directory for computer security at the same time that one is maintaining a directory for other purposes," and therefore the "[a]pplicant teaches that it can be advantageous to configure the firewall to leverage existing databases." JA1108 (January 12, 2004 Response to Office Action at 8). Thus, the applicant admitted that the alleged invention of the '361 Patent

does not want to maintain the database on the firewall because it is advantageous to configure the firewall to use information that is in an existing database, rather than import the information into a database stored on the firewall.

Ultimately, the Examiner was not convinced that this aspect of the firewall distinguished the patent application from the prior art and issued a final rejection on the application that led to the '361 Patent. JA1113-24 (Final Rejection mailed 2/18/04). When the patent applicant appealed this decision, it made a number of additional admissions regarding the firewall that only further solidified the limitations on the firewall disclosed in the '361 Patent. Specifically, the patent applicant stated that the prior art references taught a database that was stored on the firewall that would import information from a directory, whereas the alleged invention obtained information from the directory without storing the information on the firewall. JA1148-51 (Feb. 28, 2005 Appellant's Brief on Appeal at 18-21). This is best illustrated in the applicant's own drawings, reproduced below:



**PRIOR ART**                    **'361 PATENT**

25

As shown from the patent applicant's above diagrams, the cited prior art has a router access list database located on the firewall, thus it stores information imported from the directory directly on the firewall. In contrast, the application that led to the '361 Patent involves a situation where the firewall obtains information from the directory without storing it on the firewall. Relying on this significant structural distinction advocated by the patent applicant, there can be no reasonable dispute that the plain and ordinary meaning of firewall does not apply to the '361 Patent, as the patent applicant expressly disavowed conventional firewalls. Thus, Finjan's construction finds strong support in the intrinsic evidence and reflects the applicant's intent.

### b.    The Inventor's Testimony Supports Finjan's Construction.

One inventor of the '361 Patent, Steve Chew, testified that the problem the inventors were trying to solve was avoiding the need to have a large directory that would have to be copied to the firewall's local database, *i.e.*, stored on the firewall. He specifically testified as follows:

REDACTED

JA1241-42 (Chew Depo. at 64:21 through 65:3). He confirmed that the inventors wanted to achieve this functionality                REDACTED                          JA1242 (Chew Depo. at 65:11-14). He further confirmed that            REDACTED

JA1243-44

(Chew Depo. at 67:23 through 68:13). Thus, the problem the inventors of the '361 Patent were trying to avoid was storing the authentication information on the firewall's database. As a result, the '361 Patent specifically discloses a method in which the firewall can obtain authentication information without storing the information on the firewall.

### c.    Secure Computing Has No Support For Its Position.

Secure Computing's reliance upon the Examiner's citation of the Microsoft Computing Dictionary's definition of "firewall" is incredible, when one actually looks to see why the Examiner identified this prior art reference. *See* JA1091 (September 10, 2003 Office Action at 4). In issuing a rejection, the Examiner cited to the Microsoft definition to demonstrate what was

disclosed in the prior art. Thus, according to the Examiner, the "firewall" disclosed in the

application was not patentable given the prior art. <u>Id.</u> The applicant was forced to distinguish its

alleged invention from the "firewall" disclosed in the Microsoft dictionary, among other

references, by stating that it was beneficial to use information contained within an existing

LDAP database without storing the information on the firewall. JA1107-08 (Response to Office

Action dated Jan. 12, 2004 at 7-8). Thus, unlike Finjan, Secure Computing has no intrinsic

evidence whatsoever to support its position that the ordinary meaning applies to the term

"firewall."

> ### 2.    The Term "A Server Having At Least One Directory That Can Be Accessed Using A Network Protocol" Requires Construction.

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| an internal server having an LDAP directory that stores information about users, offers a static view of information and allows simple updates without transactions | Ordinary meaning within context of the claim |

As set forth in Finjan's Opening Brief, its construction of this term stems directly from

definitions found in the '361 Patent. Finjan's Opening Brief at 28.

Contrary Secure Computing's argument, construction of this term is necessary in light of

the specification, which explicitly discloses using a LDAP, which is included in the title of the

'361 Patent. While the background of the invention section references "[a] directory service" in

general and the directory access protocol (DAP) specifically, that section goes on to distinguish

the LDAP as "a new protocol" that "is gaining wide acceptance in business" because that is the

focus of the '361 Patent. JA90 ('361 Patent at 2:28-41). This is further demonstrated by the fact

that the same section criticizes the DAP as "unwieldy in size" and later proposes a need for

"leveraging an existing LDAP directory server as part of a firewall's authentication process."

JA90 ('361 Patent at 2:34-36, 2:62-64). As discussed above, this type of description constitutes

a clear disavowal of directories other than the LDAP directory.

Contrary to Secure Computing's contentions, the doctrine of claim differentiation does not support Secure Computing's position. The intrinsic evidence regarding what is disclosed in the '361 Patent rebuts Secure Computing's argument. The Federal Circuit has stated that "the written description and prosecution history overcome any presumption arising from the doctrine of claim differentiation." *Kraft Foods, Inc. v. Int'l Trading Co.,* 203 F.3d 1362, 1368 (Fed. Cir. 2000). As discussed above and in Finjan's Opening Brief, the '361 Patent specification clearly disavowed other directories in favor of a LDAP directory. In fact, every embodiment described in the '361 Patent are systems that utilize the LDAP. *See generally* JA90-93 ('361 Patent, 1:9-7:16). Thus, the overwhelming intrinsic evidence disclosing a LDAP cannot somehow be trumped by referring to the doctrine of claim differentiation in an attempt by Secure Computing to capture a broader scope of subject matter than what the patent applicant originally claimed and what the Patent Office permitted. *Kraft,* 203 F.3d at 1368 (claim differentiation cannot broaden claims beyond their correct scope)(internal citations omitted).

In addition, Secure Computing claims that Finjan "ignores the plain language of the claim" by using the phrases "storing information about users," "offer a static view of information," and "allow simple updates without transactions" in its definition. Secure Computing's Opening Brief at 8. These phrases, however, stem directly from the intrinsic evidence to describe directories in general. Describing the invention as a whole rather than referring to any specific preferred embodiment, the '361 Patent specification states that a directory "can store information about users," "offers a static view of the information," and "allows simple updates without transactions." JA90 ('361 Patent at 2:17-24). Moreover, this discussion of directories in the intrinsic evidence is set out without any qualification and applies to directories in general. For these reasons, Finjan's construction is well founded in the intrinsic evidence.

3.    The Term "Authorization Filter" Requires Construction.

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| a module to determine whether one or more attributes of the client user's LDAP entry is satisfied or whether the client user is a member of a group in the LDAP directory | Ordinary meaning within context of the claim |

Contrary to Secure Computing's assertions, "authorization filter" is not clear within the context of the claim language. Claim 1, for example, recites the term in the phrase "a comparison of the contents of at least part of one or more entries in said at least one directory to an *authorization filter*, wherein said *authorization filter* is generated based on a directory schema that is predefined by said entity," but provides no definition for the term itself. JA93 ('361 Patent at 7:27-31) (emphasis added). Secure Computing claims that the straightforward nature of the term is allegedly found in the appeal brief during prosecution of the '361 Patent, where the applicant explained that "[a]t its simplest, an authorization filter is an attribute and value pair." Secure Computing's Opening Brief at 8. As an example, the applicant uses "'Department = Accounting' (i.e. the user must work for the accounting department to be able to access the financial database server.)" *Id.* at 8-9. Secure Computing does not explain, however, how a fact-finder would derive the definition of "authorization filter" as "an attribute and value pair" by referencing only the claim language. In fact, if the term is as straightforward as Secure Computing would have this Court believe, one wonders why the applicant felt the need to proffer this much explanation to the Patent Office Examiner, who is presumably one ordinarily skilled in the art.

Finjan's construction of "a module to determine whether one or more attributes of the client user's LDAP entry is satisfied or whether the client user is a member of a group in the LDAP directory" is consistent with the intrinsic evidence as it comes directly from the specification. JA92 ('361 Patent at 5:25-27; 6:43-45). Finjan's definition of the term is also wholly supported by the prosecution history. In one office action response, the applicant

29

described reading an entry from the LDAP directory associated with a user, comparing the entry to an authorization filter, and denying authorization if one or more attributes of the entry does not satisfy the filter. JA1108 (*See* January 12, 2004 Response to Office Action at 8). In its appeal brief, the applicant again described the steps for receiving a request from a user, obtaining the user's attributes (e.g. country, organization, location, department, user name, etc.) from a directory, comparing the attributes to an authorization filter, and authorizing or denying the request on the basis of the comparison. *See* JA1130-55 (Feb. 28, 2005 Appellant's Brief on Appeal at 11-12). Thus, the applicant has explicitly characterized the authorization filter as a module that determines whether one or more attributes of the client user's LDAP entry is satisfied or whether the client user is a member of a group in the LDAP directory. For these reasons, Finjan's construction is proper.

**4.    The Term "Directory Schema That Is Predefined By Said Entity" Requires Construction.**

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| an authentication scheme specified to interact with an existing LDAP directory that has been uniquely developed for an organization's internal needs | Ordinary meaning within context of the claim |

Finjan's definition of "directory schema" as "an authentication scheme" is simply a reflection of the fact that all the claims in the '361 Patent describe a system or method for controlling access to network resources. *See, generally,* JA93 ('361 Patent at 7:18-8:52). In fact, Finjan's construction of a "directory schema" as "an authentication scheme" that interacts with an existing LDAP directory developed to suit an organization's needs does not require the LDAP directory to be authentication-specific. Thus, the LDAP can be used for other purposes other than authentication, but within the context of the '361 Patent, the LDAP must be used at the very least, for authentication purposes.

In addition, the claims of the '361 Patent disclose using a directory to "store information concerning an entity's organization," wherein the directory is an LDAP directory. JA93 ('361 Patent at 7:21-23, 32-35, 50-51; 8:7-10, 38-40). The claims further state that the entity

predefines a directory schema for generating an authorization filter, which is in turn used in a comparison to the content of the directory's entries.  JA93 ('361 Patent at 7:24-31, 49-55; 8:38-44).  Because the alleged invention is directed toward a "mechanism for leveraging an existing LDAP directory server as part of a firewall's authentication process" (JA90 ('361 Patent at 2:63-64)), Finjan's construction is the only correct definition for this term and should be adopted.

5.    The Term "Network Protocol" Requires Construction.

| Finjan's Construction | Secure Computing's Construction |
| --- | --- |
| lightweight directory access protocol | Ordinary meaning within context of the claim |

As discussed above and in Finjan's Opening Brief, Finjan's reference to an LDAP directory is consistent with the applicant's intended scope for the '361 Patent.  In addition, the only network protocol disclosed in the intrinsic evidence is an LDAP and the only instance where the specification references "network protocol" defines the protocol as defined by an LDAP standard.  JA90 ('361 Patent at 2:39-43).  Thus, Finjan's construction is supported by the intrinsic evidence of the '361 Patent.

6.    The Term "Per-Service Authentication Scheme" Requires<br>Construction.

| Finjan's Construction | Secure Computing's Construction |
| --- | --- |
| a scheme in which the authorization module determines whether the user is in one or more groups in the LDAP directory in order to satisfy the authorization filter | Ordinary meaning within context of the claim |

As an initial matter, the fact that the disputed term is "per-service *authorization* scheme" rather than the actual claim term of "per-service *authentication* scheme," is an error that the parties overlooked in the Joint Claim Construction Chart filed on August 24, 2007.  Contrary to Secure Computing's statement, *both* parties, not Finjan alone, mistakenly requested the Court to construe this term using "authorization" rather than "authentication."  In addition, this oversight by no means indicates an acknowledgment that "authorization" and "authentication" are interchangeable within the context of the '361 Patent.

Secure Computing contends that the term "per-service authorization scheme" needs no construction but nonetheless felt it necessary, in its Opening Brief, to define the term as "an authorization scheme that grants access to a client user to a class of services." Secure Computing's Opening Brief at 12. It is unclear how one would arrive at this definition when the term itself makes no mention of a "client user" or a "class of services." The claim language also merely recites the term without associating it with either a client user or a class of services.

While reserving the right to assert an indefiniteness argument at a later and more appropriate time in this case, Finjan's definition for this term should be adopted for the purposes of claim construction alone.

7.    The Term "Per-User Authentication Scheme" Requires Construction.

| Finjan's Construction | Secure Computing's Construction |
|---|---|
| a scheme in which the authorization module determines whether one or more attributes of the client user's LDAP entry satisfies the authorization filter | Ordinary meaning within context of the claim |

Unlike the previous term, "per-user authentication scheme" is the correct term in dispute as it is used in the claims. Similar to "per-service authentication scheme," however, Finjan has not conceded whatsoever that "per-user authentication scheme" should be equated with "per-user authorization scheme." Rather, because the specification also does not provide any instances of "per-user authentication scheme," and claim construction is an inappropriate venue for indefiniteness arguments, Finjan construes this term by relying on "per-user authorization scheme" instead, which is found in the '361 Patent specification.

Secure Computing contends that "per-user authentication scheme" needs no construction but sets out "an authorization scheme that allows access on a user-by-user basis," as the definition in its Opening Brief. Secure Computing's Opening Brief at 13. Again, the claim language provides no guidance as to what this term means. In addition, it appears that Secure Computing agrees that the '361 Patent, without qualification, states that "[i]f per-user authorization is configured, authorization module 206 determines whether one or more attributes

32

of the client user's LDAP entry satisfies an authorization filter." Secure Computing's Opening Brief at 13-14. The '361 Patent specification defines "per-user authorization" with reference to the invention as a whole rather than particular preferred embodiments and Finjan's construction tracks this definition verbatim.

While again reserving the right to assert an indefiniteness argument at a later and more appropriate time in this case, Finjan's definition for this term should be adopted for the purposes of claim construction alone.

## IV.    THERE ARE NO INDEFINITE CLAIM TERMS IN THE FINJAN PATENTS.

Any attempt to argue indefiniteness during claim construction is wholly inappropriate. *See, e.g., Pharmastem Therapeutics, Inc. v. Viacell Inc.*, 2003 WL 124149, *1, n.1 (Sleet, J., D. Del., Jan. 13, 2003). At Secure Computing's insistence, however, Finjan is forced to respond to these fatally deficient summary judgment arguments regarding indefiniteness.

### A.    The Terms in the '194 Patent are not Indefinite.

The claim limitations Java$^{TM}$ applet, ActiveX$^{TM}$ Control, JavaScript$^{TM}$ script, and Visual Basic script are not indefinite because they are easily understood by one skilled in the art. As best put by the Federal Circuit, "[a]s a general matter, it is well-established that the determination whether a claim is invalid as indefinite 'depends on whether those skilled in the art would understand the scope of the claim when the claim is read in light of the specification.'" *Atmel Corp. v. Information Storage Devices, Inc.,* 198 F.3d 1374 (Fed. Cir. 1999). In this case, the specification provides that:

> "Downloadable is typically requested by an ongoing process such as by an Internet browser or web engine. Examples of Downloadables include Java$^{TM}$ applets designed for use in the Java$^{TM}$ distributing environment developed by Sun Microsystems, Inc., JavaScript scripts also developed by Sun Microsystems, Inc., ActiveX$^{TM}$ controls designed for use in the ActiveX$^{TM}$ distributing environment developed by the Microsoft Corporation, and Visual Basic also developed by the Microsoft Corporation."

JA13 ('194 Patent at 1:47-55).

As can be seen from the above quote, the terms Java, ActiveX, and Visual Basic are referring to the distributing environment in which these applets, controls and scripts are run. Thus, even a cursory reading of the '194 Patent provides suitable technical meaning to these terms which requires Secure Computing's position to be rejected.

In any case, these terms are well understood in the art as evidenced by Secure Computing's own engineers. During the depositions of Secure Computing's engineers, the witnesses were asked what the terms Java Applet, ActiveX, JavaScript and Visual Basic meant. Each witness knew these terms and provided substantially similar answers in accordance with the teachings of the specification. JA1256-57 (Alme Depo. at 99:2 through 100:10); JA1260-61 (Scholtz Depo. at 13:25 through 14:21); JA1279-80 (Schnellbacher Depo. at 24:15 through 25:9); JA1273 (Borgolte Depo. at 25:13-23); JA1237-38 (Stecher Depo. at 207:10 through 208:10). It is clear from Secure Computing's own engineers that these terms are well known in the network security field and have a precise technical meaning. As such, these terms are not indefinite and Secure Computing's position should be rejected.

Secure Computing's mischaracterization of the MPEP and the outdated law surrounding the use of trademarks in patents is alarming. Conveniently, when citing to the MPEP, Secure Computing failed to include the first line in the subsection which reads "[t]he presence of a trademark or trade name in a claim is not, per se, improper under 35 U.S.C. §112, second paragraph, but the claim should be carefully analyzed to determine how the mark or name is used in the claim." This first sentence, however, has been interpreted to uphold patents as valid. In fact, the very case Secure Computing relied upon for its arguments regarding indefiniteness, *Ex parte Simpson*, 218 U.S.P.Q. 1020 (Bd. App. 1982), was distinguished based on this very sentence in subsequent decisions. For example, the District Court in Michigan held that the claim limitation, Windows™, is properly construed as Microsoft Windows Version 3.0 because of "the Federal Circuit's admonition that 'claims are generally construed so as to sustain their validity, if possible.'" *Polyvision Corp. v. Smart Techs. Whittaker Corp.*, 2007 WL 1596425 at *17 (W.D.Mich. 2007) (citing *Technibilt Div. v. UNR Indus., Inc.*, 911 F.2d 709, 712

34

(Fed.Cir.1990)). Also, the Board of Patent Appeals has held on several occasions that the use of trademarks does not render a claim indefinite if the trademark is known by those skilled in the art. *See Ex Parte William Z. Goldstein*, 2005 WL 4773193, at *2 (Bd. Pat. App. June 7, 2005) ("The issue before us is whether an artisan would have understood, as of the time of the filing of the application, what ARC stood for."); *see also Ex Parte Jerry Kitten*, 1999 WL 33134953, at *2 (Bd. Pat. App. Sept. 16, 1999) ("Based on these product sheets and because claim 13 further limits the fertilizer used in claim 1 to a fertilizer prepared from these well-identified proprietary products, we do not find the use of the trademarks renders claim 13 unclear or confusing."). In light of the law, MPEP and the fact that the terms Java applet, ActiveX control, JavaScript script, and Visual Basic script are well known to those skilled in the art, these terms are not indefinite.

Furthermore, the prosecution history demonstrates that both the Examiner, and the applicant, clearly understood what was meant by the terms Java applet, ActiveX control, JavaScript script, and Visual Basic script. In the original application, the terms Java applet, ActiveX control, JavaScript script, and Visual Basic script appeared in original claims 7-10. *See Original Application.* Despite requiring amendments to some of these claims, no amendments were ever required during to the use of the well known terms, Java applet, ActiveX control, JavaScript script, and Visual Basic script. *See JA181-90 (Office Action dated 1/7/99).*

Furthermore, one of skill in the art would know what was meant by these trademarked terms by reading the cited references to the '194 Patent which were considered pertinent to the applicant's disclosure during the prosecution of the '194 Patent. JA181-90 (Office Action dated 1/7/99). In addition to a number of patents, the prior art that was made of record included the following with references to these very software components:

> "Finjan Announces a Personal Java[TM]. Firewall For Web Browsers--the SurfinShield[TM] 1.6", Press Release of Finjan Releases SurfinShield, Oct. 21, 1996, 2 pages. .
>
> "Finjan Software Releases SurfinBoard, Industry's First JAVA Security Product For the World Wide Web", Article published on the Internet by Finjan Software, Ltd., Jul. 29, 1996, 1 page.
>
> "Powerful PC Security for the New World of Java[TM] and Downloadables, Surfin Shield.TM." Article published on the Internet by Finjan Software Ltd., 1996, 2 Pages. .

"Company Profile Finjan--Safe Surfing, The Java Security Solutions Provider" Article published on the Internet by Finjan Software Ltd., Oct. 31, 1996, 3 pages. .

"Finjan Announces Major Power Boost and New Features for SurfinShield.TM. 2.0" Las Vegas Convention Center/Pavillion 5 P5551, Nov. 18, 1996, 3 pages. .

"Java Security: Issues & Solutions" Article published on the Internet by Finjan Software Ltd., 1996, 8 pages. .

Mark LaDue, "Online Business Consultant" Article published on the Internet, Home Page, Inc. 1996, 4 pages. .

Norvin Leach et al, "IE 3.0 applets will earn certification", PC Week, v.13, n.29, p1(2), Jul. 1996. .

Microsoft Authenticode Technology, "Ensuring Accountability and Authenticity for Software Components on the Internet", Microsoft Corporation, Oct. 1996. .

Frequently Asked Questions About Authenticode, Microsoft Corporation, Feb. 1997

See JA1-2 ('194 Patent); *see also* JA1228-32 (Zhang article). These articles demonstrate that these terms are well known in the art, as well as provides further explanation regarding various aspects of Java applets, ActiveX controls, JavaScript scripts, and Visual Basic scripts. Thus, one of skill in the art would have a sufficient understanding of the terms Java applet, ActiveX control, JavaScript script, and Visual Basic script based on the disclosure of the '194 Patent.

**B.    The Terms in the '822 Patent are not Indefinite Under 35 U.S.C. § 112.**

Secure Computing does not even attempt to meet its burden of demonstrating that any terms of the '822 Patent are indefinite. Secure Computing does nothing to support its naked allegation that certain terms are means-plus-function elements, even though most of those terms do not include the requisite "means" phrase in the term. Means-plus-function claim terms are founded in Paragraph 6 of 35 U.S.C. § 112, which provides in part that an "element in a claim for a combination may be expressed as a means or step for performing a specified function." *See also, IMS Tech. Inc. v. Haas Automation Inc.,* 206 F.3d 1422, 1429-30 (Fed. Cir. 2000) ("Limitations contemplated by §112, ¶ 6, often referred to as means-plus-function or step-plus-function limitations, recite a specified function to be performed rather than the structure, material, or acts for performing that function.") Secure Computing's contention that several terms in the '822 Patent are indefinite under Section 112 is absurd because the majority of these terms are not subject to the limitations of §112, ¶ 6 and the '822 Patent specification provides structure and support for all the terms.

36

As an initial matter, the Court must address whether §112, ¶ 6 applies to the disputed terms. *See Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1361 (Fed. Cir. 2000). In answering this question, the Federal Circuit has long held that, where a phrase does not refer to the word "means," a presumption exists that the limitations inherent to §112, ¶ 6 is inapplicable. *See Phillips,* 415 F.3d at 1311 ("we have held that the absence of that term creates a rebuttable presumption that section 112, paragraph 6, does not apply."); *see also LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 453 F.3d 1364, 1372 (Fed. Cir. 2006) (" ' "[A] claim term that does not use 'means' will trigger the rebuttable presumption that §112, ¶ 6 does not apply.") This presumption is strong and can be overcome only where the claim phrase is functional, does not have a "reasonably well understood meaning in the art," and does not recite sufficient structure for performing the function. *See Linear Tech. Corp. v. Impala Linear Corp.,* 379 F.3d 1311, 1320 (Fed. Cir. 2004). The courts, in determining whether the presumption of inapplicability is rebutted, typically conduct a thorough analysis of both intrinsic and extrinsic evidence. *See CCS Fitness Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002) (dictionary definitions consulted to determine that an artisan of ordinary skill would understand the term in question to have an ordinary meaning).

Secure Computing has not provided any of the requisite analysis to overcome the presumption. Other than mobile code means, the remaining seven disputed terms do not include the word "means." To support its contention that these terms are means-plus-function claim limitations, Secure Computing makes cursory references to the claim language and deposition testimony and bare assertions that the disputed terms are functional and that the specification provides no definition or structure to support the term. Secure Computing's "support" for its contentions is superficial at best and, in some instances, non-existent. *See* Secure Computing's Opening Brief at 37-40, (for the terms "information monitor" and "destination-characteristics," Secure Computing merely states that the terms "have no ordinary meaning as admitted by Finjan's own CTO," and that "[t]he specification also lacks any definition for these terms.")

Contrary to Secure Computing's assertion, the disputed terms that do not include "means" are not subject to §112, ¶ 6 because the terms have ordinary meaning to those skilled in the art, the '822 Patent provides detailed descriptions clarifying the meaning of these terms, and the claim language encompassing these terms is not functional in nature. First of all, the citation to the testimony of Finjan's CTO, Mr. Ben-Itzhak, is no indication that these terms have no customary or ordinary meaning. He is neither an inventor nor a drafter of the '822 Patent. In fact, these terms mean exactly what they say. For example, the term "content inspection engine" means an engine that examines content and "destination-characteristics" means the characteristics of the destination.

In addition, the '822 Patent specification and claim language provide further clarification to the meaning of these terms. For instance, claim 32 states that "destination-characteristics include characteristics corresponding to at least one of a destination user, a destination device and a destination process," and Figure 5 illustrates a "content inspection engine" comprising sub-components including an inflater, a parser, a data fetcher, a content detector, etc. JA45, 57 ('822 Patent at 24:29-32; FIG. 5). Moreover, Figures 4 and 5 depict and the specification describes the remaining terms including "packaging engine" (denoted element 403), "linking engine" (denoted element 405), "transfer engine" (denoted element 406), "inspection controller" (denoted element 506), "MPC generator" (denoted element 432), "policy generator" (denoted element 433), and "information monitor" (denoted element 401). *See, generally,* JA56-58 ('822 Patent at 11:44-16:50).

Secure Computing's assertion that the claims using the disputed terms are functional in nature is erroneous. Rather, the claims describe these terms to specify a particular type. For example, while "content inspection engine" describes an engine for examining content, the claim language "for determining whether the downloadable-information includes executable code" sets out a particular type of content inspection engine that examines code to determine whether it includes executable code.

"Mobile code means," the only disputed term including the word "means," is also not indefinite because the '822 Patent describes structures to support the term. Claim 28 states in part that "mobile code means" is "communicatively coupled to the receiving means for causing mobile protection code to be executed by a mobile code executor at a downloadable-information destination." JA57 ('822 Patent at 24:5-8). The '822 Patent specification, in turn, provides that "[a] suitable information-destination or "user device" can further include one or more devices or processes (such as email, browser or other clients) that are capable of receiving and initiating or otherwise hosting a mobile code execution." JA54 ('822 Patent at 7:60-64). The specification, therefore, provides specific devices or processes for carrying out the stated function intended for "mobile code means."

For the reasons stated above, the terms in the '822 Patent are not indefinite under §112, ¶ 6 because Secure Computing failed to over come the presumption of inapplicability for the terms that do not incorporate the word "means," and the '822 Patent provides adequate support for "mobile code means."

## V.     CONCLUSION

For the foregoing reasons, Finjan respectfully requests that the Court adopt its proposed constructions for the disputed terms discussed above.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Paul J. Andre
Lisa Kobialka
Meghan A. Wharton
James R. Hannah
Perkins Coie LLP
101 Jefferson Drive
Menlo Park, CA  94025-1114
(650) 838-4300

Dated: September 28, 2007
Public Version: October 4, 2007

By   /s/ Philip A. Rovner
        Philip A. Rovner (#3215)
        Hercules Plaza
        P. O. Box 951
        Wilmington, DE  19899
        (302) 984-6000
        provner@potteranderson.com

Attorneys for Plaintiff

39

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on October 4, 2007, the within document

was filed with the Clerk of the Court using CM/ECF which will send notification of such

filing(s) to the following; that the document was served on the following counsel as

indicated; and that the document is available for viewing and downloading from

CM/ECF.

### BY HAND DELIVERY AND E-MAIL

Frederick L. Cottrell, III, Esq.
Kelly E. Farnan, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
cottrell@rlf.com; farnan@rlf.com

I hereby certify that on October 4, 2007 I have sent by E-mail the

foregoing document to the following non-registered participants:

Jake M. Holdreith, Esq.
Christopher A. Seidl, Esq.
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
jmholdreith@rkmc.com; caseidl@rkmc.com

/s/ Philip A. Rovner
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
E-mail: provner@potteranderson.com