IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FINJAN SOFTWARE, LTD., an Israel )
corporation, )
)
  Plaintiff, and Counter-Defendant )
)
v. )   C. A. No. 06-00369 GMS
)
SECURE COMPUTING CORPORATION, )
a Delaware corporation; CYBERGUARD )   **REDACTED - PUBLIC VERSION**
CORPORATION, a Delaware corporation, )
WEBWASHER AG, a German corporation )
and DOES 1 THROUGH 100, )
)
  Defendants, and Counter-Claimants )

## DEFENDANT SECURE COMPUTING CORPORATION'S
## RESPONSIVE CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Ronald J. Schutz
Jake M. Holdreith
Christopher A. Seidl
Trevor J. Foster
ROBINS, KAPLAN, MILLER &
CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500

Fredrick L. Cottrell, III (#2555)
cottrell@rlf.com
Kelly E. Farnan (#4395)
farnan@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

*ATTORNEYS FOR DEFENDANTS*

Dated: September 28, 2007

## TABLE OF CONTENTSPage

TABLE OF AUTHORITIES .................................................................................... iv

INTRODUCTION ................................................................................................. 1

I.    BACKGROUND ......................................................................................... 3

    A.    Secure Computing Has Been an Innovator in Computer Security
        For Years—Finjan Is Not A Pioneer In The Field ............................... 3

II.   KEY PRINCIPLES OF CLAIM CONSTRUCTION IGNORED BY
    FINJAN ..................................................................................................... 4

    A.    Claims Are Not Limited By Unclaimed Details In The
        Specification, Even Where The Specification Discloses Only One
        Embodiment ...................................................................................... 4

    B.    Finjan Never Identifies "Words of Manifest Exclusion"
        "Intentional Disclaimer" or "Disavowal of Claim Scope" In The
        Secure Computing's Specifications .................................................... 7

III.  THE PROPER CONSTRUCTION OF THE PATENTS ................................... 7

    A.    The '361 Patent ................................................................................ 7

        1.    Finjan's General Strategy of Importing an LDAP limitation
            Throughout All of The Claims Should Be Rejected ................. 7

            a    The claims of the '361 Patent are not all limited to
                the preferred embodiment's use of the lightweight
                directory access protocol (LDAP) ................................. 8

            b    Claim differentiation proves that the independent
                claims are not limited to LDAP ..................................... 8

            c.   The cases Finjan relies on to support the conclusion
                that the preferred embodiment limits the claims do
                not stand for that proposition ....................................... 9

        2.    The Generic Word "Firewall" Is Not Limited to LDAP ............ 10

            a.   Finjan failed to show that the inventors disclaimed
                the ordinary meaning of "firewall" by words or
                expressions of manifest exclusion ................................ 11

        3    A Server Having At Least One Directory That Can Be
            Accessed Using A Network Protocol Is Not Limited To An
            Internal Server Having An LDAP Directory ......................... 13

        4    Directory Schema That Is Predefined By Said Entity Is Not
            Limited To LDAP ................................................................ 14

        5    The Remaining Terms of the '361 Patent Should Not Be
            Limited to the LDAP Embodiment ..................................... 15

    B.    The '010 Patent ............................................................................... 15

i

1.    Document Control Server .................................................. 15

    a    Finjan's representation of the "intent of the patent" is not a reason to import limitations from the specification ..................................................... 16

2.    Fetching the Requested Document ..................................... 17

    a.    Separate parsing and cleaning steps are described in a preferred embodiment and should not be imported into the claims ................................................ 17

    b.    The inclusion of different claims that expressly describe the three steps of obtaining, parsing, and cleaning indicate that fetching should not be limited in the same manner ........................................... 18

3    The General Term "Proxy" Should Not Be Limited with Other Aspects of a Preferred Embodiment ....................... 18

4    Role ................................................................................. 18

    a.    Finjan again improperly adds limitations from the specification ................................................... 19

    b.    Finjan's construction is presumptively wrong because it excludes a preferred embodiment ............... 20

C.    The '194 Patent .......................................................................... 20

1    Downloadable ................................................................... 20

    a.    Finjan's reliance on an ambiguous statement in the file history over an express definition in the specification is improper ..................................... 21

    b.    The prosecution history of the '822 Patent is not relevant to claim construction of the '194 Patent ........ 21

    c.    The prosecution statements in the '780 and '822 Patents support Secure Computing's construction ......... 22

2    Addressed to a Client ........................................................ 22

3    Server That Serves As a Gateway ...................................... 24

D.    The '780 Patent .......................................................................... 25

1    The Applicants Clearly Agreed to the Plain Meaning of "Performing a Hashing Function" on the Downloadable Together with the Fetched Software Components ................. 25

E.    The '822 Patent .......................................................................... 26

1    Finjan Admitted that Several Terms in the '822 Patent Are Indefinite ........................................................................ 26

RLF1-3207078-1

2.    "Downloadable-information" is Not Synonymous with "Mobile Code " ............................................................ 27

3.    "Information-destination" is Not Limited to the Term "Client" ........................................................................ 27

4.    Information-recommunicator is Not Limited to the Term "Server" ....................................................................... 29

5.    Evaluating the Detection Indicators Is Written In the Plural Form ........................................................................... 29

6.    Level of Downloadable-information Characteristic and Executable Code Characteristic Correspondence ............... 31

CONCLUSION ........................................................................... 31

# TABLE OF AUTHORITIES

Page

## Cases

*Bell Atlantic Network Servs , Inc. v. Covad Comms. Group, Inc ,*
    262 F.3d 1258 (Fed. Cir. 2001) ......................................................... 9

*Gemstar-TV Guide Int'l, Inc  v  ITC,*
    383 F.3d 1352 (Fed. Cir. 2004) ......................................................... 7

*Gillette Co  v  Energizer Holdings, Inc ,*
    405 F 3d 1367 (Fed. Cir. 2005) .................................................. 7, 12

*Inverness Med  Switz  Gmbh v  Princeton Biomeditech Corp ,*
    309 F.3d 1365 (Fed  Cir  2002) ....................................................... 21

*Irdeto Access, Inc  v  Echostar Satellite Corp ,*
    383 F.3d 1295 (Fed. Cir. 2004) ...................................................... 10

*Liebel-Flarscheim Co  v  Medrad Inc ,*
    358 F.3d 898 (Fed. Cir. 2004) ......................................................... 9

*Phillips v  AWH Corp.,*
    415 F.3d 1303 (Fed  Cir. 2005) .................................................. *passim*

*SRI Int'l v  Matsushita Elec  Corp ,*
    775 F 2d 1107 (Fed. Cir. 1985) ...................................................... 17

*Tandon Corp  v  U S. International Trade Comm,*
    831 F 2d 1017 (Fed  Cir. 1987) ...................................................... 18

*Vitronics Corp  v  Conceptronic, Inc ,*
    90 F.3d 1576 (Fed  Cir. 1996) ........................................................ 20

## Other Authorities

5A CHISUM ON PATENTS (2005) ........................................................ 13

*Barron's Dictionary of Computer and Internet Terms* 195 (5th ed  1996) ......... 23

Bryan A  Garner, *Garner's Modern American Usage,*
    615 (2003) ................................................................................ 29

George McDaniel, *IBM Dictionary of Computing* 13 (1994) ..................... 23

*Webster's New World Dictionary of Computer Terms*
    510 (5th Ed  1994) ...................................................................... 14

RLF1-3207078-1

## INTRODUCTION

Secure Computing Corporation ("Secure Computing") is one of the leading providers in the world for software and hardware that protects computer networks from a wide variety of threats, from viruses to hacker and criminal attacks to unauthorized access in or out of a network.

Secure Computing invented a new way to manage a firewall by taking advantage of information in an existing employee directory that can be referenced or imported into the firewall. Basing access control at the firewall on information in an existing employee directory simplifies the process of deciding and keeping track of who may access computer resources within an organization. The invention is useful because the employee information need not be created specifically for the firewall. The existing information may, but need not be, found in a particular type of directory known as an "LDAP" or lightweight directory access protocol directory. Embodiments of this invention are claimed in Secure Computing's '361 patent.

Secure Computing also invented a system for controlling access to documents using a "document control server" to decide whether a given user has permission to see a document. The system can use "roles" to decide what limitations are placed on that person's ability to access the requested document. Roles could be, for example, a doctor participating in a health care plan or a government agent requesting information from the CIA. This invention is useful in making document access control more efficient. Embodiments of this invention are claimed in Secure Computing's '010 patent.

These inventions arise out of Secure Computing's longstanding experience and success in providing security to computer systems, beginning with the Federal Government in the 1980s. Secure Computing uses ordinary terms in its patent claims that

1

are established and well-understood in the computer security field, and seeks constructions that recognize the ordinary meanings, consistent with the context in the claims themselves.

Finjan is a small, Israeli company that entered the network security field in the mid- to late-1990s. Finjan claims methods of protecting a network from threats that its patents name "Downloadables." Secure Computing does not agree with Finjan's characterization of this technology as "pioneering." Moreover, the term "Downloadable," like many terms in Finjan's patents, has no standard or ordinary meaning, and its meaning in the claims therefore must be divined from reading the claims themselves and the specifications of Finjan's patents to understand how Finjan used the terms.

Finjan's proposed claim constructions do not give Secure Computing's claim terms their ordinary meaning as required by the Federal Circuit. Instead, Finjan scours the specifications of Secure Computing's patents for specific embodiments and incorrectly asserts that those specific embodiments are limitations on the claimed invention. Secure Computing, on the other hand, correctly relies on the claims themselves and only relies on the specification and other intrinsic evidence to limit terms when the claims have no ordinary meaning. Consequently, Secure Computing's constructions should be adopted.

Secure Computing seeks construction of terms of Finjan's patents that (1) do not have an ordinary meaning and therefore must be construed according to how they are used in the specification, or (2) that are the subject of clear definition and disclaimer by Finjan in the intrinsic evidence.

2

I.    BACKGROUND

A.    Secure Computing Has Been an Innovator in Computer Security For Years—Finjan Is Not A Pioneer In The Field

Secure Computing has been a leader in the area of computer security since the 1980s. *The Origin of Sidewinder® G2 Security Appliance*, *available at* http://www.securecomputing.com/index.cfm?skey=1024. JA2361-64. Secure Computing Corporation originally arose out of a division of Honeywell International, Inc—a world-wide provider of high-technology. Honeywell maintained a division called the Secure Computing Technology Center (SCTC). The National Security Agency (NSA) turned to the Secure Computing Technology Center to build a highly secure computer that could safely run the UNIX operating system. In particular, the NSA placed its faith in the expertise of SCTC's chief architect, W. Earl Boebert.

In 1989, W. Earl Boebert, an expert in information security,[1] and his team founded Secure Computing Corporation after Honeywell spun off its Security Computing Technology Center. For its first few years, Secure Computing focused its business on securing computers and networks to protect against threats to highly classified information related to national security. During the late 1980s and early 1990s, Secure Computing used its experience in building security solutions for the U.S. government to eventually create non-classified security solutions for the commercial market. In particular, Secure Computing decided to create a highly secure firewall that could analyze the content of incoming and outgoing data. The firewall could be used to block

---

[1] JA2402-13, The Nat'l Academies, *Committee Membership Information*, *at* http://www8.nationalacademies.org/cp/CommitteeView.aspx?key=157 (outlining Mr. Boebert's accolades in computer security).

specified data content based on a security policy. The firewall, Sidewinder, was released in October 1994. Many computer security products followed over the years

Secure Computing's products have been well-received and commercially successful In fact, Secure Computing recorded $176 million in revenue from sales of its products and services in 2006 Secure Computing also has a customer base of over 19,000 customers worldwide. *Company Fact Sheet, at* http://www.securecomputing.com/index.cfm?skey=233&menu=about JA2354-60.

Finjan, on the other hand, did not exist until nearly a decade after Mr. Boebert and the Secure Computing Technology Center began building secure computing solutions for the NSA Finjan's products have not been as well received by the marketplace.

## REDACTED

## II.    KEY PRINCIPLES OF CLAIM CONSTRUCTION IGNORED BY FINJAN

### A.    Claims Are Not Limited By Unclaimed Details In The Specification, Even Where The Specification Discloses Only One Embodiment

Although professing adherence to the claim construction guidelines set forth in *Phillips v AWH Corp*, 415 F 3d 1303 (Fed Cir 2005), Finjan regularly deviates from those guidelines to support its proffered constructions. Finjan fails to respect four of *Phillips*' general principles of claim construction:

- Claims are to be construed through the eyes of one of ordinary skill in the art in light of the totality of the intrinsic record, which includes the claims, the specification, and the prosecution history. *Id* at 1314.

- Importing limitations from the specification is improper. *Id* at 1323. Persons of ordinary skill in the art rarely confine definitions of terms to the exact embodiments. *Id*

4

- Terms must be construed in the context in which a term is used in the asserted claim. *Id.* at 1314.

- Differences among claims are useful in understanding the meaning of particular claim terms. *Id.*

At the same time that it promotes these guidelines, *Phillips* also recognizes that not all guidelines apply in a given situation. *Id.* at 1324. For example, *Phillips* holds that it is generally inappropriate to narrow terms that have an ordinary meaning (such as "firewall" and "directory" in this case). *Id.* at 1314. An exception arises when the patentee defined the term during prosecution (as Finjan did here with respect to the term "performing a hashing function on the Downloadable and the fetched software components"). In those cases, as *Phillips* explained, the patentee's definition made during prosecution overcomes the ordinary meaning. *Id.* at 1317. Another exception arises where a term has no ordinary meaning—as in many of the terms in Finjan's '822 patent in this matter. *Id.* at 1314. Because there is no ordinary meaning, the court must look to the specification, not to improperly import a limitation, but rather to find the meaning of the claim term. *Id.* Apart from such exceptions, claim terms are entitled to their ordinary meaning to one of ordinary skill in the art in light of the entire intrinsic record.

Finjan fails to follow the basic canons of claim construction. Rather, Finjan, in a self-serving manner, picks and chooses when to follow rules of claim construction and when to ignore them. For example, on page 13 of its brief, Finjan correctly states that the Federal Circuit issued a "clear warning" that "although the specification often describes very specific embodiments of the invention, [the Court has] repeatedly warned against confining the claims to those embodiments." Finjan Opening Br. at 13 (D.I. 112) (quoting *Phillips*, 415 F.3d at 1323). But in interpreting Secure Computing's claims Finjan plainly contradicts its previous statement and Federal Circuit law by arguing, for example, on

5

page 26 of its brief that "the only embodiments described in the '361 Patent are systems that utilize LDAP . [and] the claims should be limited accordingly ... because the nature of the intrinsic evidence imposes inherent limitations to the claims." Finjan Opening Br. at 26-27 (D.I. 112).

Finjan's contradictory approach to claim construction is diametrically opposed to decades of Federal Circuit precedent, confirmed by the en banc decision of the Federal Circuit in *Phillips*. The first step in defining claim terms is to determine if the claim term has an ordinary meaning. If there is no ordinary meaning, then one should look to the specification for guidance. The full quote of *Phillips*, which Finjan references once, states,

> Although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments (citations omitted) In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment. (citation omitted) That is not just because section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments.

*Id.* at 1323

Almost all of Finjan's proposed constructions of Secure Computing's patents can be rejected on the basis that Finjan simply recites the language in the specification and invites the Court to substitute words in the specification for words in the claim. For instance, Finjan invites error each time it merely repeats the claim term it is supposedly construing within its proposed definition, and then adds additional words from the specification without showing a clear disclaimer.

6

**B.    Finjan Never Identifies "Words of Manifest Exclusion" "Intentional Disclaimer" or "Disavowal of Claim Scope" In The Secure Computing's Specifications.**

Many of Finjan's constructions of Secure Computing's claims are based explicitly or implicitly on its assertion that each given feature in the specification is a required limitation of the invention. However, Finjan never points to language within the specification or the prosecution history indicating a "clear" disavowal of claim scope as required by *Phillips*, 415 F.3d at 1323. The Federal Circuit has held that mere recitations of features of "the present invention" is not a disclaimer of other embodiments. *See, e.g. Gillette Co v Energizer Holdings, Inc*, 405 F.3d at 1369, 1374 (specification referring to elements as an integral part of the "present invention" not enough to limit claims absent "words or expressions of manifest exclusion" to limit the scope of the claim); *Gemstar-TV Guide Int'l, Inc v ITC*, 383 F.3d 1352, 1366 (Fed Cir 2004) (statement in the specification indicating that an "'innovative cursor . . is required' was not the use [of] words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.") Accordingly, Finjan is simply importing limitations from the specification into the claims in violation of *Phillips*

## III.    THE PROPER CONSTRUCTION OF THE PATENTS

**A.    The '361 Patent**

**1.    Finjan's General Strategy of Importing an LDAP limitation Throughout All of The Claims Should Be Rejected**

Secure Computing's constructions of each of the specific disputed terms of its '361 patent are set forth individually in the Joint Claim Chart filed with the Court Finjan offers a generic error, however, as to all of those terms—the importation of a limitation to each of the ordinary terms, such as a "directory" and a "firewall," to be limited to a

7

structure that includes an "LDAP" or "lightweight directory access protocol" structure Finjan's argument is simply an effort to import a feature of the preferred embodiment into every disputed limitation and should be rejected as to all terms

### a. The claims of the '361 Patent are not all limited to the preferred embodiment's use of the lightweight directory access protocol (LDAP)

The term Lightweight Directory Access Protocol ("LDAP") does not appear in any of the asserted independent claims of Secure Computing's '361 patent, but only in dependent claims Finjan, nevertheless, attempts to import separate limitations related to the use of LDAP or an LDAP directory in every disputed claim term in the independent claims of Secure Computing's '361 Patent, even though ther term LDAP is not present in any of those claims Finjan's basis for this assertion is that "the only embodiments described in the '361 Patent are systems that utilize the LDAP " Finjan Opening Br at 26-27 (D.I 112). As Secure Computing has previously shown, limitations should not be imported from the preferred embodiment even if only one embodiment is disclosed. *Phillips*, 415 F.3d at 1323. Finjan itself admitted that the Federal Circuit has issued a "clear warning" against such an approach. Finjan Opening Br at 13 (D.I. 112).

### b. Claim differentiation proves that the independent claims are not limited to LDAP

While all examples of the preferred embodiment of the '361 specification use LDAP, the claims indicate that the invention is not so limited based on the doctrine of claim differentiation. In particular, while claim 1 merely claims a "directory," dependent claim 2 separately claims the "at least one directory is a lightweight directory access protocol directory " '361 Patent, JA93 claim 2 The Federal Circuit has held that the doctrine of claim differentiation means that "the presence of a dependent claim that adds

8

a particular limitation raises a presumption that the limitation in question is not found in the independent claim." *Liebel-Flarscheim Co v Medrad Inc*, 358 F 3d 898, 910 (Fed Cir. 2004) The examiner also agreed that claim 1 claimed a directory not limited to an LDAP directory '361 Prosecution History, Non-Final Rejection (mailed Sept. 10, 2003) JA2021 at 7 ("[C]laims 2 and 9 [] further limit claims 1 and 8 respectively by specifying the directory as being an LDAP directory ") Accordingly, this Court should not read the term "LDAP" into the independent claims, in contravention of the doctrine of claim differentiation and clear prosecution history.

> ### c.    The cases Finjan relies on to support the conclusion that the preferred embodiment limits the claims do not stand for that proposition

Neither case cited by Finjan supports the proposition that claim terms must be limited to a "narrower construction" when the embodiments describe only one embodiment. On the contrary, the first step in claim construction analysis is determining if the particular term has an ordinary meaning to one of skill in the art. The ordinary meaning should be adopted unless the patentee clearly indicated that the term is used in a manner that is inconsistent with the ordinary meaning

The cases that Finjan cited are not applicable here  In *Bell Atlantic Network Servs, Inc v Covad Comms Group, Inc*, 262 F 3d 1258 (Fed. Cir. 2001) for example, there was a dispute as to whether the term "mode" could include varying a "rate." All of the references in the specification made clear that the applicant referred to "the terms 'rate' and 'mode' as two separate and distinct concepts " *Bell*, 262 F 3d at 1270. For this reason, the court did not use the ordinary meaning of the term "mode " Finjan has pointed

9

to no analogous instance in which the '361 Patent specification excludes non-LDAP structures from the terms Finjan seeks to define

The *Irdeto* court, on the other hand, looked to the specification because the court determined that the term "group key" was admittedly a term that had no ordinary meaning. *Irdeto Access, Inc v. Echostar Satellite Corp*, 383 F.3d 1295 (Fed. Cir. 2004) ("Having conceded that the 'key' modifiers have no accepted meaning in the art, the applicant expressly directed the public to the specification to discern that meaning and thus measure the scope of the claimed invention.") In the instant case, Finjan recognizes that the disputed terms in the '361 Patent such as "protocol" and "directory" have an ordinary meaning. Finjan admits it is trying to persuade the Court to adopt a "narrower construction" of those terms—a departure from ordinary meaning. Finjan Opening Br. at 27 (D.I. 112). Finjan does not point to any portions of the specification that indicate that the terms "protocol" or "directory" cannot include directories or protocols other than LDAP such as, for example, Novell Directory Services (NDS). On the contrary, Finjan does precisely what the Federal Circuit in *Phillips* rejects—it seeks to import limitations from the preferred embodiment arguing that it is the only embodiment described.

### 2.    The Generic Word "Firewall" Is Not Limited to LDAP

A "firewall" is a common term used by people of ordinary skill. Finjan does not dispute that the term firewall has a well understood meaning. Finjan admits as much when it states that "Generally a firewall is a mechanism that allows only authorized users to access a network using its own authentication database." Finjan Opening brief at 27 (D.I. 112) This "general" meaning does not include any limitations about LDAP. Finjan simply bootstraps limitations atop the word "firewall." Based on this admission alone, the Court should reject Finjan's construction of "firewall."

10

a.  **Finjan failed to show that the inventors disclaimed the ordinary meaning of "firewall" by words or expressions of manifest exclusion**

Finjan claims that the applicants "clearly disclaimed the ordinary meaning for the term 'firewall '" Finjan argues that a "firewall" is "a firewall that does not authenticate users using its own database but, rather, information contained within an LDAP directory " Finjan Opening Br. at 27 (D.I. 112)

Finjan does not and cannot point to any statement that says "the firewall of all embodiments must not use its own database and must use information contained within an LDAP directory." Instead, Finjan points to a description of the preferred embodiment in which the preferred embodiment uses information from an LDAP directory. Its evidence of such a disclaimer is that the specification states, in a detailed description of a preferred embodiment, "in accordance with the present invention, firewall 210 does not authenticate users using its own database. Rather, firewall 210 authenticates users using information contained within an LDAP directory 204." Finjan omits the next sentence of the specification, which states: "As will be described in greater detail below, firewall 210 can authenticate users through an authentication scheme that can be based upon the unique composition of an organization's LDAP directory 204." '361 Patent, JA91 at col.4 ll 44-47 (emphasis added); JA91 col.3 ll 42-43 ("A preferred embodiment of the invention is discussed in detail below.")

The point of this statement is that a firewall administrator can simply grab existing information from an existing directory to set up and maintain a firewall. The administrator need not build a new firewall authorization directory from scratch. This statement merely says that in a preferred embodiment (not all embodiments) a firewall

11

"can" (not must) use an authentication scheme "based on" an LDAP directory (not that the firewall can't copy information from an LDAP directory and use it for its own authentication scheme.) In that particular embodiment, the firewall does not authenticate using its own database, but that does not exclude embodiments that do authenticate using their own databases *See Gillette Co v Energizer Holdings, Inc*, 405 F 3d 1367, 1374 (Fed Cir 2005) (rejecting the argument that the claims were limited to a system with three blades based on the specification statement that "in accordance with the present invention there is provided a safety razor blade unit comprising a guard, cap and a group of three blades.") (emphasis added).

Finjan further argues that the inventors' description of conventional firewalls amounts to a clear disavowal of claim scope. The inventor criticized conventional firewalls because they "require that employee names and passwords be entered into a firewall authentication database." '361 Patent, JA90 at col 2 ll 55-57. But the invention solves that problem regardless of whether it uses an authentication database that resides on the firewall. For instance, when the information from a directory server is automatically imported into a database on the firewall, there is still no need for an administrator to separately enter employee names and passwords on the firewall. In any case, this statement falls well short of the necessary "words or expressions of manifest exclusion." *Gillette*, 405 F.3d at 1374

The law is also clear that just because the specification discusses the advantages of a particular embodiment, such advantages need not be met by all of the claims. *See Phillips*, 415 F 3d at 1326-27 ("[T]he fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to

12

structures that are capable of achieving all of the objectives " ) (quotations omitted)

Chisum explains this rule as follows:

> A patent's specification will often discuss the problem or problems that the disclosed invention solves and the invention's objectives or purposes. Applying the principles that a claim is to be read in the light of the specification but that limitations are not to be read into a claim, court decisions take the specification discussion of problem and solution and of objectives into account in construing patent claim language, but do not strictly limit a patent claim to the embodiments that fully achieve all the objectives

5A CHISUM ON PATENTS § 18.03[2][c][iv] (2005) . Because the term firewall has an ordinary meaning that has not been disavowed by words or expressions of manifest exclusion, the term should not be construed.

### 3. A Server Having At Least One Directory That Can Be Accessed Using A Network Protocol Is Not Limited To An Internal Server Having An LDAP Directory

The independent asserted claims of Secure Computing's patents simply refer to a "directory" and a "server;" they do not include the modifiers Finjan proposes of an "LDAP" directory and an "internal" server. "Directory" and "server" are well understood terms that are not limited to "LDAP" directories and "internal" servers. In fact the use of the modifiers "LDAP" and "internal" with the terms is strong intrinsic evidence that the words by themselves—as they appear in the claims—are not limited. *See Phillips*, 415 F.3d at 1314 (indicating that the claim in that case "refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel") Finjan's construction is that the phrase means "an internal server having an LDAP directory that stores information about users, offers a static view of information and allows simple updates without transactions" Finjan Opening Br. at 28 (D.I. 112). (emphasis added). All five of the underlined limitations are simply added to the claim

13

terms based on descriptions of particular embodiments in the patent There is nothing in the claim language that requires the "functional" limitations on a directory that Finjan's construction proposes

### 4. Directory Schema That Is Predefined By Said Entity Is Not Limited To LDAP

"A directory schema that is predefined by said entity" is a phrase that has a plain an ordinary meaning. Although Finjan never points to a word in the phrase that one of ordinary skill, or even a layperson, cannot understand, it maintains that the phrase cannot be understood. Based on the simplicity of the language, Secure Computing is left to guess that the only term Finjan is troubled with is "schema " The term "schema," however, takes its ordinary meaning. As one computer dictionary states, a schema is "a structure for organizing knowledge relative to context or expectations." JA2350, *Webster's New World Dictionary of Computer Terms* 510 (5th Ed 1994)

Finjan relies on a disorganized recitation of various parts of certain embodiments in the specification to arrive at the conclusion that the phrase means "an authentication scheme specified to interact with an existing LDAP directory that has been uniquely developed for an organization's internal needs " Finjan Opening Br. at 29-30 (D.I. 112). This definition is transparently cherry-picking phrases out of the specification with no logical reason for ascribing the meaning to the claim terms Secure Computing has already recited the reasons why that approach is flawed. The only reason that Finjan argues for such a construction is that Finjan believes that the specification "summarily describes" this "feature." Finjan Opening Br at 30 (D.I 112) Claim construction does not involve the inclusion of a summary description of the preferred embodiment. *Phillips,*

14

415 F.3d at 1323. This Court should reject Finjan's construction, because it does not attempt to define the actual meaning of the terms.

### 5. The Remaining Terms of the '361 Patent Should Not Be Limited to the LDAP Embodiment

The remaining terms for which Finjan has proffered a construction are all merely further improper attempts to include some version of LDAP-specific limitations in the claim terms. The particular terms are "authorization filter," "network protocol," "per-service authorization scheme," and "per-user authorization scheme." None of these terms actually recite LDAP. Secure Computing identified specific arguments related to each of these constructions in its opening brief. Finjan's opening brief does nothing more than recite language from embodiments in the specification and conclude, without warrant, that certain attributes of an embodiment that interacts with an LDAP directory should be ascribed to terms with well-understood meanings. Consequently, this Court should reject Finjan's remaining constructions based on Secure Computing's criticisms of Finjan's improper attempts to infuse LDAP language into the claims. *Phillips*, 415 F.3d at 1323.

### B. The '010 Patent

#### 1. Document Control Server

A document control server has an ordinary meaning, so it should not be construed. In particular, one of ordinary skill would understand that a document control server simply refers to a server that controls documents. The term is simply a name for the server that is described in the claims.

Finjan admits that "server" has an accepted, ordinary meaning when it argues just that in support of the ordinary meaning of a "server that serves as a gateway" in its own

patent. *See* Finjan Opening Br. at 13 (D.I. 112).[2] Finjan further admits that "document control" is a perfectly understandable phrase when it uses the term to represent to the Court that "[i]n general terms, the '010 Patent discloses a document control system . . . ." Finjan Opening Br. at 22 (D.I. 112). It is contradictory to simultaneously argue that "document control server" can not be understood without construction.

> **a.    Finjan's representation of the "intent of the patent" is not a reason to import limitations from the specification**

Finjan's proposed construction again contradicts the basic canons of claim construction. Finjan proposes that a document control server is "a mechanism which allows a specified business partner to access documents on another company's non-public internal network." Finjan Opening Br. at 23 (D.I. 112). As discussed in Secure Computing's opening brief, this definition imports several limitations including that a "business partner" must specifically be given access to documents and that the "business partner" must access "another company's non-public internal network." Finjan arrives at this conclusion after citing in its brief 10 different paragraphs from the specification over a span of 5 block quotes. This is simply another attempt to improperly limit the claimed invention based on one embodiment disclosed in the specification.

Finjan's warrant for grafting these limitations onto a straightforward term is without any legal basis. Finjan proposes that "[t]he clear intent of the '010 Patent is to describe a system that allows business partners access to a company's non-public internal network. Since Finjan's construction plainly reflects this intent, its construction should be

---

[2] Secure Computing does not argue that the word "server" in the "server that serves as a gateway" phrase needs definition, but only that the phrase "serves as a gateway" requires construction. *See* Secure Computing Br. at 26-27 (D.I. 111).

16

adopted." Finjan Opening Br. at 22 (D.I. 112) While Secure Computing contests the existence of such an intent, the Federal Circuit has never concluded that the "intent of the patent" should be written into the claims. Finjan fails to cite any authority for such a proposition

Because the term "document control server" has an ordinary meaning, Finjan's attempt to haphazardly add limitations from the specification should be rejected.

### 2. Fetching the Requested Document

The phrase "fetching the requested document" has an ordinary meaning. It means exactly what it says, "fetching the requested document." Finjan argues that the term "fetching" actually means "obtaining, parsing, and cleaning "

### a. Separate parsing and cleaning steps are described in a preferred embodiment and should not be imported into the claims

Finjan again improperly seeks to add limitations from the specification and other claims. As the Federal Circuit has stated, "specifications teach, claims claim." *SRI Int'l v Matsushita Elec. Corp.*, 775 F 2d 1107, 1121 n.14 (Fed. Cir. 1985) (*en banc*). Finjan makes two arguments, both of which depend on importing language from specific embodiments in the specification.

Finjan first asserts that because the specification discusses an embodiment where "document control server 12 must parse and 'clean,'" then all of the claims should include parsing and cleaning limitations Finjan Opening Br. at 24 (D.I. 112) (quoting the '010 specification but omitting the reference to document control server <u>12</u>.) Again, this section of the specification is merely describing an embodiment and does not create additional limitations to be incorporated into the claims.

17

> **b.    The inclusion of different claims that expressly
> describe the three steps of obtaining, parsing, and
> cleaning indicate that fetching should not be limited
> in the same manner**

Finjan's second argument is that some claims include a "fetching step . . . where

the obtaining, parsing, and cleaning steps would otherwise be expected." Finjan Opening

Br at 24 (D.I. 112). Finjan never gives an explanation as to why one would "expect" the

same steps to be recited in every different independent claim. On the contrary, the fact

that the inventors chose to include a "fetching" step in some claims and three separate

steps for "obtaining, parsing, and cleaning" in other claims indicates that a "fetching"

step is not synonymous with all three "obtaining, parsing, and cleaning" steps. *Tandon*

*Corp. v U S International Trade Comm*, 831 F.2d 1017, 1023 (Fed. Cir 1987) ) ("There

is presumed to be a difference in meaning and scope when different words or phrases are

used in separate claims.")

> **3.    The General Term "Proxy" Should Not Be Limited with Other
> Aspects of a Preferred Embodiment.**

As discussed in Secure Computing's opening brief, the term "proxy" has an

ordinary meaning. The term refers to an intermediary process that, in the context of the

claims, hides the address of a document. Finjan admits that "'[p]roxy' is a general and

broad term " Finjan Opening Br at 25 (D.I 112)

> **4.    Role**

The term "role" means "membership in a group of one or more." It is a perfectly

familiar term We have roles, for example as zealous advocates and as officers of the

court The specification gives examples that a user could be in a "marketing role" and an

"engineering role." '010 Patent, JA73 at col 4 ll 19-26. Finjan, however, seeks to divorce

the term from its ordinary meaning and add two additional limitations to the claims by

yet again reading in elements discussed in the specification  Finjan's construction of role

is "an alias which provides access to a list of allowed documents " Finjan Opening Br. 26

(D.I. 112)  Finjan's definition has no correspondence to the ordinary meaning of "role"

and manufactures two limitations: (1) that a role must be an alias,[3] and (2) that a role

provides access to documents.

###### a.    Finjan again improperly adds limitations from the specification

A recurring problem with Finjan's constructions is that Finjan selects several

separate limitations and improperly packs those limitations into one term. Nothing about

the term "role," in isolation, indicates that the role must provide access to documents.

Other limitations in additional claims that describe the manner in which a role must act

may provide those limitations  For instance, claim 30 includes "limiting access to

documents as a function of the roles assigned to the user." '010 Patent claim 30. In that

example, the meaning of the term "roles" does not change, but the function that the

"roles" must perform is expressly limited. Likewise claim 33 limits that particular

claimed invention to an embodiment in which a "server path link" is replaced by "a link

to an alias " '010 Patent, JA 81 at claim 33. The term "roles" described in claim 30, on

which claim 33 depends, does not include the limitation that the roles are an alias, rather

the dependent claim expressly limits one of the claimed inventions to an embodiment that

includes an "alias" that maps to a server

---

[3] A role can be used as an alias, but the claim is not so limited  An alias here can refer to
the name or file path where a document is found.

19

  **b.** **Finjan's construction is presumptively wrong because it excludes a preferred embodiment**

Moreover, Finjan's assertion that a role is an alias should be rejected because it excludes an embodiment described in the specification. In particular, one embodiment describes an alias that maps to one server. '010 Patent, JA74 at col.6 ll.43-57. However, another embodiment of the invention indicates that more than one role can be assigned to a server, so the term "role" need not describe an address map to a server, because it would be illogical to include two different mapping aliases for the same server. '010 Patent, JA73 at col.4 ll.27-34. As the Federal Circuit has stated, a construction that excludes a preferred embodiment "is rarely, if ever, correct." *Vitronics Corp. v Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)).

  **C.** **The '194 Patent**

   **1.** **Downloadable**

The '194 Patent specification makes clear that a Downloadable is "a program or document containing an executable application program that is downloaded from one computer to another computer." Both sides agree that the term Downloadable should be defined by consulting the intrinsic evidence. Finjan Opening Br. at 7-9 (D.I. 112). Both parties also cite the same portion of the '194 Patent specification, which states "[a] Downloadable is an executable application program, which is downloaded from a source computer and run on a destination computer." '194 Patent, JA13 at col.1 ll.44-47. Inexplicably, Finjan now argues that this clear definition in the specification should not control. Finjan does not want the term "Downloadable" to be defined as including an "executable," the way Finjan expressly defined it in the public record. Finjan is attempting to use excerpts from various file histories to improperly erase the

20

specification's definition of Downloadable and replace it with the ambiguous phrase "mobile code." This is improper.

> ### a. Finjan's reliance on an ambiguous statement in the file history over an express definition in the specification is improper

First, Finjan incorrectly relies on ambiguous prosecution history rather than a clear definition in the specification. The Federal Circuit has stated that the specification should be used to construe claim terms over the prosecution history *Phillips v AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) ("[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.") Moreover, the file history may only be used to narrow the meaning of claim terms when a prosecution statement makes "a clear and unambiguous disclaimer of a claim scope." *Inverness Med. Switz. Gmbh v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1372 (Fed. Cir. 2002). No such unambiguous disclaimer exists here, nor does Finjan claim that the applicant disclaimed claim scope during prosecution.

> ### b. The prosecution history of the '822 Patent is not relevant to claim construction of the '194 Patent

Second, Finjan incorrectly asserts that the prosecution history of later-issued patents supports its position. On the contrary, the Federal Circuit has indicated that a disclaimer of claim scope made during the prosecution of a sibling patent that contains the same claim terms and the same specification may be relevant to claim construction. Here, the '822 patent prosecution is irrelevant because it contains different claim terms (i.e. Downloadable-information) and has a substantially different specification. Likewise,

21

the '780 prosecution is irrelevant because there was no clear and unambiguous disclaimer of claim scope.

      c.  **The prosecution statements in the '780 and '822 Patents support Secure Computing's construction**

    Third, if statements during the prosecution of the '780 and '822 patents were relevant, those file histories prove that Secure Computing's construction is correct. For instance, the '780 file history states in numerous places that a Downloadable includes an executable. See Rejection (mailed July 1, 2003), JA397 at 5 ("Apperson et al discloses of providing executable code (downloadable) "); id., JA400 at 8 ("It is obvious that the teachings of Apperson et al could have included HTML code and application code as forms of executable code (downloadables) since it is executable information which is transferred across the Internet."); Response to Arguments (mailed Oct. 27, 2003), JA418 at 2 ("Doyle et al recites of dynamic link libraries allow executables (downloadables) to be stored separately ") Likewise, the very same sections of the '822 file history that Finjan cites actually prove that Downloadable are not simply "mobile code " As discussed in Secure Computing's opening brief, the '822 file history makes clear that a Downloadable is broader than simply "mobile code." '822 Patent, JA53 at col.6 1.6-10 ("[S]uch information can also include more traditionally viewed 'Downloadables' or 'mobile code' (i.e. distributable components), as well as downloadable application programs or other further Downloadables.")

      2.  Addressed to a Client

    The term "addressed to a client" refers to the addresses of particular client computers that are inserted into data packages to facilitate the transfer of information

over the Internet. Finjan openly admitted this fact during prosecution of the claims based

on same specification in a European application. Specifically, Finjan admitted:

> [I]t would have been routine knowledge for the man in the art that
> the operation of the Internet and of computer networks involves the
> addressing of data, e.g. in the form of data packages, to individual
> computers and that the <u>references in the present application</u> as originally
> filed <u>to Downloadables being</u> <u>addressed to particular clients</u> necessarily
> involved such Downloadables being incorporated <u>in data or data packages</u>
> <u>addressed to particular client computers</u> . . . .

JA2064, Int'l Pub. No. WO 98/21683, Reply to Examination Report (dated Dec.

21, 2005) (emphasis added). This statement is a simple admission by Finjan that in the art

Downloadables "addressed to particular clients" means data is "addressed to particular

client computers" especially in the form of packets.

"Addressing" as supported by contemporary dictionaries means "to refer to a

device or an item of data by its address." JA2071, George McDaniel, *IBM Dictionary of

Computing* 13 (1994). The "address" of a client computer is its IP address: "the numeric

address of a machine, in the format used on the Internet." JA2076, *Barron's Dictionary

of Computer and Internet Terms* 195 (5th ed. 1996). Consequently, the limitation

"addressed to a client" means "containing the client computer's IP address."

Finjan has a problem. Most web servers do not address data to a client, but instead

address data to a firewall that protects the client. A minority of security systems,

however, use firewalls that intercept data that is, in fact, addressed to a client.

Recognizing that its claims only read on to a minority of security systems, Finjan

attempts to persuade the Court to read out any limitation provided by the phrase

"addressed to a client." Finjan's improper strategy to maximize the number of infringing

products is illustrated by its focus on "how network security <u>generally</u> works." Finjan

Opening Br. at 11 (emphasis added) (D.I. 112). It is irrelevant to claim construction how

23

security systems "usually" work. All that matters is what the claims claim. In this case, the claims claim that the information must be "addressed to a client" not "addressed to a firewall."

As described above, the critical point of Secure Computing's construction is that addressing data to a particular client requires that the data packet contain the <u>client's</u> network address and not the address of a different device, such as a firewall. Finjan's opening brief indicates that Finjan disputes a definition limited to the use of the TCP/IP protocol. Secure Computing understands that the TCP/IP protocol is the protocol used to transfer data in packets across the Internet. The contemporaneous dictionaries cited above also support that understanding. If Finjan wishes to construe the claim in order to read on to other protocols that can be used to transfer data packages over the Internet, Secure Computing is amenable to a construction that defines "addressed to a client" as "containing the client computer's <u>network</u> address."

### 3.    Server That Serves As a Gateway

The term gateway is a marketing term that has no ordinary meaning to a person of ordinary skill in the art. Gallagher Depo., JA2155 at 188:4-20. Consequently, the specification must be the Court's guide. The term "gateway," however does not appear in the '194 specification. As outlined in Secure Computing's opening brief, the only example of a gateway in the '194 Patent is in Figure 2. That figure, along with the specification, indicates that a gateway is "a computer that receives data from its external communications interface and transfers the data through its internal communications interface to the client."

Finjan agrees that the only relevant intrinsic reference that explains the word "gateway" appears in Boebert. Finjan states that the examiner's June 17, 1999 rejection

24

during the prosecution of the '194 Patent defines a gateway as a server that stands between a client and a public network. *Id* The examiner stated that the Boebert invention discloses a system in which a "secure computer (or gateway) stands between a client and a public network." *Id* This statement does not define the term "gateway," but rather it indicates that a "gateway" is capable of standing between a client and public network. The Boebert reference that the examiner cited, however, explains that the secure computer or gateway "includes a private network interface connected to the private network [and] an unsecured network interface connected to the unsecured network." 5,864,683 Patent, JA2384 at col.6 ll.34-37. Boebert's definition is nearly identical to the arrangement shown in Finjan's Fig.2 and the correct construction that a "gateway" is a computer that "receives data from its external communications interface and transfers the data through its internal communications interface to the client."

Finally, Finjan's accusation that Secure Computing is importing limitations from the preferred embodiment is unfounded, because Secure Computing has shown that the term "gateway" is ambiguous marketing jargon. Gallagher Depo., JA2155 at 188:4-20. The specification is the only guide for a technical understanding of the term. This is the appropriate and correct way to use the specification.

D.    The '780 Patent

1.    The Applicants Clearly Agreed to the Plain Meaning of "Performing a Hashing Function" on the Downloadable Together with the Fetched Software Components

Secure Computing's construction is straightforward application of plain English. In particular, "performing a hashing function on the Downloadable and the fetched software components to generate a Downloadable ID" means "performing a hashing function on both the Downloadable and the fetched software components together to

25

generate a single Downloadable ID " This construction is consistent with Finjan's clear and unmistakable definition during prosecution to overcome prior art: "Specifically, the present invention fetches software components required by the Downloadable, and performs a hashing function on the Downloadable **together with** its fetched components " '780 Application, Amendment and Response to Office Action (dated July 31, 2003) at JA2060 (emphasis added). Finjan has not acknowledged, let alone rebutted, this clear statement in the prosecution history. A definition is necessary for this phrase because Finjan, both during meet-and-confers and the opening brief, appears to disagree with the plain meaning that "a hashing function" and "a Downloadable ID" means one hashing function and one Downloadable ID.

  E.  **The '822 Patent**

    1.  **Finjan Admitted that Several Terms in the '822 Patent Are Indefinite**

  Secure Computing included eight terms from the '822 Patent in its Joint Claim Chart that it submitted to the Court prior to the opening briefs, indicating that those eight terms are indefinite.[4] Secure Computing engaged in several meet-and-confers with Finjan discussing its reasons for concluding that these terms are indefinite. Finjan's decision not to provide any definition or supply any support for these claims in its opening brief amounts to an admission that these terms are indefinite. If Finjan attempts to define these terms in its responsive brief, then it has robbed Secure Computing of the opportunity to respond to Finjan's citations to support in the patent specification. Finjan had notice of

---

[4] The terms are: "mobile code means," "content inspection engine," "packaging engine," "linking engine," "transfer engine," inspection controller," "MPC generator," and "policy generator "

Secure Computing's contentions and chose not to respond. A response at this stage is too
late.

### 2.    "Downloadable-information" is Not Synonymous with "Mobile Code."

The term Downloadable-information is a broad term that, based on the
specification, simply refers to "data downloaded from one computer to another." Based
on the claims and specification, all data that is received is analyzed to determine if the
data contains executable code. Finjan appears to be arbitrarily adding the phrase "mobile
code" to the term to make it appear like the applicants used the term "mobile code"
synonymously with Downloadable.

The quotations cited by Finjan demonstrate that "downloadable-information" is
not simply limited to a program or document that can contain "mobile code." Mobile
code is merely a subset of the information that Downloadable-information can include.
For example, one section of the specification that Finjan cites states:

> resource servers 1-N (102, 103) might provide one or more
> resources including web pages, streaming media, transaction-facilitating
> information, program updates or other downloadable information,
> summarily depicted as resources 121, 131 and 132. Such information
> can also include more traditionally viewed "Downloadables" or "mobile
> code" (i.e. distributable components), as well as downloadable
> application programs or other further Downloadables.

'822 Patent, JA53 at col 6 l.2-9. This statement illustrates that downloadable information
can include "mobile code . . or other further Downloadables." Clearly, the terms mobile
code and Downloadables are not synonymous.

### 3.    "Information-destination" is Not Limited to the Term "Client"

The term information-destination has no ordinary meaning as admitted by Finjan.
Finjan Opening Br. at 17 (D I. 112) (indicating that information-destination requires

27

construction). The specification includes an express definition for the term: "A suitable information-destination or 'user device' can further include one or more devices or processes (such as email, browser or other clients) that are capable of receiving and initiating or otherwise hosting a mobile code execution." '822 Patent, JA54 at col. 7 ll. 60-64. This definition alone proves that the term information-destination is necessarily broader than "client."

Finjan's arguments for treating the term information-destination synonymously with the word "client" are without merit. First, Finjan knew how to use the word "client" as evinced by claims in the '194 Patent and by the descriptions cited by Finjan in the '822 specification. Finjan, however, did not use the simple term "client" in its claims. Presumably, the use of the phrase "information-destination" instead of "client" was intentional.

Second, the specification rejects a construction that narrowly limits the invention to a "client-server" architecture. While Finjan correctly notes that the specification says that a client-server configuration is presumed, Finjan fails to mention that the next sentence states that "[i]t will be appreciated, however, that other configurations of interconnected elements might also be utilized (e.g. peer-peer, routers, proxy servers, networks, converters, gateways, services, network reconfiguring elements, etc.) in accordance with a particular application." '822 Patent, JA53-54 at col. 6 l. 65-col. 7 l. 2. Consequently, the broad reading of the term, as defined in the specification, must be used.

28

### 4. Information-recommunicator is Not Limited to the Term "Server"

The term information recommunicator has no ordinary meaning, but the specification indicates that a recommunicator is "an information supplier or intermediary for servicing one or more further interconnected devices or processes or interconnected levels of devices or processes " Finjan also agrees that the term has no ordinary meaning as it also asked for the term to be construed. As identified in Secure Computing's opening brief, Secure's construction is taken directly from the specification *See* '822 Patent, JA54 at col. 7 ll.49-56.

Finjan incorrectly claims that the terms recommunicator and server are used interchangeably. On the contrary, in one portion, the specification separates the two terms by an "or" indicating that the terms are not synonymous. *Id* Likewise, the patent discloses that it is not limited to a simple "client-server" architecture. Again, the broader of the two constructions should be adopted.

### 5. Evaluating the Detection Indicators Is Written In the Plural Form.

This is a very simple construction. "Detection indicators" is plural Consequently, there must be two or more detection indicators that are analyzed to determine whether executable code is detected. Finjan incorrectly argues that the "proper rules of English" indicate that only one detection indicator is evaluated. Finjan Opening Br. at 19 (D.I. 112). The claim language recites the step of "evaluating the detection-indicators " '822 Patent, JA61 at claim 1. It does not say "evaluating one or more detection indicators," a phrase Finjan elsewhere knew how to use. "Detection-indicators" is indisputably plural in

29

the claim [5] Because the evaluating step must evaluate a plurality of detection indicators, Secure Computing's construction of evaluating two or more detection indicators is correct

Finjan's further argument that the specification does not discuss producing and evaluating two or more detection indicators is demonstrably false. Contrary to Finjan's assertions, the specification expressly describes embodiments in which more than one detection indicator is produced during a single analysis. For example, the specification describes one analysis at step 1001—a file type analysis. The specification indicates that that the file type analysis may produce multiple detection indicators "by comparing one or more included file headers for file type indicators (e.g. extensions or other descriptors)." '822 Patent, JA60 at col 19 ll.46-48 (emphasis added). So, the file type analysis can produce, for example, a file type extension indicator and a file type descriptor indicator. The specification also describes a content analysis at step 1003. *Id* at col 19 ll 55-62. The content analysis produces a detection indicator if the information "does or is likely to include binary information." *Id* at col 19 ll 58-59 The content analysis step also produces a detection indicator if the analysis finds "patterns indicative of included executable code." Consequently, the content analysis is capable of producing two indicators (e g binary and pattern indicators).

Secure Computing's construction should be adopted because the language is plainly written in the plural form and the specification supports the fact that even a single analysis can produce two or more indicators

---

[5] JA2353, Bryan A. Garner, *Garner's Modern American Usage*, 615 (2003) ("Most nouns form their plurals simply by adding -s.")

6.    Level of Downloadable-information Characteristic and Executable Code Characteristic Correspondence

Based on Finjan's opening brief, Secure Computing does not have a meaningful disagreement with Finjan over this term. Secure Computing is willing to accept Finjan's proposal that the phrase means a level of correspondence between a Downloadable-information characteristic and executable code characteristic that meets a sufficient threshold. See Finjan Opening Br. at 21 (D.I. 112).

## CONCLUSION

For the reasons given herein, Secure Computing respectfully request that the Court adopt Secure Computing's constructions.

Kelly E. Farnan

Fredrick L. Cottrell, III (#2555)
cottrell@rlf.com
Kelly E. Farnan (#4395)
farnan@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

OF COUNSEL:

Ronald J. Schutz
Jake M. Holdreith
Christopher A. Seidl
Trevor J. Foster
ROBINS, KAPLAN, MILLER &
CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500

*ATTORNEYS FOR DEFENDANTS*

Dated: September 28, 2007

31

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 11, 2007, I electronically filed the foregoing document with the Clerk of Court using CM/ECF and caused the same to be served on the plaintiff at the address and in the manner indicated below:

### BY HAND DELIVERY

Philip A. Rovner, Esquire
Potter, Anderson & Corroon
Hercules Plaza - 6th Floor
Wilmington, DE 19899

### BY FEDERAL EXPRESS

Paul J. Andre
Perkins Coie LLP
101 Jefferson Drive
Menlo Park, CA 94025-1114


*Kelly E. Farnan*

Kelly E. Farnan (#4395)