IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FINJAN SOFTWARE, LTD., an Israel corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 06-369-GMS |
| v. | ) ) ) | |
| SECURE COMPUTING CORPORATION, a Delaware corporation; CYBERGUARD CORPORATION, a Delaware corporation, WEBWASHER AG, a German corporation and DOES 1 THROUGH 100, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF FINJAN SOFTWARE, LTD.'S OPPOSITION TO DEFENDANTS' EXPEDITED MOTION FOR STAY OF ENFORCEMENT OF JUDGMENT**

Plaintiff Finjan Software, Ltd. ("Finjan") hereby requests that the Court deny Defendants-counterclaimants Secure Computing Corporation's, Cyberguard Corporation's, and Webwasher AG's ("Defendants") Expedited Motion for Stay of Enforcement of Judgment ("Motion"). As set forth below, there is no compelling reason to permit Defendants to deviate from the ordinary course of the post trial process by not posting an appropriate security for a stay of the execution of the judgment entered in this case.

**ARGUMENT**

On March 28, 2008, this Court entered judgment in favor of Finjan Software, Ltd. and against Defendants for monetary damages totaling $9,180,000 ("Judgment"). [D.I. 242] Plaintiff and Defendants filed post-trial motions, and Defendants now seek a stay of the execution of the Judgment pending the disposition of those motions. [See Motion at ¶ 4] Pursuant to Fed. R. Civ. P. 62(b), this Court "may stay the execution of a judgment" pending the

disposition of post-trial motions only upon "appropriate terms for [Finjan's] security." Fed. R. Civ. P. 65(b).

Defendants' assertion that judicial economy will be served by an unsecured stay is unfounded. [Motion at ¶ 5] While there is always a possibility that post-trial motions will alter the amount of the Judgment, considering the sweeping verdict in favor of Plaintiff in this matter, it is unlikely that the amount of the Judgment will be altered in Defendants' favor. Little or no amount of judicial resources would be expended by forcing Defendants to pay or secure the Judgment amount at this time. By contrast, should an unsecured stay be granted, considerable judicial resources will be consumed if Finjan is forced to initiate enforcement proceedings to obtain the Judgment amount in the future.

Defendants' request for a stay is particularly weak because Defendants do not propose to provide for the security of the Judgment amount. This Court disfavors ordering a stay of enforcement of a monetary judgment where the offending party has not provided for the security of the judgment holder. In *Callaway Golf Co. v. Slazenger*, the adjudicated infringing party in a patent infringement action sought a stay of the enforcement of a monetary judgment by arguing that it was likely to succeed on post-trial motions. *Callaway Golf Co. v. Slazenger*, C.A. No. 01-669-KAJ, 2005 WL 3656937, at *1 (D. Del. Feb. 25, 2005). This Court refused to issue an unsecured stay and stated that the adjudicated infringer "was no different from any other litigant who believes it will prevail on post trial motions" and ordered that if the adjudicated infringer wished to stay enforcement "pending post trial motions, it must proceed in the ordinary course and post an appropriate bond." *Id.* The Court in the *Callaway* matter ruled that the adjudicated infringer must post a bond in the full amount of the judgment in order to secure a stay. *Id.* Likewise, in *Philips Electronics v. Contec*, this Court ordered the adjudicated infringer to "post a

bond in the amount of the judgment" in order to obtain a stay of enforcement of the judgment for

monetary damages. *Phillips Elecs. N. Am. v. Contec Corp.*, C.A. No. 02-123-KAJ, 2004 WL

1622442, at *3 (D. Del. July 12, 2004).

Equally troubling is Defendants' assertion that "[t]here is not risk to Finjan with a stay in

place and no security should be required for a stay."  Notwithstanding its assertions of financial

stability, Secure's own statements in its Form 10-K for 2007 filed with the Securities and

Exchange Commission reveal that Secure is deeply in debt.  [See Declaration of Jill Putman in

Support of Defendants-Counterclaimants' Expedited Motion for Stay of Enforcement of

Judgment and Request for Expedited Relief at Ex. 1, D.I. 248-2]  Further, Secure's assertions of

future financial stability, cashflow and success is dependent on the nonoccurrence or occurrence

of events outside the control of Secure. [Id.] Secure identifies the following risks to continued

cashflow, financial stability and solvency in its Form 10-K for 2007:

(a)    Secure has experienced operating losses in the past and may experience operating
       losses in the future. [Id. at 17]  Specifically, in 2007 Secure incurred operating
       losses of $7.9 million, $6.6 million, $4.9 million, and $3.6 million in the quarters
       ended March 31, 2007, June 30, 2007, September 30, 2007, and December 31,
       2007, respectively. [Id.]  Worldwide net operating loss carryforwards totaled
       approximately $357.1 million on December 31, 2007, comprised of $344.1
       million domestic net operating loss carryforwards and $13.0 million of
       international net operating loss carryforwards. [Id. at 33]

(b)    Secure acknowledged that if it is unable to attain operating profits in the future, its
       stock price may decline. [Id. at 17]

(c)    Secure incurred net losses of $35.1 million and $27.4 million in 2007 and 2006,
       respectively.  Secure expects to generate net losses going forward. [Id. at 30]

(d)    While Secure was cash flow positive in 2007, Secure has experienced negative
       cash flow in the past and may experience negative cash flow in the future. [Id. at
       17]

(e)    Secure acknowledges that if at a time when it experiences negative cash flow, as
       it has in the past, sources of financing are not available, Secure would be in a
       position where it may not have sufficient cash to satisfy working capital
       requirements. [Id.] Secure acknowledges that its failure to obtain financing at

that time could result in insolvency. [Id.]

(f)    Secure acknowledges that if it fails to meet the borrowing requirements under its credit agreement, it may be unable to obtain necessary short-term financing and that if it defaults on a secured loan, Secure's material assets could be subject to forfeiture. [Id.] Secure is currently party to a senior secured credit facility providing a $90.0 million term loan facility, a $20.0 million revolving credit facility and a swingline loan sub-facility. [Id.] As of December 31, 2007, Secure had $44.0 million of outstanding indebtedness. [Id.] Of this indebtedness, approximately $24.0 million bears interest at rates that fluctuate with changes in certain prevailing interest rates. [Id.] The credit agreement, including the $20 million revolving credit facility, is subject to certain restrictions including limitations on additional indebtedness, restricted payments, the incurrence of liens, transactions with affiliates and sales of assets. [Id.] In the future, should Secure exhaust the credit lines addressed in this paragraph, Secure would be unable to take on additional indebtedness in order to satisfy the Judgment. [Id.]

(g)    Secure has stated that it intends to use the $20 million credit facility for general working capital and ongoing corporate purposes as deemed necessary. [Id. at 38]

(h)    The credit agreement discussed in the preceding paragraphs requires Secure to comply with certain financial covenants, including maintaining leverage and interest coverage ratios and capital expenditure limitations. [Id. at 17] Secure acknowledges that it cannot be certain that it will be able to comply with such financial covenants when a loan is needed or continue to comply with such covenants when a loan is outstanding. [Id.] Should Secure fail to satisfy these covenants or find itself unable to meet the conditions for borrowing under its credit agreement when funds are required, Secure could be prevented from meeting payment obligations, which could have a material adverse effect on Secure's business, financial, conditional and operating results. [Id.]

(i)    Secure's obligations under the credit agreement discussed in the preceding paragraphs are secured by substantially all of its material assets, including real and personal property, inventory, accounts, intellectual property and other intangibles. [Id.] Should Secure default under the credit agreement for any reason, Secure's lenders could take possession of any and all of its assets, including intellectual property, and dispose of those assets to the extent necessary to pay off Secure's debts. [Id.] Under such circumstances, Secure would be unable to satisfy the Judgment.

(j)    Secure faces intense competition in the market for enterprise gateway security products. [Id. at 19] Secure acknowledges that competition in this market is likely to persist and to intensify as a result of increasing demand for security products and that as a result, it may be difficult for Secure to significantly increase its market share or its market share may actually decline. [Id.]

(k)    Because it operates in a highly competitive market, if a Secure competitor can

4

offer Secure's customers a better solution or if Secure is unable to rapidly offer a competitive product, Secure may lose customers. [Id.] Many of Secure's competitors and potential competitors have significantly greater financial, marketing, technical and other competitive resources than Secure and such competitors' ability to offer new solutions rapidly and at relatively low costs could lead to increased price pressure, reduced margins, and a loss of Secure market share. [Id.] Further, competitors with substantially more resources than Secure are capable of operating at significant losses for extended periods of time, enabling them to sell their products and services at a lower price than Secure. [Id. at 20] If Secure is unable to maintain competitive pricing, the demand for Secure's products, as well as its market share, will decline, having an adverse effect on its business. [Id.] In responding to such competitive pressures, should Secure lower the price of its products and services, if Secure is unable to reduce its component costs or improve operating efficiencies, Secure's margins will be adversely effected. [Id.]

(l)     Secure faces considerable uncertainty in the market place because future potential competitors could include developers of operating systems or hardware suppliers not currently offering competitive enterprise gateway security products, including Microsoft, Sun Microsystems, Inc., IBM, Computer Associates, and Hewlett Packard. [Id. at 19]    Should any of those potential competitors begin to offer enterprise-wide security systems as a component of its hardware, demand for Secure's solutions would decrease as these solutions dominate the market. [Id.] Further, consolidation among competitors may erode Secure's market share because such cooperative relationships increase the ability of Secure's competitors to address the needs of Secure's prospective customers and rapidly acquire significant market share. [Id.]

(m)     If Secure loses a significant customer, it will realize smaller profits. [Id. at 22] Secure derives a significant portion of its revenues from a limited number of customers. [Id.] Secure's top five customers made up 10% of Secure's total sales in 2007. [Id.] Should Secure lose any of these customers or if its revenues from any of these customers are reduced Secure will incur smaller gross profits. [Id.]

(n)     Technology in the enterprise gateway security market is changing rapidly, and if Secure fails to develop new products that are well accepted, Secure's market share will decline. [Id. at 20] According to Secure, the rate of new enterprise gateway security product introductions is substantial and security products have relatively short product life cycles. [Id.] To compete successfully, Secure must enhance its existing products and develop and introduce new products in a timely manner. [Id.] Secure's net sales and operating results will be materially effected if it fails to introduce new products on a timely basis. [Id.]

(o)     Denial of Secure's pending patent applications or invalidation or circumvention of Secure's issued patents may weaken Secure's ability to compete in the enterprise gateway security market. [Id.] Secure cannot be certain that any pending or future patent applications will be granted. [Id.] Further, there is also the risk that

a current or future Secure patent, regardless of whether Secure is an owner or a licensee of such patent, may be challenged, invalidated or circumvented. [Id.]

(p)    Secure's product lines are not diversified beyond providing enterprise gateway security solutions, and any drop in the demand for enterprise gateway security products would materially harm Secure's business. [Id. at 21] Substantially all of Secure's revenue come from sales of enterprise gateway security products and related services. [Id.] If for any reason Secure's sales of these products and services are impeded, Secure's net sales and operating results will be significantly reduced. [Id.]

(q)    Secure's stock price is highly volatile, which may impair Secure's ability to raise money, if necessary to satisfy the Finjan judgment. [Id.] The price of Secure's common stock, like that of many technology companies, has fluctuated widely. [Id.] Such fluctuation in Secure's stock price may cause Secure investors to lose money and impair its ability to raise additional capital, if necessary. [Id.]

(r)    Secure's products may fail to adequately perform. [Id. at 22] Software products such as those sold by Secure often contain undetected errors or bugs when first introduced or as new versions are released, and software products or media may contain undetected viruses. [Id.] Such errors, bugs, or viruses in Secure's products may result in loss of or delay in market acceptance, recalls of hardware products incorporating the software, or loss of data. [Id.] Secure's net sales and operating results would be substantially reduced should Secure experience delays or difficulties with new product introductions or product enhancements. [Id.]

(s)    Secure could potentially face substantial liability should its products fail to adequately perform. [Id. at 21] If Secure's products fail to function properly or are not properly designed, not only will Secure's reputation be harmed, but customers will likely make product liability and warranty claims against Secure. [Id.] Secure's customers, including major financial institutions, defense-related government agencies protecting national security information, and other large organizations, rely on Secure's products to prevent unauthorized access to their networks and data transmissions and to protect confidential business information with commercial value far in excess of Secure's net worth. [Id.] Therefore, should Secure's products malfunction or not be found to be properly designed, Secure would face warranty and other legal claims exceeding its ability to pay. [Id.]

(t)    Secure is involved in other litigation which may result in Secure being required to satisfy substantial judgments. [Id. at 25] On January 19, 2007, Rosenbaum Capital, LLC. filed a putative securities class action complaint in the United States District Court for the Northern District of California against Secure and certain directors and officers of the company. [Id.; *Rosenbaum Capital, LLC v. McNulty et al,* Case No. 3:07-cv-00392-SC (Filed Jan. 19, 2007, N.D. Cal.)] The alleged plaintiff class includes persons who acquired Secure's stock between May 4, 2006 through July 11, 2006. [Id.] The complaint alleges generally that

defendants made false and misleading statements about Secure's business condition and prospects for the fiscal quarter ended June 30, 2006, in violation of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. [Id.] Secure's Motion to Dismiss was denied on March 4, 2008. [*Rosenbaum*, D.I. 38] In another action, on September 21, 2007, Diane Josifovich filed a complaint against Secure Computing in the Superior Court of New Jersey, Somerset County. [Putman Decl., Ex. 1 at 25] The complaint alleges that Secure breached its contract with Ms. Josifovich with respect to payment for commission sales. [Id.] Related to this allegation, the complaint also alleges claims of promissory estoppel, equitable estoppel, misrepresentation, and breach of the covenant of good faith and fair dealing. [Id.] The complaint also alleges that Secure Computing retaliated against Ms. Josifovich and created a hostile work environment on the basis of Ms. Josifovich's gender. [Id.] The complaint seeks unspecified monetary damages. [Id.] In February 2008, the plaintiff amended her complaint to add a claim that she was allegedly retaliated against by being placed on a performance improvement plan and terminated. [Id.] This matter is pending.

(u)     Following costly acquisitions in the 2005/2006 timeframe, Secure's gross profit margin substantially decreased while several categories of operating expenses substantially increased. Such acquisition activities greatly weakened the financial performance of Secure. [Id. at 29-37] Secure's gross profit as a percentage of revenue decreased from 80% in 2005 to 72% in 2006. [Id. at 34] Gross profit for Secure's *products* decreased to 68% in 2006 compared to 79% in 2005. [Id.] This decline was driven in part by the amortization of the developed technologies acquired in the CyberGuard and CipherTrust acquisitions. [Id.] As a percentage of revenue, total operating expenses were 82% for 2006 compared to 61% in 2005. [Id. at 35] This increase was primarily driven by the inclusion of costs not incurred in 2005, such as: share-based compensation of $9.6 million, amortization of purchased intangibles of $10.6 million, litigation settlement expense of $2.5 million, and costs for severance due to acquisition related restructurings, duplicate and integration costs, facility move costs and the write-off of an asset that was deemed to be fully impaired as a result of Secure's acquisition of CipherTrust of $2.6 million. [Id.] In addition, the acquired and assumed CyberGuard and CipherTrust expenses were higher as a percentage of revenue than Secure's 2005 stand-alone expense rates. [Id.] As a percentage of revenue, selling and marketing expenses were 48% in 2006 compared to 39% in 2005. [Id.] This increase was driven by costs for Secure's acquisitions, share-based compensation costs, and in addition, the acquired and assumed CyberGuard and CipherTrust expenses were higher as a percentage of revenue than Secure's 2005 stand-alone expense rates. [Id.] As a percentage of revenue, research and development expenses were 19% for the year compared to 15% in 2005. [Id.] This increase was driven by share-based compensation costs and in addition, the acquired and assumed CyberGuard and CipherTrust expense rates were higher as a percentage of revenue than Secure's 2005 stand-alone expenses. [Id.] As a percentage of revenue, general and administrative expenses were 8% in 2006 compared to 7% in 2005. [Id.] Secure stated that this increase was primarily due to duplicate costs incurred for the transitional employees due to the acquisitions. [Id.]

## **CONCLUSION**

Given this level of uncertainty, Finjan respectfully requests that the Court either (a) deny in its entirety Defendants' request for an order staying any enforcement of the Judgment, and any proceedings to enforce it, by execution or otherwise, pending disposition of all of the parties' post trial motions and, if necessary, appeal in the above-entitled matter; or (b) agree to issue a stay order only upon Defendants' provision of security for the full Judgment amount in the form of any of the following:  (i) full payment of the Judgment amount to Finjan; (ii) Secure's deposit of the full Judgment amount in a Court-approved interest bearing escrow account; or (iii) Secure's purchase of a bond securing the full Judgment amount.


OF COUNSEL:

Paul J. André
Lisa Kobialka
King & Spalding LLP
1000 Bridge Parkway
Redwood City, CA 94065
(650) 590-0700

Dated: April 10, 2008
859704

POTTER ANDERSON & CORROON LLP


By: _____
        Philip A. Rovner (#3215)
        Hercules Plaza
        P. O. Box 951
        Wilmington, DE  19899
        (302) 984-6000
        provner@potteranderson.com

*Attorneys for Plaintiff*
*Finjan Software, Ltd.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on April 10, 2008, the within document

was filed with the Clerk of the Court using CM/ECF which will send notification of such

filing(s) to the following; that the document was served on the following counsel as

indicated; and that the document is available for viewing and downloading from

CM/ECF.

### BY HAND DELIVERY AND E-MAIL

Frederick L. Cottrell, III, Esq.
Kelly E. Farnan, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
cottrell@rlf.com; farnan@rlf.com

I hereby certify that on April 10, 2008 I have sent by E-mail the foregoing

document to the following non-registered participants:

Jake M. Holdreith, Esq.
Christopher A. Seidl, Esq.
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
jmholdreith@rkmc.com ; caseidl@rkmc.com

Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
E-mail: provner@potteranderson.com