## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

FINJAN SOFTWARE, LTD., an Israel corporation,

          Plaintiff,

          v.

SECURE COMPUTING CORPORATION, a Delaware corporation, CYBERGUARD, CORPORATION, a Delaware corporation, WEBWASHER AG, a German corporation and DOES 1 THROUGH 100,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 06-369 GMS

**PUBLIC VERSION**

---

### PLAINTIFF FINJAN SOFTWARE LTD.'S
### OPENING BRIEF IN SUPPORT OF ITS POST-TRIAL MOTION FOR ENTRY
### OF PERMANENT INJUNCTION PURSUANT TO 35 U.S.C. § 283

OF COUNSEL:

Paul J. Andre
Lisa Kobialka
KING & SPALDING LLP
1000 Bridge Parkway
Suite 100
Redwood Shores, CA 94065
(650) 590-0700

Dated:  April 25, 2008
Public Version: May 2, 2008

Philip A. Rovner (#3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE  19899
(302) 984-6000
provner@potteranderson.com

Attorneys for Plaintiff
Finjan Software, Ltd.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   NATURE AND STAGE OF PROCEEDINGS ....................................................1

III.  SUMMARY OF ARGUMENT ............................................................................2

IV.   STATEMENT OF FACTS ...................................................................................3

V.    ARGUMENT.........................................................................................................5

    A.   AN INJUNCTION IS APPROPRIATE IN LIGHT OF THE FACTS OF
        THIS CASE. ...................................................................................................5

    B.   THE TRADITIONAL FOUR-FACTOR ANALYSIS SUPPORTS
        ISSUANCE OF A PERMANENT INJUNCTION IN THIS CASE. .....................7

        1.   Finjan Has Been Irreparably Harmed by Defendants' Infringement,
            and, Without an Injunction, Will Continue to Suffer Irreparable
            Harm. ...................................................................................................8

            a.   Finjan and Defendants Are and Have Always Been Head-
                to-head Competitors.......................................................................9

            b.   Defendants' Sales of the Infringing Webwasher Products
                Deprived Finjan of Market Share and Intangible Benefits. ...........11

            c.   Finjan Suffered Irreparable Harm Because it Lost Valuable
                Access to Potential Customers for Finjan Products.......................14

            d.   Finjan Suffered Irreparable Harm Because It Lost its Right
                to Exclude Licensees...................................................................15

            e.   Defendants' Post-Trial Conduct Has Caused Further
                Irreparable Harm to Finjan............................................................16

        2.   Monetary Relief is Inadequate to Compensate Finjan. ..............................16

        3.   The Balance Of Hardships Favors the Granting of an Injunction in
            this Case. ...............................................................................................19

        4.   The Public Interest is Best Served by Granting an Injunction...................22

VI.   CONCLUSION.....................................................................................................23

## TABLE OF AUTHORITIES
### CASES

*3M Innovative Properties Co. v. Avery Dennison Corp.,*
2006 WL 2735499 (D. Minn. Sept. 25, 2006) ............................................................................7

*z4 Techs., Inc. v. Microsoft Corp.,*
434 F. Supp. 2d 437 (E.D. Tex. 2006) ...................................................................................13

*800 Adept, Inc. v. Murex Securities, Ltd.,*
505 F. Supp. 2d 1327 (M.D. Fla. 2007) ....................................................................7, 13, 16

*Baden Sports, Inc. v. Kabushiki Kaisha Molten,*
2007 WL 2790777 (W.D. Wash. Sept. 25, 2007) ....................................................................7

*Black & Decker Inc. v. Robert Bosch Tool Corp.,*
2006 WL 3446144 (N.D. Ill. Nov. 29, 2006) .....................................................................7, 12

*Commonwealth Scientific & Industrial Research Org. v. Buffalo Tech. Inc.,*
492 F. Supp. 2d 600 (E.D. Tex. 2007) ........................................................................7, 8, 15, 20

*eBay, Inc. v. MercExchange, LLC.,*
547 U.S. 388 (2006) ..................................................................................................1, 6, 21

*Fisher-Price, Inc. v. Safety 1st, Inc.*
279 F. Supp. 2d 526 (D. Del. 2003) .....................................................................................22

*Fresenius Medical Care Holdings, Inc. v. Baxter Int'l, Inc.,*
No. C 03-1431 SBA, 2008 WL 928496 (N.D. Cal Apr. 4, 2008) ............................................9

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.,*
397 F. Supp. 2d 537 (D. Del. 2005) .....................................................................................18

*Johns Hopkins Univ. v. Datascope Corp.,*
2007 WL 2682001 (D. Md. Aug. 9, 2007) ..............................................................................7

*Martek Biosciences Corp. v. Nutrinova Inc.,*
520 F. Supp. 2d 537 (D. Del. 2007) ...........................................................................6, 8, 19, 22

*MGM Well Services, Inc. v. Mega Lift Systems, LLC,*
2007 WL 1231682 (S.D. Tex. Apr. 25, 2007) .......................................................................20

*MPT, Inc. v. Marathon Labels, Inc.,*
2007 WL 184747 (N.D. Ohio Jan. 19, 2007) ..........................................................................7

*Muniauction, Inc. v. Thomson Corp.,*
2007 WL 2225847 (W.D. Pa. July 31, 2007) ............................................................6, 13, 17

*Novozymes A/S v. Genencor Int'l Inc.,*
    474 F. Supp. 2d 592 (D. Del. 2007)...........................................................................6, 8, 17, 19

*Odetics, Inc. v. Storage Tech. Corp.,*
    14 F. Supp. 2d 785 (E.D. Va. 1998) ...............................................................................15, 19

*Ortho-McNeil Pharm., Inc. v. Mylan Labs. Inc.,*
    2007 WL 869545 (D.N.J. Mar. 20, 2007)................................................................................6

*Power-One, Inc. v. Artesyn Tech., Inc.,*
    No. 2:05-CV-463, 2008 WL 1746634 (E.D. Tex. Apr. 11, 2008)...........................................21

*Sanofi-Synthelabo v. Apotex, Inc.,*
    470 F.3d 1368 (Fed. Cir. 2006)...................................................................................7, 22

*Smith & Nephew, Inc. v. Synthes,*
    466 F. Supp. 2d 978 (W.D. Tenn. 2006).................................................................16, 18, 20

*Sundance, Inc., v. Demonte Fabricating Ltd.,*
    2007 WL 3053662 (E.D. Mich. Oct. 19, 2007) ........................................................................7

*Telequip Corp. v. The Change Exchange,*
    2006 WL 2385425 (N.D.N.Y. Aug. 15, 2006) ...................................................................7, 18

*Tivo Inc. v. Echostar Communications Corp.,*
    446 F. Supp. 2d 664 (E.D. Tex. 2006).....................................................................7, 8, 13

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
    503 F.3d 1295 (Fed. Cir. 2007)................................................................................................6

*Windsurfing Int'l Inc. v. AMF, Inc.,*
    828 F.2d 755 (Fed. Cir. 1985), *cert. denied,* 477 U.S. 05 (1986)...........................................20

## STATUTES

35 U.S.C. § 283................................................................................................................2, 5, 6

## I.   INTRODUCTION

Defendants Secure Computing Corporation ("Secure Computing"), Cyberguard

Corporation ("Cyberguard") and Webwasher AG ("Webwasher") (collectively "Defendants")

directly compete with Finjan Software, Ltd. ("Finjan") through the sale of their infringing

Webwasher software products, Webwasher appliance products, and the Cyberguard TSP

appliance products (the "Webwasher Products").  Despite a jury finding of willful infringement

of three different Finjan patents, Defendants have decided to brazenly continue to sell and

market to this day the Webwasher Products which are in direct competition with Finjan.  There is

no reasonable dispute that Finjan is suffering tremendous harm from Defendants' continued

infringement which is direct, immediate and not wholly compensable by any money damages.

Finjan, a small company, should not be forced to compete against companies like Secure

Computing, a large publicly-traded company, that has unapologetically stolen its technology and

used it to try and "kill" Finjan in the marketplace.

While the Supreme Court's decision in *eBay v. MercExchange* may have changed the

landscape for courts examining injunction requests in patent infringement cases involving non-

competitors, the matter now before this Court is the prototypical case involving direct

competitors in which the *eBay* concurrences acknowledge a permanent injunction remains the

appropriate remedy, and courts following *eBay* have continued to routinely enter permanent

injunctions.  *See eBay, Inc. v. MercExchange, LLC.*, 547 U.S. 388 (2006).

## II.   NATURE AND STAGE OF PROCEEDINGS

In June 2006, Finjan filed the present patent infringement action against Defendants

asserting that the Webwasher Products infringed Finjan's Patents-In-Suit, U.S. Patents Nos.

6,092,194 ("the '194 Patent"), 6,804,780 ("the '780 Patent"), and 7,058,822 ("the '822 Patent")

(collectively the "Finjan Patents"). *See* Complaint [D.I. 1]; *see also* Declaration of Lisa

Kobialka in Support of Finjan's Opening Brief in Support of its Motion for Entry of Permanent

Injunction Pursuant to 35 U.S.C. § 283 ("Kobialka Decl."), Exs. 1-3 (JTX-1, JTX-2, JTX-3). On

March 12, 2008, following a trial on the merits, a jury returned a unanimous verdict in favor of

Finjan. *See* Verdict Form [D.I. 226]. The jury found that the Webwasher Products infringed all

45 of the asserted claims, which the jury also found to be valid. [*Id.*] The jury also found that

Defendants' infringement was willful. [*Id.*] Finjan was awarded the following damages: (a) a

royalty of 16% on $49,000,000 in sales revenue of the Webwasher software products, (b) a

royalty of 8% on $3,250,000 in sales of the Webwasher appliance products and (c) a royalty of

8% on $13,500,000 in sales for the Cyberguard TSP appliance products. [*Id.*] On March 28,

2008, this Court entered a Judgment consistent with the jury's verdict. *See* Judgment [D.I. 242].

### III.   SUMMARY OF ARGUMENT

Finjan respectfully requests this Court issue a permanent injunction against Defendants[1]

enjoining them from making, using, selling, offering to sell, or importing the Webwasher

Products or any product that is not colorably different. The basis for this motion, as discussed in

greater detail below, is as follows:

1)    Defendants' past infringement has caused Finjan irreparable harm by causing

Finjan to lose market share, potential customers, and its positive reputation in the marketplace.

2)    There is no adequate legal remedy to compensate Finjan for Defendants'

continued willful infringement, particularly given the irreparable harm Finjan has suffered and

will continue to suffer if Defendants are not enjoined.

---

[1] Cyberguard acquired Webwasher and Secure Computing subsequently acquired Cyberguard.
[Kobialka Decl., Ex. 4, Trial Transcript ("T.T.") at 699-700].

3) The balance of hardships weighs in favor of granting an injunction because, without an injunction, Finjan would experience continued loss of market share and intangible benefits after expending considerable time and money in developing its patented technologies while Defendants, even with an injunction, will have the ability to continue to sell other products and develop other products that do not infringe Finjan's patents.

4) The public interest is served by issuing an injunction against Defendants by giving Finjan the right to exclude others from infringing upon its valid patent rights and upholding the fundamental purpose of awarding inventors a limited monopoly over innovative technology.

## IV.  STATEMENT OF FACTS

Finjan is a pioneer in the field of computer network security.  Founded in 1996 to commercialize its revolutionary technology, Finjan was issued a number of pioneering patents in the field of behavior based network security.  [*Id.*, Exs. 1-3 (JTX-1, JTX-2, JTX-3); Ex. 4, T.T. at 207:11-25, 288:25-289:8; Ex. 5, Deposition Transcript of Touboul ("Touboul Depo.") at 66:2-67:21.]  The '194 Patent, the first asserted patent issued to Finjan, introduced behavior-based network security technology into the market at a time when traditional signature based scanning technology was widely used to detect viruses that attack computer networks.  [*Id.*, Ex. 4, T.T. at 183:23-184:8; 186:2-187:11].  Rather than examining a file to determine whether it includes a known virus signature, the invention of the '194 Patent detects a network virus by examining the file's behavior.  [*Id.*, Ex. 1, JTX-1; Ex. 4, T.T. at 214:5-215:19, 289:16-21, 329:17-330.]  With Finjan's patented technology, a computer network is protected against both known and unknown viruses that perform malicious operations.  [*Id.*].  Finjan's '780 and '822 Patents further built on

3

the innovative technology of the '194 Patent. *[Id.,* Ex. 2, JTX-2; Ex. 4, T.T. at 330:22-331:5,
415:20-417:19; Ex. 3, JTX-3; Ex. 4, T.T. at 331:5-333:3, 436:2-437:5, 286 :2-287:19].

Finjan commercialized the Finjan Patents in several product lines and marked its products
with the patent numbers of the Finjan Patents. *[Id.,* Ex. 4, T.T. at 218:17-221:7]. Currently,
Finjan incorporates its patented technology in its Vital Security™ line of products. *[Id.,* at
216:1-10]. It has received a number of awards for its Vital Security™ products, including
influential magazine awards. *[Id.,* at 216:11-16].

Finjan's patented technology was well-received in the marketplace. *[Id.,* at 289:22-
290:9]. In the 2003 timeframe, market analyst companies such as IDC and Gartner recognized
that behavior-based technologies would be increasingly implemented to provide protection
where traditional signature-based technologies were ineffective. *[Id.,* Ex. 6, PTX-23 at
SC072856]. As behavior-based technology gained increasing popularity in the marketplace,
however, Finjan struggled to compete with large corporations such as Defendants who utilized
Finjan's patented technology in their own security products. *[See e.g.,* Kobialka Decl., Ex. 4,
T.T. at 221:20-222:7].

At trial, the overwhelming evidence demonstrated that Defendants directly competed
with Finjan after stealing its proprietary technology and that Defendants sought to push Finjan
out of the market altogether. After carefully examining Finjan's patents and technology, one
software developer at Webwasher, Martin Stecher, developed the infringing product in just a few
months to compete with Finjan. *[Id.,* Ex. 7, PTX-21 at SC077723; Ex. 4, T.T. at 306:1-16,
580:5-581:5; Ex. 8, PTX-31 at SC077630]. Mr. Stecher testified that Webwasher spent
approximately $100,000 to $150,000 in total development expenses for the infringing product.
*[Id.,* Ex. 4, T.T. at 1232:4-8]. The infringing Webwasher product was nicknamed the "Finjan

Killer" in Defendants' internal emails. [*Id.*, Ex. 9, PTX-16; Ex. 10, DTX-1056]. Dr. Giovanni
Vigna, Finjan's infringement expert, showed the jury during trial at least two instances where the
Webwasher Product was referred to as "Finjan Buster" in the infringing Webwasher source code.
[*Id.*, Ex. 4, T.T. at 456:18-458:12]. Furthermore, as noted by Defendants' damages expert, at the
time Defendants incorporated the Finjan patented technology into the Webwasher Products, "the
industry was moving toward proactive scanning. It was part of the frontier and something that
Secure [Computing] wanted...something that Finjan had." [*Id.*, at 1210:1-25].

As described in greater detail below, Defendants have been successful in capturing
market share in the network security market as a result of its infringement. Furthermore,
Defendants enjoyed special access to customers in the market place that have enabled them to
make sales of other products and gaining them a substantial foothold in the marketplace. [*Id.*,
Ex. 4, T.T. at 607:6-20, 602:2-609:21]. As a result, Defendants is one of Finjan's largest
competitors in the market place. [*Id.*, at 221:8-9].

Defendants' actions since the jury verdict speak volumes about Defendants' intentions to
continue with their infringing activities. Aside from re-branding the infringing technology as
"Secure Web," Defendants continue to market the infringing products and have made statements
that "its WebWasher products will continue to be available." [*Id.*, Ex. 11, March 13, 2008,
Trading Markets press release; Ex. 12, April 25, 2008, Secure Computing website printout].
Additional relevant facts are set forth below in the Argument.

## V.   ARGUMENT

### A.   AN INJUNCTION IS APPROPRIATE IN LIGHT OF THE FACTS OF THIS CASE.

Section 283 of the Patent Act authorizes district courts, upon a finding of infringement, to
impose a permanent injunction "in accordance with the principles of equity." 35 U.S.C. § 283.

The Supreme Court recently confirmed the standard for the entry of permanent injunctions in patent cases in *eBay, Inc. v. MercExchange, LLC.*, 547 U.S. 388 (2006). Referring to the express language of the Patent Act, 35 U.S.C. § 283, the *eBay* Court held that "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards. [*Id*]. The Supreme Court went on to affirm that these "principles of equity" require the courts to evaluate the following factors in making its decision: (1) whether the plaintiff has suffered an irreparable injury; (2) whether monetary damages are inadequate to compensate for that injury; (3) whether the balance of hardships between the parties warrants equitable relief; and (4) whether the public interest would not be disserved by a permanent injunction. *Id.*, *eBay, Inc.* 547 U.S. at 1837; *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310-11 (Fed. Cir. 2007) (relying on *eBay* in affirming district court's grant of permanent injection).

This Court, in *Novozymes A/S v. Genecor Int'l, Inc.*, observed that the Supreme Court in *eBay* "did not state that the loss of the right to exclude could not be irreparable harm." 474 F. Supp. 2d 592, 612-13 (D. Del. 2007). This Court stated that "the statutory right to exclude represents a benefit that, under these circumstances, cannot be equated by an award of cash. These are head-to-head competitors, and Novozymes has a right, granted by Congress, not to assist its rival with the use of proprietary technology." [*Id*]. In fact, consistent with *eBay*, numerous district courts have entered permanent injunctions against adjudicated patent infringers.[2] The vast majority of cases identified by Finjan involved a situation like that here:

_____

[2] *See e.g., Novozymes A/S v. Genencor Int'l Inc.*, 474 F. Supp. 2d 592 (D. Del. 2007); *Martek Biosciences Corp. v. Nutrinova Inc.*, 520 F.Supp.2d 537 (D. Del. 2007); *Muniauction, Inc. v. Thomson Corp.*, 2007 WL 2225847 (W.D. Pa. July 31, 2007); *Ortho-McNeil Pharm., Inc. v.*

the parties were head-to-head competitors in a market in which one or both used the patented
technology in its products.

## B.   THE TRADITIONAL FOUR-FACTOR ANALYSIS SUPPORTS ISSUANCE OF A PERMANENT INJUNCTION IN THIS CASE.

The facts now before the Court present a classic example of a case where a permanent

injunction should issue. The Finjan Patents cover pioneering technology in the field of network

security. [*See* Kobialka Decl., Ex. 4, T.T. at 288:25-289:8]. Finjan and Defendants directly

compete for the same customers in the network security market. In late 2003, Defendants

recognized that, in order to compete with Finjan in the network security market, it must offer a

proactive functionality similar to the patented technology incorporated in the Finjan products.

[*Id.*, Ex. 13, PTX-34 at SC077703]. Shortly thereafter, Defendants began selling the first

versions of the infringing Webwasher Products. Through the sale of the infringing Webwasher

Products, Defendants successfully preserved and subsequently grew its market share in the

network security market. Defendants' launch of the infringing products at such a key time

thwarted Finjan's ability to gain a foothold in market share. Further, Defendants' infringing

sales have shaped the market in a way that has prevented and continues to prevent Finjan from

occupying the market position it deserves. There are no hardships that tip in Defendants' favor,

nor are there sufficient public interest concerns to overcome the public's interest in protecting an

---

*Mylan Labs. Inc.*, 2007 WL 869545 (D.N.J. Mar. 20, 2007); *Sanofi-Syntheolabo v. Apotex, Inc.*, 470 F. 3d368 (N.Y. Dec. 8, 2006); *Commonwealth Scientific and Industrial Research Organization v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600 (E.D. Tex. 2007); *800 Adept, Inc. v. Murex Securities, Ltd.*, 505 F. Supp. 2d 1327, 1337 (M.D. Fla. 2007); *Sundance, Inc., v. Demonte Fabricating Ltd.*, 2007 WL 3053662 (E.D. Mich. Oct. 19, 2007); *Baden Sports, Inc. v. Kabushiki Kaisha Molten*, 2007 WL 2790777 (W.D. Wash. Sept. 25, 2007); *Johns Hopkins Univ. v. Datascope Corp.*, 2007 WL 2682001 (D. Md. Aug. 9, 2007); *MPT, Inc. v. Marathon Labels, Inc.*, 2007 WL 184747 (N.D. Ohio Jan. 19, 2007); *Tivo Inc. v. Echostar Communications Corp.*, 446 F. Supp. 2d 664 (E.D. Tex. 2006); *Black & Decker Inc. v. Robert Bosch Tool Corp.*, 2006 WL 3446144 (N.D. Ill. Nov. 11, 2006); *3M Innovative Properties Co. v. Avery Dennison Corp.*, 2006 WL 2735499 (D. Minn. Sept. 25, 2006); *Telequip Corp. v. The Change Exchange*, 2006 WL 2385425 (N.D.N.Y. Aug. 15, 2006).

inventor's right to exclude his main competitor from practicing his invention. The factors now before the Court are exactly the type of facts upon which courts have routinely granted injunctive relief, and Finjan respectfully requests that this Court similarly grant injunctive relief here.[3]

### 1. Finjan Has Been Irreparably Harmed by Defendants' Infringement, and, Without an Injunction, Will Continue to Suffer Irreparable Harm.

As in this case, when the patentee and the infringer are head-to-head competitors, the patentee enjoys "a right, granted by Congress, not to assist its rival with the use of [the patentee's] proprietary technology." *See Novozymes*, 474 F. Supp. 2d at 613; *see also Martek*, 2007 WL 3181307 at \*16 (holding that patentee "has a right to exclude its rival from using its proprietary technology). Under such circumstances, the patentee's statutory right to exclude infringers from the market represents a benefit that cannot be equated by an award of cash. [*Id*]. As in this case, where a defendant's infringement has "shaped the market" to the patentee's disadvantage, resulting in long-term customer loss, these collateral effects of infringement demonstrate a situation where the patentee cannot be adequately compensated by money damages alone. *See Tivo* 446 F. Supp. 2d at 670; *see also Commonwealth Science*, 492 F. Supp 2d at 605 (finding that "when an infringer saturates the market for a patented invention with an infringing product . . . that infringer violates the patent holder's exclusionary right in a way that cannot be compensated through money damages"). In this case, Defendants' continued brazen infringement in the network security market where Finjan and Defendants compete head-to-head has irreparably harmed and continues to irreparably harm Finjan.

---

[3] Finjan seeks to enjoin all three Defendants because Cyberguard has not yet been dissolved and Webwasher, which has changed its name, is an operating subsidiary of Secure Computing. [Kobialka Decl., Ex. 14, Deposition Transcript of Putman ("Putman Depo.") at 25:16-26:15; 41:19-42:2].

a.  **Finjan and Defendants Are and Have Always Been Head-to-head Competitors.**

The fact that Finjan and Defendants currently compete for customers in the network security market goes to a showing of irreparable harm. *Fresenius Medical Care Holdings, Inc. v. Baxter Int'l, Inc.,* No. C 03-1431 SBA, 2008 WL 928496 at 3-4 [D.I. 1019] (N.D. Cal Apr. 4, 2008) (order granting request for preliminary injunction and noting that "[c]ourts routinely find irreparable harm, and therefore grant permanent injunctions where, as here, the infringer and the patentee are direct competitors).

As the evidence presented at trial demonstrated, Finjan saw Defendants as key competitors in the network security market. In 2006, Finjan internally circulated the "Finjan/Webwasher Competitive Analysis" which extensively analyzed the pricing and technology of the infringing Webwasher Products as they compete with Finjan's patented products. [Kobialka Decl., Ex. 15, DTX-1071]. In fact, Finjan's CTO testified that Finjan competed with Defendants for almost every targeted customer. *[Id.,* Ex. 4, T.T. at 221:8-14].

At trial, Finjan presented substantial evidence demonstrating that Defendants also clearly considered Finjan a competitor in the marketplace. In fact, there can be no question that Finjan and its proprietary technology were on Defendants' radar for years because they were competitors. Before 2004, Defendants disparaged Finjan's proactive technology, claiming that "the theoretical virus threat that Finjan can protect us for is close to zero…." *[Id.,* Ex. 8, PTX-31]. Defendants created whitepapers discussing Finjan's technology, describing it as "weak" in order "to have arguments against solutions like Finjan" to demonstrate that Finjan's proactive "functionality is not necessary." *[Id.,* Ex. 16, PTX-33; Ex. 13, PTX-34]. There would be no reason for Defendants to create such documentation if they believed that Finjan was not a competitor.

Furthermore, when it became apparent to Defendants that Finjan's technology was important, Defendants copied Finjan's proprietary technology specifically to compete with Finjan. Defendants' own documents state that copying Finjan would allow Defendants "to compete exactly with [Finjan]." [*Id.*, Ex. 17, PTX-36; *see also* Ex. 18, PTX-35; Ex. 4, T.T. at 318:22-319:17]. During the development of the infringing products, Defendants called the competing product "Finjan Killer." [*Id.*, Ex. 17, PTX-36; Ex. 9, PTX-16; Ex. 10, DTX-1056]. Found in the source code of Defendants' competing product was the name "Finjan Buster." [*Id.*, Ex. 4, T.T. at 456:18-458:12]. In fact, there were comments in the source code that the Webwasher Product functionality "helps [Defendants] to be competitive with products from Finjan." [*Id.*, at 457:14-15]. Martin Stecher, the project manager in charge of developing the infringing product, testified that he "kept hearing from [the] sales team: Please build something for us so we can compete against Finjan products - so that we can compete or respond to Finjan marketing." [*Id.*, at 313:25-314:11].

Other documents authored by Defendants also discuss Finjan as a competitor, compare Finjan's technology to Defendants' infringing technology and discuss "head to head" wins with customers over Finjan. [*See generally id.*, Ex. 16, PTX-33 (Finjan products "compete[] against Webwasher in many deals"); Ex. 19, PTX-120; Ex. 20, PTX-48; Ex. 21, PTX-118]. For example, Defendants prepared a document to be distributed to its sales force setting out why the Webwasher product is superior to Finjan's products. [*Id.*, Ex. 19, PTX-120] As another example, in a document that specifically identifies Finjan as a competitor, Defendants noted that Webwasher's "first large customer win for Proactive Filter" was Credit Suisse. [*Id.*, Ex. 21, PTX-118 at SC 02745] In landing Credit Suisse as a customer, Webwasher directly competed with Finjan. [*Id.*, Ex. 20, PTX-48; Ex. 4, T.T. at 1207:13-1209:3, 1209:21-23].

The overwhelming evidence is that Finjan and Defendants are direct competitors and Finjan competes directly with Defendants for most if not all of Finjan's targeted customers. As Finjan's Chief Technical Officer, Yuval Ben-Itzhak, testified at trial, Defendants are currently Finjan's top competitors in the market. [*Id.*, Ex. 4, T.T. at 221:8-9]. More specifically, he testified that prospective customers identify Defendants as Finjan's competitor for sales. [*Id.*, at 221:10-14].

Defendants are a much larger enterprise than Finjan. [*See e.g., id.*, Ex. 22, PTX-43; Ex. 23, JTX-45]. Finjan clearly does not have the resources to compete with them for the same customers. On the other hand, Defendants have the resources to compete and does in fact compete with Finjan for each of Finjan's target customers. Consequently, Finjan is being irreparably harmed by having to directly compete with willful infringers such as Defendants.

### b. Defendants' Sales of the Infringing Webwasher Products Deprived Finjan of Market Share and Intangible Benefits.

In the years prior to Webwasher's incorporation of the proactive scanning functionality in its network security products, Finjan and Webwasher shared a virtually identical portion of the network security market. [*Id.*, Ex. 24, PTX-25]. In the Worldwide Secure Content Management 2005-2009 Forecast Update and 2004 Vendor Shares: Sypware, Spam, and Malicious Code Continue to Wreak Havoc, leading industry analyst IDC provided a market share analysis for the Secure Content Management showing market shares for software, appliance, and hosted service. [*Id.* at SC076372-73]. The IDC determined that during for the years 2003 and 2004, Finjan and Webwasher both had a 0.3% market share. From 2003 to 2004, Finjan sales grew by over 38% while Webwasher experienced only 23.4% growth. [*Id.*] An IDC market analysis published in 2007 shows that following Defendants' introduction of the infringing Webwasher Products, Defendants' market share improved five fold to 1.5% while Finjan's market share fell 66% to

11

0.1%. [*See id.*, Ex. 27 (IDC Market Analysis - Worldwide Secure Content and Threat Management 2007-2011 Forecast and 2006 Vendor Shares: 1 + 1 = 4)]. Clearly, Defendants' sale of the infringing Webwasher Products between 2004 and 2006 contributed to both the decline in Finjan market share and the increase in Defendants' market share. Finjan's loss and Defendants' gain in market share is highly indicative that Finjan has suffered irreparable harm as a result of Defendants infringing sales. *Black & Decker*, 2006 WL 3446144, at *4 ("Loss of market share is a key consideration in determining whether a plaintiff has suffered irreparable harm.").

Defendants' infringing activities also caused Finjan to lose market share in that it caused Finjan to lose access to valuable customer relationships. Defendants' infringing sales to customers provided Defendants with special access to those customers to promote and make sales of non-infringing products and diminished Finjan's opportunities to sell its products to those customers. As a result, Finjan lost the benefit of gaining special access to the customers to promote the sale of Finjan products. At trial, Finjan presented evidence that Defendants' sale of the infringing Webwasher Products allowed Defendants to get a "foot-in-the-door" with customers that they otherwise would not have had an opportunity to approach. [Kobialka Decl., Ex. 4, T.T. at 607:6-20, 602:2-609:21; Ex. 25, PTX-116; Ex. 21, PTX-118].

Finjan continues to seek to sell its patented products in a very competitive marketplace. [*See id.*, Ex. 26, JTX-11 at 15 (Secure Computing's Form 10-K 2006 acknowledged that "[t]he market for enterprise gateway security is highly competitive and [that it] expect[s] competition to intensify in the future.")]. However, because Defendants have secured a substantial foothold in the marketplace, Finjan finds itself without the market share it rightfully deserves. Finjan faces

stiff competition from Defendants with its infringing Webwasher Products, as it is being forced to compete against its own proactive scanning technology. [*Id.*, Ex. 4, T.T. at 221:20-222:7].

At the exact time that Finjan's patented technology began to be recognized as a crucial component of products in the marketplace,[4] Defendants incorporated Finjan's patented technology and introduced an infringing product that directly competed with Finjan's innovative products. Such conduct by Defendants resulted in irreparable harm to Finjan. *800 Adept*, 505 F. Supp. 2d at 1337 (finding that "where a company pioneers an invention in the marketplace, irreparable harm flows from a competitor's attempts to usurp the pioneering company's market position and goodwill"); *Muniauction*, 502 F. Supp. 2d at 483 ("Recognition as the industry innovator is a tangible benefit afforded by any patent."). As a result of Defendants' introduction of infringing Webwasher Products at this crucial time, Finjan's pioneering efforts were neutralized, its market position undercut, and the good will that it should have enjoyed as a technology innovator in the market responsible for developing new technology was lost. *Tivo*, 446 F. Supp. 2d at 670 ("Loss of market share in this nascent market is a key consideration in finding that Plaintiff suffers irreparable harm - Plaintiff is losing market share at a critical time in the market's development, market share that it will not have the same opportunity to capture once the market matures.").

While specific lost sales can be compensated, money cannot remedy all the other incalculable harms associated with loss of market position, including lost opportunities to secure new customers and capture market share - market share that would have enhanced Finjan's reputation, brand-loyalty and goodwill. *z4*, 434 F. Supp. 2d 437 (E.D. Tex. 2006) at 440

---

[4] For example, in August 2003, the IDC published a report describing the rise in virus attacks and the significant increase in the market in just a year. [Kobialka Decl., Ex. 6, PTX-23 at SC072838-39 and SC072845]. It also predicted that "proactive technologies will increasingly become part of organizations' security architectures." [*Id.* at SC072855].

(describing the "loss of brand name recognition or the loss of market share" as the "type of injuries that are often incalculable and irreparable"). The longer Defendants are permitted to sell the infringing Webwasher Products and cement its current position, the more difficult it will be for Finjan to gain its fair share of the market.

### c.    Finjan Suffered Irreparable Harm Because it Lost Valuable Access to Potential Customers for Finjan Products.

Enhancement of the value of Finjan's intangible assets including brand-loyalty and good will would have supported increased sales of Finjan products. Defendants' infringing sales to customers provided them with special access to those customers to promote and make sales of Defendants' non-infringing products and diminished Finjan's opportunities to sell its products to those customers. Because Defendants' infringing sales caused Finjan to be unable to sell its patented products to these customers, Finjan also lost the benefit of gaining special access to the customers to promote the sale of Finjan products. As was made clear during the trial, in the market in which Finjan and Defendants compete, special access to consumers is a key ingredient for success. In fact, Michael Gallagher, Secure Computing's Vice President of Product Development and Customer Support, testified that Secure Computing believes that if it is exposed to customers in a non-sales environment, then it can convince those customers that they would be happier with Secure Computing's products. [*Id.*, Ex. 4, T.T. at 701:1-12]. He also testified that the ability to access customers to sell a variety of products after an initial sale is of primary importance. [*Id.*, at 712:9-1, 736:17-738-8]. In fact, following the acquisition of Cyberguard, Secure Computing identified the Webwasher product as an ideal product to "create interest with and penetrate new accounts." [*Id.*, Ex. 21, PTX-118].

Had Finjan been able to make the original sale of Finjan's patented product to these customers, Finjan would have likely created substantial brand loyalty and good will in those

14

customers which likely would have spawned sales of other Finjan products. [*Id.*, Ex. 4, T.T. at 606:19-608:22]. Finjan's loss of such valuable special access to customers is not quantifiable. *Commonwealth Science*, 492 F. Supp. 2d at 605 (noting that the damage that infringement causes to "the patent holder's good will or brand name recognition" is impossible to quantify, and therefore represents harm not adequately compensable by monetary damages). Because the sales of these other products that do not infringe the Finjan Patents, Finjan was not able to claim damages for the sales. As such, instances where Defendants leveraged their infringement of the Finjan Patents to support sales of non-infringing products results in irreparable harm to Finjan. Allowing Defendants to continue these infringing sales maintains the status quo under which Finjan must compete against its own technology. [*Id.*, at 221:20-222:7]. Thus, an injunction precluding sales of the infringing Webwasher Products will give Finjan a chance to compete fairly with Defendants and grow its sales of all of its products.

> **d.    Finjan Suffered Irreparable Harm Because It Lost its Right to Exclude Licensees.**

Finjan has consistently chosen to develop and market its own network security products incorporating the Finjan Patents rather than licensing them to others. [*Id.*, at 597:10-600:8, 601:19-603:16, 671:14-672:3, 674:11-679:6]. Finjan has not licensed the Finjan Patents to any competitor. Defendants' infringement has, in essence, forced Finjan to involuntarily "license" its proprietary technology with its main competitor. Such a result is clearly irreparable harm and is "antithetical to a basic tenet of the patent system . . . that the decision whether to license is one that should be left to the patentee." *Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 785, 795 (E.D. Va. 1998).

e.   **Defendants' Post-Trial Conduct Has Caused Further Irreparable Harm to Finjan.**

Following the trial in this matter, Defendants released a press release that falsely characterized the verdict causing harm to Finjan. Specifically, following the jury's verdict that Defendants willfully infringed Finjan's three patents, Defendants' press release stated that "[t]he jury rejected Finjan's accusations of infringement with respect to the hashing function in Webwasher and therefore found no infringement of one of the three patents asserted by Finjan." Yahoo! Finance, Exh. G to Lee Decl. While Defendants purport to have issued a revised press release, the false version is still readily available on the Internet. [*See* Kobialka Decl., Ex. 11, March 13, 2008, Trading Markets press release]. Additionally, Defendants have made clear to the market that they intend to continue selling the infringing product in their marketing materials and in press releases. [*Id.*, Ex. 12,  April 25, 2008, Secure Computing website printout; Ex 28, March 28, 2008, Market Wire press release].

The effect of Defendants' post-trial conduct is clear - the tarnishment of Finjan's image, credibility and reputation as an innovator and owner of valuable patent rights. While nothing can fully compensate Finjan for the harm caused by Defendants, the equitable remedy of an injunction would at least ameliorate some of the irreparable damage to Finjan by firmly enforcing the Finjan patent rights that withstood the test of litigation.

2.   **Monetary Relief is Inadequate to Compensate Finjan.**

The insufficiency of legal remedies to compensate Finjan for Defendants' willful infringement is shown, first and foremost, by the same evidence demonstrating irreparable harm discussed above. Irreparable injury is a basis for showing inadequacy of legal remedy, and accordingly the concepts of "irreparable injury" and "no adequate remedy at law" often overlap in the context of a permanent injunction. *800 Adept*, 505 F. Supp. 2d at 1337; *see also Smith &*

16

*Nephew*, 466 F. Supp. 2d at 982-986 ("Although stated as two separate factors under *eBay* the irreparable harm requirement contemplates the adequacy of alternate remedies available to the plaintiff.") (citations omitted). For example, Finjan's loss of market share and loss of special access to customers is an irreparable harm, which necessarily cannot be compensated solely with monetary damages. *Muniauction,* 502 F. Supp. 2d at 482-83 (granting permanent injunction where the "evidence at trial proved that plaintiff suffered permanent loss of market share as a result of defendants' infringing sales" because such harm "cannot be compensated for solely with monetary damages, making equitable relief appropriate").

Defendants continue to be Finjan's primary competitors in the network security market. Under these circumstances where the infringing party is the patentee's primary competitor in a market, courts have repeatedly recognized that monetary damages are insufficient because the loss in market share, business opportunities and reputation is incalculable. *See e.g., Novozymes,* 474 F. Supp 2d at 612-13 (granting permanent injunction in matter involving "head to head competitors" and, in examining the question of the adequacy of the patent holder's remedy at law, noting that the "statutory right to exclude represents a benefit that, under these circumstances, cannot be equated by an award of cash"); *Muniauction,* 502 F. Supp. 2d at 482 ("If plaintiff cannot prevent its only competitor's continued infringement of its patent, the patent is of little value.").

Defendants have made no commitment to cease selling their infringing Webwasher Products absent an injunction. [*See* Kobialka Decl., Ex. 29, Secure Computing Technical Support website printout]. In fact, Defendants' conduct has been to the contrary. Defendants have made statements to the public about their plans to continue selling the infringing product. [*Id.*, Ex. 12, April 25, 2008, Secure Computing website printout; Ex 28, March 28, 2008, Market

Wire press release]. As recently as March 28, 2008, Defendants stated in a press release that "its WebWasher products will continue to be available." [*Id.*, Ex 28, March 28, 2008, Market Wire press release]. Indeed, the threat of continued infringement is a significant consideration favoring injunctive relief. *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 397 F. Supp. 2d 537, 546 (D. Del. 2005) (granting injunction despite adjudicated infringer's "unconvincing argument that it will not revert back to infringing behavior"); *see, e.g. Smith & Nephew*, 466 F. Supp. 2d at 984 ("Relief in the form of monetary damages alone would not meet the ends of justice here because this remedy would allow the infringement to continue. Monetary damages generally are not an adequate remedy against future infringement because the central value of holding a patent is the right to exclude others form using the patented product."); *Telequip*, 2006 WL 2385425 at *2 (finding that monetary damages are not an adequate remedy against future infringement).

In fact, the certainty of Defendants' continued infringement of Finjan's Patents is supported by Defendants' rush to rebrand the infringing Webwasher Products as "Secure Web" within weeks of the jury verdict, and before the Court's entry of judgment. [Kobialka Decl., Ex. 12, April 25, 2008, Secure Computing website printout; Ex 28, March 28, 2008, Market Wire press release]. However, it is clear that the Defendants' infringing product under any name, Secure Web or otherwise, has the exact same functionalities as the infringing Webwasher Products. Defendants' efforts are designed solely to thwart Finjan's attempts to obtain an injunction against their infringing activities. [*See e.g. id.*, Ex. 30, September 24, 2007 Secure Computing press release; Ex. 12, April 25, 2008, Secure Computing website printout (February 1, 2007 showing Webwasher functionalities which are identical to those in Secure Web as of April 25, 2008]. In fact, the infringing product as portrayed on Secure Computing's website as

18

of April 25, 2008 is listed as "Secure Web (Webwasher)" [Secure Computing website printout as of April 25, 2008]. Based on Secure Computing's attempts to phase out the use of the name "Webwasher" and replace it with the name "Secure Web" while maintaining the same functionality of the infringing product, Finjan requests an injunction not only on the Webwasher hardware and software product, but also the Secure Web product containing the same infringing technology as the Webwasher product found by the jury to infringe at trial.

Finjan's loss of the right to exclude others from using its patents has caused Finjan irreparable harm for which money damages are not adequate. *Martek*, 520 F. Supp. 2d at 558-59 ("The statutory right to exclude represents a tangential benefit associated with patent rights that cannot be quantified in monetary damages."); *Novozymes*, 474 F. Supp. 2d at 612 (finding irreparable harm and noting that "the Supreme Court in *eBay* did not state that loss of the right to exclude could not be irreparable harm. . . the Court simply rejected the proposition that the patentee's right to exclude should always lead to injunctive relief"). Thus, an injunction against Defendants is the appropriate remedy.

### 3.    The Balance Of Hardships Favors the Granting of an Injunction in this Case.

Like the "irreparable harm" and "inadequate remedy at law" factors, and for the same reasons discussed above, the balance of hardships in this case strongly favors a grant of injunctive relief. Generally speaking, the harm that Finjan will endure if a permanent injunction is not entered in this case is a continuation of the irreparable harm that Finjan has already suffered as a consequence of Defendants' willful infringement. Denying an injunction will also deprive Finjan of its right to exclude others from practicing its pioneering patent, which the courts have recognized as being a hardship in and of itself. *Odetics, Inc. v. Storage Tech. Corp.,* 14 F. Supp. 2d 785, 797 (E.D. Va. 1998), *aff'd,* 185 F.3d 1259 (Fed. Cir. 1999 ("A compulsory

license, which may arise from a refusal to enjoin, is fundamentally at odds with the right of exclusion built into our patent system.") (citations omitted).

In contrast, the harm that Defendants will endure if a permanent injunction is entered is that Defendants will no longer be able to continue their blatant infringement of Finjan's patents. This restriction is imposed by law, rather than by the particular circumstances of this case, and should not be considered an unreasonable hardship. *MGM,* 2007 WL 1231682, at *15. Indeed, it is something that Defendants expected when they made the deliberate decision to copy Finjan's patented proprietary technology. As Defendants' own documents demonstrate, Defendants knew that Finjan would "check very carefully which of [Finjan's] patents [Defendants] may touch by recreating [Finjan's] system." [Kobialka Decl., Ex. 31, PTX-38].

Further, any loss Defendants may suffer from ceasing the sale of the infringing Webwasher Products is irrelevant to the balancing of hardships since the harm would stem from Defendants' own willful infringement. *Smith & Nephew,* 466 F. Supp. 2d at 984 ("The hardship to [infringer] of permanently enjoining its infringing conduct is limited to the injury ordinarily expected when an injunction is imposed. Only hardship to the defendant that is not an inseparable part of the plaintiff's right is cognizable") (citations and quotations omitted); *Commonwealth Science,* 492 F. Supp. 2d at 606 ("Mere hardship in ceasing operations is not sufficient."); *see also Windsurfing Int'l Inc. v. AMF, Inc.,* 828 F. 2d 755, 1003 n.12 (Fed. Cir. 1985), *cert. denied,* 477 U.S. 05 (1986).

In this matter, Finjan expended significant time resources developing the Finjan technology. Finjan, founded in 1996 based on its pioneering technology, spent years and developing its proprietary technology. [Kobialka Decl., Ex. 4, T.T. at 207:11-25, 288:25-289:8; Ex. 5, Touboul Depo. at 66:2-67:21. Defendants, on the other hand, expended around $150,000

in development costs over a three month period. [*Id.*, T.T. at 1232:4-8]. In a recent case decided under the *eBay* framework, a court examined similar facts and noted that "[r]egarding the third prong of the *eBay* test, [the patent holder] presented evidence that it had spent more that $20 million on its patented invention and product over many years, while the [adjudicated infringer] had invested less that $200,000." *Power-One, Inc. v. Artesyn Tech., Inc.*, No. 2:05-CV-463, 2008 WL 1746634 at n.1 (E.D. Tex. Apr. 11, 2008) (Memorandum Opinion and Order). The court went on to find that if the patent holder is "not granted an injunction, not only will it lose any potential of recouping its significant investment, it would also lose its right to exclude others from infringing its intellectual property. . . [w]hile [the adjudicated infringer] will suffer a minor hardship if enjoined, the harm can be ameliorated by narrowly tailoring the injunction." *Id.* In concluding, the court noted that "[o]n the whole, [the patent holder] would suffer a much greater hardship if an injunction was denied than [the adjudicated infringer] would suffer if enjoined." *Id.* This is exactly the scenario before this Court, where Finjan spent years developing its technology only to have Defendants, a top competitor in the marketplace for Finjan, steal its technology with the express purpose to compete against Finjan.

Additionally, an injunction will have a limited impact on Defendants' overall business as the Webwasher Products are not their only products. Secure Computing, for example, is a large company that generates substantial revenue each year from the sale of a variety of other additional computer security products. Secure Computing's Vice President of Product Development and Customer Support testified at trial regarding the various divisions of Secure Computing's business and the numerous products they sell in addition to the infringing Webwasher Products. [Kobialka Decl., Ex. 4, T.T. at 692:4-12, 693:23-698:20]. Thus, Defendants' potential hardship from an order enjoining the infringing products would be

21

mitigated by revenues from a broad and diverse variety of product offerings. This is far from the type of case where an injunction against the infringing Webwasher Products would deal a fatal blow to Defendants' commercial viability.

The burden on Finjan if an injunction does not issue will be far greater than any burden suffered by Defendants if enjoined. Finjan has experienced over three years of infringement by Defendants. Without a permanent injunction, Finjan will continue to suffer encroachment on its sales of its patented products, continued loss of market share and missed sales opportunities caused by its lack of special access to customers that the Finjan Patents should have provided.

### 4.    The Public Interest is Best Served by Granting an Injunction.

The final factor that Finjan must satisfy to receive a permanent injunction is that associated with the public interest. There is substantial public interest in enforcing valid patents. In *Sanofi-Synthelabo v. Apotex,* the Federal Circuit upheld the district court's finding that the public's interest in protecting patents outweighed the serious harms that could occur if the infringing item were removed from the market by an injunction. *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383-84 (Fed. Cir. 2006). In doing so, the Federal Circuit explained that it has "long acknowledged the importance of the patent system in encouraging innovation" and that "encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude." *Id.* at 1383. Cases in this Court have concurred with this view. *Martek,* 520 F. Supp. 2d at 559 (stating that "it is almost redundant to note the substantial interest in enforcing valid United States patents, while the court perceives no countervailing harm to the public (such as that the infringing products are medically necessary or that their removal from the stream of commerce would harm the public) in granting injunctive relief.") (citations and quotations omitted) (parenthesis in original); *Fisher-Price*, 279 F. Supp. 2d 526,

528 (D. Del 2003) (granting injunction where "[t]he infringing products at issue, infant seats and bassinets, are not medically necessary items; nor do they possess any other exceptional characteristic or function such that their removal from the stream of commerce would harm the public.") (citations omitted).

Enjoining Defendants' infringing network security products will not harm the public interest, as Finjan can provide the public with the patented technology. Moreover, it will serve the public interest by upholding Finjan's legitimate rights as a patent holder exercising its lawful right to exclude.

## VI.  CONCLUSION

For the foregoing reasons, Finjan respectfully requests that the Court grant its motion for a permanent injunction against further infringing sales by Defendants.


                                        POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Paul J. Andre
Lisa Kobialka                           By: /s/ Philip A. Rovner
King & Spalding LLP                          Philip A. Rovner (#3215)
1000 Bridge Parkway                          Hercules Plaza
Redwood City, CA 94065                       P. O. Box 951
(650) 590-0700                               Wilmington, DE  19899
                                             (302) 984-6000
Dated: April 25, 2008                        provner@potteranderson.com
Public Version:  May 2, 2008
862898                                  *Attorneys for Plaintiff*
                                        *Finjan Software, Ltd.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on May 2, 2008, the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following; that the document was served on the following counsel as indicated; and that the document is available for viewing and downloading from CM/ECF.

### BY HAND DELIVERY AND E-MAIL

Frederick L. Cottrell, III, Esq.
Kelly E. Farnan, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
cottrell@rlf.com; farnan@rlf.com

I hereby certify that on May 2, 2008 I have sent by E-mail the foregoing document to the following non-registered participants:

Jake M. Holdreith, Esq.
Christopher A. Seidl, Esq.
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
jmholdreith@rkmc.com; caseidl@rkmc.com

/s/ Philip A. Rovner
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
E-mail: provner@potteranderson.com

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FINJAN SOFTWARE, LTD., an Israel corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | Civil Action No. 06-369 GMS |
| v. | ) ) | |
| SECURE COMPUTING CORPORATION, a Delaware corporation, CYBERGUARD, CORPORATION, a Delaware corporation, WEBWASHER AG, a German corporation and DOES 1 THROUGH 100, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER GRANTING FINJAN SOFTWARE, LTD.'S MOTION FOR ENTRY OF PERMANENT INJUNCTION

Defendants Secure Computing Corporation, Cyberguard Corporation, and Webwasher

AG (collectively, "Defendants") have infringed Claims 1-14, 24-30, 32-36, and 65 of U.S. Patent

No. 6,092,194 ("the '194 patent"), Claims 1-6, 9-14, and 18 of U.S. Patent No. 6,804,780 ("the

'780 patent"), and Claims 4, 6, 8, 12-13 of U.S. Patent No. 7,058,822 ('the '822 patent") owned

by Finjan Software, Ltd. ("Finjan"), through the manufacture, use, sale, offer for sale, and

importation into the United States of Webwasher hardware and software products and the TSP

product.

IT IS HEREBY ORDERED that

(a) With respect to the '194 patent:

Defendants, their officers, agents, representatives, servants, employees, and attorneys,

and those persons and entities in active concert or participating with them who receive actual

notice of this Order by personal service or otherwise are hereby ordered and enjoined from infringing Claims 1-14, 24-30, 32-36, and 65 of the '194 patent by making, using, offering for sale, selling, or importing into the United States the Webwasher hardware or software products, the TSP product, or any product no more than colorably different from these infringing products, including the Secure Web product.

(b) <u>With respect to the '780 patent:</u>

Defendants, their officers, agents, representatives, servants, employees, and attorneys, and those persons and entities in active concert or participating with them who receive actual notice of this Order by personal service or otherwise are hereby ordered and enjoined from infringing Claims 1-6, 9-14, and 18 of the '780 patent by making, using, offering for sale, selling, or importing into the United States the Webwasher hardware or software products, the TSP product, or any product no more than colorably different from these infringing products, including the Secure Web product.

(c) <u>With respect to the '822 patent:</u>

Defendants, their officers, agents, representatives, servants, employees, and attorneys, and those persons and entities in active concert or participating with them who receive actual notice of this Order by personal service or otherwise are hereby ordered and enjoined from infringing Claims 4, 6, 8, 12-13 of the '822 patent by making, using, offering for sale, selling, or importing into the United States the Webwasher hardware or software products, the TSP product, or any product no more than colorably different from these infringing products, including the Secure Web product.

(c) <u>Notice of this Order</u>

Within twenty (20) days of this Order, Defendants shall provide a copy of this Order to its officers, agents, representatives, servants, employees, and attorneys, and those persons and entities in active concert or participating with them, such persons and entities including its distributors and suppliers.

(d) <u>Term of Order</u>

This Order shall take effect immediately upon execution by the Court and shall continue in effect until the respective expiration dates of the '194, '780, and '822 patents.

SO ORDERED:

Dated: _____          _____

                                            Honorable Gregory M. Sleet