IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FINJAN SOFTWARE, LTD., an Israel corporation, | ) ) ) | |
| Plaintiff-counterdefendants, | ) ) | Civil Action No. 06-00369-GMS |
| v. | ) ) ) | |
| SECURE COMPUTING CORPORATION, a Delaware corporation; CYBERGUARD CORPORATION, a Delaware corporation, WEBWASHER AG, a German corporation and DOES 1 THROUGH 100, | ) ) ) ) ) ) ) | |
| Defendants-counterclaimants. | ) ) | |

## DEFENDANTS-COUNTERCLAIMANTS' ANSWERING BRIEF IN OPPOSITION TO FINJAN'S MOTION TO AMEND JUDGMENT AND FOR AN ACCOUNTING OF SALES

OF COUNSEL:

Ronald J. Schutz
Jake M. Holdreith
Christopher A. Seidl
Trevor J. Foster
ROBINS, KAPLAN, MILLER & CIRESI
L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500

Dated: May 9, 2008

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Kelly E. Farnan (#4395)
farnan@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

***ATTORNEYS FOR SECURE COMPUTING***

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

NATURE OF THE PROCEEDINGS AND BACKGROUND ............................................... 1

STAGE OF THE PROCEEDINGS ........................................................................................ 2

ARGUMENT .......................................................................................................................... 3

    I.    THE COURT SHOULD DENY FINJAN'S REQUEST FOR AN
        ACCOUNTING ....................................................................................................... 3

        A.    Finjan Waived Its Right To Request An Accounting ................................ 3

        B.    Secure Would Be Unfairly Prejudiced By Finjan's Use of a Jury-
            Determined Royalty Rate For Determining Damages Beyond What
            Was Presented At Trial ............................................................................. 5

        C.    Secure Complied With Its Discovery Obligations.................................... 7

    II.    IF THE COURT GRANTS PREJUDGMENT INTEREST ON THE
        COMPENSATORY AWARD, THE ONE-YEAR TREASURY
        CONSTANT MATURITY RATE, COMPOUNDED ANNUALLY, IS
        AN APPROPRIATE PREJUDGMENT INTEREST RATE.................................. 8

    III.    SECURE DOES NOT OBJECT TO FINJAN'S REQUEST FOR
        POSTJUDGMENT INTEREST .............................................................................. 11

CONCLUSION...................................................................................................................... 11

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bowling v. Hasbro, Inc.,*
   2008 U.S. Dist. LEXIS 30043, (D. R.I. March 17, 2008) .............................................. 7

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.,*
   246 F.3d 1336 (Fed. Cir. 2001) ........................................................................ 9

*Datascope Corp. v. SMEC, Inc.,*
   879 F.2d 820 (Fed. Cir. 1989) ........................................................................ 19

*Eolas Techs. Inc. v. Microsoft Corp.,*
   2004 U.S. Dist. LEXIS 534, (N.D. Ill. Jan. 14, 2004),
   *rev'd on other grounds,* 399 F.3d 1325 (Fed. Cir. 2005).................................. 10

*General Motors Corp. v. Devex Corp.,*
   461 U.S. 648 (1983)........................................................................................ 8

*Laitram Corp. v. NEC Corp.,*
   115 F.3d 947 (Fed. Cir. 1997) .................................................................... 9, 10

*Lucent Techs., Inc. v. Newbridge Networks Corp.,*
   168 F. Supp. 2d 269 (D. Del. 2001)........................................................ 3, 4, 5

*Oscar Mayer Foods Corp. v. Conagra, Inc.,*
   869 F. Supp. 656 (W.D. Wis. 1994) .............................................................. 6

*Phillips Petroleum Co. v. Rexene Corp.,*
   1997 U.S. Dist. LEXIS 18460, (D. Del. Sept. 4, 1997).................................. 9

*Schering Corp. v. Precision-Cosmet Co.,*
   614 F. Supp. 1368 (D. Del. 1985).............................................................. 9, 10

*Tristrata Tech., Inc. v. ICN Pharm., Inc.,*
   2004 U.S. Dist. LEXIS 6559 (D. Del. Apr. 7, 2004)................................ 3, 4, 5

**Statutes**

28 U.S.C. § 1292(c)(2)........................................................................................ 8

28 U.S.C. § 1961................................................................................................ 9, 11

35 U.S.C. § 284.................................................................................................... 6

Fed. R. Civ. P. 50................................................................................................ 3

Fed. R. Civ. P. 50(b) ............................................................................................................................ 3

Fed. R. Civ. P. 59 ................................................................................................................................... 3

Fed. R. Civ. P. 59(e) ............................................................................................................................ 4

RLF1-3282131-1

## INTRODUCTION

Finjan Software, Ltd.'s ("Finjan") motion for an accounting should be denied because: (1) Finjan waived its right to request an accounting; (2) Defendants-counterclaimants Secure Computing Corporation, Cyberguard Corporation, and Webwasher AG ("Secure") would be unfairly prejudiced by the application of the jury-determined royalty rate to additional sales not presented at trial by Finjan; and (3) Secure complied with its discovery obligations. On its face, Finjan's motion should be denied because of waiver – Finjan did not request an accounting in the Final Joint Pretrial Order or its Complaint or Amended Complaint. In this Court, that is a clear waiver.

If the Court grants prejudgment interest, the appropriate rate is the one-year Treasury Constant Maturity Rate, compounded yearly, because Finjan has not affirmatively demonstrated that Finjan has in the past borrowed money at the prime rate in order to maintain its operations and Secure's financial position justifies a rate lower than the prime rate.

## NATURE OF THE PROCEEDINGS AND BACKGROUND

This action involves allegations of infringement relating to five United States Patents. The relevant facts for this motion are contained in trial transcripts (*See* D.I. 227-234) (cited to herein as "(Tr. at page:line (D.I.).)" and the trial exhibits from the eight-day trial, as well as the facts presented in Secure's opening brief in support of its post-trial motions (D.I. 266), and the various pleadings and discovery materials in this case.

Finjan asserts that Secure's Webwasher product and Cyberguard TSP product infringe claims 1-4, 24-30, 32-36 and 65 of the '194 Patent, claims 1-6, 9-14 and 18 of the '780 Patent, and claims 4, 6, 8, 12 and 13 of the '822 Patent.[1] At trial, Secure asserted several substantial defenses,

---

[1] In its post-trial motions, Secure asserts that the jury should have found that Finjan's Vital Security products infringe claims 1-5, 7-12 and 14-15 of Secure's '361 Patent.

1

including non-infringement and invalidity of Finjan's Patents.

## **STAGE OF THE PROCEEDINGS**

This case was tried to a jury from March 3-11, 2008. (D.I. 227-233.) The jury was asked

to assess the amount of damages, if any, that Finjan was entitled to receive. Specifically, in the

Joint Special Verdict Form (D.I. 220, 226), the jury was asked:

**Webwasher Software**

If you have found that one or more of the asserted claims of U.S. Patent No. 6,092,194, U.S. Patent No. 6,804,780, and/or U.S. Patent No. 7,058,822 are valid and infringed by Secure Computing's Webwasher Software, then what is the reasonable royalty rate to which Finjan Software has proven by a preponderance of the evidence and the amount of sales of the Webwasher Software that the royalty rate should be applied to?



**Webwasher Hardware Appliances**

If you have found that one or more of the asserted claims of U.S. Patent No. 6,092,194, U.S. Patent No. 6,804,780, and/or U.S. Patent No. 7,058,822 are valid and infringed by Secure Computing's Webwasher Hardware Appliances, then what is the reasonable royalty rate to which Finjan Software has proven by a preponderance of the evidence and the amount of sales of the Webwasher Hardware Appliances that the royalty rate should be applied to?



**Cyberguard TSP Hardware Appliances**

If you have found that one or more of the asserted claims of U.S. Patent No. 6,092,194, U.S. Patent No. 6,804,780, and/or U.S. Patent No. 7,058,822 are valid and infringed by Secure Computing's Cyberguard TSP Hardware Appliances, then what is the reasonable royalty rate to which Finjan Software has proven by a preponderance of the evidence and the amount of sales of the Cyberguard TSP Hardware Appliances that the royalty rate should be applied to?



On March 12, 2008, in response to these questions, the jury answered: 16% applied to

$49,000,000 in sales of Webwasher Software; 8% applied to $3,250,000 in sales of Webwasher

Hardware Appliances, and 16% applied to $13,500,000 in sales of Cyberguard TSP Hardware

Appliances.[2] (D.I. 226, 242; *see also* Tr. at 1671:12-1678:25 (D.I. 234).) On March 28, 2008, the Court entered Judgment in favor of Finjan, for monetary damages. (D.I. 242.) On March 27, 2008, after the verdict and prior to the entry of judgment, Secure timely moved for JMOL, pursuant to Fed. R. Civ. P. 50(b), and in the alternative, moved for a new trial and/or remittitur. (D.I. 240.) On April 11, 2008, following the Court's entry of judgment on the verdict, Secure timely filed an amended motion under Rule 50, for JMOL, and under Rule 59, for a new trial or to alter or amend the judgment (remittitur). (D.I. 253.)

## ARGUMENT

## I.    THE COURT SHOULD DENY FINJAN'S REQUEST FOR AN ACCOUNTING

### A.    Finjan Waived Its Right To Request An Accounting

In this Court, when a party fails to request an accounting in the Final Joint Pretrial Order or in its complaint, that party waives any ability to request an accounting and a post-trial request for accounting should be denied. *See Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 269, 271-73 (D. Del. 2001) (denying request for accounting because request was not in Amended Complaint or Final Pretrial Order); *Tristrata Tech., Inc. v. ICN Pharm., Inc.*, 2004 U.S. Dist. LEXIS 6559, at *3-6 (D. Del. Apr. 7, 2004) (denying request for accounting because request was not in the Final Pretrial Order). Here, Finjan waived its ability to seek an accounting because Finjan did not request an accounting in the Final Joint Pretrial Order, or its Complaint or Amended Complaint (*See* Finjan Ex. C; D.I. 170; D.I. 43; D.I. 1.)

The *Lucent* case is directly on point and mandates a denial of Finjan's motion for an accounting. In *Lucent*, a patent infringement plaintiff moved for an accounting, pursuant to Fed.

---

[2] Finjan inexplicably devotes attention to Secure's press releases following the jury's verdict. (Finjan Br. at 4-5 (D.I. 262).) On March 13, Secure made a press release that inadvertently stated that the jury found non-infringement of the '780 Patent. (Finjan Ex. G.) As soon as it was made aware of mistake, Secure corrected its press release. (Finjan Ex. H.) Finjan has shown no prejudice, nor would any prejudice be relevant to a motion for an accounting.

3

R. Civ. P. 59(e), arguing that "courts routinely order accountings to update a jury's damages award to the time of final judgment." 168 F. Supp. 2d at 271-72. This Court denied the plaintiff's request for an accounting because of the plaintiff's "failure to preserve its request for an accounting in either the Amended Complaint or the Final Joint Pre-Trial Order." *Id.* at 273. Likewise, in *Tristrata*, this Court denied a patent infringement plaintiff's request for an accounting after the plaintiff failed to include a request for an accounting in the Final Pretrial Order. 2004 U.S. Dist. LEXIS 6559, at *3-6. The plaintiff argued that an accounting was necessary because it did not have all relevant sales data at trial and its expert testified that he was unable to include all infringing sales in his opinion. *Id.* The Court rejected this argument, stating that if the plaintiff "believed that the jury had insufficient information by which to return a non-speculative award including these damages, the Court would have expected [plaintiff] to have requested an accounting of these sales in its Pretrial Order . . . ." *Id.* at *5. Therefore, the Court denied the plaintiff's motion for an accounting because it "waived its right to request an accounting by not including it in its Pretrial Order." *Id.* at *6. Here, like the plaintiff in *Lucent*, Finjan argues that it is "standard practice" to order accountings to update a jury's damages award to the time of final judgment. Further, like the plaintiff in *Tristrata*, Finjan argues that an accounting is necessary because it allegedly did not have all relevant sales data at trial and its expert testified that he was unable to include all infringing sales in his opinion. Like the Court in *Lucent* and *Tristrata*, this Court should deny Finjan's request for an accounting because of Finjan failed to preserve its request for an accounting in either the Complaint, the Amended Complaint, or the Final Joint Pre-Trial Order.

Finjan concedes that it did not expressly request an accounting in its Complaint or Amended Complaint or in the Final Pretrial Order. Instead, Finjan argues that it made its request "in its Amended Complaint by requesting '[s]uch further and other relief as the Court and/or the

jury may deem proper and just'" and in its Trial Brief by requesting "other damages." (Finjan Br. at 3-4 (D.I. 262).) Finjan cites no authority for the proposition that such requests satisfy the requirements in the District of Delaware. Indeed, such requests do not pass muster under *Lucent* or *Tristrata*. First, *Lucent* and *Tristrata* expressly hold that a request for accounting must be in either the complaint or Final Pretrial Order – a request in a Trial Brief does not satisfy this requirement. Second, in *Lucent*, the court expressly held that requests that "lack clarity" are not sufficient to preserve a request for accounting. 168 F. Supp. at 273. Finjan's alleged request in its Amended Complaint does not pass the *Lucent* or *Tristrata* tests. In fact, in both *Lucent* and *Tristrata*, the plaintiffs made the same requests in their complaints that Finjan now relies on for its accounting request. (*See* Ex. 1 at 6 (*Tristrata* complaint requesting "such other and further relief as this Court may deem just and proper"); Ex. 2 at 13, Ex. 3 at 14 (*Lucent* complaints requesting "such other further relief as may be just and appropriate").) These type of vague requests were not a basis for allowing an accounting in *Lucent* or *Tristrata*, and it should not be in this case either.

Finjan's failure to expressly request an accounting (or even a request for "corresponding damages for a given period of time") in its complaints or the Final Joint Pretrial Order waives its right to an accounting. The Court should not allow Finjan to skirt around this Court's requirement that an accounting must be expressly requested in the complaint or Final Pretrial Order. The Court should deny Finjan's motion for an amendment of the judgment and for an accounting based on waiver.

## B. Secure Would Be Unfairly Prejudiced By Finjan's Use of a Jury-Determined Royalty Rate For Determining Damages Beyond What Was Presented At Trial

If the Court determines that Finjan did not waive its request for an accounting, the Court should still deny Finjan's request for an accounting because it would unfairly prejudice Secure.

Under Finjan's own theory, the jury was misled as to the actual number of Webwasher and Cyberguard TSP products Finjan is claiming in the royalty base. Finjan's damages expert Mr. Russell Parr did not consider a higher sales volume, which may have persuaded both the jury and the damages expert to lower the exorbitant royalty rates opined by Mr. Parr and found by the jury.

This case was tried to a jury. Finjan asked the jury to determine a royalty rate based on alleged infringing sales presented at trial. The only quantity of allegedly infringing sales Finjan put before the jury for which damages were sought were the sales that Mr. Parr presented. (Tr. at 581:22-683:20 (D.I. 229).) The jury was instructed to "determine the amount of damages, if any, to be awarded to Finjan for the infringement." (D.I. 225 at Jury Instruction No. 28.) The jury was also instructed that "[t]he amount of those damages must be adequate to compensate the patentee for infringement." (*Id.*) The Joint Special Verdict Form provided to the jury does not permit the Court or the parties to determine how the damages were calculated. (D.I. 220.) The jury determined shockingly high royalty rates of 16% for Webwasher Software and 8% for Webwasher Hardware Appliances and Cyberguard TSP Hardware Appliances. Now, Finjan would like the Court to apply the jury-determined rates to additional products sold both before[3] and after the trial. Finjan methodology is flawed and unfair to Secure because the additional volume of sales could have lowered the jury-determined royalty rates. In a hypothetical negotiation analysis, volume discounts should be considered – that is, royalty rates should generally go down as the royalty base – or volume of licensed goods sold – increases. *See*

---

[3] In addition, Finjan's request for an award of additional damages for sales before trial improperly invades the jury's province to determine damages and is an inappropriate use of 35 U.S.C. §284 to enhance damages. *See Oscar Mayer Foods Corp. v. Conagra, Inc.*, 869 F. Supp. 656, 668 (W.D. Wis. 1994)(denying accounting of pre-trial damages because it would "be an improper invasion of the jury's province to determine actual damages and an inappropriate use of 35 U.S.C. § 284 to enhance inadequate compensatory damages.")

6

*Bowling v Hasbro, Inc.*, 2008 U.S. Dist. LEXIS 30043, at *21-22 (D.R.I. March 17, 2008)(excluding expert's reasonable royalty opinion because, among other things, he failed to consider volume discounts for royalty rates). Here, on one hand, Finjan had the jury consider a lower royalty base, thereby justifying higher royalty rates and, now, Finjan is attempting to take advantage of those high royalty rates and would like the Court to apply them to additional sales. Finjan's manipulation of the damages case naturally results in a much higher, but incorrect, damages award. And, as explained below, this is not Secure's doing – Secure has complied with its discovery obligations. The Court should deny Finjan's attempt to receive a higher damages award based on an improper and post-hoc accounting.

### C.    Secure Complied With Its Discovery Obligations

Secure has, at all times during this litigation, complied with its discovery obligations. Nothing about Secure's discovery conduct justifies an accounting. Finjan has not, and cannot, show that Secure refused to provide supplemental Webwasher sales data. Finjan never asked for such supplementation.[4] Finjan's opening brief points to no letter or correspondence where Finjan requests supplemental Webwasher sales data. And, a request for such additional information at this late stage would be extremely untimely and improper.

Finjan's focus on Cyberguard TSP data is similarly flawed – Finjan never asked for such supplemental data after discovery.[5] Further, Finjan's contention that Secure refused to produce Cyberguard TSP sales data after June 30, 2006 is false. In response to Finjan's document requests and interrogatories related to Cyberguard TSP sales data, Secure objected to Finjan's requests as overly broad, unduly burdensome, and irrelevant in that it sought information relating

---

[4] Finjan has not supplemented its own document production.

[5] As of December 31, 2007, Secure no longer takes orders for Cyberguard TSP Hardware Appliances. (Ex. 4 at 7-8.)

7

to "Cyberguard TSP." (Finjan Exs. K (pp. 51-52) and L (pp. 36-37).) However, because Cyberguard with Webwasher was specifically accused, Secure agreed to produce sales information related to "Cyberguard TSP with Webwasher that it is able to locate after a reasonable search." (*Id.*) Thereafter:

- o  Finjan never challenged Secure's discovery responses concerning Cyberguard TSP

- o  Secure produced all responsive information related to Cyberguard TSP

- o  Finjan never requested a meet and confer regarding Secure's discovery responses or production concerning Cyberguard TSP

- o  Finjan never moved to compel discovery regarding Cyberguard TSP

In short, there were no sales of Cyberguard TSP with Webwasher after June 30, 2006 and Secure is not withholding sales records from production - the sales simply did not occur. Despite Secure's compliance with its discovery obligations concerning Cyberguard TSP, and Finjan's silence during discovery concerning Cyberguard TSP, Finjan now comes to this Court accusing Secure of discovery misconduct in an attempt to obtain an accounting. Finjan's accusations are wrong. Finjan's motion for an accounting should be denied.[6]

## II.   IF THE COURT GRANTS PREJUDGMENT INTEREST ON ANY COMPENSATORY AWARD, THE ONE-YEAR TREASURY CONSTANT MATURITY RATE, COMPOUNDED ANNUALLY, IS AN APPROPRIATE PREJUDGMENT INTEREST RATE

Prejudgment interest in a patent case is awarded "where necessary to afford the plaintiff full compensation for the infringement," but district courts have discretion to withhold a prejudgment interest award in various circumstances. *General Motors Corp. v. Devex Corp.*, 461

---

[6] If the Court is inclined to grant Finjan's motion for accounting, Secure respectfully submits that, due to the substantial issues presented in Secure's post-trial motions and the complexity, expense, and uncertainty surrounding the completion of an accounting, the Court should defer any action on accounting until after any appeals in this case are concluded. *See* 28 U.S.C. § 1292(c)(2) (stating that the Federal Circuit "shall have exclusive jurisdiction of an appeal from a judgment in a civil action for patent infringement which . . . is final except for an accounting.").

8

U.S. 648, 656 (1983) (stating that it does "not construe § 284 as requiring the award of prejudgment interest whenever infringement is found.") Prejudgment interest may be denied if there is justification for withholding such an award. *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1346, 1361-62 (Fed. Cir. 2001)(affirming denial of prejudgment interest based on plaintiff's litigation tactics). Therefore, this Court may withhold prejudgment interest.

If the Court awards prejudgment interest, a prejudgment interest rate based upon the Treasury Constant Maturity Rate, compounded annually, is appropriate. Many federal courts, including the Federal Circuit and the District of Delaware, have used or upheld prejudgment interest levels based upon U.S. Treasury rates, compounded annually. *See, e.g.*, *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997); *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 829 (Fed. Cir. 1989); *Phillips Petroleum Co. v. Rexene Corp.*, 1997 U.S. Dist. LEXIS 18460, at *83 (D. Del. Sept. 4, 1997); *Schering Corp. v. Precision-Cosmet Co.*, 614 F. Supp. 1368, 1383-84 (D. Del. 1985).

In *Laitram*, the Federal Circuit affirmed the district court's use of the U.S. Treasury bill rate, compounded annually, instead of the prime rate, because "there was no evidence that [plaintiff] borrowed money at a higher rate, what that rate was, or that there was a causal connection between any borrowing and the loss of the use of the money awarded as a result of [defendant's] infringement." 115 F.3d at 955. Likewise, in *Schering*, the District of Delaware applied the T-bill rate set forth in 28 U.S.C. § 1961, compounded annually, because the plaintiff did not affirmatively demonstrate that the plaintiff "borrowed money at or above the prime rate in order to continue its operations." 614 F. Supp. at 1384. Like in *Laitram* and *Schering*, Finjan has presented no evidence that it has borrowed money at a higher rate than the T-bill, what that rate was, or that there was a causal connection between any borrowing and the loss of the use of

9

the money awarded as a result of Secure's alleged infringement. Finjan has simply not shown that it borrowed money at or above the prime rate in order to continue operations. Therefore, like in *Laitram* and *Schering*, the T-bill rate compounded annually is the only appropriate rate.

In addition, the alleged loss of use of money by Finjan also could be characterized as an unsecured loan to Secure. One court discussing this issue has stated that "[t]he argument against using the prime rate is that the prime rate is designed to compensate for financial risk (albeit the low risk of prime borrowers) associated with the possibility of non-payment by borrowers. Given [Defendant's] strong financial position, it presents a risk that is much more like that of federal governments making the Treasury Bill rate more appropriate." *Eolas Techs. Inc. v. Microsoft Corp.*, 2004 U.S. Dist. LEXIS 534, at \*26-28 (N.D. Ill. Jan. 14, 2004), *rev'd on other grounds*, 399 F.3d 1325 (Fed. Cir. 2005). Assuming Finjan is entitled to prejudgment interest, that loan was risk free, given Secure's financial position, and therefore commands a low interest rate.

Even Finjan acknowledges Secure's healthy financial condition. (*See* Finjan Br. In Support Enhanced Damages at 18-19 (D.I. 264).) As Secure has consistently argued, Finjan should not be allowed to use Secure's financial position as a shield and a sword. For example, in opposition to Secure's motion to stay enforcement of the judgment (D.I. 247), Finjan disparaged Secure's financial position. (Finjan Opposition at p. 3-7 (D.I. 251).) Then, in support its motion for enhanced damages, Finjan wants to use Secure's healthy financial position to obtain treble damages. Now, in response to this brief, Finjan will likely reply that Secure's financial position does not justify a low prejudgment interest rate. Finjan cannot have it both ways. Secure's financial position justifies the use of the Treasury Constant Maturity Rate. Finjan can provide no evidence that Secure's financial position put it at risk greater than warranted by the one-year Treasury Constant Maturity Rate.

10

If the Court awards prejudgment interest, the interest rate should be at the one-year Treasury Constant Maturity Rate, compounded annually, in the amount of $589,954.[7] (*See* Ex. 5 Decl. of Carl Degen at ¶ 5 and Ex. B (attaching table showing appropriate rates and formulas for prejudgment interest calculation under the T-bill rate.))

## III.    SECURE DOES NOT OBJECT TO FINJAN'S REQUEST FOR POSTJUDGMENT INTEREST

Secure does not dispute that postjudgment interest is granted as a matter of right, pursuant to 28 U.S.C. § 1961. Secure respectfully submits that, if the Court denies Secure's post-trial motions, then postjudgment interest should be calculated from the date of final judgment, using the formula set forth in section § 1961.

### CONCLUSION

Based upon the foregoing, Finjan's motion for an amendment of the judgment, for accounting, and for prejudgment interest, should be denied.

---

[7] If the Court awards Finjan prejudgment interest at Finjan's requested prime rate, compounded quarterly, Secure respectfully requests that the Court use the calculation attached as Exhibit 3, which calculates prejudgment interest based on ongoing sales, for a total of $1,390,947. Finjan's prejudgment interest calculation (Finjan Ex. P) is flawed because it incorrectly assumes a lump sum payment on the first day of alleged infringement (thereby artificially raising the prejudgment interest total), instead of ongoing royalty payments per quarter. (*See* Ex. 5, Degen Decl. at ¶¶ 3-4 and Ex. A.) Finjan's damages expert, Mr. Parr, did not opine that a lump sum up front payment was appropriate, but rather he opined regarding a percentage of sales. (Tr. at 594:7-23 (D.I. 229).)

11

OF COUNSEL:

Ronald J. Schutz
Jake M. Holdreith
Christopher A. Seidl
Trevor J. Foster
ROBINS, KAPLAN, MILLER &
CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402
(612) 349-8500

Dated: May 9, 2008

*Kelly E. Farnan*

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Kelly E. Farnan (#4395)
farnan@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19899
(302) 651-7700

***ATTORNEYS FOR SECURE COMPUTING***

12

# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 9, 2008, I electronically filed the foregoing with the

Clerk of Court using CM/ECF and caused the same to be served on the plaintiff at the addresses

and in the manner indicated below:

## HAND DELIVERY & E-MAIL

Philip A. Rovner
Potter Anderson & Corroon LLP
1313 N. Market Street,
Hercules Plaza, 6th Floor
Wilmington, DE 19899-0951

I further certify that on May 9, 2008, the foregoing document was sent to the following

non-registered participants in the manner indicated:

## E-MAIL

Paul J. Andre
Lisa Kobialka
King & Spalding, LLP
1000 Bridge Parkway, Suite 100
Redwood Shores, CA 94065

*Kelly E. Farnan*

Kelly E. Farnan (#4395)

EXHIBIT 1



ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TRISTRATA TECHNOLOGY, INC.            )
                                      )
            Plaintiff,                )
                                      )
    v.                                )        No.:        0 1    5 0
                                      )
ICN PHARMACEUTICALS, INC. and         )
MEDICIS PHARMACEUTICAL CORPORATION)
                                      )
            Defendants.               )

## COMPLAINT AND JURY DEMAND

Plaintiff, Tristrata Technology, Inc. ("TTI"), by its attorneys, Mayer, Brown & Platt, alleges

for its Complaint against Defendants ICN Pharmaceuticals, Inc. and Medicis Pharmaceutical

Corporation on knowledge as to itself and its own acts and upon information and belief as to all other

matters, as follows:

## SUMMARY OF COMPLAINT

1.      This is an action for patent infringement pursuant to the patent laws of the United

States, 35 U.S.C. §100, et seq. arising out of Defendants' willful and deliberate infringement of the

patents described below.

2.      The patents were issued to Drs. Eugene J. Van Scott and Ruey J. Yu, who are

pioneers in the field of the use of alpha-hydroxy-acids ("AHA") for the treatment of conditions

associated with the skin. Each of the patents describes and claims compositions comprising alpha

hydroxy acids in combination with hydroquinone. Each of the patents also describes and claims

methods of preparing and using such compositions to treat various skin conditions such as age spots,

12790876 1

wrinkles, and keratoses. (The two patents at issue in this suit are collectively referred to as the "TTI Patents.")

3. TTI provided notice of the TTI Patents to manufacturers, sellers and/or distributors of cosmetic products both in the United States and abroad, including, specifically, each of the Defendants. The notices explicitly informed each recipient, among other things, that: (i) the patents had been issued and assigned to TTI; and (ii) TTI was willing to enter into licensing agreements with such entities. To date, several of the largest manufacturers and/or marketers in the cosmetics industry have entered into such license agreements with TTI, including, without limitation, Avon, Chesebrough Pond's, Elizabeth Arden, Allergan, Beiersdorf, Inc., L'Oreal, Chanel, Neoteric Cosmetics, Inc., and Erno Laszlo. Furthermore, TTI has received substantial royalty payments in return for granting such licenses.

4. However, Defendants have continued to refuse to recognize the TTI Patents and have willfully and deliberately infringed the TTI Patents by, among other things, promoting the use of their products through national advertisements and otherwise in a manner designed to induce infringement of the TTI Patents.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1338(a).

6. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c) and 28 U.S.C. §1400(b).

## THE PARTIES

### The Plaintiff

7.     Plaintiff TTI is a Delaware corporation with its principal place of business at 1105 North Market Street, Suite 1300, P.O. Box 8985, Wilmington, Delaware 19899.  TTI is in the business of developing and licensing novel dermatological, pharmaceutical and skin care product technology.  TTI is the assignee of certain patents issued to Drs. Van Scott and Yu (the "Inventors").

### The Defendants

8.     Defendant, ICN Pharmaceuticals, Inc. ("ICN") is a Delaware corporation with its principal place of business in California.  ICN is in the business of manufacturing, distributing and/or selling cosmetic products in this District and elsewhere throughout the United States.

9.     Defendant, Medicis Pharmaceutical Corporation ("Medicis") is a Delaware corporation with its principal place of business in New York.  Medicis in the business of manufacturing and/or selling cosmetic products in this District and elsewhere throughout the United States.

## THE PATENTS

10.     On October 1, 1996, United States Letters Patent No. 5,561,157 entitled "Method for Enchancing the Therapeutic Effect of a Composition Comprising Hydroquinone and Comprising Same" was duly and legally issued to the Inventors and assigned to TTI.  A copy of this patent ("the '157 Patent") are annexed hereto as Exhibit A.  The '157 Patent describes and claims compositions comprising alpha hydroxy acids in combination with hydroquinone.  The '157 Patent also describes and claims methods of preparing and using such compositions to treat various skin conditions such as age spots, wrinkles, and keratoses.

12790876 1

3

11.    On September 9, 1997, United States Letters Patent No. 5,665,776, entitled "Additives Enhancing Topical Actions of Therapeutic Agents" was duly and legally issued to the Inventors and assigned to TTI.   A copy of this patent ("the '776 Patent") are annexed hereto as Exhibit B.  The '776 Patent describes and claims compositions comprising alpha hydroxy acids in combination with hydroquinone.  The '776 Patent also describes and claims methods of preparing and using such compositions to treat various skin conditions such as age spots, wrinkles, and keratoses.

12.    TTI is the assignee of the '157 and '776 Patents.

13.    TTI's methods for treating various skin conditions such as age spots, wrinkles, and keratoses, as described and claimed in the annexed patents, have enjoyed excellent commercial success since its introduction.  Indeed, TTI's methods have become the method of choice for the consuming public for reducing wrinkles, fine lines and other visible effects of aging on the human skin.

## FIRST CLAIM FOR RELIEF

14.    TTI repeats and realleges the allegation of paragraphs 1 through 13 as if fully set forth herein.

15.    Each of the Defendants, ICN and Medicis, are engaged in the manufacture, distribution and/or sale of cosmetic products comprising alpha hydroxy acids in combination with hydroquinone.  These products are sold and promoted through national advertisements and other marketing materials that encourage prospective customers to apply such products to their skin for the purpose of visibly treating various skin conditions such as age spots, wrinkles, and keratoses - - i.e., to use their products in a manner that would infringe the '157 Patent.

12790876 1

4

16.    By virtue of these promotional activities, Defendants have been contributing, and continue to contribute, to and/or to induce the infringement of the '157 Patent in violation of 35 U.S.C. §271.

17.    Each Defendant has received express notice of the '157 Patent and/or had prior knowledge of that patent prior to the filing of this complaint. Despite notice of the '157 Patent and TTI's offer to negotiate a license agreement, Defendants either did not respond to TTI's notice or refused to enter into a license agreement, and continue to induce infringement of the '157 Patent in violation of 35 U.S.C. §271.

18.    Defendants' actions have been willful and deliberate, entitling TTI to increased damages under 35 U.S.C. §284 and making this an exceptional case within the meaning of 35 U.S.C §285.

### SECOND CLAIM FOR RELIEF

19.    TTI repeats and realleges the allegations of paragraphs 1 through 18 as if fully set forth herein.

20.    Each of the Defendants, ICN and Medicis, are engaged in the manufacture, distribution and/or sale of cosmetic products comprising alpha hydroxy acids in combination with hydroquinone. These products are sold and promoted through national advertisements and other marketing materials that encourage prospective customers to apply such products to their skin for the purpose of visibly treating various skin conditions such as age spots, wrinkles, and keratoses - - i.e., to use their products in a manner that would infringe the '776 Patent.

12790876 1

21.    By virtue of these promotional activities, Defendants have been contributing, and continue to contribute, to and/or to induce the infringement of the '776 Patent in violation of 35 U.S.C. §271.

22.    Each Defendant has received express notice of the '776 Patent and/or had prior knowledge of that patent prior to the filing of this complaint. Despite notice of the '776 Patent and TTI's offer to negotiate a license agreement, Defendants either did not respond to TTI's notice or refused to enter into a license agreement, and continued to induce infringement of the '776 Patent in violation of 35 U.S.C. §271.

23.    Defendants' actions have been willful and deliberate, entitling TTI to increased damages under 35 U.S.C. §284 and making this an exceptional case within the meaning of 35 U.S.C §285.

WHEREFORE, TTI prays for judgment:

A.    Finding that the '157 and '776 Patents have been infringed by the Defendants, as alleged herein;

B.    Awarding damages adequate to compensate TTI for Defendants' infringement, but not less than a reasonable royalty for the use made of the claimed inventions by each Defendant, together with interest, including pre-judgment interest, and costs as fixed by the Court;

C.    Finding that Defendants' infringements have been willful and deliberate;

D.    Awarding TTI increased damages and attorneys' fees pursuant to 35 U.S.C. § 284 and § 285 because of the willful and deliberate nature of Defendants' infringement;

E.    Permanently enjoining Defendants and their officers, agents, servants, employees and affiliates, as well as all others in active concert or participation with them as any of the foregoing, from inducing or contributing to the infringement of the '157 and '776 Patents;

F.    Awarding TTI such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Arthur G. Connolly, III (No. 2667)
CONNOLLY, BOVE, LODGE & HUTZ LLP
1220 Market Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141

Of Counsel:

Michael O. Warnecke
Donald W. Rupert
Robert J. Depke
MAYER, BROWN & PLATT
190 South LaSalle Street
Chicago, IL 60603
(312) 701-8602

Kevin M. McGovern
Brian T. Foley
McGovern & Associates
One Lafayette Place
Greenwich, CT 06830
(203) 622-1101

DATED: March 6, 2001

12790876 1

7

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LUCENT TECHNOLOGIES INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 97- 347 |
| | ) | |
| NEWBRIDGE NETWORKS CORPORATION, | ) | |
| NEWBRIDGE NETWORKS INC., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants | ) | |

## COMPLAINT

Plaintiff Lucent Technologies Inc. ("Lucent"), by its attorneys, for its

complaint against defendants Newbridge Networks Corporation, and its wholly owned

subsidiary Newbridge Networks Inc. (collectively, "Newbridge"), hereby demands a jury

trial and alleges as follows:

## SUMMARY

1.     This is a patent infringement action to stop Newbridge's

unauthorized and infringing manufacture and sale of products incorporating Lucent's

patented data networking inventions.  Lucent is a leader in the field of design and

manufacture of data networking equipment.  Newbridge sells data networking equipment

in competition with Lucent.  Lucent seeks injunctive relief to prevent Newbridge from

continuing to infringe Lucent's valuable patent rights in the field of data networking.  In

addition, Lucent seeks monetary damages for Newbridge's past infringement of these

patents.  Defendants' response to Lucent's assertion of these patents has failed to

conform to the required standard of care. Therefore, the damages awarded to Lucent should be trebled and Lucent should be awarded its attorney fees, costs, and expenses for this exceptional case.

## NATURE OF THE ACTION

2. Lucent was formed in 1995 when AT&T Corp. ("AT&T") divested certain business segments that were engaged in product sales and development in areas that were not directly related to AT&T's core business as a communications provider. Among these divested business segments was Bell Laboratories, where the transistor, communications laser, and cellular telephone were first developed. These divested businesses were incorporated into a single corporate entity, Lucent, which is now a publicly-traded corporation, wholly independent of AT&T.

3. One of Lucent's businesses is the data networking equipment business, a technical field pioneered by Bell Laboratories. Data networking is a relatively new field, which relates to systems that allow data networks to communicate with each other. Bell Laboratories was an innovator in this field, investing millions of dollars into data networking-related research. Lucent continues this work, likewise investing millions of dollars each year in data networking product research and development. In addition, as part of the divestiture, Lucent received most of AT&T's sizeable data networking patent portfolio, with the right to receive royalties from existing and future licensees.

4. Newbridge manufactures and sells products that are covered by various Lucent patents. Lucent has, on several occasions, provided actual notice to Newbridge of its infringement of Lucent's patents. Newbridge, however, has ignored

these warnings by continuing to infringe, thus necessitating this action by Lucent to protect its intellectual property.

## THE PARTIES

5.    Lucent is a corporation organized under the laws of the State of Delaware, with its principal place of business in Murray Hill, New Jersey. Lucent is a leader in the field of data networking technology. Lucent owns all right, title, and interest, including the right to sue for past infringement, in the patents in suit.

6.    Defendant Newbridge Networks Corporation is a Canadian company with its principal offices at 600 March Road, Kanata, Ontario, Canada. Newbridge Networks Corporation makes, uses, sells, and offers to sell data networking equipment in the United States under the product line "MainStreet." On information and belief, Newbridge Networks Corporation has committed acts of infringement in this district.

7.    Defendant Newbridge Networks Inc. is a company incorporated under the laws of the State of Delaware, with its principal place of business at 593 Herndon Highway, Herndon, Virginia, 22071. Newbridge Networks Inc. is a wholly owned subsidiary of Newbridge Networks Corporation. Newbridge Networks Inc. uses, sells, and offers to sell the MainStreet data networking products in the United States. In addition, on information and belief, Newbridge Networks Inc. makes and imports the MainStreet line into the United States, and has committed acts of infringement in this district.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this patent infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(c), 1391(d), and 1400(b) because defendants have committed acts of infringement in this district and defendant Newbridge Networks, Inc. resides in this district.

## FACTUAL BACKGROUND

### Overview Of The Data Networking Technology

10.    This case involves data networking technology. In general, data networking technology allows various electronic devices (*e.g.*, computers, phones, and facsimile machines) to communicate with one another. For instance, data networking allows a computer user in one location to send an electronic mail message to another computer user in another location. In a broad sense, the telephone system (commonly referred to as the Public Switched Telephone Network, or "PSTN") is a type of data networking system in which the data being transmitted is the human voice. In fact, the telephone system is often used as part of a data network, and proposals are now being developed to make the telephone system part of one global data networking system.

11.    Specifically, this case involves a type of data networking technology called "packet switching." Packet switching is a way of transmitting data between two or more users. To use packet switching, the two communicating users must be connected in some manner to a "network" which supports packet switching. The network may be a small, local area network ("LAN") that connects users within a single,

small office. More commonly, it is a large, wide area network ("WAN") connecting different LANs in different locations.

12.    Transmission of data via packet switching requires that all data be in digital form, i.e., represented by a series of ones and zeroes. Thus, where the data being sent is the human voice, it is first converted into a digital format (a series of data streams). Where the data is already in digital format (e.g., e-mail or digital audio or video), it need not be converted. A first packet switch located near the sender breaks down the digital data stream into a number of discrete "packets" or segments. These packets are then forwarded to a second packet switch connected to the receiving user (possibly through a number of other packet switches). The second packet switch reassembles the message into the original digital data stream. The digital data stream is ultimately converted into a form that is useable by the end user, e.g., voice, video or text.

13.    Packet switching differs from the "circuit switching" normally employed by standard telephone systems. Circuit switching requires that an actual physical circuit be set up and dedicated for the duration of the telephone call, to continuously transmit data. Packet switching does not require that a circuit be dedicated for the duration of the communication. Instead, packet switching is designed to allow individual packets to be transmitted over the same path. This allows for more efficient use of the overall system, i.e., it can send more information to more users, in a faster manner, using the same basic network structure. It also allows additional design flexibility for features such as congestion control and error correction.

14.    Two important methods of packet switching are central to this case. The first is "frame relay." In frame relay, the packets of data are formed in variable-sized "frames" before sending them through the network. The second is

Asynchronous Transfer Mode ("ATM"), in which the packets of data sent through the network are contained in "cells" of a uniform size. Each of these methods is an improvement over using conventional circuit switching to transmit data.

### Lucent's Data Networking Patents

15.     Lucent owns a number of patents relating to packet switching, frame relay and ATM resulting from work performed by Bell Laboratories. One of these patents, U.S. Patent No. 4,769,810 by Eckberg et al. ("the '810 patent," attached as exhibit A), describes and claims a method and apparatus for controlling congestion in a packet switching network. The invention solved a problem in packet switching systems of how to relieve excessive congestion in the network during periods of peak use. The '810 patent covers a method of monitoring whether a particular user is transmitting data at an excessive rate and marking packets to be dropped. The '810 patent also covers the packet switching apparatus that allow this marking to be accomplished. This invention is used in both the frame relay and the ATM methods of packet switching.

16.     A second Eckberg et al. patent, U.S. Patent No. 4,769, 811 ("the '811 patent," attached as exhibit B), relates to congestion control in a packet switching network. The '811 patent describes and claims a method of determining whether to drop a packet due to congestion, as well as the apparatus for performing this method. This invention allows the system to better control which packets are dropped in the event of network congestion. For example, a packet switching system employing this invention may preferentially drop certain packets of a single user who excessively uses the system, while preserving other packets, in the event of excessive congestion. This invention is used in both the frame relay and the ATM methods of packet switching.

17.    A third patent, U.S. Patent No. 4,979,174, by Cheng et al., entitled "Error Correction and Detection Apparatus and Method" ("the '174 patent," attached as exhibit C), describes and claims a method and apparatus for both detecting and correcting errors in packet information. The invention capitalizes on the superior error-correction capabilities of single-bit error correction and the superior error-detection capabilities of multi-bit error detection, by providing a means to use both to correct and detect errors in the transmission of different kinds of data. This invention is used in ATM networks.

18.    A fourth patent, U.S. Patent No. 4,437,087, by Petr ("the '087 patent," attached as exhibit D), covers a method and apparatus for "adaptive differential pulse code modulation," or "ADPCM," which is used to compress speech and other voice band signals into a useable digital format. This innovation is significant because it allows networks that operate on digital signals, like packet switching networks, to more efficiently transmit voice data (and thus act as a digital telephone network). In fact, the '087 invention was adopted by an international standards body as the standard modulation technique for compressing voice signals to 32 kilobits per second. With respect to this standard, AT&T promised to license the '087 patent royalty-free at 32 kilobits per second, but only in exchange for a reciprocal license from the licensee on the same terms. The invention claimed in the '087 patent is not limited, however, to the standard compression rate of 32 kilobits per second. The '087 patented invention can be used with either frame relay or ATM.

### Newbridge's MainStreet Products
### Infringe Lucent's Data Networking Patents

19.    Newbridge manufactures and sells packet switching equipment under the trade name "MainStreet." Newbridge sells this equipment in direct competition with switching equipment sold by Lucent. Newbridge's MainStreet line of products, including the MainStreet 3600 line of switch products, includes switches for frame relay networks.

20.    Newbridge's frame relay network products include congestion control features. Newbridge's frame relay products with these features infringe at least the '810 and '811 patents. Newbridge frame relay products also use ADPCM voice compression. On information and belief, Newbridge practices the standard 32 kilobit per second ADPCM compression covered by the '087 patent. Newbridge, however, does not have a license from Lucent to practice this invention. In addition, on information and belief, Newbridge has made modifications to its ADPCM compression that removes it from compliance with the standard for which AT&T offered a royalty free license, but which modifications remain covered by the '087 patent.

21.    Newbridge also manufactures and sells a line of MainStreet switches for ATM packet switching. Newbridge sells these switches in direct competition with Lucent. The Newbridge switches for ATM networks include the MainStreet 36170 line of switch products.

22.    Newbridge's ATM products include congestion and error control features. Newbridge's ATM products with these features infringe at least the '810, '811, and '174 patents.

**Newbridge Has Been On Notice Of Lucent's Patent Rights**

23.    Newbridge received actual notice from both AT&T and Lucent that both its frame relay and ATM products infringe the above-described patents. In spite of this actual notice, Newbridge has continued its infringement of Lucent's valuable patent rights, and has actively encouraged others to use the infringing Newbridge equipment in an infringing manner.

**Lucent Will Be Irreparably Harmed By Newbridge's Continued Infringement**

24.    Lucent has been damaged by Newbridge's infringement of its valuable patent rights. First, Newbridge's infringement of Lucent's patent rights has deprived Lucent of sales of data networking equipment that it would have made but for Newbridge's infringement. Second, Newbridge's continuing infringement damages Lucent's reputation and goodwill as a leading source of technological advancements in the data networking industry. The public and marketplace perception of Lucent as a source of data networking innovations erodes when unauthorized infringers, like Newbridge, are permitted to a free ride on Lucent's intellectual property. Third, Newbridge's unauthorized, infringing use of Lucent's patents has threatened the value of this intellectual property. Newbridge's disregard for Lucent's property rights threatens Lucent's relationships with businesses that pay for the right to use this property. Accordingly, unless and until Newbridge's continued acts of infringement are enjoined, Lucent will suffer irreparable harm for which there is no adequate remedy at law.

**COUNT I**
**(Patent Infringement of United States Patent No. 4,769,810)**
**(Against Both Defendants)**

25.    Paragraphs 1 through 24 are incorporated by reference as if stated fully herein.

26.    Lucent owns the '810 patent, including the right to sue for past infringement.

27.    The '810 patent is valid and enforceable.

28.    Defendants make, use, sell, and offer to sell products that infringe at least one of the claims of the '810 patent.

29.    On information and belief, defendants have also contributed to and/or induced infringement of the '810 patent.

30.    Lucent has been damaged by defendants' infringement and will suffer irreparable injury unless enjoined by this Court.

**COUNT II**
**(Patent Infringement of United States Patent No. 4,769,811)**
**(Against Both Defendants)**

31.    Paragraphs 1 through 24 are incorporated by reference as if stated fully herein.

32.    Lucent owns the '811 patent, including the right to sue for past infringement.

33.    The '811 patent is valid and enforceable.

34.    Defendants make, use, sell, and offer to sell products that infringe at least one of the claims of the '811 patent.

35.     On information and belief, defendants have also contributed to and/or induced infringement of the '811 patent.

36.     Lucent has been damaged by defendants' infringement and will suffer irreparable injury unless enjoined by this Court.

## COUNT III
### (Patent Infringement of United States Patent No. 4,979,174)
### (Against Both Defendants)

37.     Paragraphs 1 through 24 are incorporated by reference as if stated fully herein.

38.     Lucent owns the '174 patent, including the right to sue for past infringement.

39.     The '174 patent is valid and enforceable.

40.     Defendants make, use, sell, and offer to sell products that infringe at least one of the claims of the '174 patent.

41.     On information and belief, defendants have also contributed to and/or induced infringement of the '174 patent.

42.     Lucent has been damaged by defendants' infringement and will suffer irreparable injury unless enjoined by this Court.

## COUNT IV
### (Patent Infringement of United States Patent No. 4,437,087)
### (Against Both Defendants)

43.     Paragraphs 1 through 24 are incorporated by reference as if stated fully herein.

44.     Lucent owns the '087 patent, including the right to sue for past infringement.

45.    The '087 patent is valid and enforceable

46.    Defendants make, use, sell, and offer to sell products that infringe at least one of the claims of the '087 patent.

47    On information and belief, defendants have also contributed to and/or induced infringement of the '087 patent.

48    Lucent has been damaged by defendants' infringement and will suffer irreparable injury unless enjoined by this Court.

**WHEREFORE**, Lucent respectfully requests that the Court:

a.    Permanently enjoin defendants, their agents, attorneys, successors and assigns, and all persons acting on their behalf or within their control, from making, using, selling, offering to sell, importing, advertising, or otherwise engaging in acts of infringement of Lucent's patents as alleged herein,

b.    Award actual damages for said infringement;

c.    Award treble damages pursuant to 35 U.S.C. § 284 in view of defendants' failure to meet the required standard of care in continuing their acts of infringement after notice from Lucent;

d    Enter an order declaring this as an exceptional case pursuant to 35 U.S.C. § 285 and award Lucent its attorney fees, costs, and expenses in this exceptional case; and

e    Grant to Lucent such other further relief as may be just and

appropriate.

Respectfully submitted,

Josy W. Ingersoll (#1088)
YOUNG, CONAWAY, STARGATT & TAYLOR
11th Floor, Rodney Square North
Wilmington, DE 19899-0391
(302) 571-6600

John M. Desmarais
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

William A. Streff, Jr.
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

Jay I. Alexander
KIRKLAND & ELLIS
655 15th Street, N.W.
Washington, D.C. 20005
(202) 879-5000

Attorneys for Lucent Technologies Inc.

Dated: June 24, 1997

EXHIBIT 3

30

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LUCENT TECHNOLOGIES INC., | ) | |
| | ) | |
| Plaintiff-Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Civil Action No. 97-347 (JJF) |
| | ) | |
| NEWBRIDGE NETWORKS CORPORATION, | ) | |
| | ) | |
| Defendant-Counterclaim Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NEWBRIDGE NETWORKS INC., | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED COMPLAINT

Plaintiff Lucent Technologies Inc. ("Lucent"), by its attorneys, for its complaint

against defendants Newbridge Networks Corporation, and its wholly owned subsidiary

Newbridge Networks Inc. (collectively, "Newbridge"), hereby demands a jury trial and alleges

as follows:

### SUMMARY

1.     This is a patent infringement action to stop Newbridge's unauthorized and

infringing manufacture and sale of products incorporating Lucent's patented data networking

inventions. Lucent is a leader in the field of design and manufacture of data networking

equipment. Newbridge sells data networking equipment in competition with Lucent. Lucent

seeks injunctive relief to prevent Newbridge from continuing to infringe Lucent's valuable

patent rights in the field of data networking. In addition, Lucent seeks monetary damages for Newbridge's past infringement of these patents. Defendants' response to Lucent's assertion of these patents has failed to conform to the required standard of care. Therefore, the damages awarded to Lucent should be trebled and Lucent should be awarded its attorney fees, costs, and expenses for this exceptional case.

## NATURE OF THE ACTION

2.    Lucent was formed in 1995 when AT&T Corp. ("AT&T") divested certain business segments that were engaged in product sales and development in areas that were not directly related to AT&T's core business as a communications provider. Among these divested business segments was Bell Laboratories, where the transistor, communications laser, and cellular telephone were first developed. These divested businesses were incorporated into a single corporate entity, Lucent, which is now a publicly-traded corporation, wholly independent of AT&T.

3.    One of Lucent's businesses is the data networking equipment business, a technical field pioneered by Bell Laboratories. Data networking is a relatively new field, which relates to systems that allow data networks to communicate with each other. Bell Laboratories was an innovator in this field, investing millions of dollars into data networking-related research. Lucent continues this work, likewise investing millions of dollars each year in data networking product research and development. In addition, as part of the divestiture, Lucent received most of AT&T's sizeable data networking patent portfolio, with the right to receive royalties from existing and future licensees.

2

4.    Newbridge manufactures and sells products that are covered by various Lucent patents. Lucent has, on several occasions, provided actual notice to Newbridge of its infringement of many of Lucent's patents. Newbridge, however, has ignored these warnings by continuing to infringe, thus necessitating this action by Lucent to protect its intellectual property.

## THE PARTIES

5.    Lucent is a corporation organized under the laws of the State of Delaware, with its principal place of business in Murray Hill, New Jersey. Lucent is a leader in the field of data networking technology. Lucent owns all right, title, and interest, including the right to sue for past infringement, in the patents in suit.

6.    Defendant Newbridge Networks Corporation is a Canadian company with its principal offices at 600 March Road, Kanata, Ontario, Canada. Newbridge Networks Corporation makes, uses, sells, and offers to sell data networking equipment in the United States under the product line "MainStreet." On information and belief, Newbridge Networks Corporation has committed acts of infringement in this district.

7.    Defendant Newbridge Networks Inc. is a company incorporated under the laws of the State of Delaware, with its principal place of business at 593 Herndon Highway, Herndon, Virginia, 22071. Newbridge Networks Inc. is a wholly owned subsidiary of Newbridge Networks Corporation. Newbridge Networks Inc. uses, sells, and offers to sell the MainStreet data networking products in the United States. In addition, on information and belief, Newbridge Networks Inc. makes and imports the MainStreet line into the United States, and has committed acts of infringement in this district.

3

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this patent infringement action pursuant to

28 U.S.C. §§ 1331 and 1338(a).

9.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(c), 1391(d),

and 1400(b) because defendants have committed acts of infringement in this district and

defendant Newbridge Networks, Inc. resides in this district.

## FACTUAL BACKGROUND

### Overview Of The Data Networking Technology

10.    This case involves data networking technology.  In general, data

networking technology allows various electronic devices (*e.g.*, computers, phones, and facsimile

machines) to communicate with one another.  For instance, data networking allows a computer

user in one location to send an electronic mail message to another computer user in another

location.  In a broad sense, the telephone system (commonly referred to as the Public Switched

Telephone Network, or "PSTN") is a type of data networking system in which the data being

transmitted is the human voice.  In fact, the telephone system is often used as part of a data

network, and proposals are now being developed to make the telephone system part of one

global data networking system.

11.    Specifically, this case involves a type of data networking technology

called "packet switching."  Packet switching is a way of transmitting data between two or more

users.  To use packet switching, the two communicating users must be connected in some

manner to a "network" which supports packet switching.  The network may be a small, local area

4

network ("LAN") that connects users within a single, small office. More commonly, it is a large, wide area network ("WAN") connecting different LANs in different locations.

12. Transmission of data via packet switching requires that all data be in digital form, i.e., represented by a series of ones and zeroes. Thus, where the data being sent is the human voice, it is first converted into a digital format (a series of data streams). Where the data is already in digital format (e.g., e-mail or digital audio or video), it need not be converted. A first packet switch located near the sender breaks down the digital data stream into a number of discrete "packets" or segments. These packets are then forwarded to a second packet switch connected to the receiving user (possibly through a number of other packet switches). The second packet switch reassembles the message into the original digital data stream. The digital data stream is ultimately converted into a form that is useable by the end user, *e.g.*, voice, video or text.

13. Packet switching differs from the "circuit switching" normally employed by standard telephone systems. Circuit switching requires that an actual physical circuit be set up and dedicated for the duration of the telephone call, to continuously transmit data. Packet switching does not require that a circuit be dedicated for the duration of the communication. Instead, packet switching is designed to allow individual packets to be transmitted over the same path. This allows for more efficient use of the overall system, *i.e.*, it can send more information to more users, in a faster manner, using the same basic network structure. It also allows additional design flexibility for features such as congestion control and error correction.

14. Two important methods of packet switching are central to this case. The first is "frame relay." In frame relay, the packets of data are formed in variable-sized "frames"

before sending them through the network. The second is Asynchronous Transfer Mode ("ATM"), in which the packets of data sent through the network are contained in "cells" of a uniform size. Each of these methods is an improvement over using conventional circuit switching to transmit data.

### Lucent's Data Networking Patents

15.    Lucent owns a number of patents relating to packet switching, frame relay and ATM resulting from work performed by Bell Laboratories. One of these patents, U.S. Patent No. 4,769,810 by Eckberg et al. ("the '810 patent," attached as exhibit A), describes and claims a method and apparatus for controlling congestion in a packet switching network. The invention solved a problem in packet switching systems of how to relieve excessive congestion in the network during periods of peak use. The '810 patent covers a method of monitoring whether a particular user is transmitting data at an excessive rate and marking packets to be dropped. The '810 patent also covers the packet switching apparatus that allow this marking to be accomplished. This invention is used in both the frame relay and the ATM methods of packet switching.

16.    A second Eckberg et al. patent, U.S. Patent No. 4,769, 811 ("the '811 patent," attached as exhibit B), relates to congestion control in a packet switching network. The '811 patent describes and claims a method of determining whether to drop a packet due to congestion, as well as the apparatus for performing this method. This invention allows the system to better control which packets are dropped in the event of network congestion. For example, a packet switching system employing this invention may preferentially drop certain packets of a single user who excessively uses the system, while preserving other packets, in the

6

event of excessive congestion. This invention is used in both the frame relay and the ATM methods of packet switching.

17.    A third patent, U.S. Patent No. 4,979,174, by Cheng et al., entitled "Error Correction and Detection Apparatus and Method" ("the '174 patent," attached as exhibit C), describes and claims a method and apparatus for both detecting and correcting errors in packet information. The invention capitalizes on the superior error-correction capabilities of single-bit error correction and the superior error-detection capabilities of multi-bit error detection, by providing a means to use both to correct and detect errors in the transmission of different kinds of data. This invention is used in ATM networks.

18.    A fourth patent, U.S. Patent No. 4,437,087, by Petr ("the '087 patent," attached as exhibit D), covers a method and apparatus for "adaptive differential pulse code modulation," or "ADPCM," which is used to compress speech and other voice band signals into a useable digital format. This innovation is significant because it allows networks that operate on digital signals, like packet switching networks, to more efficiently transmit voice data (and thus act as a digital telephone network). In fact, the '087 invention was adopted by an international standards body as the standard modulation technique for compressing voice signals to 32 kilobits per second. With respect to this standard, AT&T promised to license the '087 patent royalty-free at 32 kilobits per second, but only in exchange for a reciprocal license from the licensee on the same terms. The invention claimed in the '087 patent is not limited, however, to the standard compression rate of 32 kilobits per second. The '087 patented invention can be used with either frame relay or ATM.

19.    A fifth patent, U.S. Patent No. 4,750,136, by Arpin et al ("the '136 patent," attached as exhibit E), covers a method and apparatus for initializing a communications system. This invention is significant because it eliminates the need for a user to manually load parameters into a circuit board being inserted into a switch or other communications device. The invention of the '136 patent also allows a user to replace a malfunctioning circuit board in a switch or other communications device without powering down the device. The '136 patented invention can be used in any communications system, including ATM and frame relay systems.

**Newbridge's MainStreet Products
Infringe Lucent's Data Networking Patents**

20.    Newbridge manufactures and sells packet switching equipment under the trade name "MainStreet." Newbridge sells this equipment in direct competition with switching equipment sold by Lucent. Newbridge's MainStreet line of products, including the MainStreet 3600 line of switch products, includes switches for frame relay networks.

21.    Newbridge's frame relay network products include congestion control features. Newbridge's frame relay products with these features infringe at least the '810 and '811 patents. Newbridge frame relay products also use ADPCM voice compression. On information and belief, Newbridge practices the standard 32 kilobit per second ADPCM compression covered by the '087 patent. Newbridge, however, does not have a license from Lucent to practice this invention. In addition, on information and belief, Newbridge has made modifications to its ADPCM compression that removes it from compliance with the standard for which AT&T offered a royalty free license, but which modifications remain covered by the '087 patent.

8

22.    Newbridge also manufactures and sells a line of MainStreet switches for ATM packet switching. Newbridge sells these switches in direct competition with Lucent. The Newbridge switches for ATM networks include the MainStreet 36170 line of switch products.

23.    Newbridge's ATM products include congestion and error control features. Newbridge's ATM products with these features infringe at least the '810, '811, and '174 patents.

24.    The Newbridge frame relay and ATM products have an initialization feature that eliminates the need for a user to manually load parameters into circuit boards inserted into the products. This feature also allows a user to replace a malfunctioning circuit board in a Newbridge frame relay or ATM product without powering down the device. The Newbridge frame relay and ATM products with this initialization feature infringe the '136 patent.

## Newbridge Has Been On Notice Of Lucent's Patent Rights

25.    Newbridge received actual notice from either AT&T or Lucent that both its frame relay and ATM products infringe the above-described patents. In spite of this actual notice, Newbridge has continued its infringement of Lucent's valuable patent rights, and has actively encouraged others to use the infringing Newbridge equipment in an infringing manner.

## Lucent Will Be Irreparably Harmed
## By Newbridge's Continued Infringement

26.    Lucent has been damaged by Newbridge's infringement of its valuable patent rights. First, Newbridge's infringement of Lucent's patent rights has deprived Lucent of sales of data networking equipment that it would have made but for Newbridge's infringement. Second, Newbridge's continuing infringement damages Lucent's reputation and goodwill as a leading source of technological advancements in the data networking industry. The public and

9

marketplace perception of Lucent as a source of data networking innovations erodes when unauthorized infringers, like Newbridge, are permitted to free ride on Lucent's intellectual property. Third, Newbridge's unauthorized, infringing use of Lucent's patents has threatened the value of this intellectual property. Newbridge's disregard for Lucent's property rights threatens Lucent's relationships with businesses that pay for the right to use this property. Accordingly, unless and until Newbridge's continued acts of infringement are enjoined, Lucent will suffer irreparable harm for which there is no adequate remedy at law.

## COUNT I
### (Patent Infringement of United States Patent No. 4,769,810)
### (Against Both Defendants)

27.    Paragraphs 1 through 26 are incorporated by reference as if stated fully herein.

28.    Lucent owns the '810 patent, including the right to sue for past infringement.

29.    The '810 patent is valid and enforceable.

30.    Defendants make, use, sell, and offer to sell products that infringe at least one of the claims of the '810 patent.

31.    On information and belief, defendants have also contributed to and/or induced infringement of the '810 patent.

32.    Lucent has been damaged by defendants' infringement and will suffer irreparable injury unless enjoined by this Court.

## COUNT II
### (Patent Infringement of United States Patent No. 4,769,811)
### (Against Both Defendants)

33.    Paragraphs 1 through 26 are incorporated by reference as if stated fully herein.

34.    Lucent owns the '811 patent, including the right to sue for past infringement.

35.    The '811 patent is valid and enforceable.

36.    Defendants make, use, sell, and offer to sell products that infringe at least one of the claims of the '811 patent.

37.    On information and belief, defendants have also contributed to and/or induced infringement of the '811 patent.

38.    Lucent has been damaged by defendants' infringement and will suffer irreparable injury unless enjoined by this Court.

## COUNT III
### (Patent Infringement of United States Patent No. 4,979,174)
### (Against Both Defendants)

39.    Paragraphs 1 through 26 are incorporated by reference as if stated fully herein.

40.    Lucent owns the '174 patent, including the right to sue for past infringement.

41.    The '174 patent is valid and enforceable.

11

42.    Defendants make, use, sell, and offer to sell products that infringe at least one of the claims of the '174 patent.

43.    On information and belief, defendants have also contributed to and/or induced infringement of the '174 patent.

44.    Lucent has been damaged by defendants' infringement and will suffer irreparable injury unless enjoined by this Court.

## COUNT IV
### (Patent Infringement of United States Patent No. 4,437,087)
### (Against Both Defendants)

45.    Paragraphs 1 through 26 are incorporated by reference as if stated fully herein.

46.    Lucent owns the '087 patent, including the right to sue for past infringement.

47.    The '087 patent is valid and enforceable.

48.    Defendants make, use, sell, and offer to sell products that infringe at least one of the claims of the '087 patent.

49.    On information and belief, defendants have also contributed to and/or induced infringement of the '087 patent.

50.    Lucent has been damaged by defendants' infringement and will suffer irreparable injury unless enjoined by this Court.

## COUNT V
### (Patent Infringement of United States Patent No. 4,750, 136)
### (Against Both Defendants)

51.     Paragraphs 1 through 26 are incorporated by reference as if stated fully herein.

52.     Lucent owns the '136 patent, including the right to sue for past infringement.

53.     The '136 patent is valid and enforceable.

54.     Defendants make, use, sell, and offer to sell products that infringe at least one of the claims of the '136 patent.

55.     On information and belief, defendants have also contributed to and/or induced infringement of the '136 patent.

56.     Lucent has been damaged by defendants' infringement and will suffer irreparable injury unless enjoined by this Court.

57.     WHEREFORE, Lucent respectfully requests that the Court:

a.      Permanently enjoin defendants, their agents, attorneys, successors and assigns, and all persons acting on their behalf or within their control, from making, using, selling, offering to sell, importing, advertising, or otherwise engaging in acts of infringement of Lucent's patents as alleged herein;

b.      Award actual damages for said infringement;

c.   Award treble damages pursuant to 35 U.S.C. § 284 in view of defendants'

failure to meet the required standard of care in continuing their acts of infringement after

notice from Lucent;

d.   Enter an order declaring this as an exceptional case pursuant to 35 U.S.C.

§ 285 and award Lucent its attorney fees, costs, and expenses in this exceptional case;

and

e.   Grant to Lucent such other further relief as may be just and appropriate.

Respectfully submitted,

Josy W. Ingersoll (#1088)
YOUNG, CONAWAY, STARGATT & TAYLOR
11th Floor, Rodney Square North
Wilmington, DE 19899-0391
(302) 571-6600

John M. Desmarais
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

William A. Streff, Jr.
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

Jay I. Alexander
KIRKLAND & ELLIS
655 15th Street, N.W.
Washington, D.C. 20005
(202) 879-5000

Dated: January 13, 1998          Attorneys for Lucent Technologies Inc.

14

EXHIBIT 4

Secure Computing: Product Life Cycle Information

---

This page was printed from the **Secure Computing Corporation** web site,
located at http://www.securecomputing.com/index.cfm?skey=1312

---

## Product Life Cycle Information

Generally, Secure Computing® provides technical support on our products as it relates to the hosting platform for three (3) years. This is to ensure that our support-services customers can be confident that we will have a supported version of our software available for their operating system, host application, or appliance platform for typically no less than three years from the date that the product first shipped.

Secure Computing maintains a product life cycle program to ensure our customers clearly understand the support status of their Secure Computing products at all times. Policies related to product life stages vary by product. Appliances, for example, have different life cycle characteristics than do pure software products or than do subscription-based services like URL filtering or anti-virus updates. Our product life cycle programs assume that our customers stay relatively current with the latest released version of our products, and upgrade their Secure Computing software as new releases become available.

### Product Life Cycle Charts
The following charts detail the product life cycle support status of Secure Computing's products.

- Identity and Access Management
    - SafeWord® versions
    - SecureWire™
- Network Gateway Security (UTM/Firewall/VPN)
    - Sidewinder®
        - Sidewinder Anti-Spam Add-On Module
        - Sidewinder SoftRemote Add-On Module
    - SecurityReporter™
    - Secure CommandCenter™
    - Sidewinder G2® Enterprise Manager
    - CyberGuard® Classic
    - CyberGuard® TSP
    - SnapGear®
    - Gauntlet™
    - Global Command Center™ (GCC)
- Web Gateway Security
    - Webwasher® Web Gateway Security Appliance
    - Webwasher®
    - SmartFilter®
    - Internet Database of Categorized Content
    - N2H2 Bess® and Sentian™
    - ZIX Message and Web Inspector
- Messaging Products

Contact **Customer Service** with questions, or to receive future support announcements regarding product status.

### Life Stage Descriptions

- **ACTIVE Status**
    Products identified with the Active status are currently orderable and no last order date has been published. The product is fully supported by Secure Computing.

Secure Computing: Product Life Cycle Information

**Recommendation:** Purchase

- **LOD Status**
  Products identified with the LOD status have a published last order date or they may have in fact passed the last order date. The product is fully supported by Secure Computing.

  **Recommendation:** Make last purchase or plan for upgrade

- **MAINTENANCE Status**
  Products identified with the Maintenance status have a published end of life date and will continue to be supported with minor fixes & patches but will not receive any new feature enhancements.

  **Recommendation:** Upgrade as soon as possible

- **EOL Status**
  Products identified with the EOL status have a published end of life date and they have past their end of life date. The product is no longer supported under Secure Computing agreements. No new software releases for the product's platform (e.g., the host operating system, host application, or appliance platform) are planned, and no additional maintenance releases or patches will be made available.

  **Recommendation:** Must upgrade

**Product Life Cycle Charts**
The following charts detail the product life cycle support status of Secure Computing products.

---

## Identity and Access Management

## SafeWord® Strong Authentication Product List

| Software/version | Status | LOD date | EOL date | Supported platforms |
|---|---|---|---|---|
| SafeWord® RemoteAccess™ 2.2 | Active | | | WIN 2000, WIN 2003 |
| SafeWord® RemoteAccess™ 2.1 | LOD* | 12/29/06 | | WIN 2000, WIN 2003 |
| SafeWord® RemoteAccess™ 2.0 | LOD* | 09/30/05 | | WIN 2000, WIN 2003 |
| *Note: The above LOD versions are past LOD, in support, (Must upgrade to v2.2 for maintenance) | | | | |
| SafeWord® RemoteAccess™, Cisco Compatible 2.2 | Active | | | WIN 2000, WIN 2003 |
| SafeWord® RemoteAccess™, Cisco Compatible 2.1 | LOD* | 12/29/06 | | WIN 2000, WIN 2003 |
| SafeWord RemoteAccess™, Cisco Compatible 2.0 | LOD* | 09/30/05 | | WIN 2000, WIN 2003 |
| *Note: The above LOD versions are past LOD, in support, (Must upgrade to v2.2 for maintenance) | | | | |
| SafeWord® for Citrix® 2.2 | Active | | | WIN 2000, WIN 2003 |
| SafeWord® for Citrix® 2.1 | LOD* | 12/29/06 | | WIN 2000, WIN 2003 |
| SafeWord® for Citrix® 2.0 | LOD* | 09/30/05 | | WIN 2000, WIN 2003 |
| SafeWord® for Citrix® 1.1 | LOD* | 12/18/03 | | WIN 2000 |
| *Note: The above LOD versions are past LOD, in support, (Must upgrade to v2.2 for maintenance) | | | | |
| SafeWord for Check Point 2.2 | Active | | | WIN 2000, WIN 2003 |
| SafeWord for Check Point 2.1 | LOD* | 12/29/06 | | WIN 2000, WIN 2003 |
| SafeWord for Check Point 2.0 | LOD* | 09/30/05 | | WIN 2000, WIN 2003 |

Secure Computing: Product Life Cycle Information

| | | | | |
|---|---|---|---|---|
| ***Note:**The above LOD versions are past LOD, in support, (Must upgrade to v2.2 for maintenance)* | | | | |
| SafeWord® for Nortel Networks 2.2 | Active | | | WIN 2000, WIN 2003 |
| SafeWord® for Nortel Networks 2.1 | LOD* | 12/29/06 | | WIN 2000, WIN 2003 |
| SafeWord® for Nortel Networks 2.0 | LOD* | 09/30/05 | | WIN 2000, WIN 2003 |
| ***Note:**The above LOD versions are past LOD, in support, (Must upgrade to v2.2 for maintenance)* | | | | |
| SafeWord® PremierAccess® 4.0 | Active | | | WIN 2000, WIN 2003, SOL 9-10 |
| SafeWord® PremierAccess® 3.2 | Active | | | WIN 2000, WIN 2003, SOL 9-10 |
| SafeWord® PremierAccess® 3.1.1 | LOD* | 12/31/04 | | WIN 2000, SOL 7-8 |
| SafeWord® PremierAccess® 3.1 | LOD* | 11/27/02 | | WIN 2000, SOL 7-8 |
| SafeWord® PremierAccess® 3.0 | LOD* | 05/31/02 | | WIN 2000, SOL 7-8 |
| ***Note:**The above LOD versions are past LOD, in support, (Must upgrade to v4.0 or v3.2 for maintenance)* | | | | |
| SafeWord Plus™ 2.1.1 | EOL | | 01/31/06 | SOL 7 |
| SafeWord Plus™ 2.1 | EOL | | 01/31/06 | SOL 7 |
| SafeWord Plus™ 2.0 | EOL | | 01/31/06 | SOL 7 |
| SafeWord® AS 5.x | EOL | | 12/31/02 | WINNT4, SOL 2.5-7, HPUX11 |

Patches and upgrades >>

## SecureWire Product List

| Model | Status | LOD date | EOL date | Original release | Comments |
|---|---|---|---|---|---|
| 2500 | ACTIVE | | | 3.0.0 | |
| 500 | ACTIVE | | | 3.0.0 | |
| 100 | ACTIVE | | | 3.0.0 | |

## Network Gateway Security (UTM/Firewall/VPN)

### Sidewinder® (G2)

**Note:** These tables for Sidewinder G2 below, reflect product life cycle status for major product version and their updates, up to 3 decimal points (e.g. 6.1.1). Beginning in November 2005, the life cycle support information for patch levels (e.g. 6.1.1.03) will be noted in the release notes for each patch.

### Sidewinder® (G2) Software Only - for customers running on a hardware platform of their own choosing (i.e. not an appliance)

| Version | Status | LOD date | EOL date | Comments |
|---|---|---|---|---|
| 6.1.1.x | EOL | Not for sale, upgrade only | 12/31/06 | Software upgrades available until 3/31/06. All software only versions are EOL on 12/31/06. Please inquire about special discounts on appliance upgrades. |
| 6.1.0.x | EOL | Not for sale, upgrade | 12/31/06 | Software upgrades available until 6/30/05. All software only versions are EOL on 12/31/06. Please inquire about special discounts on |

Secure Computing: Product Life Cycle Information

| | | only | | appliance upgrades. |
|---|---|---|---|---|
| 6.0.x | EOL | 6/30/04 | 2/1/06 | - |
| 5.2.x | EOL | 3/31/03 | 12/31/04 | - |
| 5.1.x | EOL | | 2/28/03 | - |
| 5.0.x | EOL | | 6/30/02 | - |

Sidewinder and Sidewinder G2 patches are available here >>

## Sidewinder® (G2) - Appliance Hardware

| Model | Status | LOD date | EOL date | Original release | Compatible & Supported versions | Replacement Model |
|---|---|---|---|---|---|---|
| 210 E | ACTIVE | | | 7.0.0.02 | 7.0.0.02 with 7.0.0.02H06 | |
| 410 E | ACTIVE | | | 7.0.0.02 | 7.0.0.02 with 7.0.0.02H06 | |
| 510 E | ACTIVE | | | 7.0.0.02 | 7.0.0.02 with 7.0.0.02H06 | |
| 1100 E | ACTIVE | | | 7.0.0.02 | 7.0.0.02 with 7.0.0.02H06 | |
| 2100 E | ACTIVE | | | 7.0.0.02 | 7.0.0.02 with 7.0.0.02H06 | |
| 2150 E | ACTIVE | | | 7.0.0.02 | 7.0.0.02 with 7.0.0.02H06 | |
| 4150 E | ACTIVE | | | 7.0.0.02 | 7.0.0.02 with 7.0.0.02H06 | |
| 110 D | LOD | 4/30/08 | | 6.1.2.01 | 6.1.2.01 or higher | 110 E |
| 210 D | LOD | 4/30/08 | | 6.1.2.01 | 6.1.2.01 or higher | 210 E |
| 410 D | LOD | 4/30/08 | | 6.1.2 | 6.1.2 or higher | 410 E |
| 510 D | LOD | 4/30/08 | | 6.1.2 | 6.1.2 or higher | 510 E |
| 1100 D | LOD | 4/30/08 | | 6.1.2.02 | 6.1.2.02 or higher | 1100 E |
| 2100 D | LOD | 4/30/08 | | 6.1.2.02 | 6.1.2.02 or higher | 2100 E |
| 2150 D | LOD | 4/30/08 | | 6.1.2.02 | 6.1.2.02 or higher | 2150 D |
| 4150 D | LOD | 4/30/08 | | 6.1.2.02 | 6.1.2.02 or higher | 4150 E |
| 110 C | LOD | 9/30/06 | | 6.1.0.05 | 6.1.2 or higher | 110 D |
| 210 C | LOD | 9/30/06 | | 6.1.0.05 | 6.1.2 or higher | 210 D |
| 410 C | LOD | 4/30/06 | | 6.1.0.05 | 6.1.2 or higher | 410 D |
| 510 C | LOD | 4/30/06 | | 6.1.0.05 | 6.1.2 or higher | 510 D |
| 1100 C | LOD | 12/31/06 | | 6.1.1.01 | 6.1.2 or higher | 1100 D |
| 2100 C | LOD | 12/31/06 | | 6.1.0.05 | 6.1.2 or higher | 2100 D |
| 2150 C | LOD | 12/31/06 | | 6.1.0.05 | 6.1.2 or higher | 2150 D |
| 4150 C | LOD | 12/31/06 | | 6.1.1.01 | 6.1.2 or higher | 4150 D |
| 1100 B | LOD | 6/30/05 | | 6.1.0.05 | 6.1.2 or higher | |
| 4150 | LOD | 5/1/05 | | 6.1 | 6.1.2 or higher | |
| 210 | LOD | 3/15/05 | | 6.1 | 6.1.2 or higher | |
| 310a | LOD | 10/31/04 | | 6.1 | 6.1.2 or higher | |
| 310b | LOD | 3/15/05 | | 6.1.0.04 | 6.1.2 or higher | |

Secure Computing: Product Life Cycle Information

| | | | | | | |
|---|---|---|---|---|---|---|
| 315 | LOD | 3/15/05 | | 6.1 | 6.1.2 or higher | |
| 410a | LOD | 10/31/04 | | 6.1 | 6.1.2 or higher | |
| 410b | LOD | 3/15/05 | | 6.1.0.04 | 6.1.2 or higher | |
| 415 | LOD | 3/15/05 | | 6.1 | 6.1.2 or higher | |
| 510/515 | LOD | 3/15/05 | | 6.1 | 6.1.2 or higher | |
| 1100/1150 | LOD | 3/15/05 | | 6.1 | 6.1.2 or higher | |
| 2100 | LOD | 3/15/05 | | 6.1 | 6.1.2 or higher | |
| 2150 | LOD | 3/15/05 | | 6.1 | 6.1.2 or higher | |
| 25a | MAINTENANCE | 8/31/02 | | 5.2.1 | 6.1.2 or higher (6.1 upgrade requires min. 512 MB RAM) Not eligible to upgrade to v7.0 | |
| 25b | MAINTENANCE | 3/31/04 | | 6.0 | 6.1.2 or higher Not eligible to upgrade to v7.0 | |
| 100 | MAINTENANCE | 3/31/04 | | 6.0 | 6.1.2 or higher 6.0 EOL as of 2/1/06 | |
| 250 | MAINTENANCE | 3/31/04 | | 6.0 | 6.1.2 or higher Not eligible to upgrade to v7.0 | |
| 1000a | MAINTENANCE | 12/31/02 | | 5.2.1 | 6.1.2 or higher (6.1 upgrade requires min. 512 MB RAM) Not eligible to upgrade to v7.0 | |
| 1000b | MAINTENANCE | 9/30/03 | | 6.0 | 6.1.2 or higher Not eligible to upgrade to v7.0 | |
| 1000c | MAINTENANCE | 3/31/04 | | 6.0 | 6.1.2 or higher Not eligible to upgrade to v7.0 | |
| 2000a | MAINTENANCE | 9/30/03 | | 6.0 | 6.1.2 or higher Not eligible to upgrade to v7.0 | |
| 2000b | MAINTENANCE | 3/31/04 | | 6.0 | 6.1.2 or higher Not eligible to upgrade to v7.0 | |
| 4000 | MAINTENANCE | 3/31/04 | | 6.0 | 6.1.2 or higher Not eligible to upgrade to v7.0 | |

## Sidewinder® (G2) - Appliance Software

| Version | Status | LOD date | EOL date | Comments |
|---|---|---|---|---|
| 7.0.0 | ACTIVE | | | v7.0 is not available for Sidewinder G2 Enterprise Manager |
| 6.1.2 | MAINTENANCE | 12/31/2007 | 12/31/2009 | |
| 6.1.1.x | EOL | 3/31/06 | 4/30/08 | Upgrade to v6.1.2 or if eligible v7.0.0 |
| 6.1.0.x | MAINTENANCE | 6/30/05 | 9/30/07 | |
| 6.0.x | EOL | 6/30/04 | 2/1/06 | |
| 5.2.1 | EOL | 3/31/03 | 12/31/04 | - |

**Sidewinder and Sidewinder G2 patches are available here >>**

Secure Computing: Product Life Cycle Information

## Sidewinder Anti-Spam Add-On Module

| Version | Status | LOD date | EOL date | Comments |
|---|---|---|---|---|
| All versions | MAINTENANCE | 12/31/2007 | 12/31/2008 | Subscription may be renewed only through 12/31/2008 via the pro-rated price. |

TrustedSource™, Secure Computing's proactive reputation-based security technology is now bundled for FREE with Sidewinder v7 in 2008.

## Sidewinder SoftRemote Add-On Module

| Version | Status | LOD date | EOL date | Comments |
|---|---|---|---|---|
| All versions | MAINTENANCE | 12/31/2007 | 12/31/2008 | Support may be renewed only through 12/31/2008 via the pro-rated price. |

The SoftRemote IPSec VPN Client can now be purchased directly through SafeNet. See URL: http://www.safenet-inc.com/softremote/index.asp

## CommandCenter - Appliance Hardware

| Model | Status | LOD date | EOL date | Original release | Compatible & Supported versions |
|---|---|---|---|---|---|
| CC500 | ACTIVE | | | 4.0 | 4.0 or higher |
| CC1500 | ACTIVE | | | 4.0 | 4.0 or higher |
| CC2500 | ACTIVE | | | 4.0 | 4.0 or higher |
| CC2800 | ACTIVE | | | 4.0 | 4.0 or higher |

## CommandCenter - Appliance Software

| Version | Status | LOD date | EOL date | Comments |
|---|---|---|---|---|
| 4.0 | ACTIVE | | | This product replaces Global Command Center for Sidewinder and Sidewinder Enterprise Manager. v4.0 is not available for SnapGear. |

CommandCenter patches are available here >>

## SecurityReporter - Software

| Version | Status | LOD date | EOL date | Compatible & Supported versions |
|---|---|---|---|---|
| 4.6.4 | ACTIVE | | | Sidewinder v7.0 or higher, and Sidewinder G2 v6.1.1 or higher |
| 4.6.3 | MAINTENANCE | 09/30/2007 | | Sidewinder v7.0 or higher, and Sidewinder G2 v6.1.1 or higher |
| 4.2.30 | MAINTENANCE | 5/21/07 | | Sidewinder G2 v6.1.0.05 or higher |
| 4.2.29 | EOL | 8/21/06 | 5/21/07 | Sidewinder G2 v6.1.2 or higher |

## Sidewinder G2® Enterprise Manager - Appliance Hardware

**Note:** Sidewinder G2 Enterprise Manager is being replaced by "Secure Firewall CommandCenter", please inquire about upgrade options.

| Model | Status | LOD date | EOL date | Original release | Compatible & Supported versions |
|---|---|---|---|---|---|
| 10 D | LOD | 12/31/07 | | 6.1.2.02 | 6.1.2.02 or higher |
| 25 D | LOD | 12/31/07 | | 6.1.2.02 | 6.1.2.02 or higher |
| 50 D | LOD | 12/31/07 | | 6.1.2.02 | 6.1.2.02 or higher |

Secure Computing: Product Life Cycle Information

| UL D | LOD | 12/31/07 | | 6.1.2.02 | 6.1.2.02 or higher |
|------|-----|----------|--|----------|--------------------|
| 10 C | LOD | 12/31/06 | | 6.1.1.01 | 6.1.1.01 or higher |
| 25 C | LOD | 12/31/06 | | 6.1.0.05 | 6.1.0.05 or higher |
| 50 C | LOD | 12/31/06 | | 6.1.0.05 | 6.1.0.05 or higher |
| UL C | LOD | 12/31/06 | | 6.1.0.05 | 6.1.0.05 or higher |
| 10 | LOD | 6/30/05 | | 6.1 | 6.1 or higher |
| 25 | LOD | 3/15/05 | | 6.1 | 6.1 or higher |
| 50 | LOD | 3/15/05 | | 6.1 | 6.1 or higher |
| UL | LOD | 3/15/05 | | 6.1 | 6.1 or higher |

**Sidewinder and Sidewinder G2 patches are available here >>**

## Sidewinder G2® Enterprise Manager - Appliance Software

**Note:** Sidewinder G2 Enterprise Manager is being replaced by "Secure Firewall CommandCenter", please inquire about upgrade options.

| Version | Status | LOD date | EOL date | Comments |
|---------|--------|----------|----------|----------|
| 6.1.2 | LOD | 12/31/07 | 12/31/09 | |
| 6.1.1.x | MAINTENANCE | 3/31/06 | 4/30/08 | |
| 6.1.0.x | EOL | 6/30/05 | 3/31/07 | |
| 6.0.x | EOL | 6/30/04 | 2/1/06 | |
| 5.2.1 | EOL | 3/31/03 | 12/31/04 | |

## CyberGuard "Classic" Appliances

- All Classic software releases were EOL on December 31, 2007, however some Classic appliances can continue to be used (if they are eligible) and also make the upgrade to TSP or Sidewinder v7.0 software. Please check with your Secure Computing account manager or channel partner for more information about eligibility and upgrade options.
- Last Order Dates are represented as "while quantities last."
- Fulfillment will transition to replacement models if possible.
- When inventory depletion is complete the model will no longer be available for sale (Sold Out).

| Model | Status | LOD date | EOL date | Original release | Compatible & Supported versions | Replacement Model |
|-------|--------|----------|----------|------------------|-------------------------------|-------------------|
| FS300 | LOD | 12/31/06 | | Classic v5.2 | Classic v5.2 | None |
| FS600 | LOD | 12/31/06 | | Classic v5.2 | Classic v5.2 | None |
| KS1000 | LOD | 12/31/06 | | Classic v5.2 | Classic v5.2 | KS1000-J |
| KS1500 | LOD | 12/31/06 | | Classic v5.2 | Classic v5.2 | KS1500-J |
| KS1500R | Sold Out | 2/17/06 | | Classic v5.2 | Classic v5.2 | None |
| SL3200 | Sold Out | 2/17/06 | | Classic v5.2 | Classic v5.2 | None |
| KS1000J | LOD | 12/31/06 | | Classic v5.2 | Classic v5.2 | None |
| KS1500J | LOD | 12/31/06 | | Classic v5.2 | Classic v5.2 | None |

## CyberGuard Classic Appliance - Software

| Version | Status | LOD date | EOL date | Comments |
|---------|--------|----------|----------|----------|
| Classic (all versions) | EOL | 12/31/06 | 12/31/07 | EOL occurred on 12/31/07 |

## CyberGuard "TSP" Appliances

- TSP units will move to the Secure Computing common appliance platforms.

Secure Computing: Product Life Cycle Information

- Last Order Dates are represented as "while quantities last."
- When inventory is depleted, fulfillment will transition to replacement models.
- NO EOL dates have been announced for the TSP line.

| Model | Status | LOD date | EOL date | Original release | Compatible & Supported versions | Replacement Model |
|-------|--------|----------|----------|------------------|--------------------------------|-------------------|
| TSP 110 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 210 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 410 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 510 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 1100 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 2100 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 2150 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 4150 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 7300 | LOD | 12/31/06 | | v6.4 | v6.4 & higher | |
| TSP 7100 | LOD | 12/31/06 | | v6.4 | v6.2 & higher | TSP 7300 |
| TSP 5100 | Sold Out | 2/17/06 | | v6.2 | v6.2 & higher | TSP 3450-J |
| TSP 3600 | Sold Out | 2/17/06 | | v6.2 | v6.2 & higher | TSP 3450-J |
| TSP 3400 | LOD | 12/31/06 | | v6.2 | v6.2 & higher | TSP 3400-J |
| TSP 3100 | LOD | 12/31/06 | | v6.2 | v6.2 & higher | TSP 3100-J |
| TSP 1150 | LOD | 12/31/06 | | v6.2 | v6.2 & higher | TSP 410 D |
| TSP 1250 | LOD | 12/31/06 | | v6.2 | v6.2 & higher | TSP 510 D |
| TSP 3100-J | LOD | 12/31/06 | | v6.2 | v6.2 & higher | TSP 1100 D |
| TSP 3400-J | LOD | 12/31/06 | | v6.2 | v6.2 & higher | TSP 1100 D |
| TSP 3450-J | LOD | 12/31/06 | | v6.4 | v6.2 & higher | TSP 2150 D |
| TSP 7100 | LOD | 12/31/06 | | v6.2 | v6.2 & higher | TSP 4150 D |

## CyberGuard TSP Appliance - Software

| Version | Status | LOD date | EOL date | Comments |
|---------|--------|----------|----------|----------|
| 6.4.x | MAINTENANCE | 12/31/07 | 12/31/09 | |
| 6.3.0 | MAINTENANCE | | 12/31/08 | Note: 6.3 was a restricted release and will EOL with 6.2. |
| 6.2.x | MAINTENANCE | | 12/31/08 | |
| 6.1.3 | EOL | | 7/2005 | |
| 6.1.2 | EOL | | 4/2005 | |
| 6.1.1 | EOL | | 12/2004 | |

## SnapGear® Product List

| Model | Status | LOD date | EOL date | Current SW version | Comments |
|-------|--------|----------|----------|--------------------|----------|
| SG720 | ACTIVE | | | 3.1.5u3 | |
| SG710+ | MAINTENANCE | 12/2006 | 12/2008 | 3.1.5u3 | |
| SG710 | MAINTENANCE | 12/2006 | 12/2008 | 3.1.5u3 | |
| SG640 | ACTIVE | | | 3.1.5u3 | |
| SG635 | MAINTENANCE | 12/2006 | 12/2008 | 3.1.5u3 | |
| SG580 | ACTIVE | | | 3.1.5u3 | |
| SG565 | ACTIVE | | | 3.1.5u3 | |

Secure Computing: Product Life Cycle Information

| | | | | | |
|---|---|---|---|---|---|
| SG560 | ACTIVE | | | 3.1.5u3 | |
| SG300 | ACTIVE | | | 3.1.5u3 | |
| SG630 | EOL | 12/2005 | 12/2007 | 3.1.5u3 | |
| SG575 | EOL | 06/2005 | 06/2007 | 3.1.5u3 | |
| SG570 | EOL | 06/2005 | 06/2007 | 3.1.5u3 | |
| SG550 | EOL | 06/2005 | 06/2007 | 3.1.5u3 | |
| SG530 | EOL | 06/2005 | 06/2007 | 3.1.5u3 | |
| Lite2+ | EOL | 12/2004 | 12/2006 | 1.8.10 | |
| Lite2 | EOL | 12/2004 | 12/2006 | 1.8.10 | |

## Gauntlet software

| Version | Status | LOD date | EOL date |
|---|---|---|---|
| 6.0 | EOL | 10/15/03 | 12/31/04 |
| 5.5 | EOL | | 12/31/03 |
| 5.0 | EOL | | 7/31/03 |

## e-ppliance Gauntlet (all models)

| Version | Status | LOD date | EOL date |
|---|---|---|---|
| 2.0 | EOL | 10/15/03 | 12/31/04 |
| 1.5 | EOL | | 12/31/03 |
| 1.0 | EOL | | 7/31/03 |

Gauntlet patches are available here >>

## Global Command Center - Software

| Version | Status | LOD date | EOL date | Comments |
|---|---|---|---|---|
| 3.2.x | MAINTENANCE | 3/31/08 | 12/31/09 | After 12/31/2007, available only with orders of 50+ SnapGear units and 1 year of Support. |
| 3.2.0 | EOL | | 3/1/08 | |
| 3.1 | EOL | | 12/31/07 | |
| 3.0 | EOL | | 6/1/07 | |
| 2.5.2 | EOL | | 10/31/05 | |
| 2.5.1 | EOL | | 3/31/05 | |
| 2.5 | EOL | | 11/30/04 | |
| 2.0 | EOL | | 6/30/04 | |

- Global Command Center (GCC) and Sidewinder G2 Enterprise Manager (EM) will be replaced by CommandCenter 4.0 appliance.
- Between now and the end of 2009 GCC and EM customers will migrate from Sidewinder G2 and TSP to Sidewinder 7.0, which is centrally managed by CommandCenter 4.0. For roadmap details please contact your account manager or channel partner.

## Web Gateway Security

## Webwasher Web Gateway Security Appliance

Secure Computing: Product Life Cycle Information

| Model | Status | LOD date | EOL date | Supported OS |
|---|---|---|---|---|
| WW2900C | Active | | | Proprietary |
| WW1900C | Active | | | Proprietary |
| WW1100C | Active | | | Proprietary |
| WW500C | Active | | | Proprietary |
| SME250C | Active | | | Proprietary |
| WW2900B | Maintenance | 12/2007 | | Proprietary |
| WW1900B | Maintenance | 12/2007 | | Proprietary |
| WW1100B | Maintenance | 12/2007 | | Proprietary |
| WW500B | Maintenance | 12/2007 | | Proprietary |
| SME250B | Maintenance | 12/2007 | | Proprietary |
| SME250 | Maintenance | 8/2007 | 8/2012 | Proprietary |
| WW1900 | Maintenance | 6/2007 | 6/2012 | Proprietary |
| WW1100 | Maintenance | 6/2007 | 6/2012 | Proprietary |
| WW500 | Maintenance | 6/2007 | 6/2012 | Proprietary |
| WW1000 | LOD | 12/2006 | 3/2010 | Proprietary |

## Webwasher Product List

| Software/version | Status | LOD date | EOL date | Supported platforms |
|---|---|---|---|---|
| Webwasher 6.7 | Active | | | Debian 3.1 & 4.0, RHES 4.0 & 5.0, Solaris 9 & 10, SLES 9.0 & 10.0, WIN 2003 |
| Webwasher 6.6 †[1] | Maintenance | 4/2008 | 12/2008 | Debian 3.1 & 4.0, RHES 3.0 & 4.0, Solaris $8^2$, 9 & 10, SLES $8.0^2$ & 9.0, WIN 2002 & 2003 |
| Webwasher 6.5 †[1] | Maintenance | 9/2007 | 6/2008 | Debian 3.1 & 4.0, RHES 3.0 & 4.0, Solaris $8^2$, 9 & 10, SLES $8.0^2$ & 9.0, WIN 2002 & 2003 |
| Webwasher 6.0 †[1] | EOL | 3/2007 | 12/2007 | Debian 3.1, RHES 3.0 or 4.0, Solaris 8, 9 or 10, SLES 8.0 or 9.0, WIN 2000 or 2003 |
| Webwasher 5.3 †[1] | Maintenance | 12/2006 | 12/2009 | Debian 3.1, RHES 3.0 or 4.0, SLES $8.0^2$ or 9.0, Solaris $8^2$ or 9, WIN $2000^2$ or 2003 |
| Webwasher 5.2[#] | EOL | 11/2005 | 12/2006 | Debian 3.0 or 3.1, RHES 3.0, SLES 8.0 or 9.0, Solaris 8 or 9, WIN 2000 or 2003 |
| Content Reporter 4.7 †* | Active | | | RHEL 4.0, SLES 9, Solaris 8 or 9 *, WIN 2000 or 2003. Support database versions: Oracle 8.1.7, Oracle 9i, or 10g, Microsoft SQL 2000 or 2005, MaxDB 7.5 (included) |
| Content Reporter 4.6 † | EOL | 12/2006 | 06/2007 | WIN 2000 or 2003, Linux, Solaris 7, 8 or 9. Support database versions: Oracle 8.1.7, Oracle 9i, Oracle 10g, Microsoft SQL 2000, MaxDB 7.5 (included) |
| Content Reporter 4.5 | EOL | 11/2005 | 12/2006 | WIN 2000 or 2003, Solaris 7, 8 or 9. Support database versions: Oracle 8.1.7, Oracle 9i, Oracle 10g, Microsoft SQL 2000, MaxDB 7.5 (included) |
| Instant Messenger Filter 4.2 † | Active | | | WIN 2000 or 2003 |

Secure Computing: Product Life Cycle Information

| Instant Messenger Filter 4.0 | EOL | 11/2005 | 01/2008 | WIN 2000 or 2003 |
|---|---|---|---|---|

\# McAfee no longer provides Anti-Virus signature updates for WW v5 2 or older effective 1/31/2007

[1] For Computer Associates eTrust Anti-Virus module: LOD defined as of 9/2007 and EOL defined as of 12/2008

[2] EOL for this platform defined as of 12/2007

\* Content Reporter is only supported on Solaris 64 bit OS

† Webwasher has not been tested on, and does not currently support 64-bit OS editions or hardware

## SmartFilter Product List

| Software/version | Status | LOD date | EOL date | Supported OS or application platforms |
|---|---|---|---|---|
| SmartFilter 3.x.x | EOL | 7/2004 | 9/2006 | Win 2000, RHL 7.2, RHL 9.0, Solaris 2.6 or 8 |
| SmartFilter 4.0.x | EOL | 9/2005 | 9/2007 | Win 2000, Win 2003, RHL 7.3, RHL 9.0, Red Hat ES 3.0, Solaris 8 or 9 |
| SmartFilter 4.1.x | LOD | 06/2007 | 06/2008 | Win 2000, Win 2003, Win XP Pro, RHL 9.0, Red Hat ES 3.0 or 4.0, Solaris 8 or 9 |
| SmartFilter 4.1.1.02 - Cisco CE | LOD | 06/2007 | 04/2008 | |
| SmartFilter 4.1.1.01 - UFP (FW-1) | LOD | 06/2007 | 06/2008 | |
| SmartFilter 4.1.1.01 - Volera (IFP) | LOD | 06/2007 | 06/2008 | |
| SmartFilter 4.1.1.02 - Sidewinder 6.1.x | LOD | 06/2007 | 12/2009 | |
| SmartFilter 4.2.x | ACTIVE | | | Win 2000, Win 2003, Win XP Pro, Win Vista, Red Hat ES 3.0/4.0/5.0, Solaris 8/9/10 |
| SmartFilter DA 4.0.x | Active | | | RHL 7.3, Red Hat ES 3.0 or 4.0 |
| SmartFilter Control List SDK 3.x | EOL | 09/2003 | 09/2006 | Various OEM Platforms |
| SmartFilter Control List SDK 4.0.x | EOL | 04/2004 | 04/2006 | Various OEM Platforms |
| SmartFilter Control List SDK 4.1.x | EOL | 05/2005 | 05/2007 | Various OEM Platforms |
| SmartFilter Control List SDK 4.2.x | LOD | 01/2007 | 01/2009 | Various OEM Platforms |
| SmartFilter Control List SDK 4.3.x | Active | | | Various OEM Platforms |
| SmartFilter IFP SDK 2.0.x | Active | | | Various OEM Platforms |
| SmartFilter IFP SDK 3.0.x | Active | | | Various OEM Platforms |
| SmartFilter CSP SDK 4.0.x | Active | | | Various OEM Platforms |

## Internet Database of Categorized Content

| Software/version | Status | LOD date | EOL date | Supported OS |
|---|---|---|---|---|
| SmartFilter database | | | | |
| SmartFilter 4.x XL | Active | | | |
| SmartFilter 4.x SL | Active | | | |

http://www.securecomputing.com/index.cfm?skev=1312&nf=1

| SmartFilter 4.x NS | Active | | | |
|---|---|---|---|---|
| SmartFilter 3.x 3P | LOD | 07/2004 | 12/2008 | |
| SmartFilter 3.x 3S | LOD | 07/2004 | 12/2008 | |
| SmartFilter 3.x 3W | EOL | 07/2004 | 09/2006 | |
| SmartFilter 3.x 3M | EOL | 07/2004 | 09/2006 | |
| Webwasher 6.x XL | Active | | | |
| Webwasher 5.x WL | LOD | 12/2006 | 12/2009 | |
| Webwasher 5.x WS | Active | 12/2006 | 12/2009 | |
| Webwasher 5.x WD | Active | 12/2006 | 12/2009 | |
| N2H2 database | | | | |
| N2 2 Digest | EOL | 09/2005 | 09/2007 | |
| N2 Novell ICS | EOL | 09/2005 | 09/2006 | |
| N2 i2100 3 & 4 | EOL | 09/2005 | 09/2006 | |
| N2 i2100 catserver | EOL | 09/2005 | 09/2006 | |
| N2 1 digest | EOL | 09/2005 | 09/2006 | |

## N2H2 Bess and Sentian Product List

| Software/version | Status | LOD date | EOL date | Supported OS or application platforms |
|---|---|---|---|---|
| Bess i2100 Managed Service 4.0 | EOL | 10/2002 | 09/2006 | Proprietary |
| Bess®/Sentian™ 3.5 | EOL | 09/2005 | 09/2006 | WIN 2003, WIN 2000 |
| Bess/Sentian 2.5 | EOL | 09/2005 | 09/2006 | RHL 7.2 or 7.3, RHEL 2.1 |

## ZIX Product List

*See Webwasher Web Inspector above*

| Software/version | Status | LOD date | EOL date | Supported OS |
|---|---|---|---|---|
| ZIX Message Inspector | EOL | 3/2005 | 12/2006 | Windows |
| ZIX Web Inspector | EOL | 3/2005 | 12/2006 | Windows |

## Messaging Products

## Hardware and Software Lifecycles

| Status | HW Models | LOD date | EOL date |
|---|---|---|---|
| Active | **Generation 4** S10D, S120, E2200, E5200 | | |
| Active | **Generation 3** S10B, S25B, S50B, S100B, E2000A, E2000B, E2000C, E3000A, E3000B*, E5000A, E5000B, C10000A, C10000B | 3/31/2008** | 6/30/2011 |
| Discontinued | **Generation 2** S10A, S25A, S50A, S100A(112) | 6/30/2006 | 1/1/2009 |
| | **Generation 2** | | |

Secure Computing: Product Life Cycle Information

| Discontinued | 305, 345, 345A, 345B, 345X | 1/1/2005 | 1/1/2009 |
| Discontinued | **Generation 1** 110,210 | 1/1/2004 | 2/19/2007 |

* The E3000 appliance will remain "Active" past the LOD and EOL date and will be subject to different discontinue dates.
** While supplies last.

| Status | SW Version | LOD date | EOL date |
|---|---|---|---|
| Active | IronMail 6.7.x, CMC 2.7.x, Edge 2.7.x*, Encryption 6.7.x* | | |
| Active | IronMail 6.5.x, CMC 2.5.x, Edge 2.1.x, Encryption Push/Pull | 06/2008 | |
| Maintenance | IronMail 6.1.x & 5.x, CMC 2.1.x | 09/2006 | 07/2008 |
| EOL | IronMail 4.1.x, CMC 1.5.x | 01/2006 | 05/2006 |

* Edge 2.7.x and Encryption 6.7.x are future releases.

**S10B Server Last Order Date Announcement**

**110/210 Server End of Life Announcement**

**Patches and upgrades >>**

----------------------------------------------------------------------

This page was printed from the **Secure Computing Corporation** web site, located at **http://www.securecomputing.com/index.cfm?skey=1312**

----------------------------------------------------------------------

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FINJAN SOFTWARE, LTD., an Israel corporation, | ) ) ) | |
| Plaintiff-counterdefendants, | ) ) | Civil Action No. 06-00369-GMS |
| v. | ) ) ) | |
| SECURE COMPUTING CORPORATION, a Delaware corporation; CYBERGUARD CORPORATION, a Delaware corporation, WEBWASHER AG, a German corporation and DOES 1 THROUGH 100, | ) ) ) ) ) ) | |
| Defendants-counterclaimants. | ) ) | |

## **DECLARATION OF CARL DEGEN**

I, CARL DEGEN, declare:

1.     I am President of Christensen Associates, an economic research and consulting firm located in Madison, Wisconsin. I am an economist. I make this declaration based upon personal knowledge.

2.     I understand that Finjan Software, Ltd. ("Finjan") is seeking prejudgment interest on the jury's March 12, 2008, verdict in the above case. I also understand that Finjan is requesting that the prejudgment interest be calculated at the prime rate, compounded quarterly.

3.     I have reviewed Finjan Software, Ltd.'s Exhibit P to its Opening Brief in Support of its Post-Trial Motion to Amend Judgment and for an Accounting of Sales, which is Finjan's table of its prejudgment interest calculations.

4.     Finjan's calculation overstates the interest. It assumes that $9.18 million would be a lump sum payment, paid on the first day of alleged infringement in 2004. Neither I nor Finjan's damages expert, Mr. Russell Parr, opined that a lump-sum, up-front payment was

appropriate in this case. Instead, both Mr. Parr and I opined regarding a royalty as a percentage of sales. Therefore, an interest calculation based on a lump-sum payment, as Finjan has done in Exhibit P, is not appropriate in this case. Under Finjan's calculation, Finjan would receive substantial interest on payments before they would have been due. Finjan's prejudgment interest calculation in Exhibit P is incorrect because it should assume ongoing royalty payments each quarter. A corrected calculation of interest using the prime rate, compounded quarterly, is attached as Ex. A.

5. In my experience, prejudgment interest is most commonly calculated using the Treasury rate with annual compounding. A correct calculation of interest using the one-year Treasury Constant Maturity Rate, compounded annually, is attached as Ex. B.

To the best of my knowledge and belief, I declare, under penalty of perjury, that all the statements made by me are true.

Dated: May 9, 2008

Carl G. Degen

Exhibit A

## Correction of Finjan's Proposed Prejudgment Interest Calculation
### (Prime Rate Compounded Quarterly)

### Webwasher Software Sales

| | 2004 Q4 | 2005 Q1 | 2005 Q2 | 2005 Q3 | 2005 Q4 | 2006 Q1 | 2006 Q2 | 2006 Q3 | 2006 Q4 | 2007 Q1 | 2007 Q2 | 2007 Q3 | 2007 Q4 | 2008 thru April | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Interest Base[1] | $0 | $580,982 | $1,067,907 | $1,737,081 | $2,296,317 | $2,845,618 | $3,289,902 | $4,125,082 | $5,063,652 | $5,271,490 | $7,167,136 | $8,149,515 | $8,725,922 | $8,885,605 | |
| Annual Interest Rate[2] | | 5.44% | 5.91% | 6.43% | 6.67% | 7.43% | 7.90% | 8.25% | 8.25% | 8.25% | 8.25% | 8.18% | 7.52% | 5.97% | |
| Prejudgment Interest[3] | $0 | $7,745 | $15,449 | $27,261 | $38,990 | $51,445 | $63,135 | $82,568 | $101,354 | $125,530 | $143,457 | $161,712 | $159,683 | $173,417 | $1,151,746 |
| Royalty Base[4] | $3,631,136 | $2,394,873 | $4,085,788 | $3,324,843 | $3,189,446 | $2,455,242 | $4,825,283 | $5,350,016 | $6,915,520 | $4,813,226 | $5,243,262 | $2,591,843 | | | |
| Royalty Paid @ end of quarter[5] | $580,982 | $479,180 | $653,726 | $551,975 | $510,311 | $392,839 | $772,045 | $856,003 | $1,106,483 | $770,116 | $838,922 | $414,695 | | | |

### Webwasher Hardware Sales

| | 2004 Q4 | 2005 Q1 | 2005 Q2 | 2005 Q3 | 2005 Q4 | 2006 Q1 | 2006 Q2 | 2006 Q3 | 2006 Q4 | 2007 Q1 | 2007 Q2 | 2007 Q3 | 2007 Q4 | 2008 thru April | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Interest Base[1] | | | | | | | $0 | $41,825 | $74,476 | $101,353 | $150,582 | $222,920 | $271,351 | $276,317 | |
| Annual Interest Rate[2] | | | | | | | 7.90% | 8.25% | 8.25% | 8.25% | 8.25% | 8.18% | 7.52% | 5.97% | |
| Prejudgment Interest[3] | | | | | | | $0 | $837 | $1,491 | $2,029 | $3,014 | $4,423 | $4,966 | $5,393 | $22,152 |
| Royalty Base[4] | | | | | | | $522,814 | $397,674 | $317,322 | $590,005 | $866,550 | $550,096 | | | |
| Royalty Paid @ end of quarter[5] | | | | | | | $41,825 | $31,814 | $25,386 | $47,200 | $69,324 | $44,008 | | | |

### TSP Appliance Sales

| | 2004 Q4 | 2005 Q1 | 2005 Q2 | 2005 Q3 | 2005 Q4 | 2006 Q1 | 2006 Q2 | 2006 Q3 | 2006 Q4 | 2007 Q1 | 2007 Q2 | 2007 Q3 | 2007 Q4 | 2008 thru April | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Interest Base[1] | | $0 | $196,000 | $394,835 | $597,032 | $803,169 | $937,689 | $1,131,684 | $1,154,336 | $1,177,441 | $1,201,008 | $1,225,048 | $1,249,357 | $1,272,220 | |
| Annual Interest Rate[2] | | 5.44% | 5.91% | 6.43% | 6.97% | 7.43% | 7.90% | 8.25% | 8.25% | 8.25% | 8.25% | 8.18% | 7.52% | 5.97% | |
| Prejudgment Interest[3] | | $0 | $2,835 | $6,196 | $10,137 | $14,520 | $17,995 | $22,652 | $23,105 | $23,568 | $24,039 | $24,309 | $22,863 | $24,829 | $217,049 |
| Royalty Base[4] | | $2,450,000 | $2,450,000 | $2,450,000 | $2,450,000 | $1,500,000 | $2,200,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Royalty Paid @ end of quarter[5] | | $196,000 | $196,000 | $196,000 | $196,000 | $120,000 | $176,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |

1 Cumulative "Royalty Paid" and "Prejudgment Interest." Equals the sum of the prior quarter's "Interest Base," "Preudgment Interest," and "Royalty Paid @ end of quarter."
2 Average of monthly prime rates for the quarter reported by the Federal Reserve at http://www.federalreserve.gov/releases/h15/data/Monthly/H15_PRIME_NA.txt.
3 Equals "Interest Base" multiplied by [(1 plus "Annual Interest Rate")^(1/4)] minus "Interest Base." To calculate interest through April 2008, the exponent is (1/3) instead of (1/4) to account for the extra month of interest.
4 Accrued sales revenue relied on by the jury.
5 "Royalty Base" multiplied by 16 percent for Webwasher Software Sales or multiplied by 8 percent for Webwasher Hardware Sales and TSP Appliance Sales.

| GRAND TOTAL PREJUDGMENT INTEREST | $1,390,947 |
|---|---|
| Finjan's proposed interest | $2,306,100 |
| Difference | $915,153 |

**Exhibit B**
**Calculation of Prejudgment Interest Through April 2008**
**(1-Year Treasury Constant Maturity)**

**Webwasher Software Sales**

| | 2004 | 2005 | 2006 | 2007 | Thru April 2008 | Total |
|---|---|---|---|---|---|---|
| Interest Base[1] | | $580,982 | $2,777,196 | $6,041,551 | $8,338,462 | |
| Annual Interest Rate[2] | | 3 62% | 4 93% | 4 52% | 2 01% | |
| Prejudgment Interest[3] | | $21,022 | $136,985 | $273,179 | $55,498 | $486,683 |
| Royalty Base[4] | $3,631.136 | $13,594,950 | $19,546.061 | $12,648,331 | | |
| Royalty Paid @ end of year[5] | $580,982 | $2,175,192 | $3,127,370 | $2.023.733 | | |

**Webwasher Hardware Sales**

| | 2004 | 2005 | 2006 | 2007 | Thru April 2008 | Total |
|---|---|---|---|---|---|---|
| Interest Base[1] | | | | $99,025 | $264,034 | |
| Annual Interest Rate[2] | | | | 4 52% | 2 01% | |
| Prejudgment Interest[3] | | | | $4,478 | $1,757 | $6,235 |
| Royalty Base[4] | | | $1,237.810 | $2,006,651 | | |
| Royalty Paid @ end of year[5] | | | $99,025 | $160,532 | | |

**TSP Appliance Sales**

| | 2004 | 2005 | 2006 | 2007 | Thru April 2008 | Total |
|---|---|---|---|---|---|---|
| Interest Base[1] | | | $784,000 | $1.118.671 | $1,169,253 | |
| Annual Interest Rate[2] | | | 4 93% | 4 52% | 2 01% | |
| Prejudgment Interest[3] | | | $38,671 | $50,583 | $7.782 | $97,035 |
| Royalty Base[4] | | $9,800,000 | $3.700.000 | | | |
| Royalty Paid @ end of year[5] | | $784.000 | $296,000 | | | |

**GRAND TOTAL PREJUDGMENT INTEREST**     $589,954

1  Cumulative "Royalty Paid" and "Prejudgment Interest "  Equals the sum of the prior quarter's "Interest Base," "Prejudgment Interest," and "Royalty Paid @ end of year "
2  Annual average of monthly interest rates for U S  Treasury securities at 1-year constant maturity reported by the Federal Reserve at http://www federalreserve gov/releases/h15/data/Monthly/H15_TCMNOM_Y1 txt
3  Equals "Interest Base" multiplied by (1 plus "Annual Interest Rate") minus "Interest Base "  To calculate interest through April 2008, (1 plus "Annual Interest Rate") is raised to the (1/3) to account for the less than full year time period
4  Accused sales revenue relied on by the jury
5  "Royalty Base" multiplied by 16 percent for Webwasher Software Sales or multiplied by 8 percent for Webwasher Hardware Sales and TSP Appliance Sales