## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FINJAN SOFTWARE, LTD., an Israel corporation, | ) ) | |
| Plaintiff, | ) ) ) | C. A. No. 06-369-GMS |
| v. | ) ) ) | |
| SECURE COMPUTING CORPORATION, a Delaware corporation, CYBERGUARD, CORPORATION, a Delaware corporation, WEBWASHER AG, a German corporation and DOES 1 THROUGH 100, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**APPENDIX TO PLAINTIFF FINJAN SOFTWARE LTD.'S OPPOSITION
TO DEFENDANT-COUNTERCLAIMANTS' MOTION FOR JUDGMENT
AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50 AND, IN
THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR
REMITTITUR PURSUANT TO FED. R. CIV. P. 59**

OF COUNSEL:

Paul J. Andre
Lisa Kobialka
King & Spalding LLP
1000 Bridge Parkway
Redwood City, CA 94065
(650) 590-0700

Dated: May 9, 2008

Philip A. Rovner (#3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

Attorneys for Plaintiff
Finjan Software, Ltd.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on May 9, 2008, the within document was

filed with the Clerk of the Court using CM/ECF which will send notification of such

filing(s) to the following; that the document was served on the following counsel as

indicated; and that the document is available for viewing and downloading from

CM/ECF.

## BY HAND DELIVERY AND E-MAIL

Frederick L. Cottrell, III, Esq.
Kelly E. Farnan, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
cottrell@rlf.com; farnan@rlf.com

I hereby certify that on May 9, 2008 I have sent by E-mail the foregoing

document to the following non-registered participants:

Jake M. Holdreith, Esq.
Christopher A. Seidl, Esq.
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
jmholdreith@rkmc.com ; caseidl@rkmc.com

/s/ Philip A. Rovner
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
E-mail: provner@potteranderson.com

# EXHIBIT 1
# PART 1

3

1

```
 1         IN THE UNITED STATES DISTRICT COURT
           IN AND FOR THE DISTRICT OF DELAWARE
 2
                    - - -
 3
   FINJAN SOFTWARE LTD.,      :  Civil Action
 4
            Plaintiff,        :
 5
            v.                :
 6
   SECURE COMPUTING CORPORATION, :
 7  CYBERGUARD CORPORATION,     :
   WEBWASHERE AG and DOES 1    :
 8  THROUGH 100,               :
                              :
 9         Defendants.        :  06-469-GMS

10
                Wilmington, Delaware
11         Monday, February 4, 2008    MARCH 3, 2008
                   8:30 a.m.
12

13  BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

14  APPEARANCES:

15         PHILIP A. ROVNER, ESQ.
           Potter Anderson & Corroon LLP
16              -and-
           PAUL J. ANDRE, ESQ.,
17         LISA KOBIALKA, ESQ.,
           JAMES HANNAH, ESQ.,
18         MEGHAN WARTON, ESQ.
           KRIS KASTENS, ESQ., and
19         HANNAH LEE, ESQ.
           King & Spalding
20         Silicon Valley, California

21                          Counsel for Plaintiff

22

23

24

25
```

---

1    THE COURT: Good morning. Please be seated.

2    (Counsel respond "Good morning.")

3    THE COURT: Where are my jury instructions?

4  Okay. I am hoping that GSA will do something with the

5  temperature in here.

6    Okay. There are some issues.

7    MR. ANDRE: There are a few issues, Your Honor.

8  Paul Andre for plaintiff, Finjan Software.

9    The first issue, Your Honor, comes with regard

10  to our pretrial conference. Your Honor instructed us to

11  meet and confer with counsel regarding experts and what is

12  in the expert report. One of the issues that came up was

13  their expert's attempt to argue in the alternative on claim

14  interpretation. And Your Honor told them to pick a

15  position. And it was clear that they were supposed to come

16  up with one position on a term. They haven't.

17    So that was the first issue, is the term list.

18    THE COURT: Do you have a specific complaint,

19  Mr. Andre?

20    MR. ANDRE: The specific complaint is they are

21  using the word list --

22    THE COURT: It's list, okay.

23    MR. ANDRE: The word list, one way for

24  infringement and another way for invalidity.

25    THE COURT: Fine. Counsel.

---

2

1  APPEARANCES (Continued):

2         FREDERICK R. COTTRELL, III, ESQ., and
           KELLY J. FARNAN, ESQ.
3         Richards, Layton & Finger
                -and-
4         RONALD J. SCHUTZ, ESQ.,
           CHRISTOPHER A. SEIDL, ESQ.
5         TREVOR J. FOSTER, ESQ., and
           JAKE HOLDREITH, ESQ.
6         Robins, Kaplan, Miller & Ciresi, L.L.P.
           (Minneapolis, MN)
7         Counsel for Defendants

---

4

1    MR. HOLDREITH: Your Honor, good morning. Jake

2  Holdreith from Robins, Kaplan.

3    Mr. Wallach was very clear that his definition

4  was a data structure such as Link List. That is how he did

5  his infringement analysis. He is commenting on the

6  plaintiff, Finjan's interpretation of list in the validity

7  case.

8    What Finjan seems to be doing is saying they

9  don't want him to comment on their definition. There is a

10  disagreement between the experts on what the meaning of the

11  word is. Our guys wants to comment on, If it means what I

12  say it means, here's the case. If it means what they say it

13  means, here is the case. That is perfectly proper.

14    THE COURT: But he is not adopting, he is not

15  asserting a definition A and definition B.

16    MR. HOLDREITH: Absolutely not, no. He is very

17  clear about his definition.

18    MR. ANDRE: Your Honor, that is incorrect. He

19  is taking both positions. He is saying that for

20  infringement --

21    THE COURT: Why can't we wait until he testifies

22  and find out?

23    MR. ANDRE: We can, Your Honor. It is something

24  we wanted to raise.

25    THE COURT: If it occurs to you and your team

113

1  making a decision; and, finally, your deliberations, which
2  will be valuable for you to discuss the case and the
3  evidence among yourselves and determine the outcome of the
4  case.
5        Please keep in mind that evidence is often
6  introduced in a somewhat piecemeal fashion. So, as the
7  evidence comes in, you, as jurors, need to keep an open
8  mind.
9        I think I have made clear what the trial
10  schedule will be.
11        THE COURT: About how long, Mr. Andre?
12        MR. ANDRE: About 45 minutes, maximum.
13        THE COURT: We will hear from the plaintiffs
14  first.
15        MR. ANDRE: May it please the Court.
16        THE COURT: You may proceed.
17        MR. ANDRE: Good morning, ladies and gentlemen
18  of the jury.
19        My name is Paul Andre. I am representing Finjan
20  Software, along with my colleagues here, you will see over
21  the next nine days, hopefully you won't see us on weekends.
22        As Judge Sleet has informed you, this is a
23  patent infringement case involving computer security. Now,
24  computer security has become very important as of late
25  because of just the amount of information that is on

114

1  computer systems now. Most of us do online banking, we shop
2  online. And businesses and industry use what the most
3  confidential information on computer systems.
4        So computer security has become extremely
5  evolved over the last 10 to 15 years.
6        The technology in this case is going to be very
7  complex. I am not going to try to sugarcoat that. It is
8  complex technology. But the facts in this case are very
9  simple.
10        I am going to talk to you first about some of
11  the facts that are going to be presented over the next seven
12  court days. Then I will try to describe some of the
13  technology to you as well.
14        The first fact that you are going to hear or one
15  of the early facts you will hear is in 1996, Finjan Software
16  was founded and that company was founded based on the idea
17  of the inventor of these patents that there is a better way
18  to protect computers. It's a new way of ensuring that
19  computers do not get infected with viruses or other type of
20  malicious code.
21        Now, from 1996 up to the early 2000 time period,
22  Finjan, being a very small company, they were making some
23  sales, but the technology was not viewed as acceptable to
24  some of the industry. They had traditional technology,
25  signature-based technology. We will describe what that is.

115

1        In fact, the defendants in this case were one of
2  the leading providers of traditional technology. They
3  discredited Finjan's technology. You are going to see
4  evidence, like Plaintiff's Exhibit No. 31. And this is from
5  the defendants, in which they say the theoretical virus
6  threat that Finjan did protect us for is close to zero,
7  especially if a normal A.V. scanner is used instead, "A.V."
8  meaning antivirus, the traditional approach. They were
9  difficulties crediting Finjan's software in 2002.
10        You are going to see Exhibit 33. Exhibit 33 is
11  also a document from the defendants. This is dated a little
12  later in time. Here they talk about Finjan's product, which
13  they called SurfinGate for Web 7.0 offers only one feature
14  that a Webwasher does not have: Proactive behavior
15  inspection.
16        You will hear that a lot, proactive protection,
17  as opposed to reactive. And I will talk about that shortly.
18        The defendants were stating at that time that
19  investigations show that this technology is quite weak and
20  does not add substantial additional security to an Internet
21  Gateway filtering product.
22        The defendants in this case discredited this
23  type of technology continually through the early 2002, 2003
24  time period.
25        But Finjan's technology was starting to get some

116

1  traction. You are going to see evidence, as in Exhibit 32,
2  where they started looking at Finjan's technology. Here you
3  will see that they actually tested Finjan's products. They
4  wrote some information on it. They tested by what was
5  Finjan doing because it was starting to get some market
6  acceptance.
7        You are also going to see that later on, in
8  another one of their documents, Exhibit No. 35, that when
9  they talk about proactive security, it was a key trend
10  identified by IDC.
11        Now, IDC, you are going to hear evidence in this
12  case, is a company that does analyst -- they are analysts.
13  They do market analysis and this kind of information. You
14  will hear that people in this industry listen to IDC. They
15  get their reports. This is how they look at the market.
16        You are also going to see that these defendants
17  make a statement here that they have to develop their own
18  technology or create something similar to Finjan.
19        So in the 2004 time period, these defendants
20  were now looking into the idea of going into proactive
21  security, considering whether they want to develop their own
22  technology or do something like Finjan's Plaintiff's.
23        Exhibit 36, you are going to see Plaintiff's
24  Exhibit 36 quite often. This is an e-mail chain between
25  some high-up executives within these defendants' companies.

Ben-Itzhak - direct

1 this proactive security technology?

2 A.    Finjan has several patents that covers proactive

3 security technology.

4 Q.    Now, do you have a copy of the booklet provided to

5 you?

6 A.    No, I don't have it in front of me.

7          MR. ANDRE:  Your Honor, may I approach the

8 witness?

9          THE COURT:  You may, Mr. Andre.

10         MR. ANDRE:  Thank you.

11 BY MR. ANDRE:

12 Q.    Mr. Ben-Itzhak, would you please look at what is in

13 the jury books marked as JTX-1.  That is the one with the

14 U.S. Patent with the number ending in '194.  Do you see that

15 document?

16 A.    Yes, I do.

17 Q.    Have you ever seen this Joint Exhibit No. 1 before?

18 A.    Yes.  I did see this document before.

19 Q.    What is JTX-1?

20 A.    It's a Finjan patent, '194.  That is also in this

21 case.

22 Q.    Would you look on, I believe it's the tab after that,

23 that is the document marked as JTX-2.

24          Do you see that document?

25 A.    Yes, I do.

---

218

Ben-Itzhak - direct

1 Q.    And have you seen that document before?

2 A.    Yes.  I saw this document before.

3 Q.    And what is JTX-2?

4 A.    JTX-2 is the '780 patent of Finjan that is also in

5 this case.

6 Q.    And I believe the next tab is JTX-3.  Would you please

7 look at that exhibit, please?

8 A.    Yes.

9 Q.    Have you seen this document before?

10 A.    Yes.

11 Q.    And do you know what JTX-3 is?

12 A.    It's another Finjan patent, No. '822.  That is also

13 part of this case.

14 Q.    Mr. Ben-Itzhak, how does Finjan use these patents to

15 protect its technology?

16 A.    We enforce them, like here, like in this case.

17 Q.    And does Finjan mark its products with its patents

18 that protects those products?

19 A.    Yes, we do.  We do mark our products with our patents.

20 Q.    Now, when we talk about marking the products, what are

21 you referring to?

22 A.    We are adding the patent numbers to the product,

23 actually to the user interface of the product.  If you are

24 using the product, you will see the numbers shown there on

25 the first screen.  We also include that in the documentation

---

219

Ben-Itzhak - direct

1 of the product.  We also include these numbers on our

2 website.  You can go on our website and see the list of all

3 the patents that Finjan holds.

4          This is how we present it.

5 Q.    If you turn to the next tab, you will see a JTX-4.  Do

6 you see that?

7 A.    Yes, I do.

8 Q.    Do you recognize that document?

9 A.    Yes.  This is a user manual for vital security,

10 Finjan.

11 Q.    And if you turn to the second page of this document,

12 you will see a copyright on the second page.  Do you see

13 that?

14 A.    Yes, I do.

15 Q.    When was this document published?

16 A.    2004.

17 Q.    And if you look on the, it looks to be the fourth

18 paragraph, it states, "The Finjan Software products

19 described in this document are protected by U.S. patents,"

20 and it lists a series of patents there.

21          Do you see that?

22 A.    Yes, I do.

23 Q.    Is the '194 patent listed there?

24 A.    Yes, the '194 is the first patent shown there.

25 Q.    And is the '780 patent listed in that list?

---

220

Ben-Itzhak - direct

1 A.    Yes.  The '780 patent is shown there as well.

2 Q.    Now, in this 2004 document, the '822 patent is not

3 listed there, is it?

4 A.    I don't see the '822 patent shown.

5 Q.    If you will turn back to JTX-3, you will see the '822

6 patent, in the right corner, the issue date?

7 A.    Yes.

8 Q.    Do you see that, June 6, 2006?

9 A.    Yes, I do.

10 Q.    Now, what is Finjan's practice, how it marks its

11 products with their patent once the patent issues?

12 A.    When the patent issues, we add the patent number to

13 the presentation.

14 Q.    I don't think this is in the manual here.  We will

15 just show on the screen.  It's a document, Exhibit 1070.

16 JTX-1070.

17          If you will go to the, I believe it's the second

18 page of that document, you will see that the patent numbers

19 are listed in that document as well.

20          Do you see that?

21 A.    Yes, I do.

22 Q.    And do you see where the '822 patent is listed on that

23 document?

24 A.    Yes, I do.

25 Q.    Now, are there any other ways that Finjan gives notice

1  the case.

2       So in the very first deposition in the case,

3  they asked Gallagher, Who is this Kruse guy? And they were

4  told, He is the guy responsible for the TSP product.

5       THE COURT: Was a direct question interposed to

6  your client, or counsel, asking for a specific

7  identification of this type of witness? I would imagine it

8  would have been.

9       MR. HOLDREITH: I don't understand there is a

10  contention in the case that there was an interrogatory to

11  which we failed to respond.

12       THE COURT: Or some other request?

13       MR. HOLDREITH: I don't understand there is any

14  contention of that nature. If there is, I will certainly

15  respond to it.

16       THE COURT: Is there such a contention?

17       MR. ANDRE: The contention is that they provided

18  us with their initial disclosures. They supplemented on

19  December 8, 2006. This person was never identified in

20  initial disclosures. When we asked them to identify people

21  in the interrogatories, you know, who would have useful

22  information, they didn't identify this individual. The

23  first time we saw his name with relation to this case was in

24  the witness list.

25       He was identified in the deposition as, you

---

238

1  know, Who is this guy? And they said, You know, he is in

2  the firewall division. That's 10,000 people. Who knows?

3       MR. HOLDREITH: If there is an allegation there

4  is an interrogatory to which his name was responsive, I will

5  need to see the actual interrogatory. I would probably need

6  overnight to study it and figure out what our position is.

7       MR. ANDRE: We have Interrogatory No. 25.

8  "Identify each and every person involved in the research,

9  development, design, troubleshooting, manufacture,

10  marketing, distribution, sale or licensing of the security

11  products, which include without limitation, Cyberguard TSP,"

12  which is what they are talking about, "and describe in

13  detail the role each person played." He wasn't identified.

14       THE COURT: Counsel.

15       MR. HOLDREITH: The first I heard it, of course.

16  I don't know what our response is, as I stand here. I

17  haven't memorized it all. I would be interested in seeing

18  it.

19       THE COURT: All right.

20       MR. HOLDREITH: What I would like to do is look

21  at this overnight, if that is the contention?

22       THE COURT: Sure. Would you like the evening to

23  think about that?

24       MR. HOLDREITH: Yes, Your Honor. I will look at

25  these. But we did, under 33(d), disclose about 20 or 30

---

1  documents in response to that answer. So I will have to

2  study those and see whether Mr. Kruse is named in those.

3       THE COURT: Yes. You need to think about

4  whether the mere disclosure of documents, when a request has

5  been interposed to disclose individuals, is adequate under

6  the rules.

7       MR. HOLDREITH: I don't think there was any

8  objection to our response or any motion to compel or request

9  for us to be more specific.

10       THE COURT: Fair enough. But there is also an

11  obligation at the outset to be responsive to the request.

12       We will hopefully not talk about it tomorrow but

13  we will see.

14       MR. ANDRE: To give an example, Your Honor, we

15  had a new CEO come on our company, Mr. Vigaro (phonetic),

16  who is here today. He didn't start until October or

17  November. We put him on our witness list. They objected on

18  the same grounds. We did not disclose him. We took him

19  off. We are asking them to do the same.

20       THE COURT: Okay. Anything else?

21       MR. HOLDREITH: No, Your Honor. I will look at

22  the documents so I can have a final response. I will confer

23  with counsel, see if we can work it out. If we can't, I

24  will state our position.

25       THE COURT: Anything else we should talk about?

---

240

1       MR. ANDRE: Not that I know of.

2       THE COURT: Counsel, see you at 8:30.

3       (Court recessed at 4:40.)

4

5

6  Reporter: Kevin Maurer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

243

241

IN THE UNITES STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

1

2

3

4  FINJAN SOFTWARE LTD.,      :    Civil Action
                             :    No. 06-369(GMS)
5           Plaintiff,       :

6     v.                     :

7  SECURE COMPUTING CORPORATION,  :
   CYBERGUARD CORPORATION,        :
8  WEBWASHERE AG and DOES 1       :
   THROUGH 100,                   :
9                                 :
           Defendants.       :
10
                    - - -
11
              Wilmington, Delaware
12            Tuesday, March 4, 2008
                  8:30 a.m.
13              Day Two of Trial

14                  - - -

15  BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
                            and a Jury
16
    APPEARANCES:
17
             PHILIP A. ROVNER, ESQ.
18           Potter Anderson & Corroon LLP
                      -and-
19           PAUL J. ANDRE, ESQ.,
             LISA KOBIALKA, ESQ.,
20           JAMES HANNAH, ESQ.,
             MEGHAN WARTON, ESQ.,
21           KRIS KASTENS, ESQ., and
             HANNAH LEE, ESQ.
22           King & Spalding
             (Silicon Valley, California)
23
                           Counsel for Plaintiff
24

25

242

1  APPEARANCES (Continued):

2

3        FREDERICK R. COTTRELL, III, ESQ., and
         KELLY E. FARNAN, ESQ.
4        Richards, Layton & Finger
                  -and-
5        RONALD J. SCHUTZ, ESQ.,
         CHRISTOPHER A. SEIDL, ESQ.,
6        TREVOR J. FOSTER, ESQ., and
         JAKE M. HOLDREITH, ESQ.
7        Robins, Kaplan, Miller & Ciresi, L.L.P.
         (Minneapolis, MN)
8
                  Counsel for Defendants
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

244

1        THE COURT: Please be seated. Good morning.

2        (Counsel respond "Good morning.")

3        THE COURT: I understand there is 110 issue? Or

4  am I misinformed?

5        MR. ROGERS: Your Honor, there is 110, the IDC

6  report. We attempted to redact it. Mr. Rovner will be

7  arguing for us on this 110. We were not able to reach

8  agreement.

9        THE COURT: Mr. Rovner.

10        MR. ROVNER: I don't know if you want to hear

11  from Mr. Schutz first.

12        THE COURT: Yes. It's his objection.

13        MR. SCHUTZ: Your Honor, the IDC report has --

14  there is 110 report, I believe; am I correct, that you want

15  to introduce this morning?

16        MR. ROVNER: 23.

17        MR. SCHUTZ: PTX-23, so we are clear for the

18  record. PTX-23 has 32 pages in it. If they redact two of

19  those 32 pages, I would withdraw my objection. As I

20  understand what they want to establish with this report,

21  Judge, it is that there was a trend toward behavior-based

22  technology. And if they want to do that, I submit they

23  don't need this self-serving hearsay endorsement by IDC of

24  Finjan.

25        THE COURT: Under the heading "Overview"?

---

1        MR. SCHUTZ: Under "Finjan Software Overview."

2  These reports have vendor profiles in them. And the vendor

3  profiles are, in essence, taken from press releases and

4  self-serving statements that the vendors supply to IDC. So

5  this is 110 of the 32 pages. It's just about Finjan.

6        They don't need it to prove the point that they

7  have told the Court they want to make, which is the market

8  is moving toward behavior-based, because that's what the

9  rest of the report is about. And, of course, it says,

10  "SurfinGate for e-mail delivers a patented realtime content

11  inspection process." Well, we dispute that. So if this

12  were to come in, I can't cross-examine this report --

13        THE COURT: Where were you just reading from?

14        MR. SCHUTZ: Right here at the top where I have

15  got the arrow, Judge.

16        There is a lot of other self-serving stuff here,

17  too. Right here, they have got, "Finjan Software is a

18  pioneer in proactive content behavior inspection."

19        So they are trying to use again a hearsay

20  document to validate what Finjan is asserting in this case,

21  that they are pioneers. Well, I can't cross-examine this

22  report.

23        THE COURT: I am reluctant to accept your

24  overall characterization of the document of hearsay in its

25  entirety. Perhaps there are elements of the document that

253

1   underlining or make any use of it during this case. With
2   that representation, I will withdraw my objection.
3           MS. KOBIALKA: We want to be clear, what we have
4   attached, we provided, Exhibit 9A, is the actual exhibit
5   attached to the original transcript and we haven't done
6   anything in terms of editing in. We are fine with not
7   referring to it. But we wanted to put that on the record.
8           THE COURT: Not referring to the underlining?
9           MS. KOBIALKA: The underlining that they are
10  concerned about.
11          THE COURT: So stipulated.
12          MR. ANDRE: One housekeeping matter, Your Honor.
13  Our next witness after Mr. Ben-Itzhak, he will be off
14  shortly, is one of the inventors. Then we have some
15  deposition testimony we are going to read into the record.
16          I have not done this in your Court before, so I
17  am not sure of the procedure. We would like to have one of
18  our attorneys read the questions and another attorney
19  sitting there. Is that acceptable?
20          THE COURT: Yes, that's fine. Approximately,
21  how long will it take to accomplish that?
22          MR. ANDRE: This will be very short. 15
23  minutes, 20 minutes. It's a very short deposition
24  transcript. Then the exhibits that are identified in the
25  transcript are exhibit numbers for the depo. We also have

254

1   PTX numbers for those, we will identify those at the time.
2           THE COURT: They are admitted.
3           MR. ANDRE: Thank you.
4           THE COURT: You can identify them at the time,
5   sure.
6           Ms. Walker.
7           THE COURT: Mr. Ben-Itzhak, would you come up,
8   sir.
9           (Jury enters courtroom at 9:03 a.m.)
10          THE COURT: Good morning, members of the jury.
11  Please be seated.
12          Mr. Ben-Itzhak. I think we left off at some
13  point yesterday with the Direct Examination, during the
14  Direct Examination of Mr. Ben-Itzhak. And we will continue
15  that.
16          Mr. Ben-Itzhak, you are still under oath.
17          YUVAL BEN-ITZHAK, having been duly
18  sworn as a witness, was examined and testified further as
19  follows:
20          MR. ANDRE: Good morning, ladies and gentlemen.
21          DIRECT EXAMINATION
22  BY MR. ANDRE:
23  Q.  Mr. Ben-Itzhak, yesterday, when we were wrapping up
24  the day, we were talking about reports that you reviewed
25  from a company called IDC.

255

Ben-Itzhak - direct

1           Do you recall that?
2   A.  Yes, I do recall that.
3   Q.  I am going to hand to you, and to the ladies and
4   gentlemen of the jury, this is not in your jury book, this
5   is PTX-23.
6           MR. ANDRE: Your Honor, may I approach the
7   witness?
8           THE COURT: Yes, you may.
9   BY MR. ANDRE:
10  Q.  Mr. Ben-Itzhak, do you recognize what has been handed
11  to you as Plaintiff's Exhibit 23?
12  A.  Yes, it's a market analysis report by IDC.
13  Q.  If you look at the bottom, the very bottom of this
14  document, it has the following information. It has the date
15  of August 2003.
16          Do you see that?
17  A.  Yes, I do.
18  Q.  Mr. Ben-Itzhak, do you recall seeing these IDC reports
19  within the time frame of August 2003 and thereafter?
20  A.  Yes. I remember seeing this report while I was in
21  Finjan.
22  Q.  Now, if you look at the first page, and the very last
23  bullet point on this first page, could you tell us what that
24  is talking about?
25  A.  It highlights, key highlight in the study saying

256

Ben-Itzhak - direct

1   several proactive virus technologies, such as behavior-based
2   analysis and heuristics, are becoming part of organization's
3   security architectures.
4   Q.  Based on your experience in the industry, prior to
5   this report, was this type of behavior-based analysis and
6   heuristics, was that an important part of a company's
7   computer security systems?
8   A.  It is a problem that IDC reported here, and indicating
9   that more and more companies are starting to use this
10  technology, having the reactive and anti-virus detection
11  limitation we talked about yesterday.
12  Q.  If you will turn to Page 19 of this report, ending in
13  Bates Nos. 855. The bottom paragraph is entitled, "New
14  Solutions." This paragraph begins, "As megaworms jump from
15  network to network at immeasurable rates of speed, the
16  demand for more proactive virus protection technologies has
17  become behind due to the rationale of hybrid threats," it
18  lists some of those threats out, e.g., Nimda Code read, and
19  Bugbear, that have escaped traditional signature-based virus
20  measures.
21          Then it goes on to the next-to-last sentence and
22  states that, "IDC believes that several proactive
23  technologies will increasingly become part of organizations'
24  security architectures."
25          Do you see that?

257

Ben-Itzhak - direct

1    A.    Yes, I do.

2    Q.    Someone in the computer security field, what is that

3    paragraph telling you?

4    A.    What I understand from this paragraph is there are new

5    type of threats that are starting to be used by criminals on

6    the networks. And they manage to escape a signature-based

7    virus measure as mentioned here failed to detect it. As

8    previously, yesterday, as I provided the example of a photo

9    album showing all the pictures of the criminals, and if

10   someone else is come in, the picture doesn't exist in this

11   photo album, this is just an exact example, as written here,

12   this NIMDA Code read and Bugbear, their photos or their

13   signatures were not in the anti-virus database. As a

14   result, they managed to escape it.

15            This is my understanding. And IDC, what they

16   write here, it's, Proactive technology is needed because you

17   can no longer rely on the signature. So that is my

18   understanding.

19   Q.    At the time of this report in August, 2003, did Finjan

20   have proactive technologies in their products?

21   A.    In 2003, Finjan had this product technology.

22   Q.    To your knowledge, did the defendants have proactive

23   technology in their products?

24   A.    To my understanding, they didn't have that at that

25   time. It seems the products released later.

258

Ben-Itzhak - direct

1    Q.    We talked a little bit yesterday about the competition

2    in the marketplace between Finjan and the Defendants. And

3    you stated that it was a tough competition because you were

4    competing against, essentially, your own technology when you

5    were competing against them?

6    A.    That's correct.

7    Q.    Is there any other reason why the competition is tough

8    between Finjan and Secure Computing, or the Defendants?

9    A.    Yes, absolutely. As the attorney from the other side

10   mentioned, they are very large companies. They have a lot

11   of money. They are spending it in the market to promote

12   their own product.

13            We are a much smaller company and have very

14   limited resources, investing a lot of effort and money to

15   develop, to invent and develop and patent it, have an

16   agreement with the government. We are trying to sell it

17   now, because we have it on our product and we are trying to

18   win the account.

19            It is very difficult to compete with someone

20   that is, to our understanding, using our technology with

21   much more resources, and, as they mention, "Finjan killer."

22   They confirm it in their opening message, it kills it.

23   Basically kills it. That's tough. That's why we are here.

24            MR. ANDRE: Thank you. I have no further

25   questions, Your Honor.

259

Ben-Itzhak - direct

1            THE COURT: Mr. Schutz, you may cross-examine.

2                    CROSS-EXAMINATION

3    BY MR. SCHUTZ:

4    Q.    Good morning, Mr. Ben-Itzhak.

5    A.    Good morning.

6    Q.    You joined Finjan in the fall of 2005. Correct?

7    A.    That's correct.

8    Q.    So you just testified that in 2003, that Finjan's

9    product had proactive scanning on it. Is that right?

10   A.    That's right.

11   Q.    How did you learn that?

12   A.    From documents and I spoke with people in the company.

13   Q.    Did you talk to Mr. Touboul about that?

14   A.    No, I did not speak with Mr. Touboul.

15   Q.    Why did you --

16           THE COURT: Let him answer the question,

17   counsel.

18           THE WITNESS: I did not speak with Mr. Touboul

19   since he is no longer in the company.

20   BY MR. SCHUTZ:

21   Q.    What happened to him?

22   A.    He left the company before I joined. So, for me, I

23   never met him and he never worked in the company when I was

24   an employee of Finjan.

25   Q.    He is the only listed inventor on the '194 patent.

260

Ben-Itzhak - direct

1    Correct?

2    A.    As I remember, that's correct.

3    Q.    And you never talked to him about the '194 patent. Is

4    that correct?

5    A.    I never talked to him -- Your Honor --

6            THE COURT: If you don't understand the

7    question, tell the lawyer.

8            MR. ANDRE: Your Honor, may I interpose an

9    objection? It calls for attorney/client communication. He

10   can answer yes or no, but if there is an attorney

11   involved...

12           THE COURT: Let's see counsel at sidebar.

13           (The following took place at sidebar.)

14           (Record read.)

15           MR. ANDRE: Yes or no is okay. I think what he

16   is asking me, if there was a conversation, it may have been

17   on the phone with me, introducing him, but if he went into

18   substance --

19           THE COURT: That is not privileged, if you

20   introduced him to the inventor.

21           MR. ANDRE: If we talked about the patent.

22           THE COURT: Let's see.

23           That objection is overruled.

24   BY MR. SCHUTZ:

25   Q.    Mr. Ben-Itzhak, let's start to make sure we are clear.

269

Ben-Itzhak - direct

1  roll out if they like it, if they want it.
2      Because it is important for us, if they say, We
3  don't need it, or, We already have it, we probably would go
4  back to the board and decide if it is good for us or not.
5  Q.    Mr. Ben-Itzhak, do you believe that innovation,
6  especially in this technological area, is a good thing?
7  A.    Innovation is good in general in this domain and in
8  all other domains.
9  Q.    Do you believe that competition brings out the best
10  products?
11  A.    Honest and legitimate competition are helpful to the
12  market.  That is what patents are all about.  Patents are
13  about, if you invest the time and your mind and effort, and
14  you are willing to share it with the public so the public
15  can take it and benefit from it, it is my understanding, and
16  I am not a lawyer, but it is my understanding that you have
17  a contract with the government that, if you have a
18  monopoly -- maybe there is a better way to say it.  On the
19  specific things that you disclose, and you disclose them,
20  the whole idea is you can get protected.  If someone is
21  copying what you are doing, you have at least the power to
22  say, Hey, this is not fair competition, and you should stop
23  that.
24  Q.    That is exactly right.  And I want you to hold that
25  thought --

270

Ben-Itzhak - direct

1      THE COURT:  Counsel, I would like to see counsel
2  at sidebar.
3      (The following took place at sidebar.)
4      THE COURT:  Mr. Schutz, I am a fair guy and I
5  will give any lawyer a reasonable latitude.  But you are
6  exceeding the boundaries.
7      MR. SCHUTZ:  Got it, Judge.
8  BY MR. SCHUTZ:
9  Q.    As I said, Mr. Ben-Itzhak, we are going to come back
10  to that point in a few minutes.  I would like to return now
11  to the marketplace.
12  A.    Okay.
13  Q.    Do you agree with me that the customers for the
14  products in this space are extremely sophisticated?
15  A.    No, I do not agree.
16  Q.    You think the customers are unsophisticated?
17  A.    I do not agree on that, either.
18  Q.    So you think they are somewhere between sophisticated
19  and unsophisticated?
20  A.    This is more like -- what I think is there is a mix.
21  You sometimes meet customers that are very sophisticated,
22  and it's very nice to see, to meet these educated people in
23  the domain, of course.  Sometimes we meet people that got
24  hit with this type of attacks and they have no idea on
25  security but they are really concerned with their data.  And

271

Ben-Itzhak - direct

1  they ask for a solution.
2      So, they are not sophisticated.  It is a mix.
3  Q.    Would you agree with me, Mr. Ben-Itzhak, that
4  customers that buy these products will not buy a product if
5  it doesn't work?
6      MR. ANDRE:  Objection.  Lacks foundation.
7      THE COURT:  I will let you answer that, go
8  ahead.  But we need to wrap this up, counsel.
9      You can answer.
10      THE WITNESS:  Okay.  I never met a customer that
11  was willing to pay and use a product that doesn't work for a
12  long time.  Probably he will get the product, test it.  If
13  it is broken, he will return it back and ask for the money
14  that was -- that is what I would do and recommend everyone
15  to do.  It seems we have so many customers and we are
16  selling for quite some time and they didn't return the
17  product.
18  BY MR. SCHUTZ:
19  Q.    Mr. Ben-Itzhak, Finjan has never made money in its
20  entire existence.  Is that correct?
21  A.    This is completely wrong.
22  Q.    Are you testifying that Finjan has been profitable in
23  any single year since its existence?
24  A.    This is not your previous question.  You asked me if
25  we made money.  We are selling, we get money.  If we are

272

Ben-Itzhak - direct

1  profitable, it is completely different question.
2  Q.    I am sorry if my question was unclear.  Finjan has
3  never been profitable in any year in its existence.
4  Correct?
5  A.    I am not the CFO of the company.  I can testify that
6  this philosophy, we are not profitable.  So I didn't review
7  all the years you mentioned in your opening statement,
8  numbers, I don't know if they are accurate or not.  But I
9  trust you, you are a lawyer in court, you are probably
10  saying the truth.
11      I cannot comment on that.  In all the years, I
12  can speak about the years that I am familiar with.  And
13  profitability in the business doesn't indicate if your
14  product is successful or not, because you may lose money in
15  the market, and Secure had bad quarters as well.  We know,
16  it is a public company, they publish that.
17      So you may lose money because maybe a bad
18  management decision or decided to open a fancy office
19  somewhere and you spend a lot of money.  It has nothing to
20  do with if you are selling a product or not.  It is
21  management decisions.
22  Q.    The fact remains, in every year of Finjan's existence,
23  it has failed to make a profit.  Correct?
24  A.    As I said before, I cannot testify to that.  I am not
25  the CFO and I don't have the financial report in front of me

273

Ben-Itzhak - direct

1 right now.

2 Q.  Since you have joined --

3       THE COURT: He has answered the question,

4 counsel.

5 BY MR. SCHUTZ:

6 Q.  Mr. Ben-Itzhak, I am going to put up on the screen

7 here a memo. I think that you looked at this yesterday. I

8 just want to confirm that you, in fact, are the author of

9 this document. Correct?

10 A.  Yes. This is correct.

11 Q.  Who is Marc?

12 A.  I mentioned that on my deposition with your colleague.

13 He is an attorney as well, patent attorney. I asked to

14 remove this sentence. It is not very critical. I am not

15 disclosing anything here. But he is a patent attorney that

16 we work with. This communication was with Marc Berger.

17 That is his full name.

18 Q.  I am not going to ask you to say --

19 A.  Sure.

20 Q.  -- anything Mr. Berger sent to you?

21 A.  He is a lawyer and I disclosed that in my deposition.

22 Q.  In any event, you, in fact, are the author of this

23 document. Correct?

24 A.  I wrote the original form. This is a restricted form

25 of the document.

274

Ben-Itzhak - direct

1 Q.  Mr. Ben-Itzhak, I have now put up here a document that

2 bears the title, "Finjan Webwasher Competitive Analysis."

3 It's DTX-1071. The previous document I showed you was

4 DTX-1160.

5       I now have on the screen DTX-1071. That is an

6 April 2006 document authored by Finjan. Correct?

7 A.  That's what I see here, yes.

8 Q.  Mr. Ben-Itzhak, do you believe that, prior to the year

9 2000, that Finjan had used the term "behavior-based

10 analysis"?

11       MR. ANDRE: Objection. Lacks foundation.

12       THE COURT: I am sorry. Could you repeat the

13 question, please?

14 BY MR. SCHUTZ:

15 Q.  Do you believe that Finjan used the term

16 "behavior-based analysis" before the year 2000?

17       THE COURT: Maybe you could establish some

18 foundation.

19 BY MR. SCHUTZ:

20 Q.  Mr. Ben-Itzhak, you have previously testified about

21 events at the company before you joined the company. Right?

22 A.  About what? Sorry.

23 Q.  You have previously testified about events at the

24 company and some company history prior to the time when you

25 actually joined the company. Right?

275

Ben-Itzhak - direct

1 A.  Yes.

2 Q.  And you have studied, at least to some level, some

3 history of the company. Correct?

4 A.  That's correct.

5 Q.  And you knew about a SurfinGate product which was in

6 existence before you joined the company. Correct?

7 A.  That's correct.

8 Q.  And, so, my question, sir, is: Prior to the year

9 2000, do you believe that Finjan used the term

10 "behavior-based analysis"?

11 A.  I believe the company used this term, since I found it

12 in several documents. So that's what I believe.

13 Q.  Prior to 2000. Correct?

14 A.  Probably, yes.

15 Q.  Now, do you have a familiarity with the patents that

16 Finjan is asserting in this case?

17 A.  I am not a patent lawyer. So I can read them.

18 Q.  Well, have you read them?

19 A.  I read the patent, not as an attorney.

20 Q.  Do you understand that -- you testified earlier, in

21 fact, in response to I think some of my questions about the

22 patent gives you protection. Right?

23 A.  What's the question, please?

24 Q.  You understand that a patent can give a company like

25 Finjan some protection. Right?

276

Ben-Itzhak - direct

1 A.  To my understanding, the patent law in the U.S. and

2 the whole idea of patents is that you have an agreement with

3 the government where you disclose the invention that you do,

4 and if the government reviews that by the Patent Office,

5 that was the video that we saw at the beginning, and they

6 check whatever they need to check -- I don't know the exact

7 procedure -- if they think this is a good invention, they

8 give you the patent and you get a number.

9       And as a result of it, you disclose it, then you

10 get protection from the government for that invention.

11 Q.  So if you disclose it, if you disclose it and you

12 understand that the rules require that --

13       THE COURT: Is there on objection?

14       MR. ANDRE: Yes, Your Honor. We are getting

15 into legal --

16       THE COURT: Sustained.

17 BY MR. SCHUTZ:

18 Q.  In any event, you have looked at the patents.

19 Correct?

20 A.  I have looked at the patents, that's right.

21 Q.  And do you know why Finjan never put in the patents or

22 the claims the term "behavior" or "behavior-based"?

23       MR. ANDRE: Objection, Your Honor.

24       THE COURT: Sustained.

25       MR. SCHUTZ: No further questions, Judge.

Ben-Itzhak - direct

1    THE COURT: Any redirect?

2              REDIRECT EXAMINATION

3    BY MR. ANDRE:

4    Q.    I just want to clear up the record. I believe both

5    you and counsel stated that the patent was filed in 2006,

6    the application. Was that in 1996, in reality?

7    A.    Probably, yes.

8    Q.    Now, counsel showed you a table on PTX-23. If we can

9    go to PTX-23, I think it's on Page 4A of that document. If

10   you look at the very top of that table, it says, "Worldwide

11   "Anti-Virus Software Revenues By Vendor, 2001 and 2002," in

12   millions of dollars.

13             Mr. Ben-Itzhak, what is your understanding of

14   what is meant by "worldwide anti-virus software revenues"?

15   A.    It means that, this is the size of the anti-virus

16   software market between the year 2001, 2002, in million

17   dollars. It means how much companies or vendors are selling

18   in this market during these years.

19   Q.    These vendors, like Symantech, we are talking about

20   traditional anti-virus signature-based detection?

21   A.    Yes, that's correct, it is the reactive technology, is

22   signature-based technology that we mentioned, yes.

23   Q.    When this report came out, the traditional based, the

24   signature-based technology was still the most popular type

25   of technology in the marketplace. Correct?

---

Ben-Itzhak - direct

1    A.    Yes, absolutely. This is correct.

2    Q.    Just looking at Finjan's sales for the 2001-2002 time

3    period, it's roughly about $6 million and change. Is that

4    correct?

5    A.    Well, I don't know. I don't have the financial report

6    in front of me.

7    Q.    According to the IDC?

8    A.    According to the IDC, these are the numbers, yes.

9    Q.    I am just going to show you the same table in the IDC

10   report marked PTX-25. You don't have that with you. We

11   will just pull it up.

12             MR. SCHUTZ: Sidebar on this, Judge. 25.

13             (The following took place at sidebar.)

14             THE COURT: This is PTX-25?

15             MR. ANDRE: This is 23 here that we have marked

16   with this witness and showed this table. I used it to show

17   their sales were very slow. This is two years later. It

18   shows their sales have increased in '97. It is the exact

19   same table.

20             MR. SCHUTZ: I need to make sure I interpose an

21   objection to Exhibit 25 as hearsay.

22             THE COURT: You have already objected and you

23   could have done that in open court, counsel. That objection

24   is well-preserved, Mr. Schutz. That is overruled.

25   BY MR. ANDRE:

---

Ben-Itzhak - direct

1    Q.    Let's go back though that table very quickly. On that

2    table, you see Finjan sales of $6 million, and you don't see

3    Webwasher on this table, do you?

4    A.    I don't see Webwasher on this table.

5    Q.    Now let's go to PTX-25. This is Page 10 of the

6    report. It has a very similar table. If you go down to the

7    number five on that list, you will see Webwasher.

8              You see their sales of 12.5 million and 15.4

9    million?

10   A.    Yes, I do see Webwasher and the number, yes.

11   Q.    If you go below that, you will see, "Fijian Software."

12   You will see 9.3 million up to 12.9?

13   A.    Yes, I do see these numbers here.

14   Q.    If you look at the top of this table, this is the

15   2003-2004 revenues. Correct?

16   A.    Yes, that's correct.

17   Q.    So, from 2001-2002, you went from six million and

18   change to nine million, to $12 million in sales, according

19   to IDC. Correct?

20   A.    According to IDC, this is correct.

21   Q.    And in that same time period, Webwasher went from not

22   being on the table at all to suddenly coming on the table.

23   Right?

24   A.    Yes, according to these two tables that we just

25   reviewed.

---

Ben-Itzhak - direct

1    Q.    Counsel also showed you Exhibit DTX-1071. And he

2    showed this document in his opening statement as well. You

3    may recall it. If you turn to the second page of this

4    document --

5    A.    It's in the binder?

6    Q.    No, I am sorry. We will look at it on the screen, if

7    you don't mind.

8    A.    Okay.

9    Q.    The fourth paragraph down, it states, "In respect to

10   behavior analysis of binary codes," it says, "Webwasher's

11   content protection, inspection, the code import table, it

12   doesn't block malicious operations such as read, write and

13   network access."

14             Do you see that?

15   A.    Yes, I do see that.

16   Q.    This is a Finjan paper. Correct?

17   A.    It is a Finjan paper, correct.

18   Q.    What are binary codes?

19   A.    On the Internet, you may find different kinds of

20   content. As I mentioned yesterday, you may find videos and

21   files and scripts, Java applets, and also binaries. If you

22   want to install, let's say, a program, you download it with

23   32 binary if you have a Windows operating system. Binary is

24   just one file type.

25             If you remember the diagram I explained

281

Ben-Itzhak - direct

1   yesterday, that we check what is the file type being
2   downloaded. So binary is one out of many file types that
3   you can get from the Internet.
4   Q.    And how is it different than any other type of content
5   that is on the Internet?
6   A.    Scripts, for example, it's a different content. You
7   still have the source code or the instructions of the
8   program, the binary. It just looks different. It is a set
9   of ones and zeros that already, is already the program code.
10  You don't have the source code. Sorry for the technical
11  terms here. But it's just the different things.
12        At the end of the day, both of them are trying
13  to do some operations, like read files and add or delete
14  files. But it's doing it just in a different -- it's a
15  different method, and the web today includes both, or at
16  least both.
17  Q.    In this report, you are saying that the Webwasher
18  product doesn't block binary code in this way, but you are
19  not saying anything about the other code out there?
20  A.    First of all, I didn't write this document, of course.
21  This was reading by others and a not under my control. But
22  we are not saying that Webwasher doesn't block scripts or
23  applets or all the other type of contents that I mentioned.
24        I would just see here the underlined line, and I
25  disagree is, because just recently, actually, last Saturday,

282

Ben-Itzhak - direct

1   I personally checked the Webwasher appliance that is sitting
2   here, and I found it blocking binary code using samples on
3   Secure Computing's websites that they provide as a sample.
4         So, again, I didn't write this document, but
5   from very recent experience, they do block binaries coming
6   from the web.
7   Q.    This does not say that Webwasher was not doing
8   behavior protection on Java applets or scripts or that type
9   of code. Right?
10  A.    I did not see these words here.
11        MR. ANDRE: Thank you. I have no further
12  questions.
13        THE COURT: You are excused.
14        (Witness excused.)
15        MS. KOBIALKA: Finjan would like to call David
16  Croll.
17        THE COURT: Let me see counsel at sidebar.
18        (The following took place at sidebar.)
19        THE COURT: I just want to point out, as to your
20  last objection, Mr. Schutz, if memory serves me correctly,
21  and maybe it doesn't, Mr. Andre will correct me, both of you
22  will, the reference of the witness' attention and the jury's
23  attention to the market share going up, wasn't made until
24  your cross-examination. Am I correct?
25        MR. SCHUTZ: I think that's correct, Judge.

283

Ben-Itzhak - direct

1         THE COURT: To then interpose an additional
2   objection, when Mr. Andre, in the interests of completeness,
3   at the very least, brings it up, seems to me to be a -- the
4   other portions of the grid, seems to me to be a bit
5   disingenuous on your part.
6         MR. SCHUTZ: Not intentional, Judge. I wanted
7   to make sure I preserved the record on hearsay.
8         THE COURT: Let me give you some guidance on how
9   I judge. You have made that argument. If you continue to
10  beat me up with arguments, I am going to start beating you
11  up and I am going to win that fight.
12        MR. SCHUTZ: I understand that, Judge. It
13  wasn't my intent. I don't want some appellate lawyer coming
14  back saying I waived my objection.
15        THE COURT: There is no way they can ever argue
16  waiver on this. Given the way I have watched you lawyer,
17  very carefully and meticulously, that is not going to
18  happen.
19        MR. ROVNER: Your Honor, now that he has
20  introduced that, he qualified it as this is what he
21  believed, he can put it in for its truth. I think this
22  document gets in for its truth, because he opened the door.
23        THE COURT: Unfortunately, I think you are
24  right. I agree.
25        DAVID KROLL, having been duly

284

Kroll - direct

1   sworn as a witness, was examined and testified as follows:
2                DIRECT EXAMINATION
3   BY MS. KOBIALKA:
4   Q.    Good morning, Mr. Kroll.
5   A.    Good morning.
6   Q.    Were you ever employed by Finjan?
7   A.    Yes.
8   Q.    What was that time frame?
9   A.    Early 1999 through April 2002.
10  Q.    So you don't work there any longer. Right?
11  A.    That's correct.
12  Q.    Where do you currently work?
13  A.    I work at Advanced Micro Devices, AMD.
14  Q.    What is your position there?
15  A.    I am director of employee communications.
16  Q.    How would you describe your industry experience?
17  A.    I worked in high-tech marketing and communications.
18  Q.    Could you just briefly describe your educational
19  background?
20  A.    Sure. I attended Kansas State University with a
21  degree in speech communication and marketing.
22  Q.    When did you obtain that degree?
23  A.    1989.
24  Q.    Do you have any kind of engineering background?
25  A.    I do not.

285

Kroll - direct

1    Q.    You don't write source code or anything like that?

2    A.    No.

3    Q.    While you were at Finjan, turning back to that time,

4    what was your job title there?

5    A.    I was hired as a director of corporate communications.

6    Q.    That was in the 1999 time frame?

7    A.    Correct.

8    Q.    Later, did you hold another job title while you were

9    at Finjan?

10   A.    Yes. I was eventually promoted to the vice president

11   of marketing in 2001.

12   Q.    What were your job responsibilities while you were at

13   Finjan?

14   A.    Several areas. I have worked a lot with our product

15   management and R&D teams in Israel. So it would be on early

16   morning sessions, going over product builds and feature

17   reviews. Then also with the sales force to help the sales

18   team sell. So how to communicate the features and benefits

19   of Finjan products out to customers.

20         And on the marketing side, oversaw the marketing

21   collateral, the press releases, the website, trade shows,

22   events, all the ways we communicated to the outside world.

23   Q.    While you were at Finjan, were you ever involved with

24   any patents?

25   A.    I wrote a press release whenever we would receive a

286

Kroll - direct

1    patent. And I was the inventor on one patent.

2    Q.    I would like to show you what is marked as Exhibit

3    JTX-3.

4          I believe it may be in that binder there in

5    front of you.

6    A.    Okay.

7    Q.    Once you have had a chance to look at it, let me know

8    if you recognize the document.

9    A.    Yes, I do.

10   Q.    What is your understanding of what this document is?

11   A.    This was what we called our patent that covered the

12   technology for sandbox technology that was intended for our

13   gateway product.

14   Q.    Are you a named inventor on this patent?

15   A.    Yes.

16   Q.    What did you refer to this patent as at Finjan while

17   you were there?

18   A.    We call it the "Portable Sandbox Patent."

19   Q.    Just for reference, do you see the last three numbers,

20   it says "822" on the patent?

21   A.    Yes, I do.

22   Q.    If we refer to it as "822" or the "Portable Sandbox

23   Patent," we will be talking about the same thing. Right?

24   A.    Yes, okay.

25   Q.    Is this patent, the '822 patent, related to any other

287

Kroll - direct

1    patent of Finjan that you are aware of?

2    A.    Yes. It was an extension or add-on to our original

3    SurfinGate patent or gateway patent.

4    Q.    Do you recall what the number was of that patent that

5    you are referring to?

6    A.    I don't, offhand.

7    Q.    But your original patent -- why don't you take a look

8    at JTX-1 in your book, see if that helps you remember the

9    number.

10   A.    Yes, I see GTX-3 and GTX-1.

11   Q.    Is this the original patent you were just referring

12   to, if you remember?

13   A.    Yes, it is, yes.

14   Q.    I will refer to that as the "'194 patent."

15         Generally, are you familiar with this '194

16   patent?

17   A.    Yes. When we wrote up, this is the Portable Sandbox

18   Patent, it was based on the original technology from this

19   patent.

20   Q.    Did you ever write a press release when this patent

21   was issued to Finjan?

22   A.    Yes.

23   Q.    Okay. Why did you write a press release about it?

24   A.    Well, it's a big deal to get a patent. And it was our

25   original core technology for Finjan. So we wanted to

288

Kroll - direct

1    promote that as a leader in the space for proactive

2    monitoring and behavior-based monitoring for code, that we

3    were the inventors of this patent, and it would demonstrate

4    our leadership to market.

5    Q.    I would like to show you what's DTX-1149. I believe

6    it's in the book there, too, for you as well.

7          Do you recognize this document?

8    A.    Yes.

9    Q.    Is this the press release you were just referring to

10   about the '194 patent?

11   A.    Yes, it is.

12   Q.    About what time frame was this press release done?

13   A.    It looks like July 2000.

14   Q.    How did you describe the '194 patent technology?

15   A.    Probably the second paragraph has it best. "The

16   patent covers methods for receiving a downloadable program,

17   such as ActiveX or JavaScript, scanning the code in

18   realtime, applying a security policy to the downloaded

19   program, and then blocking the program if the security

20   policy has been violated. For example, attempting to delete

21   a file on a recipient's PC."

22         The patent also covers the scanning of digital

23   certificates, which are used to validate the identity and

24   origin of downloaded active code, such as ActiveX controls.

25   Q.    Why was this technology significant to Finjan?

Kroll - direct

1  A.    Well, we were first to market it. If you go back into

2  time, the web was just coming out in 1995-1996. Finjan was

3  probably the very first company to recognize the dangers of

4  downloadable code from the Internet. It was such a new

5  thing. So they were quite visionary and pioneered the first

6  products that would monitor code in realtime and look at

7  code behavior, instead of reactive products. So they were

8  computing times.

9  Q.    When you use the word "reacted," could you just

10 briefly explain what you mean?

11 A.    Well, the current products on the market were

12 anti-virus companies, Norton, Symantech, et cetera, are the

13 ones that are still around today. Their technology is based

14 on signatures and comparing lists of known viruses that are

15 already out there.

16       So if your computer can recognize an incoming

17 file that is malicious, it can block it. Any new or

18 first-time attacks that come out, they are not on those

19 lists. Products such as what we had at Finjan to properly

20 monitor the behavior of that code was a significant leap

21 forward at that time.

22 Q.    While you were at Finjan, was Finjan successful in

23 marketing this technology?

24 A.    I wish. It, actually, out of the gates, we were very

25 successful, and with the threats that were out there, but

Kroll - direct

1  the number of attacks didn't quite proliferate as people had

2  expected. So the web was growing leaps and bounds, and

3  hackers were developing worms and other types of programs

4  that would take advantage of these technologies.

5        But there weren't quite the number that we

6  anticipated. I think Finjan was way too early to market, as

7  sometimes technology companies can be very visionary but a

8  little too early to market. So the market demand didn't

9  quite carry through and turn into the sales we hoped for.

10 Q.    Did the dotcom bust help?

11 A.    No. We actually, in 2001, it was probably one of

12 worst days of my professional carrier. We had to lay off 50

13 percent of the company with no severance. So the year

14 prior, we had spent balancing incoming cash from customers,

15 vendors, pay vendors, pay suppliers, and we finally hit a

16 wall. It was a horrible day. That was in 2001.

17 Q.    Turning back to the '822 patent that you are an

18 inventor on. Generally, how did the idea come about? What

19 was your involvement?

20 A.    Well, representing the customers' side, we knew a lot

21 of the features and weaknesses of a product. We had a very

22 strong desktop product, SurfinShield. Our sandbox product

23 is, SurfinGate, had some weaknesses, that we knew customers

24 wanted, and I wanted those features in the product. So

25 there was a lot of discussion with product management, R&D.

Kroll - direct

1  We came up and fleshed out the idea for the Portable

2  Sandbox.

3  Q.    You had discussions with specific people at Finjan.

4  Is that correct?

5  A.    Yes. It was mainly Nimrod Vered and Yigal Edery, who

6  are listed on the patent.

7  Q.    Those are the other inventors?

8  A.    They are.

9  Q.    How often did you talk to them?

10 A.    Sometimes daily, but we always had weekly calls. So

11 it was very active discussions. Through the course of my

12 tenure at Finjan, we talked to those guys all the time.

13 Q.    You have used the term "Portable Sandbox." What do

14 you mean by that?

15 A.    Well, essentially, wrapping a code at the gateway. So

16 a program comes in, let's say, through the Internet, and the

17 gateway server, we can wrap a piece of code around it and

18 bring it down to the desktop and have it run and monitor the

19 code and block any policies that it violates, such as

20 attempting to delete a file or install a malicious program.

21       All that is done without installing anything on

22 the client.

23 Q.    Is it important that nothing is installed on the

24 client for your customers at that time at Finjan?

25 A.    Yes. It is actually a huge deal. If you can imagine

Kroll - direct

1  an IT person at a company with five, ten, 20,000 computers,

2  and to not have to install software on each desktop and be

3  able to cover that gateway is a huge deployment and

4  efficiency advantage for the company.

5  Q.    So they can just install it once on the gateway as

6  opposed to many, many computers?

7  A.    Yes, absolutely.

8  Q.    You said, "It acts like a wrapper." What exactly do

9  you mean?

10 A.    Well, it actually attaches a piece of code around the

11 program. So if a program comes in and it is determined that

12 it needs to be wrapped, you actually attach a piece of code,

13 which is the sandbox, and a sandbox, all that is is like a

14 safe zone. When the program actually runs on the desktop's

15 computer, then it can monitor the behavior inside that safe

16 zone and protect it.

17 Q.    Why is it difficult to detect whether some code may be

18 malicious at the gateway?

19 A.    Code isn't run at the gateway. So when you are

20 downloading something from the Internet, your web browser,

21 when it hits your company's server, it passes through that

22 to your desktop. At the time it is running through your

23 gateway server, it cannot run itself. The code actually has

24 to be executing. So the best and the only time to see what

25 is going on is when it is executing and unveiling its true

293

Kroll - direct

1  intentions on the client computer.

2       MS. KOBIALKA:  I have no further questions at

3  this time.  Thank you.

4       CROSS-EXAMINATION

5       MR. HOLDREITH:  Good morning, Your Honor.

6       THE COURT:  Good morning.

7       CROSS-EXAMINATION

8  BY MR. HOLDREITH:

9  Q.   Good morning, Mr. Kroll.

10 A.   Good morning.

11 Q.   Now, you were, as you testified, primarily involved in

12 marketing and advertising.  Is that fair to say?

13 A.   That would be the primary function of my job, yes.

14 Q.   And as you mentioned in your testimony, you don't have

15 particular training or experience as a designer of code or

16 network security products?

17 A.   That's correct.

18 Q.   And, in fact, you are not the originator of the idea

19 for the '822 patent.  Is that fair to say?

20 A.   Well, I contributed to the concept, so I would say

21 Yigal Edery, in many of our discussions of trying to get

22 that sandboxing technology that we had at the desktop up to

23 the server product, there was a lot of discussion about

24 that.  The first spark probably came from Yigal, and we all

25 helped flesh out the idea and the general concept of it.

294

Kroll - direct

1  Q.   Fair enough.

2       And, now, your role with respect to the patent

3  was generally to aid in the editing process but not the

4  technical details.  Is that fair to say?

5  A.   Yes.

6  Q.   Now, I would like to look at that patent again.

7  That's JX-3.  Here is the cover page up on the screen.  This

8  is the patent that you were talking about that names you as

9  an inventor.  Is that right?

10 A.   Yes.

11 Q.   If we look at this abstract, it explains that one of

12 the things you wanted to do with this idea was to protect

13 against malicious operations of Java applets, ActiveX

14 controls, JavaScript scripts, Visual Basic scripts, add-ins,

15 downloaded/uploaded programs or other downloadables.

16       That is what the patent says.  Is that right?

17 A.   Yes.

18 Q.   And is it fair to say one of the things you wanted was

19 a solution that could address all of these threats, Java

20 applets, ActiveX, scripts, add-ins, downloadables?

21 A.   Or mobile code.

22 Q.   You wanted to catch it all if you could?

23 A.   Sure.

24 Q.   In your patent, I am going to refer you now to Column

25 110.  You understand there is some drawings in the patent?

295

Kroll - direct

1  A.   Yes.

2  Q.   And then there is some text that describes what you

3  thought your idea was.  Right?

4  A.   Yes.

5  Q.   And you helped edit this text, some of this text in

6  the '822 patent?

7  A.   In the application.

8  Q.   That's right.  And you understand that this patent is

9  the text from the application?

10 A.   Most of it, yes.

11 Q.   And, so, you went through this text when you were

12 working on the patent?

13 A.   You know, I am not even sure if I saw the final

14 patent.  Our patent attorneys did much of that.  I am very

15 involved in the writing of the application and the details

16 around that, yes.

17 Q.   Exactly.  One of the things you said here in the

18 specification of this patent is that there was somebody

19 named Golan, who -- you understand Golan came before the

20 '822 patent.  You were talking about the prior art here.

21 Correct?

22 A.   Yes.

23 Q.   And Golan had a protection system that focused only on

24 protecting against ActiveX controls.  That's what you said

25 here.

296

Kroll - direct

1  A.   Yes.

2  Q.   And you said, Golan doesn't protect against other

3  distributable components, let alone other downloadable

4  types.  Right?

5  A.   Yes.

6  Q.   And other distributable components, that means things

7  like Java applets?

8       MS. KOBIALKA:  Objection, Your Honor.

9       THE COURT:  May I see counsel, please.

10      (The following took place at sidebar.)

11      MS. KOBIALKA:  I am afraid we are starting to go

12 down a path of trying to make legal conclusions and

13 interpreting the patent.  He has already said he is not an

14 engineer.

15      THE COURT:  I agree.  What is the purpose of

16 this line of questioning?

17      MR. HOLDREITH:  He said he edited this text.

18      THE COURT:  He is not a lawyer.  Sustained.

19      (End of sidebar conference.)

20      THE COURT:  The objection is sustained.

21 BY MR. HOLDREITH:

22 Q.   Mr. Kroll, I would like to ask about the press release

23 you were asked about.  It is DTX-1149.

24      Is it fair to say this was not intended for

25 patent lawyers but intended for a more general audience?

Kroll - direct

1  A.    Yes.

2  Q.    The press release is not an effort to explain what the

3  exact boundaries of the patent are, was it?

4  A.    That's correct.

5  Q.    The press release includes some language that promotes

6  Finjan's products at the time, about SurfinGate. Do you see

7  that?

8  A.    Yes.

9  Q.    Would you agree with me that the SurfinGate product

10 evolved over time?

11 A.    Yes.

12 Q.    One of the things you wanted to do was update the

13 product to meet new threats?

14 A.    Sure.

15 Q.    And you did that?

16 A.    Yes.

17 Q.    So the SurfinGate product in 2000 was different from

18 the SurfinGate product in, say, 1997?

19 A.    Yes, there would be different features.

20 Q.    You mentioned that SurfinGate had weaknesses. Is that

21 right?

22 A.    Yes.

23 Q.    Was the '822 patent an effort to address some of those

24 weaknesses?

25 A.    Yes.

---

Kroll - redirect

1  Q.    Do you have an understanding, based on what you can

2  recall about this patent, that every time there is a

3  downloadable, it needed to be sandboxed?

4  A.    Every time?

5  Q.    Yes.

6  A.    No.

7  Q.    Why wouldn't you do that?

8  A.    Well, the products work based on policies. So there

9  is plenty of good downloadables from the web, whether it be

10 a ticker, a little clock, something you may want to download

11 or an application you want to install that you wouldn't

12 sandbox, because that would be an okay application to run on

13 your computer.

14       So the products were built to have policies to

15 allow certain types to be allowed into a network and then

16 others would be blocked.

17 Q.    You were asked questions about how software at Finjan

18 had evolved over time.

19 A.    Yes.

20 Q.    Do you have an understanding of why the products were

21 evolving over time?

22 A.    Yes. Absolutely. When you develop products, you

23 start with a certain idea in mind and what you are trying to

24 achieve and deliver for customers, then you get feedback

25 from the industry, the market, there may be new threats that

---

298

Kroll - redirect

1  Q.    Were some of the weaknesses that it couldn't catch all

2  of the different downloadables that came in, sir?

3  A.    Correct.

4  Q.    And some of those were like Java applets. That was a

5  weakness you were trying to address?

6  A.    It, actually, the SurfinGate product at that time did

7  monitor Java applets, while we had issues with attachments

8  to e-mails and other pieces.

9  Q.    Other types of components?

10 A.    Yeah.

11       MR. HOLDREITH: Thank you. That is all I have.

12       THE COURT: Redirect.

13       MS. KOBIALKA: Yes, please.

14            REDIRECT EXAMINATION

15 BY MS. KOBIALKA:

16 Q.    I would like you to take a look at DTX-3. There was

17 some text that was shown to you from the abstract. We

18 actually didn't get to see the whole sentence. I would like

19 to highlight that, starting from "Java applets, ActiveX,"

20 all the way to the end of the sentence, do you see at the

21 end of the sentence, it says, "Visual Basic scripts,

22 add-ins, downloaded/uploaded programs, or other

23 downloadables or mobile code in whole or part."

24       Do you see that?

25 A.    Yes, I do.

---

300

Kroll - redirect

1  occur. You build those into the products as the days and

2  the years go by.

3  Q.    Was that one of your job responsibilities in terms of

4  addressing customer comments about the products?

5  A.    Yes. That was one of the main pipelines into our

6  Israeli design team on what new features and input needed to

7  be included in the products to improve them.

8  Q.    Is that one of the reasons why you were involved on

9  these calls with the Israeli R&D team you mentioned?

10 A.    Absolutely.

11       MS. KOBIALKA: Thank you. I have no further

12 questions.

13       THE COURT: Thank you, sir. You are excused.

14       (Witness excused.)

15       MR. ANDRE: Your Honor, at this point, we would

16 like to read in some deposition transcripts. We would like

17 to have two of our attorneys read it in, if that's okay.

18       THE COURT: Ladies and gentlemen, this is an

19 example of the other kind of evidence that you will get from

20 time to time, evidence or testimony that was previously

21 recorded. This testimony was recorded in writing. And we

22 will have someone who will play the witness and someone who

23 will play the examiner.

24       This is testimony from previously-taken

25 depositions.

Kroll - redirect

1    MR. ANDRE: Your Honor, for the record, the
2    person reading the answers will be Mr. Hannah and the person
3    reading the questions will be Mr. Kastens:
4        "Question: Please state your full name and
5    spell your last name for the record.
6        "Answer: Christoph Norbert Alme. Surname is
7    A-l-m-e.
8        "Question: Are you currently employed,
9    Mr. Alme?
10        "Answer: Yes.
11        "Question: Where are you employed?
12        "Answer: With Secure Computing GmbH.
13        "Question: And what is your current title
14    there?
15        "Answer: At the moment, I am principal engineer
16    and team lead.
17        "Question: Thank you. Let's turn to page
18    bearing Bates No. SC 03462, (PTX-9 or PTX-9A). What does
19    this slide show?
20        "Answer: You can see a debug file of the
21    Webwasher.
22        "Question: Can you walk me step by step and
23    tell me what each of these lines is referring to, please?
24        "Answer: The first line refers to the calling
25    of the mobile code filter. The second line states the URL

302

Kroll - redirect

1    from which the content has been received. The third line
2    states that the proactive scanning has started to filter
3    embedded script code.
4        "Can I put line numbers on this?
5        "Question: Sure. Go ahead.
6        "Answer: Otherwise, I get confused. Line 5
7    shows the URL. Line 6 shows the proactive scanning has
8    started. Line 7 says that a function named ActiveXObject
9    has been found; and due to Rule No. 435 and respectively to
10    this function code, the bit flag for the category
11    CoadLoading was set.
12        "The next line is the current context of the
13    parameter. And that line says that the current context
14    consisting in the function -- in the last function names of
15    parameters has set the bit flags for FileRead and FileWrite
16    due to 446.
17        "In Line 9, it states that we have found the
18    function name 'CreateTextFile,' and the bit flag for the
19    category FileWrite was set due to rule 450. In Line ten, we
20    have the current context of the last function name in
21    parameters; and due to Rule 523, the bit flag for the
22    category 'Vulnerable' was set.
23        "In Line 11, you can see that proactive
24    scanning has finished and that content is to be blocked; and
25    for that reason, proactive scanning throws an exception.

303

Kroll - redirect

1        "In Line 13, it says that an error handler was
2    added. In Line 14, mitigation script code for JavaScript
3    was added. Line 15 says that proactive scanning has
4    finished filtering embedded script code. And Line 16 states
5    that the transaction has been completed.
6        "Question: Is this an accurate depiction of the
7    proactive scanner?
8        "Answer: Definitely not. This is just a debug
9    log file.
10        "Question: Is this an accurate depiction of the
11    steps that the proactive scanner takes?
12        "Answer: The flow of processes, the steps --
13    the sequence of steps is correct, but lines only show up in
14    a log file if that action has been called in the proactive
15    scanner. So what you can see here has been performed in
16    that sequence, but this does, by no means, claim
17    completeness.
18        "Question: So these are all the steps that
19    would be performed on the JSENC .HTML web page; is that
20    correct?
21        "Answer: These are all the steps that are
22    performed but they aren't all the steps that have been
23    performed.
24        "THE WITNESS: Maybe not all steps.
25        "Question: But at least these steps were

304

Kroll - redirect

1    performed?
2        "Answer: These steps were performed, yes.
3        "Question: Five lines from the bottom, it says
4    'mobile code blocked.'
5        "Do you see that?
6        "Answer: That one and the line before belong in
7    one line.
8        "THE WITNESS: It's a character term.
9        "(Exhibit 5 marked.) (PTK-10.)
10        "MR. HANNAH: For the record, Exhibit 5 bears
11    Bates number SC 01360 through SC 01386 (PTX-10). It is
12    entitled 'Webwasher Mobile Code Filter, Detection and
13    Classification of Malicious Mobile Code.' And on the cover,
14    the author is Christoph Alme and the date is July 5, 2004.
15        " Do you recognize this document, Mr. Alme?
16        "Answer: Yes, I do recognize it.
17        "Question: Did you write this document?
18        "Answer: Yes.
19        "Question: Did anybody else help you write this
20    document?
21        "Answer: What do you mean by 'help'?
22        "Question: Did anybody else author this
23    document?
24        "Answer: No.
25        "Question: What is this document?

305

Kroll - redirect

1         "Answer: It's a document that was written
2  during the development of the mobile code filter. It was
3  meant to be a basis. It was a basis for marketing to use it
4  to write, for instance, a white paper.
5         "Question: Does this paper describe the
6  proactive scanner that be we have been talking about this
7  morning?
8         "Answer: Yes.
9         "Question: How did you come up with the idea
10  for the proactive scanner?
11        "Answer: Not at all.
12        "Question: What do you mean?
13        "Answer: It wasn't my idea.
14        "Question: Whose idea was it?
15        "Answer: I don't really know. I am a
16  developer. I got a task to perform something.
17        "Question: Who gave you the task?
18        "Answer: At the end of the day, obviously my
19  direct bosses, Peter Borgolte and Mr. Stecher.
20        "Question: Do you know how they came up with
21  the idea for proactive filter?
22        "Answer: I do not know that, no.
23        "Question: Did you look at any other products
24  when you were developing the proactive filter?
25        "Answer: No.

306

Kroll - redirect

1         "Question: Have you ever reviewed Finjan's
2  products while you were working for Secure Computing?
3         "Answer: I reviewed them within the period
4  covering both Webwasher and to Secure Computing.
5         "Question: When did you review Finjan's
6  products?
7         "Answer: In spring/summer 2003.
8         "Question: Why did you review Finjan's
9  products?
10        "Answer: Because these orders were given to me
11  by my boss.
12        "Question: Did you ever review Finjan's
13  products in your development of the proactive scanner?
14        "Answer: I reviewed screen shots but I did not
15  review the product itself. I was shown screen shots. I was
16  shown screen shots."
17        MR. ANDRE: Your Honor, that ends the deposition
18  of Mr. Alme. The next deposition we will be reading is of
19  Mr. Stecher, another employee of the Defendants.
20        THE COURT: That is fine.
21        "Question: Can you please state your full name
22  and spell your last name for the record.
23        "Answer: My name is Martin Stecher,
24  S-t-e-c-h-e-r.
25        "Question: Are you currently employed,

Kroll - redirect

1  Mr. Stecher?
2         "Answer: Yes.
3         "Question: And where are you employed?
4         "Answer: With Secure Computing GmbH.
5         "Question: And what is your current title?
6         "Answer: Vice president, development.
7         "MR. HANNAH: We have just marked Exhibit 19
8  (PTX-19). Exhibit 19 (PTX-19) bears Bates number SC 077266
9  through SC 077274. It's entitled 'Webwasher 5 Training,
10  Proactive Security.' It also says Paderborn, January 31st
11  through January 3rd, 2005. It appears to be a
12  presentation -- a slide show presentation.
13        "Have you ever seen Exhibit 19 before?
14        "Answer: I recognize individual slides but I
15  cannot tell whether I have seen the entire presentation. I
16  believe I haven't.
17        "Question: I would like to turn your attention
18  to the second page, which bears Bates No. SC 077267. It
19  states that 'Proactive Security,' and then as a bulet point
20  underneath that, it says, 'Perfect extension to anti-virus
21  scanning. Scanning of unknown malicious code, day zero
22  attacks and exploits.' And then, 'Pure gateway solution, no
23  client software needed.'
24        "Do you see that?
25        "Answer: Yes.

308

Kroll - redirect

1         "Question: Can you tell me what your
2  understanding of what that means?
3         "Answer: To me, it is a perfect extension of
4  the traditional anti-virus. It also says that proactive
5  security is able to find unknown malicious code and that it
6  is able to protect from day zero attacks and exploits. And
7  it is a solution that works only at the gateway -- that
8  works only at the gateway and does not need an installation
9  at the client computer.
10        "Question: Are all of these attributes true of
11  proactive scanning?
12        "Answer: In terms of marketing, yes. But words
13  like 'perfect' are not -- are, technically speaking, not
14  correct -- valid.
15        "Question: What is the 'day zero attack'?
16        "Answer: If a new chunk of malware is released
17  before signatures for it have been made, then day zero is
18  basically the first day from the moment of its inception
19  until -- or before signatures have been made for it.
20        "Question: And how does proactive scanning
21  prevent day zero attacks?
22        "Answer: Unknown code can be assigned to
23  categories -- unknown code for which we do not have
24  signatures yet can be assigned to categories using rules.
25  And these categories can be blocked, and this way, day zero

Kroll - redirect

1  attacks, unknown files, can be blocked.

2       "Question: I would like to turn your attention

3  to the page bearing Bates number SC 03442 (PTX 9A). What

4  does this page show?

5       "Answer: That is the page -- the only page

6  which I wish our customers would see.

7       "Question: Okay.

8       "Answer: Because this whole story with

9  categories is way too complex for our customers. And,

10  therefore, we have this page where you can choose from three

11  default settings. And in this case, we have medium as the

12  default setting; and not only in this case, but that's

13  generally how we sell the product. And the customer also

14  has an option of being more relaxed or with higher

15  strictness. And technically speaking, the false negative

16  and the false positive rates change.

17       "Question: Is this the security policy that is

18  set by the administrator?

19       "Answer: Regarding the proactive scanner, I

20  wish that our customers only used these three buttons --

21  that their administrators only used these three buttons.

22       "Question: If your customer chose one of these

23  button, that would set the security policy; is that correct?

24       "Answer: All Webwasher settings are the

25  security policy. And this setting here changed a part of

310

Kroll - redirect

1  this entire security policy. And to be precise, it changes

2  the settings of the drop-down menus I spoke about on

3  Tuesday.

4       "Question: Mr. Stecher, before the break, we

5  were looking at this presentation of Webwasher Proactive

6  Scanning. We were looking at page bearing Bates number

7  SC 03446 (PTX-9A). I believe the pending question was, What

8  does this slide mean?

9       "Answer: So here we are talking particularly

10  about the media types HTML and scripts, even though HTLM

11  also refers to the fact that scripts can be embedded. And,

12  again, we have one option of having a look at the scripts

13  directly or as the other version using the script code

14  mitigation. And further down, we have a reference to the

15  Anna Kournikova virus, which I also mentioned on Tuesday.

16       "Question: Does this slide show how script code

17  mitigation works?

18       "Answer: It doesn't show it as a picture, but

19  the written description is fairly accurate.

20       "Question: I'd like to turn your attention to

21  page bearing Bates number SC 03462. What does this page

22  show?

23       "Answer: Webwasher has a function where all

24  filters that can be used are written in a specific log file.

25  We used that for debugging purposes when a customer has

1  certain problems with the file so that we can get an

2  indication that a certain file is blocked which should not

3  be blocked and that a certain rule might be responsible for

4  that. And it seems to me that this excerpt shows a log file

5  of how the filtering of these files work. Other filters

6  probably would have written more; this is the proactive

7  scanning filter.

8       "MR. HANNAH: Mark Exhibit 32, please.

9       "(Exhibit 32 marked.) (PTX-32)

10       "MR. HANNAH: Exhibit 32 bears Bates number

11  SC 077723 through SC 077725 (PTX-32). It is an e-mail from

12  Thomas Friedrich to a number of individuals, including

13  Martin Stecher. It is dated 5/23/2003.

14       "BY MR. HANNAH:

15       "Question: Do you recognize this document,

16  Mr. Stecher?

17       "Answer: I don't remember this document

18  exactly, but I know what it refers to: Our weekly meetings.

19       "Question: Do you still have these weekly

20  meetings?

21       "Answer: Yes. Only they have moved to a

22  different time in the schedule.

23       "Question: In the bottom half of this first

24  page, there is a reference to Finjan, and it says that

25  testing has been finished. Martin distributes new version

312

Kroll - redirect

1  of document to participants of this meeting only. The paper

2  is strictly company confidential and must not be further

3  distributed.

4       "Do you see that?

5       "Answer: Yes.

6       "Question: What is that referring to?

7       "Answer: I probably -- I believe that this

8  probably refers to the tests of our Finjan evaluation copy,

9  and Mr. Alme performance double-checks and checked files.

10  And the results of these tests were not too positive with

11  regard to the performance of the Finjan products, and I did

12  not want to circulate this information beyond the small

13  amount of people.

14       "Question: It might help refer to the next

15  exhibit, which is 33 (PTX-33).

16       "MR. (HANNAH: And what I would like to mark...

17       "(Exhibit 33 marked.) (PTX-33)

18       "MR. HANNAH: Exhibit 33 (PTX-33) bears Bates

19  number SC 153656 through SC 153663. It is entitled 'Finjan

20  SurfinGate Web 7.0 Competitive Analysis.'

21       "BY MR. HANNAH:

22       "Question: Do you recognize this document,

23  Mr. Stecher?

24       "Answer: I have a faint memory of it, yes.

25       "Question: Is this the document that is

313

Kroll - redirect

1  referred to in Exhibit 32?

2          "Answer: I think so, yes, even though I mean to

3  remember that I was actually referring to a rougher version

4  than this, but date wise it seems to be correct.

5          "Question: Was this document ever shown outside

6  of Webwasher? And for clarity, I am referring to Exhibit

7  33.

8          "Answer: I don't know. But I don't hope so,

9  very much actually, because very clearly it has been marked

10  as strictly confidential and for internal use only.

11          "MR. HANNAH: I would like to mark Exhibit 34.

12  It bears Bates number SC 077703 through SC 077705 (PTX-34).

13          "It appears to be an e-mail, although there is

14  no from or to participants on it, but it is titled, Product

15  meeting minutes from September 16, 2003. And present -- it

16  states that Martin was present.

17          "(Exhibit 34 marked.) (PTX-34)

18          "Do you recognize this document, Mr. Stecher?

19          "Answer: It looks like one of the product

20  meeting minutes and it seems to be the case that Mr. Peter

21  Borgolte wrote this.

22          "Question: The reference on the first page to

23  Martin, is that reference to you?

24          "Answer: Yes.

25          "Question: On the second page, you see there is

314

Kroll - redirect

1  a reference to Webwasher 5.0, and -- well, could you please

2  read that paragraph and let me know when you have had a

3  chance to do so?

4          "Answer: Okay.

5          "Question: What is meant by that paragraph?

6          "Answer: Ever since the issue do we or should

7  we build something like proactive security in 2002, at the

8  same time we kept hearing from our sales team: Please build

9  something for us so we can compete against Finjan

10  products -- so that we can compete or respond to Finjan

11  marketing.

12          "And at the time when we were dealing with 5.0,

13  we still had clearly different priorities. And in the

14  meeting, in this meeting, this product development meeting,

15  I just clearly stated that with this version, we would not

16  be implementing anything like that; that would come later.

17  So I stated that at that moment -- at that moment, we

18  wouldn't have a technical response but we should have a

19  marketing-based response explaining why we didn't need that

20  at the time yet.

21          "MR. HANNA: I would like to mark Exhibit 35,

22  please.

23          "(Exhibit 35 marked.) (PTX-35)

24          "MR. HANNAH: For the record, Exhibit 35,

25  (PTX-35) bears Bates number SC 030765 through SC 030766. It

Kroll - redirect

1  is an e-mail from Roland Cuny to a number of recipients,

2  including Martin Stecher. It is dated April 19, 2004. The

3  subject is 'Notes: Product Planning September Release.'

4          "Do you recognize this document, Mr. Stecher?

5          "Answer: I do not recognize it as such but I do

6  not doubt its authenticity.

7          "Question: Number 3 reads 'Proactive Security,'

8  and underneath, it says, 'It is a key trend identified by

9  the IDC. Develop own technology or create something similar

10  to Finjan.'

11          "Did you start to develop a similar technology

12  to Finjan around the time of this e-mail?

13          "Answer: We thought about our options at the

14  time and we did some research or science -- we made designs

15  for our own technology there, which is apparently

16  characterized by a few similarities with Finjan products.

17          "Question: This reference to IDC, is this a

18  reference to the IDC opinions that we discussed earlier

19  today?

20          "Answer: I don't know if it's a reference to

21  exactly the same documents we had this morning, but I know

22  that Mr. Cuny dealt with -- deals with IDC documents a lot

23  more frequently than I do.

24          "Question: I would like to show you Exhibit 16

25  (PTX-16), which was marked yesterday at the proceedings with

316

Kroll - redirect

1  Mr. Alme. It is an e-mail from Mr. Alme to you that is

2  dated 5/28/2004, and the subject is 'Proactive Security.'

3          "Do you recognize this document?

4          "Answer: I do not recognize it as such. But I

5  believe it was an e-mail sent to me. I'll have a look at it

6  now.

7          "Yes.

8          "Question: Did you write this document or a

9  portion of this document?

10          "Answer: Yes. What I find a little confusing

11  is that apparently this quoting system, when you respond to

12  an e-mail, is exactly the other way around than it should

13  be. So apparently there are these quote marks with e-mails

14  to Mr. Alme and not the other way around. I'm slightly

15  confused by that, but otherwise, yes.

16          "Question: Can you please tell me what is meant

17  by this document.

18          "Answer: I can go back and try to remember how

19  the e-mail -- Mr. Alme gives me some feedback about the

20  exchange of information that happened.

21          "Question: Sure.

22          "Answer: I believe that I started thinking

23  about how we could go for a basic approach to solve this

24  problem.

25          "Question: What problem was that?

317

Kroll - redirect

1    "Answer: The problem of treating unknown files.

2    "My approach was rather a black list/white list

3    approach. I believe that actually this e-mail is part of an

4    e-mail which I sent to the management. So, first of all,

5    what I wanted was some feedback to give me a guideline

6    regarding the direction of our development, and I also

7    wanted to make a point that developing that kind of item

8    wouldn't be something that you do just do after lunch, but

9    that buy-in and funding would be required for that.

10    "And I assume that I also sent this e-mail to my

11    employees because I wanted to have some feedback and

12    cooperation how this could be implemented. And in this

13    feedback -- in this e-mail, Mr. Alme gives me some feedback

14    that we have to consider with this approach and what might

15    have to be changed.

16    "Question: So what were your considerations?

17    "Answer: Do you happen to have the original

18    e-mail I wrote? That would make it a lot easier for me.

19    "Question: I believe it may be part of the next

20    e-mail that I would like to mark. So we can go ahead and

21    try to take a look at that and see if it is actually the

22    same.

23    "MR. HANNAH: So for the record, I would like to

24    mark Exhibit 36. (PTX-36).

25    "(Exhibit 36 marked.) (PTX-36)

318

Kroll - redirect

1    "MR. HANNAH: Exhibit 36 (PTX-36) bears Bates

2    number SC 166304 through SC 166318. It is -- the first

3    e-mail on the first page is an e-mail from Horst Joepen to a

4    number of recipients, including Martin Stecher. I believe

5    the e-mail that we are going to talk about first is on a

6    page bearing Bates number SC 166305, which appears to be an

7    e-mail from Martin Stecher to Horst as well as a number of

8    other recipients.

9    "Question: Is this the e-mail that you were

10    asking for, Mr. Stecher?

11    "Answer: Actually, that's it. And it confirms

12    my memory that I first sent this e-mail to the managers of

13    CyberGuard and Webwasher. I have read the first designated

14    part.

15    "Question: Can you please explain.

16    "Answer: That was in an early stage of our

17    ideas of how to implement that. I passed on two

18    suggestions, which apparently were the result of a technical

19    meeting. And one of these approaches was based on a black

20    list and the other on a white list, and I wanted some

21    feedback which would meet with some more approval.

22    "Question: Which was the black list and which

23    was the white list?

24    "Answer: The white list is the second one and

25    the black list is the first one.

319

Kroll - redirect

1    "Question: Which of these two options did

2    Webwasher pursue?

3    "Answer: None of them was implemented.

4    "Question: What is different about between what

5    is listed here and what was implemented?

6    "Answer: The option that was finally

7    implemented is closer to what is listed under 1. However,

8    we chose more diverse methods to ensure that. And the rules

9    and category-based system with media types, which we

10    eventually implemented, was only the result of further

11    meetings, let alone the extensions that were added after the

12    first version.

13    "That becomes especially clear if you have a

14    look at the error rates I forecast there, and it also

15    becomes clear in the mix of options and the higher

16    performance rate we eventually achieved with our proactive

17    scanner solution.

18    "MR. HANNAH: I'd like to mark Exhibit 37.

19    (PTX-37).

20    "(Exhibit 37 marked.) (PTX-37)

21    "MR. HANNAH: And I think it makes sense to mark

22    Exhibit 38 (PTX-38) as well.

23    "(Exhibit 38 marked.) (PTX-38)

24    "MR. HANNAH: For the record, Exhibit 37

25    (PTX-37) bears Bates number SC 075235 through SC 075236. It

320

Kroll - redirect

1    appears to be an e-mail from Frank Berzau to Thomas -- to a

2    number of participants, including Martin Stecher.

3    "Exhibit 38 (PTX-38) is presumably an attachment

4    to this e-mail. It bears Bates number SC 155173 through

5    SC 155181, and it is a document -- the first line says,

6    'Proactive Security,' and it describes a number of patents.

7    "THE WITNESS: May I correct the counsel in

8    that?

9    "BY MR. HANNAH:

10    "Question: Absolutely.

11    "Answer: This certainly was not an attachment

12    to this e-mail.

13    "Question: Okay. I was just about to ask you

14    about that.

15    "With regard to Exhibit 37, if you look at

16    number 3, it states that Roland was doing research on

17    proactive security -- on proact., and I think it means see

18    patents from Finjan and Trend.

19    "Do you see that?

20    "Answer: Yes.

21    "Question: Is this the research we discussed

22    earlier today and a couple of days ago with regard to the

23    patent research Roland was doing -- and to be precise --

24    Roland Cuny was doing?

25    "Answer: That was the reference to that, yes.

1     "Question: Now I'd like to turn your attention

2   to Exhibit 38.

3       "Is this document a summary of the research that

4   Roland Cuny was doing?

5       "Answer: Almost everything that Mr. Cuny did

6   was documented within the intranet by Mr. Cuny himself; and

7   with regard to this task, he saved or he put this content on

8   the intranet."

9       MR. ANDRE: Your Honor, that concludes the

10  reading of the deposition transcripts for now.

11      We would actually ask for the break a bit

12  earlier. We are getting into that complex portion of the

13  technology we talked about. This generates a lot of heat

14  so we have to turn it off for a reason.

15      THE COURT: Ladies and gentlemen, we will take

16  our break a little early today.

17      (Jury leaves courtroom at 10:30 a.m.)

18      (Recess taken.)

19      THE COURT: Ms. Walker.

20      (Jury enters courtroom at 10:55 a.m.)

21      THE COURT: Please take your seats, ladies and

22  gentlemen.

23      Mr. Andre, your next witness.

24      MR. ANDRE: Thank you, Your Honor. May it

25  please the Court, we would like to call Dr. Giovanni Vigna

---

322

1   to the stand.

2       GIOVANNI VIGNA, having been duly

3   sworn as a witness, was examined and testified as follows:

4       MR. ANDRE: Your Honor, we are going to be

5   getting into the complex technology portion of the case that

6   I have been warning everybody about. So we would like to

7   give out two binders to the jury.

8       THE COURT: All right.

9       (Binders passed to jurors.)

10      THE COURT: You may proceed, Mr. Andre.

11      MR. ANDRE: Thank you, Your Honor. We will be

12  showing all the exhibits on the screen and all the relevant

13  pages. If the binders get too unwieldy, we will make sure

14  everyone can see them otherwise.

15      THE COURT: I am sure the jury will find it

16  helpful.

17          DIRECT EXAMINATION

18  BY MR. ANDRE:

19  Q.   Good morning, Dr. Vigna. Would you please provide us

20  with your educational background?

21  A.   Yes. I got my Master's in electronic engineering at

22  the Politecnico di Milano in Italy in 1994. Then I got my

23  PhD, again in electronic engineering, Politecnico di Milano

24  in 1998.

25  Q.   What is your employment background since you finished

---

1   in 1998?

2   A.   I was at the computer science department of the

3   University of California in Santa Barbara as a post-doc

4   until 2000, when I was hired as an assistant processor, and

5   then in 2004, I got tenure and became an associate processor

6   in that department.

7   Q.   What type of research do you do at UC Santa Barbara?

8   A.   My research focused on computer security in general.

9   And I have worked extensively on intrusion detection

10  systems, vulnerability analysis, web security, and malware

11  detection.

12  Q.   Do you have any awards or honors for your research?

13  A.   Well, a college paper that got awarded, for example, a

14  best paper award. Recently, I got a Most Influential Paper

15  from ten years ago from the International Conference of

16  Software Engineering. And I got also awards for teaching.

17  In particular, I got the academic teaching award, which is

18  given to the four top processors at US SB each year.

19  Q.   What type of classes do you teach at University of

20  California Santa Barbara?

21  A.   I teach both undergrad and graduate classes. At the

22  undergraduate level, I teach upper division classes on

23  operating systems, natural computing, and computer security.

24      At the graduate level, I teach computer security

25  classes like macrosecurity, intrusion detection,

---

324

1   vulnerability analysis and such.

2   Q.   Have you received any funding for your research?

3   A.   Yes. That is part of our survival in the system. So

4   I have several grants that I obtained from different

5   agencies, including the Department of Defense, the Army, and

6   the National Science Foundation.

7   Q.   Do you have any publications specifically relevant to

8   computer security?

9   A.   Yes. I would say that almost all my publications are

10  on computer security, with a few notable exceptions at the

11  beginning of my career where I was more focusing on software

12  engineering issues.

13  Q.   Have you given any type of tutorials or lectures on

14  computer security outside of your classroom?

15  A.   Yes. When I was in Italy, I gave several tutorials to

16  law enforcement agencies and banking institutions about

17  practical security, how systems are broken into and what are

18  the best countermeasures.

19      And in my carrier here in the United States for

20  the past ten years, I have given several tutorials in

21  different forms.

22  Q.   Are you a member of any organizations that would be

23  relevant to computer security?

24  A.   Yes. I am part of several organizations, the ACM, the

25  IEEE, the International Society and the Users Association,

---

Vigna - direct

1  which are general computer science associations, but, of

2  course, my focus within those is on security.

3  Q.    Do you have any type of editorships at this time?

4  A.    Actually, I am involved in, I think, four editorial

5  boards. That means that I am part of a group of people

6  that, for several journals, decides which papers are going

7  to be accepted. And I am a member of the Journal of

8  Computer Security, the IEEE Transactions on Dependable and

9  Secure Computing, the ACS Transaction on Information System

10  Security, and the IEEE Internet Security Magazine.

11  Q.    Have you been the chair of any committees relating to

12  network security?

13  A.    I did. I have been the chair of the RAID Conference,

14  which is the Recent Advances in Intrusion Detection

15  Conference, and of the NDSS Conference, the Network and

16  Distributed System Security Conference.

17  Q.    What technical program committees have you been

18  involved with?

19  A.    A number. I don't remember them all. But the major

20  conferences in my field, such as IEEE Security and Privacy,

21  the NDSS Committee, ACM Computer and Communications Security

22  Committee, User Net Security, and so forth.

23  Q.    Do you supervise any graduate students at the

24  University of California Santa Barbara?

25  A.    Yes, I do. That is again part of my job as a

326

Vigna - direct

1  processor. It's like remembering the name of your kids.

2  I think I have six Ph.D. students right now, a

3  couple of post-docs, and two or three Master's students. I

4  hope I haven't forgotten anybody.

5  MR. ANDRE: Your Honor, at this time, I would

6  like to tender Dr. Vigna as an expert in computer security.

7  THE COURT: Any objection?

8  MR. HOLDREITH: No, Your Honor. I will ask

9  questions later.

10  THE COURT: Dr. Vigna is accepted by the Court

11  as an expert witness.

12  THE WITNESS: Thank you, Your Honor.

13  MR. ANDRE: Thank you, Your Honor.

14  BY MR. ANDRE:

15  Q.    Dr. Vigna, you were retained by Finjan in this case.

16  Is that correct?

17  A.    Correct.

18  Q.    And could you tell us what you were retained to do in

19  this case?

20  A.    Well, what I was asked to do is to give my objective

21  opinion on the fact that one of -- a class of the products

22  of Secure Computing was infringing on three of the patents

23  held by Finjan.

24  Q.    And were you asked to be an expert in this case --

25  before you were asked to be an expert in this case, did you

Vigna - direct

1  have any opinions on this topic?

2  A.    Absolutely not.

3  Q.    What did you rely upon in forming your opinion in this

4  case?

5  A.    Documentation, analysis of the source code. I read a

6  number of documents, including depositions, documents from

7  the court. And I also attended a demonstration.

8  Q.    Did you look over the patents?

9  A.    Of course.

10  Q.    Did you rely on the interpretation the Court's

11  interpretation of the claims of those patents?

12  A.    Yes, I did.

13  Q.    Did you look at the Webwasher product itself?

14  A.    I did. I did look over the product, and I looked also

15  at the source code for the product.

16  Q.    What was your ultimate conclusion after you did all of

17  this analysis?

18  A.    So I went claim by claim for the three patents. And I

19  found that for all the claims that I was asked to provide an

20  opinion about, there was infringement. So the Secure

21  Computing product infringed the claims.

22  Q.    Did you find that the Webwasher software infringed the

23  claims?

24  A.    Correct.

25  Q.    Did you find that the Webwasher appliance, the box,

328

Vigna - direct

1  itself, infringed the claims?

2  A.    Yes, that, too.

3  Q.    Did you find that the CyberGuard TSP infringed the

4  claims?

5  A.    As it contains that code, yes, it does.

6  Q.    Now, just so -- we will keep pointing to this. Over

7  in the corner, we have set up a little mini Internet. Is

8  that correct?

9  Can you explain what the setup is over here?

10  A.    Yes. So this is sort of like a very simplified,

11  extremely simplified version of the Internet and how a

12  client would interact with the outside Internet.

13  So here I have a laptop that represents the

14  client that is trying to access some resource in the outside

15  Internet, like you would go on the Internet and try to

16  access a web page or unload some kind of executable, and

17  that computer right there represents the Internet. But, of

18  course, it just represents one host in the Internet.

19  And that pizza box, that's what we call it in

20  our jargon, represents the appliance which sits between the

21  client and the server and performs the analysis, blocking

22  whatever has to be blocked and so forth.

23  THE COURT: Members of the jury, if any of you

24  need to stand to see, that is fine. I notice you straining

25  your necks. Please feel free to stand.

Vigna - direct

1  BY MR. ANDRE:

2  Q.    As we go through these claims, feel free to refer to

3  that any time you want. We will walk through some of the

4  documentation first since we have the big binders.

5  A.    Okay.

6  Q.    I would like to show you JTX-1. It is not in your

7  binder, I don't believe. We have marked that earlier. That

8  is the '194 patent.

9        You are familiar with this patent, Dr. Vigna?

10 A.    Yes, I am.

11 Q.    We have prepared a demonstrative regarding this

12 patent.

13       Could you just generally describe what the '194

14 patent discloses?

15 A.    Sir, can you repeat that question?

16 Q.    We prepared a demonstrative of this patent.

17       Can you generally describe what the '194 patent

18 discloses?

19 A.    Yes. So this patent focuses on describing a method

20 to -- whenever -- to analyze the downloadables that are

21 addressed to our client. So whenever the downloadable is

22 sent towards the client, it is intercepted, and it is

23 analyzed, so the functions that are executed, or that could

24 be potentially executed by the downloadable are extracted,

25 and, through a number of rules, are abstracted into possible

---

331

Vigna - direct

1  particular downloadable. This is done so that whenever the

2  downloadable is downloaded again, it can be easily compared

3  to whatever has been seen before so that the work doesn't

4  have to be done twice.

5  Q.    And the third patent in this case is the JTX-3, which

6  is the '822 patent. We have a demonstrative of this as

7  well.

8        Would you describe generally what this patent

9  discloses?

10 A.    Yes. In this case, this patent describes a method so

11 that, in certain cases, if a downloadable contains code,

12 and, for some reason, that code, for example, cannot be

13 immediately identified as malicious or not, additional code

14 is packed with the downloadable so that whenever the

15 downloadable got eventually executed on the client, if a

16 dangerous operation is invoked, it is not the actual code of

17 the downloadable that gets executed. But, first, this

18 additional code, called "sandboxing code," is executed first

19 so that additional checks at one time can be performed. And

20 then, if everything is legit, the original code is executed

21 afterwards.

22 Q.    How does the '822 patent work with the '194 patent?

23 A.    The '194 patent is, defines a method to get a

24 downloadable and identify this category of possible

25 malicious actions. This is done not by executing the code

---

330

Vigna - direct

1  malicious operations.

2        In this case, for example, you have this purple

3  downloadable that, after the analysis, generates a file

4  saying that it might read to a file, it might write to a

5  file. After that, the patent describes a technology, so

6  that the profile of the possible actions that a downloadable

7  could perform is compared to a policy that says, Well, if it

8  writes to a file, then it should be blocked, for example.

9  And if the actions, the list of possible actions match the

10 policy, then the downloadable is blocked. And it is not

11 allowed to reach the client.

12       Of course, there are other things that can be

13 done to determine if the downloadable is desirable or not

14 depending on the policy. I think the '194 patent includes

15 looking for digital signatures, URL White Lists, URL Black

16 Lists, and so forth.

17 Q.    The second patent in this case, JTX-2, which is the

18 '780 patent, are you familiar with that patent?

19 A.    Yes, I am.

20 Q.    Is this the one that discloses during the ID?

21 A.    Correct.

22 Q.    Can you describe how that is done?

23 A.    The ID in this case is that as downloadables are

24 fetched, whenever they are fetched, a unique ID is

25 generated. That ID is used to identify uniquely that

---

332

Vigna - direct

1  but just by analyzing the image of the code.

2        I will give you a little explanation in a

3  second.

4        While the '822 patent, whenever the first method

5  is not effective, the '822 patent adds another level of

6  security, so that if you cannot really decide if something

7  is bad, well, put some code around it and send it to the

8  client so that if that thing that you couldn't decide

9  happened to be bad, it will be caught eventually.

10       This is because, these are two, if you want,

11 general approaches to securing code which roughly correspond

12 to static analysis and dynamic analysis. This is a

13 scientific term.

14       In layman's terms, in the first case, look at

15 the downloadable, it's like reading a play. You see what

16 the actors would say and you have a rough idea of what could

17 happen in the play but you really don't see the play. Just

18 reading the script of the play, you can see, Othello is

19 going to kill Desdemona, or something like that. So this

20 could be something bad.

21       When the code is actually executed is when the

22 play, so when the script is actually enacted. At that

23 point, it might happen that, you know, the particular actor

24 does never get to that scene for some reason. So it's not a

25 problem. Or maybe it does get to that scene, and that is a

---

**333**

Vigna - direct

1  problem. But you know only when the actual code or the
2  actual play is actually played out, and, therefore, you need
3  two different mechanisms.
4  Q.    Putting aside the patent for the time being, generally
5  speaking, what does the Webwasher product do?
6  A.    So, the Webwasher product acts as an intermediary
7  between the client and the server. And whenever the client
8  requests a resource, the Webwasher appliance will request
9  that resource on behalf of the client, retrieve that
10  resource, perform some analysis, and decide if that resource
11  has to be sent to the client or not.
12      That analysis includes analyzing downloadables,
13  which are resources that might contain code, extracting,
14  parsing the downloadable, extracting functions, determining
15  what a downloadable could do, comparing that profile with a
16  security policy that says what is allowable, what is not
17  allowable, and deciding to block or not to block.
18      In some cases, it might decide to add some
19  sandboxing code so that the decisions that could not be made
20  when the downloadable was first downloaded will be made on
21  the client's side during execution.
22  Q.    I want to get into the looking at the Webwasher
23  product now and comparing it to the claims of the patent.
24  We will start with the '194 patent and Claim 1, JTX-10.
25      MR. ANDRE: Your Honor, this is a claim chart.

**334**

Vigna - direct

1      THE COURT: That's fine.
2      MR. ANDRE: Your Honor, is it okay if I move
3  from the podium?
4      THE COURT: Absolutely.
5      MR. ANDRE: Thank you.
6  BY MR. ANDRE:
7  Q.    If you look at Claim 1 of the '194 patent, we have
8  broken this down into three claim elements, it's a
9  computer-based method, comprising the steps of. And the
10  first step is receiving an incoming downloadable addressed
11  to a client by a server that serves as a gateway to the
12  client.
13      Does the Webwasher -- when I say "Webwasher
14  product," I am talking about the software and the appliance
15  itself, the question is: Does the Webwasher product receive
16  an incoming downloadable addressed to a client by a server
17  that serves as a gateway to the client?
18  A.    Yes, it does.
19  Q.    Now, you are aware that the Court interpreted the term
20  "downloadable," are you not?
21  A.    Yes.
22  Q.    Did you use the Court's interpretation?
23  A.    Yes, I did.
24  Q.    And the term "downloadable" was interpreted as an
25  executable application program which is downloaded from a

**335**

Vigna - direct

1  source computer and run on the destination computer?
2  A.    Correct.
3  Q.    What are some examples of downloadables?
4  A.    Well, examples of downloadables are ActiveX controls,
5  which are binary objects that are sent to a browser and will
6  be executed within a browser. There are Java applets, which
7  are Java programs that again will be executed within a
8  browser, JavaScript code, which is interpreted code that
9  could be either in a separate file or as part of the actual
10  web page, so embedded in the web page itself, DV script
11  code, macros attached to documents and so forth.
12  Q.    Does the Webwasher receive an incoming downloadable?
13  A.    Yes, it does.
14  Q.    I would like to -- we will show you this on the screen
15  for you -- show PTX-10. If we will go to Page 4A, Bates
16  Nos. 1363. If you will highlight this section right here.
17      This talks about Webwasher protects against the
18  ActiveX controls. Do you see that?
19  A.    Yes.
20  Q.    Would that be an example of downloadable?
21  A.    Absolutely.
22  Q.    And Java applet right here?
23  A.    Yes.
24  Q.    Visual Basic script, would that be a downloadable?
25  A.    Yes.

**336**

Vigna - direct

1  Q.    Claim 1 also talks about it serving as the gateway, as
2  a gateway to, serves as the gateway. If you will go up on
3  that same page, up in this area, the second bullet point
4  right here, it says, "Performs a heuristic analysis at the
5  gateway and blocks program code based on its potential
6  behavior. Do you see that?
7  A.    Yes.
8  Q.    Could you please explain what that is talking about?
9  A.    Well, a gateway is this intermediary between the
10  client and the server. And it's definitely the obvious
11  place where you would put a protection system. And the
12  Webwasher acts as the gateway between the client and the
13  server, and, therefore, it is able to intercept the
14  downloadable addressed to the client and perform the
15  analysis as needed.
16  Q.    Would you go back to the first page of this document,
17  PTX-10.
18      Did you rely on this document in performing your
19  analysis in your expert report?
20  A.    I think so. I would have to check my expert report to
21  make absolutely sure that this is the document, since there
22  were several very similar documents. But I would say yes.
23  Q.    And this document is entitled, "Webwasher Mobile Code
24  Filter-Detection and Classification of Malicious Mobile
25  Code."

Vigna - direct

1    What does this document describe, generally?
2    A.    This document describes this proactive scanning that
3    is performed by Webwasher to identify a downloadable that
4    can potentially be harmful and block that.
5    Q.    There is a term that has come up quite often in this
6    case, I didn't know the meaning of it until you told me, the
7    term "heuristic."
8        What does that mean?
9    A.    Heuristic is sort of a practical rule. So heuristic
10    is sort of like experience codified. So a heuristic is, in
11    layman's terms, could be a rule of thumb. But in some way,
12    your experience allows you to codify a number of pieces of
13    information so that you can put them together and make a
14    decision.
15        So a classic example is when you want to assess
16    a situation. So we are very good at heuristics as human
17    beings. We are not as good at heuristic as computers. But,
18    for example, in my report, I have the example of a
19    bank. And you see a person in the bank. And you have to
20    decide if that person is a customer or a robber or something
21    else. And you see that that person carries a gun. Then
22    heuristic would sort of flash and say, Okay, a gun in a
23    bank, not very good, but could be a guard. Right? So,
24    okay. If it's a gun and it's a guard, then it's okay.
25        But, for example, if it's -- if the person has a

Vigna - direct

1    "addressed to a client" was brought up in counsel's opening
2    statement, saying that was a very specific term of art.
3        Do you have an ordinary meaning of that term?
4    A.    Absolutely. For me, it's clear that "addressed to a
5    client" means that the final destination of the
6    downloadable, or whatever the communication is, is the
7    client. So that means that the ultimate destination of
8    something is described that way.
9        So, I am looking for an example, but -- okay.
10    For example, you are in high school and you are passing
11    little notes, I used to do that in high school sometimes
12    when I got bored, so you passed little notes. And you want
13    to reach somebody at the other side of the room. Actually,
14    the farther away the guy is, the more fun it is; right? So
15    you give it to your next-door person and say, Hey, give it
16    to Jim, and there is some funny comment on something.
17        And this person knows that that note is
18    addressed to Jim. So he will pass it on until eventually it
19    reaches Jim, and Jim will probably send back another funny
20    note and so forth.
21        The concept here is that you want some
22    communication that has to reach a certain person and it's
23    very clear who that person is.
24    Q.    And in the world of computers, are there a lot of
25    different ways to address, in this case, downloadables to a

338

Vigna - direct

1    gun and has a ski mask on, then it's not that good. That's
2    a heuristic, because how do you know that a guy with a gun
3    and a ski mask is not a harmless person? You know. It is
4    your experience codified. If you see somebody with a ski
5    mask and an gun, you make a certain decision.
6    Q.    I want to show you one more document, PTX-12. This
7    was another document that was listed in your expert report.
8        Could you describe generally what this document
9    is describing?
10    A.    Again, I think this is describing step-by-step how
11    proactive scanning is performed. So the process of
12    retrieving a downloadable, extracting categories of
13    behavior, and based on these categories, apply a security
14    policy that determines if a certain downloadable is
15    acceptable or not.
16    Q.    If we go to the next page of that document, and you
17    look at the heading under "Behavior Heuristics," you will
18    see a type of malicious code right here in this section,
19    ActiveX, Windows, Executable, et cetera.
20        Are those examples of different types of
21    downloadables as described in the '194 patent?
22    A.    Yes, these are examples of the downloadables.
23    Q.    Now, the second part of this first element, where it
24    says, "Receiving an incoming downloadable addressed to a
25    client by a server that serves as a gateway," the term

340

Vigna - direct

1    client?
2    A.    Well, you have to understand that addresses at home
3    are different from addresses at work. When something is
4    addressed to somebody, it is clear from the context that
5    that is supposed to go to that client.
6        In the particular case, for example, of a setup
7    with a gateway, the client performs a request. And the
8    intermediary, the gateway, or the proxy, whatever is in the
9    middle, remembers, Oh, the client asked for this resource.
10    So when the resource is asked on behalf of the client and
11    received back from the website, or wherever the resource is
12    asked, the proxy knows that the ultimate destination of that
13    resource is the client and the downloadable is addressed to
14    the client, and, therefore, it's passed on.
15    Q.    Does the Webwasher receive downloadables that are
16    addressed to a client?
17    A.    Absolutely, yes.
18    Q.    And is it by a server that serves as a gateway to the
19    client?
20    A.    Correct, because it acts as an intermediary between
21    the client and the server. Whenever the client asks, the
22    intermediary says, Okay, I am going to ask for you -- asks
23    for the actual resource, gets the resource, which is to the
24    client, and passes it on.
25    Q.    I want to direct your attention to PTX-26. This is

Vigna - direct

1  another document that was listed in your expert report that

2  you rely upon.

3        Do you recall what this paper was about?

4  A.    Yes. I think it describes the Webwasher product and

5  how it performs proactive scanning.

6  Q.    What is this term "White Paper"? What does that mean?

7  A.    "White Paper," it's a very generic term that is used

8  in the scientific community to describe a semi-scientific

9  description of a process.

10       So it's a technical report that is a mix of

11 technical information and marketing information that is used

12 to describe a technology and usually trying to appeal to a

13 large segment of the population. So a technical paper, like

14 what I would write, is to other scientists and usually they

15 are probably boring to read and very technical. These are

16 trying to be a little more, a little simpler and more easy

17 to read.

18 Q.    If I turn to the last page of this, Page 28 of PTX-26,

19 there is a paragraph right here, just the first sentence, it

20 says, "Webwasher CSM Suite runs on the gateway only and

21 requires no client software to deploy or maintain."

22       Could you describe what that sentence is

23 stating?

24 A.    Yes. I mean, this sentence describes in a nutshell

25 what the Webwasher CSM Suite does. It is on the gateway, so

342

Vigna - direct

1  it acts as an intermediary within the client server, and it

2  says it does not require any client side modification.

3        It claims to have novel methods to verify media

4  types, verify digital signatures, and block entrusted

5  program code. In particular, it says it performs heuristic

6  analysis. So based on these rules, to block program code

7  based on potential behavior, potential actions that could be

8  performed, and also that it neutralizes suspicious script

9  code that it could exploit vulnerability on the client's

10 side.

11 Q.    I am going to show you one more document, PX-153.

12 This is another document that you relied upon in your expert

13 report.

14       Could you describe what this is?

15 A.    This is a manual. If I remember, it is actually a

16 pretty thick one. And it describes the feature of the

17 Webwasher Anti-Malware product, Version 6.0, which includes

18 a number of the things that we discussed so far.

19 Q.    ·I will direct your attention to Page 1-1 that ends in

20 Bates Page 345. This paragraph right here, The Webwasher

21 anti-malware product enabled you to configure in depth

22 malware detection and blocking at the corporate gateway.

23       Did you use that in forming your opinion that

24 the Webwasher is a server that serves as a gateway to the

25 client?

Vigna - direct

1  A.    Yes. This and other points in the documentation that

2  you are highlighting. But this is pretty clear, yes.

3  Q.    Did you rely on any deposition testimony, we heard

4  some this morning, about how the Webwasher serves as a

5  gateway as well?

6  A.    Yes. I remember, I think, I read the deposition of

7  Mr. Stecher, which said that the product was working on the

8  gateway.

9  Q.    Now, given the documents we have looked at, and if you

10 will look at the setup over here, is this a configuration

11 showing the Webwasher serving as a gateway to our little

12 molecule Internet here?

13 A.    Yes. So the setup is now the client and the appliance

14 are configured so it acts as a gateway to the Internet.

15 Q.    Our little sign went off the monitor. The one with

16 the monitor is the actual Internet. Is that correct?

17 A.    Correct.

18 Q.    That computer is serving as an Internet or browser on

19 the Internet, and then it goes through the Webwasher

20 product. Is that correct?

21 A.    Correct.

22 Q.    Then it goes to your laptop on the stand here, and

23 that's the client?

24 A.    Correct.

25 Q.    So, given all the documents you have looked at, the

344

Vigna - direct

1  deposition testimony and the actual configurations that you

2  have seen here, what is your opinion? Does the Webwasher

3  receive an incoming downloadable addressed to a client by a

4  server that serves as a gateway to the client?

5  A.    Yes.

6  Q.    Okay if we put a check in that box?

7  A.    You can.

8  Q.    We will start the second element now. The second

9  element of Claim 1 talks about comparing, by the server,

10 downloadable security profile data pertaining to the

11 downloadable, the downloadable security profile data

12 includes a list of suspicious computer operations that may

13 be attempted by the downloadable against a security policy

14 to determine if the security policy has been violated.

15       Now, we talked a little about heuristic, and we

16 heard counsel say in his opening statement that what

17 Webwasher does is it tries to determine the potential, it

18 tries to determine if something is potentially harmful. And

19 he claimed that the patent claim here required that it has

20 to know that something is bad, and he made a distinction

21 between the potential harm and a known harm.

22       Is that your understanding of what this claim

23 language is talking about?

24 A.    Sir, my understanding is that this claim describes how

25 to identify a computer operation that might be performed by

Vigna - direct

1   a downloadable. And then comparing those possible actions

2   with respect to a security policy.

3           Does that answer your question?

4   Q.    It does. Does the Webwasher product perform the

5   method in Part B of Claim 1 here, Element B?

6   A.    Absolutely, yes.

7   Q.    When you see the word listed "suspicious computer

8   operations," is that using heuristic as a word, the

9   suspicious operations?

10  A.    Yes. Because in my understanding, Webwasher analyzes

11  the downloadable, extracts the actual functions that might

12  be executed, and then uses these heuristic rules to identify

13  potential suspicious behavior. And there are a number of

14  behavior categories. This set of possible behaviors

15  represents a profile. And then this is compared with a

16  security policy.

17  Q.    Counsel also mentioned that the Webwasher product does

18  not create a profile that includes a list.

19          Do you agree with that statement?

20  A.    I think that the product produces a list of suspicious

21  behavior.

22  Q.    Could you use the flip pad there --

23          MR. ANDRE: Your Honor, may I approach and move

24  that out a little bit?

25          THE COURT: Yes.

---

346

Vigna - direct

1   BY MR. ANDRE:

2   Q.    Could you draw on the flip pad how Webwasher creates a

3   profile that includes a list of suspicious computer

4   operations?

5   A.    Yes.

6           (Witness steps down from stand.)

7           Can you see it?

8   Q.    Yes.

9   A.    So the main idea is that a downloadable is received by

10  the intermediary, it went the client and the server. So

11  this downloadable is received, and here it is analyzed. And

12  this analysis produces, as a result, a number of functions

13  that could be executed. And "function" is a term to

14  describe a low-level representation of an action, like Write

15  to a File.

16          So a function could be called "FWrite," say. So

17  if I see this function in the code, I am going to say, Okay,

18  since this function is in the code, potentially it might

19  execute an FRead. There could be others. Like an FRead,

20  there can be a function to write to the registry, which is a

21  very sensitive part of the Windows operating system. It

22  depends on the type of downloadable.

23          Then what happens is that there are some rules

24  here that say, Well, you know, if I Xerox, for example, this

25  function for this particular type of downloadable, then I

---

348

Vigna - direct

1   can say that, in a more categorical fashion, This

2   downloadable writes to file.

3           This is very simple. It's a one-to-one mapping.

4   So it is a very simple heuristic rule. It is sort of like

5   the ski mask.

6           Well, if I, for example, read from a file and

7   write to the registries, I may decide this is like the ski

8   mask plus gun situation, and as I decide if I see both of

9   this, I will just say, for example, I don't know, Write

10  Registry. I am doing an example. These are specific

11  functions that are invoked in the code, and then some rules

12  are applied to generate these categories of behavior. And

13  we have a list, so this guy writes to a file, writes to the

14  registry, for example, talks to processes, and, for example,

15  sends e-mail.

16          So, here, I have my list of suspicious behavior

17  for this particular downloadable.

18          Then I send this to another component that

19  contains a security policy that pretty much decides,

20  depending on, you know, of course there are certain things

21  that are obvious, certain things that might depend on the

22  particular installation, the particular user, the particular

23  environment, and it says, Well, you know, if it writes a

24  file, this cannot go through.

25          So, here, there is some kind of security policy,

---

348

Vigna - direct

1   and it's one of the security policies of the system.

2   Security policies are very general terms. That means pretty

3   much whatever the whole system thinks about security. It

4   can be many different things.

5           One subset of the security policy is the one

6   that decides, Hey, if this things writes to file, I don't

7   want to see it in my network. So if this type of behavior

8   happens, kill this thing.

9           So when it is retrieved from the Internet with

10  the Webwasher appliance and this behavior is found and

11  violates a security policy, this guy will never allow that

12  downloadable to reach this particular client, and,

13  therefore, this client is protected.

14          So, here, it decides, you know, go to the trash,

15  or it goes to the client if it is okay.

16          Okay?

17          (Witness resumes stand.)

18  Q.    Now, I am going to show you document PTX-113. This is

19  one of the documents you relied on in your report. And this

20  is the step-by-step guide again. We will go to Page 10 of

21  this report, 1396 Bates page. On the bottom portion of this

22  document, this is the first paragraph here, it talks about

23  behavior profile. Do you see that?

24  A.    Yes.

25  Q.    Would you please explain what that is talking about?

Vigna - direct

1  A.    That is talking about the process of actually both

2  extracting the type of behavior, giving the functions and

3  then using the policy to describe how important certain

4  parts of the behavior are. So, if, for example, a security

5  policy might say, If it is writing to a file and it is

6  reading from the registry, then it's really bad. So it's a

7  heuristic.

8  Q.    Is a behavior file, is that equivalent to what is

9  referred to here as a -- a "behavior profile" equivalent to

10  what is referred to here as a "security profile"?

11  A.    Yes. In the patent, I think it's referred to as the

12  "downloadable security profile" or "DSP." That's what I am

13  talking about.

14  Q.    It is exactly the same thing?

15  A.    It is pretty much the same thing.

16  Q.    When we talk about the list of suspicious computer

17  operations -- in the same document, go to Page 18 and 19,

18  PTX-113.

19        Here you have some headings of different types

20  of, I guess what you call "functions," or I don't know what

21  you call these?

22  A.    Actually, these are categories of behavior.

23  Q.    Categories of behavior. In these type of categories,

24  would these be the list of suspicious computer operations

25  you are referring to?

350

Vigna - direct

1  A.    Correct.

2  Q.    So this first one says, "Read or Write to Access the

3  Local File"?

4  A.    Yes.

5  Q.    The second one is, "Read/Write Access to the

6  Registry"?

7  A.    Yes. And, as you can see here, I mean, these are

8  fairly abstract ways to describe those operations. And, so,

9  part of the mapping is going to those lower-level functions

10  to this file operation. Because, for example, "Read and

11  Write Access to Local File" might be different if you are

12  talking about an ActiveX control or a Java applet, that's

13  what the heuristics do. They ask for the way to behave.

14  Q.    If you compare this to what is listed in the patent,

15  Column 5 of the '194 patent, and in Column 6, it talks about

16  an example list of operations deemed potentially hostile.

17  You see, "File Operations, Read a File, Write a File"?

18  A.    Yes.

19  Q.    Are those the same categories or same list that you

20  saw on the Webwasher product?

21  A.    It's very similar in content to that list. So it

22  describes reading from a file, writing to a file, reading

23  and writing to the registry, and so forth.

24  Q.    If we go through PTX-11, which is another document you

25  rely upon, I just want to compare the patent to what is

352

Vigna - direct

1  listed on PTX-11. Page 15. If you look at the first one up

2  here, it says, "Read/Write Access to a Local File."

3        Is that the same as what is being described

4  right here?

5  A.    Yes.

6  Q.    If you go down to the next one here, "Read/Write

7  Access to the Registry," is that what is being described

8  right here?

9  A.    Yes.

10  Q.    Then we will skip down one here to "Dynamic Loading,"

11  right here.

12        Is that what is being described right here?

13  A.    Yes.

14  Q.    So the list of suspicious computer operations, that's

15  an example list that is disclosed in the '194 patent, is the

16  same as the list of operations, suspicious computer

17  operations disclosed in these Webwasher documents?

18  A.    Yes. There is a very close resemblance.

19  Q.    Not to beat a dead horse, I do want to show you one

20  more exhibit, PTX-26. Go to page 11.

21        Do you recognize that paper? PTX-26. That is

22  another white paper.

23  A.    Yes.

24  Q.    This list here of the security check, where it says,

25  "Local File, System Read Access," is this -- how does that

Vigna - direct

1  relate to the list of suspicious computer operations?

2  A.    It is a suspicious computer operation.

3  Q.    And in the same document, if you go to Page 14, and

4  you highlight this area right here where it says, "The

5  strict mobile code," it says, it is entitled, "Proactive

6  Scanner," could you read that and tell me what that is

7  saying there?

8  A.    So, this snippet of text describes a particular

9  pre-configured security policy called "Strict," that say

10  that mobile code may be malicious or may perform an

11  operation not required for that kind of mobile code will be

12  blocked. So only mobile code that does not perform any

13  suspicious or un-required operation will be allowed.

14        And this is, my understanding of the Webwasher

15  product, this is one of the possible security policies that

16  are used to interpret the list of behavior categories.

17  Q.    Is this an actual screen shot from the Webwasher

18  product itself?

19  A.    Yes, I think it is.

20  Q.    And if you look back to the "B" element of Claim 1,

21  where it says you have a downloadable security profile data

22  pertaining to the downloadable, the downloadable security

23  profile data includes a list of suspicious computer

24  operations that may be attempted by the downloadable, is

25  that portion of that element, what you just described,

Vigna - direct

1 found --
2 A.    Yes, it is.
3 Q.    Is that found in the Webwasher product?
4 A.    I did find it in the Webwasher product.
5 Q.    And then, To compare that against a security policy to
6 determine if the security policy has been violated; do you
7 see that?
8 A.    Yes.
9 Q.    What we just saw earlier, was that the security policy
10 that you would compare it against?
11 A.    Yes.
12 Q.    I believe you were here for the opening statements of
13 counsel. Counsel actually admitted there was a security
14 policy in the Webwasher product.
15        Do you recall that?
16 A.    Yes.
17 Q.    If we go back to PTX-26, we go to the next page, Page
18 15, could you tell us what we are looking at right here on
19 the Webwasher product?
20 A.    This, I do believe, is either derived from or is
21 directly a straight shot from the Webwasher product. And it
22 shows how to configure a security policy where you decide
23 for certain type of downloadables what categories of
24 behavior should cause the downloadable to be acceptable or
25 not acceptable.

354

Vigna - direct

1        For example, two down, the second group of
2 things, you have the "Write Access to Local Files." And it
3 decides that, you know, it allows if that particular
4 behavior is identified.
5        If you go, instead, to the last one, it says
6 that if it acts as if it accesses other processes, it might
7 decide to block in the high capability configuration.
8 Q.    Did you rely upon any other source of information --
9 strike that.
10       Let me ask you a question first. Based on your
11 view of all the documentation in this case, did you find
12 that the B element of Claim 1 was infringed by the Webwasher
13 product?
14 A.    Yes.
15 Q.    Did you rely on any other information, like deposition
16 testimony, to determine that?
17 A.    Well, all the sources that are listed in my expert
18 report.
19 Q.    And for both the A and B, did you look at source code
20 of the product, itself, as well?
21 A.    Yes, I did.
22 Q.    Did the source code confirm that those elements were
23 infringed?
24 A.    Yes.
25 Q.    By the Webwasher product?

Vigna - direct

1 A.    Yes, I am confident that the code demonstrates that.
2 Q.    So is it okay if I put a check in this box B here?
3 A.    Go ahead.
4 Q.    Then the final element of Claim 1 talks about
5 preventing execution of the downloadable by the client if
6 the security policy has been violated.
7        Did you find that the Webwasher product had this
8 feature, performed this method?
9 A.    Absolutely, yes.
10 Q.    And I will go through these very quickly. If we go to
11 PTX-10, Page 4A. This is the introduction to the document
12 here. It talks about preventing malicious JavaScript and
13 the other type of content inspection.
14        Is this, in essence, preventing execution of
15 downloadable by the client if the security policy has been
16 violated?
17 A.    Well, this part of the evidence, other evidence is
18 gained by operating the appliance. And if you see that
19 there is an downloadable that matches messages sent to the
20 users saying that a downloadable has been blocked.
21        Also, in other places in the documentation, it
22 shows clearly that a message is sent to the user saying that
23 the downloadable has been blocked.
24 Q.    So, in the second bullet point, it says, "Performs an
25 analysis and blocks program code based on its potential

356

Vigna - direct

1 behavior"?
2 A.    Correct.
3 Q.    That's for C?
4 A.    Yes.
5 Q.    Based on your view of all the documents in this case,
6 the source code and deposition testimony, what is your
7 position regarding the C element of Claim 1?
8 A.    That Webwasher infringes the claim.
9 Q.    And since all three of these elements are infringing,
10 in your opinion, would you give an opinion that Claim 1 of
11 the '194 patent is infringed?
12 A.    I think so, yes.
13 Q.    Seeing this documentation that is nice -- could you
14 actually show us how this operates on an actual appliance?
15 A.    Yes.
16        Okay. What we have here is a setup that is
17 somewhat contrived. It is, of course, simplified because
18 bringing the Internet into the courtroom would have been a
19 little complicated.
20        So this computer will actually, the computer
21 laptop here on my desk will play two different roles, which
22 could be slightly confusing. So I will use it to access the
23 appliance and show you how the appliance is configured and
24 the type of messages it would create. And I will also use
25 this computer as the client computer, as the normal user

Vigna - direct

1 would use it. And I will tell you each time which hat I am

2 wearing so that you don't get confused.

3 But the main important thing that you try to

4 understand is that the requests will start from this laptop,

5 will go through the appliance and get to the Internet.

6 Actually, why don't we start by not having the appliance be

7 the intermediary between us and the rest of the world.

8 So, to do that, I will start by opening the

9 browser, going to Internet Options. I am sure some of you

10 have done this before. I go to Connections. I go to LAN

11 Settings. And I say, See user proxy server for your LAN.

12 This particular setting is telling my computer

13 to always -- the browser, in particular, to always

14 use Webwasher as my intermediary to the rest of these.

15 The moment I do this (indicating), then I am not

16 using it anymore. So if I do okay and I go to this web page

17 that you see here, this web page is actually a web page on

18 the server, as you might notice, this web page has been

19 directly copied from the Secure Computing website. It

20 contains a number of downloadables that are supposed to be

21 blocked.

22 So it's like a testing page that Secure

23 Computing put on the Internet so you can test if your system

24 is actually working.

25 Right now, I disabled the Webwasher, so I am not

---

Vigna - direct

1 using it as an intermediary, and, therefore, when I go here,

2 as a professor, I know that whenever you do a Daymove,

3 something is not going to work. Right now, if I click on

4 this, I should be able to download it no problem. In fact,

5 it comes back to me and says, Do you want to download this

6 class? And if I say "save" here, I will actually save it on

7 my computer. So no protection. Whatever I try to access, I

8 get. This is not very good, especially considering this

9 class could do something really bad to me.

10 Now I will configure my browser, we will go back

11 to the Internet Options, Connection, LAN Settings, and we

12 will say, Yes, I want to use a process server as my

13 intermediary as a gateway to the Internet.

14 Okay. Now, at this point, all my requests to

15 the Internet will go through the gateway.

16 So now I will stop for a second to be the

17 client, and I will be the administrator of that Webwasher

18 device that you see, the pizza box right there.

19 So here is how I access the Webwasher. This is

20 the interface. And, for example, I can go here. I have to

21 authenticate myself so that I can do all the modifications

22 that I want. You see this anti-malware. There was some

23 proactive scanning. I look, for example, here is something

24 to say, Oh, these are behavioral heuristics. Here I am

25 showing you an interface again to that particular device,

---

Vigna - direct

1 the Webwasher product.

2 So I am not acting as a client. I am wearing

3 the hat of the administrator of the gateway between the

4 client and the server. For example, here, you can see that

5 for, I think this is very similar to what we saw before, for

6 ActiveX control, I can decide that certain operations, like

7 the dynamic creation of program code, should cause the

8 blockage of this particular download.

9 So here is your security pause. It says, Allow

10 or deny, depending on certain particular -- apply changes, I

11 guess it's right here.

12 So, here I am. And here I see -- remember those

13 very high-level restrictions for policies? Here, in

14 particular, I am choosing the script policy that will say

15 whenever something even, you know, is doing something that I

16 don't want, block that downloadable. I could choose a

17 medium or a relaxed one. These are sort of like a

18 simplified version of all the different rules that you could

19 apply. Instead of giving you a million options or giving

20 you three options, three possible policies, and I chose the

21 strict one.

22 Now we know that we have a strict policy for the

23 gateway. So, what I would expect -- now, I am again the

24 client, so now I am a user, I just went to this web page,

25 and I say, Oh, cool, there is this thing that they are

---

Vigna - direct

1 asking me to download, I am going to click on it because it

2 looks fun, it's called follow your class.

3 When I do this, I have to check, if I am really

4 going through our friend here, let's make sure this is

5 actually active. And this should be correct. That should

6 be right.

7 So now when I download this, that makes sense,

8 the request has been blocked by proactive scanning.

9 So what you see here is that it says, Well, your

10 request for this particular clear beam dot exit has been

11 blocked, and because this program could potentially perform

12 a file write access, dynamic code loading, and vulnerable

13 operations.

14 So this is a list of three categories of

15 behavior that my policy says, When you see this type of

16 behavior, block it. That is a ski mask and your gun right

17 there.

18 So this is how they are identified. And here

19 you can see the malware, the file type, et cetera, et

20 cetera. You can see this has been generated, while the

21 clock on this machine is not really up to date, it is

22 18:58:53. So at 6:00 p.m., 58 minutes and 53 seconds.

23 So I am the user. I try to access this file.

24 My intermediary intercepted the downloadable address to me

25 and said, Uh-Huh, you ain't going to see this, because we

Vigna - direct

1  identify that as something bad for you. And, therefore,
2  instead of receiving the downloadable, I am receiving from
3  Webwasher this warning mask saying, I blocked it.
4        Now, I am taking off the hat of the user and I
5  am going back to the administrator. Because suppose I got,
6  as a client, I went to myself, as the administrator, and
7  say, you know, What's happening here? Why am I not getting
8  the executable that I want to get?
9        So, now, as an administrator, I will go back
10  here, and, for example, let's see if I remember what this
11  is, I want to see the log files and understand what's going
12  on, and, for example, I want to see a filter. Okay?
13        Now I have to look for something that looks
14  like, in time, similar to what I saw right here. So here it
15  said, if you remember, 18:58:53. This then happened exactly
16  at that point. You are here, 18:58.
17        THE COURT: Hold on just a second. There is a
18  request for a sidebar.
19        (The following took place at sidebar.)
20        MR. HOLDREITH: I am sorry to interrupt, Your
21  Honor. This is pretty well beyond his report. I don't mind
22  if he does this demonstration. We have got nothing to hide
23  here. But I am going to want the same kind of latitude for
24  my expert to respond to it.
25        THE COURT: Let's first see if it is beyond his

---

362

Vigna - direct

1  report.
2        MR. ANDRE: Your Honor, everything is in his
3  report. He reviewed the source code. He listed this
4  appliance as a document he reviewed. He talked in great
5  detail about the functionality as he is describing it right
6  now. So I think it is in his report.
7        MR. HOLDREITH: Nothing about this filter stuff.
8        THE COURT: That is your word. That is your
9  word. I want to see it. Otherwise, we can resolve it,
10  counsel has requested to have what he describes as
11  "latitude."
12        MR. ANDRE: We can do that as well. If their
13  experts wants that latitude with respect to the appliance.
14        THE COURT: That is fine.
15        (End of sidebar conference.)
16        THE COURT: You may continue.
17        THE WITNESS: Thank you.
18        This is something the user usually doesn't see.
19  Since the user complain, this has been blocked, the
20  administrator went in and identified something that happened
21  when the user identified the problem at 18:58:53. You can
22  see here, this is a log. I think it is similar to something
23  that was shown before, where sort of a debug information
24  that is useful to troubleshoot problems. And here you can
25  see, you know, that there is this mobile code filter and

---

Vigna - direct

1  proactive scanning is starting. So this is where this
2  proactive scanning process begins.
3        This is just a block. I will show you in other
4  forms what is actually going on behind this very simple
5  output.
6        So it defines two different low-level
7  executions. You see this kernel 32 DLM load libraries that
8  are not very descriptive, but, you know, the high-level
9  behavior is code loading. This is determined using a
10  certain heuristic. That is Rule No. 81.
11        Then there is another weird type of thing that I
12  don't look at. It tells me, this tells me, through
13  Rule 376, that the behaviors are File Write and Vulnerable.
14  So these are the list of categories of behavior that are
15  extracted by parsing the binary and identifying those
16  low-level functions. And those are then compared to the
17  security policy, and guess what? The content is denied.
18  And an exception throws a mobile code blocked. That's what
19  you receive.
20        So this shows exactly within the appliance the
21  list of -- how the list of behavior categories is extracted,
22  so the behavior profile, and how this profile is actually
23  compared to the access control list or security policy, and,
24  eventually, the downloadable is blocked.
25  Q.    And just looking at there log here, how does that

---

364

Vigna - direct

1  relate to receiving the incoming downloadable and then
2  comparing the profile to the policy and then blocking of the
3  policy, can you just walk through the three steps?
4  A.    That is exactly what happens here. So the
5  downloadable is received, of course, because it is
6  intercepted by the intermediary. The proactive scanning is
7  starting. And the system is analyzed. And this profile is
8  extracted, which is Code Loading, File Write and Vulnerable.
9  And this is actually compared to a security policy and
10  eventually blocked. As you can see, this is the same
11  process described in those claims.
12  Q.    You mentioned you saw a log similar to that earlier.
13  If we go to PTX-9, this was in the deposition transcript
14  that was read by my colleagues today, by Mr. Alme.
15        Is that the log that you are talking about?
16  A.    Yes.
17  Q.    Does this show a screen shot from the Webwasher
18  product?
19  A.    Definitely looks like it.
20  Q.    Does this give the same steps that you just showed
21  with the Webwasher product that would include the steps in
22  Claim 1?
23  A.    Yes.
24  Q.    Now, you mentioned earlier that you were going to be
25  able to show us how this is actually done.

365

Vigna - direct

1    Does that have to do with the source code?

2    A.    Yes.

3    Q.    Did you review the source code in coming up with your

4    opinion that Claim 1 of the '194 patent was infringed by

5    Webwasher?

6    A.    Yes.

7    Q.    We will get to the source code when we get to the

8    other claims and we will relate back to it so we don't have

9    to switch computers too much.

10    Did you find every element of Claim 1 in the

11    Webwasher product?

12    A.    Yes, I did.

13    Q.    Have you ever heard of something called the "Doctrine

14    of Equivalents"?

15    A.    Yes, I did.

16    Q.    What is the Doctrine of Equivalents?

17    A.    So, I am not a lawyer, so allow me to use wrong

18    verbiage. I am not super precise maybe.

19    My understanding is that the Doctrine of

20    Equivalents says that even though sometimes there is no

21    absolute literal correspondence between a claim and

22    something in a product that is supposed to be infringing, if

23    the product does the same thing, in substantially the same

24    way, with substantially the same results, then it is

25    infringing. And that's my understanding.

---

366

Vigna - direct

1    Q.    Now, in your analysis, did you find that Claim 1 of

2    the '194 patent was literally infringed by the Webwasher

3    product?

4    A.    Yes, I did.

5    Q.    Did you find, to the extent that the Defendants were

6    going to raise a defense to these claims, at the very least,

7    doesn't Webwasher products perform substantially the same

8    function, that's all of the claim elements in Claim 1 of the

9    '194 patent?

10    A.    Yes.

11    MR. HOLDREITH: We have an objection based on

12    prosecution history estoppel.

13    (The following took place at sidebar.)

14    THE COURT: Is this an issue that was addressed

15    at the pretrial conference?

16    MR. HOLDREITH: It is in our jury instructions

17    that we asked for at the close of the case. You have not

18    ruled on this.

19    MR. ANDRE: You did at the pretrial conference,

20    Your Honor. It was brought up. It was an attempt to end

21    run the summary judgment motion.

22    THE COURT: I thought I ruled it out of order.

23    MR. HOLDREITH: It is on particular elements of

24    the claim. List was added by amendment. He can't testify

25    of --

---

367

Vigna - direct

1    THE COURT: I will tell you what he can and

2    can't testify to.

3    Again, was this not addressed at the pretrial

4    conference. If not, why not?

5    MR. HOLDREITH: We have a jury instruction

6    pending with Your Honor.

7    THE COURT: I am not talking about the jury

8    instruction. I think this was addressed during the course

9    of the discussion of at least one of the motions in limine.

10    That is my question. Was it or wasn't it?

11    MR. HOLDREITH: We didn't get to the jury

12    instructions. It was not in a motion in limine. There was

13    a motion on the Doctrine of Equivalents in general. We are

14    talking about specific elements now.

15    THE COURT: Go ahead.

16    MR. ANDRE: Your Honor, it was a motion on

17    Doctrine of Equivalents and this witness in particular. And

18    Your Honor denied that motion. So now we are talking about

19    Doctrine of Equivalents and they are bringing it up.

20    THE COURT: So now you are parsing the objection

21    that you made earlier in the form of a motion?

22    MR. HOLDREITH: No, sir. I just don't want to

23    waive our request for the jury instruction with list.

24    THE COURT: I don't know how you practice law in

25    Michigan. You preserved this with your motion in limine, I

---

368

Vigna - direct

1    think.

2    There is an objection? Why are we interrupting

3    this jury right now, to discuss this right now, a matter

4    that we are going to have to discuss at the jury prayer

5    conference? Why are we doing that?

6    MR. HOLDREITH: I thought I needed to make the

7    objection.

8    THE COURT: You don't. I tried to give

9    Mr. Schutz the direction. I am going to try to give you

10    some.

11    I think your positions are well-preserved on

12    these issues. I am directing you to keep in mind the

13    arguments you may have had heretofore. And stop

14    interrupting the witness' testimony during the course of

15    this trial. It is unnecessary.

16    (End of sidebar conference.)

17    BY MR. ANDRE:

18    Q.    Dr. Vigna, going back to the doctrine of equivalents,

19    at the very least, does the Webwasher product perform

20    substantially the same way as the method in Claim 1?

21    A.    Yes.

22    Q.    At the very least, does the Webwasher product yield

23    the same results as the results of the method of Claim 1?

24    A.    Yes.

25    Q.    That's for each and every element of Claim 1 for each

Vigna - direct

1  of those analyses?

2  A.    Correct.

3  Q.    Let's go to some of the dependent claims now. You

4  understand what a dependent claim is in this case?

5  A.    Yes.

6  Q.    So Claim 2 is dependent upon Claim 1. Is that

7  correct?

8  A.    Yes.

9  Q.    Can we show Claim 2, please.

10        Claim 2 is the method of Claim 1, further

11  comprising the step of decomposing the downloadable into the

12  downloadable security profile data.

13        Do you see that?

14  A.    Yes.

15  Q.    Does the Webwasher product decompose the downloadable

16  into the downloadable security profile data?

17  A.    Yes. That's the step that I identified there, where

18  the downloadable is parsed, and the basic functions are

19  extracted, and by applying heuristic rules to those

20  functions, the categories of behavior, the list of

21  categories is extracted, which represent the security

22  profile.

23  Q.    If we turn to PTX-12, this is the step-by-step guide

24  you relied on for your opinion. Is that correct?

25  A.    Yes.

Vigna - direct

1  decompose the binary, which is just ones and zeros, into,

2  into something which has meaning.

3  Q.    Based on your view of the documentation of Webwasher

4  and your review of the actual appliance and the source code,

5  did you come up with an opinion as to whether the Webwasher

6  appliance infringes Claim 2 of the '194 patent?

7  A.    Yes. In my opinion, it infringes.

8  Q.    Can I put a check in that box?

9  A.    We can put a check in that box.

10        MR. ANDRE: Your Honor, I am going to take a

11  step back.

12  BY MR. ANDRE:

13  Q.    At the very least, does the Webwasher perform

14  substantially the same function, all the elements of

15  Claim 1?

16  A.    Yes.

17  Q.    Just in case I didn't get an answer, I want to have it

18  for the record. Thank you.

19        We will go to Claim 3. Claim 3 is dependent

20  upon Claim 2, wherein, The security policy includes an

21  access control list and further comprising the step of

22  comparing the downloadable security profile data against the

23  access control list."

24        Dr. Vigna, did you form an opinion as to whether

25  the Webwasher product infringed Claim 3 of this patent?

370

Vigna - direct

1  Q.    If you turn to Page 10 of that document, the top

2  paragraph of this document here, it talks about behavior

3  heuristics.

4  A.    Okay.

5  Q.    Could you describe what we are talking about in this

6  first sentence here where it talks about decomposing the

7  program code?

8  A.    Yes. This paragraph describes the fact that proactive

9  scanning decomposes the program code, so it parses the

10  program code and potential function codes in parameters. So

11  those function codes that I described, and it classifies

12  them as, at least the possible behaviors, using these

13  heuristic rules.

14  Q.    I have heard you use the word "parsed" a few times.

15        Is that the same as being decomposed?

16  A.    Yeah. I mean, you can have different types of

17  downloadables. And each downloadable, each type of

18  downloadable has its own characteristics. So an ActiveX

19  control is not the exact same thing as a Java applet, even

20  though it might perform the same function.

21        So you need different parsers -- I am sorry.

22  This is actually, probably decomposing would be more of a

23  layman's term. But a parser is something that analyzes that

24  representation and identifies those -- it can do anything,

25  but, in particular, it will identify this function and

372

Vigna - direct

1  A.    Yes. My opinion is that the Webwasher product

2  infringes that claim.

3  Q.    When you are in the product itself, can you show where

4  that infringes?

5  A.    Yes. Right now?

6  Q.    Sure.

7  A.    This can be shown in different ways. I will show, I

8  guess, later how the code actually infringes that. So I

9  will show you the exact characteristic of the code.

10        Now, Windows is the gray. Actually coming back

11  to life, it did. So I am going to wear the hat of the

12  administrator. Let's see. So we are talking about access

13  control lists. Let's say, for example, Java applet. This

14  allow, block that you see here, allow, block, block, block,

15  allow, allow, this is the definition of an access control

16  list, it's a list of statements that says, If this happens,

17  block, or allow. Where the -- and this is obviously applied

18  to different categories of behavior, such as Write Access to

19  Local File, as you can see up above, Access to the Network,

20  Dynamic Loading of Program Code and so forth.

21        This is just one example for Java applet. But I

22  guess that, you know, we can look at it for, I don't know,

23  Visual Basic scripts and so forth.

24  Q.    If you look at PTX, the screen shot, PTX-10, would

25  this also be like an access control list that you are

Vigna - direct

**373**

1  talking about?
2  A.   Yes. Absolutely.
3  Q.   So, based on your view of the product, the source code
4  and the documents in this case, do you have an opinion as to
5  whether the Webwasher product infringes Claim 3?
6  A.   Yes, it does.
7  Q.   Is it okay if we check that box?
8  A.   You can check that box.
9  Q.   All right. The next claim is Claim 4A. This is the
10  method of another dependent claim, Claim 1. It says, "The
11  steps of scanning for a certificate and comparing the
12  certificate against a trusted certificate."
13        Do you have an opinion as to whether the
14  Webwasher product infringes Claim 4A?
15  A.   Yes, it does.
16  Q.   And what is that opinion based upon?
17  A.   Well, documentation, knowledge of the source code, and
18  operation of the appliance.
19  Q.   I am going to show you what's marked as PTX-154. This
20  is another White Paper on the Webwasher product. If you go
21  to Page 11 of this document, this first sentence right here
22  above the table, can you tell me that is talking about
23  there?
24  A.   Yes. So, in this case, this paragraph describes the
25  fact that Webwasher inspects the code's certificate and

---

Vigna - direct

**374**

1  detects expired or revoked certificates as well as unwanted
2  authors. And I think that -- let me say just two words
3  about certificates.
4        So this is a rather complex concept that is
5  difficult to explain in a clear fashion, so I will try to do
6  my best. The idea is that it is possible to associate with
7  a downloadable some kind of electronic legal document called
8  a certificate that says, in a way that cannot be tampered
9  with or that is tamper evidence so we try to modify it, you
10  will be caught. It tries to identify who wrote this mobile
11  code or what is the content of the mobile code.
12        So the certificates are used in a number of
13  different ways. For example, when a downloadable is
14  received through a browser and there is a certificate, the
15  browser says, Okay, let's analyze the certificate. The
16  certificate says, in a way that cannot be forged, that this
17  piece of code comes from Microsoft. So the browser says,
18  Hey, Microsoft, I am Microsoft, I am Windows, I like this
19  guy, I am going to execute it.
20        So you can make decisions based on the
21  certificate. Of course, Microsoft is not the only one that
22  can create certificates for downloadables. Everybody can.
23        So there is a policy that will say, Okay, I
24  trust these people, and you have to understand that these
25  certificates cannot be forged. It is really important. It

---

Vigna - direct

1  is like you would sign the code, and, actually, it's called
2  "signing the code." Of course, there is no physical
3  signature. Just ones and zeros. But through the
4  application of certain cryptographic functions, it is
5  possible to bind the certificate to the code.
6        I am sorry, it's really difficult not to get
7  technical with this. But it's a way to say, in an
8  un-forgeable way, where this code comes from and then you
9  can make decisions based on these certificates. That's what
10  they do.
11  Q.   If you look at the user manual, PTX-153, of the
12  Webwasher product, we go to Page 4-67. The Bates number is
13  529. You will see the bottom half of this page is called
14  "Certificate Verification." Do you see that?
15  A.   Yes.
16  Q.   Is that a -- how does that play into Claim 4 regarding
17  the scan certificate and compare the certificate against the
18  trusted certificate?
19  A.   In this particular case, what is shown here is a
20  procedure through which a certificate is verified to be
21  still good. So if it has been revoked, that means that that
22  certificate is not valid anymore, or is expired, because,
23  actually, these certificates can have an expiration date, so
24  they are not valid forever but only for a limited amount of
25  time. Then the Webwasher has the ability to say, Hey, I

---

Vigna - direct

**376**

1  will block a particular downloadable if the associated
2  certificate is expired or revoked.
3  Q.   Based upon your view of the technical documents in
4  this case and the testimony and the appliance and source
5  code, do you have an opinion as to whether Claim 5 is
6  infringed or not?
7  A.   Yes, it does.
8  Q.   I am sorry, Claim 4, one step ahead, Claim 4.
9  A.   All right. Difficult to keep track.
10        Yes.
11  Q.   This is the one regarding the steps of scanning for a
12  certificate and comparing the certificate against the
13  trusted certificate?
14  A.   Yes.
15  Q.   Okay to put a check in that box?
16  A.   You can check it.
17  Q.   Thanks.
18        All right. Now we will go to Claim 5. This is
19  the claim, the method of Claim 1, "Further comprising the
20  step of comparing the URL from which the downloadable
21  originated against a known URL"; do you have an opinion as
22  to whether the Webwasher product actually compares the URL
23  from which the downloadable originated against a known URL?
24  A.   Yes.
25  Q.   What is that opinion?

Vigna - direct

1    A.    Well, the opinion is that it does compare to a list of
2    known URLs.
3            So it is possible to make a decision based upon
4    what the URL is. Maybe everybody knows what a URL is?
5    Q.    Would you please explain that?
6    A.    A URL is called a Uniform Resource Locator. It's that
7    HTTP://www.cnn.com/index.HTML. It is a long string that
8    terms where a resource is on the Internet. It says which
9    article to use to get that resource, what is the server that
10   has the resource, what is the resource name. You put that
11   all together, you see that on top of your browser, that is
12   called a URL. Maybe you know what it is. But I cannot
13   assume that.
14   Q.    Looking at the user manual, PTX-153, on Page 3-30,
15   Page 423 is the Bates number, you will see a couple
16   paragraphs here talking about URLs.
17           How do those two paragraphs relate to your
18   opinion regarding Claim 5?
19   A.    This shows that, you know, URLs can be added and used
20   as filters, and that known good or known bad, URLs can be
21   used as a basis to allow or reject a certain downloadable.
22           Say, okay, if I downloaded, for example, this
23   particular piece of code from www.Microsoft.com, I can say,
24   Well, it is from Microsoft website, I trust it. Or I might
25   say, If this downloadable came from a URL that is known to

378

Vigna - direct

1    be, for example, a site where pirate software or Trojan
2    horses are instituted, then I would like to block it.
3    Q.    Based on your view of the product, the source code,
4    and the documentation, do you have an opinion as to whether
5    the Webwasher infringes Claim 5 of the '194 patent?
6    A.    I think it does, because it provides a mechanism to do
7    exactly that.
8    Q.    If we go to Claim 6, this is the method of 5 wherein
9    the URL is a trusted URL.
10           Did you just discuss that with the documents we
11   just saw?
12   A.    Yes, and this is also the case. One possibility is to
13   identify some URLs, like, for example, anything that comes
14   from www.Microsoft.com as denied, and, therefore, you want
15   to trust it.
16   Q.    And I am going to do 6 and 7 together. Claim 7 talks
17   about the method of Claim 5 wherein the known URL is an
18   untrusted URL?
19   A.    Correct. That would be an example of the website from
20   which people download pirate software, for example, Trojan
21   applications.
22   Q.    Based on your view of the source code in this case,
23   the appliance, and the documentation, is it your opinion
24   that Webwasher infringes Claim 5 -- Claim 6 of the '194
25   patent?

380

Vigna - direct

1    A.    Yes.
2    Q.    Can I put a check here?
3    A.    Go ahead.
4    Q.    Based on your view of the source code, the Webwasher
5    appliance, and the documentation and testimony in this case,
6    is it your opinion that the Webwasher product infringes
7    Claim 7 of the '194 patent?
8    A.    Yes.
9    Q.    Okay if I put a check there?
10   A.    Go ahead.
11   Q.    The next series of claims, they are Claims 8 through
12   11 that have been asserted in this case. They talk about
13   the method of Claim 1 wherein the downloadable is a Java
14   applet or ActiveX control or JavaScript or Visual Basic.
15   You talked about those quite a bit today. Is that correct?
16   A.    Correct.
17   Q.    And did you form an opinion, as to Claim 8, whether
18   the method of Claim 1 as to whether the downloadable is a
19   Java applet?
20   A.    Yes. In my opinion, the method of Claim 1 is used
21   when the downloadable is a Java applet, an ActiveX control,
22   JavaScript, or Visual Basic script in the Webwasher product,
23   so my opinion is that the Webwasher product infringes all of
24   those claims.
25   Q.    And that's based -- is that based on the documents we

380

Vigna - direct

1    saw earlier today, as well as your view of the source code
2    and the product itself?
3    A.    Correct.
4    Q.    I have to do these individually because that is the
5    rules. We are trying to get through this and it's about
6    lunchtime.
7            Based on your view of the source code, the
8    appliance, and your documentation and deposition testimony,
9    is your opinion that Webwasher infringes Claim 8 of the '194
10   patent?
11   A.    Yes.
12   Q.    Can I put a check in that box?
13   A.    Check the box.
14   Q.    Is it your opinion that, based on your review of the
15   source code, the appliance in this case, and the
16   documentation you reviewed and the deposition testimony,
17   that the Webwasher infringes Claim 9 of the '194 patent?
18   A.    Yes, and you can check the box.
19   Q.    And based on your review of the source code, the
20   appliance, the documentation and testimony, is it your
21   opinion that Webwasher infringes Claim 10 of the '194
22   patent?
23   A.    Yes. You can check the box.
24   Q.    And based on your review of the source code, the
25   appliance, and the documentation and testimony in this case,

Vigna - direct

1  is it your opinion that Webwasher infringes Claim 11 of the
2  '194 patent?
3  A.   Yes. You can go ahead and check the box.
4        MR. ANDRE: Your Honor, now is a natural
5  breaking point for lunch. Do you want to go till 1:00?
6        THE COURT: Yes.
7        MR. ANDRE: We will go to 1:00. That's fine.
8        THE COURT: Good.
9  BY MR. ANDRE:
10 Q.   We will go to Claim 12. This is the method of Claim 1
11 where the security policy includes a default security policy
12 to be applied regardless of the client to whom the
13 downloadable is addressed.
14       Dr. Vigna, did you form an opinion as to Claim
15 12 of this patent?
16 A.   Yes.
17 Q.   What is your opinion?
18 A.   The opinion is that the Webwasher product infringes
19 this claim, as it provides a security policy that, a default
20 security policy that would be applied regardless of the
21 particular destination of a downloadable.
22 Q.   Could you show that on the appliance itself?
23 A.   So this, for example, shows this, "Proposes," up here,
24 you can see "Proposes Default Policies For Mobile Code."
25 And these are the policies that will be applied regardless

Vigna - direct

1  customized to the particular environment of the client. And
2  in my expert report, you will find an exact point where it,
3  for example, is shown that the sent code depends on the type
4  of browser, whatever code is activated depends on the
5  browser that the client has.
6        That's one way to address the particular user.
7  Or, otherwise, one can go to this User Management tab, and,
8  for example, define specific type of policies for specific
9  recipients, IP addresses, sender, group, user name. So you
10 can see clearly from this particular part of the appliance
11 how policy management can be customized for a particular
12 user.
13 Q.   Let me show you, also on Exhibit 152, Page 4-60, which
14 is Bates No. '914.
15       This is the user guide for Webwasher you relied
16 on before. Is that correct?
17 A.   Yes.
18 Q.   Would you look at the "Modifying, Creating and
19 Deleting Policies" section?
20 A.   Correct.
21 Q.   Does that describe what you were just talking about --
22 A.   Yes.
23 Q.   -- with respect to Claim 13?
24       Could you please describe what you are looking
25 at?

382

Vigna - direct

1  of the particular destination.
2  Q.   Does that support your opinion that the Webwasher
3  product infringes Claim 12 of the '194 patent?
4  A.   Yes.
5  Q.   Is it okay to put a check in that box?
6  A.   It is okay.
7  Q.   Did you base that opinion upon a review of the source
8  code, the appliance, and the documentation you were provided
9  in this case?
10 A.   Yes.
11 Q.   Let's go to Claim 13. This talks about the method of
12 Claim 1 where the security policy includes a specific
13 security policy corresponding to the client to whom the
14 downloadable is addressed.
15       Dr. Vigna, did you form an opinion as to Claim
16 13 in this case?
17 A.   Yes.
18 Q.   What is your opinion?
19 A.   That it infringes.
20 Q.   And are you able to show that on the product itself?
21 A.   I could show the side effect of that happening. I am
22 sure that there is a way to can optimize the policy for a
23 particular user.
24       My opinion is based fundamentally on the fact
25 that when code is sent to protect a client, that code is

384

Vigna - direct

1  A.   So here is the part of the manual that describes how
2  to modify a policy. And you can customize a policy to a
3  specific group of users or a specific IP. And, therefore,
4  you can address, you know, apply specific rules to specific
5  users.
6  Q.   Based on your review of the source code, the
7  appliance, itself, the documentation in this case, is it
8  your opinion that the Webwasher infringes Claim 13 of the
9  '194 patent?
10 A.   Yes, it does.
11 Q.   Can I check the box?
12 A.   You can check the box.
13 Q.   Claim 14 talks about -- I will just read it from here.
14 The method of Claim 1, where the client belongs to a
15 particular group, and the security policy includes a
16 specific security policy corresponding to the particular
17 group.
18       Do you see that?
19 A.   Yes.
20 Q.   Did you form an opinion about Claim 14?
21 A.   Yes. If you look at the appliance and you put it on
22 the screen, you can see that this, a particular group, like
23 identified here, can be defined and mapped to a particular
24 policy. And this allows you to identify a group of people
25 for whom certain policies apply. That's stated in this

385

Vigna - direct

1  particular snapshot of the Webwasher interface.

2  Q.    Based on your review of the source code in this case,

3  the appliance, and the documentation, did you form an

4  opinion as to whether the Webwasher product infringes Claim

5  14 of the '194 patent?

6  A.    Yes. My opinion is that it infringes.

7  Q.    Can I check the box?

8  A.    You can check that box.

9  Q.    Now we go down to Claim 24 of the '194 patent.

10        Do you have an understanding of what this claim

11  is talking about here?

12  A.    Yes. In this case, the decision is made also by

13  comparison of the downloadable being analyzed against a

14  known downloadable.

15  Q.    Did you form an opinion as to whether the Webwasher

16  product infringed Claim 24?

17  A.    Yes, it infringes.

18  Q.    And what did you base that opinion upon?

19  A.    For example, by looking at the source code, it is easy

20  to show that a downloadable, when it is received, is

21  compared to existing downloadable, for example, by

22  generating an ID, in particular, an M.D. 5 ID of that

23  downloadable, to see if that particular downloadable has

24  been seen before, and, therefore, it is known.

25  Q.    If we go to the user manual, PTX-152, and go to Page

386

Vigna - direct

1  4-5, it talks about, I think it's 4.2, "Virus Scanning."

2  Does that support your opinion as to Claim 24?

3  A.    Yes. This is another way of comparing to a known

4  downloadable. In this particular case, we have discussed in

5  this court before the concept of signatures. The classic

6  virus scanning technique is to have a number of identifiers

7  or signatures for specific downloadables, or specific

8  malicious codes or malware, and compare the signature with

9  what we know already.

10  Q.    In this Claim 24, this is taking the -- is it taking

11  the proactive scanning as described in Claim 1 and combining

12  that with the traditional signature-based scanning?

13  A.    I think so. It is a form of reactive scanning,

14  because you are reacting to something that is known, being

15  that you will describe that very well, saying that it's like

16  a photo album of things I have seen before.

17        In this particular case, you are going through

18  the photo album, saying, Have I seen this downloadable

19  before? So if that is the case, you can make a decision

20  based on that particular information.

21  Q.    Did you find that the Webwasher product combined these

22  two types of functionality in its product?

23  A.    Yes, it obviously does.

24  Q.    Based on your review of the source code and the

25  appliance and the documentation in this case, do you have an

387

Vigna - direct

1  opinion as to whether it infringes Claim 24 of the '194

2  patent?

3  A.    Yes, it does.

4  Q.    Claim 25 is just a method of Claim 24 where the known

5  downloadable is hostile.

6        Did you form an opinion as to Claim 25 in this

7  case?

8  A.    Yes. This is very similar. You can bring again the

9  virus scanning technique, where, in virus scanning, the

10  comparison is done with hostile known downloadable. That is

11  a definition of a virus signature, something that

12  characterizes a known malicious downloadable.

13  Q.    And did you form an opinion as to whether the

14  Webwasher infringed Claim 25 based on your review of the

15  source code, the appliance, itself, and the documents in

16  this case?

17  A.    Yes, and it infringes.

18  Q.    Claim 26, the method of claim 24 wherein the known

19  downloadable is non-hostile. Did you form an opinion as to

20  Claim 26?

21  A.    Yes, I did.

22  Q.    What was your opinion?

23  A.    My opinion is that the Webwasher product infringes

24  this particular claim because it has the mechanism to

25  compare a downloadable to an existing downloadable that is

388

Vigna - direct

1  non-hostile and analyzed before to determine if the

2  downloadable is to be allowed or not.

3  Q.    Now, is there a term that is referred to as a "White

4  List"?

5  A.    Yes. Actually, in general, you have two general ways

6  to allow or block certain content. One is called White

7  Listing, one is called Black Listing. They are

8  complementary.

9        So, Black Listing can take many forms. It can

10  be a series of signatures, a series of URLs, a series of

11  IDs, a series, even, of just types of downloadables. But

12  you say whenever something is in the Black List, it has to

13  be blocked; while, when something is in the White List, and

14  again, the White List can be a White List of downloadables,

15  of URLs, of certificates, you name it, but whenever a match

16  is found in the White List, then that is to be allowed.

17        Of course, this, too, should have no

18  intersection, so there is no element that is both in a White

19  List or a Black List. And there are things that are neither

20  in one or the other, and, therefore, you have to analyze

21  them.

22  Q.    And let's go to the user manual, PTX-153. This is

23  3-57, Page 3-57. You will see that the bottom half of that

24  page, we are talking about White Listing?

25  A.    Yes.

Vigna - direct

1    Q.    Does that support your opinion as to Claim 26?

2    A.    Exactly. So this is, for example, a mechanism to

3    identify that a downloadable is similar to a known White

4    Listed -- not similar -- is identical to a known White

5    Listed downloadable and therefore can be allowed in. It's

6    been described as trusted.

7    Q.    Do you have an opinion as to whether, based on your

8    review of the source code, the appliance in this case, and

9    the documents that you reviewed, whether Claim 26 is

10    infringed by the Webwasher product?

11    A.    Yes, it does.

12    Q.    Would you go to Claim 27. The claim requires a method

13    of Claim 24, further comprising the step of including a

14    previously received downloadable as a known downloadable.

15          Do you have an opinion as to whether the

16    Webwasher product infringes Claim 27?

17    A.    Yes. And my opinion is that it infringes.

18    Q.    And what is Claim 27 talking about here?

19    A.    So, in this particular case, the comparison is done not just with any

20    known downloadable but something that has been downloaded

21    before.

22    A.

23          So this is a very common technique that is

24    called "Cache-ing," where you want to make sure that if you

25    already saw something, for example, a web page, you will not

---

Vigna - direct

1    download it again.

2          In this particular case, there is a mechanism so

3    that a downloadable this time, which is something different,

4    is identified as seen before. And, therefore, it can be --

5    it doesn't need to be analyzed again. This is done, as we

6    will see, by deriving IDs and comparing specific IDs.

7    Q.    Let me show you PTX-12. This is the step-by-step

8    guide once again. If you turn to Page 30 of this, the very

9    top, it talks about the Proactive Scanning Cache.

10          Is this what you are talking about when you are

11    talking about "Cache-ing"?

12    A.    Yes, exactly.

13    Q.    Would you describe what is going on here?

14    A.    Yes. So the Proactive Scanning Cache described here

15    is to maintain in memory or accessible, this is accessible,

16    the security profile derived for a number of recently seen

17    downloadables, because, as described here, oftentimes there

18    are malware outbreaks. And you sometimes notice, less and

19    less, but once upon a time, you get, you know, 25 "Melissa"

20    e-mails in your mailbox. So there is a few days where there

21    is a storm of this malware going into your mailbox or being

22    transferred over the Internet. And, so, the gateway has to

23    process many times the same thing.

24          So the idea here is to analyze it once, derive

25    the security profile, so the list of possibly dangerous

---

Vigna - direct

1    behaviors, and save it in a Cache, identifying uniquely the

2    type of downloadable that generated that profile.

3          So when a new downloadable is received, before

4    starting the analysis, an ID is generated from the

5    downloadable, compare to what it said, and it says, Okay,

6    did I already see this? And if this is the case, instead of

7    redoing the work twice, the save security profile is

8    extracted and used as a basis to determine through the

9    security policy if the downloadable has to be allowed or

10    not.

11    Q.    Based on your review of the source code and the

12    appliance and the documents in this case, did you form an

13    opinion as to whether the Webwasher product infringes Claim

14    27 of the '194 patent?

15    A.    Yes.

16    Q.    What is that opinion?

17    A.    That it infringes.

18    Q.    We will go to Claim 28, which is another dependent

19    claim. This is the claim where the security policy

20    identifies a downloadable to be blocked per administrative

21    override. Do you see that?

22    A.    Yes.

23    Q.    Did you form an opinion as to whether the Webwasher

24    product infringed Claim 28?

25    A.    Yes, I think it infringes.

---

Vigna - direct

1    Q.    Is this a type of Black Listing?

2    A.    That is exactly what it is. So there is some -- a

3    list of no malicious downloadables that have to be blocked

4    because they are known to be malicious. So there is no need

5    to perform the complete analysis.

6    Q.    If we go to the user manual, PTX-153, is this talking

7    about what you were talking about, the Black Listing?

8    A.    Yes. For example, this is based on the media type, so

9    the type of downloadable.

10    Q.    What is it talking about when it says "Per

11    administrative override" in the claim?

12    A.    Administrative override is sort of a technical term to

13    say, I want this particular condition to overrule anything

14    else. So even though I would analyze this downloadable, I

15    would find it okay, I want to override the possible outcome,

16    say, Okay, whenever I see this particular type, for example,

17    in this case of downloadable, I want it blocked.

18          So it's sort of like other writing, the normal

19    flow of analysis, because you already know that those types

20    of known downloadables or downloadables Black Listed in some

21    way have to be blocked.

22    Q.    And based on your review of the source code, the

23    appliance, and the documents in this case, did you form an

24    opinion as to whether the Webwasher infringes Claim 28 of

25    this type of Black Listing?

---

393

Vigna - direct

1    A.    Yes. In my opinion, it infringes.

2           THE COURT: Ladies and gentlemen, we will take

3    our lunch break.

4           (Jury leaves courtroom at 12:57 p.m.)

5           (Luncheon recess taken.)

6           THE COURT: Ms. Walker.

7           MR. ANDRE: Your Honor, we would like to clear

8    the courtroom. The parties have agreed to step out. Should

9    we go into that now?

10          THE COURT: Is it the request of the parties

11   that this portion of the record -- what is your request?

12          MR. SCHUTZ: It is the source code, it is going

13   to be displayed on the screen.

14          THE COURT: With regard to the record, what is

15   your request?

16          MR. ANDRE: We don't need to do anything about

17   the record. The record will be fine.

18          (Jury enters courtroom 2:02.)

19          THE COURT: Ladies and gentlemen, please take

20   your seats. We will continue on.

21          Is it the desire of the parties to seal the

22   courtroom?

23          MR. ANDRE: I think we can police it ourselves,

24   Your Honor.

25          THE COURT: All right. I am prepared to have

394

Vigna - direct

1    you do that.

2           MR. SCHUTZ: We will keep an eye out.

3           MR. ANDRE: Your Honor, we are going to be

4    looking at source code. I believe our technical person, the

5    computer is not booted up yet.  Can he step up there real

6    quick to make sure it's working.

7           THE COURT: Sure.

8           (Pause.)

9           THE WITNESS: We have a little technical issue.

10   When the computer is rebooted, after a certain amount of

11   time, it automatically starts a check on the file system.

12   So /1 in the amount of 20 times, without being checked.

13   They are forcing a check. We are 51.4 percent through it.

14   It's normal unique maintenance and we cannot do anything

15   about it. We are at 55 now. Getting better.

16          The last 50 percent was really fast, apparently.

17   BY MR. ANDRE:

18   Q.    Before we get into the source code, let me ask two

19   more of the dependent claims very quickly.

20          Claim 29 of the '194 patent is a dependent claim

21   wherein the security policy identifies a downloadable to be

22   allowed per administrative override?

23          Did you form a basis about whether the Webwasher

24   appliance provides that type of administrative override?

25   A.    Yes. As we have seen before, the White Listing

395

Vigna - direct

1    mechanisms allow the Webwasher -- allow the user of the

2    Webwasher appliance to allow a downloadable per

3    administrative override. Therefore, it infringes the claim.

4    Q.    Based on your view of the source code and the

5    appliance and the documents in this case, did you form an

6    opinion as to whether Claim 29 is infringed by the Webwasher

7    product?

8    A.    Yes, it infringes.

9    Q.    Then the final dependent claim is Claim 30. This is

10   the method of Claim 1, comprising the step of informing a

11   user upon detection of a security policy violation.

12          Did you form an opinion as to Claim 30 of the

13   '194 patent?

14   A.    Yes. And my opinion is that it infringes.

15   Q.    Can we see PTX-11.

16          Page 6. At the top, it has that box that came

17   up with the appliance, "Request blocked by ProActive

18   scanning"?

19   A.    Correct. That is the same message that we showed

20   before when operating the Webwasher product that shows that

21   the user is informed of the fact that the downloadable has

22   been blocked.

23   Q.    Based on your review of the source code, the

24   appliance, and the documents in this case, is it your

25   opinion that Claim 30 of the '194 patent is infringed?

396

Vigna - direct

1    A.    Yes, it infringes the patent.

2    Q.    Dr. Vigna, the next independent claim is independent

3    Claim 32, which, instead of having a method, is a system of

4    execution by a server that serves as a gateway to a client

5    and the system comprising.

6           What is the difference between this type of

7    claim and the method claim of Claim 1?

8    A.    Well, one is -- I cannot see it on my screen. I think

9    I can almost read the board.

10          In the original one, it is talking about a

11   method. This particular case is talking about the actual

12   execution by an application.

13   Q.    If you look at the first element, Element A, a

14   security policy, you have gone over that in some detail here

15   today?

16   A.    Yes.

17   Q.    Is it your opinion that the Webwasher has a security

18   policy?

19   A.    Definitely, yes.

20   Q.    Is that based upon the information that you reviewed

21   for your opinion?

22   A.    Yes, from the information, the documentation, the

23   appliance, the knowledge of the appliance, and this is

24   obvious, source code.

25   Q.    Could you just get into the source code and show us

397

Vigna - direct

1  what a security policy looks like and actually walk us

2  through some of the elements of the source code?

3  Q.    Absolutely. Here we have to get a little technical,

4  so you have to bear with me. It is not really easy to

5  discuss this. But I will try to do my best to make the jury

6  understand what I am talking about.

7          Here, as you can see, this terminal window

8  accesses the source code of the appliance. In this

9  particular case, Webwasher --

10 Q.    Before you start, what is source code?

11 A.    Applications, computer programs are executed by a

12 computer. But we have a hard time giving the instruction

13 directly to the processor in your computer because these

14 instructions are very, very simple and very small. They do

15 very incredibly simple, stupid operations, like add one to a

16 number, subtract one from a number. And building a complex

17 application like Word, by specifying this small instruction,

18 would be a daunting task. I would prefer water boarding to

19 that.

20         So what we came out, after years and years of

21 software engineering, would be high-level languages. These

22 are languages that are much higher level. That means that

23 we can tell the computer something like, Open this file.

24 And instead of using this very, very small, simple

25 instruction, we can give one high-level instruction that

398

Vigna - direct

1  will tell the computer to do something that we can relate

2  to, like open a file, write to a file, save to disk, and so

3  forth.

4          Now, of course, we like to talk to the computer

5  at this high-level language that we understand. But the

6  computer can only execute this very low-level operation. So

7  there is a process called Compilation that takes what we

8  call the source code, that means our high level description

9  of what the program should do, and transforms it into this

10 small, simple, stupid level instruction that the CPU, the

11 processor of a computer, can understand, so that we don't

12 have to deal with this low level stuff and we can

13 concentrate on the high level stuff.

14         So the source code can be of different types.

15 So there are different languages. Like there are languages

16 that we speak, French, Italian, English, and so forth.

17 There are languages like C, C plus plus, Pasquale, Java,

18 JavaScript, and so forth that they all do pretty much the

19 same thing. It's just a way to describe what the computer

20 should do.

21         I usually associate a program with one of those

22 books, and I don't know if any of you ever looked at one of

23 those, where you have chapter, at the end of the chapter,

24 you can take door No. 1 or door No. 2. So the books are

25 called "Interactive Books." And you can take different

399

Vigna - direct

1  paths throughout the book. So you make choices.

2          A program is more or less the same thing. There

3  is a general script that has to be followed. But you can

4  make decisions at a certain point. So if the user clicks on

5  this button, then do this particular thing, that would be

6  your open the door A versus open the door B in your book.

7          What I am here to explain is that the source

8  code is used to describe an algorithm. An algorithm is a

9  very weird word to describe a process. So the classic

10 algorithm is like put a coin in the coin machine. Select

11 with numbers the type of thing that you want to eat. Press

12 the button. If the things comes out from below, take it

13 out. That is a process. What I just described to you is an

14 algorithm.

15         I can do the same thing with source code. I can

16 say, Wait for user to put user name. Wait for user to put

17 password. If user name and password are the correct one,

18 then log in the user, and so forth. And I would do this in

19 source code.

20         That makes a long story short.

21         What I am going to show you is the source code

22 of one version of the Webwasher product. When you will see

23 the code, it will be rather confusing. It is confusing for

24 me. So it took me time to understand exactly what was going

25 on. I will try to do my best to show you step by step the

400

Vigna - direct

1  algorithm, the process that this source code is

2  implementing.

3          This is something that you probably can't

4  understand. It is sort of weird. So if you don't

5  understand, believe me, welcome to the club.

6          So it should give you a precise idea of what's

7  going on for, you know, in certain particular situations.

8          So I won't be able to explain everything, but I

9  hope to highlight the things that you want to understand.

10 Q.    With that in mind, could you show us where the first

11 element of Claim 32 of the security policy, where you find

12 that in the source code?

13 A.    Okay. For example, here is the source files. For

14 example, there is a security policy -- can I give a little

15 bit of context?

16 Q.    Yes.

17 A.    Getting to the security policy becomes sort of out of

18 context without showing you what I am talking about. I am

19 going to go into this mobile code filter directory. You can

20 see, and now I am going to open a file, C filter mobile code

21 dot CPP. CPP stands for C plus plus. So the extension of

22 that file shows the particular type of language that is used

23 in this application.

24         I am going to open an editor, emacs. Here we

25 have the code we are talking about. You can see the author

Vigna - direct

1    here is Cristoph, 2005, et cetera, et cetera.

2        Here, we are going to go to a particular method

3    here called run heuristics filter. This is a particular

4    operation. You can see up here. You can see that this, you

5    know, for you, probably this is incomprehensible and very

6    low level, but with respect to the instruction that the

7    actual CPU uses, this is very high level.

8        So, for example, here, do you remember in the

9    logs that I showed from the Webwasher application, at a

10    certain point, it was aligned within the log saying,

11    Proactive scanning starting. And here you have exactly the

12    log, the function that says, Write to the filter log,

13    proactive scanning is starting. And this is a side effect

14    will create that line of log.

15        Here, for example, you can see, is analyzing the

16    mobile code type. And say, Oh, if it's a Window 32

17    application, then I am going to use a certain parser to find

18    out where the functions are. If it is a Java application, I

19    am going to use a different parser. If it is a JavaScript,

20    I am going to use another different parser. That is to

21    abstract those functions. Remember I said the parser will

22    abstract those functions.

23        It goes on and on. At a certain point -- I am

24    sorry, I have to jump a little ahead -- there is, at a

25    certain point here, for example, I have to find exactly

402

Vigna - direct

1    where it is, it is difficult to find out, for example, here,

2    here, after it decided what type of executable we are

3    talking about, here it calculates the hash of downloadable,

4    and we will see in a second that this is important, and then

5    the cache is used to find out if this particular

6    downloadable has been seen before, if it is in the cache.

7    And if this is the case, then that particular profile is

8    used.

9        Otherwise, we will go to here. And we will

10    decide to evaluate, okay, this particular downloadable. So

11    evaluate is actually a reference to another file that I am

12    going to open right now. You can see it is not super easy

13    to follow, but bear with me another second. I am going to

14    get this.

15        So, in a way, this is sort of an important part

16    of the process, where the parser that has been chosen for

17    that particular type of downloadable is called to abstract

18    the functions or the parameters, the FWrite, FRead that I

19    talked about there. And then after that, there is this

20    evaluate all atomics on indicator and evaluate all

21    composites on context. These are those heuristic rules that

22    are used to take this basic function and transform them into

23    a list of possible malicious behavior.

24        So I know that it's difficult to say, like, Hey,

25    you know, it is obvious from there, but that's technically

404

Vigna - direct

1    what is done.

2        After that, it will be decided if the

3    downloadable has to be rejected or not. So we have to look,

4    for example, to this evaluate all composites function.

5        For example, in this case, there are a bunch of

6    rules that will be applied. And here it will decide, for

7    example, if -- it will decide if the categories are applied

8    to this -- we can all make mistakes. Here it will go

9    through the rule and get the composite rule, apply it, and

10    if that rule is actually matched, the rule will be

11    identified and written to a particular file -- sorry,

12    written to the log file, and the actual action that has to

13    be operated whenever this is matched is chosen.

14        In particular, you can see -- let me find

15    exactly where that thing is in my code note. I did notes

16    because keeping this in mind would be crazy.

17        That would be here. This is to find number of

18    typical actions that will be associated with the outcome.

19    So, for example, block and notify the sender, block and

20    notify the sender and the recipient or the recipient,

21    depending on what type of action has been decided on that

22    particular operation.

23        Now, if we want to see how the functions are

24    actually mapped to the category of behavior, we have to go

25    see, for example, this file. This file contains actually

1    the rules that take those low-level functions that I showed

2    you before and define the categories that I described.

3        For example, let's go here. You can see there

4    are four languages, such as JavaScript, Visual Basic, Visual

5    Basic for Application. There is a function that when the

6    function is called register read will be mapped in the

7    category register read.

8        Or, for example, maybe more interesting, here in

9    this particular case, if I have a function called eval, then

10    we will map this to the behavior of code creation.

11        What you see here is an encoded version of those

12    rules that take the low-level function and define categories

13    of behavior. Of course, this is formatted to be

14    understandable by a computer, by a program, and, therefore,

15    is not very pretty to look at.

16    Q.    Are these the rules that are used to identify the list

17    of suspicious computer operations?

18    A.    Correct.

19    Q.    So with respect to the Claim 32, you are asking for a

20    system to execute a server that serves as a gateway, you are

21    talking about the Element 3 here that talks about a compiler

22    coupled to the interface comparing downloadable security

23    profile data pertaining to the downloadable?

24    A.    Absolutely.

25    Q.    The downloadable security profile data includes a list

**405**

Vigna - direct

1  of suspicious computer operations that may be attempted by
2  the downloadable against the security policy?
3  A.    Correct.
4  Q.    When you say a "comparator," I guess is the word, what
5  is a comparator?
6  A.    A comparator is something that compares. So we get
7  this list of possible behavior, and we compare it to
8  something that says, If you do this, then you should block.
9        So it's a comparison between a security policy
10  and a list of actions that the downloadable might perform.
11  And whenever a match is found, the corresponding action is
12  taken.
13  Q.    So, based on your previous testimony regarding Claim
14  1, is it your opinion that the Webwasher system has a
15  security policy?
16  A.    Absolutely.
17  Q.    Is it based on the same information you base that
18  opinion upon in Claim 1?
19  A.    Yes.
20  Q.    The second element here, the B element, we talked
21  about an interface for receiving an incoming downloadable
22  addressed to a client, what is it referring to when it says
23  an "interface for receiving"?
24  A.    An interface for receiving means that there is a means
25  through which a downloadable is received from the outside.

**406**

Vigna - direct

1  So it is clear that Webwasher operates at the gateway and is
2  an intermediary between a client and a server. That means
3  it has some means to receive the downloadable from a remote
4  server and to pass it down to the client. Therefore, it
5  clearly meets the claim by construction.
6        Also, it is easy to find in the code a
7  description of, for example, the setup of the ports used by
8  the proxy that will show exactly how this the interface to
9  receive the downloadable can be configured.
10  Q.    Is it your opinion that the B element of Claim 32,
11  where it says, Interface for receiving an incoming
12  downloadable addressed to a client, is that infringed by the
13  Webwasher product?
14  A.    Yes.
15  Q.    Then we get to the C element, which is the comparator
16  which you just talked about. It's coupled to the interface.
17        Is the comparator in this case coupled to the
18  interface?
19  A.    Yes. I mean, the interface is used to retrieve the
20  downloadable. And then some processing is made to abstract
21  the list of behavior, which is then compared to the security
22  policy to make the final decision.
23  Q.    And is that something that -- I was going to say, is
24  it very hard to find the code? It would take some time to
25  get there? Could you show that in a code, the interface for

**407**

Vigna - direct

1  receiving the downloadable?
2  A.    I think I can find something.
3  Q.    I am sorry. The comparator coupled to the interface
4  is what I was looking for?
5  A.    The comparator coupled to the interface is what I just
6  showed, where the comparator is this evaluate, composite,
7  all composite function and evaluate all atomic.
8        I can show you again. I think it's right here.
9        For example, this function -- by the way,
10  evaluate all atomics on indicator, it is going to be used to
11  evaluate the functions and abstract the high-level behavior
12  and determine what type of action is going to be taken.
13        At a certain point, there is going to be -- I
14  will show you in the code -- so this is done to -- for
15  example, in the code, these are the category of behavior,
16  you can see here, you know, no category, File Read, File
17  Write, Registry Read, Registry Write. These are the
18  categories that are extracted, as represented in the code.
19  And you can see that it is, you know, sort of very low
20  level.
21        At the very end, there is -- let me go back to
22  it.
23        Okay. At this point, for example, there is this
24  function handle action, which is actually what will define
25  the action associated with the security policy.

**408**

Vigna - direct

1        So, at this point, the downloadable has been
2  analyzed, the categories of behavior have been determined.
3  So the type of action that will be performed. And this is
4  how the actual action is executed. You can see here, here,
5  here and so forth.
6  Q.    When you say the "category of behavior," are you
7  referring to the suspicious computer operations?
8  A.    Correct.
9  Q.    That's the File Write and the File Read and the type
10  of operations that you demonstrated earlier?
11  A.    Absolutely.
12  Q.    The issue that counsel brought up in his opening was
13  that the downloadable security profile data includes a list
14  of suspicious computer operations.
15        Does the Webwasher include the downloadable
16  security profile that includes the list of suspicious
17  computer operations and can you prove that in the code?
18  A.    Yes.
19  Q.    Could you please do so?
20  A.    Yes. In the code, as I showed before, this is how the
21  list of computer operations are defined. So this is how,
22  after using the parser, how these categories are represented
23  and mapped in the appliance.
24        So there is a loop that goes through the
25  downloadable, extracts the function, depending on the type

409

Vigna - direct

1  of downloadable, and then says, If this function is called a

2  certain name, then map it to Code Loading.

3       If you remember, this is the exact, for example,

4  in this case, if I have a function that is equal to eval,

5  you can see here that it will be mapped to the category

6  "Code Creation."

7       So these are the rules that are used to perform

8  the mapping in the code.

9  Q.    Do you have an opinion whether or not the Webwasher

10  product infringes the C Element of the comparator coupled to

11  the interface for comparing downloadable security profile

12  data pertaining to the downloadable, the downloadable

13  security profile data includes a list of suspicious computer

14  operations that may be attempted by the downloadable,

15  against the security policy to determine if the security

16  policy has been violated?

17  A.    Absolutely, I have an opinion. And the opinion is

18  that it infringes the claim.

19  Q.    Is that based upon your review of the source code, the

20  appliance, and the documents in this case?

21  A.    Correct.

22  Q.    Then the final element in the independent Claim 32 is

23  a logical engine preventing execution of the downloadable by

24  the client if the security policy has been violated.

25       First of all, when we are talking about

---

411

Vigna - direct

1  which are quite a bit of them, do you have an opinion as to

2  whether Claim 32 of the '194 patent is infringed?

3  A.    Yes. And my opinion is that it infringes.

4  Q.    Claims 33, 34, 35 and 36 are dependent upon Claim 32.

5  They add in the element of having a Java applet, an ActiveX

6  control, a JavaScript and Visual Basic script.

7       Do you have an opinion of whether Claim 33 of

8  the '194 patent is infringed by the Webwasher product?

9  A.    Yes, and I think it is.

10  Q.    Do you have an opinion as to whether claim 34 of the

11  '194 patent is infringed by the Webwasher product?

12  A.    Yes, I think it is.

13  Q.    Do you have an opinion as to whether Claim 35 is

14  infringed by the Webwasher?

15  A.    I think it is.

16  Q.    And how about Claim 36?

17  A.    Same, I think it is.

18  Q.    And is your opinion based upon the documents you

19  looked at earlier, showing the Java, applets, the ActiveX,

20  the JavaScript and the Visual Basic, and the source code you

21  have shown us here today?

22  A.    Correct. You can see in the code, we are talking

23  about VBScript, JavaScript, and so forth. So in this set of

24  rules you will find all different kinds of executables, as

25  listed there.

---

410

Vigna - direct

1  computers, what are engines? It's not something you put in

2  a car, obviously. What is an engine?

3  A.    This is something that is often used in computer

4  science. The term "engine" is some kind of component whose

5  task is to operate some kind of analysis or transformation.

6  Sometimes it is referred to as an engine because it has an

7  active task to perform. Some people refer to it as an

8  engine.

9       Like, for example, I used in my research of an

10  intrusion detection engine, as the part that is responsible,

11  for example, to actually analyze the traffic and detect

12  intruders. That is one possible use.

13  Q.    What is a logical engine?

14  A.    A logical engine would be something that applies some

15  kind of logic rules to perform analysis that will determine

16  certain properties of a downloadable.

17  Q.    Do you have an opinion as to whether the system used

18  in the Webwasher product uses a logical engine for

19  preventing execution of the downloadable by the client if

20  the security policy has been violated?

21  A.    Yes. I think that the Webwasher appliance actually

22  infringes the patent because it has this active component,

23  it does exactly that.

24  Q.    So, based on your review of the source code, the

25  appliance, and all the documents that you have looked at,

---

412

Vigna - direct

1  Q.    Now we are in the final claim of the '194 patent.

2  This is Claim 65. This relates to a computer-readable

3  storage medium storing program code for causing a server

4  that serves as a gateway to a client to perform the steps

5  of, and then it lists A, B and C steps. I want to talk

6  first about what is computer-readable storage medium storing

7  program code? What is that?

8  A.    This is simply saying that there is a disk on the

9  computer that contains the code that would do this

10  operation. So usually what you get on this disk is the

11  compiled version of what I just showed here.

12  Q.    In counsel's opening statement, they said, for

13  example, the CyberGuard TSP product has the code, does the

14  function. Even if it didn't function, would it be your

15  opinion a product that has all the steps of 65, would that

16  still infringe if it had the code?

17  A.    It is my understanding of this issue that if the code

18  is there, even though it might not be active for a certain

19  class of user or whatever, that is infringing the patent,

20  because it's stored on the machine, and therefore, it is

21  actually matching that particular claim.

22  Q.    And looking at the first element of Claim 32, Claim

23  65, receiving incoming downloadable addressed to a client,

24  that is the same element that was in Claim 1. Correct?

25  A.    Correct.

# EXHIBIT 1
# PART 2

Vigna - direct

1    Q.    Is it your opinion that it infringes?
2    A.    I think it does, it infringes.
3    Q.    Is that based on your view of the source code and the
4    appliance and the documents?
5    A.    Correct.
6    Q.    Then the second, the B element here is comparing the
7    downloadable security profile data pertaining to the
8    downloadable against a security policy to determine if the
9    security policy has been violated?
10   A.    Correct.
11   Q.    Do you have an opinion if that element is infringed?
12   A.    Yes. I think in a way, you know, I have already
13   demonstrated that this is actually infringing the patent,
14   Webwasher is infringing this particular claim.
15   Q.    And is that based on the review of the source code,
16   the appliance, and the documents in this case?
17   A.    Correct.
18   Q.    Then the final element of Claim 65 is preventing
19   execution of the downloadable by the client if the security
20   policy has been violated.
21         Do you have an opinion as to whether that infringes or
22   not?
23   A.    Yes, I do. And it infringes.
24   Q.    Is it for the same reason that you articulated earlier
25   today?

414

Vigna - direct

1    A.    My opinion is based on what I showed before and on the
2    documents that I reviewed, the source code, and the use of
3    the appliance.
4    Q.    With respect to Claim 32 -- sorry about that.
5          With respect to Claim 32, do you find that the
6    Webwasher product literally infringes every element of Claim
7    32?
8    A.    Yes.
9    Q.    Referring to the doctrine of equivalents, to the
10   extent it did not literally infringe, do you have an opinion
11   if it would at least, at least the Webwasher product would
12   perform substantially the same function as each and every
13   element of Claim 32?
14   A.    Yes.
15   Q.    And do you have an opinion as to whether the Webwasher
16   product performs in substantially the same way as Claim 32?
17   A.    Yes, it does.
18   Q.    Does the Webwasher product yield at least the same
19   result?
20   A.    Yes, it does.
21   Q.    What do you base that opinion on?
22   A.    I base that opinion on the source code of the
23   application, the use of the appliance, and the documentation
24   that I reviewed.
25   Q.    With respect to Claim 65, do you find that every

Vigna - direct

1    element of Claim 65 literally infringes -- strike that.
2          Do you find that the Webwasher product literally
3    infringes every claim element of Claim 65?
4    A.    Yes, I think so.
5    Q.    At least does the Webwasher product perform
6    substantially the same function as that described in Claim
7    65?
8    A.    Yes, it does.
9    Q.    Does at least the Webwasher product perform
10   substantially the same way as in Claim 65?
11   A.    Yes, it does.
12   Q.    And at least does the Webwasher product yield the same
13   result as that which is claimed in Claim 65?
14   A.    Yes, it does.
15   Q.    Is that for every single element in Claim 65?
16   A.    Yes.
17   Q.    Thank you.
18         All right. So that's it for the '194 patent. I
19   would like to turn your attention to the '780 patent.
20         Dr. Vigna, could you just give a very brief
21   description of what is claimed in Claim 1 of the '780
22   patent?
23   A.    Yes.
24         So in this patent, a method is disclosed to
25   compute a unique ID of a downloadable for md5, a

416

Vigna - direct

1    downloadable itself. The idea is that is that a
2    downloadable is retrieved and an ID is computed. But the
3    downloadable also references other components. Also
4    together with the first component, other components are also
5    analyzed and an ID is generated.
6          This ID is then used to identify or to determine
7    if a downloadable has been seen before. And the way in
8    which this ID is created is by performing a hash function.
9          Here I have to do a very short digression on
10   what a hash function is.
11         So, again, a hash function is, it's a way to
12   take an object and generate in a secure way a unique idea.
13   A secure way means that if two objects are different, then
14   they will have different IDs. And it is very hard
15   computationally, given an ID, to generate another object
16   that will have the same ID. You have to sort of believe me
17   here because there are actually pretty complex mathematics
18   behind these type of functions. Here we are not really
19   discussing these functions working or not. They are used in
20   computer science and programs every day.
21         One, for example, of the most known functions is
22   called md5. Shawan (phonetic) is another example of such
23   type of functions. They are used to generate unique IDs for
24   these downloadables.
25         Now, I am hiding some little problems with these

417

Vigna - direct

1  functions. They are completely irrelevant to the effect of

2  this patent. But the main concept is that this hash

3  function is applied to these downloadables to generate these

4  IDs. So whenever a new downloadable is received, the hash

5  function can be applied again, the ID generated, and

6  compared to IDs that haven't been seen before. And if the

7  two IDs match, that means that the same downloadable has

8  been seen again.

9         It's like putting a label on people. So if I

10  wanted to generate a hash on the people in this room, for

11  example, I will just generate a label, and I would put your

12  name on it. This wouldn't be a good hash, because maybe

13  some here have the same name. So I probably would use your

14  first name, last name, and Social Security number. I

15  could be pretty sure that nobody here has the same ID.

16        So if somebody comes and I saw that person, I

17  say, hey, that is the ID I already saw and I don't have to

18  go through the identification again. I just know who you

19  are.

20  Q.    Turning to the elements of Claim 1 of the '780 patent,

21  the first element is obtaining a downloadable that includes

22  one or more references to software components required to be

23  executed by the downloadable.

24        What is that element referring to?

25  A.    This is downloading, downloadable, to obtaining it.

418

Vigna - direct

1  And this downloadable might have one or more references to

2  other downloadables. This can happen in different ways.

3         For example, a Java program can reference

4  another Java program, actually, I would say, another Java

5  class. So at a certain point in the execution of this

6  program it might be the case that this particular

7  downloadable says, hey, I need another piece of myself. And

8  this piece will be also downloaded, and operated on

9  subsequently.

10  Q.    Let me show you PTX-11. I believe it's Page 5. If

11  you look at the bullet point right here, what is that

12  showing there?

13  A.    This shows that there are behavioral heuristics and

14  policy options available for different types of

15  downloadables, such as executables, ActiveX controls and

16  other types of downloadables, such as Java applets and

17  applications and so on.

18  Q.    Do Java applets have software components?

19  A.    Yes. Java applets can either come in a package

20  version where all the needed components are one single

21  group, or can be downloaded on command during execution. So

22  our first downloadable will be executed. And as this applet

23  gets executed, more elements will be requested and

24  downloaded.

25  Q.    Are you able to -- I am not sure you can do this on

419

Vigna - direct

1  the source code. Are you able to demonstrate on the source

2  code the first element, Element A of Claim 1?

3  A.    I haven't looked into it. So it would take me some

4  time to do that.

5  Q.    Let's see what the document is.

6         Based on your review of the documents, and the

7  testimony in this case, and the source code and the

8  appliance, do you have an opinion as to whether the

9  Webwasher product obtains a downloadable that includes one

10  or more references to software components required to be

11  executed by the downloadable?

12  A.    Yes. I think it does.

13  Q.    What do you base that opinion on?

14  A.    On the use of the appliance, the documents I reviewed.

15  Q.    Now, the next step is a step called fetching at least

16  one software component identified by the one or more

17  references. We have heard a little bit about this earlier.

18  What is fetching?

19  A.    Fetching, in my understanding, is, as the

20  downloadables are downloaded and executed, more pieces will

21  be requested. So fetching is, as somebody said I think

22  yesterday, a fancy word for go get it. So the applet is

23  executing in an environment, at a certain point it wants to

24  execute something else, so it will request another

25  component.

420

Vigna - direct

1         But guess what? The request from the client

2  will go through the Webwasher appliance and it will go to

3  the Internet, and before it can go back to the client will

4  be analyzed by the Webwasher appliance again, which probably

5  will generate another ID and identify, this is a known or

6  previously visited downloadable.

7  Q.    Did you see or hear any testimony regarding fetching

8  by the Webwasher product?

9  A.    Yes. I mean, fetching in this case is, you know, is

10  this new downloadable will be requested as the first one has

11  been fetched by the Webwasher product. Also, all subsequent

12  ones will be fetched as well whenever they are requested.

13  Q.    Did you form an opinion as to whether the Webwasher

14  product infringed the second element of fetching at least

15  one software component identified by the one or more

16  references?

17  A.    Yes.

18  Q.    What is your opinion?

19  A.    I think it infringes.

20  Q.    What is that opinion based upon?

21  A.    It's based upon an analysis of the documents and the

22  operation of the Webwasher product.

23  Q.    Now, the final element, the C element, is performing a

24  hashing function on the downloadable and the fetched

25  software component to generate a downloadable ID.

421

Vigna - direct

1    A.    Yes.

2    Q.    Did you form an opinion about the C element of Claim 1

3    of the '780 patent?

4    A.    Yes. I looked at the code and I found exactly this

5    operation being performed. I can show you.

6    Q.    Could you put us back in the code.

7    A.    Here, for example, is what happens. You can see this

8    function called calculate hash. So whenever the

9    downloadable is received, this function is called to

10   actually compute this hashing function and arrive at an ID.

11   And this same ID is used to find in the cache something that

12   has been already classified.

13         In fact, the following message is, if this is

14   found, it says, retrieve classification from cache. That

15   means that this downloadable was already analyzed before,

16   and has been found.

17         To give you a little insight of how this

18   calculate hash is performed, we have to open a new file

19   called C mobile code cache dot cpp. This is the code of

20   that calculate hash. And you can see here this md5 hasher

21   that tells us that exactly the md5 hashing function is used

22   to calculate this ID.

23         So here you can see, this hasher dot final is

24   what will actually create the final hash for the

25   downloadable.

422

Vigna - direct

1    Q.    Let me show you also a document, PTX-10. This is the,

2    one of the Webwasher mobile code filter detection and

3    classification of malicious mobile code. If you go to Page

4    19 of this, at the bottom, under Section 4.14, that last

5    paragraph, is that talking about the hashing function that

6    is in Element C as well?

7    A.    Yes, it's talking about the cache-ing, which is based

8    on the hashing function. So what it is saying, if you look

9    at the second line, it says that it is uniquely accessible

10   through a hash of the code itself. We just saw in the code

11   how this hash is generated through the computation of an md5

12   check.

13         I can also show on the appliance, if you put

14   this on, where the cache is.

15   Q.    If you would switch over to the appliance instead of

16   the source code.

17   A.    It should be up? No.

18         Okay. Much better.

19         So here you have something that is called

20   cache-ing up here. Actually, wrong cache-ing. You have to

21   go to anti-malware. And we have to look at the proactive

22   scanning cache, this down here.

23         And here, you see, it says temporarily stores

24   the classification of mobile code to accelerate the

25   processing of consecutive requests.

423

Vigna - direct

1         So in this particular case, we say that so far,

2    we had 48 different samples that have been cached.

3         I can, for example, ask to clear completely the

4    cache. So almost immediately, it will download other

5    downloadables, and all the ones that are referenced. And

6    you will have 34 downloadables because there could be

7    different images, objects, and so forth that are

8    downloadable -- that are downloaded automatically from the

9    interface itself.

10        So if you look at this number 34, if now I put

11   on the hat of the user, and I go, for example, to test your

12   security installation, and I download, for example, this

13   Clear Beam, this is blocked, but what we will see here,

14   actually now we have one more downloadable, we had 34, now

15   we have 35, because Clear Beam has been downloaded as well.

16        So you can see, whenever this happened, whatever

17   goes through, the hash gets computed and the particular

18   classification is stored in a cache using as an index the

19   md5 hash of that particular downloadable.

20   Q.    And the function you are just describing and what is

21   disclosed in the documents, does that infringe Element C of

22   performing a hashing function on the downloadable in the

23   fetched software components to generate a downloadable ID?

24   A.    Correct.

25   Q.    Do you have an opinion as to whether the Webwasher

424

Vigna - direct

1    product infringes that element?

2    A.    It is my opinion that it does.

3    Q.    Do you base your opinion on the availability of the

4    source code, the Webwasher appliance and the documents that

5    you have reviewed in this case?

6    A.    Correct.

7    Q.    All the elements are checked on Claim 1. Do you

8    believe that the Webwasher product literally infringes Claim

9    1 of the '780 patent?

10   A.    Yes, I think so.

11   Q.    You now, you found that every element of Claim 1 in

12   Webwasher is literally infringed. Is that your opinion?

13   A.    Yes, that is my opinion.

14   Q.    Did you find at the very least the Webwasher product

15   contains an equivalent of every element of Claim 1?

16   A.    I do believe that.

17   Q.    Specifically, at the very least, does the Webwasher

18   product perform the same function as Claim 1 of the '780

19   patent?

20   A.    Yes.

21   Q.    And each and every element?

22   A.    Yes.

23   Q.    At the very at least, does the Webwasher product

24   perform substantially in the same way in Claim 1 as the '780

25   patent, and the same element?

425

Vigna - direct

1    A.    Yes.

2    Q.    Does the Webwasher product substantially in the same

3    way to get the same result in the claimed element?

4    A.    Yes.

5    Q.    We are going to go to the dependent claims of the '780

6    patent. Claim 2 is the method of Claim 1 wherein the

7    downloadable includes an applet.

8          Do you have an opinion as to whether Claim 2 of

9    the '780 patent is infringed?

10   A.    Yes. By reviewing the code, the documentation, and

11   using the appliance, I can tell that this applies to

12   applets.

13   Q.    And did you see any of the applets when you were

14   working with the code in this particular case?

15   A.    Yes.

16   Q.    So is it okay if I check Claim 2?

17   A.    You can check.

18   Q.    With respect to Claim 3, which is a method of Claim 1

19   where the downloadable includes an active software control,

20   do you have an opinion as to whether the Webwasher product

21   infringes Claim 3 of the '780 patent?

22   A.    I do. My opinion is that it does infringe.

23   Q.    What do you base that opinion upon?

24   A.    On the analysis of the code, the documentation, and by

25   using the appliance.

426

Vigna - direct

1    Q.    Is it okay to put a check in that box?

2    A.    You can go ahead and put it.

3    Q.    Dependent Claim 4 is the method of Claim 1 wherein the

4    downloadable includes a plug-in. What is a plug-in?

5    A.    So, a plug-in is a generic term for something that

6    extends an existing application. Most of the time, you

7    know, if you talk about a plug-in in this context, you will

8    talk about a browser plug-in, which means different things

9    for different browsers.

10         For example, Microsoft Internet Explorer allows

11   a particular type of object called BHOs or browser helper

12   objects. Those are those that enter your browser and give

13   you all those fancy toolbars that allow you to do weird

14   stuff and searches and beautiful things, and sometimes not

15   so beautiful things.

16         For example, Firefox, a plug-in could be written

17   in JavaScript, so in a different language.

18         The main idea is that in this context, there is

19   some executable that arrives at the client and extends an

20   existing application.

21   Q.    In your view of the source code and the appliance and

22   the documents in this case, do you have an opinion as to

23   whether the Webwasher product infringes Claim 4 of the '780

24   patent?

25   A.    Yes, it does. I have an opinion, and it does

427

Vigna - direct

1    infringe.

2    Q.    Claim 5 requires that the downloadable include an HTML

3    code. What is an HTML code?

4    A.    HTML is yet another language. It's called hyper-taxed

5    markup language. And it is the language with which you

6    describe web pages. So every time, I would say 99.99

7    percent of the times you visit a website, you are looking at

8    HTML code. The difference is that the browser is able to

9    take HTML code and present it to you in a very pretty way.

10         But you can always, you know, go, and if you can

11   switch for a second to my appliance here, any time you can

12   go to view source, and here, you will see your HTML code.

13         So HTML code is this. But the interesting thing

14   is that HTML code per se, I just say, hey, write something

15   here, but can also, as you can see here, contain some code.

16   Specifically, VBScript or JavaScript code.

17         So HTML can be both just passive, pretty

18   printing code that shows beautiful tables and images, but

19   can also contain, like in this case, explicit code that

20   might execute specific actions. So it's a downloadable.

21   And, yes, I have an opinion that it does infringe.

22   Q.    And the final claim, Claim 6, is where the

23   downloadable includes an application program. Do you have

24   an opinion as to whether Claim 6 is infringed by the

25   Webwasher product?

428

Vigna - direct

1    A.    Yes. Actually, the clear beam dot exit that I just

2    downloaded and it was blocked by Webwasher was exactly one

3    of these application programs.

4          My opinion is it infringes.

5    Q.    Is that based on your review of the source code, the

6    appliance and the documents?

7    A.    Correct.

8    Q.    With respect to the independent Claim 9 of the '780

9    patent, it is a system for generating a downloadable ID to

10   identify a downloadable comprising, this is a communications

11   engine for obtaining a downloadable that includes one or

12   more references to software components required to be

13   executed by the downloadable.

14         Could you describe what that's referring to?

15   A.    This is sort of a very similar description -- sorry.

16   It is a description for a system that is very similar to

17   what we just saw.

18         So it's a communications engine. So active

19   components that communicate. That obtains the downloadable,

20   so it would be our Webwasher appliance. And as this

21   downloadable is executed and this downloadable has one or

22   more references to other components, also, these other

23   components are downloaded. And each of them, together, are

24   given an ID by means of a hash function. So in time, all

25   the further components that are downloaded together with the

429

Vigna - direct

1  first one will all be marked, and for all of them, an ID

2  will be generated.

3  Q.    You do you have an opinion as to whether the Webwasher

4  product infringes the first element of Claim 9?

5  A.    Yes, by analyzing the source code, by using the

6  appliance, and by looking at the documentation, I have the

7  opinion that the Webwasher product infringes the patent, the

8  claim, I should say.

9  Q.    And the second element requires an ID generator

10  coupled to the communications engine that fetches at least

11  one software component identified by the one or more

12  references, and for performing a hashing function on the

13  downloadable and the fetched software components to generate

14  a downloadable ID?

15  A.    Yes, as I said before, this ID generator is used on

16  both the original downloadable and the new fetched software

17  component, could generate an ID for each of them.

18  Q.    Do you have an opinion as to whether the Webwasher

19  product infringes the B element of Claim 9 of the '780

20  patent?

21  A.    Yes, I have an opinion that is based on my analysis of

22  the source code, the documentation, and the use of the

23  appliance. My opinion is that it infringes.

24  Q.    Do you have an opinion that the Webwasher product

25  literally infringes Claim 9 of the '780 patent?

430

Vigna - direct

1  A.    Yes, I do. I think it infringes.

2  Q.    Do you find at the very least the Webwasher product

3  contains an equivalent of every element of Claim 9?

4  A.    Yes, I think it does.

5  Q.    Specifically, at the very least, does the Webwasher

6  product perform substantially the same function as all the

7  elements of Claim 9?

8  A.    Yes, I think it does.

9  Q.    At the very least, does the Webwasher product perform

10  in substantially the same way as Claim 9?

11  A.    Yes, I think it does.

12  Q.    At the very least does the Webwasher product yield the

13  same result as that claimed in Claim 9?

14  A.    It does.

15  Q.    When we are talking about this doctrine of

16  equivalents, is it your opinion that there is infringement

17  of the doctrine of equivalents on all of the independent

18  claims based on at the very least the same materials that

19  you reviewed for your opinion on literal infringement?

20  A.    Can you repeat that question?

21  Q.    Yes. I butchered that one. Sorry.

22      When you are giving these doctrine of

23  equivalents opinions, are you basing these opinions on the

24  same material that you base your opinion on literal

25  infringement on?

431

Vigna - direct

1  A.    Yes. It was that easy.

2      THE COURT: Let's take our afternoon break.

3      (Jury leaves courtroom at 3:15 p.m.)

4      (Recess taken.)

5      THE COURT: Ms. Walker, bring the jury in.

6      (Jury enters courtroom at 3:33 p.m.)

7      THE COURT: All right, ladies and gentlemen.

8  Please be seated.

9      Mr. Andre.

10      MR. ANDRE: Thank you, Your Honor.

11  BY MR. ANDRE:

12  Q.    Dr. Vigna, we had just concluded with Claim 9 of the

13  '780 patent. Claim 10 of the '780 patent requires the

14  downloadable include an applet, and Claim 11 includes an

15  active software control, 12, the downloadable includes a

16  plug-in, 13, the downloadable includes HTML code, and 14,

17  the downloadable includes an application program.

18      These were the same dependent elements that were

19  in the previous claim element, Claim 1. Do you recall that?

20  A.    Yes.

21  Q.    I won't go through each one of these. Do you believe

22  that the Webwasher product infringes Claim 10?

23  A.    Based on my analysis of the documentation, the

24  source code, and the product itself, I do believe so.

25  Q.    Do you believe that the Webwasher product infringes

432

Vigna - direct

1  Claim 11 of the '780 patent?

2  A.    Yes, based on the same sources, I do believe it

3  infringes.

4  Q.    Do you have an opinion as to whether the Webwasher

5  product infringes Claim 12 of the '780 patent?

6  A.    Yes. I have an opinion, and my opinion is that it

7  infringes.

8  Q.    Do you have an opinion as to whether the Webwasher

9  product infringes Claim 13 of the '780 patent?

10  A.    Yes, my opinion is that it infringes.

11  Q.    Does it infringe for the same reason that the previous

12  dependent claims infringe with the HTML that you showed on

13  the screen?

14  A.    Correct, in all cases, my analysis of the

15  documentation, of the source code, and of the appliance

16  itself, shows that these are the type of downloadables that

17  Webwasher can go with.

18  Q.    Finally, Claim 14, do you have an opinion as to

19  whether the Webwasher appliance, Webwasher product infringes

20  Claim 14 of the '780 patent?

21  A.    Yes, I do believe so. It infringes.

22  Q.    If we go to the last independent claim, or last

23  asserted independent claim of the '780 patent, Claim 18,

24  this is another claim that is claiming a computer-readable

25  storage medium storing program code for causing a computer

Vigna - direct

1  to perform the steps of, and then it lists out the steps.

2      I am not sure I asked you this earlier, so I

3  will ask you now. It talks about program code, not source

4  code. What is the difference?

5  A.   Well, program code, as I explained before, are those

6  very simple low-level operations that the CPU can execute

7  directly. It is called program code or binary code.

8  Usually this is what is actually executed. It's called the

9  executable, binary executable, the program code. It is not

10 source code, but it is the result of compiling source code

11 into an executable.

12 Q.   So based upon your inspection of the appliance, the

13 source code, and the documentation, were you able to

14 determine if the Webwasher product has program code?

15 A.   Yes. It has program code. It is stored on a disk.

16 And it is executed. Even if it weren't executed, it is

17 stored on a disk in executable form. It does infringe the

18 patent.

19 Q.   It doesn't matter if the program codes execute or not,

20 it is on the disk, it is your opinion it would infringe?

21 A.   Correct.

22 Q.   The first element of Claim 18 is obtaining a

23 downloadable that includes one or more references to

24 software components required to be executed by the

25 downloadable. That is the same as the A element in Claim 1.

Vigna - direct

1  Is that correct?

2  A.   It is the same element, and the same explanation

3  applies.

4  Q.   Do you have an opinion as to whether the element A in

5  Claim 18 is infringed by the Webwasher product?

6  A.   I do have an opinion, and my opinion is that it

7  infringes.

8  Q.   What is that opinion based upon?

9  A.   It is based upon the analysis of the source code, the

10 appliance, and the documentation that I reviewed.

11 Q.   And the second element requires fetching at least one

12 software component identified by the one or more references.

13 Do you have an opinion as to whether --

14 A.   Yes, it is again executable, by reference to the

15 downloadables, the other downloadables it will be

16 downloadable, and together with the first one will be hashed

17 to produce an ID.

18 Q.   And is your opinion based upon the same information

19 you relied on earlier for Claim 1 for the element that was

20 the same as this?

21 A.   Correct.

22 Q.   The final element of Claim 18 requires performing a

23 hashing function on the downloadable and the fetched

24 software components to generate a downloadable ID.

25     Do you have an opinion as to whether that

Vigna - direct

1  element is infringed by the Webwasher product?

2  A.   Yes. I have an opinion. And my opinion is that it

3  infringes.

4  Q.   Is that opinion based on the same information that you

5  provided earlier with respect to Claim 1 in Element C?

6  A.   That's correct, the analysis of the source code, the

7  appliance, and the documentation.

8  Q.   Is it your opinion that Claim 18 of the '780 patent

9  literally infringes, is literally infringed by the Webwasher

10 product?

11 A.   Yes. My opinion is that it does. So Webwasher does

12 infringe that particular claim.

13 Q.   With respect to the doctrine of equivalents, do you

14 find that, at the very least, the Webwasher product contains

15 an equivalent of every element of Claim 18?

16 A.   Yes.

17 Q.   Specifically, at the very least, does the Webwasher

18 product perform substantially the same function as every

19 element of Claim 18?

20 A.   Yes, it does.

21 Q.   At the very least, does the Webwasher product perform

22 in substantially the same way as every element in Claim 18?

23 A.   Yes, it does.

24 Q.   At the very least, does the Webwasher product yield

25 the same result as every element in Claim 18?

Vigna - direct

1  A.   Yes, it does.

2  Q.   Let's turn our attention to the third patent, the '822

3  patent. Would you remind us once again what the '822 patent

4  covers?

5  A.   In a nutshell, this patent covers a method that

6  associates the downloadable with some code that is sent with

7  the downloadable to the client, so that some check can be

8  performed on the client's side to make sure that the

9  security policy enforced by the intermediary is enforced on

10 the client's side.

11 Q.   We heard from one of the inventors of this patent

12 earlier today. He called it the sandboxing patent. Are you

13 familiar with that term?

14 A.   Yes. Sandboxing is a term that is often used to

15 describe mechanisms that tend to interpose between a certain

16 component and the rest of the world. So it goes back to the

17 concept of protecting a certain environment.

18     So I am receiving this object from the outside

19 world. And I want to be able to confine or limit the type

20 of access that this component has with respect to my

21 environment.

22     So I can create a sandbox around it that will

23 allow me to check what type of operation this unknown

24 component is trying to invoke.

25     And according to my security policy, I can at

437

Vigna - direct

1 run time examine if the type of operation is acceptable or
2 not. This is a sandboxing mechanism.
3 Q.    Would it be safe to say a sandbox is simply a
4 protective environment?
5 A.    It is a protective environment.
6 Q.    Now, the first asserted claim in this patent is Claim
7 4. Now, Claim 4 has four elements. The first element, A,
8 it's a processor-based method, comprising receiving
9 downloadable information.
10     I think we have covered this extensively. But
11 does the Webwasher product receive downloadable information?
12 A.    Yes. The Webwasher product does that, on behalf of
13 a client.
14 Q.    Do you have an opinion as to whether the A element is
15 infringed by the Webwasher product?
16 A.    Yes, I do. I think it infringed.
17 Q.    What do you base that on?
18 A.    Based on the analysis of the source code, the
19 documentation, and the use of the appliance.
20 Q.    The second element is determining whether the
21 downloadable information includes executable code. Do you
22 see that element?
23 A.    Yes.
24 Q.    Do you understand what that is referring to?
25 A.    Yes. So in this case whoever received the

438

Vigna - direct

1 downloadable has to look at it and say, okay, is the code
2 contained in this component, this downloadable information
3 that I just received.
4     A classic example, I mean, there are certain
5 modules for which that would be obvious, like a program, of
6 course, it's code. A program is code. So that wouldn't be
7 a big surprise.
8     But, for example, when I show you the source
9 code of that web page that contains some JavaScript code,
10 that particular web page could have been a completely
11 passive page with just HTML code that per se does not
12 execute any application, or like in the case that I have
13 that is shown, the page contained inside some code, so you
14 want to be able to say, hey, this is not just a page. This
15 is a page that contains some executable code.
16 Q.    And based on your review of the source code, the
17 appliance, and the documentation in this case, did you form
18 an opinion as to whether Element B of Claim 4 of the '822
19 patent was infringed by the Webwasher product?
20 A.    Yes. By looking at both the source code, the
21 documentation, and the appliance, I can tell you that is
22 what happens.
23 Q.    Now, the next element is causing mobile protection
24 code to be communicated to at least one information
25 destination of the downloadable information, if the

439

Vigna - direct

1 downloadable information is determined to include executable
2 code.
3     Did you use the Court's claim construction in
4 forming your opinion on an information destination being the
5 client?
6 A.    Yes, I did.
7 Q.    What is mobile protection code?
8 A.    This, actually, the verbiage of this particular claim
9 is a little, can be difficult to parse. But it's actually
10 very simple. Whenever a downloadable is received, and if,
11 for example, certain operations cannot be determined as safe
12 or unsafe, one might decide, well, I cannot make that
13 decision right now, so I am going to add to this
14 downloadable some additional mobile protection code. And I
15 will shift this to the client.
16     So in a way, I am postponing my decision on what
17 is to be considered good or bad.
18     So this additional mobile protection code is
19 something that gets communicated to the client together with
20 the original download so that whenever the download will
21 execute those functions about which we cannot really make a
22 decision, then the additional mobile protection code will
23 kick in and will allow us to make the decision at that very
24 moment, so dynamically.
25     If you remember the point I made exactly a few

440

Vigna - direct

1 hours ago, when my mind was a lot fresher than this, it is
2 like the Desdemona that situation, where I know the script,
3 the kill by Othello. But I won't know until that thing
4 happens in the play. So I am sending this code so when that
5 event is going to happen, I can make that decision. I don't
6 have all the elements at the moment of the analysis to make
7 a yes or no decision.
8 Q.    Did you form an opinion as to whether the C element in
9 Claim 4 was infringed by the Webwasher product?
10 A.    Yes. I analyzed the source code, the documentation,
11 and the appliance. And I can show you, for example, on the
12 source code exactly what happens in one specific case.
13     So an interesting file.
14     Let's look at this file. As you see up here,
15 first of all, we have something that says potentially
16 hostile identifications. In this, there is something called
17 hostile markup code. If you remember, markup code, HTML is
18 the hyper-taxed markup language. In a way it is trying to
19 identify if the code contains something bad.
20     The script can be completely blocked, like, for
21 example, here, or, more interesting, there is this function,
22 inject hooks. You have to understand that sandboxing is
23 often implemented by a hooking function. So in order to
24 protect the environment, you have to create the sandbox. So
25 the sandbox is really sort of a trick that you play on the

Vigna - direct

1  downloadable. So you put a hook, so that when the

2  downloadable thinks it's calling, I am going to write on

3  your registry or I am going to write to a file, the

4  downloadable thinks it's going to write to a file. But

5  actually you inject a different function and your function

6  gets executed first. So you get to see, what file are you

7  trying to write exactly? And if you agree that that file is

8  okay to be written to, then you go ahead and you execute the

9  original function.

10        So in a ways the sandbox is implemented by

11  hijacking, by taking control of the function that the

12  downloadable thinks it is going to execute.

13        It is like when Othello is trying to strangle or

14  stab Desdemona, he is saying, wait a minute, let me check

15  that everything is legit. And if everything is all right,

16  you can take action.

17        Here you can see exactly what happens. You say

18  string replace.

19        For example, whenever there is a document write

20  application, this will be substituted with a ww document

21  write, which stands for the Webwasher version of the

22  document write.

23        So when this JavaScript code, for example, will

24  invoke that document write or the exact screen or the exact

25  command, actually, they will execute the Webwasher version

Vigna - direct

1  of those functions. And in those functions the actual

2  security policy will be analyzed and the original message

3  will be allowed or disallowed, depending on the condition of

4  the security policy.

5        This additional code is exactly that -- I don't

6  remember the exact verbiage of the patent, but the

7  protection code that is sent together with the downloadable

8  is exactly that double double document write implementation,

9  where that will decide exactly how to execute that

10  particular operation.

11        So here you can see, for example, the ww write,

12  if this is hostile, okay, at the moment of the write, so if

13  Othello is actually killing Desdemona, okay, then block it.

14  Otherwise, actually, do the original write.

15        So you can see how this allows sort of the

16  system to get in the middle, between the downloadable and

17  your environment. And that middle is actually the sandbox.

18  Q.  Just to confirm this with some of the documents, we

19  have looked at PTX-10, Page 15 of this document. Towards

20  the bottom of the page, do you see something called

21  sandboxing? When it talks about wraps the suspicious code

22  in a sandbox, is that what you are referring to?

23  A.  That is a very precise description of what happens.

24  The suspicious code is wrapped in a sandbox, so as a I told

25  you before, each operation that the downloadable thinks it

Vigna - direct

1  is going to invoke, it is actually going to invoke the

2  sandbox first, which can then inspect and classify the

3  operation. And if granted, the operation will be forwarded

4  to the operating system for actual execution.

5  Q.    If we go to the next page on PTX-10, Page 16, right

6  below the figure that that paragraph -- could you tell us

7  what that first sentence is referring to?

8  A.    So I think that if the "preceding" phase hasn't

9  determined if the list of possible malicious behavior -- I

10  am sorry. After the list of possible behaviors have been

11  determined, if that list is not enough to say you are a good

12  guy or a bad guy, then you have to inject sandboxing code.

13        And Webwasher works with JavaScript and VBScript

14  files. And it sends the injected code along with the

15  gateway security policy for this file.

16        So the security policy is the one that when the

17  interception happens decides yes or no, and it sends that to

18  the client computer. This is like, you know, the sandbox

19  that is sent with the downloadable to the client computer.

20        So this is, you know, a direct match with what

21  is described in the patent.

22  Q.    The last element of Claim 4, the D element, wherein

23  the causing mobile protection code to be communicated

24  comprises forming a sandboxed package including the mobile

25  protection code and the downloadable information, and

Vigna - direct

1  causing the sandboxed package to be communicated to the at

2  least one information destination, which we agree --

3  A.    This is a fancy way to say exactly what we just saw,

4  where the mobile protection code are those ww functions that

5  are sent to the client, together with the original

6  downloadable.

7  Q.    We have heard some discussion in the last couple days

8  regarding mitigation. Is that associated with sandboxing in

9  some way?

10  A.    Yes.

11  Q.    Let me show you PTX-9. This is on Page 3440. The top

12  part, the proactive scanning is a two-tiered filter that

13  blocks program code based on its potential behavior and

14  mitigates suspicious script code before transport to the

15  client computer.

16        Could you explain what you are talking about in

17  that paragraph?

18  A.    It is very much what I just described. So the

19  proactive scanning here is described as a two-step process.

20  The first process is extracting the list of possible

21  malicious behavior, comparing it to a security policy, and

22  deciding allow or block.

23        And you can see at the bottom part, the figure,

24  on the left-hand side, for example, for ActiveX control,

25  there is this allow or block decision that is the result of

445

Vigna - direct

1  applying the security policy. But you can see, then, in the
2  fourth group of downloadable, that there might be situations
3  where it is not possible to make a final decision. And
4  that's especially the case for JavaScript code in HTML or
5  not in HTML and VBScript code. This is for a number of
6  reasons.
7          One of the reasons is that these languages have
8  particular features, for example, that allow the creation of
9  code on the fly, and execution of that code.
10         Okay. Therefore, sometimes, just looking at the
11  code, it is not possible to say, oh, okay, Othello might
12  kill Desdemona. You don't even know what the actual script
13  is. In those cases, one is clueless. You don't really know
14  exactly without executing the code, what is going on.
15         So the only way that you have to take control is
16  either to block, when you see this automatic code execution,
17  or to do script mitigation, which is to create a sandbox,
18  that is sent to the client with a downloadable. And
19  whenever that particular function is executed, at that time
20  one will have -- the code will have all information
21  necessary to make that final decision, because it's
22  happening right now. The evaluation is happening there, so
23  you have the piece of evidence, the pieces of evidence
24  necessary to make that final decision.
25  Q.    Do you have an opinion as to whether the fourth

446

Vigna - direct

1  element of Claim 4 of the '822 patent is infringed by the
2  Webwasher product?
3  A.    I do have an opinion. I think it does.
4  Q.    Is it based upon the source code, the appliance, and
5  the documents you reviewed?
6  A.    Correct.
7  Q.    Could you just jump into the Internet setup here and
8  show how sandboxing works in the real world?
9  A.    Yes. For example, in this particular case, here, for
10  example, here I have some, a malicious script that I just
11  tried to download. Webwasher identified that there is
12  something fishy that cannot be determined at run time.
13         But since I have a script security policy
14  configured, it will just say forget about it. I will not
15  even try to execute.
16         So let me change the rules of the game a little
17  bit, and let me for a second wear the hat of the
18  administrator of Webwasher.
19         So I am loading in, go to my anti-malware, and I
20  go to practice scanning, setup wizard.
21         Instead of doing a strict level, I can, for
22  example, this is actually medium, let's do relaxed.
23         Then let's do medium.
24         Let's see if this works. Okay, just wait a few
25  seconds for that to be put in place.

447

Vigna - direct

1          And now, when I reload these contents, as you
2  will see -- okay. I see what happens. Let me just try
3  this.
4          We have two sessions going on and I don't want
5  to confuse it.
6          So let's download this again.
7          Here you can see, look, for example, at this
8  particular piece of code.
9          So in my original code, you see this code. It
10  was encrypted data. So my code was actually encrypted. And
11  then it was on the fly decrypted and executed, because it's
12  one of the script languages that can create code on the fly
13  and execute it.
14         So you can see that the original source code has
15  been modified to add this ww filter code so that when eval
16  is called, okay, actually, the code is first filtered and
17  not executed, effectively implementing a sandbox system.
18         So this shows how the sandbox is actually
19  executed.
20  Q.    With respect to the dependent claims on the '822,
21  Claim 5 requires that the sandbox package is formed such
22  that the mobile protection code will be executed by the
23  information destination before the downloadable information?
24  A.    Correct. This means that the code that is shipped
25  with the downloadable is interposed before the actual

448

Vigna - direct

1  downloadable code is executed. Otherwise, the sandboxing
2  would be ineffective. This means that the injected code, as
3  we have seen, will be executed before the actual code is
4  executed.
5  Q.    Based on your review of the source code and the
6  appliance and the documents in this case, do you believe
7  that Claim 5 is infringed by the Webwasher product?
8  A.    I do believe that, because that's exactly what
9  happens.
10  Q.    And in Claim 6, that is a method wherein the sandboxed
11  package further includes protection policies according to
12  which the mobile protection code is operable.
13  A.    Yes.
14  Q.    Would you explain what that is talking about?
15  A.    So, okay, we have to hook this function call, so that
16  our sandboxing code is executed before the downloadable.
17  But also we have to imbed in this hooked code all the policy
18  that will tell yes or no, do it or don't do it, whenever the
19  code is executed.
20         Actually, if you remember, you showed a piece of
21  documentation before where exactly it would say, from the
22  Webwasher documentation, that would say, and we are going to
23  send the protection code with the downloadable, and in
24  addition, the security policy, to determine what can and
25  cannot be done.

449

Vigna - direct

1      So it is a direct correspondence with this.
2    Q.    Based upon your review of the source code, the
3    appliance, and the documentation in this case, do you have
4    an opinion as to whether Claim 6 of the '822 patent is
5    infringed by the Webwasher product?
6    A.    Yes, that's my opinion.
7    Q.    And Claim 8 is a claim which requires the protection
8    policies correspond with at least one of the information
9    destination and a user of the information destination?
10   A.    Yes.
11   Q.    What is that talking about?
12   A.    Well, the protection policies are associated with the
13   particular client receiving the code.  So the code is
14   customized depending on the particular client, the
15   particular type of user, and this would infringe.
16   Q.    And do you have an opinion as to whether the Webwasher
17   product infringes Claim 8 of the '822 patent based on your
18   review of the source code and --
19   A.    Yes, my opinion is that it does.
20   Q.    Let's go back to Claim 4 very quickly.  Did you find
21   that every element of Claim 4 is literally in the Webwasher
22   product?
23   A.    Yes.
24   Q.    And did you find at the very least that the Webwasher
25   product contains an equivalent of every element of Claim 4

450

Vigna - direct

1    in the '822 patent?
2    A.    Yes.
3    Q.    Specifically, at the very least does the Webwasher
4    product perform substantially the same function of Claim 4?
5    A.    Yes, sir, it does.
6    Q.    That is every element of Claim 4?
7    A.    Yes.
8    Q.    At the very least does the Webwasher product perform
9    in substantially the same way as every element in Claim 4?
10   A.    Yes.
11   Q.    At the very least does the Webwasher product yield the
12   same result as every element in Claim 4?
13   A.    Yes.
14   Q.    Are the materials you relied on for your literal
15   infringement opinion the same documents that you relied on
16   for your doctrine of equivalents opinion?
17   A.    Correct.
18   Q.    This will be the last asserted series of claims,
19   Claims 12 and 13 of the '822 patent.  This is a
20   processor-based system, as opposed to a method.  It has four
21   elements.  The first element is an information monitor for
22   receiving downloadable information.  Do you understand what
23   that is referring to?
24   A.    Yes.  The information monitor is a fancy term to say
25   intermediary between a client and a server, it is something

451

Vigna - direct

1    that monitors the exchange of information between a client
2    and a server.  And therefore, Webwasher directly watches
3    this definition, as it can act as an intermediary and
4    receives the downloadable information.
5    Q.    So in your opinion, does the Webwasher product
6    infringe the first element of Claim 12?
7    A.    Yes, it does.
8    Q.    And you base that on the review of the source code,
9    the appliance itself, and the documents you reviewed?
10   A.    Correct.
11   Q.    The second element is a content inspection engine
12   communicatively coupled to the information monitor for
13   determining whether the downloadable information includes
14   executable code.
15      Could you explain what that is referring to?
16   A.    So a content inspection engine, again, by engine,
17   usually one refers to the component as some active behavior,
18   so in this case, it is a component that inspects, analyzes,
19   the content of the information to determine if the
20   downloadable information includes executable code.
21      Again, this is a fancy, technical way to say,
22   there is an intermediary, there is a downloadable that comes
23   in, and there is something that acts as the downloadable and
24   says, oh, is there any code inside this?
25   Q.    And based on your review of the source code, the

452

Vigna - direct

1    Webwasher appliance, and the documents in this case, do you
2    have an opinion as to whether the B element of Claim 12 is
3    infringed by the Webwasher product?
4    A.    Yes, I think it does infringe.
5    Q.    Is that based --
6    A.    Based on the analysis of the source code, the
7    documentation, and the use of the appliance.
8    Q.    The C element is a packaging engine communicatively
9    coupled to the content inspection engine for causing mobile
10   protection code to be communicated to at least one
11   information destination of the downloadable information, if
12   the downloadable information is determined to include
13   executable code.
14      Do you see that?
15   A.    So, again, engine here is used as component, active
16   component.  And this component is responsible for modifying
17   the downloadable or extend it with this mobile protection
18   code, which are those ww functions that I showed you before,
19   that will, you know, intersect the actual action performed
20   by the downloadable and verify that they don't violate the
21   policy of the system.
22   Q.    Previously, when we were looking at PTX-10, on Page
23   16, the paragraph below the image there, you described this
24   earlier, how does that relate to the claim element here?
25   A.    That is exactly what I am talking about.

453

Vigna - direct

1    So here it's clear that the sandboxing code is

2    injected into JavaScript and VBScript, for example, along

3    with the gateway security policy, along with the code

4    necessary to make the decision on the client side whenever

5    necessary. And this package, so this thing that has been

6    prepared by a component that packages the downloadable, with

7    the protection code is sent to the client computer.

8         Then it says, of course, that the script code

9    will be executed and monitored in an environment where the

10   sandboxing function will intercept suspicious function codes

11   and further inspect them with respect to the policy. And if

12   malicious behavior is recognized, then the sandbox will

13   block and would erect the browser.

14   Q.   Based upon what you just described and your view of

15   the source code and the other documents and the appliance,

16   do you have an opinion as to whether the C element of Claim

17   12 is infringed by the Webwasher product?

18   A.   Yes. Based on that information I found that the

19   Webwasher product infringe the patent claim.

20   Q.   And the final element of the Claim 12, wherein the

21   packaging engine comprises an MPC generator for providing

22   the MPC, a linking engine coupled to the MPC generator for

23   forming a sandbox package including the MPC and the

24   downloadable information, and a transfer engine for causing

25   the sandbox package to be communicated to at least one

454

Vigna - direct

1    information destination. Could you describe what that is?

2    A.   Yes. I know it doesn't look like this, this is a

3    fancy way to say, again, the same thing, that there is a

4    packaging, an active component that will package the

5    original downloadable with additional code, called mobile

6    protection code, that will create a sandbox. So again, when

7    the downloadable tries to execute a dangerous operation, the

8    sandboxing code will be executed instead. And the decision

9    will be made at that time based on the security policy

10   enforced by the Webwasher appliance.

11   Q.   If we look at PTX-9, going back to that little figure

12   we had, if you look at the last line, it says before

13   transport to the client computer, that last line in the

14   paragraph above the image?

15   A.   Correct.

16   Q.   When we talk about transport to the computer, is that

17   the transport engine that we are referring to in this last

18   element?

19   A.   Yes, the packaging engine together with the code

20   before the downloadable, before it is sent to the client

21   computer so the client computer will benefit from the

22   protection code.

23   Q.   Given your review of the source code, the appliance,

24   and all the documents in this case, do you have an opinion

25   of whether the last element of Claim 12 is infringed?

455

Vigna - direct

1    A.   Yes. And my opinion is that it does.

2    Q.   Is it infringed by the Webwasher product?

3    A.   Correct.

4    Q.   Did you find that every element of Claim 12 of the

5    '822 patent was literally infringed by the Webwasher

6    product?

7    A.   Yes, I think so.

8    Q.   Did you find at the very least the Webwasher product

9    contains an equivalent of every element of Claim 12?

10   A.   Yes. I think it does.

11   Q.   Specifically, at the very least does the Webwasher

12   product perform substantially the same function as all the

13   elements of Claim 12?

14   A.   Yes, it does.

15   Q.   At the very least, does the Webwasher product perform

16   in substantially the same way as a every element in Claim

17   12?

18   A.   Yes, it does.

19   Q.   At the very least does the Webwasher yield essentially

20   the same results as every element of Claim 12?

21   A.   Yes, it does.

22   Q.   And the last claim is a dependent claim, Claim 13, it

23   says the same elements of Claim 12 wherein the packaging

24   engine further comprises a policy generator communicatively

25   coupled to the linking engine for providing protection

456

Vigna - direct

1    policies according to which the MPC is operable. Do you

2    have an opinion as to whether that claim is found in the

3    Webwasher product?

4    A.   This particular claim is a fancy version, something

5    that says that there is some kind of policy that is included

6    with a downloadable so that it is applied whenever on the

7    client's side the sandboxing code is executed. And, yes,

8    Webwasher does that, sends the security policy, together

9    with the mobile protection code or the mitigation code, as

10   they call it, to the client side. And therefore, I think,

11   it does infringe this patent claim.

12   Q.   Can I check that box?

13   A.   You can check that box.

14        MR. ANDRE:  Your Honor, might I have one moment,

15   please?

16        (Pause.)

17   BY MR. ANDRE:

18   Q.   Dr. Vigna, when you were reviewing the source code for

19   the Webwasher product, and you were searching around, did

20   you come across Finjan's name in the source code?

21   A.   Yes. Actually, I did. Out of curiosity, I searched

22   for Finjan across the code and found a few references to it

23   in the tree of information that was associated with the

24   source code.

25   Q.   Could you do that search now and see if you can find

457

Vigna - direct

1 it again?

2    A.    I can. What I am going to do here is look for the
3 Finjan word in everything. It might take a few seconds.

4             Right now, this command is recursively searching
5 every single file within the ww CSM 510 directory, looking
6 for the word Finjan in any position in any file.

7             Okay. Just found something. For example, in
8 this case there is a file called ww 350 MR project. I guess
9 it's a project file. In this particular case, for example,
10 there is this, I guess this is what triggered it, "Finjan
11 buster needs research."

12             This would be one of those. But we can complete
13 the search on all the code.

14             You can see here, this says function helps to be
15 competitive with products from Finjan. These are the things
16 that triggered that particular search. This is something
17 else from another version of Webwasher, 6.5.3, to be
18 precise. And in this particular code, again, we have, you
19 know, something here, it must be -- here it is. Function
20 helps to be competitive with Finjan. Increased security.

21    Q.    Is it still searching or is that it?

22    A.    Still searching. It will take another few seconds.
23 Not very long, though.

24             (Pause.)

25             I notice in the next-to-the-last line, Finjan Bu

458

Vigna - direct

1 after needs research. Is that the same reference as you
2 noted earlier?

3    A.    Yes, it is the same task referred to in a different
4 source file.

5    Q.    It is right before this proactive security note. Is
6 that correct?

7    A.    I am not an expert in this, on project files. I think
8 this is an XML description of a task that had to be
9 performed by somebody, and that's what is described here.
10 That's another similar task, you can see the Finjan buster
11 again referenced here. These are copies of pretty much
12 exact same thing.

13             MR. ANDRE: Thank you very much, Dr. Vigna. I
14 appreciate your time today.

15             Your Honor, we have no further questions of Dr.
16 Vigna.

17             THE COURT: That will bring us to the end of our
18 day, ladies and gentlemen.

19             Please remember my instructions to you of
20 yesterday and earlier. We will see you back at 9:00
21 tomorrow.

22             (Jury leaves courtroom at 4:21 p.m.)

23             THE COURT: Doctor, you are excused for the day.

24             THE WITNESS: Thank you very much, Your Honor.

25             MR. SCHUTZ: Your Honor, may we have the usual

459

Vigna - direct

1 instruction?

2             THE COURT: Yes. Doctor, you are under
3 examination and therefore should not discuss your testimony
4 with your counsel or anyone.

5             THE WITNESS: Okay. Thank you.

6             MR. SCHUTZ: One housekeeping matter.

7             THE COURT: That is why I stayed.

8             MR. SCHUTZ: We would like the transcript of his
9 testimony under seal because it made a lot of references to
10 very specific functionalities in the source code, which if
11 it became public would enable someone to more easily hack
12 through Webwasher. And we don't want that to happen.

13             THE COURT: Any objection?

14             MR. ANDRE: No objection.

15             THE COURT: We will do that.

16             Anything else in advance of tomorrow?

17             MR. HOLDREITH: Your Honor, it would be helpful
18 to us if we could just inspect Dr. Vigna's setup over there
19 a little bit. Counsel said that would be all right. I
20 wonder if the courtroom is available for 15 minutes or so.

21             THE COURT: Sure.

22             Is there a more recent than when the PTO was
23 submitted iteration of the proposed final jury instructions
24 floating around anywhere?

25             MS. KOBIALKA: I don't think so. We are still

460

Vigna - direct

1 working through some of those issues.

2             THE COURT: I would like to have one tomorrow by
3 the end of the day, see where you are.

4             What about the verdict form, have you been
5 discussing the verdict form at all?

6             MS. KOBIALKA: We have exchanged some e-mails
7 about it. We will get that as well.

8             THE COURT: I should think that you would be
9 able to consolidate into one document your proposals as to
10 the verdict form. I see some differences. I am not sure
11 that I know the reason for them.

12             One side may prefer one form and another
13 another. I see in Secure's here, there is mention made of
14 patent exhaustion, at least in the iteration I have, and
15 licensing, barred by license or release. That may be
16 another interrogatory. If you can't, you can't. But if you
17 can, good.

18             See you tomorrow.

19             (Court recessed.)

20                   - - -

21 Reporter: Kevin Maurer

22

23

24

25

461

IN THE UNITES STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

FINJAN SOFTWARE LTD.,          :   Civil Action
                               :   No. 06-369(GMS)
                Plaintiff,     :

       v.                      :

SECURE COMPUTING CORPORATION,  :
CYBERGUARD CORPORATION,        :
WEBWASHERE AG and DOES 1       :
THROUGH 100,                   :
                               :
                Defendants.    :

- - -

Wilmington, Delaware
Tuesday, March 4, 2008    *Wed. Mar 5*
8:30 a.m.
Day Three of Trial

- - -

BEFORE: HONORABLE GREGORY M. SLEET, Chief Judge,
                                    and a Jury

APPEARANCES:

       PHILIP A. ROVNER, ESQ.
       Potter Anderson & Corroon LLP
                -and-
       PAUL J. ANDRE , ESQ.,
       LISA KOBIALKA, ESQ.,
       JAMES HANNAH, ESQ.,
       MEGHAN WARTON, ESQ.,
       KRIS KASTENS, ESQ.,
       HANNAH LEE, ESQ.
       King & Spalding
       (Silicon Valley, California)

                         Counsel for Plaintiff

462

APPEARANCES (Continued):

       FREDERICK R. COTTRELL, III, ESQ., and
       KELLY J. FARNAN, ESQ.
       Richards, Layton & Finger
                -and-
       RONALD J. SCHUTZ, ESQ.,
       CHRISTOPHER A. SEIDL, ESQ.,
       TREVOR J. FOSTER, ESQ., and
       JAKE M. HOLDREITH, ESQ.
       Robins, Kaplan, Miller & Ciresi, L.L.P.
       (Minneapolis, MN)

       Counsel for Defendants

463

THE COURT: Good morning. Please be seated.
There are some issues?

MR. ANDRE: Good morning, Your Honor.

THE COURT: Mr. Andre.

MR. ANDRE: We have a couple issues regarding
deposition designations. With we are going to finish with
Dr. Vigna today. We will put our damages expert in.

THE COURT: Is he actually going to finish
today?

MR. ANDRE: We will be closing our case today.
Defendants have deposition designations they are going to
play into the record on videotape. We have the same
objection from both of them. There is a subject matter
regarding our 8 --

THE COURT: To the entire --

MR. ANDRE: A portion of both of them, they
relate to a recall of our product, our latest product, 8.5
version. It is highly prejudicial, and has absolutely no
bearing on validity in this case whatsoever. That is the
basis.

THE COURT: All right. Mr. Schutz.

MR. SCHUTZ: First, a minor correction. I think
we are readings them in. Yes.

The issue, Judge, is in response to their
allegations that their product has been commercial licensee

464

successful and they have put that out there front and center
and it's merely rebuttal to commercial success.

I think it also probably relates, at least at
some level, to their argument that we copied their product,
although it is the later of these but it goes right to the
heart of commercial success.

THE COURT: Sounds like it does to me,
Mr. Andre.

MR. ANDRE: This is a version, Your Honor, that
was released two months ago. In --

THE COURT: You are saying the version that was
recalled?

MR. ANDRE: Yes. This is the last couple
months. In deposition took place in October 2007. It was a
hardware problem. That product has hit the market now,
widely successful. We have had our best quarter ever in the
fourth quarter.

So what -- if you see the testimony, Your Honor,
it is just a couple pages. I can hand this up if you would
like to see it.

THE COURT: I think I have the issue.

Mr. Absolute, I don't want to have a mini-trial
on this issue, if we can avoid it. I understand your point.
Why don't you react to, Mr. Andre has just indicated that
this is a later version -- is it an entirely different

465

1  product or a later iteration of an earlier product?

2          MR. ANDRE: It is the newest version. It is a

3  later iteration. It is software updates.

4          THE COURT: There was a recall?

5          MR. ANDRE: Yes, based on a hardware issue.

6          THE COURT: Is that made clear in the dep

7  segments that you want to read, Mr. Schutz?

8          Take a moment.

9          MR. SCHUTZ: Your Honor, as I understand it,

10  it's actually three separate versions, and that will be

11  clear in here. It's about the last year and a half. And

12  their corporate rep got up there and said, It's a great

13  product and we have a great company. It is a rebuttal to

14  that. I think we are entitled to that as a matter of

15  fairness.

16          THE COURT: Do you have a witness to explain

17  this, if we get into this?

18          MR. ANDRE: We do, Mr. Ben-Itzhak. But it is

19  not relevant to any issue in this case.

20          THE COURT: It may be. Mr. Schutz and his team

21  say it is, he says there is three different versions. We

22  can parse it if you want. We have a few moments, if we can

23  narrow the focus a little bit and identify with greater

24  particularity what we are talking about.

25          If it is a later version that's not the subject

466

1  of a commercial success attack, or lack thereof, then I can

2  understand your point. But I agree with Mr. Schutz that it

3  goes to the issue of commercial success.

4          It may be prejudicial, but if it is a version of

5  the software, you say it's a version of one of the

6  inventions that is at issue, it seems to me, it is fair

7  game. Why don't you go ahead.

8          MR. ANDRE: I am looking at this testimony, it

9  is regarding Version 8.5 that's what Ms. Kaye talks about

10  and that's also what Mr. Frommer is speaking about.

11          THE COURT: This is the version that you say --

12  what is it you say about this?

13          MR. ANDRE: It was released just a few months

14  ago. What happened in this deposition regarding Ms. Kaye,

15  she is quite humorous, by the way, she is a technical

16  writer. The defendant's counsel went on our website and

17  pulled the user manual for 8.5, when they asked her, Is this

18  product released yet? This is October of 2007. She says

19  that's not released.

20          THE COURT: Let's see if we can do it this way.

21  It may be easier, if there is agreement, if there is not,

22  then it is not going to be easier.

23          Mr. Schutz, do you agree, if this is a later

24  version, a product that was released a couple months ago and

25  therefore perhaps not relevant and not subject to the attack

467

1  that you would like to make, if you would agree on that

2  principle, maybe the two of you could talk.

3          MR. SCHUTZ: The top line there, Judge. Upgrade

4  from Version 8.4 to 8.43. There is 8.5 later on, he says.

5  It is more than just 8.5. It says, so the quality problem

6  is related to hardware problems with appliances. And there

7  is upgrade problems across versions. That is the answer.

8  It goes to more than 8.5. It's not just the layout test

9  version.

10          THE COURT: The playing field will stay level

11  here. I want to make sure we are talking about the same

12  version, Mr. Andre. He says 8.4, 8.43.

13          MR. ANDRE: They are talking about upgrades,

14  automatic upgrades from 8.43 to 8.5. 8.5 is the recall.

15          THE COURT: I am going to overrule the

16  objection. You can put on a witness. You have already

17  explained the reason. I am sure you can explain it to the

18  jury.

19          MR. ANDRE: Thank you, Your Honor. Ms. Kobialka

20  will explain our issue.

21          MS. KOBIALKA: Good morning, Your Honor.

22          THE COURT: Good morning.

23          MS. KOBIALKA: They indicated that their expert

24  is going to be relying on JTX-37, which are some handwritten

25  notes of one of their witnesses that was on their will-call

468

1  witness. I understand this witness is no longer coming.

2  There has been no authentication or foundation for this

3  particular exhibit.

4          MR. HOLDREITH: We plan to use this exhibit in

5  cross-examination of Dr. Vigna. This is an exhibit that was

6  hand-drawn by one of the WebWasher employees in Germany at

7  the request of Mr. Hannah that to illustrate how WebWasher

8  can be configured.

9          Mr. Hannah had the opportunity to cross-examine

10  the witness during the deposition. In fact, the witness

11  drew this at the direction of Mr. Hannah. I showed it to

12  Dr. Vigna during his deposition. I asked him some questions

13  about this configuration of WebWasher. I believe he will

14  testify today that he understands this is a configuration of

15  WebWasher. And there is some testimony that I would like to

16  elicit about how the product operates in this configuration

17  and how that relates to his opinion.

18          THE COURT: You are not offering it as an

19  exhibits?

20          MR. HOLDREITH: I am happy to use it as a

21  demonstrative. I am happy if it comes in as substantive

22  evidence.

23          MS. KOBIALKA: That wasn't the objection. The

24  objection was to Dr. Wallach, their using it.

25          MR. HOLDREITH: My plan was to use it on

469

1  cross-examination. If Dr. Vigna comments on it in some

2  unexpected way, I would like Dr. Wallach to answer that.

3          THE COURT: We can talk about that at the time.

4  Right now, you don't object to the stated intended use.

5      MS. KOBIALKA: As a demonstrative, no.

6          THE COURT: On cross and as a demonstrative.

7      MS. KOBIALKA: That's correct.

8          The other objection we raise is they have

9  indicated they want to use our source code, but they told us

10  they are not going to use it as an exhibit or demonstrative

11  but they want it to be an exhibit in this case. I tried to

12  talk to the other side and meet and confer, and I do not

13  understand their position. If you want to say he looked at

14  the source code, I am okay with that.

15      THE COURT: Who is this?

16      MS. KOBIALKA: The defendants' expert witness.

17      THE COURT: Which expert?

18      MS. KOBIALKA: Mr. Wallach.

19      MR. HOLDREITH: He just wants to refer to the

20  source code, the Finjan source code and he examined him. We

21  did want to put them on notice of that. I am not going to

22  put their source code in the record.

23          MS. KOBIALKA: But they are insisting on putting

24  it as an exhibit on Defendant's Exhibit list. I don't know

25  why you want to make it an exhibit.

470

1          MR. HOLDREITH: We want to refer to it by

2  exhibit number. I am not putting it into evidence.

3          THE COURT: You are not seeking to have it

4  admitted?

5          MR. HOLDREITH: No, Your Honor.

6      MS. KOBIALKA: I want to make sure that the

7  source code is not going to be evidence, so we are clear on

8  the record.

9          THE COURT: You are not going to move its

10  admission, as I understand it?

11          MR. HOLDREITH: No, sir, I will not put the

12  source code in evidence.

13          THE COURT: So the record is clear, it is not in

14  evidence at this point.

15      MS. KOBIALKA: Thank you, Your Honor.

16      THE COURT: Anything else?

17      MR. ROVNER: Your Honor, I have one point. Last

18  evening we sent over exhibits that we are going to use with

19  Mr. Parr today, two of them were IDC reports, I believe to

20  be the IDC man, but they have objected on the same basis on

21  which they have been objecting and which you overruled

22  yesterday. We plan on using at least one, possibly two --

23          THE COURT: I haven't heard Mr. Schutz object to

24  anything. I didn't see Mr. Schutz open his mouth.

25          MR. SCHUTZ: We just have a protocol that at

471

1  10:00 o'clock, we lodge objections. It is always a protocol

2  issue. I understand the Court's ruling.

3          MR. ROVNER: We got it at 11:00. I thought

4  maybe someone had forgotten.

5          THE COURT: Same ruling. We will come back in

6  ten minutes.

7          (Recess taken.)

8          THE COURT: All right. Ms. Walker. Counsel, I

9  hope you are keeping time on one another. This is a timed

10  trial. We will break at 4:00 today. I have a sentencing at

11  4:15. You can leave your stuff there. But I am going need

12  the space at 4:15.

13          MR. HOLDREITH: Your Honor, I discussed with

14  counsel, we are going to start with source code so we will

15  be clearing the courtroom.

16          (Jury enters courtroom at 9:05 a.m.)

17          THE COURT: We will have a bit of an early day.

18  We will break at 4:00 today, ladies and gentlemen, because I

19  have a sentencing at 4:15.

20          All right, Doctor.

21          GIOVANNI VIGNA, having been duly

22  sworn as a witness, was examined and testified as follows.

23          THE COURT: You are still under oath, Dr. Vigna.

24  We are now ready for cross-examination. Mr. Holdreith.

25          MR. HOLDREITH: Thank you, Your Honor.

472

Vigna - cross-examination

1      CROSS-EXAMINATION

2  BY MR. HOLDREITH:

3  Q.    Good morning, Dr. Vigna.

4  A.    Good morning.

5  Q.    At your deposition, you introduced yourself to me as

6  Vigna and that's how I learned to pronounce your name. I am

7  in that habit so I am going to stick with that today.

8  A.    And I say both ways are fine.

9  Q.    In your deposition, you told me to call you Mr. Vigna.

10  I will call you Dr. Vigna today, so if I slip into my old

11  habit, I apologize.

12  A.    Yes. I don't care much about titles.

13  Q.    Yesterday, you ended your testimony by referring to

14  some source code and you did a search for the word "Finjan."

15          Do you remember that?

16  A.    Correct.

17  Q.    Can you do that search again right now and go back to

18  those lines of code that you were pointing out?

19  A.    Yes. You said, "Those lines of code"?

20  Q.    I am going to ask you about that. The references that

21  you found to the word Finjan?

22  A.    All right. So what I did, I ran this command, it's

23  called grap, which will find any occurrence within the

24  directories that contain the source code. So I do this, it

25  will search pretty much everywhere.

473

Vigna - cross-examination

1    It will take a few moments. Recursive, just to
2    give you a filler, the dash it means that it is looking for
3    Finjan regardless of the case of the word. And the -R means
4    that it's looking recursively throughout all folders.
5    Q.    While it is looking, I will ask you a couple of
6    questions, we will let the program run.
7        My question just now, I said you found some code
8    that contained Finjan. And you asked me a question.
9        In fact, the references to "Finjan" here are not
10   in lines of code, are they?
11   A.    No, they are not. I said that I found it in the
12   folders of the source code. That's correct.
13   Q.    These references are, would you agree with me, they
14   are sort of comments or notes that somebody made in the file
15   that are intended for humans to read?
16   A.    My guess, these are an XML coded representation of the
17   tasks in a project management system.
18   Q.    I have a simpler question. These are comments which
19   are intended for humans to read?
20   A.    Well, it depends. The actual format is made to be,
21   it's X amount, so it is not directed to a human to read like
22   this. It is directed to be parsed by an application. And
23   the content, itself, is, as you can see, natural language,
24   English. And it is common, written by a human, possibly, to
25   be read by a human.

---

475

Vigna - cross-examination

1    Q.    And the other reference you found was the one that
2    said, "Finjan buster needs research"?
3    A.    Correct.
4    Q.    Did you find any other references to Finjan in this
5    search?
6    A.    We will let the program finish. I don't think so.
7    But let the program finish and I will be able to tell you
8    with certainty.
9    Q.    Let's talk about these two while the program is
10   running.
11       Right now, the program is running in the
12   background looking for Finjan in other places?
13   A.    Correct.
14   Q.    Since you have got this one highlighted, "Finjan
15   buster needs research."
16       You know that WebWasher employees wrote the code
17   for WebWasher. Right?
18   A.    Well, I don't really know that.
19   Q.    You didn't study that?
20   A.    No, I didn't do any analysis or code attribution.
21   Q.    Now, you know that there is a lot of code in
22   WebWasher. You have been searching through it?
23   A.    Yes.
24   Q.    In fact, the program is still running, searching
25   through it?

---

474

Vigna - cross-examination

1    Q.    And do you understand that these are sort of like
2    notes in the file about something that was happening?
3    A.    Notes in the file --
4    Q.    So these are notes that a human can read to try to
5    understand what was happening?
6    A.    Correct.
7    Q.    You found one reference here on the screen, and it
8    sort of breaks awkwardly at the bottom. It is in that third
9    line up from the bottom, where it says, Note equals Finjan
10   buster needs research, period.
11       Is that the reference you were pointing out?
12   A.    I mean, I was pointing out function helps to be
13   competitive with products from Finjan. And -- where is
14   that? "Finjan buster needs research," which is here.
15       Whenever Finjan appears, which is the result of
16   applying that particular message here, we have, you know,
17   more results that say, I guess, the same thing. But if it
18   prints, it means that somewhere the word "Finjan" is there.
19       For example, again, here we have --
20   Q.    Dr. Vigna, you are giving me a longer answer than I
21   really called for. I don't want to cut you off. But I am
22   asking a simple question right now.
23       The reference you found yesterday includes this,
24   Function helps to be competitive with products from Finjan?
25   A.    Yes.

---

476

Vigna - cross-examination

1    A.    Correct.
2    Q.    And you know that it takes time and efforts to write
3    code?
4    A.    You are asking me in general?
5    Q.    Yes. It doesn't write itself?
6    A.    Of course. A human being has to actually write the
7    code.
8    Q.    And you know that people had to write code that could
9    analyze a downloadable and characterize the behavior of that
10   downloadable in ProActive scanning?
11   A.    Yes.
12   Q.    And you know that there are hundreds of rules in the
13   database of heuristic rules in WebWasher?
14   A.    Actually, I haven't counted them, so that's what you
15   are telling me or you are asking me?
16   Q.    I am asking you. You have seen references to Rule
17   400, Rule 800?
18   A.    Well, you know, if the rules are -- you know, I can
19   call Rules 100, 200, 300, and I have three rules. I haven't
20   counted them. But if you want, I can count them and give
21   you an answer.
22   Q.    I don't need you to do that right now.
23   A.    Some time.
24   Q.    You know the rules are numbered in the hundreds?
25   A.    Yes, they are numbered.

477

Vigna - cross-examination

1    Q.    And it takes time to write hundreds of rules -- let me
2    withdraw that question.
3              A person had to write those rules?
4    A.    Not necessarily. Sometimes rules can be automatically
5    generated.
6    Q.    You know that the rules in the heuristic database were
7    written by people. Right?
8    A.    I don't know that.
9    Q.    You don't, all right.
10             Now, "Finjan buster needs research here," isn't
11   it reasonable to conclude that that is a reference to, We
12   need to do work on this Finjan buster project?
13   A.    Sorry. Can you repeat the question? I don't
14   understand what you are asking.
15   Q.    When somebody wrote, "Finjan buster needs research"
16   here, isn't it reasonable to conclude that person was saying
17   we need to work on this project?
18   A.    Need to do research on the Finjan buster, yes.
19   Q.    The other comment that you found, and maybe you can
20   highlight it here so we can see it, a function helps to be
21   competitive with products from Finjan.
22             Do you see that?
23   A.    Yes.
24   Q.    Did you do any investigation to figure out what
25   function that is referring to?

478

Vigna - cross-examination

1    A.    No.
2    Q.    And you did a report in this case. Right? You gave
3    an expert report?
4    A.    Yes, I did.
5    Q.    And in your expert report, you didn't make any
6    reference to these Finjan references, did you?
7    A.    I didn't.
8    Q.    Is this some research you did recently after your
9    report?
10   A.    This is not. I mean, I looked for Finjan, actually,
11   when I reviewed the source code. And I saw that there was
12   these comments in the code.
13   Q.    It's fair to say you didn't think it was worth
14   mentioning that in your report?
15   A.    Well, my report had a different -- I mean, in my
16   report, I was looking at the claims and finding infringing
17   parts in WebWasher for each of the claims. And that was my
18   job.
19   Q.    You didn't think that this was important enough for
20   that analysis to mention it. Is that right?
21   A.    Well, yes. To that degree, I think that this is
22   not -- that was not my role.
23   Q.    And you know that Finjan and Secure Computing compete
24   with each other?
25   A.    I do know, yes.

479

Vigna - cross-examination

1    Q.    You know that one of the ways they compete is they try
2    to build products that are competitive with each other?
3              MR. ANDRE: Objection, Your Honor. Lack of
4    foundation. He is a technical expert, not a competitive
5    expert.
6              THE COURT: Sustained.
7    BY MR. HOLDREITH:
8    Q.    In any event, Dr. Vigna, you were not asked to find
9    any code here and determine whether it had been written as
10   original work by any WebWasher people?
11   A.    Sorry. Can you repeat that question?
12   Q.    I will repeat the question. In your investigation,
13   you were not asked to determine whether WebWasher code was
14   the original work of WebWasher employees?
15   A.    No, I wasn't asked to do that.
16   Q.    And you are not offering any opinions one way or
17   another on that?
18   A.    No.
19   Q.    And, in fact, these comments are simply comments that
20   show people at WebWasher were working on product?
21   A.    I haven't done any research on that to be able to give
22   you a definitive answer. I know that these are tasks. They
23   look like tasks that were assigned to WebWasher people at a
24   certain point in time.
25   Q.    And their task is to go do some work and write some

480

Vigna - cross-examination

1    code and come up with a product?
2    A.    It says, Do research, we need to do research on the
3    Finjan buster. That's all I can say.
4    Q.    Now I want to ask you about a demonstration that you
5    did yesterday that related to a CyberGuard web page.
6              Do you remember that?
7    A.    Yes.
8    Q.    Can you switch over to that system?
9    A.    Okay.
10   Q.    And pull that page up.
11   A.    So the page you are asking me about is the CyberGuard
12   page?
13   Q.    That's right.
14   A.    Is this the page?
15   Q.    Yes.
16             MR. ANDRE: Your Honor, I would like to unseal
17   the record now. Source code.
18             THE COURT: Okay. Is there someone in the
19   courtroom that should not be here?
20             MR. ANDRE: We will bring them in.
21             THE COURT: Unseal the record?
22             MR. ANDRE: Yes, Your Honor.
23   BY MR. HOLDREITH:
24   Q.    Dr. Vigna, this is a page from a server, and you found
25   this page on the Internet somewhere. Is that right?

481

Vigna - cross-examination

1  A.   This setup was prepared for me. So I haven't
2  personally prepared this page. But I think that this page
3  was actually prepared by Yuval. And he said that he took it
4  from the CyberGuard website.
5  Q.   Mr. Ben-Itzhak gave this page to you?
6  A.   Yes. I mean, the setup here was given to me, yes.
7  Q.   Can you just scroll down and show us the exe file that
8  you clicked on.
9  A.   (Witness complies.)
10 Q.   You are now pointing to a file called cleanrbin.exe
11 A.   Correct.
12 Q.   Is that an executable file?
13 A.   Yes, that is my understanding.
14 Q.   Is that a downloadable within the meaning of the
15 Finjan patents?
16 A.   Yes.
17 Q.   Is that .exe file the kind of file that has a
18 reference to other components?
19 A.   It might.
20 Q.   Do you know if this one has a reference to other
21 components?
22 A.   I haven't analyzed that file to be able to answer
23 that.
24 Q.   Are there any other components on this server that
25 this cleanrbin.exe refers to?

482

Vigna - cross-examination

1  A.   I have no idea.
2  Q.   You have no idea.
3       All right. Your demonstration here was relevant
4  to the '780 patent. Right? You were showing how the
5  hashing works?
6  A.   Well, also, the '194 patent. Right?
7  Q.   Let me ask you: You were showing how WebWasher
8  creates a hash when you retrieved this file. Right?
9  A.   I also showed how WebWasher blocks this file, because
10 it has some behavior --
11 Q.   I understand that. Right now I want to ask you about
12 the demonstration where you --
13 A.   The hash, okay.
14 Q.   -- where it gets hashed by WebWasher.
15 A.   Correct.
16 Q.   All right? Can you read this from where you are
17 sitting?
18 A.   Actually, I can't.
19 Q.   This is a claim from the '780 patent. Do you
20 understand that?
21 A.   Yes.
22 Q.   And this claim has a limitation that says you generate
23 a downloadable ID to identify a downloadable. Right?
24 A.   Yes.
25 Q.   And it says, if I can just stand over here so I can

483

Vigna - cross-examination

1  read a little better, there is a downloadable that includes
2  one or more references to software components. Right?
3  A.   Yes.
4  Q.   And the components are required to be executed by that
5  downloadable. Is that right?
6  A.   Correct.
7  Q.   So you have two things. You have a downloadable, and
8  you have a component referenced by the downloadable?
9  A.   Yes.
10 Q.   And what this claim says you do is, you fetch at least
11 one software component identified by the one or more
12 references. Right?
13 A.   Yes.
14 Q.   And you perform a hashing function on the downloadable
15 and on the fetched software component?
16 A.   Correct.
17 Q.   Is that right?
18       So you have a downloadable. You have a software
19 component. You have to get both things, get the
20 downloadable, get the component, hash the downloadable and
21 the software component. Right?
22 A.   Yes.
23 Q.   And in your demonstration, you showed WebWasher
24 hashing this cleanrbin.exe?
25 A.   Yes. That was one of the files that I showed the

484

Vigna - cross-examination

1  demonstration for.
2  Q.   But you have no idea whether this cleanrbin.exe has a
3  reference to a software component?
4  A.   Correct.
5  Q.   And you have no idea whether this .exe file, when you
6  clicked on it, whether that caused your computer to request
7  and fetch a separate software component?
8  A.   Say that again?
9  Q.   Sure. When you clicked on the cleanrbin.exe file
10 yesterday, you have no idea whether your computer fetched a
11 software component?
12 A.   Yeah, correct.
13 Q.   And, so, you have no idea whether your demonstration
14 showed infringement of this '780 patent?
15 A.   Well, I see a web page, HTML code being downloaded
16 right now. That code has reference to another downloadable
17 that is cleanrbin.exe. I am sure that there are IDs being
18 created for the page, for cleanrbin.exe, and cleanrbin.exe
19 will ask for more references to different components. Those
20 IDs will be created, also.
21       Another example would be the IO class that you
22 see in the same file that is a Java application. I don't
23 know if it references other systems. But it is clear from
24 what I saw that when you download, for example, a Java
25 applet and a new piece is required, then that new piece is

485

Vigna - cross-examination

1 also hashed for an ID. So that's my understanding.

2 Q.    Hang on --

3          THE COURT: Let him finish his answer.

4          MR. HOLDREITH: Sorry, Your Honor. I meant to

5 ask a very specific question.

6          THE COURT: You did ask a specific question. He

7 was answering it. If you need a follow on, go ahead and

8 follow on. But let him finish his answer.

9          Have you finished, Doctor?

10         THE WITNESS: I am finished, Your Honor, thank

11 you.

12 BY MR. HOLDREITH:

13 Q.    The narrow question I intended to ask is when you

14 clicked on cleanrbin.exe in your demonstration yesterday,

15 you don't know whether cleanrbin.exe fetched a software

16 component?

17 A.    I don't. I know that the page that contains the

18 reference to cleanrbin.exe has been downloaded and there is

19 a reference to these other downloadables.

20         We decided before that, you know, pages with

21 code in it and HTML code represented a downloadable.

22 Q.    Now, you just said, I think, in your answer a moment

23 ago, that if you download a Java applet with a reference to

24 a component, that is downloading a downloadable, with a

25 reference to a software component, and it fetches that

486

Vigna - cross-examination

1 component, and it hashes those things. Right?

2 A.    Yes. Actually, it would be downloading an HTML web

3 page. There is a reference to an applet, which is a

4 reference, possibly, to another component. I don't know,

5 because I haven't reviewed the downloadable Java applet to

6 see if there are these other components.

7          My answer is based on how WebWasher works. What

8 I do, I go into code and I see that whenever there is a

9 reference, this is downloaded and the hash is computed. And

10 that is my, you know, report. Maybe, there could be corner

11 cases where, yes, the page has one reference to

12 cleanrbin.exe and cleanrbin.exe is not referenced anywhere

13 else. The chain of reference has to terminate at a certain

14 point. Otherwise, it would only reference new code and new

15 code. That is my point.

16 Q.    I want to be clear about this, Dr. Vigna. Is the

17 cleanrbin.exe file, in your opinion, is that a component of

18 this web page?

19 A.    It is referenced in this web page.

20 Q.    Is it a component of this web page?

21 A.    Define "component." Can you give me a definition, a

22 component of what?

23 Q.    I am asking within the context of this claim, '780

24 claim, you are the expert here, is the cleanrbin.exe file a

25 component of this CyberGuard web page?

487

Vigna - cross-examination

1 A.    With respect to that patent, I see that I have a

2 downloadable that includes one reference to that

3 cleanrbin.exe, correct. So there is one downloadable, the

4 web page has a reference to these other downloadables

5 cleanrbin.exe.

6 Q.    I understand your opinion is that is a reference. Is

7 it your opinion that cleanrbin.exe is a component?

8 A.    Where do you see component in that?

9 Q.    It says here, It fetches at least one software

10 component?

11 A.    Exactly.

12 Q.    That's what I am referring to.

13 A.    That software component is referenced in the web page

14 and is downloaded as a consequence. It is not a software

15 component of the web page. It is referenced, the software

16 component identified by one of the more references. And I

17 can show you the web page exactly, the URL, and I explained

18 yesterday what a URL is, that is referencing the

19 cleanrbin.exe.

20         Actually, if you let me, I can, if I do this

21 here, I can see exactly the reference that is referencing

22 that component, cleanrbin.exe.

23 Q.    So we have questions here. One is whether there is a

24 reference. The other is whether cleanrbin.exe is in your

25 opinion a component?

488

Vigna - cross-examination

1 A.    It is a component.

2 Q.    Is it a component of this web page?

3 A.    Not of the web page. It is one software component

4 that is referenced by the web page.

5 Q.    And you are willing to stick to that opinion?

6 A.    That's what it is, my opinion, yes.

7 Q.    Now, let's talk a little more about the '780 patent.

8          By the way, you did not reference this

9 cleanrbin.exe file in your report, did you?

10 A.    No, I didn't.

11 Q.    Is this work you did after your report?

12 A.    Well, this is something that I was given as a setup to

13 do a demonstration. My report is based on looking at the

14 code and observing how the code works in the general case.

15 I don't write my report on specific, you know, one single

16 example because there could be a corner case.

17 Q.    I am going to ask you some more about this patent, the

18 '780 patent.

19         Now, do you understand, Dr. Vigna, that the

20 interpretation of hashing here requires that you have to

21 perform a hashing function on the downloadable and the

22 fetched software component together?

23 A.    You want to generate a hash for both of them, yes.

24 Q.    Specifically, as the term has been interpreted in this

25 case, this claim reads, or will be interpreted to read that

489

Vigna - cross-examination

1  you perform a hashing function on the downloadable and the
2  fetched software components together to generate a
3  downloadable ID?
4  A.    Well, together like in time. So all the components
5  that are part of interacting with a certain web page with
6  references, all of them will be hashed, and an ID will be
7  generated for each of them.
8  Q.    More basic question. You understand the Court has
9  interpreted the term in this case?
10  A.    I understand.
11  Q.    You understand the Court's interpretation is, The
12  downloadable and the fetched software component are hashed
13  together?
14  A.    Yes. My understanding is, if I can make an analogy,
15  is that I was describing the mechanism of producing an ID,
16  like putting tags on people at a party, for example. So if
17  I have a bunch of people together in the room, they are
18  together and I will give each of them a label with their
19  name and their ID on it. The fact they are together
20  specially or in time is what means I operate on them as a
21  group together. And each of them separately get an ID.
22  Q.    I am going to show you Joint Exhibit 52 in this case,
23  Mr. Vigna. Did you consider -- could I have the screen,
24  please?
25      Did you consider and were you told about file

490

Vigna - cross-examination

1  history in this case that is relevant to this term
2  downloading and hashing?
3      MR. ANDRE: Objection, Your Honor. We are
4  talking about claim construction. The prosecution
5  history --
6      THE COURT: Let me see counsel.
7      (The following took place at sidebar.)
8      THE COURT: What is the question?
9      MR. HOLDREITH: Your Honor, I want to ask him if
10  he is using interpretation of hashing together, so we have a
11  foundation to answer the infringement contention.
12      MR. ANDRE: Your Honor, Your Honor has
13  interpreted this term. He said he used Your Honor's
14  interpretation. They are going to put the prosecution
15  history up which he did not rely upon in his report because
16  he relied on your instruction.
17      THE COURT: Why are you referencing the
18  prosecution history?
19      MR. HOLDREITH: I want to establish that he did
20  not consider this document in the prosecution history which
21  is relevant to his claim interpretation.
22      THE COURT: He wouldn't have to do that. What
23  is relevant to his claim interpretation is my interpretation
24  of the disputed elements. I am not going to get into a
25  debate between you and the witness as to how he did his job.

491

Vigna - cross-examination

1  Is that what we are about to do?
2      MR. HOLDREITH: I think he is parsing your claim
3  interpretation. I want to establish that.
4      THE COURT: You can establish that. If he is
5  doing that, you have a right to do that.
6      MR. HOLDREITH: I think this document -- I am
7  sorry to interrupt.
8      THE COURT: Go ahead.
9      MR. HOLDREITH: I think this document, where the
10  patentee explains that hashing together means you put them
11  together, you know, hash that and hash that --
12      THE COURT: I want to be careful here. Did he
13  reference this in his report?
14      MR. HOLDREITH: He did not.
15      THE COURT: But he wouldn't have to.
16      MR. HOLDREITH: It impeaches his parsing of your
17  claim construction.
18      THE COURT: That assumes that he is parsing.
19  That is your position. I suspect Mr. Andre says, Well, it
20  is not parsing. And this jury will not understand that
21  anyway, at the end of the day. What you want to establish
22  is he is not following the Court's claim construction?
23      MR. HOLDREITH: That's right, Your Honor.
24      THE COURT: That is fine. Mr. Andre.
25      MR. ANDRE: Your Honor, he just read Your

492

Vigna - cross-examination

1  Honor's claim construction. He said, That's the claim
2  construction I used and this is my understanding of this
3  claim interpretation. He hasn't tried to change that.
4      THE COURT: You want to say that is not the
5  claim construction, not the interpretation, you used another
6  interpretation, your own interpretation?
7      MR. HOLDREITH: That's right.
8      THE COURT: But it is not based on this because
9  he never looked at it.
10      MR. HOLDREITH: Exactly.
11      THE COURT: He wouldn't have to, would he?
12      MR. HOLDREITH: I think it makes his parsing
13  impossible. There is one other issue, which is prosecution
14  history estoppel on this claim element. He testified to the
15  doctrine of equivalents yesterday.
16      THE COURT: Yes.
17      MR. HOLDREITH: And he found equivalent
18  infringement on this claim. I want to establish that he was
19  never told that this limitation was added by amendment, that
20  prosecution history estoppel prevents it.
21      MR. ANDRE: It is not for this witness. It is
22  unfair. This witness has never seen this document. This is
23  legal theory, legal conclusion.
24      THE COURT: I have a problem with what you want
25  to do. In theory, I think it is absolutely appropriate you

## Page 493

Vigna - cross-examination

1  need to do that, if you can. But I am concerned about

2  getting mired in real minutiae, and you need to be

3  concerned, all parties, about this jury's ability to follow

4  what you are saying. It's already difficult enough. This

5  is dense stuff.

6          I think maybe if you can find another way to

7  attack him on this, I would suggest that. I am concerned

8  about this. He didn't use it. I am not going to let you

9  reference it in your cross.

10          If you have something that he is familiar with,

11  that you think you can use, another way you can approach

12  this?

13          MR. HOLDREITH: I can't establish any other way

14  that he did not consider this.

15          THE COURT: You can say he didn't consider it.

16          MR. HOLDREITH: I will just put it in the

17  record.

18          THE COURT: You can get that in.

19          (End of sidebar conference.)

20  BY MR. HOLDREITH:

21  Q.    Dr. Vigna, when we left off, I was asking you: Have

22  you considered the prosecution history in this case in

23  forming your understanding of hashing a downloadable and a

24  fetched component together?

25  A.    I am sorry, I don't understand what you mean by

## Page 494

Vigna - cross-examination

1  "prosecution history."

2  Q.    In fact, if you were here for the video at the

3  beginning of the Court, you saw there is a written record

4  between the Patent Office --

5  A.    I wasn't here for the video. I think you have to

6  explain to me a little bit.

7  Q.    I am not going to spend a lot of time on this.

8          Is it fair to say you didn't look at this

9  document, which is a statement by the patentee about what it

10  means to hash things together?

11  A.    I don't think I read this document.

12  Q.    You weren't made aware that the patentee amended the

13  claims to include a limitation about that?

14          MR. ANDRE: Objection.

15          THE COURT: I am going to sustain that

16  objection.

17  BY MR. HOLDREITH:

18  Q.    Now, Dr. Vigna, WebWasher never --

19          THE COURT: You can take that down, please.

20          MR. HOLDREITH: Yes, sir.

21  BY MR. HOLDREITH:

22  Q.    WebWasher never takes a downloadable and a fetched

23  component and puts them together and makes one hash of those

24  two things together?

25          Do you agree with that?

## Page 495

Vigna - cross-examination

1  A.    Can you define "puts them together"?

2  Q.    Sure. It never takes the downloadable and the

3  component, makes one string out of those, and runs a hash

4  across that whole string to make one ID?

5  A.    It never does that.

6  Q.    What WebWasher does is there is a downloadable, it

7  hashes the downloadable. Right?

8  A.    Yes.

9  Q.    And there is a component, it hashes the component

10  separately. Right?

11  A.    Go ahead. I have to listen to the whole thing before

12  I can say yes.

13  Q.    There is a separate hash for the downloadable and a

14  separate different hash for the component?

15  A.    That's been referenced by the downloadable.

16  Q.    Right.

17  A.    For each of those, it will generate one hash.

18  Q.    So there is two hashes?

19  A.    Correct. If the two -- well, there are two hashes if

20  the two components are different. If they are the same

21  component, it will be the same hash.

22  Q.    Did you ever run an experiment where WebWasher

23  downloaded a downloadable with a component that's identical

24  to the downloadable?

25  A.    No. But I can see exactly when that would happen.

## Page 496

Vigna - cross-examination

1  Q.    Even if you did that, you would still hash the

2  downloadable first and generate a hash?

3  A.    Correct.

4  Q.    And download the component separately and generate a

5  second hash?

6  A.    Correct.

7  Q.    All right. You made an analogy just now about

8  labeling people in a room.

9  A.    Yes.

10  Q.    If you were going to generate an ID for people in a

11  room together, you could take all of that collection of

12  people and generate one ID that says, Here is the ID of that

13  collection of people, couldn't you?

14          MR. ANDRE: Your Honor, may we approach on this

15  issue real quick? I am objecting to this line of

16  questioning. Claim interpretation. I apologize.

17          (The following took place at sidebar.)

18          THE COURT: You know, encounter, we will never

19  get through this witness.

20          MR. ANDRE: Your Honor, I saw where we were

21  going with this. This is the joint claim construction chart

22  that we filed with the Court. The proposed construction

23  they put forward is they were composed together during a

24  single downloadable ID.

25          The Court's claim interpretation got rid of the

Vigna - cross-examination

1    word "single," it said, Generate a downloadable ID. They
2    are going to try to get back to the single.
3         THE COURT: So you are reading his mind?
4         MR. ANDRE: That's where they are going.
5         THE COURT: Where are you going?
6         MR. HOLDREITH: Our understanding of your
7    construction is you put the two together and you make one ID
8    for both of them.
9         MR. ANDRE: That is the claim interpretation
10   that Your Honor rejected.
11        THE COURT: The order is what it is. Let's
12   stick to it. I rejected it. Let's not try to parse that.
13   It seems like you are agreeing that that is where you are
14   going. If that is where you are going, I am going to
15   sustain that objection.
16        Don't push it with me on that, okay? Let's stay
17   within the boundaries of the Court's claim construction
18   order and we will get through this nicely. I think you have
19   a lot of grist for your mill. You don't have to push the
20   envelope on this.
21        (End of sidebar conference.)
22   BY MR. HOLDREITH:
23   Q.   Dr. Vigna, you identified hashing and WebWasher with a
24   cache-ing function. Is that right?
25   A.   What I said is that a hash is used to generate an ID,

Vigna - cross-examination

1    Q.   Now, I want to start with a background question. You
2    did not know of Finjan before your work in this case. Is
3    that right?
4    A.   Correct.
5    Q.   And you were retained to examine the claims and
6    compare them to some products and see if the products did
7    everything that is specified in Finjan's patent claims. Is
8    that right?
9    A.   I was asked to give an objective opinion as to if the
10   WebWasher product was infringing those claims, correct.
11   Q.   And you understand it's the claims that you compared
12   to WebWasher product?
13   A.   Yes.
14   Q.   That's what you did. You compared the claims to the
15   product?
16   A.   I looked at the claims and I tried to find if, in the
17   product, there was anything that would infringe on those
18   claims.
19   Q.   You did not compare the Finjan products to the
20   WebWasher product?
21   A.   Absolutely not.
22   Q.   In fact, you didn't study the Finjan products at all
23   as part of your work in this case?
24   A.   I actually never saw a Finjan product.
25   Q.   Now, I would like to show you Claim 1 of the '194

Vigna - cross-examination

1    which is then used as part of the cache-ing mechanism to
2    identify a downloadable.
3    Q.   So, in WebWasher, when you were pointing out where
4    WebWasher hashes, you pointed to the cache-ing function. Is
5    that right?
6    A.   Well, actually, if you remember, there are two caches
7    going on. There is the web page cache-ing, which is
8    something not related directly to security. It is just then
9    optimization of access to the net.
10        And there is the malware ProActive cache-ing,
11   which is based on storing for a certain amount of time our
12   presentation of the profile, as I said with a downloadable,
13   and that is indexed or identified using the hash.
14   Q.   Exactly. And you can turn that hashing off in
15   WebWasher?
16   A.   Let me check. I think you can.
17        Yes, I think you can.
18   Q.   So the cache-ing is optional?
19   A.   You can turn it off.
20   Q.   All right. Dr. Vigna, now I would like to back up a
21   little bit and talk about how you did your analysis of
22   infringement in this case in general. Do you have that
23   question in mind? I will ask you some specific questions
24   about it.
25   A.   Okay.

Vigna - cross-examination

1    patent. I will get a board so you can see it. I will
2    actually show you Claim 32, which is not the method, it is
3    the system.
4         This is one of the claims that you studied in
5    this case. Is that right?
6    A.   Correct.
7    Q.   And this claim, among other things, requires you to
8    find a server that serves as a gateway to a client?
9    A.   Correct.
10   Q.   It also requires you to find downloadable security
11   profile data pertaining to the downloadable; the
12   downloadable security profile data includes a list of
13   suspicious computer operations that may be attempted by the
14   downloadable. Right?
15   A.   Correct.
16   Q.   And it also requires you to find a downloadable
17   addressed to a client?
18   A.   Again, correct.
19   Q.   And you said, "Again, correct"? You didn't say
20   incorrect. Right?
21   A.   It is correct, sorry.
22   Q.   Those three limitations I just pointed out, those are
23   in every claim of the '194, aren't they?
24   A.   To give, you know, a complete answer, I should review
25   the patent. I don't remember right now. I haven't

Vigna - cross-examination

1  memorized every single claim. But those three things seem
2  pretty important.
3  Q.    I will represent to you, those three are part of every
4  claim in one way or another. Counsel can ask you questions
5  if --
6  A.    I will take your word.
7  Q.    Now, you know there are dependent claims in the
8  patent. Right?
9  A.    Correct.
10  Q.   I am going to show you one of those now.
11  A.   Okay.
12  Q.   This is the '194 patent we see right here. The same
13  patent we are looking at. Right? And at the end of this
14  patent, after all the drawings and all the written
15  description, there are claims.
16        This Claim 32 that we are looking at right now,
17  it has a downloadable addressed to the client. Right?
18  A.   Yes.
19  Q.   It has the downloadable security profile data includes
20  a list of suspicious operations that may be attempted by the
21  downloadable. Right?
22  A.   Yes.
23  Q.   And it has a server that serves as a gateway to the
24  client. Right?
25  A.   Yes.

Vigna - cross-examination

1  BY MR. HOLDREITH:
2  Q.    You understand that if any of these three things are
3  missing, a server that serves as a gateway to a client, a
4  downloadable addressed to a client, or a list of suspicious
5  computer operations, you understand this claim is not
6  infringed?
7  A.    You mean Claim 32 plus 33?
8  Q.    That's right.
9  A.    Yes.
10  Q.   You understand, even if it has everything else, if
11  just one of those is missing, the claim is not infringed?
12  A.   Correct.
13  Q.   You operated a WebWasher appliance, Dr. Vigna?
14  A.   Yes.
15  Q.   And you looked at WebWasher source code?
16  A.   Yes.
17  Q.   There is another product in this case called
18  CyberGuard TSP that you have accused of infringement. You
19  are aware of that?
20  A.   Yes.
21  Q.   You never operated a CyberGuard TSP appliance?
22  A.   I never did.
23  Q.   And you never looked at the source code for a
24  CyberGuard TSP appliance?
25  A.   I reviewed the source code for WebWasher, which is

Vigna - cross-examination

1  Q.    Now, there is a dependent claim right underneath that,
2  Claim 33, it says, The system of Claim 32, then it adds,
3  wherein the downloadable includes a Java applet. Right?
4  A.    Yes.
5  Q.    You understand when it says "the system of Claim 32,"
6  that means Claim 33 has to have everything that is in Claim
7  32 plus what's in 33?
8  A.    Correct.
9  Q.    So in the dependent claims, it's not enough to just
10  find there is an ActiveX control, you still have to find the
11  downloadable addressed to the client, the suspicious
12  computer operations in a list, and the server that serves as
13  a gateway to the client?
14  A.   Correct.
15  Q.   And that's how you did your analysis?
16  A.   Yes. That's my understanding.
17  Q.   And you understand that if WebWasher is missing any
18  one of those three things, none of the claims of this '194
19  patent are infringed?
20        MR. ANDRE: Objection, Your Honor. He is
21  talking about one claim here, not every claim being
22  asserted.
23        THE COURT: Why don't you rephrase that
24  question, Mr. Holdreith.
25        MR. HOLDREITH: Sure.

Vigna - cross-examination

1  included in the CyberGuard appliance, as far as I know.
2  Q.    But you didn't review all of the source code for the
3  CyberGuard TSP appliance, did you?
4  A.    Other than WebWasher included in that product, no.
5  Q.    Okay.
6  A.    I reviewed the code for a few different versions of
7  WebWasher product, which is part of CyberGuard. So I kept
8  myself with that part. And if there is other functionality
9  in the CyberGuard TSP that does other stuff, I haven't
10  reviewed that other functionality because it seemed not
11  relevant for this particular opinion on this infringement.
12  Q.   Dr. Vigna, you know that, as a general matter, in
13  software, software can be locked so that it is unavailable
14  to the user without a key or code or a license or something
15  like that?
16  A.   In general, there are ways to make software inoperable
17  unless you have a key.
18  Q.   And on CyberGuard TSP, you never did anything to
19  evaluate whether WebWasher code on that appliance is locked
20  and unavailable to the client?
21  A.   I did not.
22  Q.   And do you know, from your review of documents in this
23  case, whether WebWasher on TSP is locked and unavailable to
24  the client?
25  A.   I know that it is part of that particular product.

Vigna - cross-examination

1   And I don't have details about what is available or not

2   available and what are the options that a user has, because,

3   in general, when you have a product that has multiple

4   pieces, you can sell it to a user and say, Okay, this is the

5   product and then the user can get all the code. Then,

6   depending on what the user pays in terms of fees, it will

7   activate a certain functionality or another.

8        I cannot review the marketing plan of anybody to

9   decide what really will be activated or not.

10       My information that I got is that WebWasher was

11  part of the CyberGuard TSP, and also that since the patent

12  contains a thing that says if it is in storage, then it is

13  also infringing, that was sufficient to formulate my

14  opinion.

15  Q.   Okay. But, Dr. Vigna, my specific question is: You

16  never evaluated whether WebWasher is locked and unavailable

17  to the client on CyberGuard TSP?

18  A.   For which configuration of the CyberGuard product?

19  Q.   We are asking about the CyberGuard TSP appliance. You

20  understand that?

21  A.   Yes.

22  Q.   You just told us you didn't operate that appliance?

23  A.   Absolutely.

24  Q.   You didn't look at the source code for CyberGuard TSP?

25  A.   Okay. Again, I looked at the source code of part of

---

506

Vigna - cross-examination

1   CyberGuard TSP, which is WebWasher part.

2   Q.   Fair enough. You didn't look at the source code for

3   all of CyberGuard TSP?

4   A.   That's correct. For whatever is not WebWasher, I

5   didn't analyze that code.

6   Q.   Okay. You are not offering any opinion in this case

7   whether or not CyberGuard TSP locks WebWasher and makes it

8   unavailable to the client?

9   A.   Yeah. I don't know that.

10  Q.   You understand that ProActive scanning -- and that's

11  what you looked at in this case, really, isn't it?

12  ProActive scanning?

13  A.   I looked at in this case different things. I looked

14  at ProActive scanning. I looked at the generation of IDs.

15  I looked at, you know, sandboxing and code mitigation. I

16  looked at different things.

17  Q.   Let me ask you about ProActive scanning in particular

18  right now.

19       Did you do anything to determine whether

20  ProActive scanning is a separate module of WebWasher that

21  has to be paid for separately and licensed to the client?

22       MR. ANDRE: Objection, Your Honor. Outside the

23  scope of this witness' testimony.

24       THE COURT: Rephrase.

25  BY MR. HOLDREITH:

---

507

Vigna - cross-examination

1   Q.   You don't have any opinions in this case about whether

2   ProActive scanning is a locked module that requires a

3   separate license?

4   A.   No.

5        THE COURT: That's sustained. Asked and

6   answered.

7        MR. HOLDREITH: Yes, sir.

8   BY MR. HOLDREITH:

9   Q.   You were not asked in this case to identify any actual

10  users of WebWasher, you didn't point to a particular person

11  and say, Here is a company that uses WebWasher?

12  A.   No.

13  Q.   You formed an opinion that WebWasher categorizes

14  behavior of downloadables. Is that fair?

15  A.   My opinion was that WebWasher produces a profile that

16  describes the possible actions that a downloadable can

17  perform, correct.

18  Q.   All right. Now, I want to focus on this '194 patent.

19  In particular, on the list of suspicious operations. All

20  right?

21  A.   Yes.

22  Q.   You said that WebWasher meets this claim element

23  because it implements a ProActive scanning approach. Isn't

24  that right?

25  A.   Are you referring only to the list of suspicious

---

508

Vigna - cross-examination

1   operations?

2   Q.   Right.

3   A.   So my finding was that the process of ProActive

4   scanning includes analyzing a downloadable, decomposing it,

5   and extracting a list of categories of possible behavior.

6   Q.   Exactly. So when you looked for a list, you found it

7   in the ProActive scanning portion of WebWasher. That's

8   where you found the list?

9   A.   You want to know technically the module in which I

10  found it?

11  Q.   You said ProActive scanning in your report?

12  A.   It is part of the ProActive scanning process.

13  Q.   Exactly. You said it is a list of categories of

14  behavior. Is that right?

15  A.   Correct.

16  Q.   Now, you referred to a description of ProActive

17  scanning in the WebWasher step-by-step guide. Do you

18  remember that?

19  A.   If you can refresh my memory with the exact place, I

20  will be happy to remember better.

21  Q.   I have now put on the screen Plaintiff's Trial Exhibit

22  No. 12, which is WebWasher Proactive Step-by-Step Guide.

23       You referred to this document in your report and

24  in your testimony. Right?

25  A.   I believe so. If it's listed in my testimony, then I

Vigna - cross-examination

1  read it.

2  Q.  You remember testifying about this document yesterday?

3  A.  Yeah. You know, I will say that the documents that

4  are reviewed, there were several documents with exactly the

5  same title and similar variations. Whenever I see something

6  popping up, I cannot immediately say, Oh, yes, that is the

7  version that I just talked about. I want to be precise.

8  That is my only concern.

9  Q.  Then let's look at the language. You referred to this

10  language in the step-by-step guide about behavioral

11  heuristics in your testimony. Right?

12  A.  Yes.

13  Q.  And, Dr. Vigna, this is where you find the list of

14  categories of behaviors. Is that right?

15  A.  Yeah. Classified a defective operation or behaviors

16  using a set of context-sensitive heuristic rules.

17  Q.  And you relied on this document?

18  A.  Yes. That was part of the document that I used to

19  form my opinion.

20  Q.  And this document, in your opinion, is an accurate

21  description of how WebWasher's ProActive scanning works?

22  A.  Actually, the only accurate description is the code

23  itself. This is, I guess, a white paper. So, as I said

24  before, this is a mix of technical information and

25  simplifications that are introduced in order to make the

Vigna - cross-examination

1  matter more understandable. So sometimes it is not, you

2  know, technically, technically precise. My role as an

3  expert is to read this, read the code, look at the appliance

4  and try to figure out what's really going on. That's what I

5  write about.

6  Q.  Dr. Vigna, when you relied on this description in the

7  step-by-step guide, you didn't have any disagreements with

8  it, did you?

9  A.  A disagreement? I don't think that they are lying

10  here.

11  Q.  Now, you said that WebWasher uses category flags to

12  characterize the behavior of a downloadable. Is that right?

13  A.  Yeah. I put category flags in quotes.

14  Q.  And you looked at some other documents yesterday. Let

15  me just ask you: There is a more detailed description here

16  of behavioral heuristic in WebWasher. Right?

17  A.  Yes.

18  Q.  And this is a description of ProActive scanning in

19  WebWasher?

20  A.  Correct.

21  Q.  And it's a description of how WebWasher categorizes

22  behavior. Right?

23  A.  Wait a moment.

24  Yes, it describes how WebWasher analyzed the

25  functions and extracts this list of possible actions,

Vigna - cross-examination

1  behaviors.

2  Q.  This description continues on the next page. This is

3  just more detail on how WebWasher categorizes behaviors?

4  A.  Okay.

5  Q.  Is that right?

6  A.  Yes. It says that, you know, as more rule matches,

7  more behaviors are added to the list.

8  Q.  Do you see on this document there is some lines that

9  are in a box that's called Picture 8?

10  A.  Correct.

11  Q.  Would you agree with me those are lines in a

12  downloadable that WebWasher is looking at?

13  A.  Well, actually, in this particular description, it

14  says that it's an example layout of a sliding context. It's

15  not very clear what it is. It doesn't explain what FC and

16  PV are. So it's difficult to say precisely what this figure

17  means.

18  Q.  You don't know that function -- FC refers to function

19  calls?

20  A.  Correct, function calls.

21  Q.  And PV refers to parameter values?

22  A.  Right.

23  Q.  And this is a picture of some function calls and

24  parameter values in a downloadable?

25  A.  Is that what you know, that that is the case?

Vigna - cross-examination

1  Q.  You don't know?

2  A.  I am getting from you the information that "FC" is

3  function call and "PV," parameter values. But it makes

4  sense.

5  Q.  You are the expert, Dr. Vigna.

6  A.  I just don't want to give an opinion to something that

7  is not clear. You are giving me the information about how I

8  should interpret this picture. I am glad to within the

9  context, if you are giving me that information.

10  Q.  In any event, this is part of the description of

11  behavioral heuristics that you relied on in this case.

12  Right?

13  A.  Yes.

14  Q.  This page here does not anywhere say that you make a

15  list, does it?

16  A.  I cannot read the printing on the figure. So if you

17  absolutely assure me that in the little wording on the

18  figure there is never the word "list," I would say, yes, on

19  that page, the word "list" never appears.

20  Q.  I want to highlight something else for you here,

21  Dr. Vigna, if I can do this correctly.

22  This is a figure which depicts operations of

23  WebWasher's scanning. Isn't that right?

24  A.  Yes. It says that these are the main parts of the

25  anti-virus filtering process web.

513

Vigna - cross-examination

1    Q.    And WebWasher is represented by all of these things

2    happening between this wall here and this wall here.  Is

3    that right?

4    A.    I think this is correct.

5    Q.    Bear with me, Dr. Vigna.  I want to look at some of

6    these documents that you looked at yesterday with counsel.

7    I am going to walk through them.

8            This is another document that you explained in

9    your testimony yesterday.  Is that right?

10   A.    I think so.

11   Q.    I am now showing you on Plaintiff's Exhibit 9, Page

12   11.

13   A.    Yes.

14   Q.    This is a depiction of the ProActive scanning function

15   of WebWasher.  Is that right?

16   A.    Yes.

17   Q.    And there is a description on this page of ProActive

18   scanning that says it's a two-tiered filter that blocks

19   program code based on its potential behavior, there is more

20   of it, but it says that.  Right?

21   A.    Yes.

22   Q.    And then it says, And mitigates suspicious script code

23   before transport to the client computer.  Right?

24   A.    Yes.  Actually, I would say, with respect to our

25   documentation that we have seen, it is more encompassing

514

Vigna - cross-examination

1    description most of the time, ProActive scanning, in the

2    documents that I reviewed, it refers exclusively to the

3    scanning of the downloadable to identify the list of

4    suspicious categories of behavior.  And in this case, I

5    think it is presented by adding the aspect of the sandboxing

6    all together.  But I think it's, most of the time I see the

7    two things separately.

8    Q.    Let's just clarify that so we understand what you are

9    saying.

10           I think you are pointing out that there are two

11   functions here.  One is categorizing potential behavior.

12   Right?

13   A.    Correct.

14   Q.    And another one is mitigating suspicious script code?

15   A.    Yes.  As far as I understand, the first part is the

16   parts that we refer to, ProActive scanning, and the part

17   that is directly mapped on the '194 patent.  While the

18   second part is the one that we call sandboxing or script

19   code mitigation.  And it is the one that infringes the '822

20   patent.

21   Q.    Right now we are talking about the '194 patent.

22   That's the categorizing behavior part of this?

23   A.    Yes.

24   Q.    And when we talk about the '822 patent, which is

25   sandboxing, that is where you talk about script code

515

Vigna - cross-examination

1    mitigation?

2    A.    Correct.

3    Q.    Two different things?

4    A.    Yes.

5    Q.    There is another document you looked at with counsel.

6    This is Plaintiff's Exhibit 10.  It's called, WebWasher

7    Mobile Code Filter-Detection and Classification of Malicious

8    Mobile Code.  You looked at this document, didn't you?

9    A.    Yes.

10   Q.    On this document, you pointed out, I think, the title

11   page here, with the description of WebWasher's mobile code

12   filter?

13   A.    Yes.

14   Q.    Now, this description talks about performing a

15   heuristic analysis.  Right?

16   A.    Yes.

17   Q.    And it talks about blocking program code based on its

18   potential behavior?

19   A.    Correct.  That's what I call ProActive scanning.

20   Q.    That is ProActive scanning?

21   A.    Yes.

22   Q.    That was my question.

23   A.    Here it is referring to mobile code filter, right,

24   which is the whole thing.

25   Q.    The heuristic analysis is part of categorizing the

516

Vigna - cross-examination

1    behavior.  Would you agree with that?

2    A.    I do agree with that.

3    Q.    Now, on this Plaintiff's Exhibit 10, you also looked

4    at this page with counsel, I believe.  This page says that

5    WebWasher's mobile code filter performs a heuristic analysis

6    that the gateway blocks, unblocks program code based on its

7    potential behavior?

8    A.    Yes.

9    Q.    You agree that is what WebWasher does?

10   A.    I think the ProActive scanning, which is described

11   here as a part of the filter is in WebWasher and is directly

12   mapped to the '194 patent.

13   Q.    We looked through a number of documents yesterday and

14   you testified about a number of documents that have similar

15   description to this, didn't you?

16   A.    That is sort of a vague question.  So can you be more

17   specific?

18   Q.    Fair enough.

19           You pointed to a number of documents yesterday

20   that explain that WebWasher uses heuristic rules to

21   categorize behavior?

22   A.    Especially code, which is, you know, most direct

23   representation of what an application does.

24   Q.    All right.  Now, none of those documents said the

25   words, "WebWasher creates a list of suspicious computer

517

Vigna - cross-examination

1  operations." Right?

2  A.    I cannot answer that question because I should go back

3  and check every document, see if they have or don't have the

4  exact wording list of suspicious behavior. I don't know.

5  My understanding is it does generate a list of suspicious

6  behavior.

7  Q.    You understand this claim requires a list of

8  suspicious computer operations?

9  A.    Correct. And in my opinion, in my understanding, that

10  was determined by analyzing different sources, not only the

11  documentation, but also the source code and operating the

12  appliance.

13          I saw the generation of a list of suspicious

14  behavior. For example, when I used the appliance, I showed

15  you, and everybody else, how, for certain types of

16  downloadables, you have a list that included writing to a

17  file or reading from a file and so forth. And that, for me,

18  is a list of suspicious behavior.

19  Q.    In this case, you didn't find any WebWasher

20  descriptions that used the words, "a list of suspicious

21  computer operations." Is that fair?

22  A.    Sincerely, I do not remember if the exact word list is

23  in the documentation, which is White Papers, presentation,

24  manuals.

25          As an expert, I look at the code, I look at the

518

Vigna - cross-examination

1  documents, and the appliance itself, and I say, Okay, this

2  is obviously a list of suspicious operation. And that's my

3  understanding.

4  Q.    I apologize, I don't want to belabor this, if I didn't

5  ask a clear question. I am asking about the whole phrase.

6          You didn't find the phrase "list of suspicious

7  computer operations" in any WebWasher description, did you?

8  A.    And my precise answer is, at this point, I cannot tell

9  you yes or no, because I should go back, review every single

10  document looking for that particular wording of what I

11  recognize in the product.

12  Q.    Fair enough.

13          Dr. Vigna, you are aware of a definition in

14  computer science of a link -- let me start that question

15  over.

16          You are aware of a definition of list in

17  computer science, which is a linked list?

18          MR. ANDRE: Objection, Your Honor. Outside the

19  scope of this witness' testimony.

20          THE COURT: You can answer the question.

21          THE WITNESS: Okay. In computer science, there

22  is a concept of a list, which is generic data structure,

23  which is a sequence of elements. And you want to represent

24  it in different ways. The concept of a list can be implemented in

25  different ways. For example, a linked list that you just

519

Vigna - cross-examination

1  mentioned is one possible way to implement the list. A

2  double linked list is another way to represent a list.

3          You can use something else called a tree to

4  represent a list. You can use, for example, something like

5  a bit map to represent a list or a set of flags organized in

6  a bit map to represent a list.

7          Actually, funny that you mentioned that, but

8  after I read some days ago Ben Wallach's rebuttal to my

9  concept of what a list is, I went and looked at assignments

10  in computer science classes. And there are assignments that

11  I found that say, Okay, here is a list, implement it in two

12  ways, as a bit map, as a set of flags, that is, or as a

13  linked list, showing that the concept of a list can actually

14  be implemented in many different ways.

15  Q.    I am not sure if you are agreeing with me or not.

16          There is a definition of "list" in computer

17  science, which is a linked list?

18  A.    No. I mean, if you put it that way, I have to say no.

19  There is the concept of a list, which is an abstract

20  concept, and then there is one possible implementation of

21  that concept, that is a linked list. So it would be like

22  you ask me, Oh, there is a car, and the car can only be with

23  a diesel model. I will say, No, it can be a car, generic

24  concept, it can be implemented as an electric car, it can be

25  implemented as a diesel car, it can be implemented as a, you

520

Vigna - cross-examination

1  know, normal petrol car.

2  Q.    Exactly. Now, what I am trying to ask you, Dr. Vigna,

3  is when you looked for a list in WebWasher, you did not

4  limit your search to a search for a linked list; is that

5  fair?

6  A.    That is correct. I was looking for something that

7  represents a list of suspicious operations, regardless of

8  how it is implemented.

9  Q.    Now, a linked list, let's understand what that is,

10  that is a list that can have any number of items on it. Is

11  that right?

12  A.    That's not correct.

13  Q.    Can't a linked list have one or a hundred or a

14  thousand items?

15  A.    Depending on how it is implemented. I mean, the

16  concept of a linked list -- what is your question? Do you

17  want me to explain to you what a linked list is?

18  Q.    No. I am just asking you if a linked list is

19  something that can have an undefined number of members on

20  it?

21  A.    That depends on how that linked list is implemented.

22  I can put together, if you give me 20 minutes, a linked list

23  that has a limited number of elements.

24  Q.    A linked list can have, depending on how you implement

25  it, one or a hundred or a thousand or a million numbers?

Vigna - cross-examination

1    A.    Absolutely, depending on how you implement it.

2    Q.    That is not the definition that you used for a list in

3    this case?

4    A.    What I used in this case is the generic concept, the

5    high-level concept of a list, like a sequence or something

6    like that.

7    Q.    Do you agree or disagree with this statement:  The

8    list in the '194 patent is a data object such as a linked

9    list?

10            MR. ANDRE:  Objection, Your Honor.  He is asking

11    for claim interpretation.

12            MR. HOLDREITH:  I am asking for the basis of the

13    witness' infringement analysis.

14            THE COURT:  Rephrase the question.

15    BY MR. HOLDREITH:

16    Q.    When you did your infringement analysis, Dr. Vigna,

17    did you use the definition of list that it is an object such

18    as a -- a data object such as a linked list?

19            MR. ANDRE:  He is asking for claim

20    interpretation at this time, Your Honor.

21            THE COURT:  Is that what you are asking?

22            MR. HOLDREITH:  No, sir.  The foundation for his

23    infringement opinion.  I want to know what definition he

24    used.

25            THE COURT:  Why don't you ask him that.

---

Vigna - cross-examination

1    BY MR. HOLDREITH:

2    Q.    What definition of list did you use in your

3    interpretation of the '194 patent?

4    A.    I used the abstract concept of list of elements.  So

5    in layman's term, it would be like a grocery list, like a

6    sequence of elements that are represented.  I wasn't looking

7    for any specific implementation of that list.

8    Q.    It's fair to say that definition uses other kinds of

9    lists other than a data object that's a linked list?

10    A.    I don't understand the question.  Can you rephrase it?

11            THE COURT:  That's fine.

12    BY MR. HOLDREITH:

13    Q.    It's fair to say, you interpret "list," it can be any

14    kind of list?

15    A.    Yes, it's a list.

16    Q.    When it comes time to decide if there is a list in the

17    prior art, your definitions would say, Let's see if there is

18    any kind of price list in the prior art?

19            MR. ANDRE:  Objection, Your Honor.  This witness

20    is not talking about the prior art in this case.

21            THE COURT:  Sustained.

22    BY MR. HOLDREITH:

23    Q.    Now, Dr. Vigna, the list in this case is specifically

24    a list of suspicious computer operations that may be

25    attempted by the downloadable.  Right?

---

Vigna - cross-examination

1    A.    That is correct.

2    Q.    And one way to make that list is you look at the

3    downloadable, you see some suspicious computer operations in

4    the downloadable, and you go write them down on a list?

5    A.    I didn't understand what you are asking me.

6    Q.    One way you could make a list of suspicious computer

7    operations that may be attempted by a downloadable is you

8    look at the downloadable, you look for computer operations,

9    and you write those computer operations onto a list?

10    A.    I can only answer what WebWasher does.  If you ask me

11    potentially what you can do, given, you know, generic

12    directions, well, there is an infinite possibility of how

13    you can do things.  Actually, I can prove that there are

14    infinite ways to do exactly what you are asking.  If you are

15    asking me if WebWasher does that?

16    Q.    No. I am asking you if there is one way you can make

17    a list --

18    A.    There are infinite ways of doing that.

19    Q.    Is that one way of doing it?

20    A.    Since they are infinite, that is definitely one.

21    Q.    Now, I want to ask you something about the patent

22    itself.

23            You read the '194 patent?

24    A.    I did.

25    Q.    You read the whole thing cover to cover?

---

Vigna - cross-examination

1    A.    I did.

2    Q.    There is a lot of text and drawings in there?

3    A.    Yes.

4    Q.    Here is the patent.  You recognize this as the '194

5    patent?

6    A.    Yes.

7    Q.    There is a statement that I would like to show you in

8    the patent about a list.  I just lost my place.  Give me a

9    moment to catch up.

10    A.    Yes.

11    Q.    Without going through the patent in its entirety, let

12    me ask you a general question.  Do you know there is a

13    statement in the patent that says, You make a list of all

14    suspicious operations on the list downloadable may attempt?

15    A.    Are you asking me if within the patent -- I should

16    check.  I don't remember.  I haven't memorized the patent.

17    Q.    When you did your infringement analysis, did you base

18    your infringement analysis on the list meaning to include

19    all suspicious operations the downloadable may attempt?

20    A.    My analysis is based on the claims because that is the

21    only thing, as far as I understand, that matters.

22            You are referring to this particular claim here,

23    32?

24    Q.    That is fine, sure.

25    A.    Let me read what it says.

---

Vigna - cross-examination

1    A list, there is a typo, A list of suspicious

2  computer operations that may be attempted.  That's what I

3  tried to find in WebWasher, and I found a list of suspicious

4  computer operations that may be attempted.

5  Q.    The claim doesn't say "a list of all suspicious

6  computer operations"?

7  A.    That claim doesn't say that.

8  Q.    And you don't interpret it to require that the list

9  have all suspicious computer operations?

10  A.    Correct.  It says "a list of suspicious operations."

11  Q.    So if another expert testifies in this Court that the

12  list must include all suspicious computer operations, you

13  would disagree with that?

14          MR. ANDRE:  Objection, Your Honor.

15          THE COURT:  Basis?

16          MR. ANDRE:  Completely hypothetical.

17          THE COURT:  You can answer the question.

18          THE WITNESS:  Can you re-ask it?

19  BY MR. HOLDREITH:

20  Q.    Sure.  If another expert comes into court and

21  testifies that you must make a list of all suspicious

22  computer operations, you would disagree with that?

23  A.    So, you are saying that an expert will come here and

24  say, in order to infringe, you have to have all suspicious

25  operations, then I would disagree with that.

526

Vigna - cross-examination

1  Q.    Now, I would like to ask you about these category

2  flags, Dr. Vigna.

3  A.    Go ahead.

4  Q.    I am going to show you Plaintiff's Exhibit 11, which I

5  think you looked at yesterday.  This is the Secure Computing

6  WebWasher Proactive Scanning Step-By-Step Guide White Paper.

7          Do you remember you looked at this?

8  A.    Yes.

9  Q.    I am going to look at Page 15 with you.  Here it is.

10  Now, these are categories that WebWasher uses to categorize

11  a downloadable, Read/write access to local files, for

12  example?

13  A.    Yes.  These are categories of behavior.

14  Q.    And these flags characterize how the downloadable

15  might behave?

16  A.    Where do you see flags?

17  Q.    I am sorry.  Are there flags in WebWasher that

18  correspond to these categories?

19  A.    In WebWasher, what has been done is that the functions

20  are extracted, the heuristic rules are applied, and these

21  categories of behavior are identified.

22          And there is a checkmark, there is a big flag,

23  data structure in memory that represents that that

24  particular behavior is present in the list.

25  Q.    When WebWasher does what you just said, it's making a

checkmark that says, This downloadable fits into the

2  category, it might do read/access to local files.  Is that

3  right?

4  A.    That's not really correct.  What happens is that there

5  is associated to the downloadable a list of possible

6  behaviors.  And whenever the write access is found, that

7  behavior is added to the list.

8  Q.    But the flags correspond to these behaviors, don't

9  they?

10  A.    The flags are an implementation of this list of

11  possible behaviors.

12  Q.    So if you see that this downloadable fits in a

13  category, you set a flag?

14  A.    In the list of behaviors, you put, you checkmark that

15  particular element of the list.

16  Q.    The list you are talking about is a list of these

17  categories.  Right?

18  A.    I am talking about the list of possible behaviors

19  associated with a certain downloadable.  There is a data

20  structure that is used to describe the list of possible

21  behaviors for that downloadable.  Whenever one of those

22  behaviors is found, it is added to the list.

23  Q.    What I am showing you here on Plaintiff's Exhibit 11,

24  these are categories.  Right?

25  A.    Categories of behavior, correct.

528

Vigna - cross-examination

1  Q.    When you check a box, you are checking a box for a

2  category.  Right?

3  A.    What do you mean by "checking a box"?

4  Q.    You said that WebWasher checks a box.

5  A.    No.  I am saying that there is a list which is

6  implemented as a bit map, which is an implementation detail.

7  So the category is added to the list and that is the

8  high-level definition of what happens.

9          In practice, you know, this category is out of

10  the list, yes.  This downloadable is writing to a file.  If

11  you look down how the actual implementation of that list is

12  made, that, technically speaking, is a bit map, which is a

13  series of ones and zeros, to represent if an element is part

14  or not of the list.  And in that particular case, bit of one

15  is put in the position in the list corresponding to that

16  particular behavior.

17          That is my technical understanding.

18  Q.    I don't want to get stuck on the distinction between a

19  checkmark around a bit that is set to zero or one.  The

20  question I want to ask is what is on what you call a list is

21  a behavior, that is one of these categories shown on this

22  Plaintiff's Exhibit 11?

23  A.    Can you ask me a precise question?  I don't understand

24  what you are asking.

25  Q.    Sure.  You just described, There is what you call a

Vigna - cross-examination

1  list, a bit map?

2  A.    Correct.  Implemented as a bit map.

3  Q.    In the bit map, you could set a bit to one or zero,

4  depending on whether that category is something you want to

5  flag?

6  A.    Flag, I mean, if you add to the list that particular

7  behavior, you add it.

8        You add this to the list of possible behaviors.

9  So it is part of the list.

10       What I am saying is that behind the curtains,

11 and, so, it's in the way in which it is implemented, which

12 is one of the possible choices to implement this, it happens

13 to be a bit map. So you will see a one appearing in a data

14 structure, a 32 bit integrated, if I remember correctly, in

15 memory, will be set to one.  As far as I am concerned, that

16 is the implementation of the list.

17 Q.    I hear you answering me about the bit map.  What I

18 intend to ask about is what is the bit map flagging.

19       Is it one of these categories shown on

20 Plaintiff's Exhibit 11?

21 A.    Seriously, I don't understand -- okay.  What do you

22 mean by "flag" and "check box"?

23       I don't understand.  I want to answer you.  But

24 you are asking me if these categories are part of the list

25 of behaviors?  I don't understand, sincerely, what you are

---

Vigna - cross-examination

1        THE COURT:  Yes.

2        MR. HOLDREITH:  Thank you.

3  BY MR. HOLDREITH:

4  Q.    Dr. Vigna, can you see all right?

5  A.    Yes.

6        Sorry for the shoulder, Your Honor.

7        THE COURT:  That is okay.

8  BY MR. HOLDREITH:

9  Q.    This is the drawing that you made yesterday.  Correct?

10 A.    Yes.

11 Q.    And you are showing here how the '194 patent works.

12 Correct?  You are not sure?

13 A.    No.  I mean, what I am describing here is actually

14 what WebWasher does.

15 Q.    This is how WebWasher works?

16 A.    Yes.

17 Q.    All right.  There is a downloadable.  WebWasher looks

18 in the downloadable, and it sees, what is this?

19 A.    FWrite.

20 Q.    What is FWrite?

21 A.    It is one function.

22 Q.    It is a function.  What is this?

23 A.    FRead.

24 Q.    What is FRead?

25 A.    It's another function.

---

Vigna - cross-examination

1  precisely asking me.

2  Q.    You have talked about a list of categories of

3  behavior.  Is that fair?

4  A.    Correct.

5  Q.    The categories of behavior that go on that list, are

6  they these categories that are found on Plaintiff's Exhibit

7  11, which is up on the screen here?

8  A.    I mean, these are examples.  And I showed in the code,

9  I think it was, you know, rule data was dot H file, there

10 are the exact set of possible categories of behavior that

11 will be put in the list of behavior associated with one

12 particular downloadable.

13 Q.    So what WebWasher is putting on that thing that you

14 call a "list" is one or more categories.  Is that fair?

15 A.    Yes.  WebWasher looks at the downloadable, extracts

16 the functions, and then, using the rules, says, Okay, if you

17 do this particular function and maybe this other particular

18 function, then I will add to the list of possible behaviors

19 for this downloadable this particular category, like write

20 to the registry.  That's what happens.

21 Q.    Now, you gave an example yesterday, which is written

22 on that flip chart right over there in the corner.  Right?

23 A.    Yes.

24 Q.    In that example, you said there was a downloadable --

25       MR. HOLDREITH:  Your Honor, may I approach?

---

Vigna - cross-examination

1  Q.    And what is this?

2  A.    It's W reg.  These are just examples I made up.

3  FWrite and FRead are actually used in the C code.  So it is

4  one particular example of the low level functions that I was

5  trying to explain.  Those could be a different type,

6  different type of downloadables.

7  Q.    WebWasher, in your opinion, looks at these functions?

8  A.    And their parameters.

9  Q.    And it uses heuristic rules?

10 A.    Correct.

11 Q.    To decide whether there is a category?

12 A.    Whether the download has that type of behavior in the

13 list of possible behaviors.

14 Q.    There are multiple functions or multiple conditions

15 that can lead to a category such as write files in

16 WebWasher?

17 A.    Well, it depends on the rules that you have there.

18 But you have, in my example, two types of rules.  You

19 have atomic rules that, as far as I understand, just map one

20 function to one particular behavior.  Then you have

21 composite rules that might involve more than one function

22 that leads to a particular behavior.

23 Q.    You know there are lots of different ways to implement

24 writing to a file?

25 A.    Correct.

---

533

Vigna - cross-examination

1    Q.    There are lots of different functions you can use
2    alone or in combination --
3    A.    Correct.
4    Q.    -- that write to a file?
5    A.    Yes.
6    Q.    Now, when WebWasher creates a category that says,
7    Write to files from this downloadable, it never copies this
8    function FWrite onto a list.  Would you agree with that?
9    A.    You don't copy it to a list.  What WebWasher does, it
10   sort of decomposes and parses a downloadable, extracts its
11   functions.  And it applies the rules to determine if a
12   certain category of behavior is part of the downloadable.  I
13   don't know if it copies that somewhere else.
14            Definitely with respect to the list of possible
15   suspicious operations, there is no copying of the low-level
16   function into -- let me rephrase that.
17            So what WebWasher does is to decompose the
18   downloadable, or, I should say, parse it, and extract the
19   low-level functions, then apply either atomic or composite
20   rules to determine if certain categories of behavior are
21   associated with the downloadable.
22            And then I was asked if the low-level function
23   is copied directly in the list of suspicious operations, and
24   as far as I understand, there is no direct copying of that
25   function in that list.

534

Vigna - cross-examination

1    Q.    So these are the categories of behavior in WebWasher.
2    Right?
3    A.    Right.  Those are just examples.
4    Q.    These are examples of categories of behavior in
5    WebWasher?
6    A.    Correct.
7    Q.    And if you know that the category "Write Files"
8    pertains to a downloadable in WebWasher, that does not tell
9    you what function or combination of functions are in the
10   downloadable, what specific functions were in that
11   downloadable?
12   A.    So I know that that category has been determined by
13   taking those functions and applying some rules.  I don't
14   understand what you are asking me.
15   Q.    Sure.  If all you know is, I have a downloadable, and
16   WebWasher has decided it's in the category of behavior of it
17   might write to a file?
18   A.    Correct.
19   Q.    That's all you know?
20   A.    Suppose I know only that?
21   Q.    Are you with me so far?
22   A.    Yes.
23   Q.    From that information, you do not know what functions
24   were in that downloadable?
25   A.    What I would know is, of course, I would need the

535

Vigna - cross-examination

1    rules.  And I could sort of go backwards in the rules and
2    find all the rules in the rules that are possibly applied
3    that would result in write files.
4            By looking at the precondition of those
5    applicable rules, I would find what are the possible
6    candidates that were in the downloadable that might have led
7    to that particular behavior.
8    Q.    There are many, many candidates for any given category
9    of what the functions are that might have led to that
10   behavior?
11   A.    Many, many is a little imprecise.  I would say it
12   depends on the type of rules.  There could be one, there
13   could be more than one.
14   Q.    But WebWasher doesn't make a list of what those
15   functions were that made WebWasher decide the category
16   "Write Files" pertains to this downloadable?
17   A.    Actually, I am not completely sure about that.  That's
18   something that I haven't explored directly.
19            What I was more concerned, I went into my source
20   code analysis, and as you pointed out at the beginning of
21   this part of the hearing, it's a very big product.  So I was
22   concentrating on the part that infringed on the claims.  So
23   I was concentrating on the list of suspicious behavior.
24            Maybe, the code is very complex, there is some
25   other data structure that maintains that mapping.  I haven't

536

Vigna - cross-examination

1    seen it.  So I cannot really talk about it.
2    Q.    Fair enough.
3            Now, Dr. Vigna, I would like to refer you to a
4    portion of your report.
5            MR. HOLDREITH:  Your Honor, may I approach and
6    give Dr. Vigna a copy of his report?  I have one for counsel
7    and the Court as well.  I have already provided one to the
8    court reporter.
9            THE COURT:  Okay.
10   BY MR. HOLDREITH:
11   Q.    I would like you to --
12           MR. HOLDREITH:  Your Honor, I wasn't going to
13   publish it to the jury.  But I am happy to do that if it
14   would be helpful.
15           THE COURT:  I was asking if it needed to still
16   be displayed.
17           MR. HOLDREITH:  I am sorry.  I didn't realize
18   you were referring to the document on the screen.
19   BY MR. HOLDREITH:
20   Q.    Dr. Vigna, you may find it helpful to refer to
21   Paragraph 51 of your report while I ask these questions.
22   A.    Yes.
23   Q.    While you are reviewing that -- I will come over in a
24   minute.  Have you read Paragraph 51 of your report now?
25   A.    Yes.

Vigna - cross-examination

1  Q.    You, as part of your investigation, looked at a file
2  in WebWasher called "rt-mef.js." Is that fair to say?
3  A.    Yes.
4  Q.    And --
5         MR. HOLDREITH: Your Honor, I realized I am
6  going to be reading a short portion of the source code to
7  Dr. Vigna. I apologize for this. I didn't anticipate it.
8  I am going to need to ask anyone not subject to the
9  protective order to be excused for a moment.
10        (Pause.)
11 BY MR. HOLDREITH:
12 Q.    Dr. Vigna, when you looked at the rt-mef.js file, you
13 found descriptions of what the operations are in JavaScript
14 that are to be considered to be suspicious in WebWasher.
15 Right?
16 A.    Correct.
17 Q.    You gave examples of what those are in your report.
18 Is that right?
19 A.    Yes. In this part of the report, I was trying to
20 define the rule set that is used to derive the categories of
21 behavior. And here, if I can assign my own words, even
22 though the main rule set file was encrypted, it was possible
23 to examine other files. So in forming my opinion, the best
24 possible way is to show what I showed later, I think, when I
25 was examined by Paul, that there is this rule file that I

Vigna - cross-examination

1  Q.    "ShowModalDialog." Right?
2  A.    Yes.
3  Q.    "showHelp." Right?
4  A.    Yes.
5  Q.    "CreateTextFile"?
6  A.    Correct.
7  Q.    "DeleteFile"?
8  A.    Correct.
9  Q.    "GetSpecialFolder"?
10 A.    Correct.
11 Q.    "RegWrite"?
12 A.    Correct.
13 Q.    "RegRead"?
14 A.    Yes.
15 Q.    Those are all what you found in the "rt-mcf.js" file
16 that contains descriptions of whether the operations in
17 JavaScript that are to be considered suspicious?
18 A.    I said, actually, to be precise, The operations that
19 are considered suspicious and cause the script to be
20 blocked.
21        MR. HOLDREITH: Your Honor, I would like to
22 publish just a limited portion of this report just so the
23 jury can see that list of commands. I can write them on a
24 piece of paper.
25        MR. ANDRE: Your Honor, I am not sure what

Vigna - cross-examination

1  was, this "wwwmcfdb.dat" that I referred to before which
2  actually has the exact rule to show how certain low-level
3  functions are mapped to high-level behavior.
4         But that was not available. It was encrypted.
5  And so I couldn't analyze it.
6         So I said, Okay, that is not there. But there
7  is this file which has a similar functionality and shows how
8  certain functions are clearly identified as malicious.
9  Q.    Now, the functions you identified as suspicious
10 operations for JavaScript include "execCommand." Is that
11 right?
12 A.    Yes. These are potentially hostile identifications.
13 I don't refer to those as categories of behavior.
14 Q.    Networks you don't. You refer to descriptions of what
15 the operations are in JavaScript that are to be considered
16 suspicious. Correct?
17 A.    Yes.
18 Q.    The operations are "execCommand." Is that right?
19 A.    Yes.
20 Q.    "ExecScript"?
21 A.    Yes.
22 Q.    And I will provide the court reporter with a list of
23 these.
24        "ShowModalDialog." Right?
25 A.    Yes.

Vigna - cross-examination

1  portions are to be published. I have a general objection to
2  showing expert reports.
3         No objection, Your Honor.
4  BY MR. HOLDREITH:
5  Q.    This is Paragraph 51 of your report. You wrote, "It
6  was possible to examine another file called "rt-mcf.js" that
7  contains descriptions of what are the operations in
8  JavaScript. That's what you wrote?
9  A.    Correct.
10 Q.    The list that we just discussed is this list down
11 here, "execCommand," "execScript," "showModalDialog," and so
12 forth. Correct?
13 A.    Correct.
14 Q.    These operations are not categories of behavior, are
15 they?
16 A.    These operations are actually the actual functions
17 that JavaScript performs. Just to give an example of what I
18 am talking about, if you get me for a second to the source
19 code laptop, I can show you something that will explain to
20 you better.
21        Can you switch for a second, please, so that I
22 can answer this question correctly?
23        The other one.
24        Okay. You just talked about, for example, an
25 "execCommand." So this is the rule that I wasn't able to

1  access. This is the file that I was trying to access and it
2  was encrypted. And you can see, for example, that the exact
3  operation, "execCommand" here, is used to determine
4  particular categories of behavior, which is code creation
5  for JavaScript.
6          So this is to explain to you that my, as an
7  expert, I was trying to find all the evidence that this was
8  happening, even though, since this database was encrypted
9  and I had access to it, I think the very morning that I came
10 here, I couldn't really derive the categories of behavior.
11 But it was obvious they were there. And finally I had the
12 actual evidence.
13 Q.   These are the operations that after analysis by the
14 heuristic rules in WebWasher might result in a category. Is
15 that right?
16 A.   Correct.
17 Q.   And WebWasher does not put any of these operations on
18 a list that it compares to a security policy. Right?
19 A.   These are actually, in this particular case, if I
20 remember correctly, four JavaScripts. These are used
21 directly in the policy that is sent to the client as part of
22 the sandbox, because these are the actual operation, the
23 list of operations that are instrumented on the sandbox
24 side. And, therefore, those have to be executed on the
25 client side, they cannot be extracted away but have to be

1  A.   Yes.
2  Q.   Now, when you did your analysis and observed WebWasher
3  running, you did not examine the network address of the
4  packets. Is that fair to say?
5  A.   You are asking me if I looked at the network address
6  in the packets exchanged between which components?
7  Q.   From a web server to WebWasher gateway?
8  A.   Okay. I haven't.
9  Q.   You don't know what mechanism WebWasher uses when it's
10 configured as a proxy to keep track of packets?
11 A.   I sort of have an understanding of that. So my
12 understanding is that there is many possible configurations
13 in which WebWasher can operate. And, in general, WebWasher
14 acts as an intermediary between the client and the server,
15 depending on how the actual traffic is delivered, which can
16 happen in many different ways, the contents of the packets
17 can be completely different.
18          For example, WebWasher could actually be
19 connected as a gateway for a larger scale gateway to another
20 proxy, okay, in cascade. And at that point, the IP address
21 wouldn't be the one of the server or the client but will be
22 only the IP addresses involved between the two proxies.
23          So, from that point of view, the actual IP
24 address on the packet is completely irrelevant.
25 Q.   You just described some hypothetical ways that servers

1  associated with a particular language and the particular
2  environment in which they are executed.
3  Q.   Dr. Vigna, WebWasher never puts these operations, like
4  "execScript," "showModalDialog," onto a list of suspicious
5  operations that it compares to a security policy?
6  A.   So, as I showed you in the source code, what it does,
7  it takes those operations, interprets them with a rule, and
8  depending on where the operations are, will put in the list
9  of possible malicious behavior; for example, for
10 "execCommand," will put in the list of suspicious behavior,
11 you know, create code or whatever I showed in my rule.
12 Actually, code creation, sorry.
13 Q.   Exactly. WebWasher does an analysis of these
14 operations, based on that analysis it decides whether there
15 is a category that pertains to the downloadable?
16 A.   Correct.
17 Q.   Dr. Vigna, I would like to now turn to a different
18 limitation from the claims of the '194 patent. It is the
19 addressed to a client limitation.
20 A.   Okay.
21 Q.   I will just go to the claim of this patent so I can
22 highlight it. This is the limitation I want to ask you
23 about now. It is that the gateway server has to receive an
24 incoming downloadable addressed to a client. Do you
25 understand that limitation?

1  could handle packets. Right?
2  A.   Yes. Because you asked me a hypothetical question.
3  Q.   I apologize if I wasn't clear. I mean to ask you
4  about a specific test of WebWasher.
5          You did not test WebWasher to see how it handles
6  packets?
7  A.   In which configuration? The one that we showed here?
8  Q.   When you did your report in this case, and you formed
9  your opinions, you wrote a report; you know that was
10 supposed to be as accurate and complete as possible?
11 A.   Yes.
12 Q.   And you did not at that time analyze WebWasher to see
13 how it handles packets coming into WebWasher?
14          I will ask a more specific question.
15 A.   No. I will answer that question.
16          Packets are handled by -- in operating systems,
17 there are different levels. This is a technical
18 explanation. There is a part of the operation system,
19 called the TCIP stack, which takes care of exchanging
20 packets within the neighboring notes and takes care of
21 parsing it and un-parsing the actual raw IP or TCP packets.
22          WebWasher, as a piece of code, doesn't really
23 handle the packets directly. It operates at a higher level
24 as a process. And, therefore, the reasons in terms of, for
25 example, socket connections, which are an abstraction that

Vigna - cross-examination

1  the operating system provides to higher-level applications
2  to interact with remote components.
3      What WebWasher does, and I could verify that by
4  looking at the code, because there is code to set up a proxy
5  and to set up in common connection, with a common interface
6  and a growing interface, what I could verify is that
7  WebWasher has sort of like two end points and can operate as
8  an intermediary at an application level between a client and
9  a server.
10     Now, below that, what happens at the actual
11 network level is very difficult to analyze, because it
12 depends on the particular setup. I can give you a little
13 example, if you want, of what the different examples of
14 stuff are.
15     But it can be very confusing.
16 Q.   Dr. Vigna, I am asking you about the opinions you
17 formed in this case and in your report. I am trying to ask
18 a very specific question. You didn't set up an instance of
19 WebWasher --
20 A.   Okay, you are asking if I didn't do it?
21 Q.   Yes. You did not set up an instance of WebWasher that
22 was receiving downloadables and look at those downloadables
23 to understand how they were addressed?
24 A.   You know, you are asking me the wrong question,
25 meaning that I cannot answer the question because, for the

Vigna - cross-examination

1  last part, if you ask me, Did I set up WebWasher before I
2  wrote my report, in order to write my report, did I set up
3  physically the appliance and put a sniffer, which would give
4  me the packets exchanged between WebWasher appliance and the
5  server, okay, did I do that? I didn't do that. So I didn't
6  analyze the single packet.
7      But the moment you say "downloadable address,"
8  then it didn't make sense anymore, because what I am saying,
9  I am saying low-level network packets which are a transport
10 mechanism to transfer raw data.
11     The address on those packets had nothing to do
12 with who is the final destination of that particular
13 downloadable. And my task as an expert was to understand,
14 Is that downloadable addressed to a client? Yes, it is,
15 because it is its final destination.
16     If you remember yesterday, I was making the
17 example of being in high school and exchanging little notes.
18 You have the same concept.
19     I am sending a note to my friend on the other
20 side of the room. And what I intend to is to address, you
21 know, a piece of paper to the other guy. I really don't
22 care how it gets transported there. I am not even sure who
23 is going to, actually going to handle the handing the note
24 to whomever, I don't have any control on that.
25     The important thing to understand here is that

Vigna - cross-examination

1  the client made a request. And the downloadable has been
2  retrieved and that downloadable has a final destination has
3  a client, and, therefore, it is addressed to the client.
4  Q.   You just gave the example about school again. I want
5  to make sure I understand that. In that example, you are
6  saying, Addressed to somebody is when I pass a note, I might
7  not hand it to the person it is going to, but I say, Pass
8  this to Jim?
9  A.   Correct.
10 Q.   In WebWasher, you did not set up an instance of
11 WebWasher and run a server that was sending messages back to
12 WebWasher and establish how that server, in your words,
13 says, Hey, send this to Jim?
14 A.   That's a really difficult question to answer.
15     What I can tell you is that I haven't set up
16 WebWasher, the server, and I haven't looked at the low-level
17 packets being exchanged. But I looked at the code. And by
18 operating the appliance, I have a clear understanding of how
19 WebWasher gets a request from the client. That would be me,
20 for example, saying, Give it to Jim.
21     The request from the client will be me giving
22 the little note that says, Hey, ask Jim where he is going to
23 party tomorrow night? So I ask for a piece of information.
24 This thing goes off to Jim.
25     Jim writes the answer, and it just gives it

Vigna - cross-examination

1  back.
2      Everybody in the path, for some magic reason,
3  knows that that goes, little thing has to go back to me.
4  That is exactly what happens. In technical terms, you know,
5  depending on what the setup is, that is why I cannot give a
6  final answer because a lot depends on the topology, how
7  things are connected and their differences, but at the high
8  level, what happens is that the client makes a request. The
9  proxy intercepts that request for a downloadable.
10     And it says, Okay, let me ask this downloadable
11 to the server on your behalf. And it remembers, that is the
12 client who asked for that downloadable. So it asks the
13 server, the downloadable comes back and says, Okay, I got
14 the downloadable. I do some analysis. But I remember that
15 it's this client who asked me in the first place and I know
16 the downloadable is destined to this client. Therefore, I
17 pass it over if I decide that it is allowable.
18     MR. HOLDREITH: Your Honor, for my planning
19 purposes, I am sorry, I can't remember when the Court likes
20 to take a break.
21     THE COURT: We can break now.
22     MR. HOLDREITH: This is a convenient point.
23     (Jury leaves courtroom at 10:55 a.m.)
24     (Recess taken.)
25     THE COURT: All right.

Vigna - cross-examination

1    (Jury enters courtroom at 11:25 a.m.)
2    THE COURT: Mr. Holdreith.
3    MR. HOLDREITH: Thank you, Your Honor.
4    BY MR. HOLDREITH:
5    Q.    Dr. Vigna, I have a few questions now for you about
6    just one last limitation of the '194 patent. I will put the
7    board back up so you can see it. Do you see that all right?
8    A.    Yes. Thank you.
9    Q.    Just to highlight the claim language, this is the last
10   of the three limitations I told you I was going to ask you
11   about. It's this one. Let's see if I can get it to
12   highlight for me.
13   A server that serves as a gateway to a client.
14   I am going to ask you about that one now. Okay?
15   A.    Okay.
16   Q.    Do you know that WebWasher can be the machine that is
17   between the client and the Internet. Right?
18   A.    Define "between," please.
19   Q.    Well, it can have a direct connection out to the
20   Internet and a direct connection to a client computer?
21   A.    A connection means a cable -- you have to be precise.
22   Q.    Let me use the example you have in front of you to
23   make it easy.
24   A.    Perfect.
25   Q.    You have got a mock client or a real client, the

550

Vigna - cross-examination

1    computer in front of you, it is a laptop. Right?
2    A.    Yes, this one.
3    Q.    And you have a mock Internet server over by the wall?
4    A.    Correct.
5    Q.    And your client can make requests to that Internet
6    server?
7    A.    Yes.
8    Q.    And those requests all run through WebWasher that's
9    running on the table there?
10   A.    The patents. Let me explain this, because this can be
11   a little confusing. Could I use that thing for a second?
12   Q.    Certainly.
13   (Witness steps down from stand.)
14   A.    So. We talk about gateways, we have different
15   possible configurations. We can have actually the most
16   simple configuration that would never happen in reality,
17   where you have a client. So this is the client computer.
18   There is a client application, like a browser.
19   This computer is physically connected through a
20   cable to that pizza box that I showed you before.
21   Q.    Let me stop you there. The pizza box is WebWasher?
22   A.    Yes. We call this "pizza boxes" because they look
23   like pizza boxes and we eat a lot of pizza.
24   There is a cable going out that connects to a
25   server machine that has a server process running on it,

which is the actual web server providing the pages.
2    This hardware has an application running on it
3    called, for example, proxy. And this, altogether, as a
4    logical unit, represents a gateway. This will really never
5    happen. This is a super simplified version.
6    Q.    If you don't mind, Doctor, that is an illustration of
7    what I meant to ask you.
8    A.    Let me finish. The situation that you see here is
9    slightly different. That's why it could be confusing.
10   What we have here is the laptop, with a client
11   running on it. Actually, the client is connected to an
12   object called a router. That object is actually this white
13   object right here (indicating), with all the cables coming
14   out. So this router has the only task of actually moving
15   packets around and making people talk to each other.
16   So attached to this router, there is actually
17   the pizza box -- WebWasher hardware appliance, running, for
18   example, the proxy. And in this setup, also, to the router,
19   there is the server running, the server hardware running the
20   actual web application that is serving the page.
21   If you remember, at the beginning, when I showed
22   the setup, the first thing I did, that I could connect directly to the
23   my browser and I showed that I could connect directly to the
24   server and download a downloadable without WebWasher being
25   in the way.

552

Vigna - cross-examination

1    And I did this because this router, you know,
2    represented the network gateway, so it is the packet level,
3    if I have to talk to anybody else, I am first going to talk
4    to this guy (indicating). So like IP configuration, I am
5    talking to the router and asking the router to forward
6    packets to somebody else. So I can configure my system to
7    actually go directly from the client to the server. And by
8    doing this, I cut WebWasher out of the equation, and I don't
9    get any protection.
10   However, if I configure my client to use
11   WebWasher as a gateway to the outside, then whenever I do a
12   request, the request physically goes, of course, to the
13   router, but then it goes to WebWasher, and then through
14   WebWasher to this guy and back.
15   Again, if you look at this as a whole, this
16   whole system represents a gateway to the outside as far as
17   this client is concerned. It is in the middle and can
18   filter any communication.
19   Now, just to give you one final scenario.
20   Normally, what you have is a lot of different networks, with
21   a lot of different computers. And this could be a
22   corporation. And then there is what we call a "gateway."
23   And this gateway sometimes is referred to as a number of
24   computers, as a firewall, as a web filter, as a web
25   protection system, an anti-virus.

Vigna - cross-examination

1    What that gateway means in this context is an
2    intermediary with respect to the rest of the Internet,
3    which, again, is made of, you know, millions of different
4    networks.
5        So, as you can see, when we say, Server that
6    serves as a gateway to the client, we mean something that
7    acts as an intermediary, and that is between the client -- I
8    should put here the server.
9        This is to show that several different
10    configurations are possible, and I can tell you that, to go
11    back to the packet sniffing, it didn't make sense in my
12    expert report to look at the address of the packets, because
13    it would be different here than here.
14        For example, in this connection, the address of
15    the packets will be between the server and the router, which
16    doesn't really matter. And here would be from the server
17    directly to the proxy. While here will be across these
18    different networks and so forth.
19        I want to make sure you understand the different
20    meaning of "gateway."
21    Q.    I don't want to interrupt, Dr. Vigna. But I am on a
22    clock in this trial. You may know that. I appreciate all
23    that information.
24    A.    I am sorry.
25    Q.    I have a much more limited question for you.

Vigna - cross-examination

1    will be made this way, an HTTP connection will be made that
2    way (indicating).
3    Q.    I am now going to show you this drawing. You have
4    seen this before?
5    A.    Yes. That is very similar to what I put here.
6    Q.    This drawing was made by one of the, a person who
7    works at WebWasher?
8    A.    Yes.
9    Q.    And it illustrates one way that you can configure
10    WebWasher. Right?
11    A.    Correct.
12    Q.    In this configuration, if I can just step over and
13    point it out, this is WebWasher, the box labeled
14    "WebWasher"?
15    A.    This one, yes, which would be this one.
16    Q.    And the client, that's the user's computer, is labeled
17    "Client"?
18    A.    Correct.
19    Q.    And the web server out on the Internet, the place you
20    are requesting the content from, that's this web server?
21    A.    Yes.
22    Q.    And in this setup, there is a proxy server here, in
23    the middle. Right?
24    A.    Yes.
25    Q.    And when WebWasher is configured as an ICAP server, it

---

554

Vigna - cross-examination

1    A.    All right.
2        (Witness resumes stand.)
3    Q.    Did you say the router could be a gateway?
4    A.    At the network level?
5    Q.    Yes.
6    A.    It acts as the gateway for the packets.
7    Q.    All right. Now, for lack of a more precise term,
8    there is a language or protocol called HTTP. Right?
9    A.    Correct.
10    Q.    And in the middle configuration there that you have
11    illustrated, which I understand is what your demonstration
12    is?
13    A.    Yes.
14    Q.    All of those machines are using HTTP. Right? That's
15    the language, the protocol?
16    A.    Actually, that's not always the case. So it depends.
17        For example, you can have here, here, one thing
18    that happens sometimes, you have a proxy, you can have also
19    in the gateway another element. For example, these are
20    talking to each other. For example, using the ICAP --
21    Q.    I am getting to that. I want to ask you, your actual
22    setup here?
23    A.    In the setup here, these computers can talk to each
24    other using a variety of protocols. Whenever a web request
25    is made by the client to the server, then an HTTP connection

556

Vigna - cross-examination

1    communicates with the proxy using a protocol called ICAP?
2    A.    Correct.
3    Q.    And you pointed out in your deposition that although
4    this arrow is a two-way arrow, really, you could draw this
5    as an arrow going one way to WebWasher and the other way
6    going back --
7    A.    That would be more precise. I would say more
8    consistent with the rest of the drawing.
9    Q.    The messages that go from the client to the proxy,
10    those use the HTTP protocol. Right?
11    A.    Correct.
12    Q.    And the messages that go from the proxy to the web
13    server and back, those also use the HTTP protocol?
14    A.    Correct.
15    Q.    And that's different from the ICAP protocol for the
16    messages that go back and forth between WebWasher and the
17    proxy server?
18    A.    It is a different protocol. ICAP is not HTTP.
19    Q.    And in this low level of interaction, at the level of
20    protocol, the client here is not a client of the ICAP server
21    that is WebWasher. Right?
22    A.    Well, here you are mixing two very different
23    descriptions. So when you talk about clients and servers,
24    you have two general ways to represent it. So, if you
25    remember, in my deposition, I actually -- you asked me

Vigna - cross-examination

1  actually to put a box around that proxy plus filter engine,
2  similar to the box that you see here. That's the one that I
3  signed.
4          So that whole thing in the middle at a higher
5  level is an intermediary between the client and the server.
6  At this higher, architectural level, I have a client, which
7  is the laptop, and a server, which is the web server.
8  However, when you talk about structuring relationship
9  between components at any level, you can see a client and a
10 server. In a way it's like, you know, you watch a movie on
11 TV. You go to wherever, the channel, and you get some
12 information. But, actually, that channel is, the TV is
13 asking a central station for the signal. The signal is
14 asking a central distributor for the content, and so forth.
15 That means that even though I am the client, and the far
16 away service provider with my movie is the server, there are
17 a bunch of intermediaries with which at a lower level we
18 have a client/server relationship.
19          In that drawing, in particular, you could see
20 that there is the client and there is the web server. And
21 that at the application level, that is all that matters, the
22 thing in the middle is the gateway server that is the
23 intermediary. Within that gateway server, true, the proxy
24 is acting as a client with respect to the WW filter engine,
25 which is the ICAP server.

558

Vigna - cross-examination

1          But this is at a very, it's just the way you
2  structure that particular communication. But as the general
3  understanding goes, still, the client is the client, the
4  laptop, the one that initiates the communication, and the
5  final destination, the server, is the one that is
6  representing the server.
7  Q.   I am going to try to ask a very specific question.
8  A.   Go ahead.
9  Q.   Do you agree with me, there is a client/server
10 relationship between WebWasher ICAP server and the proxy
11 server?
12 A.   Correct.
13 Q.   And in that relationship, the proxy is the client?
14 A.   Correct.
15 Q.   And WebWasher is the server?
16 A.   Correct.
17 Q.   The client of the WebWasher server in that
18 relationship is the proxy?
19 A.   In that particular context, within the gateway, so
20 there is the whole gateway component, within the component,
21 there are two sets of components and they talk to each other
22 in a client-server relationship, which is not to be confused
23 with the client in an HTTP interaction and the server, which
24 is the one that provides the information, yes.
25 Q.   I am still trying to ask a very precise question. I

Vigna - cross-examination

1  want to make sure we are talking the same language here, the
2  client of WebWasher ICAP server, that ICAP transaction is
3  the proxy server?
4  A.   Yes. When you say, Talking about the same language,
5  client and server are the same words. But it is really
6  important to determine the level of abstraction at which you
7  are talking. If you say client and server, within the
8  specific interaction, it makes sense. If you look at the
9  whole picture and you say, Oh, those are client and a
10 server, that is not really true because at this higher level
11 they are the gateway.
12 Q.   Dr. Vigna, I want to now ask you about the last of the
13 three patents, the '822 patent. All right?
14 A.   Okay.
15 Q.   I have now put in front of you Claim 12 of the '822
16 patent. You are familiar with this claim?
17 A.   Yes.
18 Q.   And I am putting on the screen so I can enlarge this
19 and do a little highlighting the '822 patent. You see that?
20 A.   Yes.
21 Q.   That is JX-3. We are going to go right to the end of
22 that patent, to the claims. You have got your Claim 12, I
23 am blowing that up on the screen.
24          Do you see Claim 12 up there?
25 A.   Yes.

560

Vigna - cross-examination

1  Q.   I want to ask you now about this portion of the claim,
2  Causing Mobile Protection Code, called MPC, to be
3  communicated to at least one information destination of the
4  downloadable information.
5          Do you see that?
6  A.   Yes.
7  Q.   That's a mouthful. We will break that down in a
8  minute.
9  A.   Yes.
10 Q.   You see, there is another clause here that says, If
11 the downloadable information is determined to include
12 executable code. Right?
13 A.   Correct.
14 Q.   So there is two clauses there. Now, just to make this
15 simple, for purposes of your analysis, your infringement
16 analysis, the information destination, that could be the
17 client computer. Right?
18 A.   The information destination can be the client
19 computer, correct.
20 Q.   All right. And the downloadable information, in your
21 analysis, that could be the downloadable?
22 A.   Yes.
23 Q.   What we are talking about here in your analysis is,
24 there is a downloadable that's going to a client computer
25 like that laptop?

Vigna - cross-examination

1    A.    Correct.

2    Q.    And the second phrase in this claim, the phrase that I

3    have highlighted, If the downloadable information is

4    determined to include executable code, that's a condition.

5    Right?

6    A.    Yes.

7    Q.    So the first thing you do is you say, Does that

8    downloadable include executable code?

9    A.    You do -- you send it if the downloadable contains

10    code, yes.

11    Q.    So you have to answer the question, Does the

12    downloadable have executable code?

13    A.    Yes.

14    Q.    And if the answer to that question is yes, then you

15    cause mobile protection code to be sent along with the

16    downloadable to the client?

17    A.    If you are discussing an implementation of this

18    particular mechanism, yes. For example, if you have means

19    to add the protection code to JavaScript code, when you see

20    going, whenever you do that, then you are using this method.

21    Q.    And the mobile protection code, that is what sometimes

22    has been called the sandbox in this case?

23    A.    Correct.

24    Q.    What these two phrases together say are, If you see

25    downloadable code that's executable, put a sandbox on it?

Vigna - cross-examination

1    advertise that in their literature for VBScript and for

2    JavaScript.

3    Q.    Exactly. We are going to look at the step-by-step

4    guide here. We have seen this document before?

5    A.    Yes, I did.

6    Q.    This is PX-12. If we look at the next page here, this

7    page has examples of different types of downloadables that

8    WebWasher uses ProActive scanning on. Right?

9    A.    Okay.

10    Q.    So, now, this says that behavior heuristic, that is

11    not sandboxing. Right? That's different?

12    A.    Correct.

13    Q.    Behavior heuristic is used on mobile code including

14    ActiveX controls?

15    A.    Yes.

16    Q.    And Windows executables?

17    A.    Correct.

18    Q.    And Dynamic Link libraries?

19    A.    Yes.

20    Q.    And Java applets?

21    A.    Yes.

22    Q.    And JavaScript?

23    A.    Correct.

24    Q.    And Visual Basic script?

25    A.    Yes.

562

Vigna - cross-examination

1    A.    Might put a sandbox on it, yes.

2    Q.    It doesn't say "might" in this claim anywhere, does

3    it?

4    A.    Causing a mobile protection code to be communicated,

5    to at least one information destination, yes.

6    Q.    Right. And this is a claim that you investigated with

7    respect to script code mitigation on WebWasher. Right?

8    A.    Correct.

9    Q.    And you concluded that the script code mitigation

10    function of WebWasher does this?

11    A.    Yes.

12    Q.    Now, you have actually tested in this case WebWasher.

13    You actually ran WebWasher, and you downloaded the

14    downloadable, and you observed to see whether it put a

15    sandbox on that downloadable?

16    A.    Yes.

17    Q.    Now, the example you gave is that WebWasher sent

18    script code mitigation in the case of JavaScript. Right?

19    A.    Correct.

20    Q.    That is the particular downloadable you looked at?

21    A.    Yes. In that particular case, it infringes.

22    Q.    And there are lots of different downloadables that

23    have executable code. Right?

24    A.    Yes. Actually, for example, WebWasher does not do

25    this for executables. They implemented that and they

564

Vigna - cross-examination

1    Q.    And Visual Basic for applications macros?

2    A.    Yes.

3    Q.    The only time that WebWasher uses script code

4    mitigation, what we call a sandbox, is JavaScript, and

5    VBScript. Right?

6    A.    Correct. Those are the two instances that I found

7    violate the patent.

8    Q.    And if WebWasher sees a downloadable with executable

9    code that's an ActiveX control, there is such a thing.

10    Right?

11    A.    They haven't implemented anything that would create a

12    sandbox, as far as I know, for ActiveX control. So there is

13    no code there. So I didn't flag an infringement.

14    Q.    Let me make sure we are communicating. An ActiveX

15    control can be a downloadable with executable code. Right?

16    A.    Correct.

17    Q.    And if WebWasher sees an ActiveX control that's

18    downloadable with executable code, it doesn't say, Okay, now

19    put a sandbox on it?

20    A.    You are correct.

21    Q.    And that's true for all of these other types of mobile

22    code other than JavaScript and VBScript?

23    A.    Correct.

24        MR. HOLDREITH: Dr. Vigna, that is all the

25    questions I have for you right now.

565

Vigna - redirect

1  THE COURT: Mr. Andre, redirect.

2  MR. ANDRE: Thank you, Your Honor.

3  REDIRECT EXAMINATION

4  BY MR. ANDRE:

5  Q.  Good morning, Dr. Vigna.

6  A.  Good morning.

7  Q.  I am going to show you Claim 1 of the '194 patent,

8  which is JTX-1. With respect to this patent, the first

9  claim element that counsel talked to you about was the claim

10  element, here it says, The downloadable security profile

11  data includes a list of suspicious computer operations that

12  may be attempted by the downloadable. Do you recall that

13  testimony?

14  A.  Correct.

15  Q.  Now, when you are writing your expert report and doing

16  your analysis, you did a source code review. Correct?

17  A.  Correct.

18  Q.  And this was the -- can we have the Elmo on, please?

19  This was the portion of your expert report that

20  counsel showed you. When you are preparing your report,

21  you stated that there is a series of rules that are

22  extracted from an encrypted database called www -- wwmcf --

23  A.  I remember the name of the file. Wwwmcfdb.dat.

24  Q.  You stated that the contents of the rule set file

25  could not be accessed during the source code review because

566

Vigna - redirect

1  of encryption. Correct?

2  A.  Correct.

3  Q.  What exactly does that mean, it was encrypted?

4  A.  By analyzing the code, I could determine two things:

5  The structure of the rules, how the rules are actually

6  potentially structured. And that the system would go open

7  this file, de-crypt it, and load the rules to do the actual

8  analysis.

9  Unfortunately, the file, the .dat file, the .dat

10  file, was encrypted, I think, with an encryption system

11  called "blowfish" that makes it unreadable to a human being.

12  Therefore, I could not really see what actual rules were

13  used to interpret those low-level functions to derive the

14  list of behaviors.

15  Q.  The night before you testified here, yesterday, you

16  went and had access to the source code again?

17  A.  Correct.

18  Q.  Was that available to you at that time?

19  A.  No. It was encrypted again. I mean, the first time

20  that I reviewed the source code, I asked that file to be

21  decrypted, and it wasn't. Then I think it was yesterday or

22  two days ago, I sat down, looking at the code. And I found

23  that the file was still encrypted and I couldn't access it.

24  Q.  Was the first time you had access to that file

25  yesterday morning right before you went to testify?

567

Vigna - redirect

1  A.  Correct. They showed me the file like a few minutes

2  before the whole proceeding started.

3  Q.  And based on that very quick review, did that provide

4  you any insight into your opinion regarding the claim

5  element that we were just discussing, the downloadable

6  security profile data that includes a list of suspicious

7  computer operations?

8  A.  Actually, I was really pleased with the contents of

9  the file, because I found in the file exactly what I

10  expected, which are precise rules that define exactly how

11  the decomposed structure of the downloadable is translated

12  into this list of behaviors. I couldn't do that for my

13  report. It would have been a lot more compelling that way.

14  But it was nice to see that what I imagined would have been

15  in that file was actually there.

16  It strengthened my current opinion that there is

17  an infringement.

18  Q.  Now, with respect to the second claim term that

19  counsel brought up, the downloadable addressed to a client,

20  you gave a demonstration where you were acting as a client?

21  A.  Correct.

22  Q.  And you sent a request out to our little mock Internet

23  here?

24  A.  Yes.

25  Q.  Did it make it back to the client?

568

Vigna - redirect

1  A.  Yes.

2  Q.  Would you call that being addressed to the client

3  since you requested it?

4  A.  Yes.

5  Q.  Is there anything special about that term "addressed

6  to a client" that would limit it to any particular way of

7  addressing the client?

8  A.  No. Actually, I think that there has been some

9  confusion on the other side on what is address as a verb and

10  address as a noun. Address as a noun is used to

11  characterize packets. They are exchanged at a very low

12  level.

13  When you say something is addressed, then you

14  are talking about higher-level concept where you imagine the

15  final destination of some piece of information is the

16  client.

17  Q.  Is it your opinion that you were able to, with

18  WebWasher product, receive the incoming downloadable

19  addressed to the client by a server that serves as a

20  gateway?

21  A.  Absolutely. I think that WebWasher system adds, as

22  the intermediary, and I agree that there are different types

23  of configurations that can act as an ICAP server with a

24  proxy, connect as a proxy itself, can be in a router type of

25  situation. But the important thing is this intermediary

Vigna - redirect

1  action. So it will receive, on behalf of the client, the
2  downloadable addressed to the client. And, so, will act as
3  a gateway between the client and the server, and that is my
4  opinion.
5  Q.    When we showed you JTX-37, counsel showed you this
6  configuration here?
7  A.    Correct.
8  Q.    The claim language requires receiving an incoming
9  downloadable addressed to a client?
10 A.    Correct.
11 Q.    So in that preamble, is this the client?
12 A.    Yes.
13 Q.    So this is receiving to the client?
14 A.    Yes.
15 Q.    By a server that serves as a gateway?
16 A.    Correct.
17 Q.    To the client? This is the client. Right?
18 A.    Yes.
19 Q.    With the WebWasher in this configuration, would it be
20 a gateway to the client?
21 A.    Yes. In this configuration, it would be much clearer
22 if there was a box like here, because there is two things
23 together that represent a gateway to the client. Because
24 you have to understand that that is -- that is why I
25 complain about this single arrow here. What happens is

570

Vigna - redirect

1  actually the request goes like this, like this, like this,
2  and backwards like this. So you can see that it goes
3  through the filter engine, and this is an intermediary to
4  the server, because it has the power to block. If it wasn't
5  a gateway, then it wouldn't have the possibility to block
6  because it wouldn't be between the client and the server.
7          So this whole system together is the gateway
8  between the client and the server. And it's the server
9  acting as a gateway.
10 Q.    And so the written record is very clear, so the
11 request goes from the client to the proxy through WebWasher,
12 back up to the proxy, out to the Internet. Is that correct?
13 A.    Correct.
14 Q.    And then from the Internet, it comes back into the
15 proxy, back through WebWasher box?
16 A.    Correct.
17 Q.    Back up to the proxy and then to the client again?
18 A.    Correct.
19 Q.    And, in that configuration, is WebWasher product there
20 acting as a server that serves as a gateway to the client?
21 A.    Yes.
22 Q.    We will go to the '822 patent, JTX-3. Go to Claim 4.
23 Counsel was asking about this element here, Causing mobile
24 protection code to be communicated to at least one
25 information destination of the downloadable information, if

571

Vigna - redirect

1  the downloadable information is determined to include
2  executable code?
3  A.    Correct.
4  Q.    And you made the determination that if, for WebWasher
5  product, it does exactly this process for JavaScript and
6  VBScript?
7  A.    Correct. In those two instances, it sends some mobile
8  protection code to create a sandbox.
9  Q.    And in those instances, do you have an opinion whether
10 that element is infringed by WebWasher product?
11 A.    Sorry, can you say that again?
12 Q.    In those instances where they are using JavaScript or
13 VBScript, is your opinion that the WebWasher product
14 infringes that element?
15 A.    Absolutely, yes.
16 Q.    Counsel also talked about if the WebWasher code or
17 WebWasher product that is incorporated into the CyberGuard
18 TSP, if it is locked in some way, he wondered whether it
19 would affect your opinion of infringement?
20 A.    It would not affect my opinion on infringement.
21 Q.    If you go to the '194 patent. Claim 65, this is one
22 of the claims that you gave your opinion on yesterday.
23 Correct?
24 A.    Yes.
25 Q.    This is a claim for a computer readable storage medium

572

Vigna - redirect

1  storing program code for causing a server that serves as a
2  gateway to a client to perform the steps of...
3  A.    Correct.
4  Q.    Now, even if the WebWasher modules were locked on the
5  CyberGuard TSP, which we are not saying they are, if they
6  were, would it have any bearing on your opinion as to this
7  type of machine code, program code claims?
8  A.    Yes. I mean, my understanding of this claim is that
9  if the program is in storage, so it's on the disk, for
10 example, of that particular product, then it infringes.
11 Q.    And would the same thing be true of the system claims
12 that we discuss also in these patents, not the method
13 claims, but the system claims and the program code claims.
14 Would it be the same thing for the system claims?
15 A.    Yes.
16 Q.    If you would go to the '780 patent, JTX-2, go to Claim
17 9 of that patent.
18         Counsel asked you if you were able to determine
19 the cache-ing function?
20 A.    Yes.
21 Q.    On WebWasher product, whether it would still infringe
22 or not. If the cache-ing function was turned on or off,
23 once again, would it have any effect on your opinion
24 regarding these type of system claims or the program code
25 claims?

Vigna - redirect

1  correct?

2       "Answer:  The information I received is gleaned

3  a step earlier by discussions with engineers and team

4  members, and these presentations are the end result, rather.

5       "Question:  Have you given these presentations

6  to customers?

7       "Answer:  We, including me, according to my

8  knowledge, have never given a presentation on ProActive

9  scanning.  ProActive scanning is one component of many.

10  Therefore, a presentation about WebWasher technology is much

11  more diverse than that.

12       "Question:  Before the break, we were talking

13  about some White Papers and presentations and some websites

14  that you used to gain knowledge about WebWasher technology,

15  and, in particular, ProActive scanning.

16       I would like to show you what has been marked as

17  Exhibit 7, PTX-12.  It is WebWasher Proactive Scanning

18  Step-by-Step Guide.  The author is Christoph Alme, and I

19  believe it was marked at his deposition -- or interview a

20  couple of days ago.  Actually, let me hand you the official

21  exhibit.  There we go.

22       Do you recognize this document?

23       "Answer:  Yes.

24       "Question:  What is this document?

25       "Answer:  It is a step-by-step guide.

Vigna - redirect

1       Is this document, Exhibit -- do you recognize

2  Exhibit 8, PTX-13?

3       "Answer:  Yes.

4       "Question:  Is this a document that you would

5  give customers?

6       "Answer:  Yes.  That is a document I would give

7  to customers.

8       "Question:  And would you give this document to

9  customers in order for them to understand how ProActive

10  scanning works?

11       "Answer:  Yes.

12       "Question:  Have you ever reviewed Finjan's

13  products?

14       "Answer:  Yes.

15       "Question:  And when was that?

16       "Answer:  That was a few years ago, I suppose.

17  2002, 2003, and a few months ago.

18       "Question:  What were the circumstances upon

19  your first review of Finjan's products in 2002 or 2003?

20       "Answer:  It was an introduction and a

21  presentation about GUI.

22       "Question:  What did you learn from viewing

23  Finjan's products?

24       "Answer:  I only saw the GUI and that I was

25  available by the huge number of configuration options that

Vigna - redirect

1       "Question:  What is this document -- what is the

2  purpose of this document?

3       "Answer:  This document has the purpose of

4  giving customers enough information to understand the

5  product and to configure the product adequately.

6       "Question:  Is this an accurate document?

7       "Answer:  My answer to this question basically

8  is that I cannot answer this question based on my knowledge.

9  Based on the information I gave earlier, i.e., the fact that

10  this kind of document basically is the source of my

11  knowledge.  So, for me, it is basically impossible to be a

12  judge of whether this is accurate or not.

13       "Question:  Fair enough.

14       So is it -- is it safe to say that you rely on

15  this document to provide you with how ProActive scanning

16  works?

17       "Answer:  Yes.  You can say it like that.

18       "Question:  I would like to show you Exhibit 8.

19  It is also WebWasher WebWasher Proactive Scanning

20  Step-by-Step Guide.  I believe it was marked at the

21  proceedings with Mr. Alme.  However, the step-by-step guide

22  does not contain the company -- company confidential stamp.

23  And just to be clear, when I introduce a document, I'm just

24  doing that solely for the record so somebody reading the

25  record would know what we're talking about.

Vigna - redirect

1  were available.

2       "Question:  Was one of the configuration options

3  the ProActive scanning?

4       "Answer:  No.

5       "Question:  What did you do after you observed

6  Finjan's products in 2002 or 2003?

7       "Answer:  I asked several sources how we could

8  improve the competitive situation with regards to Finjan.

9  And as I said before, customers are the top priority there,

10  so my most important question to the customer is, What is

11  your problem you are trying to solve?

12       "Question:  What was the most important problem

13  that they were trying to solve at that time?

14       "Answer:  Within this context, the most

15  important requirement for the customer was an extension of

16  the traditional reactive anti-virus protection.  And from a

17  broader point of view in this context, the most important

18  problem was the blocking of websites with inappropriate

19  content using the category-based technology, and the most

20  important issue was still traditional anti-virus.

21       "Question:  Was there any development of any

22  product based on your review of Finjan's products?

23       "Answer:  No individual products but products

24  were developed on the basis of these findings.

25       "Question:  What products were those?

Parr - direct

1  "Answer: First of all, WebWasher is a suite of
2  products. We have never had different products. It has
3  always been the one WebWasher suite. And the ProActive
4  technology that was developed as a response to these
5  requirements was offered as a part of WebWasher anti-virus."
6  THE COURT: Your next witness.
7  MR. ROVNER: Good morning, Your Honor. Philip
8  Rovner.
9  THE COURT: Good afternoon now.
10  MR. ROVNER: Is it?
11  Philip Rovner for the Plaintiff, Finjan. I am
12  co-counsel with the people seated at this table. At this
13  time, we will be presenting Russell Parr. Mr. Parr will be
14  presented as an expert on damages available to Finjan.
15  RUSSELL L. PARR, having been duly
16  sworn as a witness, was examined and testified as follows:
17  MR. ROVNER: Your Honor, with the Court's
18  permission we would like to hand out the books that we would
19  like to use with Mr. Parr to the jury.
20  THE COURT: Ms. Walker.
21  (Binders handed to jurors.)
22  BY MR. ROVNER:
23  Q.  Good afternoon, Mr. Parr. I have been corrected.
24  Would you please state your name for the record?
25  A.  Russell Parr.

582

Parr - direct

1  Q.  Could you please give us a brief overview of your
2  educational background?
3  A.  I have an M.B.A. focused on finance. And I have a
4  Bachelor of Science in electrical engineering. In addition,
5  I have two professional designations. One is the chartered
6  financial analyst designation. And the second is accredited
7  senior appraiser from the American Society of Appraisers.
8  Q.  First things first. Your formal education, could you
9  just tell us when you obtained those degrees and from where?
10  A.  The Bachelor of science degree, I obtained, I think it
11  was in 1976, from Rutgers University. And then the M.B.A.,
12  also from Rutgers, would be 1981.
13  Q.  Could you sort of give us a little more description of
14  these other credentials that you mentioned?
15  A.  Yes. The chartered financial analyst is, say, an
16  investment analyst credential. It is offered by the CSA
17  Institute. It is focused on investment professionals. It
18  requires passing three examinations that cover accounting,
19  economics, fixed income securities, equity securities,
20  ethics, derivative investments. It's all about and totally
21  focused on investment analysis.
22  There is three exams given. The first Saturday
23  in June of each year, and you have to pass them
24  consecutively in order to have the designation provided to
25  you.

Parr - direct

1  The other one, American Society of Appraisers,
2  is, my focus, again, was getting the designation for
3  business valuation, appraising business values. Again, to
4  focus on securities of privately-held companies. And that
5  required an examination, submission of reports that I had
6  done for review, and then work experience, all leading to
7  whether or not you were accepted and allowed to have the
8  designation.
9  Q.  Do those designations and the information that you
10  learned in acquiring those credentials help you in your work
11  that you do today?
12  A.  Well, yes. My whole education definitely benefits
13  what I do today.
14  Q.  Would you describe exactly what you do today? I think
15  we should start out with: Are you employed?
16  A.  Yes.
17  Q.  Could you give us a little description of who your
18  employer is and what you do?
19  A.  The name of my company is Intellectual Property
20  Research Associates. It is in Yardley, Pennsylvania. I
21  basically do three separate areas or aspects of business.
22  The first is I do consulting. I do consulting for
23  individuals, universities, and corporations that are doing
24  licensing negotiations. Either they want to license
25  technology in or they have technology they want to license

584

Parr - direct

1  out and they will come to me for information and consulting
2  about what royalty rate might be appropriate.
3  In addition, in the consulting area, I do
4  valuations of technology. Not so much value with regard to
5  royalty rate but value of what it's worth if you want to pay
6  and buy and own it.
7  I have done that for companies that are going
8  for private placements. They have to have it in the private
9  placement documents, a report that talks about the value of
10  the technology, because when you are trying to get people to
11  invest in start-up companies, they want to know what they
12  are investing in.
13  For new companies, very often the only thing
14  they have is patent technology. And so I have been
15  contacted several times to do an investment analysis of
16  technology.
17  So that's my consulting practice.
18  Q.  Could you just tell the members of the jury some of
19  your clients in that type of work?
20  A.  Okay. For consulting, I have worked for Baxter
21  Healthcare, giving them royalty rate information for
22  licensing artificial blood. I have also done work for
23  Motts, giving them royalty rate information and consulting
24  for a technology that had to do with smoothies when they
25  were considering going into the smoothie industry.

Parr - direct

1  infringed, those products. Is that correct?

2  A.    That's correct.

3  Q.    In performing this analysis, about how much time did

4  you spend?

5  A.    Well, about probably now 100 hours into my efforts

6  leading up to today.

7  Q.    And you are compensated for your time. Correct?

8  A.    Yes, I am.

9  Q.    Just to be clear, do you stand to make more money if

10  Finjan wins or more money if Secure wins? How is it

11  determined?

12  A.    No, I don't make a dime depending on the outcome. I

13  just get paid for my work and for my opinion at $500 an hour

14  and the outcome does not affect my compensation.

15  Q.    Okay. Going into your analysis, you have a general

16  understanding of what the defendants do in terms of what

17  products they are selling that are alleged to infringe?

18  A.    Yes, I do.

19  Q.    Would you tell us?

20  A.    I look at them as, well, there is WebWasher 5.1, which

21  is a, what I am calling malware protection. It protects a

22  network from viruses and things called farming and fishing

23  and other terrible threats that float around the Internet.

24  That is a software product.

25          I also understand there is CyberGuard TSP

Parr - direct

1  A.    Well, you definitely want to look at the profits of

2  the product that's using the technology. Then you want to

3  consider the importance of the technology as it's used for

4  generating sales, possibly generating additional sales of

5  other products. You want to look at whether it's a growing

6  product or something that is going to die off soon.

7          Those are the general things. Is it important

8  in selling a product? What are the profits that are being

9  made from it? That type of thing.

10  Q.    You mentioned "product." Did you look at the product

11  that is accused to infringe or the general product or the

12  company itself? What exactly are you looking at?

13  A.    If we were going to do a deal for licensing

14  technology, we would have to come to some agreement about

15  what the profit margins are that you are going to make using

16  my technology. I don't care what the profit margins are

17  from your corporation. Your corporation might be making a

18  lot of different products. Some are super-profitable. Some

19  might be just mediocre. But what your company is making as

20  a bottom line has nothing really to do with the technology

21  that I am licensing to you for making two or three specific

22  products.

23          So when you are trying to figure out a royalty

24  rate and you are looking at financial information, it is

25  vital that you look at the profits associated with how the

594

Parr - direct

1  product, which does a similar protection, and it's a

2  hardware product. So instead of just software, you get

3  software I believe imbedded in a piece of hardware.

4          Then I understand there is also another hardware

5  or appliance product called WebWasher. And those are the

6  products at issue here.

7  Q.    Okay. In terms of determining, you determining, you

8  mentioned a royalty, what do you do -- first explain what a

9  royalty is and second explain how -- what do you use to

10  determine that royalty, in general terms, financial

11  documents and the like?

12  A.    Okay. Well, a royalty is a form of tribute. I think

13  it even comes back from medieval times when people had to

14  pay tribute to the king for the use of land or for the

15  use of the farm or for killing deer in his land.

16          It has come to mean now payment for use of

17  technology or for use of trademark. It's typically most,

18  most all the time a percentage of the sales, a percentage of

19  the selling item.

20          So if you are going to use my technology to make

21  a product, you will pay me a royalty on each one that you

22  sell. Kind of like renting my technology, but it's called a

23  royalty payment instead of a rental payment.

24  Q.    Just in general terms, and we will get more specific

25  later, what do you use to determine that royalty?

596

Parr - direct

1  technology is going to be used. And it is not as

2  important -- looking at the company's overall profits is a

3  good clue to taking you where you need to go. But, more

4  importantly, if you can, you want to know what the profit

5  margin is of the product using the technology.

6  Q.    Have you attempted to learn what the profit margins

7  are for the products at issue?

8  A.    I have done that, yes.

9  Q.    Here we have Slide G-100, please.

10          You mentioned earlier certain factors. 15

11  factors I think you said. We have a slide here, Reasonable

12  Royalty Determination. It is the Georgia-Pacific case.

13          Would you just tell us what that is exactly?

14  A.    That is the case where the factors were first listed.

15  And they have been used ever since as guidance for coming up

16  with a reasonable royalty.

17  Q.    And the 15 factors that you described, or that you are

18  going to describe, they are contained in that

19  Georgia-Pacific case?

20  A.    That's right, from that case.

21  Q.    We are going to go through these factors. Could you

22  tell us what Factor 1 pertains to?

23  A.    The first factor basically says --

24  Q.    Before you start --

25          MR. ROVNER: Your Honor, I have given Mr. Parr a

Parr - direct

1   copy of his expert report. I want counsel to know that.
2   And I would ask Mr. Parr, with the Court's permission, that
3   he be able to refer to it?
4           MR. SCHUTZ:  As long as we have the same
5   courtesy.
6           MR. ROVNER:  That is fine. He has got it before
7   him. I didn't want anyone to think it was something else he
8   was looking at.
9   BY MR. ROVNER:
10  Q.   Mr. Parr, if you need to look at your report, go right
11  ahead. This is Slide 1. If you could tell me what Factor 1
12  is?
13  A.   The first factor is, remember, we are trying to figure
14  out, we are looking for information to give us guidance as
15  to what the royalty rates should be for these two parties.
16          The first thing is, let's look at the person
17  that owns the patent, the plaintiff in this case, and what
18  have they received? Have they licensed it to other people?
19  Have they received royalty rates for it?
20          That is the first thing you look for.
21  Q.   Have you seen any licenses that would apply to Factor
22  1?
23  A.   Well, I have seen one license but I don't believe it
24  applies.
25  Q.   What license is that?

598

Parr - direct

1   A.   There is a license --
2   Q.   Just tell me the name of it.
3   A.   There is a license between Finjan and Microsoft.
4           MR. ROVNER:  Your Honor, at this point, there is
5   some -- it was produced and it's very highly confidential.
6   We would ask that those who are not entitled to look at it
7   in the courtroom step out for a bit. We are not actually
8   going to show the agreement but we will be discussing it.
9           (Pause.)
10  BY MR. ROVNER:
11  Q.   Mr. Parr, you mentioned the Microsoft-Finjan license.
12          Could you give us a little more detail?
13  A.   Right. I read the license. It looks like for an $8
14  million fee, Microsoft soft received a license to all the
15  Finjan patents. But in addition to providing the $8
16  million, they also provided some intangible benefits. They
17  promised to include Finjan at a conference where they would
18  be featured side by side at a display booth. I think it was
19  a big conference.
20          They also were promised that they would be
21  participating in a "Webinar" with Microsoft. There would be
22  press releases allowed to talk about the prestige of Finjan
23  being associated with this investment. And those are the
24  three, I think, things I remember.
25          But I also know from deposition testimony that

600

Parr - direct

1   people at Finjan felt this was just a fantastic endorsement
2   of their company and their technology because Microsoft was
3   willing to not only pay money but give them these other
4   intangibles.
5           The reason I said I don't find this useful,
6   though, for the royalty analysis is because, in a sense, I
7   don't know the total amount of value that Microsoft
8   provided. I know they paid $8 million in cash. But I don't
9   know how to determine in economic terms, especially the
10  value of the prestige, the endorsement by Microsoft.
11  Q.   Why an endorsement? Was there a business arrangement?
12  Why are you describing it as an endorsement?
13  A.   Well, because of the public relations announcement.
14  Finjan was allowed to go out and say to the world, Microsoft
15  gave us money to get access to our patents.
16  Q.   Microsoft seal of approval, something like that?
17  A.   The depositions seem to indicate that is how they felt
18  about it, that it was of tremendous value. I don't know the
19  economic value of that.
20          So, without that, I know it's more than $8
21  million, but I don't know how much higher it is. And there
22  is no running royalty, which is what we are looking for
23  here, so I couldn't use this Microsoft license to help me.
24  Q.   In fact, Finjan does not compete with Microsoft, I
25  assume. Correct?

600

Parr - direct

1   A.   Not at the time and not in any way that I have heard
2   of since.
3   Q.   Is that another difference?
4   A.   Well, right. The best evidence would be licenses with
5   royalty rates where Finjan has licensed to competitors and
6   what royalty rate is that? That doesn't exist. We haven't
7   got any of that. In the real world licensing, there is none
8   of that.
9   Q.   If you could go to the next factor that you have
10  analyzed? And I will direct your attention to the board.
11          MR. SCHUTZ:  Can we bring our people in?
12          THE COURT:  Yes, please do.
13  BY MR. ROVNER:
14  Q.   Mr. Parr, could you go to the next, we have No. 2?
15  A.   The next question and answer to look for is, we tried
16  to look to see what Finjan has received for licensing their
17  patents and failed. The next rule is, Let's look at what
18  Secure Computing pays for other similar technology, if they
19  do, to put into their products. And I requested all those
20  licenses. And none were provided.
21          So I can't answer that question. I don't know
22  what they have paid for technology to license. I am
23  assuming, I guess they don't license any technology, don't
24  license or provide it.
25  Q.   You asked them for it and they didn't provide it, so

# EXHIBIT 1
# PART 3

Parr - direct

1  that is why you are assuming they don't do it?

2  A.    That's right.

3  Q.    The next factor then?

4  A.    No. 3, kind of define the scope, what kind of license

5  are we talking about? We are trying to price something. So

6  what is it we are pricing? We definitely know we are

7  pricing technology, but what are we pricing? Are there

8  limitations to the use?

9          Basically, this deal would turn on a

10  nonexclusive use for the United States. So what price would

11  you charge for that kind of license.

12  Q.    So we are clear, I want to make sure we keep track of

13  all this, again, we are talking about this so-called

14  hypothetical negotiation, something that didn't happen but

15  you are treating it as if it did for purposes of determining

16  a royalty rate. Is that correct? Is that fair?

17  A.    Yes. I am trying to say what I think would happen if

18  it did.

19  Q.    Could you go over to the next factor, Mr. Parr?

20  A.    One of the factors that you are supposed to consider

21  is, in this hypothetical negotiation, what's the established

22  policy of the person that owns the technology. Quite often,

23  corporations don't want to license keystone technology.

24          Sometimes they licence peripheral technology

25  that they are not using directly. But other times they will

---

Parr - direct

1  Q.    They don't involve proactive scanning?

2  A.    That's right. I understand they are unrelated to

3  proactive scanning.

4  Q.    Well, if Finjan does not want to license in their core

5  area to a competitor, yet -- that's correct? That's what

6  you are saying?

7  A.    Finjan, the answer to No. 4, you have got a person

8  going to this hypothetical negotiation that does not want to

9  license to a competitor because it's different than

10  licensing outside my business. I am licensing to a

11  competitor who is going to turn around and use my own

12  technology against me. I am going to lose sales, I am going

13  to lose profits most likely.

14          So I am going to want to press for a higher

15  royalty rate because of the damage that is going to happen

16  once I extend the license.

17  Q.    So that would, in the list of factors, that would tend

18  to increase the rate. Is that correct?

19  A.    Well, right. If you wanted to assign the effect of

20  each and every one of these factors, that would be a reason

21  to pressure upwards.

22  Q.    Slide 102. This is another slide with various

23  Georgia-Pacific factors. We are now on No. 5.

24  A.    We have already touched on this in the sense that

25  factors of saying, in this hypothetical negotiation, what is

---

Parr - direct

1  have technology that's key to their business and they

2  certainly don't want to license it because they can get more

3  benefit out of using it as an advantage, proprietary

4  advantage.

5          So what I have seen from my studies here is that

6  Finjan is not interested in licensing the patents in suit.

7  They use it themselves, their brochures say that they are

8  the only source of proactive scanning, and they say it in

9  capital letters. It leads me -- there is a lot of

10  information. But that alone leads me to believe that they

11  want to use it proprietarily, to be the only place to get

12  it.

13          So they don't want to license it. The answer to

14  that question is the established policy of Finjan is that

15  they want to use it and sell it and not license it.

16  Q.    Have you seen any instances where Finjan has at least

17  been considering the idea of licensing a patent that is not

18  in their core area?

19  A.    The only instance I have seen is a letter from their

20  lawyers to a company called Webroot expressing an interest.

21  There was no offer. There was no acceptance. There were no

22  terms. But there was a letter talking about, would you be

23  interested in considering licensing. And there are two

24  patents that were identified. I understand -- I know they

25  are not the ones in this case.

---

Parr - direct

1  the relationship between the two parties. Is one a simple

2  outside inventor, a university who is not in the business of

3  licensing to a corporation? Or are they competitors?

4          This with 4 would have a tendency to increase

5  the royalty rate, the amount that they would want, because

6  you are giving a proprietary advantage to a competitor who

7  is against you.

8          So I see the two companies, Secure and Finjan,

9  as competitors.

10  Q.    PTX-120. Is this one of the documents that you have

11  reviewed in reaching that conclusion that they are

12  competitors?

13  A.    Yes, it is. It is a WebWasher product talking about

14  why companies use WebWasher over Finjan. So this pretty

15  clearly indicates to me that WebWasher is talking about a

16  Finjan product and the relative choice between their two

17  products is the first indication I got that there is

18  competition between the companies.

19  Q.    Because a company is writing why their company chooses

20  their product over someone else's?

21  A.    That's right. I don't think a company is going to

22  bother producing something like this unless somebody is

23  competing with them. It would be like me doing an analysis

24  about why you would want to buy my services over the gas

25  attendant down the street. We are not competing.

Parr - direct

1   Q.   Right.

2   A.   So, anyway, what we were talking about, after you get

3   to the lost profits -- I mean the gross profits --

4   Q.   You said "gross profit." What is gross profit margin,

5   then?

6   A.   That is the ratio of gross profit divided by the total

7   revenue. In a sense, what we are looking at is after I pay

8   for the material and labor to make a product, I have 72

9   percent of the revenue dollar left. So out of every dollar

10  I collect from a customer, after I pay for material and

11  labor to make the product, I still have 72.2 percent, as an

12  example, for 2006, still left over.

13          That is the profit at that level, the gross

14  profit to get a product to the warehouse, but it's not doing

15  me any good there.

16          Now you have to consider what expenses are going

17  to move it. In general, you have marketing, which could be

18  advertising. Then you have selling expenses, which could be

19  the salespeople out knocking at doors. Then you have

20  general and overhead, administrative. That is back office

21  expenses, like the home office where they do accounting and

22  your health insurance for the employees.

23          Now, after you consider those expenses, you

24  subtract those, and that gets you to what is called

25  operating profit.

618

Parr - direct

1           And the operating profit margin would be to take

2   the operating profit and divide it by total revenues.

3   Q.   Okay. If you could go to Slide 108, please.

4           Now, do you recognize this slide, Mr. Parr?

5   A.   Yes.

6   Q.   Would you briefly describe what this is?

7   A.   Those are gross profit margins on a consolidated

8   basis, say, reflecting all of the products of those two

9   companies, for the years shown, and those are the gross

10  profit margins.

11  Q.   Do these come from the exhibits to your report,

12  Exhibits 1 and 2 that we showed for Secure and CyberGuard?

13  A.   I think that's the source. But the ultimate source

14  would be the Security and Exchange Commission 10-K filings.

15  Q.   Those -- I know it is tough to see -- but those are on

16  the left?

17  A.   The cover pages are on the left, right.

18  Q.   Okay. So these represent gross profits for the

19  company. Is that correct? For the two companies?

20  A.   For each of those years, that's right.

21  Q.   Does that give you enough information to come up with

22  royalty rates in this case? What else do you have to do?

23  A.   No. Because, remember, a royalty rate is a sharing of

24  the products. You are going to make a product, and use my

25  technology, we are going to share the profits and that will

Parr - direct

1   reflect a reasonable royalty. But the gross profit margin

2   isn't what we are sharing.

3           What we are trying to share is the profit margin

4   that's left over after you have made the product, marketed

5   the product, paid for selling expenses and cover overhead

6   expenses.

7           Now we know, because we have identified that

8   profit margin, what should be split.

9           So this is just like the starting point and it

10  shows very healthy gross profit margins but it is not the

11  basis for making a royalty rate.

12  Q.   So we have up on the board here Total Gross Profit

13  Margin which we showed on that slide for the two companies.

14  I am going back to Secure's financials. If you could

15  continue down, you mentioned operating profit.

16          Could you describe that and how you got there?

17  A.   These are all directly from the SEC report. You

18  subtract selling and marketing. There is a research and

19  development cost, general administrative. Then there is

20  amortization of purchased intangible assets. And they had

21  an operating expense in one of the years of the litigation

22  settlement.

23          They add up all of their zero total expenses.

24  And when you subtract that from the gross profits that we

25  have already talked about, you get the bottom line operating

620

Parr - direct

1   profits before income taxes.

2   Q.   What do you need to do, if anything, to get to profit

3   margins for the products we are talking about?

4   A.   Well, the first thing I did was, we are trying -- we

5   are trying to figure out the profit margins of products that

6   the company sells. And you eliminate expenses that are not

7   related to the product. I have licensed you technology so

8   you can make a product, and I want a share of those profits.

9           Litigation settlement costs has nothing to do

10  with, say, my technology and how you are using it with your

11  product. It could be completely unrelated. It is a

12  non-recurring expense. It is a one-time thing.

13          And in our deal, the royalty negotiation, I am

14  not going to participate or pay you for that. I am not

15  going to allow for that to be part of the calculations of

16  your operating profit margin.

17          I don't know why you got sued. I don't know why

18  you decided to settle instead of fight. But it is a

19  non-recurring expense, it has nothing to do with my product.

20  You don't get to charge that against the operating profit

21  margins we are going to split.

22          The same thing is true with research and

23  development. You are spending money, lots of it, companies

24  do and should, to develop new products that they will sell

25  and make new sales and new profits.

Parr - direct

1    But that should come out of your split. We

2    split the operating profit margins of the products I have

3    licensed you to do, I don't care what you do with your

4    share. And you can and want to maybe spend it on research

5    and development. But that's your decision. That doesn't

6    come out of the profits before we do the split. Because I

7    am not going to get anything out of future research and

8    development with new products going forward.

9    I also eliminate the one-time event or

10    acquisitions. These, again, are extraordinary expenses with

11    acquisitions of the amortization of purchased intangibles.

12    There is a non-expense, actually, because it's

13    an amortization of cash payment that was made. So it's not

14    really an expense of cash going out the wind. It is an

15    accounting expense. So I have reversed those. Those are

16    the only three elements I have reversed.

17    Q.    So the numbers -- could you point out -- do you have a

18    pointer there?

19    A.    Yes.

20    Q.    If you could point out, you have made adjustments on

21    this particular exhibit. Is that correct?

22    A.    Yes.

23    Q.    Could you point out what they are, just so we are

24    clear?

25    A.    All right. For up here, they are the expenses that

---

Parr - direct

1    One year we also have this expense for

2    amortization of intangibles, and I reversed that. Once I

3    made those adjustments, I have what I want to use as the

4    operating expenses to subtract from the revenues. When I do

5    that, I get the profit margins on the bottom of 16.1

6    percent, 30.9, and 26.9 percent. And those three over that

7    three-year period averages approximately, I think it's 25

8    percent.

9    Q.    Now, explain to me and to the jury, if you would, why

10    does operating profit matter when we are trying to get to

11    this royalty number?

12    A.    Remember we are going split profits. You are using --

13    say you are using my technology to make a product. And you

14    are going to hire the salespeople, make provisions to

15    manufacture, hold inventory, you are going to do a lot of

16    things. So we are going to split it.

17    First, we have to define what profit we are

18    going to split. And that's what I am trying to identify

19    here. All I have got is the consolidated financial

20    statements for Secure Computing. And I am saying there

21    could be other expenses in there that have nothing to do

22    with the product we have licensed. But I can't identify

23    them.

24    I do know, though, the research and development

25    should not be associated with the profit margin on the

---

Parr - direct

1    were reported on the 10-K, showing total expenses of the

2    whole company. I want to adjust the expenses. So to get to

3    the total adjusted operating expenses, I took the entire

4    amount of this litigation settlement and decided settlement,

5    and decided that's nothing to do with licensing the

6    technology of the ProActive scanning product, so I

7    subtracted it. It's not an expense that should be

8    associated with the ProActive scanning product.

9    Over here is an adjustment I made for research

10    and development. Remember I said, I don't think we should

11    include those as expenses against a ProActive scanning

12    product because you are making new?

13    But if you look up here, the research and

14    development, it was $34 million. I made it 27. That's

15    because I found an internal Secure Computing memo that said,

16    20 percent of the R&D expenses are associated with current

17    sales of products. Okay?

18    Then you have got some expenses that are

19    associated with current sales. And I only want to eliminate

20    those that are most likely associated with future products

21    that are unrelated. So I only took out, I took out 80

22    percent of the total amount up there.

23    Then for amortization of expenses -- by the way,

24    I did that for each year, 80 percent, 80 percent, 80

25    percent.

---

Parr - direct

1    product I have licensed, you have made.

2    Amortization shouldn't have anything to do with

3    it. And settlement of the litigation, a one-time

4    non-occurring event, would have nothing to do with it.

5    Q.    I see. Well, earlier you testified that there would

6    be different royalty rates for the software and for

7    appliances.

8    A.    That's right.

9    Q.    This operating profit margin, which you said you used

10    to get to a royalty, how do you use -- these numbers are not

11    specific to the product. How do we get to the product so we

12    can get the ultimate answer?

13    A.    By going back and looking at the gross profit margin,

14    unfortunately, Secure Computing doesn't do this on a

15    product-by-product basis.

16    Q.    You haven't seen any material to that effect?

17    A.    That's right. To be fair, not all companies do. But

18    they do look, say, I have information of gross profit on a

19    product-by-product basis.

20    So for the hardware, appliance products, the

21    information I found said that their gross profit margin is

22    about 70 percent. Well, that ties right into what we have

23    up here of about 70 percent, and also what CyberGuard shows

24    as 68.9, 70 percent.

25    That let me conclude that the average 25 percent

---

Parr - direct

1  that I have just calculated can be associated with the
2  hardware products, because they have a gross profit margin
3  that ties in with these gross profit margins that's close.
4       So for the operating profit margin, to associate
5  with the hardware projects, I have used the average of my
6  adjusted profit margins and said it's 25 percent.
7  Q.   Have you also concluded that it was 25 percent?
8  A.   No.
9  Q.   Could you explain?
10 A.   In my report, I had used 35 percent, because I thought
11 I had enough information to say that the appliances were ten
12 percent more profitable at the gross profit margin level
13 than this document shows on a consolidated basis.
14      I don't have enough to really go there, because
15 what I do see is that the appliances are pretty much at the
16 70 percent profit margin area -- 72, 70, 75. The reason I
17 looked is, I said, There is no basis to add this ten percent
18 increase to the 25. So I am telling you my report used 35
19 percent operating profit margin for appliances, but I am
20 telling you now the right answer is 25 percent, not the 35.
21 Q.   What effect does that have, if any, on your ultimate
22 conclusion of a royalty rate for appliance?
23 A.   It lowered the royalty rate.
24 Q.   So the number, your eight percent for appliances is
25 lower than what you had in your report for November?

626

Parr - direct

1  A.   That's right.
2  Q.   What about software?
3  A.   Software, if you look at software and compare the
4  software product profit margins to the operating profit
5  margins here and in CyberGuard, software product gross
6  profit margins are enormously higher. They are not in the
7  70s, 75 or 80. There is testimony by someone at Secure
8  Computing that they are 99 percent. So if you have got
9  product in this mix, in this, that is making 99 percent, by
10 the time you go through all of the other expenses that I
11 have done, then the operating profit margins for software
12 would be more like 55 percent.
13      So if your gross profit margin for the
14 appliances is 70 percent, and I made no changes, operating
15 profit margins associated with them is 25 percent, but if
16 your gross profit margin for products is 30 percent higher
17 because it's 99 percent, then you have got to make an
18 adjustment.
19      And I am saying the operating profit margin I am
20 associating with the software is 55 percent.
21 Q.   I think we were up to Factor 9 now. Could you
22 describe what Factor 9 entails?
23 A.   I kind of addressed these together. It's pretty much
24 talking about, say, the utility and advantage of the
25 technology that the dispute is about, and the character of

Parr - direct

1  how it's embodied, and benefits of the invention.
2       The first thing is the character of it is, it's
3  a product. It's not a process that saves you money in
4  manufacturing. It is an actual product that has features
5  and functionality that consumers want.
6       The advantage of it is that it's ProActive
7  scanning or I guess you could say instantaneous scanning,
8  there is no delay between the entrance, the introduction of
9  a new threat, and the time that this software captures it.
10      The reason that is better than the old modes, I
11 understand the old modes, where you buy software, it has a
12 list of things to hunt for that it might see coming into
13 your computers and it nails them. Something new is
14 introduced, your computer is vulnerable until the vendor of
15 your software issues updates, or a patch. Then you get the
16 patch and put it in your computer. Now you are safe against
17 the new thing. But the time in between getting the update
18 and the introduction in the Internet of a new ugly malware,
19 you are vulnerable.
20      This I understand is the first invention to
21 solve that problem. So that kind of addresses this factor.
22 And it also makes it kind of a keystone technology.
23      This has become fundamentally important in the
24 industry. It's not like a little feature that's an add-on.
25 It's core to these products now.

628

Parr - direct

1  Q.   Okay. Your description was much briefer than what we
2  have heard from for the past couple days on this. You are
3  not an expert in the field of ProActive scanning? You are
4  attempting to put your -- describe what you have been told.
5  Correct?
6  A.   I am describing my understanding of the technology and
7  why it's important.
8  Q.   You are an electrical engineer, but you are not coming
9  into this Court as an expert in the technology at issue?
10 A.   That's correct.
11 Q.   So in Factor 9, you concluded that this is something,
12 you said "keystone." Could you elaborate on that?
13 A.   Keystone, fundamental. It is not what I would call an
14 add-on feature. It is not what I would call a side benefit.
15 It's fundamentally important to the product and the
16 product's viability.
17 Q.   Have you looked at any documents from Secure that
18 would confirm that for you?
19 A.   Yes.
20 Q.   So you did more than just talk to people, you actually
21 looked at things in this record. Is that correct?
22 A.   Right. I saw evidence that supports this in Finjan
23 documents, Secure documents, and outside third-party
24 documents.
25 Q.   Okay. You have seen this before. We focused on

Parr - direct

1  Factor 3. Is that something that again would guide you in

2  terms of whether this technology is important or not?

3  A.    Right.

4  Q.    In relative terms to the Georgia-Pacific factors?

5  A.    Yes. It's obviously got more functionality and

6  utility, which addresses Factors 9 and 10, because in a

7  planning session for products, this has been identified as a

8  the number three item that needs to be developed on their

9  own or create something similar to Finjan's.

10  Q.    It is talking about the ProActive security. Right?

11  A.    Oh, yes.

12  Q.    Could you go to PTX-24, please.

13        You talked about documents from third parties.

14  Is this one of them?

15  A.    Yes.

16  Q.    What is this document?

17  A.    This company, IDC, provides market research. They

18  talk about the state of an industry, the players in an

19  industry, trends in the industry. And that's what this

20  document is.

21  Q.    Could you go to 23228, please.

22  A.    This is the conclusion of the, pretty much of the

23  report. I am having trouble reading that.

24  Q.    Could you blow up the last two paragraphs.

25  A.    Thank you.

Parr - direct

1  Q.    This is the conclusion, essential guidance. Is that

2  right?

3  A.    In here, I can't find the exact same sentence, for me

4  to get to the report, they are talking about ProActive

5  scanning is fundamentally important if you are going to have

6  a competitive product in the security area.

7  Q.    Well, could you go over to the first sentence of the

8  second paragraph and highlight that.

9  A.    IDC believes that a multi-layered approach to the

10  security infrastructure is necessary to thwart the threats

11  outlined in this document.

12  Q.    Could you go over to the first paragraph, the first

13  line?

14  A.    In the first, the first three lines, more ProActive

15  security products and services. The spotlight is on these

16  things and there is a growing need for them. So that is a

17  fundamental conclusion of this report.

18  Q.    Okay. What does that do to your analysis, if

19  anything?

20  A.    Well, it provides me support for what I have said

21  before, that we are not talking about some nice optional

22  feature. Products are having to have ProActive scanning,

23  and it makes it fundamentally important to the product and

24  makes it fundamentally important, say, for you to take a

25  license from me. It's not an option when you can say,

Parr - direct

1  Well, I don't really need this feature so I am not going to

2  pay you. It addresses Factors 9 and 10. This is important.

3  Q.    Now, you said -- could you go back over to Slide 103,

4  please.

5        You said you take Factors 9 and 10 together?

6  A.    I tend to, yes.

7  Q.    Why is that?

8  A.    Well, normally, the information you discover addresses

9  both of these things at the same time. The questions are

10  kind of similar. You are talking about what is the

11  advantage of the property and what is the commercial nature

12  of it and what benefits are involved.

13        When you are talking about the advantages and

14  utility, in Factor 9, it leads you directly to the benefits

15  of the invention in what you asked for in No. 10. So I tend

16  to find information that answers both at the same time. So

17  rather than repeat the same paragraphs over and over twice

18  in the report, I just put the two together and addressed

19  them together.

20  Q.    Could you go over to Slide 104, please.

21        Factor 11, what significance, if any, does that

22  play?

23  A.    Factor 11, did you say?

24  Q.    Yes.

25  A.    Oh, well, one of the things you consider when we are

Parr - direct

1  splitting the royalties, did you make any benefit from it?

2  Are more customers coming to you? What has the person that

3  has allegedly infringed gotten from it?

4        In my report, I showed that they have $66

5  million of sales over the period of infringement. And the

6  sales forecast, in addition, Secure Computing show at

7  least out to 2010 with a, I think it's an average annual

8  compound growth rate of 14 percent, which is pretty healthy.

9  Q.    Could you go to G-111, please.

10        Is that what you are talking about?

11  A.    Right. So the WebWasher product is shown to go from

12  just over 17 million in 2005 to over 32 million, maybe it's

13  even 35 million, by 2010. And the TSP product is at a lower

14  level but still keeping pace and growing at about the same

15  annual average increase rate.

16        So this shows evidence not only of what we found

17  them selling, I think in my report it's 66 million,

18  approximately. Maybe it's 50 million. But they have sold

19  tens of millions of dollars. Not only that, they are

20  expecting and showing and anticipating to sell many more

21  tens of millions.

22  Q.    Okay. Do you take this into account, these

23  projections which show growth, I am sure -- you are talking

24  about profits and talking about growth. If the company or

25  companies have not made money in the past, and we have heard

Parr - direct

1   some testimony about who is making money, who is not, and
2   some of the defendants are not making money, have not made
3   money in every year; how does that affect your analysis?
4   A.    That's why I am trying to somehow identify profit
5   margins associated with the products. If I license
6   something to you for a royalty, and then you make great
7   sales of it and have future expectations of sales on it, but
8   the company loses money because of other products or other
9   circumstances or the fact that maybe a building burned down
10  and you have an extraordinary expense, in a sense, that
11  doesn't release you from paying for the royalty of a
12  profitable product.
13          When determining a royalty rate, I don't care
14  what the profitability is on your entire company. I want to
15  try to figure out what's the profitability of the product
16  that you are going to make using my technology.
17          That is what is important. Not the entire
18  company's profitability.
19  Q.    Okay. Thank you.
20          We have heard testimony in this trial about what
21  products are alleged to infringe. Just so I am clear, you
22  mentioned the WebWasher software. You mentioned the
23  WebWasher appliance. And you mentioned the CyberGuard TSP
24  appliance. Correct?
25  A.    That's right.

634

Parr - direct

1   Q.    If it is an issue over the CyberGuard TSP, you have
2   been told to assume that the CyberGuard TSP appliance
3   infringes. Is that correct?
4   A.    Oh, definitely, I have been asked to assume that
5   because I don't have the technical capability to say, Yes,
6   that one does, and, No, that one doesn't. I assumed that
7   all the TSP, plaintiff's products, should be in the royalty
8   base, that you should have to pay a royalty on them.
9   Q.    Your understanding is because the WebWasher component
10  is part of the CyberGuard TSP appliance. Correct?
11  A.    Yes, that's right.
12  Q.    Have you seen anything in the defendants' own papers
13  to support that?
14  A.    Yes, I have.
15  Q.    Could you turn to 263, please.
16          Do you recognize that?
17  A.    Yes.
18  Q.    What is it?
19  A.    I think it's a selling document that describes the
20  CyberGuard TSP firewall product. In the first line, it says
21  that the CyberGuard TSP enterprise, gateway security, and
22  appliance provides ProActive positive security against.
23  So I basically, as I said, took the assumption
24  that was handed to me, but here is evidence that supports
25  giving me that assumption.

Parr - direct

1   Q.    I notice that some of the right side is cut off, I
2   apologize for that. If you could go to the bottom half of
3   the document. It says, This CyberGuard TSP Firewall, do you
4   see that?
5   A.    Yes.
6   Q.    It has a list of features. Correct?
7   A.    Yes.
8   Q.    And if we go up to the next page, it says, WebWasher
9   Content Filtering. Correct?
10  A.    Yes, it does.
11  Q.    That is in a marketing piece, as far as you know, from
12  the defendants. Correct?
13  A.    Yes, that's right.
14  Q.    Would you go to JTX-46, please.
15          Do you recognize this document?
16  A.    Yes.
17  Q.    Could you describe for the jury what that is?
18  A.    It's guidelines for WebWasher support in the TSP v6.4.
19  Another indication that there is WebWasher ProActive
20  scanning functionality in a TSP product.
21          In the middle of the second sentence, the TSP
22  v6.4 appliance software real lease includes an embedded
23  WebWasher server. As I understand the WebWasher server,
24  that would include the ProActive scanning functionality. So
25  again, it looks like the TSP has allegedly infringing

636

Parr - direct

1   technology.
2   Q.    Could you go over to the next paragraph, please, the
3   second sentence.
4           Would you highlight that, please?
5   A.    Do you want me to read it?
6   Q.    Yes.
7   A.    "Therefore, it will come as no surprise that Secure
8   Computing has always been and continues to be very excited
9   about WebWasher functionality being imbedded in TSP, and we
10  now report" --
11  Q.    That is what I needed.
12          At least Secure Computing is saying that
13  WebWasher functionality is being imbedded in the TSP.
14  Correct?
15  A.    That's right. So when I was asked to assume that TSP
16  products should be part of the royalty base, and include
17  them in the calculations, it seemed to be not much of a
18  stretch to accept that assumption.
19  Q.    Can we go back to G-104.
20          Factor 12, could you describe for us what Factor
21  12 requires?
22  A.    Now we are starting to get into using what we have
23  gathered. This is the portion of the profit or the selling
24  price that may be customary in the particular business or
25  comparable businesses to allow for use of the invention. 13

Parr - direct

1   You don't get what is called "freedom to operate."

2           That is what we are really talking about,

3   freedom to sell these products, freedom to make these profit

4   margins that I have talked about, freedom to get the

5   ancillary sales, new products, new clients. That is what

6   you want. I decided it's worth 18 percent for software,

7   eight percent for hardware, and it doesn't matter how many

8   patents can be your roadblock. You have to pay that to get

9   through the gate.

10  Q.      That is, in fact, what the parties are doing at the

11  time of the hypothetical negotiation, they are trying to

12  come up with a number or numbers that will give them the

13  freedom to operate?

14  A.      During the hypothetical negotiation, suppose I was

15  licensing technology from you, this is a product we are

16  going to make, this is the profit I am going to make, here

17  is the royalty I am going to pay you, we agreed.

18          From your side of the deal, I want every single

19  patent, because I want freedom to operate. If you say,

20  Well, I only have one, but it's a strong patent and it can

21  stop you, then that's what I am going to pay for, because

22  what I want is freedom to operate, so you are going to give

23  me all 100 or just one.

24          MR. ROVNER: Thank you, Mr. Parr. No further

25  questions.

650

Parr - direct

1           THE COURT: All right. Mr. Holdreith.

2           MR. HOLDREITH: Thank you, Your Honor.

3           Your Honor, I am going to mention the terms of

4   the agreement that we asked earlier. I am going to have to

5   ask Ms. Bunch to step out just for a moment.

6           THE COURT: All right.

7                   CROSS-EXAMINATION

8   BY MR. HOLDREITH:

9   Q.      Good afternoon, Mr. Parr.

10  A.      Good afternoon.

11  Q.      You just discussed freedom to operate with counsel.

12  Is that right?

13  A.      Yes.

14  Q.      Freedom to operate is the idea you pay some money, you

15  don't have to ever worry about this patent again?

16  A.      No. That would be a lump-sum payment, which could get

17  you freedom to operate or a deal that gets me freedom to

18  operate and I get all the patents needed on a running basis.

19  I will pay you a percentage on each one and I will get

20  freedom to operate for as long as the license is in effect.

21  Q.      Fair enough. You pay an amount, you get freedom, you

22  don't have to worry about the patent anymore?

23  A.      Right. It could be a lump-sum amount or a running

24  royalty where I pay as I go.

25  Q.      And in the case of Microsoft, Microsoft paid $8

Parr - cross-examination

1   million?

2   A.      That was the cash amount they paid.

3   Q.      Right. They got freedom to operate?

4   A.      They got the rights. But I don't know that they are

5   operating. But they do have the rights to operate.

6   Q.      They have got freedom to operate. They don't have to

7   worry about these patents?

8   A.      They don't have to make payments in the future.

9   Q.      That's right?

10  A.      That's right.

11  Q.      That $8 million covers Microsoft from now through the

12  end of time?

13  A.      Plus the intangible assets that they provided. But

14  the $8 million plus all of those additional intangibles

15  covers them for as long as the patents are valid.

16  Q.      The patents are about 20 years?

17  A.      I think two of them go to 17, so that makes ten years.

18  I think one of them expires a little after that.

19  Q.      Microsoft paid --- that license was concluded in what

20  year?

21  A.      I don't recall the year.

22  Q.      It would have been 2005. Is that right?

23  A.      I don't recall.

24  Q.      Microsoft got, let's say, 12 years of freedom to

25  operate for $8 million. Right?

652

Parr - cross-examination

1   A.      It's not just the 8 million. It's 8 million cash plus

2   the other intangibles that I understand Finjan management

3   valued highly and coveted.

4   Q.      The endorsement?

5   A.      The endorsements, the prestige of being associated

6   with Microsoft, the "Webinar" Convention Center, coupling.

7   All those things.

8   Q.      And Microsoft has freedom to operate throughout the

9   world. Right? That license is worldwide?

10  A.      It may be. I don't recall without looking at it.

11  Q.      Now, in this case, you are proposing that Secure

12  Computing should pay $10 million?

13  A.      For past infringement, that's correct.

14  Q.      For two years?

15  A.      Yes. For the period of time, in effect, end of 2004

16  through 2007. Over two years.

17  Q.      A little bit over two years?

18  A.      Yes. That's right.

19  Q.      Two years and a couple months?

20  A.      They should pay at least 10.1 million until we find

21  out what the other sales we are left with.

22  Q.      Really it is more than ten million you are proposing.

23  Right?

24  A.      Yes. They should pay ten.

25  Q.      Microsoft, 12 years, $8 million, Secure Computing, two

Parr - cross-examination

1  years and a couple of months, $10 million and then some

2  more?

3  A.  Okay.  But Microsoft, you get the prestige that was

4  valued highly by Finjan.  With Secure Computing, you get

5  your own technology immediately being used against you and

6  you don't get an endorsement that has any significance.

7      So the thing you are eliminating from your

8  comparison is what Finjan highly coveted, is the prestige

9  associated with Microsoft, singling them out among the

10  thousands of small software companies as someone we are

11  investing in.

12  Q.  Microsoft, under its license, it has the freedom to

13  make a product.  Right?

14  A.  Yes.  The license would give them freedom to enter if

15  they wanted to.

16  Q.  And if Microsoft wants to compete mercilessly with

17  Finjan and drive them out of business using Finjan's

18  technology, they have the absolute right to do that under

19  the license?

20  A.  I would believe they could do that if they decided

21  they wanted to.

22  Q.  And Microsoft is one of the largest if not the largest

23  software company in the world?

24  A.  One of the largest.

25  Q.  Finjan would have to assume, in concluding a license

654

Parr - cross-examination

1  deal with Microsoft, that Microsoft was a potential

2  competitor?

3  A.  I don't know what they assume.

4  Q.  All right.  I want to talk about your calculation now.

5  You calculated a royalty rate, which here is eight to 18

6  percent.  Right?

7  A.  Yes, that's right.

8  Q.  And you apply that to a royalty base, which is the

9  sales?

10  A.  Exactly right, yes.

11  Q.  So you multiply the percent by the dollars in the

12  sales number?

13  A.  That's right.

14  Q.  So you have to calculate those two things, first you

15  figure out the percent, then you figure out the sales base,

16  then you multiply the two?

17  A.  Exactly.

18  Q.  I want to talk about the royalty number first.  The

19  percent.

20  A.  Okay.

21  Q.  You read Mr. Degen's report in this case?

22  A.  Yes, I did.

23  Q.  You know what his calculation of the royalty rate is?

24  A.  I have forgotten.  I think it's four percent.

25  Q.  About four percent.  You know that Mr. Degen has

Parr - cross-examination

1  calculated that if Secure Computing prevails on its

2  patents -- you know we are going to put on a patent case?

3  A.  That's right.

4  Q.  If Secure Computing prevails, Finjan should pay -- do

5  you know what the number is?

6  A.  I don't know the amount.  It's based on the four

7  percent, I think.

8  Q.  It's two percent, isn't it?

9  A.  I don't recall.

10  Q.  You don't remember that?

11  A.  Don't know.

12  Q.  And you agreed with that two percent?

13  A.  Based on the technology that Secure is arguing about,

14  the lower royalty seemed appropriate.

15  Q.  So you said, Finjan wins, they get eight to 18

16  percent, Secure Computing wins, they get two percent?

17  A.  Exactly.

18  Q.  Now, when you were applying the Goldscheider rule,

19  that is the rule of thumb you mentioned?

20  A.  Yes.

21  Q.  You apply that to net operating margin.  Right?

22  A.  No.  I call it operating profit margin.

23  Q.  Operating profit margin?

24  A.  That's to eliminate the confusion with another level

25  of profit margin called net income.  The difference between

656

Parr - cross-examination

1  the two, operating profit margin is what we talked about,

2  and then you can subtract interest on debt and income taxes,

3  and that gets you to your final net.

4      I am using operating margins before interest

5  expenses and before debt.

6  Q.  The correct figure is operating margin?

7  A.  That's correct.

8  Q.  I am showing you now one of your demonstrative

9  exhibits that counsel showed.  These are operating profit

10  margins that you calculated for Secure Computing and

11  CyberGuard?

12  A.  That's correct.

13  Q.  These are company-wide?

14  A.  These would be on a consolidated basis.

15  Q.  That is all profits?

16  A.  That's correct.

17  Q.  Your preference in this case is to have operating

18  margin specific to the products?

19  A.  That's my preference.

20  Q.  But you did look at operating margin company-wide?

21  A.  That's right.

22  Q.  And, now, these are not the actual operating profit

23  margins that were stated in the company's audited financial

24  statements, are they?

25  A.  No, that's correct.

1  Q.  You adjusted them?

2  A.  That's right.

3  Q.  You reversed some research and development expenses?

4  A.  That's right.

5  Q.  And we are going to look in a moment in the financial

6  statements. The audited financial statements have a

7  different operating margin number. Right?

8  A.  Because they include the expenses I reversed, that's

9  correct.

10  Q.  And the effect of your reversing expenses, that was to

11  raise the operating margins?

12  A.  That's right. The effect is to increase profit

13  margin.

14  Q.  That leads to a higher royalty percentage?

15  A.  Exactly.

16  Q.  So you changed the audited financials and came up with

17  a higher number?

18  A.  Well, I like to think that I adjusted them to get to

19  the more appropriate royalty -- I mean operating profit

20  margin for application of the 25 to 33 percent rule.

21  Q.  You know that Secure Computing began selling WebWasher

22  in what year?

23  A.  I think that they acquired CyberGuard in January of

24  2006.

25  Q.  2006, exactly. That's shown right here. Correct?

1  that's what you take a quarter to a third of. Right?

2  A.  That's right. But I wouldn't use these exactly as you

3  are talking about it.

4  Q.  I realize that.

5  A.  Okay.

6  Q.  If you take a quarter to a third of the 12.9 percent,

7  what is that?

8  A.  I don't have a calculator on me.

9  Q.  A quarter to a third of 13 percent, is that about

10  three to four?

11  A.  Four percent, about.

12  Q.  Three to four.

13       If you take a quarter to a third of the 16.1

14  percent, what is that?

15  A.  Four to five.

16  Q.  Four to five percent. All right. Mr. Parr, I know

17  this is very hard to see, but this is your Exhibit 1.

18       Do you recognize that?

19  A.  Yes, I do.

20  Q.  And this is the calculation you did which resulted in

21  the 16.1 percent we just saw. Right?

22  A.  Yes.

23  Q.  What you did is you reversed those expenses?

24  A.  Right. In a sense, I took them out of the expenses

25  because I am trying to identify expenses that are

1  A.  Yes.

2  Q.  And CyberGuard -- so Secure Computing, they were not

3  selling WebWasher in 2004 or 2005?

4  A.  That's correct.

5  Q.  And CyberGuard began selling WebWasher in what year?

6  I will help. It is October 1994. Right?

7  A.  That's when they started selling WebWasher 5.1 as

8  infringing. I don't know if there was a version they sold

9  before that.

10  Q.  Thank you for being precise. I meant to ask, When did

11  CyberGuard start selling WebWasher with ProActive scanning?

12  A.  That would be around the hypothetical date,

13  October-November of 2004.

14  Q.  So the only full year for which you have an operating

15  margin for CyberGuard selling WebWasher with ProActive

16  scanning was 2005?

17  A.  Yes.

18  Q.  So, we apply the rule of thumb to this operating

19  margin percentage if we are doing it on a company-wide

20  basis. Right?

21  A.  With no further adjustments for software versus

22  hardware?

23  Q.  Right.

24  A.  All right. Go ahead. Hypothetically.

25  Q.  But that's the correct -- it's operating margin,

1  appropriate to associate with the products. And I decided

2  these are not appropriate so they shouldn't be part of the

3  expenses that lead to an operating profit margin.

4  Q.  Did you reverse revenues from any other products?

5  A.  No, because I am looking for a profit margin

6  associated in this case with total revenues.

7       So the revenues here are for existing products,

8  in total, and I am taking out expenses that have nothing to

9  do with the sales of those total revenues.

10       So I left all expenses, except for the ones that

11  change, because they have nothing to do with all the

12  revenues. So I wouldn't change any revenue numbers.

13  Q.  So you just adjust the expenses but not the revenues.

14  Is that fair to say?

15  A.  Well, it would be wrong to adjust the revenues.

16  Q.  That's your opinion?

17  A.  Okay, yeah, that's my opinion.

18  Q.  Now, I am putting side-by-side here -- I am sorry. I

19  will show you the whole document. This is the 10-K of

20  Secure Computing for 2006. It's JX-11. And you took the

21  numbers before you adjusted them out of this 10-K. Right?

22  A.  I believe that's the page. I haven't got it in front

23  of me. Those look like the numbers.

24  Q.  And I don't want to make you guess. Do you have a set

25  of your demonstratives there in front of you?

Parr - cross-examination

1   A.    Total sales, right. Once we come up with the margin
2   we use that to derive the royalty rate. Then we need a
3   royalty base, what's called royalty base. That would be the
4   sales, that's right.
5   Q.    If somebody said, you know, the royalty here really
6   should be four percent, not 18 percent, the first thing you
7   would do is, you would multiply this 49 million by four
8   percent, not 18 percent?
9   A.    Just because somebody says it doesn't mean I would do
10  it. If somebody decides that they want to use a four
11  percent, that would be the thing to do.
12  Q.    Right. Then the other thing you have to look at is
13  what is included in this 49 million?
14  A.    That's right.
15  Q.    Did you take all of the sales of WebWasher around the
16  world when you calculated that number?
17  A.    Yes.
18  Q.    I understand. This is software.
19  A.    I was told to include non-U.S. sales.
20  Q.    You also included sales to the federal government?
21  A.    Absolutely, yes.
22  Q.    And you also included sales of WebWasher regardless of
23  whether the ProActive scanning module was licensed and
24  available to the customers?
25  A.    Well, the product scanning feature was in the product,

Parr - cross-examination

1   Q.    I just want to get back to Microsoft for a second.
2   You know that Microsoft has revenues in the many billions of
3   dollars and that is a multiple, that is many, many times
4   Secure Computing's annual revenue?
5   A.    You trailed off after saying, Microsoft has sales in
6   the many billions.
7   Q.    I am sorry. Microsoft has sales in the many billions?
8   A.    Yes.
9   Q.    That is many times the revenue of Secure Computing?
10  A.    Yes.
11  Q.    You know the Microsoft license excludes -- never mind.
12  I am going to withdraw that question because of the people
13  in the courtroom.
14        Now, Finjan offered a license of its portfolio
15  to a company called Webroot. Isn't that true?
16  A.    No. They offered two unrelated patents to Webroot.
17  Q.    I am showing you now a letter, which is Defendants'
18  Exhibit 1305. This was Exhibit 3 at your deposition.
19  A.    Yes. It says, Regarding offer to license, then it
20  lists two patents. And that's what it's regarding.
21  Q.    That is what you are pointing out. This is an offer
22  to license two patents?
23  A.    That's right.
24  Q.    I want you to read a little further down. Let me show
25  what this letter is. This is a letter to a fellow named

Parr - cross-examination

1   it infringes, so I included it.
2   Q.    So regardless of whether it was unlocked, you included
3   it?
4   A.    That's correct.
5   Q.    The same is true for TSP here, you have $12 million
6   worth of sales. That's all the sales of CyberGuard TSP,
7   regardless of whether the WebWasher ProActive scanning was
8   unlocked and available to the customer?
9   A.    Okay. I included it because I understood that the
10  ProActive scanning functionality was in the product. That's
11  why I included it. And I didn't differentiate between
12  whether it was turned on or not.
13  Q.    And it was unavailable to customers, locked, they
14  couldn't use it, those sales are still included in this
15  number?
16  A.    Because I understand that still means infringement and
17  it should be part of the royalty base. So I included them.
18  Q.    Now, you know, Mr. Parr, that WebWasher customers do
19  selectively license modules. Right?
20  A.    Is that the software or the appliance?
21  Q.    With respect to both, I suppose it's the software.
22  A.    I don't know if it applies to the software. I do know
23  there is an argument about whether customers turn on the
24  ProActive scanning or not. But I don't know if it is the
25  appliance or the software, too.

Parr - cross-examination

1   Peter Watkins, who is the chief executive officer, and a
2   fellow named Patrick Summers, who is the general counsel at
3   Webroot?
4             MR. ANDRE: Your Honor, may we approach?
5             THE COURT: Okay.
6             (The following took place at sidebar.)
7             MR. ANDRE: Your Honor, this is relating to two
8   different patents. The patents aren't in this case. It is
9   our business dealings here. It has absolutely no relevance
10  whatever, it is our confidential business dealings.
11            THE COURT: You are speaking in broad terms. I
12  am not sure it has no relevance. What is your reaction to
13  that?
14            MR. HOLDREITH: I am about to establish that the
15  next sentence in the letter Finjan wants to license to whole
16  portfolio of patents.
17            THE COURT: Even if it wasn't the whole
18  portfolio that Finjan doesn't license.
19            (End of sidebar conference.)
20            THE COURT: I am informed that the jury could
21  use a stretch break. I was going to try to work you till
22  4:00 o'clock on the sly, but it didn't work.
23            (Jury leaves courtroom at 3:32 p.m.)
24            (Recess taken.)
25            THE COURT: All right. Let's bring them back

Parr - redirect

1   Q.    Right. And you have concluded that gross profit

2   margin for software is anywhere, around 93 percent to 99

3   percent. Right?

4   A.    Yes. That's the information I obtained, yes.

5   Q.    Could we go to PX-136, please.

6         Do you see that, PTX-136?

7   A.    I see it.

8   Q.    If you go to the next page. I will give you a second

9   to get it.

10        Do you recognize that document?

11  A.    I do recognize this document.

12  Q.    Could you go over to Page 2. Is this one of the

13  documents you used to determine the 93 percent gross profit

14  margin for software?

15  A.    Yes.

16  Q.    Tell the jury how you came about that using this

17  document.

18  A.    I didn't do any calculations. I just looked at it.

19  The WebWasher-Germany is showing gross profit margin, the

20  figures look like they are from all aspects of the

21  WebWasher. It comes out with a gross profit margin of 93

22  percent.

23  Q.    Did this 93 percent, did this document -- did you make

24  any adjustments to this?

25  A.    No.

---

Parr - redirect

1   Q.    Did you read the deposition of Ms. Putman?

2   A.    Jill Putman, that's right.

3   Q.    Do you know her to be the vice president of finance

4   for Secure Computing?

5   A.    Yes.

6   Q.    Is she also the treasurer of Secure Computing?

7   A.    Well, yes. I just remember her as vice president of

8   finance. I didn't remember she was also treasurer.

9   Q.    She gave deposition testimony. Correct?

10  A.    Yes.

11  Q.    Do you feel you can rely on financial information

12  provided by the director of finance?

13  A.    Yes.

14  Q.    And is that where she said that there was a gross

15  profit margin of 99 percent?

16  A.    Yes.

17  Q.    And you felt that was something you could rely on?

18  A.    Yes.

19        MR. ROVNER: I have no further questions, Your

20  Honor.

21        THE COURT: All right. Thank you, Mr. Parr.

22        THE WITNESS: Thank you very much, Your Honor.

23        THE COURT: Take care. Excused.

24        MR. ANDRE: Thank you, Your Honor. At this

25  time, Plaintiff, Finjan Software, rests its case.

---

Parr - redirect

1   Q.    This is coming from the defendants. Right?

2   A.    Right. There is no R&D in here that I need to

3   eliminate, no ordinary expenses. I would have, but they

4   weren't in there to need to be adjusted.

5   Q.    You also said they had gross profit margins of 99

6   percent. Correct?

7   A.    Yes.

8   Q.    And you choose to rely on that. Right?

9   A.    Yes.

10  Q.    And you relied on it because you saw some testimony

11  from an employee of Secure. Right?

12  A.    Secure Computing employee, that's right.

13  Q.    Could you put up the first page of --

14        MR. HOLDREITH: Your Honor, I believe counsel is

15  about to show a page of a witness that is not here. I

16  object on hearsay grounds. I believe counsel is about to

17  show a page of a deposition of another witness.

18        MR. ROVNER: Mr. Parr relied on deposition

19  testimony of a Secure employee. I am going to point out

20  what that testimony was.

21        MR. HOLDREITH: Your Honor, I have no objection

22  if he asks Mr. Parr if he relied on it. But putting the

23  testimony in, that is hearsay.

24        THE COURT: Don't put it up, ask him about it.

25  BY MR. ROVNER:

---

Parr - redirect

1         THE COURT: All right. So, ladies and

2   gentlemen, as a predicted, Finjan has rested on its

3   case-in-chief, that is its direct case. We will resume

4   these proceedings tomorrow at 9:00.

5         (Jury leaves courtroom at 4:00 o'clock p.m.)

6         THE COURT: Counsel, did you say you had a set

7   of final instructions?

8         MS. KOBIALKA: We are getting really close to

9   being able to file something. I think it might be a little

10  later today, if that would be okay.

11        THE COURT: All right. Anything before we

12  recess?

13        MR. SCHUTZ: Not from us.

14        MR. ANDRE: Thank you, Your Honor.

15        (Court recessed).

16                - - -

17  Reporter: Kevin Maurer

18

19

20

21

22

23

24

25

685

```
 1              THE UNITES STATES DISTRICT COURT
 2         IN AND FOR THE DISTRICT OF DELAWARE
 3              -  -  -
 4   FINJAN SOFTWARE LTD.,        :   Civil Action
                                  :   No. 06-369(GMS)
 5                  Plaintiff,    :
                                  :
 6        v.                      :
                                  :
 7   SECURE COMPUTING CORPORATION,:
     CYBERGUARD CORPORATION,      :
 8   WEBWASHER AG and DOES 1      :
     THROUGH 100,                 :
 9                                :
                    Defendants.   :
10              -  -  -
11           Wilmington, Delaware
12        Thursday, March 6, 2008
               9:00 a.m.
13          Day Four of Trial
14              -  -  -
15   BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
                              and a Jury
16
     APPEARANCES:
17
         PHILIP A. ROVNER, ESQ.
18       Potter Anderson & Corroon LLP
                  -and-
19       PAUL J. ANDRE, ESQ.,
         LISA KOBIALKA, ESQ.,
20       JAMES HANNAH, ESQ.,
         MEGHAN MARTON, ESQ.,
21       KRIS KASTENS, ESQ., and
         HANNAH LEE, ESQ.
22         King & Spalding
           (Silicon Valley, California)
23
                        Counsel for Plaintiff
24
25
```

686

```
 1   APPEARANCES (Continued):
 2
 3       FREDERICK R. COTTRELL, III, ESQ., and
         KELLY J. FARNAN, ESQ.
 4       Richards, Layton & Finger
                  -and-
 5       RONALD J. SCHUTZ, ESQ.,
         CHRISTOPHER A. SEIDL, ESQ.,
 6       TREVOR J. FOSTER, ESQ., and
         JAKE M. HOLDREITH, ESQ.
 7         Robins, Kaplan, Miller & Ciresi, L.L.P.
           (Minneapolis, MN)
 8
                    Counsel for Defendants
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

687

```
 1            THE COURT:  Good morning.  Please be seated.  I
 2   understand you have a desire to discuss some Rule 50 issues,
 3   Mr. Schutz.
 4            MR. SCHUTZ:  Yes, Your Honor.  Defendants would
 5   move for judgment as a matter of law pursuant to Federal
 6   Rule of Civil Procedure 50, more particularly, Defendant
 7   Secure Computing Corporation, CyberGuard Corporation, and
 8   WebWasher AG, referred to in the rest of this motion merely
 9   as "Defendants," hereby move for judgment as a matter of law
10   pursuant to Rule 50(a) of the Federal Rules of Civil
11   Procedure as follows:
12            That defendants do not literally infringe or
13   infringe under the doctrine of equivalents any asserted
14   claim of United States Patent No. 6,092,194; that defendants
15   do not literally infringe or infringe under the doctrine of
16   equivalents any asserted claim of United States Patent No.
17   6,804,780; that defendants do not literally infringe or
18   infringe under the doctrine of equivalents any asserted
19   claim of United States Patent No. 7,058,822; that Finjan's
20   claims are barred or limited by the doctrine of patent
21   exhaustion; that Finjan has not proved, by clear and
22   convincing evidence, that any infringement by defendants is
23   willful; that Finjan has not proved, by a preponderance of
24   the evidence, that it is entitled to any damages; that
25   Finjan has not proved that this is an exceptional case.
```

688

```
 1            Further, the Defendants move for judgment as a
 2   matter of law in their favor on any and all claims on which
 3   Finjan has the burden of proof and on any defense asserted
 4   by the Defendants.
 5            Thank you, Your Honor.
 6            THE COURT:  I will deny each of your motions,
 7   with the exception of, if you want to talk about
 8   willfulness, I will hear you.
 9            MR. SCHUTZ:  Your Honor, under the recent
10   standard set forth in In Re Seagate --
11            THE COURT:  I am aware of the holding.
12            MR. SCHUTZ:  That case requires a much more
13   elevated standard of reckless disregard.  We don't think
14   they have proven infringement, let alone that we acted with
15   reckless disregard under any objection standard, Your Honor.
16            THE COURT:  Mr. Andre, what is the evidence that
17   will support willfulness, a finding of willfulness.
18            MR. ANDRE:  Your Honor, what we have presented
19   in this case thus far is that the defendants in this case
20   were aware of the patents-in-suit in this case.  They read
21   the patents.  We have put forward deposition testimony from
22   Mr. Stecher, Mr. Barzau and Mr. Alme, in which they stated,
23   after looking at the patents and doing research, they
24   developed their product.
25            There was additional evidence that they, when
```

1  products necessary to proactively protect -- that is

2  highlighted, in italics, proactively protect -- their IT

3  infrastructure at the enterprise gateway.

4  A.    Correct.

5  Q.    That was the focus of your purchase of this company,

6  to get the proactive protection, you spent 270, 300 million

7  to get that. Isn't that correct?

8  A.    No, it's not. In the first paragraph that you

9  highlighted, you will see two companies, CyberGuard and

10  CipherTrust. They are both listed there. The context of --

11  recognize this is a note to our shareholders, which is a

12  strategic thing going forward, which is tactical.

13        The proactive protection that we extensively

14  marketed and we had spoken to our customers today is to

15  trust its source messaging proactive protection for

16  determining anti-spam, and that is available on all of our

17  products today.

18  Q.    The products that Secure Computing and its

19  subsidiaries, CyberGuard and WebWasher, what you market,

20  they are gateway products. Right?

21  A.    Yes.

22  Q.    They set the gateway and protect the client computer

23  at the gateway. Correct?

24  A.    They sit at the edge of the perimeter, which is

25  usually considered the gateway. And they protect or they

---

1  manage the traffic of the clients behind that device or the

2  traffic of the Internet coming to that device.

3  Q.    There is two distinct different types of protection

4  that you offer. One is a firewall. I believe you called

5  that the -- there is at least two.

6        The network gateway, would that be the firewall

7  product?

8  A.    Correct.

9  Q.    And then the web gateway, that would be the WebWasher

10  product?

11  A.    Right, web only. There is some Legacy mail work in

12  the WebWasher, but we do not proactively sell that.

13  Q.    You consider those two distinct product lines.

14  Correct?

15  A.    Yes.

16  Q.    Now, you also mentioned that the WebWasher modules can

17  be turned on and off. Correct?

18  A.    Correct.

19  Q.    Now, regardless, if the module is turned on or off,

20  the module is still in the product. Right?

21  A.    The module is resident in the binary source code that

22  is in the product.

23  Q.    When someone wants to order WebWasher and they don't

24  want any proactive protection, you don't go into the actual

25  box and delete source code. Do you?

---

1  A.    No.

2  Q.    So it's still there?

3  A.    Yes.

4  Q.    The same with the CyberGuard TSP?

5  A.    Yes.

6  Q.    And, in fact, you mentioned that you still offer for

7  sale the CyberGuard TSP product with the WebWasher function

8  turned on if the customer really wants it. Right?

9  A.    With or without the function, and the function is

10  available if somebody wanted to order it, correct.

11  Q.    It is offered for sale if somebody wants to order it?

12  A.    It is offered for sale if they determine they would

13  like to buy it, yes.

14  Q.    You still advertise even today -- if we can go to the

15  DTX-1296, this was your company's product info sheet here.

16  If you will turn to the third page of that. When you talk

17  about CyberGuard in this paragraph here, it states that the

18  CyberGuard TSP, the TSP appliances are designed to protect

19  midsized to large enterprises against both known and

20  zero-hour attacks using a hybrid architect that combines

21  staple packet filtering, seven-layer inspection, and secure

22  content policy enforcement.

23        Do you see that?

24  A.    Yes.

25  Q.    The zero-hour attack, that is nomenclature for

---

1  proactive protection right?

2  A.    Proactive protection which could be anti-virus, which

3  could be protocol inspection, which could be intrusion

4  prevention. So not specific to malware. There is many ways

5  to do proactive detection within a network gateway product.

6  Q.    And the proactive scanner of the WebWasher product,

7  that's actually in the anti-virus module as well. Right?

8  A.    The proactive scanner surrounds the anti-virus module.

9  The anti-virus module, there is no stand-alone anti-virus

10  module with WebWasher on TSP.

11  Q.    Even regardless if it's on CyberGuard TSP or just the

12  WebWasher product, you testified earlier that only the

13  anti-malware had the proactive scanner on it?

14  A.    Correct.

15  Q.    Now, that's not quite correct, is it? The anti-virus

16  also has the proactive scanner on it. Correct?

17  A.    No.

18  Q.    Do you know who Martin Stecher is?

19  A.    No.

20  Q.    Martin Stecher is the engineer who works for Secure

21  Computing in Germany?

22  A.    Martin Stecher, I do know him, yes.

23  Q.    Martin is someone who knows this product line fairly

24  well?

25  A.    Yes.

---

Gallagher - cross

1  THE COURT: He can't testify.

2  MR. SCHUTZ: I don't want it flashed on the

3  screen.

4  THE COURT: No.

5  MS. KOBIALKA: This document was produced after

6  discovery was closed. He we asked for this witness'

7  deposition, they gave a declaration, if we can just give a

8  declaration, they said, we didn't want the parties to have

9  to fly back to Germany.

10  We ended up getting an affidavit from this

11  particular witness that said this was a big joke.

12  MR. ANDRE: This was a joke on his part. That

13  was not meant to be serious.

14  THE COURT: Let's see what this witness knows

15  about it.

16  MR. SCHUTZ: I will be back up here wanting to

17  dispute the affidavit to establish foundation for that,

18  because it is completely distorted.

19  THE COURT: I don't know what it is in the

20  affidavit.

21  MR. HOLDREITH: I have it right here.

22  This is a low-level employee in Germany. The

23  employees were asked to search their computers for e-mail

24  mentioning Finjan. They were sitting around in a room doing

25  the search. None of them had any responsive e-mail and they

---

734

Gallagher - cross

1  were sort of complaining, on this exercise of searching,

2  there is nothing there. So he wrote this in order to have a

3  search result come up and make a joke about it.

4  THE COURT: Would this gentleman be able to talk

5  about it?

6  MR. HOLDREITH: He has no knowledge of it.

7  THE COURT: Then it won't be an issue.

8  MR. SCHUTZ: I would like to lodge a 403

9  objection as well, for the record.

10  MR. HOLDREITH: And I should say, I think he has

11  no knowledge.

12  THE COURT: Your 403 objection is what?

13  MR. SCHUTZ: Highly prejudicial.

14  THE COURT: It may be prejudicial. I don't

15  think it is unfair. If he knows about it, he can talk about

16  it. You can explain it. You have the ability to have him,

17  on redirect, explain just what is in that affidavit.

18  MR. SCHUTZ: One step at a time, which you

19  suggested.

20  MR. ROVNER: Your Honor —

21  THE COURT: Let's see.

22  (End of sidebar conference.)

23  BY MR. ANDRE:

24  Q. Mr. Gallagher, are you familiar with an employee at

25  your company named Udo Bretz, B-r-e-t-z?

---

1  A. I recognize the name. I could not speak to if that is

2  a current employee. And I can't put a name to a face. That

3  name has come up at some time at Secure.

4  MR. ANDRE: Your Honor, may I approach and show

5  the witness this?

6  THE COURT: Yes, you may.

7  BY MR. ANDRE:

8  Q. Mr. Gallagher, I have placed in front of you an e-mail

9  from Udo Bretz. Have you seen that e-mail before?

10  A. No.

11  Q. Are you familiar with the subject matter in that

12  e-mail?

13  A. I understand what reverse-engineering is. I am not

14  familiar with the context of this e-mail.

15  Q. And at any time did -- are you familiar with the fact

16  that the people who were in your development team were told

17  not to mention Finjan in the marketplace or within the

18  company as well?

19  A. If they were told that, it was by the legal team. My

20  direction was not to them to limit their discussions on

21  Finjan.

22  Q. You said you took this Finjan very seriously once the

23  litigation began.

24  Did you ever obtain the opinion of counsel

25  regarding whether or not Secure Computing infringes on

---

736

Gallagher - redirect

1  Finjan's patents?

2  A. No.

3  THE COURT: Are you done with that e-mail,

4  Mr. Andre?

5  MR. ANDRE: Your Honor, I would like to move the

6  e-mail into evidence. But the witness hasn't seen the

7  e-mail.

8  THE COURT: That request is denied. You can

9  retrieve the e-mail.

10  MR. ANDRE: Thank you, Your Honor.

11  Your Honor, I have no further questions of this

12  witness.

13  THE COURT: Any redirect?

14  MR. SCHUTZ: Yes, Your Honor. Briefly.

15  REDIRECT EXAMINATION

16  BY MR. SCHUTZ:

17  Q. Mr. Gallagher, I have once again put up JTX-45, which

18  is the 2006 annual report. Before we go to a paragraph in

19  here, I would like to go back to the CyberGuard acquisition.

20  How many customers did CyberGuard have at the time of the

21  acquisition?

22  A. Thousands. I couldn't give you an exact number.

23  Somewhere greater 6,000. Probably six to 8,000 customers.

24  Q. How important was it in terms of valuing the

25  acquisition for Secure Computing to acquire this company and

---

805

Wallach - direct

1  Q.    I am sorry. Exhibit 12. Have I been saying "Exhibit
2  11"?
3  A.    Just that one time, I think.
4  Q.    My mistake. Exhibit 12. In your opinion, Doctor,
5  does Exhibit 12 show in any way that WebWasher makes a list
6  of suspicious computer operations?
7  A.    It does not.
8  Q.    I am now going to show you Exhibit 26 that Dr. Vigna
9  discussed. This is WebWasher White Paper on proactive
10  security. Have you considered this document?
11  A.    Yes, I have.
12  Q.    Dr. Vigna discussed this page, I believe it's 15.
13  Have you reviewed Page 15 of Exhibit 26?
14  A.    Yes, I have.
15  Q.    Now, this is where the administrator can make some
16  changes to WebWasher. Is that right?
17  A.    That's correct.
18  Q.    And what is the administrator doing when the
19  administrator uses this part of WebWasher?
20  A.    The administrator, you will notice that the categories
21  of behavior are rows along this table. This is a user
22  interface that the administrator would use to configure the
23  security policy.
24        So, for example, the top line here is, Dynamic
25  creation of program code. And the administrator can either

806

Wallach - direct

1  allow or block that behavior.
2  Q.    Now, the administrator here, who is that, for example?
3  Put that in real terms.
4  A.    So, for a typical large company, there will be one or
5  a handful of people whose job it is to manage the computers
6  for that company. And everybody else just fires up their
7  web browser and surfs the web and all the security concerns
8  are supposed to be taken care of by this one person.
9  Q.    So this person, who is the administrator for the
10  company, can make the decisions about what to block or allow
11  here?
12  A.    Yes.
13  Q.    What is your understanding of -- strike that.
14        This is the security policy. This has nothing
15  to do with an actual downloadable. Right?
16  A.    That's correct. This is the administrator stating a
17  policy of what is and is not allowable within the company
18  or, you know, network.
19  Q.    Is there anything, in your opinion, in Exhibit 26
20  which says that WebWasher makes a list of suspicious
21  computer operations?
22  A.    There is not.
23  Q.    I am going to show you another document that Dr. Vigna
24  looked at. This looks familiar. It is a step-by-step
25  guide. But this is Plaintiff's Exhibit 113. It is another

807

Wallach - direct

1  version.
2        Did you look at this document?
3  A.    Yes, I did.
4  Q.    And is this document very, very similar to the one we
5  just looked at?
6  A.    Yes, it is.
7  Q.    Is there any difference between Exhibit 113 and
8  Exhibit -- the other step-by-step guide that we just looked
9  at that leads you to make any different conclusions from the
10  ones you have expressed?
11  A.    There is nothing here that would lead me to a
12  different conclusion.
13  Q.    Have you looked through all the descriptions of
14  WebWasher that Dr. Vigna pointed out?
15  A.    Yes, I have.
16  Q.    Have you looked through all the descriptions of
17  proactive scanning in WebWasher that Dr. Vigna pointed out?
18  A.    Yes, I have.
19  Q.    Do they all say basically the same thing?
20  A.    Yes.
21  Q.    Do any of them support the idea that WebWasher makes a
22  list of suspicious computer operations?
23  A.    No.
24  Q.    Have you verified that conclusion by comparing in the
25  source code what WebWasher does to these descriptions?

808

Wallach - direct

1  A.    Yes, I have.
2  Q.    And is the source code consistent with your opinion?
3  A.    The source code is consistent with my opinion.
4  Q.    Dr. Wallach, I now want to talk about the other
5  limitation that you pointed out in the '194 patent.
6  A.    Okay.
7  Q.    Just to orient us, can you please point out for us
8  what that limitation is?
9  A.    This is the addressed to a client limitation.
10       MR. ANDRE: Your Honor, objection. May we have
11  a sidebar?
12       (The following took place at sidebar.)
13       MR. ANDRE: I apologize, Your Honor. But they
14  are ready to elicit testimony -- pursuant to Dr. Wallach's
15  expert report, he does not have an understanding as to
16  "addressed to a client" unless he is allowed to use a
17  definition that he proposed earlier that Your Honor
18  expressly disavowed.
19       This is his report. It says, I have received
20  the Court order the day before I submitted the report so I
21  have not had any ample time to study the implication of the
22  Court order. To the extent that the Court order is intended
23  to indicate that the ordinary meaning is not a downloadable
24  that is sent to the client's computer network address, I am
25  not sure what the ordinary meaning is. To the extent the

Wallach - direct

1   Court has not foreclosed the ordinary meaning may be a

2   downloadable that is sent to the client's network address, I

3   have outlined my opinion.

4         So he has given his opinion only to the extent

5   that this is the definition that could be used.

6         He also confirmed that in his deposition as

7   well. In his deposition, he stated, the question was, I

8   believe you stated this before, but the last couple of lines

9   you say you are not sure what the ordinary meaning of

10  addressed to a client is.

11        That's correct.

12        The Court's order with this term says the '194

13  term, "addressed to a client," is construed to have its

14  plain and ordinary meaning. There is a footnote, you said,

15  Plain and ordinary meaning Re: United States Philips.

16        You go on to state, The Court further observes

17  that the defendant's proposed construction would

18  unjustifiably narrow the term's broad scope which is not

19  expressly limited or redefined by the specification.

20        In their proposed construction, of "addressed to

21  a client" was containing the client's computer IP address.

22  That is the definition he wants to use now. He stated in

23  the deposition and his expert report he didn't have an

24  ordinary meaning. Now they are going to elicit testimony

25  that they do not infringe this element.

810

Wallach - direct

1         MR. HOLDREITH: Your Honor, the plaintiff has

2   the burden of proof to establish that the WebWasher has the

3   limitation "addressed to a client." I intend to elicit from

4   Dr. Wallach testimony consistent with his report that

5   Dr. Vigna never pointed out anything in WebWasher which

6   receives a downloadable addressed to a client to have him

7   comment on Dr. Vigna's explanation that it's like giving a

8   note to someone and saying, Hey, send this to Jim, and that

9   he didn't find anything in WebWasher that does that.

10        I would like to have him testify, and it would

11  be by offer of proof if Your Honor finds it's inconsistent

12  with the order that WebWasher also gave the --

13        THE COURT: It's inconsistent with the order.

14        MR. HOLDREITH: Can we make an offer of proof on

15  that in written form, if that is suitable to the Court?

16        THE COURT: Go ahead.

17        MR. HOLDREITH: We will submit that.

18        THE COURT: I am going to reject it, but you can

19  go ahead and preserve your issue.

20        MR. HOLDREITH: We just need to put it in the

21  record. We will file something at the end.

22        MR. ANDRE: Because he doesn't know what this

23  meaning "addressed to a client" is, the ordinary meaning,

24  both in his report and in his deposition, I don't think he

25  should comment on this term at all. If he doesn't know what

Wallach - direct

1   the term means, for him to say Dr. Vigna is wrong in his

2   interpretation, I think that is contrary to what he

3   disclosed in this case.

4         MR. HOLDREITH: He is not going to comment on

5   Dr. Vigna's interpretation. He is going to say Dr. Vigna

6   did not point to anything in WebWasher.

7         THE COURT: That is up to the jury to decide

8   that. That is not up to him. That is a fact that you want

9   him to opine on. That is in the province of the

10  fact-finder, whether Dr. Vigna did opine or not is up to you

11  to argue, it seems to me, not up to him.

12        Maybe I am missing something, Mr. Holdreith.

13  Maybe you can be a little more specific as to why you think

14  he should be permitted to comment on that.

15        MR. HOLDREITH: It seems to me this is a fairly

16  complex technology --

17        THE COURT: No question.

18        MR. HOLDREITH: -- where it is difficult for the

19  layperson to understand whether Vigna actually pointed to

20  something in WebWasher which is a downloadable addressed to

21  a client.

22        It seems to me that a technical explanation, I

23  will keep it very short --

24        THE COURT: Whether it is short or long is not

25  the issue. The issue is whether it is an appropriate

812

Wallach - direct

1   subject for his comment and whether it unduly and unfairly

2   invades the province of the jury. I am not sure whether it

3   does.

4         Do you want to weigh in?

5         MR. SCHUTZ: I will just briefly, Your Honor. I

6   think what he is really going to testify about is that

7   Dr. Vigna testified in his opinion that using the example

8   of, Hey, Jim, that WebWasher, in fact, sends a downloadable

9   addressed to a client and that's his opinion, and this

10  witness can say, I disagree with his opinion because it

11  doesn't work that way.

12        On the other, this "addressed to a client"

13  thing, certainly, to the extent that that is an issue, it is

14  a potential 112 issue on indefiniteness, if the claim is

15  construed in a way that is indefinite, then the patent is

16  also invalid and we have a 112 defense in this case.

17        MR. ANDRE: That is a different argument.

18        THE COURT: That is not the reason we are at

19  sidebar.

20        MR. SCHUTZ: I don't think so. I don't want

21  that to get lost in the mix here.

22        MR. ANDRE: Your Honor, all I am saying is this

23  witness has repeatedly said, I don't have an ordinary

24  meaning for this term. I don't care, if he wants to satisfy

25  any of these terms he has an opinion on, that is fine, but

Wallach - direct

1    he says, I am not sure what the ordinary meaning is. He
2    confirmed it in deposition.
3            They are going to ask him, Is Dr. Vigna's
4    ordinary definition wrong? They are going to say, Yes, it
5    is. This passing a note, that was an analogy that he gave.
6            MR. SCHUTZ: No.
7            MR. HOLDREITH: I am going to ask him, Can
8    WebWasher do that, in the configuration and network, can a
9    server pass a note to WebWasher and say, Hey, give this to
10   Jim?
11           MR. SCHUTZ: Using Dr. Vigna's construction of
12   the term.
13           MR. ANDRE: That is not this witness'
14   construction of the term. This witness has no
15   interpretation of this term.
16           THE COURT: Wait a second. He is an admitted
17   expert.
18           MR. ANDRE: He is.
19           THE COURT: In the field. One of skill in the
20   art. He is being asked to comment -- I understand your
21   point. I have already indicated I will not permit the
22   witness to be queried in that regard. But I am going to
23   permit Secure to make an offer of proof, having already
24   stated I am going to reject the offer nonetheless.
25           But why wouldn't it be fair comment from this

Wallach - direct

1    doesn't get there.
2            MR. HOLDREITH: He is going to talk about how
3    WebWasher works.
4            MR. SCHUTZ: Application protocol layer
5    addresses, none of that stuff, he is not going there. If he
6    goes there, we will stop.
7            MR. ANDRE: I don't think this witness should be
8    testifying about this claim element at all.
9            THE COURT: I disagree with that.
10           MR. HOLDREITH: So I know where I can go, I am
11   going to tell him --
12           THE COURT: The question should be circumscribed
13   by the discussion we just had. I think Mr. Schutz has just
14   outlined the permissible, what I believe are the permissible
15   parameters of that question.
16           I take Mr. Andre's point on the issue. You have
17   indicated that is not going to be the direction in which you
18   take this witness. If you do, you can stand up and object.
19   You understand the limitations of my ruling.
20           MR. ANDRE: I think so, Your Honor. Just to be
21   clear, if this witness then goes on to say, I do not believe
22   WebWasher infringes because it does not take a downloadable
23   addressed to a client --
24           THE COURT: He can't say that. He has not
25   expressed a view. I don't think Mr. Holdreith intends to

814

Wallach - direct

1    witness, who is an expert, to express a view as to
2    Dr. Vigna's example of how this actually functions, what it
3    does or doesn't do? He heard the testimony.
4            MR. ANDRE: If it is related to the "addressed
5    to a client" issue, because this witness has said
6    repeatedly, I don't know what that means.
7            THE COURT: He is not being asked to give his
8    understanding of what plain and ordinary meaning is to one
9    of skill in the art. That is not the question that has been
10   posed.
11           MR. ANDRE: They are presenting this testimony
12   to actually try to rebut Dr. Vigna's testimony as to proof
13   he put forward as to "addressed to a client."
14           THE COURT: He is saying it doesn't work that
15   way. He is saying the system doesn't function that way and
16   can't function that way.
17           MR. ANDRE: Your Honor, it is something, if he
18   expresses an opinion that WebWasher does not infringe this
19   claim element "addressed to a client," which is what he is
20   doing, he is doing it without knowing the definition of
21   "addressed to a client."
22           MR. SCHUTZ: If I may weigh in? What he is
23   saying is that using Dr. Vigna's definition as set forth
24   through his example, Vigna says it, in fact, is addressed to
25   a client that way and he is going to say, Hey Jim, it

816

Wallach - direct

1    ask that question.
2            MR. HOLDREITH: I will not ask him.
3            THE COURT: He can comment, I think, fairly, on
4    the example adduced from your expert that he listened to,
5    and he has examined the code, he is an expert in the field.
6    This is a classic case of dueling experts.
7            MR. HOLDREITH: One little bit of difficulty.
8    Sorry to belabor this, Your Honor. He is a technical guy.
9    When he explains this, he might start saying --
10           MR. SCHUTZ: Cut him off.
11           MR. HOLDREITH: There is that network address
12   behind there.
13           THE COURT: You have to be careful in
14   questioning him. I will listen carefully. If we hear those
15   magic words, I will jump in.
16           MR. HOLDREITH: I will do my best.
17           (End of sidebar conference.)
18   BY MR. HOLDREITH:
19   Q.   Okay. Dr. Wallach, the limitation we are talking
20   about is "addressed to a client."
21   A.   Yes.
22   Q.   That is on the claim board here as well?
23   A.   Yes.
24   Q.   Were you present in the courtroom when Dr. Vigna gave
25   an example of how he thinks something can be addressed to a

Wallach - direct

1  client that is similar to passing a note in school?

2  A.    Yes.

3  Q.    Were you present when Dr. Vigna said, It's like when I

4  give the note to somebody else and I say, Here, give this to

5  Jim?

6  A.    Right.

7  Q.    All right. I want to ask you at a very high level of

8  generality, I don't want to talk about network protocols or

9  anything like that. But using that kind of analogy, if you

10  have a system where there is a client communicating to the

11  Internet through WebWasher, and WebWasher makes a request

12  for some content, let's use an example of, say, it's

13  requesting content from Google, it is a Google search?

14  A.    Okay.

15  Q.    Can the Google server, when it sends the response

16  back, can it say to WebWasher, Here, give this to Jim?

17  A.    No, it does not.

18  Q.    And at a high level of generality, now, without going

19  into the protocols, why is it that the web server that's

20  delivering that Google back to WebWasher, why can't it say,

21  Give this to Jim?

22  A.    The reason is that it never has any idea who Jim is or

23  even if there is a Jim. Instead, it receives the request

24  from the WebWasher appliance.

25  Q.    So when WebWasher talks to Google, does WebWasher say,

818

Wallach - direct

1  Hey, I am requesting this for Jim?

2  A.    It does not.

3  Q.    And why would you set it up so that the Google server

4  doesn't know who Jim is?

5  A.    There are many reasons. A company might choose not to

6  divulge the contents -- how many employees it has, how many

7  computers it has. It's a privacy issue.

8  Q.    So, can WebWasher be configured so that it ever tells

9  the web server out there, Google or whoever, who is behind

10  WebWasher?

11  A.    I am not sure. But it's certainly not for the full

12  configuration.

13  Q.    Are there other firewalls or gateways where Google

14  does know who is behind the firewall and does know that it's

15  Jim back there?

16  A.    I can imagine that it would be possible to build such

17  a firewall.

18  Q.    In that case, could the Google server, when it makes

19  its response, could it say to the firewall or the gateway,

20  Here, here is a response, give this to Jim?

21  A.    It is feasible to build it in such a way.

22  Q.    Does that ever happen with WebWasher?

23  A.    No.

24  Q.    We have talked about infringement of the '194 patent.

25  Do you have an opinion about whether WebWasher's proactive

820

Wallach - direct

1  scanning infringes any claim of the '194 patent?

2  A.    My opinion is that WebWasher does not infringe any

3  claim.

4  Q.    I want to move on now and a talk about the validity of

5  the '194 patent.

6  A.    Okay.

7  Q.    Here is how we are going to do this, Dr. Wallach, just

8  to orient you. We have got three patents that Finjan has

9  asserted, as you know, '194, '780, '822.

10  A.    Right.

11  Q.    For each patent, I am going to ask you first about

12  infringement of that patent and then about validity. So

13  when we finish this conversation, we are going to come back

14  to the '780 patent, and we will talk about infringement

15  first and then validity. Do you understand that?

16  A.    Yes, I do.

17  Q.    I am now asking you about validity of this '194

18  patent.

19  A.    Okay.

20  Q.    Can you explain your understanding that you used in

21  evaluating the validity of this patent? By that, I mean,

22  what does it mean for a patent to be valid or invalid?

23  A.    When a patent is invalid, you say it's invalid over

24  the prior art, or that the prior art anticipates the patent,

25  basically, if somebody else had the idea first. And you

Wallach - direct

1  establish that by looking at older research papers, older

2  patents, older products, anything that was available to the

3  public prior to the filing date of the patent.

4  Q.    How do you go about trying to figure out if somebody

5  else had that idea first?

6  A.    Well, once you establish that the documents that you

7  are interested in predate the filing date of the patent,

8  effectively, you evaluate infringement again. If the older

9  system infringes the patent, so it has all the elements that

10  the patent requires, well, that means the older system

11  anticipates the patent and the -- at least that claim of the

12  patent is not valid.

13  Q.    And in validity, are you comparing the claims of the

14  patent to something that came before?

15  A.    That's correct.

16  Q.    So in infringement, if everything is there that's in

17  the patent claim you infringe, but if it turns out the thing

18  that would infringe came first --

19  A.    Then the patent is not valid.

20  Q.    Now, when you did your invalidity analysis, did you

21  consider some of the things that were written prior to the

22  filing date of the '194 patent?

23  A.    Yes, I did.

24  Q.    Just so we have it in mind, the filing date of the

25  '194 patent is what?

Wallach - direct

1 message?

2 A.    If we are talking about a packet filtering firewall,

3 then people have invented extensions to these firewalls that

4 let them remember something about the packets that have come

5 before.  And that lets them capture some of this more

6 sophisticated behavior, without necessarily needing to

7 reassemble the entire e-mail message or the entire web page.

8 Q.    How about an application layer firewall, what does it

9 do when a message is broken up across a number of packets?

10 A.    It will receive all the packets, put them all

11 together, then apply some processing.  And then, if it's

12 okay with it, it will ship it on.

13 Q.    Now, is a firewall, is it a kind of computer or is it

14 something else?

15 A.    Firewalls are typically either a general-purpose

16 computer, such as the device sitting over here, or a

17 firewall might be a network router, which is a more

18 specialized computing device that's meant to move packets

19 around quickly.

20 Q.    You just said, The device sitting over here.  What

21 were you pointing to?

22 A.    I was pointing to the WebWasher appliance, the "pizza

23 box," as Dr. Vigna put it.

24 Q.    Now, is gateway also, can that be a kind of computer?

25 A.    Yes.

826

Wallach - direct

1 Q.    And can gateways and firewalls run programs?

2 A.    Yes, they can.

3 Q.    Can they run programs that are made for detecting

4 viruses?

5 A.    Yes, they can.

6 Q.    All right.  Now I would like to walk through some of

7 the publications and the patents that you looked at so that

8 you can explain what they are.

9 A.    Okay.

10 Q.    I am now showing you DTX-1263.  What is this?

11 A.    Just a second while I get it up here.

12       This is a research paper published by Ramond Lo

13 and several other co-authors from the University of

14 California at Davis.

15 Q.    Is Mr. Lo here?

16 A.    Yes.

17 Q.    When was this published?

18 A.    This paper was published at a research conference in

19 1991.

20 Q.    And we are going to look at another paper that Mr. Lo

21 published.  Right?

22 A.    Yes, we will.

23 Q.    How are we going to keep track of which is which?

24 A.    This paper we will be referring to as Lo '91.

25 Q.    I have just enlarged a copyright notice.  It says,

Wallach - direct

1 Copyright 1991 and IEEE.

2       What is IEEE?

3 A.    The Institute for Electronical and Electrical

4 Engineers, something like that.  It is a professional

5 society of electrical engineers and computer scientists.

6 Q.    Are those people who deal with issues of network

7 security, among other things?

8 A.    Yes.

9 Q.    This was published to them?

10 A.    Yes.

11 Q.    What is this Lo 1991 article about?  I will just show

12 you a part of it.  What was Mr. Lo writing about in 1991?

13 A.    Lo and his co-authors were concerned with building

14 tools to help identify malicious code that perhaps they had

15 never seen before.  And they considered two broad classes of

16 techniques.  They considered techniques that could look at,

17 let's just call it a downloadable.  They could look at a

18 downloadable completely by itself, read it from top to

19 bottom and looking for behaviors that they considered

20 inappropriate.  The term they use for that is "static

21 analysis."  And they also consider techniques that could

22 examine a program while it's running in order to detect

23 malicious behavior.  That broad class of techniques they

24 refer to as dynamic analysis.

25 Q.    Let me stop you there.  Can you explain, just in

Wallach - direct

1 simple terms, what the main difference is between static

2 analysis and dynamic analysis?

3 A.    Yes.  Static analysis, you read a program like you

4 read a book.  Dynamic analysis, you run the program and

5 monitor its behavior as it's running.

6 Q.    In static analysis, are you looking at the lines of

7 code and trying to decide what they are going to do?

8 A.    Yes, they are.

9 Q.    And in dynamic analysis, are you running the program

10 and watching it?

11 A.    That's correct.

12 Q.    Let me ask you about some more of this paper.  Mr. Lo

13 talks about a testbed here.  What is a testbed?

14 A.    When you are doing research, you need to build

15 infrastructure to help you do your research.  If your

16 research is high-energy physics, you are building a particle

17 accelerator.  And you build this expensive apparatus and you

18 use it to test your theories about particle physics.

19       In the context of computer security, you build

20 the software infrastructure that helps you run experiments.

21 What we do is an experimental science just like the particle

22 physicists.  The only difference is we don't need great big

23 expensive buildings.

24 Q.    If you make a testbed in computer science, are you

25 actually testing your program for detecting malicious code?

Wallach - direct

1  Ji '600 in 1995 and the Chen patent?

2  A.    Yes.

3  Q.    And I didn't blow it up very well, but are they

4  related in any other way?

5  A.    Eva Chen worked for Trend Micro and these patents are

6  both assigned to Trend Micro.

7  Q.    What is happening on is Eva Chen is working for Trend

8  Micro and several patents come out of that work?

9  A.    That's correct.

10  Q.    Dr. Wallach, what is described in the Chen patent?

11  A.    So the Chen patent describes a macro virus detection

12  and removal tool.

13  Q.    What is a macro?

14  A.    Macros are code that ride inside documents like that

15  Microsoft Word document.

16  Q.    Is a macro a kind of downloadable?

17  A.    Yes.

18  Q.    Or can it be at least if it's downloaded?

19  A.    Yes. If you download a Microsoft Word document from

20  the Internet, that would be a downloadable.

21  Q.    Can you give us an example of how a macro could be a

22  downloadable with some malicious property?

23  A.    Starting in 1995, Microsoft added this macro facility

24  to Microsoft Word, and immediately people started

25  engineering viruses that would spread by virtue of Word

---

Wallach - direct

1  for combinations of instructions that could be ultimately

2  used for some malicious intent.

3  Q.    Let's look at the text inside the Chen patent. This

4  is now the background of the invention. At Column 1, there

5  is a description, The field of the invention, starting on

6  about Line 5. What does this tell you?

7  A.    So it says that this particular invention is all about

8  detecting and removing viruses.

9  Q.    And is there anything here that tells you whether this

10  is a concern in a network environment?

11  A.    In fact, the area that you are now highlighting points

12  to the use of computers in networks and how networks can be

13  used to facilitate the spread of viruses.

14  Q.    Dr. Wallach, is a macro something that can just

15  automatically execute code by itself?

16  A.    A macro only operates when it's inside the

17  application, like Microsoft Word.

18  Q.    Is there an application that can just call the macro

19  without the user doing anything?

20  A.    That was an issue early on in Microsoft Word, that

21  these were what were called "auto execute macros."

22  Q.    Does Chen disclose anything about whether these auto

23  execute macros existed?

24  A.    The region you just highlighted says, Macros can be

25  triggered by the application program, such as by pressing a

---

862

Wallach - direct

1  documents rather than programs moving around. The very

2  first one was called the concept virus. That was its name

3  because it was a proof of concept that, in fact, you could

4  design a virus that could spread inside Word documents

5  rather than inside programs.

6  Q.    Do macros include operations, computer operations?

7  A.    Yes, they do.

8  Q.    Could you tell us what is being described here in the

9  text that I have highlighted in the abstract of the Chen

10  patent?

11  A.    Right. So the Chen patent is looking for previously

12  unknown macro viruses. We have seen this distinction before

13  between things you already know about and things you don't

14  know about. So the Chen patent is looking for things you

15  don't already know about.

16  Q.    And how does it do that?

17  A.    It does that in the similar fashion to what we have

18  talked about earlier. It looks for particular patterns that

19  are likely to indicate malicious behavior, patterns in the

20  operations.

21  Q.    It says here that, it has a module, and it determines

22  whether the decoded macro includes a combination of suspect

23  instructions which correspond to instruction identifiers.

24          What does that mean?

25  A.    It's more or less what I just said. You are looking

---

864

Wallach - direct

1  key.

2  Q.    I am showing you now some text in Column 2, at about

3  line 50. This is a discussion of the macro virus

4  information module. What is this text teaching us?

5  A.    It says that it uses information to detect both known

6  and unknown viruses.

7  Q.    So was Chen a method for detecting unknown malicious

8  code?

9  A.    Yes.

10  Q.    This is not a signature scanning technique?

11  A.    They are saying it's both. They can both detect

12  signatures for viruses they know about, and they can look

13  for patterns that might be indicative of viruses they don't

14  know about.

15  Q.    Now, was Chen a system or a piece of software, a virus

16  detector that was installed on a gateway?

17  A.    The patent is, I believe, silent on that issue.

18  Q.    Does Chen tell you anything about where you could

19  deploy the virus detector of Chen in this text that I have

20  highlighted in Column 4 at about Line 60?

21  A.    It says that a variety -- there is many different ways

22  you could configure it.

23  Q.    When it says, A variety of alternative computer system

24  configurations are available and the present invention is

25  independent of their use, does that tell you anything about

---

Wallach - direct

1  art. Do you understand that?

2  A.    Yes.

3  Q.    Have you had prepared a table with the elements of the

4  claims so that we can keep track of this analysis?

5  A.    Yes, I have it in front of me.

6  Q.    I've provided a copy to counsel. As a demonstrative

7  exhibit, this will be similar to what Dr. Vigna walked

8  through.

9            Can I have the Elmo, please.

10           Now, in order to try to make this a little less

11  tedious, because we do have to, the law will require us to

12  hit every claim, but if you put side by side on this table

13  similar elements of similar claims.

14  A.    Right.

15  Q.    The phrasing is not identical, but are these elements

16  that you have put side by side very similar to each other?

17  A.    Indeed, they are.

18  Q.    So I am going to ask you now about did Shaio '338

19  patent. That was one of the references you explained?

20  A.    Yes.

21  Q.    I got a little out of order while we jumped around, so

22  bear with me while I pull that reference out.

23           This is Exhibit DTX-1021. We may have to jump

24  back and forth a little bit. I am first going to ask you --

25  could I have the presentation system, please?

---

910

Wallach - direct

1            Just remind us briefly, what is the Shaio

2  patent.

3  A.    So the Shaio patent describes a so-called

4  intelligent firewall that, among other things, includes a

5  Java bytecode verifier.

6  Q.    And did you find each and every limitation of Claim 1

7  of the '194 patent in the Shaio patent?

8  A.    Yes.

9  Q.    Let's walk through that, if I could ask you about the

10  first element, if I could have the Elmo please.

11           Is Shaio a computer-based method and does Shaio

12  also disclose a system?

13  A.    Yes.

14  Q.    How did you determine that?

15  A.    By reading the patent.

16  Q.    Does Shaio receive an incoming downloadable addressed

17  to a client by a server that serves as a gateway to the

18  client?

19  A.    Yes.

20  Q.    How do you know that?

21  A.    Because it describes a firewall that receives content.

22  Q.    And directing your attention now, if I could have the

23  presentation system, to Column 2, at Lines about 24 to 30,

24  does this have anything to do with that limitation of

25  receiving an incoming downloadable?

---

Wallach - direct

1  A.    So this refers to realtime testing of executable codes

2  such as applets. So executable codes such as a applets.

3  That is an example of a downloadable.

4  Q.    And how do you know that the downloadable is received

5  by Shaio?

6  A.    If you don't receive it, you can't do anything else to

7  it. You have to receive it.

8  Q.    Now, when you considered whether in Shaio the

9  downloadable was addressed to the client, do you understand

10  that you have to be consistent with Finjan's infringement

11  position? You have to assume that the patent is as Finjan

12  has asserted it?

13  A.    Okay.

14  Q.    And did you apply Dr. Vigna's definition of addressed

15  to a client?

16  A.    Yes, I did.

17  Q.    Using Dr. Vigna's definition of addressed to a client,

18  does the Shaio patent have a downloadable addressed to a

19  client?

20  A.    Yes, it does.

21  Q.    Can we check off this first claim element?

22  A.    Yes, we can.

23  Q.    Is the element found in the same places for Claim 32?

24  I will point out to you, this has the addition of a security

25  policy.

---

912

Wallach - direct

1  A.    Right.

2  Q.    Does Shaio disclose a security policy?

3  A.    Yes.

4  Q.    How does it do that?

5  A.    It, by virtue of having the Java bytecode verifier,

6  there is implicitly a policy that if the bytecode verifier

7  rejects the content, then that policy might be enough to

8  transmit it.

9  Q.    The security policy is if the applet is broken --

10  A.    Then don't send it long.

11  Q.    Is the element in Claim 65 essentially the

12  substantially similar element?

13  A.    Yes, it is.

14  Q.    Found in the same places?

15  A.    Yes.

16  Q.    Can I check that off?

17  A.    Yes, you may.

18  Q.    The next element of the patent, Claim 1, is comparing

19  by the server downloadable security profile data pertaining

20  to the downloadable, the downloadable security profile data

21  includes a list of suspicious computer operations that may

22  be attempted by the downloadable.

23           That is the list of suspicious computer

24  operations. Right?

25  A.    Yes.

937                                                                                                          939

Wallach - direct

1  tools of Hershey onto the firewall of Shaio for a person
2  working in the industry in 1996?
3  A.    This is all very straightforward.
4  Q.    Do you have an opinion about whether the '194 patent
5  is anticipated by the combination of Shaio and Hershey?
6  A.    Yes.
7          MR. ANDRE: Objection.
8          THE WITNESS: Obvious.
9          MR. ANDRE: Withdrawn.
10 BY MR. HOLDREITH:
11 Q.    Thank you for that correction. It is getting late in
12 the day.
13          Do you have an opinion about whether Claim 27 of
14 the '194 patent is obvious in light of Shaio combined with
15 Hershey?
16 A.    Yes, it is obvious.
17 Q.    Claim 28 of the '194 patent adds to Claim 27 that you
18 can override the security policy administratively to block
19 the downloadable. What does that mean in general terms?
20 A.    The idea is, even though -- we have actually discussed
21 this for some of the earlier claims. If you have an
22 administrative rule that says, you know, throw caution to
23 the wind, if it came from Microsoft.com, I am willing to
24 trust it no matter what, then that would be an
25 administrative override.

Wallach - direct

1  Q.    Do you have an opinion as to whether Claims 28 and 29
2  of the '194 patent are obvious in light of Shaio combined
3  with the Firewall Toolkit?
4  A.    It is my opinion that they are obvious.
5  Q.    All right. I think this is the last claim on this
6  patent for this reference.
7          Claim 30 includes the step of informing a user
8  upon detection of a security policy violation. What does
9  that mean?
10 A.    The concept is that a user might want to know that we
11 have denied them access to something. The user says, please
12 go to something something dotcom, and if the answer is no,
13 then they ought to understand why the answer was no. There
14 should be some feedback to the user.
15 Q.    Did you find in Shaio disclosure of informing the user
16 if there is detection of a security policy violation?
17 A.    Shaio did not discuss that.
18 Q.    Where did you find that?
19 A.    So, again, I looked to the Firewall Toolkit.
20 Q.    Was it common in 1995 in your opinion for computers to
21 inform users if they detected a problem?
22 A.    All the time.
23 Q.    Anything unusual about doing that?
24 A.    That's straightforward stuff.
25 Q.    Was there any problem, would there have been any

938                                                                                                          940

Wallach - direct

1  Q.    Did you find an administrative override in Shaio?
2  A.    I did not.
3  Q.    Where did you find an administrative override?
4  A.    So in this case, and this applies to actually the next
5  three claims, actually, at least 28 and 29 for sure, I
6  looked to the Firewall Toolkit.
7  Q.    Claim 28 of the '194 patent says you could
8  administratively allow -- sorry, block, and Claim 29 says
9  you can administratively allow. Is that right?
10 A.    One of them says allow. The other one says block.
11 Q.    Did you find allowing and blocking in the Firewall
12 Toolkit?
13 A.    Yes, the Firewall Toolkit has Whitelisting and
14 Blacklisting support.
15 Q.    How do you know that?
16 A.    I read the source code.
17 Q.    Did you find in the source code administrative
18 override in the Firewall Toolkit?
19 A.    Yes. When you install it you can specify a policy for
20 things to be allowed and denied.
21 Q.    Would there be any difficulty for someone working in
22 the computer industry in 1996 on security products to
23 combine the administrative override feature of the Firewall
24 Toolkit with Shaio?
25 A.    That would be very straightforward.

Wallach - direct

1  problem combining that feature of the Firewall Toolkit with
2  Shaio for a person working in computer security in 1996?
3  A.    That would be very straightforward.
4  Q.    Do you have an opinion as to whether Claim 30 of the
5  '194 patent is obvious in light of Shaio combined with the
6  Firewall Toolkit?
7  A.    Yes. My opinion is Claim 30 is obvious.
8  Q.    Now, for Claims 28 and 29, could you also combine
9  what's found in Hershey with the Firewall Toolkit and Shaio?
10          MR. ANDRE: Objection. This wasn't disclosed in
11 his expert report.
12          THE COURT: Disclosed in the report?
13          MR. HOLDREITH: I believe it was. I will have
14 to double-check it, Your Honor. Perhaps I can do that
15 overnight.
16          THE COURT: Why don't we break here.
17          Ladies and gentlemen, we have come to the end of
18 our day. Please remember my earlier instructions to you.
19 Travel safely. We will see you back here at 9:00.
20          (Jury leaves courtroom at 4:30 p.m.)
21          THE COURT: I have got to go.
22          (Court recessed at 4:30 p.m.)
23          - - -
24 Reporter: Kevin Maurer
25

941

```
 1              IN THE UNITES STATES DISTRICT COURT

 2             IN AND FOR THE DISTRICT OF DELAWARE

 3                        - - -

 4    FINJAN SOFTWARE LTD.,      :   Civil Action
                                 :   No. 06-369(GMS)
 5                  Plaintiff,   :
                                 :
 6         v.                    :
                                 :
 7    SECURE COMPUTING CORPORATION, :
      CYBERGUARD CORPORATION,    :
 8    WEBWASHER AG and DOES 1    :
      THROUGH 100,               :
 9                               :
                  Defendants.    :
10                        - - -

11
                   Wilmington, Delaware
12              Friday, March 7, 2008
                     9:00 a.m.
13              Day Five of Trial

14
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
15                                   and a Jury

16
      APPEARANCES:
17
                PHILIP A. ROVNER, ESQ.
18              Potter Anderson & Corroon LLP
                      -and-
19              PAUL J. ANDRE, ESQ.,
                LISA KOBIALKA, ESQ.,
20              JAMES HANNAH, ESQ.,
                MEGHAN WARTON, ESQ.,
21              KRIS KASTENS, ESQ., and
                HANNAH LEE, ESQ.
22              King & Spalding
                (Silicon Valley, California)
23
                           Counsel for Plaintiff
24

25
```

942

```
 1    APPEARANCES (Continued):

 2
           FREDERICK R. COTTRELL, III, ESQ., and
 3         KELLY J. FARNAN, ESQ.
           Richards, Layton & Finger
 4               -and-
           RONALD J. SCHUTZ, ESQ.,
 5         CHRISTOPHER A. SEIDL, ESQ.,
           TREVOR J. FOSTER, ESQ., and
 6         JAKE M. HOLDREITH, ESQ.
           Robins, Kaplan, Miller & Ciresi, L.L.P.
 7         (Minneapolis, MN)

 8              Counsel for Defendants

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

943

1    THE COURT: Good morning.

2    (Counsel respond "Good morning.")

3    THE COURT: Mr. Andre.

4    MR. ANDRE: Your Honor, we have an objection

5  imposed yesterday at the end of the day regarding a

6  combination of references they were going to use to try to

7  show invalidity in one of the patent claims.

8    Our objection was that reference was not

9  disclosed for that claim. We have not been able to work out

10  the objection. It is still out there for this morning.

11    MR. HOLDREITH: Your Honor, I will show you

12  briefly the disclosure in Dr. Wallach's report.

13    I understand that Mr. Andre's objection is we

14  would like to show that for Claim 28 and 29, which are

15  dependent on 27, what the combination is.

16    In 27, Dr. Wallach disclosed Hershey and Shaio

17  as a combination. 28 depends on 27 so it includes

18  everything. Here he added firewall tool kit as part of the

19  combination.

20    We think that is sufficient by itself for

21  Dr. Wallach to now explain to the jury that you combine

22  Hershey, Shaio and firewall tool kit to render Claim 28

23  obvious.

24    If that weren't sufficient, he did say here it

25  would be obvious for any other firewall to adopt the same

944

1  features. He has already testified Hershey and Shaio are

2  other firewalls. All we want to do is have him explain that

3  for 28 and 29, combining firewall tool kit with Hershey and

4  Shaio, two other firewalls.

5    MR. ANDRE: Our problem with that, Your Honor,

6  is that, first of all, with any other firewalls, it would be

7  unfair disclosure because that could be 20,000 different

8  firewalls. I don't think that covers it.

9    As Your Honor knows, with respect to validity,

10  each dependent claim has to stand on its own merits. This

11  is a table which they are trying to show Shaio discloses

12  everything. They added references in to kind of fill in the

13  holes for Shaio.

14    For Claims 28 and 29, they only mention the

15  firewall tool kit, FWTK. They never mentioned Hershey in

16  those two claims. To try to fill in the holes, to try to

17  back-door it into Claim 27, I think is improper disclosure.

18    THE COURT: I will sustain the objection.

19    MR. ANDRE: That is all we have, Your Honor.

20    THE COURT: Nothing from the other side?

21    MR. HOLDREITH: Nothing.

22    THE COURT: Be back at 9:00.

23    (Recess taken.)

24    THE COURT: All right, Ms. Walker.

25    MR. HOLDREITH: Your Honor, may Dr. Wallach come

Wallach - direct

1  A.   Yes.

2  Q.   I see a reference here in Chen as well to a Hershey

3  patent. Do you see that?

4  A.   Yes.

5  Q.   Is that the Hershey patent we just discussed?

6  A.   It's the same.

7  Q.   What does it mean here that it's in a list of

8  references cited in Chen?

9  A.   That means that Chen is acknowledging that Hershey is

10  closely related or is relevant -- you know, to understand

11  Chen, it would help to understand Hershey.

12  Q.   Are Ji and Chen and Hershey all in the same field of

13  network security?

14  A.   Yes, they are.

15  Q.   Are they all aimed at solving related problems?

16  A.   Yes, they are.

17  Q.   Were they known solutions as of 1996 to trying to

18  detect unknown viruses and known viruses at a gateway?

19  A.   Yes, they were.

20  Q.   Was it within the technical grasp of people working in

21  your field to combine those three ideas and put them

22  together on a gateway?

23  A.   Yes, it was.

24  Q.   Now, do you need to combine Ji and Chen and Hershey,

25  all three of them, to make the '194 patent claims obvious?

---

958

Wallach - direct

1  A.   I believe you only need Ji and Chen.

2  Q.   In your claim chart, if I could have the Elmo back,

3  please, I see that the column headings say you could combine

4  Ji and Lo '91 or Ji and Chen. Is that right?

5  A.   Yes.

6  Q.   What does that mean?

7  A.   The Ji reference talks about a firewall that can do

8  anti-virus scanning using a virus scanner that knows about

9  preexisting viruses. Both Lo '94 and Chen talk about

10  scanning for previously unknown viruses.

11        If we combine Ji with either Lo '94 or Chen, we

12  then have the firewall that scans for viruses from Ji with

13  the previously unknown virus scanning properties in either

14  Lo '94 or Chen.

15  Q.   You could use either Lo or Chen, you don't need both?

16  A.   That's correct.

17  Q.   I would like you to briefly remind us of what is in

18  the Chen patent. I am showing you now Chen. This is the

19  abstract of Chen on the front page.

20        Can you remind us -- I will try to highlight

21  this. Can you remind us of what the abstract discloses

22  here?

23  A.   Chen is focused on scanning macros for viruses, and

24  for viruses that are perhaps previously unknown.

25  Q.   I would like to show you Column 2 of Chen. Can you

---

960

Wallach - direct

1  remind us, is a macro a type of downloadable?

2  A.   Yes.

3  Q.   Can it be?

4  A.   Yes, it can.

5  Q.   Column 2, at about Line, let's say, 53, does that tell

6  us what kind of viruses Chen is capable of detecting?

7  A.   Yes. So Chen discloses the ability to detect both

8  known and unknown viruses.

9  Q.   Finally, Column 7 of Chen, which I am now showing you,

10  starting at about Line 45, does Chen disclose specific

11  techniques for scanning for known and unknown viruses?

12  A.   Yes, it does.

13  Q.   All right. And if I specifically highlight, about

14  Line 47, what does Chen explain about scanning for known

15  viruses?

16  A.   Chen discloses the use of signature scanning, where

17  you have a specific pattern that you know matches a specific

18  virus.

19  Q.   If I show you now Column 8 -- I think I cut it off a

20  little bit -- Column 8, starting at about Line 58 in Chen,

21  does Chen disclose how to scan for unknown viruses?

22  A.   Yes, it does.

23  Q.   Is there anything in this disclosure that discloses

24  using a list of suspicious computer operations to identify

25  unknown viruses?

---

960

Wallach - direct

1  A.   We have these sets of instruction identifiers.

2  Q.   What does that tell you?

3  A.   That are these are -- these could well be the list of

4  suspicious computer operations.

5  Q.   I want to be careful here. Chen starts with

6  instruction identifiers.

7        Are those the instructions in a macro or do

8  those tell you what to look for in the macro?

9  A.   Could you restate the question?

10  Q.   So you have instruction identifiers in Chen?

11  A.   Yes.

12  Q.   They identify instructions?

13  A.   Yes.

14  Q.   Are those telling you what to look for or are those

15  telling you what you found?

16  A.   They are already telling you what you found. The

17  instruction identifiers are the instructions.

18  Q.   All right. Dr. Wallach, I would like to walk through

19  the chart now, but rather quickly. You have just told us

20  where different elements of the claims of the '194 patent

21  are found in Ji and Chen.

22  A.   Right.

23  Q.   I am going to go through your table. Let's pause if

24  there is something remarkable and worth discussing. But if

25  you have already told us where these things are found in Ji

961

Wallach - direct

1  and Chen, just let us know that and tell me which boxes I
2  should be checking?
3  A.    Okay.
4  Q.    Are you with me?
5  A.    I am with you.
6  Q.    Here is your table. This is the '194 patent. This,
7  again, is the Ji and Lo combination or the Ji and Chen
8  combination.
9          Did you find a computer-based method and did you
10 find a system in those combination of references?
11 A.    Yes, I did.
12 Q.    Did you find the step of receiving an incoming
13 downloadable addressed to a client by a server that serves
14 as a gateway to the client?
15 A.    Yes.
16 Q.    Let me pause on that. Can I check all three boxes
17 across?
18 A.    Yes, you can.
19 Q.    These are similar elements?
20 A.    Yes. It's the same concept.
21 Q.    In the system Claim 32, there is also a security
22 policy. Did you point that out in Ji just now?
23 A.    Ji discloses a security policy.
24 Q.    When you found that the Ji and Chen combination
25 receives a downloadable "addressed to the client," did you

962

Wallach - direct

1  use Dr. Vigna's definition of that term?
2  A.    Yes, I did.
3  Q.    That is to be consistent -- is that so that you could
4  be consistent with Finjan saying, Here is how the patent
5  should be interpreted and you evaluated whether it's valid?
6  That was not a very well-phrased question.
7          THE COURT: No, it is not. It is quite leading.
8  I understand this is an expert. In order to get through the
9  testimony, it is helpful. But you can't testify, counsel.
10 You can't put the words in his mouth.
11          MR. HOLDREITH: I will move on, Your Honor.
12 BY MR. HOLDREITH:
13 Q.    I am going to the next element, Dr. Wallach, which is,
14 Comparing by the server downloadable profile security data.
15 This is the element that contains the list of suspicious
16 operations?
17 A.    That's correct.
18 Q.    Did you find this element in the Ji and Chen
19 combination?
20 A.    I found it in Chen.
21 Q.    Can I check the boxes all the way across?
22 A.    Yes, you can.
23 Q.    The next element is, Preventing execution of the
24 downloadable by the client if the security policy has been
25 violated. Did you find that in the Ji and Chen combination?

963

Wallach - direct

1  A.    Yes.
2  Q.    Do you have an opinion whether Claims 1, 32, and 65 of
3  the '194 patent are invalid in light of the Ji and Chen
4  combination or the Ji and Lo combination?
5  A.    Yes. My opinion is these claims are invalid because
6  they are obvious.
7  Q.    Claim 2 adds that you decompose the downloadable into
8  downloadable security profile data. Did you find that in
9  the Ji and Chen or Ji and Lo combination?
10 A.    Yes. I found it in Chen and in Lo, yes.
11 Q.    I will check that box. I will ask you about all these
12 claims, your opinion on them after you tell us which
13 elements you found.
14          Let me move on to 3, which adds, The security
15 policy includes an access control list and comparing the
16 downloadable security profile data against that list.
17          Did you find this element in the Ji and Chen
18 combination or the Ji and Lo combination?
19 A.    Yes.
20 Q.    May I check that box?
21 A.    Yes, you may.
22 Q.    Claim 4 adds that you scan for a certificate and
23 compare the certificate against a trusted certificate.
24          Did you find that element in the Ji and Chen or
25 the Ji and Lo combination?

964

Wallach - direct

1  A.    In this instance, no.
2  Q.    Did you find that element in some other reference?
3  A.    Yes. I found it in the Microsoft Authenticode and
4  the Sun Signed Java references.
5  Q.    I have written, "Authenticode and Signed Java" in that
6  box. Is that correct?
7  A.    Yes.
8  Q.    Now, were Authenticode and Signed Java known solutions
9  to comparing a certificate in 1996?
10 A.    Yes, they were.
11 Q.    Was it within the technical grasp of people working in
12 network security in 1996 to compare certificates?
13 A.    Yes, it was.
14 Q.    Would there be any challenge to combining a
15 certificate comparison with the Ji firewall?
16 A.    There would be no challenge.
17 Q.    Claim 5 adds, Comparing a URL from which the
18 downloadable originate against a known URL.
19          Did you find that in Ji and Chen or in Ji and
20 Lo?
21 A.    I did not.
22 Q.    Did you find that somewhere else?
23 A.    Yes. I looked to the firewall tool kit for that
24 feature.
25 Q.    Would there be any difficulty in adding a firewall

965

Wallach - direct

1  tool kit feature of comparing a URL against the known URL to
2  the Ji and Lo combination in 1996?
3  A.    No.  That would be very simple.
4  Q.    Was it a known problem in 1996 and a known solution
5  that downloadables might come from URLs that could be
6  compared to a list?
7  A.    That was very straightforward at the time.
8  Q.    Claim 5 says, The URL is a trusted URL.  Where did you
9  find that element?
10  A.    I am sorry.  5 says known?
11  Q.    6, I am looking at 6 now.  6 says, The method of Claim
12  5 wherein the known URL is a trusted URL.
13          Did you find that somewhere?
14  A.    I found that in the firewall tool kit.
15  Q.    How about Claim 7, which says, Wherein the known URL
16  is an untrusted URL.
17  A.    I likewise found that in the firewall tool kit.
18  Q.    Claim 8 and Claim 32 specify that the downloadable
19  includes a Java applet.
20          Did you find disclosure of that in the Ji and
21  Chen combination?
22  A.    I did not.
23  Q.    Did you find that somewhere else?
24  A.    Yes.  I found that in the firewall tool kit.
25  Q.    How about the next set of six claim, Claims 9, 10 and

966

Wallach - direct

1  11, and Claims 34, 35 and 36, which are specific to ActiveX
2  controls, JavaScript and Visual Basic script.  Where did you
3  find those?
4  A.    I found all of those in the firewall tool kit.
5  Q.    Have I now filled out this page correctly?
6  A.    Yes, you have.
7  Q.    Dr. Wallach, Claim 12 says, The security policy
8  includes a default security policy to be applied regardless
9  of the client to whom the downloadable is addressed.
10          Did you find that in the Ji and Chen combination
11  or the Ji and Lo combination?
12  A.    Yes, I did.
13  Q.    Should I check that box?
14  A.    Yes, you can.
15  Q.    Claim 13 says, The security policy includes a specific
16  security policy corresponding to the client to whom the
17  downloadable is addressed.
18          Did you find that in the Ji and Chen
19  combination?
20  A.    I did not.
21  Q.    Where did you find that?
22  A.    In the firewall tool kit.
23  Q.    Claim 14 adds that the client belongs to a particular
24  group.  And the security policy corresponds to the
25  particular group.

967

Wallach - direct

1  Q.    Where did you find that?
2  A.    In the firewall tool kit.
3  Q.    Claim 24 adds that, to Claim 1, you compare the
4  downloadable against a known downloadable.  Did you find
5  that in the Ji and Chen combination?
6  A.    Yes, I did.
7  Q.    Should I check that box?
8  A.    Yes.
9  Q.    Claim 25 says, The method of Claim 24 wherein the
10  known downloadable is hostile.  Where did you find that?
11  A.    In the Ji and Chen or Ji and Lo.
12  Q.    Claim 26 says, The method of Claim 24 wherein the
13  known downloadable is non-hostile.  Where did you find that?
14  A.    I found it in Ji and Lo.  And I also found it in the
15  firewall tool kit.
16  Q.    I will put a check, because you found it in Ji and Lo.
17  Should I say or firewall tool kit?
18  A.    Yes.
19  Q.    Claim 27 adds, The method of Claim 24 further
20  comprising the step of including a previously received
21  downloadable as a known downloadable.
22          Where did you find that?
23  A.    I found it in Hershey.
24  Q.    Hershey, again, is the reference that is cited in
25  Chen?

968

Wallach - direct

1  A.    Yes.
2  Q.    Claim 28 says, The method of Claim 27 wherein the
3  security policy identifies a downloadable to be blocked per
4  administrative override.
5          Did you find that in the Ji and Chen or the Ji
6  and Lo combination?
7  A.    I found that in the firewall tool kit.
8  Q.    Claim 28 adds, Wherein the security policy identifies
9  a downloadable to be allowed per administrative override.
10  So that's where you allow it.
11  A.    I am sorry.  29?
12  Q.    Yes.
13  A.    You said 28.
14  Q.    Thank you, Dr. Wallach.  Let me re-ask the question.
15          Claim 29 adds that you administratively override
16  the downloadable to be allowed.
17          Did you find that?
18  A.    In the firewall tool kit.
19  Q.    The last claim, Claim 30, says, The step of informing
20  a user upon detection of a security policy violation.  Did
21  you find that?
22  A.    In Ji and Chen.
23  Q.    Dr. Wallach, do you find an opinion whether Claims 2,
24  3, 4, 5, 6, 7, 8, 9, 10 and 11, 33, 34, 35, 36, and also
25  Claims 12, 13, 14, 24, 25, 26, 27, 28, 29 and 30 of the '194

Wallach - direct

1    patent are valid or invalid?

2    A.    It's my opinion that they are invalid.

3    Q.    Is that for the reasons you just stated?

4    A.    Right.  Because they are obvious in light of the prior

5    art.

6    Q.    I realize it's a little tedious to step through those

7    tables.  You will be happy to know we are now finished with

8    the '194 patent.

9          We are going to talk now about the '780 patent.

10   All right?

11   A.    Okay.

12   Q.    The '780 patent, Dr. Wallach, is the patent about

13   hashing.  Do you recall that?

14   A.    Yes.

15   Q.    I will put a representative claim up.  Do you see

16   that, Dr. Wallach?

17   A.    Yes, I do.

18   Q.    Dr. Wallach, the '780 patent in Claim 9 claims three

19   things as we were discussing yesterday.  I am going to ask

20   you about them.  You have to have a downloadable?

21   A.    Right.

22   Q.    A software component?

23   A.    Right.

24   Q.    A reference to the software component, I should have

25   said?

Wallach - direct

1    A.    That's correct.

2    Q.    And you have to fetch the software component?

3    A.    Correct.

4    Q.    And then you have to hash the downloadable and the

5    fetched software component?

6    A.    That's correct.

7    Q.    And yesterday, as we discussed, you understand there

8    is a construction in this case that adds the word together

9    to hashing, you hash together?

10   A.    That's correct.

11   Q.    Can you explain what it means to take a downloadable

12   and a software component, fetch the component and hash them

13   together?

14   A.    Right.  When you say "together," what you are

15   saying -- it's easier to describe the alternative first.

16   You could hash each one separately and produce a separate

17   hash value for each of them.  If you have five components,

18   you have five hashes.

19          What this claim requires is that if you have

20   five components, you end up with one hash, which means --

21          MR. ANDRE:  Objection, Your Honor.

22          THE COURT:  Basis?

23          MR. ANDRE:  He is citing improper claim

24   construction that the Court provided.

25          THE COURT:  See counsel.

Wallach - direct

1          (The following took place at sidebar.)

2          THE COURT:  Mr. Andre, do me a favor, when you

3    stand up an object, don't just stand there, get my

4    attention.

5          MR. ANDRE:  This is the issue yesterday on the

6    '780 patent.  He stated if you get five hashes, you get a

7    single ID.  That was the proposed construction they provided

8    to Your Honor.  They wanted a single downloadable ID.  Your

9    Honor rejected that.  You said you just need to generate an

10   ID.

11         MR. HOLDREITH:  If he said single ID, I couldn't

12   speak to him --

13         THE COURT:  Why don't you lead him and correct

14   it.

15         MR. HOLDREITH:  I will.

16         (End of sidebar conference.)

17         THE COURT:  The objection is sustained.

18   BY MR. HOLDREITH:

19   Q.    I want to focus my question on the hashing process,

20   what it means to hash them together.  Not so much the part

21   of generating the ID.

22   A.    Yes.

23   Q.    How do you take a downloadable and a software

24   component and perform a hash on them together?

25   A.    So when you -- I mentioned this yesterday.  A hash

Wallach - direct

1    function takes a string of arbitrary length and produces a

2    summary of fixed length, no matter how big the original

3    string was.

4          So when you say "hashing together," that means,

5    the only way I can interpret that is that you bring the

6    strings together, so if you are hashing two things together,

7    you bring the two strings together and run the hash function

8    over it.

9    Q.    Can you do one hash on those two things put together?

10   A.    Yes, you can.

11   Q.    How does WebWasher actually work?

12   A.    What WebWasher does is it separately hashes each

13   software component that might go through, and it never

14   combines them, it never places them together.

15   Q.    So if WebWasher were to retrieve a downloadable and a

16   software component, can you just walk through the steps of

17   what WebWasher would do?

18   A.    WebWasher treats each component as a completely

19   independent entity.  For each individual component, it will

20   do this analysis that we have talked about for previously

21   unknown viruses, and there is an optional feature in

22   WebWasher that can be used to check digital signatures on a

23   downloadable.

24          Again, if there are five components, each one

25   will be checked independently.

Wallach - direct

1   A.    May 30th, 1996.

2   Q.    Is this prior art to the '780 patent?

3   A.    Yes, it is.

4   Q.    You also mentioned Microsoft Authenticode. I am now

5   showing you Exhibit DTX-1276 entitled, Microsoft

6   Authenticode Technology. Is this a reference you

7   considered?

8   A.    Yes, it is.

9   Q.    What is this reference -- let me ask you about the

10  date first. What is the date?

11  A.    October 1996.

12  Q.    Is this prior art to the '780 patent?

13  A.    Yes, it is.

14  Q.    What is the Authenticode reference, Exhibit 1276, what

15  does it teach?

16  A.    This describes Microsoft's Signed ActiveX technology

17  that they invented as part of Internet Explorer 3.0, which

18  came out in 1996.

19  Q.    Here is a description, Authenticode of Digital

20  Signatures. I have highlighted some text that says, starts

21  with, To save time, digital signature protocols use a

22  cryptographic digest, which is a one-way hash.

23        Can you explain what that means?

24  A.    The cryptographic operations that are used in digital

25  signatures, some of them are expensive and some of them are

Wallach - direct

1   cheap, which is to say, some of them run very quickly and

2   some of them run very slowly.

3         So the standard way that you make these

4   algorithms run fast is that you try to minimize the time

5   doing the expensive thing and do most of it doing the cheap

6   thing.

7         In this case, the cheap thing is the hash

8   function. Hash functions are cheap and fast. So you run a

9   hash function over the code that you are trying to

10  authenticate and then you digitally sign just the hash

11  rather than signing the whole thing.

12  Q.    When a piece of Microsoft Authenticode with a hash is

13  requested and received by a browser, what happens?

14  A.    So the browser first recomputes the hash, then it --

15  Q.    What does that mean, "recomputes the hash"?

16  A.    Okay. So the browser received this thing. It's an

17  ActiveX control. The browser wants to verify the

18  authenticity of this ActiveX control.

19        So the first step is that it computes -- it

20  computes a hash over the ActiveX control that it just

21  received, and then it compares that hash to the hash in this

22  thing called a digital certificate.

23        If the hashes match, then it knows it's looking

24  at the same, the very same thing that was signed.

25        It then goes through a more complicated

Wallach - direct

1   cryptographic process, that isn't worth getting into right

2   now, to verify the signature on the hash.

3   Q.    Dr. Wallach, are ActiveX controls downloadables that

4   can have a reference to a software component?

5   A.    Yes, they can.

6   Q.    When a browser requests an ActiveX component that has

7   a reference to a software component, what will the browser

8   do?

9   A.    The browser will separately fetch the other ActiveX

10  component, and they are never hashed together.

11  Q.    In Java -- let me ask you this: The Mueller patent we

12  looked at, what kind of downloadables are discussed in

13  Mueller?

14  A.    Mueller discusses Java applets as downloadables.

15  Q.    And when a browser requests a Java applet and performs

16  a hash of its assigned applet, is that similar to the

17  Microsoft process, if you can explain briefly?

18  A.    It is comparable. The main difference is that you can

19  have multiple components all stored in a single file, kind

20  of like a zip file. And they are all downloaded together

21  and all of the issues are all in the file together.

22  Q.    Do you have an opinion, Dr. Wallach, as to whether the

23  claims of the '780 patent are anticipated by Authenticode or

24  by Signed Java?

25  A.    Yes. My opinion is that they are anticipated and/or

Wallach - direct

1   rendered obvious.

2   Q.    All right. Have you prepared a chart that lays out

3   the claims of the '780 patent, similar to the charts for the

4   '194 patent we just looked at?

5   A.    Yes, I have.

6   Q.    Is this the chart, Dr. Wallach, that I have now put up

7   on the Elmo?

8   A.    Yes.

9   Q.    Similar to what we just did with the '194, the Ji and

10  Chen references, I would like to go through this table. Let

11  me know if you found these elements, and if there is

12  anything worth pausing on and discussing, let me know.

13  A.    Okay.

14  Q.    Now, again, at the heading of these columns, I see you

15  have referred to Authenticode and you have referred to

16  Signed Java.

17        Does that mean you need both of those references

18  for your analysis of these claims?

19  A.    No. Either/or.

20  Q.    The first element is, A computer based method for

21  generating a downloadable ID to identify a downloadable.

22  Did you find that in Authenticode and did you find that in

23  Signed Java?

24  A.    Yes.

25  Q.    Should I check these boxes?

Wallach - direct

1    So that's this code, in the parlance of the '822

2    patent, this is the mobile protection code. Something has

3    to be there to do the watching.

4    Q.    This abstract also discusses an instrumented applet.

5    What does that mean?

6    A.    So instrumentation is a fancy word for modifying the

7    or rewriting something, so, that way, you can keep track of

8    what it's doing while it is working.

9    Q.    An applet, is that the same kind of applet we have

10   been talking about today?

11   A.    Yes.

12   Q.    How do you instrument an applet in the meaning of the

13   Ji '97 patent?

14   A.    You rewrite the applet. So you change some of the

15   computer operations that it might use.

16   Q.    And it says here, "The instrumented applet is then

17   transferred to the client (web browser) together with

18   security monitoring code."

19         What does that mean?

20   A.    So the client or web browser we have talked about.

21   The security monitoring code is -- we have also talked

22   about. This is analogous to the mobile protection code of

23   the '822 patent.

24   Q.    It's called security monitoring code in Ji?

25   A.    That's correct.

Wallach - direct

1    Q.    And in your opinion, what's the relationship of

2    security monitoring code in Ji to mobile protection code in

3    Finjan's '822 patent?

4    A.    It is the same idea.

5    Q.    The rest of the abstract says, "During run time at the

6    client, the instrumented instructions are thereby monitored

7    for security policy violations, and execution of an

8    instruction is prevented in the event of such a violation."

9         What does that mean?

10   A.    That means that if there is a particular computer

11   operation that you think can be used for some legitimate

12   purpose but also can be used for some bad purpose, you have

13   now replaced calls to that dangerous operation with calls to

14   your own monitoring code. Then your monitoring code can

15   look at how it's trying to be used and it can say, That's

16   okay, that's not okay.

17         All of that happens in this mobile protection

18   code or security monitoring code.

19   Q.    Let me break that down for a second. You said you

20   replace calls with calls to your own code. Is that what you

21   just said?

22   A.    Yes, that's what I said.

23   Q.    Can you just explain that? What does that mean?

24   A.    This is a rewriting process. I mean, a program is

25   something that has a sequence of instructions. And when you

Wallach - direct

1    rewrite the program, you can replace some of these

2    instructions with other instructions. And when you do that,

3    when the program is running -- when it hits one of these

4    instructions that you have replaced, it now does what you

5    want it to do rather than what it originally wanted to do.

6    Q.    We have just read the abstract of Ji '97. Did you

7    read through the entire patent, all of the written

8    description?

9    A.    Yes, I did.

10   Q.    And all of the drawings?

11   A.    Yes.

12   Q.    And the claims?

13   A.    Yes.

14   Q.    This patent has about 12 columns of text, including

15   the claims?

16   A.    That's correct.

17   Q.    All right. I am not going to go through that in

18   laborious detail.

19         Did your reading of Ji '97, including the entire

20   specification and claims, did you use all of that material

21   in your analysis?

22   A.    Yes.

23   Q.    Do you have an opinion, based on your comparison of

24   the '822 patent to the Ji '97 reference, whether the claims

25   of the '822 patent are valid?

Wallach - direct

1    A.    My opinion is that the asserted claims are invalid in

2    light of the prior art.

3    Q.    I am going to now -- did you prepare another table?

4    A.    Yes.

5    Q.    For the '822 patent?

6    A.    Yes.

7    Q.    Is that the table you prepared?

8    A.    Yes.

9    Q.    Okay. Same protocol here. Let's go through the

10   table. If there is anything worth stopping on and

11   discussing, would you please point it out.

12         I am going to start with Claim 4 of the '822

13   patent.

14         Did you find a processor-based method in the Ji

15   '97 patent?

16   A.    Yes.

17   Q.    What does that mean, a "processor-based method"?

18   A.    That means it runs on a computer.

19   Q.    Did you find receiving downloadable information in the

20   Ji '97 patent?

21   A.    Yes.

22   Q.    What does that mean?

23   A.    That means that you are getting ---so downloadable

24   information in this patent is the same thing as a

25   downloadable in the earlier patents. It's that you are

1057

Wallach - cross

1  bottom, where it says --

2  Q.    Well --

3  A.    You asked me a question. I am going to give you an

4  answer. That is how this works.

5          THE COURT: I will tell you how this works.

6  This isn't your classroom. Let's relax.

7          THE WITNESS: Okay. Very good.

8          Please ask the question again.

9  BY MR. ANDRE:

10  Q.    Page 14 on this exhibit, highlight this bottom section

11  right here, this is how you can set the security policy.

12  "Mobile code that may be malicious or may perform operations

13  not required for that kind of mobile code will be blocked.

14  Only mobile code that does not perform any suspicious or

15  unrequired operations will be allowed."

16          So they didn't use — they use the word

17  "suspicious operations" here in this policy.

18          Then when you go to the next page of this

19  document, you go back to the chart, it states, Operations

20  performed are exactly as Dr. Vigna and the patent says, Read

21  a File, Write a File. And you are saying you think those

22  should be categories and not operations. That is your

23  opinion?

24  A.    I am saying these are not operations. These are

25  categories of operations. There is no such computer

1058

Wallach - cross

1  operation as, quote, usage of vulnerable functionality. If

2  you flip open a computer manual and look at lists of

3  operations that are available to a computer programmer,

4  there is no page saying, Here's the operation called usage

5  of vulnerable functionality.

6  Q.    If you read the patent itself, the '194, and you read

7  it, and you saw that this is an example of list of

8  operations, wouldn't you understand what the patent was

9  talking about when you said list of operations is Read a

10  File, Write a File, that's what the patent is talking about?

11  That's what the patent is trying to convey?

12  A.    You are quoting the patent accurately.

13  Q.    So if you are reading the claims in light of the

14  patent, the specification and how the patentee intended this

15  to be interpreted, then doesn't common sense dictate what

16  the patentee understood Read a File and Write a File to be

17  an operation?

18  A.    The patentee was clearly talking about individual

19  specific operations, not categories.

20  Q.    And going back to that Column 5 again. What the

21  patent was talking about was, an example list of operations

22  deemed potentially hostile are Read a File, Write a File.

23  That's what the patentee was talking about. Right?

24  A.    The patentee was trying to avoid listing a large

25  number of different ways of accomplishing the same task.

1059

Wallach - cross

1  Q.    You don't know that, do you, Doctor?

2          THE COURT: Let him finish his answer.

3          MR. ANDRE: I am sorry.

4          THE WITNESS: There are known to one of skill in

5  the art many different ways of reading and writing a file.

6  The patentee was doing us all a favor, and instead of

7  listing them all out, the patentee instead was doing us a

8  favor and saying, There are many different operations that

9  can have the behavior of reading a file.

10  BY MR. ANDRE:

11  Q.    You don't know that, do you, Doctor? You are now

12  speculating on this? Because the patentee was very clear.

13  This is --

14          THE COURT: Is that an argument you want to

15  make, Mr. Andre, or do you want to ask him a question?

16          MR. ANDRE: I will withdraw that. Thank you,

17  Your Honor.

18  BY MR. ANDRE:

19  Q.    We will go onto the next.

20          Now, the -- let me do a housekeeping matter.

21  You didn't provide any opinion as to all these other claims

22  in the '194 because they are dependent upon the independent

23  claims. Right? So you didn't provide any type of

24  noninfringement opinion as to all these other claims that we

25  went through in painstaking detail. Did you?

1060

Wallach - cross

1  A.    We did a chart, and for every claim, I provided an

2  opinion. That's all those check boxes.

3  Q.    This was the noninfringement we are talking about.

4  Not your invalidity?

5  A.    Well, in the noninfringement case, we were focused on

6  the independent claims.

7  Q.    That's what I am saying. So you didn't address all

8  these dependent claims, did you?

9  A.    When you address the independent claim, you address

10  the dependent claims, you address the independent claims as

11  well, at the same time.

12  Q.    But there is nothing else other than the computer

13  operations that you took issue with on the '194 patent?

14  A.    We took issue with the "addressed to a client" and we

15  took issue with the "suspicious operations."

16  Q.    Now, with respect to the '780 patent, you -- put Claim

17  1 of the '780 patent up, please.

18          With respect to the '780 patent, this last

19  element is where you took issue with Dr. Vigna's

20  infringement opinion. Correct?

21  A.    That's correct.

22  Q.    And in the WebWasher product, you don't dispute that

23  it performs a hashing function on a downloadable, do you?

24  A.    I do not dispute that.

25  Q.    And you don't dispute that it performs a hashing

Wallach - cross

1   function on the fetched software component, do you?

2   A.    I don't dispute that.

3   Q.    So what you dispute is performing a hashing function

4   on the downloadable and a fetched software component

5   together?

6   A.    That's correct.

7   Q.    And you heard Dr. Vigna testify that the WebWasher

8   product does do them together, they go out and do them, does

9   the hashing function on both of those, the downloadable and

10  a software component together.  Correct?

11  A.    He argued that they happened contemporaneously.  He

12  did not argue that there was a single hashing function

13  evaluated over both the downloadable and the fetched

14  software components together.

15  Q.    So your opinion is based upon what you just said, it

16  has to be a single hashing function on those two together?

17  A.    That is my interpretation of this claim.

18  Q.    Is there any other basis that you provided for why the

19  WebWasher product does not infringe Claim 1 of the '780

20  patent?

21  A.    That is the basis I have provided.

22  Q.    Let's go to the '822 patent.  If you go to Claim 4 of

23  this patent, please.  Now, with this claim, I believe your

24  issue with regard to infringement, the WebWasher, was using

25  this word right here, "If the downloadable information is

1062

Wallach - cross

1   determined to include executable code."  Right?

2   A.    That is the essence of my concern.

3   Q.    You read the word "if" as whenever?

4   A.    That's correct.

5   Q.    And you put that in your expert report, that they are

6   synonymous?

7   A.    That's my interpretation of this claim.

8   Q.    So if I said, for example, If it's Friday, I am going

9   to go to the store, that's the same thing as, Whenever it is

10  Friday, I go to the store?

11  A.    That's one way of reading that statement.

12  Q.    So you are saying that every single time, every single

13  type of downloadable comes in, it has to be wrapped in a

14  sandbox.  That is your interpretation?

15  A.    When a computer scientist uses language like this,

16  they tend to be very precise, if this, then that.

17        When they say that, what they mean is whenever

18  this, then that.

19  Q.    You are changing words here.  You are changing words

20  in the claim from "if" to "whenever"?

21  A.    I am trying to clarify the word.

22  Q.    You are clarifying the word "if"?

23  A.    Yes.

24  Q.    Okay.  "Now, the claim says that the mobile code,

25  protection code is communicated to at least one information

1   destination of the downloaded information, if the

2   downloadable information is determined to include executable

3   code."  Correct?

4   A.    That's what it says.

5   Q.    So if JavaScript comes into this WebWasher product,

6   that would happen.  Right?

7   A.    If JavaScript comes in and the feature is enabled,

8   then this would happen.

9   Q.    So if JavaScript comes in, it infringes?

10  A.    That's not true.

11  Q.    Well, if JavaScript comes in, this step happens?

12  A.    If JavaScript comes in, that step happens, yes.

13  Q.    If Visual Basic Script comes in, that step happens?

14  A.    That's true.

15  Q.    Let's talk about the validity of these patents now.

16  Let me take one more step back through this claim.  If

17  JavaScript comes in, all these steps happen.  Right?

18  A.    If JavaScript comes in, we are not disputing that any

19  of these steps happen.

20  Q.    And if Visual Basic Script comes in, all these steps

21  happen.  Right?

22  A.    That's correct.

23  Q.    Now let's talk about the validity of these patents.

24        Now, the references you rely upon for validity,

25  those are all provided to you by lawyers for Secure

1064

Wallach - cross

1   Computing.  Right?

2   A.    That's correct.

3   Q.    And when you were doing your analysis of all the prior

4   art that the lawyers provided to you, you didn't factor into

5   your opinion whether or not that prior art had considered

6   previously by the United States Patent and Trademark Office,

7   did you?

8   A.    I analyzed the prior art.

9   Q.    As you testified to, you didn't identify which of that

10  prior art had already been considered by those people

11  working in the United States Patent and Trademark Office,

12  did you?

13  A.    I did not.

14  Q.    And when you look at trying to determine validity of a

15  patent, you have to use a standard of one of ordinary skill

16  in the art.  Correct?

17  A.    That's correct.

18  Q.    And in 1996, when this patent was filed --

19  A.    Are we referring to the '194 patent?

20  Q.    The '194 patent.  In 1996, when the '194 patent was

21  filed, by your own admission, you were not one skilled in

22  the art at that time, were you?

23  A.    It's not relevant.  It's true, but it's not relevant.

24  Q.    Because you are one skilled in the art today.

25  Correct?

1065

Wallach - cross

1　A.　Beyond that, yes.

2　Q.　You are one of extraordinary skill. You are a doctor.

3　A.　That's my job.

4　Q.　So you look back in hindsight and see 1996 and what

5　was happening then and try to apply prior art at that time.

6　Correct?

7　A.　Yes.

8　Q.　And when you are looking at, for the obviousness

9　determinations, you didn't even consider any type of these

10　secondary considerations of nonobviousness, did you?

11　A.　Perhaps you could describe what "secondary

12　considerations" are.

13　Q.　That is a good point. Let me take a step back. Have

14　you ever been informed of what second considerations of

15　nonobviousness are?

16　A.　I was informed by counsel and it is in my report. I

17　have forgotten them right now. Perhaps you can remind me.

18　Q.　We will get to it. You didn't express any opinion

19　today of secondary considerations of nonobviousness?

20　A.　If you remind me of the definition, I can tell you

21　whether I have done it. I am not sure.

22　Q.　I don't know if I can do that. His Honor might get

23　mad at me for that one. Answering questions is not my job.

24　We will get to them later.

25　　　I want to go through the references that you

1066

Wallach - cross

1　talked about yesterday and today, and just kind of give a

2　real quick download on these.

3　　　One of the references you looked at was

4　DTX-1268. This was the reference, "combatting viruses

5　heuristically."

6　　　You talked about this yesterday afternoon in

7　some degree?

8　A.　Yes.

9　Q.　You didn't rely on this reference at all for your

10　opinion on invalidity, did you?

11　A.　I cited it in my report and discussed it.

12　Q.　But it wasn't one of the references that you used

13　today or yesterday, when you were making all the check

14　boxes, to see that this reference is a reference that would

15　invalidate any of these claims. Correct?

16　A.　We did not use this as part of a claim chart.

17　Q.　All right. Let's go to the references you actually

18　did use. Let's go first to DTX-1019.

19　　　This is the Ji patent that you were talking

20　about. Right?

21　A.　This is the Ji '95 patent.

22　Q.　The Ji '95 patent.

23　　　This is also known as the '600 patent. Right?

24　A.　Yes.

25　Q.　Now, this patent was considered by the United States

1067

Wallach - cross

1　Patent and Trademark Office in the prosecution of the '194

2　patent. Right?

3　A.　I am not sure.

4　Q.　Let's go to JTX-1, please.

5　　　When you blow up this chart right here, this is

6　'194, you can see that. Right here, you see the Ji '600

7　patent, right here, do you see that?

8　A.　Yes.

9　Q.　Would that indicate that the United States Patent and

10　Trademark Office had already looked at the Ji patent in

11　reference to the '194 patent?

12　A.　It would appear to indicate that.

13　Q.　That didn't factor into your consideration regarding

14　your opinion of validity of this patent, did it?

15　A.　My consideration -- first off, I never used Ji by

16　itself. I used Ji in combination with other references.

17　Q.　But it didn't factor into consideration, the fact that

18　it was before the United States Patent and Trademark Office,

19　in the prosecution of the '194 patent, did it?

20　A.　Not particularly, no.

21　Q.　Now, in the Ji patent, itself, what it talks about is

22　the traditional signature-based virus detection. Right?

23　A.　That's one of the things it talks about.

24　Q.　It doesn't talk about proactive scanning, does it?

25　A.　Actually, it does. It doesn't use that particular

1068

Wallach - cross

1　term, which is a Finjan trademark term or something, or

2　WebWasher, I forget which. But it talks about heuristic

3　scanning for unknown viruses.

4　Q.　The testimony you provided earlier in this case, you

5　stated that the security policy in Ji is inherent in that

6　document. Is that correct?

7　A.　I believe I said that.

8　Q.　So it didn't really say there is a security policy.

9　You say it's just there somewhere?

10　A.　I said that they are talking about detecting viruses,

11　and they didn't particularly talk about what you are

12　supposed to do once you detect the virus, because that part

13　is -- well, of course, when you detect it, you are going to

14　say no or something.

15　Q.　Let's go to the next reference, see if we can get

16　through these things very quickly.

17　　　Let's go to the Lo 1991 reference, which is

18　DTX-1263.

19　　　This reference here, the Lo reference, gateway

20　is not discussed in this reference. Correct?

21　A.　That's not the focus of this paper.

22　Q.　This is not a gateway issue. In fact, this paper

23　requires what is to be used with a human, a human analyst?

24　A.　Not necessarily.

25　Q.　That is what it is describing, where you have a human

1113

Degen - direct

1  Q.  Now, we are going to jump into some of the specifics

2  in a moment. But would you tell us what information, the

3  types of information that you actually looked at before you

4  started or during the course of your analysis?

5  A.   Yes.  I was provided financial data, marketing

6  documents, deposition testimony, things that help me put

7  values on the patents.  I talked to some Secure Computing

8  personnel, and pretty much reviewed everything that was

9  available as part of this case.

10 Q.   And were you here during the testimony of one of

11 Secure Computing's executives, Mr. Gallagher?

12 A.   Mr. Gallagher, yes, and I had spoken with him earlier

13 as well.

14 Q.   Now, with respect to Mr. Parr's opinions, do you

15 differ with him on his opinions?

16 A.   Well, as I said, we used the same methodology, but we

17 still have -- we get very different opinions, and it's

18 because we disagree in some fundamental areas.  First and

19 foremost, in terms of forming the underlying profit to which

20 to apply the rule of thumb, I differ significantly.

21       Second, within the range of the rule of thumb,

22 basically, Mr. Parr was at the high end, a third, and I am

23 really at the lower end, a quarter.  And there is several

24 reasons for that as well.

25       Then, finally, I applied my royalty rate to a

1114

Degen - direct

1  different base than Mr. Parr did.  Primarily because counsel

2  instructed me that certain things were not expected to be

3  considered infringing, and so I deducted them from the base,

4  hoping to inform you best for your decision.

5  Q.   Now, with regard to both Mr. Parr's opinion and your

6  opinion, is it the case that they only become relevant if

7  the jury finds some patents infringed and valid?

8  A.   That's correct.  The assumptions I make in valuing a

9  patent are that the patents are valid and infringed.  And

10 then in the context of this hypothetical negotiation, that's

11 where the people start, that they know that and they are not

12 discounting for either one of those.

13 Q.   Mr. Degen, have you prepared an overview chart that

14 summarizes your opinions regarding, I think this chart

15 relates to the Finjan claims against Secure?

16 A.   I have prepared such a chart, yes.

17 Q.   Let me see if I can put that up here.

18       Is that the --

19 A.   No.

20 Q.   That's not the chart, you are right.  It's 1335.

21       Is this the chart?

22 A.   Yes, it is.

23 Q.   Could you just, at a high level, walk us through what

24 your opinion is, and then we will go back and sort out the

25 detail.

1115

Degen - direct

1  A.   Right.  Before we go through the details of this

2  chart, let me just tell you that it is my opinion that if

3  the '194 patent and either, and/or the '780 and the '822

4  patent are infringed, that a reasonable royalty in this case

5  would be four percent of the revenues of the products you

6  find infringing.

7       There has been some discussion about the

8  CyberGuard TSP appliance.  My understanding is it's never

9  actually been sold with a working WebWasher module on it.

10 Because of that limitation, it's my opinion that Secure

11 Computing would have been willing to pay something -- you

12 heard Mr. Gallagher talk about the fact that by including it

13 in their marketing materials, they were able to preserve

14 some customer relationships and switch them over to the

15 Sidewinder product.  But certainly a four-percent royalty

16 for that use of it would be too high.

17       So it's my opinion that a royalty of one percent

18 would be appropriate for the CyberGuard TSP appliances for

19 any of the patents.

20 Q.   Let me just follow up on that for a second.

21       Were you here when Mr. Gallagher testified that

22 Secure Computing has received no revenue for WebWasher

23 itself being at least loaded onto a TSP appliance?

24 A.   Yes, I was.  My understanding is that they have sold

25 WebWasher appliances, but the fees associated with using

1116

Degen - direct

1  WebWasher they have never collected.  They have never

2  actually turned it on and gotten revenues from WebWasher.

3  Q.   Do you mean TSP appliances?

4  A.   Yes, I do.  I mean TSP appliances.

5  Q.   Even though they have never activated that feature for

6  any customer, it appears that you have included sales of the

7  CyberGuard TSP appliance?

8  A.   Yes.  I include them and I apply a one-percent royalty

9  to them.  Again, primarily because Secure Computing did use

10 the WebWasher in its advertising.  So it did get some value

11 from it.

12 Q.   Finjan has asserted three patents against Secure in

13 this case.  Have you distinguished between the patents; for

14 example, you know, if the jury finds that they are not all

15 infringed, have you broken out a scenario that takes into

16 account that possible situation?

17 A.   Yes.  You might have guessed that when I gave my first

18 opinion because I was emphasizing the importance of the

19 inclusion of the '194.  If, for any reason, the '194 patent

20 is found either invalid or not infringed and you did the

21 '780 or the '822 or both, are the only infringed patents

22 here, it is my opinion that a reasonable royalty would then

23 only be two percent.  That is primarily because most of the

24 marketing materials and an everything I have reviewed,

25 certainly all of Mr. Parr's analysis, focuses on proactive

1137

Degen - direct

1  is the same one I have on the floor here, but I want to blow
2  something up.
3          There was a point in time before Secure acquired
4  CyberGuard where CyberGuard was a standalone company. Is
5  that your understanding?
6  A.    Yes. CyberGuard purchased WebWasher and then was
7  bought by Secure in '06.
8  Q.    So all these numbers that you have got up here at the
9  top of Exhibit 1340 for CyberGuard Corporation, are all
10  those numbers, do they reflect financial information for
11  WebWasher when it was part of CyberGuard Corporation, before
12  the Secure acquisition?
13  A.    That's my understanding. That's what the documents
14  indicate.
15  Q.    And at any time that CyberGuard was in existence as a
16  standalone company with WebWasher as a part of it, did they
17  ever make money on the WebWasher product?
18  A.    Yes. In quarter four of '04, they made four-tenths of
19  a percent profit. But the cumulative profit would be
20  significantly negative, seven percent loss.
21  Q.    Mr. Parr, now -- I am sorry, Mr. Degen. Now that we
22  have Exhibit 1340, what do you do with that to get a
23  royalty?
24  A.    As I was explaining, I averaged the Secure Computing
25  profit for the six quarters, I have data available specific

Degen - direct

1  preserve that monopoly.
2          Did you look at that factor in arriving at your
3  opinion?
4  A.    I looked at all of these factors. This is one where I
5  think I have a very different valuation of the evidence than
6  Mr. Parr has, because he basically concluded that Finjan was
7  trying to preserve their patent monopoly, and the evidence I
8  saw in the case said they were not.
9  Q.    What is some of the evidence that you saw that led you
10  to the conclusion that they were not trying to preserve
11  their monopoly?
12  A.    Their actual license to Microsoft.
13  Q.    Mr. Degen, I want to caution you, if you are going to
14  go into any numbers, if you think you need to go into a
15  number there, we will have to ask Mary Bunch to leave. If
16  you need to go there, let me know and we will ask her to
17  leave. If not, fine.
18  A.    I don't think we will need to go there, because this
19  factor is really about their desire to preserve their
20  monopoly by not licensing. And all I really want to note is
21  that in the Microsoft license that you have already heard a
22  lot about, is a clear willingness to license to probably the
23  biggest threat in the industry.
24          So I absolutely can't accept the fact that
25  Finjan was trying to preserve its patent monopoly by

1138

Degen - direct

1  to WebWasher. I got 16 percent. A quarter of that would be
2  four percent. A third of that would be about five and a
3  third percent. So that was my rule of thumb range,
4  somewhere between four and essentially five and some change.
5  Q.    You are familiar with the 15 Georgia-Pacific factors?
6  A.    Yes, I am.
7  Q.    The numbers and analysis that we went through, do
8  those fit into one or more of the Georgia-Pacific factors?
9  A.    Yes. Factor 12 talks about the customary profit
10  allocation in an industry. And in this case, there is not
11  really evidence of one specific of this industry. So
12  Mr. Parr and I both applied the commonly used across
13  industry rule of them. And it's applied to net operating
14  profits. So it would be Factor 12.
15  Q.    I would now like to ask -- were you done in that?
16  A.    Yes.
17  Q.    So you got four percent, basically?
18  A.    Four to five-and-a-half was sort of where, what I used
19  for my range of valuation of the other factors.
20  Q.    I would like to now turn to Georgia-Pacific Factor 4.
21  I have up here one of the graphics that Mr. Parr used. You
22  can see Georgia-Pacific Factor 4 is the licensor's
23  established policy and marketing program to maintain its
24  patent monopoly by not licensing others to use the invention
25  or by granting licenses under special conditions designed to

1140

Degen - direct

1  licensing to the 900-pound gorilla in the room.
2  Q.    Let me now put another document on the screen and ask
3  you if you considered this one in analyzing this willingness
4  to license factor.
5  A.    Right. He is going to show you two more here. One is
6  the web route letter and the other is a letter to Alladin,
7  that I both understand to be demonstrating a willingness to
8  license.
9  Q.    I think we have seen this before. Is this one of
10  those that supports your opinion that they were willing to
11  license it?
12  A.    Yes. My reading of this letter is that Finjan is
13  offering a -- is offering to discuss a license to its patent
14  portfolio.
15  Q.    You had also mentioned a letter to Alladin. Let me
16  see if I can get that up on the screen.
17          Is this the letter that you were referring to?
18  A.    Yes.
19  Q.    And what does the "Re:" line on this letter say,
20  that's Exhibit 1075?
21  A.    Patented technology of Finjan Software.
22  Q.    Have you read this letter?
23  A.    Yes, I have.
24  Q.    Does this letter make reference to the '194 patent,
25  which is one of the patents-in-suit here?

1153

Degen - direct

1  you are deducting now? I want to make sure I am pointing to
2  the right start?
3  A.    Thank you for fixing me. Before I deduct the
4  non-proactive scan modules, I take out the sales that were
5  made by WebWasher while WebWasher was operating out of
6  Germany. So the product was made in Germany, it was sold
7  out of Germany, or other parts of the world. Basically, I
8  take out all the sales that occurred outside the United
9  States. I am not a legal expert, but I have worked now for
10  these cases, my understanding is it has to be made, sold or
11  used in the United States.
12  Q.    Let's look at these numbers just a little bit. So the
13  numbers go from the left-hand column, which is the farthest
14  away in time, over to the most currents, which is the
15  right-hand column?
16  A.    That's right. It runs from quarter 4 of '04, November
17  '04, through quarter three of '07.
18  Q.    So the line that says, Deduct U.S. -- Non-U.S.
19  Software Revenue, you have not made any deductions for the
20  time when Secure Computing, when they took over. Right?
21  A.    That's correct.
22  Q.    You only deducted under when CyberGuard owned it?
23  A.    That's correct. As soon as CyberGuard started filling
24  the orders out of the United States, processing orders, then
25  I have included all the foreign sales.

1154

Degen - direct

1  Q.    Did Mr. Parr take into account sales outside the
2  United States?
3  A.    His base number includes the WebWasher sales outside
4  the United States in this period.
5  Q.    So what was the next deduction?
6  A.    The next deduction is -- after the non-U.S. software
7  deduction, the next deduction I do is for non-proactive scan
8  modules. These are things like the URL filter, the real
9  cash cow of the WebWasher suite. And, so, basically, my
10  understanding from, I don't know whether it was a
11  conversation -- I think it was a conversation with
12  Mr. Stecher and with Cristoph Alme of Secure Computing, that
13  there were three modules that actually embodied the
14  proactive scanning. That would be anti-virus, anti-malware,
15  and the content protector. So the non-proactive modules
16  here would be everything else.
17        I calculate and deduct those revenues. You see
18  some percentage numbers there. That's to help me calculate,
19  there is a few missing quarters of data. And I fill them in
20  with interpolation or similar techniques.
21  Q.    Then you make another deduction?
22  A.    Yes. The final deduction I make, and it only occurs I
23  think in four of the quarters, is to deduct the sales to the
24  federal government. My understanding is that under certain
25  circumstances, no royalties can be collected for the federal

1155

Degen - direct

1  government's use. And based on what counsel told me, I have
2  subtracted those.
3  Q.    Mr. Degen, if -- there is a dispute between you and
4  Mr. Parr and us and these folks here on what should be in or
5  out of the base.
6        If the jury decides that some things that you
7  have taken out should be in, do your charts allow them to
8  find those numbers and add them back in?
9  A.    Yes. Let's just be clear. I don't think the dispute
10  is between Mr. Parr and myself. I think it's among the
11  lawyers. These are legal questions.
12        Just so we are clear. In the end, my opinion is
13  that the royalty rates I opine to should apply to whatever
14  sales you determine to be infringing and whatever sales the
15  Court determines to be infringing.
16  Q.    I just want to know if they, is there enough
17  information in here that they can make a decision, okay,
18  this should be in or this should be out, the numbers are
19  there for them to do the math, if they need to?
20  A.    Sort of. If all of my deductions are out, you can go
21  back to Mr. Parr's base. But these deductions -- the first
22  thing I did is take out the non-U.S. sales. Then I took out
23  the non-proactive scanning modules. But I didn't want to
24  double count. So when I take out the non-proactive scanning
25  modules, I don't deduct the non-proactive scanning modules

1156

Degen - direct

1  that were sold outside the U.S. So you have to be a little
2  careful in terms of reconstructing this.
3  Q.    All right. So after you are all done, you come up
4  with a base. Is that right?
5  A.    That's correct. This gets us a software base. And my
6  software base is $11,001,636.
7  Q.    Then do you also calculate a hardware base or an
8  appliance base?
9  A.    I do a very similar calculation for a hardware base.
10  And basically, I only have two adjustments to do here. One
11  is, the first thing I subtract in the hardware base is the
12  CyberGuard TSP Appliance sales. And that's simply because I
13  want to apply a separate royalty to them, a different
14  royalty, of only one percent, because they were never used
15  by the customers and they played a pretty minimal role in
16  selling the device.
17        The only other deduction I do again is sales to
18  the federal government, and that's your dispute.
19  Q.    Then you summarize these in a chart. Is that right?
20  1335, I think. I have got it on the screen here. You
21  probably have it by exhibit number.
22  A.    Yes.
23  Q.    We looked at this earlier, we have looked at the
24  beginning, we have gone through all the detail, now we are
25  back.

Degen - direct

1    What is the final conclusion with regard to
2    Finjan's assertion of patents against Secure?
3    A.    Okay. I am sorry for spoiling the anticipation. But
4    as I had already told you, the bottom line is $663,000.
5    That is four percent of WebWasher's software, four percent
6    of WebWasher modules that include proactive scanning, four
7    percent of all WebWasher appliances, excluding foreign sales
8    and sales to the federal government -- no, there is no
9    foreign sales, just the federal government. And then,
10    finally, one percent of CyberGuard TSP Appliance numbers.
11    If I multiply those out and add them up, I am at $663,000.
12        Just to complete the package, and you will see
13    the detail in Footnote 2, if, for some reason, the '194 is
14    found invalid and/or not infringed, then where I have four
15    percent in that table, it should be two percent, and the
16    total will be 392,000. And I will just ask you to consider
17    the magnitude of those relative to the valuations you have
18    seen. And I think you will see that they are very
19    reasonable in terms of what someone would pay for the idea
20    un-implemented, just to use it, not to own it.
21        MR. SCHUTZ: Your Honor, this is the segue to
22    Finjan's case against Secure.
23        THE COURT: Okay. Why don't we call a time out
24    for the weekend.
25        Ladies and gentlemen, please remember my earlier

1158

Degen - direct

1    instructions to you: Keep an open mind, do not discuss this
2    case with anyone, no research whatsoever. Travel safely.
3    9:00 Monday. See you.
4        (Jury leaves courtroom at 4:30 p.m)
5        THE COURT: All right. Real quickly, I wanted
6    to make an observation regarding the current state of the
7    joint proposed final jury instructions. I count 49
8    instructions total. It appears that, if I am counting
9    correctly, 27 are contested still. It is my hope that, over
10    the weekend, counsel will be able to put your heads
11    together. It's unacceptable to me that we should come to
12    our conference, our prayer conference, with this many
13    contested instructions.
14        Counsel would still be able to preserve your
15    positions with regard to objections that have been
16    interposed for various reasons, and, yet, it seems to me,
17    come together on a good set of instructions that will give
18    this jury the guidance it needs to get through this rather
19    difficult area.
20        Anything you need from me before we adjourn?
21        Have a good weekend.
22        (Court recessed.)
23        - - -
24    Reporter: Kevin Maurer
25

1159

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

FINJAN SOFTWARE LTD.,                 : Civil Action
                                      : No. 06-369(GMS)
            Plaintiff,                :
                                      :
      v.                              :
                                      :
SECURE COMPUTING CORPORATION,         :
CYBERGUARD CORPORATION,               :
WEBWASHER AG and DOES 1               :
THROUGH 100,                          :
                                      :
            Defendants.               :

- - -

Wilmington, Delaware
Monday, March 10, 2008
8:30 a.m.
Day Six of Trial

- - -

BEFORE: HONORABLE GREGORY M. SLEET, Chief Judge,
        and a Jury

APPEARANCES:

            PHILIP A. ROVNER, ESQ.,
            Potter Anderson & Corroon LLP
                  -and-
            PAUL J. ANDRE, ESQ.,
            LISA KOBIALKA, ESQ.,
            JAMES HANNAH, ESQ.,
            MEGHAN WARTON, ESQ.,
            KRIS KASTENS, ESQ., and
            HANNAH LEE, ESQ.,
            King & Spalding
            (Silicon Valley, California)

                        Counsel for Plaintiff

---

1160

1  APPEARANCES (Continued):

2
3       FREDERICK R. COTTRELL, III, ESQ., and
        KELLY J. FARNAN, ESQ.
        Richards, Layton & Finger
4             -and-
        RONALD J. SCHUTZ, ESQ.,
5       CHRISTOPHER A. SEIDL, ESQ.,
        TREVOR J. FOSTER, ESQ., and
6       JAKE M. HOLDREITH, ESQ.
        Robins, Kaplan, Miller & Ciresi, L.L.P.
7       (Minneapolis, MN)

8                  Counsel for Defendants

---

1161

1          THE COURT: Good morning, counsel.

2          (Counsel: Good morning, Your Honor.)

3          THE COURT: I understand there is an evidentiary

4   issue we need to talk about. I think we might still be

5   waiting for a juror, too.

6          MR. SCHUTZ: Your Honor, after some further

7   discussions with Mr. Rovner, there is a potential

8   evidentiary issue we may be able to defer. It has to do

9   with an exhibit that they have identified for possible use

10  with Mr. Parr. Mr. Rovner tells me that depending on

11  Mr. Degen's testimony this morning, he may not use it. If

12  Your Honor wishes -- it's a three-minute issue, and if it

13  does come up, we can defer it if you wish.

14         THE COURT: We can do that.

15         MR. ANDRE: Your Honor, may I discuss a

16  housekeeping matter.

17         THE COURT: Sure.

18         MR. ANDRE: Mr. Degen will be the Defendants'

19  last witness. So we will be moving for our Rule 50 motions

20  thereafter. I was talking to counsel about how we want to

21  proceed these last two days.

22         We think we might be able to get our rebuttal

23  case in today, we aren't sure. It depends on how long the

24  cross goes. We have the charge conference. We filed

25  another set of jury instructions this morning. We have

---

1162

1   about, substantive, about four or five issues on those jury

2   instructions. There is a couple, three or four of them that

3   we don't think they should be there, they don't think they

4   should be there, that type of thing.

5          THE COURT: You mean the jury instructions,

6   there doesn't need to be an instruction on a particular

7   topic?

8          MR. ANDRE: Exactly. The substantive disputes,

9   there is a dispute on obviousness, as Your Honor may figure,

10  with KSR.

11         THE COURT: I guess it's the case that the

12  parties are going to benefit from some guidance from the

13  various groups that weigh in on model jury instructions at

14  some point. I think most of them have not.

15         MR. ANDRE: Not yet. That's correct.

16         We didn't know if you wanted to try to have the

17  charge conference on the jury instructions late this

18  afternoon, even if we do not finish today and we can carry

19  on tomorrow morning. Or if you want to do it tomorrow

20  morning.

21         THE COURT: We should do it today. Because what

22  I would like to do is to have the instructions collated and

23  in shape so that there is no delay with regard to getting

24  them to the jury.

25         MR. ANDRE: If we have our last witness on the

Degen - cross

1    MR. SCHUTZ: Your Honor --

2        THE WITNESS: Ultimately, the jury will decide

3    which products they believe are infringed.

4        THE COURT: Hold on. Why don't you rephrase.

5    Try to be responsive.

6        If the question calls for a yes or no, you can

7    give a yes or no. You will be given an opportunity to

8    explain at some point.

9        THE WITNESS: Thank you, Your Honor.

10   BY MR. ROVNER:

11   Q.    I will rephrase the question. Didn't, in your expert

12   report, your rebuttal report, dealing with the Finjan

13   patents, didn't you say that, For purposes of this report, I

14   have assumed that Finjan's patents are valid and infringed

15   by Secure Computing's accused products? Yes or no?

16   A.    Yes.

17   Q.    Are you backing off that statement that you wrote in

18   your report?

19   A.    No.

20   Q.    But isn't it a fact that that is exactly -- that

21   sentence is what you violated in coming up with your

22   conclusions in your report and in your trial testimony on

23   Friday?

24   A.    No.

25   Q.    Didn't you -- the CyberGuard TSP Appliance is an

1188

Degen - cross

1    accused product. Correct?

2    A.    That's my understanding, yes.

3    Q.    And you have presumed that that doesn't infringe.

4    Correct?

5    A.    No, I have not. I include it in my royalty base and I

6    apply a royalty of one percent to it.

7    Q.    Haven't you eliminated, in your royalty, base all

8    CyberGuard TSP appliances sales?

9    A.    No. I separate them from the WebWasher appliances.

10   But if you look at my summary table, there is a line that

11   explicitly lists the CyberGuard TSP appliances.

12   Q.    But then you discount them. Mr. Parr included the

13   CyberGuard TSP products in his royalty base. You took them

14   out. Correct?

15   A.    No, that's not correct. They are part of my royalty

16   base and they are a line on my summary table.

17   Q.    But you acknowledge them but then you eliminate them.

18   You take them out because you say they didn't contain the

19   infringing -- the WebWasher technology. Isn't that correct?

20   A.    That's not correct. I assign a separate royalty value

21   to them because the value of the accused technology to

22   CyberGuard in that particular product was limited in as much

23   as they never really did use it to sell anything. The

24   convenience of being able to just install it as part of

25   their master load, but they never actually licensed it to

1    anyone. It is not excluded from my royalty base, but I

2    choose to assign a separate royalty rate to it because of

3    the way it was used in that particular product.

4    Q.    Okay. Now, let's talk about what you said in your

5    deposition. Let me hand that to you.

6        MR. ROVNER: May I approach, Your Honor?

7        THE COURT: Yes.

8        What page, Mr. Rovner?

9        MR. ROVNER: Page 127.

10   BY MR. ROVNER:

11   Q.    Mr. Degen, can you turn to Page 127?

12   A.    Yes, I have it.

13   Q.    Page 127, Line 19. Question directed to you, "Why did

14   you decide to include some of the accused infringing

15   products that Secure Computing says don't infringe and

16   didn't and went ahead and included some of the accused

17   infringing products that Secure Computing says doesn't

18   infringe"?

19        Your answer was: "My understanding is the

20   non- -- the modules that I have excluded are not even

21   alleged to include the proactive scanning features which

22   would contain the elements disclosed in the patent."

23        That was your testimony. Correct?

24   A.    That's correct.

25        MR. SCHUTZ: Your Honor, he didn't read the

1190

Degen - cross

1    complete answer.

2        MR. ROVNER: You will have redirect.

3        THE COURT: In the interests of completeness --

4    BY MR. ROVNER:

5    Q.    This is what you continued. "So while there may be a

6    dispute, an ongoing dispute about whether the patent

7    elements are, in fact, in Secure's commercial embodiment or

8    not, the things I have excluded, I have excluded because my

9    understanding is that they do not contain any proactive

10   scanning feature that could be construed as containing the

11   claims of the patents."

12        Is that your complete answer?

13   A.    Yes, it is.

14   Q.    So you excluded certain products. And that would be

15   the CyberGuard TSP product, wouldn't it?

16   A.    Well, I didn't exclude certain products. They all

17   fall under the rubric of WebWasher. What I have excluded is

18   the particular modules that did not embody the proactive

19   scanning feature.

20        In my discussions with counsel and the people

21   from Secure, I understood that the modules were sold

22   separately, and that only the -- I only included the modules

23   that had the proactive scanning code included in them.

24   Q.    Okay. Now, you heard Mr. Gallagher last week say that

25   the CyberGuard TSP product did have the source code embodied

Degen - cross

1   in the -- the WebWasher source code in the CyberGuard TSP
2   product, didn't you?
3   A.   Yes, I did.
4   Q.   But that's not what you said just now or what you said
5   in your deposition. You eliminated those because it didn't
6   embody the CyberGuard TSP product, did not embody the -- did
7   not have that source code in it. Correct?
8   A.   There is a confusion going on here. We are confusing
9   the fact that I segregate part of the base for the
10   CyberGuard TSP appliances with the adjustment I do for the
11   nonaccused modules.
12          The CyberGuard TSP is included in a base and
13   applied to a one-percent royalty. The software modules that
14   are part of WebWasher excluded, you saw as a calculation
15   of the base. And there I excluded them because I understood
16   they did not include the proactive scanning technology. I
17   think you are mixing those two things up.
18   Q.   Yes or no, Mr. Degen: Does the CyberGuard TSP product
19   contain the WebWasher functionality, whether it is turned on
20   or not, is it there?
21          Strike that.
22          Is the WebWasher proactive scanning technology
23   available for purchase in the CyberGuard TSP product?
24   A.   My understanding is that it's available for purchase.
25   My understanding is also that no one has ever purchased it,

1192

Degen - cross

1   and that CyberGuard actively discouraged the sale. It was
2   technically available for sale. But as Mr. Gallagher
3   testified, his strategy was not to sell it, and they have
4   not.
5   Q.   They discouraged the sales. Is that what you are
6   saying?
7   A.   That's what I understood Mr. Gallagher to say the
8   other day.
9   Q.   PTX-263, please. That Secure Computing document is
10   off their website. Do you see that?
11   A.   Yes, I do.
12   Q.   Could you turn to Page 2. The bottom of Page 1, do
13   you see where it says, CyberGuard TSP Features and Benefits?
14   A.   Yes, I do.
15   Q.   Would you turn to the next page, please. Do you see,
16   WebWasher content filtering advertising there?
17   A.   Yes, I do.
18   Q.   Are they actively discouraging the purchase there?
19   A.   It says what it says. My understanding is that
20   they -- when customers wanted to inquire about it, they were
21   trying to migrate them to their Sidewinder product. That
22   was the testimony of Mr. Gallagher.
23   Q.   I am asking you whether you said, seconds ago, that
24   they discouraged the sale of the WebWasher technology in the
25   CyberGuard TSP product.

Degen - cross

1   Is that, to you, discouraging the sale?
2          THE COURT: When you say that you might want to
3   refer --
4   BY MR. ROVNER:
5   Q.   The WebWasher content filtering. It looks to me like
6   they are marketing it. You say they discouraged the sale.
7   Is that your testimony?
8   A.   You are mischaracterize --
9   Q.   How am I mischaracterizing --
10         MR. SCHUTZ: Your Honor --
11         THE COURT: Yes, Mr. Rovner. Mr. Maurer can't
12   take both of you talking at the same time.
13         THE WITNESS: My testimony was I understood from
14   Mr. Gallagher they were actively discouraging it. That is
15   not my opinion. Those were his statements. It is in their
16   documents. You looked at these documents with him the other
17   day. But my understanding is they use the opportunity to
18   market Sidewinder and, to this point, have been completely
19   successful in discouraging the sale of WebWasher on this
20   CyberGuard appliance.
21   BY MR. ROVNER:
22   Q.   Do you see a discrepancy in Mr. Gallagher's testimony
23   about discouraging the sale of WebWasher content in
24   CyberGuard TSP when you compare it to their marketing
25   materials that were on their website?

1194

Degen - cross

1   A.   No, I do not.
2   Q.   You see no discrepancy?
3   A.   No, I do not. He admitted that it was listed on their
4   website and it was in their marketing materials. But their
5   strategy was to actively discourage, when people called and
6   wanted it, to migrate them to Sidewinder, that they really
7   intended not to sell it even though it was in their
8   marketing materials.
9   Q.   Let me see if I can come up with something that might
10   put a point on this.
11         You testify at trials. Right? One of your job
12   is as a damages expert. Right?
13   A.   That's correct.
14   Q.   And your marketing materials are your resume.
15   Correct? Your CV?
16   A.   My CV is what it is. We also do other marketing
17   material.
18   Q.   On your CV, you market yourself as an expert in patent
19   infringement damages cases. Right?
20   A.   Well --
21   Q.   I can read it if you don't know your own CV?
22   A.   Why don't you read it to me. I don't know it by
23   heart.
24   Q.   "Professional Experience" -- this is attached to your
25   expert report -- "I have testified in numerous litigations

Degen - cross

1  involving intellectual property and other business disputes
2  and in postal rate cases."
3       You actually told us about your role in postal
4  rate cases. Right?
5  A.  That's correct.
6  Q.  In your resume, your marketing piece, are you actively
7  discouraging people from hiring you in postal rate cases or
8  in intellectual property cases?
9  A.  I am not. But I currently actively discourage the
10 Postal Service from using me in those cases because we are
11 transitioning to other witnesses. It is still listed in my
12 resume. From a corporate standpoint, we are transitioning
13 to other witnesses within the company.
14      It is in my resume. But I haven't testified in
15 a postal rate case in several years and we are giving
16 younger people an opportunity.
17 Q.  So your resume is not 100 percent correct because
18 instead of -- your resume is saying what you have done but
19 it is certainly not to be construed as something you would
20 do in the future. Is that what you are saying?
21 A.  That's not correct. Just like WebWasher and
22 CyberGuard. If the Postal Service really needs me for a
23 particular assignment, then I am available. But if it is an
24 assignment somebody else can do, we are going to have
25 somebody else at my firm do it.

1196

Degen - cross

1  Q.  Your firm is still doing postal rate cases, you are
2  not. Is that correct?
3  A.  That's correct.
4  Q.  Do you notice that, the annual report for Secure?
5  A.  Yes.
6  Q.  Could you tell the members of the jury what the
7  purpose of an annual report is?
8  A.  My understanding is that annual reports are final to
9  inform shareholders about what the firm has been up to and
10 report financial results.
11 Q.  Shareholders are the owners of the company. Right?
12 A.  That's correct.
13 Q.  And you want to be honest with your owners. Right?
14 A.  Yes.
15 Q.  You see, "Enterprise Gateway Security Appliances." Do
16 you see that?
17 A.  Yes.
18 Q.  And in this annual report -- you have seen this
19 before, haven't you?
20 A.  Yes, I have.
21 Q.  It's describing the products in the Secure Computing
22 line. Right?
23 A.  Yes. It appears to be; yes.
24 Q.  Could you turn to Page 9, please. The top box, would
25 you highlight that, please.

Degen - cross

1       It's entitled, "CyberGuard Total Stream
2  Protection (TSP)."
3       Do you see that?
4  A.  Yes. That's what it says.
5  Q.  Could you tell me where in that paragraph Secure is
6  telling its owners that they are discouraging the sale of
7  the CyberGuard TSP product?
8  A.  I don't see any references to that.
9  Q.  Okay. Isn't it a fact that they are marketing this
10 product and isn't "zero-hour attacks," isn't that another
11 word, another phrase for proactive scanning?
12 A.  My understanding is it can be, yes.
13 Q.  Are they misleading the owners of the company?
14 A.  I wouldn't want to speculate on that.
15 Q.  Your understanding is, based on Mr. Gallagher's
16 testimony, that they are discouraging the sales. And where
17 does it say that?
18 A.  It does not.
19 Q.  Okay. And when was the purchase -- his testimony, as
20 I understand it, was that they marketed this for a little
21 bit just to sort of appease the CyberGuard customers. Am I
22 right, something like that?
23 A.  I don't think that's quite right. I think he
24 testified that it's still technically available.
25 Q.  But they kept this on the website, made it sound like

1198

Degen - cross

1  he was keeping it on for a little bit, for the transition.
2  Right?
3  A.  I think it's still there.
4  Q.  Let's see if it is. When was the acquisition of
5  CyberGuard by Secure?
6  A.  In early 2006.
7  Q.  Could you turn to page 87 of the report?
8       What was the date again?
9  A.  I think it was in early 2006. I don't know the exact
10 date off the top of my head.
11 Q.  What is the date of the report there? This is the
12 signature page of the annual report that we just looked at,
13 JTX-45. What is the date?
14 A.  March 16, 2007.
15 Q.  When this report went out to the owners of the
16 company, 14 months later, they are still advising CyberGuard
17 TSP. Right?
18 A.  Yes.
19 Q.  With proactive scanning feature, that feature
20 included. Right?
21 A.  In this document they are calling it zero-day
22 response, whatever.
23 Q.  You understand it to be proactive scanning. Right?
24 A.  I am not sure that proactive scanning is the only
25 zero-day technology. But basically, yes.

Degen - cross

1   Q.   Fair enough.  So this is the last document that I am
2   aware of that was sent to the shareholders.  But as you
3   said, earlier today, they are still marketing CyberGuard TSP
4   with zero-hour detection.  Right?  To this day?
5   A.   It still appears on their website, is my
6   understanding.  They still haven't sold any.
7   Q.   Okay.
8           Now, let's get back to your report.  Talking
9   about the fact that you are only as good as the information
10  you rely on.  I think that was my phrase.
11          You testified today that the proactive scanning
12  feature is available for purchase.  Correct?
13  A.   I am sorry.  In what context?
14  Q.   The proactive scanning feature, WebWasher, is
15  available in the CyberGuard TSP product.  Correct?
16  A.   That is my understanding.  I thought that's what
17  Mr. Gallagher said the other day.
18  Q.   But it is your understanding today, sworn testimony
19  today, your understanding is that it's available on the
20  CyberGuard TSP product.  Right?
21  A.   No.  My sworn testimony is that that is what I recall
22  Mr. Gallagher saying.  It's not an opinion I hold
23  separately.  It's just my best recollection of what he
24  testified to.
25  Q.   What is your opinion?

Degen - cross

1   A.   Yes, I goo.
2   Q.   You said you -- a few minutes ago, you said you didn't
3   have an opinion as to whether the WebWasher function was
4   available in the CyberGuard TSP appliances.  Correct?
5   A.   That's correct.
6   Q.   Why don't you read for the jury the second sentence,
7   in Paragraph 15?  This is your rebuttal expert report.
8   Right?
9   A.   "The WebWasher proactive scanning functionality has
10  never been and is not available for purchase by customers on
11  CyberGuard TSP appliances."
12  Q.   What is right, Mr. Degen?  You just told us you didn't
13  have any idea, and in your expert report, you wrote that it
14  has never and is not available for purchase.  That's not
15  what you are saying today, is it?
16  A.   At the time I wrote my report, my understanding was
17  that it was not available.  I was aware it had never sold,
18  and I understood it was not sold.  I came to trial and I
19  heard Mr. Gallagher testify that while it is technically
20  available, they have discouraged the marketing of it and
21  still have not sold it.
22  Q.   Your rebuttal expert report, upon which your opinions
23  are based, it's wrong.  Correct?  That statement is wrong?
24  A.   That's my current understanding, yes.
25  Q.   Your current understanding is your report is wrong.

1200

Degen - cross

1   A.   I don't know one way or the other, other than what I
2   heard him say in court.
3   Q.   So you don't know separately whether the WebWasher
4   proactive scanning function is available in the CyberGuard
5   TSP product.  Right?
6   A.   That's correct.
7   Q.   Okay.  Let's look at your expert report, your rebuttal
8   expert report.
9           Could you put the rebuttal expert report on the
10  scene?
11          MR. SCHUTZ:  That is not an exhibit, Your Honor.
12  I would object to it.
13          MR. ROVNER:  Your Honor, when Mr. Parr was on
14  the stand, they showed him his report to show which
15  documents he had reviewed and to refresh his recollection,
16  on the screen, as to what document he had looked at and he
17  said, Yes, it looks like I have seen that.
18          MR. SCHUTZ:  That was after -- if he shows it to
19  him and establishes it, then it can go up.
20          THE COURT:  Why don't you show it to him.
21  BY MR. ROVNER:
22  Q.   Could you turn to Page 7 of your rebuttal expert
23  report?
24  A.   Okay.
25  Q.   Paragraph 15, do you see that?

1202

Degen - cross

1   So we are clear, on that topic, that sentence?  Yes or no,
2   Mr. Degen?
3   A.   My understanding is that sentence is incorrect within
4   my report.
5   Q.   Isn't it that sentence that you based your -- you gave
6   TSP, CyberGuard TSP a one-percent royalty rate based on a
7   false conclusion.  Correct?
8   A.   In part.  My understanding was it had never been sold
9   and that understanding is still true.
10  Q.   Okay.  That's not what you said in this report.  Never
11  available, has never been available.  Right?
12  A.   No.  What I said is --
13  Q.   Read it again.
14  A.   -- it has never and is not available for purchase by
15  customers on CyberGuard TSP appliances.
16          THE COURT:  Mr. Rovner, we don't need to beat
17  the jury up with this point.  You have made your point.
18  BY MR. ROVNER:
19  Q.   One final question.  Mr. Gallagher testified
20  unambiguously that it is available for purchase on the
21  CyberGuard TSP appliance.  Right?
22  A.   Again, that's my best recollection from sitting in
23  court, but I wasn't taking notes.
24  Q.   Your job was to get your facts right.  You testified
25  to that earlier today.  Right?

Degen - cross

1  A.  That's correct.

2  Q.  You talked to Mr. Gallagher in preparing your report,

3  didn't you?

4  A.  That's correct.

5  Q.  So why didn't you get it right in the report if you

6  talked to Mr. Gallagher, who testified one way, you wrote in

7  your report another thing. Why?

8  A.  I did not talk to Mr. Gallagher about this particular

9  issue.

10  Q.  Okay. Now, it helps Secure's case for some reason to

11  show that the CyberGuard TSP appliance -- strike that.

12       The WebWasher functionality not being available

13  on CyberGuard TSP, that helps your case. Right?

14  A.  I don't have a case. What do you mean, helps my case?

15  Q.  Your royalty rate is lower than Mr. Parr's. Right?

16  A.  My opinion is, yes.

17  Q.  Yes, what? Your royalty rate is lower than

18  Mr. Parr's?

19  A.  Yes, that's correct.

20  Q.  If it turns out that the CyberGuard TSP product

21  contains the WebWasher functionality, including its source

22  code and that is found to infringe, your opinion has nothing

23  to do with that. You said it wasn't available; wasn't

24  there. Correct?

25  A.  No, I wouldn't agree with that. I don't think the

1204

Degen - cross

1  fact -- what I heard Mr. Gallagher testify to changes my

2  opinion. While they have continued to nominally market it,

3  what I understood him to say is that they had actively

4  discouraged sales of it and that there had been no sales and

5  had I had that fact at the time I formed my opinion, I would

6  have reached the same opinion.

7  Q.  Okay. Was that fact available to you when you wrote

8  your report?

9  A.  I did not see it in any of the documents. I could

10  have asked Mr. Gallagher. I didn't realize it was something

11  that was in dispute.

12       I thought I had it right.

13       Certainly, I have the part right about it not

14  being sold. That is really the most important thing.

15       The difference between not selling it and

16  actively discouraging selling it both result in not selling

17  it.

18       What I can say is none of the CyberGuard TSP

19  appliance sales were a direct result of the use of the '194

20  patent.

21  Q.  But the functionality, let's make no mistake about it,

22  WebWasher functionality is present in that TSP product, as a

23  best you understand. Is that correct?

24  A.  I wouldn't necessarily agree with the word

25  "functionality." My understanding is that the source code

1206

Degen - cross

1  is on the device as part of the installation dump. But the

2  functionality is not available and has never been -- it's

3  never been functional, I guess that is my quibble, with the

4  word "functionality."

5  Q.  It is available. I will show you Mr. Gallagher's if

6  you don't want to take my word for it. Would you like to

7  see that?

8  A.  It is there but it has never been turned on --

9  Q.  It's available, though?

10  A.  If you pay --

11       THE COURT: He is agreeing with you, Mr. Rovner.

12  Gee, wiz.

13  BY MR. ROVNER:

14  Q.  Where did you get your information that it was never

15  available that formed your expert report?

16  A.  I don't recall specifically. Let me check my

17  footnotes here.

18       I cite a document there, and I don't know the

19  document control numbers by heart, so I can't say.

20  Q.  They are Secure Computing documents, though. Right?

21  Produced by Secure Computing. That's why they have the "SC"

22  in front of it?

23  A.  That's correct.

24  Q.  Okay. On Friday, you mentioned a number of

25  Georgia-Pacific factors. Correct?

1206

Degen - cross

1  A.  That's correct.

2  Q.  You didn't mention them all, though, did you?

3  A.  I did not.

4  Q.  Now, your -- one of the ones you did discuss briefly,

5  No. 5 is, you talked about -- just show Slide G-102, please.

6       "The commercial relationship between the

7  licensor and the licensee," No. 5, you touched upon that.

8  Right?

9  A.  That's correct.

10  Q.  And you said that, and correct me if I am wrong --

11  that there was some limited competition but they really

12  weren't in the same league. Is that correct?

13  A.  That's correct. I don't know if I used the word "same

14  league." What I said is my understanding is that there was

15  very limited evidence that in the absence of Secure's

16  accused product -- in other words, if Secure had been

17  selling its product without the proactive scanning feature,

18  there was very limited evidence that, absent that, Finjan

19  would have made the sale.

20       Some of that evidence was the fact that

21  Mr. Gallagher's testimony that he rarely saw Finjan as the

22  final competitor, I think Nimrod Vered from Finjan testified

23  that they really didn't have the length or breadth to

24  compete with the Fortune 500 firm.

25       I think Dan Frommer from Finjan testified in

Degen - cross

1  A.    I believe in his report, he cites a range of 93 to 99

2  and cited Jill Putman's testimony for the 99 number, yes.

3  Q.    So it was right there in his report.  Jill Putman

4  deposition, Page 74, 99 percent gross profit margin for

5  software.  Right?

6  A.    Correct.

7  Q.    And you wrote your rebuttal expert report after that.

8  Correct?

9  A.    That's correct.

10  Q.    Why didn't you call Ms. Putman before you wrote your

11  rebuttal expert report and say, Mr. Parr is citing this

12  crazy 99 percent number, what's the truth here?  Why didn't

13  you call her then?

14  A.    Because I had the truth.  I had the WebWasher, the

15  Secure and CyberGuard documents that were specific to the

16  WebWasher products and the documents clearly showed me what

17  the operating profit was, what the gross margins were.

18      Also, in her deposition, the question was not,

19  What is the gross margin for WebWasher?  She simply cited

20  the 99 percent with respect to trying to explain why the

21  CyberGuard financials looked better than the -- why the

22  Secure financials looked better than CyberGuard.

23  Q.    So at the time you wrote your expert report, you

24  thought you had an answer, right, to Mr. Parr's reference to

25  Ms. Putman's deposition.  Right?

---

1220

Degen - cross

1  A.    I am sorry.

2  Q.    When you wrote your rebuttal expert report, you

3  considered Mr. Parr's reference to Ms. Putman's deposition.

4  Correct?

5  A.    Yes.

6  Q.    Never bothered to call Ms. Putman before you wrote

7  your report because you thought you knew the answer.  You

8  said you relied on the correct information?

9  A.    Well, I had the documents that were kept in the normal

10  course of business.  Also, I read Ms. Putman's deposition

11  and she was not opining as to the gross profit margin for

12  WebWasher.  So there wasn't even a conflict.

13  Q.    Yet, you felt last week that you should call her.

14  Correct?  Nothing had changed.  Right?

15  A.    Nothing had changed.

16  Q.    But last week, you decided to call her, yet, before

17  the expert report, with the same information, you didn't

18  bother to check with her.  Right?

19  A.    That's correct.

20  Q.    Nothing -- go ahead, sorry.

21  A.    In general, when I am reviewing documents, if I had

22  actual financial statements, I will rely on those over

23  deposition testimony and e-mails.  My primary source, what I

24  like to use the most is the documents that are kept in the

25  normal course of business.  And they were available to me.

---

Degen - cross

1  So that's what I used.

2  Q.    So when Ms. Putman said in her deposition, this is at

3  Page 74, the question was, "Why is a lower gross margin

4  predicted for CyberGuard"?  Her answer was, "A larger

5  portion of the CyberGuard business has a hardware component

6  attached to it which carries a great deal of cost.  In

7  contrast, a larger portion of the Secure Computing revenue

8  carries no hardware components and in fact runs at 99

9  percent margins."

10      I read that correctly, right?  As far as you

11  know?  And I could give you her deposition if you would like

12  to check.

13  A.    That is consistent with my recollection.

14  Q.    The 99 percent margins for software, at least

15  according to Ms. Putman, the director of finance, are a lot

16  higher than the hardware margins.  Right?

17  A.    When I talked to Ms. Putman, she explained --

18  Q.    I am not asking about the conversation.

19      MR. SCHUTZ:  Your Honor.  I think it's fair to

20  allow the witness to --

21      THE COURT:  Can you answer yes or no?

22      THE WITNESS:  If he asks it again.

23  BY MR. ROVNER:

24  Q.    I am only asking about her deposition testimony.

25      THE COURT:  Rephrase or re-put the question,

---

1222

Degen - cross

1  please.

2  BY MR. ROVNER:

3  Q.    When Ms. Putman wrote that the software margins are

4  higher, the gross profit margins for software are 99

5  percent, that's higher than the margins for hardware.

6  Correct?

7  A.    That's what she said for all of Secure's software.

8  Q.    And your point is that she didn't specify WebWasher

9  software.  Right?

10  A.    Well, she didn't specify it and I don't think that's

11  what she had in mind.

12  Q.    As a general notion, software is less expensive to

13  make than a hardware appliance.  Right?

14  A.    That's been my experience, yes.

15  Q.    So your testimony a few minutes ago was that when you

16  had the information, the hard facts, the documents, you

17  didn't rely on deposition testimony.  Right?

18  A.    With respect to financial information, absolutely.

19  Q.    Does financial information also include where sales

20  were made, whether they are U.S. sales, non-U.S. sales,

21  things like that?

22  A.    Yes.

23  Q.    Now, part of your royalty base deals with U.S. sales

24  or non-U.S. sales.  Mr. Parr includes all sales.  You

25  exclude them because you say that they involved non-U.S.

# EXHIBIT 1
# PART 4

Degen - cross

1    sales. Correct?

2    A.    Yes and no. I exclude the non-U.S. sales through 2005

3    during which time I understand that sales outside the U.S.

4    were made and fulfilled outside the U.S.

5    Q.    And that's for CyberGuard. Correct? That's a

6    CyberGuard time frame?

7    A.    Right. That would be during CyberGuard's ownership of

8    WebWasher.

9    Q.    What is your evidence to support that?

10   A.    I don't know off the top of my head. I may have cited

11   some in my report. Do you want me to look?

12   Q.    Let's look at the report. Why don't we look at your

13   response expert report at Paragraph 13.

14   A.    Yes.

15   Q.    Paragraph 13, your response report: Prior to Secure

16   Computing Corporation's acquisition of CyberGuard in 2006, I

17   understand that non-U.S. sales were completely manufactured,

18   sold and serviced outside the U.S.

19        Do you see that?

20   A.    Yes, I do.

21   Q.    And the source for that statement is Footnote 12, it

22   says, For example, see the deposition of Jill Putman.

23   Right?

24   A.    That's correct.

25   Q.    So Secure's director of finance gave you that

---

1224

Degen - cross

1    information. Right?

2    A.    Well, I read her deposition.

3    Q.    Okay. And in the deposition, it says just that.

4    Right?

5    A.    That's -- I think it says something close to that.

6    The sentence doesn't quote her deposition directly. But it

7    summarizes what I understood from reading her deposition.

8    Q.    Now, tell me, and tell the jury, more importantly,

9    when did -- this is CyberGuard information. Right?

10   CyberGuard sales. Correct?

11   A.    Correct.

12   Q.    When did Ms. Putman work for CyberGuard?

13   A.    I don't know that she did.

14   Q.    Isn't it a fact that she never worked for CyberGuard

15   and was merely a Secure Computing employee at the time you

16   are alleging that CyberGuard did not have any U.S. sales?

17   A.    I don't know either way.

18   Q.    Let me give you a copy of Ms. Putman's deposition.

19        MR. ROVNER: May I approach?

20        THE COURT: Yes.

21   BY MR. ROVNER:

22   Q.    That's the deposition you relied on. Right?

23   A.    Yes.

24   Q.    Could you turn to Page 22 of her deposition. Line 15.

25   Do you see that?

---

1226

Degen - cross

1    A.    Yes.

2    Q.    So in 1999, your position at Secure Computing changed.

3        Can you tell me what your new position was?

4        "Answer: Director of finance."

5        Does that help you remember whether Ms. Putman

6    was ever a CyberGuard employee?

7    A.    It does not.

8    Q.    So you think she could be?

9    A.    Well, she could have been before 1999.

10   Q.    I was trying to make this a little quicker. Why don't

11   we go to Page 21.

12        Question, on line ten, So you have been at

13   Secure Computing for ten years?

14        "Answer: Yes."

15        We can certainly establish that Ms. Putman was

16   not an employee of CyberGuard during the time that the

17   alleged sales were taking place. Right?

18   A.    That appears to be the case, yes.

19   Q.    In talking about -- strike that.

20        So, for your conclusion that CyberGuard's

21   non-U.S. sales were completely manufactured, sold, and

22   serviced outside the U.S. comes from Ms. Putman. Right?

23   A.    I think I had other background, maybe it was from

24   counsel, too, that there would be other testimony.

25        Mr. Gallagher testified that he was part -- he

---

1226

Degen - cross

1    was aware of the effort to bring those foreign fulfillment

2    services in house.

3        So I don't recall that I had talked about him

4    ahead of time. When I cite her, I say, "For example."

5    Q.    But you don't have any other examples?

6    A.    I don't.

7    Q.    Mr. Gallagher, too, was a Secure Computing employee

8    only. He never worked a day for CyberGuard, did he?

9    A.    No. But he would have been part of the transition

10   when they bought CyberGuard and would have been aware that

11   they had to move fulfillment from Paderbon, Germany, into

12   the U.S. That is the point at which the fulfillment began

13   in the U.S. So even though neither one of them were

14   CyberGuard officials, in the purchase of CyberGuard, they

15   would have had to take over those functions, such as

16   fulfillment, and bring them into the U.S.

17        So they would at least be knowledgeable about

18   the fact that, at the time of the purchase, the fulfillment

19   was outside the U.S.

20   Q.    You are saying Ms. Putman and Mr. Gallagher, Secure

21   employees during the entire time that CyberGuard was selling

22   WebWasher, would have known whether sales were made out of

23   CyberGuard's California office or Florida office? They

24   would have known that?

25   A.    Sales to where?

Degen - cross

1    Q.    Sales to any part of the world. Are you aware of

2    that? They had sales offices in California and Florida?

3    This is CyberGuard we are talking about.

4    A.    I was aware of that.

5    Q.    And your testimony is that Mr. Gallagher and

6    Ms. Putman, Secure employees at the time, are competent to

7    inform you as to what CyberGuard's sales model was before

8    Secure acquired it?

9    A.    I think it's fair to say that Secure didn't change

10   their sales model the day before the purchase. So certainly

11   the people who bought Secure would have known at the time --

12   sorry, as Secure bought WebWasher, Secure would have known

13   how sales were being made and fulfilled as they transitioned

14   them into their own company. In fact, they did move sales

15   fulfillment into the United States.

16   Q.    So you say that Ms. Putman, for example, would have

17   been competent to discuss the CyberGuard sales model?

18   A.    Well, what I know is that they told me that the sales

19   were not fulfilled -- that sales outside of the U.S. were

20   fulfilled, made, and fulfilled outside the U.S.

21   Q.    And Ms. Putman, you relied on Ms. Putman, that is the

22   deposition cite. Right?

23   A.    That's correct.

24   Q.    So she could testify, in your opinion, about the

25   CyberGuard sales model?

1228

Degen - cross

1    A.    I don't know what her basis was for her testimony.

2    But I was relying on her testimony.

3    Q.    Okay. Why don't you turn to Page 44 of Ms. Putman's

4    deposition, the same deposition that you relied on.

5         Page 44, Line 16: Are you familiar with the

6    sales model as you defined it earlier in the deposition used

7    by CyberGuard to sell the WebWasher product prior to the

8    acquisition by Secure Computing?

9         "Answer: No."

10        That's the same Ms. Putman you relied on.

11   Right?

12   A.    That's correct.

13   Q.    Do you recognize this board, Mr. Degen? Figure 5. I

14   think you used it on Friday?

15   A.    I think so. I can barely see it.

16   Q.    Could you see it Friday? Were you able to see it on

17   Friday?

18   A.    I can see it now. It was obscured. I can't read the

19   numbers on it from here. I have got a copy.

20   Q.    Can you see that any better, Mr. Degen?

21   A.    I have a copy in front of me.

22   Q.    Okay. You discussed this on Friday. Right?

23   A.    That's correct.

24   Q.    And one of the discrepancies that you and Mr. Parr

25   have is on profit margins. Correct?

1230

Degen - cross

1    A.    That's correct.

2    Q.    And Mr. Parr, to establish profit margins, said that

3    he took out, he reversed some research and development

4    costs. Correct?

5    A.    Correct. He took out 80 percent of the R&D costs.

6    Q.    Because, you may disagree with him, but his premise

7    was that you want to get to the specific products at issue,

8    the accused products, to find out what the margins are for

9    them. Right?

10   A.    That's what he said, yes.

11   Q.    That's what he said.

12        So he took out research and development based on

13   his opinion that not all the research and development that's

14   listed in the financials went to the specific WebWasher

15   product. Right?

16   A.    That's my understanding, yes.

17   Q.    Now, you have a line here to determine, this is your

18   operating profitability for both CyberGuard and Secure. And

19   you have got research and development here. Correct?

20   A.    That's correct.

21   Q.    And that's company-wide, right? Consolidated?

22   A.    Well, my understanding is this is WebWasher's share.

23   But these are from financial statements that are labeled

24   WebWasher Product. So these are CyberGuard and Secure's

25   allocations of R&D to the WebWasher products.

1230

Degen - cross

1    Q.    And R&D, you are the math major, for CyberGuard, what

2    are you attributing research and development -- you have it

3    here, Total, $1.4 million. Right?

4    A.    That's the total for R&D for CyberGuard for the

5    quarters shown, yes.

6    Q.    So if you had lower R&D, your profit margin would go

7    up. Is that correct?

8    A.    That's correct.

9    Q.    That's what Mr. Parr did. He took out some R&D and

10   his profit margin went up. Right?

11   A.    That's correct.

12   Q.    The same thing with Secure Computing, you have

13   research and development of 3.5 million?

14   A.    That is the total over the six quarters shown, yes.

15   Q.    That serves to lower operating margin. Right?

16   A.    R&D is a deduction that lowers operating margin, yes.

17   Q.    Mr. Parr tried to get at the specific product, what

18   the research and development was for the WebWasher product.

19   Right?

20   A.    That's what he says he was trying to do, yes.

21   Q.    WebWasher was not developed by CyberGuard or Secure

22   Computing. Right?

23   A.    That's correct.

24   Q.    It was developed by WebWasher?

25   A.    Correct.

1247

Degen - cross

1   Q.   In addition to the royalty base, you talked about the
2   royalty rate. And we are talking about the hypothetical
3   negotiation. Isn't it true that you can also consider not
4   only profitability but trends, whether someone predicted
5   that maybe they weren't making a lot of money on the day of
6   the hypothetical negotiation, but they may have projected
7   that they would make money. Correct? Is that something you
8   would take into account?
9   A.   Absent evidence regarding expectation at the time --
10  if there were evidence that it were expected at the time, I
11  would consider it, yes.
12  Q.   Could you turn to PTX-135. Do you recognize this
13  exhibit, PTX-135? "CyberGuard Revenue Projections"?
14  A.   Yes, I do.
15  Q.   Do you see "CyberGuard Firewall" here and "Classic"
16  and "TSP"?
17  A.   Yes.
18  Q.   What can you tell us about the projections at least at
19  the time, Secure ---CyberGuard's projections?
20  A.   Do you want me to read them?
21  Q.   No. If you could summarize this line (indicating).
22  A.   The first year is 8.4 million, and the last year,
23  which is 2010, is 16.2 million.
24  Q.   Okay. Does that show you anything?
25  A.   It shows an increasing sales trend.

1248

Degen - cross

1   Q.   Almost double. Right?
2   A.   Yes.
3   Q.   Is that something you would take into account at the
4   time of the hypothetical negotiation?
5   A.   Not in determining a rate, because the rate applies to
6   the revenues, and the revenues are what they are.
7        So if sales go up, then the total royalty goes
8   up, because the base increases. But, you know, in general,
9   in terms of negotiating a license. But in this particular
10  instance, we have the revenues during the infringing period
11  and I would focus on those.
12  Q.   Now, turning to Secure's patents. We talked about the
13  two of them. Right?
14  A.   Correct.
15  Q.   You believe that two percent was appropriate. Is that
16  correct?
17  A.   That's correct.
18  Q.   On the first day of the trial, Mr. Schutz mentioned
19  that the patents were brought into this case because Finjan
20  brought a lawsuit and they are fighting back by bringing
21  these, their two patents into the lawsuit. Are you aware of
22  that?
23  A.   No. I wasn't here for the first day.
24  Q.   Well, if that's the case, that these patents were
25  brought into the case in retaliation for Finjan bringing its

1249

Degen - cross

1   three patents into suit, is that a Georgia-Pacific factor?
2   A.   No.
3   Q.   Do you know when Secure -- do you know when Finjan
4   received notice of the two patents-in-suit?
5   A.   I do not.
6   Q.   Do you know that it was at the time that the two
7   patents were brought into this litigation?
8   A.   I told you I didn't know.
9   Q.   Your royalty base for the two Secure patents deals
10  with -- talks about years prior to the bringing of this
11  lawsuit. Right?
12  A.   That's correct, for one of the products -- do you want
13  me to just double-check it?
14  Q.   Sure.
15  A.   For the '010 patent I calculate damages beginning in
16  2003. And for the '361 patent, I begin calculating damages
17  in quarter one of '07, I think when the patent issued.
18  Q.   And the '010 damages only goes to 2004; correct?
19  Because Finjan was not selling that product after 2004.
20  Right?
21  A.   That's correct.
22  Q.   You have got a two-percent rate for the Secure
23  patents, and a four-percent rate for the Finjan patents with
24  your other qualifiers. Correct?
25  A.   Yes. Basically, I am saying two percent for Finjan's,

1250

Degen - redirect

1   and the two -- the '780 and the '822. But if the '194 is in
2   play for Finjan, then four percent collectively for the
3   total.
4   Q.   In identifying the Secure patents, they are not, to
5   use your words, they are not anything involving the next
6   frontier, are they?
7   A.   No.
8        MR. ROVNER: No further questions, Your Honor.
9        THE COURT: All right. Mr. Schutz.
10       MR. SCHUTZ: Thank you, Your Honor.
11       REDIRECT EXAMINATION
12  BY MR. SCHUTZ:
13  Q.   Mr. Degen, let's start out with the purchase price for
14  CyberGuard, which was something around $300 million. Do you
15  recall that?
16  A.   Yes, I do.
17  Q.   Was CyberGuard an existing entity at the time?
18  A.   Yes.
19  Q.   Did it have employees?
20  A.   Yes.
21  Q.   Did it have physical facilities?
22  A.   Yes, it did.
23  Q.   Did it have active customers?
24  A.   Yes.
25  Q.   And in valuing a company in terms of purchasing it and

Heberlein - direct

DIRECT EXAMINATION

BY MR. ANDRE:

Q.   Good afternoon, Mr. Heberlein.

A.   Good afternoon.

Q.   Would you please tell us where you are currently employed?

A.   I am currently employed at NetSquare, Inc., which is basically my own business. It is in Davis, California.

Q.   What is NetSquare, Inc.? What do you do?

A.   NetSquare, Inc. does research and development to computer security. I worked out of the university for about eight years doing research and development for Secure Computing and basically spun off my own business doing exactly the same thing.

Q.   Would you please give us a brief rundown of your educational background?

A.   Yes. I received a Bachelor of Science in computer science and math from the University of California at Davis in 1988. And I received a Master's degree in computer science with a specialty in computer security, in particular, intrusion detection, in 1991, also from the University of California at Davis.

Q.   And what did you do after you received degrees in the computer security area?

A.   Well, when I finished my Bachelor's of science in

1272

Heberlein - direct

1988, I worked for a year as a post-graduate researcher at UC Davis doing computer security work. We started the network security monitor, which is a network-based intrusion detection system.

After a year of working there as an employee, I went back and was a graduate student for another two years when I did my Master's. I finished that in 1991. And I returned to postgraduate researcher status until 1996, at which point, I left and started my own company.

Q.   So, from the 1991 to 1996 period when you were doing this postgraduate research at UC Davis, what kind of work were you doing?

A.   We were doing a variety of computer security technologies. We were doing, by and large, intrusion detection systems. We developed network-based monitors. And we integrated network-based monitors into host-based monitors to create large architectures of intrusion detection systems. The software was deployed at a number of different sites across the world.

Q.   When you are talking about intrusion detectors, you are talking about hackers?

A.   It can be a wide variety of things. It can be hackers, it can be malicious code, such as viruses or worms. It can be insiders within the corporation. Our customers typically are military people, they are always concerned

Heberlein - direct

about insiders.

They had great concerns about just about everybody.

Q.   Do you still do work with the military and that kind of stuff in today's work?

A.   I still do work with the military intelligence communities, yes.

Q.   Have you published any papers regarding computer security?

A.   Yes. I published about a dozen papers.

Q.   And over what time period was that?

A.   That was primarily my time at University of California, Davis. I started my own company, since I don't get browny points for publishing papers and a lot of our customers are very sensitive about the research we do for them, we tend not to publish that information.

Q.   What type of computer security projects have you done in the past?

A.   Well, we did the network security monitor, which was the first network-based intrusion detection system. And that became part of a system called ASIM, which is the Automated System Information Management System that the Air Force deployed worldwide. So this software was deployed in over 100 Air Force sites globally. The Defense Information Systems Agency, which has responsibility for protecting the

1274

Heberlein - direct

information infrastructure of the overall DOD, also took the same software that I had done for my Master's degree and renamed it JIDS, for Joint Intrusion Detection System, and deployed that within their organization. The Lawrence Livermore National Laboratory, also known as LLNL, is a nuclear weapons lab based in California. Part of the Department of Energy.

And they also took the software and it was -- they called it NIDS, for Network Intrusion Detection System. They distribute it within the Department of Energy.

That was primarily the NSM. We also took the NSM and incorporated it into a system called DIDS, which stood for Distributed Intrusion Detection System, which was an effort that the Air Force used to try and integrate host and network-based monitoring.

That was deployed at a number of sites, although I am not particularly privy to which sites they actually deployed that. We also did vulnerability analysis where we would look at different types of attacks and try and understand the fundamentals of those attacks so we could build security systems that would address variations of the particular attack.

Q.   That is a pretty good example of what you have done here.

MR. ANDRE: At this time, Your Honor, I would

Heberlein - direct

1  like to tender Mr. Heberlein as an expert in computer

2  security.

3       THE COURT: Any objection?

4       MR. HOLDREITH: No objection, Your Honor.

5       THE COURT: Mr. Heberlein is accepted as an

6  expert in computer security.

7  BY MR. ANDRE:

8  Q.    Mr. Heberlein, you have been retained by Finjan in

9  this case. Is that correct?

10 A.    That's correct.

11 Q.    You were asked to give an opinion. Is that correct?

12 A.    That is correct.

13 Q.    And what exactly was your assignment from Finjan in

14 this case?

15 A.    Well, actually, I produced two different documents.

16 The first document was sort of an overall analysis of the

17 technology in the market and how these technologies are

18 deployed in the systems and why the technologies are

19 important.

20      The second document was a rebuttal to

21 Dr. Wallach's argument that the patents were invalid. So

22 that was my analysis of his arguments.

23 Q.    And what did you conclude regarding Dr. Wallach's

24 opinion that the patents were invalid?

25 A.    I disagreed with his opinion.

Heberlein - direct

1  A.    I used the claim interpretation that was provided by

2  the Court, that is correct.

3  Q.    Before you provided this opinion, did you have any

4  opinion one way or the other about the Finjan patents?

5  A.    No, I did not have any opinion about the patents

6  beforehand.

7  Q.    Did you get a chance to read the trial testimony of

8  Dr. Wallach that was here last week?

9  A.    Yes, I read the trial testimony. It was a little

10 frustrating.

11 Q.    Why is that?

12 A.    Once again, as sort of my responsibility, it is to

13 rebut the arguments that they make. And, once again, for

14 them to claim that a patent is invalid, they have to go

15 through each of those limitations, they have to say, If a

16 claim has three parts, A, B, and C, they have to prove that

17 all components, A, B, and C, were anticipated by the

18 prior art, for example.

19      And when they provided his evidence, they would

20 put up a chart and it says, Well, was this limitation, you

21 know, taken care of by the prior art? Yes, it was. And he

22 would just put a checkmark.

23      For example, he would say, The URL filter was in

24 the fire tool kit, but wouldn't provide any evidence of the

25 fact that it was in the tool kit. So it is very difficult

Heberlein - direct

1  Q.    And what did you rely upon on coming to your

2  conclusions that the patents in this case, the Finjan

3  patents, were valid?

4  A.    Well, there is a number of pieces of information. One

5  is certainly instructions from the attorneys about what

6  for a patent or a claim in a patent to be rendered invalid,

7  that the evidence that the other side must cite must clearly

8  identify each and every single limitation within that claim.

9  So they gave me certain instructions such as that.

10      There was the documents that they provided as

11 prior art. So I reviewed all those prior arts.

12      I reviewed the argument, itself, that he made.

13 And my own experience from about 20 years in computer

14 security.

15 Q.    Did you rely on the Court's claim interpretation?

16 A.    Yes, I did.

17 Q.    Did you read the patents and the prosecution history

18 of those patents?

19 A.    Yes, I read the patents and the prosecution history.

20 Q.    And did you review Dr. Wallach's, his report and those

21 references cited in his report?

22 A.    I reviewed his report and the references that he

23 cited, that's correct.

24 Q.    When you gave your opinion, did you use the claim

25 interpretation that was provided by the Court?

1  for me, as an expert, to rebut nonexistent evidence. And I

2  found that frustrating.

3  Q.    Let's talk about some of the references that

4  Dr. Wallach relied upon. We will start with the '194

5  patent. We will take these in more or less the same order

6  that Dr. Wallach talked about them. If we go to DTX-1019,

7  this was referred to as the Ji '95 patent earlier in this

8  case.

9       Do you recognize this document?

10 A.    Yes.

11 Q.    Do you have an understanding of what this document is

12 disclosing?

13 A.    This document is basically a firewall that has a

14 standard virus detection system attached to it.

15 Q.    So when you talk about a "standard virus detection,"

16 are you talking about the signature-based virus protection

17 that has been known for years?

18 A.    That is correct.

19 Q.    Was this reference considered by the United States

20 Patent and Trademark Office during the prosecution of the

21 '194 patent?

22 A.    Yes. The Patent Office -- the person who examines the

23 patents and determines whether the patents should be awarded

24 had already looked at this particular document, and said,

25 No, the '194 patent is still fine.

Heberlein - direct

1279

1   Q.   If you go to JTX-1, you go to that list of the patents
2   that were cited right here, this Ji patent here, 5,623,600,
3   that is the Ji '95 that we were talking about. Is that
4   correct?
5   A.   That's correct.
6   Q.   And did the fact that the Patent and Trademark Office
7   looked at this patent during the prosecution of the '194,
8   did that have any effect on your opinion?
9   A.   Certainly, the assumption is that the patent is
10  invalid if the Patent Office awarded it. Although, when I
11  did my analysis, I also did the analysis that, you know,
12  suppose it wasn't the case? I would give the benefit of the
13  doubt to Secure Computing as much as possible.
14  Q.   Let's go back to JTX- -- DTX-1019, the Ji patent.
15           Now, this patent here, does it cover proactive
16  scanning?
17  A.   No, it does not.
18  Q.   When you say "firewall," we heard a lot of talk about
19  firewalls here. What exactly is a firewall?
20  A.   There is sort of a split between two different
21  technologies that people put at their borders at their cite.
22  One is what people typically call the firewall these days,
23  which is a packet filtering firewall. So the packet comes
24  in, it gets analyzed, they determine whether the packet
25  should go through into the organization, and if so, let it

1280

Heberlein - direct

1   go.
2           That is typically the way a firewall is talked
3   about today, the way a firewall is sold today.
4   Q.   Stop there a second. You say packeting, packet
5   filtering. That is a new term for us here.
6           What exactly is packet filtering?
7   A.   Okay. So a packet comes into the firewall and the
8   firewall acts as a filter. And it says whether, you know,
9   basically, to allow this to go through, to allow the packet
10  to filter through the firewall or whether to drop it.
11          For example, if you have a packet firewall,
12  filtering firewall, and a packet comes in destined to, say,
13  one of your computers for a web server, and your web server
14  isn't supposed to be available to the outside world and the
15  firewall is configured just to drop the packet, it just
16  doesn't even let it through, so that is the idea that
17  filtering firewall, the packet comes in, it looks at that
18  individual packet, decides whether to sort of throw it into
19  the organization or just drop it on the floor.
20  Q.   Is that different than -- we had WebWasher product
21  over here earlier. Is that different than a gateway
22  appliance?
23  A.   Correct. The gateway appliances that are becoming
24  more popular today basically take a whole piece of
25  information, a whole document or whole program. When you

Heberlein - direct

1   move a document or program from some remote machine to
2   another machine, it takes that document or that program and
3   breaks it up into little packets and those little packets go
4   across the network.
5           In a filtering firewall, once again, each packet
6   comes in and it makes a determination of whether to let it
7   go through and lets it through. Whereas, in a gateway, all
8   the packets come to the gateway, so it can basically
9   reassemble the program or reassemble the image or reassemble
10  whatever it is you are transferring, do the analysis on it,
11  and then allow that particular object through, if it thinks
12  it is okay, or it drops the whole object if it thinks it is
13  suspicious.
14  Q.   I want to show you a demonstrative that we put
15  together as G-124. Is this an accurate depiction between a
16  firewall and application gateway as disclosed in the '194
17  patent or a cartoon character?
18  A.   It's relatively simple. But, once again, at the top
19  level, the idea is that the packet comes in from the left,
20  it gets to the firewall, makes a determination, if it allows
21  it through, the packet goes through.
22          So, you know, the same packet basically appears
23  on both sides of the network.
24          In an application gateway, once again, the
25  packets come in. It could be a whole bunch of different

1282

Heberlein - direct

1   packets, depending on the size of the packets. They all
2   arrive at the gateway. And the gateway reconstructs it. So
3   you have to take all these little packets, reconstruct the
4   original object. It will analyze the object and create new
5   packets and those new packets are transmitted across the
6   network. And that's what those purple or pink, whatever
7   those are, those are new packets. They aren't the original
8   packets that came in. There are also different packets.
9   The original idea is that original packets are lost in the
10  gateway.
11  Q.   In going back to DTX-1019, you say the Ji patent
12  involved this patent filtering system?
13  A.   The Ji system, the Ji '95, I believe, was -- let me
14  check on that. The Ji '95, although they use the word
15  "firewall" here, they were talking about a gateway type
16  system.
17  Q.   Let me ask you about the Ji on Column 7, you also
18  mentioned this, on Column 7, line 59, right here, this
19  paragraph here, where it was talking about Ji, it says, This
20  is preferably done by invoking a virus checking program on
21  the temporarily stored file. For example, a program that
22  performs a version of signature scanning.
23          Is that what you are talking about when you are
24  talking about Ji doing the traditional signature scanning?
25  A.   Correct.

Heberlein - direct

1   Q.   Let's go to one of the other references that

2   Dr. Wallach relied upon, which is DTX-1264. This is

3   referred to as the Lo '64?

4   A.   Lo '64? Lo '94.

5   Q.   Lo '94, sorry. Are you familiar with this document?

6   A.   Yes, I am.

7   Q.   How are you familiar with this document?

8   A.   A number of ways. One is, this particular work was

9   done at UC Davis in the computer security lab, when I was

10  working at the computer security lab.

11  Q.   Could you go to the section right here?

12  A.   I knew all the authors. I knew Ramond. Carl Levitt

13  was my thesis advisor. Ron Olsson was another faculty

14  member that I worked with.

15  Q.   The first question about this, this has a date of May

16  4, 1994. Do you see that?

17  A.   Yes.

18  Q.   Do you know if this document was actually published on

19  that date?

20  A.   I have no idea supporting the fact that that document

21  was published at that date. When they -- when Secure

22  Computing provided this particular document as prior art,

23  they referenced a web server. And they said, Oh, someone

24  could have downloaded it from this web server, but that web

25  server didn't actually exist at the time the prior art

---

Heberlein - direct

1   through or not. So it requires human interaction. So every

2   time something goes on, the human must take a step to make a

3   response.

4        The next statement says, For systems running

5   without attention. So if you want to put this out, you

6   know, and let it run in an automated fashion, this approach

7   just isn't a viable approach. That's what they said.

8   Q.   Is this saying that you have to have -- this should

9   not be used with the gateway and used to run independently

10  without having a human there to check it every time?

11  A.   That's correct.

12  Q.   Let me show a few more sites to provide this jury what

13  we are talking about. If you go to Page 7. This paragraph

14  under Bullet Point 5, it talks about, The analyst will need

15  to locate the privilege-granting setup, system call and then

16  slice for the authentication code. Do you see that?

17  A.   Yes.

18  Q.   What is that referring to?

19  A.   Once again, the tool helps identify some pieces of

20  evidence. But then it relies on the analyst to continue to

21  pursue information on the system. So the analyst still

22  needs to do additional work. It is basically what these

23  statements are saying, The person has to do more work.

24  Q.   Let me show you one more site along those lines, Page

25  13.

---

1284

Heberlein - direct

1   needed to be available. I have no idea whether this was

2   publicly available or not.

3   Q.   And what exactly is the Lo '94 reference actually

4   describing?

5   A.   The Lo '94 document looks at a tool that a security

6   analyst uses to analyze a piece of code. If I may going to,

7   for example, install some new software on my machine and I

8   might want analyze it first, I start up this tool, and I

9   will sit there and use that tool to help me analyze the code

10  to determine whether I think it's okay or not to install on

11  my system. The tool provides feedback, helps me do my

12  analysis as a person, and if I think it is okay, then I can

13  install it in my system.

14  Q.   Let's just show some sites that support what you are

15  talking about. Page 4. On this particular paragraph, under

16  "Related Work," right here, it talks about third, When a

17  run-time tool identifies a problem, it either stops the

18  malicious program or asks for human attention. For systems

19  running without attention, run-time approaches are simply

20  not viable.

21        Could you explain what that is referring to?

22  A.   Okay. There are some systems that would run, and if

23  they think you are accessing a file that maybe the program

24  shouldn't but we are not entirely sure, we will put a window

25  for the user and the user determines whether it should go

---

1286

Heberlein - direct

1        If you look at this paragraph right here -- the

2   paragraph below that, I am sorry -- the last line, About 100

3   lines of C statements are collected for analysis by the

4   security analyst, who, after carefully examining the code,

5   determines the program does what it should.

6        Could you describe what that is stating?

7   A.   Once again, the idea is there was a larger program to

8   begin with. This tool would reduce it but it would still,

9   you know, create 100 lines of source code that a human has

10  to go through and analyze that source code by hand to

11  determine whether that code should be allowed to be

12  installed on the system or not.

13  Q.   Now, Dr. Wallach attempted to use this reference to

14  show that there is some type of behavior-based scanning

15  going on here.

16        Does this document show an automated

17  behavior-based scanning that you could install in the

18  gateway?

19  A.   No, they are very clear this is designed to be used by

20  a human.

21  Q.   Actually, your science laboratory at the University of

22  California, Davis, were you guys pretty much on the cutting

23  edge at this time, in 1994?

24  A.   Yes, we were.

25  Q.   I want to show you on Page 5, look at this third

Heberlein - direct

1  paragraph right here. Just that very first sentence says?

2  Virus scanners are the only automated tool available

3  nowadays for malicious code detection."

4        Do you see that?

5  A.    Yes.

6  Q.    "They detect known viruses by scanning binary programs

7  for predetermined machine code sequence." Do you see that?

8  A.    Yes.

9  Q.    What is that referring to?

10  A.    Once again, as an automated tool, this is something if

11  you want to install on a gateway that will a run on its own

12  without a human sitting there analyzing everything, for an

13  automated tool at this time, the authors believed that the

14  traditional virus signature-based scanning was the only

15  technique that was a viable technique.

16  Q.    Let's go to the next reference that Dr. Wallach relied

17  upon, DTX-1021. This was referred to as the Shaio

18  reference. Do you know what this reference is?

19  A.    Yes, I do. It's another reference to a filtering file

20  system.

21  Q.    Does the Shaio reference disclose a proactive

22  scanning?

23  A.    No, it does not disclose proactive scanning.

24  Q.    Is this -- the firewall technology at the time, there

25  is a lot of firewall patents we are going to talk about,

---

1288

Heberlein - direct

1  were firewall patents -- strike that.

2        Were firewalls new in the 1996 time period?

3  A.    Firewalls were not new in the 1996 time period. I

4  think they probably emerged around '92 or '93.

5  Q.    At the time of the '194 patent application, firewalls

6  had been around for anywhere from four to five years.

7  Correct?

8  A.    Correct. Primarily, the filtering firewall base was

9  the most popular form.

10  Q.    And then the last, primary reference that -- let me --

11  well, let me ask one more question about Shaio.

12        Shaio was used by Dr. Wallach to show that there

13  was a bytecode verifier that was incorporated by reference.

14  Do you recall that?

15  A.    Yes, I do.

16  Q.    What is a bytecode verifier?

17  A.    In Java, Java is one of the program languages, you

18  take the original Java code and compile it down to this

19  intermediate form called the bytecode. And the verifier,

20  you look at that bytecode and make sure that it basically

21  has a syntax there, so it is not going to crash when you run

22  it, so its primary purpose is to make sure it is

23  well-formed.

24  Q.    When we talk about "well-formed," do you mean

25  well-formed code?

---

Heberlein - direct

1  A.    Well-formed code.

2  Q.    If you have a bytecode verifier and you have

3  well-formed code that comes into it, does that code get

4  passed on?

5  A.    Yes.

6  Q.    If that well-formed code is some nasty virus that is

7  going to destroy your system, does that get passed on?

8  A.    As long as the person who wrote the virus doesn't have

9  any syntax errors in his virus, it will get passed on.

10  Q.    Based on your experience working with viruses and

11  worms and all these other nasty little things that go around

12  the computer, are many of those written with well-formed

13  code?

14  A.    Many of those are very well written.

15  Q.    The last primary reference that Dr. Wallach relied

16  upon for the '194 patent was DTX-1022, which is the Chen

17  patent.

18        Are you familiar with this document?

19  A.    Yes, I am.

20  Q.    And what is this document?

21  A.    This document is a patent for looking at macro

22  viruses, in, like a Word document. These are instructions

23  within, like, a Word document that you would type up, for

24  example. And it would scan the file that's on your machine

25  to look for those particular -- potential word viruses that

---

1290

Heberlein - direct

1  are the macros.

2  Q.    Would this type of thing probably be located on the

3  computer itself?

4  A.    Yes, that's the way they describe it.

5  Q.    It is not located at the gateway, is it?

6  A.    They do not describe it as located at the gateway.

7  Q.    So those are the four primary references that we are

8  using. We will address the secondary references as well.

9  Using these references, I want to show you the charts that

10  Dr. Wallach went through, and, as you said, just kind of

11  checked them as they went.

12        The first one involves the '194 patent and using

13  the Shaio reference. Mr. Heberlein, you have seen these

14  charts that I tried to fill out as Dr. Wallach went through?

15  A.    Yes.

16  Q.    Let's just walk through these very quickly. This is

17  where Dr. Wallach said everything that is in Shaio is found

18  in the '194 patent. Do you recall that?

19  A.    Yes, I do.

20  Q.    You saw his testimony on that?

21  A.    I read his testimony on that.

22  Q.    That's what I meant to say. Just to start off with,

23  do you think every element of Claim 1 of the '194 patent is

24  found in the Shaio reference?

25  A.    No. I do not believe that every element of Claim 1 is

---

Heberlein - direct

1   found in the Shaio reference.

2   Q.    Just, once again, the Shaio reference is the firewall

3   patent. Am I right?

4   A.    That is correct.

5   Q.    Let's start with the very first element. We all

6   agree -- that is kind of out of focus, isn't it. Can you

7   read that okay?

8   A.    Yes, I can. A little fuzzy.

9   Q.    I guess we can all agree it is a computer-based

10  method, comprising. We can agree that Shaio does have a

11  computer-based method. Okay.

12        Right here, "receiving an incoming downloadable

13  addressed to a client." Does the Shaio reference actually

14  receive an incoming downloadable addressed to a client?

15  A.    No. Once again, if you remember my earlier testimony

16  where I talked about the filtering firewall versus the

17  gateway where a filtering firewall, a packet comes in, gets

18  examined and goes out, whereas a gateway will go ahead and

19  receive the entire document, do its analysis and then

20  release it.

21        So when they are talking about here, a receiving

22  an incoming downloadable, that's what the gateway needs to

23  do, is pull the whole document down or the whole program

24  down and do the analysis.

25        The Shaio reference describes a system that is

Heberlein - direct

1   be next to impossible to extract a security profile.

2   Correct?

3   A.    I think that's a reasonable assumption.

4   Q.    Is there any type of comparison of -- I guess if it

5   doesn't have a downloadable, there is nothing to compare it

6   to, is there?

7   A.    It doesn't have the downloadable and you can't build a

8   profile for the downloadable and it can't do the comparison

9   with anything.

10  Q.    Would you disagree with Dr. Wallach that that element

11  is anticipated by the Shaio reference?

12  A.    I would disagree, and, once again, it would have been

13  nice and helpful for me if he would have provided explicit

14  examples of each of these pieces. He just sort of waves his

15  hands and says it's there and doesn't prove it.

16  Q.    One of the things -- I should address this -- that

17  Dr. Wallach did, to save time, we are doing the same thing,

18  he addressed Claims 32 and 65 at the same time, because he

19  said these elements are similar.

20        Is your opinion the same for Claims 32 and 65

21  with regard to the first element?

22  A.    Yes.

23  Q.    The one I marked out there. It doesn't receive an

24  incoming downloadable?

25  A.    That's correct.

1292

Heberlein - direct

1   the filtering type, where the packets come in and the

2   packets go out.

3   Q.    Do you recall if Dr. Wallach provided any evidence

4   whatsoever to support this checkmark within his opinion?

5   A.    I don't recall any specific testimony on that.

6   Q.    Would you disagree with this checkmark in these

7   columns here regarding an incoming downloadable for the

8   Shaio reference?

9   A.    Yes, I would.

10  Q.    Now, Mr. Heberlein, just that one element alone, is

11  that enough to make Claim 1 of the '194 patent valid over

12  Shaio?

13  A.    That is enough. Just because you missed the one

14  limitation, that is enough to allow this claim to be valid

15  and all additional dependent claims that are dependent on

16  this one would also be valid.

17  Q.    There is a second element here, Compare the

18  downloadable security profile data pertaining to the

19  downloadable. Do you see that?

20  A.    Yes.

21  Q.    Does Shaio do anything like that? Does it do that

22  step?

23  A.    I couldn't identify any particular security profile

24  that was extracted from a downloadable.

25  Q.    In fact, since it doesn't get downloadables, it would

1294

Heberlein - direct

1   Q.    And for the second element, the, Generating a security

2   profile from the downloadable, you disagree with Dr. Wallach

3   on that regarding Claims 1, 32 and 65?

4   A.    That's correct.

5   Q.    Then the actual third element of Claim 1 and Claim 32

6   and 65 as well -- I want to ask one other question. My

7   colleague just pointed something out.

8         The bytecode verifier, would it do any of those

9   steps we talked about earlier?

10  A.    The bytecode verifier was not about downloading and it

11  didn't extract a security profile. And it doesn't compare

12  that computer profile to a particular security policy to

13  determine whether to allow it to go through or not.

14  Q.    If we look at this third element of Claim 1,

15  Preventing execution of the downloadable by the client if

16  the security profile has been violated, obviously, there is

17  no downloadable, is there anything that would try to look at

18  a security profile and a downloadable and prevent execution

19  of a downloadable in the Shaio reference or the bytecode

20  verifier that he discussed?

21  A.    No. Once again, I couldn't identify anything that

22  says, you know, here is a security profile and here is a

23  security policy, and we will do the comparison. I couldn't

24  find anything to that effect in this the document.

25  Q.    We talked about Shaio and the firewall patent that

1315

Heberlein - direct

1  the Shaio reference, in light of the firewall tool kit,
2  would invalidate Claim 28?
3  A.    Once again, I saw no evidence that that would be the
4  case.
5  Q.    We talked about the firewall tool kit.  That is just a
6  disk.  Right?  It's not a publication.  Right?
7  A.    Well, it's not a disk.  It's a bunch of source code,
8  correct.
9  Q.    We saw it on a disk.  We saw it on a little compact
10  disk.  That is what the source code is stored on.  Right?
11  A.    That is apparently how you got the source code here,
12  that's correct.
13  Q.    Fair enough.  If you -- in that little disk, in that
14  source code, if I were to print out on paper just one page
15  and go through all that source code and print it out, how
16  many pages -- I know you can't tell exactly -- approximately
17  how many pages does the source code encompass?
18  A.    Boy, that is a wild guess.  I would say a few hundred
19  pages, probably.
20  Q.    In those 200 pages --
21  A.    A few hundred.
22  Q.    I am sorry.  A few hundred pages.  Without knowing
23  where the site or the reference that Dr. Wallach is
24  referring to is, were you able to just try to figure out,
25  take a shot in the dark and figure out what he was trying to

1316

Heberlein - direct

1  say when he says, Firewall tool kit?
2  A.    Yes.  I looked through the source code as part of my
3  earlier rebuttal for the document that I had.  And I
4  couldn't find anything.  Once again, if he is going to make
5  this claim, it would be helpful for me to rebut it if he
6  actually told me where in the evidence or showed me the
7  evidence that he is claiming invalidates this.  So he didn't
8  show me any particular evidence.  So it's virtually
9  impossible for me to do any rebuttal on that particular
10  aspect of his statement.
11  Q.    So based on that, do you have an opinion as to whether
12  Dr. Wallach's opinion regarding Claim 28 is viable?
13  A.    I believe that Claim 28 is viable.
14  Q.    Is valid?
15  A.    Is valid.
16  Q.    The last two claims of the '194 patent are very
17  similar to the previous claim.  Once against, using the
18  firewall tool kit for both claims, and with the Shaio
19  reference, would you have the same analysis for Claims 29
20  and 30 that you had for Claim 28?
21  A.    Let's see.  Certainly on Claim 29, that, once again, I
22  saw nothing in the firewall tool kit that would provide that
23  capability.  And on Claim 30, he didn't provide any evidence
24  to back up his claim.
25  Q.    So based on that, would you disagree with

1317

Heberlein - direct

1  Dr. Wallach's opinion on Claims 29 and 30?
2  A.    I would disagree with his position.
3  Q.    So based on the sites we showed you in Shaio and the
4  bytecode verifier that was incorporated by reference, do you
5  have an opinion that any of the claims of the '194 patent
6  are anticipated by Shaio?
7  A.    No.  Once again, you know, there is a number of pieces
8  that just sort of wipe it out.  One, the filtering firewall
9  as opposed to a gateway, which is one of these things we
10  talked about, are two different animals.
11      The other element is the issue of downloadables.
12  So there are just too many major pieces that are missing
13  from the Shaio reference.
14  Q.    Did you find that any of the secondary references that
15  Dr. Wallach relied on to try to find these missing elements,
16  did they, in fact, supply those elements or did they provide
17  evidence that they were there?
18  A.    I could not find any evidence and I didn't see any
19  evidence that he provided to show that they were there.
20  Q.    Dr. Wallach also went through the same set of claims
21  using combination of references.  The references he used as
22  a base reference was the Ji reference that we discussed, the
23  Ji '95.  He combined that with the Lo '94 or the Chen
24  reference.  Do you see that?
25  A.    Yes, I see that.  Let me pull up my notes here one

1318

Heberlein - direct

1  second.
2  Q.    Sure.
3      (Pause.)
4  Q.    It's towards the back of your report there.
5  A.    Okay.
6  Q.    Do you have it?
7  A.    Yes.
8  Q.    We have talked about the Ji reference, the Ji '95
9  reference, the Lo '94, and the Chen reference.  Let's see if
10  we can get through these claims.
11      Once again, we will forego the preamble here.
12  Does the Ji reference, in combination with Lo, disclose
13  receiving an incoming downloadable addressed to a client, by
14  a server that serves as a gateway to the client?
15  A.    I didn't have an opinion on that particular
16  limitation.  I think if you go to the next page, if you
17  could do that for a second.
18      Correct.  That top line there, where we are
19  talking about comparing the downloadable security profile
20  data pertaining to the downloadable, that is part of Claim 1
21  and that's the limitation that the combined documents don't
22  provide.
23  Q.    Would you describe why that is the case?
24  A.    Once again, the '194 patent goes ahead and extracts
25  this representation of the security behavior of a program,

1319

Heberlein - direct

1 or a downloadable, and then compares that against the

2 security policy. And those two pieces, extracting the

3 profile and comparing it to a policy, are missing from the

4 existing documents.

5          I didn't see any particular evidence that

6 Wallach provided that identified those two pieces.

7 Q.    And the idea of combining references, I want to talk

8 about that real quick.

9          You mentioned earlier that the Lo reference

10 involves a human analyst and it's just a tool for a human

11 analyst. It's not stuck on the gateway to automatically

12 check things coming into the gateway. Correct?

13 A.    That's correct. I couldn't see any reasonable

14 explanation for why Wallach would want to combine these two

15 references.

16          One is a system based on a firewall that runs

17 automatically. And the other one is a set of tools that are

18 specifically designed to work with a human, an analyst. We

19 went through that before where the analyst has to check this

20 or we narrowed it down to underlining code. It makes no

21 sense to combine those and say, I can just combine these and

22 throw those out and therefore it anticipates the claims.

23          There is no reasonable explanation to combine

24 these two.

25 Q.    Now, counsel and Dr. Wallach said that would be a

1320

Heberlein - direct

1 reason to combine Ji and Chen because they worked in the

2 same company, Trend Micro. We had a board showing the same

3 references together, showing the two companies.

4          I want to show you the cover of the Ji

5 reference, if you go to DTX-1019.

6          If you go to that list of patents there on the

7 left -- I am sorry. We should go to the Chen reference. It

8 came later in time. That is 1022.

9          Now, the Chen reference was issued a few years

10 after the Ji patent. Correct?

11 A.    That is correct.

12 Q.    And did the inventors of Chen, even though they had

13 common inventors, did they disclose the Ji patents in this

14 prosecution?

15 A.    No, I didn't see any reference that said, Look at this

16 other work we had done.

17 Q.    What conclusion did you draw from that?

18 A.    For starters, there is not -- when you combine

19 references, you need to provide some motivation that says, I

20 can combine this reference with that reference. And I

21 didn't see any motivation for that.

22          There was a claim in the testimony that because

23 they worked at the similar company, or had a similar

24 inventor, that that would be motivation to combine. But,

25 for example, in our case at UC Davis, I worked with people

1321

Heberlein - direct

1 who did the Raymond Lo work, the Lo '94 work. And I was

2 doing network security monitoring and we were analyzing

3 network security packets, and we wouldn't know to combine

4 these. They were different efforts and we went our own way.

5          In addition, in the work of UC Davis, the work

6 had similar authors, Carl Lovett, who was my advisor, as

7 well as Raymond Lo's advisor. The fact that it was the same

8 organization and the common author -- at a minimum, they

9 should say, Look at their previous work, we can combine

10 these two.

11 Q.    And in this particular case, it would different types

12 of work? I believe you described Ji earlier as using the

13 traditional signature-based virus detection and Chen looking

14 at macros on the computer screen?

15 A.    That's correct.

16 Q.    There would be no -- is there -- it would be your

17 opinion there would be no motivation to look to each other

18 and put these two together for any reason?

19 A.    You know, I would not see any particular reason to do

20 it. If they could provide some strong evidence, I would

21 take a look at that evidence.

22          It would have been nice if the authors would

23 have said, in their paper, that, Gee, we can combine this

24 with our other work, which they didn't do.

25 Q.    In fact, the common inventors which had a duty to

1322

Heberlein - direct

1 disclose didn't even disclose their previous patent, did

2 they?

3 A.    No.

4 Q.    So based on your view of the Ji reference in

5 combination with either Lo or Chen, do you disagree with

6 Dr. Wallach's opinion regarding the second element here?

7 A.    Yes, I do.

8 Q.    The third element there kind of falls with No. 2. Is

9 that the same way?

10 A.    Correct.

11 Q.    So would you disagree Dr. Wallach's opinion regarding

12 the third element of Claim 1?

13 A.    Yes, I do.

14 Q.    Then when you combine references, we are not talking

15 about anticipation of claims. We are talking about

16 obviousness. Right? When we combine references?

17 A.    Yes.

18 Q.    So is it your opinion that the Ji reference in

19 combination with either Lo '94 or the Chen reference do not

20 make the Claim 1 obvious of the '194 patent?

21 A.    No. Because as we went through, several limitations

22 weren't part of it, and, so, to make it obvious, you have to

23 knock off all the limitations. I believe they did.

24 Q.    That is true for Claims 1, 32 and 65?

25 A.    Yes.

1323

Heberlein - direct

1  Q.   Of the '194 patent, I should say?

2  A.   Yes.

3  Q.   Then as we get into the dependent claims, Claim 2,

4  which is dependent on Claim 1, do you have any basis for

5  showing that -- obviously, if Claim 1 is not obvious, Claim

6  2 wouldn't be either.  Is there any independent basis that

7  you have?

8  A.   I couldn't find any evidence or independent evidence

9  that would identify decomposing it into a security profile.

10      Once again, the important step in the '194 is to

11  take the original program and extract the security behavior

12  aspects of it, then you have that security aspect behavior

13  that you can then compare against other things.

14  Q.   Let's talk about that just a little bit using the Chen

15  reference.  I believe that is what Dr. Wallach had attempted

16  to state, although he didn't show it.  We will go to Exhibit

17  1022.  If we go to Figure 6 of this, blow up this section

18  right.

19      Does this show what you just talked about where

20  it doesn't extract a security profile from the virus coming

21  in?

22  A.   That's correct.

23  Q.   Could you describe to the jury what that is

24  describing?

25  A.   Once again, this is a flow diagram for the steps that

1324

Heberlein - direct

1  the Chen work takes.  It starts out, once again at the top,

2  where it says, Start.  The next thing is it scans for known

3  viruses, then it makes a decision step there, basically,

4  does it have any known viruses, that is the traditional

5  signature method we know about.  If so, it goes to the

6  branch on the right.

7      If it doesn't have any known signature elements,

8  it goes down to the box below, Box 615.  Then it pulls out,

9  not from the code, it pulls out a set of instructions that

10  it wants to look for.  Once again, this isn't the analysis

11  of the code itself.  Then in Box 620, we look at the code

12  itself.

13      That is the basic beginning of the steps.

14  Q.   Is that a fundamental difference than what is

15  described in the '194 patent?

16  A.   Correct.  Because in the '194 patent, we analyze --

17  not we, the patent analyzes the code, or analyzes the

18  downloadable and extracts this profile.

19      So they are looking at a, you know, they talk

20  about, they don't talk about extracting a profile here.

21  Q.   Could we go back to the Elmo, please.

22      So you are talking about Claim 2.  Is it your

23  opinion that Dr. Wallach's opinion is incorrect regarding

24  Claim 2 of the '194 patent?

25  A.   That, and, in addition, the fact that it's dependent

Heberlein - direct

1  on Claim 1.

2  Q.   And looking at Claim 3, do you have an opinion if

3  Dr. Wallach's opinion is correct regarding his analysis of

4  Claim 3?

5  A.   We are doing the -- this is just the Ji-Chen one.

6  Q.   Ji-Chen or Ji-Lo.  It is two different parts in your

7  report?

8  A.   Once again, the fact we don't extract a security

9  profile that we can compare against a policy renders this

10  one moot.

11  Q.   Now, you reviewed the testimony of Dr. Wallach

12  regarding the Ji and the Chen and the Lo reference.  Did you

13  see anything in his testimony to provide to this jury where

14  he gave specific sites to where these elements could be

15  found?

16  A.   I did not see any particular evidence.  When he was

17  doing these charts, this would have been an ideal spot to

18  say, Here is this restriction, or, here is this limitation

19  in this claim, here is the evidence in these other documents

20  that address this particular limitation.

21      You know, it would have made, you know, my job a

22  lot easier to rebut it if he would have been very explicit

23  to say, Here is our evidence for this limitation, and he

24  doesn't provide a nice, concise example of that.

25  Q.   Do you have an opinion as to whether Dr. Wallach's

1326

Heberlein - direct

1  opinion is correct regarding Claim 3 of the '194 patent in

2  light of Ji and Lo or Ji and Chen?

3  A.   I disagree with his opinion.

4  Q.   Now, when we get to other dependent claims, now we

5  have, it's either Ji, Lo, Microsoft Authenticode or Signed

6  Java, or Ji, Chen, Microsoft, Authenticode, Signed Java.

7      Do you have an opinion as to whether, trying to

8  pull bits and pieces out of all these different references

9  would invalidate, make Claim 4 obvious of the '194 patent?

10  A.   Once again, actually, all the arguments that he uses

11  here are the same arguments that he apparently made in the

12  previous one, where he just says, Firewall, tool kit, it's

13  there.  He didn't provide any evidence, though.  Microsoft,

14  Authenticode, it's there, but he never provides any evidence

15  to that fact.

16  Q.   Claim 4 is talking about the scanning for trusted

17  certificates.  Is that the same analysis you gave earlier,

18  the Microsoft Authenticode would not do that?

19  A.   Correct.  We are looking at, once again, I hate to

20  belabor this point, but two different pieces here.  One is

21  whether the code has been signed, and the code hasn't been

22  tampered with, which is what the Authenticode does, versus

23  looking for a -- looking at a trusted certificate, whether

24  it is coming from a company that I trust.

25      That's what this particular limitation is about.

Heberlein - direct

1   And the Authenticode isn't addressing that.

2   Q.   And you saw the testimony of Dr. Wallach here last

3   week that Microsoft and Authenticode is the same thing as

4   the Signed Java?

5   A.   Yes.  He said they are the same.

6   Q.   Would you disagree with his analysis regarding Claim

7   4, then?

8   A.   I would disagree with his analysis.

9   Q.   Claim 5, 6 and 7 deal with the issues of URLs once

10  again.  Is there anything that the firewall tool kit would

11  add to the combinations of Ji and Lo or Ji and Chen and this

12  firewall tool kit that's not referenced at any specific

13  point?  Would that add anything to your opinion regarding

14  those claims?

15  A.   No, it would not.

16  Q.   Do you have an opinion as to Claims 5, 6 and 7 of the

17  '194 patent in light of Ji and Lo or Ji and Chen with the

18  addition of the firewall tool kit?

19  A.   I couldn't find anything that would discredit the

20  claims.

21  Q.   Do you disagree with Dr. Wallach's opinion regarding

22  those?

23  A.   I disagree with the opinion.

24  Q.   Then we get into these claims 8 and 33, 9 and 34, 10

25  and 35, and 11 and 36, which are side-by-side.  Once again,

Heberlein - direct

1   it has the same references with the firewall tool kit.  This

2   involves the Java applets, the ActiveX control, the

3   JavaScript and Visual Basic.

4            Was there any place cited in the firewall tool

5   kit or any evidence that was cited specifically that would

6   provide you with a reference point that would allow you to

7   find what Dr. Wallach was talking about, what the firewall

8   tool kit added to these claims?

9   A.   No.  Once again, they are part of Claim 1.  When you

10  look at this particular claim, you have to include all the

11  elements of Claim 1.  And Claim 1 was building a security

12  profile from a downloadable.

13           There was no evidence that combining all these

14  elements would create that capability.

15  Q.   So, when we have these combinations of Ji and Lo or Ji

16  and Chen, you have to add all these other different

17  references in, is that an admission that basically Ji and Lo

18  or Ji and Chen just don't do it and they are just trying to

19  add more pieces to the puzzle?

20  A.   That's correct.  To --

21           MR. HOLDREITH:  That is just argument, Your

22  Honor.  Objection.

23           THE COURT:  Sustained.

24  BY MR. ANDRE:

25  Q.   Was there anything in the fire tool kit -- strike that

Heberlein - direct

1   .

2            Was there anything in Dr. Wallach's expert

3   report or in his testimony here last week that would give

4   you any indication what he was talking about or the spot he

5   was talking about with regard to the firewall tool kit and

6   these claims?

7   A.   I did not see any particular testimony that would

8   address this particular issue.

9   Q.   And based on that, do you have an opinion as to

10  whether Dr. Wallach's opinion, regarding Dr. Wallach's

11  opinion regarding these claims that require Java applets,

12  ActiveX control, JavaScript and Visual Basic?

13  A.   You know, once again, I disagree with his opinion.

14  Q.   That being said, do you disagree with his opinion

15  regarding Claims 8, 9, 10, 11, 33, 34, 35, and 36 of the

16  '194 patent?

17  A.   Correct.

18  Q.   Now we are on to Claim 12 of the '194 patent.

19  Dr. Wallach testified that the elements of Claim 12 can be

20  found in Ji and Lo or Ji and Chen.  Do you have an opinion

21  as to whether that is the case?

22  A.   Once again, I disagree because I saw no evidence that

23  any of these combinations would create a security -- let's

24  see.  Once again, this is part of an extension to Claim 1

25  where Claim 1 said, We had to extract the security profile,

Heberlein - direct

1   and then this one says, Compare that profile to a policy,

2   and, once again, I saw nothing that would say, Here is the

3   profile that we can compare against the policy.

4   Q.   So would you disagree with Dr. Wallach's opinion

5   regarding Claim 12?

6   A.   I would.

7   Q.   Claim 13 and 14 requires the addition, once again, of

8   the firewall tool kit.  Did you see any evidence in

9   Dr. Wallach's expert report or even in his testimony that

10  would allow the firewall tool kit to fill the holes that he

11  is trying to do here by combining Ji and Lo and Ji and Chen?

12  A.   I saw no evidence in his testimony that would support

13  that position.

14  Q.   Would you disagree with his opinion regarding 13 and

15  14?

16  A.   Yes, I do.  In addition, it's also dependent on Claim

17  1.  We discussed that before.

18  Q.   In Claim 24, it's a method of Claim 1 further

19  comprising the steps of comparing the downloadable against a

20  known downloadable.  Do you have an opinion, and Claim 25 is

21  the method of Claim 24 wherein the known downloadable is

22  hostile.

23           Did you see anything in Dr. Wallach's report

24  that would support his opinion that those particular claims

25  are obvious?

1331

Heberlein - direct

1  A.    I didn't see anything in his testimony that would
2  support that.
3  Q.    In Lo '94 -- that is the lab you worked in at UC
4  Davis -- when you require a human analyst, a human being to
5  sit there and look at the code when it comes in, would that
6  reference apply to what was really being discussed in the
7  '194 about putting something at the gateway to look for
8  downloadables?
9  A.    Once against, it's different animals.
10 Q.    Like apples and orange type things?
11 A.    Yes.
12 Q.    Based on that, would you disagree with Dr. Wallach's
13 opinion regarding Claims 24 and 25?
14 A.    Yes, I would.
15 Q.    Finally, with regards for Claim 26, it's the known
16 downloadable is not hostile, that is pretty close to the
17 previous claim, Claim 25, would you have the same opinion
18 regarding Claim 26?
19 A.    Well, once again, yeah, I saw no evidence where he
20 could identify that a downloadable was non-hostile.
21 Q.    So you disagree with his opinion there?
22 A.    I disagree with his opinion there.
23 Q.    Now, you add the Hershey reference in Claim 27, and
24 did you have an opinion as to the Claim 27 and Dr. Wallach's
25 opinion?

1332

Heberlein - direct

1  A.    Once again, especially with regards to Lo '94, I
2  couldn't figure out any way that you could combine Hershey
3  with Lo '94. And it's also, you know, valid based on the
4  fact that it's dependent on a claim that we have already
5  established was valid.
6  Q.    Now, when you testified that you disagree with
7  Dr. Wallach, does that mean it is your opinion that these
8  claims are, in fact, valid?
9  A.    It is my opinion that they are valid and it's also
10 certainly my opinion that they -- he didn't prove that they
11 were invalid. So certainly both cases.
12 Q.    With respect to Claims 28 and 29, requires the
13 addition of the firewall tool kit, did you have an opinion
14 regarding those two claims?
15 A.    I could not find anything in the source code and he
16 didn't provide any evidence that I know of that would back
17 up those claims.
18 Q.    Do you disagree with Dr. Wallach's opinion regarding
19 Claims 28 and 29?
20 A.    I disagree with his opinion.
21 Q.    Finally, with regard to Claim 30, the method of Claim
22 1, further comprising that the step of informing a user upon
23 detection of a security policy violation, do you disagree
24 with Dr. Wallach's opinion that the Ji and Chen or Ji and Lo
25 were disclosed as elements?

1334

Heberlein - direct

1  A.    Yes. Once again, it's dependent on Claim 1, which we
2  have already established is valid.
3  Q.    So based upon your view of the evidence that has been
4  presented to the jury in this case, do you find any evidence
5  that the asserted claims of the '194 patent are obvious in
6  light of the prior art?
7  A.    No, I do not find any evidence for that.
8  Q.    I want to look at the '780 patent right now.
9          Mr. Heberlein, the '780 patent, the references
10 cited against the '780 patent by Dr. Wallach were the
11 Microsoft Authenticode and the Signed Java. Do you recall
12 that?
13 A.    Yes, I do.
14 Q.    With respect to the Microsoft Authenticode reference,
15 and that's DTX-1276, do you recall reading the testimony
16 that Dr. Wallach only showed you a single paragraph of this
17 reference?
18 A.    Yes.
19 Q.    If we go to Page 758, highlight this last paragraph
20 here, this is the single paragraph that Dr. Wallach
21 testified to regarding the Signed Java -- I mean the
22 Microsoft Authenticode technology. Is that correct?
23 A.    That is correct.
24 Q.    Is there anything in that paragraph that you saw that
25 would anticipate or make obvious any of the claims of the

1334

Heberlein - direct

1  '780 patent? Feel free to read it.
2          (Pause.)
3  A.    I disagree there is anything in here that invalidates
4  the '780 patent.
5  Q.    Let's talk about that specifically. The first element
6  here is a computer-based method for grabbing a downloadable
7  ID to identify a downloadable. Then it says, "Comprising."
8  That is the preamble of the claim. Right?
9  A.    Yes. What's the reference number for this again? The
10 DTX number?
11 Q.    It's 1276. It should be in the book in front of you.
12 A.    Okay.
13 Q.    Does the Microsoft Authenticate obtain a downloadable
14 that includes one or more references to software components
15 required to be executed by the downloadable?
16 A.    The evidence that he provided didn't show any evidence
17 of doing the downloadable portion of this.
18 Q.    So would you disagree with Dr. Wallach's opinion
19 regarding the second element of Claims 1, 9 and 18?
20 A.    Yes, I would.
21 Q.    Let me take a step back real quick. On this Microsoft
22 Authenticode document, we will go to JTX-2, could you
23 highlight this area here.
24          So was the Microsoft Authenticode technology
25 before the United States Patent and Trademark Office during

1335

Heberlein - direct

1  the prosecution of the '780 patent?

2  A.   That is correct, that the Patent Office had this

3  document before them when they were reviewing this patent.

4  Q.   At the very least, did they understand that

5  Microsoft Authenticode was cited by the patentee as

6  potential prior art and the claims came out on the list? [

7  A.   That's correct, the Patent Office cited that Microsoft

8  had this technology.

9  Q.   Not only did they have that reference, but there is

10  another reference here, that is the exact reference that you

11  are looking at as DTX-1276.  Correct?

12  A.   Yes, it is.

13  Q.   So they not only had the reference that Dr. Wallach

14  relied upon for Microsoft Authenticode, they had other

15  documents regarding Microsoft Authenticode as well.

16  Correct?

17  A.   That's correct.  The Patent Office had this document

18  as well as other Microsoft Authenticode documents in front

19  of them when they were analyzing this patent.

20  Q.   Could we go back to the Elmo, please.

21           So based on your view of the Microsoft

22  Authenticode document, and, more specifically, what

23  Dr. Wallach provided in his testimony, did he provide any

24  evidence to show that the Microsoft Authenticode fulfilled

25  the third element here, the fetching at least one software

1336

Heberlein - direct

1  component identified by the one or more references?

2  A.   The Authenticode technology that he presented did not

3  provide any evidence to that.

4  Q.   Would you disagree with his opinion regarding the

5  third element of Claims 1, 9 and 18 of the '780 patent?

6  A.   Yes, I disagree.

7  Q.   Then the final elements of these independent Claims 1,

8  9 and 18 talk about performing a hashing function on the

9  downloadable and the fetched software component to generate

10  a downloadable ID.  Do you see that?

11  A.   Yes, I do.

12  Q.   Do you agree with Dr. Wallach's opinion that that

13  element would be anticipated or made obvious by the

14  references cited?

15  A.   The evidence that he provided, I disagree with his

16  opinion.

17  Q.   Now, with respect to Claim 2 and 10, if Claim 1 is not

18  anticipated or made obvious, would that hold true for Claim

19  2 and 10 as well?

20  A.   Yes.  Once again, sort of the patent rules say that if

21  you have a dependent claim -- or an independent claim that

22  is valid and any claim that depends on that is also valid.

23  It trickles on down.

24  Q.   When we get to Claims 3 and 11, do you have an opinion

25  as to whether his analysis regarding Microsoft Authenticode

1337

Heberlein - direct

1  would be the same for 3 and 11?

2  A.   You know, once again, it's based on a valid claim --

3  or it's dependent on a valid claim.  And he provided no

4  evidence in his testimony on this as well.

5  Q.   Then we get to Claim 4 where the downloadable includes

6  a plug-in.  Is that based on the same type of analysis?

7  A.   Same type of analysis.

8  Q.   That's Claim 4 and 12.  Is that correct?

9  A.   4 and 12.

10  Q.   Then Claims 5 and 13, this was -- there wasn't any

11  cites to dependent Claims 5 and 13 to any of these

12  references, so Dr. Wallach just said, Well, one with skill

13  in the art would just know it, it would be obvious just

14  because it would be known.  Do you agree with that?

15  A.   I am not particularly aware of anyone assigning HTML

16  pages themselves.  So I didn't see any reference that they

17  provided to support their claim.

18  Q.   So would you disagree with the opinion that it would

19  just be obvious even though there were no references that

20  cite to this HTML code?  It would just be obvious to apply

21  it to independent Claim 1?

22  A.   I disagree that it would have been obvious.

23  Q.   With regard to Claim 6 and 14, do you have an opinion

24  as to whether those claims would be obvious in light --

25  anticipated or obvious in light of the prior art?

1338

Heberlein - direct

1  A.   Once again, both 6 and 14 are dependent on valid

2  claims.  So by default, they are valid.

3           And I don't recall any particular evidence that

4  Wallach provided, I can't recall anything that he provided

5  at this time.

6  Q.   So based on your review of what was provided to this

7  jury by Dr. Wallach, did you see any evidence that the

8  claims of the '780 patent would be anticipated or made

9  obvious by the prior art?

10  A.   Based on the evidence that, you know, he showed you

11  guys, I don't believe that there is anything in that

12  evidence that would invalidate these claims.

13  Q.   Based on your own independent review of the claims of

14  the '780 patent and looking at the Microsoft Authenticode,

15  do you have an opinion as to whether those claims are valid

16  in light of that art?

17  A.   I believe the claims are valid based on that analysis.

18  Q.   Now we are going to get to the last of the patents,

19  the '822 patent, the sole reference Dr. Wallach relied on to

20  try to prove invalidity of this claim is Ji '97, which is

21  DTX-1932.

22           When you reviewed his testimony, did you notice

23  the only thing he showed the jury was this abstract?

24  A.   Yes, I am aware of that.

25  Q.   Is there anything in the abstract that would, in your

1339

1   opinion, invalidate the '822 patent, the claims of the '822

2   patent?

3   A.   Let me read it real carefully here.

4   Q.   Sure.

5        (Pause.)

6   A.   Based on this evidence, I believe all the claims are

7   still valid.

8   Q.   This Ji '97 reference, the '348 patent arbitration

9   that was -- was that cited to the United States Patent and

10  Trademark Office during the prosecution of the '822?

11  A.   Yes.  Once again, when the Patent Office was looking

12  at this particular patent to determine whether it was valid

13  or not, the Patent Office had in their hands this particular

14  evidence and looked at it and said, No, the patent is still

15  valid.

16  Q.   JTX-3, the second page, please.  Is that the Ji '348

17  patent we were just talking about?

18  A.   I believe so.  Yes, I wanted to check the numbers.

19  Q.   If we go to the Elmo, this is the chart that

20  Dr. Wallach used.  And did you notice that, regarding Claim

21  4, one of the elements of the claims is missing from this

22  chart?

23  A.   Yes.  I was aware of that.

24  Q.   Could you give me that board over there.

25       So Claim 4 of the '832 patent, the second

1340

1   element is determining whether the downloadable information

2   includes executable code.  Do you see that?

3   A.   Yes, I see that.

4   Q.   And that element is not in Dr. Wallach's analysis, is

5   it?

6   A.   That is correct.

7   Q.   And when you reviewed his trial testimony, he didn't

8   mention this element of Claim 4, did he?

9   A.   I don't recall seeing -- seeing any testimony to that

10  data point.

11  Q.   So there is nothing for you to rebut there so we won't

12  even do that and go to the next one here.

13       "Causing mobile protection code to be

14  communicated to at least one information-destination of the

15  downloadable," et cetera, do you see that?

16  A.   Yes, I do.

17  Q.   And that's actually two separate claim elements.

18  Correct?  On this chart here, there is, Causing mobile code

19  and the "wherein" clause?

20  A.   Yes.

21  Q.   That is included into a single box here.  Right?

22  A.   Yes.

23  Q.   Now, based on the, your view -- the testimony provided

24  by Dr. Wallach, do you agree with his assessment that these

25  multiple elements are found in Ji, this check box here?

1341

1   A.   No, I disagree.

2   Q.   Would you tell you us why?

3   A.   In particular, once again, it's referencing the fact

4   that we have got to determine whether the code is there, and

5   Ji does not do that step.

6   Q.   Then when you get to -- is it okay if I cross that one

7   out then?

8   A.   Yes.  There is the one that's not there.  That is sort

9   of the important one.

10  Q.   So the element that's missing, which we are not going

11  to address because there is nothing to address, that is an

12  important element to you in this claim?

13  A.   Right.  Once again, when there is a claim, there is

14  several limitations, limitation A, B and C.  For them to

15  invalidate this claim, they have to in -- show evidence that

16  each one of those, A, B and C, are, in fact, anticipated by

17  the prior art.

18       In this case, they skip one of those.  You can't

19  go A and C and skip B, and once you skip B, it's game over.

20  Q.   Based on that, these dependent claims that are

21  dependent, Claims 4, 5, 6 and 8, which are all dependent on

22  Claim 4, kind of stair stepping up, do you have an opinion

23  as to whether those would be valid in light of the evidence

24  provided to this jury?

25  A.   Yes.  Once again, because each one is dependent on a

1342

1   previous one, that is valid.  They are all valid.

2   Q.   Would you disagree with Dr. Wallach's opinion

3   regarding Claims 5, 6 and 8?

4   A.   Yes, I do.

5   Q.   Then we get into Claim 12, you have, "A

6   processor-based system, comprising:  An information monitor

7   for receiving downloadable information; a content inspection

8   engine communicatively coupled to the information monitor

9   for determining whether the downloadable-information

10  includes executable code."

11       Do you see that?

12  A.   Yes, I do.

13  Q.   Did you find anything in Ji that would include those

14  elements?

15  A.   We are talking about the part that flows from the

16  second part -- the last part of the top page and the bottom

17  page?

18  Q.   There is two separate elements, I believe.

19  A.   I don't remember any testimony or any evidence

20  describing a content inspection engine.

21  Q.   Do you disagree with Dr. Wallach's opinion regarding

22  the content inspection engine and the Ji reference?

23  A.   That's correct.

24  Q.   How about the claim regarding the packaging engine?

25  A.   I don't recall from any of his testimony where he

1343

Heberlein - direct

1  identified a mobile production code packaging engine.

2  Q.    So would you disagree with Dr. Wallach's opinion

3  regarding a package engine as well, that element?

4  A.    Once again, he didn't provide me enough evidence to

5  agree with him. So I am going to have to disagree with him.

6  Q.    Claim 13 is dependent upon Claim 12. Would that --

7  what would be your basis of disagreeing with Dr. Wallach on

8  that one?

9  A.    Once again, because it's dependent on a claim that's

10  already valid, it would be valid as well.

11  Q.    Mr. Heberlein, just so we can wrap this up on this

12  issue of the claims, is it your opinion that the claims, the

13  asserted claims of the '194 and the '780 and '822 are valid

14  in light of the prior art?

15  A.    It is my opinion that they are all valid.

16  Q.    Now, have you heard of a, something called secondary

17  or considerations of nonobviousness?

18  A.    Yes, I have.

19  Q.    What is your understanding of secondary considerations

20  of nonobviousness?

21  A.    Secondary considerations of nonobviousness --

22        THE COURT: Mr. Andre, we are going to take our

23  afternoon break.

24        (Jury leaves courtroom at 3:15 p.m.)

25        (Recess taken.)

---

1344

Heberlein - direct

1        THE COURT: We are going to go straight through

2  until 4:30.

3        MR. ANDRE: Your Honor, may the witness take the

4  stand.

5        (Jury enters courtroom at 3:32.)

6        THE COURT: Ladies and gentlemen, please take

7  your seats and we will continue.

8        MR. ANDRE: Thank you, Your Honor.

9  BY MR. ANDRE:

10  Q.    Mr. Heberlein, before we broke, I asked you if you

11  have ever heard of something called secondary considerations

12  of nonobviousness?

13  A.    Yes, I have.

14  Q.    What is your understanding of those?

15  A.    In a broad sense, it's measures of success that the

16  patented technology has had. Success is determined in a

17  number of ways. One, does it address a long-felt need. Is

18  it financially successful? Is it copied by competitors?

19  Those are some examples.

20  Q.    Let me ask you a question about that. On your

21  opinion, has the patented inventions of Finjan's patents we

22  are talking about here today, have they met a long-felt but

23  unresolved need in the marketplace?

24  A.    Yes, it has. May I explain?

25  Q.    Please do so.

---

1345

Heberlein - direct

1  A.    One of the major concerns in security, once again,

2  that large corporations that spend a lot of money to protect

3  their information, is the so-called zero-day attack. The

4  zero-day attack is an attack that either wasn't previously

5  known and exploits vulnerability that you didn't know about

6  or at least a vulnerability that you can't patch in your

7  system.

8        You have these vulnerabilities within your

9  computer systems, and a new attack comes and you have never

10  seen the attack. So you want some mechanism to stop that

11  attack before it gets through.

12        That is particularly an important aspect. That

13  is what a lot of these -- the major focus of these patents

14  are, is being able to stop the suspicious activities that

15  you didn't know about before, any attack that you didn't

16  know about before.

17        Also, there is a number of benefits to their

18  architecture that they describe in the patent. Once again,

19  remember, we talked about two different types of security

20  systems. One is the filtering firewall. And one is the

21  gateway. The filtering firewall can be really fast.

22  Packets come in, packets go out. It is a relatively simple

23  system that you can implement fairly fast.

24        The gateway, which is the approach that these

25  technologies are talking about, a much more complex system.

---

1346

Heberlein - direct

1  A much richer system. So, for example, if someone is

2  downloading a large file, a gigabyte file or something like

3  that, it might be a huge file that has to be analyzed. All

4  that information has to go to the gateway. And the gateway

5  constructs this information.

6        If a packet is lost somewhere across the

7  network, the gateway has to say, Hey, I didn't see that

8  packet. I need to go back and ask the remote machine for

9  that packet.

10        Filtering firewall, you don't have to worry

11  about that. The application of gateway also has to

12  reconstruct all of this information. All these packets come

13  in and now it has to take all the data and reconstruct the

14  data it is going to analyze. Then it does the analysis.

15        The gateway we are talking about here has to do

16  a whole bunch of extra work that the filtering firewall

17  doesn't.

18        To address that, you need to look at

19  optimization techniques. That is what these patents are

20  talking about. Remember before, you would see this new

21  downloadable code, the first time you have seen it, for

22  example, you have to do some analysis. That analysis is

23  costly. We are going to do the analysis, extract the

24  security profile, we are going to go ahead and keep it.

25  That is sort of the focus of the '194 patents and the

1347

Heberlein - direct

1  additional patents.

2       The next time that same downloadable comes by, I

3  don't have to go through all that additional work to

4  decompose and analyze that program because I have already

5  done it once and we have kept that information to use it a

6  second time.

7       We have got this optimization that says, I have

8  kept this information around, I don't need to do it a second

9  time.

10       So we talked about quickly the zero-day attack,

11  then the optimization for extracting the security profile

12  and keeping that security profile, so that, subsequently, I

13  don't have to do further analysis.

14       A third aspect is especially important for a lot

15  of worms and viruses, the self-propagating code. In the

16  security field, we talk about a security code being hard and

17  crunchy on the outside and soft and chewy on the inside.

18  What that means is that a site will protect the perimeter,

19  it will put a lot of protection, it will investment money,

20  they will put the firewall to stop the attack from coming

21  in.

22       Once an attack has gotten into the system, it

23  can spread pretty easily. Once again, if you have a

24  zero-day attack, and, once again, the worm gets in

25  initially, once it gets in, it can spread throughout your

---

1348

Heberlein - direct

1  organization relatively quickly.

2       So the classical signature-based detection

3  system, a classical signature-based virus detection system

4  can't stop those worms.

5       It is a classical system that they can't build a

6  signature until they see the attack. Once the attack gets

7  inside your network, it can route your network and you are

8  kind of screwed up.

9       The technology they are talking about here

10  addresses all those issues and addresses the zero-day

11  attack, it addresses workload that you are going to have to

12  address on your server.

13       Once again, you are going to put this gateway

14  there. It is going to intercept all this traffic between

15  your organization and the outside world. So you want it to

16  be fast or else users are going to complain.

17       It is also especially important in the case of

18  self-automated worms that are new, because you want to stop

19  them before they get in. You want to stop them at that

20  gateway the very first time you ever seen them.

21  Q.   Has the evolution of the Internet had any effect on

22  this long-felt need in this space?

23  A.   Yes. If you look back when the web first came out,

24  most pages were the static HTML page. So I would get on my

25  browser. I would go off to a site. It would pull down a

---

1349

Heberlein - direct

1  page and display ^ read SDMRAND this system. It would have

2  some text and a picture. And every time you went, you got

3  the exact same stuff back. It was always displayed exactly

4  the same.

5       Over time, there has been this evolution to what

6  is now called Web 2.0 or Web Application. So if you look in

7  the newspaper or see stories, they will, that will talk

8  about Web 2.0 or Web Applications, which create a much more

9  dynamic environment on your system, so when I go out to a

10  site, if you go to Google maps, for example, you will pull

11  down something. Now I can actually drag around that map

12  like I was using in the application.

13       Maybe you will have a stock ticker on your

14  system that constantly goes out and updates the stock

15  quotes. On your web page, you constantly have this updated

16  ^ stuff going on. There is entire games that are web-based

17  games.

18       As you move to this new technology, this Web

19  2.0, the system is much more dynamic. The mechanisms to

20  provide that dynamic environment is these downloadable

21  codes, so pulling down this downloadable code. It is this

22  increasing trend that the market has to address.

23  Q.   Did you find any evidence of copying of the invention

24  of the Finjan patents in the marketplace?

25  A.   Yes, that's another example of, sign of secondary

---

1350

Heberlein - direct

1  considerations. Did someone else like your stuff,

2  especially a competitor? Yes, there is a number of

3  examples.

4  Q.   Would you please give one of them.

5  A.   Certainly, the WebWasher approach copies this, and

6  they talk about it, specifically wanting to address the same

7  capabilities. They talk about the Finjan killer. We want

8  to address, have the capability just like Finjan does.

9  Q.   Did you rely upon any documents to make your

10  determination that the WebWasher copied the patented

11  technology of Finjan's?

12  A.   There were several e-mails. I believe they may have

13  already been presented; if not, we can present them here.

14  There were several documents that they presented, generated

15  a White Paper internally that they would use to describe

16  their systems.

17  Q.   Did you look at -- can we see PTX-10.

18       Did you look at this White Paper here?

19  A.   Yes, I did.

20  Q.   Did you look at this step-by-step guide as well?

21  A.   Yes, I did.

22  Q.   Based on your review of these e-mails and these guides

23  and White Papers, did you make -- is that how you made the

24  determination that WebWasher copied Finjan's patented

25  technology?

1351

Heberlein - direct

1    A.    Yes, sir. Once again, based on these documents, it
2    certainly appears that WebWasher was trying to duplicate
3    Finjan's technology.
4    Q.    Did you see any evidence of commercial success of the
5    patented technology?
6    A.    Yes, there is a number of them. Finjan is making
7    millions of dollars selling their products. Obviously,
8    there is some success there.
9          In addition, Microsoft licensed their patents.
10         So Microsoft is the largest software corporation
11   in the world. It's got -- I don't know about millions of
12   developers, but large numbers of developers. So instead of
13   just developing it on their own, they went off to Finjan and
14   said, Let's just license their technology.
15   Q.    We are calling these "secondary considerations," the
16   considerations that you just discussed today. Do they
17   further support your opinion that the asserted claims are
18   valid and not obvious?
19   A.    Yes, they do.
20   Q.    Just one final question: Do you find that the Finjan
21   technology and patents are valid?
22   A.    I believe that the patents are valid.
23   Q.    Thank you very much, Mr. Heberlein.
24         MR. ANDRE: I haven no further questions, Your
25   Honor.

1352

Heberlein - direct

1          THE COURT: Mr. Holdreith.
2          MR. HOLDREITH: Thank you, Your Honor.
3                    CROSS-EXAMINATION
4    BY MR. HOLDREITH:
5    Q.    Mr. Heberlein, good afternoon.
6    A.    Good afternoon.
7    Q.    Now, you are Mr. Heberlein, not Dr. Heberlein. Right?
8    A.    That's correct.
9    Q.    You just gave an opinion that WebWasher is a copy of
10   Finjan. Right?
11   A.    That is correct, based on the -- WebWasher has
12   technologies that Finjan has based on the descriptions in
13   the documents that I looked at.
14   Q.    What you said is that WebWasher is copied from Finjan.
15   Right?
16   A.    Based on my opinion from what I saw, yes.
17   Q.    But you did not look at source code for any Secure
18   Computing product, did you?
19   A.    I did not. Someone else was doing that.
20   Q.    You didn't rely on somebody else here, did you? This
21   is your opinion?
22   A.    This is my opinion, correct.
23   Q.    You didn't look at source code?
24   A.    I did not look at their source code.
25   Q.    You did not look at any Secure Computing product in

Heberlein - cross

1    operation?
2    A.    I did not look at any Secure Computing product in
3    operation regarding these particular patents.
4    Q.    And you haven't, in fact, looked at WebWasher in
5    detail, have you?
6    A.    I have not looked at WebWasher in detail at the code
7    level. I have looked at the White Papers.
8    Q.    You don't know how WebWasher particularly operates, do
9    you?
10   A.    I do not know the specifics of how the code operates,
11   that is correct.
12   Q.    And you have not done a limitation-by-limitation
13   analysis, where you compared WebWasher to Finjan's patent?
14   A.    That is correct. I did not do a limitation to show
15   that WebWasher infringed specifically on specific claims.
16   Q.    So you don't even know if WebWasher does what Finjan's
17   patent says?
18   A.    Based on the documentation that I have seen, it
19   certainly appears to be the same. But I have not done a
20   detailed source code analysis with a claim-by-claim
21   analysis. That is correct.
22   Q.    I would like to show you Exhibit 1056. This is one of
23   the e-mails that you just mentioned that you relied on when
24   you were studying whether WebWasher was copied. Right?
25   A.    I believe so.

1354

Heberlein - cross

1    Q.    This is an e-mail called, Product Meeting Minutes,
2    dated June 1 of 2004?
3    A.    According to the print there, yes.
4    Q.    And here are some participants. Do you know who any
5    of these people are?
6    A.    Not based on those names, no.
7    Q.    The paragraph that you relied on is this Paragraph 3
8    of Exhibit 1056. Right?
9          (Pause.)
10   A.    Yes. I believe there was additional e-mails which
11   reference the term "Finjan killer."
12   Q.    And this e-mail says, "For WebWasher 5.1 planning, two
13   solutions were elaborated." Right?
14   A.    I see the text there.
15   Q.    And the text says, "First, we could copy Finjan's
16   features." That's what it says?
17   A.    I see that.
18   Q.    That's what you relied on?
19   A.    I don't know if I relied specifically on this one and
20   solely this one.
21   Q.    Well, you pointed this out in your report, didn't you?
22   A.    I believe so. But I don't know if I cited additional
23   ones.
24   Q.    And the next sentence after that says, "This idea was
25   dropped because the gain in security is questionable."

1355

1357

Heberlein - cross

1 Right?

2 A. Yes.

3 Q. "And development is too time-consuming." That is the

4 next sentence. Right?

5 A. I see that.

6 Q. The next sentence says, "Second, we developed our own

7 mix of methods, which are more favorable for corporate

8 customer needs." Right?

9 A. I see that.

10 Q. So what this e-mail says is, We could, we could copy,

11 that idea was dropped?

12 A. I see that statement.

13 Q. Now, I would like to talk to you about some of the

14 prior art you discussed with counsel. First I am going to

15 ask you about Shaio, which is Exhibit 1021.

16        Do you have that?

17 A. Yes.

18 Q. All right. Now, in your opinion, Shaio does not look

19 at downloadables. Right?

20 A. It does not receive a downloadable.

21 Q. I am going to show you now Column 2 of Shaio. Column

22 2 says, "There is a need for an intelligent firewall."

23 Right?

24 A. Yes.

25 Q. And it says, "that provides realtime security testing

Heberlein - cross

1 I am disagreeing that they receive a downloadable.

2 Q. Now, the other thing Shaio says -- is it your opinion

3 that Shaio is not an effort to combat malicious code like

4 viruses?

5 A. That is not the primary focus of the Shaio effort.

6 Q. You said, Shaio just looks for broken code?

7 A. Shaio -- well, Shaio has the typical firewall

8 filtering features, which, once again, looks at packets

9 going in, packets going out.

10        Once again, if malicious code is coming from the

11 outside and you choose to block it because it has an outside

12 address, it could block bad code simply because it's coming

13 from the outside address. But that's true with all

14 filtering firewalls.

15        It blocks malformed applets, and certainly

16 malicious code can have bugs in it, too, as we have

17 discussed before.

18        The fact that it blocks poorly formed code can

19 mean it could potentially, you know, block a malicious

20 packet. But it's looking not at malicious stuff, because

21 malicious stuff needs to be well formed.

22 Q. Doesn't Shaio look at parsed executable code, look at

23 the instructions and attempt to reduce the probability of

24 viruses?

25 A. Shaio looks at a single network packet at a time and

1356

1358

Heberlein - cross

1 of network packets." Right?

2 A. Yes.

3 Q. "Which may include executable code such as applets."

4 Right?

5 A. Yes, I see that.

6 Q. You know that applets are downloadables. Right?

7 A. I know that applets are downloadable. This does not

8 talk about receiving the downloadable in total. It's

9 looking at an individual packet.

10 Q. Well, it can't look at executable code such as applets

11 unless it receives them, can it?

12 A. Once again, this is talking about just potentially a

13 fragment of the packet -- or a fragment of the program. We

14 are talking about receiving the entire downloadable.

15 Q. What it says here is that it "may include executable

16 code such as applets," right? Not part of applets?

17 A. They provide no means to talk about how to, you know,

18 receive entire applets.

19 Q. So even though they say they look at applets, your

20 opinion is they don't look at applets?

21 A. They say they look at packets, which may include

22 portions of executable code such as applets.

23 Q. There is no disagreement here that applets are

24 downloadables. Right?

25 A. I am not disagreeing that an applet is downloadable.

Heberlein - cross

1 does whatever limited analysis it can do on that individual

2 packet.

3 Q. That wasn't exactly my question. Let me just show you

4 the text of the Shaio Patent at Column 5. This is at about

5 Line 7.

6        Shaio says, "Additional security may be provided

7 by intelligent firewall 185c1"?

8 A. Yes.

9 Q. The intelligent firewall, that is Shaio?

10 A. I would disagree with the term "intelligent." But,

11 yes, it's a firewall. It's a filtering firewall.

12 Q. The patent says it's an intelligent firewall. You

13 disagree?

14 A. It's a matter of semantics. I think, you know,

15 looking at what the firewall, the semantic, what Shaio did

16 was really simple and I don't think hardly anybody in the

17 field would consider that an intelligent firewall.

18 Q. So Shaio says it's an intelligent firewall; you say it

19 is not?

20        THE COURT: You have already established that.

21        MR. HOLDREITH: I will move on, Your Honor.

22 BY MR. HOLDREITH:

23 Q. Shaio then says he looks at nonconforming instructions

24 in an attempt to reduce the probability of viruses. Isn't

25 that what the Shaio patent says?

Heberlein - cross

1   A.    The patent does talk about looking at nonconforming

2   viruses -- or nonconforming bytecode.

3   Q.    Well, it says here "nonconforming instructions,"

4   doesn't it?

5   A.    Instructions.

6   Q.    And the purpose of looking at nonconforming

7   instructions here is to reduce the probability of viruses.

8   That's what Shaio says?

9   A.    It can do that.

10  Q.    One of the things you said, I think, is that you don't

11  think Shaio could be combined with the technique of

12  filtering URLs. Right?

13  A.    Not successfully.

14  Q.    Now, filtering URLs was known by the middle of 1996.

15  Would you agree with that?

16  A.    I don't know. I would have to look at some specific

17  examples of that.

18  Q.    Did you read the trial transcript in this case?

19  A.    I did. I don't recall a specific line item on that.

20  Q.    Do you remember Paula Greve testified from Secure

21  Computing?

22  A.    I looked at Wallach's testimony.

23  Q.    You didn't read Paula Greve's testimony?

24  A.    No, I did not.

25  Q.    So do you know that Paula Greve said that Secure

Heberlein - cross

1   gateway to stop hostile downloadables, would they know, if

2   there was a request to go to www.stealmycreditcard.com, that

3   you could block that request because you didn't like that

4   URL. Right?

5   A.    The question was: Was there a product somewhere in

6   existence at that time that could do that capability?

7   Q.    Right.

8   A.    I don't know. I don't disagree that there could be a

9   product out there that could do that.

10  Q.    Do you think someone working in the field of network

11  security would know that you could use that technique in

12  1996 at a gateway?

13  A.    It depends on the technology at the gateway.

14  Q.    For some gateways, you could use that technique?

15  A.    For some gateways, you could use that.

16  Q.    There is nothing mysterious about URL filtering?

17  A.    Other than the fact that I think it wouldn't work well

18  in a filtering firewall environment.

19  Q.    Another piece of the prior art that you talked about

20  was the Lo '94 reference. Right?

21  A.    That's correct.

22  Q.    And you worked with Mr. Lo?

23  A.    Yes, I did.

24  Q.    At UC Davis?

25  A.    Yes.

1360

Heberlein - cross

1   Computing came out with SmartFilter for URL --

2        MR. ANDRE: Objection, Your Honor. Outside the

3   scope of direct testimony. The witness has no knowledge of

4   this testimony.

5        THE COURT: I am going to sustain that

6   objection.

7   BY MR. HOLDREITH:

8   Q.    If there is evidence in this case, Mr. Heberlein, that

9   URL filters were known and available in the middle of 1996,

10  would you agree or disagree with that statement?

11  A.    If there is evidence that URL filters were known, I

12  guess I would agree with that statement if you provide

13  evidence.

14  Q.    URL filtering, is an example of URL filter if I get a

15  downloadable from www.stealmycreditcard.com, I might block

16  that downloadable because I don't like that URL name?

17  A.    Well, you would block -- typically, the way you would

18  do it is block the request as it goes out.

19  Q.    Fair enough. URL filtering would be, I try to make a

20  request out to www.stealmycreditcard.com, the gateway says,

21  We are not going to that URL?

22  A.    Right. I have seen that used with gateways. I don't

23  recall having seen that in the filtering firewalls which are

24  like this one.

25  Q.    The question is: In 1996, if someone was building a

1362

Heberlein - cross

1   Q.    In the computer science department?

2   A.    Yes.

3   Q.    And you said you don't think that Mr. Lo's 1994

4   article was publicly available?

5   A.    The -- I do not know if it was available. In the

6   documentation that Secure Computing provided for the prior

7   art, they referenced where they got that particular article

8   from, and the cite that they referenced for that article did

9   not exist at that time.

10  Q.    The reference you are talking about is a URL?

11  A.    Correct, they cited a URL.

12  Q.    You mentioned that URL in your report?

13  A.    Yes, I believe I did.

14  Q.    The URL is just a link that somebody could point to on

15  the Internet to go get a copy of the Lo article.

16        Do you understand that?

17  A.    Yes, I understand that.

18  Q.    And you know that that link points to a UC Davis

19  computer science server. Right?

20  A.    Which did not exist at that time.

21  Q.    Your point is, you were in the department, so you know

22  that that server did not exist in 1994. That is your

23  testimony?

24  A.    I believe that did not exist. I also checked

25  archive.org and I did not see it there.

Heberlein - cross

1   Q.   You know UC Davis, the computer science department
2   contains an online bibliography of papers, right?
3   A.   It does now.  I don't know if it did back then.
4   Q.   You know that that bibliography talks about the server
5   we are talking about?
6   A.   Again, I don't know if that system was available at
7   the time the prior art was needed.
8   Q.   Did you go look at the link, the URL that points to
9   the Lo '94 article on the UC Davis computer science server?
10  A.   I looked at the one you guys provided.
11  Q.   That link points to a bibliography that shows that
12  Mr. Lo's article was published in computers and security in
13  1995, doesn't it?
14       MR. ANDRE:  Objection, Your Honor.  This was not
15  produced in this case, this information that counsel is
16  asking questions on.  This is the first we have ever heard
17  of this.
18       THE COURT:  Is that accurate?
19       MR. HOLDREITH:  This is the link that is in his
20  report.
21       THE WITNESS:  No --
22       THE COURT:  Hold on.
23       (The following took place at sidebar.)
24       MR. HOLDREITH:  Your Honor, the link that he
25  cites in his report is this link here.  I am just

---

Heberlein - cross

1   him if the link that he recited in his report doesn't, in
2   fact, on their bibliography show that their article was, in
3   fact, published in 1995 in computers and security.
4        THE COURT:  Why can't he ask that?
5        MR. ANDRE:  It's not --
6        THE COURT:  He is not being asked to offer on
7   opinion as to whether it was available or not.  Is that
8   correct?
9        MR. HOLDREITH:  Yes, sir.
10       MR. ANDRE:  And this witness has never said it
11  wasn't available.  He says, I don't know if it was or not.
12       THE COURT:  I don't think this is too terribly
13  damaging.  You can ask the question.
14       (End of sidebar conference.)
15       THE COURT:  The objection is overruled.
16       MR. HOLDREITH:  Your Honor, may I approach so I
17  can hand him the document?
18       THE COURT:  Yes.
19  BY MR. HOLDREITH:
20  Q.   Mr. Heberlein, I am now, I have put in front of you a
21  page.  Do you recognize at the bottom of that page, in the
22  sort of sand colored bar, there is a link, which is the link
23  that you recited in your report,
24  HTTP:setlab.cs.ucdavis.edu/papers/lo95.ps.
25  A.   I see that.

---

Heberlein - cross

1   establishing that if you go look at that link on their
2   bibliography, it shows this article was published in 1995.
3        MR. ANDRE:  He is trying to impeach this witness
4   with this information, which doesn't impeach him, to start
5   off.  We have complained this was not proper prior art
6   reference because they have not provided evidence that this
7   paper was published.
8        THE COURT:  Is it one of the references listed
9   in the instructions the parties have proposed?
10       MR. ANDRE:  It is.
11       THE COURT:  You have agreed on those reference,
12  I think?
13       MR. ANDRE:  Yes.
14       THE COURT:  I didn't see an objection.  I don't
15  know how you can object now.
16       MR. ANDRE:  I am objecting to him trying to
17  impeach this witness with something he didn't provide
18  earlier.  This witness testified he wasn't sure if it was
19  available or not.  That is his opinion.  He didn't make an
20  opinion one way or another.  He just said, I don't know if
21  it was available.  He doesn't say it was or it wasn't.
22  That's what he testified.  That is consistent with his
23  report.  He is trying to impeach him with something that is
24  not contested.
25       MR. HOLDREITH:  Your Honor, I am going to ask

---

Heberlein - cross

1   Q.   That is the link to Dr. Lo's paper?
2   A.   The one question I have remaining is, quite often, the
3   documents posed online aren't exactly the same as the
4   documents that were published in the journal.
5   Q.   You recognize that that is the link that was in your
6   report, isn't it?
7   A.   I don't have that with me right offhand but I will
8   trust you.
9        MR. HOLDREITH:  Your Honor, may I approach with
10  a copy of the witness' report?
11       THE COURT:  Yes, you may.
12  BY MR. HOLDREITH:
13  Q.   If you would like to refer to your own copy, it is
14  Paragraph 265.  Do you have that right there?
15  A.   Yes.
16  Q.   It's the same link.  Right?
17  A.   I believe it is.
18  Q.   There is a typo in your report.  It says, "edy." That
19  is a typo, the link is "edu"?
20  A.   Okay.
21  Q.   Is that right?
22  A.   Yes.
23  Q.   In this bibliography from UC Davis, it says, Mr. Lo's
24  paper was published in computers and security in 1985,
25  doesn't it?

Heberlein - cross

1   A.   That the paper was.  It would have been helpful to
2   have the actual computers and security publication.  I don't
3   know if you have that offhand.
4   Q.   It's right underneath that page I just gave you.
5   A.   There we go.  It looks different than the previous
6   one, the formatting.
7   Q.   Different format.  I am not going to have you go
8   through the exercise, Mr. Heberlein, right now of comparing
9   word for word.  Your counsel can certainly ask you about
10  that.
11         This is the article found at the link that you
12  cited in your report.  Right?
13  A.   I did not cite this particular article.  I cited the
14  link that you guys cited and I just said that link wasn't
15  available.
16  Q.   Say that again.
17  A.   When you guys produced your prior art, you said,
18  Here's the document that we are relying on and here's the
19  URL to go find out.  When I looked, that URL did not exist
20  at the time of the prior art.  That's what I am saying.
21  Q.   But when you do look at that URL in the bibliography
22  at UC Davis, what you see is the article was published in
23  1985.  Right?
24  A.   What I see is, certainly, a paper was published.  I
25  have not looked this particular paper and it is a different

1368

Heberlein - cross

1   format than I looked at.
2   Q.   The title of that paper is, "Malicious Code
3   Filtering."  Right?
4   A.   There are a lot of papers with this type of title.
5   Q.   That paper is titled, "Malicious Code Filtering."
6   Right?
7   A.   Correct.  I have seen other papers at UC Davis that
8   have various publications between them over time.
9   Q.   The author of that paper is Mr. Lo, the lead author?
10  A.   That is correct.
11  Q.   In the department of computer science at Davis?
12  A.   Oh, yes.
13  Q.   Now, the Lo '94 paper is the one about telltale signs.
14  Do you remember that?
15  A.   It included segments on that.
16  Q.   In your view, Mr. Lo's work was only for a human
17  operator to review.  Right?  It wasn't for automatic
18  scanning?
19  A.   It had components that would do preliminary scanning
20  automatically and produce the preliminary results for
21  further review by an analyst.  They are pretty thorough on
22  stating that.
23  Q.   And you pointed out or pointed to a page called,
24  "Related Work."  Right?  Which is Page 4 of Mr. Lo's
25  article, Exhibit 1264.

Heberlein - cross

1   A.   Give me a second here.
2         Okay.
3   Q.   And what you said is, this says, When a run-time tool
4   identifies a problem, it either stops the malicious program
5   or asks for human attention.  Right?
6   A.   That is one approach that people have used.
7   Q.   So the tool can do two things.  One thing it can do is
8   ask for human attention?
9   A.   I see what you are saying.  Yes.
10  Q.   Or it could stop the malicious program?
11  A.   It could stop the program.  It doesn't know whether
12  it's malicious or not.
13  Q.   It says right there it stops the malicious program.
14  Isn't that what it says?
15  A.   Yes.  It also says this approach is not -- simply not
16  viable for systems running without attention.
17  Q.   That says that about run-time approaches, doesn't it?
18  A.   That's what this entire paragraph is about is run-time
19  systems.
20  Q.   And "run-time" is when you run it on the client
21  computer and you watch it run?
22  A.   Generally, that's the case.
23  Q.   And static analysis, that's what you do on the
24  gateway, when you look at the program code and the
25  instructions.  Right?

1370

Heberlein - cross

1   A.   Generally, that's the case, although not exclusively.
2   Q.   So for run-time approaches, you can't run without
3   attention.  That's what Lo says?
4   A.   Correct, in this particular area.
5   Q.   Now, here is the page in Lo '94 about telltale signs.
6   It's Page 5.  Doesn't Mr. Lo say that the telltale signs
7   should be simple enough so that their identification can be
8   mechanized?
9   A.   I am waiting for you to highlight it.
10  Q.   All right.  Yes?
11  A.   Yes, I see that.
12  Q.   When Mr. Lo was identifying telltale signs, one of the
13  things he said is, Let's make them simple enough so that you
14  can identify them mechanically, not by human attention?
15  A.   Correct.  That was one of the preliminary steps to
16  help the analyst.
17  Q.   What he says is it's mechanically, that's how you
18  identify the telltale signs?
19  A.   Yes.  I agree that, once again, the tool was designed
20  to help an analyst.  The tool has to do something by itself.
21  Q.   And one of the things it can do is stop malicious
22  code.  Right?
23  A.   This is a static analysis tool.
24  Q.   And one of the things it can do is stop malicious
25  code.  Right?

1371

Heberlein - cross

1  A.   I am not sure.  Can you show me an example where it
2  specifies that?
3  Q.   That is the text we just read.  If your counsel has
4  more questions about that, I am sure he will ask.
5      Another reference you looked at was Ji '95?
6  A.   That text was referring to other systems, not this
7  code.
8  Q.   You also looked at a patent to Mr. Ji in 1995.  Right?
9  A.   Yes, I did.
10  Q.   That is Exhibit 1019.  Do you have that?
11  A.   Yes, I have it here.
12  Q.   And you agree that Ji is a gateway that puts packets
13  together and looks at them.  Right?
14  A.   I think I would agree with that.
15  Q.   Now, one of your opinions in this case is that Ji
16  doesn't give any motivation to combine with, for example,
17  behavior analysis techniques?
18  A.   To combine with the Lo paper.
19  Q.   With the Lo paper, for example.
20      Here at Column 7 of the Ji patent, at about Line
21  55, one of the things that the authors of the Ji patent say
22  is those skilled in the art will also -- sorry, will realize
23  that various other virus detection methods may be used.
24      That's one of the things he says.  Right?
25  A.   Yes.  Yes.  He just throws that out.

1372

Heberlein - cross

1  Q.   And the Ji authors also recognize that there is such a
2  thing as behavior-based interception.  Right?
3  A.   Could you highlight that section?
4  Q.   It's Column 1, at about Line 58.  That says, There is
5  a virus detection method commonly referred to as behavior
6  interception that monitors the computer system for important
7  operating system functions such as write, erase, format
8  disk, et cetera?
9  A.   I see that.
10  Q.   So Ji says, I use signature scanning at the gateway.
11  Right?
12  A.   Yes.
13  Q.   He says, You could use other virus detection
14  techniques.  Right?
15  A.   Yes.
16  Q.   And he says, There is another virus detection
17  technique, which is behavior inspection?
18  A.   Behavior inspection at -- behavior analysis at
19  run-time.  I don't think it uses behavior inspection.
20  That's part of the reason I identified that in the Lo '94
21  paper, because that technique really isn't amenable to
22  automated analysis.
23  Q.   I know it's your opinion that Lo is not amenable to
24  automated analysis?
25  A.   No.  Lo says the technique they are describing here is

1373

Heberlein - cross

1  not amenable to automated analysis with that type of
2  behavior.
3  Q.   The prior art technique identified in Ji?
4  A.   Correct.
5  Q.   Ji says you can use whatever other virus detection
6  technique you want?
7  A.   Right.  I am just saying the prior art you guys cited
8  stated that approach was not a good approach for automated
9  analysis.
10  Q.   Doesn't Ji also have a configurable file for deciding
11  what to do when you detect a problem?
12  A.   For deciding what to do when you detect a problem?  I
13  am not aware of a particular cite, but if you can show it to
14  me.
15  Q.   If you look at Column 8, at about Line 6.  Ji says,
16  "The response of the FTP proxy server is determined
17  according to user's needs and wants as specified in a
18  configuration file."
19      Do you see that?
20  A.   I see that.
21  Q.   Ji also says, "This configuration file is preferably
22  fully modifiable according to input from the user and stored
23  in memory."
24  A.   I see that.
25  Q.   Ji says that.  Now, you said one of the problems you

1374

Heberlein - cross

1  see in Chen is that, in Chen, the security policy is hard
2  coded.  You can't modify it?
3  A.   In Chen, so we are talking about another reference
4  here.  You are not talking about this particular reference.
5  Q.   You understand, right, that Ji and Chen Dr. Wallach
6  combined together?
7  A.   Right.
8  Q.   And you said, Yeah, but in Chen, you can't modify the
9  security policy.  It's hard coded, didn't you?
10  A.   Okay.  But I think you are misrepresenting this
11  particular policy.  When we are looking at the '194 example,
12  that there was the security profile that we would extract
13  from the program, and then you would have the policy that
14  would say whether I think that behavior is suspicious or
15  not.  This is saying, this particular policy is saying,
16  Somehow we have detected that it's suspicious.  Now what's
17  the response policy?
18      So the policy is two different animals, once
19  again.  One policy which talked about in the patents in
20  question, '194 is talking about a policy to determine
21  whether the software is suspicious or not.  And the
22  reference you were referring to here in Ji '95 is a response
23  policy to say, okay, What do I do once it's been determined
24  that it's suspicious?
25  Q.   Your view is that the security policy in the '194

Heberlein - cross

1  you now, the steps here, you scan the macro using a first
2  instruction identifier, in Step 620. Right?
3  A.    Yes.
4  Q.    And you determine, is there a first suspect
5  instruction there?
6  A.    That's what it says.
7  Q.    Then you scan -- if there is a first suspect
8  instruction, you scan and look for a second suspect
9  instruction. Right?
10  A.    That's what it says.
11  Q.    And, finally, if you found the suspect instructions,
12  you flag the macro as infected by an unknown virus. Right?
13  A.    Yes.
14  Q.    And it's your opinion that is not what the '194
15  patent does. Is that right?
16  A.    That is correct.
17  Q.    Do you know if that's what WebWasher does?
18  A.    I do not know specifically in detail what WebWasher
19  does. The documents I looked at in the descriptions sound
20  very similar to the patents and less similar to this.
21  Q.    Chen also has a Figure 9, could you look at that.
22  A.    Yes.
23  Q.    Do you have any opinion as to whether these are
24  suspicious computer operations shown in Figure 9 of Chen?
25  A.    These are suspicious computer operations. But these

---

Heberlein - cross

1  permitting that macro to execute if it violates a security
2  policy, isn't it?
3  A.    I would agree with that.
4  Q.    Now, you know that Chen was not considered by the
5  patent examiner during the prosecution of the '194 patent.
6  Right?
7  A.    The -- I believe the Chen document was provided prior
8  to the '194 being awarded. But I don't know of it being
9  examined by the Patent Office itself.
10  Q.    Are you referring to the Chen on the face of the '194
11  patent?
12  A.    No. I believe, is it the '780 in which they reference
13  this one?
14  Q.    Okay. I want to ask you specifically about '194. You
15  know that in the '194 patent, the Patent Office never looked
16  at this Chen patent. Right?
17  A.    Okay.
18  Q.    And you know that there is a Chen, a different
19  inventor who is listed on the front of the '194. Different
20  inventor, different patent?
21  A.    Okay. Again, I am not disputing that.
22  Q.    Chen says --
23          THE COURT: Counsel, before you ask that
24  question, let me see counsel at sidebar.
25          (The following took place at sidebar.)

---

Heberlein - cross

1  are not suspicious computer operations pertaining to the
2  specific downloadable. That is the important part of the
3  patents.
4  Q.    Chen looks for these suspicious instructions in a
5  downloadable. Would you agree with that?
6  A.    Chen extracts these -- looks for these suspicious
7  computer operations in a downloadable.
8  Q.    And Chen can detect both known and unknown viruses.
9  Would you agree with that?
10  A.    I would agree with that, of the type of macros they
11  are talking about here.
12  Q.    And the downloadable -- the macros are downloadables.
13  You agree with that. Right?
14  A.    They can be downloadables, yes.
15  Q.    The suspect instructions, if Chen finds them, Chen
16  removes them. Right?
17  A.    I believe that's the case, yes.
18  Q.    Specifically, if we look at Column 3, at about Line
19  55, Chen has a number of options for what you can do,
20  including correcting the file or notifying the user. Right?
21  A.    Yes, I see that.
22  Q.    So Chen says, If I find a virus, I am either going to
23  delete that macro or fix it. Right?
24  A.    Yes, I don't disagree with that.
25  Q.    And deleting the macro or fixing it is a way of not

---

Heberlein - cross

1          THE COURT: How much more do you have?
2          MR. HOLDREITH: I think maybe ten more minutes.
3          THE COURT: We will have to finish this
4  tomorrow. I have a criminal trial starting Wednesday. You
5  guys are going to be out of here. The jury may still be
6  deliberating.
7          So let's wrap this up for the day. We are going
8  to do the plea. I have a 5:00 discovery dispute
9  teleconference because some depositions are being held in a
10  case we are starting a little later. Then we will come back
11  and deal with the jury instructions.
12          MR. HOLDREITH: We are at your convenience on
13  everything else.
14          MR. SCHUTZ: It will be after 5:00.
15          THE COURT: I hope the 5:00 won't take very
16  long. It depends how much they have been arguing about.
17  And they have been arguing about a lot.
18          So let's go ahead and wrap this up. You can
19  leave your stuff. The Marshal should be up in a few moments
20  with the prisoner.
21          THE COURT: Ladies and gentlemen, we are going
22  to have to end it here today. We have a little bit more. I
23  think this is our last witness. How many more witnesses do
24  you anticipate on your rebuttal?
25          MR. ANDRE: This is a rebuttal on the validity

Heberlein - cross

1    THE COURT: I think that's right.

2    MR. SCHUTZ: It is infringement by

3  functionality.

4    THE COURT: I agree. Go ahead.

5    MR. SCHUTZ: So I mean, we would not necessarily

6  have to have this language here if we got the functionality

7  instruction later on.

8    THE COURT: Let's talk about the functionality

9  instruction. Go ahead.

10    MR. SCHUTZ: If we jump to that, Your Honor, I

11  believe that is No. 19.2.

12    THE COURT: At Page 28.

13    MR. SCHUTZ: There are a couple of cases that we

14  think are spot on. I think there is even one by Your Honor

15  that is relevant.

16    THE COURT: Isco v. Conductus.

17    MR. SCHUTZ: This is a Federal Circuit case,

18  Southwest Software v. Harlequin, Incorporated. For the

19  record, the cite is 226 F.3d 1280. I will get the exact

20  language here.

21    THE COURT: The pin cite is at 1291.

22    MR. SCHUTZ: There is also some discussion as

23  1287 indicates.

24    Basically, the bottom line is, if the function

25  has been de-featured, even though it may be on the product,

---

Heberlein - cross

1  but de-featured, in other words, in our parlance, locked and

2  unavailable, then it is not infringing. That is our

3  position.

4    We think this case is actually spot on point.

5    THE COURT: Do you think there is some dispute

6  of fact on that issue?

7    MR. SCHUTZ: Yes, because what Mr. Parr did is

8  he took every sale of WebWasher, whether proactive scanning

9  in the malware module was paid for or not, and included it

10  in his royalty base.

11    THE COURT: He did.

12    MR. SCHUTZ: That is really where the dispute

13  comes down. That is the big difference between, I think the

14  number was 49 million for software versus Mr. Degen's 24

15  million. That is where it comes into play. If that is not

16  deemed to infringe, it about halves the royalty base that

17  Mr. Parr used.

18    That is why it is important.

19    THE COURT: In addition to that, would you

20  address the Finjan objection which they articulated, I guess

21  it's at Page 20.

22    MR. SCHUTZ: 20 or 29?

23    THE COURT: We are talking about the same issue,

24  I think.

25    You are right. The specific objection to the

---

Heberlein - cross

1  functionality objection you propose is at 29. But I think

2  you correctly point out that this is tied up in Finjan's

3  objection and your proposal to the general, as far as the

4  general.

5    MR. SCHUTZ: Right. Our attempt here is not to,

6  you know, argue our case through the jury instructions. If

7  the Court wanted to lift language out of the Southwest

8  Software opinion, which is the law set down, we would have

9  no objection to that. The point we wanted to get across I

10  think Your Honor understands.

11    THE COURT: What I am going to do on these two

12  instructions is, I haven't had a chance yet to review the

13  cases, including my own, again, so I will look at that

14  overnight. Unfortunately, I think we are going to have a

15  little time in the morning. It appears that I can announce

16  a ruling and we still will have time for the plaintiff to

17  get together a set of instructions without delaying the

18  jury. The other work can be done, it seems to me, and we

19  can, Ms. Kobialka, just await word from me on this

20  particular issue.

21    I understand the arguments. I do want to take a

22  moment to review Southwest and the other cases.

23    Did you want to say something?

24    MS. KOBIALKA: Your Honor, I just want to

25  respond, because we do have claims regarding program code.

---

Heberlein - cross

1  This is very confusing, I think I think, for the jury,

2  because it doesn't matter whether or not this functionality

3  is on or off. That is a problem.

4    THE COURT: That's right. I need you to respond

5  to that, Mr. Schutz.

6    MR. SCHUTZ: I don't believe -- and I have to

7  double-check. I know Your Honor is going to look at this.

8  I don't think it makes any difference under Southwest,

9  because the whole purpose of de-functioning goes to program

10  code. It really doesn't distinguish between method or not.

11  If it is de-functioned and taken off, then it is not

12  infringement. I will double-check. I don't think it makes

13  a difference whether it's program code or whether it is the

14  code never works because of a de-function.

15    THE COURT: Are you sure you don't want to have

16  Ms. Kobialka handle this? She seems --

17    MS. KOBIALKA: I don't believe --

18    THE COURT: You are going to learn one day.

19    MR. ANDRE: I already know that, Your Honor. I

20  am worn down today.

21    MS. KOBIALKA: With respect to the Isco case and

22  these other cases that they cite to, this is a situation

23  where the code is locked or there is some sort of alteration

24  that occurs such that you would have to alter it in order to

25  infringe. That is not our contention in this case.

Heberlein - cross

1    What we are really dealing with are program code

2  claims, system claims that are going to infringe regardless

3  of whether they are used or not.

4         THE COURT: Regardless of whether they are

5  locked or unlocked.

6         MS. KOBIALKA: That's correct.

7         THE COURT: I think it would make sense for me

8  to take a look and make sure on this before I finally rule.

9  So I will do that.

10         So, then, let's go on forward. The next one I

11  have is 18. Is that correct? This is Finjan's proposed

12  instruction 18 at Page 22.

13         If I skip something, you need to tell me.

14         MR. SCHUTZ: Yes, Your Honor. I believe with

15  regard to 16 there is the issue of activity outside the

16  United States, and government sales was raised.

17         MR. ANDRE: No. 18 is just about the --

18         MR. SCHUTZ: I am talking about 16.

19         THE COURT: Mr. Schutz, you are right, because

20  in Secure's proposed instruction, I think appropriately,

21  there is the sentence in the first paragraph, the last

22  sentence, do you see that, that was omitted from Finjan's.

23  Is that what you are talking about, Mr. Schutz?

24         MR. SCHUTZ: Yes.

25         THE COURT: Was that inadvertent, Ms. Kobialka?

1392

Heberlein - cross

1         MS. KOBIALKA: Let me just try and find it.

2         THE COURT: Look at 18. Read the first

3  paragraph, last sentence, Page 18.

4         MR. ANDRE: Your Honor, may I? It's not quite a

5  correct statement of the law, because you can make something

6  outside the United States and import it in, and it would

7  still infringe. Or you can make something in the United

8  States and export it out. It says it has to be made, used,

9  offered for sale or sold outside the United States. Our

10  contention is, some of the source code may be made in

11  Germany but sold in the United States. This language is not

12  exactly correct.

13         THE COURT: What do you want to propose?

14         MR. SCHUTZ: I have a one-word clarification. I

15  think if it says, if the patented invention is not made,

16  used, offered for sale, or sold inside -- I guess two

17  words -- the United States, the activity should not be

18  considered infringing. Two-word change. That would cover

19  all of the things. Two-word change.

20         THE COURT: You got that, Ms. Kobialka?

21         MS. KOBIALKA: Yes.

22         THE COURT: Mr. Schutz, did you say there was

23  another remaining issue?

24         MR. SCHUTZ: They flagged an issue. It was on

25  the government, sales by the government.

Heberlein - cross

1         THE COURT: Was that in this one?

2         MR. SCHUTZ: Sorry.

3         MR. ANDRE: Judge, on this one, for the first

4  time the jury is going to hear something called a Finjan

5  Mirage product, the Finjan Internet 1 Box. Those products

6  have not come up in all, the Finjan Mirage has not been

7  mentioned, nor has the Internet 1 Box. We don't know where

8  they are coming from.

9         THE COURT: He makes a point that I overlooked

10  here, Mr. Schutz.

11         MR. SCHUTZ: Your Honor, that parenthetical can

12  be taken out. I think that it is an historical artifact.

13  The Finjan 1 Box can come out as well.

14         THE COURT: I am glad you reminded me of that.

15         I think that completes 16 other than the ruling

16  I have to make.

17         I think we can move on to Page 22, then. The

18  jury instruction No. 18 proposed by Finjan, I have already

19  indicated that I disagree with Secure's position on DOE. I

20  think that that is the principal basis of the objection

21  here. Is that correct? I may have misspoken. Maybe I am

22  looking at something else. Hold on a second.

23         I am talking about the method claims. Direct

24  infringement, literal infringement. I am at Page 22.

25         MS. KOBIALKA: Page 2 is Finjan's proposed 18.

1394

Heberlein - cross

1  We don't have a proposal for the method claim. In their

2  counterproposal they have it.

3         THE COURT: That's what's going on.

4         MR. SCHUTZ: The issue there, Your Honor, is

5  there is a dispute, as you caught, I think, yesterday, as to

6  whether method steps must be performed in order. And we

7  have inserted language that we believe is directly out of

8  the case law on that. That is on Page 24, second paragraph.

9         THE COURT: Yes.

10         MR. HANNAH: Your Honor, I have a case from this

11  district, the Ampex versus Eastman-Kodak case. It states in

12  that case that if there are two steps within a method claim

13  which must be performed in order, that all the steps in the

14  method claim must be performed in order. And so, in this

15  case, two of the steps -- all of the steps must be performed

16  in order, it is our contention, to get the A, B, C, D.

17         But even more specifically, if you look at the

18  '361, which is the one under contention here, about the

19  method steps and which limitations, that they must be

20  performed in order, the querying requires that it must query

21  and it must perform a second step. If you took those two

22  out of order -- what they are trying to do is rearrange the

23  claim so it's B, A, C, D. If you remember, that's what

24  happened with Dr. Wallach. They are trying to push their

25  position on the jury with this construction by saying you

1407

Heberlein - cross

1  about two-thirds of the way down where it says, Accordingly
2  we overrule the standard, et cetera.
3        THE COURT: It's at the top of the version I
4  have, which is a Westlaw printout. The right-hand column,
5  Accordingly, we overrule the standard set out in Underwater
6  Devices and hold that proof of willful infringement
7  permitting enhanced damage requires at least a showing of
8  objective recklessness.
9        MR. SCHUTZ: That's correct, sir.
10        THE COURT: Both sides agree you have got to
11  show objective recklessness. The question is how do you
12  tell the jury what that means.
13        You don't resist the notion, do you, Mr. Schutz,
14  that the language that is proposed defines objective
15  recklessness? Don't let me minimize your objection. You
16  seem to be suggesting that we need to say, well, the
17  standard that has to be met is that of objective
18  recklessness and here is what that means.
19        MR. SCHUTZ: Exactly, Your Honor. That is what
20  I am proposing the Court do, because that's what Finjan
21  says.
22        THE COURT: Why does that heighten -- I don't
23  mean to mischaracterize your position, Ms. Kobialka. But I
24  am not quite sure that I understand how that heightens the
25  burden.

1408

Heberlein - cross

1        MS. KOBIALKA: As I understood what he was
2  proposing is that the language would be to, establish
3  willful infringement, and this language of reckless
4  disregard, that that is somehow suggesting reckless
5  disregard has to be proven in addition to this objectively
6  high likelihood.
7        THE COURT: He is saying, look, here is the
8  standard you have to meet, ladies and gentlemen, that Finjan
9  has to meet or that you have to find. That is that there is
10  evidence sufficient to support the conclusion that this
11  standard has been met. That is the standard being objective
12  recklessness. That you can find that the defendants acted
13  in an objectively reckless manner. Here is what that means.
14        Then you go ahead and provide, you lifted the
15  language appropriately that defines it.
16        I am not quite sure that I understand.
17        MS. KOBIALKA: We can do that if we can have the
18  sentence that says this is what objective recklessness
19  means.
20        THE COURT: Yes, to make clear, so as not to
21  confuse the jury. I think that is your concern.
22        MS. KOBIALKA: Absolutely.
23        THE COURT: I think Mr. Schutz agrees with that.
24        MR. SCHUTZ: I think that is what I propose.
25        MS. KOBIALKA: This will give you heartburn.

1409

Heberlein - cross

1  They do say, we leave it to future cases to further develop
2  the application of the standard.
3        MR. SCHUTZ: It may be this case.
4        THE COURT: It very well could be.
5        (Laughter.)
6        THE COURT: District Judges, it is the bane of
7  the trial judge's existence when the Appellate Court makes
8  those kinds of statements.
9        In any event, I did have a question on Page 32
10  as to the last sentence. The fact that you may have
11  determined that the infringer was wrong and that the patent
12  is infringed does not alone mean that infringement was
13  willful.
14        I am wondering if The fact that you may have
15  determined that the patent is infringed does not alone mean
16  that infringement was willful wouldn't be a more appropriate
17  way to say that.
18        MS. KOBIALKA: That would be fine, Your Honor.
19        THE COURT: Read the sentence as it currently
20  stands, it says the infringer was wrong. I have eliminated
21  that in my proposed change to read, the fact that you may
22  have determined that the patent is infringed does not alone
23  mean that the infringement was willful.
24        MR. SCHUTZ: We are fine with that, Your Honor.
25        THE COURT: Then we are --

1410

Heberlein - cross

1        MR. SCHUTZ: I hate to go back. There is one
2  thing, I think it was in, Your Honor, No. 18, we had some
3  language on Page 24 in the second paragraph of our
4  instruction. In that paragraph, it begins, A method claim
5  of a patent is directly infringed only by one practicing or
6  performing the patented method. And this would be the
7  language, they have got, it has to be performed in order.
8        THE COURT: Why are we talking about this again?
9  Isn't this the issue I need to look at?
10        MR. SCHUTZ: No, it is not. This one has to
11  deal with the issue of inducing infringement. That is the
12  legal issue this relates to. So, in other words, a method
13  claim, they have to show that there has been someone who has
14  performed a method, and we will be arguing they haven't
15  shown that.
16        In other words, the mere fact we sell a
17  WebWasher, a product, doesn't mean that -- and they have not
18  shown evidence of any user actually performing the method
19  steps. That's why we ask that that sentence be included.
20        MR. HANNAH: Your Honor, this is the same issue
21  that I had.
22        We don't believe that it is proper to
23  specifically point out a method claim in this instance.
24        THE COURT: Because there are other types of
25  claims.

Heberlein - cross

1    MR. HANNAH: We have system claims, program

2    claims.

3    THE COURT: I agree. I am not quite sure.

4    I do agree with that, Mr. Schutz. There are

5    other types of claims, not just method claims. Why are we

6    calling out method claims?

7    MR. SCHUTZ: Because method claims have unique

8    requirements from other claims. The system claims, all they

9    have to do is show that the system is --

10    THE COURT: We are back to the ordering issue.

11    Right?

12    MR. SCHUTZ: This is separate and distinct from

13    ordering.

14    THE COURT: I am being obtuse.

15    MR. SCHUTZ: The issue under method claims is

16    they have to show the method was performed by someone, that

17    is a user. And so this issue is separate and distinct.

18    And, yes, there are method claims and system claims and

19    apparatus claims.

20    THE COURT: I got you. Counsel says that

21    doesn't really address that requirement.

22    MR. HANNAH: That is incorrect. It depends on

23    how the method claim is written. You can write a method

24    claim like the defendants have which requires the user to

25    perform the steps of the method, or you can write a method

1412

Heberlein - cross

1    claims in which it requires the process of the apparatus

2    itself to perform the method of the claim.

3    For instance, in this case, the '194 patent, it

4    requires a computer-based method of a gateway application,

5    and then the steps that have to be performed by the gateway.

6    Another instance which you could have had, which

7    would have been bad prosecution, bad people writing the

8    patents, if you had a user who had to click on a button

9    which received a downloadable. That would be another type

10    of method claim.

11    They are trying to put their argument before the

12    jury in the jury instructions, which we believe is

13    inappropriate.

14    THE COURT: Again, you have prevailed. I think

15    he is right. I think there is a distinction in the

16    arguments that are being made here. I think counsel has

17    correctly stated the current status of the law, as I

18    understand it, on this particular subject.

19    I am going to side with Finjan on this one.

20    Let's move on from 18. We are up to prior art.

21    MR. ANDRE: That's correct, Your Honor. We were

22    objecting to this because we don't think the prior art that

23    was not used to try to invalidate the patent should be

24    before the jury. Since we got kind of waylaid today and we

25    haven't put on our prior art yet, so we are withdrawing our

Heberlein - cross

1    objection. We will go with their list. Make life easier

2    for everybody.

3    THE COURT: Did you get that, Mr. Schutz?

4    MR. SCHUTZ: We talked about agreement. I think

5    there was also going to be a modification to just a specific

6    reference to the check points.

7    MR. ANDRE: That's correct.

8    THE COURT: The next one I have, we are all the

9    way up to damages.

10    MR. SCHUTZ: Obviousness.

11    THE COURT: Did I miss obviousness?

12    MR. ANDRE: Page 42, Your Honor.

13    THE COURT: Page 42. How could I miss that?

14    Okay. What is the rub here? What is the nub of the

15    disagreement? I just missed it.

16    MR. ANDRE: Your Honor, the instructions are

17    pretty much identical, with respect, if you look at Finjan's

18    proposal on Page 42, the Instruction 27, the first, second,

19    third and fourth paragraphs are all pretty much identical to

20    what is in Secure Computing's. What is different is our

21    fifth paragraph, and it would be their fourth paragraph they

22    kind of interjected there.

23    We both just lifted language from KSR, with two

24    exceptions in that, in Secure Computing's proposal, the

25    first sentence and the last sentence of the fourth paragraph

1414

Heberlein - cross

1    are misstatements from KSR. As such, we believe our

2    instruction is more in line with the KSR case.

3    THE COURT: Secure?

4    MR. SCHUTZ: Your Honor, I think the only

5    difference, the one we have a substantive disagreement over

6    is our paragraph on Page 46, it's the fourth paragraph, that

7    includes the obvious to try concept that was right out of

8    the KSR case.

9    So --

10    THE COURT: Where it says a patent claim can be

11    proved obvious by showing?

12    MR. SCHUTZ: Yes, if it is obvious to try, the

13    KSR case says the same, I am quoting the KSR case, The same

14    restricted --

15    MS. KOBIALKA: What page?

16    THE COURT: 46.

17    MR. SCHUTZ: The KSR case, I have got a Westlaw

18    cite. I believe that it's 1742. So it would be 127 Supreme

19    Court 1742. And just shortly after that -- I am sorry. It

20    is 1742 but it's toward the end of Page 1742. Where the

21    Court says, I believe this is at Headnote 6, The same

22    constricted analysis led the Court of Appeals to conclude in

23    error that a patent claim cannot be proved obvious merely by

24    showing the combination of elements was obvious to try.

25    Then it goes on, and concludes with, In that

1431

Heberlein - cross

1  break. It may happen by the lunch break, it sounds to me

2  like what you are talking about. I didn't realize that you

3  were planning this comprehensive a rebuttal case. Go ahead.

4          MR. ANDRE: We just had the one rebuttal expert

5  on their claims of invalidity, then the one on their patents

6  and that's it. We have one very short fact witness in

7  between. There is only the three witnesses. We obviously

8  didn't anticipate it going this long, either.

9          THE COURT: It is going to take me about an hour

10  and 15 minutes to instruct the jury, roughly, in that

11  neighborhood. Unless you don't want me to instruct the

12  jury.

13          It is not unheard of, by the way, as you may

14  know. There are all kinds of ways to instruct the jury.

15          But I tend to prefer that the jury sit and

16  listen while I give instructions.

17          I don't know how -- if you even know how long

18  your closings are planned for at this point.

19          MR. SCHUTZ: I think we will have to keep our

20  closings relatively short, if we are starting closing at

21  2:00. I think we each have an hour and that's it,

22  basically.

23          THE COURT: I think that's right, Mr. Schutz.

24          MR. SCHUTZ: An hour is more than enough for me,

25  Judge.

1432

Heberlein - cross

1          THE COURT: I am going to impose an hour

2  limitation on the closing speeches. I am going to give you

3  15 minutes on rebuttal.

4          MR. ANDRE: Thank you, Your Honor.

5          MR. SCHUTZ: Just a clarification. Does he get

6  an hour and 15 or 45 and 15?

7          THE COURT: I am going to give him an hour and

8  15, since they bear the burden. I will give him an hour and

9  15. I am going to hold you very much -- that is going to

10  be, on both counsel, it is going to be an hour on your

11  opening closing, Mr. Andre, an hour in responsive closing,

12  and 15 on the rebuttal. That's it. As it is, this jury is

13  likely going to have to come back on Wednesday -- we have

14  accommodations for that -- to begin its deliberations, I

15  expect, or probably to continue its deliberations, if they

16  do get started.

17          So you are going to want to plan for somebody

18  being here.

19          MR. SCHUTZ: Your Honor, may I suggest

20  45 minutes and an hour? That takes a half-hour out. That

21  half-hour may be -- I think the jury --

22          THE COURT: I will go with that. That is fine,

23  an hour; 45 minutes. That's good.

24          MR. SCHUTZ: As a housekeeping matter, I have to

25  go back to Minneapolis. I have another trial.

1433

Heberlein - cross

1          THE COURT: That is fine. Mr. Holdreith is more

2  than capable of dealing with questions and issues that might

3  come up. And they might. They probably will come up. Mr.

4  Andre, you need to make sure somebody is here from your

5  team, because I know you have other matters to get on to.

6          MR. ANDRE: I will be here, Your Honor.

7          One last housekeeping matter. On the verdict

8  form, there are some objections that are still interposed.

9          THE COURT: I think our discussion suggests how

10  those matters should be handled by counsel.

11          MR. ANDRE: Agreed, Your Honor. I wanted to

12  make sure that would be okay with Your Honor, if we cleaned

13  up the verdict form and it tonight or tomorrow morning.

14          THE COURT: See you in the morning, counsel. I

15  don't think there is a need for us to meet at 8:30. I think

16  we talked about what we need to talk about. Right?

17          MR. SCHUTZ: I don't think there is anything --

18          MR. ROVNER: Your Honor, we are going to give

19  us your ruling on the functionality. It is our

20  responsibility to turn around the jury instructions. That

21  will be tomorrow at some point.

22          THE COURT: Why don't we meet at a 8:30.

23          (Court recessed.)

24          - - -

25  Reporter: Kevin Maurer

1434

Heberlein - cross

1435

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

FINJAN SOFTWARE LTD.,          :   Civil Action
                               :   No. 06-369(GMS)
                 Plaintiff,    :
                               :
        v.                     :
                               :
SECURE COMPUTING CORPORATION,  :
CYBERGUARD CORPORATION,        :
WEBWASHER AG and DOES 1        :
THROUGH 100,                   :
                               :
                 Defendants.   :

- - -

Wilmington, Delaware
Tuesday, March 11, 2008
8:50 a.m.
Day Seven of Trial

- - -

BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
                          and a Jury

APPEARANCES:

        PHILIP A. ROVNER, ESQ.
        Potter Anderson & Corroon LLP
                -and-
        PAUL J. ANDRE, ESQ.,
        LISA KOBIALKA, ESQ.,
        JAMES HANNAH, ESQ.,
        MEGHAN WARTON, ESQ.,
        KRIS KASTENS, ESQ., and
        HANNAH LEE, ESQ.
        King & Spalding
        (Silicon Valley, California)

                    Counsel for Plaintiff

1436

APPEARANCES (Continued):

        FREDERICK R. COTTRELL, III, ESQ., and
        KELLY E. FARNAN, ESQ.
        Richards, Layton & Finger
                -and-
        RONALD J. SCHUTZ, ESQ.,
        CHRISTOPHER A. SEIDL, ESQ.,
        TREVOR J. FOSTER, ESQ., and
        JAKE M. HOLDREITH, ESQ.
        Robins, Kaplan, Miller & Ciresi, L.L.P.
        (Minneapolis, MN)

                    Counsel for Defendants

1437

THE COURT: Good morning. Please be seated.

All right. Here are the rulings on the remaining jury instruction issues.

As to No. 16, I am going to side with Finjan's position on this. I was working from Secure's instruction. I am going to eliminate the entirety of the last paragraph except the last sentence, insert it as the last paragraph in the Finjan, in the proposed 16. You made a bit of a mess, Finjan, of the last sentence. You might want to proofread a little more carefully next time.

That means that 19.2 will not be given. That carries forward, the same line, same ruling will carry forward in the damages instruction as well.

As to 47, proposed Finjan 48, I am going to strike it. I am going to give Finjan's proposed 70. I don't know why you didn't number them both 47. I guess it was just to pluck my nerves. But we are going to give 48, Secure's instruction. I am rejecting Finjan's 47.

I think Secure's position is the better position, based on my reading of the law.

And there was a marking. I am going to overrule Secure's objection, go ahead and give the marking instruction. If I am wrong and you convince me I am wrong, I can correct that later on. But you are going to have to deal with that now. Right now, given the amount of time

1438

that I had to deal with the issues, that is the best rulings I can -- that is the way I see the rulings at this point.

All right. Are you ready for the jury?

With that, I expect that we can get the instructions in shape, give them to the other side, and get sufficient copies, and we will instruct them as soon as we are able.

The witness can resume the stand.

All parties' objections have been acknowledged by the Court and reserved. The Court has ruled as it has. Clearly, in my view, I am going to be very disappointed if either of you goes up to the Federal Circuit on any of these waiver issues. I don't think either party has waived anything. You may have waived the issue of marking. I know that is part of the marking. There is no evidence. Insofar as preservation of issues for appeal, waivers, I just cannot imagine.

But maybe.

Again, just to recapitulate, with regard to closings, plaintiffs will have a total of an hour, the defense will have 45. If you want to rebut, you are going to have to reserve a portion of the hour.

MR. ANDRE: Thank you, Your Honor.

THE COURT: We are still waiting for one. Why don't we just relax for a few moments.

1463

Jaeger - direct

1  request, what the patent does it says, you know, we have
2  this -- you have information about your organization
3  oftentimes in a directory server, so we will talk about this
4  LDAP directory server and what sort of things are in it in
5  more detail later. The idea is there is useful information
6  in here for making a determination whether this packet
7  should be authorized.
8          So in this patent, they advocate the firewall
9  using this information from the directory server at the time
10  the request is made.
11         Then the next one, if the firewall authorizes
12  this, if they find information in the directory server, that
13  describes you, and there is also a process of authenticating
14  the specific person to a specific rule -- I am sorry, for
15  authenticating a specific person, and if that person is,
16  let's see -- there is an authentication process, basically,
17  where there may be information in the directory that helps
18  determine whether this person is allowed to make this
19  request based on the identity of this person.
20         The request is made. If it is authorized, it
21  will go out to the Internet and get the request, fulfill the
22  request and you will get the response.
23  Q.    Is it fair to say that this patent is about how to
24  determine whether a client's outbound request is permitted?
25  A.    That's correct.

1464

Jaeger - direct

1  Q.    Now, looking at this diagram here, it looks like we
2  have two components. Is that right?
3  A.    That's right.
4  Q.    There is the firewall, which is what I am referring to
5  when I say two components, there is the firewall and then
6  there is the directory server or server that contains the
7  directory?
8  A.    That's right.
9  Q.    We have heard this term firewall used a lot. I just
10  want to get your understanding of what you mean by firewall.
11  A.    All right. So basically, as I said before, when the
12  client computer is going to send something, you might ask
13  for a web page or something like this, it is going to break
14  down your request, no matter how big it is. If it is too
15  big, it can't send it in one request. So it may have to
16  break it down into separate little chunks that it's going to
17  then send using the networking hardware. Those chunks are
18  called packets.
19         It is going to break these down into packets and
20  put it on, think of it like a wire, you need some other
21  components, but it's eventually going to go to a firewall
22  component in this patent.
23         The firewall component is going to look at each
24  of these packets and make a decision based on information in
25  the directory server whether you are allowed to send this

1465

Jaeger - direct

1  request.
2  Q.    And do you have an opinion whether or not the Finjan
3  NG appliances infringe the asserted claims of the '361
4  patent?
5  A.    My opinion is that they do not infringe the '361
6  patent, the NG appliances do not infringe the '361 patent.
7  Q.    Based on your review of the materials, could you just
8  describe for the jury what the NG appliances are, how they
9  work?
10  A.    Okay. So the NG appliance is an application, it
11  basically will receive packets sent over the network, but
12  these packets will be composed into a request. So the
13  problem that they are trying to solve with this product that
14  you have difficulty solving with the firewall is that, in
15  order to determine whether a URL is okay, the attacker may
16  do things to modify this, the way this URL is sent, so they
17  can break it up into really small packets. They could do
18  things to try to confuse the firewall.
19         So it's difficult for firewalls to figure out
20  how to authorize requests on a packet-by-packet basis.
21         Whereas if you compose these packets back
22  together into the original URL request, at basically what is
23  called the application layer, which is what the NG
24  appliances will receive, then you will see the actual
25  request. And you will see what it looks like to the web

1466

Jaeger - direct

1  system, rather than having to guess at, you know, is there
2  another packet? Do all of these combined together meet the
3  requirements for really testing whether this is a legitimate
4  request or not?
5          So this NG appliance will look at the request
6  based on having the full application level request. It will
7  see it like the system will see it on the other end.
8  Q.    Well, let's turn to the asserted claims, which are the
9  '361, Claims 1 through 5, 7 through 12, 14 and 15.
10         What is the basis for your opinion that the NG
11  appliances do not infringe the '361 patent claims?
12  A.    So my opinion is that the NG appliance does not
13  infringe the '361 patent because the NG appliance does not
14  include a server in the product.
15  Q.    Why don't we do this. Could we show G-121, so we can
16  actually look at the claim language here.
17  A.    Okay.
18  Q.    So this element that you just mentioned, the server,
19  does that appear in Claim 1?
20  A.    Yes, it does. It is the first sub-bullet -- there is
21  no bullet, but sub-item, element, I guess you might say.
22  Q.    It reads a server having at least one directory that
23  can be accessed using a network protocol, said at least one
24  directory being configured to store information concerning
25  an entity's organization.

Jaeger - direct

1    Is that correct?

2  A.    That's correct. And the NG appliance does not include

3  such a server.

4  Q.    And is it your understanding that if that element,

5  that entire first element, if you can highlight the whole

6  thing, if that doesn't appear in Claim 1, if it's completely

7  missing from the NG appliance, how does it apply to the

8  dependent claims, which are Claims 2 through 7?

9  A.    My understanding is that the dependent claims depend

10  on the first claim, the independent claim being infringed.

11  So if the independent claim is not infringed, then the

12  dependent claims will not infringe.

13  Q.    Is a directory server needed for Finjan's NG

14  appliances?

15  A.    It is not needed, no.

16  Q.    Why don't we take a look at a DTX-1069.

17    Do you recall seeing this document previously?

18  A.    Yes, I do.

19  Q.    Is it your understanding this is a document that Dr.

20  Wallach used in his trial testimony?

21  A.    That's my understanding.

22  Q.    Why don't we turn to 10-1 and 10-2. Do you recognize

23  these pages?

24  A.    Yes.

25  Q.    What are these pages about? What does this tell you?

Jaeger - direct

1  A.    What this page tells me is that there is an interface

2  provided in the NG appliance for an administrator to add new

3  users or new groups to the appliance manual.

4  Q.    So it's done manually?

5  A.    In this case, yes.

6  Q.    As a result, there is no directory server?

7  A.    You don't need a directory server to do this, no.

8  Q.    Can the NG appliances be configured to work with a

9  directory server, let's say, for another company?

10  A.    Yes, they can.

11  Q.    Why don't we go to the next point that you had with

12  regard to your opinion?

13  A.    Okay. So the next point is that it's my opinion that

14  the NG appliance does not infringe because it's not a

15  firewall.

16  Q.    Why don't we take a look at G-121. Is that the last

17  element there of Claim 1?

18  A.    Yes, it is.

19  Q.    Let me read that into the record. That is, a firewall

20  that is configured to intercept network resource requests

21  from a plurality of client users on an internal network,

22  said firewall being operative to authorize a network

23  resource request based upon a comparison of the contents of

24  at least part of one or more entries in said at least one

25  directory to an authorization filter wherein said

Jaeger - direct

1  authorization filter is generated based on a directory

2  schema that is predefined by said entity.

3    That is that particular element?

4  A.    That's right.

5  Q.    And if we could turn to Claim 8, which is G-122. Does

6  this particular element also appear in Claim 8 and the

7  dependent claims on Claim 8?

8  A.    It appears in the independent claim, Claim 8, in the

9  preamble, I believe that's called.

10  Q.    So it's an authentication method at a firewall?

11  A.    Yes.

12  Q.    It's at that firewall?

13  A.    Yes.

14  Q.    And does this firewall element appear also in Claim

15  15?

16  A.    In this case, it appears at the end.

17  Q.    At the very last element there?

18  A.    Yes.

19  Q.    Through a firewall?

20  A.    Yes.

21  Q.    If said authorization filter is satisfied?

22  A.    That's correct.

23  Q.    Is it your understanding that all the asserted claims,

24  including the dependent claims, require a firewall of some

25  sort?

Jaeger - direct

1  A.    That's my understanding, yes.

2  Q.    How are the NG appliances different from a firewall?

3  A.    As I said, the NG appliances don't look at the

4  individual packets. They put them back together into the

5  request. So they will look at the application level

6  request.

7    So in this case, one instance of it they will

8  look at is a web request. So they will build it back into

9  the web request.

10    The other aspect that is important in this

11  context to it not being a firewall is that the NG appliance

12  is configured to support specific applications. So, you

13  know, web, there is an e-mail as well. And you have to give

14  a few others. So if you created your own new service on a

15  computer somewhere and you opened up the network interface,

16  they are called ports, so that you could start to

17  communicate with your new service, the NG appliance would

18  not support that kind of communication.

19    But the firewall would enable you to control

20  that kind of communication.

21  Q.    Just to be clear, is it your opinion that the NG

22  appliances are not a firewall?

23  A.    It is my opinion that they are not a firewall.

24  Q.    Can the NG appliances work with a firewall, JX-14?

25  A.    Yes. A firewall and an NG appliance can be put into a

1471

Jaeger - direct

1  system together.

2  Q.    Let's take a look at 3-6 of that exhibit. What does

3  this page here show you?

4  A.    It shows me that the -- in the context of the patent I

5  will talk about outgoing requests. But the client requests

6  will in this case go to the firewall. The firewall might

7  redirect them to the NG appliance to make a decision, then

8  send the request out to the Internet.

9  Q.    Is this consistent with your understanding that the NG

10  appliance can also work with the firewall?

11  A.    Yes.

12  Q.    Why don't we go to the next basis for your opinion?

13  A.    Okay.

14  Q.    We can take a look at Claim 8, which is G-121.

15  A.    Okay. So the third reason I believe that the NG

16  appliances, it is my opinion that the NG appliances do not

17  infringe the '361 patent is that the NG appliances do not

18  query this directory server that we talked about after they

19  receive the network request.

20  Q.    Thankfully, this claim is just numbered, so I won't

21  have to read it. Is that referring to 8(b) and (c), those

22  elements?

23  A.    Also (a).

24  Q.    As well as (a)?

25  A.    Right. So relative to receiving a network request, we

1472

Jaeger - direct

1  are not then subsequently querying the directory in the NG

2  appliance.

3  Q.    So is it your opinion that 8(a), (b) and (c) then are

4  missing from the NG appliances, those elements?

5  A.    Those elements are not executed that way in the NG

6  appliance. That's missing. I am not sure of the definition

7  in this sentence.

8  Q.    Fair enough. So is it your opinion, then, that the NG

9  appliances don't infringe Claim 8 and all the dependent

10  claims, which are 9 through 12 and 14, for this reason?

11  A.    Yes, it is.

12  Q.    Why don't we take a look at Claim 15, which is G-123.

13  Does this element appear in Claim 15?

14  A.    Yes, it does.

15  Q.    Where does it appear?

16  A.    The first computer receives a network request, the

17  first computer readable program, I should say, receives a

18  network request. And then the second has to do with

19  querying the directory server. And the third has to do with

20  determining based on the result of the query what to do,

21  whether to allow the packet to go through.

22  Q.    So for Claim 15, I want to make sure we have a clear

23  record, what we have highlighted here then are the elements

24  of the claim, the first portion reading, and I won't read

25  the whole thing, it starts first computer readable program

1473

Jaeger - direct

1  code, and continues on at an internal network. We go onto

2  the next element, which starts, second computer readable

3  program code. It ends, predefined by said entity. Then the

4  next element, which is third computer readable program code,

5  and it ends satisfy said authorization filter.

6        Those are the elements in your opinion that are

7  not performed by the NG appliances?

8  A.    That's correct.

9  Q.    What does it mean -- basically, what does all this

10  mean? We are talking about queries that come back from the

11  network request.

12  A.    Right. So the way that I read the patent is that the

13  idea is that the network request is going to come in and we

14  have this directory server that has information about your

15  organization. So the idea is that you want to have your

16  firewall enforce your network policy based on the current

17  state of that directory server, you know, a complete state

18  of that.

19  Q.    Utilizing this diagram that we have up here, maybe if

20  you want to use the laser pointer, you can.

21  A.    Right. So as we mentioned at the beginning, the

22  patent is about the firewall having access to this directory

23  server here. If we do the request to the directory server

24  when the packet is received or after the packet is received,

25  then we are going to have access to, you know, pretty much

1474

Jaeger - direct

1  the current state of the directory server.

2        So relative to the NG appliance, the NG

3  appliance may be configured to work with the directory

4  server. But the interaction is independently generated

5  before the network request comes in. There are also

6  configuration issues with respect to that, that we will talk

7  about.

8  Q.    Why is this important, the relationship between the

9  network request and the query?

10  A.    This is important because if the query is done at some

11  point earlier, then someone might have modified the

12  directory server in some way, that now the information that

13  you are looking at where it has authorized the network

14  request isn't current.

15  Q.    Why don't I show you JTX-56. Do you recognize this

16  document?

17  A.    Yes, I do. I will give a little explanation. This is

18  part of the interaction between the inventors and their

19  attorneys and the Patent Office. So they are talking about

20  why the patent, the attorneys and the inventors are making a

21  case to the Patent Office why this patent is valid, why they

22  should award this patent, why the Patent Office should award

23  this patent. They are putting together an argument for that

24  to the Patent Office.

25  Q.    If we turn to Page 11 of that document --

Jaeger - direct

1  MR. FOSTER: Objection, Your Honor.

2  THE COURT: Basis?

3  MR. FOSTER: It is outside the scope of his

4  expert report and the claim construction.

5  (The following took place at sidebar.)

6  THE COURT: What is your response?

7  MS. KOBIALKA: Dr. Jaeger reviewed the

8  prosecution history and provided that in his report. That

9  is disclosed in his report. We are not talking about claim

10  construction. We are talking about here is he is

11  setting forth what his understanding is in terms of how

12  these steps need to be performed as the claims are labeled,

13  A, B, C, D.

14  THE COURT: Has he revealed this in his analysis

15  in his report?

16  MS. KOBIALKA: Yes. That was his basis for

17  noninfringement.

18  MR. FOSTER: Your Honor, in the rebuttal expert

19  report that Dr. Jaeger gave, there is no reference to the

20  file history. The only reference to the file history is

21  that he reviewed it. There is nothing, no description of

22  this document anyplace in his report.

23  MS. KOBIALKA: He says he reviewed the

24  prosecution history. He relied on other things as well,

25  which he will testify about. But that included the

Jaeger - direct

1  prosecution history. He never said I didn't look at the

2  prosecution history. It was part of his disclosure.

3  THE COURT: This is in the history (indicating)?

4  MS. KOBIALKA: Yes. This is the file history of

5  the patent.

6  MR. SCHUTZ: We haven't had notice in terms of

7  his position. If it is in his report and you can show us...

8  THE COURT: You didn't have notice that he

9  relied on the prosecution history.

10  MR. FOSTER: All he said is that was one of the

11  things he reviewed. He didn't say relied on this in coming

12  to his conclusion in any of the definitions. He didn't rely

13  on it for disclaimer or any of these arguments. We need

14  notice of that.

15  MS. KOBIALKA: They sat and deposed him on all

16  of his opinions, the basis for his opinions. To the extent

17  they didn't ask these questions, they didn't cover it. This

18  is the basis of one of his noninfringement opinions as to

19  how these elements are performed. In his report he talks

20  about this very specifically.

21  THE COURT: You are saying he talks about this

22  very specifically, what you are holding in your hand.

23  MS. KOBIALKA: He didn't cite to this particular

24  page, no.

25  MR. FOSTER: Your Honor, if I may, Ms. Kobialka

Jaeger - direct

1  has indicated at our deposition we should have questioned

2  him because this is the basis. An expert report has to

3  specifically declare the basis of your opinion. This was

4  not declared. So I had no reason to depose him on that

5  subject matter.

6  THE COURT: It is not -- you will forgive the

7  poor analogy -- throwing darts at a board exercise that

8  counsel are put to at a deposition, Ms. Kobialka. You know

9  that. That is why Rule 26 is so specific on this particular

10  area of discovery. Go ahead.

11  MS. KOBIALKA: Well, that's part of the reason

12  why we disclosed all of the things he reviewed. They had

13  the opportunity to ask him, did you --

14  THE COURT: You have to give a reason, is what

15  counsel is saying.

16  MS. KOBIALKA: I understand.

17  THE COURT: Do you want to weigh in?

18  MS. KOBIALKA: My last point is that what he is

19  suggesting is every single document, every single pin cite,

20  would have to be provided to support his opinion. And that

21  is not what the Federal Rules require.

22  THE COURT: Do you want to get your rule book?

23  Let's go through it together. I always forget the section.

24  MS. KOBIALKA: 26.

25  THE COURT: Now we have all the italicized

Jaeger - direct

1  language to deal with.

2  MR. SCHUTZ: Experts. This section here, I

3  think it's on Page --

4  THE COURT: We have to look at the newly

5  effective --

6  MR. SCHUTZ: I think the reports were done

7  before December.

8  I think it's 1603 is where it starts, Trial

9  Preparation, Experts.

10  THE COURT: Right.

11  MR. SCHUTZ: I am sorry, Page 162, the previous

12  page, disclosure of expert testimony.

13  THE COURT: So we are literally on the same

14  page. We are talking about 26(a). It's actually (a)(E).

15  It's actually (a)(1)(E)[2], I think, is what it is.

16  In any event, we are under the heading

17  Disclosure of Expert Testimony.

18  Go ahead, Ms. Kobialka.

19  MS. KOBIALKA: What it says here is that you

20  have to contain a complete statement of all opinions to be

21  expressed and the basis and reasons therefor.

22  There is no dispute right now whether or not he

23  provided that this is one of his bases of noninfringement.

24  If you continue on, it says any exhibits to be used as a

25  summary of or in support --

1479

Jaeger - direct

1 THE COURT: It also says the data or other
2 information considered by the witnesses in forming the
3 opinions. Then go on, any exhibits.
4 MS. KOBIALKA: That's correct. It talks about
5 exhibits.
6 He has identified the data that he relied on.
7 He didn't identify each and every single one because we
8 could go on for days and days about the potential
9 information that he could have relied on for it.
10 THE COURT: But if we look at the letter of the
11 rule as well as the spirit of the rule, of the entire body
12 of the rule, which is to foster notice and to discourage
13 trial by surprise, and therefore during the inception, or
14 the most important phases, that is the discovery phase, but
15 in this case the writing phase by the expert, that there be
16 full disclosure to the other side so the other side has
17 notice as to the areas that it wants to try to contest, must
18 try to contest. That is in this case a specific document,
19 which is, I guess -- I don't know if it was an exhibit or
20 not.
21 MS. KOBIALKA: Yes. It was identified as one of
22 the things that he reviewed and relied upon for his opinion.
23 MR. SCHUTZ: But not discussed in the body of
24 his report.
25 THE COURT: But not discussed.

1480

Jaeger - direct

1 MR. FOSTER: Right. This is the only portion of
2 the expert report --
3 THE COURT: You should see this, Ms. Kobialka.
4 MR. FOSTER: This is the only portion of the
5 expert report that he identifies that he reviewed the file
6 history. It's this list of all the things he reviewed. The
7 file history itself is nearly 600 pages in this case. Now
8 they are trying to go to a specific page and say that is the
9 basis of one of his definitions. There is no end on this.
10 MR. HANNAH: Your Honor, moreover, you will
11 remember during the testimony of Dr. Wallach, he got up on
12 the stand and said that I did review the prosecution
13 history. It had nothing to do with my opinion.
14 This witness has read the trial transcript of
15 Dr. Wallach, and he is now rebutting that position of Dr.
16 Wallach, stating, I have now read the prosecution history.
17 It does in fact have bearing on this patent. And it should
18 be in this order of the claims.
19 So he is merely rebutting the fact that Dr.
20 Wallach said the prosecution history has nothing to do with
21 the patent.
22 MR. FOSTER: Your Honor, the proper way would
23 have been to actually cross-examine Dr. Wallach on any
24 argument in the prosecution history and not now say that
25 they can have an expert opine on the prosecution history.

1481

Jaeger - direct

1 And I think that counsel is misstating the testimony. I
2 don't believe Dr. Wallach made an affirmative statement that
3 the prosecution history has nothing to do with the patent,
4 which is what he is basing his argument on.
5 MR. HANNAH: The province of a rebuttal expert
6 is to get up and rebut.
7 THE COURT: I am not sure that it is not proper
8 rebuttal. I don't disagree, necessarily, with your
9 opponent, about cross-examination. I am not sure that
10 renders this improper rebuttal.
11 My concern is the issue of notice. That is
12 really where, as they say, the rubber meets the road, Ms.
13 Kobialka. I am trying to give you an opportunity to tell me
14 why you think they have had adequate notice on this witness
15 are prepared to do what they can with this witness on cross.
16 MS. KOBIALKA: I think they can definitely cross
17 him. They have always known the prosecution history of one
18 of the patents they are asserting is going to be at issue
19 here. To the extent they are going to have an expert get up
20 and not rely on anything in it, and it is critical to one of
21 his opinions on infringement, we need to have the
22 opportunity to rebut that.
23 Dr. Wallach didn't disclose it in his report,
24 specifically. You know, there has been a certain amount
25 of --

1482

Jaeger - direct

1 THE COURT: If it is critical to his opinion or
2 noninfringement, why didn't he talk about it in his report?
3 MS. KOBIALKA: He did. This is the problem. He
4 did talk about this issue. He relied on other things as
5 well.
6 THE COURT: Then why don't you use the other
7 things. I will let you do that. But I am not going to let
8 you do this.
9 (End of sidebar conference.)
10 BY MS. KOBIALKA:
11 Q. We were talking about why it is important regarding
12 the network request, then having to query. I would like to
13 know, did you read any deposition testimony that supported
14 your conclusion with regard to the ordering?
15 A. Yes. I read Mr. Chew's testimony, deposition
16 testimony.
17 Q. What in Mr. Chew's testimony provides you with that
18 basis to support your opinion?
19 A. Well, Mr. Chew's testimony told me that the main --
20 well, that doing the query after the network request, as I
21 said before, gave you the current state of the directory
22 server. And this was of significant value -- I am
23 paraphrasing, it's been a while since I read it -- of the
24 patent itself.
25 Q. So it was important that the network request, and then

1483

Jaeger - direct

1    there was the query.  Is that correct?
2    A.    Yes.
3    Q.    All right.  Just remind us, is Mr. Chew an inventor on
4    the '361 patent?
5    A.    Yes, he is.
6    Q.    Now, let's turn to what the NG appliances do.
7            JTX-14.
8            Have you reviewed this document, JTX-14?
9    A.    Yes, I have.
10   Q.    Turning to this particular page, it's 3-2 -- can we
11   show the next page, too.  Both of them at the same time,
12   which is also 3-3.
13           What do these pages tell you about the NG
14   appliances?
15   A.    These pages tell me that the NG appliance comes with
16   its own database.
17   Q.    Why is that important?
18   A.    Well, this database stores information about the user
19   community that it will use in determining whether to
20   authorize a network, an application request, a URL request,
21   for example.
22   Q.    So we are looking at 3-2, 3-3.  Does this continue on
23   for a few pages?
24   A.    Yes, it does.  There are two database options that
25   they have.

1484

Jaeger - direct

1    Q.    Why don't we take a look at DTX-1069, 12-4.  This is
2    the document that Dr. Wallach relied on.
3            What does this page tell you?
4    A.    So this page describes how the administrators interact
5    with a directory server through the NG appliance.  So if you
6    optionally wanted to import information from the directory
7    server to the NG appliance, into the NG appliances database,
8    you would configure that through the commands that they are
9    talking about there.
10   Q.    If we go two pages beyond that, 12-6, what does this
11   tell you?
12   A.    This tells me two things.  One is how frequently you
13   will do this importation, so the administrator can set it up
14   so that the importation is done on a certain regularity
15   here.  In this example, it says every two days.  You can't
16   really read it from there.
17           Thank you.
18           So what's going to happen in this configuration
19   is that the NG appliance, every two days, is going to go and
20   import some information from the directory server.
21           Now, the section below this, the window below
22   this, what you can do is, you can choose which groups.  So
23   we haven't really talked about what is in the directory.
24   But you can think of the directory as storing something that
25   looks like an organizational chart.

1485

Jaeger - direct

1            So you will have a company, you might have major
2    organizations, departments, groups.  And at the bottom you
3    will have individuals.
4            In computer science we call those leaves, which
5    would be the individual people, and there would be
6    information about those individual people, and you are going
7    to use that to determine whether to allow the request.
8            With the NG appliance, you can get the -- the
9    administrator can get a view of the entire directory server
10   and choose which specific groups they want to download.
11   What they will do is choose a specific set of groups, and
12   those groups will then be imported into the database.  And
13   when we do this update, we have two days in this case, we
14   will import the same groups that have already been
15   configured.
16   Q.    What we have just discussed, this supports your
17   opinion why the NG appliances do not infringe Claims 8
18   through 12, 14 and 15.  Is that correct?
19   A.    That is correct.
20   Q.    Let's turn to your next opinion with regard to
21   noninfringement.
22   A.    Okay.  That's right.  I start.  It's my opinion, yes.
23           So the fourth reason is that the -- there is
24   claim language that the rules, these are called
25   authorization filters, that are used by a device that would

1486

Jaeger - direct

1    infringe on this claim, that these rules have a -- are
2    generated based on the, what's called the schema or
3    directory schema.
4            This is a very complex and subtle point.  But
5    you could think of a schema, when you go to work somewhere
6    for the first time, you know, the company might give you a
7    form and ask you to fill out information about yourself,
8    what's your name, where do you live, when were you born,
9    these kinds of things.
10           So you would fill out this form.  And the form,
11   the structure of the form would constitute what's analogous
12   to a schema.  What a schema is is the structure of the
13   entries in the database.  So it's, you know, if you are
14   familiar with spread sheets, they are the fields at the top
15   where you would have the employee name, here is where you
16   put the employee number, here is where you put where they
17   were born, where they live, so on and so forth.  And every
18   employee would have a record in that directory, schema.
19   Those again would be the leaves in the directory itself.
20           Basically, you fill out this form, and then your
21   information gets placed in the directory, depending on what
22   groups you want.
23   Q.    Turning to the claim language, this highlights the
24   language.  Is it in the last portion of Claim 1,
25   authorization filter is generated based on a directory

1487

Jaeger - direct

1  schema?

2  A.    That's right.

3  Q.    Okay. If we could turn to the next slide, 122. Is it

4  your understanding that this element appears in all of the

5  asserted claims of the '361 patent?

6  A.    Yes, it does.

7  Q.    Let's turn to Claim 8. Does it appear in 8(b)?

8  A.    Yes, it does.

9  Q.    Keep moving through, Claim 15?

10 A.    Under the second computer readable program code.

11 Q.    An authorization filter that is generated based on a

12 directory schema. Is that correct?

13 A.    That is correct.

14 Q.    Do the NG appliances base their authorization filter

15 on a directory schema?

16 A.    So the authorization filter is the, in the NG

17 appliance, is the stuff that's stored in the NG appliance's

18 database. So it uses the information in its own database to

19 determine whether you are allowed to send a packet or not.

20        So this database is populated by information you

21 import from a directory. But the database base's structure,

22 that is the form that was used to determine what was in the

23 database, can be used without the directory. So this

24 structure or schema is independent of the directory itself.

25 Q.    Why don't we turn to DTX-1069 at 12-4.

1488

Jaeger - direct

1        Did you review Dr. Wallach's testimony regarding

2  this particular page?

3  A.    Yes, I did.

4  Q.    Does this page define authorization filters or

5  anything on this page? Is there anything that defines

6  authorization filter?

7  A.    This page describes the process of how you set up

8  import and export. So it doesn't describe the structure of

9  the filter. It describes how you would get information to

10 fill in the values for particular users from the directory.

11 Q.    Let's turn to the last bit. Why don't we take a look

12 at Claim 4, which is 121.

13        So in Claim 4, do you see the element, a

14 per-user authentication scheme?

15 A.    Yes, I do.

16 Q.    Do you have an opinion with regard to all the claims

17 that have some form of authentication scheme in them?

18 A.    Yes, I do.

19 Q.    What is that opinion?

20 A.    My opinion is that the NG appliances do not implement

21 an authentication scheme, do not.

22 Q.    Let's quickly look at which claims have this

23 particular requirement. So we have identified Claim 4. Is

24 there any other ones on this page?

25 A.    There is Claim 4, Claim 5.

1489

Jaeger - direct

1  Q.    Can we turn to the next slide?

2  A.    And Claim 11 and Claim 12.

3  Q.    What does it mean when they use this language per-user

4  authentication scheme?

5  A.    So the term authentication has a very specific meaning

6  in computer security. So we talk in computer security about

7  Alice and Bob. That's A and B, we just use names for them.

8  The idea of an authentication scheme is that it enables you

9  to really, really, to verify that you really are talking to,

10 say, Alice at a particular time.

11        I could send you a message -- I am not Alice,

12 presumably. I could say, you know, I am Alice. And, you

13 know, you could choose to believe that I am Alice or not.

14 But you haven't really verified whether I am Alice. And in

15 this case I am not Alice.

16        In order to do authentication, in order to

17 really know whether you are talking to Alice or not, in

18 order to implement a scheme that would verify that, you need

19 to have some secret that you share with Alice.

20        So what we will talk about mostly are passwords,

21 and that's mostly what's used these days. We wish we could

22 use more things. Traditionally, and I think you probably

23 all have, if you use computers, frequently will have

24 passwords you will use to authenticate. The idea is that

25 the server in your authenticating, too, will have some

1490

Jaeger - direct

1  password, will have some secret. And Alice will have to

2  prove to you that she knows that secret. If she can't prove

3  to you that she knows that secret, you are not going to

4  authenticate her. You are going to say, you are not Alice.

5  You have not passed authentication.

6        And the NG appliances themselves do not

7  implement an authentication scheme. They don't store such

8  secrets. They don't implement the mechanism that uses such

9  secrets in order to authenticate Alice or Bob or anybody

10 else.

11 Q.    Looking at Claim 8, do you see where it reads at the

12 beginning an authentication method?

13 A.    Yes, I do.

14 Q.    Is this also that same --

15 A.    So this is a bigger method. What they are saying here

16 is that you are going to gain access to the network. You

17 are going to be able to submit a network request by

18 authenticating. And that describes the whole -- it

19 describes the whole method. The whole method basically will

20 enable the system to authenticate you as Alice or Bob.

21        Using that information and other rules about

22 whether you are allowed to send a request to a particular

23 URL, it will then -- it doesn't say that. I am talking

24 about the Finjan one, it will basically use whatever -- it

25 will authenticate you, and if you succeed in authenticating,

Jaeger - direct

1  it may let you go through. It doesn't really talk about --
2  sorry.
3          It will succeed in authenticating and pass the
4  authorization filter and let it go through.
5  Q.    The NG appliances don't utilize an authentication
6  method?
7  A.    They do not implement an authentication method at a
8  firewall consisting of those steps, no.
9  Q.    Okay. So that, then, supports your opinion of
10  noninfringement with regard to Claims 8 through 12 and 14.
11  Correct?
12  A.    Correct.
13  Q.    Why don't we turn to the next slide for Claim 15. I
14  believe this authentication process also appears in the
15  beginning, where it says a computer program product for
16  enabling a processor in a computer system to implement an
17  authentication process.
18  A.    That's correct.
19  Q.    Is that the same type of thing we had just discussed?
20  A.    Yes, it is.
21  Q.    Is it also your opinion that there is no infringement
22  of Claim 15 in connection with the authentication process?
23  A.    That is correct.
24  Q.    There is also some language, per service, that was
25  used, I believe, in Claim 5. What does per service mean?

Jaeger - direct

1  A.    So a service is some, basically, program that is
2  listening on the network. So there are services for logging
3  into computers. There are services for sending e-mail.
4  There are services for using a web. And so these define
5  specific network facing is the term we will use,
6  functionality that you can communicate with over the
7  Internet.
8          So we have in the patent two types of
9  authentication. One is per user, and one is per service.
10  The idea -- the distinction they are making is that, in my
11  opinion, is that you can authenticate as Alice or Bob. You
12  can say, okay, I will be Bob this time. So you are Bob.
13  And I want to gain access to the network. And so the
14  firewall will run some scheme to authenticate that you are
15  really Bob, and then based on determining that you are Bob,
16  it will let you have whatever access that you want, that it
17  will authorize.
18          The other thing is you may ask to authorize for
19  a specific service, maybe for e-mail. So you will just ask
20  to authorize for that particular service. So you are going
21  to say I am going to authorize Bob to use the e-mail
22  service. And that is all.
23  Q.    Dr. Jaeger, do you have an understanding of what is
24  meant by inducing infringement?
25  A.    Yes.

Jaeger - direct

1  Q.    Do you have an opinion regarding whether Finjan has
2  induced infringement of the asserted claims of the '361
3  patent as a result of its NG appliances?
4  A.    My opinion is they have not induced infringement, the
5  NG appliance has not induced infringement of the '361
6  claims.
7  Q.    Has there been any evidence of any inducing
8  infringement that you were able to read in Dr. Wallach's
9  testimony?
10  A.    I saw no specific case.
11  Q.    Do you have any other bases for your opinion regarding
12  no inducing of infringement by Finjan?
13  A.    Yes, I do.
14  Q.    Are those the same as you have discussed already this
15  morning?
16  A.    Yes.
17  Q.    Why don't we turn to now the assertion of invalidity
18  with regard to the '361 patent.
19          What was your determination regarding whether or
20  not the asserted claims of the '361 patent were valid?
21  A.    So my determination was that the claims of the '361
22  patent are invalid.
23  Q.    Was it based on your theory of anticipation and
24  obviousness?
25  A.    Yes. It was based on both.

Jaeger - direct

1  Q.    What is your understanding of what we mean them by
2  anticipation?
3  A.    So by anticipating, my understanding is that this
4  requires one reference to disclose or one system to disclose
5  all of the elements of all the claims in the patent, in this
6  case the '361 patent.
7  Q.    And what is your understanding of obviousness?
8  A.    So my understanding of obviousness is that obviousness
9  requires that one obtain one or more references, and these
10  references, with some -- if you have more than one you have
11  to show motivation. Would it be sufficient for someone
12  skilled in the state of the art to be able to fulfill all
13  the elements of all the claims in the patent?
14  Q.    What reference did you rely upon to form your opinion
15  regarding invalidity?
16  A.    So I used the Check-Point Firewall 1, its architecture
17  and the administration document.
18  Q.    It's PTX-188.
19          Is this the document that you are referring to?
20  A.    Yes, it is.
21  Q.    Do you refer to it sometimes as the Check-Point
22  reference or the CP reference?
23  A.    I think usually the CP reference.
24  Q.    Now, was this particular reference cited to the Patent
25  Office during the time that they were applying for a patent

1563

1 that claim. You must consider each patent claim separately,
2 as I have told you several times now.
3     A claim limitation is literally present if it
4 exists in the accused product, just as it is described in
5 the claim language, either as I have explained that language
6 to you, or if I did not explain it, as you understand it.
7     I will explain something called the doctrine of
8 equivalents. I mentioned it earlier.
9     As I said, an accused infringer can directly
10 infringe a claim of a patent either literally or under the
11 doctrine of equivalents.
12     Now, under the doctrine of equivalents, an
13 accused product can infringe an asserted patent claim if it
14 performs steps that are identical or equivalent to the
15 requirements of the claim. If the accused product does not
16 perform an identical or equivalent step to even one step of
17 that particular asserted patent claim, the accused product
18 cannot infringe the claim under the doctrine of equivalents.
19 Thus, in making your decision under the doctrine of
20 equivalents, you must look at each individual requirement of
21 the asserted patent claim and decide whether the accused
22 product performs an identical or equivalent step to that
23 individual claim requirement.
24     A step performed by an accused product is
25 equivalent to a requirement of an asserted if a person of

1564

1 ordinary skill in the field would think that differences
2 between the step and the requirement were not substantial as
3 of the time of the alleged infringement. One way to decide
4 whether any difference between a requirement of an asserted
5 claim and a step performed by the accused product is not
6 substantial is to consider whether, as of the time of the
7 alleged infringement, the step of the accused product
8 performed substantially the same function, in substantially
9 the same way, to achieve substantially the same result as
10 the requirement in the patent claim.
11     In deciding whether any difference between a
12 claim requirement and the accused product is not
13 substantial, you may consider whether, at the time of the
14 alleged infringement, persons of ordinary skill in the field
15 would have known of the interchangeability of the step with
16 the claimed requirement. The known interchangeability
17 between the claim requirement and the step of the accused
18 product is not necessary to find infringement under the
19 doctrine of equivalents. The same step of the accused
20 product may satisfy more than one element of a claim.
21     This is a discussion about inducing
22 infringement.
23     A person induces patent infringement if he or
24 she purposely causes, urges, or encourages another to
25 infringe a patent. Inducing infringement cannot occur

1565

1 unintentionally. This is different from direct
2 infringement, which, as I have told you, can occur
3 unintentionally. In order to induce infringement, there
4 must first be an act of direct infringement and proof that
5 the defendant knowingly induced infringement with the intent
6 to encourage the infringement. Intent to cause the acts
7 that produce direct infringement is not enough to show
8 inducement of infringement. Finjan must have affirmatively
9 intended to cause direct infringement and must have known or
10 should have known that its actions would induce actual
11 infringement. It must be established that Finjan possessed
12 specific intent to encourage another's infringement and not
13 merely that Finjan had knowledge of the acts alleged to
14 constitute inducement. Secure Computing has the burden of
15 showing that Finjan induced infringing acts and that Finjan
16 knew or should have known their actions would induce actual
17 infringement.
18     Willful infringement.
19     Finjan contends that Secure Computing has
20 willfully infringed the claims of its patents. If you find,
21 on the basis of the evidence and the law as I have explained
22 it, that Secure Computing directly infringes at least one
23 valid and asserted claim of the '194 patent, the '780 patent
24 or the '822 patent, you must then decide whether or not
25 Secure Computing's infringement was willful.

1566

1     Although the patent owner must prove
2 infringement by a preponderance, or by the preponderance of
3 the evidence standard, the burden of proving that the
4 infringement was willful is the clear and convincing
5 standard.
6     Proof of willful infringement requires a showing
7 of objective recklessness. To establish willful
8 infringement, a patent owner must prove by clear and
9 convincing evidence that the alleged infringer proceeded
10 with the activities that are accused of infringement with an
11 objectively high likelihood that its actions constituted
12 infringement of a valid patent. The state of mind of the
13 alleged infringer is not relevant to this objective inquiry.
14 If the patent owner proves that objective threshold, then
15 the patent owner must prove that the objectively high risk
16 or likelihood of infringement was either known, or so
17 obvious that it should have been known, to the accused
18 infringer. The accused infringer's state of mind is
19 relevant to this second inquiry.
20     The fact that you may have determined that the
21 patent is infringed does not alone mean that the
22 infringement was willful.
23     On to validity, or invalidity.
24     Only a valid patent may be infringed. For a
25 patent to be valid, the invention claimed in the patent must

1575

1 reason to pursue the known options within his or her

2 technical grasp. If this leads to the anticipated success,

3 it is likely the result of ordinary skill and common sense,

4 not innovation.

5        In deciding obviousness, you must avoid using

6 hindsight; that is, you should not consider what is known

7 today or what was learned from the teachings of the patent.

8 You should not use the patent as a roadmap for selecting and

9 combining items of prior art. You must put yourself in the

10 place of the person of ordinary skill at the time the

11 invention was made.

12        In determining whether or not these claims would

13 have been obvious, you should make the following

14 determinations:

15        First, what is the scope and content of the

16 prior art?

17        Second, what differences, if any, are there

18 between the invention of the claims of the patent and the

19 prior art?

20        Next, what was the level of ordinary skill in

21 the art at the time the invention was made?

22        Next, are there any objective indications of

23 nonobviousness?

24        Against this background, you must decide whether

25 or not the invention covered by the patent claims of

1576

1 Finjan's patents would have been obvious.

2        I will say it again. In this case, Secure

3 Computing contends that Claims 1 through 14, 24 through 30,

4 32 through 36 and 65 of the '194 patent are invalid because

5 they are rendered obvious by combinations of the following:

6 the Shaio reference, the FWTK reference, the Hershey

7 reference, the Lo 1991 reference, the Lo 1994 reference, the

8 Ji reference, that is the Ji 1995 reference, the Chen

9 reference, the Authenticode reference, and the Signed Java

10 reference.

11        Now, Secure Computing contends Claims 1 through

12 6, 9 through 14 and 18 of the '780 patent are invalid

13 because they are rendered obvious by the knowledge of one of

14 ordinary skill in the art in combination with known methods

15 of applying digital signature to code, such as the

16 Authenticode reference and the Signed Java reference.

17 Secure Computing contends that Claims 4, 6, 8, 12, and 13 of

18 the '822 patent are invalid because they are rendered

19 obvious by the Ji 1997 reference. If you find that Secure

20 Computing has proved by clear and convincing evidence that

21 these claims are obvious, you must find that the claims are

22 invalid.

23        In this case, Finjan contends that Claims 1

24 through 5, 7 through 12, and 14 through 15 of the '361

25 patent are invalid because they are rendered obvious by the

1577

1 CP reference, the LDAP reference, the LDAP authentication

2 reference, and the AD reference. Finjan contends that Claim

3 37 of the '010 patent is invalid because it is rendered

4 obvious by the SESAME reference, the SAM reference, the

5 Apache reference and the RBAC reference. If you find that

6 Finjan has proved by clear and convincing evidence that

7 these claims are obvious, then you must find that the claims

8 are invalid.

9        Now I will describe in more detail the specific

10 determinations you must make in deciding whether or not the

11 claimed invention would have been obvious.

12        Determining the scope and content of the prior

13 art means that you should determine what is disclosed in the

14 prior art, relied on by Finjan and Secure Computing. You

15 must decide whether the prior art was reasonably relevant to

16 the particular problem the inventor faced in making the

17 invention covered by the patent claims. Such relevant prior

18 art includes prior art in the field of the invention, and

19 also prior art from other fields that a person of ordinary

20 skill would look to when attempting to solve the problem.

21        Now, in determining the differences between the

22 invention covered by the patent claims and the prior art,

23 you should not look at the individual differences in

24 isolation. You must consider the claimed invention as a

25 whole and determine whether or not it would have been

1578

1 obvious in light of the prior art to a person of ordinary

2 skill at the time of the invention.

3        It is common sense that familiar items may have

4 been obvious beyond their primary purposes, and a person of

5 ordinary skill often will be able to fit the features

6 multiple prior art together, like pieces of a puzzle.

7 Multiple references in the prior art can be combined to show

8 that a claim of a patent is obvious. Any need or problem

9 known in the field and addressed by the patent can provide a

10 reason for combining the elements in the manner claimed. To

11 determine whether there was an apparent reason to combine

12 the known elements in the way a patent claims, you can look

13 to interrelated teachings of multiple patents, to the

14 effects of demands known to the design community or present

15 in the marketplace, and to the background knowledge

16 possessed by a person of ordinary skill in the field or in

17 the art. Neither the particular motivation of the person of

18 ordinary skill nor the alleged purpose of the patentee

19 controls. One of ordinary skill is not confined only to

20 prior art that attempts to solve the same problem as the

21 patent claim.

22        In deciding whether to combine what is described

23 in various items of prior art, you should consider whether

24 there was an apparent reason for a skilled person to combine

25 the known elements in the fashion claimed by the patent at

1631

1    Well, it's because Mr. Degen considered the real
2  evidence, and Mr. Parr put a turtle on a fence post. That's
3  what he did. Mr. Parr said, well, I would like to have
4  operating profit, product-specific operating profit. But
5  there is no such information, so I have to do some jiggering
6  with the numbers, and I came up with this really high
7  royalty rate.
8    What did Mr. Degen do? What Mr. Degen did is he
9  looked at three specific documents. First, let's go to
10 Exhibit 1340. You have seen this. This is where he takes
11 all the information on the operating profits, specific
12 information of Webwasher, and he puts it in this chart. And
13 he calculates an operating profit. And the number he comes
14 up with is 16 percent.
15   One of the things we know he did in this case
16 was he did not take into account the operating profit for
17 Webwasher when CyberGuard owned it. If he had done that,
18 the 16 percent would have been a lower number, because as
19 you can see, CyberGuard never made any money when they had
20 this product. It was down to 16 percent. Where did he get
21 that information from? The same place Mr. Parr could have.
22 There were three documents. Exhibits, Defendants' Exhibits
23 1319, 1320 and 1321. That is 1319, 1320, and 1321. You
24 have seen them before. I don't need to flash them up here
25 again. I will just flash up, you know, one of them I think

1632

1  here.
2    I think it was Page 2 here, we talked about was
3  the source of some numbers, as you can see, it was, you
4  know, consolidated Webwasher revenues. It's packed full of
5  all the financial information. And, you know, this is not
6  made-up information, folks.
7    The date of this information -- let's look at
8  this. The date of this information is June 30, 2005. There
9  was no lawsuit on June 30, 2005. There was no threat of a
10 lawsuit on June 30, 2005. This was CyberGuard going about
11 their business, keeping numbers in the ordinary course of
12 their business.
13   Mr. Parr had this information. He had this
14 document. And he had two other product-specific documents.
15 He chose to ignore them and not use them.
16   He decided, instead of looking at the actual
17 numbers and the actual facts, he was going to put a turtle
18 on a fence post. But he didn't stop there. He didn't stop
19 there.
20   That just is one of the starting spots.
21   So you have this number of 16 percent. He had a
22 much higher number. Then what do you do? You decide, well,
23 you can take a quarter to a third. Mr. Parr took a third,
24 about 32 percent, actually, and Mr. Degen took a quarter.
25 Why did he do that? Mr. Degen testified that Mr. Parr said

1633

1  that Webwasher wasn't willing to license their product. But
2  that's not true. And we looked at three specific instances
3  where they had agreed to license their product.
4    I am going to show you one of those, which I
5  will call the Alladin letter, it is Exhibit 1075. As you
6  can see, this is a letter about the patented technology from
7  Finjan that he is offering to license.
8    And it includes a reference to the '194 patent.
9  And on the last page, you know, you have seen this
10 paragraph, where it clearly shows that you need to make
11 arrangements if Alladin wants to use our technology and it
12 needs to be authorized, in other words, a license.
13   So there was Webroot letter that we looked at,
14 the Alladin letter, and, of course, there is the Microsoft
15 license. Let's talk about that Microsoft license for a
16 moment.
17   I am not going to mention the numbers in it,
18 because I would like Mary Bunch to be able to stay in the
19 room here. Here is what we know about the Microsoft
20 license.
21   The Microsoft license was for all their patents.
22 All of them. All their patents, all their patent
23 applications, all their continuing applications. All their
24 foreign patents and foreign applications. You remember what
25 the number is. Think about that number and think about the

1634

1  number that they want in this case.
2    Ask yourself this: They have given the keys to
3  their company, all their patents and all their technology,
4  to the largest, what you heard at least two of their own
5  witnesses say, the largest software company in the world.
6  The largest software company in the world has the ability to
7  compete with them, has what Mr. Parr repeatedly referred to
8  as freedom to operate.
9    They don't have to pay anything else. They
10 don't have to pay yearly fees, nothing.
11   What have they done in this Court? They have
12 said, see this turtle up here, it's 18 percent for two years
13 and no freedom to operate. No freedom to operate.
14   My mother would call that unmitigated gall.
15 That's what it is.
16   One other point on this before we move on.
17   The last factor that the damage experts consider
18 is called the hypothetical negotiation, which is, you know,
19 when you come with a royalty rate under this Georgia-Pacific
20 factor by having the two parties in a room on the eve of
21 negotiations, eve of use of the technology, which would be
22 in late '05. So you have got Finjan on one side of the room
23 and Webwasher at the time, CyberGuard -- CyberGuard recently
24 purchased Webwasher -- on the other side. And you would
25 have Finjan coming into the room saying, we want 18 percent.

1659

1 them testified about that.

2 I think it is a fair comment on the opportunity

3 to examine evidence and not, I think especially in light of

4 the serious copying charges that have been routinely levied

5 here in this courtroom.

6 THE COURT: I agree that they have alleged

7 copying in support of, I gather, among other things, their

8 contentions about willful infringement, their claim of

9 willful infringement. That question -- and I will let Mr.

10 Andre respond -- is, in your view, does it open the door to

11 fair comment to the extent that it invites the jury to

12 disregard an instruction that I gave them?

13 MR. SCHUTZ: It was not certainly not intended

14 by me to disregard the instruction.

15 THE COURT: I am not accusing you of that. I am

16 just asking if you don't think that might have happened.

17 MR. SCHUTZ: No, I don't.

18 One other comment. He did also put up on the

19 screen testimony and elicited from his witness to do a

20 Finjan search. I couldn't sit there and not comment. They

21 found the word Finjan in our source code. So I think it was

22 fair comment to say he never then said it's the same source

23 code as this.

24 The implication that I submit counsel was trying

25 to leave this jury with was that because the word Finjan was

1660

1 in the source code, which they flashed up here again, that

2 we copied the source code. I think that is the clear

3 implication that counsel was trying to get. I am sure he

4 will deny it.

5 I think my comment was eminently reasonable and

6 fair.

7 THE COURT: I don't disagree with your assertion

8 with regard to the likely, the intended use and inference

9 that they would like the jury to draw. I don't disagree

10 with that.

11 I am just not sure I still don't have the

12 concern.

13 Let me hear.

14 MR. ANDRE: Your Honor, when I heard the

15 comment, I was concerned. We should be comparing product to

16 claims. When I heard that, in a particular infringement

17 case, it is the accused products to the claims as

18 interpreted by the Court. My ears perked up as well,

19 because I think there is going to be a product-to-product

20 comparison for the infringement. Copying is an issue on

21 willfulness, not infringement itself. I do have that

22 concern, as Your Honor does.

23 THE COURT: Well, I am simply going to remind

24 the jury -- I am not going to comment on your comment. I am

25 going to remind the jury it is their obligation to follow my

1661

1 instructions and I have instructed them that you do not

2 compare products, you compare claims to accused products.

3 MS. KOBIALKA: There was an exhibit that was

4 never displayed to the jury. This is the Microsoft license

5 we had to close the courtroom for. They are insisting it

6 needs to go back to the jury.

7 MR. ROVNER: It was never shown.

8 MR. SCHUTZ: That is fine.

9 (End of sidebar conference.)

10 THE COURT: Before you go back, ladies and

11 gentlemen, I simply want to remind you of an earlier

12 instruction that I gave you. You got so many.

13 But that is, your job is, of course, to follow

14 my instructions, but to remember in discharging your

15 responsibility to determine whether there is infringement on

16 either side, because there are patents being asserted,

17 patents being asserted by both parties and certain claims of

18 both patents being asserted, you must compare the claim of

19 the asserted patent to the accused product.

20 It's not a comparison of products. It's a

21 comparison of claim to product. Okay?

22 So, Ms. McDavid, will you swear our jury

23 officer.

24 (Jury officer sworn.)

25 THE COURT: In case you didn't hear, he has been

1662

1 sworn to keep you safe and keep anyone from bothering you.

2 As I told you in my closing instruction, your

3 first duty, again, conduct your deliberations the way you

4 want, but I am suggesting that you first pick a foreperson.

5 I then would suggest that, given the hour of the day, you

6 determine whether you want to begin the deliberations this

7 evening or whether you want to come back tomorrow morning

8 and begin them at 9:00.

9 We will await word from you through the

10 foreperson that you select. You can communicate that

11 through your jury officer.

12 (At 3:50 p.m. the jury left the courtroom.)

13 THE COURT: So, counsel, what I need from you is

14 to make sure Ms. McDavid has contact information for you.

15 If they decide they don't want to continue to deliberate, I

16 won't need you. I will release them back from the jury

17 room. And they will be back here tomorrow at 9, as you

18 heard.

19 Good luck, counsel.

20 MR. ANDRE: Your Honor, is it okay if we wait

21 here to see if they are going to deliberate tonight or not?

22 THE COURT: You can wait if you want. We can

23 call and notify you, if you would like.

24 We will call Delaware counsel.

25 MR. ROVNER: Your Honor, I will file those jury

```
 1    instructions that you read when I get back to the office.
 2    They have not been filed.
 3              THE COURT:  I have the originals.  We will scan
 4    them in.
 5              MR. ROVNER:  That is fine.
 6              THE COURT:  Thank you, counsel.
 7              (Court recessed.)
 8                     - - -
 9
10    Reporter:  Kevin Maurer
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```