## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

FINJAN SOFTWARE, LTD., an Israel corporation,

    Plaintiff,

    v.

SECURE COMPUTING CORPORATION, a Delaware corporation, CYBERGUARD, CORPORATION, a Delaware corporation, WEBWASHER AG, a German corporation and DOES 1 THROUGH 100,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 06-369 GMS

**PUBLIC VERSION**

---

**PLAINTIFF FINJAN SOFTWARE LTD.'S OPPOSITION TO
DEFENDANT-COUNTERCLAIMANTS' MOTION FOR JUDGMENT AS A MATTER
OF LAW PURSUANT TO FED. R. CIV. P. 50 AND, IN THE ALTERNATIVE, MOTION
FOR NEW TRIAL AND/OR REMITTITUR PURSUANT TO FED. R. CIV. P. 59**

OF COUNSEL:

Paul J. Andre
Lisa Kobialka
KING & SPALDING LLP
1000 Bridge Parkway
Suite 100
Redwood Shores, CA 94065
(650) 590-0700

Dated: May 9, 2008
Public Version: May 16, 2008

Philip A. Rovner (#3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

Attorneys for Plaintiff
Finjan Software, Ltd.

**TABLE OF CONTENTS**

I. NATURE AND STAGE OF PROCEEDING ............................................................1

II. SUMMARY OF ARGUMENT ...........................................................................1

III. STATEMENT OF FACTS ................................................................................2

IV. ARGUMENT...................................................................................................2

    A.    NO GROUNDS EXIST TO OVERTURN THE JURY'S VERDICT, GRANT A NEW TRIAL OR REDUCE THE DAMAGES AWARD...................2

    B.    DEFENDANTS WILLFULLY INFRINGED FINJAN'S PATENTS. ...................3

        1.    Finjan Presented Substantial Evidence Of Willful Infringement. ..............3

        2.    Defendants Acted With Reckless Disregard With Respect To Finjan's Patents .......................................................................................5

    C.    FINJAN PROVIDED SUBSTANTIAL EVIDENCE PROVING INFRINGEMENT OF THE THREE FINJAN PATENTS. ...................................7

        1.    Prosecution History Estoppel Simply Does Not Apply As Defendants Failed To Raise It At Trial And Adduce Evidence To Support Such A Claim. .................................................................................7

        2.    During The Prosecution Of The '780 Patent, There Were No Narrowing Amendments That Relate To Defendants' Defense To Infringement.................................................................................................8

        3.    Finjan Presented Substantial Evidence of Infringement Under DOE. .........................................................................................................11

        4.    Finjan Properly Applied the Court's Construction to the Asserted Claims. .......................................................................................................13

    D.    THE WEBWASHER PRODUCTS RECEIVE A DOWNLOADABLE ADDRESSED TO A CLIENT.............................................................................14

        1.    Finjan Put Forward Overwhelming Evidence That the Webwasher Products Receive a Downloadable "Addressed To a Client." ..................14

        2.    Defendants' Arguments Regarding "Addressed to a Client" Are Factually Inaccurate and Mischaracterize Dr. Vigna's Testimony............16

        3.    Construing the '194 Patent Claim Element "Addressed to a Client" As Its Plain And Ordinary Meaning Was Correct. ....................................17

        4.    The Webwasher Products Create a List of Suspicious Computer Operations. .................................................................................................19

E.    FINJAN PROVED THE WEBWASHER PRODUCTS INFRINGE THE '822 PATENT USING A LEGALLY CORRECT INTERPRETATION OF THE CLAIMS......................................................................................23

F.    THERE IS SUBSTANTIAL EVIDENCE SUPPORTING INFRINGEMENT OF METHOD CLAIMS. ........................................24

G.    FINJAN PRODUCED SUBSTANTIAL EVIDENCE AT TRIAL THAT THE WEBWASHER PRODUCTS INFRINGED EVEN IF THE FUNCTIONALITY WAS DISABLED............................................................26

H.    THE COURT SHOULD UPHOLD THE REASONABLE FINDING OF THE JURY AT TRIAL THAT THE FINJAN'S PATENTS ARE VALID...........28

    1.    Defendants Did Not Present Substantial Evidence That Finjan's Patents Were Invalid and Failed to Show That A New Trial is Warranted..................................................................................28

    2.    Defendants Failed To Provide Substantial Evidence at Trial That The Independent Claims of the '194 Patent Were Rendered Obvious By Combining the Ji 95 Reference with Chen or the Lo 1994 Reference and Failed To Show That A New Trial is Warranted..................................................................................31

    3.    Defendants Failed To Provide Substantial Evidence That The Dependent Claims of the '194 Patent Were Rendered Obvious and Failed to Show That a New Trial is Warranted. .........................................34

    4.    There Was Substantial Evidence Of Secondary Considerations of Non-Obviousness...................................................................37

    5.    Defendants Failed To Provide Substantial Evidence At Trial that The '780 Patent is Invalid and Failed to Show That A New Trial is Warranted..................................................................................38

    6.    Defendants Failed To Provide Substantial Evidence At Trial that The '822 Patent is Invalid and Failed to Show That A New Trial is Warranted..................................................................................39

I.    THE JURY'S FINDING REGARDING DAMAGES WAS SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE, THE DAMAGES AWARD WAS NOT INTRINSICALLY EXCESSIVE AND THE AWARD DID NOT "SHOCK THE CONSCIENCE" IN LIGHT OF THE EVIDENCE PRESENTED AT TRIAL.......................................................................41

    1.    The Great Weight Of The Evidence Supports The Jury's Damages Award.............................................................................41

    2.    ████████████████████████████████████████.........................42

3.    The Jury's Determination that Finjan is Entitled to a 16% and an 8% Royalty Rate on Infringing Sales of Software and Appliances Respectively is Supported by the Evidence Considered by the Jury. ........44

4.    The Jury's Determination of the Royalty Base is Supported by the Evidence Presented at Trial. ...................................................................46

J.    FINJAN'S NG APPLIANCES DO NOT INFRINGE THE CLAIMS OF THE '361 PATENT. .............................................................................................48

1.    Defendants Assertions, even if believed, do not support a JMOL.............48

2.    Finjan does not Infringe the '361 Patent.....................................................48

V. CONCLUSION.............................................................................................................50

# TABLE OF AUTHORITIES

### CASES

Abbott Labs. v. Syntron Bioresearch, Inc.,
    334 F.3d 1343 (Fed. Cir. 2003)...........................................................................13, 24

Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.,
    485 F.Supp.2d 519 (D. Del. 2007)..............................................................................22

Bell Commc'ns Rsch., Inc. v. Vitalink Commc'ns Corp.,
    55 F.3d 615 (Fed. Cir. 1995)........................................................................................24

Black and Decker, Inc. v. Robert Bosch Tool Corp.,
    No. 2007-1243, 2007-1244, 2008 WL 60501 (Fed. Cir. Jan. 7, 2008)......................7

BMC Resources, Inc. v. Paymentech, L.P.,
    498 F.3d 1373 (Fed. Cir. 2007)...................................................................................25

Boyce v. Edis Co.,
    224 F.Supp.2d 814 (D. Del. 2002)..........................................................................3, 42

Caver v. City of Trenton,
    420 F.3d 243 (3d Cir. 2005)..........................................................................................2

Chainey v. Street,
    2008 WL 1700461 (3d Cir. Apr. 14, 2008) .........................................................3, 8, 41

Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.,
    246 F.3d 1336 (Fed. Cir. 2001)............................................................................. 26-27

CytoLogic Corp. v. Ventana Medical Systems, Inc.,
    424 F.3d 1168 (Fed. Cir. 2005)....................................................................28, 32, 35

Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,
    469 F.3d 1005 (Fed. Cir. 2006)...................................................................................40

Donald M. Durkin Contracting, Inc. v. City of Newark,
    C.A. No. 04-163 GMS, 2008 WL 952984 (D. Del. Apr. 9, 2008) ............................3

DSU Medical Corp. v. JMS Co.,
    471 F.3d 1293 (Fed. Cir. 2006)...................................................................................41

E.I. DuPont De Nemours and Co. v. Monsanto Co.,
    903 F.Supp. 680 (D. Del. 1995)..................................................................................25

Energy Transp. Group, Inc. v. William Demant Holding AS,
    C.A. No. 05-422 GMS, 2008 WL 114861 (D. Del. Jan. 7, 2008) ............................6

Festo Corp. v. Shoketsu Kinzolu Kogyo Kabushiki Co.,
    344 F.3d 1359 (Fed. Cir. 2003) ("Festo IX") ............................................................ Passim

Georgia-Pacific Corp. v. United States Plywood Corp.,
    318 F.Supp. 1116 (S.D.N.Y. 1970) ........................................................ 43-45

Glaxo Group Ltd. v. Ranbaxy Pharms., Inc.,
    262 F.3d 1333 (Fed. Cir. 2001)........................................................................34

Graham v. John Deere Co. of Kansas City,
    383 U.S. 1 (1966)............................................................................31, 34

Hilgraeve Corp. v. Symantec Corp.,
    265 F.3d 1336 (Fed. Cir. 2001)......................................................................25

Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,
    426 F.Supp.2d 211 (D. Del. 2006) .......................................................... 42-43, 45

Honeywell Intern., Inc. v. Hamilton Sundstrand Corp.,
    166 F.Supp.2d 1008 (D. Del. 2001).................................................................48

In re Seagate Tech., LLC,
    497 F.3d 1360 (Fed. Cir. 2007).............................................................. 3, 5-6

Interactive Gift Express, Inc. v. Compuserve Inc.,
    256 F.3d 1323 (Fed. Cir. 2001)......................................................................24

ISCO Intern., Inc. v. Conductus, Inc.,
    279 F. Supp. 2d 489 (D. Del. 2003)..................................................................27

Koito Mfg. Co. v. Turn-Key-Tech, LLC,
    381 F.3d 1142 (Fed. Cir. 2004).................................................................29, 32

KSR Intern. Co. v. Teleflex Inc.,
    127 S.Ct. 1727 (2007)......................................................................... 31-32

Lighting World, Inc. v. Birchwood Lighting, Inc.,
    382 F.3d 1354 (Fed. Cir. 2004).....................................................................40

Lightning Lube, Inc. v. Witco Corp.,
    4 F.3d 1153 (3d Cir.1993)........................................................................3, 8

Lucent Tech., Inc. v. Newbridge Networks Corp.,
    168 F.Supp.2d 181 (D. Del. 2001)...............................................................41, 45

Magnivision, Inc. v. Bonneau Co.,
    115 F.3d 956 (Fed. Cir. 1997).......................................................................28

Martek Biosciences Corp. v. Nutrinova Inc.,
 520 F.Supp.2d 537 (D. Del. 2007)..................................................................................2

Mondzelewski v. Pathmark Stores, Inc.,
 2000 WL 654137 (D Del. Mar. 20, 2000) ....................................................................42

Monsanto Co. v. Ralph,
 382 F.3d 1374 (Fed. Cir. 2004).....................................................................................41

National Instruments Corp. v. Mathworks, Inc.,
 2004 WL 2030128 (Fed. Cir. Sept. 3, 2004) ...............................................................25

Nobelpharma AB v. Implant Innovations, Inc.,
 141 F.3d 1059 (Fed. Cir. 1998).....................................................................................48

O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.,
 2008 U.S. App. LEXIS 7053 (Fed. Cir. Apr. 3, 2008) ................................................19

Paice LLC v. Toyota Motor Corp.,
 504 F.3d 1293 (Fed. Cir. 2007).............................................................................. Passim

Phillips v. AWH Corp.,
 415 F.3d 1303 (Fed. Cir. 2005).....................................................................................18

Pitney Bowes, Inc. v. Hewlett-Packard Co.,
 182 F.3d 1298 (Fed. Cir. 1999).....................................................................................50

Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.,
 411 F.3d 1332 (Fed. Cir. 2005).......................................................................................2

Quaker City Gear Works, Inc. v. Skil Corp.,
 747 F.2d 1446 (Fed. Cir. 1984).....................................................................................29

Ryco, Inc. v. Ag-Bag Corp.,
 857 F.2d 1418 (Fed. Cir. 1988).....................................................................................42

Spence v. Board of Educ.,
 806 F.2d 1198 (3d Cir. 1986).........................................................................................42

Stratoflex, Inc. v. Aeroquip Corp.,
 713 F.2d 1530 (Fed. Cir. 1983).....................................................................................37

United States Surgical Corp. v. Ethicon, Inc.,
 103 F.3d 1554 (Fed. Cir. 1997).....................................................................................22

Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.,
 375 F.3d 1341 (Fed. Cir. 2004).....................................................................................22

W. R. Grace & Co. v. Intercat, Inc.,
  60 F.Supp.2d 316 (D. Del. 1999)....................................................................................42

Xerox Corp. v. 3Com Corp.,
  458 F.3d 1310 (Fed. Cir. 2006)......................................................................................39

z4 Techs., Inc. v. Microsoft Corp.,
  507 F.3d 1340 (Fed. Cir. 2007)......................................................................................25

## STATUTES AND RULES

35 U.S.C. § 112..............................................................................................................19, 40

Fed. R. Civ. P. 50(a)(1)..........................................................................................................2

Fed.R.Civ.P. 50................................................................................................................3, 7

Rule 50(a)................................................................................................................... Passim

Rule 50(a)(2)...........................................................................................................................3

Rule 50(b) ........................................................................................................................2-3, 7-8

## I. NATURE AND STAGE OF PROCEEDING

On March 12, 2008, a jury provided a verdict in favor of Finjan Software, Ltd. and Finjan Software, Inc. (collectively "Finjan") in this five patent dispute. The jury found that Secure Computing Corporation ("Secure Computing"), Cyberguard Corporation ("Cyberguard"), and Webwasher AG ("Webwasher")(collectively "Defendants") infringed Finjan's three asserted patents and found Defendants' infringement to be willful. The jury upheld the validity of these patents and awarded past damages for sales of Defendants' Webwasher software, Webwasher appliances, and TSP appliances (collectively "Webwasher Products"). The jury awarded $9,180,000 in past damages based on the sales information available at trial.[1] In addition, the jury found that Finjan did not infringe Defendants' two asserted patents. The Court entered judgment on March 28, 2008.

## II. SUMMARY OF ARGUMENT

After seven days of hearing and seeing the evidence put before them by both sides, the jury carefully deliberated, even going late into the evening, before rendering its verdict based on the substantial evidence presented. While the technology at issue was complex, the facts were simple: Defendants willfully infringed every asserted claim of United States Patent Nos. 6,092,194 ("the '194 Patent"), 6,804,780 ("the '780 Patent"), and 7,058,822 ("the '822 Patent")(collectively "the Finjan Patents"). Furthermore, the jury saw past Defendants' baseless claims and found no infringement of United States Patent Nos. 7,185,361 ("the '361 Patent") and 6,357,010 ("the '010 Patent")(collectively "Defendants' Patents").[2] As described below, this jury determination is based on the substantial evidence in the record.

Defendants' Motion for Judgment as a Matter Of Law (D.I. 266, "Defendants' Motion" or "JMOL") is based on issues and arguments that are untimely and not supported at all by the

---

[1] Finjan has filed a post trial motion seeking a full accounting of sales through trial. *See* D.I. 262 (Finjan's Motion for Accounting and Interest).

[2] Defendants did not challenge the jury's verdict with regard to the '010 Patent.

substantial evidence presented at trial. Defendants also attempt to resurrect arguments based on prosecution history estoppel and claim construction, despite the fact that they adduced no evidence at trial to support such arguments and have no place at this stage of the case. For these reasons, Finjan respectfully requests the Court to deny Defendants' Motion in its entirety.

### III.  STATEMENT OF FACTS

All relevant facts are described and cited below. [3]

### IV.  ARGUMENT

### A.  NO GROUNDS EXIST TO OVERTURN THE JURY'S VERDICT, GRANT A NEW TRIAL OR REDUCE THE DAMAGES AWARD.

"Judgment as a matter of law is only appropriate where, viewing all reasonable inferences in a light most favorable to the non-moving party, there is no legally sufficient evidentiary basis to find for that party on that issue." Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (citation and internal quotation omitted); Fed. R. Civ. P. 50(a)(1). In other words, the Court must decide whether there was "substantial evidence" to support the jury verdict. Princeton Biochemicals, Inc. v. Beckman Coulter, Inc., 411 F.3d 1332, 1336 (Fed. Cir. 2005). "'Substantial' evidence is such relevant evidence from the record taken as whole as might be accepted by a reasonable mind as adequate to support the finding under review." Martek Biosciences Corp. v. Nutrinova Inc., 520 F.Supp.2d 537, 544 (D. Del. 2007) (quotation omitted). In this case, there was substantial evidence, such that Finjan had "a reasonable jury, [which] given the facts before it, could have arrived at the conclusion it did." Id. at 544-45 (citation omitted). "The court may not determine the credibility of the witnesses nor 'substitute its choice for that of the jury between conflicting elements of the evidence.'" Id. at 545 (citation omitted).

---

[3]  All references to the trial transcript are cited as "T.T." and are included as Exhibit 1 to the Appendix filed herewith. Due to the voluminous nature of the substantial documentary evidence supporting the jury's verdict, the exhibits admitted at trial that are cited herein are not contained in the accompanying Appendix. However, a courtesy copy of those exhibits will be provided to the Court.

Of critical importance is that the same claims or issues on which judgment as a matter of law is sought under Rule 50(b) **must** have been raised in the pre-verdict judgment under Rule 50(a). *See* Fed.R.Civ.Proc. 50; *see also* <u>Lightning Lube, Inc. v. Witco Corp.</u>, 4 F.3d 1153, 1172 (3d Cir.1993) ("to preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgment as a matter of law at the close of the nonmovant's case, pursuant to Rule 50(a), and specify the grounds for that motion."); *see also* <u>Chainey v. Street</u>, 2008 WL 1700461, at 14 (3d Cir. Apr. 14, 2008) (quoting <u>Williams v. Runyon</u>, 130 F.3d 568, 571-72 (3d. Cir. 1997) ("[A] defendant's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the plaintiffs on notice waives the defendant's right to raise the issue in their Rule 50(b) motion.").

Furthermore, no new trial is warranted here, as there would not be any miscarriage of justice if the verdict were to stand, the trial was fair, and no substantial errors were made. <u>Donald M. Durkin Contracting, Inc. v. City of Newark</u>, C.A. No. 04-163 GMS, 2008 WL 952984, at *1 (D. Del. Apr. 9, 2008). Finally, there is no evidence that remittur is warranted. Indeed, Defendants fall well short of demonstrating that the award was "intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded." <u>Boyce v. Edis Co.</u>, 224 F.Supp.2d. 814, 817-18 (D. Del. 2002) (internal quotations and citations omitted).

## B.    DEFENDANTS WILLFULLY INFRINGED FINJAN'S PATENTS.

### 1.    Finjan Presented Substantial Evidence Of Willful Infringement.

Finjan proved at trial that Defendants willfully infringed Finjan's Patents under the standard set forth in <u>In re Seagate Tech., LLC</u>, 497 F.3d 1360 (Fed. Cir. 2007). The jury, using the <u>Seagate</u> standard for willful infringement, found that Defendants' infringement was willful. T.T. at 1566:6-19. Finjan presented overwhelming evidence at trial that showed Defendants "acted despite an objectively high likelihood that its actions constituted infringement of a valid patent" and "this objectively-defined risk was either known or so obvious that it should have been known" to Defendants. <u>Id</u>.

3

Finjan presented substantial evidence of willful infringement through numerous documents and witness testimony, including:

**PTX-31 and 32** - In early 2002, the "Finjan testing [is] finished" by Defendants and the analysis of the feature set is complete.

**PTX-33 and 34** - As a result of the testing, Defendants learn that as of 2003 Finjan "offers only one feature that Webwasher does not have: 'Proactive Behavior Inspection.'"

**PTX-23, 24 and 25** - In late 2003, early 2004, IDC reports began to indicate a trend toward Finjan's patented "proactive virus detection technolog[y]."

**PTX-35** - Defendants recognize, in early 2004, that "Proactive Security" is "a key trend identified by IDC" and that in order to stay competitive in the market they would have to "develop own technology or create something similar to Finjan."

**PTX-36** - In order to quickly bring a competitive product to market "(a.ka. the Finjan Killer)," Defendants realize they need to use the Finjan Patents as a roadmap because "[s]urprise, surprise that a feature that Finjan works on for years cannot be done within a few weeks."

**PTX-16** - Going forward, two options are discussed in mid-2004. "Option 1 is what Finjan does," but would lead to patent infringement because Finjan "will also check carefully which of their patents we may touch by recreating their system."

**T.T. at 319:6-7** - Despite the fact that Defendants would infringe the Finjan Patents, "[t]he option that was finally implemented is closer to what is listed under 1."

**PTX-37** - Defendants' developers "Christoph and Jan started research proactive security features" including "doing research on proact. sec patents from finjan."

**PTX-38** - In a summary of their findings, Defendants listed and characterized "US Patent 6,092,194 - 'System And Method For Protecting a Computer and a Network from Downloadables', Finjan (SurfinGate behavior-inspection of code at the gateway)."

**T.T. at 306:12-16** - Not only did Defendants use the Finjan Patents as a road map, the lead developer testified that he reviewed Finjan's patented products in order to develop infringing products.

**PTX-48** - After only four months, Defendants announced that the "new Proactive filtering that will be available in release 5.1 by end of October."

**T.T. at 315:13-16** - Defendants' VP acknowledged that their products are "characterized by a few similarities with Finjan products."

### 2.    Defendants Acted With Reckless Disregard With Respect To Finjan's Patents.

The substantial evidence from Finjan showed that Defendants knew of the objectively-defined risk of infringement and acted with a reckless disregard for Finjan's rights to its valid Patents. The jury was presented with substantial evidence that Defendants were researching the Finjan Patents prior to infringement, such that Defendants had notice of the patents while actively testing Finjan's products embodying the patented technology. Also, Defendants could not present any evidence that they had any reason to believe the patents were invalid at the time they were developing the infringing products. Thus, as set forth in Finjan's Motion for Enhanced Damages incorporated here by reference, the evidence in this case was overwhelming that Defendants knew of the objectively-defined risk of infringement, and acted despite of this knowledge. D.I. 264 at 10.

Emails between Defendants' employees that showed Defendants were aware of the Finjan Patents and Finjan's patented technology prior to infringement. Finjan presented the jury with an email dated June 2004 as evidence of Defendants' knowledge of Finjan's Patents and showed that Defendants were "doing research on proact[ive] sec[urity] patents from [F]injan." PTX-37. It also identified a Webwasher document describing numerous patents of interest to Defendants which identified and summarized the '194 Patent. PTX-38.

Another email in May 2004 addressed to Martin Stecher, the project manager for the infringing Webwasher product, used the name "Finjan Killer" to describe Defendants' competing product. PTX-16; PTX 36. Defendants actually stated in the email that it had two options, and option number 1 was to do what "Finjan does" and "compete exactly with [Finjan]." Id. Defendants also stated in the same email that "they will check very carefully which of [Finjan's] patents we may touch by recreating their system." Id. Defendants did exactly that. As the jury heard at trial, Mr. Stecher testified that "[t]he option that was finally implemented is closer to what is listed under 1." T.T. at 319:6-7. Furthermore, Defendants' knowledge of Finjan's patented technology and willingness to infringe was made prominent at trial when Dr. Vigna,

5

Finjan's infringement expert, showed that Defendants' own source code included references to Finjan throughout the code. T.T. at 457:10-11.

Additional substantial evidence of willful infringement was found in the testimony of Michael Gallagher, Secure Computing's Vice President. He testified that Defendants did not obtain an opinion of legal counsel as a basic precaution to avoid infringement. T.T. at 735:24-736:2. Although there is no affirmative duty to obtain opinion of counsel under Seagate to avoid willful infringement, failure to obtain the opinion of counsel can be considered by the jury in the totality of circumstances as evidence of willful infringement. Energy Transp. Group, Inc. v. William Demant Holding AS, C.A. No. 05-422 GMS, 2008 WL 114861, at *1 (D. Del. Jan. 7, 2008).

There was also substantial evidence that Defendants had actively tested and evaluated Finjan's products prior to infringement with notice of Finjan's Patents. T.T. at 306:1-6 (Defendants' principal engineer, Christoph Alme, reviewing Finjan's screenshots that detailed Finjan's products); T.T. at 580:21-581:5 (Frank Berzau, Defendants' Director of Product Management testifying that Webwasher was developed as a response to review of Finjan's product); T.T. at 312:7-8 (Martin Stecher testifying to evaluating Finjan's product); PTX-32 (email stating "Finjan-testing finished"). Mr. Yuval Ben-Itzhak, Finjan's CTO, testified at trial that Finjan marked its products with its patents, and because Defendants actively reviewed and tested Finjan's products, they had notice prior to the filing of this lawsuit of Finjan's Patents. T.T. at 218:14-219:3. Defendants' documents also showed that they had notice prior to the lawsuit and thereafter of Finjan's Patents. See e.g., JTX-14; DTX-1069 (2004 and 2005 Finjan's Vital Security User Guides marked with '194 and '780 Patent); DTX-1070; DTX-1139 (2006 and 2007 Vital Security User Guides marked with '194, '780 and '822 Patents). Thus, the evidence is substantial of Defendants' willful infringement.

The jury had a "substantial basis" to find Defendants "acted despite an objectively high likelihood that their actions constituted infringement" of Finjan's valid Patents. Id. Just as credible invalidity arguments can demonstrate a lack of "an objectively high likelihood that a

6

party's actions constitute infringement of a valid patent," a *lack* of such credible invalidity arguments can also demonstrate that there was an objectively high likelihood that Defendants' actions constituted infringement of Finjan's Patents. Defendants' invalidity arguments were not credible, as evidenced by the fact that the jury found all asserted claims of Finjan's Patents to be valid. *Cf.* Black and Decker, Inc. v. Robert Bosch Tool Corp., No. 2007-1243, 2007-1244, 2008 WL 60501 (Fed. Cir. Jan. 7, 2008) (holding that Defendants made credible invalidity arguments by fact that jury found claims of patents to be invalid for obviousness). As described above, neither were Defendants' prior art references credible evidence of invalidity of Finjan's Patents. Finjan's strong infringement and validity arguments at trial as well as the lack of credible noninfringement and invalidity arguments at trial demonstrated that there was an objectively high likelihood that Defendants' actions constituted reckless infringement of Finjan's Patents.

### C.      FINJAN PROVIDED SUBSTANTIAL EVIDENCE PROVING INFRINGEMENT OF THE THREE FINJAN PATENTS.

#### 1.      *Prosecution History Estoppel Simply Does Not Apply As Defendants Failed To Raise It At Trial And Adduce Evidence To Support Such A Claim.*

Evident from Defendants' lack of citations to the trial transcript or evidence, Defendants (1) did absolutely nothing at trial to present evidence to support their claim that prosecution history estoppel bars the finding of infringement under the Doctrine of Equivalents ("DOE") and (2) failed to raise this defense in its Rule 50 motions to the Court. Defendants did not have a single witness testify about the prosecution history of Finjan's Patents, much less the amendments made during prosecution and the alleged effect of those amendments.[4] They also did not cross-examine any witnesses on the subject matter. Despite having every opportunity to do so as they were not barred from presenting such evidence, Defendants failed to do so.

Furthermore, Defendants are barred from raising prosecution history estoppel in their Rule 50(b) motion because they failed to raise it at all in their Rule 50(a) motion, much less with

---

[4] Finjan's opposition to Defendants' Motion *in limine* on DOE details the lack of evidence for their baseless prosecution history estoppel arguments in the first place. *See* D.I. 156.

requisite specificity. <u>Lightning</u>, 4 F.3d at 1172; <u>Chainey</u>, 2008 WL 1700461, at *14. Their failure even to mention prosecution history estoppel in either their oral or written Rule 50(a) motions before the Court during trial results in waiver and cannot be presented under the guise of a renewed JMOL under Rule 50(b). T.T. at 687:4-688:5; D.I. 222.

### 2.   *During The Prosecution Of The '780 Patent, There Were No Narrowing Amendments That Relate To Defendants' Defense To Infringement.*

Defendants failed entirely to apply the threshold requirements for prosecution history estoppel analysis to the actual evidence in the case. Prosecution history estoppel requires that a claim element be amended in a manner altering the claim's scope. *See* <u>Festo Corp. v. Shoketsu Kinzolu Kogyo Kabushiki Co.</u>, 344 F.3d 1359, 1365 (Fed. Cir. 2003) ("Festo IX"). Such amendments must actually ***narrow*** the scope of the claims and the DOE arguments must attempt to recapture territory surrendered during prosecution of the patent. <u>Id</u>. at 1366 (emphasis added). Prosecution history estoppel only limits equivalents in the territory between the original claim limitation and the amended claim limitation. <u>Festo Corp. v. Shoketsu Kinzolu Kogyo Kabushiki Co.</u>, 344 F.3d 1359, 1367 (Fed. Cir. 2003) ("Festo X") (citing <u>Festo Corp. v. Shoketsu Kinzolu Kogyo Kabushiki Co.</u>, 535 U.S. 722, 740 (2002) ("Festo VIII")). As set forth below, the amendments to the claims of the '780 Patent broadened or clarified aspects of the invention. Furthermore, there was no amendment to any claim element that Defendants used as a basis for their defense to infringement.

As can be seen below, the amendments to the '780 Patent's claims broadened or clarified aspects of the invention and did not narrow the scope of the claims.

1.    A computer-based method for generating a Downloadable ID to identify a Downloadable, comprising ~~the steps of~~:

obtaining a Downloadable <u>that includes one or more references to software components required to be executed by the Downloadable</u>;

fetching ~~if the Downloadable includes one or more references to a component~~ at least one software component identified by the one or more references;

and performing a <u>hashing</u> function on the Downloadable and <s>all</s> the <u>fetched</u> <u>software</u> components <s>fetched</s> to generate a Downloadable.

SC's Motion at 5-7.

Looking to the preamble, the deletion of the phrase "the steps of" from the original claim was a broadening amendment as the claim is no longer limited to performing "steps." The next amendments were the addition of "that includes one or more references to software components required to be executed by the Downloadable" to the first element and the deletion of "if the Downloadable includes one or more references to a component" from the second element. <u>Id.</u>, Ex. 1 at 3-5. This amendment merely moved a phrase from the second element to the first element. The next amendment was the addition of the word "hashing." As detailed in the prosecution history, this amendment merely clarified the function that was performed on the Downloadable. JTX-54; SC's Motion, Exs. 1 & 2.

The next amendment deleted the word "all," thereby expanding the scope of the claim because the claim no longer requires the fetching of *all* components, only one component must be fetched. The last amendment was the addition of the words "fetched software." This clarified the components that were fetched as introduced previously in the claim. *See* JTX-54; SC's Motion, Exs. 1 & 2. As can be seen from the actual amendments, nothing narrowed the scope of the '780 Patent claims.

In fact, these amendments had nothing to do with Defendants' defense to infringement at trial which was based on the last element found in the '780 Patent claims, such that there is no "territory between the original claim limitation and the amended claim limitation" at issue. <u>Festo X</u>, 344 F.3d at 1367 (citing <u>Festo VIII</u>, 535 U.S. at 740). Dr. Wallach, Defendants' only technical expert at trial, testified that the only basis for Defendants' alleged noninfringement of the '780 Patent related to the last element of the claims. He testified:

> Q.    With respect to the '780 patent, this last element is where you took issue with Dr. Vigna's infringement opinion. Correct?
> A.    That's correct.
> Q.    And in the WebWasher product, you don't dispute that it performs a hashing function on a downloadable, do you?

9

A.    I do not dispute that.
Q.    And you don't dispute that it performs a hashing function on the fetched
software component, do you?
A.    I don't dispute that.
Q.    So what you dispute is performing a hashing function on the downloadable
and a fetched software component together?
A.    That's correct.

T.T. at 1060:17-1061:6. Thus, the only issue Defendants even attempted to contest at trial was

performing a hashing function on the Downloadable and a fetched software component ***together***.

Id. This element, however, was never amended during the prosecution history to include the

"together" limitation, as can be seen from the actual amendments to the relevant claim language.[5]

SC's Motion, Exs. 1 & 2. "Together" was an interpretation applied to the claim term ***during***

***claim construction***, and not an amendment made to the claims during the prosecution of the '780

Patent. *See* D.I. 142 (Claim Construction Order). Consequently, prosecution history estoppel

does not apply as no relevant subject matter was surrendered, apparent from Defendants' silence

on the alleged "territory between the original claim limitation and the amended claim limitation"

at issue. Festo X, 344 F.3d at 1367. The jury was free to find infringement under DOE for at

least the last element of the claim (which was the only element Defendants contested at trial),

especially given the fact that no evidence of the prosecution history was introduced at trial.

Defendants' remaining arguments are conclusory and based on the unsupported premise

that ***if*** an amendment is made to claims, regardless of what the amendment is for, about or how it

affects the claim scope, ***then*** estoppel automatically applies. Defendants cite the prosecution

history that states the "applicant has amended the claims so as to refer to software components

required by the Downloadable." SC's Motion at 6. The applicant made this statement in relation

to the addition of the phrase "that includes one or more references to software components

required by the Downloadable" to the first element and the deletion of "if the Downloadable

includes one or more references to a component" from the second element. SC's Motion, Ex. 1.

---

[5]    Notably, Defendants did not dispute that the Webwasher Products perform the "hashing"
function of the '780 Patent claims, which was the actual element that was amended during the
prosecution of the patent application. T.T. at 1060:16-1061:6.

The other amendment in Defendants' Motion is where "the inventors amended to add the limitation 'to be executed.'" SC's Motion at 6. As provided by the prosecution history, this resulted in an amendment to the first element such that it read "that includes one or more references to software components required <u>to be executed</u> by the Downloadable." SC's Motion, Ex. 2. Defendants do nothing to tie these amendments to any alleged surrender of "territory," making the unsupported conclusion that "prosecution history is presumed to apply to all of the asserted claims of the '780 Patent." <u>Festo X</u>, 344 F.3d at 1367.

### 3.    *Finjan Presented Substantial Evidence of Infringement Under DOE.*

Defendants mischaracterize the case law regarding the requirements for DOE and mislead the Court by citing trial testimony that does not pertain to the claims that were found to infringe under DOE. SC's Motion at 7-9. Finjan's infringement expert, Dr. Giovanni Vigna, provided overwhelming testimony regarding the technology covered by the Finjan Patents and the inner workings of the Webwasher Products, and satisfied all of the requirements for the DOE. *See generally,* T.T. at 326:15-458:12.

The Federal Circuit has made clear that an expert is not required to "restart his testimony at square one when transitioning to a doctrine of equivalents analysis." <u>Paice LLC v. Toyota Motor Corp.</u>, 504 F.3d 1293, 1305 (Fed. Cir. 2007). In <u>Paice</u>, the defendant attempted to overturn the jury's finding of infringement under DOE because the expert only provided "[a] few lines" of testimony with regard to the DOE. The Federal Circuit *explicitly rejected* the Defendant's characterization of the law. <u>Id</u>. It expressly held that all of an expert's testimony can be considered for DOE analysis and the jury is not limited to when the expert is specifically referring to DOE. <u>Id</u>. Further, the Court held, "it is desirable for a witness to incorporate earlier testimony in order to avoid duplication" and the fact that the expert "did not explicitly do so does not mean he did not implicitly incorporate his earlier testimony." <u>Id</u>. Consequently, the Court "reject[ed] any notion that [an expert's] equivalents testimony is strictly limited to the few lines

pointed to by [the Defendant]." Id. Moreover, with regard to "linking," the Court held that operating the actual device in Court is sufficient to satisfy this requirement. Id. at 1305-06.

The facts in Paice are relevant to this case. At trial, Dr. Vigna provided substantial testimony regarding the technology disclosed in the Finjan Patents and the Webwasher product before and during his discussion of the topic of infringement. See JTX-2; JTX-52; PTX-10; PTX-11; PTX-12; PTX-13; PTX-26; PTX-113; PTX-118; PTX-152; PTX-153; PTX-154; PTX-219; PTX-221; PTX-263; see also T.T. at 326:15-458:12. For the '780 Patent, he described the technology of the '780 Patent, along with the remaining Finjan Patents, and described the inner workings of the Webwasher product. T.T. at 330:17-331:4; 415:20-423:24. He demonstrated the inner workings of the Webwasher product by operating the product, showing technical documents, and even analyzing the source code. Id.; see also JTX-2; JTX-52; PTX-10; PTX-11; PTX-12; PTX-13; PTX-26; PTX-113; PTX-118; PTX-152; PTX-153; PTX-154; PTX-219; PTX-221; PTX-263. He then provided his opinion that the Webwasher product literally infringed the '780 Patent, but at the very least, infringed under the DOE by providing the proper legal standard for each element and incorporating his earlier testimony regarding the technology of the infringing products. T.T. at 423:25-425:4. As such, he provided substantial evidence to support his opinion that the '780 Patent was infringed under the DOE satisfying the "particularized testimony" and "linking" requirements.

Dr. Vigna provided further testimony regarding the operations of the Webwasher products in relation to the '780 Patent which alone satisfies the analysis requirements for DOE. T.T. at 480:24-498:19. On cross-examination, he again demonstrated the operation of the Webwasher product and explained the technical documents that he relied upon in forming his opinion. Id. At one point, during sidebar, Defendants admitted that Dr. Vigna sufficiently addressed DOE during his direct testimony and attempted to offer evidence to contradict it. T.T. at 490:8-493:19. Thus, there is substantial evidence to support the jury's finding of infringement under DOE.

12

Defendants mislead the Court by arguing certain testimony that they highlighted by placing in a chart within their brief related to their DOE arguments. SC's Motion at 8, *citing* T.T. at 368:18-369:2. However, this does not apply to the claims in which infringement was found under the DOE, the '780 Patent. Instead, this testimony is related to Claim 1 of the '194 Patent, not Claim 1 of the '780 Patent as Defendants represent.

There is also substantial evidence regarding Defendants' infringement of the dependent claims under the DOE for Claim 3 of the '194 Patent and Claims 2-6 and 10-14 of the '780 Patent. Dr. Vigna testified in great detail regarding the infringement of these claims. Defendants explicitly stated that they did not contest infringement of any of the dependent claims, either literally or under the DOE. T.T. at 1059:20-1061:21. The record demonstrates that there is overwhelming evidence that the Webwasher Products infringes Claim 3 of the '194 Patent and Claims 2-6 and 10-14 of the '780 Patent under the DOE. *See* T.T at 326:15-458:12.

### 4.    *Finjan Properly Applied the Court's Construction to the Asserted Claims.*

Defendants' position regarding the construction of the '780 Patent is baffling. They inexplicably accuse the Court of error even though it adopted substantially the same construction that Defendants themselves advocated. SC's Motion at 9-11; D.I. 142 (Claim Construction Order). This position is patently ridiculous and improper at this stage of the case. Abbott Labs. v. Syntron Bioresearch, Inc., 334 F.3d 1343, 1352 (Fed. Cir. 2003) (holding that Defendants cannot request a different construction on JMOL than it originally advocated for).

The Court adopted most of Defendants' proposed construction with respect to the '780 Patent. D.I. 142 (Claim Construction Order); D.I. 131 (Final Joint Claim Construction Chart). In the Claim Construction Order, however, the Court explicitly rejected Defendants' attempt to limit the claims to a "single" Downloadable ID. Other than omitting the word "single," the Court adopted Defendants' construction. D.I. 108 (Joint Claim Construction Chart, Ex. B). Nevertheless, Dr. Wallach's opinion was based on this rejected construction of a single

13

Downloadable ID. T.T. at 1061:7-17. In contrast, Dr. Vigna used the Court's construction and testified that the '780 Patent infringed because the Downloadable and the software components are hashed together. T.T. at 415:20-425:4; 488:19-489:7. Thus, contrary to Defendants' assertion, it was Dr. Wallach who applied the wrong claim construction at trial for this element.[6]

Moreover, Defendants' argument regarding whether Dr. Vigna's opinion that "together" is met by the Webwasher Products because certain functions are performed close in time is a question of fact, not a claim construction issue. SC's Motion at 10. This is the very question that the jury resolved in Finjan's favor. The jury, after hearing from all the parties, found for Finjan. As such, Defendants' motion should be denied.

### D.    THE WEBWASHER PRODUCTS RECEIVE A DOWNLOADABLE ADDRESSED TO A CLIENT.

#### 1.    *Finjan Put Forward Overwhelming Evidence That the Webwasher Products Receive a Downloadable "Addressed To a Client."*

Finjan put forward an overwhelming amount evidence that the Webwasher Products infringe the claims of the '194 Patent, which includes the expert testimony of Dr. Vigna, source code, demonstrating the actual operation of the product, Defendants' internal and public documents, and testimony of Defendants' engineers. T.T. at 326:15-415:17; *see also* JTX-1; PTX-9; PTX-9A; PTX-10; PTX-11; PTX-12; PTX-13; PTX-19; PTX-26; PTX-113; PTX-118; PTX-152; PTX-153; PTX-154; PTX-219; PTX-221; PTX-263. Finjan went element by element through the '194 Patent claims and demonstrated how each and every element of the asserted claims were met by the Webwasher Products. Id. Notably, Defendants did not dispute the vast majority of this evidence.

---

[6] Defendants' conduct regarding the improper use of claim construction of the '780 Patent is detailed in Finjan's Motion for Enhanced Damages and Attorneys' Fees. D.I. 264 at 12-13.

Dr. Vigna gave conclusive and unrebutted testimony regarding how the Webwasher Products receive a downloadable addressed to a client. T.T. at 338:23-344:7. When asked about a downloadable addressed to a client, Dr. Vigna, testified that:

> For me, it's clear that 'addressed to a client' means that the final destination of the downloadable, or whatever the communication is, is the client. So that means that the ultimate destination of something is described that way.

T.T at 339:4-8. To begin his discussion of the element "addressed to a client," Dr. Vigna gave an example of passing a note in school. Dr. Vigna testified:

> … So, I am looking for an example….For example, you are in high school and you are passing little notes, I used to do that in high school sometimes when I got bored, so you passed little notes. And you want to reach somebody at the other side of the room. Actually, the farther away the guy is, the more fun it is; right? So you give it to your next-door person and say, Hey, give it to Jim, and there is some funny comment on something.
> And this person knows that that note is addressed to Jim. So he will pass it on until eventually it reaches Jim, and Jim will probably send back another funny note and so forth. ***The concept here is that you want some communication that has to reach a certain person and it's very clear who that person is.***

T.T. at 399:9-23 (emphasis added). This "hey Jim" example was meant as an simple description of the concept and obviously was not intended to be a technical description of the Webwasher Products. This is made very clear with Dr. Vigna's further technical testimony regarding why the Webwasher Products receive downloadables addressed to a client, stating that the client performs a request, the proxy remembers the client asked for the resource and:

> knows that the ultimate destination of that resource if the client and the downloadable is addressed to the client, and, therefore, it's passed on.

T.T. at 340:6-17. He also gave a physical demonstration of how this element is met. Indeed, there was no dispute at trial that in the Webwasher Products, downloadables are ultimately received by the client. T.T. at 328:6-333:24; 338:23-344:7; 346:9-348:17.

Dr. Vigna also testified that his opinion was further supported by the actual source code of the Webwasher Products, the testimony of Webwasher engineers, from the use of and running the Webwasher Product in the Court room, and documentation for the Webwasher Products.

T.T. at 340:25-344:7. Defendants did not challenge this testimony at all.[7] Consequently, Finjan presented substantial evidence establishing that the Webwasher Products satisfy the "addressed to a client" limitation.

### 2.    *Defendants' Arguments Regarding "Addressed to a Client" Are Factually Inaccurate and Mischaracterize Dr. Vigna's Testimony.*

Defendants' argument that Dr. Vigna never stated that a downloadable addressed to a client is received by the Webwasher Products completely ignores Dr. Vigna's testimony and is an attempt to revisit claim construction. *See* SC's Motion at 13-14. This argument is based on the premise that Dr. Vigna should have been using Defendants' overly narrow definition of "addressed to a client," (i.e., contains the network address of the client"), which is the definition Defendants proposed and the Court expressly rejected. D.I. 142 (Claim Construction Order). However, Dr. Vigna used the Court's claim construction as the ordinary meaning and provided a detailed analysis of how this claim is met.

Defendants' argument that the Webwasher Products do not work exactly like the note passing example discussed above is irrelevant and ignores the testimony of Dr. Vigna and their own expert on the subject. SC's Motion at 13-14. First, the note passing example was an obvious simplification meant to introduce the concept to aid the jury, and was not a technical description of how complicated internet and network technologies work. T.T. at 547:10-548:17. Defendants simply ignore Dr. Vigna's technical explanation of how this element is met by the Webwasher Products.

Furthermore, Defendants mischaracterized the passing note example by claiming that "Jim" is the client. SC's Motion at 14. As Dr. Vigna explained on cross-examination, however, Jim is the *server* and passing the note to Jim is an example of requesting information from a server, such as a website. He testified as follows:

---

[7]  The overwhelming evidence renders Defendants' statement that Finjan "offered no evidence whatsoever as to any information or method by which Finjan alleges that a message received by Webwasher is 'addressed to the client'" absolutely false. SC's Motion at 13-14.

> "The request from the client will be me giving the little note that says, Hey, ask Jim where he is going to party tomorrow night? So I ask for a piece of information. This thing goes off to Jim."

T.T. at 547:21-24. Thus, in this example, Dr. Vigna testified that the request first goes to the person next to you who requests the information on your behalf by passing the note to someone else. T.T. at 547:10-548:17. Jim will respond to the request by passing a note back. Id. The person next to you will receive the note on its way back and because that person remembers that you made the original request, he passes the note to you because it is addressed to you. Id. Defendants' only apparent hope for relief is to mischaracterize the testimony and evidence in this case.

Defendants' reliance on their own expert's testimony, Dr. Wallach, is also completely unfounded and unpersuasive. SC's Motion at 14, *citing* T.T. at 817:7-818:3. Dr. Wallach was asked to compare "at a very high level of generality" about the note passing example to the way the Webwasher Products work. Since the note passing example was not the basis for Dr. Vigna's opinion of infringement, this testimony is meaningless and is not the proper analysis for infringement of comparing the actual claim language to the product at issue. Additionally, as discussed above, Dr. Vigna's example was a general introduction to the concept, not a technical explanation. Furthermore, Dr. Wallach never testified regarding the meaning of addressed to a client, leaving Dr. Vigna's testimony unrebutted. Thus, the jury was free to reject Dr. Wallach's opinion, which it did, and adopt Dr. Vigna's position that the Webwasher Products did receive Downloadables addressed to a client. As the Court noted, this point "is up to the jury to decide." T.T. at 811:4-11; *see also* T.T. at 811:25-812:2. Thus, Finjan provided substantial evidence for the jury to find that the Webwasher Products satisfied the claim element "addressed to a client."

### 3. Construing the '194 Patent Claim Element "Addressed to a Client" As Its Plain And Ordinary Meaning Was Correct.

Contrary to Defendants' argument, Dr. Wallach was not "prevented at trial from addressing Finjan's construction of the ordinary meaning of 'addressed to a client.'" SC's Motion at 11. The Court expressly permitted Dr. Wallach to comment on Dr. Vigna's use of the

17

"addressed to a client" term, which he did -- he just did not do it effectively. T.T. at 813:7-816:6; 817:3-818:23.

Defendants' next argument advocates an extreme position. SC's Motion at 11-13. They claim that "addressed to a client" should have been construed because any time parties disagree over the plain and ordinary meaning, the Court is *required by law* to construe the term. Id. If this were the case, courts would be required to construe far more terms than necessary whenever there is even a hint that the parties cannot agree upon the plain and ordinary meaning of a term. That contention is ridiculous. When a claim term has an ordinary meaning, no construction is required, regardless if one party disagrees. Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005).

As this Court noted in its Claim Construction Order, "[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." D.I. 142 at n.1 (Claim Construction Order), *citing* Phillips, 415 F.3d at 1314 (internal citations omitted). This was the case with the claim term "addressed to a client" found in the '194 Patent, such that the Court determined that "addressed to a client" should have "its plain and ordinary meaning." D.I. 142 at 1 (Claim Construction Order).

Rather than follow the Court's claim construction to use the plain and ordinary meaning of this claim term, Defendants proceeded with a tactic that backfired on them. Their expert, Dr. Wallach, took the position in his rebuttal expert report and deposition, both of which were *after* the Claim Construction Order issued that he had no understanding of "addressed to a client" other than what had been explicitly determined to be too narrow by the Court. T.T. at 808:13-809:10. Because he took that position, he was properly excluded from commenting for the first

18

time at trial about the meaning of the claim element. T.T. at 815:20-816:1.[8]

Defendants rely exclusively on O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co., 2008 U.S. App. LEXIS 7053 (Fed. Cir. Apr. 3, 2008), to support their argument that all disputed terms need to be construed. SC's Motion at 11-13. However, even Defendants admit that O2 stands for, at the very most, the proposition that a claim term needs to be construed if to do otherwise would not resolve the parties dispute. SC's Motion at 11, 15. In this case, O2 is inapplicable because the Court's Claim Construction Order resolved the dispute between the parties about the claim term. See D.I. 142 (Claim Construction Order). In O2, the parties disagreed over the construction of a claim term and each argued their own construction. O2, 2008 U.S. App. LEXIS 7053, at *10. The Court in O2 declined to construe the element at all. See id., at *21. Here, Finjan argued that the claim needed no construction and Defendants argued for an extremely narrow interpretation of the claim term. The Court agreed with Finjan and construed the term to have its plain and ordinary meaning. D.I. 142 at 1-2. Unlike in O2, the dispute was resolved, Finjan won, and the Court acknowledged that Defendants' interpretation was overly narrow. See D.I. 142 at n.1. Therefore, and for the reasons stated above, the Court was correct in construing the claim term "addressed to a client" as its plain and ordinary meaning, and the O2 case is not applicable here.

### 4.    *The Webwasher Products Create a List of Suspicious Computer Operations.*

Finjan provided substantial evidence that the Webwasher Products create a list of suspicious computer operations pertaining to a downloadable. See T.T. at 344:8-355:3. Dr. Vigna testified that this element, along with every other claim element, was found in the Webwasher Products. T.T. at 365:10-12. Dr. Vigna testified that:

> Q.    When you see the word listed "suspicious computer operations," is that using heuristic as a word, the suspicious operations?
> A.    Yes.    Because in my understanding, Webwasher analyzes the

---

[8] Defendants' counsel admitted that their failure to understand the plain and ordinary meaning of "addressed to a client" was a 35 U.S.C. § 112 issue, which they abandoned at trial. T.T. at 812:12-16.

> downloadable, extracts the actual functions that might be executed, and
> then uses these heuristic rules to identify potential suspicious behavior.
> And there are a number of behavior categories. This set of possible
> behaviors represents a profile. And then this is compared with a security
> policy.
> Q.    Counsel also mentioned that the Webwasher product does not create
> a profile that includes a list. Do you agree with that statement?
> A.    I think that the product produces a list of suspicious behavior.

T.T. at 345:7-21. Dr. Vigna further clarified, showing that a list of suspicious behavior was

identical to a list of suspicious computer operations in the following testimony:

> Q.    ...Here you have some headings of different types of, I guess what
> you call "functions," or I don't know what you call these?
> A.    Actually, these are categories of behavior.
> Q.    Categories of behavior. In these type of categories, would these be
> the list of suspicious computer operations you are referring to?
> A.    Correct.

T.T. at 349:16-350:1. Dr. Vigna stated on numerous occasions that the Webwasher Products

created a list of suspicious computer operations. T.T. at 345:4-6, 345:7-16, 346:2-5, 349:16-

350:1, 365:10-12, 516:9-12, 517:7-518:3, 525:1-4, 533:22-25. That a "list of suspicious

computer operations" was created by the Webwasher Products was further supported by the

source code, his operation at trial of the Webwasher Products, and the technical documentation

of the products. *See* T.T. at 348:18-355:3; *see also* PTX-26. Many of Defendants' documents

described the Webwasher Products detecting suspicious operations. PTX-26 at 26 ("operations

performed by all kinds of mobile code"). Furthermore, the '194 Patent described operations

which are identical to what are identified in the Webwasher Products. *Compare* JTX-1 at Col. 5,

ll. 59-65 ("File operations: READ a file, WRITE a file; ...") to PTX-26 ("Read access to local

files; Write access to local files..."). As Dr. Vigna explained, these documents supported his

opinion that the Webwasher Products satisfy this claim element. T.T. at 327:3-9; 340:25-341:5;

351:19-354:7. Moreover, Dr. Wallach admitted that the documents and Webwasher Products

actually describe this list as "operations," just as the '194 Patent does. T.T. at 1050:25-1052:17;

1054:19-1055:11. Thus, Finjan provided substantial evidence of Defendants' infringement.

20

a.    **Dr. Vigna Found Literal Infringement Under the Correct Standard.**

For the '194 Patent, Dr. Vigna meticulously went over every element and presented exactly how each and every element was met by the Webwasher Products. T.T. at 326:18-415:16. His testimony demonstrated for the jury how every claim element of the '194 Patent was found in the Webwasher Product. *See, i.e.,* T.T. at 327:16-21, 365:10-12, 414:5-8, 415:2-4, 424:7-13, 449:20-23, 455:4-7.

Defendants attempt to argue that Dr. Vigna used the incorrect infringement standard, relying exclusively on Dr. Vigna's response *to a single question* to support this claim (SC's Motion at 17). Defendants ignore the remainder of Dr. Vigna's extensive testimony on the issue, including his testimony immediately after the question was asked clarifying what he meant. Specifically, in the quotation Defendants cited, Dr. Vigna was asked whether a "behavior profile" was the same thing as a "list of suspicious computer operations." T.T. at 349:8-10. He responded that they were "pretty much the same thing." T.T. at 349:15. He immediately clarified that "[a]ctually, these are categories of behavior." T.T. at 349:22. He unequivocally stated these were included in the Webwasher Products and were exactly the "list of suspicious computer operations" he was referring to. T.T. at 349:23-350:1. Thus, Defendants' motion should be denied in light of the substantial evidence.

b.    **There Was No Need to Construe The Claim Element "List of Suspicious Computer Operations."**

As they did at trial, Defendants argued that the Webwasher Products do not create a list of "suspicious computer operations" because the Webwasher Products create a list of "categories of behavior" instead. *See* SC's Motion at 14-15. Defendants attempt to conceal this factual argument, which was already been rejected by the jury, by asserting that the Court should construe a term that Defendants had previously agreed should have its ordinary meaning. D.I.

21

108 (Final Joint Claim Construction Chart). The case law on this point is clear; Defendants cannot argue for a narrower claim construction for the first time in connection with its JMOL motion, which is what they are attempting to do. <u>Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.</u>, 485 F.Supp.2d 519, 531 (D. Del. 2007); <u>Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.</u>, 375 F.3d 1341, 1350 (Fed. Cir. 2004); <u>United States Surgical Corp. v. Ethicon, Inc.</u>, 103 F.3d 1554, 1570 (Fed. Cir. 1997). There was no error whatsoever by the Court because the term "list of suspicious computer operations" was undisputed by the parties. D.I. 108 (Final Joint Claim Construction Chart). Thus, Defendants' claim construction arguments regarding this element should be rejected outright.

        **c.**    **Finjan Demonstrated That, At the Very Least, Defendants Infringed the '194 Patent Under Doctrine of Equivalents.**

Finjan conclusively proved that the asserted claims of the '194 Patent are literally infringed, or at the very least, infringed under DOE. Indeed, the jury returned a verdict demonstrating that all asserted claims of the '194 Patent were literally infringed except for claim 3. D.I. 204 at 1-2 (Entry of Judgment). Dr. Vigna testified during trial that, for each element of the claims of the '194 Patent, they would at least be infringed under DOE, and for the same reasons by incorporating his earlier testimony, which is wholly proper. T.T. at 366:5-10, 368:18-369:2, 414:5-24, 415:5-16; <u>see also</u> <u>Paice</u>, 504 F.3d at 1305. Thus, Finjan provided substantial evidence to prove the Webwasher Products, at the very least, infringed Claim 3 of the '194 Patent under DOE.

Defendants' prosecution history estoppel arguments fail for the same reasons discussed above,[9] including Defendants' failure to present any evidence at trial to support such a claim and their failure to raise it in their oral and written Rule 50(a) motions.[10]

---

[9] Finjan's opposition to Defendants' motion *in limine* details why the doctrine of prosecution history estoppel does not apply to the '194 Patent. D.I. 156.

[10] At the very least, Defendants have not satisfied the specificity requirement for Rule 50(a) motions.

The majority of the claims in the '194 Patent were never amended during prosecution and any amendments to the claims only served to clarify the claimed subject matter.[11]  Claim 3, the only claim which the jury found to be infringed under DOE, *was never amended during prosecution*.[12]  Thus, prosecution history estoppel is inapplicable, as there was no narrowing amendment.  Festo IX, 344 F.3d at 1365.  Further, Dr. Vigna provided adequate particularized testimony regarding the DOE for the Webwasher Products.  As discussed above, an expert is not required to "restart his testimony at square one when transitioning to a doctrine of equivalents analysis."  Paice, 504 F.3d at 1305.  Dr. Vigna correctly relies on his previous testimony to show infringement through DOE, rather then painstakingly reiterating his testimony.  Thus, there was substantial evidence to support the jury's finding of infringement of the '194 Patent.

### E.    FINJAN PROVED THE WEBWASHER PRODUCTS INFRINGE THE '822 PATENT USING A LEGALLY CORRECT INTERPRETATION OF THE CLAIMS.

Despite the jury's findings of fact that the Webwasher Products infringe the '822 Patent, Defendants reiterate the same arguments previously rejected by the jury with respect to whether the '822 Patent whether the word "if" needs clarification.  T.T. at 1062:19-23.  Apparent from Defendants' confusing argument, their position does not make sense and is an attempt to rewrite the claim language to create a non-infringement position.  It is no wonder the jury rejected it.  Finjan presented an abundance of evidence that the Webwasher Products infringed each element of the '822 Patent.  T.T. at 436:2-456:13; JTX-3; PTX-9; PTX-9A; PTX-10; PTX-11; PTX-12; PTX-13; PTX-26; PTX-113; PTX-118; PTX-152; PTX-153; PTX-154; PTX-219; PTX-221; PTX-263; DTX-1257.

---

[11]  Claims 3-11, 24-29, 33-36 of the '194 Patent were never amended during prosecution.  *See* D.I. 156 at 1-2; *see also* id. (Amendment and Response, May 6, 1999; Preliminary Amendment Oct. 27, 1999; Examiner's Amendment January 3, 2000).

[12]  *See* D.I. 156 at 1-2; *see also* id. (Amendment and Response, May 6, 1999; Preliminary Amendment Oct. 27, 1999; Examiner's Amendment January 3, 2000).

Defendants' expert admitted infringement of the '822 Patent as written. T.T. at 1063:15-22. Dr. Wallach's testimony boiled down to the Webwasher Product infringed sometimes, but not all of the time. Id. It is hornbook patent law that "an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes." Bell Commc'ns Rsch., Inc. v. Vitalink Commc'ns Corp., 55 F.3d 615, 622 (Fed. Cir. 1995). Thus, there is no question as to Defendants' infringement of the '822 Patent.

Furthermore, Defendants are raising for the very first time arguments regarding the ordinary meaning of the term and pointing to the specification. These arguments, however, are claim construction arguments which have been waived, as Defendants never raised during claim construction briefing that the term "if" meant "whenever" or any variation thereof. D.I. 131 (Final Joint Claim Construction Chart). The Federal Circuit has held that a party "cannot wait until after the jury returns a verdict against it and then on JMOL request a different construction." Abbott Labs., 334 F.3d at 1352 (Fed. Cir. 2003); see also Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1345-46 (Fed. Cir. 2001). Therefore, Defendants' argument regarding the construction of the '822 Patent is too little, too late.

## F.    THERE IS SUBSTANTIAL EVIDENCE SUPPORTING INFRINGEMENT OF METHOD CLAIMS.

Under Defendants' logic, no products could ever infringe a method claim.[13] There are numerous cases in which products were found to infringe method claims of a patent. The Federal Circuit has stated that "an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes." Bell Commc'ns, 55 F.3d at 622 (citations omitted). For

---

[13] Defendants' assertion that, without an instruction on method claims for infringement, the jury could not have "even known how to determine whether" Finjan proved infringement of a method claim is without merit. SC's Motion at 21 n.6. Defendants cite no legal authority that it is substantial error for a district court to decline to give a specific jury instruction on infringement of method claims in relevant patent infringement trials, and Finjan is aware of no legal precedent requiring such an instruction. As pointed out during trial, such an instruction would have been unnecessary and could have needlessly confused the jury. Simply stated, it would not have been proper to instruct the jury specifically on method claims when the case involved other types of claims as well. T.T. at 1410:1-1412:19.

this fact specific inquiry, Finjan presented the jury with substantial evidence of infringement of the method claims. *See* supra.

The Federal Circuit has held numerous times that products infringe methods claims. In National Instruments, the Federal Circuit affirmed a jury verdict finding that the Mathworks' Simulink software directly infringed several method claims. National Instruments Corp. v. Mathworks, Inc., 2004 WL 2030128, at *3 (Fed. Cir. Sept. 3, 2004). Moreover, "infringement is not avoided merely because a non-infringing mode of operation is possible." z4 Techs., Inc. v. Microsoft Corp., 507 F.3d 1340, 1350 (Fed. Cir. 2007).[14] Indeed, "an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation." Hilgraeve Corp. v. Symantec Corp., 265 F.3d 1336, 1343 (Fed. Cir. 2001) (citations omitted). As can be seen from the case law on this point, products infringe method claims.

Finjan proved at trial with substantial evidence that the Webwasher Products infringed the asserted method claims. *See* PTX-009, PTX-009A, PTX-010, PTX-011, PTX-012, PTX013, PTX-014, PTX-019, PTX-020, PTX-021, PTX-022, PTX-026, PTX-029, PTX-030, PTX-113; *see generally*, T.T. at 326:15-458-12. Furthermore, Dr. Vigna operated the Webwasher appliance in the court room to demonstrate infringement of the method claims.[15] Id. Thus, the case law and evidence presented during trial established that the Webwasher product perform the infringing methods of the Finjan Patents.

Defendants rely on case law that is entirely inapplicable to the present case. In BMC Resources, the "parties agree[d], Paymentech does not perform every step of the method at issue in this case." BMC Resources, Inc. v. Paymentech, L.P., 498 F.3d 1373 (Fed. Cir. 2007). In E.I. DuPont, the accused did not practice all of the steps of the claim. E.I. DuPont De Nemours and

---

[14] The court in z4 Techs. specifically held that software can infringe method claims under § 271(a). Id. at 1356.

[15] Dr. Vigna's operation of the Webwasher product contradicts Defendants' statement that "Finjan presented no evidence of anyone performing these methods." SC's Motion at 20.

Co. v. Monsanto Co., 903 F.Supp. 680, 734 (D. Del. 1995). In Crystal Semiconductor, the accused did not make, use or sell the products claimed of infringement in the United States. Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc., 246 F.3d 1336, 1351 (Fed. Cir. 2001). Unlike those cases, Finjan presented substantial evidence at trial that Defendants performed every step of the method at issue and that they made, used and sold the accused products in the United States. Thus, Defendants' motion should be denied.

### G. FINJAN PRODUCED SUBSTANTIAL EVIDENCE AT TRIAL THAT THE WEBWASHER PRODUCTS INFRINGED EVEN IF THE FUNCTIONALITY WAS DISABLED.

During trial, Finjan introduced a substantial amount of evidence with Dr. Vigna that the Webwasher Products infringed the Finjan Patents, even if the functionality was disabled. For example, Dr. Vigna testified that claims for a computer readable storage medium were infringed if the program was in storage and on the disk. T.T. at 571:25-572:10. He determined that infringement occurred in light of certain claims that if the program is stored, it is on the disk and therefore is present. Id. This is because the Finjan Patents not only included method claims, but also included system and program code claims. These claims do not require the steps of the methods to be performed, but rather only that the product contain the infringing system elements or program code. See JTX-1 ('194 Patent, Claims 32 and 65). Furthermore, Defendants did not contest the fact that they made, used or sold an infringing product that contained the infringing "program code" or "system elements" at trial. Indeed, during trial, Executive Vice President of Secure Computing, Michael Gallagher, confirmed that a product that contains infringing program code infringes even if the functionality is disabled. T.T. at 722:16-723:13. Furthermore, Defendants admit that they offer for sale the Cyberguard TSP product with the Webwasher functionality unlocked. Id. Thus, Defendants were properly found to infringe the

Finjan Patents, even if the functionality was locked or not enabled.[16]

None of the cases Defendants cite to apply here. The ISCO decision is irrelevant, as the facts of that decision dealt with a product that did not include a bypass circuit as required by the claims. ISCO Intern., Inc. v. Conductus, Inc., 279 F. Supp. 2d 489, 506 (D. Del. 2003). This case deals with software, not hardware, and there is no dispute the Webwasher Products contain the infringing program code. In Southwest Software, the *source code* of the infringing product was modified such that the product could not invoke the infringing feature at all during the normal operation of the product. Southwest Software, 226 F.3d at 1287. By deactivating the source code, the program code with the infringing functionality would not be present in the end product. Id. In our case, the source code was not modified and the Webwasher Products contained the infringing program code in every single product. T.T. at 722:16-723:13.

Moreover, unlike the Southwest Software and ISCO cases, the jury in this case considered program code and system claims. Because the accused products in this case actually contain both the program code and system claims disclosed in the asserted claims, the products infringe the patents because they include infringing program codes and/or systems. *See* supra. Therefore, the Court did not need to instruct the jury with proposed instruction 19.2 because the Finjan Patents include system and program code claims. By having these claims, whether the functionality is locked is not relevant. As long as the Webwasher Products are made, used or sold with the "program code" or system elements, the Webwasher Products infringe.

---

[16] This Court fully heard Defendants on their proposed instruction regarding locked functionality. T.T. at 1387:10-1391:9. After the Court heard argument on the very issue of this instruction and took the time to review the cases cited by Defendant in support of their position and consider the issue, the Court declined to include the instruction. Id.; T.T. at 1437:2-13.

## H.    THE COURT SHOULD UPHOLD THE REASONABLE FINDING OF THE JURY AT TRIAL THAT THE FINJAN'S PATENTS ARE VALID.

### 1.    *Defendants Did Not Present Substantial Evidence That Finjan's Patents Were Invalid and Failed to Show That A New Trial is Warranted.*

Defendants did not meet their heightened burden of proving invalidity at trial by a "clear and convincing standard." Magnivision, Inc. v. Bonneau Co., 115 F.3d 956, 958 (Fed. Cir. 1997). Their evidence at trial was legally insufficient to show that the Finjan Patents are invalid. In their Motion, Defendants still are unable to present any "substantial evidence" of invalidity. Indeed, Defendants have yet to present an element by element comparison of the asserted references to each of the claims that Defendants allege are rendered invalid. The failure to do this comparison in their Motion speaks volumes about the lack of evidence at trial to support their invalidity claims. The validity of Finjan Patents has now withstood the test of prosecution before the United States Patent and Trademark Office and a trial. In fact, *all* the references Defendants relied upon were a) already considered by the Patent Office, b) addressed irrelevant technology, and/or c) concerned technology already considered by the Patent Office. Thus, none of the references affected patentability of Finjan's Patents.

### a.    Defendants Failed To Provide Substantial Evidence That The Shaio Reference Anticipated The '194 Patent.

Because the testimony of Defendants' expert, Dr. Wallach, was extremely conclusory, it did not constitute "substantial evidence" that supported a finding of invalidity. *See* CytoLogic Corp. v. Ventana Medical Systems, Inc., 424 F.3d 1168, 1176 (Fed. Cir. 2005) (citing Koito Mfg. Co. v. Turn-Key-Tech, LLC, 381 F.3d 1142, 1152 (Fed. Cir. 2004)) ("[s]ubstantial evidence of invalidity must meet certain minimum requirements: "[g]eneral and conclusory testimony…does not suffice as substantial evidence of invalidity"). Dr. Wallach gave no legally sufficient evidentiary basis for the jury to find anticipation. His opinion at trial consisted mainly of him giving short "yes" or "no" responses to questions from his counsel without providing any substantive analysis to the jury, and then checking boxes on a claim chart. Below are just a few representative examples of such testimony:

28

> Q: "How did you determine that?"
> A: "By reading the patent."

*See e.g.*, T.T. at 910:14-15.

> Q: "Using Dr. Vigna's definition of addressed to a client, does the Shaio patent have a downloadable addressed to a client?"
> A: "Yes it does."
> Q: "Can we check off this first claim element?"
> A: "Yes."

*See* T.T. at 911-917, *e.g.*, T.T. at 911:17-20.    Dr. Wallach's failure at trial to provide his interpretation of each claim element of the '194 Patent and failure to explain in detail how the element is disclosed in the Shaio reference resulted in a lack of substantial evidence to support a finding of anticipation. Koito Mfg., 381 F.3d at 1152 (requiring interpretation of claim elements and detailed explanation for anticipation).

Mr. Heberlein, Finjan's expert who rebutted Dr. Wallach's assertions regarding invalidity, provided credible evidence that the Shaio reference did not anticipate the '194 Patent.[17]  T.T. at 1271-1275; 1292:10-16.  Specifically, Mr. Heberlein went element-by-element through each of the asserted claims and explained that Shaio did not contain each one of the elements of the asserted claims. T.T. at 1291:12-1292:16.

One of the elements from the independent claims of the '194 Patent that Mr. Heberlein directly rebutted was Dr. Wallach's testimony that Shaio contains the limitation "receiving an incoming Downloadable addressed to a client." T.T. at 1291:12-1292:2; *see* JTX-1 ('194 Patent, independent asserted claims 1, 32, and 65). Mr. Heberlein testified that Shaio disclosed filtering firewall technology and did not "receive an incoming Downloadable addressed to a client" because a filtering firewall analyzes packets and does not "pull the whole program down" and do the analysis on a "downloadable." T.T. at 1291:2-4; 1281:5-1282:10. His testimony was made

---

[17] Defendants improperly contend that Shaio incorporates U.S. Patent No. 5,740,441 by reference.  Shaio did not "identify with detailed particularity" the '441 patent for there to be incorporation by reference. Quaker City Gear Works, Inc. v. Skil Corp., 747 F.2d 1446, 1453-54 (Fed. Cir. 1984). Also, the '441 patent's bytecode verifier was already considered by the United States Patent & Trademark Office in the prosecution of the '194 Patent (McManis U.S. Patent No. 5,692,047 as cited on the face of the '194 Patent).

clear by his use of a visual demonstrative slide showing how a filtering firewall does not analyze a complete downloadable. Mr. Heberlein also pointed out several other basis for validity and specifically addressed Dr. Wallach's shortcomings in his invalidity analysis of not proving Shaio teaches all elements of the '194 Patent. T.T. at 1271-1275; 1281:5-1282:10; 1291:12-1292:16.

>  **b.    Finjan's Construction of "Gateway" At Trial Was Consistent With The Court's Construction.**

Using the Court's construction of the term "server that serves as a gateway" as having a "plain and ordinary meaning," Finjan's expert, Mr. Heberlein, gave his opinion at trial that the Finjan patents were valid. D.I. 142 (Claim Construction Order); *see also* T.T. at 1276:15-16; 1276:24-1277:2.    Thus, Defendants' contention that Finjan used a different definition for "gateway" at trial than the Court's Claim Construction is simply false.

Notably, Defendants' argument regarding the construction of "gateway" is being raised for the first time ever.   This issue did not come up at trial as Defendants never raised any objections to any of the testimony cited in their Motion or in Defendants' Rule 50(a) motions. Defendants should be barred from raising this new argument now. *See* D.I. 222, 253.

Contrary to Defendants' contentions, Finjan never once took the position that the meaning of the terms "gateway" and "firewall" were synonymous to a person of ordinary skill in the art, and has always defined the term "gateway" or "server that serves as a gateway" according to its ordinary meaning to a person of skill in the art in the context of the claims, even at the Markman stage. D.I. 112 at 13. Mr. Heberlein, as one of ordinary skill in the art, testified that the terms "filtering firewall" and "gateway" have different meanings in the computer security field. T.T. at 1279:18-1282:10. In fact, Defendants and their expert, Dr. Wallach, also understood the terms "gateways" and "firewalls" as having two different meanings. *See* T.T. at 826:1-5. This understanding was confirmed by Defendants' Executive VP who testified that the gateway and firewall were treated as two separate and distinct products. T.T. at 692:4-12. Defendants' arguments that "firewalls" and "gateways" are one and the same therefore are undermined by the substantial evidence before the jury.   It was entirely within the bounds of the

30

Court's Claim Construction for Mr. Heberlein to provide define "gateway" as a person of ordinary skill in the art. Thus, Defendants' newly raised argument regarding construction of the term "gateway" fails, and this Court should reject this faulty argument, and deny Defendants' Motion in its entirety.

**2.    *Defendants Failed To Provide Substantial Evidence at Trial That The Independent Claims of the '194 Patent Were Rendered Obvious By Combining the Ji 95 Reference with Chen or the Lo 1994 Reference and Failed To Show That A New Trial is Warranted.***

The Court should uphold the jury's finding that the '194 Patent was not obvious because Defendants failed to meet their burden of proving invalidity at trial. Their only witness in support of their invalidity claims was Dr. Wallach, whose testimony was legally insufficient for a number of reasons. First, he failed to show why a person of ordinary skill in the art would combine the prior art references, and his opinions were conclusory without substantive evidentiary support. Second, he improperly used hindsight to arrive at the conclusion that the '194 Patent was obvious. Thus, the jury properly rejected Defendants' obviousness analysis. *See* Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 36 (1966) (warning against a "temptation to read into the prior art the teachings of the invention at issue" and instructing courts to " 'guard against slipping into the use of hindsight'"); *see also* KSR Intern. Co. v. Teleflex Inc., 127 S.Ct. 1727, 1745 (2007) (avoiding use of hindsight bias in conducting obviousness analysis).

Defendants, through Dr. Wallach, failed to show at trial that a person of ordinary skill would be motivated to combine the Ji 1995 reference with the Chen or Lo 1994 reference in order to render the '194 patent obvious. In his testimony, Dr. Wallach did not cite to any specific evidence to show invalidity of the asserted claims of Finjan's patents. As Finjan's expert testified: "And when they provided his evidence, they would put up a chart and it says, Well, was this limitation, you know, taken care of by the prior art? Yes it was. And he would just put a checkmark." T.T. at 1277:7-1278:2; *see also* T.T. at 1325:11-24 ("I did not see any particular evidence. . . it would have made my job a lot easier to rebut it if he would have been

31

very explicit to say, here is our evidence for this limitation, and he doesn't provide a nice, concise example of that.").

Dr. Wallach merely "checked" the box on the claim chart put in front of the jury at trial. His opinion was extremely generalized and conclusory,[18] which is an insufficient basis to support a finding of invalidity. Cytologic, 424 F.3d at 1176. He also testified in a conclusory fashion that the combination of Ji 1995 and Chen or Lo 1994 would render the '194 Patent obvious. T.T. at 958:6-14. He also failed to discuss specifically the technology disclosed in the prior art references in any detail, only "checking the boxes" at direction of his counsel. T.T. at 962:18-963:6; Koito Mfg., 381 F.3d at 1152 (expert giving invalidity opinion should state his own interpretation of the claim element and *explain in detail*). Significantly, Defendants do not cite to Dr. Wallach's invalidity testimony in their JMOL brief in support of many of their arguments as there was no such substantive testimony at trial.

In contrast, Finjan's expert looked at the technology of the prior art references in great detail, and specifically rebutted Dr. Wallach's testimony that it was within the "technical grasp" of a person of ordinary skill in the art to combine the technology disclosed in Lo 1994 or Chen with the technology of Ji 1995. T.T. at 1318:8-1323:2; KSR Intern., 127 S.Ct. at 1742. Thus, the jury had substantial evidence to find the '194 Patent was not obvious.

Finjan's expert, Mr. Heberlein, testified about each of the prior art references in great detail and explained how each failed to invalidate the Finjan Patents. Mr. Heberlein knew and worked with the authors of the Lo 1994 reference personally, and the technology of the Lo 1994 reference was not meant to be used as an automated behavior-based scanning system that could be installed at the gateway. T.T. at 1283: 7-14; 1286:16-20; 1319:7-24; 1373:7-9. Also, Mr. Heberlein testified that the Ji 1995 reference and Chen did not make the '194 Patent obvious due to a number of reasons, not just two as Defendants contend. Motion at 28. Mr. Heberlein

---

[18] Defendants cite to the Veldman article, *Combating Viruses Heuristically,* 67-76 (Sept. 2003) (SC's Motion, Ex. 10) as evidence of obviousness, yet this reference was never mentioned by Dr. Wallach in his claim chart regarding invalidity of the '194 Patent at trial. *See* T.T. at 1066:3-16.

explained to the jury that the technology described in the Chen reference was not located at the gateway. T.T. at 1290:2-6. Defendants' expert, Dr. Wallach, admitted this as well. T.T. at 864:15-16 ("Now, was Chen a system or a piece of software, a virus detector that was installed on a gateway? A: The patent is, I believe, silent about that issue").

Mr. Heberlein also testified during his direct testimony and on cross-examination that Chen did not extract a security profile "pertaining to the Downloadable" and compare it to a security policy as the technology of the '194 Patent does. *See* JTX-1 ('194 Patent, Claims 1, 32, and 65); *see also* T.T. at 1318:24-1319:6; 1379:23-1380:3 ("These [in Fig. 9 of Chen] are suspicious computer operations. But these are not suspicious computer operations *pertaining to the specific downloadable*. That is the important part of the patents") (emphasis added). Further, Defendants' mischaracterize Mr. Heberlein's testimony regarding a hypothetical regarding a security policy.[19] He never testified that Chen contained a security policy of the type in the '194 Patent technology. *See* T.T. at 1380:25-1381:3 ("And deleting the macro or fixing it is a way of not permitting that macro to execute *if* it contains a security policy, isn't it?" A: "I would agree with that."). Thus, Mr. Heberlein rebutted Defendant's invalidity arguments and showed that the technology of Chen did not contain security profile data *pertaining to the specific downloadable* and did not compare such data against to a security policy, as the independent asserted claims of the '194 Patent require. *See* JTX-1 ('194 Patent, Claims 1, 32, and 65). Mr. Heberlein further noted that though some of the inventors of the Chen reference were inventors of the Ji 1995 reference, the Ji 1995 reference was never mentioned during prosecution of the Chen reference. T.T. at 1320:9-1322:3.

Defendants' JMOL arguments regarding invalidity of the '194 Patent fail because Dr. Wallach improperly used hindsight to reach the conclusion that the '194 Patent was obvious. T.T. at 1065:4-7 (Q: "So you look back in hindsight and see 1996 and was what was happening

---

[19] Defendants also mischaracterize Dr. Vigna's testimony about the "obvious" place to put a protection system today, which has nothing to do with the prior art. T.T. at 336:9-15.

then and try to apply prior art at that time. Correct?" A: "Yes."). Dr. Wallach, by his own admission, used hindsight to determine whether the '194 Patent was obvious at the time of the invention in 1996, which is improper. Graham, 383 U.S. at 36. The jury was properly instructed regarding obviousness and reasonably found that the '194 Patent was not invalid. See T.T. at 1575:5-11 (the jury was instructed that "[i]n deciding obviousness, you must avoid using hindsight; that is, you should not consider what is known today or what was learned from the teachings of the patent"). For these reasons, the Court should deny Defendants' Motion.

### 3. Defendants Failed To Provide Substantial Evidence That The Dependent Claims of the '194 Patent Were Rendered Obvious and Failed to Show That a New Trial is Warranted.

Given the lack of evidence at trial to support Defendants' challenge to the validity of the independent claims of the '194 Patent, the asserted dependent claims of the '194 Patent are necessarily valid as well. See Glaxo Group Ltd. v. Ranbaxy Pharms., Inc., 262 F.3d 1333, 1336 (Fed. Cir. 2001) ("Dependent claims are generally narrower in scope than the claims from which they depend") (citation omitted). Relying on one or more of the following references: Ji 1995, Microsoft Authenticode, Firewall Toolkit ("FWTK"), Chen, Lo 1994 reference, and Hershey, Defendants failed to present substantial evidence that the dependent claims of the '194 Patent were invalid.

In their brief, Defendants use the "same arguments" for reversing the jury's verdict with respect to Claims 2 and 3 of the '194 Patent as they do for the independent claims. SC's Motion at 29. However, these arguments fail again for the reasons stated above with respect to Claims 1, 32, and 65 of the '194 Patent. Dr. Wallach's evidence simply was insufficient to show invalidity, as he merely "checked" the box on his claim chart, rather than explain with any evidence why the dependent claims of the '194 Patent were invalid. T.T. at 963:7-969:8.

Mr. Heberlein's rebuttal evidence was credible to the jury. For example, he specifically rebutted Defendants' arguments that Chen and Lo 1994 invalidated Claims 2 and 3 of the '194 Patent by showing a figure from the Chen Patent to the jury and explained how Chen fails to

34

extract a security profile from the downloadable. T.T. at 1323:23-1324:25; 1325:2-1326:3. Mr. Heberlein's detailed opinion was credible, and the jury believed him. Defendants also failed to show that the jury had substantial evidence to find Claim 4 of the '194 invalid. Though Dr. Wallach stated in a conclusory fashion that Microsoft Authenticode and Signed Java were known solutions to "comparing certificates," Mr. Heberlein specifically rebutted Dr. Wallach's opinion by explaining to the jury that Microsoft Authenticode only looks at whether the code has been signed rather than whether it comes from a trusted company, and for this reason, would not have been combined by a person of ordinary skill in the art with the other references to render the '194 Patent obvious. T.T. at 1326:7-1372:8.

Defendants also failed to provide any "substantial evidence" that claims 5-7 of the '194 Patent were invalid for obviousness. Mr. Heberlein directly rebutted Defendants' contention that URL filters were easy to implement on a firewall in 1996. T.T. at 1361:17-18 ("I think [URL filtering] wouldn't work well in a [packet] filtering firewall environment").

Moreover, Defendants' reference to SmartFilter as prior art to invalidate Claims 5-7 is improper, as it was never asserted as prior art in this case, Dr. Wallach never testified regarding SmartFilter, and this evidence was not presented to the jury by Defendants as invalidating evidence. Thus, there was no legally "substantial basis" for a finding that Claims 5-7 of the '194 Patent were invalid.

Dr. Wallach's evidence of invalidity was again legally insufficient as he continued to make conclusory statements without providing substance. For example, Dr. Wallach could not point to specific places in the FWTK where he found the elements of the asserted dependent claims 8-11, 13-14, 26, 28-29, 32, and 34-36 of the '194 Patent. He merely repeated again and again in a robotic, conclusory fashion that he found elements in the prior art references or "in the firewall tool kit." *See e.g.*, T.T. at 965:18-966:4; 966:15-967:2; 967:12-18; 968:2-18. This is not a legally sufficient basis for a finding of invalidity. CytoLogic, 424 F.3d at 1176 ("conclusory evidence does not suffice as substantial evidence of invalidity"). Similarly, for claims 12, 24-25,

27, 30, and 33, Dr. Wallach's opinions was entirely conclusory because he could not point to any specific evidence in the prior art references to invalidate these claims. T.T. at 966-968.

Mr. Heberlein expressed his frustration in rebutting Dr. Wallach's testimony regarding the FWTK:

> "I looked through the source code…[a]nd I couldn't find anything. Once again, if he is going to make this claim, it would be helpful for me to rebut it if he actually told me where in the evidence or showed me the evidence that he is claiming invalidates this. So he didn't show me any particular evidence. So it's virtually impossible for me to do any rebuttal on that particular aspect of his statement."

T.T. at 1316:2-10.

Mr. Heberlein testified that Dr Wallach failed to show any evidence that elements of Claims 8-11, 33-36 of the '194 Patent were disclosed in the prior art references because there was no combination that would build a security profile from the downloadable. T.T. at 1327:24-1328:14; 1329:14-17. With respect to Claims 12-14, Mr. Heberlein also testified that Chen did not disclose a security profile pertaining to a Downloadable compared against a security policy to invalidate Claim 12, and that Dr. Wallach could not point out a specific place in the FWTK where it contained the elements of Claims 13 and 14. T.T. at 1329:18-1330:17.

With respect to Claims 24-27, Defendants attempt to misquote Dr. Wallach, who never gave *any* explanation in support of his invalidity opinion regarding Claim 25, including no statement regarding that the FWTK contains a whitelist. *See* T.T. at 967:9-11. Dr. Wallach similarly failed to discuss *at all* about why one of ordinary skill in the art would combine Hershey with Ji 1995 and Lo 1994 or Chen to make obvious Claim 27 of the '194 Patent. T.T. at 967:19-968:1. Mr. Heberlein testified that these asserted claims were valid, and was not cross-examined about these claims. T.T. at 1330:18-1332:11. Mr. Heberlein further testified that the technology of Lo 1994 and the '194 Patent were different as "apples and oranges." T.T. at 1331:10-11.

Finally, with respect to Claims 28-30, Dr. Wallach fails to provide any specific evidence that the prior art references invalidate these claims. Specifically, Dr. Heberlein testified he

"could not find anything in the source code and [Dr. Wallach] didn't prove any evidence." T.T. at 1332:12-20. With respect to Claim 30 of the '194 Patent, Dr. Wallach never provided any evidence within Ji 1995 and Chen as to how they work in combination to render Claim 30 obvious. T.T. at 968:19-22; 1316:23. Thus, Defendants' citations to portions of the references in its opening brief was never discussed or disclosed by Dr. Wallach at trial, and, therefore, the jury had absolutely no basis for finding Claim 30 invalid for obviousness. SC's Motion at 30-31. Based on these reasons, Defendants' motion should be denied.

### 4. There Was Substantial Evidence Of Secondary Considerations of Non-Obviousness.

Finjan provided substantial affirmative evidence at trial of secondary considerations of non-obviousness. Mr. Heberlein testified that the invention of the '194 Patent met a long-felt but unresolved need in the marketplace, there was copying of the invention by Defendants, and the invention was commercially successful. T.T. at 1344-1351; Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538 (Fed. Cir. 1983) ("evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art").

Specifically, Mr. Heberlein, with his extensive experience working in the field of computer security, testified that the technology of Finjan's 'Patents met a long-felt need in the marketplace to proactively stop previously unknown suspicious computer operations from affecting computers. T.T. at 1344-1348. He explained how a gateway was a much "richer" system than a filtering firewall, and proactive scanning technology of the Finjan Patents was a well-received improvement on the traditional signature-based scanning technology. Id.

Furthermore, Mr. Heberlein testified that Defendants' copying of the invention showed the invention of the Finjan Patents to be nonobvious. T.T. at 1349:23-1350:3. He described emails, product guides, and white papers demonstrating that Defendants had copied the inventions of the Finjan Patents. T.T. at 1350-1351:3. █████████████████

███████████████████████████████. There was substantial evidence at trial as

well demonstrating that the Finjan Patents were pioneering patents and incredibly desirable

technology. T.T. at 116:7-22; 255:10-257:21; 288:25-290:9; 629:12-630:17; PTX-23 at 72833,

72855; PTX-24 at 23228. In light of the substantial evidence of nonobviousness, Defendants'

Motion should be denied.

### 5.    *Defendants Failed To Provide Substantial Evidence At Trial that The '780 Patent is Invalid and Failed to Show That A New Trial is Warranted.*

Defendants' JMOL argument regarding the validity of the '780 Patent is a total of three

sentences, which serves only to highlight the fact that Defendants do not have "substantial

evidence" that the '780 Patent is invalid. Motion at 31. Defendants' sole argument that the jury

verdict should be overturned is that the Court's construction of the '780 Patent term "performing

a hashing function on the Downloadable and the fetched software components to generate a

Downloadable ID" was not used by Finjan at trial. However, both Finjan's experts, Dr. Vigna,

and Mr. Heberlein, testified that they specifically used the Court's construction to show how

Defendants infringed the '780 Patent and also rebut Defendants' invalidity argument related to

the '780 Patent. T.T. at 327:10-11. *See* T.T. at 489:11-21 (Dr. Vigna on cross-examination, Q:

"You understand the Court's interpretation is, The downloadable and the fetched software

component are hashed together?" A: "Yes. . . ."); *see also* T.T. at 1276:15-16; 1276:24-1277:2

(Mr. Heberlein also testifying that he relied upon the Court's claim construction of terms).

Defendants have no evidence to support their argument, such that the only conclusion a

reasonable jury could come to is that the '780 Patent is not invalid. Mr. Heberlein rebutted all of

Dr. Wallach's invalidity arguments, and showed that the technology in Microsoft Authenticode

and Signed Java, did not anticipate or render obvious the '780 Patent. T.T. at 1333:8-1338:17.

Both references were treated by both experts as disclosing the same technology. *See* T.T. at

980:17-19 (Dr. Wallach testifying on direct examination, Q: "Does that mean you need both of

these references for your analysis of these claims? A: "No. Either/or."). Mr. Heberlein

explained to the jury that the technology in the Microsoft Authenticode reference was already considered by the United States Patent and Trademark Office, including the exact document that Dr. Wallach relied upon in his invalidity opinion, in the prosecution of the '780 Patent. T.T. at 1334:24-1335:19. Mr. Heberlein went through each of the claims of the '780 Patent element-by-element, and testified to the lack of evidence from Dr. Wallach as to how the elements were present in the prior art references and the lack of evidence that a person of ordinary skill in the art would combine the references to render the '780 Patent obvious. T.T. at 1333:8-1338:17. For these reasons, Defendants' Motion should be denied.

      6.     ***Defendants Failed To Provide Substantial Evidence At Trial that The '822 Patent is Invalid and Failed to Show That A New Trial is Warranted.***

The jury reasonably found that the '822 Patent was valid in light of the substantial evidence at trial. Defendants' only argument in its Motion is that the jury should have found that the Ji 1997 reference anticipated the '822 Patent. Defendants ignore the fact that, at trial, Dr. Wallach failed to include ***an entire critical element*** of independent Claim 4 of the '822 Patent in his invalidity analysis, namely the first element of "determining whether the downloadable-information includes executable code." T.T. at 1339:19-1340:12. He simply forgot to talk about this element at all. By failing to include an entire element of independent Claim 4 of the '822 patent, Dr. Wallach failed as a matter of law to prove that Claim 4 and all asserted claims dependent on it (Claims 5, 6, and 8) were invalid by anticipation. Xerox Corp. v. 3Com Corp., 458 F.3d 1310, 1323 (Fed. Cir. 2006) (invalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention) (citation omitted); T.T. at 1341:10-19.

Defendants try to prove anticipation by inserting arguments in their brief that were never presented to the jury, as Dr. Wallach failed to testify about all the elements of the '822 Patent. In fact, the jury was only read the abstract of Ji 1997 and was not shown any of the other parts of that reference that Defendants now cite to in their brief. T.T. at 995:6; 1338:22-1339:7. Furthermore, the jury was shown evidence that the Ji reference was considered by the Patent

Office during prosecution of the '822 Patent. T.T. at 1339:8-15; JTX-3. Thus, there was insubstantial evidence for the jury to find Claims 4, 5, 6, and 8 of the '822 Patent were anticipated, and the jury reasonably found that the Ji 1997 reference did not anticipate these asserted claims.

Remarkably, Defendants' only invalidity argument in its Motion for Claims 12 and 13 of the '822 Patent is that these claims are invalid under 35 U.S.C. § 112 ¶6 ("Section 112")--a defense they specifically dropped during trial. Significantly, invalidity under Section 112 was not presented to the jury, evident from the fact that there were no jury instructions or question on the special verdict form relating to any Section 112 claims. D.I. 226; D.I. 226. Furthermore, at no time did Defendants raise on its oral and written Rule 50(a) motion claims under Section 112. Defendants did not present these claims at trial and they have been waived.

Furthermore, Defendants' argument fails as a matter of law because Claims 12 and 13 do not include the word "means" and are afforded a strong presumption that they are not means-plus-function claims which Defendants did not overcome. *See* Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 469 F.3d 1005, 1023 (Fed. Cir. 2006) (citation omitted) ("[m]eans-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function. [A] claim term that does not use 'means' will trigger the rebuttable presumption that § 112 ¶ 6 does not apply...[this presumption] is a "strong one that is not readily overcome"); *see also* Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1362 (Fed. Cir. 2004) ("we have seldom held that a limitation not using the term 'means' must be considered to be in means-plus-function form"). In the very same patent, Claim 28 recites a means-plus-function claim element by using the word "means" and describing a function, demonstrating that the patentee used the appropriate language when it intended to claim a means-plus-function claim element.

Dr. Wallach's limited testimony at trial that the terms "content inspection engine," "packaging engine," "linking engine," "transfer engine," and "MPC generator" are not "standard terms" and he could not go to Radio Shack in order to purchase structures associated with such

terms simply do not constitute clear and convincing evidence of invalidity. For the foregoing reasons, Defendants' Motion should be denied.

## I.   THE JURY'S FINDING REGARDING DAMAGES WAS SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE, THE DAMAGES AWARD WAS NOT INTRINSICALLY EXCESSIVE AND THE AWARD DID NOT "SHOCK THE CONSCIENCE" IN LIGHT OF THE EVIDENCE PRESENTED AT TRIAL.

As a preliminary matter, Defendants are barred from raising arguments regarding excessiveness of the damages in light of the Microsoft agreement, reasonableness of the juries' damages findings, reasonableness of the "rule of thumb" analysis, foreign sales, sales to the US Government, sales of locked technology, and the Cyberguard TSP royalty base because they failed use sufficient specificity in their Rule 50(a) Motion. Chainey, 2008 WL 1700461, at *14 (quoting Williams, 130 F.3d at 571-72).

Defendants' Motion on the issue of damages should be denied because it is based entirely on their assertion that the jury did not properly evaluate the evidence presented at trial. Such arguments are not persuasive. First, the evidence addressed in Defendants' Motion was presented to the jury and Defendants were allotted sufficient time to convince the jury to adopt their interpretation of that evidence as it pertained to damages. Defendants' failure to persuade the jury of its case is not grounds for Defendants to seek to overturn or modify the jury's verdict. The jury weighed the evidence, including the evidence cited in Defendants' Motion, and ultimately awarded Finjan damages in an amount that is supported by the evidence and not so high as to "shock the conscience" in light of that evidence.

### 1.   The Great Weight Of The Evidence Supports The Jury's Damages Award.

It is the role of the jury to "resolve conflicts in the evidence of damages." DSU Medical Corp. v. JMS Co., 471 F.3d 1293, 1309 (Fed. Cir. 2006). For a district court to overturn the damages verdict of the jury, the court must find that the jury's verdict is "against the great weight of the evidence or sufficiently shocking so as to warrant a new trial." Lucent Tech., Inc. v. Newbridge Networks Corp., 168 F.Supp.2d 181, 264 (D. Del. 2001); Monsanto Co. v. Ralph,

382 F.3d 1374, 1383 (Fed. Cir. 2004) ("The jury's damages award must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork."). Further, it is the practice of the Federal Circuit that "when the amount of the damages cannot be ascertained with precision, any doubts regarding the amount must be resolved against the infringer." Ryco, Inc. v. Ag-Bag Corp., 857 F.2d 1418, 1428 (Fed. Cir. 1988); *see also* W. R. Grace & Co. v. Intercat, Inc., 60 F.Supp.2d 316, 321 (D. Del. 1999) "If a patent owner is unable to determine the amount of damages with precision, the court resolves doubts against the infringer."). This Court has held that "the Court may grant a new trial on damages because the jury's award is so entirely disproportionate to the injury to the plaintiff that it "cries out to be overturned or shocks [the] conscience." Mondzelewski v. Pathmark Stores, Inc., 2000 WL 654137, at *23 (D Del. Mar. 20, 2000); *see also* Honeywell Int'l Inc. v. Universal Avionics Sys. Corp., 426 F.Supp.2d 211, 223 (D. Del. 2006) (holding that the "jury's award of damages is entitled to deference and must be upheld unless it is grossly excessive").

Generally, "remittitur is employed when a damage award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded." Boyce v. Edis Co., 224 F.Supp.2d 814, 817-18 (D. Del. 2002). It is well established that remittitur is a device to be "employed only when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive." Spence v. Board of Educ., 806 F.2d 1198, 1200 (3d Cir. 1986). As described below, the jury's damages award is based on the substantial evidence at trial.





**3.**      ***The Jury's Determination that Finjan is Entitled to a 16% and an 8% Royalty***
***Rate on Infringing Sales of Software and Appliances Respectively is Supported***
***by the Evidence Considered by the Jury.***

Defendants assert that this Court should set aside the jury's damage award because the

jury followed the opinions of Finjan's damages expert witness, Russell Parr, instead of Carl

Degen, Defendants' damages expert witness. First, Defendants argue that Mr. Parr misapplied

the rule-of-thumb. However, Defendants do not cite and Finjan is not aware of any cases or

treatises that support Defendants' position. Defendants' characterization of Mr. Parr's analysis as manipulation is also without merit. Mr. Parr examined substantial evidence, including Defendants' financial records, as well as the deposition testimony of Secure Computing's Chief Financial Officer. From that information, he formed an opinion as to the operating profits enjoyed by Defendants as a result of selling the infringing products.

The rule of thumb states that it is to be applied to the operating profit for the accused product and Mr. Parr applied the analysis to the most accurate estimate of operating profit for the accused products. [21] T.T. at 618:21-624:4; 655:18-660:12. He testified that his analysis under the rule of thumb included certain adjustments to Defendants' purported operating profit in an attempt to derive a more accurate picture of profitability for the accused products. Id. It is the practice of Defendants to "assign" expenses to the Webwasher Products without actually ensuring that those expenses directly related to the product. Defendants' expert included those improper expenses in opining to Webwasher's low operating profit margin. To correct this problem, Mr. Parr did not include expenses associated with research and development unrelated to the product, debt expenses and other expenses wholly unrelated to the infringing Webwasher Products sold by the Defendants. Id. He was questioned extensively regarding this purported "manipulation," and Defendants offered demonstrative evidence in an attempt to attack Mr. Parr's expert opinions. Defendants also called their own expert, whose testimony contradicted that of Mr. Parr. The jury weighed that evidence and gave substantial credit to the opinions of Mr. Parr. In accordance with this Courts opinion in Lucent, such analysis by the jury should not be overturned. Lucent, 168 F. Supp. 2d at 264; see also Honeywell, 426 F.Supp. at 226 (upholding jury damage award where jury was able to weigh the evidence presented by the parties in the form of expert testimony).

---

[21] Whereas Defendants complain about Mr. Parr's use of the rule of thumb, both damages experts used the same type of analysis.

Defendants' assertion that no reasonable jury would find an 8% royalty rate for the Cyberguard TSP product is without merit. The jury award is not excessive on its face and does not shock the conscience. After concluding that the Cyberguard TSP line of products infringed the Finjan Patents, they considered damages. Mr. Parr testified that, based on his analysis, the appropriate royalty rate for the Cyberguard TSP line of products was 8%. T.T. at 593:15-596:8; 624:5-626:1; 633:20-636:1. Defendants' expert, Mr. Degen, disagreed with Mr. Parr and gave testimony contradicting Mr. Parr's testimony. The jury weighed the testimony of both expert witnesses and found Finjan's evidence, as presented by Mr. Parr, more compelling. T.T. at 1114:23-1116:11; 1156:7-16. Mr. Parr and Mr. Degen were both cross examined extensively on this issue. T.T. at 670:5-12; 1187:25-1194:8; 1196:24-1202:23; 1203:20-205:8; 1247:12-1248:11. The jury's verdict was supported by the evidence and therefore should not be disturbed.

### 4. *The Jury's Determination of the Royalty Base is Supported by the Evidence Presented at Trial.*

### a. **Evidence Presented at Trial Supports the Jury's Inclusion of All Sales in the Royalty Base.**

The jury's determination of the sales to be included in the royalty base is supported by the evidence presented at trial. The jury heard conflicting evidence during the course of the trial regarding whether or not Defendants' sales of the accused products had a United States connection so as to be included in the royalty base. T.T. at 669:15-19. These sales were included in the base because the entity making the sales, Cyberguard Corporation, was a United States corporation operating in Florida and California and therefore sales were being made from the United States. Indeed, as confirmed by the undisputed testimony at trial, Cyberguard had offered the accused products for sale in the United States. T.T. at 729:16-730:3; 1238:11-21.

Defendants' expert, Mr. Degen, testified that he spoke with Secure Computing employee Jill Putman regarding the circumstances surrounding alleged sales in foreign countries and, from that conversation, opined that those sales were not connected to the United States. However,

Finjan successfully rebutted Mr. Degen's testimony by demonstrating that Ms. Putman, although designated to testify on behalf of Cyberguard regarding its sales, testified during her deposition that she was not "familiar with the sales model" used by Cyberguard. T.T. at 1222:23-1228:12. The jury weighed the evidence presented regarding the nature of the sales made by Cyberguard and determined that revenues generated from those sales should be included in the royalty base. Thus, the jury's finding is supported by the evidence presented at trial and should not be disturbed.

Likewise, the jury's determination that sales of the accused products to suppliers of the federal government should be included in the royalty base should not be disturbed because it is supported by the substantial evidence presented at trial. Mr. Parr included revenue from sales that Defendants claimed were made to the federal government because they were infringing sales under the patent laws. T.T. at 669:20-21. Defendants did not explain to the jury under which circumstances those sales should be removed from the base and Defendants utterly failed to present evidence proving the purported government sales fell under such circumstances, whereas Finjan presented evidence that no sales are covered under the Federal Government exception. PTX-270. Nevertheless, over Finjan's objections, the Court adopted Defendants' jury instruction regarding federal sales wholesale. T.T. at 1429:2-5; 1437:14-18; 1587:9-17. Thus, the jury weighed the evidence, the credibility of the witnesses and ultimately determined that Defendants failed to demonstrate that the alleged sales to the federal government were to be properly removed from the royalty base. For these reasons, Defendants' motion should be denied.

### b. Evidence Presented at Trial Supports the Jury's Inclusion of Revenues from the Sale of the Cyberguard TSP Appliance in the Royalty Base.

As discussed above, the jury's inclusion of revenues of the Cyberguard TSP product line was supported by substantial evidence. After the parties presented conflicting factual and expert evidence regarding infringement by the Cyberguard TSP product line, the jury determined that the Cyberguard TSP product line infringed the Finjan Patents and awarded damages. As such, the jury properly included the Cyberguard TSP product line in the royalty base.

J.   **FINJAN'S NG APPLIANCES DO NOT INFRINGE THE CLAIMS OF THE '361 PATENT.**

The substantial evidence at trial demonstrated that Finjan's NG Appliances do not infringe the '361 Patent. Defendants argue that JMOL should be granted because, "Finjan applied, and the jury relied on, an improperly narrow interpretation of claim scope." Motion at 48). Such assertions are completely unsupported in both fact and law.

1.   *Defendants' Assertions, even if believed, do not support a JMOL.*

Defendants provided absolutely no analysis in their Motion that would even remotely suggest that they proved at trial how the NG Appliances allegedly infringe the asserted claims of the '361 Patent. SC's Motion at 48-50. A patentee's burden of establishing a JMOL motion for infringement is especially high. Honeywell Intern., Inc. v. Hamilton Sundstrand Corp., 166 F.Supp.2d 1008, 1015 (D. Del. 2001) (reversed on other grounds). The court may grant JMOL in favor of a party bearing the burden of proof only where (1) the movant "has established [its] case by evidence that the jury would not be at liberty to disbelieve;" and (2) "the only reasonable conclusion is in [the movant's] favor." Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1065 (Fed. Cir. 1998) (citations omitted). Defendants have not even attempted to meet the minimum legal requirements of showing they established a case that the jury could not disbelieve or that the only reasonable conclusion was in their favor. Indeed, in their Motion, Defendants fail even to mention their affirmative case at all. SC's Motion at 48-50.

2.   *Finjan does not Infringe the '361 Patent.*

Dr. Trent Jaeger, Finjan's expert who addressed Defendants' '361 Patent claims, demonstrated that Finjan NG Appliances do not infringe the asserted claims of the '361 Patent for at least five distinct reasons. *See* T.T. at 1465:2-1492:22. The NG appliances do not infringe the '361 Patent because they are application layer gateways, as opposed to firewalls as required by the asserted claims of the '361 Patent. *See* JTX-5. As Dr. Jaeger testified, the NG Appliances "don't look at the individual packets. They put them back together into the request. So they will look at the application level request." T.T. at 1465:10, 1470:3-6. This is not how a firewall

operates, because firewalls "look at each of these packets" and determines whether to authorize requests on "a packet-by-packet basis." T.T. at 1464:23-24, 1465:20. Defendants incorrectly argued in their Motion that because a portion of the '361 Patent states that "[f]irewalls can control access at a network level, application level," it necessarily means a firewall is the same as an application layer gateway as discussed by Dr. Jaeger. SC's Motion at 49. This is a complete mischaracterization of Dr. Jaeger's testimony, as shown above, which clearly distinguishes the individual packet analysis of a firewall and the NG Appliance's analysis of a complete application level request.

The NG Appliances also do not infringe the '361 Patent because, as required by Claim 15, they do not query a directory as the response of a request. This is based on the substantial evidence at trial. Dr. Jaeger credibly testified that, based on the deposition testimony of Mr. Chew, an inventor on the '361 Patent, and the plain claim language, querying as a response to a request was required. T.T. at 1482:17-1483:2. In direct contradiction to the inventor's testimony and the plain language of the patent claims, Defendants make the entirely unsupported argument that Claim 15 only discloses code and not the order it is run. SC's Motion at 49.

The NG Appliances also do not infringe the asserted claims of the '361 Patent because they do not authorize requests using an authorization filter "based on a directory schema that is predefined." JTX-5 ('361 Patent, col. 7, ls. 30-31). Dr. Jaeger testified that NG Appliances have an internal database which derives the authorization filter. T.T. at 1483:13-21. And as Dr. Jaeger further testified, "the database base's structure, that is the form that was used to determine what was in the database, can be used without the directory. So this structure or schema is independent of the directory itself." T.T. at 1487:21-24. Because the schema used is independent from the directory, it is not "based on a directory schema" as required by the claims. Dr. Jaeger did not interpret this to require the whole schema has to be imported. Dr. Jaeger explicitly stated that the authorization filter was not based on the directory schema because it was created independently from the directory schema, not that the whole schema had to be imported.

Additionally, the NG Appliances do not infringe because they do not authenticate users as required by the '361 Patent claims. Dr. Jaeger testified about how authentication is different from authorization because it requires a "secret" (such as a password) which proves the person is who they say they are. T.T. at 1489:16-1490:5. He further testified that the NG Appliances do not do such authentication. T.T. at 1490:6-7. Without any support, Defendants argue that "authentication" is in the preamble and conclude that "the preamble is not a limitation." SC's Motion at 50. Despite Defendants' assertions, a preamble can be a limitation, when it is "necessary to give life, meaning, and vitality" to a claim. Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999). The preamble breathes life and meaning into the claims because it requires the additional concept of "authentication" which, as discussed above, is a distinct process from "authorization" and without which the claims would lose meaning.

The NG Appliance do not infringe the '361 Patent for additional reasons Defendants did not even attempt to refute. Dr. Jaeger testified that the NG Appliance do not infringe because they do not include a server, as required by claims 1-5 and 7. See T.T. 1466:10-1468:10. Defendants failed to address this noninfringement position. They also failed to address the requirement of querying based upon the request, as discussed above, for claims 8-12 and 14. In light of the substantial evidence at trial that Finjan does not infringe the '361 Patent, the jury's verdict should not be overturned or disturbed.

## V.  CONCLUSION

For the above reasons, Finjan respectfully request that Defendants' motion be denied.

OF COUNSEL:

Paul J. Andre
Lisa Kobialka
King & Spalding LLP
1000 Bridge Parkway
Redwood City, CA 94065
(650) 590-0700

Dated: May 9, 2008
Public Version: May 16, 2008

POTTER ANDERSON & CORROON LLP

By: _____
     Philip A. Rovner (#3215)
     P. O. Box 951
     Wilmington, DE  19899
     (302) 984-6000
     provner@potteranderson.com
     *Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on May 16, 2008, the within document

was filed with the Clerk of the Court using CM/ECF which will send notification of such

filing(s) to the following; that the document was served on the following counsel as

indicated; and that the document is available for viewing and downloading from

CM/ECF.

### BY HAND DELIVERY AND E-MAIL

Frederick L. Cottrell, III, Esq.
Kelly E. Farnan, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
cottrell@rlf.com; farnan@rlf.com

I hereby certify that on May 16, 2008 I have sent by E-mail the foregoing

document to the following non-registered participants:

Jake M. Holdreith, Esq.
Christopher A. Seidl, Esq.
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
jmholdreith@rkmc.com ; caseidl@rkmc.com

/s/ Philip A. Rovner
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
E-mail: provner@potteranderson.com