IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FINJAN SOFTWARE, LTD., an Israel corporation,

Plaintiff-counterdefendants,

v.

SECURE COMPUTING CORPORATION, a Delaware corporation; CYBERGUARD CORPORATION, a Delaware corporation, WEBWASHER AG, a German corporation and DOES 1 THROUGH 100,

Defendants-counterclaimants.

C. A. No. 06-00369-GMS

**REDACTED**
**PUBLIC VERSION**

**DEFENDANTS-COUNTERCLAIMANTS' ANSWERING BRIEF IN OPPOSITION TO FINJAN'S COMBINED POST-TRIAL MOTIONS FOR ENHANCED DAMAGES AND ATTORNEYS' FEES, EXPENSE AND COSTS**

OF COUNSEL:

Ronald J. Schutz
Jake M. Holdreith
Christopher A. Seidl
Trevor J. Foster
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Kelly E. Farnan (#4395)
farnan@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

*ATTORNEYS FOR SECURE COMPUTING*

Dated: May 9, 2008

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..... iv

INTRODUCTION ..... 1

NATURE OF THE PROCEEDINGS AND BACKGROUND ..... 2

STAGE OF THE PROCEEDINGS ..... 2

ARGUMENT ..... 3

I. LEGAL STANDARDS ..... 3

A. Correct Legal Standards for Motion for Enhanced Damages ..... 3

B. Legal Standard for Motion for Attorneys' Fees, Costs, and Expenses ..... 5

II. THE COURT SHOULD NOT ENHANCE THE DAMAGES AWARD ..... 6

A. Finjan Has Not Proven By Clear And Convincing Evidence That Secure Acted With "Objective Recklessness" ..... 6

B. The *Read* Factors Do Not Weigh In Favor of Enhanced Damages ..... 8

1. Secure Did Not Copy But Attempted To Develop Its Own, More Effective Solution ..... 8

a. Secure Presented Substantial Evidence In Its Opening Brief In Support of JMOL/New Trial That Secure Specifically Rejected Copying ..... 8

b. Webwasher Was Competing With Finjan, Not Copying ..... 9

c. It Is Undisputed That the "Option to Copy Finjan's Features" Was "Dropped" ..... 10

d. Stecher, Berzau, and Alme Were Not Aware Of Finjan's Patents And Did Not Copy Finjan ..... 11

e. Even If The Court Finds Copying, Then The Court Should Not Enhance Damages Because Finjan Admits That Market Pressure Drove Secure's Decisions ..... 12

2. Secure Acted In Good Faith ..... 13

    a. Finjan Failed To Prove That Secure Acted In Bad Faith With Knowledge Of Finjan's Patents ..... 14

b. Secure Was Cautious Of Intellectual Property Rights And Has Good Faith And Substantial Defenses of Non-Infringement and Invalidity of Finjan's Patents ..... 15

3. Secure Computing Did Not Commit Litigation Misconduct ..... 17

a. Secure Did Not Argue Contrary to the Court's Claim Construction ..... 18

i. "addressed to a client" ..... 18

ii. "performing a hashing function on the Downloadable and the fetched software components to generate a Downloadable ID" ..... 19

b. Secure Computing's Claims Are Not Frivolous or Unsupported and Dropping Claims Does Not Justify Enhanced Damages ..... 20

i. Enablement and Indefiniteness Defenses ..... 21

ii. Inequitable Conduct Claims ..... 21

iii. Patent Exhaustion Defense ..... 22

iv. Secure's Infringement Claims ..... 25

c. Secure's Witness List Complied With The Pretrial Order And A Strategic Decision Not To Call Witnesses Does Not Justify Enhanced Damages ..... 27

4. Secure Computing's Relative Size and Financial Condition Does Not Weigh In Favor of Enhancement ..... 28

5. This Was A Trial That Was Full Of, At Worst, Close Questions of Infringement, Validity, Willfulness, and Damages ..... 30

6. Duration of Alleged Infringement Does Not Justify Enhanced Damages ..... 32

7. Secure Has Taken Steps to Avoid Infringement and Has Not Disregarded The Court's Judgment ..... 34

8. Motivation For Harm ..... 35

9. Secure Did Not Attempt To Conceal Any Misconduct ..... 36

III. THE COURT SHOULD NOT GRANT ATTORNEYS' FEES, EXPENSES, AND COSTS BECAUSE THIS IS NOT AN EXCEPTIONAL CASE ..... 36

A. Attorneys' Fees Should Not Be Awarded For The Same Reasons That Enhanced Damages Should Not Be Awarded ..... 36

B. Even If The Court Awards Enhanced Damages, The Court Should Decline To Award Attorneys' Fees Because This Is Not An "Exceptional Case" ..... 36

C. Finjan's Request For Fees and Expenses Should Be Tested For Unreasonableness ..... 38

CONCLUSION ..... 38

TABLE OF AUTHORITIES

Page

Cases

*Alloc, Inc. v. Pergo*,
2008 U.S. Dist. LEXIS 35944 (E.D. Wis. May 1, 2008) ........ 31

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) ........ 33

*B. Braun Med., Inc. v. Abbott Labs.*,
124 F.3d 1419 (Fed. Cir. 1997) ........ 23

*Brooktree Corp. v. Advanced Micro Devices*,
977 F.2d 1555 (Fed. Cir. 1992) ........ 30

*Computer Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1386 (Fed. Cir. 2008) ........ 6

*Cybor Corp. v. FAS Techs.*,
138 F.3d 1448 (Fed. Cir. 1998) ........ 6, 30, 36, 37

*Depomed, Inc. v. Ivax Corp.*,
532 F. Supp. 2d 1170 (N.D. Cal. 2007) ........ 3

*Fisher-Price, Inc. v. Safety 1st, Inc.*,
2008 U.S. Dist. LEXIS 36712 (D. Del. May 5, 2008) ........ *passim*

*Forest Labs. v. Abbott Labs.*,
339 F.3d 1324 (Fed. Cir. 2003) ........ 5, 6

*General Talking Pictures Corp. v. Western Elec. Co.*,
304 U.S. 175 (1938) ........ 23

*Gentry Gallery v Berkline Corp.*,
134 F.3d 1473 (Fed. Cir. 1998) ........ 38

*Golden Voice Tech. & Training v. Rockwell Firstpoint Contact Corp.*,
2003 U.S. Dist. LEXIS 25997 (M.D. Fla. Oct. 10, 2003) ........ 20

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*,
166 F. Supp. 2d 1008 (D. Del. 2001) ........ *passim*

*IMX, Inc. v. Lendingtree, LLC*,
469 F. Supp. 2d 203 (D. Del. 2007) ........ 17, 18, 34, 37

*In re Seagate Tech , L.L.C* ,
497 F 3d 1360 (Fed. Cir. 2007) ........ *passim*

*Informatica Corp. v. Business Objects Data Integration, Inc.*,
527 F. Supp 2d 1076 (N.D. Cal. 2007) ........ 3, 4

*Jurgens v CBK, Ltd.*,
80 F.3d 1566 (Fed. Cir. 1996) ........ 28

*KSR Int'l Co v. Teleflex Inc.*,
127 S. Ct. 1727 (2007) ........ 31

*LG Electronics v. BizCom*,
453 F.3d 1370 (Fed Cir 2006), *cert. granted*, 128 S. Ct. 28 (2007) ........ 22, 23

*Mallinckrodt, Inc. v. Medipart, Inc* ,
976 F 2d 700 (Fed. Cir. 1992) ........ 23

*Modine Mfg. Co. v. Allen Group, Inc.*,
917 F.2d 538 (Fed. Cir. 1990) ........ 36

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*,
243 U.S. 502 (1917) ........ 23

*Murray v. Fairbanks Morse*,
610 F.2d 149 (3rd Cir. 1979) ........ 19

*Paper Converting Mach. Co. v. Magna-Graphics Corp.*,
745 F.2d 11 (Fed. Cir. 1984) ........ 15

*Read Corp. v. Portec, Inc* ,
*970 F.2d 816 (Fed Cir. 1992)* ........ *passim*

*Revlon Consumer Prods. Corp. v. L'Oreal S.A.*,
1997 U.S. Dist. LEXIS 4117 (D. Del. March 26, 1997) ........ 22

*State Contr. & Eng'g Corp. v. Condotte Am , Inc.*,
346 F.3d 1057 (Fed. Cir. 2003) ........ 15

*State Indus., Inc. v. A.O. Smith Corp.*,
751 F.2d 1226 (Fed. Cir. 1985) ........ 10

*Stickle v Heublein, Inc.*,
716 F.2d 1550 (Fed. Cir. 1983) ........ 20

*Trading Techs. Int'l, Inc , v. eSpeed, Inc.*,
2008 U.S. Dist. LEXIS 295 (N.D. Ill. Jan. 3, 2008) ........ 8, 9, 10

*Tristrata Tech., Inc. v. ICN Pharms., Inc.*,
314 F. Supp. 2d 356 (D. Del. 2004) ... 36

*Underwater Devices, Inc. v. Morrison-Knudsen Co.*,
717 F.2d 1380 (Fed. Cir. 1983) ... 4, 5, 13

*United States v. Univis Lens Co.*,
316 U.S. 241 (1942) ... 22, 23, 24

*Waldorf v. Shuta*,
142 F.3d 601 (3rd Cir. 1998) ... 19

**Statutes**

35 U.S.C. §283 ... 33

35 U.S.C. § 285 ... 5, 35, 36, 38

35 U.S.C. §112 ... 21

Fed. R. Civ. P. 50 ... 3

Fed. R. Civ. P. 50(b) ... 3

Fed. R. Civ. P. 59 ... 3

Fed. R. Civ. P. 62 ... 34

RLF1-3282153-1

## INTRODUCTION[1]

Defendants-counterclaimants Secure Computing Corporation, Cyberguard Corporation, and Webwasher AG ("Secure") should not be punished with enhanced damages, and certainly not treble damages, because Secure's conduct and the totality of the circumstances do not justify such an award The Court should not enhance the damages award because Secure did not act with "objective recklessness." Even if the Court affirms the jury's willfulness finding and denies Secure's post-trial motions regarding willfulness, in light of all the facts and circumstances, Secure's conduct is far from the egregious behavior that justifies enhancement.

The *Read* factors weigh strongly against enhancement. For example, but without limitation: (1) Secure attempted to develop its own solution and did not copy Finjan; (2) Secure acted in good faith and has good faith and substantial defenses of non-infringement and invalidity, and those questions were, at worst, close; (3) there has been absolutely no litigation misconduct; (4) there is no evidence that Secure was motivated by anything other than competition, nor that Secure intended to harm Finjan and, even taking Finjan's allegations as true, enhancement is not appropriate because - as Finjan argues - Secure was motivated by market pressure not malice; (5) Secure has taken remedial action; and (6) Finjan has conceded that Secure has not attempted to conceal any misconduct. Just as this Court found in *Honeywell v. Hamilton Sunstrand Corp.*, and recently in *Fisher-Price, Inc. v. Safety 1st, Inc.*, the Court should find here that there is insufficient evidence of a "culpable mindset" and the *Read* factors

[1] On the day this brief was due, Secure discovered that the Court has posted a new page limit policy on its website that limits opening and answering briefs to 20 pages Secure respectfully requests that the Court accept this brief as filed in compliance with the previous page limit, especially in light of the fact that Finjan's opening brief was 30 pages. If the Court determines that the parties' briefs should be limited to 20 pages, Secure respectfully requests that the Court grant Secure leave to re-file its brief to comply with the new page limit policy within one week after Finjan files a revised brief in compliance with the new page limit.

do not weigh in favor of enhancement. Finjan's motion for enhancement damages should be denied

For the same reasons that the Court should not enhance damages, the Court should find that this is not an "exceptional case" and, therefore, should not award attorneys' fees, expenses, and costs. However, even if the Court awards enhanced damages, the Court should find that an award of attorneys' fees, expenses, and costs is not appropriate. Finally, if the Court awards attorneys' fees, expenses and cost, Secure respectfully requests the right to challenge their reasonableness.

## NATURE OF THE PROCEEDINGS AND BACKGROUND

This action involves allegations of infringement relating to five United States Patents. The relevant facts for this motion are contained in trial transcripts (*See* D.I. 227-234) (cited to herein as "(Tr. at page:line (D.I.).") and the trial exhibits from the eight-day trial, as well as the facts presented in Secure's Opening Brief in support of its post-trial motions. (D.I. 266.)

Finjan asserts that Secure's Webwasher products and Cyberguard TSP products infringe claims 1-4, 24-30, 32-36 and 65 of the '194 Patent, claims 1-6, 9-14 and 18 of the '780 Patent, and claims 4, 6, 8, 12 and 13 of the '822 Patent.[2] At trial, Secure asserted several substantial defenses, including non-infringement and invalidity of Finjan's Patents.

## STAGE OF THE PROCEEDINGS

This case was tried to a jury from March 3-11, 2008. (D.I. 227-233.) On March 12, 2008, the jury returned a verdict in favor of Finjan. (Tr. at 1671:12-1678:25 (D.I. 234); *see also* D.I. 226.) On March 28, 2008, the Court entered Judgment in favor of Finjan, for monetary damages. (D.I. 242.) On March 27, 2008, after the verdict and prior to the entry of judgment, Secure timely

[2] Secure asserts in its post-trial briefings that the jury should have found that Finjan's Vital Security products infringe claims 1-5, 7-12 and 14-15 of the '361 Patent.

moved for JMOL, pursuant to Fed. R. Civ. P. 50(b), and in the alternative, moved for a new trial and/or remittitur. (D.I. 240.) On April 11, 2008, following the Court's entry of judgment on the verdict, Secure timely filed an amended motion under Rule 50, for JMOL, and under Rule 59, for a new trial or to alter or amend the judgment (remittitur). (D.I. 253.)

**ARGUMENT**

# I. LEGAL STANDARDS

## A. Correct Legal Standards for Motion for Enhanced Damages

In its opening brief, Finjan identified the nine factors from *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-28 (Fed. Cir. 1992) that courts consider when deciding whether to enhance damages. (Finjan Opening Br. at 4 (D.I. 264).) However, in the wake of *In re Seagate Tech., L.L.C.*, 497 F.3d 1360 (Fed. Cir. 2007), it is at least unsettled whether the *Read* factors remain relevant to an enhanced damages analysis. *See Depomed, Inc. v. Ivax Corp.*, 532 F. Supp. 2d 1170, 1177 (N.D. Cal. 2007) (stating that, after *Seagate*, "[i]t is unsettled . . . whether the factors identified in *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992), remain relevant to the willfulness inquiry."); *Informatica Corp. v. Business Objects Data Integration, Inc.*, 527 F. Supp. 2d 1076, 1082 (N.D. Cal. 2007) (reversing, in light of *Seagate*, its own prior decision to award enhanced damages under *Read*). In *Seagate*, the Federal Circuit significantly raised the bar for willful infringement and enhanced damages and held that "proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness." 497 F.3d at 370-71. Under *Seagate*, the patentee must meet a two-step test, by clear and convincing evidence: (1) a patentee must show by clear and convincing evidence that the alleged infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. The state of mind of the accused infringer is not relevant to this objective inquiry; and (2) if the threshold

objective standard in (1) is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer. *Id.* The Federal Circuit declined to further develop the application of this new heightened willfulness standard -- leaving that task to future cases -- but it did suggest that "the standards of commerce" would be among the factors to consider. *Id*

The new *Seagate* standard changed the landscape of willfulness and enhanced damages. For example, in *Informatica*, the Northern District of California recognized that *Seagate* raised the bar not only for a willfulness finding, but for a determination of enhanced damages. 527 F. Supp. 2d at 1038. The *Informatica* court reversed its prior decision to enhance damages under the *Read* factors, stating: "[c]onsidering the totality of the circumstances in light of *Seagate*, which significantly raised the bar for a finding of willfulness, the Court now declines to award any enhancement in this case." *Id.* In light of this new raised bar for willfulness and enhanced damages, and the (at least) uncertainty regarding *Read* and the determination of enhanced damages after *Seagate*, Secure will address Finjan's motion for enhanced damages under the *Seagate* standard, and under the *Read* factors. To be sure, under *Seagate*, Finjan must at least prove by clear and convincing evidence that Secure acted with "objective recklessness," which Finjan failed to do. (*See* Secure Opening Br. In Support of Motion for JMOL/New Trial at 41-50 (D.I. 266).) Under either *Seagate* or *Read*, however, Finjan's motion should be denied.

In its opening brief, Finjan also misstates two important legal standards. First, Finjan wrongly asserts that Secure Computing violated an "affirmative duty" to exercise due care, and even an "affirmative duty . . . to seek and obtain legal advice from counsel." (Finjan Opening Br. at 3, 9-10 (citing *Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380 (Fed. Cir.

1983))(D.I. 264).) The Federal Circuit in *Seagate* explicitly overruled *Underwater Devices* and held that an alleged infringer no longer has an "affirmative duty of care" or an "affirmative obligation to obtain opinion of counsel" to ensure that he does not infringe a patent. 497 F.3d at 1371-72. The Federal Circuit was clear:

> [W]e overrule the standard set out in *Underwater Devices* and hold that proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness. Because we abandon the affirmative duty of due care, we also reemphasize that there is no affirmative obligation to obtain opinion of counsel.
>
> *Id.*

Second, Finjan wrongly asserts that the jury's willfulness finding alone entitles Finjan to treble damages. (Finjan Opening Br. at 3-6 (D.I. 264).) However, as this Court said in *Honeywell Int'l Inc. v. Hamilton Sundtrand Corp.*, 166 F. Supp. 2d 1008, 1040 (D. Del. 2001), *aff'd in part and vacated in part on other grounds*, 370 F.3d 1171 (Fed. Cir. 2004), and as is well settled, a finding of willfulness "does not mandate enhanced damages, much less treble damages." *Id.* at 1040; *see also Read*, 970 F.2d at 826. The "paramount determination [for enhanced damages] . . . is the egregiousness of the defendant's conduct based on all the facts and circumstances. Thus, enhancement of damages is within the discretion of the district court and is informed by the totality of the circumstances." *Honeywell*, 166 F. Supp. 2d at 1040 (citations omitted). Like in *Honeywell*, this Court should deny enhanced damages.

**B. Legal Standard for Motion for Attorneys' Fees, Costs, and Expenses**

35 U.S.C. § 285 provides that "in exceptional cases [the court] may award reasonable attorney fees to the prevailing party." While an award of attorneys' fees is left to the Court's discretion, the Federal Circuit is "mindful of the limited circumstances in which an award of attorney fees is appropriate." *Forest Labs. v. Abbott Labs.*, 339 F.3d 1324, 1329 (Fed. Cir. 2003).

Further, the legislative history of Section 285 emphasizes the rarity of such an award. As the Federal Circuit has noted, the Senate Report that accompanied the predecessor statute to Section 285 stated that "'it is not contemplated that the recovery of attorney's fees will become an ordinary thing in patent suits.'" *Id* (internal citations omitted).

Courts analyze requests for fees and expenses under Section 285 using a two-part test. *Id*; *Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998). First, the Court must determine whether the prevailing party has proven, by clear and convincing evidence, that the case is "exceptional." *Forest Labs*, 339 F.3d at 1328; *Computer Docking Station Corp. v Dell, Inc.*, 519 F.3d 1386 (Fed Cir. 2008) Second, even if a Court finds that the case meets the "exceptional case" standard, the court then must determine whether an award of attorney fees and expenses is appropriate. *Forest Labs*, 339 F.3d at 1328 (citing *Cybor*, 138 F.3d at 1460). Generally, when enhanced damages are not awarded, then the Court should not award attorneys' fees, costs, and expenses. *See Honeywell*, 166 F. Supp. 2d at 1041; *see also Fisher-Price, Inc v. Safety 1st, Inc.*, 2008 U.S. Dist. LEXIS 36712, at *21 (D. Del. May 5, 2008)(denying attorneys' fees "[f]or reasons similar to those underlying the court's decision not to award enhanced damages . . . .") Like in *Honeywell* and *Fisher-Price*, this Court should deny attorneys' fees, costs, and expenses.

## II. THE COURT SHOULD NOT ENHANCE ANY DAMAGES AWARD

### A. Finjan Has Not Proven By Clear And Convincing Evidence That Secure Acted With "Objective Recklessness"

Secure has moved for judgment as a matter of law, or a new trial, on willfulness and Secure incorporates those arguments herein. (D.I. 240, 253, 266 at 41-48.) As Secure showed in its Opening Brief in support of its motion to overturn the jury's willfulness finding (D.I. 266 at 41-48), Finjan has not proven by clear and convincing evidence that Secure acted with "objective

RLF1-3282153-1

recklessness." Finjan failed to prove by clear and convincing evidence that Secure acted despite an objectively high likelihood that its actions constituted infringement of a valid patent because there are substantial defenses in this case, and even if Finjan met that criteria, Finjan failed to prove by clear and convincing evidence that this objectively-defined risk (defined by the record at trial) was either known or so obvious that it should have been known to Secure. (*Id.*) Secure respectfully submits that, considering the totality of the circumstances, in light of *Seagate*, and Secure's showing in its post-trial motion briefs, Finjan did not prove by clear and convincing evidence that Secure acted with "objective recklessness." Therefore, like in *Informatica*, the Court should decline to enhance damages in this case.

Further, even if the Court denies Secure's post-trial motion to overturn the jury's willfulness verdict, the Court should deny enhanced damages because: (1) a willfulness finding does not mandate enhanced damages; and (2) this case is like *Honeywell*, where this Court denied enhanced damages. In *Honeywell*, this Court denied enhanced damages because:

> Although the evidence was sufficient to support the jury's finding of willfulness, the court finds that the evidence was not strong enough to warrant enhanced damages. Honeywell supports its willfulness argument by citing a broad range of circumstantial evidence, however, there was little direct evidence which evinced the sort of culpable mindset that would make enhanced damages appropriate in this case.

166 F. Supp. 2d at 1040.

Like in the plaintiff in the *Honeywell* case, Finjan has, at best, presented a broad range of circumstantial evidence, such as the "Finjan Killer" reference, to support its willfulness claim. Finjan's evidence does not demonstrate a culpable mindset by Secure. Therefore, even if the Court sustains the willfulness verdict, the Court should deny enhanced damages.

### B. The *Read* Factors Do Not Weigh In Favor of Enhanced Damages

#### 1. Secure Did Not Copy But Attempted To Develop Its Own, More Effective Solution

##### a. Secure Presented Substantial Evidence In Its Opening Brief In Support of JMOL/New Trial That Secure Specifically Rejected Copying

*Read* factor number 1 is whether Secure deliberately copied Finjan. As Secure Computing showed in its Opening Brief in support of its post-trial motions (D.I. 266 at 46-48), Secure Computing did not copy Finjan.

As an initial matter, for willful infringement, alleged deliberate copying is only relevant once *Seagate's* threshold factor of "objective likelihood of infringement" is met. 497 F.3d at 1371; *see also Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 2008 U.S. Dist. LEXIS 295, at *8-10 (N.D. Ill. Jan. 3, 2008 (stating that copying "is only relevant once *Seagate's* threshold of 'objective likelihood of infringement' is met") That is because an alleged infringer's state of mind is not relevant to the threshold, objective factor. If the threshold factor is not met then the second factor (when state of mind is relevant) should never be considered. Here, Finjan failed to meet the objective threshold because it failed to present clear and convincing evidence that Secure acted despite an objectively high likelihood that its actions constituted infringement of a valid patent – in other words, on the record at trial, Secure presented substantial, reasonable, credible and legitimate non-infringement and invalidity defenses. Under the first *Seagate* factor, it is not relevant whether an alleged infringer believed it might be infringing a patent and did it anyway. Rather, if after the record is developed, there are substantial questions of non-infringement or invalidity of the patent, then the first factor is not satisfied. 497 F.3d at 1371-72. Therefore, the Court need not even determine Secure's state of mind (or "deliberate copying") unless Finjan meets the objective

threshold, which Finjan has not. *See Trading Techs.*, 2008 U.S. Dist. LEXIS 295, at *8-10; (*see* D.I. 266 at 41-46.).

However, even if the Court finds that Finjan met *Seagate's* objective threshold, Finjan failed to present sufficient evidence to meet the subjective factor and, as explained in Secure's post-trial motion Opening Brief (D.I. 266 at 46-48) and as explained below, Finjan failed to present evidence that Secure copied Finjan's Patents or features. Therefore, *Read* factor number 1 weighs against enhanced damages

b. Webwasher Was Competing With Finjan, Not Copying

In its opening brief, Finjan has spun evidence of competition between Webwasher and Finjan into a tangled web of alleged copying. For example, Finjan points to evidence that Webwasher has been called the "Finjan Killer" or "Finjan Buster" and that, at one time, someone at Webwasher wanted to "create something similar to Finjan." It is undisputed that, on some level, Webwasher (the relevant defendant at the time) and Finjan were competitors when Webwasher was developing Webwasher version 5.1. However, none of this evidence is evidence that Secure copied.[3] At best, this is evidence of competition. For example, Mike Gallagher, Secure's Sr. VP of Product Development and Customer Support, tied the "Finjan Killer" reference to competition as follows:

> I would say that in every product that we build, in any successful company in the industry, you certainly build your products to ensure that they can adequately compete against the competition in the space because it's a core requirement.
>
> (Tr. at 728:13-23 (D.I. 230).)

[3] The evidence of competition certainly does not prove copying of Finjan's source code which, as provided in Secure's Opening Brief in support of its post-trial motions, would be irrelevant anyway because Finjan failed to prove that any of its products or source code is an embodiment of its Patents.

Likewise, as even Finjan's own technical expert Dr. Giovanni Vigna did not dispute, the references to "Finjan Buster" and statements like "helps to be competitive with products from Finjan" are not in Secure's source code (and of course do not show copying of source code)[4] but are in separate folders and are simply notes from a Webwasher employee regarding the desire to be competitive with Finjan. (*Id.* at 473:7-480:3 (D.I. 229).) In short, the references to "Finjan Killer" and "Finjan Buster" are, in the words of the Federal Circuit, "classic commercial gamesmanship under the patent system but it is not the kind of behavior courts have categorized in the past as *willful infringement* . . The world of competition is full of 'fair fights,' of which this suit seems to be one." *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1235-36 (Fed. Cir. 1985); *see also Trading Techs.*, 2008 U.S. Dist. LEXIS 295, at *8-9 (holding that defendant's "attempts to mimic the functionality of plaintiff's product because customers preferred it" and "in order to stay competitive" does not "rise to the level of egregious copying. Rather, this is classic commercial gamesmanship.") Like the evidence in *State Industries* and *Trading Techs.*, the evidence of competition between Webwasher and Finjan does not prove copying or willful infringement, and does not justify enhanced damages.

c. <u>It Is Undisputed That the "Option to Copy Finjan's Features" Was "Dropped"</u>

It is undisputed that, on June 1, 2004, the Webwasher development team conducted a "Product Meeting," in which Webwasher version 5.1 planning was discussed. (Ex. 1 (DTX-1056); *see also* Finjan Opening Br. at p. 7 (D.I. 264); Finjan Ex. 1 at 3 (D.I. 265, 276-2)(PTX-36).) Finjan argues that the development team considered an option to do "what Finjan does." (Finjan Opening Br. at 7 (D.I. 264); Finjan Ex. 1, at 3 (D.I. 265, 276-2)(PTX-36).). However, it is

[4] It is undisputed that none of Finjan's four technical experts compared the parties' source codes to determine if they matched. Therefore, Finjan offered no proof that Webwasher uses source code that is even similar to, let alone copied from, Finjan's source code.

undisputed that, during that same June 1 planning meeting, the "option to copy Finjan's features" was "dropped." (Ex. 1 (DTX-1056))(emphasis added). Finjan never challenged or rebutted this unequivocal statement. Therefore, *Read* factor number 1 weighs against enhanced damages.

d. There Is No Evidence That Stecher, Berzau, and Alme Were Aware Of Finjan's Patents Or That They Copied Finjan

Finjan continues to erroneously argue that Martin Stecher, Frank Berzau, and Christoph Alme were aware of Finjan's Patents and copied Finjan. The substantial evidence at trial proved just the opposite — there is no evidence that Mr. Stecher, Mr. Berzau, and Mr. Alme ever looked at Finjan's Patents, or that they copied Finjan.

Finjan presented no evidence or testimony that Mr. Stecher looked at or was aware of Finjan's Patents. Further, when shown the so-called "copying option" email discussed above (PTX 36), Mr. Stecher testified as follows:

Q: Which of these options did Webwasher pursue?

A: **None of them was implemented**.

(Tr. at 319:1-3 (D.I. 228)(emphasis added)). Instead, Mr. Stecher testified, Secure chose "more diverse methods" and a "rules and category-based system with media types" that was implemented based on further meetings to improve the performance rate of the product. (*Id.* at 319:4-12.) As Finjan admits in its opening brief, when asked the difference between the two options considered at the June 1 planning meeting and what was implemented by Webwasher, Mr. Stecher said "the option that was finally implemented is closer to what is listed under 1." (*Id.* at 319:6-7.)(emphasis added). Common sense and plain English dictates that "close" does not mean a copy. The evidence at trial showed that Webwasher harshly criticized Finjan's technology as ineffective – as Finjan admits in its briefs to this Court – and developed its own, "more diverse methods" rather than copy Finjan's product. The undisputed record shows that the product Webwasher developed was in fact

more effective than Finjan's product. (*See* Finjan Ex. 1 at 3-4 (D.I. 265, 276-2); *see also* Tr. at 319:4-17 (D.I. 228).)

In addition, Finjan presented no evidence that either Mr. Alme or Mr. Berzau looked at or were aware of Finjan's Patents, and presented no evidence that either of them copied Finjan's Patents. Mr Alme testified that he did not review any products while developing the proactive scanner of Webwasher. (*Id.* at 305:23-25.) Mr. Alme testified that he merely saw screenshots of Finjan's product, not the actual product. (*Id* at 306:12-16.) Mr. Berzau testified that he merely saw the Finjan "GUI" and it did not include proactive scanning. (*Id.* at 580:2-4 (D.I. 229))("Was one of the configuration options ProActive scanning? Answer: No."). [5] *Read* factor number 1 weighs against enhanced damages.

e. <u>Even If The Court Finds Copying, The Court Should Not Enhance Damages Because Finjan Admits That Market Pressure Drove Secure's Decisions</u>

The gravamen of Finjan's copying story is that Secure first disparaged Finjan's technology and then, when consumers allegedly began to demand Finjan's technology and industry analysts allegedly identified Finjan's technology as a "trend," and only then did, Secure allegedly copied Finjan's technology. (Finjan Opening Br. at 6-7 (D.I. 264).) This story contradicts the record. The alleged "disparagement" is evidence that Secure wanted to, and did, create a different and more effective way of providing proactive security. As proven at trial, detecting unknown viruses instead of using signatures, or as Finjan's refers to it, "proactive scanning" was well known[6] and Webwasher did not believe, and still does not believe, that Finjan's Patents claim all forms of

[5] As explained in Secure's Opening Brief in support of its post-trial motions, even if Mr. Alme or Mr. Berzau did copy Finjan's product (as opposed to Finjan's Patents), it would not be relevant to willful infringement because Finjan did not prove that its product was an embodiment of the patents. (D.I. 266 at 47.)

[6] *See, e.g.* D.I. 266, Ex. 8, at col.3 ll. 13-15 (Chen patent) ("Since combinations of suspect instructions in lieu of a particular sequential signature are sought, unknown viruses are detected.")

proactive scanning. Merely showing that Webwasher knew it was providing some form of proactive security is not a demonstration that Webwasher knew or should have known it was infringing Finjan's Patents

However, as explained below in Section II.B.8, even if the Court accepts Finjan's allegations as true, Finjan's "disparagement then infringement" story demonstrates the same type of "economic pressure" that has led other courts to deny enhanced damages. *See, e.g., Read Corp.*, 970 F.2d at 827; *see also Honeywell*, 166 F Supp. 2d at 1041(denying enhanced damages because, among other things, "although the jury found that [plaintiff's] infringement was willful, there is evidence that [plaintiff] was partially motivated by economic pressure in the form of customer dissatisfaction."). Therefore, if the Court considers Finjan's disparagement/copying story at all for *Read* factor 1, it should weigh against enhanced damages.

2 Secure Acted In Good Faith

For *Read* factor 2, Finjan wrongly focuses on the fact that Secure did not obtain an opinion of counsel. (Finjan Br. at 9 (D.I. 264)(citing *Underwater Devices*).) As explained above (Section I.A), the Federal Circuit in *Seagate* expressly overruled *Underwater Devices* and held that an alleged infringer no longer has an "affirmative duty of care" or an "affirmative obligation to obtain opinion of counsel."[7] *See* 497 F.3d at 1371. Therefore, a lack of an opinion of counsel does not prove lack of good faith. Further, as explained below, Finjan has failed to prove that Secure was aware of Finjan's Patents-in-Suit and then acted in bad faith after any such notice.

[7] Of course, in the totality of circumstances analysis, a jury is not forbidden from considering whether an alleged infringer obtained an opinion of counsel. However, as stated above, there is no longer an "affirmative duty" of good faith or to obtain an opinion.

a. Finjan Failed To Prove That Secure Acted In Bad Faith With Knowledge Of Finjan's Patents

Finjan's argument that Secure acted in bad faith with knowledge of Finjan's Patents should be rejected. First, Finjan failed to present any evidence that anyone at Secure was on notice of the '780 and '822 Patents prior to the filing of this lawsuit. Therefore, the Court should not find any bad faith with respect to the '780 and '822 Patents.

With respect to the '194 Patent, as explained in Secure's Opening Brief in support of its post-trial motion (D.I. 266 at 45-46), at trial, Finjan introduced only one document that references the '194 Patent. (Tr. at 319:6-7 (D.I. 228); Finjan Ex. 8 (D.I. 265, 276)(PTX-38)). Secure's mere possession of this document does not prove that Secure acted in bad faith or had any reason to believe it was infringing a valid patent. Finjan put forward no trial testimony from Roland Cuny, the author of the document referencing the '194 Patent. (PTX-38). The only trial testimony on PTX-38 was Martin Stecher:

> Q: Is this document a summary of the research that Roland Cuny was doing?
>
> A: Almost everything that Mr. Cuny did was documented within the intranet by Mr. Cuny himself; and with regard to this task, he saved or he put this content on the intranet.

(Tr. at 321:1-8 (D.I. 228).)

Although Mr. Stecher acknowledged the existence of this document, Finjan offered no evidence that Mr. Stecher read this document, or was even aware of it, prior to Finjan filing this lawsuit. Finjan failed to present any evidence that anyone other than Mr. Cuny had access to or read the intranet described above, much less any evidence that anyone involved with the development of proactive scanning had read PTX-38. Finjan failed to make any connection between the author of PTX-38, Roland Cuny, and the development of proactive scanning. Finjan

failed to present any evidence that any of the engineers involved in the development of the Webwasher product and proactive scanning had any awareness of the '194 Patent.

Further, PTX-38 includes references to fourteen other patents. (Finjan Ex. 8 (D.I. 265)(PTX-38)). These other patents even included two patents that Secure relied on at trial to attempt to invalidate the Finjan Patents in this case – specifically, Ji 1997 (U.S. Patent No. 5,983,348) and Ji 1995 (U.S. Patent No. 5,623,600). (*Id.* at 1, 4.) Mr. Cuny's inclusion of the '194 Patent on a long list of patents does not demonstrate that Mr. Cuny had any reason to believe that Webwasher may infringe the '194 Patent. Indeed, PTX-38 proves that Mr. Cuny was aware of Secure's strong prior art, subsequently presented at trial, that could invalidate Finjan's Patents.

Finjan's complete lack of proof regarding the '780 and '822 Patents, and the mere proof that Mr. Cuny alone looked at the '194 Patent along with other prior art patents, without more, fails to show that Secure acted in bad faith with knowledge of Finjan's Patents.

b. <u>Secure Was Cautious Of Intellectual Property Rights And Has Good Faith And Substantial Defenses of Non-Infringement and Invalidity of Finjan's Patents</u>

When developing Webwasher, Secure was cautious of intellectual property rights. For example, when considering whether to do "what Finjan does," the Webwasher development team stated they did "not feel comfortable with promoting this approach." (Finjan Ex. 1 at 3 (D.I. 265)(PTX-36).) In fact, the team "dropped" the suggestion.

Further, the Federal Circuit has held that where a defendant fields a good defense, an award of enhanced damages is inappropriate. *See State Contr. & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1064 (Fed. Cir. 2003) (citing *Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 20 (Fed. Cir. 1984) ("An increase in damages for willfulness ... is

generally inappropriate when the infringer mounts a good faith and substantial challenge to the existence of infringement.") As demonstrated in Secure's Opening Brief in support of its post-trial motions, Secure presented good faith and substantial evidence at trial to prove that Finjan's Patents are not infringed and are invalid. (D.I. 266 at 5-32.)(incorporated herein). Based on the arguments presented at trial, and in Secure's Opening Brief in support of its post-trial motions, Secure has legitimate, credible, and substantial non-infringement and invalidity defenses.

And, even though Secure's defenses were not successful at trial, and even if the Court denies Secure's post-trial motion regarding non-infringement and invalidity, the Court should still deny enhanced damages because Secure's non-infringement and invalidity defenses were not frivolous and, as explained below, were litigated in good faith. *See Honeywell*, 166 F. Supp. 2d at 1040 (denying enhanced damages because defendant's defenses "although ultimately unsuccessful, were not frivolous and were litigated in good faith."); *see also Fisher-Price*, 2008 U.S. Dist. LEXIS 36712, at *19-20 (denying enhanced damages even though plaintiff prevailed at trial and on post-trial motions on infringement). The Court should deny enhanced damages because Secure mounted a substantial challenge to Finjan's infringement contentions. *See Honeywell*, 166 F. Supp. 2d at 1040 (denying enhanced damages because defendant "mounted a substantial challenge to [plaintiff's] infringement contentions."); *Fisher-Price*, 2008 U.S. Dist. LEXIS 36712, at *19-20 (denying enhanced damages because, although the jury found willful infringement, defendant relied on "substantial defenses" at trial). Secure's Opening Brief in support of its post-trial motions demonstrates Secure's strong and substantial non-infringement and invalidity defenses. (D.I. 266 at 5-32.) As this Court acknowledged, the parties engaged in a "heated trial" over infringement and validity of Finjan's Patents. (Tr. at 1211:18 (D.I. 232).) Secure presented eleven strong prior art references. (D.I. 225 at 24-25.) Secure's non-

infringement and invalidity expert took the stand for well over one full trial day. (*See* Tr. at 775:22-1103:22 (D.I. 230-231).) Finjan had to hire three separate experts, Dr. Bishop, Dr. Vigna, and Mr. Heberlein, to defend against Secure's non-infringement and invalidity defenses. (Tr. at 174:21-201:3; 322:17-573:7; 1271:1-1451:2; (D.I. 227-29; 232-33).)

In light of Secure's substantial, reasonable, credible, and legitimate non-infringement and invalidity defenses, and Secure's caution in developing Webwasher, Secure respectfully submits it acted in good faith and that *Read* factor 2 does not weigh in favor of enhanced damages.

3. Secure Computing Did Not Commit Litigation Misconduct

*Read* factor 3 – Secure's litigation behavior – weighs strongly against enhancement. The record contains no evidence that Secure, at any time during the nearly two years of litigation, acted improperly, unreasonably, or unethically. Secure's counsel took no liberties with the rules of ethics and decorum, and at all times acted professionally and with courtesy in its dealings with this Court, with Finjan, and with adverse counsel. Not one sanction was sought or awarded against Secure or its counsel. Secure litigated in good faith

Recently, this Court was faced with alleged litigation behavior that was far worse than what Finjan (incorrectly) alleges, and still this Court found that behavior was not egregious enough to justify enhance damages. *IMX, Inc v Lendingtree, LLC*, 469 F. Supp. 2d 203, 220 (D. Del. 2007). In *IMX*, the defendant allegedly: (1) advanced a meritless inequitable conduct defense; (2) refused to identify the specific prior art references upon which it sought to rely at trial until ordered to do so by this Court; (3) pursued an unsubstantiated and ambiguous obviousness defense throughout the case; (4) relied on legal arguments which have been rejected by the Federal Circuit; and (5) belatedly relied on an opinion of counsel in post-trial briefing. *Id.* Even though the Court did not reject the merits of the plaintiff's allegations of misconduct, the

Court did "not find that defendant's behavior throughout this litigation was egregious so as to favor the award of enhanced damages." *Id.* In this case, Finjan's allegations of litigation misconduct have no merit and they do not justify enhanced damages.

a. Secure Did Not Argue Contrary to the Court's Claim Construction

i. "addressed to a client"

On its face, Finjan's assertion that Secure elicited improper testimony from Dr. Wallach regarding the claim element "addressed to a client" is deficient because Finjan does not cite to any testimony it alleges was improper. Finjan merely points to a sidebar where, contrary to Finjan's assertions, the Court in fact did not instruct Secure that it could not question Dr. Wallach regarding "addressed to a client." (Finjan Opening Br. at 11-12 (D.I. 264); *see also* Tr. at 810:1-816:2 (D.I. 230).) Rather, Dr. Wallach was prohibited from testifying as to his own understanding of the ordinary meaning of "addressed to a client." (*Id.*) Dr. Wallach was permitted, which he properly did, to testify regarding Dr. Vigna's definition of "addressed to a client" and the fact that Webwasher does not work the way Dr. Vigna defines "addressed to a client." (*Id.*; *see also id.* at 816:18-818:23.) Specifically, Dr. Wallach testified that Webwasher never lets an internet server know that it has a client, and it is therefore impossible for the internet server to address messages to a client that the server does not even know exists. (Tr. at 817:7-818:2 (D.I. 230).) Secure submits that Finjan failed to offer any proof of where or how Webwasher allegedly practices the "addressed to a client" limitation. (*See* Secure Opening JMOL Br. at 13-14 (D.I. 266).) Therefore, Secure properly advanced this defense at trial, and it is a good faith and substantial defense that is supported by the record. Secure did not elicit improper testimony regarding "addressed to a client."

Secure did not make improper statements during closing argument regarding the claim element "addressed to a client." First, as discussed above, the Court did not instruct Secure that it could not question Dr. Wallach at all regarding "addressed to a client." Second, Secure's closing argument was proper because: (1) Secure properly argued that Finjan failed to meet its burden of proving that Webwasher met the "addressed to a client" limitation and that Webwasher does not work the way Dr. Vigna described; and (2) Secure did not even mention Dr. Wallach's testimony regarding "addressed to a client" in closing (rather it referenced Dr. Bishop's testimony).[8] (Tr. at 1648:22-1649:22 (D.I. 233).) Therefore, Secure did not argue contrary to the Court's claim construction.

ii. "performing a hashing function on the Downloadable and the fetched software components to generate a Downloadable ID"

Secure did not elicit improper testimony from Dr. Wallach regarding the claim limitation "performing a hashing function on the Downloadable and the fetched software components to generate a Downloadable ID." Secure properly raised with Dr. Wallach the Court's construction of this limitation (Tr. 970:7-10 (D.I. 231)("you understand there is a construction in this case that adds the word together to hashing . . .?"). Secure then asked Dr. Wallach to explain what it means to "hash together". (*Id* at lines 11-20.) When Dr. Wallach made the unsolicited comment "you end up with one hash", Finjan objected, and the Court allowed Secure to "lead him and correct it." (*Id.* at 971:13-15). Secure did just that, without objection from Finjan.[9] (*Id.* at 971:19-

[8] In addition, Finjan did not object to Secure's closing on "addressed to a client" and therefore waived any objection or issue. *See Waldorf v. Shuta*, 142 F.3d 601, 629 (3rd Cir. 1998)(holding that a failure to object to closing statement waives any objection); *Murray v. Fairbanks Morse*, 610 F.2d 149, 152 (3rd Cir. 1979)(same).

[9] Finjan's reference to Trial Transcript 1061:15-18 should be disregarded because it is Finjan's cross examination of Dr. Wallach. In fact, if anything, it was Finjan, in this instance,

972:14). Nothing about this examination was improper. Further, any issue with Dr. Wallach's testimony was cured by Finjan's initial objection, the Court's instruction to correct Dr. Wallach, and Secure's subsequent correction.

b. Secure Computing's Claims Are Not Frivolous or Unsupported and Dropping Claims Does Not Justify Enhanced Damages

The Court should not find that dropping claims and defenses in a complex, multi-patent, timed trial, is vexatious and justifies enhanced damages. The Federal Circuit has said that the mere fact that a party drops claims or defenses does not justify enhanced damages. *See Stickle v. Heublein, Inc.*, 716 F.2d 1550 (Fed. Cir. 1983); *see also Golden Voice Tech & Training v. Rockwell Firstpoint Contact Corp*, 2003 U.S. Dist. LEXIS 25997, at *15-16 (M.D. Fla. Oct. 10, 2003)(stating that "the mere fact that an issue was pleaded and then dropped prior to trial does not establish that the pleading was frivolous" and "[p]arties may decide to drop claims for a number of reasons having nothing to do with strength of their case or the quality of the defense."). It was proper for Secure to streamline the case to fit the available time, and to focus on the most important issues for the jury. Finjan's theory would put counsel in an impossible position of being unable to streamline the case during a timed trial.

Indeed, under Finjan's theory, Finjan is a vexatious litigant, as Finjan dropped several claims on the eve of trial. (*See* Ex. 2 and D.I. 170 (Finjan dropping its indirect infringement claims and dropping its claims against Secure's IronMail product); D.I. 211 (Finjan dropping infringement claims for Claims 7, 8, 15, 16, and 17 of the '780 Patent, and Claims 1, 2, 9, 15-18, 20-22, 24, 26-29, 31, 32, 34, and 35 of the '822 Patent.) For Finjan to accuse Secure of vexatious conduct for dropping claims and defenses to streamline the case, especially after Finjan dropped

---

who improperly elicited testimony from Dr. Wallach concerning "a single hashing function." It is preposterous for Finjan to complain of testimony its own counsel elicited.

almost half of its patent claims the day before trial began "for purposes of narrowing the issues in this case" (D.I 211) is not only hypocritical and self-contradictory, it is just plain wrong as to the facts and applicable law. Regardless, Secure will address each of Finjan's allegations in turn.

i. Enablement and Indefiniteness Defenses

Finjan complains that Secure dropped its § 112 enablement and indefiniteness defenses during trial. First, as demonstrated in Secure's Markman briefs, Secure's § 112 defenses are far from frivolous (D.I. 111, 120.)

Second, Secure has not dropped all of its § 112 defenses. At trial, Secure agreed not to submit its § 112 defenses to the jury but told Finjan that Secure did "not waive § 112 arguments" it made to the Court. (Ex. 3.) Therefore, as Finjan argued in its objections to jury instructions (D.I. 218 at 33 fn. 4), Secure respectfully submits that the Court should decide Secure's § 112 defenses in Secure's favor. Indeed, Secure has moved for judgment as a matter of law on its § 112 defenses. (D.I. 266 at 31-32.) Further, as explained above, even if Secure had dropped these defenses, the mere fact of dropping claims at trial does not establish vexatious litigation.

ii. Inequitable Conduct Claims

Secure's inequitable conduct claims were not frivolous and the mere fact that Secure dropped these claims does not justify enhanced damages. Secure's inequitable conduct claims were two-fold: (1) Finjan improperly claimed small-entity status to the PTO; and (2) Finjan made material misrepresentations to the PTO regarding prior art. (D.I. 168 at 12-13.) Secure had a *prima facia* case of inequitable conduct, as demonstrated by its specific and particular inequitable conduct allegations set forth in its Amended Answer and Counterclaims (D.I. 114, pp. 6-8, 10-12.) In fact, early in the case, Finjan stipulated to allowing Secure to amend its answer and counterclaims to specifically add its inequitable conduct claims. (D.I. 19.) The Court

granted Secure's stipulated request to amend to add its inequitable conduct claim (Docket Text, dated 8/31/06.)

Going into trial, Secure fully intended to pursue its inequitable conduct claims. The fact that Secure intended to pursue its claims through cross examination does not show, as Finjan argues, that Secure "knew they had no evidence going into trial." Of course, Secure could not have proven its inequitable conduct claims through its own witnesses because: (1) only Finjan witnesses would have knowledge of Finjan's patent prosecution; and (2) in this District, expert witnesses on inequitable conduct are not allowed. *See Revlon Consumer Prods. Corp. v. L'Oreal S.A.*, 1997 U.S. Dist. LEXIS 4117, at *4-10 (D. Del. March 26, 1997) (excluding expert witness on inequitable conduct). Thus, Secure was left to cross-examine Finjan's witnesses.

At trial, Secure was unable to elicit sufficient evidence from Finjan to support an inequitable conduct claim. Therefore, rather than burden the Court and to streamline the case, Secure decided to drop its inequitable conduct claims.[10] Secure informed Finjan of this decision immediately. Secure's decision to drop its viable inequitable conduct claims, and to inform Finjan immediately, does not justify enhanced damages.

iii. Patent Exhaustion Defense

Secure's patent exhaustion defense was not frivolous, especially in light of REDACTED the U.S. Supreme Court's decision to grant *certiorari* in *LG Electronics v. BizCom*, 453 F.3d 1370 (Fed. Cir. 2006), *cert. granted*, 128 S. Ct. 28 (2007).

REDACTED

[10] Likewise, Secure dropped its willful infringement claims against Finjan. But Finjan does not complain about that dropped claim.

REDACTED

Under the patent exhaustion, or first-sale, doctrine, a patentee cannot restrict the use of its patented products once they are sold. *See Univis Lens Co.*, 316 U.S. at 250 ("[S]ale of [a patented article] exhausts the monopoly in that article and the patentee may not thereafter, by virtue of his patent, control the use or disposition of the article."). In other words, a patentee who sells a patented article (directly or through an authorized licensee) cannot thereafter bring a patent infringement action against the purchasers for using the article for its only reasonable use or for reselling the article. *Id.* at 250-52 ("The first vending of any article manufactured under a patent puts the article beyond the reach of the monopoly which that patent confers."). Instead, a patentee wishing to enforce downstream limitations after an authorized sale must turn to contract law. *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 518-19 (1917). Patentees are free, however, to impose restrictions when they license others to use the patented product. *See General Talking Pictures Corp. v. Western Elec. Co.*, 304 U.S. 175, 181 (1938) ("Patent owners may grant licenses extending to all uses or limited to use in a defined field. Unquestionably, the owner of a patent may grant licenses to manufacture, use, or sell upon conditions not inconsistent with the scope of the monopoly.") (internal citations omitted).

Over time, the Federal Circuit has allowed patentees to sidestep the patent exhaustion doctrine by converting any sale into a license through the imposition of a restriction in the transfer. *See Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 708-09 (Fed. Cir. 1992). The Federal Circuit has labeled this transfer a "conditional sale," and has held that the patent exhaustion doctrine applies only to unconditional sales. *See LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 453 F.3d 1364, 1369-70 (Fed. Cir. 2006); *B. Braun Med., Inc. v. Abbott Labs.*,

124 F.3d 1419, 1426 (Fed. Cir. 1997). This holding, however, directly conflicts with Supreme Court decisions that have applied the exhaustion doctrine to conditional sales. For example, the patentee in *Univis Lens* had placed an explicit condition on the sale of its lens blanks which attempted to restrain the purchaser's right to sell the finished product. 316 U.S. at 243-46. The Supreme Court gave no effect to this condition, instead concluding that the "sale of a lens blank by the patentee or by his licensee is . . . both a complete transfer of ownership of the blank, which is within the protection of the patent law, and a license to practice the final stage of the patent procedure." *Id.* at 249. The Supreme Court is currently hearing arguments regarding this issue of patent exhaustion in the *LG* case.

REDACTED

REDACTED

iv. Secure's Infringement Claims

Secure's allegations of infringement of the '361 and '010 patents were and are supported by substantial evidence. First, with respect to the '361 patent, Finjan does not appear to contest that Dr. Wallach outlined a substantial case regarding infringement. Finjan does not criticize any of Dr. Wallach's '361 infringement opinions in its opening brief. Moreover, Dr. Wallach's detailed analysis based on his review of the source code and Finjan technical manuals should convince the Court to grant Secure JMOL of infringement on the '361 patent as outlined in Secure's opening brief in support of its post-trial motions. (*See* D.I. 266 at 48-50.)

With respect to Secure's allegations of infringement of the '010 patent, Finjan makes several unpersuasive arguments. First, Finjan's argument that Dr. Wallach's review of the "Documents 1Box" source code should have dictated his infringement opinion regarding "Vital Security for Documents" is wrong. Finjan sold two different products – "Document 1Box" and "Vital Security for Documents." Dr. Wallach testified that he believed that the products are different and that he was not provided source code for Vital Security for Documents. (Tr. at 1089:21-1091:3 (D.I. 231).) Finjan's own expert identified that the product information between the two products contained a lot of inconsistencies and that his basis for concluding that the products were the same was from Finjan's attorneys. (Tr. at 1542:10-15 (D.I. 233).). Finjan's own Chief Technical Officer, Yuval Ben-Itzhak, did not know whether the products were the same. (*Id.* at 1452:2-20.).

Despite this evidence, Finjan's attorneys appear to conclude that the products are the same. Finjan's attorney represented to Dr. Wallach that Finjan changed the name of its

Documents 1Box product to Vital Security for Documents.[11] (Tr. at 1090:3-12; 1096:5-8 (D.I. 231).). But even this strained explanation is demonstrably wrong. Even a cursory review of the exhibits at trial shows that Vital Security for Documents was released *before* Documents 1Box (*Compare* Ex. 5 at FIN012967 (PTX-208), Documents 1Box Guide showing Documents 1Box was sold in 2005 with Ex. 6 (DTX 1267) Vital Security for Documents documents indicating that Vital Security for Documents was sold in 2003). Therefore, Finjan's counsel's explanation that Documents 1Box was renamed Vital Security for Documents is without merit.[12]

Since Finjan was unable to produce the separate source code for Vital Security for Documents, Dr. Wallach was forced to rely on the best evidence Finjan could produce, which was the marketing documents. (Tr. at 1039:5-25 (D.I. 231)(explaining that the three documents used to show infringement was the only Vital Security for Documents information made available by Finjan)). Using these documents, Dr. Wallach performed a proper limitation-by-limitation infringement analysis. (*Id.* at 1040:6-1048:2.).

Finjan hurls one final criticism of Dr. Wallach based on his use of a "third party" reseller document that Finjan asserts was modified by a third-party. As Finjan knows, but neglected to tell the Court, *all* of the technical information contained in that "third-party" document was

[11] Finjan's CTO, Mr. Ben-Itzhak, did not testified regarding any name change at that point during the trial and Mr. Ben-Itzhak did not ultimately state whether or not Documents 1Box was actually one of the products that underwent a name change.

[12] As Secure's counsel discussed during a side bar, there is more to the story regarding Finjan's source code, but Secure refrained from attacking the position advanced by Finjan's counsel at trial in front of the jury. (Tr. at 1095:14-1096:3.) But there is an ample record that Finjan's position regarding source code is not correct. (*See* attached correspondence between counsel - Ex. 8 - letter from Foster to Wharton, dated Oct. 12, 2007 (indicating, for example, that the source code folders were labeled Documents 1Box, and that Finjan's explanation that Finjan had not altered the code since purchasing it from Alchemedia was not credible given the hundreds of Finjan references in the code).)

written by Finjan, *verbatim*, as can be seen in trial exhibits DTX-1267 and DTX-1271. (Exs. 6, 7.)

Finally, although the jury found all of the asserted claims of the '361 and '010 patents valid, Finjan takes the incredible position that it is owed punitive damages because the '361 and '010 patents were so clearly invalid that the claims were frivolous. (Finjan Br. at 16-17 (D.I. 264).) Finjan's accusation that Secure's position was frivolous, even though Secure won the jury's verdict of validity, is meritless. First, the fact alone that the jury found Secure's patents to be valid demonstrates that Secure's claims were far from frivolous. Second, in post-trial motions, Finjan did not even contest the jury's finding of validity of the '010 patent. Third, as Secure's response to Finjan's Renewed Motion for JMOL details, Finjan's invalidity case against the '361 patent was unsupported by the sole asserted prior art reference and was dismantled on cross-examination. (*See* Secure Resp. Br. at 1-4 (D.I. 278).) The record shows that Secure's infringement case Finjan was far from frivolous.

c.   Secure's Witness List Complied With The Pretrial Order And A Strategic Decision Not To Call Witnesses Does Not Justify Enhanced Damages

Finjan's assertion that Secure's "will call" witness list forced Finjan to waste resources is in fact forcing Secure and the Court to waste resources addressing such a meritless claim. Finjan cites no authority for its proposition that Secure was required to call Martin Stecher and Christoph Alme once they were listed on Secure's "will call" list. There is no such requirement. To make such a requirement would improperly impede upon a defendant's proper development of litigation strategy in response to the dynamics at trial.

Further, as the plaintiff, Finjan had the burdens of proof on its claims against Secure. During its case in chief, Finjan called Mr. Stecher and Mr. Alme by deposition. (Tr. at 300:15-

321:16 (D.I. 228).) Secure properly counterdesignated deposition testimony of Mr. Stecher and Mr. Alme.[13] (*See* Final Joint Pretrial Order, Schedule F, at 1, 10 (D.I. 170).) Based in part on that deposition testimony, Secure felt Finjan did not meet its burdens of proof and that Secure did not need to call Mr. Stecher or Mr. Alme in its case in chief. Therefore, Secure made the strategic decision not to call Mr. Stecher or Mr. Alme in its case. This was purely a proper strategic litigation decision, not vexatious litigation. Moreover, pursuant to the agreement of counsel,[14] Secure properly provided Finjan with the lists of witnesses it would call and the lists of exhibits that would be introduced through those witnesses in advance during trial. Secure never listed Mr. Stecher or Mr. Alme on these lists. (Ex. 10.) Secure's witness strategy was not vexatious

4. <u>Secure Computing's Relative Size and Financial Condition Does Not Weigh In Favor of Enhancement</u>

*Read* and its progeny make clear that an award of enhanced damages depends on the defendant's culpability. The mere financial size of a defendant cannot be the basis of such an award. *Cf. Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996) ("Because increased damages are punitive, the requisite conduct for imposing them must include some degree of culpability. ... 'Damages cannot be enhanced to award the patentee additional compensation to rectify what the district court views as an inadequacy in the actual damages awarded.'"). Secure should not be assessed punitive damages on the basis of its size, especially when the overwhelming evidence demonstrates that the probity of Secure's conduct does not warrant such damages.

---

[13] Therefore, Secure did in fact provide testimony of Stecher and Alme through counterdesignated deposition testimony.

[14] The parties agreed on a protocol for disclosing witnesses during trial. (Ex. 9). Secure fully complied with this protocol.

Further, Finjan is once again improperly using Secure's financial position as a shield and a sword. In opposition to Secure's motion to stay enforcement of the judgment (D.I. 251), Finjan harshly criticized Secure's financial position. (*Id* at 3-7.) For example, Finjan alleged that Secure is "deeply in debt" and its "future financial stability, cashflow and success is dependent on the nonoccurrence or occurrence of events outside the control of Secure." (*Id.* at 3.) Now, Finjan wants to use Secure's strong financial position to obtain treble damages. Finjan cannot have it both ways. In addition, Finjan's attempt to use Secure's motion to stay as evidence that Secure "would easily be able to pay enhanced damages" is off base. Secure's motion to stay related only to the $9.18 million jury verdict.

Finally, the relative sizes of Secure and Finjan do not justify enhanced damages. While Secure admittedly is larger than Finjan, Secure is not a "giant" or even a large corporation, as Finjan asserts. Secure is a medium sized S&P 600 (small cap stock) company. (Ex. 11.) Finjan is not as small as Finjan would like to portray. During trial, Finjan argued that: (1) it competes directly with Secure; (2) it is not losing money; (2) its sales are on the rise; (2) it has at least 6 offices around the world. (Tr. at 221:8-14; 206:14-207:1 (D.I. 227).) A comparison of Secure and Finjan reveals that they not as disparate as Finjan contends. For example, (1) Secure describes itself as a "global leader in Enterprise Security solutions" and Finjan likewise describes itself as a "global" and "leading provider of secure web gateway solutions for enterprise security market"; (2) while a majority of Secure's operations are in one office in St. Paul, Minnesota, including finance, information technology, manufacturing, order entry, legal, support, and R&D, Finjan has 6 Worldwide Offices (not including 7 additional sales centers); (3) Secure has a 5 person executive management team, while Finjan has a 10 person executive management team; and (4) Secure has an 8 person Board of Directors, while Finjan has a 6 person Board of

Directors. (*See* Exs. 12, 13, 14.)

REDACTED

Therefore, the relative sizes of the companies does not weigh in favor of enhanced damages.

5. This Was A Trial That Was Full Of, At Worst, Close Questions of Infringement, Validity, Willfulness, and Damages

*Read* factor 5 weighs against enhanced damages. As explained in Secure's opening post-trial brief, Secure should be granted JMOL or a new trial on non-infringement, invalidity, willfulness, and damages because the substantial evidence at trial does not support a verdict in Finjan's favor. (D.I. 266.) At worst, the evidence at trial and in Secure's post-trial motion present close questions of infringement, validity, willfulness, and damages

Enhanced damages are not appropriate in a hard fought trial such as this one. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1461 (Fed. Cir. 1998). In *Cybor*, the court refused increased damages despite a finding that the defendant had willfully infringed all twenty asserted patent claims. The defendant had substantial defenses based on claim construction and the patent's prosecution history, and the district court had found no instances of litigation misconduct. The Federal Circuit upheld the district court's denial of enhanced damages. The jury's finding of willful infringement "[did] not mean that the case was not close ... in light of [defendant's] justifiable albeit unsuccessful arguments ...." *Id.* at 1461. On the same note, punitive damages are inappropriate despite a finding of willfulness where the level of culpability is "sufficiently close on the evidence." *See Brooktree Corp. v. Advanced Micro Devices*, 977 F.2d 1555, 1581 (Fed. Cir. 1992) (citing other decisions refusing to enhance damages). In this

case, Secure presented substantial defenses based on the evidence, the claim construction and the patents' prosecution history, and there were no instances of litigation misconduct, even though the Court acknowledged that this was a "heated trial." (Tr. at 1211:18 (D.I. 232).) After a hard-fought seven-day trial, and in light of Secure's post-trial motions, Secure respectfully submits that the Court cannot find that Secure's defenses were weak.

Instead, Finjan's position regarding *Read* factor 5 is weak, and are, in particular, exposed through an unavailing attempt to convince the Court that Secure's expert used an "impermissible standard" of "hindsight" to support his invalidity opinion. (*See* Finjan Br. at 23 (D.I. 264).) Under a section 103 obviousness analysis, the appropriate inquiry is whether an invention would have been obvious to a person of ordinary skill at the time the invention was made. *KSR Int'l Co v Teleflex Inc.*, 127 S. Ct. 1727, 1742 (2007); *see also* D.I. 225 at 28 (Final Jury Instructions). In deciding obviousness, one must avoid using "hindsight" – or in other words, one should not consider what is known today or what was learned from the teachings of the patent. *Id.; see also Alloc, Inc v Pergo*, 2008 U.S. Dist. LEXIS 35944, at *30 (E.D. Wis. May 1, 2008)(stating that "hindsight" is applying "what is known today"). Dr. Wallach was asked by Finjan's counsel whether he looked back in "hindsight" to 1996 and applied what was known then, and he answered "Yes." (Finjan Ex. 2 (D.I. 265), Tr. at 1065:4-7) That is exactly the analysis Dr. Wallach is required to do. The record is clear that Dr. Wallach did not consider what is known today, instead he properly looked back at what was known at the time of the invention (1996).

Finjan's use of the word "hindsight" in its examination of Dr. Wallach appears to be an attempt to mislead the jury, and Finjan is now attempting to mislead the Court. Incredibly, Finjan used this same improper argument in closing statements:

> Their experts -- you heard in the jury
> instructions, you are not supposed to look going back with

> hindsight. Their expert did. When I asked him, you look back in hindsight and see 1996 and what was happening then and try to apply the prior art at that time. Correct ?
> Yes.
> That's what he did.
> Anything in hindsight is obvious. Anything.
> It's like learning a magic trick. I wish I could show you a trick now. If I showed you how it was done, you will see it every time then. You can't use hindsight. You heard the Court say that had. Their expert did.

(Tr. at 1617:9-20 (D.I. 233).)

Finjan attempted to use a similar ploy during the Final Pretrial Conference when it moved to exclude Dr. Wallach because he allegedly was "not one of ordinary skill at the time the inventions were created." (Final Pretrial Conference Tr. at 25:21-28:20 (D.I. 206); *see also* Finjan Motion to Exclude Dr. Wallach (D.I. 147, 148, 162).) Finjan argued that it was "very concerned about this hindsight issue that comes into play." (Final Pretrial Conference Tr. at 26:6-7 (D.I. 206).) Secure contended that Dr. Wallach is a qualified expert and that Dr. Wallach is not using hindsight. (*Id.* at 26:24-27:25.) The Court agreed with Secure and summarily denied Finjan's motion. (*Id.* at 28:19.) Undeterred by the Court's ruling, Finjan then snuck the word "hindsight" into its cross examination of Dr. Wallach, and argued to the jury, and now to this Court, that Dr. Wallach improperly used hindsight. Like Finjan's argument at the Pretrial Conference, this argument should be summarily rejected, and so should Finjan's argument in favor of *Read* factor 5.

6. Duration of Alleged Infringement Does Not Justify Enhanced Damages

Secure does not dispute that the accused Webwasher product has been on sale for approximately four years. However, as explained in Secure's Opening Brief in support of its post-trial motion, and above in Section II.B 2, Finjan's argument that Secure acted in bad faith with knowledge of Finjan's Patents is false. Finjan failed to present any evidence that anyone at

Secure was on notice of the '780 and '822 Patents prior to the filing of this lawsuit. There is absolutely no evidence that Secure "knew they would infringe the Finjan Patents." Mr. Cuny's inclusion of the '194 Patent on a long list of patents (PTX-38) does not demonstrate that Mr. Cuny had any reason to believe that Webwasher may infringe the '194 Patent. Further, Secure did not create "summaries of the Finjan Patents." As described above, at trial, Finjan presented one document that references the '194 Patent. (Tr. at 319:6-7 (D.I. 228); Finjan Ex. 8 (PTX-38)). That document is merely a cut and paste of the patent's abstract and claim 1, just as it cut and paste the abstracts, and certain claims, of the prior art patents that appear in the same document. (Compare Finjan Ex. 8 at 2 (PTX-38) with Secure Ex. 16 at 1 ("Abstract") and at 17 (col. 10, ll. 8-18) (PTX 1 – the '194 Patent).) Finally, as demonstrated in Secure's Opening Brief in support of JMOL or new trial, Secure has good faith and substantial defenses of non-infringement and invalidity.

Finjan's argument that Secure's continued sale of the accused products after Finjan's complaint was filed somehow justifies enhanced damages is also erroneous. As the Federal Circuit held in *Seagate*, it is a motion for a preliminary injunction that provides the proper remedy for combating post-filing willful infringement. 497 F.3d at 1374 (citing 35 U.S.C. § 283; *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)). As the *Seagate* court noted, "[a] patentee who does not attempt to stop an accused infringer's activities in this manner should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct. Similarly, if a patentee attempts to secure injunctive relief but fails, it is likely the infringement did not rise to the level of recklessness." *Id.* Here, Finjan deliberately chose not to file a preliminary injunction motion. Regardless of its reasons, that choice reveals that it either does not believe in the alleged severity of Secure's alleged willful infringement, or

wants to continue to inappropriately try to stockpile damages. Under *In re Seagate*, neither position justifies enhanced damages for alleged willful infringement after the complaint if filed.

7. Secure Has Taken Steps to Avoid Infringement and Has Not Disregarded The Court's Judgment

Secure continues to believe it does not infringe Finjan's Patents and that Finjan's Patents are invalid, and that Secure will ultimately prevail on its defenses. Out of an abundance of caution, however, Secure has taken remedial measures to avoid the asserted limitations allegedly claimed in Finjan's Patents. First, with respect to Cyberguard TSP, as of December 31, 2007, Secure no longer takes orders for Cyberguard TSP Hardware Appliances. (Ex. 17 at 7-8.) Second, with respect to the '822 Patent, Secure removed the "script code mitigation" feature accused of infringing the '822 patent from its current version of Webwasher. (Ex. 18, Gallagher Decl., ¶ 2.) Secure is not currently selling any software or appliance that includes the script code mitigation feature.

REDACTED

These remedial measures, even those that are post-verdict, weigh against enhanced damages. *See Fisher-Price*, 2008 U.S. Dist. LEXIS 36712, at *19-20 (finding that post-verdict "redesign efforts" weigh against enhanced damages).

Secure has not "disregard[ed] the jury's verdict" and has not refused to comply with the Court's March 28, 2008 judgment. A post-verdict statement by a company-defendant that its will continue to sell an accused product is not a "disregard of the jury's verdict." *See IMX*, 469 F. Supp. 2d at 222 n.21. Further, on April 7, 2008, pursuant to Fed. R. Civ. P. 62, Secure timely

filed an appropriate expedited motion for stay of enforcement of the judgment and requested expedited relief. (D.I. 247; 248; 254.) However, despite Secure's motion to stay and Secure's post-trial motions, Finjan took the unusual and extraordinary step of trying to collect on the judgment through brash letter writing. Secure has taken the appropriate steps to request a stay of enforcement. On May 9, 2008, the Court granted Secure's motion to stay, on appropriate terms for Finjan's security. (D.I. 277.)

8. No Motivation For Harm

Finjan offers absolutely no evidence of an improper motive or any attempt to restrain competition in the relevant market. As stated above, Finjan's copying story is that Secure first disparaged Finjan's technology and then, when consumers allegedly began to demand Finjan's technology and industry analysts allegedly identified Finjan's technology as a "trend," Secure allegedly copied Finjan's technology. (Finjan Opening Br. at pp. 6-7 (D.I. 264).) However, that evidence only reveals, if anything, Secure's determination to compete in the market – a completely legitimate business effort. As explained above, evidence of competition does not prove that Secure was attempting to harm Finjan. Even if the Court accepts Finjan's allegations as true, Finjan's "disparagement then infringement" story demonstrates the same type of "economic pressure" that has led other courts to deny enhanced damages. *See, e.g., Read Corp.*, 970 F.2d at 827; *see also Honeywell*, 166 F. Supp. 2d at 1041(denying enhanced damages because, among other things, "although the jury found that [plaintiff's] infringement was willful, there is evidence that [plaintiff] was partially motivated by economic pressure in the form of customer dissatisfaction."). Therefore, if the Court considers Finjan's disparagement/copying story at all for *Read* factor 8, it should weigh against enhanced damages.

9 Secure Did Not Attempt To Conceal Any Alleged Misconduct

There is no evidence that Secure attempted to conceal any misconduct. Indeed, Finjan has conceded that Secure has not attempted to conceal any misconduct, as Finjan does not address this factor at all in its opening brief. Therefore, *Read* factor 9 weighs against enhanced damages.

## III. THE COURT SHOULD NOT GRANT ATTORNEYS' FEES, EXPENSES, AND COSTS

### A. Attorneys' Fees, Expenses, and Costs Should Not Be Awarded For The Same Reasons That Enhanced Damages Should Not Be Awarded

In *Honeywell*, this Court denied enhanced damages based on the *Read* factors and, then, held that "[f]or the same reasons, the court declines to find that this case is an 'exceptional case' under 35 U.S.C. § 285." 166 F. Supp. 2d at 1040-41; *see also Tristrata Tech., Inc v ICN Pharms., Inc.*, 314 F. Supp. 2d 356, 362 (D. Del. 2004)(denying attorneys' fees and costs for the same reasons that enhanced damages were denied); *Fisher-Price*, 2008 U.S. Dist. LEXIS 36712, at *21 (denying attorneys' fees "[f]or reasons similar to those underlying the court's decision not to award enhanced damages . . . .") Likewise, in this case, if the Court declines to award enhanced damages, then the Court should for the same reasons decline to award attorneys' fees, expenses, and costs.

### B. Even If The Court Awards Enhanced Damages, The Court Should Decline To Award Attorneys' Fees, Expenses, and Costs Because This Is Not An "Exceptional Case"

This was not an exceptional case. Contrary to Finjan's contention, a jury's finding of willfulness does not mandate a finding that a case is "exceptional" under 35 U.S.C. § 285. The Federal Circuit has repeatedly explained that "a finding of willful infringement does not require a finding that a case is exceptional." *Cybor Corp.*, 138 F.3d at 1461(citing *Modine Mfg. Co. v Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990)).

In *Cybor*, although the jury found that the defendant willfully infringed nineteen claims of the patent at issue, the district court found that the case was not exceptional. 138 F 3d at 1460 The patentee appealed on the grounds that the jury's willfulness finding required a determination that the case was exceptional. *Cybor*, 138 F 3d at 1461. The Federal Circuit affirmed the district court. *Id*. The *Cybor* court noted that the district court had considered the evidence of willful infringement to be "weak," and further noted that the defendant's arguments in the litigation "while ultimately unsuccessful, were not frivolous or asserted for an improper purpose" and that the defendant had "litigated in good faith." *Id* at 1460-61. The facts here are similar to those in *Cybor*, and a similar result is warranted.

As explained above: (1) at worst, the legal and factual questions were close, and the willfulness evidence was weak; (2) Secure's arguments at trial, while ultimately unsuccessful, were not frivolous or asserted for an improper purpose; (3) Secure litigated in good faith. *See Fisher-Price*, 2008 U.S. Dist. LEXIS 36712, at *21 (denying attorneys' fees "despite the contentiousness and duration" of the dispute). Further, as explained above, and contrary to the position Finjan has taken, the Federal Circuit in *Seagate* explicitly overruled *Underwater Devices* and held that an alleged infringer no longer has an "affirmative duty of care" or an "affirmative obligation to obtain opinion of counsel" to ensure that he does not infringe a patent. 497 F.3d at 1371-72. Under these circumstances, even if the Court grants enhanced damages, an award of attorney fees is not appropriate. *See IMX*, 469 F. Supp. 2d at 223 (denying attorneys' fees, even though court granted enhanced damages, because it was a close case and there was no bad faith or litigation misconduct). Finjan's motion for attorneys' fees, costs, and expenses, should therefore be denied in its entirety.

C. **Finjan's Request For Attorneys' Fees, Expenses, And Costs Should Be Tested For Unreasonableness**

If the Court grants Finjan's motion for attorneys' fees and expenses, Secure reserves the right to object to the type and amount of Finjan's claimed attorneys' fees, expenses and costs as improper and/or unreasonable. Finjan's only submission regarding the amount is its statement in a Declaration by Lisa Kobialka as follows: "To date, Finjan has incurred approximately $3.5 million in attorneys' fees, expenses, and costs." (Kobialka Decl., ¶ 19 (D.I. 265).) However, even if a moving party establishes both tests for an award of fees and expense under 35 U.S.C. § 285, any such award must be reasonable and proper. *Gentry Gallery v Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998). For example, but without limitation, Secure reserves the right to challenge Finjan's submission on the grounds that fees should be deducted for: claims or defenses on which Finjan was not successful; claims that were withdrawn, dropped, or never pursued; duplicative or unnecessary fees; overhead costs; and expert fees.

**CONCLUSION**

Based on the foregoing, Secure respectfully requests that the Court deny Finjan's motion for enhanced damages, and attorneys' fees, expenses, and costs.

OF COUNSEL:

Ronald J. Schutz
Jake M. Holdreith
Christopher A. Seidl
Trevor J. Foster
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500

Dated: May 9, 2008

Kelly E. Farnan

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Kelly E. Farnan (#4395)
farnan@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

*ATTORNEYS FOR SECURE COMPUTING*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 9, 2008, I electronically filed the foregoing with the Clerk of Court using CM/ECF and caused the same to be served on the plaintiff at the addresses and in the manner indicated below:

**HAND DELIVERY & E-MAIL**

Philip A. Rovner
Potter Anderson & Corroon LLP
1313 N. Market Street,
Hercules Plaza, 6th Floor
Wilmington, DE 19899-0951

I further certify that on May 9, 2008, the foregoing document was sent to the following non-registered participants in the manner indicated:

**E-MAIL**

Paul J. Andre
Lisa Kobialka
King & Spalding, LLP
1000 Bridge Parkway, Suite 100
Redwood Shores, CA 94065

Kelly E. Farnan
Kelly E. Farnan (#4395)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 16, 2008, I electronically filed the foregoing with the Clerk of Court using CM/ECF and caused the same to be served on the plaintiff at the addresses and in the manner indicated below:

**HAND DELIVERY**

Philip A. Rovner
Potter Anderson & Corroon LLP
1313 N. Market Street,
Hercules Plaza, 6th Floor
Wilmington, DE 19899-0951

I further certify that on May 16, 2008, the foregoing document was sent to the following non-registered participants in the manner indicated:

**FEDERAL EXPRESS**

Paul J. Andre
Lisa Kobialka
King & Spalding, LLP
1000 Bridge Parkway, Suite 100
Redwood Shores, CA 94065

Kelly E. Farnan
Kelly E. Farnan (#4395)

# EXHIBIT 1

███████████████████████████████████████████████████████████████████

**From:**
**To:**
**CC:**
**BCC:**
**Sent Date:**          0001-01-01 00:00:00:000
**Received Date:**      0001-01-01 00:00:00:000
**Subject:**
**Attachments:**

Product Meeting Minutes

Date: June 1, 2004
Participants: Benita, Frank, Heiko, Martin, Peter, Roland, Thomas, Tom
Minutes: Roland Cuny

Agenda:

1. Webwasher 5.0.2 (Update)
2. Webwasher 5.0.1 (Update)
3. Webwasher 5.1 (Planning)
4. OEM Support Responsibilities (Anti Virus)
5. Webwasher Appliance (CyberGuard)
6. T-Online (Anti Spam)
7. Extranet
8. Product Marketing Manager
9. Content Reporter
10. Competition Paper

1. Webwasher 5.0.2 (Update)
- Most features requested from customers were implemented. 'Digest Function' is in works.
Release is on track as planned (mid or end of June).

2. Webwasher 5.0.1 (Update)
- Customers complain about poor stability of the software. Problems are not severe crashes
but tedious bugs which hinder productivity. As a consequence development will dedicate 80%
of this week's time for bug fixing and maintenance
- NetCologne received a stable new version which should fix their problem. Next week, Frank
and Jürgen will visit the customer to improve confidence.

3. Webwasher 5.1 (Planning)
- There was a meeting to discuss potential implementation methods for the proactive security
feature (aka 'Finjan-Killer'). Two solutions were elaborated. First, we could copy Finjan's
features. This idea was dropped because the gain in security is questionable and development
is too time consuming. Second, we develop our own mix of methods which are more favorable
for corporate customers needs. A stricter policy will block anything that is not proven to be
harmless. Several implementation ideas were developed which need further discussion, e.g.
sandboxing of javascript or verification of applet certificates.

Defendant's Trial Ex.
**DTX - 1056**
Case No. 06-369 GMS

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC075246

- The important CyberGuard integration topics drain too many development resources. 10-12 MW are missing (QA not included). This requires further actions.

4. OEM Support Responsibilities (Anti Virus)
- We lack a workflow process to handle complains of customers regarding malicious code. Frank to arrange meeting with Peter, Roland and Support.

5. Webwasher Appliance (CyberGuard)
- CG Linux ('CyberGuard Linux' = hardened Red Hat Linux 8) was selected as the operating system of choice for the appliance. Hence this is actually another integration platform we have to support.
- The appliance will integrate five CSM products (no CR, no IM)
- Need to solve Red Hat 8 multiprocessor problems, asap.
- Hardware has to be sent to Paderborn asap to integrate our software, run performance benchmarks and finally to deliver an image to the hardware manufacturer.
- Release scheduled as follows:
Appliance prototype phase (mock up, housing +GUI): End of June
Appliance beta phase (functional for beta customers): Mid/End June
Appliance FCS (first customer shipment): 2nd half of August
- Open issue of adapting the GUI to CyberGuard look&feel.

6. T-Online (Anti Spam)
- We assembled and sent a white list of known newsletters to T-Online in order to help reduce false positives. They refused the usage because we mailed them the list unencrypted over the Internet and they consider the data as disclosed
- Tomorrow, phone conference with T-Online to discuss status.
- A white paper on how to measure spam filtering efficiency was written and sent to T-Online.

7. Extranet
- Wiebke returned from maternity period and will work 10-12 hours per week on website design.

8. Product Marketing Manager
- Two interviews conducted but no success.

9. Content Reporter
- AutoNation received a new version to solve performance problems. They conducted a larger test but did not provide any feedback so far. We believe problem is fixed, thus work on MaxDB can continue.
- Solving the MaxDB performance problems are a challenge. The progress looks promising, however the risk of a show stopper remains. Some preciser estimates expected for next week latest.

10. Competition Paper
A head-to-head competition paper Webwasher vs. Finjan was created and distributed.

--

---

Roland Cuny
Dipl.-Ing. (TU)

Chief Technology Officer & Co-Founder

webwasher AG - a CyberGuard Company
Vattmannstrasse 3
33100 Paderborn / Germany

Phone: +49 52 51 / 5 00 54-22
Fax: +49 52 51 / 5 00 54-11
E-mail: mailto:roland.cuny@webwasher.com
Visit us at: http://www.webwasher.com
http://www.cyberguard.com

---

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC075248

# EXHIBIT 2

**Neff, Holly**

**From:** Seidl, Christopher A.
**Sent:** Saturday, January 05, 2008 2:13 PM
**To:** 'Kobialka, Lisa (Perkins Coie)'; Holdreith, Jake M.; 'Farnan, Kelly E.'; Foster, Trevor J.; Moravetz, Amy
**Cc:** 'Rovner, Philip A.'
**Subject:** RE: Special Verdict Form

Thanks Lisa. In that case, there should be a statement in the Final Pretrial Order, paragraph h, stating that Finjan has abandoned its indirect (contributory and inducement) infringement claims. Further, it appears that Finjan has abandoned its infringement claims against IronMail. Therefore, there should be a statement in paragraph h regarding IronMail as well. Please include these statements in the draft Final Pretrial Order that we are working on. Thanks.

Chris

---

**From:** Kobialka, Lisa (Perkins Coie) [mailto:LKobialka@perkinscoie.com]
**Sent:** Saturday, January 05, 2008 1:57 PM
**To:** Seidl, Christopher A.; Holdreith, Jake M.; Farnan, Kelly E.; Foster, Trevor J.; Moravetz, Amy
**Cc:** Rovner, Philip A.
**Subject:** RE: Special Verdict Form

No.

Lisa Kobialka
Perkins Coie LLP
101 Jefferson Drive
Menlo Park, CA 94025
Ph: (650) 838-4447
Fax: (650) 838-4350

---

**From:** Seidl, Christopher A. [mailto:CASeidl@rkmc.com]
**Sent:** Thursday, January 03, 2008 6:59 PM
**To:** Kobialka, Lisa (Perkins Coie); Holdreith, Jake M.; Farnan, Kelly E.; Foster, Trevor J.; Moravetz, Amy
**Subject:** RE: Special Verdict Form

>>>> Please read the confidentiality statement below <<<<
Lisa,

That is correct. Is Finjan asserting contributory infringement or inducement on Finjan's patents at trial?

Chris

---

**From:** Kobialka, Lisa (Perkins Coie) [mailto:LKobialka@perkinscoie.com]
**Sent:** Thursday, January 03, 2008 8:34 PM
**To:** Seidl, Christopher A.; Holdreith, Jake M.; Farnan, Kelly E.; Foster, Trevor J.; Moravetz, Amy
**Cc:** Rovner, Philip A.; Andre, Paul (Perkins Coie); Hannah, James (Perkins Coie); Wharton, Meghan (Perkins Coie); Kastens, Kris (Perkins Coie); Dennison, Steven (Perkins Coie)
**Subject:** Special Verdict Form

Chris,

Attached please find Finjan's Special Verdict Form.

When we spoke today, you asked whether we intended to pursue our indirect infringement claims. I told you I did not know. Can you tell me what you are referring to because I am afraid that misunderstood your question. Are you asking whether we are asserting contributory or inducing infringement on Finjan's patents or asking something else?

Lisa

<<13831763_1.DOC>>

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

---

Information contained in this e-mail transmission may be privileged, confidential and covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute, or reproduce this transmission.

If you have received this e-mail transmission in error, please notify us immediately of the error by return email and please delete the message from your system.

Pursuant to requirements related to practice before the U. S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U. S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

Thank you in advance for your cooperation.

Robins, Kaplan, Miller & Ciresi L.L.P.
http://www.rkmc.com

---

# EXHIBIT 3

**Seidl, Christopher A.**

**From:** Holdreith, Jake M.
**Sent:** Sunday, March 09, 2008 5:43 PM
**To:** Andre, Paul
**Cc:** Lee, Hannah; Seidl, Christopher A.; Foster, Trevor J.; Schutz, Ronald J.; George, Sharon C.; Moravetz, Amy; provner@potteranderson.com; Kobialka, Lisa
**Subject:** RE: Jury Instructions and Verdict Form

Paul,

You are correct that we will not argue Section 112 defenses to Finjan's asserted claims, patent exhaustion, and willful infringement of Secure Computing's asserted claims, to the jury. For purposes of appeal, we do not waive section 112 arguments we have made to the court.

Jake

-----Original Message-----
From: Andre, Paul [mailto:pandre@KSLAW.com]
Sent: Sunday, March 09, 2008 5:13 PM
To: Holdreith, Jake M.
Cc: Lee, Hannah; Seidl, Christopher A.; Foster, Trevor J.; Schutz, Ronald J.; George, Sharon C.; Moravetz, Amy; provner@potteranderson.com; Kobialka, Lisa
Subject: RE: Jury Instructions and Verdict Form

Jake,

Based on the verdict form, would you please confirm that Defendants are dropping their Section 112 defense, their patent exhaustion defense, and their claims of willful infringement against the Secure Computing patents.

Paul

-----Original Message-----
From: Holdreith, Jake M. [mailto:JMHoldreith@rkmc.com]
Sent: Sunday, March 09, 2008 2:37 PM
To: Andre, Paul
Cc: Lee, Hannah; Seidl, Christopher A.; Foster, Trevor J.; Schutz, Ronald J.; George, Sharon C.; Moravetz, Amy; provner@potteranderson.com; Kobialka, Lisa
Subject: RE: Jury Instructions and Verdict Form

>>>> Please read the confidentiality statement below <<<<
I think that's right. We are looking to get you the updated set by 6:30 this evening.

-----Original Message-----
From: Andre, Paul [mailto:pandre@KSLAW.com]
Sent: Sunday, March 09, 2008 4:29 PM
To: Holdreith, Jake M.
Cc: Lee, Hannah; Seidl, Christopher A.; Foster, Trevor J.; Schutz, Ronald J.; George, Sharon C.; Moravetz, Amy; provner@potteranderson.com; Kobialka, Lisa
Subject: RE: Jury Instructions and Verdict Form

Once you get us the latest version, we should have a call to discuss.
Do you agree?

Paul

-----Original Message-----
From: Holdreith, Jake M. [mailto:JMHoldreith@rkmc.com]
Sent: Sunday, March 09, 2008 12:54 PM
To: Andre, Paul
Cc: Lee, Hannah; Seidl, Christopher A.; Foster, Trevor J.; Schutz, Ronald J.; George, Sharon C.; Moravetz, Amy; provner@potteranderson.com; Kobialka, Lisa

Subject: RE: Jury Instructions and Verdict Form

>>>> Please read the confidentiality statement below <<<<
Dear Counsel,

I have identified what I believe are the remaining points of dispute with respect to the jury instructions in the attached table. As you can see, we are dropping a number of instructions and expect that this will narrow the disputes. In other cases, we are willing to agree to language you have proposed, sometimes with slight modifications.

I believe this chart identifies the major issues we expect to raise and I am sending it now so you can start to formulate your positions. I expect we should be able to limit the number of disputes for the court's consideration to a small handful. We are currently entering these changes on the jury instruction set as filed, and we'll send you that document when it is complete.

-----Original Message-----
From: Andre, Paul [mailto:pandre@KSLAW.com]
Sent: Sunday, March 09, 2008 11:32 AM
To: Holdreith, Jake M.
Cc: Lee, Hannah; Seidl, Christopher A.; Foster, Trevor J.; Schutz, Ronald J.; George, Sharon C.; Moravetz, Amy; provner@potteranderson.com; Kobialka, Lisa
Subject: RE: Jury Instructions and Verdict Form

Jake,

Could you send me the version of the verdict form with you new edits.
Also, could you get us (Lisa is back as well) a copy of the jury instructions with your latest edits when you can.

Paul

---

From: Holdreith, Jake M. [mailto:JMHoldreith@rkmc.com]
Sent: Saturday, March 08, 2008 6:45 PM
To: Andre, Paul
Cc: Lee, Hannah; Seidl, Christopher A.; Foster, Trevor J.; Schutz, Ronald J.; George, Sharon C.; Moravetz, Amy; provner@potteranderson.com
Subject: Re: Jury Instructions and Verdict Form

>>>> Please read the confidentiality statement below <<<<

Paul,

With respect to inducement and claims 1-5 and 7 of the 361, we disagree that the expert needs to testify to the ultimate legal conclusion. We'll expect that you will raise your objection with the Court.

Tomorrow, I'll send you our positions based on the jury instructions as filed with the court.

Jake
Jake M. Holdreith

Sent from my BlackBerry

----- Original Message -----
From: Andre, Paul <pandre@KSLAW.com>
To: Holdreith, Jake M.
Cc: Lee, Hannah <Hlee@KSLAW.com>; Seidl, Christopher A.; Foster, Trevor J.; Schutz, Ronald J.; George, Sharon C.; Moravetz, Amy; provner@potteranderson.com <provner@potteranderson.com>

Sent: Sat Mar 08 18:32:00 2008
Subject: RE: Jury Instructions and Verdict Form

Jake:

I do not believe the cited testimony or expert report supports Secure Computing's position regarding inducing infringement of claims 1-5 and 7 of the '361 patent. Specifically, Dr. Wallach never mentions inducing infringement of these claims, and specifically in his expert report at paragraph 105 states that his opinion on inducement is only for claims 8, 9, 10, 11, 12 and 14. Paragraph 106 of the expert report that you cite specifically refers to the method claims of the '361 patent, and as you know claim 1 is not a method claim. As such, we will not withdraw our objection to those claims.

As for the jury instructions, we are using the latest version filed.

Paul

-----Original Message-----
From: Holdreith, Jake M. [mailto:JMHoldreith@rkmc.com]
Sent: Saturday, March 08, 2008 4:08 PM
To: Andre, Paul
Cc: Lee, Hannah; Seidl, Christopher A.; Foster, Trevor J.; Schutz, Ronald J.; George, Sharon C.; Moravetz, Amy
Subject: RE: Jury Instructions and Verdict Form

>>>> Please read the confidentiality statement below <<<<
Please get back to me on which version of the jury instructions you are working from. I'll plan to use the set as filed, but if there are updates, I would like to take them into account.

In addition, I have reviewed your draft special verdict form. In an effort to narrow disputes, please consider the attached table of Dr. Wallach's testimony regarding inducement, which I believe should obviate your objection to the inducement question for claims 1-5 and 7 of the '361 Patent, found in your footnotes 6 and 7. I understand you are not objecting to the inducement question for claims 8-12 and 14 based on alleged lack of proof at trial.

As you know, the support for Dr. Wallach's inducement opinion is found at least in paragraphs 106, 98, 102 and 103 of his opening report along with the claim chart for the '361 Patent.

I hereby notify you that we are not asserting inducement of Claim 15 of the '361 Patent and we are also willing to withdraw our claim of inducement for Claim 37 of the '010 patent, and will withdraw the inducement questions as to those claims. We continue to assert direct infringement.

Please let me know if you will withdraw your objection to the inducement question for claims 1-5, 7, 8-12 and 14, which would, I believe, resolve the dispute as to Question 20 of the verdict form in its entirety, and please let me know if you agree that Question 21 should simply be deleted.

I agree that claims 4, 6 and 8 of the 822 patent can be deleted from questions 14 (enablement) and 15 (indefiniteness). As you know, we believe that at least paragraph 94 of Dr. Wallach's opening report and at least paragraph 91 of his rebuttal report support his opinions on the facts underlying our Section 112 defenses to claims 12 and 13 of the '822 Patent.

-----Original Message-----
From: Andre, Paul [mailto:pandre@KSLAW.com]
Sent: Saturday, March 08, 2008 1:30 PM
To: Holdreith, Jake M.
Cc: Lee, Hannah; Seidl, Christopher A.; Foster, Trevor J.; Schutz, Ronald J.; George, Sharon C.; Moravetz, Amy
Subject: RE: Jury Instructions

I think it was the last set that was filed with the Court, but I'll check and get back with you.

---

From: Holdreith, Jake M. [mailto:JMHoldreith@rkmc.com]
Sent: Saturday, March 08, 2008 11:11 AM
To: Andre, Paul
Cc: Lee, Hannah; Seidl, Christopher A.; Foster, Trevor J.; Schutz, Ronald J.; George, Sharon C.; Moravetz, Amy
Subject: Jury Instructions

>>>> Please read the confidentiality statement below <<<<
Paul, I understand you will be the contact on your side for conferring on jury instructions. I would like to see if we can narrow the disputes this weekend, as the Judge asked us to do, and I'll be the person on our side. I want to make sure I'm working on the correct, latest set. Can you let me know what set is the most up to date from your perspective?

Thanks,

Jake

Jake Holdreith
Office phone: (612) 349-8483
Direct FAX : (612) 339-4181
E-mail address:jmholdreith@rkmc.com

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis MN 55402-2015

www.rkmc.com

http://www.rkmc.com <http://www.rkmc.com/>

---

Information contained in this e-mail transmission may be privileged, confidential and covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute, or reproduce this transmission.

If you have received this e-mail transmission in error, please notify us immediately of the error by return email and please delete the message from your system.

Pursuant to requirements related to practice before the U. S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U. S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

Thank you in advance for your cooperation.

Robins, Kaplan, Miller & Ciresi L.L.P.
http://www.rkmc.com <http://www.rkmc.com/>

---

Confidentiality Notice This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

Confidentiality Notice
This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

Confidentiality Notice This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

Confidentiality Notice This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

Confidentiality Notice This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

# EXHIBIT 4
# REDACTED IN ITS ENTIRETY

# EXHIBIT 5



# Documents 1Box™

# User Guide



Plaintiff's Trial Exhibit

**PTX-208**

Case No. 06-369 GMS



finjan software

# Documents 1Box™

## User Guide

Documents 1 BOX
Vital Security
Connect | Protect | Forget

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
FIN012966

Documents 1Box™ User Guide

© Copyright 2005. Finjan Software group of companies. All rights reserved.

All text and figures included in this publication are the exclusive property of Finjan Software and are for your personal and non-commercial use. You may not modify, copy, distribute, transmit, display, perform, reproduce, publish, license, create derivative works from, transfer, use or sell any part of its content in any way without the express permission in writing from Finjan Software. Information in this document is subject to change without notice and does not present a commitment or representation on the part of Finjan Software.

The Finjan Software technology and/or products and/or software described and/or referenced to in this material are protected by registered and/or pending patents including U.S. Patents No. 6092194, 6154844, 6167520, 6480962, 6209103, 6298446 and 6353892, 6804780.

Finjan, Finjan logo, Documents 1Box, Vital Security and Window-of-Vulnerability are trademarks or registered trademarks of Finjan Software, Inc., and/or its subsidiaries. Microsoft, Microsoft Windows and Microsoft Exchange are registered trademarks and trademarks of Microsoft Corporation. IBM, Lotus and Lotus Notes are registered trademarks of International Business Machines Corporation. Sophos is a registered trademark of Sophos plc. SurfControl is a registered trademark of SurfControl plc. MailShell is a trademark of MailShell, Inc. All other trademarks are the trademarks of their respective owners.

| Finjan Software, Inc. | Finjan Software Ltd. |
|---|---|
| 2025 Gateway Place | Shoham Building |
| Suite 180 | 1 Hamachshev Street, P. O. Box 8251 |
| San Jose, CA 95110 | Netanya South, Israel |

Catalog number: VS4DSMB_0405_13_UM

**For the latest information regarding Documents 1Box™ and other Vital Security 1Box™ products go to: http://www.finjan.com/Products/SMB.**

# Table of Contents

**1 INTRODUCTION** .......... 1-1
OVERVIEW .......... 1-1
COMPONENTS .......... 1-2
*Appliance* .......... 1-2
*Client* .......... 1-2
*Management Console* .......... 1-2

**2 GETTING STARTED** .......... 2-1
SETTING UP THE DOCUMENTS 1BOX APPLIANCE .......... 2-2
CONFIGURING THE DOCUMENTS 1BOX .......... 2-3
INSTALLING THE DOCUMENTS 1BOX CLIENT AND AUTHENTICATION KEY .......... 2-4

**3 USING THE MANAGEMENT CONSOLE** .......... 3-1
ADDING USERS .......... 3-2
CONFIGURING USER PERMISSIONS .......... 3-4
*User Permission Types* .......... 3-4
*Downloading Authentication Keys* .......... 3-4
MANAGING DOCUMENTS .......... 3-5
*Publishing* .......... 3-5
*Viewing* .......... 3-6
LICENSE MANAGEMENT .......... 3-7
CUSTOMIZATION .......... 3-8

**4 APPENDIX** .......... 4-1
RESTORE/BACKUP UTILITY .......... 4-1
USING THE LCD PANEL .......... 4-2
REMOTELY ACCESSING THE DOCUMENTS 1BOX .......... 4-3
UPDATING DOCUMENTS 1BOX .......... 4-4
SUPPORTED GRAPHICS FORMATS .......... 4-5

*Documents 1Box™ User Guide*

*ii* *Table of Contents*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FIN012969

# 1 Introduction

**Documents 1Box™** ensures data confidentiality by protecting proprietary information from theft and misuse, and ensures data currency by preventing out-of-date information from being circulated.

**Documents 1Box** serves as a document repository, allowing users to access and view secure documents either via Microsoft Internet Explorer or via Adobe® Acrobat®. Authorized publishers with the relevant permissions can navigate to the required directory and upload the documents. If the documents are not in PDF format, they are automatically converted to PDF format. While uploading, the publisher can provide a document description.

## Overview

While methods such as firewalls restrict access to information and protect it from intruders, **Documents 1Box** enhances these security systems by controlling the way data is used once authorized access is granted, enabling you to protect information from misuse by insiders who are authorized to see the documents. It does this by preventing the unauthorized copying, emailing, saving and screen capturing of the following types of documents:

- Microsoft Office documents (Word, Excel, PowerPoint, etc.)
- PDF documents, displayed in Adobe Acrobat and Acrobat Reader (including within any browser in which PDF documents can be displayed)
- HTML documents
- Text documents
- Graphics (see the *Appendix* for a complete list of supported formats)

# Components

The **Documents 1Box** system is comprised of the **Documents 1Box** appliance, the **Documents 1Box Client** and the management console, which integrate seamlessly with your network to protect supported document types.

## Appliance

**Documents 1Box** is an appliance, preconfigured for optimum security and performance. After a simple setup procedure, **Documents 1Box** starts working at the press of a button.

The appliance contains two active partitions. The first partition contains the system that runs the operating system and the appliance itself. The second partition contains the documents repository.

The **Documents 1Box** uses a 160 GB hard drive. The available storage space for the documents themselves is approximately 100 GB.

## Client

Documents are downloaded from the appliance via the **Documents 1Box Client** (using the management console), and then decrypted for viewing on the end-user's computer. The Client and its required authentication key are downloaded and installed the first time that the user attempts to access a protected document.

The **Documents 1Box Client** supports the following operating systems:

- Microsoft Windows NT4
- Microsoft Windows 2000 Professional/Server
- Microsoft Windows XP Home/Professional

## Management Console

**Documents 1Box** is managed from a Web-based console, which is used for user administration by the system administrator as well as document access by end-users.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FIN012971

# 2 Getting Started

Take your **Documents 1Box** out of its box. The appliance is ready for immediate use.

This chapter contains the following sections:

- Setting Up the **Documents 1Box** Appliance, page 2-2
- Configuring the **Documents 1Box**, page 2-3
- Installing the **Documents 1Box** Client and Authentication Key, page 2-4

## Setting Up the Documents 1Box Appliance

**To set up your Documents 1Box appliance:**

1. Connect the power supply cable.
2. Use the RJ45 connector to connect to your network using the LAN 6 socket (the far-right socket).

**NOTE: All other LAN sockets are reserved for future use.**

3. Move the **ON/OFF** switch to the **ON** position.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FIN012973

# Configuring the Documents 1Box

The **Documents 1Box** is supplied with a default IP address - 10.0.0.100 - and can be accessed remotely for initial setup by any PC in your network, in the same subnet.

⇨ **To configure the Documents 1Box:**

The setup procedure is carried out from any PC in the network.

1. Configure the network settings of your PC to match those of the appliance:
   - IP address in the same subnet e.g. 10.0.0.101.
   - Subnet mask 255.0.0.0.
2. Open your Internet Browser and type in the following IP address http://10.0.0.100.
3. Enter the user name (**admin**) and password (**finjan**) in the **Connection** window, and then click **OK**.
4. The License Agreement appears. Read the agreement carefully, select the **I accept all of the terms of the preceding license agreement** option, and then click **Continue** in order to continue with the setup procedure.
5. The Set **Clock** page appears. If you want to set the local date and time, click the **Clock** button. Click **Continue** if you want to continue to the next step without setting the clock.
6. The **System Update and Integrity Check Schedule** page appears. Select the time at which you want the daily update and integrity check to take place, followed by the day and time at which you want the weekly reboot to take place, and then click **Submit**.

**NOTE: In the *Appendix*, see *Updating Documents 1Box*, page 4-4, for further information about product Updates.**

7. The **Server Initialization** page opens:
   a. Enter a new IP address for the **Documents 1Box** so that it can be incorporated into your company network.
   b. Enter your Subnet Mask.
   c. Enter your DNS IP.
   d. Enter your Default Gateway address.
   **Important! All fields must be filled.**
   e. Click **Submit**.

The initial setup is now complete and the system automatically reboots.

**NOTE: If necessary, these configuration settings can be accessed again by going to http://<assigned IP address>/config/.**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FIN012974

*Documents 1Box™ User Guide*

# Installing the Documents 1Box Client and Authentication Key

When logging in for the first time, users will be prompted to install the **Documents 1Box** Client, as well as an authentication key. Authentication keys are non-transferable, and each key can be downloaded only once per user. Separate authentication keys are required for each **Documents 1Box** appliance.

⇨ **To install the Documents 1Box Client:**

1. In your Internet browser, enter the required IP address. The **Welcome** screen appears:

Documents 1Box
Next

2. Click **Next**. The **License Agreement** screen appears:

Documents 1Box
License Agreement
READ THE TERMS AND CONDITIONS OF THIS TERMS OF USE AGREEMENT CAREFULLY BEFORE INSTALLING THIS PRODUCT. BY CLICKING THE "ACCEPT" BUTTON, YOU (EITHER INDIVIDUALLY OR ON BEHALF OF THE ENTITY OR COMPANY THAT YOU REPRESENT) ARE ACCEPTING AND AGREEING TO BE UNCONDITIONALLY BOUND BY THE TERMS OF THIS TERMS OF USE AGREEMENT. YOUR CONTINUED USE OF THE PRODUCT SHALL ALSO CONSTITUTE ASSENT TO THE TERMS OF THIS AGREEMENT. IF YOU DO NOT UNCONDITIONALLY AGREE TO ALL OF THE TERMS OF THIS AGREEMENT, CLICK THE "CANCEL" BUTTON AND DISCONNECT THE APPLIANCE.
TERMS OF USE AGREEMENT
1. GRANT OF LICENSE. Subject to the payment of the applicable license and subscription fees and all the terms and conditions of this Terms of Use Agreement ("Agreement"), Finjan Software Ltd. and/or Finjan Inc. (collectively, "Finjan") grants to you a limited, personal, nonexclusive, nontransferable, non-sublicensable license to use, in binary executable form only, the Finjan software ("Software") bundled in the Finjan appliance ("Appliance") (Software and Appliance together, "Product") that

2-4 *Getting Started*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FIN012975

3. Accept the terms of the license agreement, and then click I Agree. The **Client Installation** screen appears:

**NOTE: If you are using Microsoft Windows XP Service Pack 2, read the note displayed in the Client Installation screen, and then follow the directions if necessary. Skip down to step 5.**

4. Click **Download**. The **Security Warning** dialog box appears:

5. **Click Install** in order to install the **Documents 1Box** Client on your computer, and then follow the instructions shown in the Installation Wizard.

6. Once you have completed the installation, the **Authentication Key Installer** is automatically launched. After a few moments, the following dialog box appears:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FIN012976

*Documents 1Box™ User Guide*

Click **OK** to complete the installation procedure, and then click the **Login** button in the browser.

2-6 *Getting Started*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FIN012977

# 3 Using the Management Console

The Web-based **Documents 1Box** management console allows you to efficiently manage your organization's users by configuring a series of user-based and document-based permissions. Via the management console, new users can be added to and deleted from the system, and permissions can be granted regarding the publication of documents to the **Documents 1Box** repository.

**NOTE: Only system administrators or users with administrator permissions can configure user permissions.**

This chapter contains the following sections:

- Adding Users, page 3-2
- Configuring User Permissions, page 3-4
- Managing Documents, page 3-5
- License Management, page 3-7
- Customization, page 3-8

*Documents 1Box™ User Guide*

# Adding Users

The **Add/Edit User** screen allows you to add and delete users, as well as change the permissions of current users. New users can be added to the system via the **Add/Edit User** screen by clicking the **Add User** button displayed in the menu on the left-hand side of the **Users** screen. Clicking a user's **E-mail Address** allows you to change that user's permissions.

➪ **To add new users:**

1. In the **Add/Edit User** screen, click the **Add User** button. The **Add User** screen is displayed:

3-2 *Using the Management Console*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FIN012979

 **NOTE: The only valid format for a user name is an e-mail address. In other words, a person's user name is his or her e-mail address, and no other formats will be accepted.**

2. Enter the required information in the displayed fields. If you want the user to have administrative rights, select the **This user has administrator permissions** option. If you want to allow a user to reinstall an authentication key, select the **May download Authentication Key** option. See *Configuring User Permissions*, page 3-4, for an explanation regarding the option to download an authentication key.
3. Select the required **Read** and **Publish** permissions that will be granted, and then click **OK** to add the user's information to the database.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FIN012980

# Configuring User Permissions

User permissions are configured via the **Documents 1Box** management console. The system administrator defines an account for each authorized user that includes the user name, password, directories that the user is allowed to read, and directories to which the user may publish documents (if any), as well as whether or not the user has administrator permissions.

**NOTE: If user access has been revoked, the user will no longer be able to read documents from the system, even though the Documents 1Box Client and authentication key are installed.**

## User Permission Types

| Selecting... | Allows users to... |
|---|---|
| **Publish** | Upload documents to selected directories in the **Documents 1Box** repository (based on the configured directory permissions). |
| **Read** | Access and read documents stored in selected directories in the **Documents 1Box** repository, based on the directory permissions configured for each user. |
| **This user has administrator permissions** | Add or edit user information, have full access to directories with editing capabilities, manage the license agreement, customize system branding with company logos, and configure system settings such as the IP address. |

All sub-folders automatically inherit permissions from their parent folders, and these inherited permissions cannot be changed. It is, however, possible to add new permissions to these inherited permissions.

## Downloading Authentication Keys

As a user is allowed to download the **Documents 1Box** Client and install it along with the authentication key only one time, in the event that the client and authentication key must be re-installed (for example, if the user's computer must be reformatted, etc.), the system administrator can enable the option that allows the user to download an authentication key. By default, this option is enabled for new users when they are added to the system. Once the user has downloaded an authentication key, this option becomes disabled, in order to prevent the user from downloading multiple authentication keys for different computers.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FIN012981

*Documents 1Box™ User Guide*

# Managing Documents

Documents are managed and viewed via the **Documents** area of the Management Console, accessed using the Web browser.

## Publishing

Users who have permissions to publish documents can navigate to the required directory and upload the documents, which must be in either Microsoft Office format or PDF format. If the documents are not in PDF format, they will be automatically converted to PDF.

⇨ **To publish documents:**

1. In the **Documents** area, click the **Publish** button, displayed on the left side of the screen. The **Publish** screen appears:

*Using the Management Console* 3-5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FIN012982

2. Either enter the path and file name that you want to upload,

   Or,

   Click the **Browse** button to navigate to the required file.
3. Enter a description of the file that you want to publish in the **Description** field.
4. Verify that the information entered is correct, and then click the **Publish** button to publish your document.

## Viewing

Once you have logged into the system, you can browse the directory structure in order to locate the documents that you want to read. **Documents 1Box** allows documents to be read, but does not allow documents to be saved, forwarded, printed, copied/pasted, screen-captured or modified in any way.

If you attempt to save a document, a copy of the document can be saved for only ten minutes. Once this time has passed, you will no longer be able to view the document, and you must access it again via **Documents 1Box**.

If you attempt to print a document, you will notice that the **Print** button on the Acrobat toolbar has been disabled. If you attempt to print using the **Print** option in the Microsoft Internet Explorer **File** menu (which is not disabled), the document will not be printed, with a blank page being produced.

In addition, the directory structure and file list are also secure and cannot be saved, forwarded, copied/pasted, screen-captured or printed, as file names and descriptions often reveal sensitive information.

**NOTE: Documents located and extracted from your browser's cache cannot be decrypted and read. In order to view the document, you must log in and access it from within the system.**

# License Management

The **License Management** area of the Management Console allows you to upload your **Documents 1Box** license agreement and view its status. The license is issued by Finjan and then sent to your organization. The file (istlicense.dat) should be saved locally, and then installed via the **License Management** area, as shown in the screen below.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FIN012984

## Customization

The **Customize** area allows you to customize the look of the **Documents 1Box** Management Console by replacing the Finjan logo with your own organization's name and logo, and creating a new name for the **Documents 1Box** repository, both of which are shown below.

**NOTE: If you want to use your own logo, the image that you use must be a gif or jpg with a height of 106 pixels and a width of 150 pixels. Larger images will be reduced and smaller images will be stretched, which will affect the quality of the image.**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# 4 Appendix

This appendix includes the following topics:

- Restore/Backup Utility, below
- Using the LCD Panel, page 4-2
- Remotely Accessing the Documents 1Box, page 4-3
- Updating Documents 1Box, page 4-4
- Supported Graphics Formats, page 4-5

## Restore/Backup Utility

⇨ **To use the Restore/Backup utility:**

- To the **Documents 1Box** attach:
  - A monitor using the VGA port
  - A keyboard with a USB connector

    OR
  - Connect a PC to the **Documents 1Box** serial port using the serial cable supplied – to operate the **Documents 1Box** with a simple terminal utility (e.g. Windows Hyper Terminal)

Three options appear on the monitor:

1. Start **Documents 1Box.**
2. Advanced options using a VGA display and USB keyboard.
3. Advanced options using a remote terminal via the serial interface.

To boot normally, select option 1. After 10 seconds, the **Documents 1Box** automatically boots normally.

⇨ **To run the Restore/Backup utility:**

1. Select option 2 or 3 **within the first 10 seconds** to override the normal boot.

2. Select the required **Restore** or **Backup** options:

| Select: | To: |
|---|---|
| Options 1-2 | Back up system images to either NFS or a Windows shared folder. |
| Options 3-4 | Back up document images to either NFS or a Windows shared folder. |
| Options 5-7 | Restore system images from a CD ROM, NFS or a Windows shared folder. |
| Options 8-10 | Restore document images from a CD ROM, NFS or a Windows shared folder. |
| Option 11 | Restore factory settings. |
| Option 0 | Reboot. |

# Using the LCD Panel

The LCD panel is located in the right-hand corner at the front of the appliance. Information is displayed only once the operating system is running. It is possible to view four different screens using the LCD panel, using the arrow buttons to move between them. The four screen options are as follows:

| | |
|---|---|
| Documents 1Box Version # | This is the default screen, and shows the product name and your current version number. When a new version has been downloaded using the auto-update feature, the new version number will be shown here. |
| CPU Usage | This screen shows your current CPU usage. |
| Shutdown? ENTER=yes | This screen allows you to shut down the appliance. To shut down the appliance: Press Enter. The following question appears: Are you sure? Press Enter to confirm your selection, or Esc to return to the default screen. If you pressed Enter, the operating system shuts down automatically. It is recommended to wait approximately two minutes before turning off the appliance. |

**NOTE: Pressing Esc returns the currently displayed screen to the default screen.**

# Remotely Accessing the Documents 1Box

For remote access, the **Documents 1Box** uses VNC (Virtual Network Computing) software, which allows you to view and interact with one computer from another computer on your network.

⇨ **To access the Documents 1Box remotely:**

3. Open your Internet browser and type in http://<Documents 1Box machine IP>:5888.
4. Click **Enter**. The **VNC Authentication** screen appears asking for a password.

5. Enter the default password **(finjan)**, and then click **OK**. This password should be changed once the system is up and running.

You are now operating the **Documents 1Box** by remote control from your PC.

⇨ **To log in to Windows:**

The Windows login dialog box appears asking for a user name and password.

1. Enter **Administrator** in the **User** field and **finjan** in the **Password** field. These are the defaults that you can change when the system is up and running.
2. Click **Enter**. The setup icon appears.

You are now ready to configure your **Documents 1Box**.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FIN012988

# Updating Documents 1Box

The **Documents 1Box** automatically checks for software updates on a daily basis. The time of day can be configured during the setup procedure (see step 6 in *Configuring the Documents 1Box*, page 2-3). If an update is found, it will be automatically deployed. The current product version can be verified via the appliance's LCD panel. See *Using the LCD Panel*, page 4-2, for further information.

To manually check for and deploy product updates, double-click the **Update Now** icon on the desktop, accessible via the VNC remote control tool. See *Remotely Accessing the Documents 1Box*, page 4-3, for further information.

**NOTE: If Documents 1Box can access the Internet only via a Web proxy, use the VNC tool to log in to the desk top and add a new Windows environmental variable with the name "ALL_PROXY=proxy_ip:proxy_port".**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Supported Graphics Formats

The following graphical formats are supported by **Documents 1Box**:

| Format | Description |
|---|---|
| AVS | AVS X image file |
| BMP | MS Windows Bitmap image file |
| BMP | OS/2 Bitmap |
| DCX | ZSoft IBM PC multi-page Paintbrush file |
| DIB | MS Windows Device Independent Bitmap |
| DPX | Digital Moving Picture Exchange |
| FAX | Group 3 FAX encoding |
| FITS | Flexible Image Transport System |
| FPX | FlashPix Format |
| GIF | CompuServe graphics interchange format |
| GIF87 | CompuServe graphics interchange format ver 87 |
| ICO | MS Windows icons |
| ICO | OS/2 Icons |
| IPTC | NewsWire profile |
| JBIG | Joint Bi-level Image experts Group file interchange format |
| JP2 | JPEG-2000 JP2 File Format Syntax |
| JPEG | Joint Photographic Experts Group JFIF format |
| JPG | Joint Photographic Experts Group JFIF format |
| MIFF | Magick image file format |
| MNG | Multiple-image Network Graphics |
| MPC | Magick Persistent Cache image file format |
| MTV | MTV Raytracing image format |
| OTB | On-the-air Bitmap |
| PBM | Portable Bitmap |
| PCD | Kodak PhotoCD Base/16, Base/4 and Base only |
| PCDS | Kodak PhotoCD Base/16, Base/4 and Base only |
| PCT | Macintosh PICT |
| PCX | PC PaintBrush |
| PGM | Portable GrayMap |
| PICT | Apple Macintosh QuickDraw/PICT file |
| PNG | Portable Network Graphics |
| PNM | Portable Any Bitmap |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FIN012990

| Format | Description |
|---|---|
| PPM | Portable PixelMap |
| PSD | Adobe Photoshop |
| P7 | XV's visual schnauzer format |
| RAS | Raster Sun Microsystems |
| RGBA | Raw red, green, blue, and matte samples |
| SGI | Irix RGB image file |
| SUN | Raster Sun Microsystems |
| TGA | TrueVision Targa |
| TIFF | Tagged Interchange File Format |
| VICAR | V I C A R Image file format |
| VID | Visual Image Directory |
| VIFF | Khoros Visualization image file |
| WMF | Windows Meta File |
| XBM | X Windows system bitmap, black and white only |
| XPM | X Windows system pixmap file (color) |
| XWD | X Windows system window dump file (color) |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY FIN012991

# EXHIBIT 6



## Deliver Content Without Giving Away Control

Corporate espionage and the theft of intellectual property by "authorized" users is a growing concern among business executives. The patented Vital Security for Enterprise Documents secures, tracks and audits the provision and access of sensitive digital documents and helps protect important business operations and reduce legal liabilities. Vital Security prevents unauthorized copying, printing, saving, forwarding and screen capturing of sensitive information without interrupting normal business processes.

### Key Features

- Provides powerful authentication and encryption capabilities to protect sensitive business documents from unauthorized:
  - printing
  - printing to file
  - copying
  - pasting
  - screen capturing
  - saving
  - forwarding
- Minimizes overall costs by working with Internet Explorer to secure files in popular formats such as:
  - HTML
  - PDF
  - Text
- Guarantees that only the latest copies of documents are used by preventing saving and copying.
- Ensures accountability by watermarking printed documents with an expiration date and/or the identification of the person printing it.

### Control is an Illusion

You can control your information's integrity and security until it is accessed. Once on the desktop, documents replicate and travel beyond your control or knowledge. These renegade documents are the costliest security problems according to the FBI, and are a compliance nightmare in regulated industries.

### Control & Audit the Flow of Documents

Vital Security for Enterprise Documents allows an organization to audit and control the provisioning of sensitive documents at a corporate level. It gives system administrators the ability to control and set policies for business documents for individual users or user groups. Controls can be set for copying, printing, saving, forwarding and screen capturing. As a result, intellectual property can be kept up-to-date by preventing users from saving or copying, thus forcing them to always retrieve the latest copy from the repository.

### Cost Efficient Implementation

Vital Security for Enterprise Documents provides a rapid, low-cost deployment. It uses standard keys and key exchange protocols to encrypt documents and authenticate users. It also works with the Internet Explorer browser that all your users already know how to use. This dramatically reduces your implementation time and costs, and ensures a high ROI.

Rated 10/10 by ZDNet for "Ease of Use" and "Effectiveness," Vital Security has protected over half a billion documents to date for customers including AOL, AT&T and Nintendo.

### Real-Life Applications

In the race to develop and commercialize drugs, pharmaceutical companies manage hundreds of thousands of documents including patent applications, clinical trials results, drug specifications and proprietary production processes. The protection of sensitive documents from misuse or theft is critical due to competitive pressures and increasingly stringent regulatory requirements.

For companies in the entertainment industry, the creative process is one that can involve many teams working on various aspects of the same project, from start to finish. Creative teams are held to tight production schedules and milestones in order to keep the project within budget. Due to the heavy investment into these productions, protecting copyrights, intellectual properties and ideas every step of the way during the creative process is mission critical.

Vital Security for Enterprise Documents changes the equation. Authorized employees can collaborate using electronic documents while at the same time protecting that information from being copied, changed, misused or stolen which can result in adverse publicity, loss in revenue and the loss of competitive advantage.

Defendant's Trial Ex.
DTX - 1267
Case No. 06-369 GMS



## System Requirements

### Server

- Windows NT4, 2000
- Solaris 2.6, 7, 8
- Microsoft IIS4, IIS5
- NES 3.6
- iPlanet 4.0, 4.1
- Apache 1.3

### Client

- Microsoft Internet
- Explorer 5.0, 5.5 and 6.0
- Adobe Acrobat 4.0 and 5.0
- Windows 98, NT4, 2000 and XP

© 2003 by Finjan Software, Inc., and/or its subsidiaries
WWW.FINJAN.COM
Printed in the USA
USA VSEDDS1.0 10 03 EN

## Vital Security for Enterprise Documents System

- Vital Security Server: Integrates with Web servers to intercept requests for documents, and encrypts them before they are served.
- Vital Security Client: Enables a protected document to be decrypted and then securely displayed, while preventing unauthorized copying, saving, printing (even printing to a file), e-mailing and screen capturing of the protected document.

## Vital Security Server

The Vital Security Server integrates with corporate Web servers and unobtrusively monitors requests for protected information. When a request is received, the Vital Security Server intercepts it, retrieves the information and encrypts it as it is being served to the end-user's workstation. Vital Security Server's implementation of encryption and authentication provides robust security and enables its locking feature that renders documents unreadable unless the user's identity is authenticated by a non-transferable key. Because keys necessary to decrypt protected documents can be retrieved only after the user successfully authenticates with a Vital Security Key Server, a company using Finjan's Vital Security is assured that protected intellectual property will not be usable outside of the company, even if Vital Security is installed at both locations.

Vital Security Server offers a flexible and scalable architecture, which is especially useful for load balancing configurations and environments with multiple servers across the enterprise.

## For Additional Information

on products, services or support, contact a local Finjan sales representative at www.finjan.com

## Vital Security Client

The Vital Security Client intercepts protected text on its way from the browser to the screen and decrypts the protected text before it is displayed. Running in the background, the Vital Security Client protects the information displayed on the screen without interfering with the viewing experience. The Vital Security Client also intercepts print requests for protected documents by users and either blocks them entirely or routes them securely to a Vital Security Print Server. As a result, unauthorized copying, printing, saving, e-mailing and screen capturing of protected documents can be controlled.

> "One in every three business closures is the direct result of employee theft."
>
> - U.S. Chamber of Commerce and Ernst & Young

> "The average insider attack costs the target enterprise some $2.7 million, compared with $57,000 for the average outside attack."
>
> - Information Security Magazine

SC 11259

# EXHIBIT 7

# Vital Security for Documents

[Overview](#)
[Features & Benefits](#)
[Specifications](#)
[Associated Products](#)

## Overview

**Vital Security™ for Documents Overview**

Attacks from hackers and other unauthorised outsiders are well-known and understood security risks. For the first time, however, according to the CSI/FBI Computer Crime and Security Survey, 2003, disgruntled employees pose almost as big a security threat to corporations as hackers. Once an authorised user has access to sensitive documents Digital Rights Management they can be forwarded to competitors and news outlets, retained after termination, leaked to regulatory agencies or broadcast over the Web. In essence, control passes to the user as soon as the document is accessed.

Vital Security for Documents protects your confidential intellectual property from mishandling by authorised users using a centralised policy engine, removing security policy decisions from the hands of end users. Vital Security for Documents controls what sensitive information a user can access and what they can do with it after receiving it including; copying, printing, printing to a file, saving, forwarding and screen capturing of important information. Even if employees are terminated, or information gets into the wrong hands, Vital Security ensures that the information remains secured for the lifetime of the document.

Available on both Microsoft and Solaris platforms, Vital Security for Enterprise Documents' patented technology is application agnostic, transparent to users and protects PDF, HTML, and TXT files.

**Centralised Policy Management**

Documents that contain sensitive information need to be managed and controlled for their entire lifetime. Confidentiality leaks can result in monetary fines and jail time.

**Vital Security™ for Documents** includes a granular, easy-to-implement centralised policy engine that forces corporate policies on confidential documents. System administrators have the ability to control and set policies for copying, printing, saving, forwarding and screen capturing business documents for individual users or user groups. Every piece of intellectual property will be secured, whether it resides on the desktop or server, for the lifetime of the document.

Using industry standard encryption keys, Vital Security for Enterprise Documents provides robust security and enables its locking feature, rendering documents unreadable unless a non-transferable key authenticates the user's identity. Because the key required to decrypt protected documents can only be retrieved after the user successfully authenticates with a **Vital Security™ for Documents** Key Server, you are assured that protected intellectual property will not be available to non-authorised users, even if **Vital Security™ for Documents** is installed on their desktop.

**Currency**

In many industries and in many disciplines, having the most current information is extremely important. You wouldn't want manufacturing to start production on a product based on out-of-date specs. You also wouldn't want your customer service representatives giving customers advice based on older versions of your product.

**Vital Security™ for Documents** can ensure that current information is the only information available, eliminating even the possibility of out-of-date documents being used.

**Control and Audit the Flow of Documents**

Regulatory compliance has to be demonstrated during audits and reviews. **Vital Security™ for Documents** maintains a comprehensive list of everything that has been done with a document since its inception, including who

## Finjan

Enterprise Solutions
- Vital Security Appliance 5100 - for Web
- Vital Security Appliance 5200 - for Email
- Vital Security Appliance 5300 - for Load Balancing
- Vital Security Appliance 5400 - for SSL Security
- Vital Security Appliance Series NG-8000
- Vital Security for Clients
- Vital Security for Documents
- Vital Security for LiveLink
- Vital Security ICAP Adapter for Microsoft ISA Server

Home User & Small Business Solutions
- SurfinGuard Pro

Small & Medium Sized Business Solutions
- Vital Security Appliance NG-1100 - for Web Traffic
- Internet 1Box
- SSL 1Box
- Documents 1Box

## Downloads

White Papers
- Combating the New Generation of Malware
- Phishing Threats and Countermeasures
- Securing Active Content
- Spyware and Adware Threats and Countermeasures

Defendant's Trial Ex.
DTX - 1271
Case No. 06-369 GMS

has received copies and what they have done with those copies.

**Cost**

**Vital Security™ for Documents** provides a rapid, low-cost deployment. It uses standard keys and key exchange protocols to encrypt documents and authenticate users. It also works with the Internet Explorer browser and Adobe Acrobat Reader that your users already know how to use. This dramatically reduces your implementation time and costs, and ensures a high ROI

**Vital Security™ for Documents** has a proven, track record, protecting over half a billion documents with more than 4 million desktops installed.

Back to the Top

Overview :: Features & Benefits :: Specifications :: Associated Products

## Features & Benefits

**Vital Security for Documents Features and Benefits**

| | |
|---|---|
| **Granular and Centralised Policy Management** | Create unique policies for individuals or groups of users and creates consistent policy implementation for all users. |
| **Document Provisioning** | Granular policies and roles-based rules determine who has access to confidential documents and what actions they have the rights to perform. |
| **Document Policy Enforcement** | Provides powerful authentication and encryption capabilities to protect sensitive business documents from unauthorised; printing, printing to a file, copying, pasting, screen capturing, saving, and forwarding. |
| **Common Format Support** | Minimises overall costs by working with Internet Explorer to secure files in popular formats such as; HTML, PDF and TXT. |
| **Reporting and Auditing** | Detailed reports provide a lifetime of information about each document |
| **Document Versioning** | Guarantees that only the latest copies of documents are used by preventing saving and copying. |
| **Digital Watermarking** | Ensures accountability by watermarking printed documents with an expiration date and/or the identification of the person printing it. |
| **Flexible and Scalable Architecture** | Especially useful for load balancing, configurations and environments with multiple servers across the enterprise. |
| **End User Friendly** | Unobtrusively monitors web server requests for protected information. |
| **Uses Industry Standard Keys** | Reduces complexity and cost of implementation and maintenance. |

Back to the Top

Overview :: Features & Benefits :: Specifications :: Associated Products

## Specifications

**Vital Security for Documents System Requirements**

**Client Application**

- Microsoft Internet Explorer 5.0, 5.5, and 6.0
- Adobe Acrobat 4.0 and 5.0
- Windows 98, NT4, 2000 and XP

**Vital Security Server**

- Windows NT4, 2000
- Solaris 2.6, 7, 8
- Microsoft IIS4, IIS5
- NES 3.6
- iPlanet 4.0, 4.1
- Apache 1.3

Back to the Top

Overview :: Features & Benefits :: Specifications :: Associated Products

## Associated Products

Vital Security Appliance 5100 - for Web

Today's sophisticated and complex malware threats, including spyware, phishing, malicious code, viruses, worms and Trojans, require highly intelligent and robust security solutions. Leveraging Finjan's Application-Level Behaviour Blocking, **Vital Security™ Appliance 5100** is the ONLY solution that effectively combats this new generation of threats, while ensuring enterprise-level performance and high availability.

Vital Security Appliance 5200 - for Email

**Vital Security Appliance 5200** delivers the world's best and most comprehensive enterprise-level security solution for email traffic. Integrating Finjan's patented Application-Level Behaviour Blocking with best-of-breed anti-virus (McAfee®, Sophos®) and anti-spam (Mailshell™) engines, Vital Security Appliance 5200 provides the most complete email protection for known and unknown threats, including viruses, spam and malicious code attacks, such as phishing and spyware.

Vital Security Appliance 5300 - for Load Balancing

**Vital Security Appliance 5300** is the dedicated Security Load Balancer device in Finjan's Vital Security™ Appliance Series 5000, a set of robust hardware-based security solutions for enterprises. Designed to enhance overall solution reliability and performance, this powerful Security Load Balancer provides enterprises with the high availability they require for continuous business operations.

Vital Security Appliance 5400 - for SSL Security

The **Vital Security for SSL** solution provides two essential values: 1- It eliminates the risk of viruses or malicious content entering your network hidden within both transactional and application level SSL encrypted traffic; 2 -It delivers enforcement of corporate certificate policy and denies visits from corporate users to SSL sites with revoked or expired certificates.

Vital Security for Clients

**Vital Security™ for Clients** is a centrally managed security solution for enterprise desktops and off-network laptops. It protects individual computer users from mobile malicious code received through e-mails and the Web and monitors the behaviour of active content using its "sandboxing" technique.

LiveLink

Vital Security for LiveLink

**Vital Security for Livelink** ensures that documents continue to be secured even if they've been improperly sent to the wrong person. To these unauthorised eyes, your intellectual property would appear as gibberish. The patented Vital Security solution secures, tracks and audits the provision and access of sensitive digital documents for their entire lifetime. Vital Security prevents unauthorised copying, printing, print to file, saving, forwarding and screen capturing of sensitive information without interrupting normal business processes

Vital Security ICAP Adapter for Microsoft ISA Server

Finjan's **Vital Security ICAP Adapter for Microsoft ISA Server** adds ICAP capabilities to ISA servers, allowing them to interact with ICAP servers, such as Vital Security for Web, without having to add these servers to the proxy chain. The ICAP adapter intercepts HTTP sessions and sends them via ICAP to Vital Security for Web, which serves as an ICAP server. This allows Vital Security for Web to scan content that passes through the ISA server without requirement additional servers in the proxy chain.

Back to the Top

Overview :: Features & Benefits :: Specifications :: Associated Products

<< Back to product list

call us now on: **0870 274 7070** to discuss your needs.

Back to Top

# EXHIBIT 8
# REDACTED IN ITS ENTIRETY

# EXHIBIT 9

**Seidl, Christopher A.**

**From:** Seidl, Christopher A.
**Sent:** Friday, February 29, 2008 1:35 PM
**To:** Andre, Paul; Kobialka, Lisa
**Cc:** Moravetz, Amy; George, Sharon C.; Hannah, James; provner@potteranderson.com; Schutz, Ronald J.; Holdreith, Jake M.; Foster, Trevor J.
**Subject:** RE: Finjan v. Secure Computing - Disclosures During Trial

Paul,

Your proposal sounds fine. We will need you to tell us who your last witness is so we know when to begin disclosing witnesses in our case.

Chris

-----Original Message-----
From: Andre, Paul [mailto:pandre@KSLAW.com]
Sent: Friday, February 29, 2008 1:05 PM
To: Seidl, Christopher A.; Kobialka, Lisa
Cc: Moravetz, Amy; George, Sharon C.; Hannah, James; provner@potteranderson.com
Subject: RE: Finjan v. Secure Computing - Disclosures During Trial

Chris:

Lisa asked me to jump into this discussion since I am now in Delaware.
This is what I propose for all of the disclosure issues:

* Witnesses - the name(s) of witnesses will be disclosed 48 hours prior to the day the witness is expected to testify. Witnesses testifying on Monday and Tuesday will be disclosed by noon on Saturday and Sunday, respectively, via email to opposing counsel. Witnesses testifying on Wednesday, Thursday and Friday will be disclosed by 9:00 am in the courtroom in person by counsel on Monday, Tuesday and Wednesday, respectively, and will be confirmed via email at the end of the day.
* Exhibits - a list of exhibits to be used during direct examination, identified by trial exhibit number, shall be provided by 6pm on the day before the witness testifies. Objections to exhibits that are disclosed at 6pm be provided, via email, by 10pm EST the same day.
* Demonstratives - disclosed by 6pm on the day before the demonstrative will be used
* Demonstratives to be used in opening argument - disclosed by 12 noon on Sunday, March 2
* Real evidence exhibits to be used in opening argument - disclosed by 12 noon on Sunday, March 2.

Paul

-----Original Message-----
From: Seidl, Christopher A. [mailto:CASeidl@rkmc.com]
Sent: Friday, February 29, 2008 10:12 AM
To: Kobialka, Lisa
Cc: Moravetz, Amy; George, Sharon C.; Hannah, James; Andre, Paul
Subject: RE: Finjan v. Secure Computing - Disclosures During Trial

>>>> Please read the confidentiality statement below <<<<
Lisa,

Please confirm that you agree with 9am EST for the witness disclosures.

Also, one other issue we should address - objections to exhibits. We propose that objections to exhibits that are disclosed at 6pm be provided, via email, by 10pm EST the same day. That way, if there are any objections to be raised with the Court we can do that at 8:30am the next morning. Please let me know if you agree.

Chris

-----Original Message-----
From: Seidl, Christopher A.
Sent: Thursday, February 28, 2008 7:52 PM
To: Kobialka, Lisa
Cc: Moravetz, Amy; George, Sharon C.; Hannah, James; Andre, Paul
Subject: RE: Finjan v. Secure Computing - Disclosures During Trial

Lisa,

How about 9am EST? That way, we can simply make the disclosure when we walk in to Court in the morning (we should also make the disclosures via email to have it in writing). So, for example, you will tell us by 9am EST on Saturday March 1 what witnesses you expect to call on Monday March 3. Also, we propose that you indicate, when appropriate, who your final witness is. That will then trigger our disclosure of witnesses.

Chris

-----Original Message-----
From: Kobialka, Lisa [mailto:lkobialka@KSLAW.com]
Sent: Thursday, February 28, 2008 7:33 PM
To: Seidl, Christopher A.
Cc: Moravetz, Amy; George, Sharon C.; Hannah, James; Andre, Paul
Subject: RE: Finjan v. Secure Computing - Disclosures During Trial

Chris,

We need to clarify what 48 hours prior to the day the witness is expected to testify. If we expect a witness to testify on Tuesday, what time on Sunday is notice suppose to be provided? It will be easier if we set a time when it needs to be disclosed, i.e., noon or 5 p.m. two calendar days before the witness is expected to testify. I just don't want there to be any issues with this agreement.

Very truly yours,

Lisa Kobialka

King & Spalding LLP
1000 Bridge Parkway, Suite 100
Redwood Shores, CA 94065
Ph: (650) 590-0720
Fax: (650) 590-1900

---

From: Seidl, Christopher A. [mailto:CASeidl@rkmc.com]
Sent: Thursday, February 28, 2008 4:45 PM
To: Kobialka, Lisa
Cc: Moravetz, Amy; George, Sharon C.; Hannah, James; Andre, Paul
Subject: Finjan v. Secure Computing - Disclosures During Trial

>>>> Please read the confidentiality statement below <<<<
Lisa,

This is to confirm that the parties have agreed to the following protocol for disclosures during trial:

* Witnesses - the name(s) of witnesses will be disclosed 48 hours prior to the day the witness is expected to testify
* Exhibits - a list of exhibits to be used during direct examination, identified by trial exhibit number, shall be provided by 6pm on the day

before the witness testifies

* Demonstratives - disclosed by 6pm on the day before the demonstrative will be used
* Demonstratives to be used in opening argument - disclosed by 12 noon on March 1
* Real evidence exhibits to be used in opening argument - disclosed by 12 noon on March 1

Please let me know right away if this is not your understanding of our agreement.

Regards,

Christopher A. Seidl
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
Office phone: (612) 349-8468
Fax: (612) 349-4181
E-mail address: caseidl@rkmc.com <mailto:caseidl@rkmc.com>

---

Information contained in this e-mail transmission may be privileged, confidential and covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute, or reproduce this transmission.

If you have received this e-mail transmission in error, please notify us immediately of the error by return email and please delete the message from your system.

Pursuant to requirements related to practice before the U. S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U. S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

Thank you in advance for your cooperation.

Robins, Kaplan, Miller & Ciresi L.L.P.
http://www.rkmc.com <http://www.rkmc.com/>

---

Confidentiality Notice This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

Confidentiality Notice This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

# EXHIBIT 10

**From:** Seidl, Christopher A.
**Sent:** Monday, March 03, 2008 5:44 PM
**To:** 'Lee, Hannah'; Foster, Trevor J.; Schutz, Ronald J.; Moravetz, Amy; Holdreith, Jake M.
**Cc:** 'Andre, Paul'; 'Hannah, James'; 'Kobialka, Lisa'; 'Kastens, Kristopher'; 'Wharton, Meghan'; 'Dennison, Steve'; 'Tong, Gladys'; 'provner@potteranderson.com'
**Subject:** RE: Secure Computing Disclosure of Witness for Wednesday, March 6th, 2008

Counsel:

Our witnesses for Wednesday March 6 are:

Mike Gallagher
Rick Kruse
Sarah Kaye (by deposition)
Dan Frommer (by deposition)
Paula Greve
Steve Chew
Dan Wallach

We will send a separate email with our specific designations for Kaye and Frommer.

Chris

-----Original Message-----
From: Lee, Hannah [mailto:Hlee@KSLAW.com]
Sent: Monday, March 03, 2008 5:39 PM
To: Seidl, Christopher A.; Foster, Trevor J.; Schutz, Ronald J.; Moravetz, Amy; Holdreith, Jake M.
Cc: Andre, Paul; Hannah, James; Kobialka, Lisa; Kastens, Kristopher; Wharton, Meghan; Dennison, Steve; Tong, Gladys; provner@potteranderson.com
Subject: Finjan Disclosure of Witness for Wednesday, March 6th, 2008

Counsel:

This email is to confirm Finjan's witness for Wednesday, March 6th is Russell Parr as disclosed in person earlier today. Please email us confirming your witnesses for Wednesday along with any deposition designations that you have.

Hannah

Hannah Lee
King & Spalding
Associate
hlee@kslaw.com

Confidentiality Notice This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

**From:** George, Sharon C.
**Sent:** Wednesday, March 05, 2008 6:14 AM
**To:** Neff, Holly
**Subject:** FW: Finjan v. Secure Computing - Witnesses for Thursday

---

**From:** Seidl, Christopher A.
**Sent:** Tuesday, March 04, 2008 6:21 PM
**To:** 'provner@potteranderson.com'; 'Andre, Paul'; 'Kobialka, Lisa'; 'Hannah, James'; 'Lee, Hannah'; 'Wharton, Meghan'
**Cc:** Schutz, Ronald J.; Holdreith, Jake M.; Foster, Trevor J.; George, Sharon C.; Moravetz, Amy; Farnan, Kelly E.
**Subject:** Finjan v. Secure Computing - Witnesses for Thursday

Counsel:

This is to confirm our disclosure that I made this morning of Secure Computing's witnesses for Thursday:

Dan Wallach (if not started Wednesday)
Nimrod Vered (by deposition)
Yigal Edery (by deposition)
Limor Elbaz (by deposition)
Carl Degen

Specific deposition designations will follow later.

Christopher A. Seidl
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
Office phone: (612) 349-8468
Fax: (612) 349-4181
E-mail address: caseidl@rkmc.com



# EXHIBIT 11

Standard & Poor's Compustat-Solutions for institutional investors
Return to Advisor Insight Home Page

**S&P SmallCap 600 Investor Relations Program**

**Company-sponsored Messages & Standard & Poor's Financial Data:** Investor Relations Information on the following S&P SmallCap 600 index constituents has been provided by the company. All other information is provided by Standard & Poor's. Copyright © 2008 The McGraw-Hill Companies, Inc. This Web Presentation includes the full company listing in the S&P SmallCap 600 Directory. Companies participating in this program pay an annual fee to Standard & Poor's. Additional information on these companies can be obtained by contacting the Investor Relations Officer listed on the individual Company's presentation. To order, the annual 2006 *S&P SmallCap 600 Directory* call 1-800-221-5277.

AAR Corp.
Aaron Rents, Inc.
Administaff, Inc.
Agilysys, Inc.
AMCOL International Corporation
American States Water Company
AMN Healthcare Services, Inc.
Analogic Corporation
Ansoft Corp
Applied Signal Technology, Inc.
Arch Chemicals Inc.
ArQule, Inc.
ATMI Inc.
Audiovox Corporation
Avid Technology, Inc.
Axcelis Technologies, Inc.
Baldor Electric Company
BankAtlantic Bancorp, Inc.
Basic Energy Svcs
Bassett Furniture Industries Inc.
Bel Fuse Class "B"
BioMed Realty Trust, Inc.
Boston Private Financial Holdings, Inc.
Brady Corporation
Brightpoint Inc.
Brush Engineered Materials Inc.
Building Materials Holding Corporation
Carbo Ceramics Inc.
Casey's General Stores, Inc.
A.M. Castle & Co.
Centene Corporation
Central Pacific Financial Corp.
CH Energy Group, Inc.
Champion Enterprises, Inc.
Chesapeake Corporation
Colonial Properties Trust
Lexington Realty Trust
LHC Group
Lindsay Corporation
LTC Properties, Inc.
Mannatech Inc
The Marcus Corporation
Matria Healthcare Inc.
Meridian Bioscience, Inc.
Methode Electronics, Inc.
MICROS Systems, Inc.
Microsemi Corporation
Mid-America Apartment Communities, Inc.
Monaco Coach Corporation
Moog Inc.
Myers Industries, Inc.
Nash-Finch Company
National Retail Properties, Inc.
NCI Building Systems, Inc
New Jersey Resources Corporation
Northwest Natural Gas Company
OMNOVA Solutions Inc.
On Assignment, Inc.
Oxford Industries, Inc.
Papa John's International, Inc.
Pediatrix Medical Group, Inc.
Penford Corporation
Petroleum Development Corporation
Pioneer Drilling
Planar Systems, Inc.
Polaris Industries Inc.
Pool Corporation
Portfolio Recovery Associates, Inc
Presidential Life Corporation
PrivateBancorp, Inc.
ProAssurance Corporation
Progress Software Corporation
PSS World Medical, Inc.

Community Bank System, Inc.
CONMED Corporation
Consolidated Graphics, Inc.
The Cooper Companies, Inc.
CryoLife, Inc.
CTS Corporation
Curtiss-Wright Corporation
Cymer, Inc.
Daktronics, Inc.
Delphi Financial Group, Inc.
Digi International Inc.
Diodes Incorporated
Drew Industries Incorporated
DSP Group, Inc.
El Paso Electric Company
EnPro Industries, Inc.
Esterline Technologies Corporation
Ethan Allen Interiors Inc.
First Commonwealth Financial Corporation
Fleetwood Enterprises, Inc.
Flowers Foods, Inc.
Forestar Real Estate Group Inc.
Forward Air Corporation
Gardner Denver, Inc.
General Communication, Inc.
Gerber Scientific, Inc.
Greatbatch, Inc.
Hanmi Financial Corp.
Haverty Furniture Companies, Inc.
Headwaters Incorporated
Heidrick & Struggles International, Inc.
Hutchinson Technology Incorporated
ICU Medical, Inc.
Inland Real Estate Corporation
Investment Technology Group, Inc.
Kaman Corporation
Kilroy Realty Corporation
Kirby Corporation
The Laclede Group, Inc.
Landstar System, Inc.

Quaker Chemical Corporation
Regal-Beloit Corporation
RLI Corporation
RTI International Metals Inc.
St. Mary Land & Exploration Company
Schweitzer-Mauduit International, Inc.
Sciele Pharma, Inc.
Secure Computing Corporation
Selective Insurance Group, Inc.
Simpson Manufacturing Co., Inc.
A. O. Smith Corporation
South Jersey Industries, Inc.
Southwest Gas Corporation
Spartan Motors, Inc.
Standard Motor Products, Inc.
Stewart Information Services Corporation
Susquehanna Bancshares, Inc.
TETRA Technologies, Inc.
Theragenics Corporation
TradeStation Group Inc.
Triarc Cos. Class "B"
Tronox Inc. Class "B"
UniSource Energy Corporation
United Online, Inc.
Universal Electronics Inc.
Valmont Industries, Inc.
Veeco Instruments Inc.
Volt Information Sciences, Inc.
WD-40 Company
W-H Energy Services, Inc.
Wabash National Corporation
Waste Connections, Inc.
Watsco, Inc.
Watson Wyatt Worldwide, Inc
Watts Water Technologies, Inc.
Wintrust Financial Corporation
Zale Corporation
Zenith National Insurance Corp.
Zep Inc

For questions or comments about this site, please contact speqwebmaster@mcgraw-hill.com

Reproduction in whole or in part is prohibited without the written permission of Standard & Poor's. Financial information and data provided on this site ("Information") has been obtained from sources believed to be reliable. However, Standard & Poor's does not guarantee accuracy, adequacy or completeness of the Information and is not responsible for any errors or omission or for the results to be obtained from the use of the Information. In no event shall Standard & Poor's be liable for indirect, special, punitive or consequential damages in connection with the use of the Information, even if advised of the possibility of such damages. The Information is provided for informational purposes only and should not be used or considered as an offer to sell or a solicitation to buy any security.

# EXHIBIT 12



Locator
Printable Version

Company
About Secure
Press Center
Events / Seminars
Investor Relations
Careers
Contact Us
Office Locations
Product Support
Customer Advocate
Information Request Form
Product Feature Request
Webmaster Email

*Quick Links*

- Corporate Headquarters
- Sales & Marketing
- U.S. Branch Offices
- Northern European Regional Office
- Central European Regional Offices
- Southern European and Africa Regional Office
- Asia/Pacific Headquarters and Regional Offices
- Australia Regional Offices
- Dubai Regional Office
- Latin America Regional Office

*Home > Company > Contact Us >> Office Locations*

Secure Web Secure Mail Secure Firewall Secure SafeWord

# Office Locations

**Corporate Headquarters**
**Sales and Marketing**
**United States**
4810 Harwood Road
San Jose, CA 95124-5206
USA
Toll Free: +1.800.692.5625
Tel: +1.408.979.6100
Fax: +1.408.979.6501
Sales & Service: +1.800.379.4944
**Email Sales**
**Chat online with Sales**

**Federal main office**
12010 Sunset Hills Rd. Suite 300
Reston, VA 20190
USA
Tel: +1.703.463.2300
Fax: +1.703.463.2310

---

**U.S. Branch Offices**

**Alpharetta, Georgia**
4800 North Point Parkway, Suite 300
Alpharetta, GA 30022
USA
Tel: +1.678.969.9399
Fax: +1.678.969.9398

**Concord, California**
1855 Gateway Boulevard, Suite 200
Concord, CA 94520
USA
Tel: +1.925.288.4100
Fax: +1.925.827.2593

**Deerfield Beach, Florida**
350 SW 12th Avenue
Deerfield Beach, FL 33442
USA
Tel: +1.954.375.3500
Fax: +1.954.375.3501

**Saint Paul, Minnesota**

2340 Energy Park Drive
St. Paul, MN 55108
USA
Tel: +1.651.628.2700
Fax: +1.651.628.2726

---

**International Headquarters and**
**Northern European Regional Office**
**United Kingdom**
No 1, The Arena
Downshire Way, Bracknell
Berkshire RG12 1PU
UNITED KINGDOM
Tel: +44.(0)1344 312600
Fax: +44.(0)1344 312605
**Map to UK Office**

**Scandinavian European Regional Office**
**Sweden, Kista**
Secure Computing Corporation
Kista Science Tower,
Färögatan 33
164 51 Kista
Sweden
Tel: +46.0(8).588.370.40

**Central European Regional Offices**
**Germany, Unterschleißheim**
Ohmstrasse 4/Haus C
85716 Unterschleißheim
GERMANY
Tel: +49.89.71.04.61.10
Fax: +49.89.71.04.61.11

**Germany, Paderborn**
Vattmannstrasse 3
Paderborn 33100
GERMANY
Tel: +49.(0).5251 8717 000
Fax: +49.(0).5251 8717 311

**Benelux**
Olympia 1a/1b
1213 NS
Hilversum, Netherlands
Tel: +31 35 6462 616
Fax: +31 35 6462 666

**Southern European and Africa Regional Office**
**France**
11 Quai du President Paul Doumer
Courbevoie 92400
FRANCE
Tél: +33 (0)1 46 67 27 27
Fax: +33 (0)1 46 67 27 49

---

**Asia/Pacific Regional Offices**

**Australia, Brisbane**
825 Stanley Street
Woolloongabba, Queensland 4102 Australia
Tel: +61.7.3435.2888

Fax: +61.7.3891.3630

**Australia, Sydney**
Chatswood Corporate Centre
Suite 40, Level 11
Tower B, Zenith Centre
821 Pacific Highway
Chatswood NSW 2067 Australia
Tel: +61.2.8448.2020
Fax: +61.2.8448.2022

**China, Shanghai**
1110 Tower A
The Grand Gateway
1 Hongqiao Road
Shanghai, China 200030
Tel: +021.6447.2255
Fax: +021.6447.5307

**Hong Kong**
Room 1606-8
248 Queen's Road East
Wanchai
Hong Kong
Tel: +852.2598.9280
Fax: +852.2587.1333

**Japan**
Shinjuku Mitsui Building #2, 7F
3-2-11 Nishi-shinjuku Shinjuku-ku
Tokyo 160-0023 Japan
Tel: +81.3.5339.6310
Fax: +81.3.4496.4537

**Singapore**
7 Temasek Boulevard
#22-02A Suntec Tower One
Singapore 038987
Tel: +65.6235.8689
Fax: +65.6235.5671
TechSupport: +65.6235.5882

---

**Dubai Regional Office**

**United Arab Emirates**
Dubai Internet City
Shatha Tower, Office# 1906
P.O.Box 502637
Dubai, U.A.E.
Tel: +971.4.3913504
Fax:  +971.4.3918743

---

**Latin America Regional Office**

**Sao Paulo, Brazil (authorized manufacturer's representative)**
Av Roque Petroni Jr
999 13o andar - Morumbi
Sao Paulo 04707-910
Brazil
Tel: +55.11.5185.2870

Copyright © 2008 Secure Computing Corporation. All Rights Reserved.

Access Control | Anti-malware | Anti-phishing | Anti-spam | Anti-spyware | Anti-virus | Application Firewall | Auditing & Reporting | Authentication | CIPA Compliance | Commc Criteria | Content Filtering | Data Leakage | Email Security | Enterprise Gateway Security | Firewall | Global Intelligence | Identity Management | Internet Security | Internet Security Solutions | Intrusion Detection | Messaging Gateway Security | Messaging Security | Network Gateway Security | Network Management | Network Security | Network security software | Online Banking | Password | PCI DSS | Radius Authentication | Regulations Compliance | Remote Access | Reputation Score | Reputation System | Security Appliance | Security Audit | Security Policy | Security Software | Spam Blocker | Spam Filter | Spam Prevention | Strong Authentication | TrustedSource | Unified Threat Management | UTM Security | Virus Blocker | Virus Protection | Virus Signature | VPN | Web 2 0 Threats | Web Filterir | Web Gateway Security | Web Reputation | Web Security | Wireless Network Security

© Secure Computing Corporation. All Rights Reserved. Secure Computing, SafeWord, Type Enforcement, MobilePass, SecureSupport, SecureOS, SnapGear and Strikebac are trademarks of Secure Computing Corporation, registered in the U.S. Patent and Trademark Office and in other countries. SecureWire, TrustedSource, SmartReporter, ar SecurityReporter are trademarks of Secure Computing Corporation.

secure
computing

+1.800.3
+1.408.979.6

Select Langu

Resources Products Try/Buy Support Partners Company

Search

Locator
Printable Version

Company
About Secure
Company Fact Sheet
Executive Management
Board of Directors
Privacy Policy
Disclaimer
Press Center
Events / Seminars
Investor Relations
Careers
Contact Us

Home > Company > About Secure >> Executive Management

Secure Web | Secure Mail | Secure Firewall

# Executive Management

| Executive | Title |
|---|---|
| **Dan Ryan** | President, CEO, and Chief Operating Officer |
| **Tim Steinkopf** | Senior Vice President and Chief Financial Officer |
| **Mike Gallagher** | Senior Vice President, Product Development and Support |
| **Atri Chatterjee** | Senior Vice President, Marketing |
| **Glenn Cross** | Senior Vice President of Sales |

Executive Management: Secure Computing Page 2 of 2

Copyright © 2008 Secure Computing Corporation. All Rights Reserved.

Home | Contact | Privacy Policy

http://www.securecomputing.com/corp_executives.cfm 4/30/2008



+1.800.3
+1.408.979.6

Select Langu

Resources Products Try/Buy Support Partners Company

Search

Locator

Printable Version

Company

About Secure

Company Fact Sheet

Executive Management

Board of Directors

Privacy Policy

Disclaimer

Press Center

Events / Seminars

Investor Relations

Careers

Contact Us

*Home > Company > About Secure >> Board of Directors*

Secure Web | Secure Mail | Secure Firewall

# Board of Directors

| Board Member | Title |
|---|---|
| **John McNulty** | Board Member |
| **Robert J. Frankenberg** | President - Net Ventures |
| **James F. Jordan** | Private Investor |
| **Stephen M. Puricelli** | Private Investor |
| **Eric P. Rundquist** | Former President and CEO - Eric Thomas Inc. |
| **Alexander Zakupowsky, Jr.** | Attorney at Law - Winston & Strawn LLP |
| **Cary J. Davis** | Managing Director - Warburg Pincus LLC |
| **Richard L. Scott** | Chairman and CEO - Richard L. Scott Investme |

Board of Directors: Secure Computing Page 2 of 2

Copyright © 2008 Secure Computing Corporation. All Rights Reserved.

Home | Contact | Privacy Policy

http://www.securecomputing.com/corp_board.cfm 4/30/2008

# EXHIBIT 13

SECURE COMPUTING CORPORATION,

Plaintiff,

v.

FINJAN SOFTWARE LTD., and
FINJAN SOFTWARE, INC.,

Defendants.

Civil Action No. 07-CV-2198 JMR/FLN

**DECLARATION OF PAUL HAWES IN SUPPORT OF PLAINTIFF SECURE COMPUTING CORPORATION'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE**

I, Paul Hawes, declare that:

1. I am currently the Vice President of Human Resources of Secure Computing Corporation ("Secure Computing").

2. Secure Computing is a leading enterprise computer security company that was born out of a division of Honeywell in Minneapolis in 1989. The Company started operations in Roseville, MN.

3. In 1998, Secure Computing moved its headquarters from Roseville, MN to San Jose, CA. The majority of Secure Computing's operations, however, remained in Minnesota.

4. In 2006, Secure Computing's Roseville operations moved to Saint Paul, MN. The Saint Paul facility is approximately 107,000 sq. ft. The majority of Secure Computing's operations, including finance, information technology, manufacturing, order entry, legal, support, and a large portion of research and development, are located in Saint Paul. Approximately 300 employees currently work at the Saint Paul location.

I declare under penalty of perjury that all of the statements made above are true and to the best of my knowledge.

Dated: this 25th, day of July 2007.

Paul Hawes

# EXHIBIT 14

Company

About Finjan

Management & Board of Directors

Intellectual Property

Case Studies

Testimonials

White Papers

Worldwide Offices

Careers at Finjan

Finjan in the Community

# ABOUT FINJAN

## Company Overview

Finjan is a leading provider of secure web gateway solutions for the enterprise market. Utilizing patented active real-time content inspection technology, Finjan's solutions prev other malicious web content from infiltrating corporate networks and stealing business real-time content inspection technology detects malicious content based on the code's action, without using signatures, URLs or reputation attributes. By preventing Crimewa attacks that often evade other solutions, Finjan enables companies to safeguard their v customer information.

*Finjan's Family of Secure Web Gateway Appliances*

Organizations around the world are facing a highly effective and professional cybercrin corporate networks and business data. Recently, Cybercriminals use the Web as their a wide range of illegitimate and malicious activities, including identity theft through keyl espionage, and intelligence gathering.
To protect their networks and data, enterprises are looking for a security solution that c protection, both proactive and in real-time.

Finjan addresses this need with its **active real-time protection** against zero-day and t attacks, including Crimeware, trojans, keyloggers, obfuscated malicious code, as well a and other malware.
Finjan's award-winning Vital Security™ Web appliances utilize its patented active real-t technology to prevent Crimeware and malicious Web 2.0 content from infiltrating corpo stealing business data. Each and every piece of inbound and outbound web content is regardless of its originating URL and without signature-matching.
Incoming and outgoing Crimeware, targeted Web 2.0 attacks and other malicious web and blocked, also when hiding in SSL traffic. All inspected content remains encrypted v exiting the appliances.

Many enterprises and organizations need to comply with regulatory requirements conc protection, such as SOX (COBIT) DS5, PCI DSS 1.1, GLB Act, HIPAA, and FISMA. Finjan's secure web gateway solutions assist enterprises with these compliance issues

Finjan is always striving to make its solutions as user-friendly as possible. Cisco WCCF standards are supported to ensure interoperability with various systems. Transparent h reduces transmission costs and downloading time, which is especially important for larg enterprises also benefit from Finjan's state-of-the-art external reporting and logging sys flexible and scalable data analysis platform for internal use, audits, and compliance req

**Finjan's Active Real-Time Secure Web Gateway Offerings**

Utilizing patented active real-time content inspection technology, Finjan's award-winnin Crimeware and other malicious web content from infiltrating corporate networks and st This technology allows Finjan to provide its customers with **active real-time protectio** targeted web attacks (such as Crimeware, Web 2.0 attacks, spyware, phishing, Trojans malicious code), as well as other types of malware.

Finjan's comprehensive and fully integrated Vital Security™ Web Appliances leverage time security technologies (Active real-time content inspection security, Vulnerability Ar Spyware and SSL Inspection engines) to achieve protection against any type of incomi malicious code. For increased Web 2.0 and productivity control, URL Filtering engines Web Filter® technology and Websense® are available as an extra option. Finjan's Sec Solutions also include an optional cache appliance, providing enterprises with a comple real-time web security and content acceleration.
Finjan's Secure Web Gateway Solution is known for its interoperability, including suppc standards and ICAP for interoperability with various networking and caching systems. I handling of web traffic reduces transmission coasts and downloading time, which is es large enterprises.

Finjan RUSafe™ assesses incoming and outgoing web traffic using Finjan's unmatche technologies, without requiring any changes to their security infrastructure and network traffic from the switch, scans the content using Finjan's active real-time content inspect generates summary-level and detailed-level reports which specify the magnitude and t content detected by the appliance.

**Strategic Alliances and Technology Partnerships**

Various strategic alliances, industry-leading technology partners and a global network c enable Finjan to provide businesses with optimal web security solutions that seamlessl existing network infrastructures. Alliances with major network infrastructure vendors su Radware and NetApp ensure interoperability and easy deployment.
Our customers can Integrate our active real-time security technologies with a choice of Sophos® and Kaspersky®) and URL Filtering (IBM Proventia Web Filtering® , Websen Finjan's layered solution provides enterprise users with top-notch protection against ma inappropriate web content.

**Breakthrough Technologies and Dedicated Research Center**

Case 1:06-cv-00369-GMS Document 285-3 Filed 05/16/2008 Page 19 of 70

As a leader and innovator in the web security arena, Finjan is committed to provide its ı most advanced technology solutions to ensure zero-day security. Building on a decade strives to set the standard for web security with its active real-time content inspection te addition, Finjan has a rich intellectual property portfolio including dozens of issued and Finjan's Malicious Code Research Center (MCRC) specializes in the discovery and ana vulnerabilities that could be exploited for malicious attacks. Using their knowledge and researchers contribute to the ongoing enhancement of Finjan's security offering, as we world's leading software vendors to patch their security holes.

**Finjan's Support Services**

Finjan offers a variety of technical support offerings to ensure that its customers derive from its products. Our support commitment is based on sharing information, respondinç needs, and working through issues and solutions together with our customers.

**Testimonials**

SVB **"Finjan's real-time web security protect our sensitive iı stealthy Trojans and Crimeware"**
– Arjen van de Velde, IT Specialist, SVB.

**"Finjan's Vital Security™ Web Appliance solution take: security needs, allowing IT staff to remain focused on ı This guarantees that our customers always get the hig and service in a secure online environment."**
– Christian Weirich, IT-Manager, Max Bahr.

Munich Airport International **"Finjan's behavior-based web security has been invalu blocking malicious code embedded in Active Content, information systems free from web threats"**
– Marc Lindike, Vice President Operations and Services, Munich Airport.

**"Finjan's proactive protection against Spyware and other malware allowed us to concentrate on core business activities, without spe resources handling security incidents and cleaning infected comp**
– Richard Swann, IT Infrastructure Manager, IoD.

**"Finjan... catches web-borne threats before they reach the other web security vendors are playing catch-up in this ar**
– Claude Martineau, VP of IT, Reitmans (Canada) Ltd.

Click here for more customer and analyst testimonials.

Case 1:06-cv-00369-GMS Document 285-3 Filed 05/16/2008 Page 20 of 70

© Copyright 1996 - 2008. Finjan Inc. and its affiliates and subsidiaries. All rights reserved.    **Privacy Policy**





finjan
Vital Security
securing your web

# Company Profile

NG-8100

NG-6100

NG-5100

Finjan Secure Web Gateway Offering

## Our Vision

A world in which enterprises and organizations can reap maximum benefits from the web with optimum security, allowing them to focus solely on maximizing productivity and profits

## Our Mission

To free businesses from content security worries, knowing that they are protected by the best web security system that is always steps ahead of the hacker community.

## Our Solution

Best-of-breed, patented, proactive web security solution that provides true zero-hour protection from new vulnerabilities and emerging threats

## Our Value

Finjan provides value to its customers with the best web security solutions at optimal price/performance points. We are committed to enhancing shareholder value through constant market share growth at profitable margins We provide our employees, who are also our shareholders, with a creative, challenging and enjoyable work environment with long term benefits and professional satisfaction.

# Company Overview

Finjan is a global provider of proactive web security solutions for businesses and organizations Our fully integrated, appliance-based solutions deliver the most effective shield against web-borne threats, freeing enterprises to harness the web for maximum commercial results. Finjan's solutions utilize patented behavior-based technology to proactively repel all types of web-borne threats, such as Spyware, Phishing, Trojans and other malicious code With Finjan's award-winning and widely deployed solutions, businesses can focus on implementing web strategies to realize their full organizational and commercial potential

The breakthrough security capabilities in Finjan's solutions provide customers with zero-hour protection, long before traditional anti-virus companies can release an update or patch, securing companies against unknown and emerging threats, as well as known vulnerabilities

Finjan offers its comprehensive Vital Security™ Web Appliances for businesses of all sizes, as well as the Vital Security™ SDK for gateway vendors that wish to incorporate Finjan's revolutionary scanning engines within their own enterprise applications.

# The Growing Threat to Your Business

The dramatic increase in web-borne threats, such as Spyware, Trojans, Rootkits and other malicious code, is a growing concern for corporate networks These threats, which can decimate an unprotected network in a matter of minutes, have a direct impact on bottom lines, as well as exposing businesses to identity theft, privacy liability issues and compromised intellectual property The quantity of different pieces of malware (Spyware/adware, Trojans, viruses, worms, others) identified by Sophos increased by 28% between June 2005 and June 2006 (Sophos Security Threat Management Report, July 2006)

In order to deal with these growing threats, enterprises are making large investments in their network security infrastructures IDC forecasts that the worldwide Secure Content Management (SCM) market will reach $11 6 billion in 2010, representing a compound annual growth rate of 12 3% between 2006-2010 (IDC, Worldwide Secure Content Management 2006-2010 Forecast Update, September 2006).

Source: Sophos, June 2006

Growth in Malware Threats (Jan. 2005 - June 2006)

# Securing Your Web

Finjan's best-of-breed security solutions help businesses safeguard their most valuable asset - their information By detecting and stopping known and unknown malicious attacks before they enter the corporate network, sensitive data remains secure business operations are continuous and the costs associated with security incidents are minimized Finjan's integrated "all-in-one" security appliances provide proactive, layered protection against complex threats and vulnerabilities, while reducing total cost of ownership through centralized management and reporting. Finjan delivers unsurpassed web security, without compromising network performance or business productivity

# Zero-Hour Protection for Businesses and Organizations

Finjan's Vital Security™ solutions close the Window-of-Vulnerability™ - the period of time from the first outbreak of a new virus, until an anti-virus update or patch is delivered. Traditional anti-virus and other security methods leave organizations exposed and vulnerable for hours and even days, before a security patch is delivered Instead of relying on reactive database updates, Finjan provides proactive, zero-hour protection against new virus outbreaks and malicious code using patented behavior-based technology

Finjan Closes Your Window-of-Vulnerability™

## Finjan's Best-of-Breed Web Security Offerings

Finjan offers the world's best and most comprehensive proactive web security appliances for businesses and organizations. Our Vital Security™ Web Appliances utilize patented behavior-based technology to proactively secure corporate networks against all types of web-borne attacks, including new, unknown threats. These fully integrated appliances include our Behavior-based security. Vulnerability Anti dote™ and Anti-Spyware engines. Anti-Virus. URL Filtering and SSL Inspection are also available as optional modules. Vital Security Web Appliance is available in several form factors and deployment options in accordance with each organization's specific needs. These high-performance appliances utilize robust hardware platforms and meet the high availability requirements of large enterprise networks.

## Technology Partnerships Provide Customers with Enhanced, Best-of-Breed Web Security

Finjan's comprehensive security solutions leverage a number of partnerships with industry-leading OEM vendors, such as McAfee®, Sophos® and Kaspersky® for Anti-Virus, and SurfControl® for URL Filtering. Finjan's integrated security solutions present customers with a highly effective "all-in-one" appliance, reducing businesses' total cost-of-ownership.

## Vital Security™ SDK

The Vital Security Software Development Kit (SDK) allows Independent Software Vendors (ISVs) of security and storage systems, as well as service providers, to enhance their product offerings by incorporating Finjan's best-in-class content security functionality. Utilizing Finjan's patented behavior-based technologies, the Vital Security SDK scanning engines proactively detect and block malicious content and code that attempt to exploit vulnerabilities and compromise users' computers, data, networks or any other system resource. This offering allows ISVs to provide their customers with unmatched protection against unknown malware threats, including Spyware, Phishing, viruses, worms and Trojans.

## Integrated Solutions based on Strategic Alliances

Finjan's strategic alliances with major network infrastructure vendors (e.g., Cisco, IBM, Radware, NetApp) enable us to deliver integrated solutions that reduce the cost and complexity of deploying and managing multiple security technologies. These joint efforts enable us to offer the most secure, scalable, reliable and available network environment on the market today, resulting in enhanced value for our customers.

"We are pleased to have access to this intellectual property as we work to advance the state of security innovation throughout the industry."

Kenneth Lustig, Managing Director of Intellectual Property Business Development, Microsoft

"Proactive behavior-based detection plays a critical role in reducing the risk associated with web-borne threats."

Eric Ogren, Security Analyst, Enterprise Strategy Group

"Finjan provides a proven solution that catches web-borne threats before they reach the network."

Claude Martineau, VP of IT, Reitmans (Canada) Ltd.

"Enterprises are looking to augment reactive security products with tools that use proactive protection technology."

Diana Kelley, Senior Analyst, Burton Group

"Finjan leads the market in protection from malicious mobile code."

Peter Smetny-Sowa, Sr. Consultant, CGI

"Thanks to Finjan's Vital Security we have managed to reduce negative impact from today's World Wide Web to almost zero."

Sven Kivistik, System Engineer, Estonian Union Bank

"Finjan's new line of Vital Security Web Appliances provide the enterprise market with an excellent value proposition, combining Finjan's superior security technology with a high-throughput hardware platform."

Andrew Kellett, Senior Research Analyst, Butler Group

"Finjan is the market leader with a proven system."

Richard Swann, IT Infrastructure Manager, IoD

"Finjan's behavior-based web security has been invaluable to us in blocking malicious code."

Marc Lindike, VP Operations and Services, Munich Airport

"Finjan offers the most effective solution against spyware, malicious code and other stealthy web-based attacks."

Erik Wouterson, Senior Systems Engineer, HMSHost Europe

"Finjan has been the worldwide leader in proactive malicious mobile code detection since 1996."

Brian Burke, Research Manager, Security Products, IDC



## Breakthrough Technologies and Dedicated Research Arm

Building on a decade of experience. Finjan has set a new standard for web security with its proactive behavior-based content inspection technologies. In addition, Finjan has a rich intellectual property portfolio including dozens of issued and pending patents. Finjan's Malicious Code Research Center (MCRC) specializes in the detection of dangerous vulnerabilities that could be exploited for malicious attacks. These research efforts are used for the ongoing enhancement of Finjan's security offering, allowing our customers to benefit from early discovery of new vulnerabilities prior to the availability of software patches. Finjan works closely with many of the world's leading software vendors to patch their security holes

## Maximize Investment with Finjan's Support Services

Finjan offers a range of comprehensive technical support offerings to ensure that our customers derive maximum benefits from our products. Finjan's premier Gold Support, for example, includes 24/7/365 access to Finjan's security specialists via web, email and telephone, dedicated technical support engineer, maintenance releases, product upgrades, and automatic updates.

## Why Finjan?

- Pioneer in the proactive, behavior-based security domain with 18 granted and 26 pending patents; the only technology that analyzes code in real-time, understands its intent and blocks malicious content without executing it
- Delivers zero-hour protection against unknown and known web threats, such as Spyware, Trojans, malicious code and targeted attacks
- Installed base includes Fortune 1000 companies in many vertical markets, including financial institutions, insurance, healthcare, governments, airlines and technology companies
- Millions of enterprise users worldwide trust Finjan for unmatched proactive web security
- Finjan's Malicious Code Research Center is a renowned leader in the detection of dangerous vulnerabilities that could be exploited for malicious attacks, protecting customers from new threats and constantly enhancing Finjan's security offering
- World-class strategic alliances, industry-leading technology partners and worldwide network of channel partners
- Privately owned with world-class investors including Cisco, Bessemer Venture Partners, Benchmark Capital, Israel Seed Partners, Microsoft and HarbourVest Partners
- Finjan's security solutions have received industry awards and recognition from leading analysts and publications including IDC, ESG, Butler Group, SC Magazine, CRN, ITWeek, Information Security, and PCPro

Network Computing

**For real-time security alerts as you browse the web, get free download of Finjan SecureBrowsing at http://securebrowsing.finjan.com**

**For Additional Information**

For more information, please visit www.finjan.com or contact our regional offices:

**San Jose, USA**
Toll Free: 1 888 FINJAN 8 (1 888 346 5268)
Tel: +1 408 452 9700
Email: salesna@finjan.com

**New York, USA**
Tel: +1 212 681 4410
Email: salesna@finjan.com

**United Kingdom**
Tel: +44 (0)1252 511118
Email: salesuk@finjan.com

**Germany**
Tel: +49 (0)89 673 5970
Email: salesce@finjan.com

**The Netherlands**
Tel: +31 (0)33 454 3555
Email: salesne@finjan.com

**Asia Pacific**
Tel: +972 (0)9 864 8200
Email: salesapac@finjan.com

**Israel**
Tel: +972 (0)9 864 8200
Email: salesis@finjan.com

# Finjan - Securing Your Web

© Copyright 1996 - 2007. Finjan Inc. and its affiliates and subsidiaries. All rights reserved.

All text and figures included in this publication are the exclusive property of Finjan and are for your personal and non-commercial use. You may not modify, copy, distribute, transmit, display, perform, reproduce, publish, license, create derivative works from, transfer, use or sell any part of its content in any way without the express permission in writing from Finjan. Information in this document is subject to change without notice and does not present a commitment or representation on the part of Finjan. The Finjan technology and/or products and/or software described and/or referenced to in this material are protected by registered and/or pending patents including U.S. Patents No. 6092194, 6154844, 6167520, 6480962, 6209103, 6298446, 6353892, 6804780, 6922693, 6944822, 6993502, 6965968, 7058822, 7076469, 7155743, 7155744 and 7185358 and may be protected by other U.S. Patents, foreign patents, or pending applications.

Finjan, Finjan logo, Vital Security, Vulnerability Anti.dote and Window-of-Vulnerability are trademarks or registered trademarks of Finjan Inc., and/or its affiliates and subsidiaries. Sophos is a registered trademark of Sophos plc. McAfee is a registered trademark of McAfee Inc. Kaspersky is a registered trademark of Kaspersky Lab. SurfControl is a registered trademark of SurfControl plc. Microsoft and Microsoft Office are registered trademarks of Microsoft Corporation.

All other trademarks are the trademarks of their respective owners. Q4 2007.

Finjan Management & Board of Directors Case 1:06-cv-00369-GMS Document 285-3 Filed 05/16/2008 Page 26 of 70 Page 1 of 2

Home | Contact us | RSS | Search

Qui

Products Solutions Security Center Partners Support Company News and Events

Home > Company > Management & Board of Directors

Company

About Finjan

Management & Board of Directors

Intellectual Property

Case Studies

Testimonials

White Papers

Worldwide Offices

Careers at Finjan

Finjan in the Community

# MANAGEMENT & BOARD OF DIRECTORS

## Management Team

John Vigouroux
President & CEO

Ezra Sofer
Chief Financial Offi

Yuval Ben-Itzhak
Chief Technology Officer

Werner Thalmeier
Vice President,
Products

Marcio Lempert
General Manager
Operations & International Sales

Jim Routh
Vice President,
Business Developm

Elon Gecht
Vice President,
Research & Development

Ron Kraitsman
Vice President,
Finance & Operatio

John Charles
Vice President
North American Sales

John DiTroia
Vice President
North American Fie

## Board of Directors

John Vigouroux
President & CEO

Dr. Eric Benhamou
Chairman and CEC
Benhamou Global \

Michael Eisenberg
General Partner,
Benchmark Capital

Arad Naveh
General Partner
Benchmark Capital

Daniel Chinn
General Partner
Israel Seed Partners

Adam Fisher
General Partner
Bessemer

http://www.finjan.com/Content.aspx?id=238 4/30/2008

© Copyright 1996 - 2008. Finjan Inc. and its affiliates and subsidiaries. All rights reserved. **Privacy Policy**

Home | Contact us | RSS | Search

Quick Access

Products Solutions Security Center Partners Support Company News and Events

Home > Worldwide Offices

Company

- About Finjan
- Management & Board of Directors
- Intellectual Property
- Case Studies
- Testimonials
- White Papers
- Worldwide Offices
- Careers at Finjan
- Finjan in the Community

# WORLDWIDE OFFICES

**San Jose, USA - Worldwide Headquarters**
2025 Gateway Place, Suite 180 San Jose, CA 95110, USA
Toll Free: 1 888 FINJAN 8 (1 888 346 5268)
Tel: +1 408 452 9700 Fax: +1 408 452 9701

**New York, USA**
Chrysler Building, 405 Lexington Avenue, 35th Floor, New York, NY 10174, USA
Toll Free: 1 866 FINJAN 5 (1 866 346 5265)
Tel: +1 212 681 4410 Fax: +1 212 681 4411

**North America Sales**
1-866-434-6526
1-408-452-9700
E-mail

---

**United Kingdom**
Westmead House, 4th Floor, Westmead, Farnborough, GU14 7LP, UK
Tel: +44 (0)1252 511118 Fax: +44 (0)1252 510888
E-mail
How to find us

**Central Europe (Germany, Austria, Switzerland) and Eastern Europe Sales**

Alte Landstrasse 27, 85521 Ottobrunn, Munich, Germany
Tel: +49 (0)89 673 5970 Fax: +49 (0)89 673 597 50
E-mail
How to find us

**Benelux (The Netherlands, Belgium, Luxembourg)**
Printerweg 56, 3821 AD Amersfoort, The Netherlands
Tel: +31 (0) 33 454 3555 Fax: +31 (0) 33 454 3550
E-mail

**Nordics**
Tel. +46 706219101
E-mail

**Spain and Portugal Sales**
Tel: +34 625517177
E-mail

**Italy Sales**
Tel: +39 349 0748943
E-mail

**France Sales**
Tel: +33 (0)1 44 30 04 50
E-mail

---

**Israel**
Hamachshev St. 1, New Industrial Area, Netanya, 42504, Israel
Tel: +972 (0)9 864 8200 Fax: +972 (0)9 865 9441
E-mail

**Mediterranean Sales**
Tel: +972 (0)9 864 8200
E-mail

**Asia Pacific & India Sales**
Tel: +972 (0)9 864 8200
E-mail

If you would like a Finjan representative to contact you, please fill in the form below:

* Name

* Job Title

* Company

* Country

* State

* Telephone

Cellular

* Email

* Topic of interest

I want to receive Finjan's newsletter by email ☐

Clear Form 

© Copyright 1996 - 2008. Finjan Inc. and its affiliates and subsidiaries. All rights reserved. **Privacy Policy**

# EXHIBIT 15



Finjan - Finjan Software Files Patent Infringement Lawsuit Against Secure Computing, CyberGuard and... Page 1 of 3

Home | Contact us | RSS | Search

Quick Access

Products Solutions Security Center Partners Support Company News and Events

Home > News and Events

News and Events

- Press Releases
- Finjan In the Media
- Newsletter
- Awards & Recognitions
- Events
- Image Library for the Media
- PR Contacts
- Webinars

**Finjan Software Files Patent Infringement Lawsuit Against Secure Computing, CyberGuard and Webwasher**

**San Jose, CA - June 5, 2006**

Finjan Software, Ltd., the global provider of proactive web security solutions for businesses and organizations, today announced that it has filed a patent infringement lawsuit against Secure Computing and its subsidiaries CyberGuard and Webwasher. The lawsuit claims that the three companies are infringing Finjan's intellectual property. The lawsuit, filed in the United States District Court for the District of Delaware, seeks an injunction against Secure Computing, CyberGuard and Webwasher from continued sales of the Webwasher Secure Content Management software suite, and for damages for their willful infringement of Finjan's intellectual property.

Finjan is a pioneer in the web security solutions space, holding a wide portfolio of patents dating back to 1996. As such, Finjan has several of the earliest patents covering various aspects of web security. The intellectual property in the current patent infringement case involves systems and methods for protecting a computer and a network from hostile downloadables and/or malicious code, with a priority date of November 8, 1996.

For over a decade, Finjan's customers have benefited from the company's continuous efforts to develop innovative and unique security technologies, which have proven superior to traditional signature-based technologies. Finjan invests significant time and resources to strengthen, utilize and protect its intellectual property, which continues to be a key driver of the company's growth and a benefit to customers.

Last year, Microsoft purchased a non-exclusive worldwide license for selected Finjan patents covering computer security technologies and became a shareholder in the company.

Finjan delivers best-of-breed proactive web security solutions which provide true zero-hour protection from new vulnerabilities and threats. Finjan's patented behavior-based security and vulnerability patching technologies proactively repel all types of web-borne threats, securing businesses against unknown and emerging web threats. Finjan's Vital Security™ Appliances and Vital Security™ SDK have won multiple industry awards, attesting to the unparalleled security delivered by Finjan's robust and patented behavior-based technologies.

**About Finjan**

http://www.finjan.com/Pressrelease.aspx?PressLan=293&id=901&lan=3 5/1/2008

Finjan is a global provider of best-of-breed web security solutions for businesses and organizations. The company is backed by world class investors including, Bessemer Venture Partners, Benchmark Capital, Israel Seed Partners and HarbourVest Partners, Cisco and Microsoft.

Finjan's proactive, appliance-based solutions deliver the most effective shield against web-borne threats, freeing enterprises to harness the web for maximum commercial results. Finjan's web security solutions utilize patented behavior-based technology to proactively repel all types of threats arriving via the web, such as Spyware, Phishing, Trojans and other malicious code, securing businesses against unknown and emerging threats, as well as known malware. Finjan's security solutions have received industry awards and recognition from leading analyst houses and publications including IDC, Butler Group, SC Magazine, CRN, PCPro, ITWeek, and Information Security. With Finjan's award-winning and widely used solutions, businesses can focus on implementing web strategies to realize their full organizational and commercial potential. For more information about Finjan, please visit: www.finjan.com.

© Copyright 1996-2006. Finjan Inc. and its affiliates and subsidiaries. All rights reserved.
All text and figures included in this publication are the exclusive property of Finjan and are for your personal and non-commercial use. You may not modify, copy, distribute, transmit, display, perform, reproduce, publish, license, create derivative works from, transfer, use or sell any part of its content in any way without the express permission in writing from Finjan. Information in this document is subject to change without notice and does not present a commitment or representation on the part of Finjan. The Finjan technology and/or products and/or software described and/or referenced to in this material are protected by registered and/or pending patents including U.S. Patents No. 6092194, 6154844, 6167520, 6480962, 6209103, 6298446, 6353892, 6804780, 6922693, 6944822, 6993662, 6965968 and may be protected by other U.S. Patents, foreign patents, or pending applications.

Finjan, Finjan logo, Vital Security, Vulnerability Anti dote and Window-of-Vulnerability are trademarks or registered trademarks of Finjan Inc., and/or its affiliates and subsidiaries. Sophos is a registered trademark of Sophos plc. McAfee is a registered trademark of McAfee Inc. Kaspersky is a registered trademark of Kaspersky Lab. SurfControl is a registered trademark of SurfControl plc. Secure Computing is a registered trademark of Secure Computing Corporation. Microsoft and Microsoft Office are registered trademarks of Microsoft Corporation. All other trademarks are the trademarks of their respective owners

Media Contacts:

| United States | Europe |
|---|---|
| Jan Wiedrick-Kozlowski | Dawn Harnetty/Jon Angeloni |
| Activa PR | Spreckley Partners |
| Tel. +1 585 392 7878 | Tel: +44 (0)207 388 9988 |
| Email: jan@activapr.com | Email: finjan@spreckley.co.uk |

© Copyright 1996 - 2008 Finjan Inc. and its affiliates and subsidiaries. All rights reserved. Privacy Policy

Case 1:06-cv-00369-GMS    Document 285-3    Filed 05/16/2008    Page 34 of 70

# EXHIBIT 16



US006092194A

# United States Patent [19]

**Touboul**

[11] **Patent Number: 6,092,194**

[45] **Date of Patent: *Jul. 18, 2000**

[54] **SYSTEM AND METHOD FOR PROTECTING A COMPUTER AND A NETWORK FROM HOSTILE DOWNLOADABLES**

[75] Inventor: Shlomo Touboul, Kefar-Haim, Israel

[73] Assignee: Finjan Software, Ltd., Netanya, Israel

[ * ] Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

[21] Appl. No.: 08/964,388

[22] Filed: Nov. 6, 1997

**Related U.S. Application Data**

[60] Provisional application No. 60/030,639, Nov. 8, 1996.

[51] Int. Cl.$^{7}$ ..... H04L 1/00

[52] U.S. Cl. ..... 713/200

[58] Field of Search ..... 395/187.01, 186; 713/200, 201, 202; 714/38, 704; 709/229

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,077,677 | 12/1991 | Murphy et al. | 395/10 |
| 5,361,359 | 11/1994 | Tajalli et al. | 395/700 |
| 5,485,409 | 1/1996 | Gupta et al. | 395/186 |
| 5,485,575 | 1/1996 | Chess et al. | 395/183.14 |
| 5,572,643 | 11/1996 | Judson | 395/793 |
| 5,623,600 | 4/1997 | Ji et al. | 395/187.01 |
| 5,638,446 | 6/1997 | Rubin | 380/25 |
| 5,692,047 | 11/1997 | McManis | 380/4 |
| 5,692,124 | 11/1997 | Holden et al. | 395/187.01 |
| 5,720,033 | 2/1998 | Deo | 395/186 |
| 5,724,425 | 3/1998 | Chang et al. | 380/25 |
| 5,740,248 | 4/1998 | Fieres et al. | 380/25 |
| 5,761,421 | 6/1998 | van Hoff et al. | 395/200.53 |
| 5,765,205 | 6/1998 | Breslau et al. | 711/203 |
| 5,784,459 | 7/1998 | Devarakonda et al. | 380/4 |
| 5,796,952 | 8/1998 | Davis et al. | 395/200.54 |
| 5,805,829 | 9/1998 | Cohen et al. | 395/200.32 |
| 5,832,208 | 11/1998 | Chen et al. | 395/187.01 |
| 5,850,559 | 12/1998 | Angelo et al. | 395/750.03 |
| 5,864,683 | 1/1999 | Boebert et al. | 395/200.79 |
| 5,892,904 | 4/1999 | Atkinson et al. | 395/187.01 |

OTHER PUBLICATIONS

Web page: http://iel.ihs.com:80/cgi-bin/iel_cgi?se...2ehts%26ViewTemplate%3ddocvie%5fb%2ehts, Okamato, E. et al., "ID-Based Authentication System For Computer Virus Detection", IEEE/IEE Electronic Library online, Electronics Letters, vol. 26, Issue 15, ISSN 0013-5194, Jul. 19, 1990, Abstract and pp. 1169-1170.

(List continued on next page.)

*Primary Examiner*—Robert W. Beausoliel, Jr.
*Assistant Examiner*—Christopher Revak
*Attorney, Agent, or Firm*—Graham & James LLP

[57] **ABSTRACT**

A system protects a computer from suspicious Downloadables. The system comprises a security policy, an interface for receiving a Downloadable, and a comparator, coupled to the interface, for applying the security policy to the Downloadable to determine if the security policy has been violated. The Downloadable may include a Java™ applet, an ActiveX™ control, a JavaScript™ script, or a Visual Basic script. The security policy may include a default security policy to be applied regardless of the client to whom the Downloadable is addressed, or a specific security policy to be applied based on the client or the group to which the client belongs. The system uses an ID generator to compute a Downloadable ID identifying the Downloadable, preferably, by fetching all components of the Downloadable and performing a hashing function on the Downloadable including the fetched components. Further, the security policy may indicate several tests to perform, including (1) a comparison with known hostile and non-hostile Downloadables; (2) a comparison with Downloadables to be blocked or allowed per administrative override; (3) a comparison of the Downloadable security profile data against access control lists; (4) a comparison of a certificate embodied in the Downloadable against trusted certificates; and (5) a comparison of the URL from which the Downloadable originated against trusted and untrusted URLs. Based on these tests, a logical engine can determine whether to allow or block the Downloadable.

**68 Claims, 10 Drawing Sheets**

Joint Trial Exhibit
**JTX-1**
Case No. 06-369 GMS

OTHER PUBLICATIONS

"Finjan Announces a Personal Java ™ Firewall For Web Browsers—the SurfinShield™ 1.6", Press Release of Finjan Releases SurfinShield, Oct. 21, 1996, 2 pages.

"Finjan Software Releases SurfinBoard, Industry's First JAVA Security Product For the World Wide Web", Article published on the Internet by Finjan Software, Ltd., Jul. 29, 1996, 1 page.

"Powerful PC Security for the New World of Java™ and Downloadables, Surfin Shield™" Article published on the Internet by Finjan Software Ltd., 1996, 2 Pages.

"Company Profile Finjan—Safe Surfing, The Java Security Solutions Provider" Article published on the Internet by Finjan Software Ltd., Oct. 31, 1996, 3 pages.

"Finjan Announces Major Power Boost and New Features for SurfinShield™ 2.0" Las Vegas Convention Center/Pavillion 5 P5551, Nov. 18, 1996, 3 pages.

"Java Security: Issues & Solutions" Article published on the Internet by Finjan Software Ltd., 1996, 8 pages.

"Products" Article published on the Internet, 7 pages.

Mark LaDue, "Online Business Consultant" Article published on the Internet, Home Page, Inc. 1996, 4 pages.

Jim K. Omura, "Novel Applications of Cryptography in Digital Communications", IEEE Communications Magazine, p 27, May 1990.

Norvin Leach et al, "IE 3.0 applets will earn certification", PC Week, v13, n29, p1(2), Jul. 1996.

Microsoft Authenticode Technology, "Ensuring Accountability and Authenticity for Software Components on the Internet", Microsoft Corporation, Oct. 1996.

Frequently Asked Questions About Authenticode, Microsoft Corporation, Feb. 1997.



U.S. Patent Jul. 18, 2000 Sheet 1 of 10 6,092,194

100
105
External Computer Network
125
110
Internal Network Security System
130
115
Internal Computer Network
135
120
Security Management Console

FIG. 1

FIN000003



U.S. Patent Jul. 18, 2000 Sheet 2 of 10 6,092,194

110
From
External Computer
Network 105
125
205
CPU
210
External
Communications
Interface
215
I/O Interfaces
220
225
Internal
Communications
Interface
130
To
External Computer
Network 115
230
Data Storage
Device
240
Security
Database
245
Events Log
260
Users
235
RAM
255
Security
Program
250
Operating
System

FIG. 2

FIN000004



U.S. Patent Jul. 18, 2000 Sheet 3 of 10 6,092,194

300
Security Database
240
307
Known Downloadables
309
Known Certificates
310
DSP Data
305
Security Policies
User ID,
URL,
Received
Downloadable
315
ID Generator
317
Policy Finder
320
First Comparator
325
Code Scanner
340
Certificate Scanner
Path 1
Path 2
330
ACL Comparator
Path 3
345
Certificate Comparator
Path 4
350
URL Comparator
333
Logical Engine
335
Record keeping Engine
245
Event Log
Nonsuspicious Downloadable

FIG. 3

FIN000005

U.S. Patent Jul. 18, 2000 Sheet 4 of 10 6,092,194

Security Policies
305
Policy Selectors
405
Access Control Lists
410
Trusted Certificate Lists
415
URL Rule Bases
420
Lists of Downloadables to Allow or Block per Administrative Override
425

FIG. 4

FIN000006

U.S. Patent Jul. 18, 2000 Sheet 5 of 10 6,092,194

120

To/From
Internal Computer
Network
135
505
510
Security
Policy Editor
Event Log
Analysts
Engine
515
User
Notification
Engine

FIG. 5

FIN000007



U.S. Patent
Jul. 18, 2000
Sheet 6 of 10
6,092,194

600
Start
602
Receive Downloadable
604
Generate Downloadable ID
606
Find Security Policy
608
Downloadable allowed?
Yes
No
610
Downloadable blocked?
Yes
No
614
URL comparison required?
No
Yes
616
Compare URL
618
ACL comparison required?
No
Yes
620
TCL comparison required?
No
Yes
626
Previously decomposed ?
Yes
No
628
Decompose Downloadable into DSP data
Compare DSP with ACL
630
622
Scan Certificate
Compare Certificate with TCL
624
612
Send results to Logical Engine
End

FIG. 6A



U.S. Patent Jul. 18, 2000 Sheet 7 of 10 6,092,194

606
Start
650
Security policy defined for User-ID and Downloadable?
No
Yes
Fetch the generic security policy for User ID
652
654
Fetch the policy for User ID and Downloadable
End

FIG. 6B

FIN000009

U.S. Patent Jul. 18, 2000 Sheet 8 of 10 6,092,194

655
Start
Receive Results from First Comparator, ACL Comparator, Certificate Comparator and URL Comparator
660
Compare Results with Security Policies
662
Security Policies Confirm Pass?
664
No
Yes
Pass Downloadable
666
Stop Downloadable
670
Send Substitute Downloadble to Inform The User
672
Record Findings
668
End

FIG. 6C

FIN000010





U.S. Patent Jul. 18, 2000 Sheet 9 of 10 6,092,194

628
Start
705
Disassemble the Machine Code
710
Resolve a Respective Command in The Code
715
Is The Resolved Command Suspect?
No
Yes
720
Decode and Register The Command and The Command Parameters as DSP Data
725
Done?
No
Yes
End

FIG. 7



U.S. Patent Jul. 18, 2000 Sheet 10 of 10 6,092,194

800
Start
810
Receive a Downloadable
820
Fetch Downloadable Components
830
Include Fetched Components in The Downloadable
840
Perform a Hashing Function on the Downloadable to Generate a Downloadable ID
850
Store the Downloadable ID
End

FIG. 8

FIN000012

# SYSTEM AND METHOD FOR PROTECTING A COMPUTER AND A NETWORK FROM HOSTILE DOWNLOADABLES

## INCORPORATION BY REFERENCE TO RELATED APPLICATION

This application hereby incorporates by reference related U.S. patent application Ser. No. 08/790,097, entitled "System and Method for Protecting a Client from Hostile Downloadables," filed on Jan. 29, 1997, by inventor Shlomo Touboul.

## PRIORITY REFERENCE TO PROVISIONAL APPLICATION

This application claims benefit of and hereby incorporates by reference provisional application Ser. No. 60/030,639, entitled "System and Method for Protecting a Computer from Hostile Downloadables," filed on Nov. 8, 1996, by inventor Shlomo Touboul.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates generally to computer networks, and more particularly provides a system and method for protecting a computer and a network from hostile Downloadables.

2. Description of the Background Art

The Internet is currently a collection of over 100,000 individual computer networks owned by governments, universities, nonprofit groups and companies, and is expanding at an accelerating rate. Because the Internet is public, the Internet has become a major source of many system damaging and system fatal application programs, commonly referred to as "viruses."

Accordingly, programmers continue to design computer and computer network security systems for blocking these viruses from attacking both individual and network computers. On the most part, these security systems have been relatively successful. However, these security systems are not configured to recognize computer viruses which have been attached to or configured as Downloadable application programs, commonly referred to as "Downloadables." A Downloadable is an executable application program, which is downloaded from a source computer and run on the destination computer. Downloadable is typically requested by an ongoing process such as by an Internet browser or web engine. Examples of Downloadables include Java™ applets designed for use in the Java™ distributing environment developed by Sun Microsystems, Inc., JavaScript scripts also developed by Sun Microsystems, Inc., ActiveX™ controls designed for use in the ActiveX™ distributing environment developed by the Microsoft Corporation, and Visual Basic also developed by the Microsoft Corporation. Therefore, a system and method are needed to protect a network from hostile Downloadables.

## SUMMARY OF THE INVENTION

The present invention provides a system for protecting a network from suspicious Downloadables. The system comprises a security policy, an interface for receiving a Downloadable, and a comparator, coupled to the interface, for applying the security policy to the Downloadable to determine if the security policy has been violated. The Downloadable may include a Java™ applet, an ActiveX™ control, a JavaScript™ script, or a Visual Basic script. The

security policy may include a default security policy to be applied regardless of the client to whom the Downloadable is addressed, a specific security policy to be applied based on the client or the group to which the client belongs, or a specific policy to be applied based on the client/group and on the particular Downloadable received. The system uses an ID generator to compute a Downloadable ID identifying the Downloadable, preferably, by fetching all components of the Downloadable and performing a hashing function on the Downloadable including the fetched components.

Further, the security policy may indicate several tests to perform, including (1) a comparison with known hostile and non-hostile Downloadables; (2) a comparison with Downloadables to be blocked or allowed per administrative override; (3) a comparison of the Downloadable security profile data against access control lists; (4) a comparison of a certificate embodied in the Downloadable against trusted certificates; and (5) a comparison of the URL from which the Downloadable originated against trusted and untrusted URLs. Based on these tests, a logical engine can determine whether to allow or block the Downloadable.

The present invention further provides a method for protecting a computer from suspicious Downloadables. The method comprises the steps of receiving a Downloadable, comparing the Downloadable against a security policy to determine if the security policy has been violated, and discarding the Downloadable if the security policy has been violated.

It will be appreciated that the system and method of the present invention may provide computer protection from known hostile Downloadables. The system and method of the present invention may identify Downloadables that perform operations deemed suspicious. The system and method of the present invention may examine the Downloadable code to determine whether the code contains any suspicious operations, and thus may allow or block the Downloadable accordingly.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram illustrating a network system, in accordance with the present invention;

FIG. 2 is a block diagram illustrating details of the internal network security system of FIG. 1;

FIG. 3 is a block diagram illustrating details of the security program and the security database of FIG. 2;

FIG. 4 is a block diagram illustrating details of the security policies of FIG. 3;

FIG. 5 is a block diagram illustrating details of the security management console of FIG. 1;

FIG. 6A is a flowchart illustrating a method of examining for suspicious Downloadables, in accordance with the present invention;

FIG. 6B is a flowchart illustrating details of the step for finding the appropriate security policy of FIG. 6A;

FIG. 6C is a flowchart illustrating a method for determining whether an incoming Downloadable is to be deemed suspicious;

FIG. 7 is a flowchart illustrating details of the FIG. 6 step of decomposing a Downloadable; and

FIG. 8 is a flowchart illustrating a method 800 for generating a Downloadable ID for identifying a Downloadable.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 1 is a block diagram illustrating a network system 100, in accordance with the present invention. The network

system 100 includes an external computer network 105, such as the Wide Area Network (WAN) commonly referred to as the Internet, coupled via a communications channel 125 to an internal network security system 110. The network system 100 further includes an internal computer network 115, such as a corporate Local Area Network (LAN), coupled via a communications channel 130 to the internal network computer system 110 and coupled via a communications channel 135 to a security management console 120.

The internal network security system 110 examines Downloadables received from external computer network 105, and prevents Downloadables deemed suspicious from reaching the internal computer network 115. It will be further appreciated that a Downloadable is deemed suspicious if it performs or may perform any undesirable operation, or if it threatens or may threaten the integrity of an internal computer network 115 component. It is to be understood that the term "suspicious" includes hostile, potentially hostile, undesirable, potentially undesirable, etc. Security management console 120 enables viewing, modification and configuration of the internal network security system 110.

FIG. 2 is a block diagram illustrating details of the internal network security system 110, which includes a Central Processing Unit (CPU) 205, such as an Intel Pentium® microprocessor or a Motorola Power PC® microprocessor, coupled to a signal bus 220. The internal network security system 110 further includes an external communications interface 210 coupled between the communications channel 125 and the signal bus 220 for receiving Downloadables from external computer network 105, and an internal communications interface 225 coupled between the signal bus 220 and the communications channel 130 for forwarding Downloadables not deemed suspicious to the internal computer network 115. The external communications interface 210 and the internal communications interface 225 may be functional components of an integral communications interface (not shown) for both receiving Downloadables from the external computer network 105 and forwarding Downloadables to the internal computer network 115.

Internal network security system 110 further includes Input/Output (I/O) interfaces 215 (such as a keyboard, mouse and Cathode Ray Tube (CRT) display), a data storage device 230 such as a magnetic disk, and a Random-Access Memory (RAM) 235, each coupled to the signal bus 220. The data storage device 230 stores a security database 240, which includes security information for determining whether a received Downloadable is to be deemed suspicious. The data storage device 230 further stores a users list 260 identifying the users within the internal computer network 115 who may receive Downloadables, and an event log 245 which includes determination results for each Downloadable examined and runtime indications of the internal network security system 110. An operating system 250 controls processing by CPU 205, and is typically stored in data storage device 230 and loaded into RAM 235 (as illustrated) for execution. A security program 255 controls examination of incoming Downloadables, and also may be stored in data storage device 230 and loaded into RAM 235 (as illustrated) for execution by CPU 205.

FIG. 3 is a block diagram illustrating details of the security program 255 and the security database 240. The security program 255 includes an ID generator 315, a policy finder 317 coupled to the ID generator 315, and a first comparator 320 coupled to the policy finder 317. The first comparator 320 is coupled to a logical engine 333 via four separate paths, namely, via Path 1, via Path 2, via Path 3 and via Path 4. Path 1 includes a direct connection from the first comparator 320 to the logical engine 333. Path 2 includes a code scanner coupled to the first comparator 320, and an Access Control List (ACL) comparator 330 coupling the code scanner 325 to the logical engine 333. Path 3 includes a certificate scanner 340 coupled to the first comparator 320, and a certificate comparator 345 coupling the certificate scanner 340 to the logical engine 333. Path 4 includes a Uniform Resource Locator (URL) comparator 350 coupling the first comparator 320 to the logical engine 3330. A record-keeping engine 335 is coupled between the logical engine 333 and the event log 245.

The security program 255 operates in conjunction with the security database 240, which includes security policies 305, known Downloadables 307, known Certificates 309 and Downloadable Security Profile (DSP) data 310 corresponding to the known Downloadables 307. Security policies 305 includes policies specific to particular users 260 and default (or generic) policies for determining whether to allow or block an incoming Downloadable. These security policies 305 may identify specific Downloadables to block, specific Downloadables to allow, or necessary criteria for allowing an unknown Downloadable. Referring to FIG. 4, security policies 305 include policy selectors 405, access control lists 410, trusted certificate lists 415, URL rule bases 420, and lists 425 of Downloadables to allow or to block per administrative override.

Known Downloadables 307 include lists of Downloadables which Original Equipment Manufacturers (OEMs) know to be hostile, of Downloadables which OEMs know to be non-hostile, and of Downloadables previously received by this security program 255. DSP data 310 includes the list of all potentially hostile or suspicious computer operations that may be attempted by each known Downloadable 307, and may also include the respective arguments of these operations. An identified argument of an operation is referred to as "resolved." An unidentified argument is referred to as "unresolved." DSP data 310 is described below with reference to the code scanner 325.

The ID generator 315 receives a Downloadable (including the URL from which it came and the userID of the intended recipient) from the external computer network 105 via the external communications interface 210, and generates a Downloadable ID for identifying each Downloadable. The Downloadable ID preferably includes a digital hash of the complete Downloadable code. The ID generator 315 preferably prefetches all components embodied in or identified by the code for Downloadable ID generation. For example, the ID generator 315 may prefetch all classes embodied in or identified by the Java™ applet bytecode to generate the Downloadable ID. Similarly, the ID generator 315 may retrieve all components listed in the .INF file for an ActiveX™ control to compute a Downloadable ID. Accordingly, the Downloadable ID for the Downloadable will be the same each time the ID generator 315 receives the same Downloadable. The ID generator 315 adds the generated Downloadable ID to the list of known Downloadables 307 (if it is not already listed). The ID generator 315 then forwards the Downloadable and Downloadable ID to the policy finder 317.

The policy finder 317 uses the userID of the intended user and the Downloadable ID to select the specific security policy 305 that shall be applied on the received Downloadable. If there is a specific policy 305 that was defined for the user (or for one of its super groups) and the Downloadable, then the policy is selected. Otherwise the generic policy 305

that was defined for the user (or for one of its super groups) is selected. The policy finder 317 then sends the policy to the first comparator 320.

The first comparator 320 receives the Downloadable, the Downloadable ID and the security policy 305 from the policy finder 317. The first comparator 320 examines the security policy 305 to determine which steps are needed for allowing the Downloadable. For example, the security policy 305 may indicate that, in order to allow this Downloadable, it must pass all four paths, Path 1, Path 2, Path 3 and Path 4. Alternatively, the security policy 305 may indicate that to allow the Downloadable, it must pass only one of the paths. The first comparator 320 responds by forwarding the proper information to the paths identified by the security policy 305.

Path 1

In path 1, the first comparator 320 checks the policy selector 405 of the security policy 305 that was received from the policy finder 317. If the policy selector 405 is either "Allowed" or "Blocked," then the first comparator 320 forwards this result directly to the logical engine 333. Otherwise, the first comparator 320 invokes the comparisons in path 2 and/or path 3 and/or path 4 based on the contents of policy selector 405. It will be appreciated that the first comparator 320 itself compares the Downloadable ID against the lists of Downloadables to allow or block per administrative override 425. That is, the system security administrator can define specific Downloadables as "Allowed" or "Blocked."

Alternatively, the logical engine 333 may receive the results of each of the paths and based on the policy selector 405 may institute the final determination whether to allow or block the Downloadable. The first comparator 320 informs the logical engine 333 of the results of its comparison.

Path 2

In path 2, the first comparator 320 delivers the Downloadable, the Downloadable ID and the security policy 305 to the code scanner 325. If the DSP data 310 of the received Downloadable is known, the code scanner 325 retrieves and forwards the information to the ACL comparator 330. Otherwise, the code scanner 325 resolves the DSP data 310. That is, the code scanner 325 uses conventional parsing techniques to decompose the code (including all prefetched components) of the Downloadable into the DSP data 310. DSP data 310 includes the list of all potentially hostile or suspicious computer operations that may be attempted by a specific Downloadable 307, and may also include the respective arguments of these operations. For example, DSP data 310 may include a READ from a specific file, a SEND to an unresolved host, etc. The code scanner 325 may generate the DSP data 310 as a list of all operations in the Downloadable code which could ever be deemed potentially hostile and a list of all files to be accessed by the Downloadable code. It will be appreciated that the code scanner 325 may search the code for any pattern, which is undesirable or suggests that the code was written by a hacker.

An Example List of Operations Deemed Potentially Hostile

File operations: READ a file, WRITE a file;

Network operations: LISTEN on a socket, CONNECT to a socket, SEND data, RECEIVE data, VIEW INTRANET;

Registry operations: READ a registry item, WRITE a registry item;

Operating system operations: EXIT WINDOWS, EXIT BROWSER, START PROCESS/THREAD, KILL PROCESS/THREAD, CHANGE PROCESS/THREAD PRIORITY, DYNAMICALLY LOAD A CLASS/LIBRARY, etc.; and

Resource usage thresholds: memory, CPU, graphics, etc.

In the preferred embodiment, the code scanner 325 performs a full-content inspection. However, for improved speed but reduced security, the code scanner 325 may examine only a portion of the Downloadable such as the Downloadable header. The code scanner 325 then stores the DSP data into DSP data 310 (corresponding to its Downloadable ID), and sends the Downloadable, the DSP data to the ACL comparator 330 for comparison with the security policy 305.

The ACL comparator 330 receives the Downloadable, the corresponding DSP data and the security policy 305 from the code scanner 325, and compares the DSP data against the security policy 305. That is, the ACL comparator 330 compares the DSP data of the received Downloadable against the access control lists 410 in the received security policy 305. The access control list 410 contains criteria indicating whether to pass or fail the Downloadable. For example, an access control list may indicate that the Downloadable fails if the DSP data includes a WRITE command to a system file. The ACL comparator 330 sends its results to the logical engine 333.

Path 3

In path 3, the certificate scanner 340 determines whether the received Downloadable was signed by a certificate authority, such as VeriSign, Inc., and scans for a certificate embodied in the Downloadable. The certificate scanner 340 forwards the found certificate to the certificate comparator 345. The certificate comparator 345 retrieves known certificates 309 that were deemed trustworthy by the security administrator and compares the found certificate with the known certificates 309 to determine whether the Downloadable was signed by a trusted certificate. The certificate comparator 345 sends the results to the logical engine 333.

Path 4

In path 4, the URL comparator 350 examines the URL identifying the source of the Downloadable against URLs stored in the URL rule base 420 to determine whether the Downloadable comes from a trusted source. Based on the security policy 305, the URL comparator 350 may deem the Downloadable suspicious if the Downloadable comes from an untrustworthy source or if the Downloadable did not come from a trusted source. For example, if the Downloadable comes from a known hacker, then the Downloadable may be deemed suspicious and presumed hostile. The URL comparator 350 sends its results to the logical engine 333.

The logical engine 333 examines the results of each of the paths and the policy selector 405 in the security policy 305 to determine whether to allow or block the Downloadable. The policy selector 405 includes a logical expression of the results received from each of the paths. For example, the logical engine 333 may block a Downloadable if it fails any one of the paths, i.e., if the Downloadable is known hostile (Path 1), if the Downloadable may request suspicious operations (Path 2), if the Downloadable was not signed by a trusted certificate authority (Path 3), or if the Downloadable came from an untrustworthy source (Path 4). The logical engine 333 may apply other logical expressions according to the policy selector 405 embodied in the security policy 305. If the policy selector 405 indicates that the Downloadable may pass, then the logical engine 333 passes the Downloadable to its intended recipient. Otherwise, if the policy selector 405 indicates that the Downloadable should be blocked, then the logical engine 333 forwards a non-hostile Downloadable to the intended recipient to inform the user

that internal network security system 110 discarded the original Downloadable. Further, the logical engine 333 forwards a status report to the record-keeping engine 335, which stores the reports in event log 245 in the data storage device 230 for subsequent review, for example, by the MIS director.

FIG. 5 is a block diagram illustrating details of the security management console 120, which includes a security policy editor 505 coupled to the communications channel 135, an event log analysis engine 510 coupled between communications channel 135 and a user notification engine 515, and a Downloadable database review engine 520 coupled to the communications channel 135. The security management console 120 further includes computer components similar to the computer components illustrated in FIG. 2.

The security policy editor 505 uses an I/O interface similar to I/O interface 215 for enabling authorized user modification of the security policies 305. That is, the security policy editor 505 enables the authorized user to modify specific security policies 305 corresponding to the users 260, the default or generic security policy 305, the Downloadables to block per administrative override, the Downloadables to allow per administrative override, the trusted certificate lists 415, the policy selectors 405, the access control lists 410, the URLs in the URL rule bases 420, etc. For example, if the authorized user learns of a new hostile Downloadable, then the user can add the Downloadable to the Downloadables to block per system override.

The event log analysis engine 510 examines the status reports contained in the event log 245 stored in the data storage device 230. The event log analysis engine 510 determines whether notification of the user (e.g., the security system manager or MIS director) is warranted. For example, the event log analysis engine 510 may warrant user notification whenever ten (10) suspicious Downloadables have been discarded by internal network security system 110 within a thirty (30) minute period, thereby flagging a potential imminent security threat. Accordingly, the event log analysis engine 510 instructs the user notification engine 515 to inform the user. The user notification engine 515 may send an e-mail via internal communications interface 220 or via external communications interface 210 to the user, or may display a message on the user's display device (not shown).

FIG. 6A is a flowchart illustrating a method 600 for protecting an internal computer network 115 from suspicious Downloadables. Method 600 begins with the ID generator 315 in step 602 receiving a Downloadable. The ID generator 315 in step 604 generates a Downloadable ID identifying the received Downloadable, preferably, by generating a digital hash of the Downloadable code (including prefetched components). The policy finder 317 in step 606 finds the appropriate security policy 305 corresponding to the userID specifying intended recipient (or the group to which the intended recipient belongs) and the Downloadable. The selected security policy 305 may be the default security policy 305. Step 606 is described in greater detail below with reference to FIG. 6B.

The first comparator 320 in step 608 examines the lists of Downloadables to allow or to block per administrative override 425 against the Downloadable ID of the incoming Downloadable to determine whether to allow the Downloadable automatically. If so, then in step 612 the first comparator 320 sends the results to the logical engine 333. If not, then the method 600 proceeds to step 610. In step 610, the first comparator 620 examines the lists of Downloadables to block per administrative override 425 against the Downloadable ID of the incoming Downloadable for determining whether to block the Downloadable automatically. If so, then the first comparator 420 in step 612 sends the results to the logical engine 333. Otherwise, method 600 proceeds to step 614.

In step 614, the first comparator 320 determines whether the security policy 305 indicates that the Downloadable should be tested according to Path 4. If not, then method 600 jumps to step 618. If so, then the URL comparator 350 in step 616 compares the URL embodied in the incoming Downloadable against the URLs of the URL rules bases 420, and then method 600 proceeds to step 618.

In step 618, the first comparator 320 determines whether the security policy 305 indicates that the Downloadable should be tested according to Path 2. If not, then method 600 jumps to step 620. Otherwise, the code scanner 235 in step 626 examines the DSP data 310 based on the Downloadable ID of the incoming Downloadable to determine whether the Downloadable has been previously decomposed. If so, then method 600 jumps to step 630. Otherwise, the code scanner 325 in step 628 decomposes the Downloadable into DSP data. Downloadable decomposition is described in greater detail with reference to FIG. 7. In step 630, the ACL comparator 330 compares the DSP data of the incoming Downloadable against the access control lists 410 (which include the criteria necessary for the Downloadable to fail or pass the test).

In step 620, the first comparator 320 determines whether the security policy 305 indicates that the Downloadable should be tested according to Path 3. If not, then method 600 returns to step 612 to send the results of each of the test performed to the logical engine 333. Otherwise, the certificate scanner 622 in step 622 scans the Downloadable for an embodied certificate. The certificate comparator 345 in step 624 retrieves trusted certificates from the trusted certificate lists (TCL) 415 and compares the embodied certificate with the trusted certificates to determine whether the Downloadable has been signed by a trusted source. Method 600 then proceeds to step 612 by the certificate scanner 345 sending the results of each of the paths taken to the logical engine 333. The operations of the logical engine 333 are described in greater detail below with reference to FIG. 6C. Method 600 then ends.

One skilled in the art will recognize that the tests may be performed in a different order, and that each of the tests need not be performed. Further, one skilled in the art will recognize that, although path 1 is described in FIG. 6A as an automatic allowance or blocking, the results of Path 1 may be another predicate to be applied by the logical engine 333. Further, although the tests are shown serially in FIG. 6A, the tests may be performed in parallel as illustrated in FIG. 3.

FIG. 6B is a flowchart illustrating details of step 606 of FIG. 6A (referred to herein as method 606). Method 606 begins with the policy finder 317 in step 650 determining whether security policies 305 include a specific security policy corresponding to the userID and the Downloadable. If so, then the policy finder 317 in step 654 fetches the corresponding specific policy 305. If not, then the policy finder 317 in step 652 fetches the default or generic security policy 305 corresponding to the userID. Method 606 then ends.

FIG. 6C is a flowchart illustrating details of a method 655 for determining whether to allow or to block the incoming Downloadable. Method 655 begins with the logical engine 333 in step 660 receiving the results from the first comparator 320, from the ACL comparator 330, from the certificate

comparator 345 and from the URL comparator 350. The logical engine 333 in step 662 compares the results with the policy selector 405 embodied in the security policy 305, and in step 664 determines whether the policy selector 405 confirms the pass. For example, the policy selector 405 may indicate that the logical engine 333 pass the Downloadable if it passes one of the tests of Path 1, Path 2, Path 3 and Path 4. If the policy selector 405 indicates that the Downloadable should pass, then the logical engine 333 in step 666 passes the Downloadable to the intended recipient. In step 668, the logical engine 333 sends the results to the record-keeping engine 335, which in turn stores the results in the event log 245 for future review. Method 655 then ends. Otherwise, if the policy selector 405 in step 664 indicates that the Downloadable should not pass, then the logical engine 333 in step 670 stops the Downloadable and in step 672 sends a non-hostile substitute Downloadable to inform the user that the incoming Downloadable has been blocked. Method 655 then jumps to step 668.

FIG. 7 is a flowchart illustrating details of step 628 of FIG. 6A (referred to herein as method 628) for decomposing a Downloadable into DSP data 310. Method 628 begins in step 705 with the code scanner 325 disassembling the machine code of the Downloadable. The code scanner 325 in step 710 resolves a respective command in the machine code, and in step 715 determines whether the resolved command is suspicious (e.g., whether the command is one of the operations identified in the list described above with reference to FIG. 3). If not, then the code scanner 325 in step 725 determines whether it has completed decomposition of the Downloadable, i.e., whether all operations in the Downloadable code have been resolved. If so, then method 628 ends. Otherwise, method 628 returns to step 710.

Otherwise, if the code scanner 325 in step 715 determines that the resolved command is suspect, then the code scanner 325 in step 720 decodes and registers the suspicious command and its command parameters as DSP data 310. The code scanner 325 in step 720 registers the commands and command parameters into a format based on command class (e.g., file operations, network operations, registry operations, operating system operations, resource usage thresholds). Method 628 then jumps to step 725.

FIG. 8 is a flowchart illustrating a method 800 for generating a Downloadable ID for identifying a Downloadable. Method 800 begins with the ID generator 315 in step 810 receiving a Downloadable from the external computer network 105. The ID generator 315 in step 820 may fetch some or all components referenced in the Downloadable code, and in step 830 includes the fetched components in the Downloadable code. The ID generator 315 in step 840 performs a hashing function on at least a portion of the Downloadable code to generate a Downloadable ID. The ID generator 315 in step 850 stores the generated Downloadable ID in the security database 240 as a reference to the DSP data 310. Accordingly, the Downloadable ID will be the same for the identical Downloadable each time it is encountered.

The foregoing description of the preferred embodiments of the invention is by way of example only, and other variations of the above-described embodiments and methods are provided by the present invention. For example, although the invention has been described in a system for protecting an internal computer network, the invention can be embodied in a system for protecting an individual computer. Components of this invention may be implemented using a programmed general purpose digital computer, using application specific integrated circuits, or using a network of interconnected conventional components and circuits. The embodiments described herein have been presented for purposes of illustration and are not intended to be exhaustive or limiting. Many variations and modifications are possible in light of the foregoing teaching. The system is limited only by the following claims.

What is claimed is:

1. A computer-based method, comprising the steps of:
receiving an incoming Downloadable addressed to a client, by a server that serves as a gateway to the client;
comparing, by the server, Downloadable security profile data pertaining to the Downloadable, the Downloadable security profile data includes a list a suspicious computer operations that may be attempted by the Downloadable, against a security policy to determine if the security policy has been violated; and
preventing execution of the Downloadable by the client if the security policy has been violated.

2. The method of claim 1, further comprising the step of decomposing the Downloadable into the Downloadable security profile data.

3. The method of claim 2, wherein the security policy includes an access control list and further comprising the step of comparing the Downloadable security profile data against the access control list.

4. The method of claim 1, further comprising the steps of scanning for a certificate and comparing the certificate against a trusted certificate.

5. The method of claim 1, further comprising the step of comparing the URL from which the Downloadable originated against a known URL.

6. The method of claim 5, wherein the known URL is a trusted URL.

7. The method of claim 5, wherein the known URL is an untrusted URL.

8. The method of claim 1, wherein the Downloadable includes a Java™ applet.

9. The method of claim 1, wherein the Downloadable includes an ActiveX™ control.

10. The method of claim 1, wherein the Downloadable includes a JavaScript™ script.

11. The method of claim 1, wherein the Downloadable includes a Visual Basic script.

12. The method of claim 1, wherein
the security policy includes a default security policy to be applied regardless of the client to whom the Downloadable is addressed.

13. The method of claim 1, wherein
the security policy includes a specific security policy corresponding to the client to whom the Downloadable is addressed.

14. The method of claim 1, wherein
the client belongs to a particular group; and
the security policy includes a specific security policy corresponding to the particular group.

15. The method of claim 1, further comprising, after preventing execution of the Downloadable, the step of sending a substitute non-hostile Downloadable to the client for informing the client.

16. The method of claim 1, further comprising, after preventing execution of the Downloadable, the step of recording the violation in an event log.

17. The method of claim 1, further comprising the step of computing a Downloadable ID to identify the Downloadable.

18. The method of claim 16, further comprising the steps of fetching components identified by the Downloadable and including the fetched components in the Downloadable.

19. The method of claim 18, further comprising the step of performing a hashing function on the Downloadable to compute a Downloadable ID to identify the Downloadable.

20. The method of claim 18, further comprising the step of fetching all components identified by the Downloadable.

21. The method of claim 1 further comprising the step of examining the intended recipient userID to determine the appropriate security policy.

22. The method of claim 20, wherein the appropriate security policy includes a default security policy.

23. The method of claim 1, further comprising the step of examining the Downloadable to determine the appropriate security policy.

24. The method of claim 1, further comprising the step of comparing the Downloadable against a known Downloadable.

25. The method of claim 24, wherein the known Downloadable is hostile.

26. The method of claim 24, wherein the known Downloadable is non-hostile.

27. The method of claim 24, further comprising the step of including a previously received Downloadable as a known Downloadable.

28. The method of claim 27, wherein the security policy identifies a Downloadable to be blocked per administrative override.

29. The method of claim 28, wherein the security policy identifies a Downloadable to be allowed per administrative override.

30. The method of claim 1, further comprising the step of informing a user upon detection of a security policy violation.

31. The method of claim 1, further comprising the steps of recognizing the incoming Downloadable, and obtaining the Downloadable security profile data for the incoming Downloadable from memory.

32. A system for execution by a server that serves as a gateway to a client, the system comprising:

a security policy;

an interface for receiving an incoming Downloadable addressed to a client;

a comparator, coupled to the interface, for comparing Downloadable security profile data pertaining to the Downloadable, the Downloadable security profile data includes a list a suspicious computer operations that may be attempted by the Downloadable, against the security policy to determine if the security policy has been violated; and

a logical engine for preventing execution of the Downloadable by the client if the security policy has been violated.

33. The system of claim 32, wherein the Downloadable includes a Java™ applet.

34. The system of claim 32, wherein the Downloadable includes ActiveX™ control.

35. The system of claim 32, wherein the Downloadable includes a JavaScript™ script.

36. The system of claim 32, wherein the Downloadable includes a Visual Basic script.

37. The system of claim 32, wherein

the security policy includes a default security policy to be applied regardless of the client to whom the Downloadable is addressed.

38. The system of claim 32, wherein

the security policy includes a specific security policy corresponding to the client to whom the Downloadable is addressed.

39. The system of claim 32, wherein

the client belongs to a particular group; and

the security policy includes a specific security policy corresponding to the particular group.

40. The system of claim 32, further comprising an ID generator coupled to the interface for computing a Downloadable ID identifying the Downloadable.

41. The system of claim 40, wherein the ID generator prefetches all components of the Downloadable and uses all components to compute the Downloadable ID.

42. The system of claim 41, wherein the ID generator computes the digital hash of all the prefetched components.

43. The system of claim 32, further comprising a policy finder for finding the security policy.

44. The system of claim 43, wherein the policy finder finds the security policy based on the user.

45. The system of claim 43 wherein the policy finder finds the security policy based on the user and the Downloadable.

46. The system of claim 43, wherein the policy finder obtains the default security policy.

47. The system of claim 32 wherein the comparator examines the security policy to determine which tests to apply.

48. The system of claim 47 wherein the comparator compares the Downloadable against a known Downloadable.

49. The system of claim 48, wherein the known Downloadable is hostile.

50. The system of claim 48, wherein the known Downloadable is non-hostile.

51. The system of claim 32, wherein the security policy identifies a Downloadable to be blocked per administrative override.

52. The system of claim 32, wherein the security policy identifies a Downloadable to be allowed per administrative override.

53. The system of claim 32, wherein

the comparator sends a substitute non-hostile Downloadable to the client for informing the client.

54. The system of claim 32, further comprising a code scanner coupled to the comparator for decomposing the Downloadable into the Downloadable security profile data.

55. The system of claim 54, further comprising an ACL comparator coupled to the code scanner for comparing the Downloadable security profile data against an access control list.

56. The system of claim 32, further comprising a certificate scanner coupled to the comparator for examining the Downloadable for a certificate.

57. The system of claim 56, further comprising a certificate comparator coupled to the certificate scanner for comparing the certificate against a trusted certificate.

58. The system of claim 32, further comprising a URL comparator coupled to the comparator for comparing the URL from which the Downloadable originated against a known URL.

59. The system of claim 58, wherein the known URL identifies an untrusted URL.

60. The system of claim 58, wherein the known URL identifies a trusted URL.

61. The system of claim 31, wherein the logical engine responds according to the security policy.

62. The system of claim 31, further comprising a record-keeping engine coupled to the comparator for recording results in an event log.

63. The system of claim 32, further comprising memory storing the Downloadable security profile data for the incoming Downloadable.

64. A system for execution on a server that serves as a gateway to a client, comprising:

means for receiving an incoming Downloadable addressed to a client;

means for comparing Downloadable security profile data pertaining to the Downloadable, the Downloadable security profile data includes a list a suspicious computer operations that may be attempted by the Downloadable, against a security policy to determine if the security policy has been violated; and

means for preventing execution of the Downloadable by the client if the security policy has been violated.

65. A computer-readable storage medium storing program code for causing a server that serves as a gateway to a client to perform the steps of:

receiving an incoming Downloadable addressed to a client;

comparing Downloadable security profile data pertaining to the Downloadable against a security policy to determine if the security policy has been violated; and

preventing execution of the Downloadable by the client if the security policy has been violated.

66. A method, comprising:

receiving a Downloadable;

decomposing the Downloadable into Downloadable security profile data; the Downloadable security profile data includes a list a suspicious computer operations that may be attempted by the Downloadable,

comparing the Downloadable security profile data against a security policy; and

preventing execution of the Downloadable if the Downloadable security profile data violates the security policy.

67. The method of claim 66, further comprising:

fetching all components referenced by the Downloadable;

performing a hashing function of the Downloadable and the components fetched to compute a Downloadable ID; and

storing the Downloadable security profile data and the Downloadable ID in memory.

68. A method, comprising:

providing memory storing known-Downloadable security profile data and a that includes a list a suspicious computer operations that may be attempted by a Downloadable known-Downloadable ID corresponding to the Downloadable security profile data;

receiving an incoming Downloadable;

fetching all components referenced by the incoming Downloadable;

performing a hashing function of the Downloadable and the components to compute an incoming-Downloadable ID;

comparing the known-Downloadable ID against the incoming-Downloadable ID;

retrieving the Downloadable security profile data if the known-Downloadable ID and the incoming-Downloadable ID match; and

comparing the Downloadable security profile data against a security policy to determine if the incoming Downloadable violates the security policy.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

Page 1 of 1

PATENT NO. : 6,092,194
DATED : July 18, 2000
INVENTOR(S) : Shlomo Touboul

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 13,
Line 19, after "to the Downloadable" and before "against a security" insert --, the Downloadable security profile data includes a list a suspicious computer operations that may be attempted by the Downloadable, --

Column 14,
Line 12, after "profile data and" and before "that includes" delete -- a --

Signed and Sealed this

Fifth Day of February, 2002

Attest:

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

*Attesting Officer*

# EXHIBIT 17

This page was printed from the Secure Computing Corporation web site, located at http://www.securecomputing.com/index.cfm?skey=1312

## Product Life Cycle Information

Generally, Secure Computing® provides technical support on our products as it relates to the hosting platform for three (3) years. This is to ensure that our support-services customers can be confident that we will have a supported version of our software available for their operating system, host application, or appliance platform for typically no less than three years from the date that the product first shipped.

Secure Computing maintains a product life cycle program to ensure our customers clearly understand the support status of their Secure Computing products at all times. Policies related to product life stages vary by product. Appliances, for example, have different life cycle characteristics than do pure software products or than do subscription-based services like URL filtering or anti-virus updates. Our product life cycle programs assume that our customers stay relatively current with the latest released version of our products, and upgrade their Secure Computing software as new releases become available.

### Product Life Cycle Charts

The following charts detail the product life cycle support status of Secure Computing's products.

- Identity and Access Management
  - SafeWord® versions
  - SecureWire™
- Network Gateway Security (UTM/Firewall/VPN)
  - Sidewinder®
    - Sidewinder Anti-Spam Add-On Module
    - Sidewinder SoftRemote Add-On Module
  - SecurityReporter™
  - Secure CommandCenter™
  - Sidewinder G2® Enterprise Manager
  - CyberGuard® Classic
  - CyberGuard® TSP
  - SnapGear®
  - Gauntlet™
  - Global Command Center™ (GCC)
- Web Gateway Security
  - Webwasher® Web Gateway Security Appliance
  - Webwasher®
  - SmartFilter®
  - Internet Database of Categorized Content
  - N2H2 Bess® and Sentian™
  - ZIX Message and Web Inspector
- Messaging Products

Contact **Customer Service** with questions, or to receive future support announcements regarding product status.

### Life Stage Descriptions

- **ACTIVE Status**
  Products identified with the Active status are currently orderable and no last order date has been published. The product is fully supported by Secure Computing.

**Recommendation:** Purchase

- **LOD Status**
  Products identified with the LOD status have a published last order date or they may have in fact passed the last order date. The product is fully supported by Secure Computing.

  **Recommendation:** Make last purchase or plan for upgrade

- **MAINTENANCE Status**
  Products identified with the Maintenance status have a published end of life date and will continue to be supported with minor fixes & patches but will not receive any new feature enhancements.

  **Recommendation:** Upgrade as soon as possible

- **EOL Status**
  Products identified with the EOL status have a published end of life date and they have past their end of life date. The product is no longer supported under Secure Computing agreements. No new software releases for the product's platform (e.g., the host operating system, host application, or appliance platform) are planned, and no additional maintenance releases or patches will be made available.

  **Recommendation:** Must upgrade

**Product Life Cycle Charts**
The following charts detail the product life cycle support status of Secure Computing products.

---

## Identity and Access Management

### SafeWord® Strong Authentication Product List

| Software/version | Status | LOD date | EOL date | Supported platforms |
|---|---|---|---|---|
| SafeWord® RemoteAccess™ 2.2 | Active | | | WIN 2000, WIN 2003 |
| SafeWord® RemoteAccess™ 2.1 | LOD* | 12/29/06 | | WIN 2000, WIN 2003 |
| SafeWord® RemoteAccess™ 2.0 | LOD* | 09/30/05 | | WIN 2000, WIN 2003 |
| ***Note:** The above LOD versions are past LOD, in support, (Must upgrade to v2.2 for maintenance)* | | | | |
| | | | | |
| SafeWord® RemoteAccess™, Cisco Compatible 2.2 | Active | | | WIN 2000, WIN 2003 |
| SafeWord® RemoteAccess™, Cisco Compatible 2.1 | LOD* | 12/29/06 | | WIN 2000, WIN 2003 |
| SafeWord RemoteAccess™, Cisco Compatible 2.0 | LOD* | 09/30/05 | | WIN 2000, WIN 2003 |
| ***Note:** The above LOD versions are past LOD, in support, (Must upgrade to v2.2 for maintenance)* | | | | |
| | | | | |
| SafeWord® for Citrix® 2.2 | Active | | | WIN 2000, WIN 2003 |
| SafeWord® for Citrix® 2.1 | LOD* | 12/29/06 | | WIN 2000, WIN 2003 |
| SafeWord® for Citrix® 2.0 | LOD* | 09/30/05 | | WIN 2000, WIN 2003 |
| SafeWord® for Citrix® 1.1 | LOD* | 12/18/03 | | WIN 2000 |
| ***Note:** The above LOD versions are past LOD, in support, (Must upgrade to v2.2 for maintenance)* | | | | |
| | | | | |
| SafeWord® for Check Point 2.2 | Active | | | WIN 2000, WIN 2003 |
| SafeWord® for Check Point 2.1 | LOD* | 12/29/06 | | WIN 2000, WIN 2003 |
| SafeWord® for Check Point 2.0 | LOD* | 09/30/05 | | WIN 2000, WIN 2003 |

| | | | | |
|---|---|---|---|---|
| *Note: The above LOD versions are past LOD, in support, (Must upgrade to v2.2 for maintenance) | | | | |
| | | | | |
| SafeWord® for Nortel Networks 2.2 | Active | | | WIN 2000, WIN 2003 |
| SafeWord® for Nortel Networks 2.1 | LOD* | 12/29/06 | | WIN 2000, WIN 2003 |
| SafeWord® for Nortel Networks 2.0 | LOD* | 09/30/05 | | WIN 2000, WIN 2003 |
| *Note: The above LOD versions are past LOD, in support, (Must upgrade to v2.2 for maintenance) | | | | |
| | | | | |
| SafeWord® PremierAccess® 4.0 | Active | | | WIN 2000, WIN 2003, SOL 9-10 |
| SafeWord® PremierAccess® 3.2 | Active | | | WIN 2000, WIN 2003, SOL 9-10 |
| SafeWord® PremierAccess® 3.1.1 | LOD* | 12/31/04 | | WIN 2000, SOL 7-8 |
| SafeWord® PremierAccess® 3.1 | LOD* | 11/27/02 | | WIN 2000, SOL 7-8 |
| SafeWord® PremierAccess® 3.0 | LOD* | 05/31/02 | | WIN 2000, SOL 7-8 |
| *Note: The above LOD versions are past LOD, in support, (Must upgrade to v4.0 or v3.2 for maintenance) | | | | |
| | | | | |
| SafeWord Plus™ 2.1.1 | EOL | | 01/31/06 | SOL 7 |
| SafeWord Plus™ 2.1 | EOL | | 01/31/06 | SOL 7 |
| SafeWord Plus™ 2.0 | EOL | | 01/31/06 | SOL 7 |
| SafeWord® AS 5.x | EOL | | 12/31/02 | WINNT4, SOL 2.5-7, HPUX11 |

Patches and upgrades >>

## SecureWire Product List

| Model | Status | LOD date | EOL date | Original release | Comments |
|---|---|---|---|---|---|
| 2500 | ACTIVE | | | 3.0.0 | |
| 500 | ACTIVE | | | 3.0.0 | |
| 100 | ACTIVE | | | 3.0.0 | |

---

## Network Gateway Security (UTM/Firewall/VPN)

## Sidewinder® (G2)

**Note:** These tables for Sidewinder G2 below, reflect product life cycle status for major product version and their updates, up to 3 decimal points (e.g. 6.1.1). Beginning in November 2005, the life cycle support information for patch levels (e.g. 6.1.1.03) will be noted in the release notes for each patch.

## Sidewinder® (G2) Software Only - for customers running on a hardware platform of their own choosing (i.e. not an appliance)

| Version | Status | LOD date | EOL date | Comments |
|---|---|---|---|---|
| 6.1.1.x | EOL | Not for sale, upgrade only | 12/31/06 | Software upgrades available until 3/31/06. All software only versions are EOL on 12/31/06. Please inquire about special discounts on appliance upgrades. |
| 6.1.0.x | EOL | Not for sale, upgrade | 12/31/06 | Software upgrades available until 6/30/05. All software only versions are EOL on 12/31/06. Please inquire about special discounts on |

| | | only | | appliance upgrades. |
|---|---|---|---|---|
| 6.0.x | EOL | 6/30/04 | 2/1/06 | - |
| 5.2.x | EOL | 3/31/03 | 12/31/04 | - |
| 5.1.x | EOL | | 2/28/03 | - |
| 5.0.x | EOL | | 6/30/02 | - |

**Sidewinder and Sidewinder G2 patches are available here >>**

## Sidewinder® (G2) - Appliance Hardware

| Model | Status | LOD date | EOL date | Original release | Compatible & Supported versions | Replacement Model |
|---|---|---|---|---|---|---|
| 210 E | ACTIVE | | | 7.0.0.02 | 7.0.0.02 with 7.0.0.02H06 | |
| 410 E | ACTIVE | | | 7.0.0.02 | 7.0.0.02 with 7.0.0.02H06 | |
| 510 E | ACTIVE | | | 7.0.0.02 | 7.0.0.02 with 7.0.0.02H06 | |
| 1100 E | ACTIVE | | | 7.0.0.02 | 7.0.0.02 with 7.0.0.02H06 | |
| 2100 E | ACTIVE | | | 7.0.0.02 | 7.0.0.02 with 7.0.0.02H06 | |
| 2150 E | ACTIVE | | | 7.0.0.02 | 7.0.0.02 with 7.0.0.02H06 | |
| 4150 E | ACTIVE | | | 7.0.0.02 | 7.0.0.02 with 7.0.0.02H06 | |
| 110 D | LOD | 4/30/08 | | 6.1.2.01 | 6.1.2.01 or higher | 110 E |
| 210 D | LOD | 4/30/08 | | 6.1.2.01 | 6.1.2.01 or higher | 210 E |
| 410 D | LOD | 4/30/08 | | 6.1.2 | 6.1.2 or higher | 410 E |
| 510 D | LOD | 4/30/08 | | 6.1.2 | 6.1.2 or higher | 510 E |
| 1100 D | LOD | 4/30/08 | | 6.1.2.02 | 6.1.2.02 or higher | 1100 E |
| 2100 D | LOD | 4/30/08 | | 6.1.2.02 | 6.1.2.02 or higher | 2100 E |
| 2150 D | LOD | 4/30/08 | | 6.1.2.02 | 6.1.2.02 or higher | 2150 D |
| 4150 D | LOD | 4/30/08 | | 6.1.2.02 | 6.1.2.02 or higher | 4150 E |
| 110 C | LOD | 9/30/06 | | 6.1.0.05 | 6.1.2 or higher | 110 D |
| 210 C | LOD | 9/30/06 | | 6.1.0.05 | 6.1.2 or higher | 210 D |
| 410 C | LOD | 4/30/06 | | 6.1.0.05 | 6.1.2 or higher | 410 D |
| 510 C | LOD | 4/30/06 | | 6.1.0.05 | 6.1.2 or higher | 510 D |
| 1100 C | LOD | 12/31/06 | | 6.1.1.01 | 6.1.2 or higher | 1100 D |
| 2100 C | LOD | 12/31/06 | | 6.1.0.05 | 6.1.2 or higher | 2100 D |
| 2150 C | LOD | 12/31/06 | | 6.1.0.05 | 6.1.2 or higher | 2150 D |
| 4150 C | LOD | 12/31/06 | | 6.1.1.01 | 6.1.2 or higher | 4150 D |
| 1100 B | LOD | 6/30/05 | | 6.1.0.05 | 6.1.2 or higher | |
| 4150 | LOD | 5/1/05 | | 6.1 | 6.1.2 or higher | |
| 210 | LOD | 3/15/05 | | 6.1 | 6.1.2 or higher | |
| 310a | LOD | 10/31/04 | | 6.1 | 6.1.2 or higher | |
| 310b | LOD | 3/15/05 | | 6.1.0.04 | 6.1.2 or higher | |
| | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 315 | LOD | 3/15/05 | | 6.1 | 6.1.2 or higher | |
| 410a | LOD | 10/31/04 | | 6.1 | 6.1.2 or higher | |
| 410b | LOD | 3/15/05 | | 6.1.0.04 | 6.1.2 or higher | |
| 415 | LOD | 3/15/05 | | 6.1 | 6.1.2 or higher | |
| 510/515 | LOD | 3/15/05 | | 6.1 | 6.1.2 or higher | |
| 1100/1150 | LOD | 3/15/05 | | 6.1 | 6.1.2 or higher | |
| 2100 | LOD | 3/15/05 | | 6.1 | 6.1.2 or higher | |
| 2150 | LOD | 3/15/05 | | 6.1 | 6.1.2 or higher | |
| 25a | MAINTENANCE | 8/31/02 | | 5.2.1 | 6.1.2 or higher (6.1 upgrade requires min. 512 MB RAM) Not eligible to upgrade to v7.0 | |
| 25b | MAINTENANCE | 3/31/04 | | 6.0 | 6.1.2 or higher Not eligible to upgrade to v7.0 | |
| 100 | MAINTENANCE | 3/31/04 | | 6.0 | 6.1.2 or higher 6.0 EOL as of 2/1/06 | |
| 250 | MAINTENANCE | 3/31/04 | | 6.0 | 6.1.2 or higher Not eligible to upgrade to v7.0 | |
| 1000a | MAINTENANCE | 12/31/02 | | 5.2.1 | 6.1.2 or higher (6.1 upgrade requires min. 512 MB RAM) Not eligible to upgrade to v7.0 | |
| 1000b | MAINTENANCE | 9/30/03 | | 6.0 | 6.1.2 or higher Not eligible to upgrade to v7.0 | |
| 1000c | MAINTENANCE | 3/31/04 | | 6.0 | 6.1.2 or higher Not eligible to upgrade to v7.0 | |
| 2000a | MAINTENANCE | 9/30/03 | | 6.0 | 6.1.2 or higher Not eligible to upgrade to v7.0 | |
| 2000b | MAINTENANCE | 3/31/04 | | 6.0 | 6.1.2 or higher Not eligible to upgrade to v7.0 | |
| 4000 | MAINTENANCE | 3/31/04 | | 6.0 | 6.1.2 or higher Not eligible to upgrade to v7.0 | |

## Sidewinder® (G2) - Appliance Software

| Version | Status | LOD date | EOL date | Comments |
|---|---|---|---|---|
| 7.0.0 | ACTIVE | | | v7.0 is not available for Sidewinder G2 Enterprise Manager |
| 6.1.2 | MAINTENANCE | 12/31/2007 | 12/31/2009 | |
| 6.1.1.x | EOL | 3/31/06 | 4/30/08 | Upgrade to v6.1.2 or if eligible v7.0.0 |
| 6.1.0.x | MAINTENANCE | 6/30/05 | 9/30/07 | |
| 6.0.x | EOL | 6/30/04 | 2/1/06 | |
| 5.2.1 | EOL | 3/31/03 | 12/31/04 | - |

**Sidewinder and Sidewinder G2 patches are available here >>**

## Sidewinder Anti-Spam Add-On Module

| Version | Status | LOD date | EOL date | Comments |
|---|---|---|---|---|
| All versions | MAINTENANCE | 12/31/2007 | 12/31/2008 | Subscription may be renewed only through 12/31/2008 via the pro-rated price. |

TrustedSource™, Secure Computing's proactive reputation-based security technology is now bundled for FREE with Sidewinder v7 in 2008.

## Sidewinder SoftRemote Add-On Module

| Version | Status | LOD date | EOL date | Comments |
|---|---|---|---|---|
| All versions | MAINTENANCE | 12/31/2007 | 12/31/2008 | Support may be renewed only through 12/31/2008 via the pro-rated price. |

The SoftRemote IPSec VPN Client can now be purchased directly through SafeNet. See URL: **http://www.safenet-inc.com/softremote/index.asp**

## CommandCenter - Appliance Hardware

| Model | Status | LOD date | EOL date | Original release | Compatible & Supported versions |
|---|---|---|---|---|---|
| CC500 | ACTIVE | | | 4.0 | 4.0 or higher |
| CC1500 | ACTIVE | | | 4.0 | 4.0 or higher |
| CC2500 | ACTIVE | | | 4.0 | 4.0 or higher |
| CC2800 | ACTIVE | | | 4.0 | 4.0 or higher |

## CommandCenter - Appliance Software

| Version | Status | LOD date | EOL date | Comments |
|---|---|---|---|---|
| 4.0 | ACTIVE | | | This product replaces Global Command Center for Sidewinder and Sidewinder Enterprise Manager. v4.0 is not available for SnapGear. |

**CommandCenter patches are available here >>**

## SecurityReporter - Software

| Version | Status | LOD date | EOL date | Compatible & Supported versions |
|---|---|---|---|---|
| 4.6.4 | ACTIVE | | | Sidewinder v7.0 or higher, and Sidewinder G2 v6.1.1 or higher |
| 4.6.3 | MAINTENANCE | 09/30/2007 | | Sidewinder v7.0 or higher, and Sidewinder G2 v6.1.1 or higher |
| 4.2.30 | MAINTENANCE | 5/21/07 | | Sidewinder G2 v6.1.0.05 or higher |
| 4.2.29 | EOL | 8/21/06 | 5/21/07 | Sidewinder G2 v6.1.2 or higher |

## Sidewinder G2® Enterprise Manager - Appliance Hardware

**Note:** Sidewinder G2 Enterprise Manager is being replaced by "Secure Firewall CommandCenter", please inquire about upgrade options.

| Model | Status | LOD date | EOL date | Original release | Compatible & Supported versions |
|---|---|---|---|---|---|
| 10 D | LOD | 12/31/07 | | 6.1.2.02 | 6.1.2.02 or higher |
| 25 D | LOD | 12/31/07 | | 6.1.2.02 | 6.1.2.02 or higher |
| 50 D | LOD | 12/31/07 | | 6.1.2.02 | 6.1.2.02 or higher |

| | | | | | |
|---|---|---|---|---|---|
| UL D | LOD | 12/31/07 | | 6.1.2.02 | 6.1.2.02 or higher |
| 10 C | LOD | 12/31/06 | | 6.1.1.01 | 6.1.1.01 or higher |
| 25 C | LOD | 12/31/06 | | 6.1.0.05 | 6.1.0.05 or higher |
| 50 C | LOD | 12/31/06 | | 6.1.0.05 | 6.1.0.05 or higher |
| UL C | LOD | 12/31/06 | | 6.1.0.05 | 6.1.0.05 or higher |
| 10 | LOD | 6/30/05 | | 6.1 | 6.1 or higher |
| 25 | LOD | 3/15/05 | | 6.1 | 6.1 or higher |
| 50 | LOD | 3/15/05 | | 6.1 | 6.1 or higher |
| UL | LOD | 3/15/05 | | 6.1 | 6.1 or higher |

Sidewinder and Sidewinder G2 patches are available here >>

## Sidewinder G2® Enterprise Manager - Appliance Software

**Note:** Sidewinder G2 Enterprise Manager is being replaced by "Secure Firewall CommandCenter", please inquire about upgrade options.

| Version | Status | LOD date | EOL date | Comments |
|---|---|---|---|---|
| 6.1.2 | LOD | 12/31/07 | 12/31/09 | |
| 6.1.1.x | MAINTENANCE | 3/31/06 | 4/30/08 | |
| 6.1.0.x | EOL | 6/30/05 | 3/31/07 | |
| 6.0.x | EOL | 6/30/04 | 2/1/06 | |
| 5.2.1 | EOL | 3/31/03 | 12/31/04 | |

## CyberGuard "Classic" Appliances

- All Classic software releases were EOL on December 31, 2007, however some Classic appliances can continue to be used (if they are eligible) and also make the upgrade to TSP or Sidewinder v7.0 software. Please check with your Secure Computing account manager or channel partner for more information about eligibility and upgrade options.
- Last Order Dates are represented as "while quantities last."
- Fulfillment will transition to replacement models if possible.
- When inventory depletion is complete the model will no longer be available for sale (Sold Out).

| Model | Status | LOD date | EOL date | Original release | Compatible & Supported versions | Replacement Model |
|---|---|---|---|---|---|---|
| FS300 | LOD | 12/31/06 | | Classic v5.2 | Classic v5.2 | None |
| FS600 | LOD | 12/31/06 | | Classic v5.2 | Classic v5.2 | None |
| KS1000 | LOD | 12/31/06 | | Classic v5.2 | Classic v5.2 | KS1000-J |
| KS1500 | LOD | 12/31/06 | | Classic v5.2 | Classic v5.2 | KS1500-J |
| KS1500R | Sold Out | 2/17/06 | | Classic v5.2 | Classic v5.2 | None |
| SL3200 | Sold Out | 2/17/06 | | Classic v5.2 | Classic v5.2 | None |
| KS1000J | LOD | 12/31/06 | | Classic v5.2 | Classic v5.2 | None |
| KS1500J | LOD | 12/31/06 | | Classic v5.2 | Classic v5.2 | None |

## CyberGuard Classic Appliance - Software

| Version | Status | LOD date | EOL date | Comments |
|---|---|---|---|---|
| Classic (all versions) | EOL | 12/31/06 | 12/31/07 | EOL occurred on 12/31/07 |

## CyberGuard "TSP" Appliances

- TSP units will move to the Secure Computing common appliance platforms.

- Last Order Dates are represented as "while quantities last."
- When inventory is depleted, fulfillment will transition to replacement models.
- NO EOL dates have been announced for the TSP line.

| Model | Status | LOD date | EOL date | Original release | Compatible & Supported versions | Replacement Model |
|---|---|---|---|---|---|---|
| TSP 110 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 210 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 410 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 510 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 1100 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 2100 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 2150 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 4150 D | LOD | 12/31/07 | | v6.4.1 | v6.4.1 & higher | |
| TSP 7300 | LOD | 12/31/06 | | v6.4 | v6.4 & higher | |
| TSP 7100 | LOD | 12/31/06 | | v6.4 | v6.2 & higher | TSP 7300 |
| TSP 5100 | Sold Out | 2/17/06 | | v6.2 | v6.2 & higher | TSP 3450-J |
| TSP 3600 | Sold Out | 2/17/06 | | v6.2 | v6.2 & higher | TSP 3450-J |
| TSP 3400 | LOD | 12/31/06 | | v6.2 | v6.2 & higher | TSP 3400-J |
| TSP 3100 | LOD | 12/31/06 | | v6.2 | v6.2 & higher | TSP 3100-J |
| TSP 1150 | LOD | 12/31/06 | | v6.2 | v6.2 & higher | TSP 410 D |
| TSP 1250 | LOD | 12/31/06 | | v6.2 | v6.2 & higher | TSP 510 D |
| TSP 3100-J | LOD | 12/31/06 | | v6.2 | v6.2 & higher | TSP 1100 D |
| TSP 3400-J | LOD | 12/31/06 | | v6.2 | v6.2 & higher | TSP 1100 D |
| TSP 3450-J | LOD | 12/31/06 | | v6.4 | v6.2 & higher | TSP 2150 D |
| TSP 7100 | LOD | 12/31/06 | | v6.2 | v6.2 & higher | TSP 4150 D |

## CyberGuard TSP Appliance - Software

| Version | Status | LOD date | EOL date | Comments |
|---|---|---|---|---|
| 6.4.x | MAINTENANCE | 12/31/07 | 12/31/09 | |
| 6.3.0 | MAINTENANCE | | 12/31/08 | Note: 6.3 was a restricted release and will EOL with 6.2. |
| 6.2.x | MAINTENANCE | | 12/31/08 | |
| 6.1.3 | EOL | | 7/2005 | |
| 6.1.2 | EOL | | 4/2005 | |
| 6.1.1 | EOL | | 12/2004 | |

## SnapGear® Product List

| Model | Status | LOD date | EOL date | Current SW version | Comments |
|---|---|---|---|---|---|
| SG720 | ACTIVE | | | 3.1.5u3 | |
| SG710+ | MAINTENANCE | 12/2006 | 12/2008 | 3.1.5u3 | |
| SG710 | MAINTENANCE | 12/2006 | 12/2008 | 3.1.5u3 | |
| SG640 | ACTIVE | | | 3.1.5u3 | |
| SG635 | MAINTENANCE | 12/2006 | 12/2008 | 3.1.5u3 | |
| SG580 | ACTIVE | | | 3.1.5u3 | |
| SG565 | ACTIVE | | | 3.1.5u3 | |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| SG560 | ACTIVE | | | 3.1.5u3 | |
| SG300 | ACTIVE | | | 3.1.5u3 | |
| SG630 | EOL | 12/2005 | 12/2007 | 3.1.5u3 | |
| SG575 | EOL | 06/2005 | 06/2007 | 3.1.5u3 | |
| SG570 | EOL | 06/2005 | 06/2007 | 3.1.5u3 | |
| SG550 | EOL | 06/2005 | 06/2007 | 3.1.5u3 | |
| SG530 | EOL | 06/2005 | 06/2007 | 3.1.5u3 | |
| Lite2+ | EOL | 12/2004 | 12/2006 | 1.8.10 | |
| Lite2 | EOL | 12/2004 | 12/2006 | 1.8.10 | |

## Gauntlet software

| Version | Status | LOD date | EOL date |
|---|---|---|---|
| 6.0 | EOL | 10/15/03 | 12/31/04 |
| 5.5 | EOL | | 12/31/03 |
| 5.0 | EOL | | 7/31/03 |

## e-ppliance Gauntlet (all models)

| Version | Status | LOD date | EOL date |
|---|---|---|---|
| 2.0 | EOL | 10/15/03 | 12/31/04 |
| 1.5 | EOL | | 12/31/03 |
| 1.0 | EOL | | 7/31/03 |

Gauntlet patches are available here >>

## Global Command Center - Software

| Version | Status | LOD date | EOL date | Comments |
|---|---|---|---|---|
| 3.2.x | MAINTENANCE | 3/31/08 | 12/31/09 | After 12/31/2007, available only with orders of 50+ SnapGear units and 1 year of Support. |
| 3.2.0 | EOL | | 3/1/08 | |
| 3.1 | EOL | | 12/31/07 | |
| 3.0 | EOL | | 6/1/07 | |
| 2.5.2 | EOL | | 10/31/05 | |
| 2.5.1 | EOL | | 3/31/05 | |
| 2.5 | EOL | | 11/30/04 | |
| 2.0 | EOL | | 6/30/04 | |

- Global Command Center (GCC) and Sidewinder G2 Enterprise Manager (EM) will be replaced by CommandCenter 4.0 appliance.
- Between now and the end of 2009 GCC and EM customers will migrate from Sidewinder G2 and TSP to Sidewinder 7.0, which is centrally managed by CommandCenter 4.0. For roadmap details please contact your account manager or channel partner.

---

## Web Gateway Security

## Webwasher Web Gateway Security Appliance

---

| Model | Status | LOD date | EOL date | Supported OS |
|---|---|---|---|---|
| WW2900C | Active | | | Proprietary |
| WW1900C | Active | | | Proprietary |
| WW1100C | Active | | | Proprietary |
| WW500C | Active | | | Proprietary |
| SME250C | Active | | | Proprietary |
| WW2900B | Maintenance | 12/2007 | | Proprietary |
| WW1900B | Maintenance | 12/2007 | | Proprietary |
| WW1100B | Maintenance | 12/2007 | | Proprietary |
| WW500B | Maintenance | 12/2007 | | Proprietary |
| SME250B | Maintenance | 12/2007 | | Proprietary |
| SME250 | Maintenance | 8/2007 | 8/2012 | Proprietary |
| WW1900 | Maintenance | 6/2007 | 6/2012 | Proprietary |
| WW1100 | Maintenance | 6/2007 | 6/2012 | Proprietary |
| WW500 | Maintenance | 6/2007 | 6/2012 | Proprietary |
| WW1000 | LOD | 12/2006 | 3/2010 | Proprietary |

## Webwasher Product List

| Software/version | Status | LOD date | EOL date | Supported platforms |
|---|---|---|---|---|
| Webwasher 6.7 | Active | | | Debian 3.1 & 4.0, RHES 4.0 & 5.0, Solaris 9 & 10, SLES 9.0 & 10.0, WIN 2003 |
| Webwasher 6.6 † [1] | Maintenance | 4/2008 | 12/2008 | Debian 3.1 & 4.0, RHES 3.0 & 4.0, Solaris 8[2], 9 & 10, SLES 8.0[2] & 9.0, WIN 2002 & 2003 |
| Webwasher 6.5 † [1] | Maintenance | 9/2007 | 6/2008 | Debian 3.1 & 4.0, RHES 3.0 & 4.0, Solaris 8[2], 9 & 10, SLES 8.0[2] & 9.0, WIN 2002 & 2003 |
| Webwasher 6.0 †[1] | EOL | 3/2007 | 12/2007 | Debian 3.1, RHES 3.0 or 4.0, Solaris 8, 9 or 10, SLES 8.0 or 9.0, WIN 2000 or 2003 |
| Webwasher 5.3 † [1] | Maintenance | 12/2006 | 12/2009 | Debian 3.1, RHES 3.0 or 4.0, SLES 8.0[2] or 9.0, Solaris 8[2] or 9, WIN 2000[2] or 2003 |
| Webwasher 5.2[#] | EOL | 11/2005 | 12/2006 | Debian 3.0 or 3.1, RHES 3.0, SLES 8.0 or 9.0, Solaris 8 or 9, WIN 2000 or 2003 |
| Content Reporter 4.7 †* | Active | | | RHEL 4.0, SLES 9, Solaris 8 or 9 *, WIN 2000 or 2003. Support database versions: Oracle 8.1.7, Oracle 9i, or 10g, Microsoft SQL 2000 or 2005, MaxDB 7.5 (included) |
| Content Reporter 4.6 † | EOL | 12/2006 | 06/2007 | WIN 2000 or 2003, Linux, Solaris 7, 8 or 9. Support database versions: Oracle 8.1.7, Oracle 9i, Oracle 10g, Microsoft SQL 2000, MaxDB 7.5 (included) |
| Content Reporter 4.5 | EOL | 11/2005 | 12/2006 | WIN 2000 or 2003, Solaris 7, 8 or 9. Support database versions: Oracle 8.1.7, Oracle 9i, Oracle 10g, Microsoft SQL 2000, MaxDB 7.5 (included) |
| Instant Messenger Filter 4.2 † | Active | | | WIN 2000 or 2003 |

| Instant Messenger Filter 4.0 | EOL | 11/2005 | 01/2008 | WIN 2000 or 2003 |
|---|---|---|---|---|

[#] McAfee no longer provides Anti-Virus signature updates for WW v5.2 or older effective 1/31/2007
[1] For Computer Associates eTrust Anti-Virus module: LOD defined as of 9/2007 and EOL defined as of 12/2008
[2] EOL for this platform defined as of 12/2007
[*] Content Reporter is only supported on Solaris 64 bit OS
† Webwasher has not been tested on, and does not currently support 64-bit OS editions or hardware

## SmartFilter Product List

| Software/version | Status | LOD date | EOL date | Supported OS or application platforms |
|---|---|---|---|---|
| SmartFilter 3.x.x | EOL | 7/2004 | 9/2006 | Win 2000, RHL 7.2, RHL 9.0, Solaris 2.6 or 8 |
| SmartFilter 4.0.x | EOL | 9/2005 | 9/2007 | Win 2000, Win 2003, RHL 7.3, RHL 9.0, Red Hat ES 3.0, Solaris 8 or 9 |
| SmartFilter 4.1.x | LOD | 06/2007 | 06/2008 | Win 2000, Win 2003, Win XP Pro, RHL 9.0, Red Hat ES 3.0 or 4.0, Solaris 8 or 9 |
| SmartFilter 4.1.1.02 - Cisco CE | LOD | 06/2007 | 04/2008 | |
| SmartFilter 4.1.1.01 - UFP (FW-1) | LOD | 06/2007 | 06/2008 | |
| SmartFilter 4.1.1.01 - Volera (IFP) | LOD | 06/2007 | 06/2008 | |
| SmartFilter 4.1.1.02 - Sidewinder 6.1.x | LOD | 06/2007 | 12/2009 | |
| SmartFilter 4.2.x | ACTIVE | | | Win 2000, Win 2003, Win XP Pro, Win Vista, Red Hat ES 3.0/4.0/5.0, Solaris 8/9/10 |
| SmartFilter DA 4.0.x | Active | | | RHL 7.3, Red Hat ES 3.0 or 4.0 |
| SmartFilter Control List SDK 3.x | EOL | 09/2003 | 09/2006 | Various OEM Platforms |
| SmartFilter Control List SDK 4.0.x | EOL | 04/2004 | 04/2006 | Various OEM Platforms |
| SmartFilter Control List SDK 4.1.x | EOL | 05/2005 | 05/2007 | Various OEM Platforms |
| SmartFilter Control List SDK 4.2.x | LOD | 01/2007 | 01/2009 | Various OEM Platforms |
| SmartFilter Control List SDK 4.3.x | Active | | | Various OEM Platforms |
| SmartFilter IFP SDK 2.0.x | Active | | | Various OEM Platforms |
| SmartFilter IFP SDK 3.0.x | Active | | | Various OEM Platforms |
| SmartFilter CSP SDK 4.0.x | Active | | | Various OEM Platforms |

## Internet Database of Categorized Content

| Software/version | Status | LOD date | EOL date | Supported OS |
|---|---|---|---|---|
| **SmartFilter database** | | | | |
| **SmartFilter 4.x XL** | Active | | | |
| **SmartFilter 4.x SL** | Active | | | |
| **SmartFilter 4.x NS** | Active | | | |

| | | | | |
|---|---|---|---|---|
| SmartFilter 3.x 3P | LOD | 07/2004 | 12/2008 | |
| SmartFilter 3.x 3S | LOD | 07/2004 | 12/2008 | |
| SmartFilter 3.x 3W | EOL | 07/2004 | 09/2006 | |
| SmartFilter 3.x 3M | EOL | 07/2004 | 09/2006 | |
| **Webwasher 6.x XL** | Active | | | |
| **Webwasher 5.x WL** | LOD | 12/2006 | 12/2009 | |
| **Webwasher 5.x WS** | Active | 12/2006 | 12/2009 | |
| **Webwasher 5.x WD** | Active | 12/2006 | 12/2009 | |
| **N2H2 database** | | | | |
| N2 2 Digest | EOL | 09/2005 | 09/2007 | |
| N2 Novell ICS | EOL | 09/2005 | 09/2006 | |
| N2 i2100 3 & 4 | EOL | 09/2005 | 09/2006 | |
| N2 i2100 catserver | EOL | 09/2005 | 09/2006 | |
| N2 1 digest | EOL | 09/2005 | 09/2006 | |

## N2H2 Bess and Sentian Product List

| Software/version | Status | LOD date | EOL date | Supported OS or application platforms |
|---|---|---|---|---|
| Bess i2100 Managed Service 4.0 | EOL | 10/2002 | 09/2006 | Proprietary |
| Bess®/Sentian™ 3.5 | EOL | 09/2005 | 09/2006 | WIN 2003, WIN 2000 |
| Bess/Sentian 2.5 | EOL | 09/2005 | 09/2006 | RHL 7.2 or 7.3, RHEL 2.1 |

## ZIX Product List

*See Webwasher Web Inspector above*

| Software/version | Status | LOD date | EOL date | Supported OS |
|---|---|---|---|---|
| ZIX Message Inspector | EOL | 3/2005 | 12/2006 | Windows |
| ZIX Web Inspector | EOL | 3/2005 | 12/2006 | Windows |

## Messaging Products

## Hardware and Software Lifecycles

| Status | HW Models | LOD date | EOL date |
|---|---|---|---|
| Active | **Generation 4** S10D, S120, E2200, E5200 | | |
| Active | **Generation 3** S10B, S25B, S50B, S100B, E2000A, E2000B, E2000C, E3000A, E3000B*, E5000A, E5000B, C10000A, C10000B | 3/31/2008** | 6/30/2011 |
| Discontinued | **Generation 2** S10A, S25A, S50A, S100A(112) | 6/30/2006 | 1/1/2009 |
| Discontinued | **Generation 2** 305, 345, 345A, 345B, | 1/1/2005 | 1/1/2009 |

| | 345X | | |
|---|---|---|---|
| Discontinued | **Generation 1** 110,210 | 1/1/2004 | 2/19/2007 |

* The E3000 appliance will remain "Active" past the LOD and EOL date and will be subject to different discontinue dates.
** While supplies last.

| Status | SW Version | LOD date | EOL date |
|---|---|---|---|
| Active | IronMail 6.7.x, CMC 2.7.x, Edge 2.7.x*, Encryption 6.7.x* | | |
| Active | IronMail 6.5.x, CMC 2.5.x, Edge 2.1.x, Encryption Push/Pull | 06/2008 | |
| Maintenance | IronMail 6.1.x & 5.x, CMC 2.1.x | 09/2006 | 07/2008 |
| EOL | IronMail 4.1.x, CMC 1.5.x | 01/2006 | 05/2006 |

* Edge 2.7.x and Encryption 6.7.x are future releases.

**S10B Server Last Order Date Announcement**

**110/210 Server End of Life Announcement**

**Patches and upgrades >>**

---

This page was printed from the **Secure Computing Corporation** web site, located at **http://www.securecomputing.com/index.cfm?skey=1312**

---

# EXHIBIT 18
# REDACTED IN ITS ENTIRETY