## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

FINJAN SOFTWARE, LTD., an Israel )
corporation, )
                            )
      Plaintiff-counterdefendants, )      C. A. No. 06-00369-GMS
                            )
             v. )
                            )
SECURE COMPUTING CORPORATION, a )     **REDACTED**
Delaware corporation; CYBERGUARD )     **PUBLIC VERSION**
CORPORATION, a Delaware corporation, )
WEBWASHER AG, a German corporation and )
DOES 1 THROUGH 100, )
                            )
      Defendants-counterclaimants. )

## DEFENDANTS-COUNTERCLAIMANTS' ANSWERING BRIEF TO FINJAN'S POST-TRIAL MOTION FOR ENTRY OF PERMANENT INJUNCTION PURSUANT TO 35 U.S.C. SECTION 283

OF COUNSEL:

Ronald J. Schutz
Jake M. Holdreith
Christopher A. Seidl
Trevor J. Foster
ROBINS, KAPLAN, MILLER & CIRESI
L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500

Dated: May 9, 2008

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Kelly E. Farnan (#4395)
farnan@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

*ATTORNEYS FOR SECURE COMPUTING*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS .................................................................................. 1

I.    ARGUMENT .............................................................................................. 2

    A.   A Permanent Injunction Against Secure Computing, CyberGuard, and
        Webwasher AG is Not Appropriate In This Case ........................................ 2

        1   Finjan Cannot Show Irreparable Harm ................................................ 2

               a.   Because Finjan asked for a royalty rate based upon
                   Secure's expectation of future sales, it cannot claim it will
                   be irreparably harmed by future sales ....................................... 2

               b.   Finjan has chosen monetary remedies over exclusivity in
                   the marketplace, as evinced by its decision to willingly
                   license its patents to its direct competitors ................................ 4

REDACTED

               iii   Finjan offered to license its patent portfolio to
                   Webroot, a direct competitor ..................................................... 7

             c   Competition with Secure Is Not Reducing Finjan's Market
             Share ..................................................................................................... 7

               i.    While pre-acquisition Webwasher may have
                   competed with Finjan regularly prior to 2006,
                   Secure rarely competes with Finjan currently ............................ 8

               ii.   The relevant marketplace, as defined by Finjan,
                   includes many other competitors that affect Finjan's
                   market share ................................................................................ 8

        iii.    Finjan's market share conclusions are based on incorrect revenue figures and misleading calculations .......................................................................... 8

        d.    A potential loss in convoyed sales does not support a claim of irreparable harm ........................................................................ 10

        e.    The cases upon which Finjan relies to show irreparable harm are different from the instant case ........................................ 11

        f    Secure is working towards implementing a reconfigured product that does not utilize the particular features that Finjan has accused infringement ............................................... 12

    2.    Finjan's Actions Show that Monetary Damages Are Adequate .............. 12

    3.    The Balance of the Hardships In This Case Favors Denial of an Injunction ................................................................................................ 13

    4.    The Public Interest in Protecting Sensitive Information Favors Denying An Injunction ........................................................................... 13

B.    If this Court Decides to Issue a Permanent Injunction it Should Be Stayed Pending Post-Trial Motions ................................................................................. 14

C.    In lieu of an injunction, this Court should order an ongoing royalty ...................... 15

D.    Given Finjan's financial record, this Court should either order Secure to place any ordered ongoing royalties in escrow, or, if an injunction is issued, Finjan should be required to post a bond ...................................................... 16

CONCLUSION ................................................................................................................................ 17

## TABLE OF AUTHORITIES

Page

**Cases**

*Amado v. Microsoft Corp.,*
    517 F.3d 1353 (Fed. Cir. 2008) ................................................................................. 16

*eBay, Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) ............................................................................................ *passim*

*Hilton v. Braunskill,*
    481 U.S. 770 (1987) ..................................................................................................... 14

*In re Seagate Tech., L.L.C.,*
    497 F.3d 1360 (Fed. Cir. 2007) .................................................................................. 15

*Innogenetics, N.V. v. Abbott Labs.,*
    512 F.3d 1363 (Fed. Cir. 2008) .......................................................................... 3, 4, 15

*KSR Int'l Co. v. Teleflex Inc.,*
    127 S. Ct. 1727 (2007) ............................................................................................... 14

*Martek Biosciences Corp. v. Nutrinova, Inc.,*
    520 F. Supp. 2d 537 (D. Del. 2007) ........................................................................... 11

*Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.,*
    357 F.3d 1319 (Fed. Cir. 2004) .................................................................................... 2

*Nichols Inst. Diagnostics, Inc. v. Scantibodies Clinical Lab, Inc.,*
    166 Fed. Appx. 487 (Fed. Cir. 2006) ........................................................................ 14

*Novozymes A/S v. Genencor Int'l, Inc.,*
    474 F. Supp. 2d 592 (D. Del. 2007) ........................................................................... 11

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
    2008 U.S. App. LEXIS 7053 (Fed. Cir. Apr. 3, 2008) .............................................. 14

*Paice LLC v. Toyota Motor Corp.,*
    504 F.3d 1293 (Fed. Cir. 2007) .................................................................................. 15

*T.J. Smith & Nephew Ltd. v. Consolidated Medical Equip., Inc.,*
    821 F.2d 646 (Fed. Cir. 1987) ...................................................................................... 4

*TiVo Inc. v. EchoStar Communs. Corp.,*
    446 F. Supp. 2d 664 (E.D. Tex. 2006) ....................................................................... 11

## INTRODUCTION

The decision of whether or not to grant a permanent injunction is based on the Court's determination of the equitable interests of the parties and whether or not monetary damages can reasonably compensate the patentee. Finjan has demonstrated that monetary damages are sufficient based on its willingness to license several of its largest competitors to sell competing products that practice the alleged invention. Finjan further confirmed that a value can be placed on future sales by attempting to include Secure's future sales in the calculation of its royalty rate. In a case like this, with substantial legal questions on appeal, it would be inequitable for the Court to enjoin Secure. Rather, it would be most equitable for the Court to order that Secure pay an ongoing royalty rate to Finjan. Until appeal is finalized, Secure's payments under the ongoing royalty rate order should be placed in escrow.

## STATEMENT OF FACTS

Finjan's "statement of facts" is replete with self-serving arguments that are irrelevant to the instant motion. Secure disputes that Finjan's technology was in any way "pioneering" or "revolutionary." Likewise, Secure disputes that it "stole" Finjan's technology. These are arguments—not facts.

While Secure will not specifically refute each of these allegations here, it is worth identifying one important mischaracterization of the record. Finjan, presumably in an effort to argue willful infringement, states that Martin Stecher "carefully examin[ed] Finjan's patents." Finjan Br. at 4 (D.I. 267.) This statement is unfounded. Mr. Stecher never even saw, much less "carefully examined" any of Finjan's patents, and the record does not indicate that he did. Finjan does not cite any of Mr. Stecher's testimony to support such a bold statement. As Secure has previously pointed out, only one Webwasher document references any of the asserted Finjan

1

patents. (D. I. 265 at Ex. 8). The document only references the '194 patent, not the '780 and '822 patents. *Id.* That same document contains descriptions of two of the prior art patents that Secure rigorously maintains invalidate Finjan's patents. *Id.* at SC155174, SC155176 (describing the Ji 1997, i.e. '348 patent, and Ji 1995, i.e. '600 patent, references). There is no evidence that Mr. Stecher saw this document before Webwasher 5.1 was sold, much less that he "carefully examined" Finjan's patents.

## I.    ARGUMENT

### A.    A Permanent Injunction Against Secure Computing, CyberGuard, and Webwasher AG is Not Appropriate In This Case

Finjan is asking this Court for the "drastic and extraordinary" remedy of an injunction. *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004). Recently, the Supreme Court, in *eBay, Inc. v. MercExchange, L.L.C.*, rejected the notion that in patent infringement cases the "statutory right to exclude alone justifies [a] general rule in favor of permanent injunctive relief." 547 U.S. 388, 392 (2006). The Supreme Court thus confirmed that, in order to receive an injunction, the patentee bears the burden of demonstrating: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 391.

#### 1.    Finjan Cannot Show Irreparable Harm

##### a.    Because Finjan asked for a royalty rate based upon Secure's expectation of future sales, it cannot claim it will be irreparably harmed by future sales.

The Federal Circuit recently made clear that there should be no injunction when a patentee relies on projections of future sales before the jury, because it is contradictory for a

patentee to request a monetary remedy for future sales while, at the same time, arguing that a monetary remedy is inadequate. *Innogenetics, N.V v Abbott Labs.*, 512 F.3d 1363, 1380 (Fed. Cir. 2008). In *Innogenetics*, the Federal Circuit reversed a district court's decision to enjoin an alleged infringer as an abuse of discretion, because the "reasonable royalties awarded . . . include an upfront entry fee that contemplates or is based upon future sales " *Id* at 1380 In particular, the patentee's expert based part of his damages calculation on "projected sales until 2019." *Id*. The court reversed the permanent injunction order because "[w]hen a patentee requests and receives such compensation, it cannot be heard to complain that it will be irreparably harmed by future sales." *Id* The issue was dispositive because, as the court noted, "this factor greatly outweighs the other *eBay* factors." *Id*

Here, Finjan relied on evidence of expectations of future sales in its damages case before the jury In particular, Finjan's damages expert, Mr Parr, used a CyberGuard document projecting sales of Webwasher into 2010 in offering his opinion on the royalty rate under the *Georgia-Pacific* factors Tr. at 631:20-633:18 (D.I. 229.) Mr. Parr identified that CyberGuard's "sales forecast" for Webwasher and CyberGuard TSP shows "at least out to 2010 . . . an average annual compound growth rate of 14 percent, which is pretty healthy." *Id.* at 632:6-8. Further, Mr. Parr stressed that the projected future annual sales of Webwasher in 2010 was $35 million. *Id.* at 632:11-15 So, Mr. Parr summarized that he relied on actual Webwasher sales, but also the fact that Secure is "expecting and showing and anticipating to sell many more tens of millions." *Id* at 632:19-21.[1]

Finjan's counsel relied on a similar argument in his cross-examination of Secure's damages expert. Finjan's counsel, using the exact same 2010 "sales forecast," stated:

---

[1] Secure Computing has challenged the damages award in a separate motion, and maintains that the royalty rate and sales base were excessive.

3

> Isn't it true that you can also consider not only profitability but trends, whether someone predicted that maybe they weren't making a lot of money on the day of the hypothetical negotiation, but they may have projected that they would make money. Correct? Is that something you would take into account?

Tr. at 1247:3-8 (D.I. 232.)

It is inconsistent for Finjan to rely on evidence of future, post-verdict sales in making its damages case, and then to turn around and ask for an injunction that would prevent those very sales. Just as in the *Innogenetics* case, the equities weigh against an injunction here.

Although it is unnecessary to continue weighing the *eBay* factors once the Court determines that Finjan's damages model was based, in part, on future sales, an analysis of the remaining factors still weighs against enjoining Secure.

> ### b. Finjan has chosen monetary remedies over exclusivity in the marketplace, as evinced by its decision to willingly license its patents to its direct competitors.

One of the factors to be weighed by the Court is a patentee's willingness to license. As the Federal Circuit has indicated, licensing is generally "incompatible with the emphasis on the right to exclude." *T.J. Smith & Nephew Ltd. v. Consolidated Medical Equip., Inc.*, 821 F.2d 646 (Fed. Cir. 1987). While the Supreme Court in *eBay* denied a *per se* rule that licensing must negate irreparable harm, the importance of this factor must be analyzed based on the specific case. 547 U.S. at 392. In this case, Finjan has shown a willingness to license large, direct competitors in its field, not just small organizations outside of Finjan's market. This willingness to license competitors directly contradicts Finjan's assertion that it is attempting to exclude its competition from selling the alleged invention.

4

REDACTED

REDACTED

REDACTED

### iii. Finjan offered to license its patent portfolio to Webroot, a direct competitor

On March 7, 2007, during the pendency of the instant litigation, Finjan also offered Webroot Software, Inc. an opportunity to license Finjan's patent portfolio. As the letter states, "Finjan would welcome an opportunity to discuss Webroot's interest in obtaining a license to Finjan's patent portfolio." (D.I. 266 at Ex. 17) (PTX-1305.) Webroot is listed on the IDC reports upon which Finjan relies as controlling a market share that is 6 times the size of Finjan's market share. Kobialka Decl., Ex. 27, at 6-7 (D.I. 269.) Again, Finjan has shown that it is not attempting to use its patents to exclude competitors, rather it has made a decision to license competitors and reap a monetary reward.

### c. Competition with Secure Is Not Reducing Finjan's Market Share

Finjan makes unsupportable leaps in logic to arrive at the incorrect conclusion that Secure is reducing Finjan's market share.

RLF1-3282141-1

i.    **While pre-acquisition Webwasher may have competed with Finjan regularly prior to 2006, Secure rarely competes with Finjan currently.**

Finjan and Secure Computing rarely, if ever, meet in head-to-head competition. Tr. at 716:7-10 (D.I. 230.) While it is undoubtedly true that prior to Secure's acquisition of CyberGuard and Webwasher on January 11, 2006, Webwasher and Finjan were regular and intense competitors, the same cannot be said about Secure and Finjan. Tr. at 1149:11-20 (D.I. 231) (noting that there is not much head-to-head competition).

ii.    **The relevant marketplace, as defined by Finjan, includes many other competitors that affect Finjan's market share.**

The relevant marketplace does not include a small number of players. In fact, according to the IDC report upon which Finjan relies, the market included 77 competitors in 2006 Kobialka Decl. Ex. 27 at 5-9 (D.I. 269.)



iii.    **Finjan's market share conclusions are based on incorrect revenue figures and misleading calculations.**

Finjan's market share analysis is deeply flawed. As discussed below, Finjan's analysis (1) uses revenue numbers Finjan knows to be false; (2) uses these improper numbers to exaggerate a purported decrease in Finjan's market share; and (3) improperly compares *Webwasher's* 2004

market share with *Secure Computing's* 2006 market share. When these corrections to Finjan's calculations are made, it shows that Finjan's market share between 2004 and 2006 decreased by 0.007% while the combined market share of Secure and its acquired competitors decreased by 0.006% over the same period—a nearly identical decrease.

First, Finjan used fictional revenues to calculate its market share. Finjan relied on a third-party, IDC, to report its revenue for 2003, 2004, and 2006. The IDC estimates of Finjan's revenue were completely incorrect. IDC reported Finjan received the following revenues: $9.3 million in 2003, when Finjan actually received only $5.8 million; $12.9 million in 2004, when Finjan actually received only $7.1 million; and $19.7 million in 2006, when Finjan actually received only $8.4 million. *See* Kobialka, Decl. Exs. 6, 24 at SC0076373, Ex. 27, at 7 (D.I. 268, 269); Ex. 7 (JTX-29) at FIN009722; Ex. 8 (JTX-28) at 4.

Second, assuming the IDC reports' other numbers are correct, using the fictional IDC revenue numbers that Finjan knows to be inaccurate exaggerates Finjan's purported loss in market share. As can be seen in the attached exhibit, when Finjan's revenues are corrected and used in the IDC report, Finjan's market share decreased from 2004 to 2006 by 0.7% as opposed to Finjan's calculated drop of 2%. Ex. 9.

Third, Finjan's calculation of Secure's market share growth is misleading. Finjan states that Secure Computing's market share between 2004 and 2006 skyrocketed due to the addition of the particular accused feature in Webwasher. As proof, Finjan compared *Webwasher's* market share as reported by the IDC in 2004 (0.3%) to *Secure Computing's* market share in 2006 (1.5%). What Finjan neglected to tell the Court is that Secure Computing purchased four companies in 2006 and consolidated the market share of those companies: Webwasher, SnapGear, CyberGuard, and CipherTrust. Ex. 10 Gallagher Decl. Para. 5. So, when Finjan looks

at the market share of Webwasher AG in 2004, it is excluding all of the market share that Secure Computing and its acquired companies controlled during that period. If you look at the 2004 IDC report, while Webwasher controlled 0.3% of the market, Secure Computing and CipherTrust controlled a combined 1.8% of the market share. So, if Finjan had appropriately compared the combined market share of Webwasher, Secure Computing, and CipherTrust in 2004 with the now consolidated shares of those companies in 2006, it would show that the total pre-merger market share for the Secure companies actually dropped by .006%. Nearly an identical drop in relative market share when compared to Finjan.

Thus, a loss of market share, if any, cannot be attributable to Secure. The rise from Webwasher's 0.3% market share in 2004 to Secure's 1.5% market share in 2006 is explained by the consolidation of market share following Secure's acquisition of several large competitors. And Finjan's conclusion that "[c]learly, Defendants' sale of infringing Webwasher products between 2004 and 2006 contributed to both the decline in Finjan market share and the increase in Defendants' market share" is incorrect for at least the reasons described above. Consequently, Finjan's purported loss of customers and market share arguments do not weigh in favor of an injunction.

### d.    A potential loss in convoyed sales does not support a claim of irreparable harm.

Finjan's argument that an injunction must be put in place because monetary remedies cannot compensate Finjan's lost "sales of other Finjan products" fails for two reasons. First, convoyed sales are a loss compensable by monetary damages. Finjan admits this when it included in its damage calculation an increase in the royalty rate based on Secure's potential to sell ancillary and convoyed sales to new customers. Tr. at 606:19-608:1 (D.I. 229.) Thus, Finjan monetized the value of those sales. Second, Finjan does not sell any other products other than the

Vital Security line of products. Consequently, an injunction would not even result in greater ancillary sales to Finjan.

**e.     The cases upon which Finjan relies to show irreparable harm are different from the instant case.**

Finjan relies on a few primary cases to support its claim of irreparable harm that are not applicable to the facts of this case. Finjan first relies on the *Novozymes* case. *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592 (D. Del. 2007). In *Novozymes*, a parent corporation licensed its subsidiary and nobody else so that the subsidiary could "expect[] its patents to exclude competitors from marketing" any of its patented products. *Id.* at 612. This is not a case where the patentee actually licensed its direct competitor and offered to license other major competitors, as Finjan has. Instead Novozymes' actions were consistent with exercising its right to exclude the competition as opposed to receive a monetary benefit from licensing.

Likewise, Finjan incorrectly relies on this Court's decision in *Martek* to support its decision. *Martek Biosciences Corp. v. Nutrinova, Inc.*, 520 F. Supp. 2d 537 (D. Del. 2007). In *Martek*, the alleged infringer was the "only competitor" in the market. *Id.* at 558. Further, that industry uniquely relied on long-term license and supply agreements. *Id.* Finjan, on the other hand, is not trying to exclude its "only competitor." On the contrary, it has at least 76 competitors in this field based on the IDC report upon which Finjan relies. And again, Finjan voluntarily licensed Microsoft, which is a bigger competitor to Finjan than Secure Computing is according to the IDC reports that Finjan adopts.

Finjan also relies on *TiVo Inc. v. EchoStar Communs. Corp.*, 446 F. Supp. 2d 664, 670 (E.D. Tex. 2006). First, the Federal Circuit issued a stay of the permanent injunction in this case pending appeal, thus reversing the district court's denial of the stay. Second, this case also

involves a situation where Tivo was unwilling to license its competitors. Finjan did not attempt
to protect its market share similar to Tivo.

> f.    **Secure is working towards implementing a reconfigured
> product that does not utilize the particular features that Finjan
> has accused infringement.**

With respect to the '822 patent, Secure already removed the "script code mitigation"
feature accused of infringing the '822 patent from its current version of Webwasher. Ex. 10
Gallagher Decl. at para. 2. Secure is not currently selling any software or appliance that includes
the script code mitigation feature.

REDACTED

While Finjan would like the Court to believe that Secure's decision to change the
Webwasher's product name to Secure Web was some nefarious trick to avoid an injunction, the
truth is that Secure had already decided to rebrand its company. *Id.* at para. 6. As this Court
knows, Secure made several major acquisitions in 2006. In order to consolidate its image and
brand, Secure decided to rename *all* of its products. *Id*

> 2.    **Finjan's Actions Show that Monetary Damages Are Adequate.**

As Finjan indicated, the arguments related to irreparable harm are based on whether
monetary damages are adequate. Finjan Br. at 16 (D.I. 267.) Consequently, the evidence proving
that Finjan cannot now claim irreparable harm applies equally to this factor. Without rehashing
the arguments, Secure has demonstrated that Finjan's inclusion of future sales into its damage

12

calculation and its willingness to license to its largest competitors prove that monetary damages are adequate to Finjan.

### 3. The Balance of the Hardships In This Case Favors Denial of an Injunction

REDACTED

### 4. The Public Interest in Protecting Sensitive Information Favors Denying An Injunction.

The area of computer security revolves around protecting highly sensitive information. Secure sells its products to, for example, financial institutions, banks, credit card companies, insurance agencies, medical companies, and military agencies. Tr. at 714:7-24 (D.I. 230.) A potential disruption in service to those institutions would be an incredible disservice to the public. While Finjan states that it sells a substitute product, it has already admitted that it does not have the resources to compete for Secure's customers. Finjan also made no showing that it

RLF1-3282141-1

could capture any market share based on an injunction, nor why the potential customers would not simply give their business to one of the other 75 companies competing in this market. And even if Finjan could effectively substitute, the process of substituting would cause a disruption to those businesses and thus disserve the public.

**B.      If this Court Decides to Issue a Permanent Injunction it Should Be Stayed Pending Post-Trial Motions.**

Rule 62(b) provides for a stay of an injunction pending post-trial motions. The Supreme Court has outlined the four-factor test that should be applied when considering a stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The Federal Circuit uses a sliding scale to balance these factors, so a stronger showing of likelihood of success on the merits means that a lesser showing of the other factors may be sufficient. *See, e.g., Nichols Inst Diagnostics, Inc. v. Scantibodies Clinical Lab, Inc.*, 166 Fed. Appx. 487, 489 (Fed. Cir. 2006) (unpublished) (granting a stay of a permanent injunction pending appeal based on a strong showing of an error in claim construction).

In this case, the only factor that has not been addressed yet is whether Secure has made a strong likelihood of success on the merits. Secure's Renewed Rule 50 and 59 motion details several errors of law upon which this Court should reverse the jury's finding of infringement and invalidity. Many of the questions also involve the application of new and evolving areas of law, such as the Supreme Court's decision in *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727 (2007), as well as several Federal Circuit cases, including, for example, the recent *O2 Micro* case, *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 2008 U.S. App. LEXIS 7053 (Fed. Cir. Apr. 3,

14

2008) and *In re Seagate Tech., L.L.C.*, 497 F.3d 1360 (Fed. Cir. 2007). Because a stay pending post-trial motions would only require a minimal delay it is most equitable for the Court to stay an injunction if it decides that Finjan proved the need for an injunction. If the Court decides not to stay the injunction, and ultimately Secure succeeds on some or all of its post-trial motions, the Court will have needlessly dealt a significant blow to Secure's reputation and goodwill.

      **C.    In lieu of an injunction, this Court should order an ongoing royalty.**

      The Federal Circuit has recently taken a renewed interest in ordering ongoing royalties instead of permanent injunctions as a way to balance the hardships between the parties. In *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1303 (Fed. Cir. 2007), the Federal Circuit affirmed the use of an ongoing royalty post-*eBay*. The decision of whether to use an ongoing royalty rate is based on the same equitable interests identified in the four *eBay* factors. *Id.*

      An ongoing royalty should be granted in this case, based on all of the factors discussed above. In particular, Finjan already incorporated future sales into its damages model regarding the appropriate royalty rate. Likewise, Finjan has indicated a willingness to accept monetary payments from its competitors in exchange for a license. In a situation like this, the Federal Circuit has approved a compulsory licensing or ongoing royalty scheme. *See Innogenetics*, 512 F.3d at 1380 (approving the use of a compulsory license).

      The Court should stay its determination of the rate of an ongoing royalty until it resolves the post-trial motions, because Secure has raised several substantial legal questions regarding the appropriate rate of damages. Secure still disputes the legal basis for the rates returned by the jury verdict. So, the appropriate rate may be lower than that reached by the jury. If the Court is unwilling to stay a decision of the rate pending appeal, then this Court should use, in its order for

ongoing royalties, the 8% and 16% rates returned by the jury as suggested by Finjan in its treatment of post-verdict accounting. *See* Finjan Acct. Br. at 6 (D.I. 262.)

**D.    Given Finjan's financial record, this Court should either order Secure to place any ordered ongoing royalties in escrow, or, if an injunction is issued, Finjan should be required to post a bond.**

If the Court orders an ongoing royalty, Secure's payments should be made in escrow pending appeal at the Federal Circuit. *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1356 (Fed. Cir. 2008) (approving the use of escrow payments pending appeal). It is reasonable for Secure to place funds in escrow pending appeal given that Finjan has had a very poor financial history. Finjan has lost money every year it has operated. Tr. at 163:18-23 (D.I. 227); Exs. 7, 8, 11-16.

REDACTED

Consequently, Secure has substantial reason to believe that any money it gives to Finjan will be spent by the time an appeal is finalized.

For the same reasons, if the Court decides to issue an injunction, Secure intends to recover any damages caused by Finjan if Secure prevails on appeal. Although it is not possible to accurately quantify all of the damages that Secure will suffer based on an improper injunction, the Court can use the jury's verdict of $9.18 million to set the value of the bond. Recognizing that much of the potential harm to Secure resulting from an injunction is not compensable through monetary damages, if Secure is enjoined, it reserves any and all of its rights.

16

## CONCLUSION

Because of the drastic nature of an injunction and the strong evidence that Finjan's damages can be remedied monetarily, this Court should deny Finjan's motion for a permanent injunction and order Secure Computing to pay an ongoing royalty in escrow pending appeal.

OF COUNSEL:

Ronald J. Schutz
Jake M. Holdreith
Christopher A. Seidl
Trevor J. Foster
ROBINS, KAPLAN, MILLER & CIRESI
L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500

Dated: May 9, 2008

*Kelly E. Farnan*

Frederick W. Cottrell, III (#2555)
cottrell@rlf.com
Kelly E. Farnan (#4395)
farnan@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

***ATTORNEYS FOR SECURE COMPUTING***

17

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 9, 2008, I electronically filed the foregoing with the

Clerk of Court using CM/ECF and caused the same to be served on the plaintiff at the addresses

and in the manner indicated below:

### HAND DELIVERY & E-MAIL

Philip A. Rovner
Potter Anderson & Corroon LLP
1313 N. Market Street,
Hercules Plaza, 6th Floor
Wilmington, DE  19899-0951

I further certify that on May 9, 2008, the foregoing document was sent to the following

non-registered participants in the manner indicated:

### E-MAIL

Paul J. Andre
Lisa Kobialka
King & Spalding, LLP
1000 Bridge Parkway, Suite 100
Redwood Shores, CA   94065

*Kelly E. Farnan*
Kelly E. Farnan (#4395)

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 16, 2008, I electronically filed the foregoing with the

Clerk of Court using CM/ECF and caused the same to be served on the plaintiff at the addresses

and in the manner indicated below:

### HAND DELIVERY

Philip A. Rovner
Potter Anderson & Corroon LLP
1313 N. Market Street,
Hercules Plaza, 6th Floor
Wilmington, DE 19899-0951

I further certify that on May 16, 2008, the foregoing document was sent to the following

non-registered participants in the manner indicated:

### FEDERAL EXPRESS

Paul J. Andre
Lisa Kobialka
King & Spalding, LLP
1000 Bridge Parkway, Suite 100
Redwood Shores, CA 94065

*Kelly E. Farnan*

Kelly E. Farnan (#4395)

# EXHIBIT 1
# REDACTED
# IN ITS ENTIRETY

# EXHIBIT 2



**Analyze the Future**

## MARKET ANALYSIS

# Worldwide Secure Content Management 2004–2008 Forecast Update and 2003 Vendor Shares: A Holistic View of Antivirus, Web Filtering, and Messaging Security

Brian E. Burke

## IDC OPINION

Secure content management (SCM) vendors enjoyed another strong year of growth in 2003. Major virus and worm outbreaks, explosive growth in spam, and corporate deadlines for compliance with government regulations fueled the need for Web and messaging security solutions. In light of these industry trends and the recovering economy, IDC has updated the forecast for the SCM software market for 2004–2008. IDC now expects the worldwide revenue for SCM software to reach $4.2 billion in 2004. The market is now forecast to increase to $7.5 billion in 2008 for a 16.9% compound annual growth rate (CAGR) for the period from 2003 through 2008. Important trends in the SCM market include the following:

- ☒ Spyware is moving up the priority list of corporate security concerns. Spyware has the ability to monitor keystrokes, scan files on the hard drive, monitor other applications, install other spyware programs, read cookies, and change the default home page on the Web browser.

- ☒ The recent incidents of "phishing attacks" on banks and their online customers have opened both consumer and corporate eyes to the increasing dangers of corporate identity theft.

- ☒ Spam has become a major driver for messaging security implementation. All of the major vendors in the SCM market have developed, partnered with, or acquired an antispam technology.

- ☒ Government and industry regulations such as HIPAA, Sarbanes-Oxley, Gramm-Leach-Bliley, and various SEC regulations have caused unprecedented pressure on corporations to secure the use of their electronic communications.

- ☒ Corporate concerns with employee productivity, legal liability, and network resources continue to fuel the growth of the Web filtering market. IDC believes 30–40% of Internet use in the workplace is not related to business.

Global Headquarters: 5 Speen Street  Framingham, MA 01701 USA   P.508.872.8200   F.508.935.4015   www.idc.com

Plaintiff's Trial Exhibit

**PTX-24**

Case No. 06-369 GMS

EXHIBIT
24
GERMANY

Filing Information: July 2004, IDC #31598, Volume: 1, Tab: Markets
Security Products: Market Analysis

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC023181



# TABLE OF CONTENTS

P

## IN THIS STUDY

Methodology............................................................................................................. 1
Executive Summary................................................................................................... 1
Secure Content Management Market Definition ....................................................... 2

## SITUATION OVERVIEW

Emerging Threats in the Secure Content Management Market.................................. 2
The Secure Content Management Market in 2003 ................................................... 4
Performance by Market Segment ............................................................................. 8
Secure Content Management Appliance Market ..................................................... 12

## FUTURE OUTLOOK

Forecast and Assumptions...................................................................................... 14
Vendor Profiles....................................................................................................... 24

## ESSENTIAL GUIDANCE

Related Research..................................................................................................... 49
Appendix: Methodology........................................................................................ 49

©2004 IDC

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC023182

## LIST OF TABLES

|   |   | p |
|---|---|---|
| 1 | Worldwide Secure Content Management Software Revenue by Vendor, 2002 and 2003 | 5 |
| 2 | Worldwide Antivirus Software Revenue by Vendor, 2002 and 2003 | 9 |
| 3 | Worldwide Messaging Security Software Revenue by Vendor, 2002 and 2003 | 10 |
| 4 | Worldwide Web Filtering Software Revenue by Vendor, 2002 and 2003 | 12 |
| 5 | Worldwide Secure Content Management Appliance Revenue by Vendor, 2002 and 2003 | 13 |
| 6 | Worldwide Secure Content Management Software Revenue by Segment, 2003–2008 | 14 |
| 7 | Worldwide Secure Content Management Software Revenue by Region and Operating Environment, 2003–2008 | 16 |
| 8 | Key Forecast Assumptions for the Worldwide Secure Content Management Market, 2004–2008 | 18 |

©2004 IDC

#31598

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC023183

## LIST OF FIGURES

P

1  Worldwide Secure Content Management Software Revenue Share by Region, 2003................7

2  Worldwide Secure Content Management Software Revenue Share by Operating
Environment, 2003................8

3  Worldwide Secure Content Management Software Revenue by Region, 2003 and 2008...........15

4  Worldwide Secure Content Management Software Revenue by Operating Environment,
2003 and 2008................17

#31598

@2004 IDC

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC023184

## IN THIS STUDY

This study examines the secure content management (SCM) market for the period from 2002 to 2008, with vendor revenue trends and market growth forecasts. Worldwide market sizing is provided for 2003, with trends from 2002. A five-year growth forecast for this market is shown for 2004–2008. A vendor competitive analysis, with vendor revenue and market shares of the leading vendors, is provided for 2003. This study also includes profiles of leading vendors and identifies the characteristics that vendors will need to be successful in the future. This document updates the forecast published in March 2004, *Worldwide Secure Content Management Software 2004–2008 Forecast: March 2004 Forecast* (IDC #30964, March 2004).

## Methodology

See the Appendix for a description of the data collection and analysis methodology employed in this study. In addition, please note the following:

☑ The information contained in this study was derived from the IDC Software Market Forecaster database as of July 6, 2004.

☑ Total software revenue is defined as license revenue plus subscription maintenance fees plus other software function–related services fees such as the implicit or stated value of software included in an application service provider's (ASP's) or other hosted software arrangement.

☑ IDC's revenue information for companies and software markets is based on recognized revenue as defined in U.S. practice rather than on bookings. IDC bases its reporting of, and forecasts for, the software market based on revenue as defined by GAAP.

☑ All numbers in this document may not be exact due to rounding.

☑ For more information on IDC's software definitions and methodology, see *IDC's Software Taxonomy, 2004* (IDC #30838, February 2004).

## Executive Summary

SCM vendors enjoyed another strong year of growth in 2003. Major virus and worm outbreaks, explosive growth in spam, and corporate deadlines for compliance with government regulations fueled the need for Web and messaging security solutions. Spyware is new on the scene and is quickly moving up the priority list of corporate security concerns. Spyware has the ability to monitor keystrokes, scan files on the hard drive, monitor other applications, install other spyware programs, read cookies, and change the default home page on the Web browser. What concerns corporate security departments the most is that spyware can also be used to monitor keystrokes, scan files, install additional spyware, reconfigure Web browsers, and snoop email and other applications. Some of the more sophisticated spyware can even capture screenshots or turn on Webcams. In addition to spyware, the recent

©2004 IDC                    #31598                    1

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                    SC023185

incidents of "phishing attacks" on banks and their online customers have opened both consumer and corporate eyes to the increasing dangers of corporate identity theft.

Spam continues to be a major driver for messaging security implementation. All of the major vendors in the SCM market have developed, partnered with, or acquired an antispam technology. Government and industry regulations such as HIPAA, Sarbanes-Oxley, Gramm-Leach-Bliley, and various SEC regulations continue to pressure corporations to secure the use of their electronic communications. Corporate concerns with employee productivity, legal liability, and network resources continue to fuel the growth of the Web filtering market. IDC believes 30–40% of Internet use in the workplace is not related to business.

## Secure Content Management Market Definition

SCM is a market that reflects corporate customers' need for policy-based Internet management tools that manage Web content, messaging security, virus protection, and malicious code. SCM is a superset of three specific product areas:

- ☒ **Antivirus** software identifies and/or eliminates harmful software and macros. Antivirus software scans hard drives, email attachments, floppy disks, Web pages, and other types of electronic traffic (e.g., instant messaging [IM] and short message service [SMS]) for any known or potential viruses, malicious code, trojans, or spyware.

- ☒ **Web filtering** software is used to screen and exclude from access or availability Web pages that are deemed objectionable or not business related. Web filtering is used by corporations to enforce corporate policy as well as by schools and universities and home computer owners (for parental controls).

- ☒ **Messaging security** software is used to monitor, filter, and/or block messages from different messaging applications (e.g., email, IM, SMS, and peer to peer) containing spam, company confidential information, and objectionable content. Messaging security is also used by certain industries to enforce compliance with privacy regulations (e.g., HIPAA, Gramm-Leach-Bliley, and SEC) by monitoring electronic messages for compliance violations. This market also includes secure [encrypted] email.

# SITUATION OVERVIEW

## Emerging Threats in the Secure Content Management Market

### *Spies Among Us*

Spyware is no longer just a consumer nuisance, it is quickly becoming a major concern in the corporate environment. The fact that spyware can gather information about an employee or organization without their knowledge is causing corporate security departments to take notice. Spyware is often installed without the user's

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                              SC023186

consent, as a drive-by download, or as the result of clicking some option in a deceptive pop-up window. What concerns corporate security departments is that spyware can also be used to monitor keystrokes, scan files, install additional spyware, reconfigure Web browsers, and snoop email and other applications. Some of the more sophisticated spyware can even capture screenshots or turn on Webcams.

A recent IDC survey of 600 North American organizations showed that spyware was indeed viewed as a serious threat to network security. Spyware was ranked as the fourth greatest threat to network security ahead of spam, hackers, and even cyberterrorism. The only areas organizations viewed as bigger threats than spyware were viruses, Internet worms, and employee errors.

### Gone Phishing

The recent incidents of phishing attacks on banks and their online customers have opened both consumer and corporate eyes to the increasing dangers of corporate identity theft. Phishing is clearly motivated by financial fraud and gain, and thus criminals are most often behind these attacks, rather than teenagers just trying to cause havoc. Phishing attacks use spoofed emails and fraudulent Web sites designed to fool recipients into divulging personal financial data such as credit card numbers, account usernames and passwords, and social security numbers.

IDC believes more sophisticated attackers, often from organized crime, will increasingly use phishing techniques to obtain credit card numbers, bank account information, and other personal information to perpetrate identity theft. We believe the sophistication and scale of online frauds and identity thefts will continue to increase at a rapid pace.

### Regulatory Compliance

The challenge of controlling electronic communications as they flow into and out of an organization is becoming increasingly more critical. Government and industry regulations such as HIPAA, Sarbanes-Oxley, Gramm-Leach-Bliley, and SEC have placed unprecedented pressure on corporations to secure the use of their electronic communications. In many cases in which the original intent was to address a regulatory issue, the security aspect represents part of the solution. Organizations are faced with the complex task of complying with various regulations and making sure that employees do not inadvertently, or deliberately, break the law. Each of these regulations can carry criminal penalties and/or civil penalties. Criminal means criminal prosecution of individuals as well as substantial fines. Successful criminal convictions generally lead to civil lawsuits. Civil lawsuits (especially in class action situations) can carry substantial financial penalties and damage a company's reputation with its customers. Although many regulations only fall into the civil area and would seem "toothless," the fact that they permit class action suits creates major opportunities for the legal community, especially in today's litigious society.

### Spam Not Slowing Down

IDC estimates the amount of spam being sent on an average day worldwide will jump from 4 billion in 2001 to 17 billion in 2004. Spam is quickly becoming both a potential

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                      SC023187

legal liability and a major productivity and resource drain for corporate IT departments and corporate users alike. Moreover, spam is viewed as a security threat, because it can carry viruses, malicious code, and fraudulent solicitations for privacy information. Nearly 70% of organizations surveyed have already deployed antispam solutions to address this growing threat. Organizations without such solutions are behind the times and putting themselves at unnecessary risk.

More than two-thirds of IT respondents feel the spam problem will get worse in the next two years. Moreover, IT executives feel strongly that government legislation will have little to no effect on it. Most email users surveyed (70%) without antispam solutions reported increases in the number of spam messages received in 2003 over the prior year. IDC estimates that the number of spam messages sent daily will continue to grow, reaching 23 billion worldwide in 2007. With the help of antispam solutions, spam is expected to become a problem that is more manageable, often as part of comprehensive messaging security solutions.

### The Convergence of Spam and Virus

In the past, spammers traditionally sent spam from their own ISP account. When corporate IT departments and antispam solutions first started to block messages from certain domains and ISP accounts, spammers turned to new methods to conceal their identity. We believe spammers are starting to resort to outright criminality in their efforts to conceal the sources of their spam messages, using Trojan horses to turn the computers of innocent consumers and corporate users into secret spam engines. The explosive growth of cable modems and broadband connections have left consumers and remote employees open to attack. In many cases, their computers are being used as a relay for sending spam to thousands of other people. There is also very little chance that the PC's owner will have any idea their system is being used by a third party. The SoBig virus is a good example of the convergence of spam and viruses.

## The Secure Content Management Market in 2003

Worldwide revenue for the SCM market reached $3.4 billion in 2003, representing a 24.9% growth over 2002. The market is now forecast to increase to $7.5 billion in 2008, a 16.9% compound annual growth rate (CAGR) for the period from 2003 through 2008.

### Performance of Leading Vendors in 2003

Table 1 displays 2002–2003 worldwide revenue and 2003 growth and market share for SCM vendors.

The top 5 vendors in 2003 include:

☒ **Symantec.** Symantec led the SCM software market in 2003 with $1.14 billion in revenue and a 33.2% share of the worldwide market. From 2002 to 2003, Symantec increased its revenue 36.5% in the SCM software market.

4                              #31598                              ©2004 IDC

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                              SC023188

☒ **McAfee Inc.** McAfee was the second-largest SCM software vendor in 2003 with a 16.7% market share and $572.6 million in revenue. From 2002 to 2003, McAfee's revenue decreased 7.1% in the SCM software market.

☒ **Trend Micro.** Trend Micro accounted for $402.6 million in revenue and an 11.7% share of the SCM software market in 2003. From 2002 to 2003, Trend Micro's revenue increased 22.4% in the SCM software market.

☒ **Computer Associates (CA).** CA accounted for a 3.6% share of the SCM software market in 2003 and $122 million in revenue. From 2002 to 2003, CA's revenue increased 21.7% in the SCM software market.

☒ **Sophos.** Sophos accounted for a 3.1% share of the SCM software market in 2003 and $105 million in revenue. From 2002 to 2003, Sophos' revenue increased 66.7%.

### *Performance by Geographic Region in 2003*

Figure 1 illustrates SCM software revenue share by region.

**FIGURE 1**

**Worldwide Secure Content Management Software Revenue Share by Region, 2003**



**Total = $3.43B**

Source: IDC, July 2004

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                    SC023189

*Performance by Operating Environment in 2003*

Figure 2 illustrates SCM software revenue share by operating system.



Worldwide Secure Content Management Software Revenue
Share by Operating Environment, 2003



Total = $3.43B

Source: IDC, July 2004

---

# Performance by Market Segment

### *Antivirus Software*

Antivirus software accounted for the largest segment of the SCM market in 2003, reaching $2.7 billion. From 2002 to 2003, the antivirus software market increased 21.3%.

Table 2 displays 2002–2003 worldwide revenue and 2003 growth and market share for antivirus software vendors.

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                        SC023190

### Messaging Security Software

Messaging security software accounted for the second-largest segment of the SCM market in 2003, reaching $397.5 million. From 2002 to 2003, the messaging security software market increased 56.5%.

Antispam is a subset of the messaging security market. A market sizing and forecast for the antispam market can be found in the forthcoming study *Worldwide Antispam 2004–2008 Forecast Update and 2003 Vendor Shares* (forthcoming).

Table 3 displays 2002–2003 worldwide revenue and 2003 growth and market share for messaging security software vendors.

### Web Filtering Software

Web filtering software accounted for the third-largest segment of the SCM market in 2003, reaching $337.8 million. From 2002 to 2003, the Web filtering software market increased 24.9%.

Table 4 displays 2002–2003 worldwide revenue and 2003 growth and market share for Web filtering software vendors.

## Secure Content Management Appliance Market

The SCM appliance market has exploded onto the security scene. The combination of appliances' growing in popularity across the security landscape with the strong demand for SCM solutions has made the SCM appliance market a very hot area. IDC defines an SCM appliance as a combination of hardware and software sold as an appliance with the primary function of performing Web filtering, messaging security, or virus protection.

The SCM appliance market reached $130.8 million in 2003, representing 89% growth over 2002 (see Table 5).

## Secure Content Management Services Market

Worldwide revenue for the SCM services market reached $142 million in 2003, representing a 56% growth over 2002, as shown in table 6. This market includes both

©2004 IDC                    #31598                    7

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                    SC023191

managed and hosted antivirus, web filtering, and messaging security services (i.e. antispam). The key benefits of an SCM service include ease of deployment, management, and updates of the software.

[Insert Table 6 here]

# FUTURE OUTLOOK

## Forecast and Assumptions

### Secure Content Management Forecast, 2004–2008

#### Worldwide

IDC's estimate of the growth of the SCM market through 2008 is presented in Table 7 and 8. .

8                                  #31598                              ©2004 IDC

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC023192

Worldwide revenue for the SCM software market will grow from $3.4 billion in 2003 to $7.5 billion in 2008, representing a 16.9% CAGR. It is broken out as follows:

☒ Antivirus software will grow from $2.7 billion in 2003 to $4.8 billion in 2008, representing a 12.6% CAGR.

☒ Messaging security software will grow from $397 million in 2003 to $1.7 billion in 2008, representing a 33.6% CAGR.

☒ Web filtering software will grow from $338 million in 2003 to $935 million in 2008, representing a 22.6% CAGR.

☒ Secure content management appliances will grow from $188 million in 2003 to $1.6 billion in 2008, representing a 54.4% CAGR.

**By Geographic Region**

IDC analysts around the globe supplied regional input and insight into the SCM market forecast. The worldwide forecast is the aggregation of this regional data as reported in Table 9. Revenue for 2003 and 2008 is shown graphically in Figure 3.



Worldwide Secure Content Management Software Revenue by Region, 2003 and 2008

Source: IDC, July 2004

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                    SC023193

**By Operating Environment**

This study represents IDC's operating environment forecast for the SCM market through 2008. The revenue forecast for the SCM market, segmented by operating environment, is also shown in Table 9; revenue for 2003 and 2008 is illustrated in Figure 4.



Worldwide Secure Content Management Software Revenue by Operating Environment, 2003 and 2008

Source: IDC, July 2004

#31598

©2004 IDC

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC023194

**Forecast Assumptions**

Table 10 shows the key assumptions underlying the forecast.

**TABLE 10**

Key Forecast Assumptions for the Worldwide Secure Content Management
Market, 2004–2008

| Market Force | IDC Assumption | Impact | Accelerator/ Inhibitor/ Neutral | Certainty of Assumption |
|---|---|---|---|---|
| Macroeconomics | | | | |
| Economy | Worldwide economic growth will continue to recover slowly from 2001 levels to traditional levels, which will be slightly below those in Consensus Economics' April 4 forecast. | Moderate. Economic growth will begin to have a positive impact on IT spending. | ↑ | ★★★★☆ |
| Policy | Alan Greenspan is saying that the deficit may be dangerous, hinting that interest rates may rise. It is possible that the real estate bubble will burst. Healthcare costs will continue to rise. | Moderate. The deficit and rising interest rates could result in net-new IT spending if compliance projects do not displace other IT projects on a 1:1 basis. | ↓ | ★★★★☆ |
| Profits | Pretax profits will be more than 10% in the United States. Consensus Economics' April 4 forecast will hold. | Moderate. IT spending will begin to increase as individual company profits improve. | ↑ | ★★★★☆ |
| Iraq | The war in Iraq will continue, with Saddam Hussein deposed and discredited. Travel restrictions will be lifted, and the aura of uncertainty affecting business decisions will dissipate. The war is still being financed with U.S. government debt. | Low. Economic uncertainty over Iraq will impact IT spending. | ↓ | ★★★☆☆ |
| Post-Iraq | There will be no Iraq-like war and no abnormal activity one way or the other. | Low. There will be no impact. | ↔ | ★★★☆☆ |
| Contagion | There are no major contagions on the immediate horizon. | Low. The impact of any outbreaks will likely be limited to small local areas. The exception could be the discovery of substantial mad cow disease in the United States. | ↔ | ★★★★☆ |

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                    SC023195

**TABLE 10**

Key Forecast Assumptions for the Worldwide Secure Content Management Market, 2004–2008

| Market Force | IDC Assumption | Impact | Accelerator/ Inhibitor/ Neutral | Certainty of Assumption |
|---|---|---|---|---|
| Other geopolitics | The threat of terrorism at home and other potential armed political conflict will neither escalate nor abate. | Moderate. Business decisions and project initiation will begin in line with a better economic outlook. | ↔ | ★★★☆☆ |
| U.S. elections | U.S. elections are a wild card for the forecast period in the short term. | Moderate. Traditionally, election years have been good for the economy; the issue will be what happens in 2005. | ↔ | ★★★★☆ |
| Energy | Oil prices are on the rise. | High. Oil prices will be less predictable, which is not so good for business. | ↓ | ★★★★☆ |
| Inflation | Inflation will remain under control. Over the next three years (according to Consensus Economics), expectations for the United States, Western Europe, and Asia/Pacific are that consumer prices will rise by less than 2%. Eastern Europe and Latin America, however, will continue to see double-digit inflation. There will be no deflation. | Moderate. Business confidence will be unaffected. | ↔ | ★★★★☆ |
| Unemployment | Unemployment will slowly tail off but remain above 5% in the United States and flat in Europe. There will not be a lot of job creation in the United States. | Moderate. More employment will drive more need for IT infrastructure and is a lagging indicator of an economic recovery; job creation should be accompanied by a willingness to invest in other areas. | ↑ | ★★★☆☆ |
| Telecom | The telecom industry will begin to recover. | Low. The IT industry has already factored this in. | ↔ | ★★★★☆ |
| Government and trade | Government budget deficits and trade imbalances will remain neutral in their impact on IT. The dollar may strengthen somewhat. The mood of Europe toward the United States is a concern; anger over the war in Iraq may create an informal protectionism. | Moderate. The strengthening of the dollar may help U.S. software companies somewhat. | ↔ | ★★★☆☆ |

12                              #31598                              ©2004 IDC

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                              SC023196

**TABLE 20**

Key Forecast Assumptions for the Worldwide Secure Content Management
Market, 2004–2008

| Market Force | IDC Assumption | Impact | Accelerator/ Inhibitor/ Neutral | Certainty of Assumption |
|---|---|---|---|---|
| Scandals | The Enron, WorldCom, Tyco, and Parmalat scandals will recede into memory, and business and consumer confidence will begin to return. | Low. There will be no change. | ↔ | ★★★★☆ |
| Exchange rates | Improved profits in the United States, with the possibility of interest rates going up, may strengthen the U.S. dollar somewhat. Top IT vendors' growth will be attributable mainly to the decline in the dollar. | Moderate. This may accelerate IT exports from exporting countries into the United States. | ↔ | ★★★☆☆ |
| Expansion of the eurozone | Increases will need to manage business automation and integration. | Low. There will be a balance of spending, with jobs/production moving to Eastern Europe (shutting down of some existing systems), freeing up alternative IT spending in Western Europe. | ↔ | ★★★★☆ |
| Compliance | With regulations such as Sarbanes-Oxley, Basel II, and HIPAA, increased compliance legislation within the United States and Western Europe will increase transparency in many industries. | Moderate. Compliance regulations may begin to have an effect on software spending in 2005 and beyond. Compliance will affect areas of infrastructure software and services such as security and storage and applications areas such as records management, content management, and business performance management (to name a few). | ↑ | ★★★★★ |
| Technology/service developments | | | | |
| Software complexity | Years of add-on and point-to-point integration strategies have resulted in an overcomplex infrastructure. Demand for simplicity and agility will require a focus on business process as opposed to technology itself. | Moderate. The complexity crisis will maintain the need for integration, but the demand for high quality and productivity could deter skeptical buyers from existing product offerings. Increasingly, this functionality may be delivered as an IT or business service. | ↔ | ★★★★☆ |

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                    SC023197



Key Forecast Assumptions for the Worldwide Secure Content Management
Market, 2004–2008

| Market Force | IDC Assumption | Impact | Accelerator/ Inhibitor/ Neutral | Certainty of Assumption |
|---|---|---|---|---|
| Linux | Technical IT users will lead application deployment, with homegrown applications moving first. Mainstream software is also moving toward application serving on Linux. | Low. This will have a downward impact on price pressures. | ↔ | ★★★★☆ |
| Mobility | Application and user-focused mobile deployments are now addressing business needs, which are being driven by line of business. The need for more devices with useful applications will continue. | Low. This will have a low impact on overall software growth. | ↑ | ★★★★☆ |
| Utility computing | Multinational vendors will continue to drive the concept of utility computing in various forms, but the concept is not well defined in the marketplace. | Low. This will have a low near-term impact on software revenue. Software spending may pick up toward the end of the forecast period. | ↑ | ★★☆☆☆ |
| Killer apps | New technology (e.g., Web services, wireless LANs, storage area networks, clustering, and high-growth software areas) will help drive price performance to attractive levels that support new IT spending growth. | Moderate. No killer apps or new technologies will come to drive overall industry growth in the same way Windows and Office suites did in the 1980s or the Internet did in the late 1990s. Web services will continue to be mostly a software development technique. | ↔ | ★★★★☆ |
| Labor supply | | | | |
| Productivity management | Job creation in the United States and Europe will not be prevalent. | Moderate. This will impact increasing software revenue growth. | ↑ | ★★★☆☆ |
| Offshoring | Skill supplies will be fulfilled with offshore software development. Developer jobs will not be returning to the United States or Western Europe. | Low. This will have little impact on overall software growth. The job market and pricing pressure are already major factors in Western Europe. | ↔ | ★★★★☆ |

14    #31598    ©2004 IDC

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY    SC023198

**TABLE 3**

Key Forecast Assumptions for the Worldwide Secure Content Management Market, 2004–2008

| Market Force | IDC Assumption | Impact | Accelerator/ Inhibitor/ Neutral | Certainty of Assumption |
|---|---|---|---|---|
| Capitalization | | | | |
| Venture | Venture funding will begin to pick up, but funding amounts will be smaller. | Low. Money will continue to open up. | ↑ | ★★★★☆ |
| Stocks | There will be a modest upward trend worldwide, but the U.S. stock market may be overpriced and may go down, causing some small increases in inflation in the United States. | Moderate. This will create decreased business confidence in the United States. | ↓ | ★★☆☆☆ |
| Market characteristics | | | | |
| Large enterprise software renewals | There will be extreme price pressure on large enterprise software renewals. | Moderate. This will have an impact on changing software revenue growth. | ↓ | ★★★★☆ |
| Software licensing | Attention to building predictable revenue streams through nontraditional software licensing models will increase. | Moderate. In the short term, there will be less of an impact on overall software revenue. Toward the back end of the forecast period, the impact on software revenue will be higher. | ↑ | ★★★★★ |
| U.S. homeland security | There will be an increase in government programs to improve homeland security and protect against terrorism. | Low. Security spending is not significantly on software yet; spending is currently on physical security. Software growth will be affected beyond the five-year forecast period. | ↔ | ★★★☆☆ |
| Services-oriented architectures | Services-oriented architectures will allow companies to speed the development of modularized applications and respond faster to new business pressure. | Moderate. In the short term, existing systems will be rearchitected and new integration technologies will be deployed, which will improve business processes/automation. In the midterm, applications will begin to be replaced. | ↑ | ★★★★☆ |

©2004 IDC                          #31598                          15

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC023199

## TABLE 10

**Key Forecast Assumptions for the Worldwide Secure Content Management Market, 2004–2008**

| Market Force | IDC Assumption | Impact | Accelerator/ Inhibitor/ Neutral | Certainty of Assumption |
|---|---|---|---|---|
| Application verticalization | There will be demand for clear and unique software vendor product differentiation, faster implementation, and more relevant "out of box" solutions. | High. This demand will require vendors to develop more sophisticated partnerships and increase market applicability of offered solutions (particularly to SMEs). | ↔ | ★★★★☆ |
| **Market ecosystem** | | | | |
| Services | IT services will continue to grow as companies attempt to concentrate on what they do best and rely on IT services to handle complexity they cannot. Companies clearly see the advantages of using outside services and outsourcers. IT services will grow faster than the overall IT market as budgets shift from internal spending to external companies. | Moderate. These trends are already factored in. | ↔ | ★★★★☆ |
| **Consumption** | | | | |
| Buying sentiment | IT buyers will begin to moderately spend again as the economy improves; CIOs will begin to replace hardware and operating systems, begin to spend on mobility, and regain the attitude that IT spending is critical to the well-being of a company (or household). IT spending as a percentage of revenue (or income) will increase. | Moderate. These trends are already factored in. | ↑ | ★★★★☆ |
| Saturation | PC and Internet markets will continue to saturate, but emerging geographies will invest and new applications will drive users to multiplatform usage. | Moderate. These trends are already factored in. | ↔ | ★★★★☆ |

Legend: ★☆☆☆☆ very low, ★★☆☆☆ low, ★★★☆☆ moderate, ★★★★☆ high, ★★★★★ very high

Source: IDC, July 2004

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                          SC023200

# Vendor Profiles

## *Symantec*

### Overview

Symantec is a United States–based company that was founded in 1982. The company held its initial public offering in June of 1989 and is headquartered in Cupertino, California. Employer to over 4,000 people, Symantec has operations all over the United States, as well as in Canada, New Zealand, Japan, and Australia. Within the last year, Symantec announced the acquisition of Brightmail.

### Secure Content Management Products

Symantec offers the following SCM products:

- ☒ Symantec Antivirus and Norton Antivirus offer extensive virus protection and removal for both consumer and corporate environments. Symantec's corporate offering offers protection at the client, host, and Internet gateway levels of a corporate network. Its functionality extends to scan email attachments in both Domino and Exchange collaborative environments.

- ☒ Symantec Mail-Gear resides on a corporate mail server and scans incoming and outgoing mail for inappropriate content. It provides comprehensive, policy-based email and attachment scanning and filtering to protect organizations against liability claims, spam attacks, and the loss of proprietary information.

### Strategic Direction

On a revenue basis, Symantec is the worldwide leader in security software, a broad market that can include SCM, antivirus, antispam, intrusion detection/prevention systems, vulnerability assessment and management solutions, firewall/VPN solutions, and security 3A solutions (authentication, authorization, administration). The firm enjoys long-standing OEM relationships with HP, IBM, Gateway, and Cisco (Linksys), which put its Norton line of products on over 50 million new PCs and 4 million firewall and router products worldwide each year, crossing both business and consumer markets.

Symantec's $370 million acquisition of Brightmail, announced on May 19, 2004, underscores the market reality that customers will prefer to buy comprehensive messaging security solutions rather than point (i.e., antispam or antivirus) products. The acquisition also allows Symantec to pair its strong position in both the consumer and business security markets with Brightmail's early-to-market reputation as a technology provider and OEM partner to ultimately expand Symantec's sales reach and product breadth. This acquisition is a further example of the consolidation occurring in the Internet security market that will lead to antispam protection becoming a commodity and small antispam vendors looking to partner with large firms in the broader security space to be pulled into the big deals.

©2004 IDC                    #31598                                        17

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                    SC023201

## McAfee Inc.

### Overview

Founded in 1989, Network Associates held its initial public offering in 1992. The company is headquartered in Santa Clara, California, with approximately 3,800 people currently under its employ. Network Associates has major operations across the United States, in India, and in the United Kingdom. On June 30, 2004, Network Associates announced that it has changed its name to McAfee Inc.

### Secure Content Management Products

Network Associates offers the following SCM products:

- McAfee Antivirus offers virus protection/elimination for consumer and enterprise environments. It protects at the client, server, and gateway levels, integrating with email and file servers and even PDAs to detect and eliminate viruses. It also offers policy-based spam protection in Exchange, Domino, and WebShield environments.

- VirusScan ASaP is an online enterprise antivirus service that provides continuously updated protection against viruses and malicious code. It provides continuous protection to the desktop against viruses and worms.

- VirusScreen ASaP is an online enterprise antivirus service that stops email-borne viruses and infected attachments before they enter the network. It screens streaming email and either cleans it or quarantines it before it reaches the mail server.

- McAfee.com is an online consumer antivirus service that protects consumer PCs, files, and email address book from viruses, worms, and Trojans.

### Strategic Direction

With the divestiture of the Magic help desk technology and the agreement to sell the Sniffer Technologies network management business, the new McAfee Inc. is focused on providing best-of-breed intrusion prevention and antivirus solutions that allow customers to block both known and unknown attacks. The name change clearly reflects the transformation of McAfee to a pure-play security company. McAfee has sold off two major components of its business since the beginning of this year. In February, it sold its Magic help desk software division to BMC Software. In April, it announced the sale of its Sniffer network management software to the investment firms Silver Lake Partners and Texas Pacific Group.

Through the McAfee Protection In-Depth strategy, the company provides comprehensive solutions to protect desktop, servers, wireless devices, and the network infrastructure against both existing and new security threats. The McAfee brand is known worldwide for providing proactive security solutions, and the new McAfee Inc. plans to continue to develop solutions to protect customers of all sizes against evolving security threats and vulnerabilities, including blended attacks and malicious code of all kinds.

18                                    #31598                                    ©2004 IDC

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC023202

### Trend Micro

#### Overview

Trend Micro was founded in 1988 and is headquartered in Tokyo, Japan. Its 23 business units, employing 1,800 people worldwide, can be found across Asia, Europe, North America, and South America.

#### Secure Content Management Products

Trend Micro offers the following SCM products:

☒ PC-Cillin is an antivirus solution for the consumer market segment. It detects and cleans viruses from a home computer or PDA and includes an integrated firewall to block unauthorized access.

☒ OfficeScan Corporate Edition provides virus protection for desktop and mobile clients. Centrally managed, it detects and cleanses on a policy basis across an entire organization.

☒ Scanmail offers virus detection and removal from emails and attachments. It integrates with Exchange, Domino, and OpenMail.

☒ InterScan extends Trend Micro's functionality to the gateway level of an enterprise network. It offers detection and elimination of viruses from outside the network, as well as policy-based spam removal.

☒ ServerProtect extends the antivirus capabilities to protect Linux and Windows/Novell servers, as well as file servers in an enterprise network.

#### Strategic Direction

Trend Micro is the worldwide leader in server and gateway antivirus sales. In addition to its software products, Trend Micro also continues to promote its service-based offering: Trend Micro Enterprise Protection Strategy. This is a service that manages the three primary phases of the enterprise outbreak life cycle: outbreak prevention services, damage assessment and cleanup services, and outbreak life-cycle management and reporting. Trend Micro has also tackled the spam problem through a strategic partnership with Postini and the Trend Micro Spam Prevention Service.

Trend Micro recently announced a partnership under which Cisco Systems will improve its routers, switches, and firewalls with Trend's worm-blocking technology. Trend Micro, which uses the technology in its own VirusWall product, plans to make its signature-based worm-blocking technologies available in Cisco products by 3Q04. The agreement sets the stage for broader technology integration later under which Cisco plans to bring Trend's policy-based antivirus response and remediation technologies into its gear. Trend Micro's support for Cisco's NAC program extends the principles of Trend Micro Enterprise Protection Strategy, which provides customers with a comprehensive approach to managing the impact to productivity and information from mixed threats such as network worms and viruses throughout the entire outbreak life cycle.

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                    SC023203

*Computer Associates*

**Overview**

CA was founded in 1976 and employs approximately 16,000 people worldwide. CA is headquartered in Islandia, New York, and has operations throughout the world.

**Secure Content Management Products**

*CA offers the following SCM products:*

☒ eTrust Secure Content Management is an integrated SCM solution enabling definition and deployment of a common enterprisewide security policy addressing HTTP, SMTP, and FTP security risks, including viruses, spam, hacking, and unacceptable use of the Web by employees.

☒ eTrust Antivirus provides enterprisewide protection against viruses and malware attacks — from the PDA to the gateway — including virus protection for desktops and servers, PDAs, groupware (Lotus Notes/Domino and Microsoft Exchange mail servers), and the gateway.

**Strategic Direction**

CA is focused on addressing multiple security management challenges through a single solution. CA's new eTrust Secure Content Management provides effective security at a lower total cost of ownership than the multiple "point" solutions typically deployed at most companies. CA's eTrust Secure Content Management is a comprehensive, aggressively priced solution for protecting organizations from the diverse dangers of the Internet — including viruses, spam, hacking, and unacceptable use of the Web by employees. IDC believes the integrated approach offered by CA's eTrust Secure Content Management helps move IT from firefighting mode to proactive risk minimization. Moreover, it can offload some spam management and Web filtering tasks from overburdened IT departments to users.

On November 18, 2003, CA announced an agreement with Microsoft Corp. to provide qualified Windows home computer users with a no-charge, one-year subscription to CA's eTrust EZ Armor antivirus and firewall desktop security suite.

*SurfControl*

**Overview**

SurfControl is a public company traded on the London and Nasdaq Europe exchanges. The company has more than 20,000 customers worldwide and employs nearly 530 people in 15 separate locations across the United States, Europe, and Asia/Pacific.

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY    SC023204

**Secure Content Management Products**

SurfControl offers the following SCM products:

- ⊠ SurfControl Web Filter defends against productivity, legal, network, and security threats by managing employee Web surfing activity. SurfControl Web Filter uses a combination of predefined URL lists and neural network technology for automatic categorization of new/unknown Web sites.

- ⊠ SurfControl E-mail Filter protects enterprise email servers from multiple content threats such as spam, viruses, and junk emails such as chain letters and jokes. E-mail Filter also manages email content flowing in and out of the company email system, such as confidential information and hostile or inappropriate content. Multiple technologies are used to create a gauntlet approach to identify such messages, including an antispam database that uses digital fingerprint technology, dictionaries, advanced lexical analysis, and neural networks.

- ⊠ SurfControl Instant Message Filter preserves productivity and bandwidth by blocking and managing employee access to unauthorized instant message and peer-to-peer networks.

**Strategic Direction**

SurfControl focuses on helping companies "stop unwanted content" in the workplace by continuing to expand its product offering for filtering to address new content risk areas as they emerge. The current product set in the SurfControl total filtering solution — Web, email (including antispam and antivirus), and IM — offers a complete Web and messaging security solution. IDC believes that the solution set from SurfControl can play a key business role in intelligently filtering unwanted content from entering an organization. By providing stronger controls on Web, IM, and email usage under a common user interface, these products provide a complementary enhancement to traditional IT perimeter security products.

SurfControl recently entered the security appliance market with its acquisition of the assets of SecureM Inc. By adding high-performance, scalable, hardened, and secure Linux-based email filter appliance technology to its product portfolio, SurfControl has strengthened its position in the Web and email filtering markets. SurfControl will also accelerate its global distribution plans through the addition of a China-based sales and distribution operation.

*Websense*

**Overview**

Websense was founded in 1994 and now has more than 20,600 customers. Headquartered in San Diego, California, with offices in China, Japan, Australia, and across Europe, Websense now employs approximately 350 people worldwide.

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                    SC023205

**Secure Content Management Products**

Websense offers the following SCM products:

☒ Websense Enterprise manages employee Web use at three network control points — the gateway, network, and desktop. Websense Enterprise enables management across Web pages, network protocols, and desktop applications to effectively combat growing security, legal, and productivity threats that infiltrate company networks, such as peer-to-peer file sharing, IM, hacking tools, and spyware

☒ The Client Application Manager (CAM) ensures the most effective management of employee desktop applications. Based on its Application Database, Websense CAM allows a system administrator to set application usage policies by individual user, group, workstation, or network. Each time an employee attempts to open a file for execution, the CAM client allows or refuses according to the established corporate policy

☒ Bandwidth Optimizer improves overall network performance by reducing the use of non-work-related, high-bandwidth media based on real-time network conditions.

**Strategic Direction**

Websense is the worldwide leader in Web filtering revenue for 2003. Websense Enterprise v5 2, which became available in May 2004, is built upon the company's strengths of content classification and Web filtering and transforms Websense enterprise software into a platform upon which new functional modules can be integrated. Unlike traditional Web filtering solutions that manage employee Web use at the Internet gateway only and focus primarily on managing employee access to URLs, Websense manages employee use of computing resources at the gateway, network, and desktop levels. Websense is tightly integrated with the leading Internet infrastructure providers, including Cisco, Checkpoint, Nokia, and Microsoft.

Websense recently announced the general availability of Websense Enterprise CPM, a desktop security solution that fills critical end-point gaps in today's multilayered enterprise defense systems. CPM complements firewall and antivirus solutions, bolstering the network defense grid by enabling companies to establish and enforce policies for how and when applications can be launched on corporate desktops, laptops, and servers. These end-point platforms are increasingly targeted by malicious attacks, as well as so-called "zero day" assaults that are difficult to combat because they exploit newly identified commercial software vulnerabilities before countermeasures are available and deployed.

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                    SC023206

### *Sophos*

#### Overview

Sophos is a privately owned company founded in 1985, with headquarters in the United Kingdom and over 800 employees worldwide. It also has branch offices throughout the world — in the United States and Australia and throughout Europe, Japan, and Singapore. In September 2003, Sophos announced the acquisition of the antispam vendor ActiveState.

#### Secure Content Management Products

Sophos offers the following SCM products:

- Sophos Anti-Virus software is designed specifically for corporate networks. It protects laptops, desktops, and servers by detecting, reporting, and disinfecting viruses. Scheduled and on-demand scanning is provided by Sophos's proprietary virus detection engine.

- Sophos PureMessage is a comprehensive, secure, mail filtering solution for email servers, protecting them against viruses, spam, and other email-borne security threats. It combines antivirus and antispam technologies with flexible policy management.

- Sophos MailMonitor protects corporate networks at their boundaries, reducing the significant threat of email-borne viruses. All traffic passing through gateways and email servers is checked, and any potential carriers are blocked and quarantined.

#### Strategic Direction

Sophos provides virus and spam solutions for organizations of any size, from large enterprises to small businesses. Sophos' strategic direction focuses on long-term cost of ownership reduction. Sophos is the only antivirus solutions provider covered in this study that is focused solely on the enterprise market. The company's products are sold and supported through a global network of subsidiaries and partners in more than 150 countries. In addition, virus and spam experts based at Sophos's high-security research laboratories in the United Kingdom, United States, Canada, and Australia carry out 24-hour analysis to ensure rapid response to any new threat anywhere in the world, irrespective of time zone.

The ActiveState acquisition addresses enterprise demand for comprehensive messaging security solutions that combine antispam and antivirus capabilities. Sophos has integrated its antivirus software solution into ActiveState's PureMessage enterprise antispam solution. Sophos has completed and shipped multiple, fully integrated packages over the past six months, notably PureMessage for Unix versions 4.1,4.5 and 4.6, along with the Win/Ex products. Driven by mounting pressures to ensure a secure and low-cost infrastructure, Sophos will continue to focus on providing consolidated protection against security threats such as viruses, spam, and policy breaches.

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY SC023207

### *Clearswift*

#### Overview

Clearswift, the MIMEsweeper company, is present in 15 countries worldwide with headquarters both in the United States and in the United States and sales offices in Germany, Sweden, Japan, and Australia.

#### Secure Content Management Products

Clearswift offers the following SCM products:

- ☒ MAILsweeper is an external email solution that protects organizations against inbound and outbound email threats, from spam and viruses to employee time wasting, circulation of pornography, breaches in confidentiality, legal liability, and IT resource misuse.

- ☒ MIMEsweeper for Web brings policy-based content security to the HTTP gateway. MIMEsweeper for Web analyzes Web content and blocks pages or files that are prohibited by an organization's security policy.

- ☒ SECRETsweeper is a full encryption/decryption and digital signature gateway. In combination with MAILsweeper, SECRETsweeper provides gateway signing, encryption/decryption, and policy-based management of the threats associated with encrypted email.

#### Strategic Direction

Clearswift secures content and protects against digital attacks by enforcing security policies that increase productivity, reduce IT costs, and create a safer business environment. Its goal is to provide total content security for email and Web. Clearswift enables organizations to protect themselves against digital attacks, meet legal and regulatory requirements, implement productivity-saving policies, and manage intellectual property passing through their network.

To address the gaps that exist in the current layered security infrastructure, Clearswift recently announced enhancements to its current product line and the addition of a new policy-based archiving solution. With the addition of the new archiving product, Clearswift meets the overwhelming demands of the market to address regulatory and legal issues brought on by regulatory statutes and compliance laws worldwide. Underpinning the strategic road map, Clearswift will provide content security solutions to the market on a range of platforms — software, managed services, and appliances. Clearswift's road map is focused on helping organizations address the future of the rapidly changing Internet and email content security market.

### *Tumbleweed Communications*

#### Overview

Tumbleweed Communications Corp. was founded in 1993 and held its initial public offering in 1999.

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                    SC023208

**Secure Content Management Products**

Tumbleweed Communications offers the following SCM products:

- Tumbleweed Email Firewall protects companies against a wide range of incoming email threats, including spam and viruses. It also lets companies enforce corporate policies on outgoing email to safeguard proprietary information and comply with industry and government regulations.

- Tumbleweed SecureTransport is a secure file transfer solution. SecureTransport provides support for interactive and automated delivery with a wide range of server and client platforms — from Web browsers to thin and thick clients. SecureTransport has enhanced file transfer capabilities across industry standard protocols, including HTTP, HTTPS, FTP, and secure FTP (FTP/SSL).

- Tumbleweed Secure Redirect is a secure email software solution. It works with the Tumbleweed Email Firewall to inspect outbound email at the network gateway and automatically redirect messages that contain sensitive content to a secure, encrypted channel.

- Tumbleweed MailGate is a secure, hardened Linux-based appliance, designed to remove spam and viruses from the email systems of small, medium-sized, and large enterprises.

**Strategic Direction**

Tumbleweed Communications is a leader in providing secure Internet messaging software products for enterprise and government customers of all sizes. Tumbleweed solutions are used to make email, file transfer, and Web communications secure, reliable, and automated. Using Tumbleweed solutions, businesses can stop spam and viruses, secure and automate communications and data exchange with customers and partners, and ensure compliance with email policies and regulations.

Tumbleweed recently entered the security appliance market with its acquisition of Corvigo's MailGate appliance. Tumbleweed's new MailGate 2.1 version introduces comprehensive antivirus scanning and blocking capabilities and an updated antispam data set to improve the spam capture rate of the MailGate appliance. By adding a hardened, secure Linux-based antispam appliance to its portfolio, Tumbleweed strengthens its position in the email security markets by offering customers flexible options for stopping spam with either the MailGate hardened Linux-based appliance or Tumbleweed's Email Firewall, a globally scalable Windows-based enterprise software solution.

### F-Secure

**Overview**

Founded in 1988, F-Secure Corp. has been listed on the Helsinki Stock Exchange since November 1999. The company is headquartered in Helsinki, Finland, with a North American main office in San Jose, California, as well as offices in Germany, Sweden, Japan, and the United Kingdom and regional offices in the United States.

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC023209

**Secure Content Management Products**

F-Secure offers the following SCM products:

- ☒ F-Secure Anti-Virus Total Suite combines all of the critical components required for corporate virus protection, providing security for laptops, desktops, file servers, email servers, and gateways.

- ☒ F-Secure Anti-Virus for Workstations protects laptops and desktops against viruses and malicious code in real time. It protects both site-based employees and mobile workers, ensuring maximum system availability and data integrity.

- ☒ F-Secure Anti-Virus Mail Server and Gateway products provide powerful and easy-to-deploy virus protection solutions for industry-standard firewalls, groupware, and email environments.

- ☒ F-Secure Anti-Virus for File Servers ensures that employees who connect with infected machines to corporate file servers do not spread viruses in the network.

**Strategic Direction**

F-Secure Corp. protects individuals and businesses against computer viruses and other threats spreading through the Internet and mobile networks. F-Secure is a pioneer in creating security applications that are optimized for wireless devices and offer reliable and automatic on-device protection. F-Secure Anti-Virus ensures complete protection for handheld devices. The company also offers security solutions for mobile operators and service providers. F-Secure is supported by a global ecosystem of VARs and distributors in over 50 countries. F-Secure protection is also available through major ISPs such as Deutsche Telekom and leading mobile equipment manufacturers such as Nokia.

F-Secure has stated that its focus for 2004 will be very much on antivirus and content security. The company plans to incorporate firewall technology, IDS, and so forth into its services platform. F-Secure will also be expanding its business model to include direct operator sales. F-Secure believes that its new mobile and wireless products and services, combined with a solid history in the antivirus market, will put it in a strong position to lead the mobile operator business, especially in Europe, in 2004.

*Secure Computing*

**Overview**

Secure Computing Corp. was founded in 1984 as a division of Honeywell and had its initial public offering in 1995. The company is headquartered in San Jose, California, and has sales offices throughout the United States and in the United Kingdom, France, Germany, Singapore, Hong Kong, Japan, and Australia. In October 2003, Secure Computing acquired the Web filtering vendor N2H2 along with its two filtering products Bess and Sentian.

#31598

©2004 IDC

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC023210

### Secure Content Management Products

Secure Computing offers the following SCM products:

- ☒ SmartFilter primarily an On-Box™ filtering solution that is used by companies to safeguard work environments from offensive content, limit legal liability, and protect against malicious code that can enter networks when employees use the Internet.

- ☒ Bess is used by K–12 schools to cost-effectively protect students from inappropriate or illegal Internet content. CIPA-compliant and easy to use, Bess delivers the only true education-centric filtering solution in the business.

- ☒ Sentian™ is primarily an off-box filtering solution for non-education entities

### Strategic Direction

Secure Computing sells specific solutions to address the varying needs of organizations of all sizes and educational institutions. Secure sells directly to its customer base of enterprise and government customers and through a network of OEMs, resellers, and managed security service providers. The Secure Computing business model of delivering its SmartFilter On-Box Web filtering solution to the marketplace is unique in its heavy weight on an OEM model. Market-leading OEM partners such as Cisco, Blue Coat, Network Appliance, CA, and others represent the primary mechanism for delivering the SmartFilter software and control list to the marketplace.

By combining the strengths and complementary aspects of Secure Computing and N2H2, the company offers customers more features, a wider range of Web filtering platforms, and extended URL list capabilities.

### *CipherTrust*

#### Overview

Headquartered in Atlanta, CipherTrust Inc. is a global email security company dedicated to developing comprehensive security solutions for email systems. Its flagship product, IronMail, is an appliance that provides a secure email gateway.

### Secure Content Management Products

CipherTrust offers the following SCM products:

- ☒ CipherTrust's IronMail appliance provides comprehensive email security. IronMail combines the five critical email security components of spam and fraud prevention, virus and worm protection, policy and content compliance, email privacy, and secure email gateway capabilities into a single platform. IronMail protects the messaging systems of over 30% of the Fortune 100.

### Strategic Direction

CipherTrust designed IronMail to help businesses secure their email systems and network resources at the gateway. CipherTrust came into the industry in March 2000,

©2004 IDC                                #31598                                27

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                SC023211

when an email expert and leading security specialist detected the market opportunity for an email security appliance. The company developed IronMail to help customers predict, identify, and solve critical email security issues with industry-leading knowledge and state-of-the-art technology.

Recognizing the continuously developing threats facing all business messaging systems, CipherTrust recently launched the IronMail S-Series, an antispam and email security appliance designed for the messaging infrastructures and budgets of small and medium-sized businesses. The S-Series is catered to meet the security needs of companies with fewer than 1,000 email users in an easy-to-use, comprehensive protection package complete with full support services.

## *Brightmail*

### Overview

On May 19, 2004, Symantec announced that it signed an agreement to acquire Brightmail Inc. Brightmail, a global antispam market leader delivers technology that makes messaging environments secure and manageable. Brightmail Anti-Spam protects the email networks of businesses, government agencies, and service providers, blocking unsolicited bulk email, or spam, while assuring that legitimate mail is reliably delivered. Brightmail protects over 1,800 enterprises globally. Brightmail also provides spam protection for the leading Internet service providers, including AT&T WorldNet, Cox Communications, EarthLink, MSN, TelstraClear, Xtra, and Verizon Online. Brightmail now protects approximately 300 million mailboxes worldwide.

### Secure Content Management Products

Brightmail Anti-Spam Enterprise Edition leverages the following core components to provide a proactive approach to spam fighting:

- ☒ The Probe Network is a global network of email accounts that attract and collect large quantities of spam.

- ☒ The Brightmail Logistics and Operations Center (BLOC) operations centers, with locations in North America and Europe, provide 24 x 7 spam-fighting facilities.

- ☒ The Brightmail Server is Brightmail software installed at the customer's mail gateway that uses installed filtering modules and active rules to filter suspected spam.

- ☒ Brightmail Anti-Virus uses Brightmail's email technology to integrate Symantec's antivirus capabilities into the mail servers, stopping and cleaning infected messages before they can damage the network.

### Strategic Direction

What is the attraction for Brightmail to become a division of a larger firm (Symantec's 2003 revenue of nearly $1.8 billion dwarfs Brightmail's $26 million)? One reason is that Brightmail depends on one buyer — Microsoft — for 18% of its revenue as part of a deal that will expire in December 2005. Microsoft has itself been very visible on the

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC023212

antispam front, with both its "email caller ID" initiative and its decision to offer significant antispam capabilities for its Exchange 2003 email server.

Another reason is that although the messaging security market is robust, it is made up of roughly 40 vendors with less than $5 million in revenue and only a handful of vendors with more than $20 million in revenue. Brightmail could work hard to extend its early to market leadership and still only aspire to become the largest small vendor in what is likely to remain an extremely competitive niche market.

A final reason is distribution and reach: the vast majority of Brightmail's business is in North America, while Symantec's OEM deals and channels network put its products front and center in multiple markets outside the United States. Brightmail simply could not rely on its own resources to bring its products to new markets quickly. With Symantec's deep pockets and global friendships, a Brightmail division of Symantec can grow faster than its peers in the standalone antispam market.

### Aladdin Knowledge Systems

#### Overview

Aladdin Knowledge Systems (Nasdaq: ALDN) has been providing strong network and software commerce security solutions since 1985. Employing more than 350 people worldwide, Aladdin is headquartered in Arlington Heights, Illinois, with locations in Israel, the United Kingdom, Japan, and Europe.

#### Secure Content Management Products

Aladdin Knowledge Systems offers the following SCM products:

- ☒ eSafe Gateway is a comprehensive solution providing a high-capacity, proactive, real-time, and multitier content security and antispam solution for the Internet gateway.

- ☒ The eSafe Mail solution provides email content and attachment security, with proactive antivirus and antispam capabilities optimized for enterprise network email servers.

- ☒ The eSafe Appliance is the platform-independent version of eSafe Gateway delivered as a preconfigured plug-and-play CD ready with hardened Linux OS and available installed on Aladdin hardware.

#### Strategic Direction

Aladdin is focused on providing integrated proactive content security solutions to combat the ever-growing number of blended threats. eSafe's new application filtering technology called AppliFilter effectively blocks peer to peer, IM, spyware, adware, tunneling, and other unauthorized application traffic. eSafe's AppliFilter stops these applications from circumventing firewall systems and infiltrating an organization. This pioneering approach of integrating the application filtering technology in a gateway-based content security solution is positioned to change the way organizations view perimeter security.

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                    SC023213

eSafe's AppliFilter technology is based on a sophisticated auto-updating engine that monitors all opened connections, looking for unauthorized applications and protocols patterns within the request and response TCP/IP traffic. AppliFilter is designed to enhance traditional network-level firewalls and provide application layer protection against immediate threats.

### *NetIQ*

#### Overview

NetIQ is headquartered in San Jose, California; has operations across the United States; and sells its products worldwide. NetIQ is a provider of systems management, security management, Windows administration, and Web analytics solutions.

#### Secure Content Management Products

NetIQ offers the following SCM products:

- ☑ NetIQ MailMarshal scans the content of all mail messages for virus and spam characteristics. It blocks spam and cleans viruses from messages.

- ☑ NetIQ WebMarshal is a Web filtering solution designed to ensure protection and productivity when it comes to corporate Web use. It blocks users from within a corporate intranet from accessing a predefined list of banned sites and scans file downloads for viruses.

#### Strategic Direction

NetIQ Corp. announced the acquisition of Marshal Software Ltd. on December 23, 2002. This acquisition helps NetIQ address a leading problem faced by email administrators today — the controlling of spam and the monitoring of electronic data entering and leaving the organization — and adds content security to NetIQ's comprehensive range of migration, security administration, and performance management solutions for messaging environments. Marshal Content Security Solutions from NetIQ help protect against threats to network and information security, workplace liability issues, unnecessary bandwidth consumption, and worker unproductivity associated with uncontrolled use of the Internet.

NetIQ recently announced the release of NetIQ MailMarshal 6.0 SMTP. This new release builds on NetIQ MailMarshal 5.5 SMTP with significant new antispam capabilities, end user spam management, spam classifications, native AD integration, and a new web console.

### *Webwasher AG*

#### Overview

Webwasher AG was founded in 1999 as a Siemens spin-off and is headquartered in Paderborn, Germany. On April 26, 2004, CyberGuard Corp. announced that it had acquired Webwasher AG.

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC023214

**Secure Content Management Products**

Webwasher offers the following SCM products:

☒ Webwasher URL Filter wards off security, productivity and legal threats arising from the Web at the corporate gateway in a comprehensive and highly efficient manner, giving protection also against spyware and phishing attacks. In a dual approach, it uses both a static scanning method relying on a large-scale URL database, as well as real-time scanning of uncategorized URLs. Content filtering and blocking is enhanced by a proficient media type filter, limiting, e.g. the downloading of voluminous audio and video files.

☒ Webwasher Antivirus is a filtering solution combining proactive and pattern-based methods to monitor Web and e-mail communication and deliver the security necessary to ensure an unimpeded performance of business critical processes. The solution implements the unique Webwasher Antivirus PreScan technology to accelerate scanning, providing risk-free Web usage with a very low latency time.

☒ Webwasher Anti Spam offers accurate spam detection and prevention for Web and e-mail communication. To improve the quality of the spam classification process, Webwasher's MethodMix filtering technology is applied, where several complementary methods operate and achieve their results simultaneously or in any desired combination. A queue management permits the professional handling of blocked items, as is especially required in larger organizations.

☒ Webwasher Content Protection offers protection against threats emanating from sources such as scripts, embedded objects, ActiveX, document macros, and Java Applets, and prevents leakage of confidential content in outgoing traffic. The filters included are based on a series of customizable response actions and settings, allowing for the creation of a company-wide content security policy.

☒ Webwasher SSL Scanner extends existing Web-based content security measures to the HTTPS, allowing normal content and security filters to be applied to originally encrypted content. Decryption is possible at the gateway as a result of certificate-based coordination between the employee's browser and the corporate Web gateway/proxy.

☒ Webwasher Instant Message Filter detects, reports and selectively blocks the unauthorized use of high-risk and evasive peer-to-peer file sharing and instant messaging from enterprise networks.

☒ Webwasher Content Reporter is Webwasher's premium reporting tool for Internet policy compliance, cache performance, streaming media statistics, as well as Web and e-mail activity.

**Strategic Direction**

Webwasher AG is a leading provider of Internet security solutions for companies and public institutions. On the basis of its own technology developments as well as by

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                    SC023215

cooperating with leading technology partners, the company develops and markets innovative products for the growing content security management.

The products, offered in the Webwasher CSM Suite, provide a comprehensive filtering solution implemented at the corporate gateway, integrating and enhancing existing IT infrastructure, to optimize Internet usage and give protection against threats and annoyances arising from the Internet. The products feature Web, e-mail, instant messaging, and spam filtering, as well as virus protection, centralized policy and reporting management, and single-installation deployment.

The CyberGuard acquisition of Webwasher AG creates a broad-spectrum security offering of enterprise-class, best-of-breed technologies. The combination of the two vendors technologies are well positioned to address the latest blended threats and worms like Bagle which can only be stopped effectively by a combination of application firewall plus application layer content filtering.

### *Finjan Software*

### Overview

Finjan was founded in 1996 and is headquartered in San Jose, California.

### SCM Products

Finjan offers the following SCM products:

- ☒ Vital Security™ for Web 7.0: Installed at the corporate gateway, Vital Security for Web leverages its patented proactive behavior blocking engine to close the window of vulnerability left open on the Web and integrates best-of-breed solutions in traditional anti-virus scanning, content filtering and Web filtering onto a single platform.

- ☒ Vital Security™ for E-Mail 7.0: Installed at the corporate gateway, Vital Security for E-mail leverages its patented proactive behavior blocking engine to close the window of vulnerability left open in e-mail and integrates best-of-breed solutions in traditional anti-virus scanning, anti-spam, content filtering, custom disclaimers, and document auditing with digital watermarking onto a single platform.

- ☒ Vital Security™ for Clients: A centrally managed, proactive security solution for enterprise desktops, Vital Security for Clients closes the window of vulnerability and protects against new virus outbreaks and malicious mobile code attacks received through e-mail or the Web using its run-time monitoring "sandboxing" technique.

- ☒ Vital Security™ for Documents: Enables companies to control the access, authorization and distribution of sensitive documents internally and externally. It allows trusted users to view critical business information and intellectual property unimpeded, while preventing those properties from being digitally distributed, electronically copied, or physically replicated.

#31598                    @2004 IDC

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                              SC023216

⊠ Vital Security™ for SSL: Installed at the corporate gateway, Vital Security for SSL decrypts encrypted traffic in HTTPS/SSL to allow other security solutions such as Vital Security for Web, to scan the content for viruses, worms or malicious code via ICAP. Certificate validation, URL filtering, Web based management, load balancing and auto updates are among the many features available.

⊠ SurfinGuard Pro: SurfinGuard Pro is a solution for home desktop users to protect them from new virus outbreaks and malicious code attacks. By monitoring code behavior and running the programs in a safe zone "sandbox," SurfinGuard Pro blocks harmful active content from performing malicious activity and accessing unauthorized folders on your computer.

**Strategic Direction**

Finjan Software, the inventor of proactive content behavior inspection, protects organizations using its Vital Security suite of products that provide day-zero defense against new, previously unknown attacks by leveraging its proprietary behavior blocking technology.

Believing that security is best achieved through multiple layers of protection, Finjan's Vital Security platform offers an integrated best-in-breed solution suite of proactive behavior-based and traditional security technologies, including proactive Malicious Mobile Code and Active Content defense, traditional anti-virus protection, anti-spam defense, URL filtering, HTTPS/SSL traffic scanning, digital watermarking and DRM.

### *Blue Coat Systems*

#### Overview

Blue Coat™ was founded in 1996 as CacheFlow, Inc. and is headquartered in Sunnyvale, California. The company makes wire-speed proxy appliances that provide visibility and control of Web communications, and has more than 3,500 customers worldwide.

#### Secure Content Management Products

Blue Coat offers the following SCM products:

⊠ The ProxySG™ 800 and the ProxySG 8000 were designed to meet enterprise requirements for capacity, performance, availability and centralized management. While all three provide the same broad application support and features, the 8000 Series provides an expandable, modular platform for customizing disk size, RAM and network interface cards.

⊠ The ProxySG 400 enables corporations to extend Web traffic protection and control to the network edge, while significantly reducing the administration and management costs for securing a distributed enterprise.

⊠ The ProxyAV™ 400 and 2000 Series appliances enable organizations to deploy Web anti-virus with scalable, high-performance options that meet the "real-time"

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                                    SC023217

requirements of Web traffic. The ProxyAV works with Blue Coat's ProxySG™ platform to quickly and intelligently process Web objects for Web virus scanning performance.



### Strategic Direction

The Blue Coat ProxySG™ family of proxy appliances provides visibility and control of Web communications with wire-speed performance. Based on Blue Coat SGOS ™, a custom, object-based operating system with integrated caching, these proxy appliances leverage existing authentication systems to enable flexible policy enforcement down to the individual user. The ProxySG combines comprehensive proxy support of all Web protocols with integrated content filtering, instant messaging control, peer-to-peer (P2P) control, streaming control, pop-up ad blocking and virus scanning. Blue Coat's end-to-end product portfolio includes powerful reporting, policy and configuration management software – delivering a scalable proxy solution for centralized or distributed enterprise environments.

Blue Coat also makes the ProxyAV™ appliance for scalable, high-performance Web anti-virus. The ProxyAV works with the Blue Coat ProxySG™ to quickly and intelligently process Web objects and determine which objects should be scanned for viruses. The product also leverages caching and heuristic fingerprinting as an additional performance benefit to deliver "real-time" Web traffic virus scanning.

Blue Coat partners with a range of leading technology companies and system integrators to provide complete solutions for our customers. Current technology partners include Secure Computing, SurfControl and Websense for URL filtering; and Finjan, McAfee, Panda, Sophos, Symantec, and Trend Micro for Web virus scanning. Additionally, Blue Coat has a global network of distribution and channel sales partners.

### Cerberian (Acquired by Blue Coat)

### Overview

Cerberian, Inc. was founded in 2000 and employs approximately 30 people worldwide. Cerberian is headquartered in Draper, Utah, and has operations throughout the world. On July 19, 2004, leading proxy appliance vendor Blue Coat announced it would acquire Cerberian

### Secure Content Management Products

Cerberian offers the following SCM products:

 Cerberian provides an intelligent solution to help organizations gain full control of the way employees use the Internet. Cerberian is built upon a managed service architecture, a comprehensive and constantly growing database of more than 1 billion web pages, and a patent-pending dynamic real-time rating technology,

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                    SC023218

Cerberian Web Manager delivers an accurate, cost effective, and advanced web filtering solution.

### Strategic Direction

Cerberian Web Manager provides comprehensive protection and Internet policy enforcement for businesses, government agencies, schools, libraries and homes. Cerberian delivers this advanced solution as an integrated component on a variety of gateway devices, service solutions, and security software applications allowing organizations the freedom to choose how they prefer to deploy and manage their Internet security. Cerberian has established itself as a growing player in the content filtering marketplace through several strategic alliance partnerships and OEM relationships with companies such as Blue Coat, Check Point, Computer Associates, Microsoft, SonicWALL, and Zone Labs.

### *Sendmail*

#### Overview

With over 85 employees, Sendmail Inc. has corporate headquarters in Emeryville, California, and offices in North America, Europe, and Asia.

#### Secure Content Management Products

Sendmail offers the following SCM products:

- ☑ Mailstream Manager offers antispam, antivirus, and mail policy enforcement in order to protect an organization's network from security threats.

- ☑ Workforce Mail is based on the Mailstream Manager platform, but offers email scanning and defense to the deskless worker.

#### Strategic Direction

Sendmail provides comprehensive control of the mail stream and of the messaging system, protecting against spam, viruses, and intrusion while giving legitimate users secure message access. Sendmail's Content Management Filters, leveraging the unique API built into the Sendmail MTA, allow comprehensive policy-based control of data passing through the system to limit liability, scan for viruses, protect sensitive data, and enable regulatory compliance and policy enforcement. Powerful, intuitive interfaces and tools make installation, configuration, and account and data management easy and secure, lowering administrative costs and speeding deployment.

Sendmail is designed for fast, flexible growth, scaling to millions of users at extremely high levels of concurrency — quickly, cost-effectively, and without degradation in performance, usability, or manageability.

©2004 IDC                                    #31598                                    35

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                    SC023219

### *Sigaba*

**Overview**

Secure Data in Motion (dba Sigaba) is headquartered in San Mateo, California. Originally founded in 2000, Sigaba has offices in major cities across North America. Sigaba is privately held, with funding from Liberty Partners and Royal Wulff Ventures.

**Secure Content Management Products**

Sigaba offers the following SCM products:

☒ Sigaba Secure Email secures emails automatically, based on enterprisewide policies. The system enables administrators to enforce a wide variety of policies, such as encryption, virus scanning, content filtering, archiving, and quarantining. Policies are enforced at the server, gateway, and desktop.

☒ Sigaba Secure Instant Messaging scans and monitors IM exchange both in the corporate intranet and with external users, prevents the transmittal of viruses and spam, and enforces enterprisewide policies, including archiving, auditing, transcribing, end-to-end encryption, and digital signatures.

**Strategic Direction**

Sigaba solutions enable organizations to experience the benefits of the Internet while complying with industry, government, and regulatory requirements to protect confidential information. Sigaba Secure Email, Sigaba Secure Statements, and Sigaba Secure Instant Messaging meet the most demanding regulatory requirements such as Gramm-Leach-Bliley, HIPAA, and SEC, while speeding time to cash and enhancing customer satisfaction. Sigaba's customers focus includes financial services, government, and healthcare. The company is a member of the Liberty Alliance and a contributing member to the OASIS standards body and is instrumental in making federated authentication a reality for government and financial institutions. Sigaba's future direction is to introduce integrated solutions for application-specific secure message management as it enhances content filtering and management capabilities.

### *St. Bernard Software*

**Overview**

St. Bernard Software was founded in 1995 and is headquartered in San Diego, California. It has a global presence, with offices across the United States and Europe.

**Secure Content Management Products**

St. Bernard offers the following SCM products:

☒ iPrism is a hardware appliance that monitors, filters, and reports on inappropriate Internet access within businesses, government agencies, and educational institutions.

#31598                          ©2004 IDC

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                                SC023220

☒ ePrism is an email filtering appliance that delivers a combination of email security, spam protection, and antivirus and content control in an easy-to-use, high-performance appliance.

**Strategic Direction**

In 2000, St. Bernard acquired Internet Products Inc., an Internet filtering company with an appliance-based solution called iPrism. In August 2003, St. Bernard introduced the ePrism Mail Filter. The introduction of ePrism strengthens St. Bernard's existing core product line and reaffirms the company's commitment to providing strong network security solutions to organizations. Both solutions are focused on offering a robust solution that complies with midtier customers' unique requirements for simple operation, lower administrative costs, and solid support.

*Vericept*

**Overview**

Based in Denver, Colorado, Vericept Corp. was founded in 1999 and is privately held. Key investors in Vericept include Sigma Partners, Sequel Venture Partners, and William Blair.

**Secure Content Management Products**

Vericept offers the following SCM products:

☒ Vericept's Information Privacy and Compliance Manager addresses the needs of C-level executives as well as compliance, privacy, and corporate governance officers charged with providing information security to company confidential data and protecting the confidentiality of their customers regardless of industry.

☒ Vericept's Acceptable Use Manager enables organizations to intelligently monitor for infractions against their acceptable use policies and is available for either enterprises or educational institutions. Vericept Filter leverages the URL database from Secure Computing to create a powerful filter to use in combination with content monitoring that protects entire networks and all forms of Internet communications from network misuse and information security breaches.

☒ Vericept's Preventive Security Manager addresses significant and previously undetectable voids in traditional security frameworks such as enabling network security professionals to stop malicious activity before it happens and notifying when an attack is underway.

☒ Vericept's Stored Data Analyzer was developed leveraging Vericept's patented Linguistic Engine to analyze and examine stored data.

**Strategic Direction**

Vericept enables companies to manage financial, compliance, reputation, and productivity risk by analyzing all inbound and outbound Internet traffic for any activity falling outside of a company's internal information controls and acceptable use. Vericept identifies Internet activity placing the company at risk such as the unauthorized release of private customer information; the leaking of confidential M&A

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                    SC023221

plans; the premature posting of company earnings reports; employees and contractors constantly surfing pornography, shopping, or gambling; and employees using the company network to plan violent acts and network attacks

Vericept's enterprise risk management solutions, combined with services and support, are focused on providing the tools to those responsible for maintaining information security of corporate data.

### *Cloudmark*

#### Overview

Cloudmark is a private company headquartered in San Francisco, California. The company is a funded software start-up created by veteran entrepreneurs Keen, Napster, Inktomi, Sun, Microsoft, and Netscape.

#### Secure Content Management Products

Cloudmark offers the following SCM products:

- ▣ Cloudmark Immunity, the immune system for email, was developed to help the enterprise attain 100% accuracy and zero false positives through genetic mapping, nD technology, perfect memory, and adaptive learning. Immunity automatically learns the preferences of the enterprise and its employees.

- ▣ Cloudmark Authority prevents spam from entering networks. Authority is focused on large businesses, OEM partners, service providers, and carriers.

- ▣ Cloudmark Exchange Edition, the maintenance-free, server-side antispam solution for small and medium-sized businesses, leverages the power of the SpamNet community.

- ▣ Cloudmark SpamNet was developed specifically for individuals and small businesses seeking instant protection from spam at home or their office.

#### Strategic Direction

Cloudmark Inc. recently announced Cloudmark Immunity, the immune system for email. Immunity provides a complete infrastructure to protect the heart of the enterprise through Email Genetic Mapping (EGM) and nD Visualizer technology that was developed to obtain 100% accuracy and the ability to store and retrieve infinite data about spam and legitimate mail. Immunity creates a self-adapting system that automatically learns a company's spam defense based on input from its employees.

Unlike rules-based or Bayesian classifiers, Immunity creates the infrastructure to store and retrieve information through a one-click user feedback loop Immunity's nD Visualizer technology clusters email messages by genetic similarity in a graphical interface, allowing IT administrators to see how Immunity's spam protection adapts and improves over time and enabling them to easily diagnose and optimize the email infrastructure.

38                            #31598                            ©2004 IDC

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                            SC023222

*Proofpoint*

**Overview**

Proofpoint, founded in June 2002, is a messaging infrastructure company headquartered in Cupertino, California.

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                    SC023223

**Secure Content Management Products**

Proofpoint offers the following SCM products:

☒ The Proofpoint Protection Server is a message protection software platform that provides protection against spam and viruses while ensuring compliance with corporate email policies and external regulations. This spam filtering solution runs at the enterprise's gateway and employs Proofpoint's proprietary MLX technology, a Machine Learning system developed by researchers and scientists at Proofpoint's Anti-Spam Software Laboratory.

☒ Proofpoint's P-Series Message Protection Appliance™ delivers secure, complete email protection in a hardened, easy-to-deploy package. The Proofpoint P-Series Message Protection Appliance is available in three models: the P400, P600 and P800, and is compatible with any internal email solution.

**Strategic Direction**

Proofpoint is a messaging infrastructure company that is pioneering enterprise software solutions uniquely matched to the needs of the large corporate customer. Proofpoint offers both the Proofpoint Protection Server software as well as a hardware appliance – the Proofpoint P-Series Appliance. Both of these are based on the same MLX machine learning technology. The Proofpoint family of products is built on a programmable platform that is extensible, scalable, and manageable through a common set of interfaces and deployed within the network of corporate enterprises. Proofpoint provides business software for large enterprises to detect spam, protect against email-borne viruses, and ensure compliance with corporate policies and regulations through their messaging infrastructure.

Proofpoint is also focused on reducing the administrative burden of managing messaging security solutions. By providing centralized administration for all messaging protection applications, Proofpoint significantly reduces the ongoing operational costs of large, complex messaging deployments.

*Cobion*

**Overview**

Internet Security Systems, an established world leader in Internet security since 1994, acquired content security pioneer, Cobion AG, on January 14, 2004. ISS delivers proven cost efficiencies and reduces regulatory and business risk across the enterprise for more than 11,000 customers worldwide

**Secure Content Management Products**

Cobion offers the following SCM products:

☒ Proventia Web Filter blocks and helps improve productivity and enforce Internet usage policies. Proventia Web Filter has more than 20 million catalogued Web sites and is constantly and automatically updated with 100,000 new and updated Web pages added to the database each day.

40    #31598    ©2004 IDC

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY    SC023224

☒ Proventia Mail Filter is a comprehensive antispam and mail filtering solution. Proventia monitors the content of email traffic, eliminating spam and blocking undesirable or illegal content. Proventia Mail Filter avoids blocking legitimate email using a 10-step analysis process to ensure accurate spam detection.

**Strategic Direction**

Cobion's OrangeBox Web and OrangeBox Mail are now part of Internet Security Systems' Proventia line of enterprise security products for protection from the desktop to the datacenter against a full spectrum of online threats. The Cobion acquisition enables ISS to deliver best-of-breed content security either as a standalone product or via the Proventia all-in-one protection appliance, fulfilling ISS' security convergence strategy announced last October.. Proventia incorporates advanced intrusion prevention, firewall, VPN, vulnerability scanning, and antivirus, as well as mail security and Web filtering.

ISS plans to introduce Proventia Mail Filter and Proventia Web Filter in stand alone appliance form factors in the near future.

*MessageGate*

**Overview**

MessageGate is a provider of enterprise-class messaging security and compliance solutions for Fortune 1000 companies The MessageGate technology was developed at The Boeing Co., where it has been in use for over five years, and was spun out as an independent company in 2003.

**Secure Content Management Products**

MessageGate offers the following SCM products:

☒ MessageGate enables large corporations to protect, monitor, and control the flow of information over their messaging systems. Proven for more than four years in one of the world's largest networks, MessageGate delivers a scalable and configurable solution that can secure multiple messaging platforms across inbound, outbound, and internal messaging traffic.

**Strategic Direction**

MessageGate is focused on providing large corporations with perimeter-based protection from unwanted email and comprehensive monitoring capabilities for enforcement of corporate policies and adherence to regulatory requirements. MessageGate helps reduce infrastructure costs, increase employee productivity, and provide protection from confidential information leakage and regulatory violations.

MessageGate recently announced version 3.0 of its integrated secure messaging platform and Perimeter Protection and Policy Enforcement software products. MessageGate's first level of defense, Perimeter Protection, performs a single-pass analysis of both inbound and outbound messages using attachment identification/analysis, contextual message header analysis, predictive spam blocking, antivirus capabilities, and phishing prevention technology The new version also contains an end-user quarantine that effectively eliminates false positives by allowing

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                    SC023225

individuals to examine and provide feedback on suspect messages. MessageGate Policy Enforcement, an additional layer of protection, provides a structured method of managing corporate security policies and helps organizations comply with government regulations, including Gramm-Leach-Bliley, Sarbanes-Oxley, California SB1386, NASD 3010, and HIPAA.

### *Nokia*

#### Overview

Nokia is a broadly held company with listings on the Helsinki, Stockholm, Paris, Frankfurt, and New York stock exchanges. The company has 16 manufacturing facilities in 9 countries and R&D centers in 11 countries. At the end of 2003, Nokia employed approximately 51,000 people.

#### Secure Content Management Products

Nokia offers the following SCM products:

☒ Nokia Message Protector fully integrates software from Nokia and leading content security partners together with specialized update processes to create a single, purpose-built Nokia appliance.

#### Strategic Direction

Nokia enables secure, reliable, and manageable connectivity solutions through a complete system approach to IP security. The Nokia complete system approach fully integrates industry-leading software with purpose-built Nokia platforms. Nokia Message Protector is based on the proven Nokia complete system approach: purpose-built high-performance hardware from Nokia is coupled with multiple secure content management technologies from Nokia and leading content security partners

With the release of Nokia Message Protector v1.3, the Nokia Message Protector Basic annual service is now included in the order of the Nokia Message Protector software license. The ordering of customer support for the total platform and software solution is platform based and includes Nokia Reseller Essential support for qualified Nokia resellers, distributors, and service providers and Nokia Enterprise ACCESS support for customers. The Nokia service and support elements of Nokia Message Protector have been redesigned to deliver a world-class customer experience in the most economical and easy-to-order package possible.

### *eSoft*

#### Overview

Founded in 1984 and based in Broomfield, Colorado, eSoft strives to provide small and medium-sized enterprises with sophisticated, multitier network security solutions.

#### Secure Content Management Products

eSoft offers the following SCM products:

42 #31598 ©2004 IDC

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC023226

⊠ eSoft's InstaGate Secure Content Management (InstaGate SCM) solution combines preintegrated, policy-based Internet security tools that manage email content, Web content, virus protection, and more — all on a single platform.

©2004 IDC                    #31598                                    43

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                                    SC023227

**Strategic Direction**

eSoft focuses on providing small and medium-sized enterprises with the sophisticated, multitier network security solutions available in the simplest way possible. They deliver to over 12,000 customers next-generation Internet security appliances that integrate all the security tools and services organizations need on one extensible platform, reducing the time and complexity required to mount an effective defense enterprisewide. With services like antivirus; spam, Web site, and content filtering; and more, eSoft solutions ensure a high degree of customization and scalability while reducing the costs and complexity typically associated with maintaining an effective network security system.

eSoft's InstaGate SCM also offers multiple deployment options, making it easy to integrate into existing networks, and can be implemented in conjunction with other firewalls and mail servers without reconfiguring an existing network. This simple integration protects the investment a company has made in their current network security solution while at the same time providing best-of-breed email and Web content filtering for a complete, multilayered defense.

## ESSENTIAL GUIDANCE

The 2003 onslaught of viruses and worms such as Blaster, Nachi, and SoBig not only highlights the importance of keeping security solutions up to date, it also shines a spotlight on the growing need for more proactive security products and services. Although corporate customers have long realized that antivirus software is only as good as its last update, consumers and small business customers are realizing the necessity of subscription-based updates. Consumers and small businesses are finally recognizing the fact that antivirus software is more of a service than a product. Furthermore, the rapid infection by these new worm and virus attacks means that slow responses will cripple most customer environments because they will not be able to get ahead of the initial infection and the far more serious reinfections. Malicious hackers are getting much more sophisticated and faster at exploiting application vulnerabilities. The threat of zero-day attacks that take advantage of software vulnerabilities for which there are no available fixes are starting to be viewed as a major threat to data security.

IDC believes that a multilayered approach to the security infrastructure is necessary to thwart the threats outlined in this document. This approach could include some or all of the following: SCM software, identity management software, antispam filtering products, firewall/VPNs, network forensic software, management and monitoring software, security appliances, and secured application server technology. Finally, it is essential that enterprise IT departments outline and implement security policy that is strictly enforced throughout the organization. IDC advocates awareness, strictly enforced security policies corporatewide, and a multilayered approach to building and maintaining the security infrastructure.

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                    SC023228

# LEARN MORE

## Related Research

- ☒ *Worldwide Security Software 2004–2008 Forecast Update and 2003 Vendor Shares* (forthcoming)

- ☒ *Worldwide Antivirus 2004–2008 Forecast Update and 2003 Vendor Shares* (forthcoming)

- ☒ *Worldwide Antispam 2004–2008 Forecast Update and 2003 Vendor Shares* (forthcoming)

- ☒ *Worldwide Firewall/VPN Software 2004–2008 Forecast Update and 2003 Vendor Shares* (forthcoming)

- ☒ *Worldwide Intrusion Detection and Prevention 2004–2008 Forecast Update and 2003 Vendor Shares* (forthcoming)

- ☒ *Worldwide Vulnerability Assessment and Management 2004–2008 Forecast Update and 2003 Vendor Shares* (forthcoming)

- ☒ *Worldwide Security 3A Software 2004–2008 Forecast Update and 2003 Vendor Shares* (forthcoming)

- ☒ *Worldwide Security Appliance 2004–2008 Forecast Update and 2003 Vendor Shares* (forthcoming)

- ☒ *IDC's Software Taxonomy, 2004* (IDC #30838, February 2004)

## Appendix: Methodology

The IDC Software Research Group (SRG) market sizing and forecasts are presented in terms of "packaged software revenue." Packaged software is defined as programs or codesets of any type commercially available through sale, lease, or rental, or as a service. Packaged software revenue typically includes fees for initial and continued right-to-use packaged software licenses. These fees may include, as part of the license contract, access to product support and/or other services that are inseparable from the right-to-use license fee structure, or this support may be priced separately as software maintenance. Upgrades may be included in the continuing right of use or may be priced separately.

Packaged software revenue *excludes* service revenue derived from training, consulting, and system integration that is separate (or unbundled) from the right-to-use license but *includes* the implicit value of software included in a service that offers software functionality by a different pricing scheme (e.g., the implicit or stated value of software included in an application service provider's [ASP's] or other hosted software arrangement). It is the total packaged software revenue that is further allocated to markets, geographic areas, and operating environments.

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

SC023229

IDC's industry analysts have been measuring and forecasting IT markets for more than 30 years. IDC's software industry analysts have been delivering analysis and prognostications for packaged software markets for more than 25 years.

The market forecast and analysis methodology incorporates information from five different but interrelated sources, as follows:

☑ **Reported and observed trends and financial activity.** This study incorporates reported and observed trends and financial activity in 2003 as of the end of April 2004, including reported revenue data for public companies trading on North American stock exchanges (CY 1Q03–4Q03 in nearly all cases).

☑ **IDC's *Software Census* interviews.** IDC interviews all significant market participants to determine product revenue, revenue demographics, pricing, and other relevant information.

☑ **Product briefings, press releases, and other publicly available information.** IDC's software analysts around the world meet with hundreds of software vendors each year. These briefings provide an opportunity to review current and future business and product strategies, revenue, shipments, customer bases, target markets, and other key product and competitive information.

☑ **Vendor financial statements and related filings.** Although many software vendors are privately held and choose to limit financial disclosures, information from publicly held companies provides a significant benchmark for assessing informal market estimates from private companies. IDC also builds detailed information related to private companies through in-depth analyst relationships and maintains an extensive library of financial and corporate information focused on the IT industry. We further maintain detailed revenue by product area models on more than 1,000 worldwide vendors.

☑ **IDC demand-side research.** This includes thousands of interviews with business users of software solutions annually and provides a powerful fifth perspective for assessing competitive performance and market dynamics. IDC's user strategy databases offer a compelling and consistent time-series view of industry trends and developments. Direct conversations with technology buyers provide an invaluable complement to the broader survey-based results.

Ultimately, the data presented in this study represents IDC's best estimates based on the above data sources as well as reported and observed activity by vendors and further modeling of data that we believe to be true to fill in any information gaps.

## Synopsis

This IDC study examines the secure content management (SCM) market for the period from 2002 to 2008, with vendor revenue trends and market growth forecasts. Worldwide market sizing is provided for 2003, with trends from 2002. A five-year growth forecast for this market is shown for 2004–2008. A vendor competitive analysis, with vendor revenue and the market shares of the leading vendors, is provided for 2003. This study also includes profiles of leading vendors and identifies

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                    SC023230

the characteristics that vendors will need to be successful in the future. This document updates the forecast published in March 2004, *Worldwide Secure Content Management Software 2004–2008 Forecast: March 2004 Forecast* (IDC #30964, March 2004).

"The motive and intention of virus writers has changed," said Brian Burke, research manager, Security Products. "In the past, worms and viruses were typically created to destroy data by amateurs seeking notoriety. Today, more sophisticated attackers, often organized crime, are increasingly using worms and viruses to obtain credit card numbers, bank account information, and other personal information to perpetrate identity theft."

## Copyright Notice

This IDC research document was published as part of an IDC continuous intelligence service, providing written research, analyst interactions, telebriefings, and conferences. Visit www.idc.com to learn more about IDC subscription and consulting services. To view a list of IDC offices worldwide, visit www.idc.com/offices. Please contact the IDC Hotline at 800.343.4952, ext. 7988 (or +1.508.988.7988) or sales@idc.com for information on applying the price of this document toward the purchase of an IDC service or for information on additional copies or Web rights.

Copyright 2004 IDC. Reproduction is forbidden unless authorized. All rights reserved.

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY                    SC023231

# EXHIBIT 3

```

Sybari enterprise messaging antivirus and antispam security                               Page 2 of 2

clients include IBM, Amazon.com, Cable & Wireless, Compaq, Con Edison, Dell, Deloitte & Touche, Eastman Chemical, Getronics, JD Power, Lufthansa, Mayo Foundation, Merrill Lynch, Nortel, Pirelli, Sony, Target, Texaco, Tosco, Union Pacific, US Federal Government, and Visa. Sybari's many strategic partners include Lotus Development (NYSE:IBM), Microsoft (Nasdaq:MSFT), Computer Associates (NYSE:CA), Compaq (NYSE:CPQ), and Sun Microsystems (Nasdaq:SUNW).

© 2005 Sybari Software Inc. All rights reserved.    Legal Notice    Privacy Policy    End-User License Agreement    Site Map

# EXHIBIT 4

Intelligent Application Gateway 2007

Click Here to Install Silverlight

United States Change | All Microsoft Sites

Search Microsoft.com for:

 Go

## Microsoft Forefront

Microsoft Forefront Home     | Free Newsletters

**Product Information** ▶
**How to Buy**
**Learning**
**Partners**

**Client Security**
Forefront Client Security

**Server Security**
Home
Forefront Security for Exchange Server ▶
Forefront Security for SharePoint ▶
Forefront Server Security Management Console ▶
Microsoft Antigen ▶

**Edge Security**
Home ▶
Solutions ▶
Microsoft ISA Server
Intelligent Application Gateway (IAG) ▶
Microsoft Servers ▶

**Related Sites**
Forefront Client Security TechCenter
Forefront Security for Exchange Server TechCenter
Forefront Security for SharePoint TechCenter
Antigen TechCenter
ISA Server TechCenter
IAG Technical Resources

**Security Solutions**
Easier Security
Secure Client
Secure Messaging
Integrated Security and IT Management



# Intelligent Application Gateway 2007
**Microsoft Forefront Edge Security and Access**

IAG 2007 is now part of Forefront Edge Security and Access.

- Learn more about Forefront Edge Security and Access
- View product tours
- Download evaluation software

Microsoft's Intelligent Application Gateway (IAG) 2007 is the comprehensive, secure remote access gateway that provides secure socket layer (SSL)-based application access and protection with endpoint security management. Read the resources listed below to learn how IAG 2007 enables granular access control, authorization, and deep content inspection from a broad range of devices and locations to a wide variety of line-of-business, intranet, and client/server resources.

- **Control Access**
  Secure, browser-based access to corporate applications and data from more locations and more devices.

- **Protect Assets**
  Ensure the integrity and safety of network and application infrastructure by blocking malicious traffic and attacks.

- **Safeguard Information**
  Comprehensive policy enforcement helps drive compliance with legal and business guidelines for using sensitive data.

Learn more about IAG 2007 with the evaluation resources listed below.

## Highlights



**Microsoft Announces Its Next-Generation Secure Remote Access Solution, the Forefront Unified Access Gateway**
*April, 2008.* Forefront Unified Access Gateway is the evolution of proven technologies in the current solution, the Intelligent Application Gateway (IAG 2007), and brings new features and functionality to help make remote access easier than ever for users and IT professionals.



**Microsoft placed in Visionaries Quadrant of Magic Quadrant for SSL VPN, North America, 3Q07**
On December 6, Gartner's Magic Quadrant for SSL VPN, North America, 3Q07 was published and Microsoft is positioned in the Visionary Quadrant!

- The full reprint of the report is available here



**Microsoft Lands a Winning SSL VPN in Whale**
*InfoWorld* (October 29, 2007) 8.7/10 – Excellent. Microsoft's IAG 2007 is a full-featured SSL VPN solution available only as part of an OEM/appliance bundle. IAG sits on top of Microsoft ISA Server, providing multiple layers of security. IAG's policy engine is very robust and includes a wide range of predefined applications to make

policy definition easier.



**Microsoft Delivers Enhancements to IAG 2007**
*PressPass* (May 21, 2007) Microsoft announces the technical beta of Service Pack 1 for Intelligent Application Gateway 2007. IAG 2007 SP1 improvements include client support for Windows Vista and Windows Mobile 5.0 and enhanced support for federated security. Microsoft also announced five new original equipment manufacturing (OEM) partnerships.

---

- **Product Overview**
  Learn more about how IAG 2007's functionality for controlling user access, protecting IT assets, and safeguarding business information can help you easily deploy solutions for secure application access, customizable enterprise security, and granular information protection.

- **Datasheets**
  Download the IAG 2007 and Intelligent Application Optimizer datasheets.

- **Features**
  Learn the detail about IAG 2007's Web application firewall, granular policy-based access, and endpoint security management features that simplify application-centric, policy-based access with granular Web application firewall security.

- **Frequently Asked Questions**
  Learn more about IAG 2007 by reading answers to frequently asked questions.

- **Trial Software**
  Try out the new features and functionality by downloading trial software for IAG 2007.

- **System Requirements**
  Look up system requirements and supported client software for IAG 2007.

- **White Papers**
  Learn about IAG 2007's technical architecture.

- **News and Reviews**
  Find out what the press is saying about IAG 2007.

- **Case Studies**
  See how organizations are deploying IAG 2007 in real-world situations.

🖨 Printer Friendly Version    📨 Send This Content    ⭐ Add To Favorites

**How would you rate the usefulness of this content ?**

1   2   3   4   5
Poor ◯ ◯ ◯ ◯ ◯ Outstanding

**Tell us why you rated the content this way. (optional)**

[ Submit ]

© 2008 Microsoft Corporation. All rights reserved. Contact Us  |  Terms of Use  |  Trademarks  |  Privacy Statement



# EXHIBIT 5
# REDACTED
# IN ITS ENTIRETY

# EXHIBIT 6
# REDACTED
# IN ITS ENTIRETY

# EXHIBIT 7

7

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

CONSOLIDATED FINANCIAL STATEMENTS

AS OF DECEMBER 31, 2004

Joint Trial Exhibit
**JTX-29**
Case No. 06-369 GMS

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

CONSOLIDATED FINANCIAL STATEMENTS

AS OF DECEMBER 31, 2004

IN U.S. DOLLARS

INDEX

| | Page |
|---|---|
| Report of Independent Auditors | 2 |
| Consolidated Balance Sheets | 3 |
| Consolidated Statements of Operations | 4 |
| Statements of Changes in Stockholders' Equity (Deficiency) | 5 |
| Consolidated Statements of Cash Flows | 6 |
| Notes to Consolidated Financial Statements | 7 – 20 |

Highly Confidential - Attorneys' Eyes Only

# ☰Ⅱ ERNST & YOUNG

Kost Forer Gabbay & Kasierer
3 Aminadav St
Tel-Aviv 67067, Israel

Phone 972-3-6232525
Fax    972-3-5622655

## REPORT OF INDEPENDENT AUDITORS

### To the Stockholders of

### FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

We have audited the accompanying consolidated balance sheets of Finjan Software, Inc. and its subsidiaries (the "Company") as of December 31, 2004 and 2003, and the related consolidated statements of operations, changes in stockholders' equity (deficiency) and cash flows for each of the two years in the period ended December 31, 2004. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company as of December 31, 2004 and 2003, and the consolidated results of its operations and cash flows for each of the two years in the period ended December 31, 2004, in conformity with accounting principles generally accepted in the United States.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1d to the financial statements, the Company has incurred recurring operating losses and negative cash flow from operating activities. The financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result from the outcome of this uncertainty.

Tel-Aviv, Israel
February 28, 2005

KOST FORER GABBAY & KASIERER
A Member of Ernst & Young Global

- 2 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## CONSOLIDATED BALANCE SHEETS

U.S. dollars in thousands (except share and per share data)

| | Note | December 31, 2004 | December 31, 2003 |
|---|---|---|---|
| ASSETS | | | |
| CURRENT ASSETS: | | | |
| Cash and cash equivalents | | S    4,499 | S    2,738 |
| Trade receivables (net of allowance for doubtful accounts of S 10 and S 23 as of December 31, 2004 and 2003, respectively) | | 3,463 | 3,107 |
| Prepaid expenses and other accounts receivable | | 436 | 256 |
| Total current assets | | 8,398 | 6,101 |
| INVENTORY | | 209 | |
| LONG-TERM DEPOSITS AND PREPAID EXPENSES | | 309 | 142 |
| SEVERANCE PAY FUND | | 374 | 282 |
| PROPERTY AND EQUIPMENT, NET | 1 | 632 | 438 |
| Total assets | | S    9,912 | S    6,963 |
| LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIENCY) | | | |
| CURRENT LIABILITIES: | | | |
| Current maturities of obligation under capital leasing contracts | 4 | S    - | S    11 |
| Trade payables | | 593 | 499 |
| Employees and payroll accruals | | 952 | 642 |
| Deferred revenues | | 4,374 | 4,305 |
| Accrued expenses and other liabilities | | 1,180 | 1,447 |
| Total current liabilities | | 7,099 | 6,904 |
| LONG-TERM LIABILITIES: | | | |
| Capital lease obligations, net of current maturities | 4 | - | 2 |
| Long-term deferred revenues | | 2,227 | 1,667 |
| Accrued severance pay | | 556 | 409 |
| Total long-term liabilities | | 2,783 | 2,078 |
| COMMITMENTS AND CONTINGENCIES | 5 | | |
| STOCKHOLDERS' EQUITY (DEFICIENCY) | 6 | | |
| Stock capital : | | | |
| Common stock of S 0.01 par value: | | | |
| Authorized: 27,000,000 and 15,000,000 shares at December 31, 2004 and 2003, respectively; Issued and outstanding: 247,190 and 187,946 shares at December 31, 2004 and 2003, respectively. | | 3 | 3 |
| Series A, B, C and D Preferred stock of S 0.01 par value Authorized: 18,140,278 and 10,428,196 shares at December 31, 2004 and 2003, respectively; Issued and outstanding: 16,854,931 and 10,428,196 shares at December 31, 2004 and 2003, respectively. Aggregate liquidation preference of S 30,796 as of December 31, 2004 | | 166 | 104 |
| Additional paid-in capital | | 38,894 | 39,061 |
| Treasury shares | | (9) | (9) |
| Receipts on account of shares | | 10 | 14 |
| Accumulated deficit | | (39,036) | (31,192) |
| Total stockholders' equity (deficiency) | | 30 | (2,019) |
| Total liabilities and stockholders' equity (deficiency) | | S    9,912 | S    6,963 |

The accompanying notes are an integral part of the consolidated financial statements.

February 28, 2005
Date of approval of the
financial statements

Shlomo Touboul
Chief Executive Officer

David Ater
Chief Financial Officer

- 3 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

U.S. dollars in thousands

|  | Year ended December 31, | |
|  | 2004 | 2003 |
|---|---|---|
| Revenues | $ 7,099 | $ 5,889 |
| Cost of revenues | 1,638 | 1,333 |
| Gross profit | 5,461 | 4,556 |
| Operating expenses: |  |  |
| Research and development | 4,163 | 3,064 |
| Selling and marketing, net | 6,768 | 6,338 |
| General and administrative | 2,279 | 1,662 |
| Total operating expenses | 13,210 | 11,064 |
| Operating loss | (7,749) | (6,508) |
| Financial and other expenses, net | 69 | 92 |
| Net loss before taxes on income | (7,818) | (6,600) |
| Taxes on income | 26 | 7 |
| Net loss | $ (7,844) | $ (6,607) |

The accompanying notes are an integral part of the consolidated financial statements.

- 4 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIENCY)

U.S. dollars in thousands (except share data)

| | Preferred stock | | Common stock | | Additional paid-in capital | Treasury stock | Receipts on account of shares | Accumulated deficit | Total stockholders' equity (deficiency) |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Amount | Number | Amount | | | | | |
| Balance as of January 1, 2003 | 10,428,196 | $ 104 | 254,242 | 3 | $ 29,061 | $ - | $ 14 | $ (24,585) | $ 4,597 |
| Purchase of Treasury stock | | | (66,296) | *) - | | (9) | | | (9) |
| Net loss | | | | | - | | | (6,607) | (6,607) |
| Balance as of December 31, 2003 | 10,428,196 | 104 | 187,946 | 3 | 29,061 | (9) | 14 | (31,192) | (2,019) |
| Options exercised | | | 59,244 | *) - | 8 | | (4) | | 4 |
| Issuance of Series D Preferred stock, net | 6,426,735 | 64 | | | 9,825 | | | | 9,889 |
| Net loss | | | | | - | | | (7,844) | (7,844) |
| Balance as of December 31, 2004 | 16,854,931 | $ 168 | 247,190 | 3 | $ 38,894 | $ (9) | $ 10 | $ (39,036) | $ 30 |

*) Represents an amount lower than $ 1.

The accompanying notes are an integral part of the consolidated financial statements.

- 5 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CASH FLOWS

U.S. dollars in thousands

| | Year ended December 31, | |
|---|---|---|
| | 2004 | 2003 |
| **Cash flows from operating activities:** | | |
| Net loss | $ (7,844) | $ (6,607) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation | 227 | 122 |
| Increase in trade receivables | (356) | (1,079) |
| Increase in prepaid expenses and other accounts receivable | (180) | (74) |
| Increase in trade payables | 94 | 115 |
| Increase in employee and payroll accruals and accrued expenses and other liabilities | 43 | 1,039 |
| Increase in deferred revenues | 629 | 2,864 |
| Increase in severance pay, net | 55 | 50 |
| Increase in inventory | (209) | |
| Net cash used in operating activities | (7,541) | (3,570) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment | (411) | (325) |
| Increase in long-term deposits and prepaid expenses | (167) | (134) |
| Net cash used in investing activities | (578) | (459) |
| **Cash flows from financing activities:** | | |
| Principal payments of obligation under capital leasing contracts | (13) | (7) |
| Proceeds from issuance of shares, net | 9,897 | -- |
| Options exercised | (4) | -- |
| Purchase of Treasury stock | -- | (9) |
| Net cash provided by (used in) financing activities | 9,880 | (16) |
| Increase (decrease) in cash and cash equivalents | 1,761 | (4,045) |
| Cash and cash equivalents at the beginning of the year | 2,738 | 6,783 |
| Cash and cash equivalents at the end of the year | $ 4,499 | $ 2,738 |
| Supplemental disclosure of non-cash financing activities: | | |
| Options exercised but not yet paid | 4 | -- |

The accompanying notes are an integral part of the consolidated financial statements.

- 6 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 1:-    GENERAL

a.    Finjan Software, Inc. ("Finjan") and its subsidiaries ("the Company" or "the Finjan Group") are engaged in the development, marketing and sale of behavior-based security solutions for enterprises, small and medium-sized business and home users. Finjan's security solutions, using its patented Application-Level Behavior Blocking provide protection against both known and unknown attacks, the first time they strike (e.g. Spyware, phishing, malicious code, viruses, worms and Trojans). Finjan's behavior – based security solutions integrate anti-virus, anti-spam, URL filtering and document protection.

Finjan, a Delaware Corporation, was incorporated in June 2002 and commenced operations in September 2002. As a result of the reorganization described in Note 1b, Finjan became the parent company of the following wholly owned subsidiaries:

1.    Finjan Software Ltd. ("Finjan Ltd." or "the Israeli subsidiary") - Finjan Ltd., was incorporated in Israel and commenced operations in January 1996. As a result of the reorganization, which took place in September 2002. Finjan became the parent company of Finjan Ltd. owning approximately 97% of its shares. In March 2004, Finjan purchased the balance of Finjan Ltd.'s shares. As a result Finjan Ltd. became a wholly owned subsidiary of Finjan.

2.    Finjan Inc. ("Finjan Inc.") - Finjan Inc. was incorporated in the State of California as a wholly owned subsidiary of Finjan Ltd. and commenced operations in January 1997. During 1998, Finjan, Inc. was reincorporated in the State of Delaware. In October 2003 Finjan Ltd. transferred all of its shares in Finjan Inc. to Finjan. As a result of this transfer, Finjan Inc. became a wholly owned subsidiary of Finjan.

3.    Finjan Software (UK) Ltd. ("Finjan UK") - Finjan UK was incorporated under the laws of the United Kingdom, as a wholly owned subsidiary of Finjan Ltd. in March 2003. In October 2003, Finjan Ltd. transferred its share in Finjan UK to Finjan. As a result of this transfer, Finjan UK became a wholly owned subsidiary of Finjan. Finjan UK is engaged in marketing the Company's products in England.

4.    Finjan Software GmbH ("Finjan GmbH") - Finjan GmbH was incorporated in August 2004 under the laws of Germany as a wholly-owned subsidiary of Finjan. Finjan GmbH is engaged in marketing the Company's products in Germany, Austria and Switzerland.

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

### NOTE 1:- GENERAL

b. In September 2002, Finjan entered into a stock purchase agreement ("the SPA") whereby it issued to investors 5,870,317 shares of Series C Preferred stock of Finjan at a price per share of $ 1.1382, for a total consideration of approximately $ 6,700. In addition, a loan received by Finjan Ltd. in March 2002 was assigned to Finjan and converted into 1,757,160 shares of Series C Preferred stock of Finjan. As a condition to the SPA, a reorganization agreement was signed in September 2002 between Finjan, Finjan Ltd.'s stockholders and Finjan Ltd., according to which a reorganization in the Finjan Group structure was consummated. As part of the reorganization, a new Delaware corporation, Finjan Software, Inc. was established, and it was agreed that (i) each share of outstanding Preferred A, B, C and D stock of Finjan Ltd. (assuming conversion into Common stock) was exchanged for one Series A Preferred stock of Finjan; (ii) each outstanding share of Series E Preferred stock of Finjan Ltd. was exchanged for one share of Series B Preferred stock of Finjan; (iii) each outstanding warrant or option for Common stock or Preferred stock of Finjan Ltd. shall become exercisable for the same class of securities the holder of such options or warrants has obtained in the reorganization (see also Note 6); and (iv) 254,242 outstanding shares of common A and B stock of Finjan Ltd. out of a total 362,232 shares of common A and B stock were exchanged for 254,242 shares of Common stock of Finjan. In addition, in accordance with the SPA, Finjan issued, at no consideration, 31,850 shares of Series B Preferred stock of Finjan to certain stockholders as a result of the antidilution protection provided in Finjan Ltd.'s Articles of Association. As part of the reorganization a share exchange agreement was signed with a Common A stockholder (the "Stockholder") of Finjan Ltd. whereby 105,595 Common A stock of Finjan Ltd. held by the Stockholder were transferred to Finjan in consideration for the issuance of Common stock of Finjan on a one to one basis. This reorganization has been accounted for in a manner similar to a pooling of interest.

c. In June 2004, the Company signed a stock purchase agreement ("the 2004 SPA") with certain existing shareholders and a major new investor ("the New Investor").

According to the 2004 SPA the Company issued 6,426,735 shares of Series D Preferred stock at a price per share of $ 1.556 for a total consideration of $ 10,000, net of $ 111 in issuance expenses. In connection with the SPA, the Company has restated its Certificate of Incorporation in order to adjust the rights associated with the Preferred stock.

d. As of December 31, 2004, the Company's stockholders' equity amounted to $ 30. In addition, in 2004, the Company incurred operating losses in the amount of approximately $ 7,844 and had negative cash flow from operating activities in the amount of approximately $ 7,541. The Company's ability to continue as a going concern is dependent upon it raising additional capital and attaining positive cash flow.

- S -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES

The financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP"). The significant policies followed in the preparation of the consolidated financial statements are:

a. Use of estimates:

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reporting amounts of revenues and expenses during the reporting period notes. Actual results could differ from those estimates.

b. Financial statements in U.S. dollars:

The functional currency of the Company is the U.S. dollar, as the U.S. dollar is the currency of the primary economic environment in which the Company operates and expects to continue to operate in the foreseeable future. The majority of the Company's operations is currently conducted by the Israeli subsidiary and most of the Israeli expenses are currently paid in new Israeli shekels ("NIS"); however, these operations are denominated and determined in U.S. dollars. All of the Company's revenues are generated in U.S. dollars, its cash is invested almost entirely in U.S. dollar deposits and its other financing activities including loans and equity transactions are made in U.S. dollars.

The Company's transactions and balances denominated in U.S. dollars are presented at their original amounts. Non-dollar transactions and balances have been remeasured to U.S. dollars in accordance with Statement of Financial Accounting Standards ("SFAS") No. 52 of the U.S. Financial Accounting Standards Board ("FASB"). All transaction gains and losses from remeasurement of monetary balance sheet items denominated in non-dollar currencies are reflected in the statement of operations as financial income or expenses, as appropriate.

c. Principles of consolidation:

The consolidated financial statements include the accounts of Finjan Software Inc. and its wholly owned subsidiaries, Finjan Software Ltd., Finjan Inc., Finjan Software U.K. Limited and Finjan Software GmbH. Intercompany balances and transactions have been eliminated upon consolidation.

d. Cash equivalents:

Cash equivalents are considered to be highly liquid investments, which include unrestricted short-term bank deposits with original maturities of three months or less.

e. Long-term lease deposits:

Long-term lease deposits include long-term deposits for facilities and motor vehicles leasing, presented at their cost.

- 9 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

    f.    Property and equipment:

Property and equipment are stated at cost. Depreciation is computed by the straight-line method over the estimated useful lives of the assets at the following annual rates:

|  | % |
|---|---|
| Computers and peripheral equipment | 33 |
| Office furniture and equipment | 6 - 20 |
| Leasehold improvements | Over the term of the lease |

The Company's long-lived assets are reviewed for impairment in accordance with Statement of Financial Accounting Standard No. 144 "Accounting for the Impairment or Disposal of Long-Lived Assets" ("SFAS No.144") whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted cash flows expected to be generated by the assets. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. As of December 31, 2004, no impairment losses have been identified.

    g.    Research and development costs:

SFAS No. 86, "Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed", requires capitalization of certain software development costs subsequent to the establishment of technological feasibility.

Based on the Company's product development process, technological feasibility is established upon the completion of a working model. The Company does not incur material costs between the completion of the working model and the point at which the product is ready for general release. Therefore, research and development costs are charged to the statement of operations as incurred.

    h.    Concentrations of credit risk:

SFAS No. 105, "Disclosure of Information About Financial Instruments with Off-Balance-Sheet Risk and Financial Instruments with Concentration of Credit Risk", requires disclosure of any significant off-balance-sheet and credit risk concentrations. The Company has no significant off-balance-sheet concentration of credit risk such as foreign exchange contracts, option contracts or other foreign hedging arrangements.

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents, trade receivables and other accounts receivable.

- 10 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands

## NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

Cash and cash equivalents are invested in major banks in Israel and the United States. Such deposits in the United States may be in excess of insured limits and are not insured in other jurisdictions. Management believes that the financial institutions that hold the Company's investments are financially sound and, accordingly, minimal credit risk exists with respect to these investments.

The trade receivables of the Company are mainly derived from sales to customers located in Europe and the U.S. The Company performs ongoing credit evaluations of their customers and to date has not experienced any material losses. An allowance for doubtful accounts is determined with respect to specific amounts that the Company has determined to be doubtful of collection.

i.    Revenue recognition:

The Company derives its revenue from sales of hardware appliance, software license fees and sub-license fees of its products, maintenance and support and rendering of consulting services including training and installation. The Company sells its products indirectly through distributors, resellers and directly to end-users, all of whom are considered end-users.

The Company recognizes software license revenue in accordance with Statement of Position SOP 97-2, "Software Revenue Recognition" ("SOP 97-2"), as amended. SOP 97-2 generally requires revenue earned on software arrangements involving multiple elements to be allocated to each element based on the relative fair value of the elements. When contracts contain multiple elements wherein vendor specific objective evidence (VSOE) of fair value exists for all undelivered elements, the Company accounts for the delivered elements in accordance with the "Residual Method" prescribed by SOP 98-9. Maintenance and support revenue included in these arrangements is deferred and recognized on a straight-line basis over the term of the maintenance and support agreement. The VSOE of fair value of the undelivered elements (maintenance, support and services) is determined based on the price charged for the undelivered element when sold separately.

Revenue from software license fees is recognized when persuasive evidence of an agreement exists, delivery of the product has occurred, no significant obligations with regard to implementation remain, the fee is fixed or determinable, and collectability is probable.

When VSOE of fair value did not exist for all undelivered elements the Company recognized the product sale and maintenance revenue ratably over the maintenance period.

Deferred revenue includes amounts invoiced to or received from customers for which revenue has not been recognized.

- 11 -

FIN009729

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)

Service revenue is primarily comprised of revenue from standard maintenance agreements, consulting and training fees. The Company recognizes revenues from maintenance over the contractual period of the maintenance agreement, which is generally one year. Consulting services are billed at an agreed upon rate plus out-of-pocket expenses, and training services are billed on a per session basis. The Company recognizes service revenue from consulting and training when provided to the customer.

j.    Accounting for stock-based compensation:

The Company has elected to follow Accounting Principles Board Opinion No. 25 "Accounting for Stock Issued to Employees" ("APB 25") and Interpretation No. 44 "Accounting for Certain Transactions Involving Stock Compensation" ("FIN 44") in accounting for its employee stock option plans. Under APB 25, when the exercise price of the Company's stock options is less than the market price of the underlying stocks on the date of grant, compensation expense is recognized.

The Company applies SFAS No. 123, "Accounting for Stock-Based Compensation" and Emerging Issues Task Force ("EITF") 96-18, "Accounting for Equity Instruments That are Issued to Other Than Employees for Acquiring, or In Conjunction with Selling Goods or Services", with respect to warrants and options issued to non-employees and consultants. SFAS No. 123 requires the use of option valuation models to measure the fair value of the warrants at the grant date.

In December 2002, the FASB issued SFAS 148, "Accounting for Stock Based Compensation Transition and Disclosure - an Amendment of FASB Statement No. 123" ("SFAS 148"). SFAS 148 permits two additional transition methods for entities that adopt the fair value based method of accounting for stock-based employee compensation. The Statement also requires new disclosures about the ramp-up effect of stock-based employee compensation on reported results. The Statement also requires that those effects be disclosed more prominently by specifying the form, content, and location of those disclosures. The transition guidance and annual disclosure provisions of SFAS 148 are effective for fiscal years ending after December 15, 2002, with earlier application permitted in certain circumstances. The interim disclosure provisions are effective for financial reports containing financial statements for interim periods beginning after December 15, 2002. As of the balance sheet date, the Company continues to apply APB 25.

Pro forma information regarding the Company's net loss and net loss per stock is required by SFAS No. 123 and has been determined as if the Company had accounted for its employee stock options under the fair value method prescribed by SFAS No. 123. However, the pro-forma information required by SFAS No. 123 is not disclosed due to its immateriality.

- 12 -

Highly Confidential -- Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)

    k.    Severance pay:

Finjan Ltd.'s liability for severance pay is calculated pursuant to Israeli's Severance Pay Law based on the most recent salary of the employees multiplied by the number of years of employment, as of the balance sheet date. Employees are entitled to one month's salary for each year of employment or a portion thereof. Finjan Ltd.'s liability for all of its employees is fully provided by monthly deposits with insurance policies and by an accrual. The value of these policies is recorded as an asset in the Company's balance sheet.

The deposited funds include profits accumulated up to the balance sheet date. The deposited funds may be withdrawn only upon the fulfillment of the obligation pursuant to Israel's Severance Pay Law or labor agreements. The value of the deposited funds is based on the cash surrendered value of these policies, and includes immaterial profits.

Severance expenses for the years ended December 31, 2004 and 2003, amounted to approximately $ 261 and $ 144, respectively.

    l.    Fair value of financial instruments:

The following methods and assumptions were used by the Company in estimating its fair value disclosures for financial instruments:

The carrying amounts of cash and cash equivalents, trade receivables, and other accounts receivable, trade payables and current maturities of capital lease obligations approximate their fair value due to the short-term maturity of such instruments.

The carrying amount of the Company's long-term capital lease obligations approximates its fair value. The fair value was estimated using the cash flow analysis.

    m.    Impact of recently issued accounting standards:

On December 16, 2004, the Financial Accounting Standards Board (FASB) issued Statement No. 123 (revised 2004), "Share-Based Payment" ("Statement 123R"), which is a revision of FASB Statement No. 123, "Accounting for Stock-Based Compensation" ("Statement 123"). Generally, the approach in Statement 123(R) is similar to the approach described in Statement 123. However, Statement 123 permitted, but did not require, share-based payments to employees to be recognized based on their fair values, while Statement 123(R) requires all share-based payments to employees to be recognized based on their fair values. Statement 123R also revises, clarifies and expands guidance in several areas, including measuring fair value, classifying an award as equity or as a liability and attributing compensation cost to reporting periods. The new Standard will be effective for the Company in the first interim period beginning after January 1, 2006. The Company does not expect that the adoption of SFAS 123R will have a material effect on its financial position or results of operation.

FIN009731

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 3:-  PROPERTY AND EQUIPMENT

|  | | December 31, | | |
|---|---|---|---|---|
|  | | 2004 | | 2003 |
| Cost: | | | | |
| Computers and peripheral equipment | $ | 1,326 | $ | 959 |
| Office furniture and equipment | | 195 | | 151 |
| Leasehold improvements | | 61 | | 61 |
| | | 1,582 | | 1,171 |
| Accumulated depreciation | | 960 | | 733 |
| Depreciated cost | $ | 622 | $ | 438 |

Depreciation expenses for the years ended December 31, 2004 and 2003 were $ 227 and $ 122, respectively.

NOTE 4:-  OBLIGATION UNDER CAPITAL LEASING CONTRACTS

a.   The Company leased computer equipment under capital leasing contracts. The loans were linked to the U.S. dollar and bear interest at the rate of 8.55% subject to the changes in the LIBOR interest rate every three months. As of December 31, 2004, the Company has no further commitments regarding the capital lease contract.

b.   Future minimum payments under capital leases:

| | | |
|---|---|---|
| 2005 | $ | 13 |
| 2006 | | 12 |
| 2007 | | 11 |
| 2008 | | 9 |
| | $ | 45 |

NOTE 5:-  COMMITMENTS AND CONTINGENT LIABILITIES

a.   Lease commitments:

The Company rents its facilities under operating leases in Israel, the United Kingdom, Germany and the United States.

Aggregate minimum rental commitments under non-cancelable leases as of December 31, 2004, are as follows:

| | | |
|---|---|---|
| 2005 | $ | 725 |
| 2006 | | 307 |
| 2007 | | 102 |
| | $ | 1,134 |

Rent expenses for the years ended December 31, 2004 and 2003, were $ 405 and $ 513, respectively.

- 14 -

FIN009732

FINJAN SOFTWARE. INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 5:-  COMMITMENTS AND CONTINGENT LIABILITIES (Cont.)

b.    During the years 2004 and 2003. the Company provided bank guarantees to its lessor of leased accommodation in the amounts of $ 114 and $ 112. respectively.

c.    Legal claim:

During 2003. the Company received a letter from a third party. alleging to a potential infringement of one of that party's patents. The Company responded that it does not believe that its product infringes the abovementioned patent. No further action has been taken to date. The Company does not believe that this claim has any merit, and the Company will vigorously defend itself against the claim presented therein. if necessary. The Company does not believe that this legal claim will have any impact on its financial statements.

NOTE 6: -  STOCK CAPITAL

In September 2002. the Company underwent a reorganization whereby a new Delaware corporation. Finjan Software. Inc. was established. and all Preferred stock and some of the Common stock of Finjan Ltd. were exchanged for Preferred and Common stock of Finjan Software Inc. (see Note 1).

a. Composition of stock capital of Finjan Software. Inc:

|  | December 31, 2004 | | December 31, 2003 | |
|  | Authorized | Issued and outstanding | Authorized | Issued and outstanding |
| --- | --- | --- | --- | --- |
|  | | Number of shares | | |
| Common stock (1) | 27,000,000 | 247,190 | 15,000,000 | 187,946 |
| Series A Preferred stock (2) | 226,226 | 226,226 | 226,226 | 226,226 |
| Series B Preferred stock (2) | 2,574,493 | 2,574,493 | 2,574,493 | 2,574,493 |
| Series C Preferred stock (2) | 7,627,477 | 7,627,477 | 7,627,477 | 7,627,477 |
| Series D Preferred stock (2) | 7,712,082 | 6,426,735 | - | - |
|  | 45,140,278 | 17,102,121 | 25,428,196 | 10,616,142 |

(1)    Common stock

Common stock confers upon its holders. pari passu, the right to receive notice of, and to participate in. all general meetings of the Company. to vote in such meetings. to receive dividends, and to participate in the distribution of the surplus assets of the Company in the event of liquidation of the Company.

- 15 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 6: – STOCK CAPITAL (Cont.)

    (2)   Preferred stock:

Series A, B, C and D Preferred stock confer upon their holders the same rights conferred by the Common stock. In addition, each share of Preferred Series A, C and D stock is convertible into Common stock on a one for one basis and each share of Preferred Series B stock is convertible into 1.23 shares of Common stock. Each share of Preferred Series A, B, C and D stock is converted into Common stock at the applicable conversion price at the option of the holder and automatically upon the earlier of (i) a qualified initial public offering ("IPO"), which yields not less than $ 25,000 in net proceeds to the Company, or (ii) with respect to each class, a written consent or agreement of holders of majority of the outstanding shares of such class.

Holders of shares of Series D Preferred stock are entitled to a dividend prior to the Series A, B and C Preferred Stock and the Common stock, when and if declared, at a rate of $ 0.1245 per share per annum. Holders of Series C Preferred stock are entitled to receive a dividend, prior to the Series A and B Preferred stock and the Common stock, when and if declared, at a rate of $ 0.091 per share per annum. Such dividends shall not be cumulative.

In the event of a liquidation or deemed liquidation of the Company, in which the value of the assets available for distribution among the stockholders is $ 80,000 or less, then all assets available for distribution between the stockholders will be distributed in the following order: (i) Series D Preferred stock shall be entitled to receive, prior to any other Common or Preferred stock, an amount per share equal to $ 1.5560 (subject to adjustments) for each outstanding share of Preferred D stock; (ii) Series C Preferred stock shall be entitled to receive, prior to Series A and B Preferred Stock and Common stock, an amount per share equal to $ 1.1382 (subject to adjustments) for each outstanding share of Preferred C Stock; (iii) Series B Preferred stock shall be entitled to receive, prior to Preferred A stock and Common stock, an amount per share equal to $ 1.4014 for each outstanding share of Preferred B stock (subject to adjustments); (iv) Series A Preferred stock shall be entitled to receive, prior to Common stock, an amount per share equal to $ 37.6 for each outstanding share of Preferred A stock; (v) upon completion of phases (i) to (iv) all remaining assets will be distributed ratably among the holders of Preferred and Common stock based on the number of shares of Common stock on an as converted basis. In the event that the value of the assets available for distribution exceeds $ 80,000, then Series A, B, C and D Preferred stock shall not be entitled to receive the liquidation preference described above, rather amounts available for distribution will be distributed ratably among the holders of Preferred and Common stock based on the number of shares of Common stock on an as converted basis.

- 16 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

### NOTE 6: - STOCK CAPITAL (Cont.)

b.    Stock Option Plans:

As part of the reorganization all options convertible into Common B stock in Finjan Ltd. under Finjan Ltd.'s 1996 Stock Option Plan ("the 1996 Plan") were converted into options to purchase Common stock of Finjan Software, Inc under the 2003 Plan (as defined below).

In December 2003, the Company's Board of Directors approved a new stock option plan ("the 2003 Plan"), and chose the Capital Gain Course, pursuant to the provisions of Section 102 of Israel's Income Tax Ordinance. Options granted under the 2003 Plan vest over a period of four years, and expire no later than 10 years from the date of grant. The Company reserved 4,796,689 shares of Common stock for issuance of options under the 2003 Plan. Pursuant to the 2003 Plan, the Company granted 2,777,159 options to employees of the Company.

A summary of the stock options activities in 2004 and 2003, is as follows:

|  | 2004 | | 2003 | |
| --- | --- | --- | --- | --- |
|  | Number of options | Weighted average exercise price | Number of options | Weighted average exercise price |
|  |  | $ |  | $ |
| Outstanding at beginning of year | 2,435,791 | 0.17 | 12,616 | 8.2 |
| Granted | 720,000 | 0.14 | 2,467,642 | 0.14 |
| Exercised | (59,244) | 0.14 | – | – |
| Forfeited | (319,388) | 0.15 | (44,467) | 1.0 |
| Outstanding at end of year | 2,777,159 | 0.16 | 2,435,791 | 0.17 |

The options outstanding as of December 31, 2004, have been separated into ranges of exercise price as follows:

| Exercise price | Options outstanding as of December 31, 2004 | Weighted average remaining contractual life | Weighted average exercise price | Exercisable as of December 31, 2004 | Weighted average exercise price of options exercisable |
| --- | --- | --- | --- | --- | --- |
| $ | Amount | Years | $ | Amount | $ |
| 0.14 | 2,392,022 | 9.03 | 0.14 | 1,469,099 | 0.14 |
| 0.16 | 277,250 | 9.88 | 0.16 | – | 0.16 |
| 3.06 | 5,172 | 5.83 | 3.06 | 5,172 | 3.06 |
| 14.90 | 50 | 9.83 | 14.90 | 50 | 14.90 |
| 23.00 | 120 | 9.83 | 23.00 | 120 | 23.00 |
| 25.00 | 3,645 | 9.83 | 25.00 | 3,645 | 25.00 |
|  | 2,777,159 | 9.14 | 0.16 | 1,476,386 | 0.18 |

- 17 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

### NOTE 6: - STOCK CAPITAL (Cont.)

Options to consultants:

| Issuance Date | In connection with | Number of options granted | Options exercisable | Exercise price per share | Exercisable through |
|---|---|---|---|---|---|
| 12 18 2003 | Consultants | 35.000 | 16.042 | 0 14 | 12 18 2013 |
| 10 25 2004 | Consultants | 3.000 | - | 0 16 | 10 25 2014 |
| 10 25 2004 | Consultants | 102 | 102 | 3 | 10 25 2014 |
| 10 25 2004 | Consultants | 100 | 100 | 25 | 10 25 2014 |
| | | 38.202 | 16.244 | 0.31 | |

c.   Purchase offer:

On October 27, 2003, the Company offered to all stockholders of Finjan Ltd, other than the Company ("the Stockholders"), to purchase all of their holdings in Finjan Ltd. ("the shares"), approximately 107.965 shares at a price per share of $ 0.14. Stockholders holding more than the 90% of the shares (including one of the directors and officers of Finjan Software Ltd., who holds 105.595 shares), agreed to sell their shares to the Company at the offered price per share, as a result, the Company was able to enforce the sale on all other Stockholders. The transaction was completed during March 2004.

d.   Treasury stock:

On December 30, 2003, the Company purchased 66.296 shares of its outstanding Common stock for a total consideration of $ 9. These shares were recorded as Treasury stock.

## NOTE 7: - TAXES ON INCOME

a.   Measurement of results for tax purposes under the Israeli Income Tax Law (Inflationary Adjustments), 1985:

Results for tax purposes of Finjan Ltd. are measured in terms of earnings in NIS after certain adjustments for increases in the Israeli CPI. As explained in Note 2b, the financial statements are presented in U.S. dollars. The difference between the annual change in the CPI and in the NIS/dollar exchange rate causes a difference between taxable income and the income before taxes shown in the financial statements. In accordance with paragraph 9(f) of SFAS No. 109, the Company has not provided deferred income taxes on the difference between the functional currency and the tax bases of assets and liabilities.

- 18 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

### NOTE 7:- TAXES ON INCOME (Cont.)

After the balance sheet date, Finjan Ltd. Applied to the Israeli Income Tax Authorities in order to report its annual income filings for tax purposes in U.S. dollars. As a result, commencing fiscal year 2005, Finjan Ltd. Will report to the Israeli Income Tax Authorities in U.S. dollars.

b. Tax benefits under the Law for the Encouragement of Capital Investments, 1959 ("the Law"):

On October 13, 1996, the production facilities of Finjan Ltd. were granted the status of an "Approved Enterprise" under the Law. On October 10, 2001, an expansion of the "Approved Enterprise" was granted to the Company.

According to the provisions of the Law, Finjan Ltd. has chosen to enjoy "Alternative Benefits" - waiver of grants in return for tax exemption - and accordingly, its income from the "Approved Enterprise" is tax-exempt for a period of two years, and subject for an additional period of five-eight years of reduced tax rates between 10% to 25%, depending upon the proportion of foreign ownership of Finjan Ltd. The period of benefits relating to these investment programs will expire in the years 2013 through 2016.

In the event of distribution of cash dividends from income that is tax exempt as mentioned above, Finjan Ltd, would have to pay income tax equal to 10% to 25% of the amount distributed. The tax-exempt income attributable to the "Approved Enterprise" can be distributed to shareholders without subjecting Finjan Ltd. to taxes only upon the complete liquidation of Finjan Ltd.

Finjan Ltd. currently has no plans to distribute dividends and intends to retain future earnings to finance the development of its business.

The entitlement to the above benefits is conditional upon Finjan Ltd.'s fulfilling the conditions stipulated by the above law, regulations published their under and the instruments approved for the specific investments in "Approved Enterprises". In the event of failure to comply with these conditions, the benefits may be canceled and Finjan Ltd. may be required to refund the amount of the benefits, in wholle or in part, including interest.

Should Finjan Ltd. derive income from sources other than the "Approved Enterprise" during the relevant period of benefits, such income will be taxable at the regular corporate tax rate of 35%, which will be reduced to 34% in January 2005, and will be further reduced to 32% in 2006 and 30% in 2007.

c. Tax assessments:

Finjan Ltd. has not received final tax assessments since its incorporation.

- 19 -

Highly Confidential - Attorneys' Eyes Only

FIN009737

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 7:- TAXES ON INCOME (Cont.)

    d.    Net operating losses carryforwards:

    As of December 31, 2004, Finjan Ltd. has accumulated losses for Israeli tax purposes of approximately $ 13,000, which may be carried forward and offset against taxable income for an indefinite period in the future. The Company expects that during the period these tax losses are utilized its income would be substantially tax-exempt. Accordingly, there will be no tax benefit available from such losses and no deferred income taxes have been included in these financial statements.

    As of December 31, 2004, Finjan and Finjan Inc. have combined losses carried forward amounting to approximately $ 2,000

    e.    Deferred taxes:

    Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes, and the amounts used for income tax purposes.

    The Company has provided valuation allowances in respect of deferred tax assets, since it has a history of losses. Management currently believes that it is more likely than not that the deferred tax regarding the loss carryforwards and other temporary differences will not be realized in the near future.

- - - - - - - - - - - - -

F:\W2000\2914\M\04-ES12.DOC

- 20 -

Highly Confidential – Attorneys' Eyes Only





EXHIBIT
1034
TA 10-5-07

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

CONSOLIDATED FINANCIAL STATEMENTS

AS OF DECEMBER 31, 2006

# EXHIBIT 8



EXHIBIT
1034
TA 10-5-07

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

CONSOLIDATED FINANCIAL STATEMENTS

AS OF DECEMBER 31, 2006

**ERNST & YOUNG**

Joint Trial Exhibit
**JTX-28**
Case No. 06-369 GMS

Kost Forer Gabbay & Kasierer

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

CONSOLIDATED FINANCIAL STATEMENTS

AS OF DECEMBER 31, 2006

IN U.S. DOLLARS

INDEX

| | Page |
|---|---|
| Report of Independent Auditors | 2 |
| Consolidated Balance Sheets | 3 |
| Consolidated Statements of Operations | 4 |
| Statements of Changes in Stockholders' Equity | 5 |
| Consolidated Statements of Cash Flows | 6 |
| Notes to Consolidated Financial Statements | 7 - 22 |

- - - - - - - - - - - - -

**⹂ ERNST & YOUNG**

■ Kost Forer Gabbay & Kasierer
3 Aminadav St.
Tel-Aviv 67067, Israel

■ Phone: 972-3-6232525
  Fax:   972-3-5622555

## REPORT OF INDEPENDENT AUDITORS

### To the Stockholders of

### FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

We have audited the accompanying consolidated balance sheets of Finjan Software, Inc. ("the Company") and its subsidiaries as of December 31, 2006 and 2005, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for each of the two years in the period ended December 31, 2006. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 2 to the consolidated financial statements, in 2006 the Company adopted Financial Accounting Standard Board Statement No. 123(R), "Share-Based Payment".

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company as of December 31, 2006 and 2005, and the consolidated results of its operations and cash flows for each of the two years in the period ended December 31, 2006, in conformity with accounting principles generally accepted in the United States.

Tel-Aviv, Israel
June 3, 2007

Kost Forer Gabbay and Kasierer
KOST FORER GABBAY & KASIERER
A Member of Ernst & Young Global

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

U.S. dollars in thousands (except share and per share data)

| | December 31, | |
| --- | --- | --- |
| | 2006 | 2005 |
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 9,664 | $ 8,420 |
| Restricted cash | 116 | 106 |
| Trade receivables | 3,198 | 2,423 |
| Deferred costs | 1,538 | 937 |
| Prepaid expenses and other accounts receivable (Note 3) | 530 | 383 |
| Inventory | 424 | 420 |
| Total current assets | 15,470 | 12,689 |
| **LONG-TERM PREPAID EXPENSES AND DEPOSITS:** | | |
| Deferred costs | 1,399 | 511 |
| Prepaid expenses and deposits | 98 | 75 |
| Total long-term prepaid expenses and deposits | 1,497 | 586 |
| SEVERANCE PAY FUND | 545 | 384 |
| PROPERTY AND EQUIPMENT, NET (Note 4) | 744 | 486 |
| Total assets | $ 18,256 | $ 14,145 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Trade payables | $ 1,508 | $ 633 |
| Employees and payroll accruals | 925 | 875 |
| Deferred revenues | 7,677 | 5,340 |
| Accrued expenses and other liabilities | 1,508 | 974 |
| Total current liabilities | 11,618 | 7,822 |
| **LONG-TERM LIABILITIES:** | | |
| Long-term deferred revenues | 5,579 | 3,061 |
| Accrued severance pay | 745 | 535 |
| Total long-term liabilities | 6,324 | 3,596 |
| **STOCKHOLDERS' EQUITY (Note 6):** | | |
| Stock capital - | | |
| Common stock of $ 0.01 par value - | | |
| Authorized: 36,000,000 and 27,000,000 shares at December 31, 2006 and 2005, respectively; Issued and outstanding: 365,237 and 347,065 shares at December 31, 2006 and 2005, respectively | 4 | 4 |
| Series A, B, C and D Preferred stock of $ 0.01 par value - | | |
| Authorized: 25,842,726 and 19,104,289 shares at December 31, 2006 and 2005, respectively; Issued and outstanding: 25,842,726 and 19,104,289 shares at December 31, 2006 and 2005, respectively; Aggregate liquidation preference of $ 44,781 at December 31, 2006 | 258 | 191 |
| Additional paid-in capital | 52,749 | 42,331 |
| Treasury stock | (9) | (9) |
| Accumulated deficit | (52,688) | (39,790) |
| Total stockholders' equity | 314 | 2,727 |
| Total liabilities and stockholders' equity | $ 18,256 | $ 14,145 |

The accompanying notes are an integral part of the consolidated financial statements.

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

U.S. dollars in thousands

| | Year ended December 31, | |
| | 2006 | 2005 |
| --- | --- | --- |
| Revenues | $ 8,396 | $ 6,877 |
| Patent license revenues | - | 8,000 |
| Total revenues | 8,396 | 14,877 |
| Cost of revenues (1) | 3,641 | 2,200 |
| Gross profit | 4,755 | 12,677 |
| Operating expenses: | | |
| Research and development (2) | 5,377 | 3,669 |
| Selling and marketing (3) | 10,397 | 7,133 |
| General and administrative (4) | 2,284 | 2,721 |
| Total operating expenses | 18,058 | 13,523 |
| Operating loss | (13,303) | (846) |
| Financial and other income, net | 459 | 129 |
| Loss before taxes on income | (12,844) | (717) |
| Taxes on income | 54 | 37 |
| Net loss | $ (12,898) | $ (754) |

(1)   Includes equity-based compensation expense in the amount of $ 5 and $ 0 for the years ended December 31, 2006 and 2005, respectively.

(2)   Includes equity-based compensation expense in the amount of $ 24 and $ 0 for the years ended December 31, 2006 and 2005, respectively.

(3)   Includes equity-based compensation expense in the amount of $ 35 and $ 0 for the years ended December 31, 2006 and 2005, respectively.

(4)   Includes equity-based compensation expense in the amount of $ 30 and $ 0 for the years ended December 31, 2006 and 2005, respectively.

The accompanying notes are an integral part of the consolidated financial statements.

- 4 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

U.S. dollars in thousands (except share data)

| | Common stock | | Preferred stock | | Additional paid-in capital | Treasury stock | Accumulated deficit | Total stockholders' equity |
|---|---|---|---|---|---|---|---|---|
| | Number | Amount | Number | Amount | | | | |
| Balance as of January 1, 2005 | 247,190 | $ 3 | 16,854,931 | $ 168 | $ 38,904 | $ (9) | $ (39,036) | $ 30 |
| Conversion of convertible loan | | - | 964,011 | 10 | 1,490 | - | - | 1,500 |
| Issuance of Series D Preferred stock, net | - | - | 1,285,347 | 13 | 1,920 | - | - | 1,933 |
| Options exercised | 99,875 | 1 | - | - | 17 | - | - | 18 |
| Net loss | - | - | - | - | - | - | (754) | (754) |
| Balance as of December 31, 2005 | 347,065 | 4 | 19,104,289 | 191 | 42,331 | (9) | (39,790) | 2,727 |
| Equity based compensation expenses resulting from FAS 123(R) | - | - | - | - | 94 | - | - | 94 |
| Issuance of Series D Preferred stock, net | - | - | 6,738,437 | 67 | 10,321 | - | - | 10,388 |
| Options exercised | 18,172 | - | - | - | 3 | - | - | 3 |
| Net loss | - | - | - | - | - | - | (12,898) | (12,898) |
| Balance as of December 31, 2006 | 365,237 | $ 4 | 25,842,726 | $ 258 | $ 52,749 | $ (9) | $ (52,688) | $ 314 |

The accompanying notes are an integral part of the consolidated financial statements.

- 5 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

U.S. dollars in thousands

|  | Year ended December 31, | |
|  | 2006 | 2005 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net loss | $   (12,898) | $     (754) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Depreciation | 324 | 284 |
| Stock-based compensation expenses related to employees stock options | 94 | - |
| Decrease (increase) in trade receivables, net | (775) | 1,040 |
| Increase in deferred costs | (1,489) | (1,180) |
| Increase in prepaid expenses and other accounts receivable | (147) | (75) |
| Increase in inventory | (255) | (211) |
| Increase in trade payables | 875 | 40 |
| Increase (decrease) in employees and payroll accruals and accrued expenses and other liabilities | 584 | (283) |
| Increase in deferred revenues | 4,855 | 1,800 |
| Increase (decrease) in severance pay, net | 49 | (31) |
| Net cash provided by (used in) operating activities | (8,783) | 630 |
| Cash flows from investing activities: | | |
| Purchase of property and equipment | (331) | (149) |
| Disposal of property and equipment | - | 1 |
| Decrease (increase) in long-term deposits and prepaid expenses | (23) | 94 |
| Net cash used in investing activities | (354) | (54) |
| Cash flows from financing activities: | | |
| Convertible loan received | - | 1,500 |
| Proceeds from issuance of shares, net | 10,388 | 1,933 |
| Options exercised | 3 | 18 |
| Net cash provided by financing activities | 10,391 | 3,451 |
| Increase in cash and cash equivalents | 1,254 | 4,027 |
| Cash and cash equivalents at the beginning of the year | 8,526 | 4,499 |
| Cash and cash equivalents at the end of the year | $     9,780 | $     8,526 |
| Supplemental disclosure of non-cash financing activities: | | |
| Conversion of convertible loan into Preferred stock | $         - | $   (1,500) |

The accompanying notes are an integral part of the consolidated financial statements.

- 6 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

## NOTE 1:-  GENERAL

a.   Finjan Software, Inc. ("Finjan") and its subsidiaries (together "the Company" or "the Finjan Group") are engaged in the development, marketing and sale of proactive behavior-based security solutions for enterprises, small and medium-sized businesses. Finjan's security solutions are based on Finjan's patented Application-Level Behavior Blocking which provides protection against both known and unknown attacks, the first time they strike (e.g. Spyware, phishing, malicious code, viruses, worms and Trojans). Finjan's proactive behavior-based security solutions integrate anti-virus, and URL filtering.

Finjan, a Delaware corporation, was incorporated in June 2002 and commenced operations in September 2002. As a result of a reorganization that occurred in 2002, Finjan became the parent company of the following wholly-owned subsidiaries:

1.   Finjan Software Ltd. ("Finjan Ltd." or "the Israeli subsidiary") was incorporated in Israel and commenced operations in January 1996. As a result of the reorganization, Finjan became the parent company of Finjan Ltd. owning 100% of its shares.

2.   Finjan Inc. ("Finjan Inc.") was incorporated in the State of California as a wholly-owned subsidiary of Finjan Ltd. and commenced operations in January 1997. During 1998, Finjan Inc. was reincorporated in the State of Delaware. In October 2003, Finjan Ltd. transferred all of its shares in Finjan Inc. to Finjan. As a result of this transfer, Finjan Inc. became a wholly-owned subsidiary of Finjan.

3.   Finjan Software (UK) Ltd. ("Finjan UK") was incorporated under the laws of the United Kingdom, as a wholly-owned subsidiary of Finjan Ltd. in March 2003. In October 2003, Finjan Ltd. transferred its share in Finjan UK to Finjan. As a result of this transfer, Finjan UK became a wholly-owned subsidiary of Finjan. Finjan UK is engaged in marketing the Company's products in the UK and Ireland.

4.   Finjan Software GmbH ("Finjan GmbH") was incorporated in August 2004 under the laws of Germany as a wholly-owned subsidiary of Finjan. Finjan GmbH is engaged in marketing the Company's products in Germany, Austria and Switzerland.

## NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES

The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP"). The significant policies followed in the preparation of the consolidated financial statements are:

a.   Use of estimates:

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the amounts reported for assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reporting of amounts for revenues and expenses during the reported period. Actual results could differ from those estimates.

- 7 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

    b.    Financial statements in U.S. dollars:

The functional currency of the Company is the U.S. dollar, as the U.S. dollar is the currency of the primary economic environment in which the Company operates and expects to continue to operate in the foreseeable future. The majority of the Company's operations are currently conducted by the Israeli subsidiary and most of the Israeli expenses are currently paid in new Israeli shekels ("NIS"); however, these operations are denominated and determined in U.S. dollars. Most of the Company's revenues are generated in U.S. dollars, its cash is invested almost entirely in U.S. dollar deposits and its other financing activities including loans and equity transactions are made in U.S. dollars.

The Company's transactions and balances denominated in U.S. dollars are presented at their original amounts. Non-dollar transactions and balances have been remeasured to U.S. dollars in accordance with Statement of Financial Accounting Standards ("SFAS") No. 52 of the U.S. Financial Accounting Standards Board ("FASB"). All transaction gains and losses from remeasurement of monetary balance sheet items denominated in non-dollar currencies are reflected in the statement of operations as financial income or expenses, as appropriate.

    c.    Principles of consolidation:

The consolidated financial statements include the accounts of the Company and its subsidiaries. Intercompany balances and transactions have been eliminated upon consolidation.

    d.    Reclassification

Certain amounts in prior years' financial statements have been reclassified to conform to the current year's presentation.

    e.    Cash and cash equivalents:

The Company and its subsidiaries consider all highly liquid investments, which are readily convertible to cash with a maturity of three months or less at the date of acquisition, to be cash equivalents.

    f.    Long-term lease deposits:

Long-term lease deposits include long-term deposits for the leasing of facilities and motor vehicles, presented at their cost.

    g.    Inventory:

Inventories are stated at the lower of cost or market value. Inventory write-offs and write-down provisions are provided to cover risks arising from slow-moving items or technological obsolescence.

- 8 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands (except share and per share data)

NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES (Cont.)

The Company and its subsidiaries periodically evaluate the quantities on hand relative to current and historical selling prices and historical and projected sales volume. Based on this evaluation, provisions are recorded when required to write-off inventory according to its market value.

h.    Property and equipment:

Property and equipment are stated at cost. Depreciation is computed by the straight-line method over the estimated useful lives of the assets at the following annual rates:

| | % |
|---|---|
| Computers and peripheral equipment | 33 |
| Office furniture and equipment | 6 - 20 |
| Leasehold improvements | Over the shorter of the related lease period or the life of the asset |

i.    Impairment of long-lived assets:

The Company's long-lived assets are reviewed for impairment in accordance with Statement of Financial Accounting Standard No. 144, "Accounting for the Impairment or Disposal of Long-lived Assets" ("SFAS No. 144"), whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted cash flows expected to be generated by the assets. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. During 2005 and 2006, no impairment losses have been identified.

j.    Research and development costs:

Research and development costs are charged to the statement of operations as incurred. Statement of Financial Accounting Standards No. 86, "Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed" ("SFAS No. 86"), requires capitalization of certain software development costs subsequent to the establishment of technological feasibility.

Based on the Company's product development process, technological feasibility is established upon completion of a working model. No costs are incurred by the Company between the completion of the working model and the point at which the products are ready for general release. Therefore, research and development costs have been expensed.

- 9 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

    k.   Concentrations of credit risk:

        SFAS No. 105, "Disclosure of Information about Financial Instruments with Off-Balance-Sheet Risk and Financial Instruments with Concentration of Credit Risk", requires disclosure of any significant off-balance-sheet and credit risk concentrations. The Company has no significant off-balance-sheet concentration of credit risk such as foreign exchange contracts, option contracts or other foreign hedging arrangements.

        Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents, trade receivables and other accounts receivable.

        Cash and cash equivalents are invested in major banks in Israel, Germany, the United Kingdom and the United States. Such deposits in the United States may be in excess of insured limits and are not insured in other jurisdictions. Management believes that the financial institutions that hold the Company's investments are financially sound and, accordingly, minimal credit risk exists with respect to these investments.

        The trade receivables of the Company are mainly derived from sales to customers located in Europe and the U.S. The Company performs ongoing credit evaluations of their customers and to date has not experienced any material losses. An allowance for doubtful accounts is determined with respect to specific amounts that the Company has determined to be doubtful of collection.

    l.   Revenue recognition:

        The Company derives its revenue from sales of hardware appliances, software license fees and sub-license fees of its products, training, maintenance and support. In 2005, the Company adopted a new business model, according to which the Company provides its product for a limited subscription period. The Company sells its products indirectly through distributors and resellers, and directly to end-users.

        Product revenues on shipment to distributors are deferred until the distributors resell the Company's products to the end-users ("sell through").

        Revenues are recognized when persuasive evidence of an agreement exists, delivery of the product has occurred, no significant obligations with regard to implementation remain, the fee is fixed or determinable, and collectability is probable.

        The Company recognizes its revenues in accordance with Statement of Position SOP 97-2, "Software Revenue Recognition" ("SOP 97-2"), as amended. SOP 97-2 generally requires revenue earned on software arrangements involving multiple elements to be allocated to each element based on the relative fair value of the elements. When contracts contain multiple elements wherein Vendor Specific Objective Evidence (VSOE) of fair value exists for all undelivered elements, the Company accounts for the delivered elements in accordance with

- 10 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)

the "Residual Method" prescribed by SOP 98-9. Maintenance and support revenue included in these arrangements is deferred and recognized on a straight-line basis over the term of the maintenance and support agreement. The VSOE of fair value of the undelivered elements (maintenance, support and services) is determined based on the price charged for the undelivered element when sold separately.

According to Emerging Issues Task Force 03-5, "Application of AICPA Statement of Position 97-2 to Non-Software Deliverables in an Arrangement Containing More-Than-Incidental Software" ("EITF 03-5") in an arrangement that includes software that is more than incidental to the products or services as a whole, software and software-related elements are included within the scope of SOP 97-2. The Company's products consist of appliances upon which the Company's software is installed. The software and hardware appliances are a bundled solution and are mutually essential to each other's functionality; therefore, related revenues are recognized together throughout the subscription period of each agreement.

Deferred revenue includes amounts invoiced to customers for which revenue has not yet been recognized. Related direct costs of these deferred revenues are being deferred as well, and recognized throughout the subscription period.

m.  Accounting for stock-based compensation:

Prior to January 1, 2006, the Company accounted for its stock based compensation awards using the intrinsic value method, under the recognition and measurement provisions of APB Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), and related Interpretations, as permitted by FASB Statement No. 123, "Accounting for Stock-Based Compensation".

Effective January 1, 2006, the Company adopted the fair value recognition provisions of FASB Statement No. 123(R), "Share-Based Payment" ("SFAS 123(R)"), using the prospective-transition method. SFAS 123(R) requires companies to estimate the fair value of equity-based payment awards on the date of grant using an option-pricing model. The value of the portion of the award that is ultimately expected to vest is recognized as expense over the requisite service periods in the Company's Consolidated Statement of Operations.

Under the prospective-transition method, compensation costs recognized in 2006 includes compensation costs for all share-based payments granted subsequent to January 1, 2006 based on the grant-date fair value estimated in accordance with the provisions of SFAS 123(R).

Total stock-based compensation expense resulting from stock options included in the consolidated statement of operations for the year ended December 31, 2006 was $ 94. This amount was allocated to each line item in the consolidated statement of operations as required by Staff Accounting Bulletin No. 107, "Share-Based Payment" ("SAB 107").

Pro forma information is not disclosed for the year ended December 31, 2005 as required by SFAS 123 due to its immateriality.

- 11 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

As of December 31, 2006, the total unrecognized estimated compensation cost related to non-vested stock options granted prior to that date was $ 198, which is expected to be recognized over a period of up to four years.

n.    Severance pay:

Finjan Ltd.'s liability for severance pay is calculated pursuant to Israel's Severance Pay Law based on the most recent salary of the employees multiplied by the number of years of employment, as of the balance sheet date. Employees are entitled to one month's salary for each year of employment or a portion thereof. Finjan Ltd.'s liability for all of its employees is fully provided by monthly deposits with insurance policies and by an accrual. The value of these policies is recorded as an asset in the Company's balance sheet.

The deposited funds include profits accumulated up to the balance sheet date. The deposited funds may be withdrawn only upon the fulfillment of the obligation pursuant to Israel's Severance Pay Law or labor agreements. The value of the deposited funds is based on the cash surrendered value of these policies, and includes immaterial profits.

Severance expense for the years ended December 31, 2006 and 2005, amounted to approximately $ 291 and $ 228, respectively.

o.    Fair value of financial instruments:

The following methods and assumptions were used by the Company in estimating their fair value and disclosures for financial instruments:

The carrying amount reported in the balance sheet for cash and cash equivalents, trade receivables and trade payables approximate their fair value due to the short-term maturities of such instruments.

p.    Income taxes:

The Company accounts for income taxes in accordance with Statement of Financial Accounting Standards No. 109 "Accounting for Income Taxes", ("SFAS No. 109"). This statement prescribes the use of the liability method whereby deferred tax asset and liability account balances are determined based on differences between financial reporting and tax bases of assets and liabilities and are measured using the enacted tax rates and laws that will be in effect when the differences are expected to reverse. The Company provides a valuation allowance, if necessary, to reduce deferred tax assets to their estimated realizable value, if it is more likely than not that some portion of the entire deferred tax asset.

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES (Cont.)

q.   Impact of recently issued accounting standards:

In July 2006, the Financial Accounting Standards Board ("FASB") issued Financial Interpretation No. 48, "Accounting for Uncertainly in Income Taxes" ("FIN 48"), which applies to all tax positions related to income taxes subject to Statement of Financial Accounting Standard No. 109, "Accounting for Income Taxes". FIN 48 requires a new evaluation process for all tax positions taken. If the probability for sustaining said tax position is greater than 50%, then the tax position is recorded and recognition should be at the highest amount that is greater than 50% likely of being realized upon ultimate settlement. FIN 48 requires expanded disclosure at each annual reporting period, unless a significant change occurs in an interim period. Differences between the amount recognized in the statements of financial position prior to the adoption of FIN 48 and the amounts reported after adoption should be accounted for as an adjustment to the beginning balance of retained earnings. FIN 48 is effective for fiscal years beginning after December 15, 2006.

The Company is currently evaluating the impact of the adoption of FIN 48 and has not yet determined what impact, if any, it will have on the Company's financial statements.

In September 2006, the FASB issued Statement of Financial Accounting Standard No. 157, "Fair Value Measurement" ("SFAS No. 157"), which defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements. SFAS No. 157 applies to other accounting pronouncements that require or permit fair value measurements. SFAS No. 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years. The Company does not anticipate any material impact on its consolidated financial statements upon the adoption of SFAS No. 157.

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("SFAS No. 159"). SFAS No. 159 permits entities to choose to measure many financial assets and financial liabilities at fair value. Unrealized gains and losses on items for which the fair value option has been elected are reported in earnings. SFAS No. 159 is effective for fiscal years beginning after November 15, 2007. The Company is currently assessing the impact of SFAS No. 159 on its consolidated financial position and results of operations.

NOTE 3: -   PREPAID EXPENSES AND OTHER ACCOUNTS RECEIVABLE

|  | December 31, | | | |
|  | 2006 | | 2005 | |
|---|---|---|---|---|
| Prepaid expenses | $ | 407 | $ | 339 |
| Lease deposits |  | 42 |  | 25 |
| Other |  | 81 |  | 19 |
|  | $ | 530 | $ | 383 |

- 13 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 4:-  PROPERTY AND EQUIPMENT

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2006 | | 2005 | |
| Cost: | | | | |
| Computers and peripheral equipment | $ | 1,976 | $ | 1,443 |
| Office furniture and equipment | | 172 | | 165 |
| Leasehold improvements | | 91 | | 67 |
| | | 2,239 | | 1,675 |
| Accumulated depreciation | | 1,495 | | 1,189 |
| Depreciated cost | $ | 744 | $ | 486 |

Depreciation expenses for the years ended December 31, 2006 and 2005 were $ 324 and $ 284, respectively.

NOTE 5:-  COMMITMENTS AND CONTINGENT LIABILITIES

a.    Lease commitments:

The Company rents its facilities under operating leases in Israel, the United Kingdom, Germany and the United States. In addition, the company rents certain motor vehicles under operating lease agreements.

Aggregate minimum rental and lease commitments under non-cancelable leases as of December 31, 2006, are as follows:

| 2007 | $ | 1,488 |
|---|---|---|
| 2008 | | 830 |
| 2009 | | 220 |
| | $ | 2,538 |

Rent and motor vehicle lease expenses for the years ended December 31, 2006 and 2005, were $ 1,199 and $ 1,075, respectively.

b.    During the years 2006 and 2005, the Company provided bank guarantees to the lessor of its premises in the amounts of $ 116 and $ 106, respectively.

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

## NOTE 6: - STOCK CAPITAL

a.   Composition of stock capital of Finjan Software, Inc:

| | December 31, 2006 | | December 31, 2005 | |
|---|---|---|---|---|
| | Authorized | Issued and outstanding | Authorized | Issued and outstanding |
| | Number of shares | | | |
| Common stock (1) | 36,000,000 | 365,237 | 27,000,000 | 347,065 |
| Series A Preferred stock (2) | 226,226 | 226,226 | 226,226 | 226,226 |
| Series B Preferred stock (2) | 2,574,493 | 2,574,493 | 2,574,493 | 2,574,493 |
| Series C Preferred stock (2) | 7,627,477 | 7,627,477 | 7,627,477 | 7,627,477 |
| Series D Preferred stock (2) | 15,414,530 | 15,414,530 | 8,676,093 | 8,676,093 |
| | 61,842,726 | 26,207,963 | 46,104,289 | 19,451,354 |

(1)   Common stock:

Currently, 36,000,000 shares of Common stock are authorized. Holders of the Common stock are entitled to one vote per share on all matters to be voted upon by the Company's shareholders. Subject to the rights of the holders of the Preferred stock, if any, in the event of liquidation, holders of the Common stock are entitled to share ratably in all of the Company's assets.

(2)   Preferred stock:

Series A, B, C and D Preferred stock confer upon their holders the same rights conferred by the Common stock. In addition, each share of Preferred A, C and D stock is convertible into Common stock on a one for one basis and each share of Preferred B stock is convertible into 1.23 shares of Common stock. Each share of Preferred A, B, C and D stock is convertible into Common stock at the applicable conversion price at the option of the holder and automatically upon the earlier of (i) a qualified initial public offering ("IPO"), which yields not less than $ 25,000 in net proceeds to the Company, or (ii) with respect to each class, a written consent or agreement of holders of majority of the outstanding shares of such class.

Holders of shares of Series D Preferred stock are entitled to a dividend prior to the Series A, B and C Preferred stock and the Common stock, when and if declared, at a rate of $ 0.1245 per share per annum. Holders of Series C Preferred stock are entitled to receive a dividend, prior to the Series A and B Preferred stock and the Common stock, when and if declared, at a rate of $ 0.091 per share per annum. Such dividends shall not be cumulative.

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 6: - STOCK CAPITAL (Cont.)

In the event of a liquidation or deemed liquidation of the Company, in which the value of the assets available for distribution among the stockholders is $ 80,000 or less, then all assets available for distribution between the stockholders will be distributed in the following order: (i) Series D Preferred stock shall be entitled to receive, prior to any other Common or Preferred stock, an amount per share equal to $ 1.5560 (subject to adjustments) for each outstanding share of Preferred D stock; (ii) Series C Preferred stock shall be entitled to receive, prior to Series A and B Preferred stock and Common stock, an amount per share equal to $ 1.1382 (subject to adjustments) for each outstanding share of Preferred C stock; (iii) Series B Preferred stock shall be entitled to receive, prior to Preferred A stock and Common stock, an amount per share equal to $ 1.4014 for each outstanding share of Preferred B stock (subject to adjustments); (iv) Series A Preferred stock shall be entitled to receive, prior to Common stock, an amount per share equal to $ 37.6 for each outstanding share of Preferred A stock; (v) upon completion of phases (i) to (iv) all remaining assets will be distributed ratably among the holders of Preferred and Common stock based on the number of shares of Common stock on an as converted basis. In the event that the value of the assets available for distribution exceeds $ 80,000, then Series A, B, C and D Preferred stock shall not be entitled to receive the liquidation preference described above, rather amounts available for distribution will be distributed ratably among the holders of Preferred and Common stock based on the number of shares of Common stock on an as converted basis.

(3)  On June 21, 2005, the Company signed a convertible loan agreement ("the Loan") with certain stockholders, according to which the stockholders agreed to lend the Company an aggregate amount of $ 1,500 ("the principal amount"). The principal amount of the Loan bore interest at an annual rate of 8% paid upon the earlier of repayment or conversion of the Loan.

On June 30, 2005, the Company entered into a Stock Purchase Agreement ("the 2005 SPA") whereby it issued to a new investor 1,285,347 shares of Series D Preferred stock of $ 0.01 par value each in an aggregate amount of $ 2,000. As part of the SPA, the principal amount under the Loan was converted into 964,011 shares of Series D Preferred stock, at the same terms and conditions as provided to the new investor under the 2005 SPA.

On June 30, 2005, Finjan Ltd. entered into a patent license agreement ("the license agreement") with the new investor, according to which, simultaneously with the closing of the 2005 SPA, Finjan Ltd. on behalf of itself and its affiliates, shall provide the new investor and its affiliates, effective as of the payment date, a certain limited, worldwide, nonexclusive, nontransferable, royalty-free license to Finjan Ltd.'s patents, pursuant to the terms and conditions of the license agreement in consideration of $ 8,000.

b.  In February 2006, the Company completed a stock purchase agreement ("the 2006 SPA"), whereby it issued to new and existing investors 6,426,735 shares of Series D Preferred stock of $ 0.01 par value each, in an aggregate amount of $ 10,000.

- 16 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 6: - STOCK CAPITAL (Cont.)

c.   In August 2006, the Company issued to a new investor an additional 311,702 shares of Series D Preferred stock of $ 0.01 par value each, for the aggregate amount of $ 485.

d.   Stock Option Plans:

As part of the reorganization that occurred in 2002, all options convertible into Common B stock in Finjan Ltd. under Finjan Ltd.'s 1996 Stock Option Plan ("the 1996 Plan") were converted into options to purchase Common stock of Finjan Software, Inc under the 2003 Plan (as defined below).

In December 2003, the Company's Board of Directors approved a new stock option plan ("the 2003 Plan"), and chose the capital gain course, pursuant to the provisions of section 102 of Israel's Income Tax Ordinance. Options granted under the 2003 Plan vest over a period of four years, and expire no later than 10 years from the date of grant. As of December 31, 2006, the Company reserved 6,553,642 shares of Common stock for the exercise of options under the 2003 Plan. Pursuant to the 2003 Plan, the Company granted 4,963,993 options to employees of the Company and there are 1,589,649 options to purchase shares available for future grants.

e.   Stock Option Plans:

The fair value of each option award is estimated on the date of grant using the Binomial model with the following weighted-average assumptions (annualized percentages):

Expected volatility is based on companies in a comparable stage, as well as companies in the industry. The expected term of options granted is based on the "Simplified" method acceptable by SAB 107. The risk-free rate is based on observed interest rates appropriate for the term of the Company's employee stock options. The dividend yield assumption is based on the Company's historical and expectation of future dividend payouts and may be subject to substantial change in the future.

|                               | Year ended December 31, 2006 |
| ----------------------------- | ---------------------------- |
| Volatility                    | 82.5%                        |
| Risk-free interest rate       | 4.72%                        |
| Dividend yield                | 0%                           |
| Expected life (years)         | 6.015                        |
| Suboptimal exercise factor    | 1.75                         |
| Pre-vest cancellation rate    | 15%                          |
| Post-vest cancellation rate   | 15%                          |

The average estimated fair value of employee stock options granted during the year ended December 31, 2006 was $ 0.23 per share.

- 17 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 6: - STOCK CAPITAL (Cont.)

A summary of the Company's share options activity under the Plans is as follows:

| | Year ended December 31, | | | |
| | 2006 | | 2005 | |
| | Number of options | Weighted average exercise price | Number of options | Weighted average exercise price |
|---|---|---|---|---|
| Outstanding at beginning of year | 3,908,495 | $ 0.16 | 2,777,159 | $ 0.16 |
| Granted | 1,279,463 | $ 0.5 | 1,963,484 | $ 0.16 |
| Exercised | (18,172) | $ 0.15 | (99,875) | $ 0.14 |
| Forfeited | (205,793) | $ 0.2 | (732,273) | $ 0.18 |
| Outstanding at end of year | 4,963,993 | $ 0.25 | 3,908,495 | $ 0.16 |
| Exercisable options | 2,728,726 | $ 0.16 | 1,736,208 | $ 0.16 |

The options outstanding as of December 31, 2006, have been separated into ranges of exercise price as follows:

| Exercise price | Options outstanding as of December 31, 2006 | Weighted average remaining contractual life (years) | Weighted average exercise price | Options exercisable as of December 31, 2006 | Weighted average exercise price of options exercisable |
|---|---|---|---|---|---|
| $ 0.14 | 1,755,548 | 7.02 | $ 0.14 | 1,700,068 | $ 0.14 |
| $ 0.16 | 2,085,750 | 8.91 | $ 0.16 | 1,016,685 | $ 0.16 |
| $ 0.54 | 1,120,463 | 9.5 | $ 0.54 | 9,741 | $ 0.54 |
| $ 3 | 837 | 7.83 | $ 3 | 837 | $ 3 |
| $ 14 | 50 | 7.83 | $ 14 | 50 | $ 14 |
| $ 23 | 80 | 7.83 | $ 23 | 80 | $ 23 |
| $ 25 | 1,265 | 7.83 | $ 25 | 1,265 | $ 25 |
| | 4,963,993 | 8.37 | $ 0.25 | 2,728,726 | $ 0.16 |

As of December 31, 2006, there was $ 198 of total unrecognized compensation cost related to non vested share-based compensation arrangements granted pursuant to the Plan during 2006 under FAS 123R. That cost is expected to be recognized over a weighted-average period of 4 years.

f.    Treasury stock:

On December 30, 2003, the Company purchased 66,296 shares of its outstanding Common stock for a total consideration of $ 9. These shares were recorded as Treasury stock.

- 18 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands (except share and per share data)

NOTE 7:- TAXES ON INCOME

a.   Pre-tax loss is comprised of the following:

| | Year ended December 31, | |
| | 2006 | 2005 |
|---|---|---|
| Domestic | $   (1,806) | $   (398) |
| Foreign | (11,035) | (319) |
| | $   (12,841) | $   (717) |

b.   Measurement of results for tax purposes under the Israeli Income Tax (Inflationary Adjustments) Law, 1985:

Results of the Company's subsidiary for tax purposes are measured and reflected in terms of earnings in NIS after certain adjustments for increases in the Israeli Consumer Price Index ("CPI"). As explained in Note 2b, the financial statements are measured in U.S. dollars. The difference between the annual change in the Israeli CPI and in the NIS/dollar exchange rate causes a further difference between taxable income and the income before taxes shown in the financial statements. In accordance with paragraph 9(f) of SFAS No. 109, the Company's subsidiary has not provided deferred income taxes on the difference between the reporting currency and the tax bases of assets and liabilities.

c.   Tax benefits under the Law for the Encouragement of Capital Investments, 1959 ("the Law"):

On October 13, 1996, the production facilities of Finjan Ltd. were granted status as an "Approved Enterprise" under the Law. On October 10, 2001, an expansion of the "Approved Enterprise" was granted to the Company.

According to the provisions of the Law, the Company has chosen to enjoy the "Alternative Benefits" track and, accordingly, its income from the "Approved Enterprise" is tax-exempt for a period of two years, commencing in the first year the Company has taxable income, and subject to an additional period of five to eight years of reduced tax rates between 10% to 25%, depending upon the proportion of foreign ownership in the Company in each tax year. The period of tax benefits is subject to limits of the earlier of 12 years from the commencement of production, or 14 years, from the approval date. Given the aforementioned conditions, the period of benefits relating to these investment programs will expire in the year 2015.

In the event of a distribution of cash dividends from tax exempt income as mentioned above, Finjan Ltd. would have to pay income tax equal to 10% to 25% of the amount distributed. The tax-exempt income attributable to the "Approved Enterprise" can be distributed to shareholders without subjecting Finjan Ltd. to taxes only upon the complete liquidation of Finjan Ltd.

Finjan Ltd. currently has no plans to distribute dividends and intends to retain future earnings to finance the development of its business.

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 7:- TAXES ON INCOME (Cont.)

The entitlement to the above benefits is conditional upon Finjan Ltd.'s fulfilling the conditions stipulated by the above law, regulations published thereunder and the letters of approval for the specific investments in "Approved Enterprises". In the event of failure to comply with these conditions, the benefits may be canceled and Finjan Ltd. may be required to refund the amount of the benefits, in whole or in part, including interest. Management believes that Finjan Ltd. has complied with all relevant conditions.

On April 1, 2005, an amendment to the Investment Law came into effect ("the Amendment") and has significantly changed the provisions of the Investment Law. The Amendment limits the scope of enterprises which may be approved by the Investment Center by setting criteria for the approval of a facility as an "Approved Enterprise", such as provisions generally requiring that at least 25% of the "Approved Enterprise" income will be derived from export. Additionally, the Amendment enacted major changes in the manner in which tax benefits are awarded under the Investment Law so that companies no longer require Investment Center approval in order to qualify for tax benefits.

However, the Investment Law provides that terms and benefits included in any letter of approval already granted will remain subject to the provisions of the law as they were on the date of such approval. Therefore the Israeli subsidiary's existing "Approved Enterprise" will generally not be subject to the provisions of the Amendment.

d.   Reduction in Israeli tax rates:

In June 2004 and in July 2005, the "Knesset" (Israeli parliament) passed amendments to the Income Tax Ordinance (No. 140 and Temporary Provision), 2004 and (No. 147), 2005 respectively, which determine, among other things, that the corporate tax rate is to be gradually reduced to the following tax rates: 2004 - 35%, 2005 - 34%, 2006 - 31%, 2007 - 29%, 2008 - 27%, 2009 - 26% and 2010 and thereafter - 25%.

e.   Net operating losses carryforward:

As of December 31, 2006, the Company had a net U.S. operating loss carryforward for income tax purposes of approximately $ 19,120. The net operating loss carryforward expires within 18 years.

Utilization of the U.S. net operating losses above may be subject to substantial annual limitations due to the "change in ownership" provisions of the Internal Revenue Code of 1986 and similar state provisions. The annual limitation may result in the expiration of substantial net operating losses before utilization.

The Israeli subsidiary has a net operating loss carryforward for income tax purposes, as of December 31, 2006, of approximately $ 22,600 which can be carried forward and offset against taxable income indefinitely.

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 7:- TAXES ON INCOME (Cont.)

f.    Deferred taxes:

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred tax liabilities and assets are as follows:

|  | December 31, | |
|  | 2006 | 2005 |
|---|---|---|
| Loss carryforwards | $    12,437 | $    10,279 |
| Reserves and allowances | 1,650 | 1,162 |
| Total deferred tax asset before valuation allowance | 14,087 | 11,441 |
| Valuation allowance | (14,087) | (11,441) |
| Net deferred tax assets | $        - | $        - |

As of December 31, 2006, the Company has provided valuation allowances of $ 14,087, in respect of deferred tax assets resulting from tax loss carryforwards and other temporary differences. Management currently believes that it is more likely than not that the deferred tax in respect to the loss carryforward and other temporary differences will not be realized in the foreseeable future.

NOTE 8:-   SUBSEQUENT EVENTS (UNAUDITED)

a.    On May 31, 2007, the Israeli subsidiary entered into a credit agreement. Under the terms of this agreement, the lenders extended to the Company a revolving credit line in the aggregate amount of $ 12,000. The Company may draw from time to time amounts up to this aggregate amount in dollars or in Euros, per the Company's request.

The credit installments shall bear interest as follows: (i) in the event that such installment was provided in dollars - 11.75% per annum, and (ii) in the event that the installment was provided in Euros - 10.75% per annum.

As part of the agreement, the Israeli subsidiary granted the lenders first priority floating and fixed charges over some of its assets, excluding the intellectual property

Additionally, as part of the agreement, the Company granted its lenders a warrant to purchase 700,000 shares of the Company's D Preferred stock, $ 0.01 par value each, at an exercise price equal to $ 2.1006 per share.

The warrants can be exercised for cash or by a cashless method, as specified in the agreement.

- 21 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 8:-  SUBSEQUENT EVENTS (UNAUDITED) (Cont.)

      b.    On June 5, 2006, the Company filed a patent infringement lawsuit against one of its competitors.

On May 4, 2007, the competitor filed a counterclaim against the Company for patent infringement.

The Company does not believe that this claim has any merit. The Company also does not believe that this legal claim will have any impact on its financial statements.

\- \- \- \- \- \- \- \- \- \- \- \- \- \-

F:\W2000\w2000\2914\M\06\E$12.DOC

# EXHIBIT 9

## Explanation of IDC Report Calculations

In order to calculate purported market share using Finjan's real revenue numbers, the following calculations are made.

First, in order to calculate Finjan's market share in 2004 and 2006, it is necessary to adjust the IDC's Total market revenue to remove the IDC's overstated Finjan revenues. Then divide Finjan's actual revenue by the adjusted Total market revenue.

| Adjusted Market Revenue | | |
|---|---|---|
| | 2004 | 2006 |
| Overstated IDC Revenue | 12.9 | 19.7 |
| Actual Finjan Revenue | 7.1 | 8.4 |
| Finjan Revenue Difference | 5.8 | 11.3 |
| | | |
| Unadjusted Total Market Revenue | 530.1 | 1323.7 |
| Adjusted Total Market Revenue (Unadj. Total - Diff.) | 524.3 | 1312.4 |
| | | |
| Adjusted Finjan Market Share (Actual Rev./Adjusted Total Rev.) | .0135 | .0064 |

By using the actual Finjan revenues in the IDC reports, Finjan's relative market share decreased by 0.7% (7/10 of 1%) between 2004 and 2006.

# EXHIBIT 10
# REDACTED
# IN ITS ENTIRETY

# EXHIBIT 11

FINJAN SOFTWARE LTD.

FINANCIAL STATEMENTS
AS OF DECEMBER 31, 1998
IN U.S. DOLLARS

Joint Trial Exhibit

**JTX-35**

Case No. 06-369 GMS

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD.

CONSOLIDATED FINANCIAL STATEMENTS

AS OF DECEMBER 31, 1998

IN U.S. DOLLARS

INDEX

| | Page |
|---|---|
| Report of Independent Auditors | 2 |
| Consolidated Balance Sheets | 3 |
| Consolidated Statements of Operations | 4 |
| Statements of Changes in Shareholders' Equity | 5 |
| Consolidated Statements of Cash Flows | 6 |
| Notes of Financial Statements | 7 - 15 |

- - - - - - - -


**ERNST & YOUNG**
KOST FORER & GABBAY

REPORT OF INDEPENDENT AUDITORS

To the Shareholders of

FINJAN SOFTWARE LTD.

We have audited the accompanying consolidated balance sheets of Finjan Software Ltd. and its subsidiary ("Company") as of December 31, 1997 and 1998, and the related consolidated statements of operations, changes in shareholders' equity and consolidated cash flows for each of the two years in the period ended December 31, 1998. These financial statements are the responsibility of the Company's board of directors and management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing principles, including those prescribed by the Israeli Auditors Regulations (Mode of Performance), 1973. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, either originating within the financial statements themselves, or due to any misleading statement included therein. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by the Board of Directors and management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

The aforementioned financial statements have been remeasured into U.S. dollars, on the basis described in Note 2a.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company as of December 31, 1997 and 1998, and the consolidated results of its operations, changes in shareholders' equity and cash flows for each of the two years in the period ended December 31, 1998, in conformity with generally accepted accounting principles.

Pursuant to Section 211 of the Companies Ordinance (New Version), 1983, we hereby state that we have received all the information and explanations which we have requested, and that our opinion on the above financial statements is given based on the best of the information and explanations which we received and as reflected in the books of the Company.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As more fully described in Note 2a, the Company has incurred operating losses and has an accumulated deficit. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2a. The 1998 consolidated financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result from the outcome of this uncertainty.

Tel-Aviv, Israel
September 1, 1999

*Kost forer and Gabbai*
KOST, FORER and GABBAY
A Member of Ernst & Young International

2

Highly Confidential - Attorneys' Eyes Only

FIN009839

# FINJAN SOFTWARE LTD. AND SUBSIDIARY

CONSOLIDATED BALANCE SHEETS

U.S. dollars in thousands

| | Note | December 31, 1997 | December 31, 1998 |
|---|---|---|---|
| **ASSETS** | | | |
| **CURRENT ASSETS:** | | | |
| Cash and cash equivalents | | $ 8,575 | $ 3,188 |
| Short-term bank deposit | 3 | - | 34 |
| Receivables | | 242 | 263 |
| Financial institutions | | 37 | 31 |
| Prepaid expenses | | 36 | 118 |
| Trade accounts receivable | | 34 | 75 |
| Total current assets | | 8,924 | 3,709 |
| SEVERANCE PAY FUND | 6 | 61 | 80 |
| FIXED ASSETS, NET | 4 | 312 | 427 |
| | | $ 9,297 | $ 4,216 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | |
| **CURRENT LIABILITIES:** | | | |
| Short-term bank loans | 7 | $ - | $ 500 |
| Current portion of obligation under capital lease | 5 | 18 | 20 |
| Trade payables | | 400 | 462 |
| Employees and payroll accruals | | 326 | 388 |
| Deferred revenues | | 172 | 338 |
| Accrued expenses and other liabilities | | 77 | 71 |
| Total current liabilities | | 993 | 1,779 |
| **LONG-TERM LIABILITIES:** | | | |
| Obligation under capital lease, net of current portion | 5 | 59 | 39 |
| Accrued severance pay, net | 6 | 92 | 130 |
| Total long-term liabilities | | 151 | 169 |
| **SHAREHOLDERS' EQUITY:** | | | |
| Share capital | 8 | 86 | 86 |
| Additional paid-in capital | | 13,134 | 13,159 |
| Accumulated deficit | | (5,067) | (10,977) |
| Total shareholders' equity | | 8,153 | 2,268 |
| Total liabilities and shareholders' equity | | $ 9,297 | $ 4,216 |

The accompanying notes are an integral part of the consolidated financial statements.

| | | |
|---|---|---|
| September 1, 1999 | Shlomo Touboul | William Lyons |
| Date of approval of the financial statements | Director | Director |

3

Highly Confidential - Attorneys' Eyes Only

FIN009840

FINJAN SOFTWARE LTD. AND SUBSIDIARY

CONSOLIDATED STATEMENTS OF OPERATIONS

In Thousands

| | Note | Year ended December 31, | |
| | | 1997 | 1998 |
|---|---|---|---|
| | | $ 347 | $ 739 |
| | | 62 | 258 |
| | | 285 | 481 |
| development | 11a | 1,280 | 1,750 |
| marketing, net | 11b | 2,493 | 4,106 |
| administrative | 11c | 691 | 808 |
| expenses | | 4,464 | 6,664 |
| | | 4,179 | 6,183 |
| net | | 189 | 273 |
| | | $ 3,990 | $ 5,910 |

The accompanying notes are an integral part of the consolidated financial statements.

4

Highly Confidential - Attorneys' Eyes Only

FIN009841

FINJAN SOFTWARE LTD. AND SUBSIDIARY

## STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY
U.S. dollars in thousands

| | Share capital | Additional paid-in capital | Accumulated deficit | Total shareholders' equity |
|---|---|---|---|---|
| Balance as of January 1, 1997 | $    11 | $ 3,644 | $   (1,077) | $ 2,578 |
| Issuance of shares, net | 24 | 9,541 | - | 9,565 |
| Share dividend | 51 | (51) | | - |
| Loss for the year | - | - | (3,990) | (3,990) |
| Balance as of December 31, 1997 | 86 | 13,134 | (5,067) | 8,153 |
| Issuance of shares, net | - | 25 | - | 25 |
| Loss for the year | - | - | (5,910) | (5,910) |
| Balance as of December 31, 1998 | $    86 | $ 13,159 | $ (10,977) | $ 2,268 |

The accompanying notes are an integral part of the consolidated financial statements

Highly Confidential - Attorneys' Eyes Only

FIN009842

FINJAN SOFTWARE LTD. AND SUBSIDIARY

## CONSOLIDATED STATEMENTS OF CASH FLOWS

U.S. dollars in thousands

| | Year ended December 31, | |
| --- | --- | --- |
| | 1997 | 1998 |
| Cash flows from operating activities: | | |
| Loss for the year | $ (3,990) | $ (5,910) |
| Adjustments to reconcile loss to net cash used in operating activities: | | |
| Depreciation | 69 | 129 |
| Increase in trade receivables | (242) | (21) |
| Increase in other accounts receivable | (78) | (117) |
| Increase in trade payables | 241 | 62 |
| Increase in accrued expenses and other liabilities | 263 | 222 |
| Increase in accrued severance pay, net | 21 | 19 |
| Net cash used in operating activities | (3,716) | (5,616) |
| Cash flows from investing activities: | | |
| Short-term investments | - | (34) |
| Purchase of fixed assets | (165) | (244) |
| Net cash used in investing activities | (165) | (278) |
| Cash flows from financing activities: | | |
| Proceeds from short-term bank credit | - | 500 |
| Proceeds from issuance of shares, net | 9,565 | 25 |
| Principal payments of long-term bank loan | (17) | (18) |
| Net cash provided by financing activities | 9,548 | 507 |
| Increase (decrease) in cash and cash equivalents | 5,667 | (5,387) |
| Cash and cash equivalents at the beginning of the year | 2,908 | 8,575 |
| Cash and cash equivalents at the end of the year | $ 8,575 | $ 3,188 |

The accompanying notes are an integral part of the consolidated financial statements.

Highly Confidential - Attorneys' Eyes Only

FIN009843

FINJAN SOFTWARE LTD. AND SUBSIDIARY

## NOTES TO FINANCIAL STATEMENTS
U.S. dollars in thousands

### NOTE 1:-   GENERAL

Finjan Software Ltd. was incorporated in Israel and commenced operations in January 1996. In June 1996 Finjan Inc. (together with Finjan Software Ltd., "the Company"), a wholly-owned subsidiary of Finjan Software Ltd. was incorporated in the State of California and commenced operations in January 1997. During 1998 Finjan Inc. was reincorporated in the State of Delaware.

The Company is engaged in the development and marketing of software products, and in resolving security problems posed by mobile code.

### NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES

The financial statements were prepared in accordance with generally accepted accounting principles ("GAAP").

a.   Basis of presentation

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. As of December 31, 1998, the Company had an accumulated deficit of $ 10,977 of which $ 5,910 resulted from net loss in 1998. Subsequent to December 31, 1998, the Company received long-term loans aggregating $ 3,000 for financing its activities. The Company will need to obtain additional funds to continue its research and development activities and fund other operating expenses as well as repay its long-term loans. Management believes that sufficient funds will be available from existing or additional investors or other sources to support planned expenditures and operations through December 31, 1999. However, there can be no assurance that the Company will be able to raise any additional funds. If the Company is unable to obtain the necessary capital, significant reductions in spending and the delay or cancellation of planned activities may be necessary. These actions would have material adverse effects on the Company's business, results of operations, and prospects.

b.   Financial statements in U.S. dollars

The majority of the Company's sales are made outside Israel in U.S. dollars, and a portion of the Company's costs are incurred in U.S. dollars. The U.S. dollar is also the currency of the primary economic environment in which the Company operates. Therefore, the functional and reporting currency for the Company is the U.S. dollar.

The Company's transactions and balances denominated in U.S. dollars are presented at their original amounts. Non-dollar transactions and balances have been remeasured to U.S. dollars in accordance with Statement of Financial Accounting Standards ("SFAS") No. 52 of the U.S. Financial Accounting Standards Board ("FASB"). All transaction gains and losses from remeasurement of monetary balance sheet items denominated in non-dollar currencies are reflected in the statements of operations as financial income or expenses, as appropriate.

7

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND SUBSIDIARY

NOTES TO FINANCIAL STATEMENTS
U.S. dollars in thousands

c.  Principles of consolidation:

The consolidated financial statements include the accounts of Finjan Software Ltd. and its wholly-owned U.S. subsidiary, Finjan Inc.

Significant intercompany balances and transactions have been eliminated in consolidation.

d.  Use of estimates:

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates.

e.  Cash equivalents:

Cash equivalents are considered to be highly liquid investments which include unrestricted short-term bank deposits with original maturities of three months or less,

f.  Fixed assets:

Fixed assets are stated at cost. Depreciation is computed by the straight-line method over the estimated useful lives of the assets at the following annual rates:

|  | % |
| --- | --- |
| Computers and peripheral equipment | 33 |
| Motor vehicles | 15 |
| Office furniture and equipment | 9 |
| Leasehold improvements | Over the term of the lease |

g.  Revenue recognition:

The Company generates revenues from licensing the rights to use its software products directly to end-users and indirectly through sub-license fees from resellers.

Revenues from software license agreements are recognized upon delivery of the software when collection is probable; all license payments are due within one year; the license fee is otherwise fixed or determinable; vendor-specific evidence exists to allocate the total fee to the elements of the arrangement, and persuasive evidence of an arrangement exists.

8

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND SUBSIDIARY

NOTES TO FINANCIAL STATEMENTS
U.S. dollars in thousands

The Company maintains an allowance for potential anticipated returns or exchanges of software products sold to its resellers where the right of return or exchange exists, based on estimates made by the Company's management. However, where the Company cannot determine such estimates, the related revenues are deferred until those rights lapse or until the software products are sold by the reseller to the end-user. As of December 31, 1998 the Company deferred revenues due to potential anticipated returns or exchanges of software products amounting to $264, of which $150 are in respect of an Original Equipment Manufacturer ("OEM") which hasn't yet reported the Company on its sales to end-users.

Revenues from maintenance and support contracts are recognized ratably over the contractual period or as services are performed.

Deferred revenues include unearned amounts received under maintenance and support contracts.

h.  Research and development expenses:

Research and development costs are charged to the statement of operations as incurred. Statement of Financial Accounting Standard ("SFAS") No. 86 "Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed", requires capitalization of certain software development costs subsequent to the establishment of technological feasibility.

Costs incurred by the Company between the establishment of technological feasibility and the point at which the product is ready for general release have been insignificant. Therefore, research and development costs have been expensed.

i.  Grants from government institutions:

The Company has received a grant from the Government of Israel through the Fund for Encouragement of Marketing Activities Abroad. The grant is recognized at the time the Company is entitled to such grant on the basis of the related costs incurred and is presented as a reduction of selling and marketing costs. The Company is not obligated to pay any royalties regarding that grant.

j.  Concentrations of credit risk:

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of trade receivables and cash and cash equivalents which are deposited with major banks in Israel.

k.  Stock based compensation:

The Company grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the underlying shares at the date of grant. The Company accounts for stock option grants to employees in accordance with APB Opinion No. 25, "Accounting for Stock Options Issued to Employees", and accordingly, recognizes no compensation expenses for the stock option grants.

9

FINJAN SOFTWARE LTD. AND SUBSIDIARY

NOTES TO FINANCIAL STATEMENTS
U.S. dollars in thousands

The Company has valued stock options issued to employees and warrants issued to non-employees according to the terms of SFAS No. 123 "Accounting for Stock Based Compensation" ("SFAS No. 123"). However, the pro forma information required under SFAS No. 123 was not disclosed due to its immateriality.

l.   Income taxes:

The Company follows the asset and liability method of accounting for income taxes in accordance with Israeli GAAP. Under Israeli GAAP, deferred income taxes are provided for differences resulting from changes in the Israeli Consumer Price Index ("CPI") (the basis for the Company's tax reporting) and in the exchange rate for the new Israeli shekel ("NIS") to U.S. dollar. SFAS No. 109, "Accounting for Income Taxes", does not allow deferred income taxes to be recognized for this difference, which with respect to the Company's consolidated financial statements, is immaterial.

NOTE 3:-   SHORT-TERM BANK DEPOSIT

The Company placed funds in a short-term bank deposit, for a period of one year, as collateral against a standby letter of credit. The deposit will mature in May 1999 and bears an annual interest of 5.25%.

NOTE 4:-   FIXED ASSETS, NET

| | December 31, | |
| --- | --- | --- |
| | 1997 | 1998 |
| Cost: | | |
| Computers and peripheral equipment | $ 212 | $ 412 |
| Office furniture and equipment | 82 | 125 |
| Leasehold improvements | 12 | 13 |
| Motor vehicles | 96 | 96 |
| | 402 | 646 |
| Accumulated depreciation: | | |
| Computers and peripheral equipment | 65 | 163 |
| Office furniture and equipment | 5 | 21 |
| Leasehold improvements | 1 | 2 |
| Motor vehicles | 19 | 33 |
| | 90 | 219 |
| Depreciated cost | $ 312 | $ 427 |

For charges on the Company's assets, see Note 9b.

10

Highly Confidential - Attorneys' Eyes Only   FIN009847

FINJAN SOFTWARE LTD. AND SUBSIDIARY

## NOTES TO FINANCIAL STATEMENTS
U.S. dollars in thousands

### NOTE 5: - OBLIGATION UNDER CAPITAL LEASE

The Company leases motor vehicles through capital lease. The obligation under capital lease as of December 31, 1998, reflects loans received by the Company from its lessor.

The loans are linked to the U.S. dollar and bear interest at the rate of 7.55% subject to changes in the LIBOR interest rate every three months. Maturities of the outstanding loans for the three years subsequent to December 31, 1998 are $20 in 1999; $22 in 2000 and $17 in 2001.

### NOTE 6:- ACCRUED SEVERANCE PAY

The Company's liability for severance pay, pursuant to Israeli law, is fully provided by an accrual. Part of the liability is funded through insurance policies. The cash value of these policies is recorded as an asset in the Company's balance sheet.

### NOTE 7:- SHORT-TERM BANK LOANS

The loans are in U.S. dollars, bear interest at the rate of 6.69%-6.875%, and are repaid in one installment after a period of three months.

### NOTE 8: - SHARE CAPITAL

a. Share dividend:

In March 1997, the Company's shareholders approved a share dividend of 400% on its share capital. All share amounts have been retroactively adjusted to reflect the share dividend.

b. Composed of NIS 0.01 par value shares as follows:

| | Authorized December 31, | | Issued and outstanding December 31, | |
|---|---|---|---|---|
| | 1997 | 1998 | 1997 | 1998 |
| | Number of shares | | | |
| Preferred Shares Series A (1) | 6,050,000 | 6,050,000 | 6,050,000 | 6,050,000 |
| Preferred Shares Series B (1) | 3,963,770 | 3,963,770 | 3,945,655 | 3,945,655 |
| Preferred Shares Series C (1) | 8,771,930 | 8,771,930 | 8,618,422 | 8,640,351 |
| Ordinary Shares Series A (2) | 30,956,900 | 28,356,900 | 10,560,000 | 10,560,000 |
| Ordinary Shares Series B (3) | 1,611,100 | 4,211,100 | - | - |
| | 51,353,700 | 51,353,700 | 29,174,077 | 29,196,006 |

11

Highly Confidential - Attorneys' Eyes Only

FIN009848

FINJAN SOFTWARE LTD. AND SUBSIDIARY

## NOTES TO FINANCIAL STATEMENTS
U.S. dollars in thousands

(1) Preferred Shares Series A,B and C are convertible into Ordinary Shares according to different conversion prices and confer upon their holders preference in the event of refund of capital upon liquidation, and voting rights which are equal to those of the Ordinary Shares.

(2) Ordinary Shares Series A confer upon their holders voting rights, the right to receive cash dividends and the right to a share in excess assets upon liquidation of the Company.

(3) Ordinary Shares Series B confer upon their holders the right to receive cash dividends and the right to a share in excess assets upon liquidation of the Company. They do not confer upon their holders voting rights.

c. Stock warrants:

In 1996, the Company issued 105,600 warrants to financial advisors with respect to services concerning an issuance of shares of the Company.

During 1998, the Company issued to consultants warrants to purchase 36,952 Ordinary Shares Series B of the Company for an exercise price equals to the par value of the shares, in consideration for services rendered to the Company. The warrants are fully-vested and exerciseable over a period of 10 years.

d. Stock options:

The Company has granted stock options to certain employees to purchase Ordinary Shares Series B of the Company. The options granted are generally exercisable in installments during a period of five years.

As of December 31, 1998, the Company has 3,790,957 stock options issued and outstanding. The exercise price of the options ranges between $0.14 and $0.25.

Subsequent to the balance sheet date, the shareholder of the Company resolved to increase the number of employee stock options under the Company's stock option plan by 2,000,000 stock options.

## NOTE 9:- COMMITMENTS AND CONTINGENT LIABILITIES

a. Lease commitments:

The Company rents its facilities and various equipment under operating leases in Israel for a period of three years, terminating between December 31, 1999 and December 31, 2001 and in the U.S., for a period of three years, terminating on July 31, 2001.

12

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND SUBSIDIARY

## NOTES TO FINANCIAL STATEMENTS

U.S. dollars in thousands

Future minimum annual payments under non-cancelable operating leases are as follows:

Year ended December 31,

| | |
|---|---|
| 1999 | $ 300 |
| 2000 | 304 |
| 2001 | 194 |
| | $ 798 |

Rent expenses for the years ended December 31, 1997 and 1998, were $ 146 and $ 263, respectively.

In September 1998, the Company began subleasing part of its facilities in the U.S. for a period of one year. Sublease income for the period ended December 31, 1998 was $12.

b.    The Company registered a pledge on its four vehicles, in exchange for a long-term loan from a leasing company. In addition, the Company has placed a floating charge on all of its assets in favor of a bank as collateral for a bank loan.

c.    The Company provided bank guarantees to its lessor and the leasing company in the amounts of $ 41 and $ 51, respectively.

## NOTE 10:- TAXES ON INCOME

a.    Tax benefits under the Law for the Encouragement of Capital Investments, 1959 ("the Law"):

On October 13, 1996, the production facilities of the Company were granted the status of an "Approved Enterprise" under the Law.

According to the provisions of the Law, the Company has chosen to enjoy "Alternative Benefits" - waiver of grants in return for tax exemption - and accordingly, its income from the "Approved Enterprise" is tax-exempt for a period of 2 years, and subject for an additional period of 5-8 years to reduced tax rates between 10% to 25%, depending upon the proportion of foreign ownership of the Company.

The period of tax benefits, detailed above, is subject to limits of the earlier of 12 years from the commencement of production, or 14 years, from the approval date.

The Law also grants entitlement to claim accelerated depreciation on machinery and equipment used by the "Approved Enterprise", during the first five tax years.

In the event of distribution of cash dividends from income that is tax exempt as mentioned above, the Company would have to pay income tax equal to 25% of the amount distributed. The tax exempt income attributable to the "Approved Enterprise" can be distributed to shareholders without subjecting the Company to taxes only upon the complete liquidation of the Company.

13

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND SUBSIDIARY

**NOTES TO FINANCIAL STATEMENTS**
U.S. dollars in thousands

The Company currently has no plans to distribute dividends and intends to retain future earnings to finance the development of its business.

Should the Company derive income from sources other than the "Approved Enterprise" during the relevant period of benefits, such income will be taxable at regular corporate tax rates of 36%.

b.  Tax benefits under the Israeli Law for the Encouragement of Industry (Taxation), 1969:

The Company is an "industrial company", under the above law and, as such, is entitled to certain tax benefits, including accelerated depreciation and deduction of public offering expenses in three equal annual installments, and deduction of 12.5% per annum on the purchase of certain intangible property rights.

c.  Measurement of results for tax purposes under the Income Tax Law (Inflationary Adjustments), 1985:

Results for tax purposes are measured in terms of earnings in NIS after certain adjustments for increases in the CPI. As explained in Note 2b, the financial statements are presented in U.S. dollars. The difference between the change in the Israeli CPI and in the NIS/U.S. dollar exchange rate causes a difference between taxable income and the income before taxes as reflected in the financial statements. Such differences are not material.

d.  Tax assessments:

Finjan Software Ltd. has not received final tax assessments since its incorporation.

e.  Net operating losses carryforwards:

Finjan Software Ltd. has accumulated losses for Israeli tax purposes at December 31, 1998 in the amount of approximately $ 5.1 thousand, which may be carried forward and offset against taxable income in the future for an indefinite period.

Through December 31, 1998, Finjan Inc. had federal net operating loss carryforwards of approximately $ 4.9 thousand, that can be carried forward for 15-20 years to the years 2011 through 2018.

f.  Deferred taxes:

Deferred taxes have not been provided, for it is more than likely that they will not be utilized in the foreseeable future.

14

FINJAN SOFTWARE LTD. AND SUBSIDIARY

NOTES TO FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 11:- SELECTED STATEMENTS OF OPERATIONS DATA

|  |  | Year ended December 31, | |
|---|---|---|---|
|  |  | 1997 | 1998 |
| a. | Research and development: | | |
|  | Wages and employee benefits | $ 1,061 | $ 1,312 |
|  | Rent and depreciation | 88 | 213 |
|  | Travel abroad | 23 | 129 |
|  | Communication | 23 | 40 |
|  | Other | 85 | 56 |
|  |  | $ 1,280 | $ 1,750 |
| b. | Selling and marketing, net: | | |
|  | Wages and employee benefits | $ 1,093 | $ 2,131 |
|  | Advertising and public relations | 528 | 514 |
|  | Consulting fees | 155 | 340 |
|  | Travel abroad | 152 | 344 |
|  | Exhibitions | 27 | 256 |
|  | Other | 550 | 571 |
|  |  | 2,505 | 4,156 |
|  | Less - participation from the Fund for Encouragement of Marketing Activities Abroad | 12 | 50 |
|  |  | $ 2,493 | $ 4,106 |
| c. | General and administrative: | | |
|  | Wages and employee benefits | $ 365 | $ 277 |
|  | Consulting fees | 159 | 203 |
|  | Rent and maintenance | 59 | 37 |
|  | Travel abroad | 36 | 29 |
|  | Other | 72 | 262 |
|  |  | $ 691 | $ 808 |

NOTE 12:- SUBSEQUENT EVENTS

Subsequent to the balance sheet date, the Company received a loan in the amount of $2,000 in consideration for a warrant to purchase 210,256 Preferred Shares Series C for an exercise price of $1.14 per share.

\\Kost_3\sys\LANIR\2914\M\98\E$12.DOC

15

# EXHIBIT 12

FINJAN SOFTWARE LTD. AND SUBSIDIARY

CONSOLIDATED FINANCIAL  STATEMENTS
AS OF DECEMBER  31, 1999

Joint Trial Exhibit

**JTX-34**

Case No. 06-369 GMS

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND SUBSIDIARY

CONSOLIDATED FINANCIAL STATEMENTS

AS OF DECEMBER 31, 1999

IN U.S. DOLLARS

INDEX

|  | Page |
|---|---|
| Report of Independent Auditor | 2 |
| Consolidated Balance Sheets | 3 |
| Consolidated Statements of Operations | 4 |
| Statements of Changes in Shareholders' Equity (Deficiency) | 5 |
| Consolidated Statements of Cash Flows | 6 |
| Notes of Financial Statements | 7 - 15 |

Highly Confidential - Attorneys' Eyes Only

# ☰ ERNST & YOUNG

■ Kost Forer & Gabbay
3 Aminadav St.
Tel-Aviv 61575, Israel

■ Phone:972-3-6232525 Fax:
972-3-5622555

## REPORT OF INDEPENDENT AUDITOR

### To the Shareholders of

### FINJAN SOFTWARE LTD.

We have audited the accompanying consolidated balance sheets of Finjan Software Ltd. and its subsidiary ("the Company") as of December 31, 1998 and 1999, and the related consolidated statements of operations, changes in shareholders' equity (deficiency) and consolidated cash flows for each of the two years in the period ended December 31, 1999. These financial statements are the responsibility of the Company's Board of Directors and management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing principles, including those prescribed by the Israeli Auditors Regulations (Mode of Performance), 1973. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by the Board of Directors and management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company as of December 31, 1998 and 1999, and the consolidated results of its operations, changes in shareholders' equity (deficiency) and cash flows for each of the two years in the period ended December 31, 1999, in conformity with generally accepted accounting principles.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As more fully described in Note 2a, the Company has incurred operating losses and has an accumulated deficit. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2a. The 1999 consolidated financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result from the outcome of this uncertainty.

Tel-Aviv, Israel
June 30, 2000

Kost, Forer and Gabbay
KOST FORER & GABBAY
A Member of Ernst & Young International

- 2 -

Highly Confidential - Attorneys' Eyes Only

FIN009823

FINJAN SOFTWARE LTD. AND SUBSIDIARY

**CONSOLIDATED BALANCE SHEETS**

U.S. dollars in thousands

| | Note | December 31, 1998 | December 31, 1999 |
|---|---|---|---|
| **ASSETS** | | | |
| **CURRENT ASSETS:** | | | |
| Cash and cash equivalents | | $ 3,188 | $ 657 |
| Short-term bank deposit | 3 | 34 | 34 |
| Trade receivables | | 263 | 399 |
| Prepaid expenses | | 118 | 54 |
| Other accounts receivable | | 106 | 58 |
| Total current assets | | 3,709 | 1,202 |
| SEVERANCE PAY FUND | 6 | 80 | 92 |
| FIXED ASSETS, NET | 4 | 427 | 358 |
| Total assets | | $ 4,216 | $ 1,652 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIENCY)** | | | |
| **CURRENT LIABILITIES:** | | | |
| Short-term bank loans | 7 | $ 500 | $ -- |
| Current portion of obligation under capital leasing contracts and long-term loan | 5, 8 | 20 | 1,772 |
| Trade payables | | 462 | 265 |
| Employees and payroll accruals | | 388 | 188 |
| Deferred revenues | | 338 | 463 |
| Accrued expenses and other liabilities | | 71 | 107 |
| Total current liabilities | | 1,779 | 2,795 |
| **LONG-TERM LIABILITIES:** | | | |
| Long-term loans, net of current portion | 8 | -- | 1,249 |
| Obligation under capital leasing contracts, net of current portion | 5 | 39 | 18 |
| Accrued severance pay | 6 | 130 | 149 |
| Total long-term liabilities | | 169 | 1,416 |
| **SHAREHOLDERS' EQUITY (DEFICIENCY):** | | | |
| Share capital | 9 | 86 | 86 |
| Additional paid-in capital | | 13,159 | 13,274 |
| Deferred compensation | | -- | (60) |
| Receipts on account of shares | | -- | 38 |
| Accumulated deficit | | (10,977) | (15,897) |
| Total shareholders' equity (deficiency) | | 2,268 | (2,559) |
| Total liabilities and shareholders' equity (deficiency) | | $ 4,216 | $ 1,652 |

The accompanying notes are an integral part of the consolidated financial statements

| | | |
|---|---|---|
| June 30, 2000 | Jerry Christopher | William Lyons |
| Date of approval of the financial statements | Chairman of Board of Directors | Director |

- 3 -

FINJAN SOFTWARE LTD. AND SUBSIDIARY

## CONSOLIDATED STATEMENTS OF OPERATIONS

U.S. dollars in thousands

| | Note | Year ended December 31, 1998 | Year ended December 31, 1999 |
|---|---|---|---|
| Revenues | | $ 739 | $ 2,780 |
| Cost of revenues | | 258 | 414 |
| Gross profit | | 481 | 2,366 |
| Operating expenses: | | | |
| Research and development | 12a | 1,750 | 1,605 |
| Selling and marketing, net | 12b | 4,106 | 4,942 |
| General and administrative | 12c | 808 | 509 |
| Total operating expenses | | 6,664 | 7,056 |
| Operating loss | | 6,183 | 4,690 |
| Financial (income) expenses, net | | (273) | 230 |
| Loss for the year | | $ 5,910 | $ 4,920 |

The accompanying notes are an integral part of the consolidated financial statements.

Highly Confidential - Attorneys' Eyes Only

FIN009825

FINJAN SOFTWARE LTD. AND SUBSIDIARY

## STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY (DEFICIENCY)

U.S. dollars in thousands

| | Share capital | Additional paid-in capital | Deferred compensation | Receipts on account of shares | Accumulated deficit | Total shareholders' equity (deficiency) |
|---|---|---|---|---|---|---|
| Balance as of January 1, 1998 | $ 86 | $ 13,134 | $ - | $ - | $ (5,067) | $ 8,153 |
| Issuance of shares, net | - | 25 | - | - | - | 25 |
| Loss for the year | | | | | (5,910) | (5,910) |
| Balance as of December 31, 1998 | 86 | 13,159 | - | - | (10,977) | 2,268 |
| Issuance of shares, net | (* | - | - | - | - | - |
| Exercise of stock options and warrants | - | 35 | - | - | - | 35 |
| Deferred compensation | - | 80 | - | 38 | - | 38 |
| Amortization of deferred compensation | - | - | (80) | - | - | - |
| Loss for the year | - | - | 20 | - | - | 20 |
| | | | | | (4,920) | (4,920) |
| Balance as of December 31, 1999 | $ 86 | $ 13,274 | $ (60) | $ 38 | $ (15,897) | $ (2,559) |

*) Represents an amount lower than $ 1.

The accompanying notes are an integral part of the consolidated financial statements.

- 5 -

Highly Confidential - Attorneys' Eyes Only

FIN009826

FINJAN SOFTWARE LTD. AND SUBSIDIARY

## CONSOLIDATED STATEMENTS OF CASH FLOWS
U.S. dollars in thousands

|  | Year ended December 31, | |
|---|---|---|
|  | 1998 | 1999 |
| **Cash flows from operating activities:** | | |
| Loss for the year | $ (5,910) | $ (4,920) |
| Adjustments to reconcile loss to net cash used in operating activities: | | |
| Depreciation | 129 | 189 |
| Amortization of deferred compensation | - | 20 |
| Compensation expenses related to shares granted to a consultant | - | 35 |
| Increase in trade receivables | (21) | (136) |
| Decrease (increase) in other accounts receivable | (117) | 112 |
| Increase (decrease) in trade payables | 62 | (197) |
| Increase (decrease) in accrued expenses and other liabilities | 222 | (39) |
| Increase in accrued severance pay, net | 19 | 7 |
| Erosion of long-term loans | - | 5 |
| Net cash used in operating activities | (5,616) | (4,924) |
| **Cash flows from investing activities:** | | |
| Short-term investments, net | (34) | - |
| Purchase of fixed assets | (244) | (120) |
| Net cash used in investing activities | (278) | (120) |
| **Cash flows from financing activities:** | | |
| Proceeds from short-term bank loans | 500 | - |
| Proceeds from issuance of shares, net | 25 | - |
| Proceeds from exercise of stock options and warrants | - | 38 |
| Proceeds from long-term loans | - | 3,000 |
| Principal payments of short-term loans | - | (500) |
| Principal payments of obligation under capital leasing contracts | (18) | (25) |
| Net cash provided by financing activities | 507 | 2,513 |
| Decrease in cash and cash equivalents | (5,387) | (2,531) |
| Cash and cash equivalents at the beginning of the year | 8,575 | 3,188 |
| Cash and cash equivalents at the end of the year | $ 3,188 | $ 657 |

The accompanying notes are an integral part of the consolidated financial statements.

- 6 -

Highly Confidential – Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND SUBSIDIARY

## NOTES TO FINANCIAL STATEMENTS
U.S. dollars in thousands

### NOTE 1:- GENERAL

Finjan Software Ltd. was incorporated in Israel and commenced operations in January 1996. In June 1996, Finjan Inc. (together with Finjan Software Ltd., "the Company"), a wholly-owned subsidiary of Finjan Software Ltd. was incorporated in the State of California and commenced operations in January 1997. During 1998, Finjan Inc. was reincorporated in the State of Delaware.

The Company is engaged in the development and marketing of software products, and in resolving security problems posed by mobile code.

### NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES

a.    Basis of presentation

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. As of December 31, 1999, the Company had an accumulated deficit of $ 15,862 of which $ 4,885 resulted from the net loss for 1999. During 1999, the Company received long-term loans aggregating to $ 3,000 for financing its activities. The Company will need to obtain additional funds to continue its research and development activities and fund other operating expenses as well as repay its long-term loans. Management believes that sufficient funds will be available from existing or additional investors or other sources to support planned expenditures and operations through December 31, 2000. However, there can be no assurance that the Company will be able to raise any additional funds. If the Company is unable to obtain the necessary capital, significant reductions in spending and the delay or cancellation of planned activities may be necessary. These actions would have material adverse effects on the Company's business, results of operations, and prospects.

b.    Financial statements in U.S. dollars

The majority of the Company's sales are made outside Israel in U.S. dollars, and a portion of the Company's costs are incurred in U.S. dollars. The U.S. dollar is also the currency of the primary economic environment in which the Company operates. Therefore, the functional and reporting currency for the Company is the U.S. dollar.

The Company's transactions and balances denominated in U.S. dollars are presented at their original amounts. Non-dollar transactions and balances have been remeasured to U.S. dollars in accordance with Statement of Financial Accounting Standards ("SFAS") No. 52 of the U.S. Financial Accounting Standards Board ("FASB"). All transaction gains and losses from remeasurement of monetary balance sheet items denominated in non-dollar currencies are reflected in the statements of operations as financial income or expenses, as appropriate.

- 7 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND SUBSIDIARY

## NOTES TO FINANCIAL STATEMENTS
### U.S. dollars in thousands

c.    Principles of consolidation:

The consolidated financial statements include the accounts of Finjan Software Ltd. and its wholly-owned U.S. subsidiary, Finjan Inc.

Significant intercompany balances and transactions have been eliminated in consolidation.

d.    Use of estimates:

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates.

e.    Cash equivalents:

Cash equivalents are considered to be highly liquid investments which include unrestricted short-term bank deposits with original maturities of three months or less.

f.    Short-term deposits:

The Company classifies deposits with maturities of more than three months and less than one year as short-term deposits. The short-term deposits are presented at their cost, including accrued interest.

g.    Fixed assets:

Fixed assets are stated at cost. Depreciation is computed by the straight-line method over the estimated useful lives of the assets at the following annual rates:

|  | % |
|---|---|
| Computers and peripheral equipment | 33 |
| Motor vehicles | 15 |
| Office furniture and equipment | 6 - 20 |
| Leasehold improvements | Over the term of the lease |

h.    Revenue recognition:

The Company generates revenues from licensing the rights to use its software products directly to end-users and indirectly through sub-license fees from resellers.

Revenues from software license agreements are recognized upon delivery of the software when collection is probable; all license payments are due within one year; the license fee is otherwise fixed or determinable; and persuasive evidence of an arrangement exists.

- 8 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND SUBSIDIARY

**NOTES TO FINANCIAL STATEMENTS**
U.S. dollars in thousands

Revenues from maintenance and support contracts are recognized over the contractual period or as services are performed.

Deferred revenues include amounts not yet recognized under maintenance and support contracts, of which $115. are in respect of an unrecognized income arising from an Original Equipment Manufacturer ("OEM") contract.

i.    Research and development expenses:

Research and development costs are charged to the statement of operations as incurred. Statement of Financial Accounting Standard ("SFAS") No. 86 "Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed", requires capitalization of certain software development costs subsequent to the establishment of technological feasibility.

Costs incurred by the Company between the establishment of technological feasibility and the point at which the product is ready for general release have been insignificant. Therefore, research and development costs have been expensed.

j.    Grants from Government institutions:

The Company has received a grant from the Government of Israel through the Fund for Encouragement of Marketing Activities Abroad. The grant was recognized at the time the Company was entitled to such grant on the basis of the related costs incurred and is presented as a reduction of selling and marketing costs. The Company is not obligated to pay any royalties regarding that grant.

k.    Concentrations of credit risk:

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of trade receivables and cash and cash equivalents which are deposited with major banks in Israel.

l.    Stock-based compensation:

The Company grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the underlying shares at the date of grant. The Company accounts for stock option grants to employees in accordance with Accounting Priciples Board Opinion No. 25, "Accounting for Stock Options Issued to Employees", ("APB-25"), and accordingly, recognizes no compensation expenses for the stock option grants.

- 9 -

FINJAN SOFTWARE LTD. AND SUBSIDIARY

NOTES TO FINANCIAL STATEMENTS
U.S. dollars in thousands

The Company has valued warrants issued to non-employees according to the provisions of SFAS No. 123 "Accounting for Stock Based Compensation" ("SFAS No. 123").

m.   Income taxes:

The Company follows the asset and liability method of accounting for income taxes in accordance with Israeli GAAP. Under Israeli GAAP, deferred income taxes are provided for differences resulting from changes in the Israeli Consumer Price Index ("CPI") (the basis for the Company's tax reporting) and in the exchange rate for the new Israeli shekel ("NIS") to U.S. dollar. SFAS No. 109, "Accounting for Income Taxes", does not allow deferred income taxes to be recognized for this difference, which with respect to the Company's consolidated financial statements, is immaterial.

n.   Adjustment of computer systems for the Year 2000:

The costs required in order to adjust and modify the Company's existing software in order for it to be Year 2000 Compliant are recorded as current expenses at the time they are incurred.

NOTE 3:-   SHORT-TERM BANK DEPOSIT

The Company placed funds in a short-term bank deposit, for a period of one year. The deposit will mature in May 2000 and bears annual interest of 5.25%.

NOTE 4:-   FIXED ASSETS

| | December 31, | |
| --- | --- | --- |
| | 1998 | 1999 |
| Cost: | | |
| Computers and peripheral equipment | $ 412 | $ 526 |
| Office furniture and equipment | 125 | 131 |
| Leasehold improvements | 13 | 13 |
| Motor vehicles | 96 | 96 |
| | 646 | 766 |
| Accumulated depreciation: | | |
| Computers and peripheral equipment | 163 | 315 |
| Office furniture and equipment | 21 | 41 |
| Leasehold improvements | 2 | 4 |
| Motor vehicles | 33 | 48 |
| | 219 | 408 |
| Depreciated cost | $ 427 | $ 358 |

For charges on the Company's assets, see Note 10b.

- 10 -

FINJAN SOFTWARE LTD. AND SUBSIDIARY

## NOTES TO FINANCIAL STATEMENTS
U.S. dollars in thousands

### NOTE 5: – OBLIGATION UNDER CAPITAL LEASING CONTRACTS

The Company leases motor vehicles under capital leasing contracts. The obligation under the capital leases as of December 31, 1999, reflects loans received by the Company from its lessor.

The loans are linked to the U.S. dollar and bear interest at the rate of 7.925% subject to the changes in the LIBOR interest rate every three months. Maturities of the outstanding loans for the two years subsequent to December 31, 1999 are $21 in 2000 and $18 in 2001.

### NOTE 6:– ACCRUED SEVERANCE PAY

The Company's liability for severance pay, pursuant to Israeli law, is fully provided for by an accrual. Part of the liability is funded through insurance policies. The cash value of these policies is recorded as an asset in the Company's balance sheet.

### NOTE 7:– SHORT-TERM BANK LOANS

The loans are in U.S. dollars, bear interest at the rate of 6.69%–6.875%, and are repaid in one installment after a period of three months.

### NOTE 8:– LONG-TERM LOANS

The Company's long-term loans consist of the following:

|  | December 31, | |
|---|---|---|
|  | 1998 | 1999 |
| Loan linked to the U.S. dollar Libor + 1.5% interest, due in April 2000 | $    - | $  1,000 |
| Loan linked to the U.S. dollar, 12% interest, due periodically through April 2002 | - | 2,000 |
|  | - | 3,000 |
| Less – current maturities | - | 1,751 |
|  | $    - | $  1,249 |

### NOTE 9: – SHARE CAPITAL

a.    Share dividend:

In March 1997, the Company's shareholders approved a share dividend of 400% on its share capital. All share amounts have been retroactively adjusted to reflect the share dividend.

-11-

Highly Confidential - Attorneys' Eyes Only            FIN009832

FINJAN SOFTWARE LTD. AND SUBSIDIARY

## NOTES TO FINANCIAL STATEMENTS
U.S. dollars in thousands

b.    Composed of NIS 0.01 par value shares as follows:

| | Authorized | Issued and outstanding December 31, | |
| --- | --- | --- | --- |
| | 1998 and 1999 | 1998 | 1999 |
| | | Number of shares | |
| Preferred shares Series A (1) | 6,050,000 | 6,050,000 | 6,050,000 |
| Preferred shares Series B (1) | 3,963,770 | 3,963,770 | 3,944,955 |
| Preferred shares Series C (1) | 8,771,930 | 8,640,351 | 8,640,351 |
| Ordinary shares Series A (2) | 30,956,900 | 10,560,000 | 10,560,000 |
| Ordinary shares Series B (3) | 1,611,100 | - | 30,702 |
| | 51,353,700 | 29,214,121 | 29,226,008 |

(1)    Preferred shares Series A,B and C are convertible into Ordinary shares according to different conversion prices and confer upon their holders preference in the event of refund of capital upon liquidation, and voting rights which are equal to those of the Ordinary shares.

(2)    Ordinary shares Series A confer upon their holders voting rights, the right to receive cash dividends and the right to a share in surplus assets upon liquidation of the Company.

(3)    Ordinary shares Series B confer upon their holders the right to receive cash dividends and the right to a share in surplus assets upon liquidation of the Company. They do not confer upon their holders voting rights.

c.    Share issuance

During 1999, the Company issued 30,702 Ordinary Series B shares to a consultant in favor of its services.

d.    Stock options:

The Company has granted stock options to certain employees and directors to purchase Ordinary Shares Series B of the Company. The options granted are generally exercisable in installments during a period of five years.

As of December 31, 1999, the Company has 3,992,791 stock options issued and outstanding. The exercise price of the options ranges between $0.14 and $0.25.

- 12 -

FIN009833

FINJAN SOFTWARE LTD. AND SUBSIDIARY

NOTES TO FINANCIAL STATEMENTS
U.S. dollars in thousands

NOTE 10:- COMMITMENTS AND CONTINGENT LIABILITIES

    a.    Lease commitments:

        The Company rents its facilities and various equipment under operating leases in Israel for a
period of three years, terminating on November 30, 2001 and in the U.S., for a period of three
years, terminating on July 31, 2001.

        Future minimum annual payments under non-cancelable operating leases are as follows:

Year ended December 31,

| | |
|---|---|
| 2000 | $ 266 |
| 2001 | 182 |
| | $ 448 |

        Rent expenses for the years ended December 31, 1998 and 1999, were $ 263 and $ 288,
respectively.

        In September 1998, the Company began subleasing part of its facilities in the U.S. for a period
of one year. Sublease income for the periods ended December 31, 1998 and 1999 were $ 12
and $ 63, respectively.

    b.    The Company recorded a pledge on its motor vehicles, in exchange for a long-term loan from a
leasing company. In addition, the Company has recorded a floating charge on all of its assets
in favor of a bank as collateral for a bank loan.

    c.    The Company provided bank guarantees to its lessor and the leasing company in the amounts
of $ 42 thousand and $ 34 thousand, respectively.

NOTE 11:- TAXES ON INCOME

    a.    Tax benefits under the Law for the Encouragement of Capital Investments, 1959 ("the Law"):

        On October 13, 1996, the production facilities of the Company were granted the status of an
"Approved Enterprise" under the Law.

        According to the provisions of the Law, the Company has chosen to enjoy "Alternative
Benefits" - waiver of grants in return for tax exemption - and accordingly, its income from the
"Approved Enterprise" is tax-exempt for a period of 2 years, and subject for an additional
period of 5-8 years to reduced tax rates between 10% to 25%, depending upon the proportion
of foreign ownership of the Company.

        The period of tax benefits, detailed above, is subject to limits of the earlier of 12 years from
the commencement of production, or 14 years, from the approval date.

- 13 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND SUBSIDIARY

## NOTES TO FINANCIAL STATEMENTS
U.S. dollars in thousands

The Law also grants entitlement to claim accelerated depreciation on machinery and equipment used by the "Approved Enterprise", during the first five tax years.

In the event of distribution of cash dividends from income that is tax exempt as mentioned above, the Company would have to pay income tax equal to 10% to 25% of the amount distributed. The tax exempt income attributable to the "Approved Enterprise" can be distributed to shareholders without subjecting the Company to taxes only upon the complete liquidation of the Company.

The Company currently has no plans to distribute dividends and intends to retain future earnings to finance the development of its business.

Should the Company derive income from sources other than the "Approved Enterprise" during the relevant period of benefits, such income will be taxable at regular corporate tax rates of 36%.

b.  Tax benefits under the Israeli Law for the Encouragement of Industry (Taxation), 1969:

The Company is an "industrial company", under the above law and, as such, is entitled to certain tax benefits, including accelerated depreciation and deduction of public offering expenses in three equal annual installments, and deduction of 12.5% per annum on the purchase of certain intangible property rights.

c.  Tax assessments:

Finjan Software Ltd. has not received final tax assessments since its incorporation.

d.  Net operating losses carryforwards:

Finjan Software Ltd. has accumulated losses for Israeli tax purposes at December 31, 1999 in the amount of approximately $ 6.6 million, which may be carried forward and offset against taxable income in the future for an indefinite period.

Through December 31, 1999, Finjan Inc. had federal net operating loss carryforwards of approximately $ 8.2 million, that can be carried forward for 15-20 years to the years 2011 through 2019.

e.  Deferred taxes:

Deferred taxes have not been provided, for it is more than likely that they will not be utilized in the foreseeable future.

- 14 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND SUBSIDIARY

## NOTES TO FINANCIAL STATEMENTS
U.S. dollars in thousands

## NOTE 12:- SELECTED STATEMENTS OF OPERATIONS DATA

|  | | Year ended December 31, | |
|---|---|---|---|
|  | | 1998 | 1999 |
| a. | Research and development: | | |
|  | Wages and employee benefits | $ 1,312 | $ 1,169 |
|  | Rent and depreciation | 213 | 134 |
|  | Travel abroad | 129 | 46 |
|  | Communication | 40 | 15 |
|  | Other | 56 | 241 |
|  | | $ 1,750 | $ 1,605 |
| b. | Selling and marketing: | | |
|  | Wages and employee benefits | $ 2,131 | $ 2,592 |
|  | Advertising and public relations | 514 | 338 |
|  | Consulting fees | 340 | 423 |
|  | Travel | 344 | 571 |
|  | Exhibitions | 256 | 159 |
|  | Other | 571 | 859 |
|  | | 4,156 | 4,942 |
|  | Less - participation from the Fund for Encouragement of Marketing Activities Abroad | 50 | - |
|  | | $ 4,106 | $ 4,942 |
| c. | General and administrative: | | |
|  | Wages and employee benefits | $ 277 | $ 270 |
|  | Consulting fees | 203 | 137 |
|  | Rent and maintenance | 37 | 12 |
|  | Travel abroad | 29 | 6 |
|  | Other | 262 | 84 |
|  | | $ 808 | $ 509 |

F:\LANIR\2914\M\99\E$12.DOC

- 15 -

Highly Confidential - Attorneys' Eyes Only

FIN009836

# EXHIBIT 13

FINJAN SOFTWARE LTD.

CONSOLIDATED FINANCIAL STATEMENTS

AS OF DECEMBER 31, 2000

Joint Trial Exhibit

**JTX-33**

Case No. 06-369 GMS

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD.

CONSOLIDATED FINANCIAL STATEMENTS

FOR TAX PURPOSES ONLY

AS OF DECEMBER 31, 2000

IN U.S. DOLLARS

INDEX

|  | Page |
|---|---|
| Report of Independent Auditor | 2 |
| Consolidated Balance Sheets | 3 |
| Consolidated Statements of Operations | 4 |
| Statements of Changes in Shareholders' Deficiency | 5 |
| Consolidated Statements of Cash Flows | 6 |
| Notes of Consolidated Financial Statements | 7 - 20 |

- - - - - - - -

ERNST & YOUNG

Kost Forer & Gabbay
3 Aminadav St.
Tel-Aviv 67067, Israel

Phone:972-3-6232525
Fax:  972-3-5622555

## REPORT OF INDEPENDENT AUDITOR

### To the Shareholders of

### FINJAN SOFTWARE LTD.

We have audited the accompanying consolidated balance sheets of Finjan Software Ltd. (the "Company") and its subsidiary as of December 31, 1999 and 2000, and the related consolidated statements of operations, changes in shareholders' deficiency and cash flows for each of the two years in the period ended December 31, 2000. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Finjan Software and its subsidiary as of December 31, 1999 and 2000, and the consolidated results of their operations, changes in shareholders' deficiency and cash flows for each of the two years in the period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2a to the consolidated financial statements, the Company has suffered recurring operating losses and has an accumulated deficit. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2a. The 2000 consolidated financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result from the outcome of this uncertainty.

Tel-Aviv, Israel
February 15, 2001

*Kost, Forer & Gabbay*

KOST FORER & GABBAY
A Member of Ernst & Young International

- 2 -

Highly Confidential - Attorneys' Eyes Only

## CONSOLIDATED BALANCE SHEETS

FINJAN SOFTWARE LTD.

U.S. dollars in thousands

| | Note | December 31, 1999 | 2000 |
|---|---|---|---|
| **ASSETS** | | | |
| **CURRENT ASSETS:** | | | |
| Cash and cash equivalents | | $ 657 | $ 577 |
| Short-term bank deposit | 3 | 34 | |
| Trade receivables | | 399 | 1,347 |
| Prepaid expenses | | 54 | 87 |
| Other accounts receivable | | 58 | 25 |
| Total current assets | | 1,202 | 2,036 |
| SEVERANCE PAY FUND | | 92 | 127 |
| PROPERTY AND EQUIPMENT, NET | 4 | 358 | 287 |
| Total assets | | $ 1,652 | $ 2,450 |
| **LIABILITIES AND SHAREHOLDERS' DEFICIENCY** | | | |
| **CURRENT LIABILITIES:** | | | |
| Convertible loans | 6 | $ — | $ 1,389 |
| Current maturities of long-term bank loan | 7 | 1,000 | |
| Current maturities of obligation under capital leasing contracts | 5 | 21 | 17 |
| Current maturities of long-term loan from a financial institution | 8 | 751 | 1,201 |
| Trade payables | | 265 | 425 |
| Employees and payroll accruals | | 188 | 528 |
| Deferred revenues | | 463 | 914 |
| Accrued expenses and other liabilities | | 107 | 809 |
| Total current liabilities | | 2,795 | 5,283 |
| **LONG-TERM LIABILITIES:** | | | |
| Long-term loan from a financial institution, net of current maturities | 8 | 1,249 | 331 |
| Obligation under capital leasing contracts, net of current maturities | 5 | 18 | — |
| Accrued severance pay | | 149 | 189 |
| Total long-term liabilities | | 1,416 | 520 |
| **SHAREHOLDERS' DEFICIENCY:** | | | |
| Share capital | 9 | 86 | 144 |
| Additional paid-in capital | | 13,274 | 17,154 |
| Receipts on account of shares | | 38 | 14 |
| Deferred compensation | | (60) | (33) |
| Accumulated deficit | | (15,897) | (20,632) |
| Total shareholders' deficiency | | (2,559) | (3,353) |
| Total liabilities and shareholders' deficiency | | $ 1,652 | $ 2,450 |

The accompanying notes are an integral part of the consolidated financial statements.

July 18, 2001
Date of approval of the
financial statements

William Lyons
Chairman of the
Board of Directors

Phil Kantz
Director

- 3 -

Highly Confidential - Attorneys' Eyes Only

FIN009803

FINJAN SOFTWARE LTD.

## CONSOLIDATED STATEMENTS OF OPERATIONS
U.S. dollars in thousands

| | Year ended December 31, | |
| | 1999 | 2000 |
|---|---|---|
| Revenues | $ 2,780 | $ 3,752 |
| Cost of revenues | 414 | 563 |
| Gross profit | 2,366 | 3,189 |
| Operating expenses: | | |
| Research and development | 1,605 | 1,899 |
| Selling and marketing, net | 4,942 | 4,830 |
| General and administrative | 509 | 932 |
| Total operating expenses | 7,056 | 7,661 |
| Operating loss | 4,690 | 4,472 |
| Financial expenses, net | 230 | 263 |
| Net loss | $ 4,920 | $ 4,735 |

The accompanying notes are an integral part of the consolidated financial statements.

- 4 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD.

## STATEMENTS OF CHANGES IN SHAREHOLDERS' DEFICIENCY

U.S. dollars in thousands

| | Share capital | Additional paid-in capital | Receipts on account of shares | Deferred compensation | Accumulated deficit | Total shareholders' deficiency |
|---|---|---|---|---|---|---|
| Balance as of January 1, 1999 | $ 86 | $ 13,159 | $ - | $ - | $ (10,977) | $ 2,268 |
| Issuance of shares, net | (*) | 35 | - | - | - | 35 |
| Exercise of stock options and warrants | - | - | 38 | - | - | 38 |
| Deferred compensation | - | 80 | - | (80) | - | - |
| Amortization of deferred compensation | - | - | - | 20 | - | 20 |
| Net loss | - | - | - | - | (4,920) | (4,920) |
| Balance as of December 31, 1999 | 86 | 13,274 | 38 | (60) | (15,897) | (2,559) |
| Issuance of shares, net | 58 | 3,880 | (38) | - | - | 3,900 |
| Exercise of stock options | - | - | 14 | - | - | 14 |
| Amortization of deferred compensation | - | - | - | 27 | - | 27 |
| Net loss | - | - | - | - | (4,735) | (4,735) |
| Balance as of December 31, 2000 | $ 144 | $ 17,154 | $ 14 | $ (33) | $ (20,632) | $ (3,353) |

\*) Represents an amount lower than $ 1.

The accompanying notes are an integral part of the consolidated financial statements.

- 5 -

CONSOLIDATED STATEMENTS OF CASH FLOWS

FINJAN SOFTWARE LTD.

U.S. dollars in thousands

| | Year ended December 31, | |
| --- | --- | --- |
| | 1999 | 2000 |
| Cash flows from operating activities: | | |
| Loss for the year | $ (4,920) | $ (4,735) |
| Adjustments to reconcile loss to net cash used in operating activities: | | |
| Depreciation | 189 | 178 |
| Amortization of deferred compensation | 20 | 27 |
| Compensation expenses related to shares granted to a consultant | 35 | - |
| Increase in trade receivables | (136) | (948) |
| Decrease in prepaid expenses and other accounts receivable | 112 | |
| Increase (decrease) in trade payables | (197) | 160 |
| Increase (decrease) in employee and payroll accruals, deferred revenues and accrued expenses and other liabilities | (39) | 1,493 |
| Interest on convertible loans | - | 14 |
| Increase in severance pay, net | 7 | 5 |
| Erosion of long-term bank loan and loan from a financial institution | 5 | - |
| Net cash used in operating activities | (4,924) | (3,806) |
| | | |
| Cash flows from investing activities: | | |
| Short-term investments, net | - | 34 |
| Purchase of property and equipment | (120) | (107) |
| Net cash used in investing activities | (120) | (73) |
| | | |
| Cash flows from financing activities: | | |
| Proceeds from long-term bank loan | 1,000 | - |
| Principal payment of long-term bank loan | - | (1,000) |
| Proceeds from long-term loan from a financial institution | 2,000 | - |
| Principal payments of long-term loan from a financial institution | - | (468) |
| Principal payments of short-term loans | (500) | - |
| Proceeds from convertible loans | - | 1,375 |
| Principal payments of obligation under capital leasing contracts | (25) | (22) |
| Proceeds from issuance of shares, net | - | 3,900 |
| Proceeds from exercise of stock options and warrants | 38 | 14 |
| Net cash provided by financing activities | 2,513 | 3,799 |
| | | |
| Decrease in cash and cash equivalents | (2,531) | (80) |
| Cash and cash equivalents at the beginning of the year | 3,188 | 657 |
| Cash and cash equivalents at the end of the year | $ 657 | $ 577 |

The accompanying notes are an integral part of the consolidated financial statements.

- 6 -

FINJAN SOFTWARE LTD.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

U.S. dollars in thousands

**NOTE 1:-    GENERAL**

Finjan Software Ltd. was incorporated in Israel and commenced operations in January 1996. In June 1996, Finjan Inc. (together with Finjan Software Ltd., the "Company"), a wholly-owned subsidiary of Finjan Software Inc. was incorporated in the State of California and commenced operations in January 1997. During 1998, Finjan Inc. was reincorporated in the State of Delaware.

The Company is engaged in the development and marketing of software proactive security solutions that protect companies from first-strike attacks by malicious code and active content, allowing companies to conduct e-business safely.

**NOTE 2:-    SIGNIFICANT ACCOUNTING POLICIES**

The financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") (except for Note 12, which represents the Company's financial statements in nominal (historical) new Israeli shekels ("NIS")). The significant policies followed in the preparation of the consolidated financial statements are:

a.    Basis of presentation:

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. As of December 31, 2000, the Company had an accumulated deficit of $ 20,636 thousand of which $ 4,739 thousand resulted from the net loss for 2000. During 2000, the Company received convertible loans aggregating to $ 1,375 thousand and issued Preferred shares in consideration for approximately $ 3,900 thousand for financing its activities. The Company will need to obtain additional funds to continue its research and development activities and fund other operating expenses as well as repay its long-term loans.

Management believes that sufficient funds will be available from existing or additional investors or other sources to support planned expenditures and operations through December 31, 2001. However, there can be no assurance that the Company will be able to raise any additional funds. If the Company is unable to obtain the necessary capital, significant reductions in spending and the delay or cancellation of planned activities may be necessary. These actions would have material adverse effects on the Company's business, results of operations and prospects.

b.    Use of estimates:

The preparation of financial statements in conformity with accounting principles generally accepted requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates.

- 7 -

Highly Confidential - Attorneys' Eyes Only                                                                    FIN009807

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

c.  Financial statements in U.S. dollars:

The majority of the Company's sales are made outside Israel in U.S. dollars, and a portion of the Company's costs are incurred in U.S. dollars. The U.S. dollar is also the currency of the primary economic environment in which the Company operates. Therefore, the functional and reporting currency for the Company is the U.S. dollar.

The Company's transactions and balances denominated in U.S. dollars are presented at their original amounts. Non-dollar transactions and balances have been remeasured to U.S. dollars in accordance with Statement of Financial Accounting Standards ("SFAS") No. 52 of the U.S. Financial Accounting Standards Board ("FASB"). All transaction gains and losses from remeasurement of monetary balance sheet items denominated in non-dollar currencies are reflected in the statement of operations as financial income or expenses, as appropriate.

d.  Principles of consolidation:

The consolidated financial statements include the accounts of Finjan Software Ltd. and its wholly-owned U.S. subsidiary, Finjan Software Inc. Significant intercompany balances and transactions have been eliminated in consolidation.

e.  Cash equivalents:

Cash equivalents are considered to be highly liquid investments which include unrestricted short-term bank deposits with original maturities of three months or less.

f.  Short-term deposits:

The Company classifies deposits with maturities of more than three months and less than one year as short-term deposits. The short-term deposits are presented at their cost, including accrued interest.

g.  Property and equipment:

Property and equipment are stated at cost. Depreciation is computed by the straight-line method over the estimated useful lives of the assets at the following annual rates:

|  | % |
|---|---|
| Computers and peripheral equipment | 33 |
| Motor vehicles | 15 |
| Office furniture and equipment | 6 - 20 |
| Leasehold improvements | Over the term of the lease |

The Company periodically assesses the recoverability of the carrying amount of property and equipment and provides for any possible impairment loss based upon the difference between the carrying amount and fair value of such assets. As of December 31, 2000, no impairment losses have been identified.

- 8 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

h.   Research and development costs:

Research and development costs are charged to the statement of operations as incurred. Statement of Financial Accounting Standard ("SFAS") No. 86 "Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed", requires capitalization of certain software development costs subsequent to the establishment of technological feasibility.

Costs incurred by the Company between the establishment of technological feasibility and the point at which the product is ready for general release have been insignificant. Therefore, research and development costs have been expensed.

i.   Concentrations of credit risk:

Financial instruments that potentially subject the Company and its subsidiary to concentrations of credit risk consist principally of cash, cash equivalents, short-term deposits and trade receivables.

Cash and cash equivalents and short-term deposit are invested in major banks in the United States. Such deposits in the United States may be in excess of insured limits and are not insured in other jurisdictions. Management believes that the financial institutions that hold the Company's investments are financially sound and, accordingly, minimal credit risk exists with respect to these investments.

The trade receivables of the Company and its subsidiary are mainly derived from sales to customers located primarily in the U.S. The Company performs ongoing credit evaluations of its customers and to date has not experienced any material losses. An allowance for doubtful accounts is determined with respect to those amounts that the Company has determined to be doubtful of collection. As of December 31, 2000 the Company has not recorded any allowance for doubtful accounts.

The Company has no significant off-balance-sheet concentration of credit risk such as foreign exchange contracts, option contracts or other foreign hedging arrangements.

j.   Revenue recognition:

The Company generates revenues from licensing the rights to use its software products directly to end-users and indirectly through sub-license fees from resellers.

The Company has adopted Statement of Position (SOP) 97-2, "Software Revenue Recognition", as amended ("SOP 97-2"). SOP 97-2, generally requires revenue earned on software arrangements involving multiple elements to be allocated to each element based on the relative fair value of the elements. The Company has also adopted SOP 98-9, "Modification of SOP 97-2, Software Revenue Recognition with Respect to Certain Transactions" ("SOP 98-9"), for all transactions entered into after January 1, 2000. SOP 98-9 requires that revenue be recognized under the "Residual Method" when vendor specific objective evidence (VSOE) of fair value exists for all undelivered elements and no VSOE exists for the delivered elements.

- 9 -

FIN009809

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

FINJAN SOFTWARE LTD.

U.S. dollars in thousands

To date, the Company has derived its revenue from license fees and sub-license fees of its products, maintenance and support and rendering of consulting services including implementation, training and installation.

Revenue from license fees is recognized when persuasive evidence of an agreement exists, delivery of the product has occurred, no significant obligations with regard to implementation remain, the fee is fixed or determinable, and collectability is probable. The Company generally does not grant a right of return to its customers. When a right of return exists, the Company defers revenue until the right of return expires, at which time revenue is recognized provided that all other revenue recognition criteria have been met. The Company considers all arrangements with payment terms extending beyond thirty days not to be fixed or determinable. If the fee is not fixed or determinable, revenue is recognized as payments become due from the customer provided that all other revenue recognition criteria have been met.

When contracts contain multiple elements wherein VSOE of fair value exists for all undelivered elements, the Company accounts for the delivered elements in accordance with the "Residual Method" prescribed by SOP 98-9. Maintenance and support revenue included in these arrangements is deferred and recognized on a straight-line basis over the term of the maintenance and support agreement. The VSOE of fair value of the undelivered elements (maintenance, support and services) is determined based on the price charged for the undelivered element when sold separately.

Deferred revenue includes amounts received from customers for which revenue has not been recognized.

k.    Accounting for stock-based compensation:

The Company has elected to follow Accounting Principles Board Opinion No. 25 "Accounting for Stock Issued to Employees" ("APB 25") and Interpretation No. 44 "Accounting for Certain Transactions Involving Stock Compensation" ("FIN 44") in accounting for its employee stock option plans. Under APB 25, when the exercise price of the Company's share options is less than the market price of the underlying shares on the date of grant, compensation expense is recognized. The pro forma disclosures required by SFAS No. 123 "Accounting for Stock-Based Compensation" ("SFAS 123"), were not provided due to their immateriality.

The Company applies SFAS 123 and EITF 96-18 "Accounting for Equity Instruments that are Issued to Other than Employees for Acquiring, or in Conjunction with Selling, Goods or Services" with respect to options issued to non-employees. SFAS 123 requires use of an option valuation model to measure the fair value of the options at the grant date.

l.    Government grants:

The Company received non-royalty-bearing grants from the Fund for Encouragement of Marketing Activity. These grants are recognized at the time the Company is entitled to such grants on the basis of the costs incurred and included in sales and marketing expenses.

- 10 -

Highly Confidential – Attorneys' Eyes Only

FINJAN SOFTWARE LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

    m.    Severance pay:

Finjan Software Ltd.'s liability for severance pay is calculated pursuant to Israeli severance pay law based on the most recent salary of the employees multiplied by the number of years of employment, as of the balance sheet date. Employees are entitled to one month's salary for each year of employment or a portion thereof. Finjan Software Ltd.'s liability for all of its employees, is fully provided by monthly deposits with insurance policies and by an accrual. The value of these policies is recorded as an asset in the Company's balance sheet.

The deposited funds include profits accumulated up to the balance sheet date. The deposited funds may be withdrawn only upon the fulfillment of the obligation pursuant to Israeli severance pay law or labor agreements. The value of the deposited funds are based on the cash surrendered value of these policies, and include immaterial profits.

Severance expenses for the years ended December 31, 1999 and 2000, amounted to approximately $ 7 and $ 5, respectively

    n.    Fair value of financial instruments:

The following methods and assumptions were used by the Company and its subsidiary in estimating their fair value disclosures for financial instruments:

The carrying amounts of cash and cash equivalents and accounts receivable approximate their fair value due to the short-term maturity of such instruments.

NOTE 3:-  SHORT-TERM BANK DEPOSIT

The Company placed funds in a short-term bank deposit for a period of one year. The deposit has matured in May 2000 and bore annual interest of 5.25%.

- 11 -

Highly Confidential - Attorneys' Eyes Only

FIN009811

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

FINJAN SOFTWARE LTD.

U.S. dollars in thousands

NOTE 4:-   PROPERTY AND EQUIPMENT

|  | December 31, | |
|---|---|---|
|  | 1999 | 2000 |
| Cost: | | |
| Computers and peripheral equipment | $ 526 | $ 612 |
| Motor vehicles | 96 | 96 |
| Office furniture and equipment | 131 | 132 |
| Leasehold improvements | 13 | 14 |
|  | 766 | 854 |
| Accumulated depreciation: | | |
| Computers and peripheral equipment | 315 | 438 |
| Motor vehicles | 48 | 63 |
| Office furniture and equipment | 41 | 60 |
| Leasehold improvements | 4 | 6 |
|  | 408 | 567 |
| Depreciated cost | $ 358 | $ 287 |

As for charges on the Company's assets, see Note 10b.

NOTE 5: -  OBLIGATION UNDER CAPITAL LEASING CONTRACTS

The Company leases motor vehicles under capital leasing contracts. The obligation under the capital leases as of December 31, 2000, reflects loans received by the Company from its lessor. The loans are linked to the U.S. dollar and bear interest at the rate of 8.55% subject to the changes in the LIBOR interest rate every three months. Maturities of the outstanding loans for the year subsequent to December 31, 2000 are $ 70, all of which are due in 2001.

- 12 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 6:- **CONVERTIBLE LOANS**

On November 2, 2000, the Company signed convertible loan agreements ("the agreements") with two private investors (the "investors"). According to the Agreements, the investors provided the Company with convertible loans ("the loans") in the aggregate amount of $ 1,375 thousand. The loans bear interest at a rate of 5.98% per annum. The loans and accrued interest shall be due and payable on November 1, 2001 ("the maturity date"), unless otherwise converted as described below. If at any time on or before the payment of the loans, the Company closes a round of equity financing ("the equity financing"), the loans will be automatically converted into shares of the type of equity securities sold in the equity financing, on the terms and price at which such equity securities are sold. If the Company has not closed an equity financing by the maturity date, the Company may elect to convert the loans and the accrued interest into Series D Preferred shares of the Company at the terms and the price determined in the applicable financing documents. In addition, the Company agreed to pay the investors in cash an amount equal to 25% of the loan amounts. The Company, instead of paying such amount in cash, may elect to grant the investors warrants to purchase an aggregate amount of Series A Preferred shares of the Company, or comparable shares, as designated by the fraction X/Y (when X is a number equal to 15% of the loan amounts and Y is the pre-share price), at an exercise price of $ 0.04 per share.

NOTE 7:- **LONG-TERM BANK LOAN**

The loan was linked to the U.S. dollar and bore interest at the rate of LIBOR + 1.5%. The loan was repaid in October 2000.

NOTE 8:- **LONG-TERM LOAN FROM A FINANCIAL INSTITUTION**

The Company's long-term loan consist of the following:

|  | December 31, | |
|---|---|---|
|  | 1999 | 2000 |
| Loan linked to the U.S. dollar, 12% interest, due periodically through April 2002 | $ 2,000 | $ 1,532 |
| Less - current portion | 751 | 331 |
|  | $ 1,249 | $ 1,201 |

- 13 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands

NOTE 9: - SHARE CAPITAL

    a.    Composed of NIS 0.01 par value shares as follows:

| | Authorized | | Issued and outstanding | |
| | December 31, | | | |
| | 1999 | 2000 | 1999 | 2000 |
| | Number of shares | | | |
|---|---|---|---|---|
| Preferred shares Series A (1) | 6,050,000 | 6,050,000 | 6,050,000 | 6,050,000 |
| Preferred shares Series B (1) | 3,963,770 | 3,963,770 | 3,945,655 | 3,945,655 |
| Preferred shares Series C (1) | 8,771,930 | 8,771,930 | 8,640,351 | 8,640,351 |
| Preferred shares Series D (1) | - | 40,336,779 | - | 22,804,516 |
| Ordinary shares Series A (2) | 30,956,900 | 92,552,016 | 10,560,000 | 10,560,000 |
| Ordinary shares Series B (3) | 1,611,100 | 17,541,303 | 30,702 | 446,273 |
| | 51,353,700 | 169,215,798 | 29,226,708 | 52,446,795 |

    (1)    Preferred shares Series A, B, C and D are convertible into Ordinary shares according to different conversion prices and confer upon their holders preference in the event of refund of capital upon liquidation, and voting rights which are equal to those of the Ordinary shares.

    (2)    Ordinary shares Series A confer upon their holders voting rights, the right to receive cash dividends and the right to a share in surplus assets upon liquidation of the Company.

    (3)    Ordinary shares Series B confer upon their holders the right to receive cash dividends and the right to a share in surplus assets upon liquidation of the Company. They do not confer upon their holders voting rights.

    b.    Share issuance:

During 1999, the Company issued 30,702 Ordinary Series B shares to a consultant in favor of its services.

During February to April 2000, the Company issued 22,804,516 Series D Preferred shares to certain of its existing shareholders, in consideration of $ 3,900 thousand, net.

In addition, certain of the Company's employees exercised 84,171 stock options in consideration of $ 14 thousand.

    c.    Stock Option Plans:

Under the Company's 1996 Stock Option Plan (the "Plan"), options may be granted to officers, directors, employees and consultants of the Company or its subsidiary.

Pursuant to the Plan, the Company reserved for issuance 17,541,303 Ordinary shares Series B, respectively. As of December 31, 2000, an aggregate of 7,960,669 Ordinary shares Series B of the Company are still available for future grant.

- 14 -

FINJAN SOFTWARE LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands

Each option granted under the Plan is exercisable until the earlier of ten years from the date of the grant of the option or the expiration dates of the respective option plans. The plan will expire on December 31, 2006. The exercise price of the options granted under the plans may not be less than the nominal value of the shares into which such options are exercised. The options vest primarily over four years. Any options, which are forfeited or not exercised before expiration, become available for future grants.

A summary of the stock options activities in 2000 is as follows:

|  | Number of options | Weighted average exercise price |
|---|---|---|
|  |  | $ |
| Outstanding at the beginning of the period | 3,992,791 | 0.267 |
| Granted | 6,044,181 | 0.032 |
| Exercised | (84,171) | 0.16 |
| Forfeited | (468,338) | 0.197 |
| Outstanding at the end of the period | 9,484,463 | 0.126 |

All options were granted at an exercise price equal to fair value at date of grant. Weighted average exercise price and weighted average fair value of options granted during 2000 was $ 0.032.

The number of options exercisable as of December 31, 2000 was 3,303,665.

The weighted average exercise price of the options exercisable at December 31, 2000 was $ 0.16.

The options outstanding as of December 31, 2000, have been separated into ranges of exercise price as follows:

| Exercise price $ | Options outstanding as of December 31, 2000 Amount | Weighted average remaining contractual life Years | Weighted average exercise price $ | Exercisable as of December 31, 2000 Amount | Weighted average exercise price of options exercisable $ |
|---|---|---|---|---|---|
| 0.03 | 5,850,632 | 8.81 | 0.03 | 1,543,551 | 0.03 |
| 0.14 | 25,000 | 6.07 | 0.14 | 20,000 | 0.14 |
| 0.23-0.3 | 3,608,831 | 7.50 | 0.28 | 1,740,114 | 0.28 |
|  | 9,484,463 |  |  | 3,303,665 |  |

- 15 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands

d.　Warrants:

In connection with the long-term loan from a financial institution, the Company issued, in March 1999, a warrant to purchase 210,526 Series C Preferred shares of the Company, at an exercise price of $ 1.14 per share. In respect of the abovementioned grant, compensation expenses of approximately $ 20,000 and $ 27,000, were recorded in the years ended December 31, 1999 and 2000, respectively.

NOTE 10:- COMMITMENTS AND CONTINGENT LIABILITIES

a.　Lease commitments:

The Company rents its facilities and various equipment under operating leases in Israel for a period of three years, terminating on November 30, 2001, and in the U.S., for a period of three years, terminating on July 31, 2001. Future minimum annual payments under non-cancelable operating leases for the year ended December 31, 2001 are $ 184.

Rent expenses for the years ended December 31, 1999 and 2000, were $ 288 and $ 242, respectively.

In September 1999, the Company began subleasing part of its facilities in the U.S. for a period of two year. Sublease income for the periods ended December 31, 1999 and 2000 were $ 93 and $ 97, respectively.

b.　The Company recorded a pledge on its motor vehicles, in exchange for a long-term loan from a leasing company. In addition, the Company has recorded a floating charge on all of its assets in favor of a bank as collateral for a bank loan.

c.　The Company provided bank guarantees to its lessor and the leasing company in the amounts of $ 43 thousand and $ 16 thousand, respectively.

NOTE 11:- TAXES ON INCOME

a.　Tax benefits under the Law for the Encouragement of Capital Investments, 1959 ("the Law"):

On October 13, 1996, the production facilities of the Company were granted the status of an "Approved Enterprise" under the Law.

According to the provisions of the Law, the Company has chosen to enjoy "Alternative Benefits" - waiver of grants in return for tax exemption - and accordingly, its income from the "Approved Enterprise" is tax-exempt for a period of 2 years, and subject for an additional period of 5-8 years to reduced tax rates between 10% to 25%, depending upon the proportion of foreign ownership of the Company.

The period of tax benefits, detailed above, is subject to limits of the earlier of 12 years from the commencement of production, or 14 years from the approval date.

- 16 -

Highly Confidential - Attorneys' Eyes Only　　　　FIN009816

FINJAN SOFTWARE LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

The Law also grants entitlement to claim accelerated depreciation on machinery and equipment used by the "Approved Enterprise", during the first five tax years.

In the event of distribution of cash dividends from income that is tax exempt as mentioned above, the Company would have to pay income tax equal to 10% to 25% of the amount distributed. The tax exempt income attributable to the "Approved Enterprise" can be distributed to shareholders without subjecting the Company to taxes only upon the complete liquidation of the Company.

The Company currently has no plans to distribute dividends and intends to retain future earnings to finance the development of its business.

Should the Company derive income from sources other than the "Approved Enterprise" during the relevant period of benefits, such income will be taxable at regular corporate tax rates of 36%.

b.    Tax benefits under the Israeli Law for the Encouragement of Industry (Taxation), 1969:

The Company is an "industrial company", under the above law and, as such, is entitled to certain tax benefits, including accelerated depreciation and deduction of public offering expenses in three equal annual installments, and deduction of 12.5% per annum on the purchase of certain intangible property rights.

c.    Tax assessments:

Finjan Software Ltd. has not received final tax assessments since its incorporation.

d.    Net operating losses carryforwards:

Finjan Software Ltd. has accumulated losses for Israeli tax purposes at December 31, 2000 in the amount of approximately $ 8.0 million, which may be carried forward and offset against taxable income in the future for an indefinite period.

At December 31, 2000, Finjan Software Inc. had federal net operating loss carryforwards of approximately $ 12 million, which may be carried forward for 15-20 years to the years 2011 through 2020.

e.    Deferred taxes:

Deferred taxes have not been provided because it is more than likely that they will not be utilized in the foreseeable future.


NOTE 12:- SUBSEQUENT EVENTS

Subsequent to the balance sheet date, the Company began implementing a restructuring plan ("the Plan"). Pursuant to the Plan, the Company terminated certain employees in Israel and in the U.S.

- 17 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 13:- SUMMARY OF THE COMPANY'S FINANCIAL STATEMENTS IN NOMINAL (HISTORICAL) NIS**

a.    Balance sheets:

| | December 31, | |
|---|---|---|
| | 1999 | 2000 |
| | NIS | |
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | 1,772,953 | 1,508,110 |
| Trade receivables | 790,535 | 2,609,408 |
| Government Authorities | 36,709 | 84,771 |
| Other accounts receivable | 181,584 | 170,292 |
| Subsidiary (Note 13d) | 3,659,188 | 7,370,395 |
| Total current assets | 6,440,969 | 11,742,976 |
| LOAN TO SUBSIDIARY (Note 13e) | 19,409,072 | 30,470,436 |
| INVESTMENT IN SUBSIDIARY (Note 13f) | 2,815,954 | 2,815,954 |
| PROPERTY AND EQUIPMENT, NET | 972,559 | 809,723 |
| Total assets | 29,638,554 | 45,839,089 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Convertible loans | - | 5,610,999 |
| Current maturities of long-term bank loan | 4,153,000 | |
| Current maturities of obligation under capital leasing contracts | 89,297 | 69,323 |
| Trade payables | 604,067 | 406,984 |
| Employees and payroll accruals | 529,617 | 1,098,299 |
| Deferred revenues | -494,560 | 1,099,871 |
| Accrued expenses and other liabilities | 357,779 | 2,697,388 |
| Total current liabilities | 6,228,320 | 10,982,864 |
| **LONG-TERM LIABILITIES:** | | |
| Obligation under capital leasing contracts, net of current maturities | 72,844 | |
| Accrued severance pay, net | 238,360 | 249,240 |
| Total long-term liabilities | 311,204 | 249,240 |
| **SHAREHOLDERS' EQUITY:** | | |
| Share capital | 292,260 | 523,574 |
| Additional paid-in capital | 45,082,383 | 60,715,320 |
| Receipts on account of shares | 156,723 | 55,528 |
| Accumulated deficit | (22,432,336) | (26,687,437) |
| Total shareholders' equity | 23,099,030 | 34,606,985 |
| Total liabilities and shareholders' equity | 29,638,554 | 45,839,089 |

Highly Confidential - Attorneys' Eyes Only    FIN009818

FINJAN SOFTWARE LTD.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

b.  Statements of operations:

| | Year ended December 31, | |
|---|---|---|
| | 1999 | 2000 |
| | NIS | |
| Revenues | 7,896,888 | 11,947,504 |
| Cost of revenues | 1,627,753 | 2,085,806 |
| Gross profit | 6,269,135 | 9,861,698 |
| Operating expenses: | | |
| Research and development | 6,575,873 | 7,715,490 |
| Selling and marketing, net | 3,503,559 | 3,217,656 |
| General and administrative | 2,007,868 | 3,783,415 |
| Total operating expenses | 12,087,300 | 14,716,561 |
| Operating loss | 5,818,165 | 4,854,863 |
| Financial expenses (income), net | (3,376) | (599,762) |
| Net loss | 5,814,789 | 4,255,101 |

c.  Statements of changes in shareholders' equity:

| | Share capital | Additional paid-in capital | Receipts on account of shares | Accumulated deficit | Total shareholders' equity |
|---|---|---|---|---|---|
| | | | NIS | | |
| Balance as of January 1, 1999 | 291,953 | 45,082,383 | - | (16,617,547) | 28,756,789 |
| Issuance of shares, net | 307 | | | | 307 |
| Exercise of stock options and warrants | - | - | 156,723 | | 156,723 |
| Net loss | | | | (5,814,789) | (5,814,789) |
| Balance as of December 31, 1999 | 292,260 | 45,082,383 | 156,723 | (22,432,336) | 23,099,030 |
| Issuance of shares, net | 231,314 | 15,632,937 | (156,723) | | 15,707,528 |
| Exercise of stock options | - | - | 55,528 | | 55,528 |
| Net loss | | | | (4,255,101) | (4,255,101) |
| Balance as of December 31, 2000 | 523,574 | 60,715,320 | 55,528 | (26,687,437) | 34,606,985 |

- 19 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

d.  The balance relates to on-going business relationships and linked to the U.S. dollar exchange rate.

e.  The loan to the subsidiary has no maturity date, it is linked to the higher between the rate of change in the Israeli CPI or the rate of change in the NIS/U.S. dollar exchange rate, and since June 30, 2000 bears 4% annual interest.

f.  The investment in subsidiary is presented on the cost basis.

F:\LANIR\2914\M\00\ES12-VER.doc

- 20 -

Highly Confidential - Attorneys' Eyes Only

# EXHIBIT 14

FINJAN SOFTWARE LTD. AND ITS SUBSIDARY

CONSOLIDATED FINANCIAL STATEMENTS

AS OF DECEMBER 31, 2001

Joint Trial Exhibit

**JTX-32**

Case No. 06-369 GMS

Highly Confidential – Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

CONSOLIDATED FINANCIAL STATEMENTS

AS OF DECEMBER 31, 2001

IN U.S. DOLLARS

INDEX

|  | Page |
|---|---|
| Report of Independent Auditors | 2 |
| Consolidated Balance Sheets | 3 |
| Consolidated Statements of Operations | 4 |
| Statements of Changes in Shareholders' Deficiency | 5 |
| Consolidated Statements of Cash Flows | 6 |
| Notes of Consolidated Financial Statements | 7 – 18 |

- - - - - - - -

Highly Confidential - Attorneys' Eyes Only

**⫴ ERNST &
YOUNG**

Kost    Forer    &
Gabbay
3 Aminadav St.
Tel-Aviv 67067, Israel

Phone:972-3-6232525
Fax:  972-3-5622555

REPORT OF INDEPENDENT AUDITORS

To the Shareholders of

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

We have audited the accompanying consolidated balance sheets of Finjan Software Ltd. (the "Company") and its subsidiary as of December 31, 2001 and 2000, and the related consolidated statements of operations, changes in shareholders' deficiency and cash flows for each of the two years in the period ended December 31, 2001. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company and its subsidiary as of December 31, 2001 and 2000, and the consolidated results of their operations and cash flows for each of the two years in the period ended December 31, 2001, in conformity with accounting principles generally accepted in the United States.

Tel-Aviv, Israel
July 3, 2002

*Kost, Forer & Gabbay*
KOST FORER & GABBAY
A Member of Ernst & Young Global

-2-

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

## CONSOLIDATED BALANCE SHEETS

U.S. dollars in thousands (except share and per share data)

| | | December 31, | |
|---|---|---|---|
| | Note | 2001 | 2000 |
| **ASSETS** | | | |
| **CURRENT ASSETS:** | | | |
| Cash and cash equivalents | | $ 284 | $ 577 |
| Trade receivables | | 991 | 1,347 |
| Prepaid expenses and other accounts receivable | | 59 | 112 |
| Total current assets | | 1,334 | 2,036 |
| SEVERANCE PAY FUND | | 129 | 127 |
| PROPERTY AND EQUIPMENT, NET | 3 | 144 | 287 |
| Total assets | | $ 1,607 | $ 2,450 |
| **LIABILITIES AND SHAREHOLDERS' DEFICIENCY** | | | |
| **CURRENT LIABILITIES:** | | | |
| Convertible loans | 14 | $ 400 | $ 1,375 |
| Current maturities of obligation under capital leasing contracts | 5 | - | 17 |
| Current maturities of long-term loan from a financial institution | 6 | 1,693 | 1,201 |
| Trade payables | | 674 | 425 |
| Employees and payroll accruals | | 267 | 528 |
| Deferred revenues | | 1,208 | 914 |
| Accrued expenses and other liabilities | | 692 | 823 |
| Total current liabilities | | 4,934 | 5,283 |
| **LONG-TERM LIABILITIES:** | | | |
| Long-term loan from a financial institution, net of current maturities | 6 | - | 331 |
| Accrued severance pay | | 206 | 189 |
| Total long-term liabilities | | 206 | 520 |
| **SHAREHOLDERS' DEFICIENCY:** | 7 | | |
| Share capital - | | | |
| Series A and B Ordinary shares of NIS 1 par value: Authorized: 16,934,443 and 1,100,933 shares at December 31, 2001 and 2000, respectively; Issued and outstanding: 362,232 and 110,063 shares at December 31, 2001 and 2000, respectively | | 84 | 32 |
| Series A, B, C, D and E Preferred shares of NIS 1 par value: Authorized: 11,294,830 and 591,225 shares at December 31, 2001 and 2000, respectively; Issued and outstanding: 2,298,073 and 414,405 shares at December 31, 2001 and 2000, respectively | | 565 | 112 |
| Additional paid-in capital | | 19,724 | 17,121 |
| Receipts on account of shares | | 14 | 14 |
| Accumulated deficit | | (23,920) | (20,632) |
| Total shareholders' deficiency | | (3,533) | (3,353) |
| Total liabilities and shareholders' deficiency | | $ 1,607 | $ 2,450 |

The accompanying notes are an integral part of the consolidated financial statements.

| | |
|---|---|
| August 29, 2002 | |
| Date of approval of the financial statements | Shlomo Touboul Chief Executive Officer and Chairman of the Board of Directors |

- 3 -

Highly Confidential - Attorneys' Eyes Only

FIN009784

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

## CONSOLIDATED STATEMENTS OF OPERATIONS

U.S. dollars in thousands

| | Year ended December 31, | |
|---|---|---|
| | 2001 | 2000 |
| Revenues | $ 3,858 | $ 3,752 |
| Cost of revenues | 352 | 563 |
| Gross profit | 3,506 | 3,189 |
| Operating expenses: | | |
| Research and development | 1,752 | 1,899 |
| Selling and marketing | 4,160 | 4,830 |
| General and administrative | 464 | 932 |
| Total operating expenses | 6,376 | 7,661 |
| Operating loss | (2,870) | (4,472) |
| Financial and other expenses, net | 418 | 263 |
| Net loss | $ (3,288) | $ (4,735) |

The accompanying notes are an integral part of the consolidated financial statements.

- 4 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

## STATEMENTS OF CHANGES IN SHAREHOLDERS' DEFICIENCY

U.S. dollars in thousands (except share and per share data)

| | Preferred shares | | Ordinary shares | | Additional paid-in capital | Receipts on account of shares | Accumulated deficit | Total shareholders' deficiency |
|---|---|---|---|---|---|---|---|---|
| | Number | Amount | Number | Amount | | | | |
| Balance as of January 1, 2000 | 186,360 | $ 55 | 105,907 | $ 31 | $ 13,214 | $ 38 | $ (15,897) | $ (2,559) |
| Issuance of shares, net | 228,045 | 57 | 4,157 | 1 | 3,880 | (38) | - | 3,900 |
| Exercise of stock options | - | - | - | - | - | 14 | - | 14 |
| Compensation related to warrants issued to a financial institution | - | - | - | - | 27 | - | - | 27 |
| Net loss | - | - | - | - | - | - | (4,735) | (4,735) |
| Balance as of December 31, 2000 | 414,405 | 112 | 110,064 | 32 | 17,121 | 14 | (20,632) | (3,353) |
| Issuance of shares, net | 867,932 | 208 | - | - | 875 | - | - | 1,083 |
| Conversion of convertible notes | 1,235,766 | 297 | - | - | 1,435 | - | - | 1,732 |
| Beneficial conversion feature of convertible loan | - | - | - | - | 260 | - | - | 260 |
| Compensation related to warrants issued to a financial institution | - | - | - | - | 33 | - | - | 33 |
| Conversion of Series A,B,C and D Preferred shares to Series A Ordinary shares | (220,030) | (52) | 252,168 | 52 | - | - | - | - |
| Net loss | - | - | - | - | - | - | (3,288) | (3,288) |
| Balance as of December 31, 2001 | 2,298,073 | $ 565 | 362,232 | $ 84 | $ 19,724 | $ 14 | $ (23,920) | $ (3,533) |

The accompanying notes are an integral part of the consolidated financial statements.

Highly Confidential - Attorneys' Eyes Only

FIN009786

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

## CONSOLIDATED STATEMENTS OF CASH FLOWS

U.S. dollars in thousands

|  | Year ended December 31, | |
|---|---|---|
|  | 2001 | 2000 |
| **Cash flows from operating activities:** | | |
| Net loss | $ (3,288) | $ (4,735) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation | 99 | 178 |
| Compensation related to warrants issued to a financial institution | 33 | 27 |
| Beneficial conversion feature of convertible loan | 260 | - |
| Loss on sale of property and equipment | 49 | |
| Increase (decrease) in trade receivables | 356 | (948) |
| Decrease in prepaid expenses and other accounts receivable | 53 | - |
| Increase (decrease) in trade payables | 249 | 160 |
| Increase (decrease) in employee and payroll accruals, deferred revenues and accrued expenses and other liabilities | (123) | 1,493 |
| Interest on convertible loans | 25 | 14 |
| Increase in severance pay, net | 15 | 5 |
| Interest on loan from financial institution | 161 | - |
| Net cash used in operating activities | (2,111) | (3,806) |
| **Cash flows from investing activities:** | | |
| Short-term investments, net | - | 34 |
| Proceeds from sales of property and equipment | 33 | - |
| Purchase of property and equipment | (38) | (107) |
| Net cash used in investing activities | (5) | (73) |
| **Cash flows from financing activities:** | | |
| Principal payment of long-term bank loan | - | (1,000) |
| Principal payments of long-term loan from a financial institution | - | (468) |
| Proceeds from convertible loans | 757 | 1,375 |
| Principal payments of obligation under capital leasing contracts | (17) | (22) |
| Proceeds from issuance of shares, net | 1,083 | 3,900 |
| Proceeds from exercise of stock options and warrants | - | 14 |
| Net cash provided by financing activities | 1,823 | 3,799 |
| Decrease in cash and cash equivalents | (293) | (80) |
| Cash and cash equivalents at the beginning of the year | 577 | 657 |
| Cash and cash equivalents at the end of the year | $   284 | $   577 |
| **Supplemental disclosure of non-cash investing and financing activities:** | | |
| Conversion of convertible notes | $ 1,732 | $   - |

The accompanying notes are an integral part of the consolidated financial statements.

- 6 -

Highly Confidential - Attorneys' Eyes Only

FIN009787

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 1:-  GENERAL

Finjan Software Ltd. (the "Company") was incorporated in Israel and commenced operations in January 1996. In June 1996, Finjan Inc., a wholly-owned subsidiary of Finjan Software Ltd., was incorporated in the State of California and commenced operations in January 1997. During 1998, Finjan, Inc. was reincorporated in the State of Delaware.

The Company and its subsidiary are engaged in the development and marketing of software proactive security solutions that protect companies from first-strike attacks by malicious code and active content, allowing companies to conduct e-business safely.

In November 2000, the Company established a wholly-owned subsidiary, Finjan 2000 Ltd., under the laws of the State of Israel. Finjan 2000 Ltd. has not yet commenced operations.

NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES

The financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP"). The significant policies followed in the preparation of the consolidated financial statements are:

a.    Use of estimates:

The preparation of financial statements in conformity with accounting principles generally accepted requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates.

b.    Financial statements in U.S. dollars:

The functional currency of the Company and its subsidiary is the U.S dollar, as the U.S. dollar is the primary currency of the economic environment in which the Company and its subsidiary have operated and expect to continue to operate in the foreseeable future. The majority of the Company's operations are currently conducted in Israel and most of the costs are currently incurred in new Israeli shekels ("NIS"); however, most of the costs are denominated and determined in U.S dollars. Financing activities including loans, equity transactions and cash investments, are made in U.S. dollars.

The Company's transactions and balances denominated in U.S. dollars are presented at their original amounts. Non-dollar transactions and balances have been remeasured to U.S. dollars in accordance with Statement of Financial Accounting Standards ("SFAS") No. 52 of the U.S. Financial Accounting Standards Board ("FASB"). All transaction gains and losses from remeasurement of monetary balance sheet items denominated in non-dollar currencies are reflected in the statement of operations as financial income or expenses, as appropriate.

-7-

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (cont.)

    c.    Principles of consolidation:

        The consolidated financial statements include the accounts of Finjan Software Ltd. and its wholly-owned subsidiary, Finjan, Inc. Intercompany balances and transactions have been eliminated in consolidation.

    d.    Cash equivalents:

        Cash equivalents are considered to be highly liquid investments which include unrestricted short-term bank deposits with original maturities of three months or less.

    e.    Property and equipment:

        Property and equipment are stated at cost. Depreciation is computed by the straight-line method over the estimated useful lives of the assets at the following annual rates:

|  | % |
|---|---|
| Computers and peripheral equipment | 33 |
| Motor vehicles | 15 |
| Office furniture and equipment | 6 - 20 |
| Leasehold improvements | Over the term of the lease |

        The Company and its subsidiary periodically assess the recoverability of the carrying amount of property and equipment and provide for any possible impairment loss based upon the difference between the carrying amount and fair value of such assets. As of December 31, 2001, no impairment losses have been identified.

    f.    Research and development costs:

        SFAS No. 86, "Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed", requires capitalization of certain software development costs subsequent to the establishment of technological feasibility.

        Based on the Company's product development process, technological feasibility is established upon the completion of a working model. The Company does not incur material costs between the completion of the working model and the point at which the product is ready for general release have been insignificant. Therefore, research and development costs are charged to the statement of operations as incurred.

    g.    Concentrations of credit risk:

        Financial instruments that potentially subject the Company and its subsidiary to concentrations of credit risk consist principally of cash and cash equivalents, and trade receivables.

Highly Confidential - Attorneys' Eyes Only

FIN009789

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands (except share and per share data)

NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (cont.)

Cash and cash equivalents are invested in major banks in Israel and the United States. Such deposits in the United States may be in excess of insured limits and are not insured in other jurisdictions. Management believes that the financial institutions that hold the Company's investments are financially sound and. accordingly, minimal credit risk exists with respect to these investments.

The trade receivables of the Company and its subsidiary are mainly derived from sales to customers located in the U.S. and Europe. The Company performs ongoing credit evaluations of its customers and to date has not experienced any material losses.

The Company has no significant off-balance-sheet concentration of credit risk such as foreign exchange contracts, option contracts or other foreign hedging arrangements.

h.    Revenue recognition:

The Company generates revenues from licensing the rights to use its software products directly to end-users and indirectly through sub-license fees from resellers.

The Company has adopted Statement of Position (SOP) 97-2, "Software Revenue Recognition", as amended ("SOP 97-2"). SOP 97-2, generally requires revenue earned on software arrangements involving multiple elements to be allocated to each element based on the relative fair value of the elements. The Company has also adopted SOP 98-9, "Modification of SOP 97-2, Software Revenue Recognition with Respect to Certain Transactions" ("SOP 98-9"), for all transactions entered into after January 1, 2000. SOP 98-9 requires that revenue be recognized under the "Residual Method" when vendor specific objective evidence (VSOE) of fair value exists for all undelivered elements and no VSOE exists for the delivered elements.

To date, the Company has derived its revenue from license fees and sub-license fees of its products, maintenance and support and rendering of consulting services including implementation, training and installation.

Revenue from license fees is recognized when persuasive evidence of an agreement exists, delivery of the product has occurred, no significant obligations with regard to implementation remain, the fee is fixed or determinable, and collectability is probable. The Company generally does not grant a right of return to its customers. When a right of return exists, the Company defers revenue until the right of return expires, at which time revenue is recognized provided that all other revenue recognition criteria have been met. If the fee is not fixed or determinable. revenue is recognized as payments become due from the customer provided that all other revenue recognition criteria have been met.

- 9 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

### NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (cont.)

When contracts contain multiple elements wherein VSOE of fair value exists for all undelivered elements, the Company accounts for the delivered elements in accordance with the "Residual Method" prescribed by SOP 98-9. Maintenance and support revenue included in these arrangements is deferred and recognized on a straight-line basis over the term of the maintenance and support agreement. The VSOE of fair value of the undelivered elements (maintenance, support and services) is determined based on the price charged for the undelivered element when sold separately.

Deferred revenue includes amounts received from customers for which revenue has not been recognized.

i.    Accounting for stock-based compensation:

The Company has elected to follow Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25") and Interpretation No. 44, "Accounting for Certain Transactions Involving Stock Compensation" ("FIN 44") in accounting for its employee stock option plans. Under APB 25, when the exercise price of the Company's share options is less than the market price of the underlying shares on the date of grant, compensation expense is recognized. The pro forma disclosures required by SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123"), were not provided due to their immateriality

The Company applies SFAS 123 and EITF 96-18, "Accounting for Equity Instruments that are Issued to Other than Employees for Acquiring, or in Conjunction with Selling, Goods or Services", with respect to options issued to non-employees. SFAS 123 requires use of an option valuation model to measure the fair value of the options at the grant date

j.    Severance pay:

Finjan Software Ltd.'s liability for severance pay is calculated pursuant to Israeli severance pay law based on the most recent salary of the employees multiplied by the number of years of employment, as of the balance sheet date. Employees are entitled to one month's salary for each year of employment or a portion thereof. Finjan Software Ltd.'s liability for all of its employees, is fully provided by monthly deposits with insurance policies and by an accrual. The value of these policies is recorded as an asset in the Company's balance sheet.

The deposited funds include profits accumulated up to the balance sheet date. The deposited funds may be withdrawn only upon the fulfillment of the obligation pursuant to Israeli severance pay law or labor agreements. The value of the deposited funds are based on the cash surrendered value of these policies, and include immaterial profits.

Severance expenses for the years ended December 31, 2001 and 2000, amounted to approximately $ 124 and $ 142, respectively

- 10 -

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES (cont.)

k      Fair value of financial instruments

The following methods and assumptions were used by the Company and its subsidiary in estimating their fair value disclosures for financial instruments:

The carrying amounts of cash and cash equivalents, trade receivables, trade payables and short-term loans approximate their fair value due to the short-term maturity of such instruments

l.      Reclassification:

Certain prior year accounts have been reclassified to conform to the current year presentation.

NOTE 3:-   PROPERTY AND EQUIPMENT

|  | December 31, | |
|---|---|---|
|  | 2001 | 2000 |
| Cost: | | |
| Computers and peripheral equipment | $ 615 | $ 612 |
| Motor vehicles | – | 96 |
| Office furniture and equipment | 100 | 132 |
| Leasehold improvements | – | 14 |
| | 715 | 854 |
| Accumulated depreciation: | | |
| Computers and peripheral equipment | 522 | 438 |
| Motor vehicles | – | 63 |
| Office furniture and equipment | 49 | 60 |
| Leasehold improvements | – | 6 |
| | (571) | (567) |
| Depreciated cost | $ 144 | $ 287 |

Depreciation expenses for the years ended December 31, 2001 and 2000, were $ 99 and $ 178, respectively

As for charges on the Company's assets, see Note 8b

- 11 -

                                           FIN009792

FINJAN SOFTWARE LTD, AND ITS SUBSIDIARY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 4:-  CONVERTIBLE LOANS

a.  On November 2, 2000, the Company signed convertible loan agreements ("the Agreements") with two private investors (the "Investors"). According to the Agreements, the investors provided the Company with convertible loans ("the loans") in the aggregate amount of $ 1,375 thousand. The loans bear interest at a rate of 5.98% per annum. The loans and accrued interest shall be due and payable on November 1, 2001 ("the maturity date"), unless otherwise converted as described below. If at any time on or before the payment of the loans, the Company closes a round of equity financing ("the equity financing"), the loans will be automatically converted into shares of the type of equity securities sold in the equity financing, on the terms and price at which such equity securities are sold in the amount equal to 115% of the loan amounts. If the Company has not closed an equity financing by the maturity date, the Company may elect to convert the loans and the accrued interest into Series D Preferred shares of the Company at the terms and the price determined in the applicable financing documents in the amount equal to 115% of the loan amount. The Company, instead of paying the additional 15% in shares may elect to pay 25% in cash.

In February 2001, the Investors provided the Company with an additional convertible loan in the amount of $ 357, under the same terms and conditions as the original convertible loan agreement. In March 2001, the loans in the amount of $ 1,732 were converted, as part of the financing round, into 1,235,766 Series E Preferred shares. An additional amount of 185,367 Series E Preferred shares on account of the conversion has been issued in July 2002.

The beneficial conversion feature of the convertible loan amounted to $260, was fully amortized upon conversion and is included in financial expenses.

b.  During 2001, additional convertible loans in the aggregate amount of $ 400 were received. The convertible loans are, at the holders options, convertible into Series E Preferred shares at an exercise price of $ 1.4014 per share. The loans do not bear interest.

## NOTE 5: - OBLIGATION UNDER CAPITAL LEASING CONTRACTS

The Company leased motor vehicles under capital leasing contracts. The obligation under the capital leases as of December 31, 2000, reflects loans received by the Company from its lessor. The loans are linked to the U.S. dollar and bear interest at the rate of 8.55% subject to the changes in the LIBOR interest rate every three months. During 2001, the Company paid all obligations under its capital leasing contracts.

Highly Confidential - Attorneys' Eyes Only     FIN009793

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 6:-    LOAN FROM A FINANCIAL INSTITUTION

The Company's loan consists of the following:

| | December 31, | |
|---|---|---|
| | 2001 | 2000 |
| Loan linked to the U.S dollar, 12% interest, due periodically through April 2002 | $ 1,693 | $ 1,532 |
| Less - current portion | (1,693) | (1,201) |
| | $ - | $ 331 |

During 2001, the Company did not repay the loan and accrued interest in accordance with the original payment schedule (see Note 10a).

NOTE 7: -    SHARE CAPITAL

a.    Composed of NIS 1 par value shares as follows:

| | Authorized | | Issued and outstanding | |
|---|---|---|---|---|
| | December 31, | | | |
| | 2001 | 2000 | 2001 | 2000 |
| | Number of shares | | | |
| Preferred shares Series A (1) | 60,500 | 60,500 | 15,500 | 60,500 |
| Preferred shares Series B (1) | 39,644 | 39,638 | 27,755 | 39,456 |
| Preferred shares Series C (1) | 87,728 | 87,719 | 37,855 | 86,404 |
| Preferred shares Series D (1) | 403,376 | 403,368 | 113,265 | 228,045 |
| Preferred shares Series E (1) | 10,703,582 | - | 2,103,698 | - |
| Ordinary shares Series A (2) | 14,111,626 | 925,520 | 357,768 | 105,600 |
| Ordinary shares Series B (3) | 2,822,817 | 175,413 | 4,464 | 4,463 |
| | 28,229,273 | 1,692,158 | 2,660,305 | 524,468 |

(1)    Preferred shares Series A, B, C, D and E are convertible into Ordinary shares according to different conversion prices. Preferred shares Series A, B, C, D and E confer upon their holders all rights conferred by Ordinary shares Series A. In addition, they confer upon their holders preference in the event of liquidation or winding up of the Company, equal to the price per share paid, first to holders of Preferred shares Series E and thereafter to holders of all other classes of Preferred shares, and confer certain anti-dilution and veto rights, as stated in the Company's Articles of Association.

(2)    Ordinary shares Series A confer upon their holders voting rights, the right to receive cash dividends and the right to a share in the surplus assets upon liquidation of the Company.

(3)    Ordinary shares Series B confer upon their holders the right to receive cash dividends and the right to a share in the surplus assets upon liquidation of the Company. They do not confer upon their holders voting rights.

- 13 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 7: - SHARE CAPITAL (cont.)

    b.    Share issuance and recapitalization:

In March 2001, the Company completed a financing round and raised $ 2,948,123 for its Preferred shares Series E, at a price per share of $ 1.4014 per share of which $ 1,732 were received as convertible loans (see Note 4).

As part of the financing round, Preferred shares Series A, B, C and D of most existing shareholders who did not participate in the financing round of Preferred shares Series E gave consent to the Company to convert all their holdings based on their relative conversion price, into Ordinary shares Series A.

    c.    Reverse stock split:

In March 2001, prior to the Preferred shares Series E, the shareholders approved a 100:1 reverse stock split, so that each holder of 100 shares of NIS 0.01 par value is entitled to one share of NIS 1 par value. All warrants, options, shares and per share amounts have been retroactively adjusted to reflect the reverse stock split

    d.    Stock Option Plans:

Under the Company's 1996 Stock Option Plan (the "Plan"), options may be granted to officers, directors, employees and consultants of the Company or its subsidiary.

Pursuant to the Plan, the Company reserved for issuance 2,822,817 Ordinary shares Series B

Each option granted under the Plan is exercisable until the earlier of ten years from the date of the grant of the option or the expiration dates of the respective option plans. The plan will expire on December 31, 2006. The exercise price of the options granted under the plans may not be less than the nominal value of the shares into which such options are exercised. The options vest primarily over four years. Any options, which are forfeited or not exercised before expiration, become available for future grants.

- 14 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 7: - SHARE CAPITAL (cont.)

A summary of the stock options activities in 2001 and 2000, is as follows:

|  | 2001 | | 2000 | |
|---|---|---|---|---|
|  | Number of options | Weighted average exercise price $ | Number of options | Weighted average exercise price $ |
| Outstanding at beginning of year | 94,845 | 12.6 | 39,928 | 26.7 |
| Granted | 31,190 | 3.0 | 60,442 | 3.2 |
| Exercised | - | | (842) | 16.0 |
| Forfeited | (89,581) | 11.6 | (4,683) | 19.7 |
| Outstanding at end of year | 36,454 | 6.9 | 94,845 | 12.6 |

All options were granted at an exercise price equal to fair value at date of grant. Weighted average exercise price and weighted average fair value of options granted during 2001, were $ 3 and $ 0.01, respectively.

The number of options exercisable as of December 31, 2001 and 2000, was 15,656 and 33,037, respectively.

The weighted average exercise price of options exercisable as of December 31, 2001 and 2000, was $ 10 and $ 16, respectively.

The options outstanding as of December 31, 2001, have been separated into ranges of exercise price as follows:

| Exercise price $ | Options outstanding as of December 31, 2001 Amount | Weighted average remaining contractual life Years | Weighted average exercise price $ | Exercisable as of December 31, 2001 Amount | Weighted average exercise price of options exercisable $ |
|---|---|---|---|---|---|
| 3 | 29,789 | 8.62 | 3 | 10,316 | 3 |
| 14 | 250 | 6.07 | 14 | 250 | 14 |
| 23-25 | 6,415 | 6.60 | 24.95 | 5,090 | 24.95 |
| | 36,454 | | | 15,656 | |

In May 2001, the Company made a commitment to grant certain employees options to purchase 1,263,089 shares of Ordinary shares Series B, subject to the approval of the board of directors

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 7: - SHARE CAPITAL (cont.)

    c.    Warrants:

        In connection with the loan from a financial institution, the Company issued, in March 1999, a warrant to purchase 211 Series C Preferred shares of the Company, at an exercise price of $ 114 per share. In respect of the above mentioned grant, compensation expenses of approximately $ 33 and $ 27 were recorded in the years ended December 31, 2001 and 2000, respectively. In June 2002, as part of the settlement agreement, the above mentioned warrant was cancelled (see also Note 10).

NOTE 8: - COMMITMENTS AND CONTINGENT LIABILITIES

    a.    Lease commitments:

        The Company rents its facilities and various equipment under operating leases in Israel. The rental of its facilities in Israel is for a period of two years terminating on December 31, 2003 and in the U.S., terminating on November 30, 2002 in California. Future minimum annual payments under non-cancelable operating leases for the year ended December 31, 2001 are $ 139

        Rent expenses for the years ended December 31, 2001 and 2000, were $ 168 and $ 242, respectively.

        In September 1999, the Company began subleasing part of its facilities in the U.S. for a period of two years. Sublease income for the years ended December 31, 2001 and 2000 were $ 64 and $ 97, respectively.

    b.    The Company recorded a pledge on its motor vehicles, in exchange for a long-term loan from a leasing company. This charge was removed in 2001 together with the disposal of the motor vehicles to which it related.

    c.    During the year 2001 and 2000 the Company provided bank guarantees to its lessor of leased accommodation in the amounts of $ 22 and $ 43, respectively.

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

## NOTE 9:- TAXES ON INCOME

a    Tax benefits under the Law for the Encouragement of Capital Investments, 1959 ("the Law"):

On October 13, 1996, the production facilities of the Company were granted the status of an "Approved Enterprise" under the Law.

According to the provisions of the Law, the Company has chosen to enjoy "Alternative Benefits" - waiver of grants in return for tax exemption - and accordingly, its income from the "Approved Enterprise" is tax-exempt for a period of 2 years, and subject for an additional period of 5-8 years to reduced tax rates between 10% to 25%, depending upon the proportion of foreign ownership of the Company.

The period of tax benefits, detailed above, is subject to limits of the earlier of 12 years from the commencement of production, or 14 years, from the approval date.

In the event of distribution of cash dividends from income that is tax exempt as mentioned above, the Company would have to pay income tax equal to 10% to 25% of the amount distributed. The tax exempt income attributable to the "Approved Enterprise" can be distributed to shareholders without subjecting the Company to taxes only upon the complete liquidation of the Company.

The Company currently has no plans to distribute dividends and intends to retain future earnings to finance the development of its business.

Should the Company derive income from sources other than the "Approved Enterprise" during the relevant period of benefits, such income will be taxable at regular corporate tax rates of 36%.

b.    Tax benefits under the Israeli Law for the Encouragement of Industry (Taxation), 1969:

The Company is an "industrial company", under the above law and, as such, is entitled to certain tax benefits, including accelerated depreciation and deduction of public offering expenses in three equal annual installments, and deduction of 12.5% per annum on the purchase of certain intangible property rights.

c.    Tax assessments:

Finjan Software Ltd. has not received final tax assessments since its incorporation.

- 17 -

Highly Confidential - Attorneys' Eyes Only        FIN009798

FINJAN SOFTWARE LTD. AND ITS SUBSIDIARY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 9:- TAXES ON INCOME (cont.)

    d    Net operating losses carryforwards:

        Finjan Software Ltd. has accumulated losses for Israeli tax purposes at December 31, 2001 in the amount of approximately $ 6.9 million, which may be carried forward and offset against taxable income in the future for an indefinite period

        At December 31, 2001, Finjan, Inc. had federal net operating loss carryforwards of approximately $ 14 million, which may be carried forward for 15-20 years to the years 2011 through 2020.

    e    Deferred taxes:

        Deferred taxes have not been provided because it is more than likely that they will not be utilized in the foreseeable future.

NOTE 10:- SUBSEQUENT EVENTS

    a    In June 2002, the Company and the financial institution reached a settlement agreement. According to the agreement, the original loan together with accrued interest and lease payments due on leased equipment from the same financial institution were waived, and a settlement in the amount of $ 119 was paid by the Company during June 2002. In addition, the shareholdings of the financial institution held in the Company were also sold to other internal investors as part of this settlement agreement.

    b    In March 2002, the Company signed a convertible loan agreement with a private investor. According to the agreement, the investor provided the Company with a convertible loan in the aggregate amount of $ 2 million.

- 18 -

Highly Confidential - Attorneys' Eyes Only

# EXHIBIT 15

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

CONSOLIDATED FINANCIAL STATEMENTS

AS OF DECEMBERR 31, 2003

Joint Trial Exhibit

**JTX-30**

Case No. 06-369 GMS

Highly Confidential - Attorneys' Eyes Only

FIN009739

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

CONSOLIDATED FINANCIAL STATEMENTS

AS OF DECEMBER 31, 2003

IN U.S. DOLLARS

INDEX

|  | Page |
|---|---|
| Report of Independent Auditors | 2 |
| Consolidated Balance Sheets | 3 |
| Consolidated Statements of Operations | 4 |
| Statements of Changes in Stockholders' Equity (Deficiency) | 5 |
| Consolidated Statements of Cash Flows | 6 |
| Notes of Consolidated Financial Statements | 7 - 22 |

- - - - - - - -

Highly Confidential - Attorneys' Eyes Only

 ERNST & YOUNG

:    Kost Forer Gabbay & Kasierer
     3 Aminadav St.
     Tel-Aviv 67067, Israel

:    Phone: 972-3-6232525
     Fax:   972-3-5622555

## REPORT OF INDEPENDENT AUDITORS

### To the Stockholders of

### FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

We have audited the accompanying consolidated balance sheets of Finjan Software, Inc. and its subsidiaries (the "Company") as of December 31, 2003 and 2002, and the related consolidated statements of operations, changes in stockholders' equity (deficiency) and cash flows for each of the two years in the period ended December 31, 2003. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company as of December 31, 2003 and 2002, and the consolidated results of its operations and cash flows for each of the two years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1c to the financial statements, the Company has incurred recurring operating losses and negative cash flow from operating activities. The financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result from the outcome of this uncertainty.

Tel-Aviv, Israel
March 16, 2004

Kost Forer Gabbay and Kasierer
KOST FORER GABBAY & KASIERER
A Member of Ernst & Young Global

Highly Confidential - Attorneys' Eyes Only                    FIN009741

## CONSOLIDATED BALANCE SHEETS

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

U.S. dollars in thousands (except share and per share data)

| | Note | December 31, 2003 | December 31, 2002 |
|---|---|---|---|
| **ASSETS** | | | |
| **CURRENT ASSETS:** | | | |
| Cash and cash equivalents | | $ 2,738 | $ 6,763 |
| Trade receivables (net of allowance for doubtful accounts of $ 23 and $ 40 as of December 31, 2003 and 2002, respectively) | | 3,107 | 2,028 |
| Prepaid expenses and other accounts receivable | | 256 | 182 |
| Total current assets | | 6,101 | 8,993 |
| LONG-TERM LEASE DEPOSITS | | 142 | 8 |
| SEVERANCE PAY FUND | | 282 | 152 |
| PROPERTY AND EQUIPMENT, NET | 3 | 438 | 235 |
| Total assets | | $ 6,963 | $ 9,388 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIENCY)** | | | |
| **CURRENT LIABILITIES:** | | | |
| Current maturities of obligation under capital leasing contracts | 5 | $ 11 | $ 10 |
| Trade payables | | 499 | 384 |
| Employees and payroll accruals | | 642 | 266 |
| Deferred revenues | | 4,305 | 1,823 |
| Accrued expenses and other liabilities | | 1,447 | 784 |
| Total current liabilities | | 6,904 | 3,267 |
| **LONG-TERM LIABILITIES:** | | | |
| Capital lease obligations, net of current maturities | 5 | 2 | 10 |
| Long-term deferred revenues | | 1,667 | 1,285 |
| Accrued severance pay | | 409 | 229 |
| Total long-term liabilities | | 2,078 | 1,524 |
| COMMITMENTS AND CONTINGENCIES | 7 | | |
| **STOCKHOLDERS' EQUITY (DEFICIENCY):** | 8 | | |
| Share capital – | | | |
| Common stock of $ 0.01 par value: Authorized: 15,000,000 shares at December 31, 2003 and 2002; Issued and Outstanding: 187,946 and 254,242 shares at December 31, 2003 and 2002, respectively | | 3 | 3 |
| Series A, B and C Preferred stock of $ 0.01 par value: Authorized: 10,428,196 shares at December 31, 2003 and 2002; Issued and outstanding: 10,428,196 shares at December 31, 2003 and 2002; Aggregate liquidation preference of $ 20,796 as of December 31, 2003 | | 104 | 104 |
| Additional paid-in capital | | 29,061 | 29,061 |
| Treasury shares | | (9) | |
| Receipts on account of shares | | 14 | 14 |
| Accumulated deficit | | (31,192) | (24,585) |
| Total stockholders' equity (deficiency) | | (2,019) | 4,597 |
| Total liabilities and stockholders' equity (deficiency) | | $ 6,963 | $ 9,388 |

The accompanying notes are an integral part of the consolidated financial statements.

Shlomo Touboul
Chief Executive Officer

David Aber
Chief Financial Officer

- 5 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

U.S. dollars in thousands

| | Year ended December 31, | |
| --- | --- | --- |
| | 2003 | 2002 |
| Revenues | $ 5,889 | $ 3,955 |
| Cost of revenues | 1,333 | 427 |
| Gross profit | 4,556 | 3,528 |
| Operating expenses: | | |
| Research and development | 3,064 | 1,278 |
| Selling and marketing, net | 6,338 | 4,106 |
| General and administrative | 1,662 | 680 |
| Total operating expenses | 11,064 | 6,064 |
| Operating loss | (6,508) | (2,536) |
| Financial and other income (expenses), net | (92) | 114 |
| Waiver of long-term loan and lease payments from a financial institution | - | 1,757 |
| Net loss before taxes on income | (6,600) | (665) |
| Taxes on income | 7 | - |
| Net loss | $ (6,607) | $ (665) |

The accompanying notes are an integral part of the consolidated financial statements.

- 4 -

Highly Confidential - Attorneys' Eyes Only

# FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIENCY)

dollars in thousands (except share data)

| | Preferred stock | | Common stock | | Additional paid-in capital | Treasury shares | Receipts on account of shares | Accumulated deficit | Total stockholders' equity (deficiency) |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Amount | Number | Amount | | | | | |
| Balances as of January 1, 2002 | 2,298,073 | $ 565 | 362,232 | $ 84 | $ 19,724 | $ - | $ 14 | $ (23,920) | $ (3,533) |
| Issuance of shares, net | 5,870,317 | 59 | - | - | 6,336 | - | - | - | 6,395 |
| Conversion of convertible notes | 2,227,956 | 22 | - | - | 2,378 | - | - | - | 2,400 |
| Conversion of Preferred and Ordinary shares of Finjan Ltd. to Preferred and Common stock of Finjan Software, Inc. | 31,850 | (542) | - | (31) | 623 | - | - | - | - |
| Series A and B Ordinary shares not converted into Common stock | - | - | (107,990) | *) - | *) - | - | - | - | - |
| Net loss | - | - | - | - | - | - | - | (605) | (605) |
| Balances as of December 31, 2002 | 10,428,196 | 104 | 254,242 | 3 | 29,061 | - | 14 | (24,585) | 4,597 |
| Purchase of Treasury shares | - | - | (66,296) | - | - | (9) | - | - | (9) |
| Net loss | - | - | - | - | - | - | - | (6,607) | (6,607) |
| Balances as of December 31, 2003 | 10,428,196 | $ 104 | 187,946 | $ 3 | $ 29,061 | $ (9) | $ 14 | $ (31,192) | $ (2,019) |

*) Represents an amount lower than $ 1.

The accompanying notes are an integral part of the consolidated financial statements.

- 5 -

Highly Confidential - Attorneys' Eyes Only

FIN009744

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

U.S. dollars in thousands

| | Year ended December 31, | |
|---|---|---|
| | 2003 | 2002 |
| Cash flows from operating activities: | | |
| Net loss | $ (6,607) | $ (665) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation | 122 | 92 |
| Increase in trade receivables | (1,079) | (1,037) |
| Increase in prepaid expenses and other accounts receivable | (74) | (123) |
| Increase (decrease) in trade payables | 115 | (171) |
| Increase in employee and payroll accruals and accrued expenses and other liabilities | 1,039 | 91 |
| Increase in deferred revenues | 2,864 | 1,900 |
| Increase in severance pay, net | 50 | - |
| Waiver of long-term loan from a financial institution | - | (1,693) |
| Net cash used in operating activities | (3,570) | (1,606) |
| Cash flows from investing activities: | | |
| Purchase of property and equipment | (325) | (159) |
| Increase in long-term prepaid expenses | (134) | (8) |
| Net cash used in investing activities | (459) | (167) |
| Cash flows from financing activities: | | |
| Proceeds from convertible loans | - | 2,000 |
| Principal payments of obligation under capital leasing contracts | (7) | (4) |
| Proceeds from issuance of shares, net | - | 6,395 |
| Repayment of long-term loan from a financial institution | - | (119) |
| Purchase of Treasury shares | (9) | - |
| Net cash provided by (used in) financing activities | (16) | 8,272 |
| Increase (decrease) in cash and cash equivalents | (4,045) | 6,499 |
| Cash and cash equivalents at the beginning of the year | 6,783 | 284 |
| Cash and cash equivalents at the end of the year | $ 2,738 | $ 6,783 |
| Supplemental disclosure of non-cash investing and financing activities: | | |
| Conversion of convertible notes | $ - | $ 2,400 |
| Capital lease obligations incurred upon the acquisition of property and equipment | $ - | $ 24 |

The accompanying notes are an integral part of the consolidated financial statements.

- 6 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 1:-  GENERAL

    a.      Finjan Software, Inc. ("Finjan") and its subsidiaries (the "Company" or the "Finjan Group") are engaged in the development and marketing of software security solutions that provide protection from first-strike attacks by malicious code and active content. Finjan also provides software solutions for Anti-Virus, URL Filtering, Anti Spam and document protection.

         Finjan, a Delaware Corporation, was incorporated in June 2002 and commenced operations in September 2002. Finjan is the parent company of the following companies:

         •   Finjan Software Ltd. ("Finjan Ltd.") - Finjan Ltd. was incorporated in Israel and commenced operations in January 1996. During the reorganization, as described in Note 1 b below, in September 2002 Finjan became the parent company of Finjan Ltd. owning approximately 97% of its shares. In March 2004 Finjan purchased the balance of Finjan Ltd.'s shares (see also Note10). As a result, Finjan Ltd. became a wholly owned subsidiary of Finjan.

         •   Finjan, Inc. - Finjan Inc. was incorporated in the State of California as a wholly owned subsidiary of Finjan Ltd. and commenced operations in January 1997. During 1998, Finjan, Inc. was reincorporated in the State of Delaware. In October 2003 Finjan Ltd. transferred all of its shares in Finjan Inc. to Finjan. As a result of this transfer, Finjan Inc. became a wholly owned subsidiary of Finjan.

         •   Finjan Software (UK) Limited ("Finjan UK") - Finjan UK was incorporated under the laws of the United Kingdom, as a wholly owned subsidiary of Finjan Ltd. in March 2003. In October 2003, Finjan Ltd. transferred its shares in Finjan UK to Finjan. As a result of this transfer, Finjan UK became a wholly owned subsidiary of Finjan.

    b.      In September 2002, Finjan entered into a stock purchase agreement ("the SPA") whereby it issued to investors 5,870,317 Series C Preferred stock of Finjan at a price per share of $ 1.1382, for a total consideration of approximately $ 6,700. In addition, a loan received by Finjan Ltd. in March 2002 was assigned to Finjan and converted into 1,757,160 shares of Series C Preferred stock of Finjan (see also Note 4a). As a condition to the SPA, a reorganization agreement was signed in September 2002 between Finjan, Finjan Ltd's stockholders and Finjan Ltd., according to which, a reorganization in the Finjan Group structure was consummated. As part of the reorganization, a new Delaware corporation, Finjan Software, Inc. was established, and it was agreed that (i) each outstanding Preferred A, B, C and D share of Finjan Ltd. (assuming conversion into Ordinary shares) was exchanged with one Series A Preferred stock of Finjan; (ii) each outstanding Series E Preferred share of Finjan Ltd. was exchanged with one Series B Preferred stock of Finjan; (iii) each outstanding warrant or option for Ordinary shares or Preferred shares of Finjan Ltd. shall become exercisable for the same class of securities the holder of such options or warrants has obtained in the reorganization (see also Note 8); and

- 7 -

Highly Confidential - Attorneys' Eyes Only

FIN009746

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 1:-   GENERAL (Cont.)

(iv) 254,242 outstanding Ordinary A and B shares of Finjan Ltd. out of a total 362,232 Ordinary A and B shares were exchanged for 254,242 shares of Common stock of Finjan. In addition, in accordance with the SPA, Finjan issued, at no consideration, 31,850 shares of Series B Preferred stock of Finjan to certain stockholders as a result of the antidilution protection provided in Finjan Ltd's Articles of Association. As part of the reorganization, a share exchange agreement was signed with an Ordinary A shareholder (the "Shareholder") of Finjan Ltd. whereby 105,595 Ordinary A shares of Finjan Ltd. held by the Shareholder will be transferred to Finjan in consideration for the issuance of Common stock of Finjan on a one to one basis upon the occurrence of one of the following events: i) an IPO of Finjan; ii) the acquisition of Finjan by another entity; iii) at the election of Finjan; or iv) at the election of the Shareholder (see, also, Note 8g).

This reorganization has been accounted for in a manner similar to a pooling of interest. Accordingly, (i) the consolidated statement of operations of Finjan for the year ended December 31, 2002 includes the historical consolidated results of operations of Finjan Ltd. and Finjan Inc. which was its U.S. subsidiary at the time and (ii) the consolidated balance sheet of Finjan as of December 31, 2002 includes the historical consolidated carrying cost of the assets and liabilities of Finjan Ltd. and its U.S. subsidiary.

c.   As of December 31, the Company's stockholders' deficiency amounted to $2,019. In addition, in 2003, the Company incurred operating losses in the amount of approximately $6,607 and had negative cash flow from operating activities in the amount of approximately $3,570. The Company's ability to continue as a going concern is dependent upon it raising additional capital and attaining positive cash flow. After the balance sheet date, the Company finalized a new round of investment in the amount of $10,000. Management believes that such funding will provide the necessary liquidity to meet the Company's financing needs.

NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES

The financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("U.S GAAP"). The significant policies followed in the preparation of the consolidated financial statements are:

a.   Use of estimates:

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reporting amounts of revenues and expenses during the reporting period notes. Actual results could differ from those estimates.

- 8 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES (Cont.)

  b.   Financial statements in U.S. dollars:

  The functional currency of the Company is the U.S dollar, as the U.S. dollar is the primary
  currency of the economic environment in which the Company operates and expects to
  operate in the foreseeable future. Although a large portion of Finjan Ltd.'s costs is incurred
  in New Israeli Shekels, all of the Company's revenues are generated in U.S. dollars, its cash
  is invested almost entirely in US dollar deposits and its other financing activities including
  loans and equity transactions, are made in US dollars.

  The Company's transactions and balances denominated in U.S. dollars are presented at their
  original amounts. Non-dollar transactions and balances have been remeasured to U.S. dollars
  in accordance with Statement of Financial Accounting Standards ("SFAS") No. 52 of the
  U.S. Financial Accounting Standards Board ("FASB"). All transaction gains and losses from
  remeasurement of monetary balance sheet items denominated in non-dollar currencies are
  reflected in the statement of operations as financial income or expenses, as appropriate.

  c.   Principles of consolidation:

  The consolidated financial statements include the accounts of Finjan Software Inc. and its
  wholly owned subsidiaries, Finjan Software Ltd., Finjan, Inc. and Finjan Software (U.K.)
  Ltd. Intercompany balances and transactions have been eliminated upon consolidation.

  d.   Cash equivalents:

  Cash equivalents are considered to be highly liquid investments, which include unrestricted
  short-term bank deposits with original maturities of three months or less.

  e.   Long-term lease deposits:

  Long-term lease deposits include long-term deposits for facilities and motor vehicles leasing,
  presented at their cost.

  f.   Property and equipment:

  Property and equipment are stated at cost. Depreciation is computed by the straight-line
  method over the estimated useful lives of the assets at the following annual rates:

|  | % |
|---|---|
| Computers and peripheral equipment | 33 |
| Office furniture and equipment | 6 - 20 |
| Leasehold improvements | Over the term of the lease |

- 9 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 2:-    SIGNIFICANT ACCOUNTING POLICIES (Cont.)

The Company's long-lived assets are reviewed for impairment in accordance with Statement of Financial Accounting Standard No.144 "Accounting for the Impairment or Disposal of Long-Lived Assets" ("SFAS No.144") whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted cash flows expected to be generated by the assets. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. As of December 31, 2003, no impairment losses have been identified.

g.    Research and development costs:

SFAS No. 86, "Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed", requires capitalization of certain software development costs subsequent to the establishment of technological feasibility.

Based on the Company's product development process, technological feasibility is established upon the completion of a working model. The Company does not incur material costs between the completion of the working model and the point at which the product is ready for general release has been insignificant. Therefore, research and development costs are charged to the statement of operations as incurred.

h.    Concentrations of credit risk:

SFAS No. 105, "Disclosure of Information About Financial Instruments with off-Balance-Sheet Risk and Financial Instruments with Concentration of Credit Risk", requires disclosure of any significant off-balance-sheet and credit risk concentrations. The Company has no significant off-balance-sheet concentration of credit risk such as foreign exchange contracts, option contracts or other foreign hedging arrangements.

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents, trade receivables and prepaid expenses and other accounts receivable.

Cash and cash equivalents are invested in major banks in Israel and the United States. Such deposits in the United States may be in excess of insured limits and are not insured in other jurisdictions. Management believes that the financial institutions that hold the Company's investments are financially sound and, accordingly, minimal credit risk exists with respect to these investments

The trade receivables of the Company are mainly derived from sales to customers located in Europe and the U.S. The Company performs ongoing credit evaluations of their customers and to date has not experienced any material losses. An allowance for doubtful accounts is determined with respect to specific amounts that the Company has determined to be doubtful of collection.

- 10 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands (except share and per share data)

NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)

    i.    Revenue recognition:

To date, the Company has derived its revenue from license fees and sub-license fees of its products, maintenance and support and rendering of consulting services including training and installation. The Company sells its products indirectly through sub-license fees from resellers and directly to end-users.

The Company recognizes software license revenue in accordance with Statement of Position SOP 97-2, "Software Revenue Recognition" ("SOP 97-2"), as amended. SOP 97-2 generally requires revenue earned on software arrangements involving multiple elements to be allocated to each element based on the relative fair value of the elements. The Company has also adopted SOP 98-9, "Modification of SOP 97-2, and Software Revenue Recognition with Respect to Certain Transactions" ("SOP 98-9") for all transactions entered into after January 1, 2000. SOP 98-9, requires that revenue be recognized under the "Residual Method" when vendor specific objective evidence (VSOE) of fair value exists for all undelivered elements and no VSOE exists for the delivered elements. Under the "Residual Method", any discounts in the arrangement are allocated to the delivered elements.

Revenue from license fees is recognized when persuasive evidence of an agreement exists, delivery of the product has occurred, no significant obligations with regard to implementation remain, the fee is fixed or determinable, and collectability is probable.

When contracts contain multiple elements wherein VSOE of fair value exists for all undelivered elements, the Company accounts for the delivered elements in accordance with the "Residual Method" prescribed by SOP 98-9. Maintenance and support revenue included in these arrangements is deferred and recognized on a straight-line basis over the term of the maintenance and support agreement. The VSOE of fair value of the undelivered elements (maintenance, support and services) is determined based on the price charged for the undelivered element when sold separately.

When VSOE of fair value did not exist for all undelivered elements the Company recognized the product sale and maintenance revenue ratably over the maintenance period.

Deferred revenue includes amounts invoiced to customers for which revenue has not yet been recognized.

Service revenue is primarily comprised of revenue from standard maintenance agreements, consulting and training fees. The Company recognizes revenues from maintenance over the contractual period of the maintenance agreement, which is generally one year. Consulting services are billed at an agreed upon rate plus out-of-pocket expenses, and training services are billed on a per session basis. The Company recognizes service revenue from consulting and training when provided to the customer.

- 11 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)

j.    Accounting for stock-based compensation:

The Company has elected to follow Accounting Principles Board Opinion No. 25 "Accounting for Stock Issued to Employees" ("APB 25") and Interpretation No. 44 "Accounting for Certain Transactions Involving Stock Compensation" ("FIN 44") in accounting for its employee stock option plans. Under APB 25, when the exercise price of the Company's stock options is less than the market price of the underlying stocks on the date of grant, compensation expense is recognized.

The Company applies SFAS No. 123, "Accounting for Stock-Based Compensation" and Emerging Issues Task Force ("EITF") 96-18, "Accounting for Equity Instruments that are Issued to Other Than Employees for Acquiring, or In Conjunction with Selling Goods or Services", with respect to warrants and options issued to non-employees and consultants. SFAS No. 123 requires the use of option valuation models to measure the fair value of the warrants at the grant date.

In December 2002, the FASB issued SFAS 148, "Accounting for Stock Based Compensation Transmission and Disclosure" – an amendment of FASB Statement No. 123 ("SFAS 148"). SFAS 148 permits two additional transition methods for entities that adopt the fair value based method of accounting for stock-based employee compensation. The statement also requires new disclosures about the ramp-up effect of stock-based employee compensation on reported results. The Statement also requires that those effects be disclosed more prominently by specifying the form, content, and location of those disclosures. The transition guidance and annual disclosure provisions of SFAS 148 are effective for fiscal years ending after December 15, 2002, with earlier application permitted in certain circumstances. The interim disclosure provisions are effective for financial reports containing financial statements for interim periods beginning after December 15, 2002. As at the balance sheet date, the Company continues to apply APB 25.

Pro forma information regarding the Company's net loss and net loss per stock is required by SFAS No. 123 and has been determined as if the Company had accounted for its employee stock options under the fair value method prescribed by SFAS No. 123. However, the pro-forma information required by SFAS No. 123 is not disclosed due to its immateriality.

k.    Severance pay:

Finjan Ltd.'s liability for severance pay is calculated pursuant to Israeli severance pay law based on the most recent salary of the employees multiplied by the number of years of employment, as of the balance sheet date. Employees are entitled to one month's salary for each year of employment or a portion thereof. Finjan Ltd.'s liability for all of its employees is fully provided by monthly deposits with insurance policies and by an accrual. The value of these policies is recorded as an asset in the Company's balance sheet.

- 12 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

The deposited funds include profits accumulated up to the balance sheet date. The deposited funds may be withdrawn only upon the fulfillment of the obligation pursuant to Israeli severance pay law or labor agreements. The value of the deposited funds is based on the cash surrendered value of these policies, and includes immaterial profits.

Severance expenses for the years ended December 31, 2003 and 2002, amounted to approximately $ 144 and $ 110, respectively.

1.   Fair value of financial instruments:

The following methods and assumptions were used by the Company in estimating its fair value disclosures for financial instruments:

The carrying amounts of cash and cash equivalents, trade receivables, prepaid expenses and other accounts receivable, trade payables, employee and payroll accruals, accrued expenses and other liabilities and current maturities of capital lease obligations approximate their fair value due to the short-term maturity of such instruments.

The carrying amount of the Company's long-term capital lease obligations approximates its fair value. The fair value was estimated using the cash flow analysis.

NOTE 3:- PROPERTY AND EQUIPMENT

|  | December 31, | |
|  | 2003 | 2002 |
| --- | --- | --- |
| Cost: | | |
| Computers and peripheral equipment | $    959 | $    700 |
| Office furniture and equipment | 151 | 107 |
| Leasehold Improvements | 61 | 39 |
| | 1,171 | 846 |
| Accumulated depreciation | (733) | (611) |
| Depreciated cost | $    438 | $    235 |

Depreciation expenses for the years ended December 31, 2003 and 2002 were $ 122 and $ 92, respectively.

- 13 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 4:- CONVERTIBLE LOANS

    a.    In March 2002, Finjan Ltd. signed a convertible loan agreement (the "Agreement") with a private investor (the "Investor"). According to the Agreement, the Investor provided the Company with a convertible loan (the "Loan") in the aggregate amount of $ 2 million. The Loan bears interest at a rate of 8% per annum.

           As part of the reorganization (see Note 1), the Loan was assigned to Finjan, converted into 1,757,160 Series C Preferred shares and all interest accrued was waived by the investor.

    b.    During 2001, Finjan Ltd. received convertible loans from one of its existing shareholders in the aggregate amount of $ 400. These loans were convertible, at the holder's option, into Series E Preferred shares of Finjan Ltd. at an exercise price of $ 1.4014 per share and did not bear interest. In July 2002, the convertible loans were converted into 285,429 Series E Preferred shares of Finjan Ltd.

    c.    In November 2000 and February 2001, Finjan Ltd. received convertible loans in the aggregate amount of $ 1,732. In March 2001, these loans were converted into 1,235,766 Series E Preferred shares of Finjan Ltd. In addition, in July 2002 an additional amount of 185,367 Series E Preferred shares of Finjan Ltd. were issued in connection with these loans.

NOTE 5: – OBLIGATION UNDER CAPITAL LEASING CONTRACTS

    a.    The Company leased computer equipment under capital leasing contracts. The loans are linked to the U.S. dollar and bear interest at the rate of 8.55% subject to the changes in the LIBOR interest rate every three months.

    b.    Future minimum payments under capital leases:

| | | |
|---|---|---|
| 2004 (current maturities) | $ | 12 |
| 2005 | | 1 |
| Less- amount representing interest | | (1) |
| | $ | 12 |

NOTE 6:- LOAN FROM A FINANCIAL INSTITUTION

During 1999, Finjan Inc. received a $2 million loan from a Financial Institution and leased certain property and equipment. The loan together with the accrued interest was to be repaid through April 2002. In June 2002, Finjan Inc. and the Financial Institution reached a settlement agreement according to which Finjan repaid $ 119 out of a total balance of loan and lease payments due amounting to $ 1.9 million. The balance of approximately $ 1.75 million was waived by the Financial Institution. In addition, the shareholdings of the Financial Institution in Finjan Ltd. were also sold to other internal investors as part of this settlement agreement.

- 14 -

FIN009753

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands (except share and per share data)

NOTE 7:-   COMMITMENTS AND CONTINGENT LIABILITIES

    a.    Lease commitments:

The Company rents its facilities under operating leases in Israel, United Kingdom and the United States.

Aggregate minimum rental commitments under non-cancelable leases as of December 31, 2003, are as follows:

| | | |
|---|---|---|
| 2004 | $ | 590 |
| 2005 | | 421 |
| 2006 | | 163 |
| | $ | 1,174 |

Rent expenses for the years ended December 31, 2003 and 2002, were $313 and $171, respectively.

    b.    During the years 2003 and 2002, the Company provided bank guarantees to its landlord in the amounts of $112 and $66, respectively.

    c.    On December 18, 2002, Finjan Ltd., Alchemedia Ltd. and Alchemedia Holdings, Inc. signed an agreement according to which Finjan Ltd. purchased certain tangible property and intellectual property of Alchemedia Ltd. relating to contracts involving a product (the "Product"). In consideration, Finjan Ltd. agreed to pay Alchemedia Ltd. 50% of revenues generated from a sale to a specific customer and, for a period of 24 months, 10% of all other revenues generated from sales related to the Product acquired from Alchemedia Ltd.

    d.    Legal Claim

        1.    During 2003, the Company received a letter from Tumbleweed Communications Corp. ("Tumbleweed"), alleging to a potential infringement of one of Tumbleweed's patents. The Company responded that it does not believe that its product infringes the abovementioned patent. No further action has been taken to date. The Company does not believe that this claim has any merit, and the Company will vigorously defend itself against the claim presented therein, if necessary.

        2.    After the balance sheet date, the Company received a claim from a competitor that develops security software that one of the Company's products contains text strings that appear to have been copied from the competitor's demo. The files containing the allegedly violating text were not operationally integrated into the Company's product. The Company immediately removed the allegedly violating text and executed an undertaking not to distribute the abovementioned text. The Company believes that the outcome of this matter will not have a material adverse affect on the Company's business, financial condition and results of operations.

- 15 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 8: - SHARE CAPITAL

In September 2002, the Company effected a reorganization whereby a new Delaware corporation, Finjan Software, Inc. was established, and all Preferred shares and some of the Ordinary shares of Finjan Ltd. were exchanged for Preferred and Common stock of Finjan Software Inc. (see Note 1).

a.    Composition of share capital of Finjan Ltd. as of December 31, 2002:

|  | December 31, 2002 | |
|---|---|---|
|  | Authorized | Issued and outstanding |
|  | Number of shares | |
| Common stock (1) | 15,000,000 | 254,242 |
| Series A Preferred stock (2) | 226,226 | 226,226 |
| Series B Preferred stock (2) | 2,574,493 | 2,574,493 |
| Series C Preferred stock (2) | 7,627,477 | 7,627,477 |
|  | 25,428,196 | 10,682,438 |

b.    Composition of share capital of Finjan Software, Inc as of December 31, 2003:

|  | December 31, 2003 | |
|---|---|---|
|  | Authorized | Issued and outstanding |
|  | Number of shares | |
| Common stock (1) | 15,000,000 | 187,946 |
| Series A Preferred stock (2) | 226,226 | 226,226 |
| Series B Preferred stock (2) | 2,574,493 | 2,574,493 |
| Series C Preferred stock (2) | 7,627,477 | 7,627,477 |
|  | 25,428,196 | 10,616,142 |

(1)    Common stock:

Common stock confers upon their holders, pari passu, the right to receive notice of, and to participate in, all general meetings of the Company, to vote in such meetings, to receive dividends, and to participate in the distribution of the surplus assets of the Company in the event of liquidation of the Company.

- 16 -

Highly Confidential - Attorneys' Eyes Only

FIN009755

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands (except share and per share data)

NOTE 8: - SHARE CAPITAL (Cont.)

(2)    Preferred stock:

Series A, B and C Preferred stock confers upon their holders the same rights conferred by Common stock. In addition, each Preferred Series A and C stock is convertible into Common stock on a one for one basis and each Preferred Series B stock is convertible into 1.23 shares of Common stock, at the option of the holder. Each Preferred Series A, B and C stock is converted into Common stock at the applicable conversion price automatically upon the earlier of (i) a qualified initial public offering ("IPO"), based on a company valuation of not less than $ 25 million or (ii) a written consent or agreement of the majority of the Preferred stockholders

Series C Preferred stock confers upon their holders preference in receiving dividends over all other Common and Preferred stockholders when and, if declared. Such dividends shall not be cumulative.

In the event of a liquidation of the Company with a value of less than $ 80 million, then all assets will be liquidated in the following order: (i) Series C Preferred stock shall be entitled to receive, prior to any other Common or Preferred stock, an amount per share equal to $ 1.1382 (subject to adjustments) for each outstanding Preferred C stock; (ii) Series B Preferred stock shall be entitled to receive, prior to Preferred A stock or Common stock, an amount per share equal to $ 1.4014 for each outstanding Preferred B stock (subject to adjustments); (iii) Series A Preferred stock shall be entitled to receive, prior to Common stock, an amount per share equal to $ 37.6 for each outstanding Preferred A stock; (iv) upon completion of phases (i) to (iii) all remaining assets will be distributed ratably among the holders of Preferred and Common stock based on the number of shares of Common stock on an as converted basis. In the event that the value of the assets available for distribution exceeds $ 80 million, then Series A, B and C Preferred stock shall not be entitled to receive the liquidation preference described above, rather amounts available for distribution will be distributed ratably among the holders of Preferred and Common stock based on the number of shares of Common stock on an as converted basis.

c.    Share issuance and recapitalization:

1    In March 2001, Finjan Ltd. completed a financing round and raised $ 2,948 for its Preferred shares Series E, at a price per share of $ 1.4014 per share of which $ 1,732 were received as convertible loans (see Note 4).

As part of the financing round, Preferred shares Series A, B, C and D of most existing shareholders who did not participate in the financing round of Preferred shares Series E gave consent to Finjan Ltd. to convert all their holdings based on their relative conversion price, into Ordinary shares Series A of Finjan Ltd.

- 17 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

### NOTE 8: - SHARE CAPITAL (Cont.)

2. In September 2002, Finjan Software Inc. entered into the SPA whereby it issued to certain investors 5,870,317 shares of Series C Preferred stock of Finjan Software, Inc. at a price per share of $ 1.1382, for a total consideration of approximately $ 6.7 million. (See also Note 1b).

d. Stock Option Plans:

As part of the reorganization all options convertible into Ordinary B shares in Finjan Ltd. were converted into options to purchase Common stock of Finjan Software, Inc.

Under Finjan Ltd.'s 1996 Stock Option Plan (the "Plan"), options may be granted to officers, directors, employees and consultants of the Company or its subsidiaries.

Each option granted under the Plan is exercisable until the earlier of ten years from the date of the grant of the option or the expiration dates of the respective option plans. The plan will expire on December 31, 2006. The exercise price of the options granted under the plans may not be less than the nominal value of the shares into which such options are exercised. The options vest primarily over four years. Any options, which are forfeited or not exercised before expiration, become available for future grants.

In October 2003, the Company's Board of Directors approved a new stock option plan ("the 2003 Plan"), and chose the Capital Course, pursuant to the provisions of the new Section 102 of Israel's Income Tax Ordinance. Options granted under the 2003 Plan vest over a period of four years, and expire no later than ten years from the date of grant. Under the 2003 Plan, the Company reserved for issuance 3,433,456 shares of Common stock and granted 2,467,642 options to employees of the Company.

- 18 -

Highly Confidential – Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 8: - SHARE CAPITAL (Cont.)

A summary of the stock options activities in 2003 and 2002, is as follows:

|  | 2003 | | 2002 | |
|---|---|---|---|---|
|  | Number of options | Weighted average exercise price $ | Number of options | Weighted average exercise price $ |
| Outstanding at beginning of year | 12,616 | 8.2 | 36,454 | 6.9 |
| Granted | 2,467,642 | 0.14 | - | - |
| Exercised | - | - | - | - |
| Forfeited | (44,467) | 1.0 | (23,838) | 6.1 |
| Outstanding at end of year | 2,435,791 | 0.17 | 12,616 | 8.2 |

The options outstanding as of December 31, 2003, have been separated into ranges of exercise price as follows:

| Exercise price $ | Options outstanding as of December 31, 2003 Amount | Weighted average remaining contractual life Years | Weighted average exercise price $ | Exercisable as of December 31, 2003 Amount | Weighted average exercise price of options exercisable $ |
|---|---|---|---|---|---|
| 0.14 | 52,752 | 1 | 0.14 | 52,752 | 0.14 |
| 0.14 | 2,375,390 | 10 | 0.14 | 941,426 | 0.14 |
| 3 | 5,719 | 6.33 | 3.0 | 4,484 | 3.0 |
| 14 | 50 | 3.16 | 14.0 | 50 | 14.0 |
| 23-25 | 1,880 | 4.47 | 24.87 | 1,841 | 24.87 |
|  | 2,435,791 | 9.79 | 0.17 | 1,000,553 | 0.20 |

Options to consultants:

| Issuance date | In connection with | Number of options granted | Options exercisable | Exercise price per share $ | Exercisable through |
|---|---|---|---|---|---|
| December 18, 2003 | consultant | 52,752 | 52,752 | 0.14 | December 18, 2004 |
| December 18, 2003 | consultant | 35,000 | 8,750 | 0.14 | December 18, 2013 |
|  |  | 87,752 | 61,502 |  |  |

Highly Confidential - Attorneys' Eyes Only

FIN009758

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands (except share and per share data)

### NOTE 8:- SHARE CAPITAL (Cont.)

The Company accounts for its options to consultants under the fair value method of SAFS No. 123 and EITF 96-18. The fair value of these options was estimated using a Black – Sholes option – pricing model with the following weighted assumptions for 2003 risk free interest rates of 3%, dividend yields of 0%, volatility factors of the expected market price of the Company's Ordinary shares of 0.5 and weighted – average expected life of the options of 10 years (or according to the specific agreement with the consultants). Compensation expenses related to granting of stock options to consultants are immaterial.

e.    Warrants:

In connection with the loan from a Financial Institution (see Note 6), Finjan Ltd. issued, in March 1999, a warrant to purchase 211 Series C Preferred shares of Finjan Ltd., at an exercise price of $ 114 per share. In respect of the abovementioned grant, compensation expenses of approximately $ 33 were recorded in the year ended December 31, 2001. In June 2002, as part of the settlement agreement, the abovementioned warrant was cancelled.

f.    Purchase offer:

On October 27, 2003, the Company offered to all shareholders of Finjan Software Ltd. other than the Company ("the Shareholders"), to purchase all of their holdings in Finjan Software Ltd, ("the Shares"), approximately 107,965 shares at a price per share of $0.14. In the event that the Shareholders holding 90% or more of the Shares, but less than all of the Shares, agree to the Company's proposal, the Company may enforce the sale of all Shares on all Shareholders, including any dissenting Shareholders. As of October 27, 2003, Shareholders holding more then 90% of the shares (including one of the directors and officers of Finjan Software Ltd., who holds 105,595 Shares), agreed to sell their Shares to the Company at the offered price per share, and therefore the Company may enforce the sale on all other Shareholders.

g.    Treasury shares:

On December 30, 2003, the Company purchased 66,296 of its outstanding Ordinary shares for a total consideration of $ 9. These shares were recorded as Treasury shares.

### NOTE 9:- TAXES ON INCOME

a.    Measurement of results for tax purposes under the Israeli Income Tax Law (Inflationary Adjustments), 1985:

Results for tax purposes of Finjan Ltd. are measured in terms of earnings in NIS after certain adjustments for increases in the Israeli CPI. As explained in Note 2b, the financial statements are presented in U.S. dollars. The difference between the annual change in the CPI and in the NIS/dollar exchange rate causes a difference between taxable income and the income before taxes shown in the financial statements. In accordance with paragraph 9(f) of SFAS No. 109, the Company has not provided deferred income taxes on the difference between the functional currency and the tax bases of assets and liabilities.

- 20 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands (except share and per share data)

NOTE 9:- TAXES ON INCOME (Cont.)

    b.    Tax benefits under the Law for the Encouragement of Capital Investments. 1959 ("the Law"):

On October 13, 1996, the production facilities of Finjan Ltd. were granted the status of an "Approved Enterprise" under the Law. On October 10, 2001 an expansion of the "Approved Enterprise" was granted to the Company.

According to the provisions of the Law, Finjan Ltd. has chosen to enjoy "Alternative Benefits" - waiver of grants in return for tax exemption - and accordingly, its income from the "Approved Enterprise" is tax-exempt for a period of 2 years, and subject for an additional period of 5-8 years to reduced tax rates between 10% to 25%, depending upon the level of foreign ownership of Finjan Ltd. The period of benefits relating to these investments programs will expire in the years 2013 through 2016.

In the event of distribution of cash dividends from income that is tax exempt as mentioned above, Finjan Ltd. would have to pay income tax equal to 10% to 25% of the amount distributed. The tax-exempt income attributable to the "Approved Enterprise" can be distributed to shareholders without subjecting Finjan Ltd. to taxes only upon the complete liquidation of Finjan Ltd.

Finjan Ltd. currently has no plans to distribute dividends and intends to retain future earnings to finance the development of its business.

The entitlement to the above benefits is conditional upon Finjan Ltd.'s fulfilling the conditions stipulated by the above law, regulations published there under and the instruments of approval for the specific investments in "Approved Enterprises". In the event of failure to comply with these conditions, the benefits may be canceled and Finjan Ltd. may be required to refund the amount of the benefits, in whole or in part, including interest.

Should Finjan Ltd. derive income from sources other than the "Approved Enterprise" during the relevant period of benefits, such income will be taxable at regular corporate tax rates.

    c.    Tax assessments:

Finjan Ltd. has not received final tax assessments since its incorporation.

    d.    Net operating losses carry forwards:

As of December 31, 2003, Finjan Ltd. has accumulated losses for Israeli tax purposes of approximately $9,000, which may be carried forward and offset against taxable income for an indefinite period in the future. The Company expects that during the period these tax losses are utilized its income would be substantially tax-exempt. Accordingly, there will be no tax benefit available from such losses and no deferred income taxes have been included in these financial statements.

- 21 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 9:- TAXES ON INCOME (Cont.)

As of December 31, 2003, Finjan Inc. and Finjan Software inc. have combined losses carried forward amounting to approximately $2,000.

e.   Deferred taxes:

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes, and the amounts used for income tax purposes.

The Company has provided valuation allowances in respect of deferred tax assets, since it has a history of losses. Management currently believes that it is more likely than not that the deferred tax regarding the loss carryforwards and other temporary differences will not be realized in the near future.

NOTE 10:- SUBSEQUENT EVENTS (Unaudited)

1.   In accordance to the Company's purchase offer (see Note 8f), the transaction was completed during March 2004.

2.   In June 2004, the Company signed a stock purchase agreement ("the "SPA") with certain existing shareholders and major new investor ("the new investor").

     According to the SPA, the Company issued 6,426,735 shares of Series D Preferred stock at a price per share of $1.556, reflecting a pre-money valuation on a fully diluted basis of $25,000 for a total consideration of $10,000. In connection with the SPA, the Company has restated a Certificate of Incorporation in order to adjust the rights associated to the Preferred stock.

3.   In August 2004, Finjan Ltd. established a wholly-owned subsidiary, Finjan Software GmbH, under the laws of Germany, which will be engaged in marketing the Company's products in Europe.

F:\W2000\2914\M\03\ES12.DOC

- 22 -

Highly Confidential - Attorneys' Eyes Only

# EXHIBIT 16

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES.

CONSOLIDATED FINANCIAL STATEMENTS

AS OF DECEMBER 31, 2005

Joint Trial Exhibit

**JTX-15**

Case No. 06-369 GMS

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

CONSOLIDATED FINANCIAL STATEMENTS

AS OF DECEMBER 31, 2005

IN U.S. DOLLARS

## INDEX

|  | Page |
|---|---|
| Report of Independent Auditors | 2 |
| Consolidated Balance Sheets | 3 |
| Consolidated Statements of Operations | 4 |
| Statements of Changes in Stockholders' Equity (Deficiency) | 5 |
| Consolidated Statements of Cash Flows | 6 |
| Notes to Consolidated Financial Statements | 7 - 21 |

- - - - - - - - - - - - -

Highly Confidential - Attorneys' Eyes Only

 **ERNST & YOUNG**

Kost Forer Gabbay & Kasierer
3 Aminadav St.
Tel-Aviv 67067, Israel

Phone: 972-3-6232525
Fax:    972-3-5622555

## REPORT OF INDEPENDENT AUDITORS

### To the Stockholders of

### FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

We have audited the accompanying consolidated balance sheets of Finjan Software, Inc. ("the Company") and its subsidiaries as of December 31, 2005 and 2004, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for each of the two years in the period ended December 31, 2005. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company as of December 31, 2005 and 2004, and the consolidated results of its operations and cash flows for each of the two years in the period ended December 31, 2005, in conformity with accounting principles generally accepted in the United States.

Tel-Aviv, Israel
January 23, 2006

*Kost Forer Gabbay and Kasierer*
KOST FORER GABBAY & KASIERER
A Member of Ernst & Young Global

- 2 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## CONSOLIDATED BALANCE SHEETS

U.S. dollars in thousands (except share and per share data)

| | Note | December 31, 2005 | December 31, 2004 |
|---|---|---|---|
| ASSETS | | | |
| CURRENT ASSETS: | | | |
| Cash and cash equivalents | | $ 8,526 | $ 4,499 |
| Trade receivables (net of allowance for doubtful accounts of $ 0 and $ 10 as of December 31, 2005 and 2004, respectively) | | 2,423 | 3,463 |
| Deferred costs *) | | 937 | 128 |
| Prepaid expenses and other accounts receivable ᵇ) | | 383 | 308 |
| Inventory | | 420 | 209 |
| Total current assets | | 12,689 | 8,607 |
| LONG-TERM PREPAID EXPENSES AND DEPOSITS: | | | |
| Deferred costs *) | | 511 | 140 |
| Prepaid expenses and deposits ᵃ) | | 75 | 169 |
| Total long-term prepaid expenses and deposits | | 586 | 309 |
| SEVERANCE PAY FUND | | 384 | 374 |
| PROPERTY AND EQUIPMENT, NET | 3 | 486 | 622 |
| Total assets | | $ 14,145 | $ 9,912 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | |
| CURRENT LIABILITIES: | | | |
| Trade payables | | $ 633 | $ 593 |
| Employees and payroll accruals | | 875 | 952 |
| Deferred revenues | | 5,340 | 4,374 |
| Accrued expenses and other liabilities | | 974 | 1,180 |
| Total current liabilities | | 7,822 | 7,099 |
| LONG-TERM LIABILITIES: | | | |
| Long-term deferred revenues | | 3,061 | 2,227 |
| Accrued severance pay | | 535 | 556 |
| Total long-term liabilities | | 3,596 | 2,783 |
| STOCKHOLDERS' EQUITY: | 5 | | |
| Stock capital - | | | |
| Common stock of $ 0.01 par value - | | | |
| Authorized: 27,000,000 shares at December 31, 2005 and 2004; issued and outstanding: 347,065 and 247,190 shares at December 31, 2005 and 2004, respectively | | 4 | 3 |
| Series A, B, C and D Preferred stock of $ 0.01 par value - | | | |
| Authorized: 19,104,289 and 18,140,276 shares at December 31, 2005 and 2004, respectively; issued and outstanding: 19,104,289 and 16,854,931 shares at December 31, 2005 and 2004, respectively; Aggregate liquidation preference of $ 34,296 as of December 31, 2005 | | 191 | 168 |
| Additional paid-in capital *) | | 42,331 | 38,904 |
| Treasury stock | | (9) | (9) |
| Accumulated deficit | | (39,790) | (39,036) |
| Total stockholders' equity | | 2,727 | 30 |
| Total liabilities and stockholders' equity | | $ 14,145 | $ 9,912 |

*) Reclassified.

The accompanying notes are an integral part of the consolidated financial statements.

January 23, 2006
Date of approval of the
financial statements

Asher Polani
Chief Executive Officer

Ran Kraitsman
Director of Finance

-3-

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

U.S. dollars in thousands

|  | Year ended December 31, | |
|  | 2005 | 2004 |
|---|---|---|
| Revenues | $ 6,877 | $ 7,099 |
| Patent license revenues | 8,000 | - |
| Total revenues | 14,877 | 7,099 |
| Cost of revenues | 2,200 | 1,638 |
| Gross profit | 12,677 | 5,461 |
| Operating expenses: |  |  |
| Research and development | 3,669 | 4,163 |
| Selling and marketing, net | 7,133 | 6,768 |
| General and administrative | 2,721 | 2,279 |
| Total operating expenses | 13,523 | 13,210 |
| Operating loss | (846) | (7,749) |
| Financial and other income (expenses), net | 129 | (69) |
| Loss before taxes on income | (717) | (7,818) |
| Taxes on income | 37 | 26 |
| Net loss | $ (754) | $ (7,844) |

The accompanying notes are an integral part of the consolidated financial statements.

- 4 -

Highly Confidential – Attorneys' Eyes Only

FINJAN SOFTWARE, INC., AND ITS SUBSIDIARIES

## STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIENCY)

U.S. dollars in thousands (except share data)

| | Common stock | | Preferred stock | | Additional paid-in capital **) | Treasury stock | Accumulated deficit | Total stockholders' equity (deficiency) |
|---|---|---|---|---|---|---|---|---|
| | Number | Amount | Number | Amount | | | | |
| Balance as of January 1, 2004 | 187,946 | $ 3 | 10,428,196 | $ 104 | $ 29,075 | $ (9) | $ (31,192) | $ (2,019) |
| Options exercised | 59,244 | *) | - | - | 4 | - | - | 4 |
| Issuance of Series D Preferred stock, net | - | - | 6,426,735 | 64 | 9,825 | - | - | 9,889 |
| Net loss | - | - | - | - | - | - | (7,844) | (7,844) |
| Balance as of December 31, 2004 | 247,190 | 3 | 16,854,931 | 168 | 38,904 | (9) | (39,036) | 30 |
| Conversion of convertible loan | - | - | 964,011 | 10 | 1,490 | - | - | 1,500 |
| Issuance of Series D Preferred stock, net | - | - | 1,285,347 | 13 | 1,920 | - | - | 1,933 |
| Options exercised | 99,875 | 1 | - | - | 17 | - | - | 18 |
| Net loss | - | - | - | - | - | - | (754) | (754) |
| Balance as of December 31, 2005 | 347,065 | $ 4 | 19,104,289 | $ 191 | $ 42,331 | $ (9) | $ (39,790) | $ 2,727 |

*) Represents an amount lower than $ 1.

**) Reclassified.

The accompanying notes are an integral part of the consolidated financial statements.

- 5 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CASH FLOWS

U.S. dollars in thousands

|  | Year ended December 31, | |
|---|---|---|
|  | 2005 | 2004 |
| Cash flows from operating activities: | | |
| Net loss | $ (754) | $ (7,844) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Depreciation | 284 | 227 |
| Decrease (increase) in trade receivables, net | 1,040 | (356) |
| Increase in deferred costs *) | (1,180) | (268) |
| Increase in prepaid expenses and other accounts receivable *) | (75) | (52) |
| Increase in inventory | (211) | (209) |
| Increase in trade payables | 40 | 94 |
| Increase (decrease) in employees and payroll accruals and accrued expenses and other liabilities | (283) | 43 |
| Increase in deferred revenues | 1,800 | 629 |
| Increase (decrease) in severance pay, net | (31) | 55 |
| Net cash provided by (used in) operating activities | 630 | (7,681) |
| | | |
| Cash flows from investing activities: | | |
| Purchase of property and equipment | (149) | (411) |
| Disposal of property and equipment | 1 | - |
| Decrease (increase) in long-term deposits and prepaid expenses *) | 94 | (27) |
| Net cash used in investing activities | (54) | (438) |
| | | |
| Cash flows from financing activities: | | |
| Principal payments of obligation under capital leasing contracts | - | (13) |
| Convertible loan received | 1,500 | |
| Proceeds from issuance of shares, net | 1,933 | 9,897 |
| Options exercised | 18 | (4) |
| Net cash provided by financing activities | 3,451 | 9,880 |
| | | |
| Increase in cash and cash equivalents | 4,027 | 1,761 |
| Cash and cash equivalents at the beginning of the year | 4,499 | 2,738 |
| Cash and cash equivalents at the end of the year | $ 8,526 | $ 4,499 |
| | | |
| Supplemental disclosure of non-cash financing activities: | | |
| Options exercised but not yet paid | $ - | $ 4 |
| | | |
| Conversion of convertible loan into Preferred stock | $ (1,500) | $ - |

*)    Reclassified.

The accompanying notes are an integral part of the consolidated financial statements.

- 6 -

Highly Confidential - Attorneys' Eyes Only    

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

## NOTE 1:- GENERAL

a.  Finjan Software, Inc. ("Finjan") and its subsidiaries (together "the Company" or "the Finjan Group") are engaged in the development, marketing and sale of behavior-based security solutions for enterprises, small and medium-sized business and home users. Finjan's security solutions are based on Finjan's patented Application-Level Behavior Blocking which provides protection against both known and unknown attacks, the first time they strike (e.g. Spyware, phishing, malicious code, viruses, worms and Trojans). Finjan's behavior-based security solutions integrate anti-virus, anti-spam, URL filtering and document protection.

Finjan, a Delaware corporation, was incorporated in June 2002 and commenced operations in September 2002. As a result of a reorganization that occurred in 2002, Finjan became the parent company of the following wholly-owned subsidiaries:

1.  Finjan Software Ltd. ("Finjan Ltd." or "the Israeli subsidiary") was incorporated in Israel and commenced operations in January 1996. As a result of the reorganization, Finjan became the parent company of Finjan Ltd. owning approximately 97% of its shares. In March 2004, Finjan purchased the balance of Finjan Ltd.'s shares. As a result, Finjan Ltd. became a wholly-owned subsidiary of Finjan.

2.  Finjan Inc. ("Finjan Inc.") was incorporated in the State of California as a wholly-owned subsidiary of Finjan Ltd. and commenced operations in January 1997. During 1998, Finjan Inc. was reincorporated in the State of Delaware. In October 2003, Finjan Ltd. transferred all of its shares in Finjan Inc. to Finjan. As a result of this transfer, Finjan Inc. became a wholly-owned subsidiary of Finjan.

3.  Finjan Software (UK) Ltd. ("Finjan UK") was incorporated under the laws of the United Kingdom, as a wholly-owned subsidiary of Finjan Ltd. in March 2003. In October 2003, Finjan Ltd. transferred its share in Finjan UK to Finjan. As a result of this transfer, Finjan UK became a wholly-owned subsidiary of Finjan. Finjan UK is engaged in marketing the Company's products in England.

4.  Finjan Software GmbH ("Finjan GmbH") was incorporated in August 2004 under the laws of Germany as a wholly-owned subsidiary of Finjan. Finjan GmbH is engaged in marketing the Company's products in Germany, Austria and Switzerland.

b.  In June 2004, the Company signed a Stock Purchase Agreement ("the SPA") with certain existing shareholders and a major new investor ("the Investor").

According to the SPA, the Company issued 6,426,735 shares of Series D Preferred stock at a price per share of $ 1.556 for a total consideration of $ 10,000, net of $ 111 in issuance expenses. In connection with the SPA, the Company has restated its Certificate of Incorporation in order to adjust the rights associated with the Preferred stock.

- 7 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands (except share and per share data)

NOTE 1:- GENERAL (Cont.)

c.    On June 21, 2005, the Company signed a convertible loan agreement ("the Loan") with certain stockholders, according to which the stockholders agreed to lend the Company an aggregate amount of $ 1,500 ("the principal amount"). The principal amount of the Loan bore interest at an annual rate of 8% paid upon the earlier of repayment or conversion of the Loan.

On June 30, 2005, the Company entered into a Stock Purchase Agreement ("the 2005 SPA") whereby it issued to a new investor 1,285,347 shares of Series D Preferred stock of $ 0.01 par value each in an aggregate amount of $ 2,000.

As part of the SPA, the principal amount under the Loan was converted into 964,011 shares of Series D Preferred stock, at the same terms and conditions as provided to the new investor under the 2005 SPA.

On June 30, 2005, Finjan Ltd. entered into a patent license agreement ("the License Agreement") with the New Investor, according to which simultaneously with the closing of the 2005 SPA, Finjan Ltd. on behalf of itself and its affiliates, shall provide to the New Investor and its affiliates, effective as of the payment date, a certain limited, worldwide, nonexclusive, nontransferable, royalty-free license to Finjan Ltd.'s patents, pursuant to the terms and conditions of the License Agreement in consideration of $ 8,000.

NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES

The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP"). The significant policies followed in the preparation of the consolidated financial statements are:

a.    Use of estimates:

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported for assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reporting of amounts for revenues and expenses during the reported period. Actual results could differ from those estimates.

b.    Financial statements in U.S. dollars:

The functional currency of the Company is the U.S. dollar, as the U.S. dollar is the currency of the primary economic environment in which the Company operates and expects to continue to operate in the foreseeable future. The majority of the Company's operations are currently conducted by the Israeli subsidiary and most of the Israeli expenses are currently paid in new Israeli shekels ("NIS"); however, these operations are denominated and determined in U.S. dollars. Most of the Company's revenues are generated in U.S. dollars, its cash is invested almost entirely in U.S. dollar deposits and its other financing activities including loans and equity transactions are made in U.S dollars.

-- 8 --

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands

NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)

The Company's transactions and balances denominated in U.S. dollars are presented at their original amounts. Non-dollar transactions and balances have been remeasured to U.S. dollars in accordance with Statement of Financial Accounting Standards ("SFAS") No. 52 of the U.S. Financial Accounting Standards Board ("FASB"). All transaction gains and losses from remeasurement of monetary balance sheet items denominated in non-dollar currencies are reflected in the statement of operations as financial income or expenses, as appropriate.

c.    Principles of consolidation:

The consolidated financial statements include the accounts of Finjan Software Inc. and its wholly-owned subsidiaries, Finjan Ltd., Finjan Inc., Finjan U.K. and Finjan GmbH. Intercompany balances and transactions have been eliminated upon consolidation.

d.    Cash equivalents:

Cash equivalents are considered to be highly liquid investments, which include unrestricted short-term bank deposits with original maturities of three months or less.

e.    Long-term lease deposits:

Long-term lease deposits include long-term deposits for the leasing of facilities and motor vehicles, presented at their cost.

f.    Property and equipment:

Property and equipment are stated at cost. Depreciation is computed by the straight-line method over the estimated useful lives of the assets at the following annual rates:

|  | % |
|---|---|
| Computers and peripheral equipment | 33 |
| Office furniture and equipment | 6 - 20 |
| Leasehold improvements | Over the term of the lease |

The Company's long-lived assets are reviewed for impairment in accordance with Statement of Financial Accounting Standard No.144, "Accounting for the Impairment or Disposal of Long-Lived Assets" ("SFAS No.144") whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted cash flows expected to be generated by the assets. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. As of December 31, 2005, no impairment losses have been identified.

- 9 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES (Cont.)

g.   Research and development costs:

SFAS No. 86, "Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed", requires capitalization of certain software development costs subsequent to the establishment of technological feasibility.

Based on the Company's product development process, technological feasibility is established upon the completion of a working model. The Company does not incur material costs between the completion of the working model and the point at which the product is ready for general release. Therefore, research and development costs are charged to the statement of operations as incurred.

h.   Concentrations of credit risk:

SFAS No. 105, "Disclosure of Information About Financial Instruments with Off-Balance-Sheet Risk and Financial Instruments with Concentration of Credit Risk", requires disclosure of any significant off-balance-sheet and credit risk concentrations. The Company has no significant off-balance-sheet concentration of credit risk such as foreign exchange contracts, option contracts or other foreign hedging arrangements.

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents, trade receivables and other accounts receivable.

Cash and cash equivalents are invested in major banks in Israel, Germany, United Kingdoms and the United States. Such deposits in the United States may be in excess of insured limits and are not insured in other jurisdictions. Management believes that the financial institutions that hold the Company's investments are financially sound and, accordingly, minimal credit risk exists with respect to these investments.

The trade receivables of the Company are mainly derived from sales to customers located in Europe and the U.S. The Company performs ongoing credit evaluations of their customers and to date has not experienced any material losses. An allowance for doubtful accounts is determined with respect to specific amounts that the Company has determined to be doubtful of collection.

i.   Revenue recognition:

The Company derives its revenue from sales of hardware appliances, software license fees and sub-license fees of its products, training, maintenance and support. In 2005, the Company adopted a new business model, according to which the Company provides its product for a limited subscription period. The Company sells its products indirectly through distributors and resellers, and directly to end-users, all of whom are considered end-users.

- 10 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)

Revenue from software, software-related and patent license fees are recognized when persuasive evidence of an agreement exists, delivery of the product has occurred, no significant obligations with regard to implementation remain, the fee is fixed or determinable, and collectability is probable.

The Company recognizes software license revenue in accordance with Statement of Position SOP 97-2, "Software Revenue Recognition" ("SOP 97-2"), as amended. SOP 97-2 generally requires revenue earned on software arrangements involving multiple elements to be allocated to each element based on the relative fair value of the elements. When contracts contain multiple elements wherein Vendor Specific Objective Evidence (VSOE) of fair value exists for all undelivered elements, the Company accounts for the delivered elements in accordance with the "Residual Method" prescribed by SOP 98-9. Maintenance and support revenue included in these arrangements is deferred and recognized on a straight-line basis over the term of the maintenance and support agreement. The VSOE of fair value of the undelivered elements (maintenance, support and services) is determined based on the price charged for the undelivered element when sold separately.

In 2005, the Company adopted a new business model, according to which the Company provides its products for a limited subscription period. According to Emerging Issues Task Force 03-5, "Application of AICPA Statement of Position 97-2 to Non-Software Deliverables in an Arrangement Containing More-Than-Incidental Software" ("EITF 03-5") In an arrangement that includes software that is more than incidental to the products or services as a whole, software and software-related elements are included within the scope of SOP 97-2. The Company's products consist of appliances upon which the Company's software is installed. The software, hardware appliance and maintenance are a bundled solution and are essential to the functionality of each other; therefore related revenues are recognized together throughout the service period of each agreement.

Service revenue is primarily comprised of revenue from standard maintenance agreements, and training fees. The Company recognizes revenues from maintenance over the contractual period of the maintenance agreement. Training services are billed on a per session basis. The Company recognizes service revenue from training when provided to the customer.

Deferred revenue includes amounts invoiced to customers for which revenue has not yet been recognized. Related costs of these deferred revenues are being deferred as well, and recognized throughout the service agreement.

- 11 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)

    j.    Accounting for stock-based compensation:

The Company has elected to follow Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25") and Interpretation No. 44, "Accounting for Certain Transactions Involving Stock Compensation" ("FIN 44") in accounting for its employee stock option plans. Under APB 25, when the exercise price of the Company's stock options is less than the market price of the underlying stocks on the date of grant, compensation expense is recognized.

The Company applies SFAS No. 123, "Accounting for Stock-Based Compensation" and Emerging Issues Task Force ("EITF") 96-18, "Accounting for Equity Instruments That are Issued to Other Than Employees for Acquiring, or In Conjunction with Selling Goods or Services", with respect to warrants and options issued to non-employees and consultants. SFAS No. 123 requires the use of option valuation models to measure the fair value of the warrants at the grant date.

In December 2002, the FASB issued SFAS 148, "Accounting for Stock Based Compensation Transition and Disclosure - an Amendment of FASB Statement No. 123" ("SFAS 148"). SFAS 148 permits two additional transition methods for entities that adopt the fair value based method of accounting for stock-based employee compensation. The Statement also requires new disclosures about the ramp-up effect of stock-based employee compensation on reported results. The Statement also requires that those effects be disclosed more prominently by specifying the form, content, and location of those disclosures. The transition guidance and annual disclosure provisions of SFAS 148 are effective for fiscal years ending after December 15, 2002, with earlier application permitted in certain circumstances. The interim disclosure provisions are effective for financial reports containing financial statements for interim periods beginning after December 15, 2002. As of the balance sheet date, the Company continues to apply APB 25.

Pro forma information regarding the Company's net loss and net loss per share is required by SFAS No. 123 and has been determined as if the Company had accounted for its employee stock options under the fair value method prescribed by SFAS No. 123. However, the pro-forma information required by SFAS No. 123 is not disclosed due to its immateriality.

    k.    Severance pay:

Finjan Ltd.'s liability for severance pay is calculated pursuant to Israel's Severance Pay Law based on the most recent salary of the employees multiplied by the number of years of employment, as of the balance sheet date. Employees are entitled to one month's salary for each year of employment or a portion thereof. Finjan Ltd.'s liability for all of its employees is fully provided by monthly deposits with insurance policies and by an accrual. The value of these policies is recorded as an asset in the Company's balance sheet.

Highly Confidential - Attorneys' Eyes Only                    FIN009708

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

The deposited funds include profits accumulated up to the balance sheet date. The deposited funds may be withdrawn only upon the fulfillment of the obligation pursuant to Israel's Severance Pay Law or labor agreements. The value of the deposited funds is based on the cash surrendered value of these policies, and includes immaterial profits.

Severance expense for the years ended December 31, 2005 and 2004, amounted to approximately $ 228 and $ 261, respectively.

l.    Fair value of financial instruments:

The following methods and assumptions were used by the Company in estimating its fair value disclosures for financial instruments:

The carrying amounts of cash and cash equivalents, trade receivables, prepaid expenses and other accounts receivable, trade payables, employees and payroll accruals, accrued expenses and other liabilities and current maturities of capital lease obligations approximate their fair value due to the short-term maturity of such instruments.

The carrying amount of the Company's long-term capital lease obligations approximates its fair value. The fair value was estimated using the cash flow analysis.

m.    Impact of recently issued accounting standards:

In November 2004, the FASB issued Statement of Financial Accounting Standard No. 151, "Inventory Costs, an Amendment of ARB No. 43, Chapter 4." ("SFAS No. 151"). SFAS No. 151 amends Accounting Research Bulletin ("ARB") No. 43, Chapter 4, to clarify that abnormal amounts of idle facility expense, freight handling costs and wasted materials (spoilage) should be recognized as current-period charges. In addition, SFAS No. 151 requires that the allocation of fixed production overheads to the costs of conversion be based on the normal capacity of the production facilities. SFAS No. 151 is effective for inventory costs incurred during fiscal years beginning after June 15, 2005. The Company does not expect that the adoption of SFAS No. 151 will have a material effect on its financial position or results of operations.

In December 2004, the FASB issued Statement of Financial Accounting Standard No. 153, "Exchanges of Non-monetary Assets, an Amendment of APB Opinion No. 29" ("SFAS 153"). The guidance in APB Opinion No. 29, "Accounting for Non-monetary Transactions" ("APB 29"), is based on the principle that exchanges of non-monetary assets should be measured based on the fair value of the assets exchanged. APB 29 included certain exceptions to that principle. SFAS 153 amends APB 29 to eliminate the exception for non-monetary exchanges of similar productive assets and replaces it with a general exception for exchanges of non-monetary assets that do not have commercial substance. A non-monetary exchange has commercial substance if the future cash flows of the entity are expected to change significantly as a result of the exchange. SFAS 153 is effective for non-monetary assets exchanges occurring in fiscal periods beginning after June 15, 2005. The Company does not expect that the adoption of SFAS 153 will have a material effect on its financial position or results of operations

- 13 -

FIN009709

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)

On December 16, 2004, the Financial Accounting Standards Board issued Statement No. 123 (revised 2004), "Share-Based Payment" ("Statement 123(R)"), which is a revision of FASB Statement No. 123, "Accounting for Stock-Based Compensation" ("Statement 123"). Generally, the approach in Statement 123(R) is similar to the approach described in Statement 123. However, Statement 123 permitted, but did not require, share-based payments to employees to be recognized based on their fair values while Statement 123(R) requires all share-based payments to employees to be recognized based on their fair values. Statement 123(R) also revises, clarifies and expands guidance in several areas, including measuring fair value, classifying an award as equity or as a liability and attributing compensation cost to reporting periods. The new Standard will be effective for the Company in the first fiscal year beginning after January 1, 2006. The Company is still assessing the impact, if any, that the adoption of Statement 123(R) will have on the Company's financial statements.

In March 2005, the SEC released SEC Staff Accounting Bulletin No. 107, "Share-Based Payment" ("SAB 107"). SAB 107 provides the SEC staff's position regarding the application of SFAS 123(R) and contains interpretive guidance related to the interaction between SFAS 123(R) and certain SEC rules and regulations, and also provides the SEC staff's views regarding the valuation of share-based payment arrangements for public companies. SAB 107 highlights the importance of disclosures made relating to the accounting for share-based payment transactions. The Company is currently reviewing the effect of SAB 107, however it does not believe that SAB 107 will have a material effect on its financial position, results of operations or cash flows.

In May 2005, the FASB issued Statement of Financial Accounting Standard No. 154 ("SFAS 154"), "Accounting Changes and Error Corrections", a replacement of APB No. 20, "Accounting Changes" and SFAS No. 3, "Reporting Accounting Changes in Interim Financial Statements". SFAS 154 provides guidance on the accounting for and reporting of accounting changes and error corrections. APB No. 20 previously required that most voluntary changes in accounting principles be recognized by including in net income for the period of the change the cumulative effect of changing to the new accounting principle. SFAS 154 requires retroactive application to prior periods' financial statements of a voluntary change in accounting principles unless it is impracticable. SFAS 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005.

- 14 -

Highly Confidential - Attorneys' Eyes Only    FIN009710

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands

## NOTE 3:- PROPERTY AND EQUIPMENT

|  | December 31, | |
|---|---|---|
|  | 2005 | 2004 |
| Cost: | | |
| Computers and peripheral equipment | $ 1,443 | $ 1,326 |
| Office furniture and equipment | 165 | 195 |
| Leasehold improvements | 67 | 61 |
|  | 1,675 | 1,582 |
| Accumulated depreciation | 1,189 | 960 |
| Depreciated cost | $ 486 | $ 622 |

Depreciation expenses for the years ended December 31, 2005 and 2004 were $ 284 and $ 227, respectively.

## NOTE 4:- COMMITMENTS AND CONTINGENT LIABILITIES

a.    Lease commitments:

The Company rents its facilities under operating leases in Israel, the United Kingdom, Germany and the United States.

Aggregate minimum rental commitments under non-cancelable leases as of December 31, 2005, are as follows:

| 2006 | $ 723 |
|---|---|
| 2007 | 465 |
| 2008 | 109 |
|  | $ 1,297 |

Rent expenses for the years ended December 31, 2005 and 2004, were $ 435 and $ 405, respectively

b.    During the years 2005 and 2004, the Company provided bank guarantees to its lessor of leased accommodation in the amounts of $ 106 and $ 114, respectively.

c.    Legal claim:

During 2003, the Company received a letter from a third party, alleging to a potential infringement of one of that party's patents. The Company responded that it does not believe that its product infringes the abovementioned patent. No further action has been taken to date. The Company does not believe that this claim has any merit, and the Company will vigorously defend itself against the claim presented therein, if necessary. The Company does not believe that this legal claim will have any impact on its financial statements.

- 15 -

Highly Confidential – Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

## NOTE 5: - STOCK CAPITAL

a.    Composition of stock capital of Finjan Software, Inc:

|  | December 31, 2005 | | December 31, 2004 | |
|---|---|---|---|---|
|  | Authorized | Issued and outstanding | Authorized | Issued and outstanding |
|  | | Number of shares | | |
| Common stock (1) | 27,000,000 | 347,065 | 27,000,000 | 247,190 |
| Series A Preferred stock (2) | 226,226 | 226,226 | 226,226 | 226,226 |
| Series B Preferred stock (2) | 2,574,493 | 2,574,493 | 2,574,493 | 2,574,493 |
| Series C Preferred stock (2) | 7,627,477 | 7,627,477 | 7,627,477 | 7,627,477 |
| Series D Preferred stock (2) | 8,676,093 | 8,676,093 | 7,712,082 | 6,426,735 |
|  | 46,104,289 | 19,451,354 | 45,140,278 | 17,102,121 |

(1)    Common stock:

Common stock confers upon its holders, pari passu, the right to receive notice of, and to participate in, all general meetings of the Company, to vote in such meetings, to receive dividends, and to participate in the distribution of the surplus assets of the Company in the event of liquidation of the Company.

(2)    Preferred stock:

Series A, B, C and D Preferred stock confer upon their holders the same rights conferred by the Common stock. In addition, each share of Preferred A, C and D stock is convertible into Common stock on a one for one basis and each share of Preferred B stock is convertible into 1.23 shares of Common stock. Each share of Preferred A, B, C and D stock is convertible into Common stock at the applicable conversion price at the option of the holder and automatically upon the earlier of (i) a qualified initial public offering ("IPO"), which yields not less than $ 25,000 in net proceeds to the Company, or (ii) with respect to each class, a written consent or agreement of holders of majority of the outstanding shares of such class.

Holders of shares of Series D Preferred stock are entitled to a dividend prior to the Series A, B and C Preferred stock and the Common stock, when and if declared, at a rate of $ 0.1245 per share per annum. Holders of Series C Preferred stock are entitled to receive a dividend, prior to the Series A and B Preferred stock and the Common stock, when and if declared, at a rate of $ 0.091 per share per annum. Such dividends shall not be cumulative.

- 16 -

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 5:-  STOCK CAPITAL (Cont.)

In the event of a liquidation or deemed liquidation of the Company, in which the value of the assets available for distribution among the stockholders is $ 80,000 or less, then all assets available for distribution between the stockholders will be distributed in the following order: (i) Series D Preferred stock shall be entitled to receive, prior to any other Common or Preferred stock, an amount per share equal to $ 1.5560 (subject to adjustments) for each outstanding share of Preferred D stock; (ii) Series C Preferred stock shall be entitled to receive, prior to Series A and B Preferred stock and Common stock, an amount per share equal to $ 1.1382 (subject to adjustments) for each outstanding share of Preferred C stock; (iii) Series B Preferred stock shall be entitled to receive, prior to Preferred A stock and Common stock, an amount per share equal to $ 1.4014 for each outstanding share of Preferred B stock (subject to adjustments); (iv) Series A Preferred stock shall be entitled to receive, prior to Common stock, an amount per share equal to $ 37.6 for each outstanding share of Preferred A stock; (v) upon completion of phases (i) to (iv) all remaining assets will be distributed ratably among the holders of Preferred and Common stock based on the number of shares of Common stock on an as converted basis. In the event that the value of the assets available for distribution exceeds $ 80,000, then Series A, B, C and D Preferred stock shall not be entitled to receive the liquidation preference described above, rather amounts available for distribution will be distributed ratably among the holders of Preferred and Common stock based on the number of shares of Common stock on an as converted basis.

b.    Stock Option Plans:

As part of the reorganization, all options convertible into Common B stock in Finjan Ltd under Finjan Ltd.'s 1996 Stock Option Plan ("the 1996 Plan") were converted into options to purchase Common stock of Finjan Software, Inc under the 2003 Plan (as defined below).

In December 2003, the Company's Board of Directors approved a new stock option plan ("the 2003 Plan"), and chose the Capital Gain Course, pursuant to the provisions of Section 102 of Israel's Income Tax Ordinance. Options granted under the 2003 Plan vest over a period of four years, and expire no later than 10 years from the date of grant. As of December 31, 2005, the Company reserved 4,696,814 shares of Common stock for exercise of options under the 2003 Plan. Pursuant to the 2003 Plan, the Company granted 3,908,495 options to employees of the Company and there are 788,319 options to purchase shares available for future grants.

- 17 -

Highly Confidential - Attorneys' Eyes Only

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 5: - STOCK CAPITAL (Cont.)

A summary of the stock option activities in 2005 and 2004 is as follows:

|  | 2005 | | 2004 | |
|---|---|---|---|---|
|  | Number of options | Weighted average exercise price | Number of options | Weighted average exercise price |
| Outstanding at beginning of year | 2,777,159 | $ 0.16 | 2,435,791 | $ 0.17 |
| Granted | 1,963,484 | $ 0.16 | 720,000 | $ 0.14 |
| Exercised | (99,875) | $ 0.14 | (59,244) | $ 0.14 |
| Forfeited | (732,273) | $ 0.18 | (319,388) | $ 0.15 |
| Outstanding at end of year | 3,908,495 | $ 0.16 | 2,777,159 | $ 0.16 |

The options outstanding as of December 31, 2005, have been separated into ranges of exercise price as follows:

| Exercise price | Options outstanding as of December 31, 2005 Amount | Weighted average remaining contractual life Years | Weighted average exercise price | Exercisable as of December 31, 2005 | Weighted average exercise price of options exercisable |
|---|---|---|---|---|---|
| $ 0.14 | 1,804,647 | 8.02 | $ 0.14 | 1,674,548 | $ 0.14 |
| $ 0.16 | 2,101,536 | 9.91 | $ 0.16 | 59,349 | $ 0.16 |
| $ 3.00 | 917 | 8.83 | $ 3.00 | 917 | $ 3.00 |
| $ 14.00 | 50 | 8.83 | $ 14.00 | 50 | $ 14.00 |
| $ 23.00 | 80 | 8.83 | $ 23.00 | 80 | $ 23.00 |
| $ 25.00 | 1,265 | 8.83 | $ 25.00 | 1,265 | $ 25.00 |
|  | 3,908,495 | 9.04 | $ 0.16 | 1,736,209 | $ 0.16 |

Options to consultants:

| Issuance date | In connection with | Number of options granted | Options exercisable | Exercise price per share | Exercisable through |
|---|---|---|---|---|---|
| 10/25/2004 | Consultants | 3,000 | 875 | $ 0.16 | 10/31/2014 |
| 10/25/2004 | Consultants | 102 | 102 | $ 3.00 | 2 10/31/2014 |
| 10/25/2004 | Consultants | 100 | 100 | $ 25.00 | 10/31/2014 |
| 9/25/2005 | Consultants | 7,500 | - | $ 0.16 | 9/30/2015 |
|  |  | 10,702 | 1,077 | $ 0.42 |  |

- 18 -



FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
U.S. dollars in thousands (except share and per share data)

## NOTE 5: - STOCK CAPITAL (Cont.)

c.   Purchase offer:

On October 27, 2003, the Company offered to all stockholders of Finjan Ltd. other than the Company ("the stockholders"), to purchase all of their holdings in Finjan Ltd. ("the shares"), approximately 107,965 shares at a price per share of $ 0.14. Stockholders holding more than 90% of the shares agreed to sell their shares to the Company at the offered price per share, as a result, the Company was able to enforce the sale on all other stockholders. The transaction was completed during March 2004.

d.   Treasury stock:

On December 30, 2003, the Company purchased 66,296 shares of its outstanding Common stock for a total consideration of $ 9. These shares were recorded as Treasury stock.

## NOTE 6:- TAXES ON INCOME

a.   Measurement of results for tax purposes under the Israeli Income Tax (Inflationary Adjustments) Law, 1985:

Results for tax purposes of Finjan Ltd. are measured in terms of earnings in NIS after certain adjustments for increases in the Israeli CPI. As explained in Note 2b, the financial statements are presented in U.S. dollars. The difference between the annual change in the CPI and in the NIS/dollar exchange rate causes a difference between taxable income and the income before taxes shown in the financial statements. In accordance with paragraph 9(f) of SFAS No. 109, the Company has not provided deferred income taxes on the difference between the functional currency and the tax bases of assets and liabilities.

During 2005, Finjan Ltd. applied to the Israeli Income Tax Authorities in order to report its annual income filings for tax purposes in U.S. dollars. As a result, commencing with fiscal year 2005, Finjan Ltd. will report to the Israeli Income Tax Authorities in U.S. dollars.

b.   Tax benefits under the Law for the Encouragement of Capital Investments, 1959 ("the Law"):

On October 13, 1996, the production facilities of Finjan Ltd. were granted the status of an "Approved Enterprise" under the Law. On October 10, 2001, an expansion of the "Approved Enterprise" was granted to the Company.

According to the provisions of the Law, the Company has chosen to enjoy the "Alternative Benefits" track and, accordingly, its income from the "Approved Enterprise" is tax-exempt for a period of two years, commencing in the first year the Company has taxable income, and subject to an additional period of five to eight years of reduced tax rates between 10% to 25%, depending upon the proportion of foreign ownership in the Company in each tax year. The period of tax benefits is subject to limits of the earlier of 12 years from the commencement of production, or 14 years from the approval date. Given the aforementioned conditions, the period of benefits relating to these investment programs will expire in the year 2015.

Highly Confidential - Attorneys' Eyes Only

FIN009715

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 6:- TAXES ON INCOME (Cont.)

In the event of distribution of cash dividends from income that is tax exempt as mentioned above, Finjan Ltd. would have to pay income tax equal to 10% to 25% of the amount distributed. The tax-exempt income attributable to the "Approved Enterprise" can be distributed to shareholders without subjecting Finjan Ltd. to taxes only upon the complete liquidation of Finjan Ltd.

Finjan Ltd. currently has no plans to distribute dividends and intends to retain future earnings to finance the development of its business.

The entitlement to the above benefits is conditional upon Finjan Ltd.'s fulfilling the conditions stipulated by the above law, regulations published their under and the letters of approval for the specific investments in "Approved Enterprises". In the event of failure to comply with these conditions, the benefits may be canceled and Finjan Ltd. may be required to refund the amount of the benefits, in whole or in part, including interest. Management believes that Finjan Ltd. has complied with all relevant conditions.

On April 1, 2005, an amendment to the Investment Law came into effect ("the Amendment") and has significantly changed the provisions of the Investment Law. The Amendment limits the scope of enterprises which may be approved by the Investment Center by setting criteria for the approval of a facility as an "Approved Enterprise", such as provisions generally requiring that at least 25% of the "Approved Enterprise" income will be derived from export. Additionally, the Amendment enacted major changes in the manner in which tax benefits are awarded under the Investment Law so that companies no longer require Investment Center approval in order to qualify for tax benefits.

However, the Investment Law provides that terms and benefits included in any certificate of approval already granted will remain subject to the provisions of the law as they were on the date of such approval. Therefore the Israeli subsidiary's existing "Approved Enterprise" will generally not be subject to the provisions of the Amendment.

Should Finjan Ltd. derive income from sources other than the "Approved Enterprise" during the relevant period of benefits, such income will be taxable at the regular corporate tax rate of 34%, which will be reduced to 31% in 2006, and will be further reduced to 29% in 2007, 27% in 2008, 26% in 2009 and 25% in 2010.

c.    Tax assessments:

Finjan Ltd. has received final tax assessment through December 31, 2002.

- 20 -

Highly Confidential - Attorneys' Eyes Only                                              FIN009716

FINJAN SOFTWARE, INC. AND ITS SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

### NOTE 6:- TAXES ON INCOME (Cont.)

d.     Net operating losses carryforwards:

As of December 31, 2005, Finjan Ltd. has accumulated losses for Israeli tax purposes which may be carried forward and offset against taxable income for an indefinite period in the future. The Company expects that during the period in which these tax losses are utilized, its income would be substantially tax-exempt. Accordingly, there will be no tax benefit available from such losses and no deferred income taxes have been included in these financial statements.

As of December 31, 2005, Finjan and Finjan Inc. have combined losses which may be carried forward and offset against taxable income in the future with limitation regarding their amount and their offset period.

e.     Deferred taxes:

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes, and the amounts used for income tax purposes.

The Company has provided valuation allowances in respect of deferred tax assets, since it has a history of losses. Management currently believes that it is more likely than not that the deferred tax regarding the loss carry forwards and other temporary differences will not be realized in the near future.

### NOTE 7:- SUBSEQUENT EVENTS

On January 31, 2006 ("the Closing Date"), the Company entered into Stock Purchase Agreement ("the 2006 SPA") whereby it issued to a new and existing investors 6,089.191 shares of Series D Preferred stock at par value of $ 0.01 in an aggregate amount of $ 9,475.

At a deferred closing ("the Deferred Closing") to be held not later than 60 days following the Closing Date, the Company may sell up to an additional 337,544 shares of Series D Preferred stock at the same price per share and under the same terms and conditions as provided to the investors at the Closing Date, in an aggregate amount of $ 525.

If no additional investor subscribes for the Deferred Closing or if subscription is for less than the full shares of the Deferred Closing, then two existing investors shall automatically subscribe for the remaining shares, to be allocated between them pursuant to the ratio of shares being acquired by each of them at the Closing Date.

F:\W2000\w2000\2914\M\05\ES13.DOC

- 21 -

Highly Confidential - Attorneys' Eyes Only